# EXHIBIT A

Benjamin Osorio, Esq.
Georgia State Bar #194702
EOIR ID # UY752737
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
Phone (703) 352-2399
Fax (703) 763-2304
benjamin@murrayosorio.com

**DETAINED**
**REMOVAL IMMINENT**

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE OF IMMIGRATION REVIEW
## IMMIGRATION COURT
## BALTIMORE, MARYLAND

|  |  |  |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **ABREGO GARCIA, Kilmar Armando** | ) | File No.: |
| | ) | **A# 201-577-119** |
| | ) | |
| In Removal Proceedings. | ) | |

**Honorable Immigration Judge: TBD**          **Next Hearing: TBD**

## EMERGENCY MOTION TO REOPEN
## BASED ON CHANGED CIRUMSTANCES IN EL SALVADOR, REQUEST FOR SUA
## SPONTE REOPENING

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE OF IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**BALTIMORE, MARYLAND**

```
                                    )
In the Matter of:                   )
                                    )
                                    )          File No.:
ABREGO GARCIA, Kilmar Armando       )          A# 201-577-119
                                    )
                                    )
In Removal Proceedings.             )
_____)
```

<u>**EMERGENCY MOTION TO REOPEN**</u>
<u>**BASED ON CHANGED CIRCUMSTANCES IN EL SALVADOR , REQUEST FOR SUA**</u>
<u>**SPONTE REOPENING**</u>

## I.    INTRODUCTION[1]

Respondent, Kilmar Armando Abrego Garcia ("Abrego") is a native and citizen of El Salvador who was granted withholding of removal from El Salvador under Section 241(b)(3) of the Immigration and Nationality Act ("INA") on October 10, 2019; thus, preventing Respondent's deportation to El Salvador. *See* Tab A. Yet, on March 15, 2025, the Department of Homeland Security ("DHS") removed Respondent to El Salvador—an act recognized by the Supreme Court as an illegal removal procedure.[2] Eventually, DHS returned Respondent to the United States to conduct proper removal procedures. Thereafter DHS informed Respondent that it intends to remove him to Uganda, a country that the Court did not designate as either the country of removal or an alternative country of removal. *See* Tab B.

Respondent's proceedings should be reopened because, due to a change in circumstances, Respondent is now eligible for asylum. Respondent's recent experiences at Center of Terrorist

---

[1] Because Respondent's removal is imminent, this motion to reopen and accompanying motion to stay removal is hastily filed. Undersigned counsel will supplement the motion to reopen with additional evidence.
[2] *Noem v. Abrego Garcia*, 604 U.S. __, 145 S. Ct. 1017 (2025).

Confinement (CECOT, for its Spanish acronym) in the past months amount to government persecution and torture which are changed circumstances arising in the country of nationality supporting this motion under 8 C.F.R. § 1003.2(c)(3)(ii). He is now applying for asylum within one year of his last entry into the United States. Furthermore, Respondent fears persecution and torture in Uganda. *See* Tabs C–E. Respondent's claim as to Uganda has never been adjudicated by this Court. Deportation to Uganda without an opportunity to present a fear-based claim would violate Respondent's statutory, regulatory, and due process rights, and the United States' commitment to *non-refoulement* under international law. Therefore, reopening is required and this Court should **immediately** order a stay of removal to afford Respondent an opportunity to seek protection from persecution and torture in Uganda.

His removal is imminent- it could occur in a matter of hours. If the Court denies or fails to stay removal to permit Respondent to present his claims, Respondent will face the persecution, torture, or death that he fears in Uganda and in El Salvador.

## II.    FACTS AND PROCEDURAL HISTORY[3]

Respondent is a native and citizen of El Salvador. In removal proceedings conducted on October 10, 2019, the Court granted withholding of removal from El Salvador under the INA. The Court found that Respondent had established past persecution based on a protected ground, given that Respondent continued to receive death threats by gang members even after he and his family moved neighborhoods three times in hopes of escaping danger.  As such Respondent was entitled to the presumption of a well-founded fear of future persecution in El Salvador. *See* Tab A. The Immigration Judge (hereinafter "IJ") further noted that Respondent had met his burden of proving that internal relocation in El Salvador was not possible or reasonable under the circumstances and

---

[3] These facts are summarized from Mr. Abrego's affidavit. *See* Tab C.

2

that authorities in El Salvador were unable and unwilling to protect him. *Id.* In that decision, the IJ declined to designate an alternative country for removal. *See id*.

Notwithstanding the order for withholding of removal, on March 15, 2025, DHS wrongfully removed Respondent to El Salvador. On April 10, 2025, the Supreme Court weighed on the legality of the wrongful deportation and ruled that the United States government needed to "facilitate" Respondent's return. DHS brought back Respondent on June 6, 2025.  On August 22, 2025, DHS formally designated Uganda as the third country where it was intending to send Respondent.  *See* Tab B. On August 25, 2025, Respondent's counsel informed DHS of Respondent's fear of being deported to Uganda. *See* Tab E.  Respondent fears persecution and torture in Uganda because he is a Salvadoran national and would be a deportee without any legal status in Uganda.  Furthermore, he is at risk of being removed to El Salvador by the Ugandan government where he is likely to once again face persecution and torture within CECOT. *See* Tab C; *see also* Tabs J–O. Respondent's  recent experience in El Salvador from March 2025 to June 2025, provide facts amounting to persecution, and even torture, at the hands of the Salvadoran government. Upon Respondent's return to the United States, Respondent recounted in his affidavit the treatment he received by El Salvador officials.

DHS removed Respondent from the United States where he landed in El Salvador chained up. At the time Respondent was removed, he had a clean record both in the United States and El Salvador; yet, that same night Salvadoran government officials pushed him down the plane stairs and pushed him toward the ground as they headed toward a bus. On the bus that headed towards the CECOT, officers repeatedly hit Respondent in the head anytime he lifted his head up. When Respondent arrived at CECOT, an officer told him, "who enters here doesn't leave."

From his plane arrival until this point, Salvadoran officials restrained Respondent by two chains and placed in handcuffs that were incredibly tight. The officials then forced Respondent to move from the bus to the entrance of the prison in a squat position; as Respondent struggled to move in this manner, officials beat him again with batons and proceeded to drag him by the arms. Salvadoran officers proceeded to continue to kick Respondent in the legs, shave his head with a zero razor, and drag him while hitting him with batons all the way to a cell. The officers told Respondent that he would eventually die from the water available because it contained lead.

That first night, officers forced Respondent to kneel from 9 PM until sunrise (6 AM); with no bathroom breaks, causing Respondent to urinate himself. During those hours, which felt like an eternity to Respondent, he was not allowed to sit or lay down, if he did, officers threatened to beat him up. As a result of the actions taken by law enforcement, Respondent was left with bruises all over his body and lumps on his legs and arms from the beatings.

Finally, when Respondent and other deportees were given a chance to rest. All they were offered to lay in was a metal bed, with no matres or blankets. The cell where the Respondent was held had no windows, and the electrical lights always remained on. At different nights, between 1 AM and 2 AM, Respondent heard screams for help coming from other cells where officials were surrounding and beating other inmates. Every night at 3 AM Respondent had to be ready for count. At CECOT, Respondent was also malnourished; he lost 31 pounds in the span of two weeks. Even after Salvadoran officers realized that Respondent was a civilian without a criminal record, he was imprisoned at CECOT and only later moved to another prison called Centro Industrial; where the Salvadoran government kept him until he was returned to the United States. At that detention center, for the first time, Respondent was seen by a nurse for his injuries and bumps on his feet. Upon Respondent's return to the United States, Respondent was merely released, pursuant to his

4

criminal bond, for two days until he presented at an ICE check in and DHS detained him again, this time expressing their intention to remove him to Uganda.

## III.    STANDARD FOR REOPENING

The standards governing a motion to reopen in INA § 240(c)(7)(B) and 8 C.F.R. § 1003.23(b)(3) do not apply to this motion, nor do time and numeric limitations set forth in INA § 240(c)(7)(A), (C)(i) as this motion is based on changed country conditions. Additionally, when DHS intends to deport a noncitizen to a country where they have a fear of persecution or torture, the law requires that DHS bear the burden of providing Respondent with meaningful notice and an opportunity to seek protection by moving to reopen removal to designate that new country for removal. *See e.g.*, INA § 241(b)(3); U.S. Const. amend. XIV, § 2; *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019); *accord* 8 C.F.R. § 1240.10(f); 8 C.F.R. § 1240.11(c)(1)(i). DHS has abdicated its obligation to seek reopening to designate a new country of removal in this case. Thus, because the basis for reopening is both changed country conditions and also new and previously unavailable evidence of DHS's intention to deport Respondent to Uganda, a non-designated country, this motion is excused from the statutory and regulatory reopening standards and filing requirements.

However, despite the emergency nature of this motion, Respondent has complied to the extent possible by providing evidence of the prior order granting him withholding of removal to El Salvador under the INA, a declaration by Respondent, DHS's written notice to Respondent of its intention to deport him to Uganda, and critical country conditions evidence. *See* Tabs A–C, J–O. Respondent is submitting applications for relief and some supporting documents for all claims upon reopening and will attempt to supplement the motion sooner if able. *See* Tabs D, G–H; 8

C.F.R. § 1003.23(b)(3).

Alternatively, the Court has authority to reopen removal proceedings *sua sponte* at any time. *See* 8 C.F.R. § 1003.23(b)(1). The validity of Respondent's imminent removal order has not been the subject of any judicial proceeding.

## IV. ARGUMENT

### A. Respondent's Case Should Be Reopened Based on Changed Country Conditions.

Respondent seeks reopening based on material changes in El Salvador's conditions since his last hearing. The evidence submitted establishes a "reasonable likelihood" that Respondent would be granted relief at a reopened hearing, as both the changed country conditions and new personal circumstances establish his eligibility for asylum based on past persecution suffered on account of imputed political opinion and membership in particular social groups. *Mouns v. Garland*, 113 F.4th 399, 414-15 (4th Cir. 2024) (holding that the generally applicable standard for motions to reopen is the "reasonable likelihood" standard).

### i. Changed Country Conditions Since Prior Proceedings

El Salvador has undergone dramatic changes with the adoption of a "broad state of emergency" in March 2022, which has been extended eight times and remained in place at the time of writing. Tabs J, L–M. These iron fist policies enacted by President Nayib Bukele have resulted in "the arrests of tens of thousands" of men, many simply for "violating new curfews or having tattoos." Tab O. As of July 2023, the Salvadoran government reported that more than 70,000 people were detained under the state of exception, making El Salvador the country with the world's highest incarceration rate. Tab N. These new policies create systematic persecution of individuals based on imputed gang membership—a form of imputed political opinion—where the government targets those it perceives as opposing its authority.

6

### ii. Persecution Based on Imputed Political Opinion and Particular Social Group Membership

The evidence establishes that Respondent has suffered past persecution on account of imputed anti-government political opinion and his perceived gang membership. President Bukele personally referred to Respondent as a criminal undeserving of due process rights, despite the lack of any court finding that Respondent was a gang member. This demonstrates the government's imputation of oppositional political opinion to Respondent based solely on appearance and circumstances. When Salvadoran officials detained Respondent from March to June 2025, they immediately told him that "who enters here doesn't leave" and that he would die from drinking lead-poisoned water. *See* Tab C. The systematic nature of the persecution he suffered—being forced to squat and run, hung by his arms, beaten with batons, forced to kneel from 9 PM to 6 AM while threatened with additional beatings, and deprived of medical care despite bruises, lumps, and injuries—demonstrates persecution inflicted on account of the government's perception of him as politically opposed to state authority.

Respondent has also suffered past persecution on account of his membership in cognizable particular social groups. He belongs to the group of "Salvadoran deportees with tattoos." Furthermore, the group "MS13 gang members" has been imputed onto him. Country conditions show that imputed "MS-13 gang members" and "Salvadoran deportees with tattoos" have been persecuted by the Salvadoran government. Evidence shows "tattoos were the most common factor among deportees who were killed" in El Salvador. Tab K. Under the ongoing state of emergency, the Bukele government has detained people without reason based solely on their tattoos, prior contact with the criminal justice system, or because they are a suspected gang member. Both of these groups are cognizable under Fourth Circuit precedent. *See Martinez v. Holder,* 740 F.3d 902 (4th Cir. 2014))(holding that the PSG of former MS-13 gang members is immutable); *see also,*

*Amaya v. Rosen,* 986 F.3d 424 (4th Cir. 2021)(finding that the PSG of former MS-13 gang members met the particularity requirement); *see also, Nolasco v. Garland,* 7 F.4th 180 (4th Cir. 2021)(finding that former members of MS-13 was not socially distinct in El Salvador because there was no societal distinction between present and former members, but not opining as to whether gang membership in itself was socially distinct). Moreover, this Court has already found that Respondent was persecuted and is more likely than not to be persecuted in the future by the Barrio 18 gang based on his familial ties. *See* Tab A.

The persecution Respondent suffered from March to June 2025 on account of his imputed political opinion and particular social group membership was so severe it warrants humanitarian asylum even absent future persecution risk. Officials forced him to squat and run until exhaustion, then carried him hanging by his arms; kneel while being shaved with a zero razor; remain kneeling from 9 PM to 6 AM, causing him to urinate on himself; endure beatings with batons; live in cells with metal beds and 24/7 electric lights; drink only lead-poisoned water; and go without any medical treatment despite visible injuries. *See* Tab C. This level of past persecution suffered on account of protected grounds alone justifies a grant of asylum on humanitarian grounds both because of its severity and because Respondent will suffer other serious harm if returned to El Salvador.

### iii.  Government's Inability or Unwillingness to Control Persecutors

The record establishes both direct government persecution and the government's acquiescence to gang persecution. While publicly opposing gangs, evidence shows the Salvadoran government negotiated with gangs to grant members prison privileges in exchange for commitments to lower the homicide rate and support the president's political party in the February 2021 legislative elections. Following a signed memorandum of cooperation, ICE exchanges

immigration and criminal history information with El Salvador's Civilian National Police (PNC). Human Rights Watch found that police delegations "receive lists of deportees alleged to be gang members and share those lists throughout the department, including with neighborhood-level posts." This information sharing, combined with Respondent's photographs and fingerprints being shared by DHS to PNC, ensures systematic targeting upon return.

### iv. Inability to Relocate

This Court has already acknowledged that Respondent cannot relocate within El Salvador. *See* Tab A. Respondent's unique identifiers including his face and tattoos have been shared on social media, including by government accounts. His persecutors control entry and exit to the country and internal communities, making relocation impossible. The combination of government surveillance at ports of entry and gang control over 93% of the territory means Respondent cannot find safety anywhere in El Salvador.  Furthermore, internal relocation is presumed unreasonable in cases such as Respondent's where the government is the persecutor.  8 CFR 1208.13(b)(3)(ii).

### v. Pattern of Systematic Human Rights Violations

The changed country conditions demonstrate systematic persecution of perceived political opponents. Due to the state of exception, there have been unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; torture and cruel, inhumane, or degrading treatment by security forces; harsh and life-threatening prison conditions; arbitrary arrest and detention; and serious problems with the independence of the judiciary. *See* Tab P. Cristobal, a Human Rights organization, reported 190 deaths in state custody, with 75 of 153 investigated deaths revealing a "common pattern" of lacerations, hematomas from beatings, wounds from sharp objects, and signs of choking or strangling. Released detainees reported "systemic abuse in the prison system, including beatings by guards and the use of electric

shocks." Tab Q. Prison guards "activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell." Tab N. Despite numerous complaints, the Attorney General's Office has not opened any investigations, and impunity remains a problem, particularly for prison guards.

**B. Respondent Should Be Afforded the Opportunity to Seek Relief From Being Removed to Uganda.**

Respondent warrants reopening because he seeks to apply for withholding of removal to Uganda. The fact that DHS intends to deport Respondent to Uganda was not raised in prior removal proceedings. DHS did not ask the IJ to designate Uganda as a country of removal or an alternative country of removal. Thus, Respondent was unaware of the possibility of deportation to Uganda and had no opportunity to pursue a protection claim in those proceedings. Moreover, on August 25, 2025, Respondent's counsel put DHS on notice that Respondent has a fear of removal to Uganda. *See* Tabs D–E. Thus, DHS's intention to deport Respondent to Uganda constitutes new and previously unavailable evidence. INA § 240(c)(7)(C)(ii). Here, Respondent is *prima facie* eligible for withholding from Uganda based on a protected ground. *See* Tab C; *see also* Tabs D–E.

Reopening is required by statute. Critically, Congress provided that all countries to which DHS seeks to deport a noncitizen are subject to the withholding statute. *See* INA § 241(b)(3) (referencing INA §§ 241(b)(1) and (b)(2)). The regulations support this interpretation. *See* 8 C.F.R. § 1240.11(c)(1)(i); 8 C.F.R. § 1240.10(f). The government recognized and has argued in court that a noncitizen may file a Motion to Reopen to assert fear of removal to a country not previously designated for removal. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 372 n.20 (D. Mass. 2025); *see also Silva-Pereira v. Lynch*, 827 F.3d 1176, 1192 n.2 (9th Cir. 2016) (noting the propriety of granting a Motion to Reopen where the country of removal changes after a CAT

claim is fully adjudicated). The opportunity to present a fear-based claim prior to deportation to a country where a person fears persecution or torture is also a fundamental due process protection under the Due Process Clause of the Fifth Amendment and implements the United States' obligations under international law.[4]

In the alternative, the Court must reopen proceedings *sua sponte*. 8 C.F.R. § 1003.23(b)(1). Reopening *sua sponte* is warranted due to the exceptional circumstances presented by DHS's intention of deporting Respondent to Uganda, risking deportation thereafter to El Salvador, both countries in which he fears persecution and torture. *See Matter of G-D-*, 22 I&N. Dec. 1132, 1134 (BIA 1999); *Matter of J-J-*, 21 I&N Dec. 976, 984 (BIA 1997).

Accordingly, this Court should grant Respondent's motion to reopen and ascertain Respondent's fear of future persecution and torture.

## C. Respondent's Proceedings Should be Reopened to Designate Costa Rica As The Country of Removal.

Reopening is also warranted so that Respondent may designate Costa Rica as the country of removal pursuant to 8 U.S.C. § 1231(b)(2)(A)**,** which allows a noncitizen to designate the country to which he wishes to be removed, subject to the receiving country's acceptance. Respondent recently received an offer of refugee status from the government of Costa Rica, along with official assurances that Costa Rica will not detain him and will not deport him to El Salvador. *See* Tab I.

---

[4] *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019); United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267; Refugee Act of 1980, Pub. L. 96-212, § 203(e), 94 Stat. 102, 107 (codified as amended at INA § 241(b)(3)); *see also* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, art. III, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114; Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105–277, div. G, tit. XXII, § 2242(a), 112 Stat. 2681, 2681–822 (1998) (codified at Note to INA § 241) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

This new development provides Respondent with a lawful and humanitarian pathway to safe relocation outside the United States, one that avoids the persecution and torture he faces in El Salvador and Uganda. However, Respondent cannot exercise this statutory right to designate Costa Rica unless proceedings are reopened. Permitting him to designate Costa Rica both honors U.S. obligations under domestic law and international refugee protection principles and provides a clear, administratively workable resolution of this case.

### D.  Respondent Is Eligible to Adjust Status Through His U.S. Citizen Spouse.

In addition to his eligibility for asylum based on changed country conditions, Respondent is independently eligible to adjust his status to lawful permanent resident based on his marriage to a United States citizen. An I-130 Petition for Alien Relative filed by his spouse is currently pending with U.S. Citizenship and Immigration Services ("USCIS"). *See* Tab G.

Crucially, Respondent was **paroled back into the United States** following his unlawful removal to El Salvador. *See* Tab F. Parole constitutes a lawful "admission" for purposes of adjustment of status under INA § 245(a). *See Matter of Arrabally and Yerrabelly*, 25 I&N Dec. 771, 778-79 (BIA 2012) (holding that departure under advance parole does not trigger unlawful presence bars); *Matter of Castillo-Padilla*, 25 I&N Dec. 257, 263 (BIA 2010) (confirming that parole constitutes an admission for adjustment purposes).

Because Respondent is the immediate relative of a U.S. citizen, he is not barred from adjustment by INA § 245(c). Thus, reopening is warranted not only to protect him from persecution and torture, but also to allow time for USCIS to adjudicate his eligibility for adjustment of status on the basis of his bona fide marriage.

### E.  Respondent Is Eligible For Cancellation of Removal.[5]

---

[5] Respondent intends to supplement the motion with the children's birth certificates and hardship documentation.

Respondent is also eligible for cancellation of removal for non-permanent residents under INA § 240A(b). *See* Tab H. To qualify for this relief, an applicant must demonstrate: (1) continuous physical presence in the United States for at least ten years immediately preceding the date of application; (2) good moral character during that period; (3) no convictions for offenses under INA §§ 212(a)(2), 237(a)(2), or 237(a)(3); and (4) that removal would result in exceptional and extremely unusual hardship to the applicant's U.S. citizen or lawful permanent resident spouse, parent, or child. INA § 240A(b)(1).

Respondent has been continuously physically present in the United States for more than ten years. Although his wrongful removal to El Salvador occurred on March 15, 2025, the Supreme Court's ruling in *Noem v. Abrego Garcia*, 604 U.S. ___, 145 S. Ct. 1017 (2025), recognized this removal as illegal and ordered the government to facilitate his return. His subsequent parole back into the United States on June 6, 2025, means he was not out of the United States more than 90 days at one time and does not cause a break in his continuous presence. *See Matter of Cisneros-Gonzalez*, 23 I&N Dec. 668, 670-71 (BIA 2004) (discussing the effect of departures on continuous physical presence).

Respondent has maintained good moral character throughout the requisite period. At the time of his wrongful removal, he had no criminal record in either the United States or El Salvador. While criminal charges have been filed following his return, these charges arose only after the government was ordered to facilitate his return and do not negate his demonstration of good moral character during the statutory period.  Respondent has not been convicted of any crimes that would render him ineligible for cancellation of removal under INA §§ 212(a)(2), 237(a)(2), or 237(a)(3).

Respondent's removal would result in exceptional and extremely unusual hardship to his U.S. citizen spouse and three U.S. citizen children, all of whom have special needs. The hardship

standard for cancellation of removal requires a showing that goes beyond the ordinary hardship that would be expected when a close family member is removed. *Matter of Monreal-Aguinaga*, 23 I&N Dec. 56, 62 (BIA 2001).

Here, Respondent's U.S. citizen spouse and children would face exceptional hardship due to several compounding factors. Respondent has three U.S. citizen children with special needs who require consistent, specialized care and support. The removal of their father would devastate their care structure and emotional stability. Children with special needs often require routine, consistency, and the presence of both parents to maintain their therapeutic progress and emotional well-being. *See Matter of Andazola-Rivas*, 23 I&N Dec. 319, 323-24 (BIA 2002) (considering the special needs of qualifying relatives as a significant hardship factor). The loss of Respondent as a caregiver would not only deprive these children of their father's emotional support but also place an overwhelming burden on the spouse to single-handedly manage three children with special needs.

Given the severe country conditions in El Salvador and Respondent's particular vulnerability to persecution and torture there, his spouse and children cannot safely relocate to El Salvador to maintain family unity. The evidence demonstrates that Respondent faces certain detention, torture, and possible death if returned to El Salvador, making family reunification there impossible. Moreover, relocating three special needs children to El Salvador would be particularly harmful, as the country lacks adequate special education services and medical care for children with disabilities.

The spouse and children would suffer severe psychological hardship knowing that Respondent faces persecution, torture, and potentially death in El Salvador. The documented torture Respondent already suffered at CECOT from March to June 2025—including forced

kneeling for nine hours, beatings, deprivation of food and medical care, and threats of death—would cause extreme emotional trauma to his family if separation were permanent. For children with special needs, the psychological impact of losing a parent can be particularly devastating and may result in regression of developmental progress.

The cumulative effect of these hardships—particularly the impact on three U.S. citizen children with special needs who would lose their father permanently while their mother struggles as a single parent to meet their complex care requirements—far exceeds the exceptional and extremely unusual hardship threshold required for cancellation of removal. The Board has consistently recognized that hardship to children, particularly those with special needs, weighs heavily in the hardship analysis. *See Matter of Recinas*, 23 I&N Dec. 467, 472 (BIA 2002). Therefore, reopening is warranted to allow Respondent to apply for cancellation of removal, which would provide him with lawful permanent resident status and resolve his immigration case while protecting both him and his U.S. citizen spouse from the extreme hardships that would result from his removal.

## V.    CONCLUSION

For these reasons, the Court should grant Respondent's motion to reopen proceedings to allow Respondent to seek both asylum and protection from removal to Uganda based on changed circumstances. If returned to El Salvador, Respondent will be killed by his persecutors – the Salvadoran government and Barrio 18 gang. He faces torture from the police in El Salvador who have arbitrarily arrested, detained, tortured Respondent particularly, as well as killed many of those who they suspect to be current and former gang members. The news media has largely publicized Respondent alleged affiliation with MS-13, thus he still faces being associated with MS-13 by security forces of El Salvador. Moreover, Respondent newly qualifies for immigration relief that

15

was unavailable during his previous proceedings, supporting his request to the Court to reopen his

proceedings *sua sponte*. Considering all the factors involved in this case, reopening is warranted.


Respectfully submitted,

_____
Benjamin Osorio, Esq.
*Counsel for Respondent*

**List of Exhibits in Support of Respondent's Emergency Motion to Reopen**

| TAB | Description | Page No. |
|-----|-------------|----------|
| A. | Decision of the Immigration Judge; | 1 |
| B. | DHS Designation of Uganda; | 15 |
| C. | Respondent's Affidavit, with English Translation; | 16 |
| D. | Respondent's I-589 Application; | 26 |
| E. | Respondent's Request to DHS to Present a Refoulment Claim for Uganda; | 36 |
| F. | Respondent's I-94 and Parole Documentation; | 109 |
| G. | Respondent's I-130 Receipt Notice, filed by his U.S. Citizen Spouse; | 110 |
| H. | Respondent's EOIR-42B Application for Cancellation of Removal for Certain Nonpermanent Residents; | 111 |
| I. | Offer of Status from the Costa Rican Government; | 119 |
| J. | El Salvador: Broad 'State of Emergency' Risks Abuse, Human Rights Watch (Mar. 29, 2022), https://www.hrw.org/news/2022/03/29/el-salvador-broad-state-emergency-risks-abuse-0; | 121 |
| K. | Deported to Danger, Human Rights Watch (Feb. 5, 2020), https://www.hrw.org/report/2020/02/05/deported-danger/united-states-deportation-policies-expose-salvadorans-death-and; | 125 |
| L. | Living Without Rights Feels Normal in El Salvador. It Shouldn't Be., Human Rights Watch (Sept. 13, 2022), https://www.hrw.org/news/2022/09/13/living-without-rights-feels-normal- el-salvador-it-shouldnt-be; | 248 |
| M. | We Can Arrest Anyone We Want, Human Rights Watch (Dec. 7, 2022), https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el; | 251 |
| N. | El Salvador 2023 Human Rights Report, U.S. Department of State (2024), https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/; | 307 |

**O.** Schmidt, Samantha, <u>Fans Went To Admire El Salvador's Gang Crackdown And Got Arrested</u>, The Washington Post (May 15, 2023), https://www.washingtonpost.com/world/2023/05/15/bukele-gang-crackdown-salvador/;     **351**

**P.** <u>El Salvador Country Security Report</u>, Overseas Security Advisory Council (Sept. 30, 2022), https://www.osac.gov/Content/Report/a96e39d6-0be6-4254-90c9-1c884f45d34f;     **355**

**Q.** Avelar, Bryan, <u>Inmates In El Salvador Tortured And Strangled: A Report Denounces Hellish Conditions In Bukele's Prisons</u>, El Pais (May 29, 2023), https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html;     **363**

**R.** <u>Uganda 2024 Human Rights Report</u>, U.S. Department of State (2025), https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/uganda.     **370**



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**BALTIMORE, MARYLAND**

| | | |
|---|---|---|
| **IN THE MATTER OF:** | ) | **IN REMOVAL PROCEEDINGS** |
| | ) | |
| | ) | |
| **Kilmar Armando ABREGO-GARCIA** | ) | **File #A 201-577-119** |
| | ) | |
| | ) | |
| **RESPONDENT** | ) | |

**INDIVIDUAL HEARING DATE:**    August 9 and September 27, 2019

**CHARGE:**    Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA" or the "Act"), as amended, in that the Respondent is an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General.

**APPLICATIONS:**    INA § 208, Asylum; INA § 241(b)(3), Withholding of Removal; Protection Under Article 3 of the Convention Against Torture.

**APPEARANCES**

**ON BEHALF OF RESPONDENT**
Lucia Curiel
Khatia Mikadze

**ON BEHALF OF THE DHS**
Amy Donze-Sanchez

**MEMORANDUM OF DECISION AND ORDER**

**I.    Procedural History**

The Respondent is a native and citizen of El Salvador. The Department of Homeland Security ("DHS") issued the Respondent a Notice to Appear ("NTA") on March 29, 2019 which alleged that the Respondent: (1) is not a citizen or national of the United States; (2) is a native and citizen of El Salvador; (3) entered the United States at or near an unknown place on or about an

unknown date; and (4) was not then admitted or paroled after inspection by an immigration officer.

At a Master Calendar Hearing the Respondent, through counsel, admitted the factual allegations contained in the NTA and conceded removability as charged. Based on the Respondent's admissions and concessions, the Court found his removability to be established by clear and convincing evidence as required by INA § 240(c)(3). *See also Woodby v. INS*, 385 U.S. 276 (1966). As relief from removal, the Respondent filed a Form I-589, Application for Asylum, Withholding of Removal, and Relief under Article 3 of the Convention Against Torture ("CAT"). The Respondent and his wife both testified in support of the applications. The Court reserved the matter for the issuance of a written decision.

The Court has considered the arguments of both parties and the entire record carefully. The following documentary evidence was considered by the Court and admitted into the record: Exhibit 1, the Notice to Appear; Exhibit 2, the I-213; Exhibit 3, the Respondent's application with all supporting documents; and Exhibit 5, Part A, explanation of the wife's pregnant condition while testifying.[1] All evidence and testimony admitted has been considered, even if not specifically addressed in the decision. Having reviewed the evidence of record and the applicable law, the Court's written decision and order now follow.

## II.    **Testimonial Evidence Presented**

### A. Respondent

The Respondent is a 24-year old native of El Salvador. He was born in 1995 in Los Nogales neighborhood, San Salvador, El Salvador. The Respondent testified that he fears returning to his country because the Barrio 18 gang was targeting him and threatening him with death because of his family's pupusa[2] business. The Respondent's mother, Cecilia, ran the business out of her home. Although the business had no formal storefront, everyone in the town knew to get their pupusas from "Pupuseria Cecilia." The Respondent's father, brother and two sisters all helped run the family business. The Respondent's job was to go to the grocery store to buy the supplies needed for the pupusas, and then he and his brother would do deliveries four days a week to the people in

---

[1] Exhibit 4 is a Prince George's County Police Department Gang Field Interview Sheet. It was admitted for the limited purpose of showing that the Respondent was labeled a gang member by law enforcement.
[2] El Salvadorian stuffed tortillas.

the town that ordered pupusas from Cecilia.

At some point, Barrio 18 realized the family was making money from their family business and they began extorting the Respondent's mother, Cecilia. They demanded a regular stipend of "rent" money from the business, beginning with a monthly payment and then requiring weekly payments. The gang threatened to harm the Respondent, his older brother Cesar, and the family in general if their demands were not met. Alternatively, they told Cecelia that if she could not pay the extortion money, she could turn Cesar over to them to become part of their gang. The Abrego family paid the money on a regular basis, whenever they could, and hid Cesar from the gang. On one occasion, the gang came to the family's home and threatened to kill Cesar if the family did not pay the rent. The family responded by sending Cesar to the U.S.

After Cesar left, the gang started recruiting the Respondent. They told Cecilia that she would not have to pay rent any more if she let him join the gang. The mother refused to let this happen. The gang then threatened to kill the Respondent. When the Respondent was around 12-years old, the gang came to the home again, telling Cecilia that they would take him because she wasn't paying money from the family's pupusa business. The Respondent's father prevented the gang from taking the Respondent that day by paying the gang all of the money that they wanted. During the days, the gang would watch the Respondent when he went back and forth to school. The members of the gangs all had many tattoos and always carried weapons.

Eventually, the family had enough and moved from Los Nogales to the 10th of October neighborhood. This town was about 10 minutes away, by car, from Los Nogales. Shortly after the family moved, members of Barrio 18 from Nogales went to the 10th of October and let their fellow gang members know that the family had moved to that neighborhood. Barrio 18 members visited the house demanding the rent money from the pupusa business again. They went to the house twice threatening to rape and kill the Respondent's two sisters and threatening the Respondent. The Respondent's parents were so fearful that they kept the Respondent inside the home as much as possible. Finally, the family decided they had to close the pupusa business and move to another area, Los Andes, about a 15 minute drive from their last residence. Even at this new location, the family kept the Respondent indoors most of the time because of the threats on his life. After four months of living in fear, the Respondent's parents sent the Respondent to the U.S.

Even though the Respondent's father was a former policeman, they family never reported anything to the police regarding the gang extorting the family business. The gang members had

threatened Cecilia, telling her that if she ever reported anything to the police that they would kill the entire family. The family believed them, because they were well aware of the rampant corruption of the police in El Salvador and they believed that if they reported it to the police, the police would do nothing.

At present, even though the family has now shut down the pupusa business, Barrio 18 continues to harass and threaten the Respondent's two sisters and parents in Guatemala. Additionally, they have targeted a brother-in-law who now lives with the family.

### B. The Respondent's Wife

The Respondent's wife also testified, but her testimony related to two other particular social groups not reached in this decision.[3]

## III.   Eligibility for Asylum, Withholding and CAT Relief

### A.    Asylum

An applicant for asylum bears the burden of establishing that he meets the definition of a refugee under INA § 101(a)(42)(A), which defines a refugee in part as an alien who is unable or unwilling to return to her home country because of persecution, or a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1996); 8 C.F.R. § 1208.13(a); INA § 208(b)(1)(B). The alien's fear of persecution must be country-wide. *Matter of Acosta*, 19 I&N Dec. 211, 235 (BIA 1985). Additionally, the alien must establish that he is unable or unwilling to avail himself of the protection of his country of nationality or last habitual residence. INA § 101(a)(42)(A); *see also Matter of A-B-*, 27 I&N Dec. 316, 325–26 (A.G. 2018). An applicant who establishes statutory eligibility for asylum still bears the burden of demonstrating that he merits a grant of asylum as a matter of discretion. INA § 208(b)(1); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).

### i.    Credibility and Corroboration

An alien bears the evidentiary burden of proof and persuasion in connection with any

---

[33] The other two particular social groups are: 1) Salvadoran male deportees labeled as MS-13 gang members by U.S. law enforcement; and 2) Immediate family of Jennifer Vasquez (the Respondent's wife.) The Court will not address the alternative claims for relief, as it is not necessary to do so at this time.

asylum application pursuant to section 208 of the Act. 8 C.F.R. § 1208.13(a); *see also Matter of S-M-J-*, 21 I&N Dec. 722, 723 (BIA 1997); *Matter of Acosta*, 19 I&N Dec. 211, 215 (BIA 1985); *Matter of Mogharrabi*, 19 I&N Dec. 439, 446 (BIA 1987). The Board of Immigration Appeals (BIA) has recognized the difficulties an asylum applicant may face in obtaining documentary or other corroborative evidence to support his claim of persecution. *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989). As a result, uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. *See* INA § 208(b)(1)(B)(ii); 8 C.F.R. § 1208.13(a); *Matter of Mogharrabi*, at 445. However, where it is reasonable to expect corroborating evidence for certain alleged facts, such evidence must be provided as long as the applicant has the evidence or can reasonably obtain it. *Matter of S-M-J-*, 21 I&N Dec. at 725. The absence of such corroboration may lead to a finding that an applicant has failed to meet his burden of proof. *Id.* at 725–26. The immigration judge must provide the applicant an opportunity to explain the lack of corroborating evidence and ensure that the applicant's explanation is included in the record. *See id.*; *Lin-Jian v. Gonzales*, 489 F.3d 182, 192 (4th Cir. 2007). The Board has made clear that an asylum applicant cannot meet his burden of proof by "general and vague" testimony, and "the weaker an alien's testimony, the greater the need for corroborative evidence." *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

In the instant matter, the Respondent provided credible responses to the questions asked. His testimony was internally consistent, externally consistent with his asylum application and other documents, and appeared free of embellishment. Further, he provided substantial documentation buttressing his claims. Included in this evidence were several affidavits from family members that described the family's pupusa business, and the threats by Barrio 18 to the various family members—in particular the Respondent—over the years. The court finds the Respondent credible. This finding is applicable to his other two claims as well (withholding under the Act and CAT protection).

### ii.    One-Year Filing Deadline

Under INA § 208(a)(2)(B), an applicant for asylum must demonstrate by clear and convincing evidence that the application has been filed within one year after the date of the alien's arrival in the United States. Following the *Mendez Rojas v. Johnson* case (305 F. Supp. 3d 1176 (W.D. Wash., Mar. 29, 2018)), in a joint stay agreement, the Government agreed to treat pending

asylum applications by four classes of applicants as though filed within one year of arrival.[4] *See* 305 F. Supp. 3d at 1179. Members of Class A.II are individuals in removal proceedings who have been released from DHS custody after having been found to possess a credible fear of persecution, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.* Members of Class B.II are individuals in removal proceedings who express a fear of return to their country of origin, were released from DHS custody without a credible fear determination, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.*

Here, the Respondent's asylum application is time-barred without exception. INA § 208(a)(2)(B); 8 C.F.R. § 1208.4(a)(2). The Respondent testified that he entered the U.S. in 2012. However, he did not file his application for asylum until after he was detained in August 2019, seven years after his entry into the U.S. and well-beyond the one-year filing deadline. *See* Exh. 3. He has shown no changed or extraordinary circumstances that would entitle him to relief from the one-year bar. See 8 C.F.R. § 1208.4(a)(4) and (5). Based on the foregoing, the Respondent's application for asylum is time-barred and must be denied. We turn next to withholding of removal under the Act.

**B.    Withholding of Removal Pursuant to INA § 241(b)(3)**

Withholding of removal, in contrast to asylum, confers only the right not to be deported to a particular country rather than the right to remain in the U.S. *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999). To establish eligibility for withholding of removal, a respondent must show that there is a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407 (1984). Such a showing requires that the respondent establish that it is more likely than not (i.e., a clear probability) that the alien would be subject to persecution if returned to the country from which the alien seeks withholding of removal. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). The standard for withholding of removal is thus more stringent than the standard for asylum. *Stevic*, 467 U.S. at 429-430. Under the withholding of removal regulations at 8 C.F.R. § 1208.16(b)(1), however, if an applicant has suffered past persecution, then there is a presumption that the applicant's life or freedom would be threatened in the future in the country of removal.

---

[4] Classes A.I and B.I apply only to individuals who are not in removal proceedings. *See Mendez Rojas*, 305 F. Supp. 3d at 1179.

### i.    Past Persecution

Persecution has been interpreted to include serious threats to an individual's life or freedom, or the infliction of significant harm on the applicant. *See Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); *Li v. Gonzales*, 405 F.3d 171 (4th Cir. 2005). Persecution is generally assessed cumulatively, and relevant incidents are not to be evaluated in isolation. *See Baharon v. Holder*, 588 F.3d 228 (4th Cir. 2009). A death threat qualifies as persecution. *See Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011). Extortion may constitute persecution, even if physical harm will be inflicted only upon failure to pay. *Oliva v. Lynch*, 807 F.3d 53 (4th Cir. 2015).

The Respondent suffered past persecution as he was threatened with death on more than one occasion. Therefore, DHS bears the burden of establishing "a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds" or that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *See* 8 C.F.R. § 1208.16(b)(1).

The "one central reason" standard that applies to asylum applications pursuant to section 208(b)(1)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(1)(B)(i) (2006), also applies to applications for withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006). *Matter of C-T-L-*, 25 I&N Dec. 341 (BIA 2010). An applicant must demonstrate that a statutorily protected ground would be "at least one central reason" for the feared persecution. *See* INA § 208(b)(1)(B)(i); *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208 (BIA 2007) (holding that in a mixed motive asylum case, an applicant must prove that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for the claimed persecution). An alien need not show that a statutorily protected ground would be the central reason or even a dominant central reason, but rather must show that such a ground was more than an "incidental, tangential, superficial or subordinate" reason for the past persecution or feared future persecution. *Matter of J-B-N- & S-M-*, 24 I&N Dec. at 214; *see also Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011); *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009). Persecution may be on account of multiple central reasons or intertwined reasons, and the full factual context must be taken into account when analyzing nexus. *Oliva v. Lynch*, 807 F.3d 53 (4th Cir. 2015).

EOIR - 7 of 14

ii.     **Well-Founded Fear of Future Persecution and Internal Relocation**

Based on the above, the Respondent has demonstrated the he was subject to past persecution on account of a statutorily protected ground. He is entitled to the presumption under the regulations that he would have a clear probability of future persecution on account of a protected ground. Given his testimony and other evidence concerning official corruption and other abuses, he has demonstrated that authorities were and would be unable or unwilling to protect him from past or feared future persecution. Given country conditions and the Respondent's inability to avoid the threat through internal relocation, the Respondent could not necessarily avoid the threat through internal relocation, nor would it be reasonable to expect him to do so. DHS has failed to carry their burden to show that there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable. The facts here show that the Barrio 18 gang continues to threaten and harass the Abrego family over these several years, and does so even though the family has moved three times.[5]

iii.     **Nexus to a Protected Ground**

To be cognizable under the statute, members of a "particular social group" must share a "common immutable characteristic," which may be an innate characteristic or a shared past experience. *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). In either case, it must be a characteristic that members of the group either cannot change or should not be required to change. To constitute a "particular social group" under the statute, the group must be (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *See Matter of A-B-*, 27 I&N Dec. 316 (married women in Guatemala who are unable to leave their relationships do not constitute a particular social group); *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014) (former members of Mara 18 gang in El Salvador who renounced gang membership do not constitute a particular social group); *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014); *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006) (former noncriminal drug informants do not present a cognizable social group); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985).

Under well-established Fourth Circuit precedent, family ties may provide the basis for a

---

[5] The court understands that the family's moves have been only 15 minutes away each time. However, DHS has failed to show that internal relocation is not only possible, but reasonable to expect the Respondent to so relocate.

cognizable particular social group under the INA. *See, e.g., Crespin-Valladares v. Holder,* 632 F.3d 117, 124-126 (4th Cir. 2011) ("we can conceive of few groups more readily identifiable than the family"); *Hernandez-Avalos v. Lynch,* 784 F.3d 944, 949 (4th Cir. 2015) ("membership in a nuclear family qualifies as a protected ground for asylum purposes"); *Cruz v. Sessions,* 853 F.3d 122, 127 (4th Cir. 2017) ("by virtue of her domestic partnership with Martinez, Cantillano Cruz was a member of a cognizable particular social group, namely, 'the nuclear family of Johnny Martinez'"); *Salgado-Sosa v. Sessions,* 882 F.3d 451, 457 (4th Cir. 2018) ("Salgado-Sosa's family qualifies as a 'particular social group,' protected for purposes of his asylum and withholding of removal claims"). Neither those who resist recruitment efforts by gangs nor their family members generally constitute a particular social group under the INA, nor do such bases amount to political opinion. *See Matter of S-E-G-,* 24 I&N Dec. 579 (BIA 2008); *see also INS v. Elias-Zacarias,* 502 U.S. 478 (1992) (forced recruitment or attempts to forcibly recruit into a guerrilla organization does not necessarily constitute persecution on account of political opinion). Membership or perceived membership in a criminal gang also does not constitute membership in a particular social group under the INA. *See Matter of E-A-G-,* 24 I&N Dec. 591 (BIA 2008); *see also Lizama v. Holder,* 629 F.3d 440 (4th Cir. 2011) (claimed particular social group of "young, Americanized, well-off Salvadoran male deportees with criminal histories who oppose gangs" not cognizable under the INA). At the same time, the BIA has noted that social group determinations are made on a case by case basis. *Matter of M-E-V-G-,* 26 I&N Dec. 227.

Ascertaining whether membership in a family-based social group is at least one central reason for any past or feared future persecution may present challenges, and the Fourth Circuit has encouraged an expansive view of nexus in these cases. *See Hernandez-Avalos v. Lynch,* 784 F.3d 944 (4th Cir. 2015) (mother who refused to allow her son to join a gang was persecuted on account of her membership in the particular social group of his family); *Cruz v. Sessions,* 853 F.3d 122 (4th Cir. 2017) (nexus to family relationship established because wife of murdered man was more likely than others to search for her husband, confront the suspect, and express an intent to go to the police); *Salgado-Sosa v. Sessions,* 882 F.3d 451 (4th Cir. 2018) (nexus found where man fought back when he was in his family's home during attack targeted at stepfather because membership in the family was why the man and not some other person became involved); *but see Velasquez v. Sessions,* 866 F.3d 188 (4th Cir. 2017) (personal dispute among family members may not equate to persecution on account of family group membership); *Matter of A-B-,* 27 I&N Dec. at 338-339;

*Cortez-Mendez v. Whitaker*, 912 F.3d 205 (4ᵗʰ Cir. 2019) (circumstantial evidence presented did not establish as a factual matter that the respondent's relationship to his father was at least one central reason for his mistreatment by gang members who sought to forcibly recruit him).

The evidence in this case indicates quite clearly that at least one central reason the Respondent was subject to past persecution was due to him being his mothers' son, essentially as a member of his nuclear family. That the Respondent is his mothers' son is the reason why he, and not another person, was threatened with death. He was threatened with death because he was Cecilia's son and the Barrio 18 gang targeted the Respondent to get at the mother and her earnings from the pupusa business. Pursuant to unambiguous and repeated guidance from the Fourth Circuit, the nexus requirement is satisfied in this case. *See generally Hernandez-Avalos v. Lynch,* 784 F.3d at 944; *Cruz v. Sessions,* 853 F.3d at 122; *Salgado-Sosa v. Sessions,* 882 F.3d at 451.

The Court finds that the Respondent's proposed social group, "Immediate Family Members of the Abrego Family," essentially his nuclear family, is cognizable. Membership in this family group is immutable. It is also sufficiently particular, as it is clearly delineated and easy to determine who is and is not in the group, and it is socially distinct.

With respect to social distinction, the immediate family lived in the same home, and his mother ran a pupusa business. Neighbors and others in the community recognized the family as a distinct group that was related, and ran a family business. Everyone knew that Cecilia Abrego was where you purchased your pupusas and that if you could not make it to the family's home, then the Respondent would deliver the pupusas to your house four days a week. As with many other precedential cases involving immediate family members, the proposed social group in this case too satisfies all of the legal requirements for recognition as a cognizable social group. *Cf. Crespin-Valladares v. Holder,* 632 F.3d at 124-126; *Hernandez-Avalos v. Lynch,* 784 F.3d at 949; *Cruz v. Sessions,* 853 F.3d at 127; and *Salgado-Sosa v. Sessions,* 882 F.3d at 457.

This finding—that the Abrego family was socially distinct—does not run afoul of the Attorney General's (AG) recent case, *Matter of L-E-A-,* 27 I&N Dec. 581 (A.G. 2019). In that case, the AG did not bar all family-based social groups from qualifying from relief. *Id.* at 595. Rather, the AG required that "[a]n applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society." *Id.* at 586. This case is a close call. But, the Court finds that the Respondent has established that Cecilia's family pupusa business was well-known in the community and therefore the family was socially distinct in society.

10

## C.    Relief from Removal Under CAT

The applicant for withholding of removal under the CAT bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). An applicant who establishes that he or she is entitled to CAT protection shall be granted withholding of removal unless he is subject to mandatory denial of that relief, in which case he shall be granted deferral of removal. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). An applicant is subject to mandatory denial of withholding of removal under the CAT if that individual has participated in the persecution of others, has been convicted of a particularly serious crime, has committed a serious nonpolitical crime outside of the U.S., or is a danger to U.S. national security. Under applicable provisions of law at 8 C.F.R. § 1208.16(d) and INA § 241(b)(3)(B), an alien who has been convicted of an aggravated felony for which the alien was sentenced to an aggregate term of imprisonment of at least five years is considered to have been convicted of a particularly serious crime. That does not preclude other crimes from being considered particularly serious crimes.

"Torture" is defined in the treaty and at 8 C.F.R. § 1208.18(a)(1). It is defined in part as the intentional infliction of severe physical or mental pain or suffering by, or at the instigation of, or with the consent or acquiescence of a public official. Acquiescence of a public official requires that the official have awareness of or remain willfully blind to the activity constituting torture prior to its commission, and thereafter breach his or her legal responsibility to intervene to prevent such activity. *See* 8 C.F.R. § 1208.18(a)(7).

To qualify for protection under the CAT, "specific grounds must exist that indicate the individual would be personally at risk." *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000). The mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would be more likely than not to be tortured. *Id.*

In assessing the likelihood of future torture, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; evidence of gross, flagrant or mass violations of human rights within the country of removal; or other relevant information of conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). In order for an alien to meet the burden of proof for relief under the CAT, he or she

must demonstrate that each step in the necessary chain of events is more likely than not to happen. *Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006). Under Fourth Circuit precedent, the risks of torture from all sources must be aggregated when determining whether an individual is more likely than not to be tortured in a particular country. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019).

Instances of police brutality do not necessarily rise to the level of torture, nor does the indefinite detention of criminal deportees in substandard conditions. *Matter of J-E-*, 23 I&N Dec. 291, 301-02 (BIA 2002) (indefinite detention of criminal deportees in substandard conditions in Haiti does not constitute torture where there is no evidence that government officials intentionally and deliberately detain deportees under such conditions in order to inflict torture). Abusive or squalid conditions in pretrial detention facilities, prisons, or mental health institutions will not constitute torture when those conditions occur due to neglect, a lack of resources, or insufficient training and education, rather than a specific intent to cause severe pain and suffering. *Matter of J-R-G-P-*, 27 I&N Dec. 482 (BIA 2018).

Torture must come at the hands of the government. *Matter of S-V-*, 22 I&N Dec. at 1311-12. This can include acquiescence of officials provided it meets the conditions set out in the regulations at 8 C.F.R. § 1208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity"). Awareness can include actual knowledge and willful blindness. *See* Senate Exec. Rep. 101-30 at 9 (1990); *see also Matter of S-V-*, 22 I&N Dec. at 1312. In *Matter of S-V-*, the BIA elaborated that a respondent needs to show more than that government officials are aware of the activity and powerless to stop it and needs to show that government officials are willfully accepting of the activity. *Matter of S-V-*, 22 I&N Dec. at 1311-1312. Following *Matter of S-V-*, the Attorney General, in *Matter of Y-L-, A-G-, & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002), elaborated on the definition of acquiescence and indicated that the relevant inquiry is "whether governmental authorities would approve or 'willfully accept' atrocities committed." *Id.* at 283.[6]

The Fourth Circuit has clarified that "willful blindness can satisfy the acquiescence

---

[6] That decision noted in part that it would not suffice for a respondent to show that isolated, rogue government agents were involved in atrocities despite a government's best efforts to root out misconduct.

component of 8 C.F.R. § 1208.18(a)(1)." *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 246 (4th Cir. 2013). Pursuant to the willful blindness standard, government officials acquiesce to torture when they have actual knowledge of or turn a blind eye to torture. *Id.* at 245-246.

Decisions regarding an alien's likely future mistreatment are factual determinations subject to review only for clear error; the determination as to whether any such mistreatment constitutes torture as a legal matter is subject to de novo review. *Turkson v. Holder*, 667 F.3d 523 (4th Cir. 2012); *see also Kaplun v. Attorney General*, 602 F.3d 260 (3d Cir. 2010). Whether the government would acquiesce in any future torture is likewise a mixed question of law and fact. *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884 (4th Cir. 2019).

Here, the Respondent has not shown that it is "more likely than not" that he would be tortured if he were to be removed to El Salvador.

## IV.    Conclusion

The Respondent's application for asylum is time-barred without exception. However, he has established past persecution based on a protected ground, and the presumption of a well-founded fear of future persecution. DHS has not shown there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable under the circumstances. Therefore, the Respondent's application for withholding under the Act is granted. Finally, his CAT claim fails because he has not shown that he would suffer torture.

## **ORDER**

It is hereby ordered that:

I.    the Respondent's application for asylum pursuant to INA § 208 is **DENIED**;

II.   the Respondent's application for withholding of removal pursuant to INA § 241(b)(3) is **GRANTED**; and

III.  the Respondent's application for withholding of removal under the Convention Against Torture is **DENIED**;


_10/10/19_
Date

David M. Jones
United States Immigration Judge
Baltimore, Maryland


**Appeal Rights**

Each party has the right to appeal this Court's decision to the Board of Immigration Appeals. Any appeal must be filed within 30 calendar days of the mailing of this decision. Under the regulations, a notice of appeal must be received by the Board by that deadline. The notice of appeal must also state the reasons for the appeal. *See* 8 C.F.R. § 1240.15.

B

| From: | Wall, Charles <Charles.Wall@ice.dhs.gov> |
|---|---|
| Sent: | Friday, August 22, 2025 4:00 PM |
| To: | rdean@srvhlaw.com; shecker@heckerfink.com; jdabbs@heckerfink.com; dpatton@heckerfink.com; bejamin@murrayosorio.com; lucia@caircoalitoin.org; Jonathan Cooper; Olivia Horton; Stephen Frank; Andrew J. Rossman; Sascha Rand; McKenzie Anderson; Samuel Nitze; Courtney Whang; Roey Goldstein; Sam Heavenrich; Morgan Anastasio; ssandoval@murrayosorio.com; rina@murrayosorio.com; addy@kmlawfirm.com; wpittard@kaiserlaw.com |
| Subject: | Notice Pursuant to Civil Action No. 8:25-cv-00951-PX |

[EXTERNAL EMAIL from **charles.wall@ice.dhs.gov**]

 **This message needs your attention**
 • No employee in your company has ever replied to this person.

Counsel,

Pursuant to the court order issued in the District Court of Maryland on July 23, 2025, Civil Action No. 8:25-cv-00951-PX, please let this email serve as notice that DHS may remove your client, Kilmar Armando Abrego Garcia, to Uganda no earlier than 72 hours from now (absent weekends).

Sincerely,

Charles Wall
Principal Legal Advisor
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

C

KILMAR ABREGO GARCÍA
DECLARACIÓN JURADA

Yo, Kilmar Abrego García, juro que conozco el contenido de esta declaración. También juro y afirmo a mi leal saber y entender y bajo pena de perjurio que esta declaración es verdadera y correcta. Lo firmo con mi propia voluntad.

1. Mi nombre es Kilmar Abrego García. Nací el 26 de julio de 1995 en El Salvador.
2. Fui deportado de los Estados Unidos y llevado a El Salvador e ingresé a CECOT el 15 de marzo de 2025.
3. Cuando el vuelo en el que estaba aterrizó en El Salvador y finalmente se abrieron las puertas, fui el primer nombre que llamaron, así que me levanté y caminé hacia la puerta del avión.
4. En la puerta del avión vi que había como un grupo de oficiales desde el avión hasta el autobús. Yo estaba en la puerta del avión ya encadenado y dos oficiales me agarraron de los brazos y me empujaron hacia abajo. Todavía estaba en la parte superior de las escaleras y vi que había cámaras filmando. Era de noche, pero tenían luces muy brillantes donde estábamos.
5. Los oficiales me bajaron por las escaleras y me empujaron hacia el suelo, hasta que llegamos al autobús.
6. Me sentaron en un asiento con la cabeza todavía agachada y me pusieron un segundo juego de cadenas y esposas.
7. Si en algún momento levantaba la vista, los agentes me golpeaban con las manos, diciéndome que mantuviera la cabeza agachada.
8. Seguí sentado de esta manera mientras el resto de los deportados subían al autobús y durante el trayecto hasta el CECOT, que duró unos treinta minutos.
9. Antes de salir del aeropuerto, había un agente hispano de ICE en el autobús hablando con los oficiales salvadoreños, diciéndoles que verificaran que los veintiún de la lista estaban en el autobús. Una vez que salimos del aeropuerto ya no había oficiales de ICE, solo eran los oficiales salvadoreños.
10. Si los oficiales nos veían levantar la cabeza, nos golpeaban en la cabeza o en la espalda con las manos.
11. Llegamos a CECOT y cuando nos bajamos del autobús escuché a alguien decir: "bienvenidos a CECOT. El que entra aquí no se va".
12. Cuando nos bajamos del autobús, nos obligaron a agacharnos de nuevo y a correr en cuclillas, pero no pida correr agachado, así que en un momento dado me dejaron prácticamente colgado de los brazos. Los oficiales me pararon y me dijeron: "Levántate gordo, tienes que caminar".
13. Justo al otro lado de la puerta nos quitaron las cadenas y nos hicieron desnudarnos y nos dieron su ropa de la cárcel. Había oficiales que nos gritaban que nos cambiáramos más

rápido. Me patearon las piernas con botas para que me cambiara más rápido. También me golpearon en los brazos y la cabeza con sus manos, diciéndome que me apurara y me cambiara más rápido.

14. Después de cambiarnos, nos volvieron a poner esposas y cadenas. Nos hicieron arrodillarnos. Nos afeitaron la cabeza con una navaja de afeitar cero.

15. Una vez afeitadas nuestras cabezas, nos hicieron levantarnos y caminar hasta la celda. Era una caminata larga, y nos decían que camináramos más rápido y nos golpeaban con porras para que corriéramos más rápido.

16. Me resbalaba en el suelo porque me dolían mucho las piernas. Básicamente, me hacían marchar como ranas, con un guardia debajo de cada hombro, mientras me arrastraban y me golpeaban con sus porras.

17. Atravesamos un largo pasillo y bajamos hasta la última celda, la celda 15.

18. Los oficiales seguían pegándome con sus porras de madera de la policía y en ese momento ni siquiera estaba caminando, me estaban arrastrando.

19. Una vez en la celda me decían, te vas a morir por el agua, tiene plomo, el que entra aquí no sale.

20. Nos llevaron al fondo de la celda, nos hicieron arrodillarnos y nos dijeron: no se muevan. Si te sientas o te acuestas, te golpearemos.

21. Estuvimos arrodillados desde las 9 de la noche hasta las 6 de la mañana, pero nos pareció una eternidad.

22. Aparte de mí, había otros 20 salvadoreños en la celda. Podíamos hablar un poco, pero si los oficiales nos veían hablar, nos golpeaban.

23. Esa noche sucedieron muchas cosas terribles.

24. Si alguien se caía de cansancio, era golpeado mientras aún estaba encadenado. Vi a otros deportados con los pies ensangrentados por las cadenas. Las esposas en las que nos tenían también estaban increíblemente apretadas.

25. Durante la noche pedí usar el baño, pero me dijeron que no. Como resultado, me oriné.

26. Alrededor de las 6 de la mañana, los oficiales nos dijeron que podíamos dormir y finalmente nos quitaron las esposas.

27. Había cuatro filas de camas y cada fila tenía dos camas una al lado de la otra, y había alrededor de cuatro niveles de camas, por lo que en total había como ochenta camas en una celda. Las camas eran de metal y no tenían ningún tipo de colchón. Tampoco teníamos una sábana o una almohada, así que simplemente dormimos en el metal.

28. Al día siguiente tenía moretones por todas partes, así como bultos en las piernas y los brazos por donde me golpearon.

29. La celda tenía dos pilas, que son básicamente una pila de agua de piedra o cemento, que tenían grifos. Así es como nos bañábamos. Nos dieron jabón y pasta de dientes unas dos semanas después de nuestra llegada a CECOT.

30. Además de usar el agua de la pila para bañarnos, también bebíamos de la pila. Al principio, teníamos que usar el mismo huacal que usaríamos para bañarnos, para beber agua. Pero al final nos dieron una taza.

31. No había ventanas, y las luces eléctricas estaban encendidas todo el día y toda la noche, nunca se apagaban.

32. Recibíamos comida tres veces al día, pero eran porciones muy pequeñas. Nos dieron 1-2 tortillas, un poco de arroz y un poco de frijoles. Mi estómago se acostumbró a las porciones pequeñas. Cuando me deportaron de los Estados Unidos pesaba alrededor de 215 libras, pero después de dos semanas en CECOT pesaba alrededor de 184 libras.

33. Cuando nos sacaban de la celda, nos esposaban y mientras caminábamos nos hacían marchar como una rana, y los oficiales nos golpeaban con sus porras.

34. Pasé por este proceso 3 o 4 veces mientras me llevaban para interrogarme en un edificio diferente dentro de CECOT.

35. Durante el interrogatorio, me sentaba en una mesa mientras los oficiales, que estaban al otro lado de la mesa, tomaban fotos de mis tatuajes y me hacían preguntas. Me preguntaron sobre mi familia (quiénes eran, dónde vivían), me preguntaron sobre mi afiliación o membresía a una pandilla (a qué pandilla pertenecía, cuál era mi alias).

36. No fui maltratado durante el interrogatorio, solamente cuando salía de la celda y cuando volvía a la celda.

37. En ningún momento durante mi tiempo en CECOT nos mezclaron con los pandilleros que habían sido detenidos en El Salvador, pero podíamos ver a la gente en la celda de enfrente y en la celda de al lado. Vi a personas con tatuajes en la cara, en el cuerpo, y trataban de hablar con nosotros y preguntarnos quiénes éramos y a qué pandilla pertenecíamos.

38. Una vez, durante un cambio de guardia, en la celda de enfrente de la celda en la que yo estaba. Vi cómo los detenidos golpeaban a uno de los chicos que estaban en la celda con ellos. Hicieron un círculo a su alrededor y lo golpearon terriblemente. No gritó, pero pude oír los golpes. Eso es probablemente lo peor que presencié mientras estaba en CECOT.

39. Escuché golpizas en la celda contigua a la celda en la que estaba, pero no vi esas golpizas.

40. Los otros detenidos nos enviaban pequeños mensajes en papel preguntando quiénes éramos y dónde habíamos vivido, pero ninguno de nosotros les respondía.

41. Unas tres semanas después de llegar a CECOT, finalmente conseguimos papel higiénico. Los baños eran básicamente un inodoro frente a todos. Los inodoros no tenían cisternas, por lo que había que agregar agua para inodoros desde la pila.

42. Los pandilleros que estaban en la celda de enfrente me amenazaron. Me dijeron que si no les decía de qué pandilla era, me matarían.

43. El conteo era siempre a las 3 de la madrugada en el CECOT.

44. Dos o tres veces, como a la 1 o 2 de la madrugada, escuché a personas que gritaban pidiendo ayuda. Estas personas estaban como a 4 o 6 celdas de distancia de mí. Podía

escuchar a los guardias decir: "Vas a morir aquí por lo que hiciste", y los gritos duraban horas.

45. Los tipos con los que estaba en la celda habían sido deportados de Estados Unidos y todos estuvimos de acuerdo en que no teníamos que pelear entre nosotros, y no teníamos que acercarnos a los barrotes de las otras celdas.

46. Hacia el final de mi estancia en el CECOT, los guardias nos decían que nos íbamos pronto porque éramos civiles.

47. El 8 de abril de 2025, el director llego a la celda en la que estaba y empezo a preguntar por Kilmar. Me preguntó si tenía una esposa ciudadana de los Estados Unidos y si tenía hijos con ella. Le dije que sí, y me dijo que estaría aquí por ahora y al día siguiente me sacaron de esa celda.

48. Finalmente, el 9 de abril de 2025, nos llevaron a mí y a uno de los señores mayores de nuestra celda, y a otros tres hombres de una celda diferente, y nos llevaron a una parte diferente de CECOT. En ese sector, teníamos un pequeño colchón y un plato de comida real que consistía en pollo y buen arroz. Nos tomaron fotos con los colchones mientras comíamos. Al día siguiente me llevaron, y solo a mí, al Centro Industrial.

49. Cuando llegué al Centro Industrial en Santa Ana, los oficiales vieron que tenía bultos en los pies. Les dije que me habían golpeado y hicieron que un enfermero masculino las tratara.

50. Uno de los seis hombres que nos acompañaron al Centro Industrial desde CECOT tenía una cicatriz muy mala en los tobillos debido a las cadenas y esposas que se le clavaron.

51. Cuando estuve en CECOT, no tenía idea de si alguien venía a visitar, ya que estaba al final del pasillo. Si alguna vez hubiera pasado algo en el atrio principal, no lo habría sabido.

52. En el Centro Industrial, a veces nos decían que había una visita y nos escondíamos. Básicamente, nos ponían en un cuarto con la puerta cerrada para ver películas mientras ocurría la visita.

53. Mientras estaba en el Centro Industrial, me dieron un trabajo de jardinería.

54. En el Centro Industrial tuve contacto con otros presos que me contaron que llevaban años allí.

55. Eran personas que cumplían condenas por drogas y/o asesinato. También me di cuenta de que las personas detenidas en el Centro Industrial no tenían tatuajes, ya que el centro de detención del Centro Industrial es más para delincuentes que no son pandilleros.

56. Pasé cinco noches en celdas del Centro Industrial, pero al sexto día me llevaron a la oficina y me metieron en mi propio cuarto que tenía baño, ducha y agua potable.

57. Ese día el director Osiris Luna vino a mi cuarto a hablar conmigo.

58. Me dijo que me iba a reunir con el senador de Maryland y que no podía decir nada malo de El Salvador, ni nada malo de CECOT, y que no podía hablar de lo que había pasado en CECOT. Me dijo que si hacía lo que él decía hablaría con el presidente y me sacaría

rápidamente, ya que también vio que mis tatuajes no estaban relacionados con pandillas, y que yo no tenía antecedentes penales en El Salvador ni en Estados Unidos.

59. Acepté porque quería salir y volver a casa con mi esposa y mis hijos.

60. Aproximadamente una hora después fui a reunirme con el senador. Era toda una caravana que se dirigía al Sheraton de San Salvador.

61. Tres veces durante el viaje en coche para reunirme con el senador, Osiris llamó a uno de los guardias que puso la llamada en altavoz. Osiris me recordó cada vez que teníamos un trato y que yo no podía hablar mal.

62. Cuando llegamos al Sheraton había un intérprete que había sido enviado por Osiris y estaba anotando cada palabra que yo decía.

63. Esa fue la primera vez que me di cuenta de que la gente estaba peleando por mi.

64. El senador le pidió al intérprete cinco minutos a solas conmigo y el intérprete aceptó, pero en realidad solo se fue por dos minutos.

65. Durante esos dos minutos que estuvimos solos, el senador me preguntó si alguien me había pegado y, por miedo, le dije que no. Básicamente, el intérprete volvió a entrar después de que el senador me hiciera esa pregunta.

66. Cuando terminó la reunión con el Senador, me llevaron de regreso al Centro Industrial y allí estuve hasta que me devolvieron a los Estados Unidos en un pequeño avión privado.


_____                    _____07/09/2025_____

Kilmar Abrego García                                              Fecha

KILMAR ABREGO GARCIA
SWORN DECLARATION

I, Kilmar Abrego Garcia, swear that I know the content of this statement. I also swear and affirm to the best of my knowledge and under penalty of perjury that this statement is true and correct. I sign the same with my own will.

1. My name is Kilmar Abrego Garcia. I was born on July 26, 1995, in El Salvador.
2. I was removed from the United States and taken to El Salvador and entered CECOT on March 15, 2025.
3. When the flight I was on landed in El Salvador and the doors finally opened, I was the first name they called up, so I got up and walked to the plane door.
4. At the plane door I saw that there was like a gauntlet of officials from the plane to the bus. I was at the plane door already chained and two officials grabbed my arms and pushed me down. I was still at the top of the stairs and saw that there were cameras filming. It was night but they had very bright lights where we were.
5. The officials pulled me down the stairs, and pushed me towards the ground, until we got to the bus.
6. They sat me in a seat with my head still down and put me in a second chain/handcuffs set.
7. If at any moment I looked up, the officers would hit me with their hands, telling me to keep my head down.
8. I continued to sit this way while the rest of the deportees boarded the bus and during the drive to CECOT, which was about thirty minutes.
9. Before we left the airport there was a Hispanic ICE agent on the bus talking to the Salvadoran officials telling them to verify that all twenty-one from the list were on the bus. Once we left the airport there weren't anymore ICE officials, it was just the Salvadoran officials.
10. If the officials saw us lift our heads, they would hit us in the head or back with their hands.
11. We got to CECOT and when we got off the bus I heard someone say, "welcome to CECOT. Who enters here doesn't leave."
12. When we got off the bus, they made us squat down again and made us run in this squat, but I couldn't run while squatting so at some point they had me basically hanging by my arms. The officials stopped and said, "get up fatty, you have to walk."
13. Just inside the door they took off the chains and made us strip and gave us their jail clothes. There were officials yelling at us to change faster. I was kicked in the legs with boots to get me to change faster. I was also hit in the arms and head with their hands, telling me to hurry up and change faster.

14. After changing, they put handcuffs and chains on us again. We were made to kneel. They shaved our heads with a zero razor.

15. Once our heads were shaved, they made us get up and walk to the cell. It was a long walk, and they kept telling us to walk faster and were hitting us with batons to get us to run faster.

16. I would slip on the floor because my legs hurt so much. They were basically frog-marching me, one guard under each shoulder, while they dragged me and hit me with their batons.

17. We went through a long hall and down to the last cell- cell 15.

18. The officials kept hitting me with their wooden police batons and at that point I wasn't even walking, I was being dragged.

19. Once in the cell they were saying, you're going to die from the water, it's got lead in it, whoever enters here doesn't exit.

20. They took us to the back of the cell and made us knee and said, don't move. If you sit or lie down, we will beat you.

21. We were kneeling from about 9pm to about 6am, but it felt like an eternity.

22. Aside from me there were 20 other Salvadorans in the cell. We could talk a little bit but if the officials saw us talking, they would hit us.

23. That night a lot of terrible things happened.

24. If someone fell from tiredness, they would be beaten while still chained. I saw fellow deportees with bleeding feet from the chains. The handcuffs they had us in were also incredibly tight.

25. During the night I asked to use the bathroom, but they said no. I peed myself as a result.

26. At around 6am, the officials told us we could sleep, and they finally removed the handcuffs.

27. There were four rows of beds and each row had two beds side by side, and there were about four levels of beds, so in total there were like eighty beds in a cell. The beds were made out of metal and didn't have any kind of mattress. We also didn't have a blanket or a pillow, so we just slept on the metal.

28. The next day I had bruises all over as well as lumps on my legs and arms from where I was beat.

29. The cell had two pilas, which are basically a stone or cement water basin, that had faucets. This is how we would bathe. We got soap and toothpaste about two weeks after our arrival at CECOT.

30. Aside from using the water from the pila to bathe, we would also drink from the pila. At first, we had to use the same bowl that we would use to bathe ourselves, to drink water. But eventually they gave us a cup.

31. There were no windows, and the electrical lights were on all day and all night, they never turned off.

32. We received food three times per day, but they were very small portions. We were given 1-2 tortillas, a bit of rice and a bit of beans. My stomach got used to the small portions. When I was deported from the United States I was weighing about 215 pounds, but after two weeks in CECOT I was weighing about 184 pounds.

33. When you were taken out of the cell, you were handcuffed and while you walked you were frog-marched, and the officials would beat you with their batons.

34. I went through this process 3 or 4 times as I was taken for interrogation in a different building within CECOT.

35. During the interrogation I would sit at a table while the officials, who were on the other side of the table, took pictures of my tattoos and asked me questions. They asked me about my family (who they were, where they lived), asked about my gang affiliation or membership (what gang I was in, what my alias was).

36. I was not mistreated during the interrogation, just when I was leaving the cell and when I was returning to the cell.

37. At no point during my time at CECOT was I mixed with the gang members that had been detained in El Salvador, but we could see the people in the cell in front of us and the cell next to us. I saw people with face tattoos, body tattoos, and they would try to talk to us and ask us who we were and which gang we belonged to.

38. One time during a changing of guards, in the cell in front of the cell I was in. I saw how the detainees beat one of the guys in the cell with them. They made a circle around him and beat him terribly. He didn't yell, but I could hear the beating. That's probably the worst thing I ever witnessed while at CECOT.

39. I heard beatings happening in the cell next to the cell I was in, but I didn't see those beatings.

40. The other detainees would send us little messages on paper asking who we were and where we had lived, but none of us ever answered them.

41. About three weeks after arriving at CECOT we finally got toilet paper. The toilets were basically a toilet in front of everyone. The toilets didn't have flushers, so you had to add water to the toilets from the pila.

42. The gang members that were in the cell in front of me threatened me. They told me that if I didn't tell them what gang I was from that they would kill me.

43. Count was always at 3am in CECOT.

44. Two or three times, at like 1am or 2am, I heard people that were screaming for help. These people were like 4-6 cells away from me. I could hear the guards saying, "you're going to die here for what you did," and the screaming would last for hours.

45. The guys I was in the cell with had all been deported from the United States and we all agreed that we didn't have to fight each other, and we didn't have to get close to the bars of the other cells.

46. Towards the of my time at CECOT the guards were telling us that we would be leaving soon because we were civilians.

47. On April 8, 2025, the director comes to the cell I was in and started asking for Kilmar. He asked me if I had a United States Citizen wife and if I have children with her. I told him I did, and he said I would be here for now and the following day I was moved out of that cell.

48. Finally, on April 9, 2025, they took me and one of the older guys from our cell, and three other guys from a different cell, and took us to a different part of CECOT. In that sector, we had a small mattress and a plate of real food which consisted of chicken and good rice. They took pictures of us with the mattresses while we ate our food. The next day they took me, and only me to the Centro Industrial.

49. When I arrived at Centro Industrial in Santa Ana the officials saw that I had bumps on my feet. I told them I had been beaten, and they had a male nurse treat them.

50. One of the six guys who went with us to Centro Industrial from CECOT had a very bad scar on his ankles from the chains/cuffs digging into him.

51. When I was in CECOT I had no idea if anyone ever came to visit as I was at the end of the hall. If something ever happened in the main atrium, I wouldn't have known.

52. In Centro Industrial, sometimes we were told that there was a visit, and we would hide. They would basically put us in a room with the door shut to watch movies while the visit happened.

53. While I was in Centro Industrial, I was given a gardening job.

54. In Centro Industrial I had contact with other prisoners who told me they had been there for years.

55. They were people serving sentences for drugs and/or murder. I also noticed that the people detained in Centro Industrial didn't really have tattoos, as the Centro Industrial detention center is more so for criminals who are not gang members.

56. I spent five nights in cells in Centro Industrial, but on the sixth day they took me to the office and put me in my own room which had a bathroom, with a shower, and portable water.

57. That day Director Osiris Luna came to my room to talk to me.

58. He told me I was going to be meeting with the Senator of Maryland and that I couldn't say anything bad about El Salvador, or anything bad about CECOT, and that I couldn't talk about what happened in CECOT. He told me that if I did what he said he would talk to the president and get me out quickly, as he also saw that my tattoos were not gang related, and I had no criminal registry in El Salvador or in the United States.

59. I agreed because I wanted to get out and go back home to my wife and children.

60. About an hour later I went to meet with the Senator. It was a whole caravan that went to the Sheraton in San Salvador.

61. Three times during the car ride to meet with the Senator, Osiris called one of the guards who would put the call on speaker. Osiris reminded me each time that we had a deal and that I couldn't speak badly.

62. When we arrived at the Sheraton there was an interpreter who had been sent by Osiris and he was writing down every word I said.

63. That was the first time I realized that people were fighting for me.

64. The Senator asked the interpreter for five minutes alone with me and the interpreter agreed but really only left for two minutes.

65. During those two minutes that we were alone the Senator asked me if anyone hit me, and out of fear, I said no. The interpreter basically came right back in after the Senator asked me that question.

66. When the meeting with the Senator was over I was taken back to Centro Industrial and that's where I was held until I was returned to the United States on a small private plane.


_____[SIGNATURE]_____          _____07/09/2025_____

Kilmar Abrego Garcia                          Date


---

**CERTIFICATE OF TRANSLATION**

I, **Vilma Escobar**, am competent to translate from Spanish language into English and certify that the translation of this **Affidavit** of **Kilmar Abrego Garcia** is true and accurate to the best of my abilities.

_____
Vilma Escobar
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
703-352-2399



# Application for Asylum and for Withholding of Removal

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS
Form I-589**

OMB No. 1615-0067
Expires 09/30/2027

**START HERE - Type or print in black ink. See the instructions for information about eligibility and how to complete and file this application. There is no filing fee for this application.**

NOTE: [X] Check this box if you also want to apply for withholding of removal under the Convention Against Torture.

## Part A.I.  Information About You

| **1.** Alien Registration Number(s) (A-Number) *(if any)* | **2.** U.S. Social Security Number *(any)* | **3.** USCIS Online Account Number *(if any)* |
|---|---|---|
| 201577119 | | |

| **4.** Complete Last Name | **5.** First Name | **6.** Middle Name |
|---|---|---|
| Abrego Garcia | Kilmar | Armando |

**7.** What other names have you used *(include maiden name and aliases)?*
Kilmar Abrego

**8.** Residence in the U.S. *(where you physically reside)*

| Street Number and Name | | Apt. Number |
|---|---|---|
| 421 E Spring Street 1d31 | | |

| City | State | Zip Code | Telephone Number |
|---|---|---|---|
| Cookesville | TN | 38501 | (    ) |

(**NOTE:** *You must be residing in the United States to submit this form.*)

**9.** Mailing Address in the U.S. *(if different than the address in Item Number 8)*

| In Care Of *(if applicable)*: | Telephone Number |
|---|---|
| Murray Osorio | ( 703 ) 3522399 |

| Street Number and Name | Apt. Number |
|---|---|
| 4103 Chain Bridge Road | 300 |

| City | State | Zip Code |
|---|---|---|
| Fairfax | VA | 22030 |

**10.** Sex [X] Male [ ] Female    **11.** Marital Status: [ ] Single [X] Married [ ] Divorced [ ] Widowed

| **12.** Date of Birth *(mm/dd/yyyy)* | **13.** City and Country of Birth |
|---|---|
| 07/26/1995 | El Salvador |

| **14.** Present Nationality *(Citizenship)* | **15.** Nationality at Birth | **16.** Race, Ethnic, or Tribal Group | **17.** Religion |
|---|---|---|---|
| Salvadoran | Salvadoran | Hispanic | Christian |

**18.** *Check the box, a through c, that applies:* **a.** [ ] I have never been in Immigration Court proceedings.

**b.** [ ] I am now in Immigration Court proceedings. **c.** [X] I am **not** now in Immigration Court proceedings, but I have been in the past.

**19.** *Complete 19 a through c.*

**a.** When did you last leave your country? *(mm/dd/yyyy)* 2011 **b.** What is your current I-94 Number, if any? _____

**c.** List each entry into the U.S. beginning with your most recent entry. *List date (mm/dd/yyyy), place, and your status for each entry. (Attach additional sheets as needed.)*

| Date | Place | Status | Date Status Expires |
|---|---|---|---|
| 2011 | Texas | EWI | |
| | | | |
| | | | |

| **20.** What country issued your last passport or travel document? | **21.** Passport Number | **22.** Expiration Date *(mm/dd/yyyy)* |
|---|---|---|
| | Travel Document Number | |

| **23.** What is your native language *(include dialect, if applicable)?* | **24.** Are you fluent in English? | **25.** What other languages do you speak fluently? |
|---|---|---|
| Spanish | [ ] Yes [X] No | |

## Part A.II. Information About Your Spouse and Children

| For EOIR use only. | For USCIS use only. | Action: Interview Date: _____ Asylum Officer ID No.: _____ | Decision: Approval Date: _____ Denial Date: _____ Referral Date: _____ |
|---|---|---|---|

**Your spouse**  ☐ I am not married. (Skip to **Your Children** below.)

| 1. Alien Registration Number (A-Number) (if any) n/a | 2. Passport/ID Card Number (if any) | 3. Date of Birth (mm/dd/yyyy) 12/20/1995 | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name Vasquez Sura | 6. First Name Jennifer | 7. Middle Name Stefania | 8. Other names used (include maiden name and aliases) |
| 9. Date of Marriage (mm/dd/yyyy) 06/25/2019 | 10. Place of Marriage Baltimore, Maryland | 11. City and Country of Birth Fairfax County, Virginia, USA | |
| 12. Nationality (Citizenship) US Citizen | 13. Race, Ethnic, or Tribal Group Hispanic | 14. Sex ☐ Male ☒ Female | |

**15. Is this person in the U.S.?**  ☒ Yes (Complete Blocks 16 to 24.)  ☐ No (Specify location):

| 16. Place of last entry into the U.S. n/a | 17. Date of last entry into the U.S. (mm/dd/yyyy) n/a | 18. I-94 Number (if any) | 19. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 20. What is your spouse's current status? US Citizen | 21. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) n/a | 22. Is your spouse in Immigration Court proceedings? ☐ Yes ☒ No | 23. If previously in the U.S., date of previous arrival (mm/dd/yyyy) |

**24. If in the U.S., is your spouse to be included in this application?** (Check the appropriate box.)
☐ Yes
☒ No

**Your Children.** List **all** of your children, regardless of age, location, or marital status.

☐ I do not have any children. (Skip to Part A.III., Information about your background.)

☒ I have children.  Total number of children: **1**

(**NOTE:** Use Form I-589 Supplement A or attach additional sheets of paper and documentation if you have more than four children.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) Single | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name Abrego Vasquez | 6. First Name Kilmar | 7. Middle Name Alexander | 8. Date of Birth (mm/dd/yyyy) 08/11/2019 |
| 9. City and Country of Birth Silver Spring, Maryland | 10. Nationality (Citizenship) USC | 11. Race, Ethnic, or Tribal Group Hispanic | 12. Sex ☒ Male ☐ Female |

**13. Is this child in the U.S. ?**  ☒ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location):

| 14. Place of last entry into the U.S. n/a | 15. Date of last entry into the U.S. (mm/dd/yyyy) n/a | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? US Citizen | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☒ No | |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)
☐ Yes
☒ No

**Part A.II. Information About Your Spouse and Children** (continued)

| **1.** Alien Registration Number (A-Number) *(if any)* | **2.** Passport/ID Card Number *(if any)* | **3.** Marital Status *(Married, Single, Divorced, Widowed)* | **4.** U.S. Social Security Number *(if any)* |
|---|---|---|---|
| **5.** Complete Last Name | **6.** First Name | **7.** Middle Name | **8.** Date of Birth *(mm/dd/yyyy)* |
| **9.** City and Country of Birth | **10.** Nationality *(Citizenship)* | **11.** Race, Ethnic, or Tribal Group | **12.** Sex  ☐ Male  ☐ Female |

**13.** Is this child in the U.S. ?  ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location)*:

| **14.** Place of last entry into the U.S. | **15.** Date of last entry into the U.S. *(mm/dd/yyyy)* | **16.** I-94 Number *(If any)* | **17.** Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| **18.** What is your child's current status? | **19.** What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | **20.** Is your child in Immigration Court proceedings?  ☐ Yes  ☐ No | |

**21.** If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
☐ Yes
☐ No

| **1.** Alien Registration Number (A-Number) *(if any)* | **2.** Passport/ID Card Number *(if any)* | **3.** Marital Status *(Married, Single, Divorced, Widowed)* | **4.** U.S. Social Security Number *(if any)* |
|---|---|---|---|
| **5.** Complete Last Name | **6.** First Name | **7.** Middle Name | **8.** Date of Birth *(mm/dd/yyyy)* |
| **9.** City and Country of Birth | **10.** Nationality *(Citizenship)* | **11.** Race, Ethnic, or Tribal Group | **12.** Sex  ☐ Male  ☐ Female |

**13.** Is this child in the U.S. ?  ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location)*:

| **14.** Place of last entry into the U.S. | **15.** Date of last entry into the U.S. *(mm/dd/yyyy)* | **16.** I-94 Number *(If any)* | **17.** Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| **18.** What is your child's current status? | **19.** What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | **20.** Is your child in Immigration Court proceedings?  ☐ Yes  ☐ No | |

**21.** If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
☐ Yes
☐ No

| **1.** Alien Registration Number (A-Number) *(if any)* | **2.** Passport/ID Card Number *(if any)* | **3.** Marital Status *(Married, Single, Divorced, Widowed)* | **4.** U.S. Social Security Number *(if any)* |
|---|---|---|---|
| **5.** Complete Last Name | **6.** First Name | **7.** Middle Name | **8.** Date of Birth *(mm/dd/yyyy)* |
| **9.** City and Country of Birth | **10.** Nationality *(Citizenship)* | **11.** Race, Ethnic, or Tribal Group | **12.** Sex  ☐ Male  ☐ Female |

**13.** Is this child in the U.S. ?  ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location)*:

| **14.** Place of last entry into the U.S. | **15.** Date of last entry into the U.S. *(mm/dd/yyyy)* | **16.** I-94 Number *(If any)* | **17.** Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| **18.** What is your child's current status? | **19.** What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | **20.** Is your child in Immigration Court proceedings?  ☐ Yes  ☐ No | |

**21.** If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
☐ Yes
☐ No

## Part A.III. Information About Your Background

1. List your last address where you lived before coming to the United States. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State and Country.)*
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| | Colonia 10 de Octubre | San Salvador | El Salvador | 01/10 | 10/11 |
| | Los Nogales | San Salvador | El Salvador | 1995 | 2010 |

2. Provide the following information about your residences during the past 5 years. List your present address first.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 421 E Spring St. #1D31 | Cookeville | Tennessee | USA | 2025 | PRESENT |
| 1816 Greenwich Wood Dr., Apt.11 | Silver Spring | Maryland | USA | 04/2023 | 03/2025 |
| 4502 Samar Street | Beltsville | Maryland | USA | 04/2022 | 04/2023 |
| 4501 Birchtree Lane | Temple Hills | Maryland | USA | 2019 | 04/2022 |
| | | | | | |

3. Provide the following information about your education, beginning with the most recent school that you attended.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name of School | Type of School | Location *(Address)* | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| Domingo Faustino Sarmiento | Secondary | San Marcos, El Salvador | 09/99 | 06/11 |
| | | | | |
| | | | | |
| | | | | |

4. Provide the following information about your employment during the past 5 years. List your present employment first.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| Bowers, Beltsville, Maryland | Sheet Metal Worker | 2024 | 03/2025 |
| Self Employed- various locations | Subcontractor | 2019 | 2024 |
| | | | |

5. Provide the following information about your parents and siblings (brothers and sisters). Check the box if the person is deceased.
   *(NOTE: Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Full Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* Cecilia Garcia de Abrego | Cabanas, El Salvador | ☐ Deceased  United States |
| *Father* Pedro Armando Abrego | San Vicente, El Salvador | ☐ Deceased  El Salvador |
| *Sibling* Carlos Abrego | San Vicente, El Salvador | ☐ Deceased  United States |
| *Sibling* Cesar Abrego Garcia | San Vicente, El Salvador | ☐ Deceased  United States |
| *Sibling* Brenda Abrego Garcia | San Vicente, El Salvador | ☐ Deceased  El Salvador |
| *Sibling* Karen Abrego Garcia | San Vicente, El Salvador | ☐ Deceased  El Salvador |

## Part B. Information About Your Application

*(**NOTE:** Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the INA or withholding of removal under the Convention Against Torture), you must provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You must attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, explain why in your responses to the following questions.

Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, Completing the Form," Part B, and Section VII, "Additional Evidence That You Should Submit," for more information on completing this section of the form.

1.  Why are you applying for asylum or withholding of removal under section 241(b)(3) of the INA, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below.

   I am seeking asylum or withholding of removal based on:

   ☐ Race                          ☒ Political opinion

   ☐ Religion                       ☒ Membership in a particular social group

   ☐ Nationality                    ☒ Torture Convention

---

**A.** Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

   ☐ No     ☒ Yes

If "Yes," explain in detail:
1. What happened;
2. When the harm or mistreatment or threats occurred;
3. Who caused the harm or mistreatment or threats; and
4. Why you believe the harm or mistreatment or threats occurred.

```
I have been beaten and tortured by the Salvadoran Government on account of my imputed political
opinion and on account of being labeled a MS-13 gang member.
Please see my affidavit for additional details.
```

**B.** Do you fear harm or mistreatment if you return to your home country?

   ☐ No     ☒ Yes

If "Yes," explain in detail:
1. What harm or mistreatment you fear;
2. Who you believe would harm or mistreat you; and
3. Why you believe you would or could be harmed or mistreated.

```
I fear I will be harmed, tortured, or killed by the Salvadoran Government if I am forced to
return to El Salvador because of my imputed political opinion and on account of being labeled a
MS-13 gang member.
```

## Part B. Information About Your Application (continued)

**2.** Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States (including for an immigration law violation)?

☐ No    ☒ Yes

If "Yes," explain the circumstances and reasons for the action.

> I was detained in CECOT and in Santa Ana in El Salvador.

**3.A.** Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No    ☒ Yes

If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

> My father served in the police force and both of my parents belonged to the ARENA political party. My father was also part of the Taxi Union called La Ceiba de Guadalupe.
>
> My entire family is Catholic.

**3.B.** Do you or your family members continue to participate in any way in these organizations or groups?

☐ No    ☒ Yes

If "Yes," describe for each person your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

> My entire family is still Catholic.

**4.** Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No    ☒ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

> I fear I will be harmed, tortured, or killed by the Salvadoran Government if I am forced to return to El Salvador because of my imputed political opinion and on account of being labeled a MS-13 gang member.

## Part C. Additional Information About Your Application

(**NOTE:** *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.*)

1. Have you, your spouse, your child(ren), your parents or your siblings ever applied to the U.S. Government for refugee status, asylum, or withholding of removal?

   [ ] No          [X] Yes

   If "Yes," explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Indicate whether or not you were included in a parent or spouse's application. If so, include your parent or spouse's A-number in your response. If you have been denied asylum by an immigration judge or the Board of Immigration Appeals, describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

   > I was granted Withholding of Removal by the Immigration Judge on October 10, 2019.

2.A. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren) who are now in the United States travel through or reside in any other country before entering the United States?

   [X] No          [ ] Yes

2.B. Have you, your spouse, your child(ren), or other family members, such as your parents or siblings, ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?

   [X] No          [ ] Yes

   If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay, the person's status while there, the reasons for leaving, whether or not the person is entitled to return for lawful residence purposes, and whether the person applied for refugee status or for asylum while there, and if not, why he or she did not do so.

3. Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

   [X] No          [ ] Yes

   If "Yes," describe in detail each such incident and your own, your spouse's, or your child(ren)'s involvement.

## Part C. Additional Information About Your Application (continued)

**4.** After you left the country where you were harmed or fear harm, did you return to that country?

☐ No          ☒ Yes

If "Yes," describe in detail the circumstances of your visit(s) (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s).)

```
I was wrongfully removed to El Salvador in 2025 and was detained upon my arrival. I was brought
by the U.S. Government and was paroled into the United States on June 6, 2025.
```

**5.** Are you filing this application more than 1 year after your last arrival in the United States?

☒ No          ☐ Yes

If "Yes," explain why you did not file within the first year after you arrived.  You must be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived.  For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V. "Completing the Form," Part C.

**6.** Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted, or sentenced for any crimes in the United States (including for an immigration law violation)?

☐ No          ☒ Yes

If "Yes," for each instance, specify in your response: what occurred and the circumstances, dates, length of sentence received, location, the duration of the detention or imprisonment, reason(s) for the detention or conviction, any formal charges that were lodged against you or your relatives included in your application, and the reason(s) for release.  Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

```
To be supplemented.
```

## Part D. Your Signature

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct.  Title 18, United States Code, Section 1546(a), provides in part: Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned for up to 25 years.  I certify that I am physically present in the United States or seeking admission at a Port of Entry when I execute this application.  I authorize the release of any information from my immigration record that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefit I am seeking.

*WARNING:*  **Applicants who are in the United States unlawfully are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an immigration judge.  Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn.  Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act.  You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application.  If filing with USCIS, unexcused failure to appear for an appointment to provide biometrics (such as fingerprints) and your biographical information within the time allowed may result in an asylum officer dismissing your asylum application or referring it to an immigration judge.  Failure without good cause to provide DHS with biometrics or other biographical information while in removal proceedings may result in your application being found abandoned by the immigration judge.  See sections 208(d)(5)(A) and 208(d)(6) of the INA and 8 CFR sections 208.10, 1208.10, 208.20, 1003.47(d) and 1208.20.**

| Print your complete name. | Write your name in your native alphabet. |
|---|---|
| Kilmar Abrego Garcia | |

Did your spouse, parent, or child(ren) assist you in completing this application?  [X] No    [ ] Yes *(If "Yes," list the name and relationship.)*

_____    _____    _____    _____
        *(Name)*                     *(Relationship)*                  *(Name)*                    *(Relationship)*

Did someone other than your spouse, parent, or child(ren) prepare this application?    [ ] No    [X] Yes *(If "Yes," complete Part E.)*

Asylum applicants may be represented by counsel.  Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?    [ ] No    [X] Yes

Signature of Applicant *(The person in Part. A.I.)*

➡ [ /signature/ ]        07/09/2025
    Sign your name so it all appears within the brackets        Date (mm/dd/yyyy)

## Part E.  Declaration of Person Preparing Form, if Other Than Applicant, Spouse, Parent, or Child

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

| Signature of Preparer | Print Complete Name of Preparer |
|---|---|
| /signature/ | Benjamin Osorio |

| Daytime Telephone Number | Address of Preparer: Street Number and Name |
|---|---|
| ( 703 ) 3522399 | 4103 Chain Bridge Road |

| Apt. Number | City | State | Zip Code |
|---|---|---|---|
| 300 | Fairfax | VA | 22030 |

| **To be completed by an attorney or accredited representative** (if any). | [X] Select this box if Form G-28 is attached. | Attorney State Bar Number (if applicable)<br>194702 | Attorney or Accredited Representative USCIS Online Account Number (if any)<br> |

## Part F. To Be Completed at Asylum Interview, if Applicable

**NOTE:** *You will be asked to complete this part when you appear for examination before an asylum officer of the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered ____ to ____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Asylum Officer

## Part G. To Be Completed at Removal Hearing, if Applicable

**NOTE:** *You will be asked to complete this Part when you appear before an immigration judge of the U.S. Department of Justice, Executive Office for Immigration Review (EOIR), for a hearing.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Immigration Judge

E

## Notice of Fear of Removal to UGANDA

I, Kilmar Armando Abrego Garcia (A201-577-119), hereby state that I fear persecution in UGANDA on account of my race, nationality, political opinion, and membership in a particular social group. I also fear torture by or at the acquiescence of a public official in that country. Finally, I feat that country will refoul me (re-deport me) to EL SALVADOR, where I also fear persecution on account of the above-mentioned protected grounds and torture by or at the acquiescence of a public official, and where I have been tortured in the past.

Date: 08-23-25

Kilmar Armando Abrego Garcia



August 25, 2025

Baltimore – ERO
Baltimore Field Office
31 Hopkins Plaza
6th Floor
Baltimore, MD 21201
Baltimore.Outreach@ice.dhs.gov

Re:     Kilmar Abrego Garcia
        A# 201-577-119

        Articulation of Fear of Persecution or Torture in Identified Countries and
        Demand for Stay of Removal and Reopening if DHS Intends to Remove to Any of the
        Identified Countries

To Whom It May Concern,

        I represent Kilmar Abrego Garcia in his Immigration Proceedings. Mr. Abrego Garcia
was granted Withholding of Removal on October 10, 2019. As such, the Department of
Homeland Security (DHS) cannot deport Mr. Abrego Garcia to El Salvador.

I understand that ICE is actively pursuing removal of Mr. Abrego Garcia to Uganda. By this
letter, **I am articulating a fear of persecution and torture on behalf of Mr. Abrego Garcia
to be removed to:** Uganda, Mexico, Belize, Costa Rica, Guatemala, Honduras, Nicaragua,
Panama, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador. Paraguay, Peru, Uruguay,
Venezuela, Cuba, Dominican Republic, and Haiti. **Mr. Abrego Garcia reserves the right to
claim fear toward any other country where DHS may attempt to deport him if the
Department attempts to remove him elsewhere.**

Should DHS intend to deport Mr. Abrego Garcia to any of the countries listed above, DHS
must comply with its obligations to:

- provide notice of the intent to deport to one of the designated countries;
- notify the ICE Office of the Principal Legal Advisor so that it can move to reopen
  removal proceedings to designate a new country of removal and allow Mr. Abrego
  Garcia to present his fear-based claim to an immigration judge; and
- stay Mr. Abrego Garcia's removal until his fear-based claim is adjudicated by an
  immigration judge.

The failure to comply with these obligations would violate Mr. Abrego Garcia's statutory,
regulatory, and due process rights, and the United States' commitment to non-refoulement
under international law. *See* Immigration and Nationality Act § 241(b)(3); Due Process
Clause of the Fifth Amendment; Foreign Affairs Reform and Restructuring Act of 1998, Pub.
L. No. 105–277, div. G, tit. XXII, § 2242(a), 112 Stat. 2681, 2681–822 (1998) (codified at
Note to 8 U.S.C. § 1231); *see also* 8 C.F.R. § 1240.10(f); 8 C.F.R. § 1240.11(c)(1)(i). It

Fairfax, VA | Silver Spring, MD | Newark, NJ
Tel: 800-929-7142 | Fax: 703-763-2304

would also be in direct violation of the preliminary injunction in *D.V.D. v. U.S. DHS*, 1:25-cv-10676-BEM (D. Mass. Apr. 18, 2025).

Thank you for your prompt attention to this matter. We hope that your office will comply with its legal obligations to ensure that Mr. Abrego Garcia is not deported to a country in which he fears persecution or torture without meaningful notice and opportunity to pursue a protection claim so that we may avoid pursuing other avenues to seek redress of any violation.

Sincerely,

Benjamin Osorio, Esq.
*Counsel for Mr. Abrego Garcia*

Attachment:  Form G-28 (Notice of Appearance of Attorney or Representative) for Benjamin Osorio, Esq.

Form G-28 (Notice of Appearance of Attorney or Representative) for Simon Sandoval-Moshenberg, Esq.

Order Granting Withholding of Removal or CAT Protection

Preliminary Injunction, *D.V.D. v. U.S. DHS*, 1:25-cv-10676-BEM (D. Mass. Apr. 18, 2025).

Fairfax, VA | Silver Spring, MD | Newark, NJ
Tel: 800-929-7142 | Fax: 703-763-2304



# Notice of Entry of Appearance
## as Attorney or Accredited Representative
### Department of Homeland Security

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 05/31/2021

---

## Part 1. Information About Attorney or Accredited Representative

1. USCIS Online Account Number (if any)

   ▶ _____

### Name of Attorney or Accredited Representative

2.a. Family Name (Last Name)    `Osorio`

2.b. Given Name (First Name)    `Benjamin`

2.c. Middle Name    _____

### Address of Attorney or Accredited Representative

3.a. Street Number and Name    `4103 Chain Bridge Road`

3.b. ☐ Apt. ☒ Ste. ☐ Flr. `300`

3.c. City or Town    `Fairfax`

3.d. State `VA`    3.e. ZIP Code *(USPS ZIP Code Lookup)* `22030`

3.f. Province    _____

3.g. Postal Code    _____

3.h. Country

`United States`

### Contact Information of Attorney or Accredited Representative

4. Daytime Telephone Number

   `7033522399`

5. Mobile Telephone Number (if any)

   _____

6. Email Address (if any)

   `benjamin@murrayosorio.com`

7. Fax Number (if any)

   `7037632304`

## Part 2. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

1.a. ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

Licensing Authority

`Georgia`

1.b. Bar Number (if applicable)

`194702`

1.c. I (select **only one** box) ☒ am not ☐ am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

1.d. Name of Law Firm or Organization (if applicable)

`Murray Osorio PLLC`

2.a. ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

2.b. Name of Recognized Organization

_____

2.c. Date of Accreditation (mm/dd/yyyy)

_____

3. ☐ I am associated with

   _____,

   the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

4.a. ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2).

4.b. Name of Law Student or Law Graduate

_____

---

## Part 3. Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

This appearance relates to immigration matters before (select **only one** box):

**1.a.** ☐ U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

[                                              ]

**2.a.** ☒ U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

[ All Matters                                  ]

**3.a.** ☐ U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

[                                              ]

**4.** Receipt Number (if any)

▶ [                                            ]

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select **only one** box):
☐ Applicant   ☐ Petitioner   ☐ Requestor
☐ Beneficiary/Derivative   ☒ Respondent (ICE, CBP)

## Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)

**6.a.** Family Name (Last Name)   [ Abrego Garcia ]

**6.b.** Given Name (First Name)   [ Kilmar ]

**6.c.** Middle Name   [            ]

**7.a.** Name of Entity (if applicable)   [            ]

**7.b.** Title of Authorized Signatory for Entity (if applicable)   [            ]

**8.** Client's USCIS Online Account Number (if any)

▶ [                                            ]

**9.** Client's Alien Registration Number (A-Number) (if any)

▶ A- [ 2 0 1 5 7 7 1 1 9 ]

## Client's Contact Information

**10.** Daytime Telephone Number   [            ]

**11.** Mobile Telephone Number (if any)   [            ]

**12.** Email Address (if any)   [            ]

## Mailing Address of Client

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name   [ 4103 Chain Bridge Road ]

**13.b.** ☐ Apt.   ☒ Ste.   ☐ Flr.   [ 300 ]

**13.c.** City or Town   [ Fairfax ]

**13.d.** State [ VA ]   **13.e.** ZIP Code [ 22030 ]

**13.f.** Province   [            ]

**13.g.** Postal Code   [            ]

**13.h.** Country   [            ]

## Part 4. Client's Consent to Representation and Signature

### Consent to Representation and Release of Information

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

## Part 4. Client's Consent to Representation and Signature (continued)

### *Options Regarding Receipt of USCIS Notices and Documents*

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery. USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below. You may change these elections through written notice to USCIS.

**1.a.** ☐ I request that USCIS send original notices on an application or petition to the business address of my attorney or accredited representative as listed in this form.

**1.b.** ☐ I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

**NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative. If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

**1.c.** ☐ I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### *Signature of Client or Authorized Signatory for an Entity*

**2.a.** Signature of Client or Authorized Signatory for an Entity
➡ [signature]

**2.b.** Date of Signature (mm/dd/yyyy)    08/23/2025

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS. I declare under penalty of perjury under the laws of the United States that the information I provided on this form is true and correct.

**1. a.** Signature of Attorney or Accredited Representative
[signature]

**1.b.** Date of Signature (mm/dd/yyyy)    [blank]

**2.a.** Signature of Law Student or Law Graduate
08/23/2025

**2.b.** Date of Signature (mm/dd/yyyy)    [blank]

## Part 6. Additional Information

If you need extra space to provide any additional information within this form, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper. Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a** Family Name (Last Name)  Abrego Garcia

**1.b.** Given Name (First Name)  Kilmar

**1.c.** Middle Name  Armando

**2.a.** Page Number

**2.b.** Part Number

**2.c.** Item Number

**2.d.** _____

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.** _____

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.** _____

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.** _____

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.** _____



# Notice of Entry of Appearance
## as Attorney or Accredited Representative

**Department of Homeland Security**

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 05/31/2021

---

## Part 1. Information About Attorney or Accredited Representative

**1.** USCIS Online Account Number (if any)

▶ [                    ]

### Name of Attorney or Accredited Representative

**2.a.** Family Name (Last Name) `SANDOVAL MOSHENBERG`

**2.b.** Given Name (First Name) `SIMON`

**2.c.** Middle Name [        ]

### Address of Attorney or Accredited Representative

**3.a.** Street Number and Name `4103 CHAIN BRIDGE RD`

**3.b.** ☐ Apt. ☒ Ste. ☐ Flr. `300`

**3.c.** City or Town `FAIRFAX`

**3.d.** State `VA`  **3.e.** ZIP Code `22030`

**3.f.** Province [        ]

**3.g.** Postal Code [        ]

**3.h.** Country `USA`

### Contact Information of Attorney or Accredited Representative

**4.** Daytime Telephone Number `7033522399`

**5.** Mobile Telephone Number (if any) [        ]

**6.** Email Address (if any) `ssandoval@murrayosorio.com`

**7.** Fax Number (if any) `7037632304`

## Part 2. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

**1.a.** ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

Licensing Authority

`SUPREME COURT OF VIRGINIA`

**1.b.** Bar Number (if applicable)

`77110`

**1.c.** I (select **only one** box) ☒ am not ☐ am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

**1.d.** Name of Law Firm or Organization (if applicable)

`MURRAY OSORIO PLLC`

**2.a.** ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

**2.b.** Name of Recognized Organization

[        ]

**2.c.** Date of Accreditation (mm/dd/yyyy)

[        ]

**3.** ☐ I am associated with

[        ],

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

**4.a.** ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2).

**4.b.** Name of Law Student or Law Graduate

[        ]

---

43

## Part 3. Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

This appearance relates to immigration matters before (select **only one** box):

**1.a.** ☐ U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

**2.a.** ☒ U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

All Matters

**3.a.** ☐ U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

**4.** Receipt Number (if any)

▶

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select **only one** box):
☐ Applicant    ☐ Petitioner    ☐ Requestor
☐ Beneficiary/Derivative    ☒ Respondent (ICE, CBP)

## Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)

**6.a.** Family Name (Last Name)    Abrego Garcia

**6.b.** Given Name (First Name)    Kilmar

**6.c.** Middle Name

**7.a.** Name of Entity (if applicable)

**7.b.** Title of Authorized Signatory for Entity (if applicable)

**8.** Client's USCIS Online Account Number (if any)
▶

**9.** Client's Alien Registration Number (A-Number) (if any)
▶ A- 2 0 1 5 7 7 1 1 9

## Client's Contact Information

**10.** Daytime Telephone Number

**11.** Mobile Telephone Number (if any)

**12.** Email Address (if any)

## Mailing Address of Client

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name    4103 Chain Bridge Road

**13.b.** ☐ Apt.  ☒ Ste.  ☐ Flr.    300

**13.c.** City or Town    Fairfax

**13.d.** State    VA    **13.e.** ZIP Code    22030

**13.f.** Province

**13.g.** Postal Code

**13.h.** Country

## Part 4. Client's Consent to Representation and Signature

### Consent to Representation and Release of Information

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

## Part 4. Client's Consent to Representation and Signature (continued)

### Options Regarding Receipt of USCIS Notices and Documents

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery. USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below. You may change these elections through written notice to USCIS.

**1.a.** [X] I request that USCIS send original notices on an application or petition to the business address of my attorney or accredited representative as listed in this form.

**1.b.** [X] I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

**NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative. If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

**1.c.** [ ] I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### Signature of Client or Authorized Signatory for an Entity

**2.a.** Signature of Client or Authorized Signatory for an Entity

➡ /s/ Kilmar Abrego Garcia

**2.b.** Date of Signature (mm/dd/yyyy)    08/23/2025

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

**1. a.** Signature of Attorney or Accredited Representative

**1.b.** Date of Signature (mm/dd/yyyy)    08/23/2025

**2.a.** Signature of Law Student or Law Graduate

**2.b.** Date of Signature (mm/dd/yyyy)

## Part 6. Additional Information

If you need extra space to provide any additional information within this form, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper. Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a** Family Name (Last Name)  `Abrego Garcia`

**1.b.** Given Name (First Name)  `Kilmar`

**1.c.** Middle Name

**2.a.** Page Number

**2.b.** Part Number

**2.c.** Item Number

**2.d.** _____

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.** _____

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.** _____

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.** _____

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.** _____

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BALTIMORE, MARYLAND

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN REMOVAL PROCEEDINGS |
| | ) | |
| | ) | |
| Kilmar Armando ABREGO-GARCIA | ) | File #A 201-577-119 |
| | ) | |
| | ) | |
| RESPONDENT | ) | |

**INDIVIDUAL HEARING DATE:**    August 9 and September 27, 2019

**CHARGE:**    Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA" or the "Act"), as amended, in that the Respondent is an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General.

**APPLICATIONS:**    INA § 208, Asylum; INA § 241(b)(3), Withholding of Removal; Protection Under Article 3 of the Convention Against Torture.

### APPEARANCES

**ON BEHALF OF RESPONDENT**
Lucia Curiel
Khatia Mikadze

**ON BEHALF OF THE DHS**
Amy Donze-Sanchez

### MEMORANDUM OF DECISION AND ORDER

## I.    Procedural History

The Respondent is a native and citizen of El Salvador. The Department of Homeland Security ("DHS") issued the Respondent a Notice to Appear ("NTA") on March 29, 2019 which alleged that the Respondent: (1) is not a citizen or national of the United States; (2) is a native and citizen of El Salvador; (3) entered the United States at or near an unknown place on or about an

unknown date; and (4) was not then admitted or paroled after inspection by an immigration officer.

At a Master Calendar Hearing the Respondent, through counsel, admitted the factual allegations contained in the NTA and conceded removability as charged. Based on the Respondent's admissions and concessions, the Court found his removability to be established by clear and convincing evidence as required by INA § 240(c)(3). *See also Woodby v. INS*, 385 U.S. 276 (1966). As relief from removal, the Respondent filed a Form I-589, Application for Asylum, Withholding of Removal, and Relief under Article 3 of the Convention Against Torture ("CAT"). The Respondent and his wife both testified in support of the applications. The Court reserved the matter for the issuance of a written decision.

The Court has considered the arguments of both parties and the entire record carefully. The following documentary evidence was considered by the Court and admitted into the record: Exhibit 1, the Notice to Appear; Exhibit 2, the I-213; Exhibit 3, the Respondent's application with all supporting documents; and Exhibit 5, Part A, explanation of the wife's pregnant condition while testifying.[1] All evidence and testimony admitted has been considered, even if not specifically addressed in the decision. Having reviewed the evidence of record and the applicable law, the Court's written decision and order now follow.

## II.  <u>**Testimonial Evidence Presented**</u>

### A. Respondent

The Respondent is a 24-year old native of El Salvador. He was born in 1995 in Los Nogales neighborhood, San Salvador, El Salvador. The Respondent testified that he fears returning to his country because the Barrio 18 gang was targeting him and threatening him with death because of his family's pupusa[2] business. The Respondent's mother, Cecilia, ran the business out of her home. Although the business had no formal storefront, everyone in the town knew to get their pupusas from "Pupuseria Cecilia." The Respondent's father, brother and two sisters all helped run the family business. The Respondent's job was to go to the grocery store to buy the supplies needed for the pupusas, and then he and his brother would do deliveries four days a week to the people in

---

[1] Exhibit 4 is a Prince George's County Police Department Gang Field Interview Sheet. It was admitted for the limited purpose of showing that the Respondent was labeled a gang member by law enforcement.

[2] El Salvadorian stuffed tortillas.

the town that ordered pupusas from Cecilia.

At some point, Barrio 18 realized the family was making money from their family business and they began extorting the Respondent's mother, Cecilia. They demanded a regular stipend of "rent" money from the business, beginning with a monthly payment and then requiring weekly payments. The gang threatened to harm the Respondent, his older brother Cesar, and the family in general if their demands were not met. Alternatively, they told Cecelia that if she could not pay the extortion money, she could turn Cesar over to them to become part of their gang. The Abrego family paid the money on a regular basis, whenever they could, and hid Cesar from the gang. On one occasion, the gang came to the family's home and threatened to kill Cesar if the family did not pay the rent. The family responded by sending Cesar to the U.S.

After Cesar left, the gang started recruiting the Respondent. They told Cecilia that she would not have to pay rent any more if she let him join the gang. The mother refused to let this happen. The gang then threatened to kill the Respondent. When the Respondent was around 12-years old, the gang came to the home again, telling Cecilia that they would take him because she wasn't paying money from the family's pupusa business. The Respondent's father prevented the gang from taking the Respondent that day by paying the gang all of the money that they wanted. During the days, the gang would watch the Respondent when he went back and forth to school. The members of the gangs all had many tattoos and always carried weapons.

Eventually, the family had enough and moved from Los Nogales to the 10th of October neighborhood. This town was about 10 minutes away, by car, from Los Nogales. Shortly after the family moved, members of Barrio 18 from Nogales went to the 10th of October and let their fellow gang members know that the family had moved to that neighborhood. Barrio 18 members visited the house demanding the rent money from the pupusa business again. They went to the house twice threatening to rape and kill the Respondent's two sisters and threatening the Respondent. The Respondent's parents were so fearful that they kept the Respondent inside the home as much as possible. Finally, the family decided they had to close the pupusa business and move to another area, Los Andes, about a 15 minute drive from their last residence. Even at this new location, the family kept the Respondent indoors most of the time because of the threats on his life. After four months of living in fear, the Respondent's parents sent the Respondent to the U.S.

Even though the Respondent's father was a former policeman, they family never reported anything to the police regarding the gang extorting the family business. The gang members had

3

threatened Cecilia, telling her that if she ever reported anything to the police that they would kill the entire family. The family believed them, because they were well aware of the rampant corruption of the police in El Salvador and they believed that if they reported it to the police, the police would do nothing.

At present, even though the family has now shut down the pupusa business, Barrio 18 continues to harass and threaten the Respondent's two sisters and parents in Guatemala. Additionally, they have targeted a brother-in-law who now lives with the family.

### B.  The Respondent's Wife

The Respondent's wife also testified, but her testimony related to two other particular social groups not reached in this decision.[3]

## III.  Eligibility for Asylum, Withholding and CAT Relief

### A.  Asylum

An applicant for asylum bears the burden of establishing that he meets the definition of a refugee under INA § 101(a)(42)(A), which defines a refugee in part as an alien who is unable or unwilling to return to her home country because of persecution, or a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1996); 8 C.F.R. § 1208.13(a); INA § 208(b)(1)(B). The alien's fear of persecution must be country-wide. *Matter of Acosta*, 19 I&N Dec. 211, 235 (BIA 1985). Additionally, the alien must establish that he is unable or unwilling to avail himself of the protection of his country of nationality or last habitual residence. INA § 101(a)(42)(A); *see also Matter of A-B-*, 27 I&N Dec. 316, 325–26 (A.G. 2018).  An applicant who establishes statutory eligibility for asylum still bears the burden of demonstrating that he merits a grant of asylum as a matter of discretion. INA § 208(b)(1); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).

#### i.  Credibility and Corroboration

An alien bears the evidentiary burden of proof and persuasion in connection with any

---

[33] The other two particular social groups are: 1) Salvadoran male deportees labeled as MS-13 gang members by U.S. law enforcement; and 2) Immediate family of Jennifer Vasquez (the Respondent's wife.) The Court will not address the alternative claims for relief, as it is not necessary to do so at this time.

asylum application pursuant to section 208 of the Act. 8 C.F.R. § 1208.13(a); *see also Matter of S-M-J-*, 21 I&N Dec. 722, 723 (BIA 1997); *Matter of Acosta*, 19 I&N Dec. 211, 215 (BIA 1985); *Matter of Mogharrabi*, 19 I&N Dec. 439, 446 (BIA 1987). The Board of Immigration Appeals (BIA) has recognized the difficulties an asylum applicant may face in obtaining documentary or other corroborative evidence to support his claim of persecution. *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989). As a result, uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. *See* INA § 208(b)(1)(B)(ii); 8 C.F.R. § 1208.13(a); *Matter of Mogharrabi*, at 445. However, where it is reasonable to expect corroborating evidence for certain alleged facts, such evidence must be provided as long as the applicant has the evidence or can reasonably obtain it. *Matter of S-M-J-*, 21 I&N Dec. at 725. The absence of such corroboration may lead to a finding that an applicant has failed to meet his burden of proof. *Id.* at 725–26. The immigration judge must provide the applicant an opportunity to explain the lack of corroborating evidence and ensure that the applicant's explanation is included in the record. *See id.*; *Lin-Jian v. Gonzales*, 489 F.3d 182, 192 (4th Cir. 2007). The Board has made clear that an asylum applicant cannot meet his burden of proof by "general and vague" testimony, and "the weaker an alien's testimony, the greater the need for corroborative evidence." *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

In the instant matter, the Respondent provided credible responses to the questions asked. His testimony was internally consistent, externally consistent with his asylum application and other documents, and appeared free of embellishment. Further, he provided substantial documentation buttressing his claims. Included in this evidence were several affidavits from family members that described the family's pupusa business, and the threats by Barrio 18 to the various family members—in particular the Respondent—over the years. The court finds the Respondent credible. This finding is applicable to his other two claims as well (withholding under the Act and CAT protection).

### ii.    One-Year Filing Deadline

Under INA § 208(a)(2)(B), an applicant for asylum must demonstrate by clear and convincing evidence that the application has been filed within one year after the date of the alien's arrival in the United States. Following the *Mendez Rojas v. Johnson* case (305 F. Supp. 3d 1176 (W.D. Wash., Mar. 29, 2018)), in a joint stay agreement, the Government agreed to treat pending

asylum applications by four classes of applicants as though filed within one year of arrival.[4] *See* 305 F. Supp. 3d at 1179. Members of Class A.II are individuals in removal proceedings who have been released from DHS custody after having been found to possess a credible fear of persecution, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.* Members of Class B.II are individuals in removal proceedings who express a fear of return to their country of origin, were released from DHS custody without a credible fear determination, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.*

Here, the Respondent's asylum application is time-barred without exception. INA § 208(a)(2)(B); 8 C.F.R. § 1208.4(a)(2). The Respondent testified that he entered the U.S. in 2012. However, he did not file his application for asylum until after he was detained in August 2019, seven years after his entry into the U.S. and well-beyond the one-year filing deadline. *See* Exh. 3. He has shown no changed or extraordinary circumstances that would entitle him to relief from the one-year bar. See 8 C.F.R. § 1208.4(a)(4) and (5). Based on the foregoing, the Respondent's application for asylum is time-barred and must be denied. We turn next to withholding of removal under the Act.

**B.    Withholding of Removal Pursuant to INA § 241(b)(3)**

Withholding of removal, in contrast to asylum, confers only the right not to be deported to a particular country rather than the right to remain in the U.S. *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999). To establish eligibility for withholding of removal, a respondent must show that there is a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407 (1984). Such a showing requires that the respondent establish that it is more likely than not (i.e., a clear probability) that the alien would be subject to persecution if returned to the country from which the alien seeks withholding of removal. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). The standard for withholding of removal is thus more stringent than the standard for asylum. *Stevic*, 467 U.S. at 429-430. Under the withholding of removal regulations at 8 C.F.R. § 1208.16(b)(1), however, if an applicant has suffered past persecution, then there is a presumption that the applicant's life or freedom would be threatened in the future in the country of removal.

---

[4] Classes A.I and B.I apply only to individuals who are not in removal proceedings. *See Mendez Rojas*, 305 F. Supp. 3d at 1179.

### i.    Past Persecution

Persecution has been interpreted to include serious threats to an individual's life or freedom, or the infliction of significant harm on the applicant. *See Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); *Li v. Gonzales*, 405 F.3d 171 (4th Cir. 2005). Persecution is generally assessed cumulatively, and relevant incidents are not to be evaluated in isolation. *See Baharon v. Holder*, 588 F.3d 228 (4th Cir. 2009). A death threat qualifies as persecution. *See Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011). Extortion may constitute persecution, even if physical harm will be inflicted only upon failure to pay. *Oliva v. Lynch*, 807 F.3d 53 (4th Cir. 2015).

The Respondent suffered past persecution as he was threatened with death on more than one occasion. Therefore, DHS bears the burden of establishing "a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds" or that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *See* 8 C.F.R. § 1208.16(b)(1).

The "one central reason" standard that applies to asylum applications pursuant to section 208(b)(1)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(1)(B)(i) (2006), also applies to applications for withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006). *Matter of C-T-L-*, 25 I&N Dec. 341 (BIA 2010). An applicant must demonstrate that a statutorily protected ground would be "at least one central reason" for the feared persecution. *See* INA § 208(b)(1)(B)(i); *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208 (BIA 2007) (holding that in a mixed motive asylum case, an applicant must prove that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for the claimed persecution). An alien need not show that a statutorily protected ground would be the central reason or even a dominant central reason, but rather must show that such a ground was more than an "incidental, tangential, superficial or subordinate" reason for the past persecution or feared future persecution. *Matter of J-B-N- & S-M-,* 24 I&N Dec. at 214; *see also Crespin-Valladares v. Holder,* 632 F.3d 117 (4th Cir. 2011); *Quinteros-Mendoza v. Holder,* 556 F.3d 159, 164 (4th Cir. 2009). Persecution may be on account of multiple central reasons or intertwined reasons, and the full factual context must be taken into account when analyzing nexus. *Oliva v. Lynch*, 807 F.3d 53 (4th Cir. 2015).

### ii.    Well-Founded Fear of Future Persecution and Internal Relocation

Based on the above, the Respondent has demonstrated the he was subject to past persecution on account of a statutorily protected ground. He is entitled to the presumption under the regulations that he would have a clear probability of future persecution on account of a protected ground. Given his testimony and other evidence concerning official corruption and other abuses, he has demonstrated that authorities were and would be unable or unwilling to protect him from past or feared future persecution. Given country conditions and the Respondent's inability to avoid the threat through internal relocation, the Respondent could not necessarily avoid the threat through internal relocation, nor would it be reasonable to expect him to do so. DHS has failed to carry their burden to show that there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable. The facts here show that the Barrio 18 gang continues to threaten and harass the Abrego family over these several years, and does so even though the family has moved three times.[5]

### iii.    Nexus to a Protected Ground

To be cognizable under the statute, members of a "particular social group" must share a "common immutable characteristic," which may be an innate characteristic or a shared past experience. *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). In either case, it must be a characteristic that members of the group either cannot change or should not be required to change. To constitute a "particular social group" under the statute, the group must be (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *See Matter of A-B-*, 27 I&N Dec. 316 (married women in Guatemala who are unable to leave their relationships do not constitute a particular social group); *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014) (former members of Mara 18 gang in El Salvador who renounced gang membership do not constitute a particular social group); *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014); *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006) (former noncriminal drug informants do not present a cognizable social group); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985).

Under well-established Fourth Circuit precedent, family ties may provide the basis for a

---

[5] The court understands that the family's moves have been only 15 minutes away each time. However, DHS has failed to show that internal relocation is not only possible, but reasonable to expect the Respondent to so relocate.

8

cognizable particular social group under the INA. *See, e.g., Crespin-Valladares v. Holder*, 632 F.3d 117, 124-126 (4th Cir. 2011) ("we can conceive of few groups more readily identifiable than the family"); *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) ("membership in a nuclear family qualifies as a protected ground for asylum purposes"); *Cruz v. Sessions*, 853 F.3d 122, 127 (4th Cir. 2017) ("by virtue of her domestic partnership with Martinez, Cantillano Cruz was a member of a cognizable particular social group, namely, 'the nuclear family of Johnny Martinez'"); *Salgado-Sosa v. Sessions*, 882 F.3d 451, 457 (4th Cir. 2018) ("Salgado-Sosa's family qualifies as a 'particular social group,' protected for purposes of his asylum and withholding of removal claims"). Neither those who resist recruitment efforts by gangs nor their family members generally constitute a particular social group under the INA, nor do such bases amount to political opinion. *See Matter of S-E-G-,* 24 I&N Dec. 579 (BIA 2008); *see also INS v. Elias-Zacarias*, 502 U.S. 478 (1992) (forced recruitment or attempts to forcibly recruit into a guerrilla organization does not necessarily constitute persecution on account of political opinion). Membership or perceived membership in a criminal gang also does not constitute membership in a particular social group under the INA. *See Matter of E-A-G-*, 24 I&N Dec. 591 (BIA 2008); *see also Lizama v. Holder,* 629 F.3d 440 (4th Cir. 2011) (claimed particular social group of "young, Americanized, well-off Salvadoran male deportees with criminal histories who oppose gangs" not cognizable under the INA). At the same time, the BIA has noted that social group determinations are made on a case by case basis. *Matter of M-E-V-G-*, 26 I&N Dec. 227.

Ascertaining whether membership in a family-based social group is at least one central reason for any past or feared future persecution may present challenges, and the Fourth Circuit has encouraged an expansive view of nexus in these cases. *See Hernandez-Avalos v. Lynch,* 784 F.3d 944 (4th Cir. 2015) (mother who refused to allow her son to join a gang was persecuted on account of her membership in the particular social group of his family); *Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017) (nexus to family relationship established because wife of murdered man was more likely than others to search for her husband, confront the suspect, and express an intent to go to the police); *Salgado-Sosa v. Sessions*, 882 F.3d 451 (4th Cir. 2018) (nexus found where man fought back when he was in his family's home during attack targeted at stepfather because membership in the family was why the man and not some other person became involved); *but see Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017) (personal dispute among family members may not equate to persecution on account of family group membership); *Matter of A-B-*, 27 I&N Dec. at 338-339;

9

*Cortez-Mendez v. Whitaker*, 912 F.3d 205 (4th Cir. 2019) (circumstantial evidence presented did not establish as a factual matter that the respondent's relationship to his father was at least one central reason for his mistreatment by gang members who sought to forcibly recruit him).

The evidence in this case indicates quite clearly that at least one central reason the Respondent was subject to past persecution was due to him being his mothers' son, essentially as a member of his nuclear family. That the Respondent is his mothers' son is the reason why he, and not another person, was threatened with death. He was threatened with death because he was Cecilia's son and the Barrio 18 gang targeted the Respondent to get at the mother and her earnings from the pupusa business. Pursuant to unambiguous and repeated guidance from the Fourth Circuit, the nexus requirement is satisfied in this case. *See generally Hernandez-Avalos v. Lynch,* 784 F.3d at 944; *Cruz v. Sessions*, 853 F.3d at 122; *Salgado-Sosa v. Sessions*, 882 F.3d at 451.

The Court finds that the Respondent's proposed social group, "Immediate Family Members of the Abrego Family," essentially his nuclear family, is cognizable. Membership in this family group is immutable. It is also sufficiently particular, as it is clearly delineated and easy to determine who is and is not in the group, and it is socially distinct.

With respect to social distinction, the immediate family lived in the same home, and his mother ran a pupusa business. Neighbors and others in the community recognized the family as a distinct group that was related, and ran a family business. Everyone knew that Cecilia Abrego was where you purchased your pupusas and that if you could not make it to the family's home, then the Respondent would deliver the pupusas to your house four days a week. As with many other precedential cases involving immediate family members, the proposed social group in this case too satisfies all of the legal requirements for recognition as a cognizable social group. *Cf. Crespin-Valladares v. Holder*, 632 F.3d at 124-126; *Hernandez-Avalos v. Lynch,* 784 F.3d at 949; *Cruz v. Sessions*, 853 F.3d at 127; and *Salgado-Sosa v. Sessions*, 882 F.3d at 457.

This finding—that the Abrego family was socially distinct—does not run afoul of the Attorney General's (AG) recent case, *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019). In that case, the AG did not bar all family-based social groups from qualifying from relief. *Id.* at 595. Rather, the AG required that "[a]n applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society." *Id.* at 586. This case is a close call. But, the Court finds that the Respondent has established that Cecilia's family pupusa business was well-known in the community and therefore the family was socially distinct in society.

## C.    Relief from Removal Under CAT

The applicant for withholding of removal under the CAT bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). An applicant who establishes that he or she is entitled to CAT protection shall be granted withholding of removal unless he is subject to mandatory denial of that relief, in which case he shall be granted deferral of removal. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). An applicant is subject to mandatory denial of withholding of removal under the CAT if that individual has participated in the persecution of others, has been convicted of a particularly serious crime, has committed a serious nonpolitical crime outside of the U.S., or is a danger to U.S. national security. Under applicable provisions of law at 8 C.F.R. § 1208.16(d) and INA § 241(b)(3)(B), an alien who has been convicted of an aggravated felony for which the alien was sentenced to an aggregate term of imprisonment of at least five years is considered to have been convicted of a particularly serious crime. That does not preclude other crimes from being considered particularly serious crimes.

"Torture" is defined in the treaty and at 8 C.F.R. § 1208.18(a)(1). It is defined in part as the intentional infliction of severe physical or mental pain or suffering by, or at the instigation of, or with the consent or acquiescence of a public official. Acquiescence of a public official requires that the official have awareness of or remain willfully blind to the activity constituting torture prior to its commission, and thereafter breach his or her legal responsibility to intervene to prevent such activity. *See* 8 C.F.R. § 1208.18(a)(7).

To qualify for protection under the CAT, "specific grounds must exist that indicate the individual would be personally at risk." *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000). The mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would be more likely than not to be tortured. *Id.*

In assessing the likelihood of future torture, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; evidence of gross, flagrant or mass violations of human rights within the country of removal; or other relevant information of conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). In order for an alien to meet the burden of proof for relief under the CAT, he or she

EOIR - 11 of 14

must demonstrate that each step in the necessary chain of events is more likely than not to happen. *Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006). Under Fourth Circuit precedent, the risks of torture from all sources must be aggregated when determining whether an individual is more likely than not to be tortured in a particular country. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019).

Instances of police brutality do not necessarily rise to the level of torture, nor does the indefinite detention of criminal deportees in substandard conditions. *Matter of J-E-*, 23 I&N Dec. 291, 301-02 (BIA 2002) (indefinite detention of criminal deportees in substandard conditions in Haiti does not constitute torture where there is no evidence that government officials intentionally and deliberately detain deportees under such conditions in order to inflict torture). Abusive or squalid conditions in pretrial detention facilities, prisons, or mental health institutions will not constitute torture when those conditions occur due to neglect, a lack of resources, or insufficient training and education, rather than a specific intent to cause severe pain and suffering. *Matter of J-R-G-P-*, 27 I&N Dec. 482 (BIA 2018).

Torture must come at the hands of the government. *Matter of S-V-*, 22 I&N Dec. at 1311-12. This can include acquiescence of officials provided it meets the conditions set out in the regulations at 8 C.F.R. § 1208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity"). Awareness can include actual knowledge and willful blindness. *See* Senate Exec. Rep. 101-30 at 9 (1990); *see also Matter of S-V-*, 22 I&N Dec. at 1312. In *Matter of S-V-*, the BIA elaborated that a respondent needs to show more than that government officials are aware of the activity and powerless to stop it and needs to show that government officials are willfully accepting of the activity. *Matter of S-V-*, 22 I&N Dec. at 1311-1312. Following *Matter of S-V-*, the Attorney General, in *Matter of Y-L-, A-G-, & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002), elaborated on the definition of acquiescence and indicated that the relevant inquiry is "whether governmental authorities would approve or 'willfully accept' atrocities committed." *Id.* at 283.[6]

The Fourth Circuit has clarified that "willful blindness can satisfy the acquiescence

---

[6] That decision noted in part that it would not suffice for a respondent to show that isolated, rogue government agents were involved in atrocities despite a government's best efforts to root out misconduct.

12

component of 8 C.F.R. § 1208.18(a)(1)." *See Suarez-Valenzuela v. Holder,* 714 F.3d 241, 246 (4th Cir. 2013). Pursuant to the willful blindness standard, government officials acquiesce to torture when they have actual knowledge of or turn a blind eye to torture. *Id.* at 245-246.

Decisions regarding an alien's likely future mistreatment are factual determinations subject to review only for clear error; the determination as to whether any such mistreatment constitutes torture as a legal matter is subject to de novo review. *Turkson v. Holder,* 667 F.3d 523 (4th Cir. 2012); *see also Kaplun v. Attorney General,* 602 F.3d 260 (3d Cir. 2010). Whether the government would acquiesce in any future torture is likewise a mixed question of law and fact. *Cruz-Quintanilla v. Whitaker,* 914 F.3d 884 (4th Cir. 2019).

Here, the Respondent has not shown that it is "more likely than not" that he would be tortured if he were to be removed to El Salvador.

## IV.    **Conclusion**

The Respondent's application for asylum is time-barred without exception. However, he has established past persecution based on a protected ground, and the presumption of a well-founded fear of future persecution. DHS has not shown there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable under the circumstances. Therefore, the Respondent's application for withholding under the Act is granted. Finally, his CAT claim fails because he has not shown that he would suffer torture.

## **ORDER**

It is hereby ordered that:

    I.    the Respondent's application for asylum pursuant to INA § 208 is **DENIED**;

    II.    the Respondent's application for withholding of removal pursuant to INA § 241(b)(3) is **GRANTED**; and

    III.    the Respondent's application for withholding of removal under the Convention Against Torture is **DENIED**;

_10 /10 /19_
Date

David M. Jones
United States Immigration Judge
Baltimore, Maryland

**Appeal Rights**
Each party has the right to appeal this Court's decision to the Board of Immigration Appeals. Any appeal must be filed within 30 calendar days of the mailing of this decision. Under the regulations, a notice of appeal must be received by the Board by that deadline. The notice of appeal must also state the reasons for the appeal. _See_ 8 C.F.R. § 1240.15.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **D.V.D.**, *et al.*, individually and on behalf of all others similarly situated, ) ) ) ) | |
| **Plaintiffs**, ) ) | **Civil Action No.** |
| **v.** ) ) | **25-10676-BEM** |
| **U.S. Department of Homeland Security,** *et al.*, ) ) ) | |
| **Defendants**. ) ) | |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION

**MURPHY, J.**

This case presents a simple question: before the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there? Defendants argue that the United States may send a deportable alien to a country not of their origin, not where an immigration judge has ordered, where they may be immediately tortured and killed, without providing that person any opportunity to tell the deporting authorities that they face grave danger or death because of such a deportation. All nine sitting justices of the Supreme Court of the United

States,[1] the Assistant Solicitor General of the United States,[2] Congress,[3] common sense,[4] basic

decency, and this Court all disagree.  Plaintiffs are seeking a limited and measured remedy—one

Defendants have conceded in other proceedings is the minimum that comports with due process.[5]

Plaintiffs are simply asking to be told they are going to be deported to a new country before they

are taken to such a country, and be given an opportunity to explain why such a deportation will

likely result in their persecution, torture, and/or death.  This small modicum of process is mandated

by the Constitution of the United States, and for this reason, the motion for class certification is

GRANTED, and the motion for preliminary injunction is GRANTED in part.

---

[1] *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [deportable aliens] to actually seek . . . relief in the proper venue before such removal occurs."); *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available.").

[2] Transcript of Oral Argument at 32–33, *Bondi v. Riley*, No. 23-1270 (S. Ct. Mar. 24, 2025) ("JUSTICE KAGAN: . . . [W]hen you have the order of removal but the [Convention Against Torture] proceedings have not yet been concluded, what does the government feel itself free to do with the alien? . . . [ASSISTANT TO THE SOLICITOR GENERAL]: We do think we have the legal authority to [send the non-citizen to some other country, assuming no pending claim under the Convention Against Torture as to that other country], with the following caveat: We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ("JUSTICE KAGAN: So that's what it would depend on, right?  That -- that you would have to provide [an individual being removed] notice [of what country he is being sent to], and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?  ASSISTANT TO THE SOLICITOR GENERAL: Yes, that's right.").

[3] *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231) (codifying protections under the Convention Against Torture and prohibiting the removal of an alien to any country where they would likely be tortured); 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 238.1, 241.8, 1208.16–18, 1240.11; 28 C.F.R. § 200.1 ("A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.").

[4] "[C]ommon sense often makes good law."  *Peak v. United States*, 353 U.S. 43, 46 (1957).

[5] *Supra* note 2.

# I.    Background

## A.    Legal Background

### 1.    Removal Proceedings

When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ"). 8 U.S.C. § 1229a. Removal proceedings determine not only *whether* an individual may be removed from the United States but also to *where* he may be removed. In the first instance, the alien is entitled to select a country of removal. *Id.*; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries. 8 C.F.R. § 1240.10(f).

Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections. 8 C.F.R. § 1240.11(c)(1).[6] Some of these protections are discretionary.[7] Others are mandatory, meaning that protection must be given if the conditions are met. Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections]."). CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured. *See* Foreign Affairs Reform and

---

[6] Technically, CAT protections can be a form of withholding. *See Guzman Chavez*, 594 U.S. at 530. The Court uses the phrase "withholding of removal" to refer to what has been called "statutory withholding." *Id.*

[7] For example, asylum, which protects against deportation generally to any country, is discretionary absent certain exceptions. *See generally* 8 U.S.C. § 1158; 8 C.F.R § 208.2.

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat.

2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28

C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.

### 2.      Reinstatement or Withholding-Only Proceedings

Alternatively, the U.S. Department of Homeland Security ("DHS") may reinstate a prior

order of removal for an alien it finds "has reentered the United States illegally after having been

removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5). When

DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and

is not subject to being reopened or reviewed." *Id.* DHS may also issue administrative removal

orders to individuals whom DHS determines are not lawful permanent residents and who have an

aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1.

While in both processes aliens are barred from pursuing nearly all avenues of relief from

removal, aliens may still seek protection through withholding of removal under 8 U.S.C.

§ 1231(b)(3) and CAT. 8 C.F.R. §§ 238.1(f)(3), 241.8(e). If the alien demonstrates a reasonable

fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ

where they can only seek withholding of removal and/or CAT protection. 8 C.F.R.

§§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement

"is not eligible and may not apply for any relief under [the Immigration and Nationality Act

("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings

. . . shall be limited to a determination of whether the alien is eligible for withholding or deferral

of removal."[8]).

---

[8] Deferral of removal provides CAT protections to aliens who are mandatorily ineligible for withholding of removal. *See* 8 C.F.R. § 208.17(a).

Withholding of removal and CAT protection only affect to *where* the alien may be removed, rather than *whether* the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").

### 3.    Third-Country Removals

Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.

In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals." As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:

> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A). Similarly, under FARRA,[9] which codified CAT protections, an alien may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R.

---

[9] *See supra* note 3.

§§ 208.16–18, 1208.16–18.   In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

### B.    **Factual Background**

#### 1.    **The February 18, 2025 Directive and March 30, 2025 Guidance**

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, entitled "Securing our Borders."  90 Fed. Reg. 8467.  As relevant here, on or about February 18, 2025, DHS issued a directive to the Enforcement and Removal Operations ("ERO") division of Immigration and Customs Enforcement ("ICE").  Dkt. 1-4 (the "February Directive").   The February Directive instructs ERO officers to review the cases of aliens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained" and, in case of persons who previously could not be removed because the designated countries were unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals."  *Id.* at 2.

On March 23, 2025, Plaintiffs filed this lawsuit challenging, in part, the February Directive. Dkt. 1 ("Compl.").  Plaintiffs seek an order guaranteeing them the opportunity to show—before being removed to countries not included on their removal orders—that they will suffer persecution, torture, and/or death in those countries.  They are challenging Defendants' policy or practice of designating aliens for removal to any country other than the country or alternative country of removal designated and identified in writing in their prior immigration proceedings without first providing notice and an opportunity to apply for protection from removal to that "third" country.

On March 28, 2025, the Court entered a temporary restraining order after hearing oral arguments
from both parties.[10]  Dkt. 34.

On March 30, 2025, DHS issued an updated guidance (the "March Guidance") on removals
to third countries.  Dkt. 43-1.  This guidance dictates that aliens may be removed to a third country
without notice if the United States has received assurances from that country that aliens removed
from the United States will not be persecuted or tortured.  *Id.* at 2–3.  Importantly, these assurances
are not individualized, and the March Guidance provides for no review, meaning that deportations
to a third country can occur without any consideration of the individual risks facing a particular
alien.  *Id.*  According to the March Guidance, DHS will provide the alien with notice of the third
country (and an opportunity to affirmatively assert a fear of return to that third country) only if the
United States has not received assurances, or if the Department of State does not believe those
assurances to be credible.  *Id.* at 3.

### 2.   **Plaintiffs' Cases**

Plaintiffs are individuals subject to final orders of removal, allegedly at imminent risk of
deportation to countries other than those authorized by their respective orders.  Compl. ¶ 1.[11]

Plaintiff D.V.D.[12] is a citizen of Cuba who entered the United States from Mexico.  *Id.*
¶¶ 10, 62.  In February 2017, in removal proceedings, he was ordered removed.  *Id.* ¶ 62.  His
removal order specified only Cuba as the country of removal.  *Id.*  He was released from detention
on an Order of Supervision in May of 2017.  *Id.*  Plaintiffs allege that on March 10, 2025, ICE
instructed D.V.D.'s attorney that D.V.D. needed to report for an in-person check-in on March 28,

---

[10] The Court extended the temporary restraining order after hearing further oral arguments from both parties
on April 10, 2025.  Dkt. 62.

[11] Except where indicated, the relevant facts are largely undisputed.

[12] The Court has allowed Plaintiffs to proceed under pseudonyms.  Dkt. 13.

2025, and that the ICE officer later explained that ICE was requiring all people to report in person and more frequently on a case-by-case basis. *Id.* ¶¶ 64–66. If deported to a third country, D.V.D. alleges that he is at risk of persecution due to his mental health conditions or possible imprisonment in certain countries. *Id.* ¶ 67. At oral argument on March 28, 2025, counsel indicated that D.V.D. had not been detained at that day's check-in and had been given another check-in date in September 2025. Dkt. 44 ("March 28, 2025 Tr.") at 4:24–25.

Plaintiff M.M. is a citizen of Honduras who fled due to severe domestic violence. Compl. ¶¶ 11, 68. In 2014, because she had previously been ordered removed from the United States, DHS issued a reinstatement order. *Id.* ¶ 69. In withholding-only proceedings before an IJ in 2021, she was granted withholding of removal to Honduras. *Id.* ¶¶ 69–70. M.M. is not in ICE custody, but she alleges that on March 7, 2025, an ICE officer informed her that she was on a list of people who would be deported imminently. *Id.* ¶ 71. If deported to a third country, M.M. alleges that she is at risk of being sent back to Honduras or another country where she would again face severe domestic violence. *Id.* ¶ 73. At oral argument on April 10, 2025, counsel indicated that M.M.'s check-in had been cancelled by ICE after the initiation of this suit. April 10, 2025 Rough Tr. at 1:19–21.

Plaintiff E.F.D. is a citizen of Ecuador. Compl. ¶¶ 12, 74. In October 2015, he was placed in removal proceedings after entering the United States and raising a credible fear of return. *Id.* In 2018, in removal proceedings, an IJ granted E.F.D.'s application for CAT protection. *Id.* ¶ 75. On March 18, 2025, ICE re-detained him. *Id.* ¶¶ 12, 76. He has not yet been told when his removal might happen or to where. *Id.* ¶¶ 76–77. E.F.D. alleges that he will be deported to a third country without the opportunity to apply for protection, which could include countries that will deport him

back to Ecuador, from which he was awarded CAT protection, or to countries where he has had prior dangerous experiences. *Id.* ¶ 77.

Plaintiff O.C.G. is a native of Guatemala who was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala in March 2024, without a credible fear interview. *Id.* ¶¶ 13, 78. In May of 2024, he reentered the United States, through Mexico, after experiencing violence in Mexico. *Id.* ¶¶ 79–80. His removal order was reinstated by DHS, but he was referred to an asylum officer based on his expressed fear of returning to Guatemala. *Id.* ¶ 80. He was then placed in withholding-only proceedings before an IJ and was granted withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3). *Id.* ¶¶ 80–82. Plaintiffs allege that the IJ did not designate Mexico as a country of removal and that, when DHS tried to add Mexico during the withholding-only proceedings, the IJ told DHS that it was "too late" to do so. *Id.* ¶¶ 81–83. DHS waived appeal. *Id.* ¶ 84. Despite this success, O.C.G. remained in detention and was quickly deported to Mexico. *Id.* ¶¶ 85–86. The parties dispute whether he was provided an opportunity to express fear prior to being deported to Mexico. *Compare id.* ¶¶ 85–86 (complaint alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of ICE's ERO Phoenix Field Office, asserting that notice was provided on the day of his removal, and fear of removal to Mexico was expressly denied). Plaintiffs allege that O.C.G. was taken to Mexico by bus and that, once he was placed in detention in Mexico, he was informed by Mexican authorities that he could apply for asylum in Mexico—and remain incarcerated for an unknown period of time while that application was pending—or be returned to Guatemala. Compl. ¶¶ 87–88. Plaintiffs allege that, on February 25, 2025, O.C.G. returned to Guatemala, where he remains in hiding today. *Id.* ¶ 89.

Each Plaintiff alleges that he or she has valid reasons to fear removal to specific countries that were not included in their removal orders. *Id.* ¶¶ 67, 73, 77, 88. Plaintiffs challenge Defendants' policy or practice of failing to provide notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders, which Plaintiffs allege violates the INA, FARRA, regulations implementing the two statutes, and the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 99–138.

### 3. Current Motions

Before the Court now are Plaintiffs' Motion for Class Certification, Dkt. 4, and Motion for a Preliminary Injunction, Dkt. 6,[13] through which Plaintiffs seek: (1) to prevent Defendants from removing certain of the named Plaintiffs to a "third" country without notice and an opportunity to assert fear of persecution or torture; (2) to prevent Defendants from removing any class member to a "third" country without notice and an opportunity to assert fear of torture; and (3) an order directing Defendants to facilitate the immediate return of O.C.G. to the United States. For the reasons set forth below, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for a preliminary injunction is GRANTED in part.

---

[13] The Court has already ruled on the motion to the extent it sought a temporary restraining order, and as stated on the record in the March 28, 2025 hearing, the Court denies the motion to the extent it seeks an administrative stay of the February Guidance.

## II.    Jurisdiction

Several subsections of 8 U.S.C. § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal.    Defendants argue that sections 1252(a), (b), and (g) strip this Court of jurisdiction.[14]

### A.    Sections 1252(a) and (b)

In the REAL ID Act of 2005, Congress amended the INA to limit the ways by which an individual might challenge his order of removal.  *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007) (citing 8 U.S.C. § 1252(a)(5)).[15]  In turn, section 1252(b)(9) limits the forum for those challenges to courts of appeals.  *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).[16]

Accordingly, actions that do not challenge final orders of removal are not subject to this channeling scheme.  *J.E.F.M.*, 837 F.3d at 1032.  "[A] suit brought against immigration authorities

---

[14] Defendants also argue that section 1252(f)(1) limits this Court's jurisdiction with respect to class-wide relief.    However, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court explicitly confirmed that section 1252(f)(1) concerns the availability of relief, not subject matter jurisdiction.  *Id.* at 800–01.  As the Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims."  *Id.* at 801.  While the provision may "withdraw[ ] a district court's 'jurisdiction or authority' to grant a particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA."  *Id.* at 798; *see also Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief").  As discussed below, the Court has jurisdiction to grant both the class-wide declaratory and injunctive relief sought in this case.  *See infra* at 23–27.

[15] In pertinent part, section 1252(a)(5) states:

[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

[16] Section 1252(b)(9) states:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

is not *per se* a challenge to a removal order." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011).

The Supreme Court has expressly affirmed this proposition, explaining that the phrase "arising from" in section 1252(b)(9) does not encompass all claims that merely result from the fact of or potential for removal, which reading the Court said would have "staggering results." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). Because the respondents in *Jennings* were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in section 1252(b)(9) did not apply. *Id.* Notably, under *Jennings*, an individual is not required to "cram[]" claims into the judicial review of a removal order where doing so would be unnatural.[17] *Id.*

The First Circuit has had further opportunity to clarify that the scope of section 1252(b)(9) is limited to claims that specifically arise out of what happens in the removal proceeding:

> [R]emoval proceedings are confined to determining whether a particular alien should be deported. *See* [8 U.S.C.] § 1229a(c)(1)(A). While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA. *See, e.g., McNary* [*v. Haitian Refugee Ctr., Inc.*], 498 U.S. [479,] 496, 111 S.Ct. 888 [(1991)]; *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005). Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review. Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of

---

[17] Even if an individual raised claims related to the risk of torture in a third country, the IJ would not normally consider or address such claims unless that country had already been designated as a country of removal. *See infra* at 16–17 & note 24; *see also, e.g.*, Compl. ¶¶ 81–83 (alleging that, when DHS sought to add Mexico during O.C.G.'s withholding-only proceedings, the IJ told DHS that it was "too late" to do so); Dkt. 8-4 ¶¶ 5–7 (declaration of O.C.G. that the IJ did not designate Mexico as a country of removal and that the IJ informed DHS that Mexico was not a country for removal during the withholding-only proceedings); Dkt. 8-11 at 5–6 (motion to reopen denied despite third country identified for removal); Dkt. 59-12 at 4 (motion to reopen denied where removal to third country was speculative, and indicating that even if third country were identified for removal, relief would need to be sought in federal court rather than in immigration proceedings); Dkt. 59-13 at 4 (motion to reopen denied as premature where "Respondent was not seeking protection from removal to any particular country").

section 1252(b)(9), reading "arising from" as used in that statute to encompass those claims would be perverse.

*Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007). As such, "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review are 'independent of, or wholly collateral to, the removal process,' not 'arising from' it." *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting *Aguilar*, 510 F.3d at 11).[18]

In examining Plaintiffs' requested relief, the issues in this case extend beyond those that could have been raised in their removal proceedings. This largely follows from the simple fact that Plaintiffs are no longer in removal proceedings and complain only of actions that post-date their removal proceedings. Plaintiffs neither challenge the IJs' determinations that they are removable nor claim any deficiency in the removal orders themselves. *Cf. Delgado*, 643 F.3d at 55 (challenging adjustment of status, which would necessarily render removal order "invalid"); *Aguilar*, 510 F.3d at 13–14 (challenging right to counsel in removal proceedings). Rather, Plaintiffs' claims do quite the opposite of challenge their orders of removal—they seek to hold Defendants to the terms of those orders and to receive notice and an opportunity to be heard before Defendants explicitly exceed those orders. *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D. Wash. 2019) (finding claims that "challenge[d] DHS's attempts, *outside* of removal proceedings, to designate [a third country] without reopening his proceedings so that an IJ could make the designation in the first instance and/or determine whether petitioner's life or freedom would be

---

[18] In reaching its decision in *Aguilar*, the First Circuit cited and relied upon decades of Supreme Court precedent that is "hostil[e] toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed administrative proceedings." *Aguilar*, 510 F.3d at 12 (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958), *Matthews v. Eldridge*, 424 U.S. 319, 330–31 (1976), *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

threatened in that country" independent of removal order and thus not barred by section 1252(a)(5)).[19]

Defendants propose that Plaintiffs can "cram," *Jennings*, 583 U.S. at 294, their fear-based claims into the removal proceedings (thereby placing those claims into section 1252's jurisdictional funneling scheme) by filing motions to reopen their immigration proceedings. Dkt. 51 ("PI Opp.") at 8–9. But this Court finds that remedy to be both legally insufficient and logistically impossible, effectively "foreclos[ing] all meaningful judicial review." *See Aguilar*, 510 F.3d at 12 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).[20]

For most aliens, directly moving to reopen is simply not an option. "With a few narrow exceptions, the Immigration and Nationality Act limits petitioners to a single motion to reopen

---

[19] Although this case involves sensitive subject matter and complex statutory schemes, its underlying principles are surprisingly familiar. Courts routinely consider whether jurisdiction is barred based on a prior court's order. *See, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022), *aff'd*, 2022 WL 19795808 (1st Cir. Nov. 14, 2022). Under sections 1252(a)(5) and (b)(9), district courts are precluded from revisiting orders made by immigration judges. It would not make sense, however, to offer that same protection for acts that go beyond those orders' preclusive scope.

[20] Defendants claim that an alien can raise fear-based concerns through reopening IJ proceedings or petitioning the court of appeals for review. *E.g.*, April 10, 2025 Rough Tr. at 9:24–10:5 ("MR. ENSIGN: Your Honor, they would have needed to raise it earlier or -- and if we were in the second part of the [March] guidance, they also could manifest fear at that point and then it would go to screening. So there's that potentially available as well. But, you know, to the extent they have awareness of that now, they should go back before the IJ and BIA."); *id.* at 10:19–22 ("MR. ENSIGN: Your Honor, they would have needed to go to the BIA before [they are notified of third-country removal plans]. There's nothing under the [March] guidance that would require additional notice or an opportunity to challenge it at that moment."); *id.* at 27:10–13 ("[MR. ENSIGN:] There is -- the typical way it . . . would be raised is a motion to reopen if you haven't raised it already, and then you can raise it to the Court of Appeals."); *id.* at 44:2–11 ("THE COURT: So it happens Saturday morning, the person raises a fear that department disagrees -- they make it through the first screening, the department disagrees. That person is then going to be deported on Sunday morning. As a practical matter, there's no judicial review of that decision, right? MR. ENSIGN: There would be administrative review potentially in the IJ. THE COURT: How would they do that? It's Saturday. MR. ENSIGN: Your Honor, I don't know the specifics of the IJ proceedings."). This claim is either an effort to prevaricate or is deeply disingenuous. The suggestion that an alien must—or even can—reopen an immigration proceeding at 6:00 a.m. on a Saturday prior to being removed that same weekend is preposterous on its face. *See, e.g.*, Exec. Office for Immigr. Rev., *Boston Immigration Court*, U.S. Dep't of Just., https://www.justice.gov/eoir/boston-immigration-court (last updated Apr. 9, 2025) ("The immigration court is open Monday to Friday except for federal holidays."). Further, Defendants have provided no evidence or authority—only their own argument—that there is a way for Plaintiffs to *successfully* reopen their immigration proceedings as of right and do not address Plaintiffs' well-supported contention that motions to reopen to assert fear of removal to a country not designated in their removal order are routinely denied as speculative. *See* PI Opp. at 8–9 (discussing only sua sponte motions to reopen process). Defendants' contention is belied by both the evidence in the record and clear case law on the limits of sua sponte motions to reopen. *See infra* at 14–18.

filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024)

(citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)).   In the absence of any

right to reopen the underlying immigration case, the petitioner can only ask the immigration court

to reopen "sua sponte."  *Id.*   Immigration courts have nearly unfettered "discretion to decide

whether to grant or deny sua sponte reopening."  *Id.*; *see also Phimmady v. Bondi*, 128 F.4th 18,

23 (1st Cir. 2025) (holding that judicial review of immigration court's decision not to reopen sua

sponte is limited and that there is no legal error in declining to reopen where plaintiff could not

establish settled practice of reopening cases sua sponte in similar circumstances).   Consistent with

this, Plaintiffs have provided sworn declarations indicating that their various attempts at reopening

proceedings to seek CAT protections have been denied by IJs.  *See* Dkt. 8-8 ¶ 9 (explaining that

an IJ denied motion to reopen); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (IJ order denying motion

to reopen and noting that neither "Immigration Judges nor the Board of Immigration Appeals ha[s]

jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15 regarding

the country of removal.  Nothing in this order forbids DHS from acting on its own authority to

designate a country, or forbids the parties from litigating that issue in any forum outside of the

Executive Office of Immigration Review" (citations omitted)); Dkt. 59-12 ¶¶ 12–18 ("If the United

States government were to remove Respondent to El Salvador under a separate authority, that is

outside the jurisdiction of this Court to adjudicate and/or analyze.  Respondent's relief would be

sought in Federal court, not Immigration Court.");[21] Dkt. 59-13 at 4 (IJ order denying motion to

reopen as premature where "Respondent was not seeking protection from removal to any particular

country").[22]  *But see* Dkt. 8-14 ¶ 7 (noting that an IJ granted a motion to reopen proceedings for

an alien currently in detention).[23]

Even where an alien may move as of right, or in the unlikely event that the immigration

court reopens the case sua sponte, there is no reason to believe that the court will entertain such

preemptive CAT and withholding claims.  "[A]n applicant is not entitled to have the agency

adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'"

*Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958,

965 (9th Cir. 2010), *superseded on other grounds by statute as stated in Dai v. Sessions*, 884 F.3d

---

[21] The full reasoning for the IJ's denial states:

First, country conditions in El Salvador are not relevant to Respondent's case.  Respondent was
ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is
tentative and speculative, at best.  Respondent has been ordered removed to Venezuela by this Court,
not El Salvador.  If the United States government were to remove Respondent to El Salvador under
a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze.
Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue
became ripe for review.

Dkt. 59-12 at 4.

[22] There are further substantive and logistical barriers to filing motions to reopen, especially for pro se and
detained aliens and those with limited English proficiency, and particularly where removals are executed unexpectedly
and with great haste.  *See* Dkt. 59-9 (describing procedural, evidentiary, and substantive barriers to filing motions to
reopen, especially for pro se and detained noncitizens given limitations on communication and mail access in
immigration detention, as well as the impossibility of seeking reopening without knowledge of the country to which
someone will be deported); Dkt. 59-10 (same, and highlighting that pro se individuals are unlikely to be aware of the
availability of motions to reopen as a procedural mechanism); Dkt. 59-11 (same, and highlighting difficulties for
detained individuals with limited English proficiency and the likelihood of deportation while a motion to reopen is
pending).

[23] Moreover, as a practical matter, even if Plaintiffs could viably seek to reopen their immigration proceedings
without knowing where the Government intends to send them, Plaintiffs would then need to make separate cases for
each and every potential country for which they might have a fear-based claim to avoid removal.  It is hard to imagine
that this solution, which would dramatically clog the immigration courts—and would seem to pose an even greater
hindrance to Defendants' removal efforts than providing the sought-after notice in the first place—is what Congress
intended.

858, 867 n.8 (9th Cir. 2018)) (explaining that "should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide [plaintiff] with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan"). Until an individual receives notice of the country to which he is being deported, he has no basis for reopening his immigration case and no merits basis to seek withholding from a hypothetical third country.[24]

The inability to effectively raise preemptive CAT and/or withholdings claims before an IJ precludes meaningful review in courts of appeals. That is so because courts of appeals are limited to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and are thus, at most, able to review the IJ's discretionary decision not to reopen the case or adjudicate hypothetical claims, which—when the motion or request concerns "a country that nobody is trying to send them to," *Sadychov*, 565 F. App'x at 651—is not wrongly decided. *See id.* But even that may overstate the review available to petitioners. Multiple circuits have held that courts of appeals lack *any* jurisdiction to review discretionary decisions to reopen. *See, e.g.*, *Manyary v. Bondi*, 129 F.4th 473, 479 (8th Cir. 2025) (calling due-process argument raised through request to reopen sua sponte "'an abuse of discretion argument in constitutional garb'" (quoting *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008))); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009); *see also Tamenut*, 521 F.3d at

---

[24] For this reason, the Court has declined to distinguish between those whose removal or withholding-only proceedings conclude before versus after entrance of this Court's Order. *See* April 10, 2025 Rough Tr. at 16:5–23 (considering the idea). Whichever countries or fear-based claims an alien may attempt to raise during proceedings, IJs are under no obligation to make findings about countries not previously identified as "proposed countr[ies] of removal." *See* 8 C.F.R. § 1208.16(b) (defining eligibility with respect to that limited subset); *id.* § 1240.11(c)(1) (instructing IJs to advise aliens that they may apply to that subset (citing 8 C.F.R. § 1240.10)). Imposing a before-and-after distinction would require crafting a new, burdensome system for how immigration courts identify countries of removal and adjudicate related claims.

1004 (citing cases from ten circuits).[25]  Indeed, just over two months ago, the First Circuit openly doubted (and declined to resolve) whether it had jurisdiction to review the denial of a request to reopen involving consideration of factual circumstances.  *Phimmady*, 128 F.4th at 22 & n.2 (highlighting that the "Supreme Court has 'express[ed] no opinion on whether federal courts may review [a] decision not to reopen removal proceedings.'" (quoting *Kucana v. Holder*, 558 U.S. 233, 251 n.18 (2010)) (first alteration in *Phimmady*)).[26]  Accordingly, such preemptive CAT and/or withholding claims, including the due-process issues raised in this case, are precisely the type of "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review" that the First Circuit has held are "'independent of, or wholly collateral to, the removal process,' not 'arising from' it."  *See Gicharu*, 983 F.3d at 16 (quoting *Aguilar*, 510 F.3d at 11).

Finally, Defendants argue that "Congress, in its discretion, implemented [CAT] by directing the issuance of regulations, expressly depriving courts of jurisdiction to review those regulations, and channeling all review of individual CAT claims into review of final orders of

---

[25] Several of these cases appear to have since been superseded, *see, e.g.*, *Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020), or qualified in later decisions, *see, e.g.*, *Arzu-Robledo v. Garland*, 2023 WL 6532649, at *2 (5th Cir. Oct. 6, 2023).

[26] Even assuming jurisdiction, *Phimmady* gives a strong sense of just how unreviewable, on the merits, these motions to reopen really are.  In *Phimmady*, an alien sought to reopen his immigration case after the conviction that had rendered him removable was overturned.  128 F.4th at 20.  The Board of Immigration Appeals ("BIA") denied the motion to reopen, and the First Circuit affirmed.  *Id.* at 25.  Although prior BIA decisions had established that reopening was "'an extraordinary remedy reserved for truly exceptional situations,'" *id.* at 22 (quoting *In re G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999)), nothing required reopening, "[e]ven in truly exceptional situations," *id.* (citing *Charles*, 113 F.4th at 23).  As such, the First Circuit held that there is no legal error in the denial of a sua sponte motion to reopen unless a plaintiff shows that the BIA violated an established practice of granting similar sua sponte motions.  *Id.* at 23.

removal."[27]  PI Opp. at 10 (citing FARRA § 2242(d); 8 U.S.C. § 1252(a)(4)).  But this argument

runs squarely up against the overall problem with Defendants' reading of the statute—there can

be no meaningful "review" of an issue that was not *and could not* have been raised in the first

place.  As the Supreme Court held in *Jennings* and the First Circuit confirmed in *Aguilar*,

section 1252(a)(4) cannot be read to strip jurisdiction over claims that could not have been raised

in the removal proceedings.  *See also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d

177, 188–90 (3d Cir. 2020) (holding that section 1252(a)(4) does not bar review "[w]hen a

detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for

review of a final order of removal").  As Defendants initiated the third-country-removal process

at issue *after* the conclusion of removal proceedings—and because Plaintiffs have no opportunity

to raise these issues before an IJ without some type of advance notice—there can be no judicial

review as contemplated in the channeling provisions of section 1252(a)(4).  *See also Compere v.

Nielsen*, 358 F. Supp. 3d 170, 177 n.8 (D.N.H. 2019) (finding section 1252(a)(4) "plainly

inapplicable" where the petitioner was not seeking review of CAT claim's denial).  As such,

neither section 1252(a) nor section 1252(b) bars this Court's jurisdiction.

---

[27] Defendants also highlight that CAT "is not self-executing."  PI Opp. at 10.  But CAT "has been
implemented in the United States through FARRA and the subsequent regulations."  *See Saint Fort v. Ashcroft*, 329
F.3d 191, 195–96 (1st Cir. 2003) (explaining how the Convention Against Torture was domesticated into federal law),
*superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005); *see also
Nasrallah v. Barr*, 590 U.S. 573, 580 (2020).  As courts do, this Court uses "CAT" to refer to the processes and
protections as embodied in the law.  *See, e.g., Guzman Chavez*, 594 U.S. at 530–31.

B.    <u>Section 1252(g)</u>

The Supreme Court has explained that 8 U.S.C. § 1252(g)[28] is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) [hereinafter *AADC*] ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").    In *AADC*, the Supreme Court emphasized that the provision does not encompass the universe of all possible acts and events arising from removal proceedings, but rather instructs courts to read it as a narrow provision that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Id.* at 482 (emphases in original) (quoting section 1252(g) and declining to read it so expansively as to say, "no judicial review in deportation cases unless this section provides judicial review").  Accordingly, section 1252(g) does not refer to "all claims arising from deportation proceedings."  *Id.*

Following *AADC*, the First Circuit has held that section 1252(g) does not bar review of the "lawfulness" of a removal-related action because such claims are "collateral" to the discretionary decisions immunized by section 1252(g).  *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023); *accord United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (*en banc*) ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary

---

[28] 8 U.S.C. § 1252(g) states, in pertinent part:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

authority."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While this provision bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions."); *Bowrin v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999) (holding that section 1252 "does not apply" to Government's interpretations of law); *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("The [Supreme] Court [in *AADC*] emphasized that § 1252(g) is not 'a general jurisdictional limitation,' but rather 'applies only to three discrete actions.'" (quoting *AADC*, 525 U.S. at 482)), *affirmed by an equally divided court sub nom. United States v. Texas*, 579 U.S. 547 (2016); *cf. Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1271, 1272–73 & n.2 (11th Cir. 2021) (confirming its narrow reading of section 1252(g) in *Madu*, based on *AADC*, but finding that section 1252(g) barred review of decision to remove pending *discretionary* waiver process).

Hewing close to the Supreme Court's guidance in *AADC* and the First Circuit's holding in *Kong*, this Court will not construe section 1252(g) to immunize an unlawful practice from judicial review. *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986) ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."). Here, Plaintiffs' claims do not arise from Defendants' discretionary decisions to execute their removal orders. Nor do Plaintiffs challenge their removability. What Plaintiffs challenge is Defendants' authority to effectively depart from the removal orders by designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent Plaintiffs' due-process rights and the carefully crafted

scheme that Congress has set forth.[29]  *See Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 298 (3d Cir.

2020) ("[W]hen the Act deprives the Attorney General of the discretion to act, a challenge to that

lack of statutory authority is not barred as a challenge to the exercise of discretion.").  These

assertions are collateral to Defendants' decision to execute Plaintiffs' removal, and thus not subject

to section 1252(g)'s jurisdictional bar.  *See Kong*, 62 F.4th at 617.

This Court's decision is in accord with numerous sister courts around the country that have

recognized that section 1252(g) shields only discretionary decisions concerning the three stages of

the deportation process.  *See, e.g.*, *Abrego Garcia v. Noem*, — F. Supp. 3d —, 2025 WL 1014261,

at *7–8 (D. Md. Apr. 6, 2025), *aff'd*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025)

[hereinafter *Abrego Garcia II*], *aff'd in relevant part sub nom. Noem v. Abrego Garcia*, 604 U.S.

—, 2025 WL 1077101 (Apr. 10, 2025) (*per curiam*) [hereinafter *Abrego Garcia III*]; *Gondal v.*

*U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018); *Coyotl v. Kelly*, 261 F.

Supp. 3d 1328, 1339–41 (N.D. Ga. 2017); *Hovsepian*, 359 F.3d at 1155; *Bowrin*, 194 F.3d at 488.

*But see Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (openly disagreeing with the

Supreme Court's reading of the statute, as articulated in *AADC*).  This Court may review the purely

---

[29] During the March 28, 2025 oral argument, Defendants agreed that, in designating additional countries of
removal, the Government drew its authority from statute.  March 28, 2025 Tr. at 6:12–7:4.  That implies something
beyond mere "execut[ion]" of an order.  *Cf.* 8 U.S.C. 1252(g).  This plain reading of the statute is supported by the
relevant regulations, which state that "the order of the immigration judge *does not limit* the authority of the Department
of Homeland Security to remove [an] alien to any other country as permitted by section 241(b) of the Act."  8 C.F.R.
§ 1240.12(d) (emphasis added).  That such authority is not "limit[ed]" by an order does not suggest that the authority
is still *pursuant to* that order.

legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country.[30]

There is no question that, if eligibility is demonstrated, withholding of removal and CAT protections are mandatory and removal to that country cannot occur.  *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT).  The only question is what right individuals have, under the Constitution and relevant statutes, to make that showing.  This Court has jurisdiction to hear that question.

## III.   <u>Motion for Class Certification</u>

Plaintiffs seek to certify a class, which they define as:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Dkt. 4 at 1.

As a threshold matter, limitations on certain class-wide injunctive relief under 8 U.S.C. § 1252(f)(1) do not preclude class certification or otherwise limit the Court's ability to grant Plaintiffs' requested class-wide relief.  *See* Dkt. 52 ("Class Cert. Opp.") at 7–10.

---

[30] Defendants' out-of-circuit citations stand, at most, for the proposition that courts cannot indefinitely guarantee the pre-removal completion of certain review processes.  *See Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) (finding no jurisdiction to halt removal pending appeal of motion to reopen removal proceedings); *Camarena*, 988 F.3d at 1273 (finding no jurisdiction to halt removal pending adjudication of discretionary applications for provisional unlawful presence waivers); *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021) (finding no jurisdiction to halt removal pending adjudication of a petition under the Violence Against Women Act, for which there was no mandate, statutory or otherwise, that adjudication occur prior to removal).  Defendants also cite *Foster v. Townsley*, in which the Fifth Circuit held that that section 1252(g) extends to non-discretionary decisions.  PI Opp. at 6 (citing *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)).  But as Plaintiffs correctly note, the Fifth Circuit subsequently decided *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held that section 1252(g) does not preclude jurisdiction over a challenge to the constitutionality of the statutory scheme, as opposed to a discretionary determination.  Insofar as *Tsering v. U.S. Immigr. & Customs Enf't*, 403 F. App'x 339, 342–43 (10th Cir. 2010), an unpublished decision, relies on *Foster* and its interpretation of *AADC*, this Court views it as an outlier among the circuit courts and will not follow its reasoning.

Plaintiffs seek, among other relief, declaratory judgment. Compl. ¶¶ 118–22. "[S]ection 1252(f)(1) does not strip the lower courts of the power to grant declaratory relief." *Brito v. Garland*, 22 F.4th 240, 250 n.7 (1st Cir. 2021) (citing *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief")); *accord Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 (9th Cir. 2024); *Make The Road New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Alli v. Decker*, 650 F.3d 1007, 1010–13 (3d Cir. 2011); *Gonzalez v. Sessions*, 325 F.R.D. 616, 626 (N.D. Cal. 2018); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993, at *1 (1st Cir. May 11, 2018) (citing *Jennings*, 583 U.S. 281). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (treating the issue as unsettled but suggesting that declaratory relief might be unavailable). Accordingly, certification is proper at least toward that relief.

As to the requested injunctive relief, section 1252(f)(1) simply does not apply. Section 1252(f)(1) generally prohibits lower courts from ordering federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out "the specified statutory provisions," other than on a case-by-case basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022). But the class-wide injunctive relief Plaintiffs seek—concerning the availability of CAT protection, *see* Dkt. 6-1—is based on a different statute, the Foreign Affairs Reform and Restructuring Act ("FARRA"). *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003)

(explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[31]

Defendants would have the Court go beyond the plain meaning of the statute to imply a bar to actions that collaterally impact covered parts of the INA.  PI Opp. at 5–6.  However, section 1252(f)(1) cannot be read so broadly.  Starting from first principles, "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute."  *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)).  Here, the title of the section is "Judicial Review of Orders of Removal."  110 Stat. 3009–607 (codified in 8 U.S.C. § 1252).  Thus, the text of the statute itself implies that the limitation applies only to cases arising out of such review.  *Texas v. United States*, 524 F. Supp. 3d 598, 640–41, 667–68 (S.D. Tex. 2021) ("Section 1252 concerns '[j]udicial review of orders of removal.'" (quoting the title of 8 U.S.C. § 1252)) (reading section 1252 as a whole as "deal[ing] with . . . judicial review of orders of removal" and rejecting the argument that the INA's various limiting provisions collectively "establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement") (enjoining pause of removals).  Other subsections of 1252 concerning review of removal orders are interpreted narrowly to exclude collateral claims.  *See Jennings*, 583 U.S. at 294; *Aguilar*, 510 F.3d at 11.  The Court sees no basis to graft on Defendants' proposed, additional meaning.

---

[31] It is admittedly confusing that FARRA's provisions are intermingled with the INA's in the U.S. Code.  *See generally* 8 U.S.C. § 1231.  However, the Ninth Circuit has helpfully clarified that section 1252(f)(1), in its authoritative Statutes at Large version, refers only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.  *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022).  Further, because CAT protections were codified in FARRA in 1998, CAT protections are not covered by section 1252(f)(1)'s bar related only to INA provisions as amended in 1996.  *See* FARRA, § 2242(a); *Galvez*, 52 F.4th at 830.

Defendants cite *Aleman Gonzalez* for the proposition that section 1252(f)(1) applies not just to the explicitly covered parts of the statute but to "*the way that [those parts] [are] being carried out.*" PI Opp. at 5 (quoting *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added)) (brackets added). But this puts words into the Supreme Court's mouth—that part of the *Aleman Gonzalez* opinion dealt with an entirely different issue.[32] Indeed, the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," *Aleman Gonzalez*, 596 U.S. at 552,[33] but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Id.* at 553 n.4 (emphasis removed) (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)).

The Fifth Circuit put it well and plainly in *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024):

> Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1). It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3). Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred. Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226). *Aleman Gonzalez*, 596 U.S. at 553 n.4, 142 S.Ct. 2057. That is especially the case here, where the district court found Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.
>
> Defendants respond that, in essence, they are the ultimate judges of whether § 1252(f)(1)'s bar applies. They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1). That is badly mistaken. Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to

---

[32] *See Aleman Gonzalez*, 596 U.S. 543, 551–52 (2022) (considering whether section 1252(f)(1) applies only to "the covered immigration provisions . . . 'as properly interpreted'" or as "operat[ed]" in practice by the Government).

[33] *See also id.* at 551 ("The respondents in both cases were detained pursuant to § 1231(a)(6), and no one disputes that § 1231(a)(6) is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1).").

propose additions. *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

*See also Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1357(d) is not located in Part IV [of the INA], and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that section 1252(f)(1) does not bar an injunction based on 8 U.S.C. § 1158(b)(1) since it is not a covered provision); *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1044–45 (S.D. Cal. 2020) (finding that section 1252(f)(1) did not bar class-wide injunctive relief with regards to access to counsel during non-refoulement interviews because the relief was not governed by sections 1221–32); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 585768, at *13 (D. Md. Feb. 24, 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 'simply because of collateral effects on a covered provision.'" (quoting *Al Otro Lado*, 120 F.4th at 627)). Thus, the requested class-wide relief, limited only to otherwise removable aliens with potential CAT protection claims, falls outside of section 1252(f)(1)'s bar.

### A. <u>Legal Standard</u>

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotations omitted). A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ. P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in the relevant subsection of Fed. R. Civ. P. 23(b) ("Rule 23(b)"). *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). "Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's

representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)). Plaintiffs seek certification under Rule 23(b)(2), Dkt. 4, which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed R. Civ. P. 23(b)(2). For both Rule 23(a) and 23(b), Plaintiffs must establish each of the elements; failure to establish any element will defeat class certification. *See Smilow*, 323 F.3d at 38.

**B.    Discussion**

**1.    23(a)(1) Numerosity**

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1). The requirement presents a "low hurdle," *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007), but "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citation omitted); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011). The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, particularly where, as here, Plaintiffs seek only injunctive or declaratory relief, *Reid*, 297 F.R.D. at 189 ("[T]he threshold may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder." (citation omitted)); *see also Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 99 (D.N.H. 2021) (certifying a class where "the number of current *and future members* of the putative class exceeds 40 persons" (emphasis added)).

Defendants do not dispute that Plaintiffs have met the numerosity requirement, *see generally* Class. Cert. Opp., and the Court finds this requirement met by Plaintiffs' identification of hundreds of potential class members, Dkts. 8-4, 8-8–23 (identifying individuals with final removal orders who were removed under the challenged policies and practices or are similarly at risk of unnoticed removal).

### 2.    23(a)(2) Commonality

Satisfying the commonality requirement in the instant case is simple and straightforward: Plaintiffs seek a single, common order that Defendants comply with the strictures of due process before deporting them to a county not covered by their final orders of removal.  Defendants' arguments to the contrary are uncompelling.

The commonality requirement is met when "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019).  The commonality requirement is a "low bar."  *In Re New Motor Vehicles*, 522 F.3d at 19.  Courts have found that "a single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."  *Gomes*, 561 F. Supp. 3d at 99; *see also Reid*, 297 F.R.D. at 189.

Defendants argue that the proposed class is overly broad, includes "clear dissimilarities between the proposed class and its proposed representatives," and includes aliens with "different processes and pathways for relief."  Class. Cert. Opp. at 11–14.  As such, Defendants argue class certification is not appropriate.  *Id.*

The commonality requirement is met, notwithstanding purported or actual dissimilarities among named and potential class members, based on the common due-process issue. Due process adheres regardless of the removal context. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, . . . entered the country undetected, . . . or became a legal resident but then committed an enumerated crime." (citations omitted)). That specific circumstances may differ among the various putative class members does not undermine that they all seek notice and an opportunity to be heard, and the opportunity to challenge a policy or practice which allegedly denies it. *See, e.g.*, *Gomes*, 561 F. Supp. 3d at 101 ("[T]he existence of individual differences among putative class members does not foreclose a finding of commonality so long as least one common issue is raised.").

Likewise, that some members may present additional, individualized issues, *e.g.*, return to the United States if unlawfully removed,[34] does not affect commonality. *See Tassinari v. Salvation Army*, — F.R.D. —, 2025 WL 972724, at *7 n.12 (D. Mass. Mar. 26, 2025) ("Defendant's

---

[34] Defendants acknowledge that there are procedures to compel the return of illegally removal individuals. *See* March 28, 2025 Tr. at 17:12–13 ("Yes, Your Honor. There are procedures for that."); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72 (describing process for facilitating return of certain lawfully removed aliens whose petitions for review are granted after their removal). Courts regularly order the return of wrongfully removed individuals. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing how removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia III*, 2025 WL 1077101, at *1 (denying application to stay requirement that the Government "facilitate" plaintiff's return after wrongful removal); *Abrego Garcia II*, 2025 WL 1021113, at *2–3 (Thacker, J., concurring) (holding that the court retained jurisdiction because the decision to remove plaintiff to a country for which he had withholding of removal "was not one that was within [the Attorney General's] lawful discretion" and "was not the enforcement of a valid order of removal"); *id.* at *6 ("Nor can the Government be permitted to disclaim any ability to return those it has wrongfully removed by citing their physical presence in a foreign jurisdiction."); *Ramirez v. Sessions*, 887 F.3d 693, 707 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador); *Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 287 (4th Cir. 2020) (directing the Government "to return [plaintiff] to the United States"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (similar). Here, the putative class members *already* have been awarded withholding of removal, and as discussed below, *infra* Section IV(B)(1), Plaintiffs are likely to succeed on the merits that they are and were entitled to due process in order to assert their statutory rights to seek CAT protections prior to removal, making such removals without due process wrongful.

identified individualized issues really boil down to one common question."). "Ultimately, the gravamen of Defendant[s'] challenges on commonality really goes not to whether common issues exist but rather to whether common issues predominate over individual ones; this is not a concern for a 23(b)(2) class [seeking injunctive or declaratory relief], as predominance is a requirement for certifying a class only under 23(b)(3)." *Id.* at *7 (citing *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 11 (D. Mass. 2010) (reviewing First Circuit case law)).

"Plaintiffs in this case have identified a single alleged practice"—Defendants' system-wide policy or practice of designating aliens for removal to a third country without first providing those aliens notice and an opportunity to apply for protection from removal to that country—"that provides the basis for every class member's injury." *Ramirez v. ICE*, 338 F. Supp. 3d 1, 42–50 (D.D.C. 2018) (certifying class of immigrant teens challenging transfers to ICE custody). Regardless of differences in the removal procedures applicable to each class member, they all seek to establish their right to due process.[35] *See Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) (determining "that the admittedly significant variation among the Detainees does not defeat commonality"); *Quadrelli v. Moniz*, 2020 WL 3051778, at *5 (D. Mass. June 8, 2020) (following courts that have certified classes of individuals "who have alleged a general risk of harm due to a

---

[35] The Court rejects Defendants' implicit argument that allegations of due-process violations cannot ever sustain a class action. Class. Cert. Opp. at 14. While "due process is flexible" and can vary depending on the situation, *Matthews*, 424 U.S. at 321, the basics are clear: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 333; *see also id.* at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). As such, courts have certified classes asserting due-process claims under Rule 23(b), without raising commonality concerns. *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1776.1 (3d ed.) (collecting cases); *Garcia-Rubiera*, 570 F.3d at 456–58, 461 (remanding with instructions to certify, under Rule 23(b)(2), a class challenging, among other things, a lack of notice under the Due Process Clause).

policy or practice, even if there might additionally be a unique or distinct impact as to an individual

putative class member").

Since Plaintiffs have identified a single, common question at the heart of the claims,

commonality has been satisfied. *See Gomes*, 561 F. Supp. 3d at 99 ("[A] single common question

is sufficient to satisfy the requirements of Rule 23(a)(2)."). Answering the common legal question

of whether Defendants must afford aliens with due process (and of what that due process consists)

prior to removal to a third country will "drive the resolution of the litigation." *Ramirez*, 338 F.

Supp. 3d at 45 (cleaned up).

Thus, the Court finds that Plaintiffs have satisfied the commonality requirement

under Rule 23(a)(2).

### 3.    23(a)(3) Typicality

The typicality requirement mandates that the "claims or defenses of the representative

parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does

not require that all putative class members share identical claims or defenses. *In re Credit

Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260); *see

also DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 405 (D. Mass. 2017) ("Even

relatively pronounced factual differences will generally not preclude a finding of typicality where

there is a strong similarity of legal theories or where the claim arises from the same practice or

course of conduct." (quotation omitted)). Instead, typicality is established if the claims of the class

representative "arise[] from the same event or practice or course of conduct that gives rise to the

claims of other class members, and . . . are based on the same legal theory." *Garcia-Rubiera*, 570

F.3d at 460 (citation omitted).

Defendants argue that "[t]he proposed class lacks typicality for the same reasons it lacks

commonality" and that "the class representatives are *not* part of the proposed class and do *not*

possess the same interest or suffer the same injury as the proposed class members because they cannot demonstrate they will be removed absent any notice or opportunity to assert a fear-based claim." Class Cert. Opp. at 15–16 (emphases in original).[36]

Typicality is satisfied here for largely the same reasons that commonality is satisfied. The named Plaintiffs and putative class members all share an identical interest in an injunction mandating due-process protections prior to their removal to a third country. Defendants have taken the position that there is *no* due process entitled to any alien, under any method of removal, prior to removal to a third country regardless of any potentiality that such an alien will be tortured or murdered upon arrival. *See* March 28, 2025 Tr. at 10:17–11:1 ("THE COURT: In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation? MS. LARAKERS: DHS's position is no. THE COURT: They don't have to be told anything and given no opportunity to be heard? MS. LARAKERS: DHS's position is no."). Between Defendants' representations to the Court and the Court's ultimate finding that the procedures outlined in the March Guidance do not provide adequate due process, *see infra* at 42–43, the Court finds that the named and unnamed Plaintiffs alike share an identical interest in challenging Defendants' alleged practice of removing individuals to third countries without notice and an opportunity to be heard, and, as such, satisfy the typicality requirement under Rule 23(a)(2).

---

[36] Defendants also argue that "Plaintiffs[] attempt to meet typicality by expanding the description of their class" to apply the class to "to any alien with a final order of removal under the three named removal statutes regardless of what procedures DHS applied to their removal to a third country." Class Cert. Opp. at 15. However, Plaintiffs have asserted a consistent class definition throughout this case, and by its plain language, the class definition applies only to those aliens who have been or will be attempted removed to a third country *without meaningful notice and opportunity to contest the removal*. Thus, whether an alien is a part of the class inherently depends on whether the alien received said notice and opportunity to be heard, *i.e.*, on the Government's own inaction and inaction.

### 4.    23(a)(4) Adequacy of Representation

The adequacy requirement is met when the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy is satisfied if (1) there is no conflict between the interest of the named Plaintiffs and the class members and (2) counsel chosen by the named Plaintiffs are qualified and able to litigate the claims vigorously.[37] *S. States Police*, 241 F.R.D. at 88 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Merely lacking identical interest, however, is not enough for a representative party to be found inadequate. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)).

Defendants argue that "Plaintiffs fail to meet the adequacy requirement for the same reasons Plaintiffs fail to meet the commonality and typicality requirements." Class Cert. Opp. at 16. But the adequacy requirement looks to whether the named Plaintiffs will fairly and adequately protect the interests of the proposed class. *See S. States Police*, 241 F.R.D. at 88. There is nothing in the record to suggest that the named Plaintiffs seek any unique or additional benefit from this litigation that may make their interests different from or adverse to those of absent class members. *Cf. Amchem*, 521 U.S. at 626–27 (holding that adequacy requirement was not met where named plaintiffs stood to benefit disproportionately and at the expense of other potential class members). Thus, the Court finds that Plaintiffs have satisfied the adequacy requirement under Rule 23(a)(2).

---

[37] Defendants do not contest the adequacy of Plaintiffs' counsel. *See* Class Cert. Opp. at 16.

### 5.    23(b)(2) Injunctive or Declaratory Class

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "[C]ivil rights actions . . . where a party charges that another has engaged in unlawful behavior towards a defined group, are prime examples of Rule 23(b)(2) classes." *Reid*, 297 F.R.D. at 193 (quotation omitted).

Defendants' first set of arguments goes mainly to whether the named Plaintiffs have valid claims. *See* Class Cert. Opp. at 17 (arguing that O.C.G. received notice of his removal and had an opportunity to assert fear-based claims); *id.* (arguing that E.F.D. and M.M. have an adequate remedy in a motion to reopen); *id.* at 17–18 (arguing that the claims of D.V.D. and M.M. are speculative and unripe). But these arguments, which go to the merits of the individual claims, are inappropriate to consider on a motion for class certification. "Although . . . a court's class-certification analysis . . . may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 351). To the extent Defendants' implied argument is that these individual infirmities bespeak some sort of "fatal similarity" common to the whole

proposed class, "[s]uch a contention is properly addressed at trial or in a ruling on a summary-judgment motion." *Id.* at 470.[38]

More broadly, Defendants argue that, "[t]o the extent Plaintiffs are entitled to some additional procedures under the Due Process Clause, those procedures would be different for each alien depending on the underlying facts and circumstances of their case." Class Cert. Opp. at 18. But Defendants have not provided the Court with a single example of how an "underlying fact" and/or "circumstance" might lead to different procedural minima for one individual versus another. *Cf. Reid v. Donelan*, 17 F.4th 1, 9 (1st Cir. 2021) (finding certification improper where district court recognized that "relief must be adjudicated on an individual basis"). Defendants' own contention that—if due process applies to third-country removals—the March Guidance is sufficient, PI Opp. at 8, recognizes that it is possible to establish a baseline for all putative class members. The Court does not find that the claims here "hinge on the individual circumstances of each class member." *Reid*, 17 F.4th at 11. Rather, Defendants have taken a broad position, subject to class-wide challenge.

In sum, Plaintiffs challenge a policy or practice that impacts all putative class members: failing to provide meaningful notice and opportunity to present a fear-based claim before executing removal to a third country. In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2).

---

[38] The Court instead addresses these arguments in its analysis of Plaintiffs' motion for a preliminary injunction. *See infra* Section IV(B)(1).

## IV.    Preliminary Injunction

### A.    Legal Standard

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'"  *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Of the four factors, likelihood of success "weighs most heavily" in the analysis.  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

In deciding a motion for preliminary injunction, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'"  *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction."  *Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### B.    Discussion

#### 1.    Likelihood of Success

Plaintiffs have established that they are likely to succeed in showing that Defendants have a policy or practice of executing third-country removals without providing notice and a meaningful

opportunity to present fear-based claims, and that such policy or practice constitutes a deprivation of procedural due process.

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Congress clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment").

More generally speaking, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) [hereinafter *J.G.G. III*] (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). As all nine Supreme Court justices agreed less than two weeks ago, this means that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review

is available."); *id.* at *6 (Sotomayor, J., dissenting) ("That means, of course, that the Government cannot usher any detainees . . . onto planes in a shroud of secrecy.").

Likewise, there can be no disagreement that the same constitutional guarantees apply to withholding-only relief. *Guzman Chavez*, 594 U.S. at 557 (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . . withholding-only relief." (citing *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 n. 4 (2006))); *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (explaining that the Government has an "obligation to provide [the plaintiff who was subject to an order of removal] . . . notice and an opportunity to be heard" and ensure compliance with its "obligations under [CAT]" prior to removal); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999) (finding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence"); *Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) (due-process violation to order deportation to Russia after a claim of asylum as to Latvia where uncounseled noncitizen was provided insufficient notice of Russia possibility).

The Court rejects Defendants' argument that aliens have already received, during their initial removal proceedings, all the process to which they are entitled, so as to justify providing no additional process prior to third-country removal. *See* April 10, 2025 Rough Tr. at 11:1–4 ("MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, the Due Process Clause does not require an additional procedural opportunity to raise [it] in . . . that context."). Defendants argue that aliens could have brought up, during their initial removal proceedings, all the countries where they have concerns that they will be tortured. *See, e.g.*,

April 10, 2025 Rough Tr. at 4:13–16 ("[MR. ENSIGN:] They also previously would have had an opportunity to raise it during their initial removal proceedings and they would be asked on their [I-589] form if they have fear of returning anywhere."). This is both impossible as a practical matter, since the immigration court does not normally consider claims about countries not proposed as a country of removal,[39] and fails to consider that conditions change in countries change over time.[40] Listing all the countries in the world as to which an individual might have a reasonable fear is also impractical: doing so would potentially require, for example, a person with a same-sex sexual orientation to list, at least, all 64 countries where such an orientation is illegal such that the individual fears torture. *See Homosexuality: The countries where it is illegal to be gay*, BBC (Mar. 31, 2023), https://perma.cc/32KN-RH6Q. Indeed, the Assistant to the Solicitor General, arguing before the Supreme Court on the topic of third-country removals less than a month ago, affirmatively stated that "[w]e would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country," even where that individual was already subject to an order of removal.[41]

Even without that statement, the claims at issue concern removal to countries that were *not ruled upon* in the initial proceedings and are therefore not covered by the removal order. As discussed above, the Court disagrees with Defendants' assertion that the theoretical option of a motion to reopen provides a sufficient remedy. *See supra* at 14–18; *see also Sadychov*, 565 F.

---

[39] *See supra* at 16–17 & notes 17, 24 (discussing the non-viability of preemptive claims).

[40] An alien can remain in the United States on an Order of Supervision for decades after being granted withholding. *See* April 10, 2025 Rough Tr. at 15:24–16:1 ("THE COURT: But some people have been granted withholding for 20 years, right?  MS. REALMUTO: Exactly."); *see also* Compl. ¶¶ 75–76 (alleging that E.F.D. was granted CAT protection in 2018 and had been released from immigration custody until he was re-detained in March 2025). Country conditions can change dramatically, especially over decades. *See, e.g.*, Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30976 (May 20, 2022) (providing Temporary Protected Status designation to Afghanistan in May 2022, after Taliban returned to power in August 2021).

[41] *Supra* note 2.

App'x at 651 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" (quoting *She*, 629 F.3d at 962)); Dkt. 59-12 at 4–5 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court.").[42]

The Court finds it likely that Defendants have applied and will continue to apply the alleged policy of removing aliens to third countries without notice and an opportunity to be heard on fear-based claims—in other words, without due process. Defendants have repeatedly argued that they have no obligation to provide any process whatsoever when newly designating a third country for removal. *See, e.g.*, March 28, 2025 Tr. at 10:17–11:1; April 10, 2025 Rough Tr. at 9:5–8, 10:19–11:4. Defendants' own avowed position and the numerous declarations Plaintiffs have

---

[42] *See also* Dkt. 8-8 ¶ 9 (motion to reopen denied); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (same); Dkt. 59-12 ¶¶ 12–18 (same); Dkt. 59-13 at 4 (same).

provided[43] substantiate both the prior and future use of Defendants' policy of providing no notice prior to third-country removal.[44]

Nor do the procedures outlined in DHS's March Guidance satisfy due process. The March Guidance provides no process whatsoever to individuals whom DHS plans to remove to a country from which the United States has received blanket diplomatic assurances. Dkt. 43-1 at 1–2. Defendants are, of course, correct that the Court may not question the substance of diplomatic assurances endorsed by the Executive. *See* PI Opp. at 11. However, the Court may inquire into the overall process and whether such assurances, on their own terms, satisfy the Constitution. *See Khouzam*, 549 F.3d at 259 (finding that lack of individualized determination violated due process, notwithstanding diplomatic assurance).

Blanket diplomatic assurances do not address DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory

---

[43] Notably, the parties contest whether O.C.G. received any substantial notice or a meaningful opportunity to present a fear-based claim prior to his removal to Mexico. *Compare* Compl. ¶¶ 85–86 (alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of the ICE ERO Phoenix Field Office, asserting based on hearsay that notice was provided on February 21, 2025, by "ERO" and that O.C.G. denied fear of removal). Given O.C.G.'s sworn declaration—rebutted only by a hearsay declaration—the Court finds it likely that O.C.G. was not provided sufficient process prior to removal.

[44] Defendants argue that the claims of D.V.D. and M.M. are speculative and unripe because D.V.D. and M.M. have not yet been detained or notified of any impending third-country removal. Class. Cert. Opp. at 17–18. *But see* Compl. ¶ 71 (alleging that M.M. was informed by an ICE official that she would be deported in the immediate future). There, so to speak, lies the rub—according to Defendants, an individual must await notice of removal before his claim is ripe, even where the claim is that there is no notice. But once an individual is removed, Defendants argue, there is no jurisdiction. *See* Class Cert. Opp. at 11–12.

Having granted class certification, the individual cases of D.V.D. and M.M. are less dispositive as to the issue of likelihood of success. Nevertheless, insofar as they may represent some portion of the class, the Court notes that it does not find such cases unripe. Ripeness concerns both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300–01 (1998)). Here, both tests indicate justiciability. As Plaintiffs challenge Defendants' policy and practices, rather than the putative class members' individual removability, no further facts are necessary for judicial review. *See Pustell v. Lynn Pub. Scs.*, 18 F.3d 50, 52 (1st. Cir. 1994) (finding claim ripe where "[n]o further factual development is necessary for us to resolve the question at issue, namely, whether the policy . . . is constitutional"). Likewise, Plaintiffs "suffer the harm of substantial uncertainty if we put off resolving their constitutional claims." *Id.*

and regulatory framework. *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that ***an*** alien would not be tortured there if ***the*** alien were removed to that country." (emphases added));[45] *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").

Moreover, blanket assurances offer no protection against either torture by non-state actors or chain refoulement, whereby the third country proceeds to return an individual to his country of origin. *See, e.g.*, Compl. ¶¶ 68–69 (detailing domestic violence concerns that led to withholding of removal designation); Dkt. 8-2 ¶¶ 3–4, 7–8, 13 (same). Yet these circumstances can trigger protections under CAT no less than threats coming from state actors. 8 C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

Even if such blanket assurances might, in some individual cases, satisfy due process, the March Guidance precludes any further review prior to removal. Dkt. 43-1 at 1–2 (providing noncitizens "will be removed without the need for further procedures"). There can be no right without a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Without meaningful review, the rights Congress has provided are little more than dead letter.

---

[45] The Department of Justice has previously recognized its obligation to provide a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations. *See Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) ("LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, 'Well, we won't torture this person you're sending back' – do you really think those assurances are credible? GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis. . . . Well, again, Senator, we take this obligation very, very seriously. And we know what our legal obligations are. We know what the directive of the president is. And each case is very fact-specific.").

It simply cannot be, as Defendants contend, that the Government can "decide right now that someone who is in [] custody is getting deported to a third country, give them no notice and no opportunity to say, 'I will be killed the moment I arrive there,' and, as long as the [Government] doesn't already know that there's someone standing there waiting to shoot him, that's [] fine." *See* March 28, 2025 Tr. at 29:12–18 ("In short, yes."). Defendants' obligations under CAT and the Due Process Clause require more. Plaintiffs have demonstrated a likelihood of success on the merits.

### 2.    Irreparable Harm

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

The irreparable harm factor likewise weighs in Plaintiffs' favor. Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.

Defendants' argument that this Court has no jurisdiction over already-removed aliens only bolsters Plaintiffs' argument toward finding irreparable harm. *See* Class Cert. Opp. at 11–12. Defendants contend that they may remove aliens to third countries with no possibility for review. *Id.* It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process

before an unprecedented and potentially irreversible removal occurs." *J.G.G. II*, 2025 WL 914682, at *30 (Millett, J., concurring).

Thus, Plaintiffs have demonstrated a likelihood of irreparable harm.

### 3.  Balance of Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest.  "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In cases implicating removal, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.  However, there is also "a public interest in prompt execution of removal orders." *Id.*

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022).  The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 120–21 (2022) (staying an illegal vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming district court's preliminary injunction of an illegal executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

Here, the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face.  The Court finds that these circumstances countervail the public's normal

and meaningful "interest in prompt execution."  *See Nken*, 556 U.S. at 436.  Thus, the final two

factors support issuance of relief.

### 4.    Limitations of Relief

"[An] injunction should issue only where [it is] essential in order effectually to protect . . .

rights against injuries otherwise irremediable."  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305,

312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).  Here, the "irremediable"

injury would be deportation without meaningful opportunity to present a claim based on fear of

persecution, torture, or death.

Accordingly, the Court circumscribes its remedy and declines, at this time, to require the

full extent of process Plaintiffs propose.  Instead, the Court orders that, prior to removing any alien

to a third country, *i.e.*, any country not explicitly provided for on the alien's order of removal,

Defendants must: (1) provide written notice[46] to the alien—and the alien's immigration counsel,

if any[47]—of the third country to which the alien may be removed, in a language the alien can

understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility

---

[46] Written notice comports with the traditional standards of due process.  *See Matthews*, 424 U.S. at 348
("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case
against him and opportunity to meet it.'" (citation omitted)); *Mullane*, 339 U.S. at 313, 315 ("Personal service of
written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. . . .
[W]hen notice is a person's due, process which is a mere gesture is not due process.  The means employed must be
such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness
and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably
certain to inform those affected.").  The Court's sense of what fairness requires is further supported by the
Government's own internal documents.  *See* Dkts. 1-2 (2001 draft Form 1-913 that would provide written notice prior
to third-country removal and require motion to reopen to be filed within fifteen days of being served with notice), 1-3
(2020 draft model notice that would provide written notice prior to removal to country other than designated country
of removal and that provided that "DHS w[ould] not oppose [the alien's] filing of a motion to reopen with the
Immigration Court" within fifteen days of being served with such notice).

[47] *See* 8 C.F.R. § 292.5 ("Whenever a person is required by any of the provisions of this chapter to give or be
given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to
file or submit an application or other document; or to perform or waive the performance of any act, such notice,
service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or
requested of the attorney or representative of record, or the person himself if unrepresented.").

for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear";[48] and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days,[49] for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

With respect to the return of O.C.G.,[50] the Court recognizes that whether he received notice at all, let alone meaningful notice, is hotly contested. Until the factual dispute of whether he received notice is resolved, the Court will not order the return of O.C.G. A mandatory injunction, as would be required, "alters rather than preserves the status quo," and is thus subject to an even more heightened level of legal and factual scrutiny. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (citing *Massachusetts Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). Instead, Plaintiffs may renew their motion with regards to the return of O.C.G.

---

[48] "Reasonable fear" is the most stringent standard for screenings applied in the initial removal context, meaning the alien must show the highest and most credible level of fear required at the screening stage to garner relief. *Compare* 8 CFR § 208.31 (using "reasonable fear" as the screening standard for aliens removable under certain INA provisions), *with* 8 CFR § 208.16 (using "credible fear" as the screening standard for aliens removable under other INA provisions); *see also Reasonable Fear Screenings*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/reasonable-fear-screenings (last updated Jan. 24, 2025) ("Those who are found to have a reasonable fear of persecution or torture are then given an opportunity to seek withholding of removal or deferral of removal before an Immigration Judge."). While Defendants propose applying the "more likely than not" standard, *see* April 10, 2025 Rough Tr. at 33:2–4, that would require an alien to demonstrate full entitlement to CAT protections at merely the screening stage. *See* 8 C.F.R. § 208.17(a).

[49] The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable. *See* April 10, 2025 Rough Tr. at 48:10–13 ("THE COURT: What's an appropriate number of days? MR. ENSIGN: Your Honor, our -- we think it should be shorter than [21 days]. I'm not prepared to say exactly what that period is."). To tailor its preliminary injunction as narrowly as possible, the Court has chosen to use the timeframe that Defendants proposed when developing their own forms for this scenario. *Supra* note 46. Though these forms may never have been formally adopted, they would appear to, at a minimum, reflect the agencies' determination—on two separate occasions spanning a period of nearly 20 years—of an appropriate period of time during which an alien should be permitted to object to an adverse determination.

[50] It is clear that courts can still "grant relief once a deportee crosses the border." *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (citing *Rumsfeld v. Padilla*, 542 U. S. 426, 447, n. 16 (2004); *Boumediene v. Bush*, 553 U. S. 723, 732 (2008)).

after discovery. The Court orders the parties to conduct expedited discovery on this issue and file a status update addressing a proposed discovery plan by April 25, 2025.[51]

### C.     **Bond**

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"); *see also da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal rights at issue); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that district court did not abuse its discretion when it did not require low-wage laborers to post a bond).

## V.     **Conclusion**

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. 4) is GRANTED and motion for a preliminary injunction (Dkt. 6) is GRANTED in part.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  April 18, 2025                    Judge, United States District Court

---

[51] The Court notes that Plaintiffs have not requested injunctive relief based on the right to make claims under 8 U.S.C. § 1231(b)(3)(A) beyond the named Plaintiffs. This is consistent with the limitation on certain relief under 8 U.S.C. § 1252(f)(1). *See Galvez*, 52 F.4th at 829–30. The Court thus limits its Order as to statutory claims to apply only to the named Plaintiffs while ensuring CAT protection to all similarly situated individuals.



# MOST RECENT I-94 RESULTS

| Full Name | | | |
|---|---|---|---|
| ABREGO GARCIA, Kilmar | | | |
| **Admission (I-94) Record Number** | **Most Recent Date of Entry** | **Class of Admission** | **Admit Until Date** |
| 566850763A4 | 06/06/2025 | SBP | 06/04/2026 |

### DETAILS PROVIDED ON I-94 ARRIVAL/DEPARTURE RECORD

**Last/Surname:** ABREGO GARCIA

**First (Given) Name:** KILMAR

**Date of Birth:** 07/26/1995

**Document Number:** NONE

**Country of Citizenship:** EL SALVADOR

**ANNOTATIONS:**




Please visit Official I-94 website for the most up-to-date information: https://i94.cbp.dhs.gov/

KAAG-Noem-0000004300

G



| Receipt Number | | Case Type | |
|---|---|---|---|
| IOE9742014131 | | I130 - PETITION FOR ALIEN RELATIVE | |
| Received Date | Priority Date | Petitioner | |
| 06/26/2025 | 06/26/2025 | VASQUEZ SURA, JENNIFER STEFANIA | |
| Notice Date | Page | Beneficiary   A201 577 119 | |
| 06/26/2025 | 1 of 1 | ABREGO GARCIA, KILMAR ARMANDO | |

VASQUEZ SURA, JENNIFER STEFANIA
c/o GANDHI, RINA
Murray Osorio PLLC
4103 CHAIN BRIDGE ROAD STE 300
FAIRFAX  VA  22030

**Notice Type:** Receipt Notice
Amount received: $625.00 U.S.
Section: Husband or wife of U.S Citizen, 201(b) INA

This notice confirms that USCIS received your application or petition ("this case") as shown above.

**If any of the information in your notice is incorrect or you have any questions about your case,** you can connect with the USCIS Contact Center at www.uscis.gov/contactcenter or ask about your case online at www.uscis.gov/e-request. You will need your Alien Registration Number (A-Number) and/or the receipt number shown above.

You can receive updates on your case by visiting www.uscis.gov/casestatus to get the latest status or you can create an account at my.uscis.gov/account and receive email updates for your case.

This notice does not grant any immigration status or benefit, nor is it evidence that this case is still pending. It only shows that the application or petition was receipted on the date shown.
**Processing time** - Processing times vary by form type.
- Visit www.uscis.gov/processingtimes to see the current processing times by form type and field office or service center.
- If you do not receive an initial decision or update within our current processing time, you can try our online tools available at www.uscis.gov/tools or ask about your case online at www.uscis.gov/e-request.
- When we make a decision on your case or if we need something from you, we will notify you by mail and update our systems.

**If this case is an I-130 Petition** - Filing and approval of a Form I-130, Petition for Alien Relative, is only the first step in helping a relative immigrate to the United States. The beneficiaries of a petition must wait until a visa number is available before they can take the next step to apply for an immigrant visa or adjustment of status to lawful permanent residence. To best allocate resources, USCIS may wait to process I-130 forms until closer to the time when a visa number will become available, which may be years after the petition was filed. Nevertheless, USCIS processes I-130 forms in time not to delay relatives' ability to take the next step toward permanent residence once a visa number does become available. If, before final action on the petition, you decide to withdraw your petition, your family relationship with the beneficiary ends, or you become a U.S. citizen, call 800-375-5283.
**If your address changes** - If you move while your case is pending, please visit www.uscis.gov/addresschange for information on how to update your address. Remember to update your address for all your receipt numbers.

**Return of Original Documents** - Use Form G-884, Request for the Return of Original Documents, to request the return of original documents submitted to establish eligibility for an immigration or citizenship benefit. You only need to submit one Form G-884 if you are requesting multiple documents contained in a single USCIS file. However, if the requested documentation is in more than one USCIS file, you must submit a separate request for each file. (For example: If you wish to obtain your mother's birth certificate and your mother's/father's marriage certificate, both of which are in the USCIS file that pertains to her, submit one Form G-884 with your mother's information.)

**NOTICE:** The information you provide on and in support of applications and petitions is submitted under the penalty of perjury. USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

Texas Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd., STE 110
Irving TX 75038-0012



**USCIS Contact Center: www.uscis.gov/contactcenter**



**U.S. Department of Justice**
Executive Office for Immigration Review

**Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents**

| PLEASE READ ADVICE AND INSTRUCTIONS BEFORE FILLING IN FORM | Fee Stamp (Official Use Only) |
|---|---|

**PLEASE TYPE OR PRINT**

| *1)* My present true name is: *(Last, First, Middle)*<br>Abrego Garcia, Kilmar, Armando | 2) Alien Registration (or "A") Number(s):<br>201577119 |
|---|---|
| 3) My name given at birth was: *(Last, First, Middle)*<br>Abrego Garcia, Kilmar, Armando | *4)* Birth Place: *(City and Country)*<br>La Libertad, El Salvador |

| *5)* Date of Birth: *(Month, Day, Year)*<br>07/26/1995 | 6) Sex: ☑Male ☐ Female | 7) Height: | 8) Hair Color:<br>Brown | 9) Eye Color:<br>Brown |
|---|---|---|---|---|

| 10) Current Nationality and Citizenship:<br>Salvadoran | 11) Social Security Number:<br>706768517 | 12) Home Phone Number: | 13) Work Phone Number: |
|---|---|---|---|

| 14) I currently reside at:<br><br>4502 Samar Street<br>Beltsville          MD          20705 | 15) I have been known by these additional name(s):<br>Kilmar Abrego<br>Kilmar Garcia<br>N/A |
|---|---|

16) I have resided in the following locations in the United States: (List PRESENT ADDRESS FIRST, and work back in time for at least 10 years.)

| Street and Number - Apt. or Room # - City or Town - State - Zip Code | Resided From:<br>*(Month, Day, Year)* | Resided To:<br>*(Month, Day, Year)* |
|---|---|---|
| 4502 Samar Street, Beltsville, MD, 20705 | 08/23/2025 | PRESENT |
| 421 E Spring St. #1D31, Cookeville, TN | | 08/22/2025 |
| 1816 Greenwich Wood Drive, Apt. 11, Silver Spring, MD 20903 | 04/01/2023 | 04/01/2025 |
| 4502 Samar Street, Beltsville, MD, 20705 | 04/01/2022 | 04/01/2023 |
| 4501 Birchtree Lane, Temple Hills, MD | | 04/01/2022 |

17) I, the undersigned, hereby request that my removal be cancelled under the provisions of section 240A(b) of the Immigration and Nationality Act (INA). I believe that I am eligible for cancellation of removal because: (Check all that apply.)

☑ My removal would result in exceptional and extremely unusual hardship to my:

| | UNITED STATES CITIZEN | LAWFUL PERMANENT RESIDENT |
|---|---|---|
| ☑ spouse, who is a | ☑ | ☐ |
| ☐ father, who is a | ☐ | ☐ |
| ☐ mother, who is a | ☐ | ☐ |
| ☑ child/children, who is/are a | ☑ | ☐ |

☐ I, or my child, have been battered or subject to extreme cruelty by a United States citizen or lawful permanent resident spouse or parent.

**With the exception of absences described in question #23, I have resided in the United States since:** _____
*(Month, Day, Year)*

*Please continue answers on a separate sheet as needed.*
*(1)*

Form EOIR-42B
Rev. Feb. 2025

## PART 3 - INFORMATION ABOUT YOUR PRESENCE IN THE UNITED STATES

18) I first arrived in the United States under the name of: *(Last, First, Middle)*

Abrego Garcia, Kilmar, Armando

19) I first arrived in the United States on: *(Month, Day, Year)*

20) Place or port of first arrival: *(Place or Port, City, and State)*

Texas

21) I: ☐ was inspected and admitted.

☐ I entered using my Lawful Permanent Resident card which is valid until N/A _____.

☐ Category on Lawful Permanent Resident card N/A _____. *(Month, Day, Year)*

☐ I entered using a N/A _____ visa which is valid until N/A _____. *(Specify Type of Visa)* *(Month, Day, Year)*

☑ was not inspected and admitted.

☐ I entered without documents. Explain: N/A _____.

☑ I entered without inspection. Explain: I entered without inspection through Texas. _____.

☐ Other. Explain: N/A _____.

22) I applied on N/A _____ for additional time to stay and it was ☐ granted on N/A _____
*(Month, Day, Year)* *(Month, Day, Year)*
and valid until N/A _____, or ☐ denied on N/A _____.
*(Month, Day, Year)* *(Month, Day, Year)*

23) Since the date of my first entry, I departed from and returned to the United States at the following places and on the following dates:
*(Please list all departures regardless of how briefly you were absent from the United States.)*

***If you have never departed from the United States since your original date of entry, please mark an X in this box:*** ☑

| | Port of Departure *(Place or Port, City and State)* | Departure Date *(Month, Day, Year)* | Purpose of Travel | Destination | |
|---|---|---|---|---|---|
| 1 | N/A | N/A | N/A | N/A | |
| | Port of Return *(Place or Port, City and State)* | Return Date *(Month, Day, Year)* | Manner of Return | Inspected and Admitted? | |
| | N/A | N/A | N/A | ☐ Yes ☐ No | |
| 2 | Port of Departure *(Place or Port, City and State)* | Departure Date *(Month, Day, Year)* | Purpose of Travel | Destination | |
| | N/A | N/A | N/A | N/A | |
| | Port of Return *(Place or Port, City and State)* | Return Date *(Month, Day, Year)* | Manner of Return | Inspected and Admitted? | |
| | N/A | N/A | N/A | ☐ Yes ☐ No | |

24) Have you ever departed the United States:  a) under an order of deportation, exclusion, or removal?. ................................... ☐ Yes ☑ No

b) pursuant to a grant of voluntary departure?...................................................... ☐ Yes ☑ No

## PART 4 - INFORMATION ABOUT YOUR MARITAL STATUS AND SPOUSE *(Continued on page 3)*

25) I am not married: ☑
I am married: ☐

26) If married, the name of my spouse is: *(Last, First, Middle)*
Vasquez Sura, Jennifer, Stefania

27) My spouse's name before marriage was:
N/A

28) The marriage took place in: *(City and Country)*
Baltimore, Maryland

29) Date of marriage: *(Month, Day, Year)*
06/25/2019

30) My spouse currently resides at:

*Apt. number and/or in care of*
4502 Samar St.
*Number and Street*
Beltsville          MD          20705
*City or Town          State/Country          Zip Code*

31) Place and date of birth of my spouse: *(City & Country; Month, Day, Year)*
Fairfax, Virginia, USA          12/20/1995

32) My spouse is a citizen of: *(Country)*
United States

33) If your spouse is other than a native born United States citizen, answer the following:

He/she arrived in the United States at: *(Place or Port, City and Year)* N/A _____

He/she arrived in the United States on: *(Month, Day, Year)* N/A _____

His/her alien registration number(s) is: A# N/A _____

He/she was naturalized on: *(Month, Day, Year)* N/A _____ at N/A _____
*(City and State)*

34) My spouse ☐ - is ☑ - is not employed. If employed, please give salary and the name and address of the place(s) of employment.

| Full Name and Address of Employer | Earnings Per Week *(Approximate)* |
|---|---|
| N/A | $ N/A |
| N/A | $ N/A |
| N/A | $ N/A |

*Please continue answers on a separate sheet as needed.*
*(2)*

112

Form EOIR-42B
Rev. Feb. 2025

## PART 4 - INFORMATION ABOUT YOUR MARITAL STATUS AND SPOUSE *(Continued)*

35) I ☐ - have ☑ - have not been previously married: *(If previously married, list the name of each prior spouse, the dates on which each marriage began and ended, the place where the marriage terminated, and describe how each marriage ended.)*

| Name of prior spouse: *(Last, First, Middle)* | Date marriage began: Date marriage ended: | Place marriage ended: *(City and Country)* | Description or manner of how marriage was terminated or ended: |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | N/A | N/A | N/A |

36) My present spouse ☐ - has ☑ - has not been previously married: *(If previously married, list the names of each prior spouse, the dates on which each marriage began and ended, the place where the marriage terminated, and describe how each marriage ended.)*

| Name of prior spouse: *(Last, First, Middle)* | Date marriage began: Date marriage ended: | Place marriage ended: *(City and Country)* | Description or manner of how marriage was terminated or ended: |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | N/A | N/A | N/A |

37) Have you been ordered by any court, or are otherwise under any legal obligation, to provide child support and/or spousal maintenance as a result of a separation and/or divorce?               ☐ Yes ☑ No

## PART 5 - INFORMATION ABOUT YOUR EMPLOYMENT AND FINANCIAL STATUS

38) Since my arrival into the United States, I have been employed by the following named persons or firms: *(Please begin with present employment and work back in time. Any periods of unemployment or school attendance should be specified. Attach a separate sheet for additional entries if necessary .)*

| Full Name and Address of Employer | Earnings Per Week *(Approximate)* | Type of Work Performed | Employed From: *(Month, Day, Year)* | Employed To: *(Month, Day, Year)* |
|---|---|---|---|---|
| Unemployed N/A | $ N/A | N/A | 03/12/2025 | PRESENT |
| WE Bowers 7101 Muirkirk Rd., Beltsville, MD 20705 | $ | Sheet Metal | 09/01/2024 | 03/12/2025 |
| Self Employed Various Locations | $ | Subcontractor | | 09/01/2024 |

39) If self-employed, describe the nature of the business, the name of the business, its address, and net income derived therefrom:
N/A
N/A
N/A
N/A
N/A

40) My assets (and if married, my spouse's assets) in the United States and other countries, not including clothing and household necessities, are:

**Self**
Cash, Stocks, and Bonds................................. $ 0
Real Estate................................................ $ 0
Auto (dollar value minus amount owed)........ $ 0
Other (describe on line below)...................... $ 0
N/A                          **TOTAL** $ 0

**Jointly Owned With Spouse**
Cash, Stocks, and Bonds. ............................ $
Real Estate................................................. $
Auto (dollar value minus amount owed)........ $
Other (describe on line below). .................... $
N/A                          **TOTAL** $ N/A

41) I ☐ - have ☑ - have not received public or private relief or assistance (e.g.,Welfare, Unemployment Benefits, Medicaid, TANF, AFDC, etc.). If you have, please give full details including the type of relief or assistance received, date for which relief or assistance was received, place, and total amount received during this time:  N/A
N/A

42) Please list each of the years in which you have filed an income tax return with the Internal Revenue Service:_____

Form EOIR-42B
Rev. Feb. 2025

## PART 6 - INFORMATION ABOUT YOUR FAMILY *(Continued on page 5)*

43) I have ___1___ *(Number of)* children. Please list information for each child below, include assets and earnings information for children over the age of 16 who have separate incomes:

| Name of Child: *(Last, First, Middle)* Child's Alien Registration Number: | Citizen of What Country: Birth Date: *(Month, Day, Year)* | Now Residing At: *(City and Country)* Birth Place: *(City and Country)* | Immigration Status of Child |
|---|---|---|---|
| Abrego Vasquez, Kilmar <br> A#: N/A | United States <br> 08/11/2019 | Beltsville, Maryland <br> Silver Spring, Maryland, USA | USC |
| Estimated Total of Assets: $ N/A | | Estimated Average Weekly Earnings: $ N/A | |
| N/A <br> A#: N/A | N/A <br> N/A | N/A <br> N/A | N/A |
| Estimated Total of Assets: $ N/A | | Estimated Average Weekly Earnings: $ N/A | |
| N/A <br> A#: N/A | N/A <br> N/A | N/A <br> N/A | N/A |
| Estimated Total of Assets: $ N/A | | Estimated Average Weekly Earnings: $ N/A | |

44) If your application is denied, would your spouse and all of your children accompany you to your:

Country of Birth -          ☐ Yes  ☑ No

Country of Nationality -    ☐ Yes  ☑ No

Country of Last Residence - ☐ Yes  ☑ No

If you answered "No" to any of the responses, please explain: My son has autism and would not get the medical and educational services he needs nor would he have the same opportunities and lifestyle in El Salvador. My wife was born in the U.S. and has a life here and would not have a support system in El Salvador.

45) Members of my family, including my spouse and/or child(ren) ☑ - have ☐ - have not received public or private relief or assistance (e.g., Welfare, Unemployment Benefits, Medicaid, TANF, AFDC, etc.). If any member of your immediate family has received such relief or assistance, please give full details including identity of person(s) receiving relief or assistance, dates for which relief or assistance was received, place, and total amount received during this time: _____

N/A

N/A

N/A

N/A

N/A

46) Please give the requested information about your parents, brothers, sisters, aunts, uncles, and grandparents, living or deceased. As to residence, show street address, city, and state, if in the United States; otherwise show only country:

| Name: *(Last, First, Middle)* Alien Registration Number: | Citizen of What Country: Birth Date: *(Month, Day, Year)* | Relationship to Me: Birth Place: *(City and Country)* | Immigration Status of Listed Relative |
|---|---|---|---|
| Abrego, Pedro, Armando <br> A#: N/A | El Salvador | Father <br> San Vicente, El Salvador | N/A |
| Complete Address of Current Residence, if Living: El Salvador | | | |
| Garcia de Abrego, Cecilia <br> A#: N/A | El Salvador | Mother <br> Cabanas, El Salvador | |
| Complete Address of Current Residence, if Living: Beltsville, Maryland <br> N/A | | | |

Form EOIR-42B
Rev. Feb. 2025

## PART 6 - INFORMATION ABOUT YOUR FAMILY *(Continued)*

*IF THIS APPLICATION IS BASED ON HARDSHIP TO A PARENT OR PARENTS, QUESTIONS 47-50 MUST BE ANSWERED.*

47) If your parent is not a citizen of the United States, give the date and place of arrival in the United States including full details as to the date, manner, and terms of admission into the United States: N/A

N/A

N/A

48) My father ☐ - is ☐ - is not employed. If employed, please give salary and the name and address of the place(s) of employment.

| Full Name and Address of Employer | Earnings Per Week *(Approximate)* |
|---|---|
| N/A | $ N/A |

49) My mother ☐ - is ☐ - is not employed. If employed, please give salary and the name and address of place(s) of employment.

| Full Name and Address of Employer | Earnings Per Week *(Approximate)* |
|---|---|
| N/A | $ N/A |

50) My parent's assets in the United States and other countries not including clothing and household necessities are:

**Assets of father consist of the following:**
Cash, Stocks, and Bonds.............................. $ N/A
Real Estate.................................................. $ N/A
Auto (dollar value minus amount owed)....... $ N/A
Other (describe on line below).................... $ N/A
N/A                                        **TOTAL** $ N/A

**Assets of mother consist of the following:**
Cash, Stocks, and Bonds. ............................ $ N/A
Real Estate.................................................. $ N/A
Auto (dollar value minus amount owed)....... $ N/A
Other (describe on line below). ................... $ N/A
N/A                                        **TOTAL** $ N/A

## PART 7 - MISCELLANEOUS INFORMATION *(Continued on page 6)*

51) I ☐ - have ☑ - have not entered the United States as a crewman after June 30, 1964.

52) I ☐ - have ☑ - have not been admitted as, or after arrival in the United States acquired the status of, an exchange alien.

53) I ☐ - have ☐ - have not submitted address reports as required by section 265 of the Immigration and Nationality Act.

54) I ☐ - have ☐ - have never (either in the United States or in any foreign country) been arrested, summoned into court as a defendant, convicted, fined, imprisoned, placed on probation, or forfeited collateral for an act involving a felony, misdemeanor, or breach of any public law or ordinance(including, but not limited to, traffic violations or driving incidents involving alcohol). *(If answer is in the affirmative, please give a brief description of each offense including the name and location of the offense, date of conviction, any penalty imposed, any sentence imposed, and the time actually served. You are required to submit documentation of any such occurrences.)*

To be Supplemented.

N/A

N/A

N/A

55) Have you ever served in the Armed Forces of the United States? ☐ Yes ☑ No. If "Yes" please state branch *(Army, Navy, etc.)* and service number: N/A

Place of entry on duty: *(City and State)* N/A

Date of entry on duty: *(Month, Day, Year)* N/A          Date of discharge: *(Month, Day, Year)* N/A

Type of discharge: *(Honorable, Dishonorable, etc.)* N/A

I served in active duty status from: *(Month, Day, Year)* N/A _____ to _____ *(Month, Day, Year)* N/A

56) Have you ever left the United States or the jurisdiction of the district where you registered for the draft to avoid being drafted into the military or naval forces of the United States?

☐ Yes ☑ No

Form EOIR-42B
Rev. Feb. 2025

## PART 7 - MISCELLANEOUS INFORMATION *(Continued)*

57) Have you ever deserted from the military or naval forces of the United States while the United States was at war? ☐ Yes ☑ No

58) If male, did you register under the Military Selective Service Act or any applicable previous Selective Service (Draft) Laws? ☐ Yes ☑ No

If "Yes," please give date, Selective Service number, local draft board number, and your last draft classification: N/A

N/A

59) Were you ever exempted from service because of conscientious objection, alienage, or any other reason? ☐ Yes ☑ No

60) Please list your present or past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or any other place since your 16th birthday. Include any foreign military service in this part. If none, write "None." Include the name of the organization, location, nature of the organization, and the dates of membership.

| Name of Organization | Location of Organization | Nature of Organization | Member From: *(Month, Day, Year)* | Member To: *(Month, Day, Year)* |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A |

61) Have you ever:

☐ Yes ☑ No  been ordered deported, excluded, or removed?

☐ Yes ☑ No  overstayed a grant of voluntary departure from an Immigration Judge or the Department of Homeland Security (DHS), formerly the Immigration and Naturalization Service (INS)?

☐ Yes ☑ No  failed to appear for removal or deportation?

62) Have you ever been:

☐ Yes ☑ No  a habitual drunkard?

☐ Yes ☑ No  one whose income is derived principally from illegal gambling?

☐ Yes ☑ No  one who has given false testimony for the purpose of obtaining immigration benefits?

☐ Yes ☑ No  one who has engaged in prostitution or unlawful commercialized vice?

☐ Yes ☑ No  involved in a serious criminal offense and asserted immunity from prosecution?

☐ Yes ☑ No  a polygamist?

☐ Yes ☑ No  one who brought in or attempted to bring in another to the United States illegally?

☐ Yes ☑ No  a trafficker of a controlled substance, or a knowing assister, abettor, conspirator, or colluder with others in any such controlled substance offense (not including a single offense of simple possession of 30 grams or less of marijuana)?

☐ Yes ☑ No  inadmissible or deportable on security-related grounds under sections 212(a)(3) or 237(a)(4) of the INA?

☐ Yes ☑ No  one who has ordered, incited, assisted, or otherwise participated in the persecution of an individual on account of his or herrace, religion, nationality, membership in a particular social group, or political opinion?

☐ Yes ☑ No  a person previously granted relief under sections 212(c) or 244(a) of the INA or whose removal has previously been cancelled under section 240A of the INA?

If you answered "Yes" to any of the above questions, explain: N/A

N/A

N/A

Form EOIR-42B
Rev. Feb. 2025

## PART 7 - MISCELLANEOUS INFORMATION *(Continued)*

63) Are you the beneficiary of an approved visa petition? ☐ Yes ☑ No

If yes, can you arrange a trip outside the United States to obtain an immigrant visa? ☐ Yes ☐ No If no, please explain:

N/A

N/A

N/A

N/A

64) Name of School, Type of School, Degree Earned / Date (if any), Location (City/Country), Attended From (MM/YY) To(MM/YY)

N/A

65) The following certificates or other supporting documents are attached as part of this document. : (Refer to the Instructions for documents which should be attached.)

N/A

## PART 8 - SIGNATURE OF PERSON PREPARING FORM, IF OTHER THAN APPLICANT

*(Read the following information and sign below)*

I declare that I have prepared this application at the request of the person named in Part 1, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in a language the applicant speaks fluently for verification before he or she signed the applica- tion in my presence. I am aware that the knowing placement of false information on the Form EOIR-42B may subject me to civil penalties under 8 U.S.C.§1324c.

| Signature of Preparer: | Print Name: Benjamin Osorio | Date: 08/25/2025 |
|---|---|---|
| Daytime Telephone#: 703-352-2399 | Address of Preparer: *(Number and Street, City, State, Zip Code)* 4103 Chain Bridge Road, STE 300, Fairfax, VA, 22030 | |

## PART 9 - SIGNATURE

### APPLICATION NOT TO BE SIGNED BELOW UNTIL APPLICANT APPEARS BEFORE AN IMMIGRATION JUDGE

I swear or affirm that I know the contents of this application that I am signing, including the attached documents and supplements, and that they are all true to the best of my knowledge, taking into account the correction(s) numbered_____to_____, if any, that were made by me or at my request.

_____
*(Signature of Applicant or Parent or Guardian)*

Subscribed and sworn to before me by the above-named applicant at _____

_____
*Immigration Judge*

_____
*Date (Month, Day, Year)*

## PART 10 - PROOF OF SERVICE

I hereby certify that a copy of the foregoing Form EOIR-42B was:    ❏ - delivered in person    ❏ - mailed first class, postage prepaid

on_____to the Assistant Chief Counsel for the DHS (U.S. Immigration and Customs Enforcement -  ICE)
*(Month, Day, Year)*

at  _____
*(Number and Street, City, State, Zip Code)*

☑  No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

_____
*Signature of Applicant (or Attorney or Representative)*

Form EOIR-42B
Rev. Feb. 2025

MINISTERIO DE
SEGURIDAD PÚBLICA

GOBIERNO
DE COSTA RICA

Thursday, August 21, 2025

Mrs. Jennifer L. Savage

Chargé d'Affaires

U.S. Embassy in Costa Rica

Dear Madam:

The Government of Costa Rica presents its compliments to the Embassy of the United States of American in San José, and wishes to express its willingness to accept the transfer from the United States to Costa Rica of Mr. Kilmar Armando Abrego Garcia upon the conclusion of any criminal sentence he may serve in the United States of America.

The Government of Costa Rica intends to provide refugee status or residency to Mr. Abrego Garcia upon his transfer to Costa Rica. The Government of Costa Rica assures the Government of the United States of America that, consistent with that lawful immigration status and Costa Rican law, it does not intend to detain Mr. Abrego Garcia upon his arrival in Costa Rica.

The Government of Costa Rica further assures the Government of the United States of America that it will not remove Mr. Abrego Garcia to any third country, including Mr. Abrego Garcia's home country, without Mr. Abrego Garcia's consent.

The Government of Costa Rica intends to treat Mr. Abrego Garcia in a manner that is consistent with its obligations under the Convention Relating to the Status of Refugees, done at Geneva on July 28, 1951; the Protocol Relating to the Status of Refugees, done at New York on January 31, 1967; the Convention against Torture

DESPACHO MINISTRO DE SEGURIDAD PÚBLICA
San José, Zapote, Barrio Córdoba, frente al Liceo Dr. José María Castro Madriz
Módulo A Daniel Oduber Quirós
despachoministro@msp.go.cr / www.seguridadpublica.go.cr
2600-4204
@seguridadcrc                                    119

**MINISTERIO DE SEGURIDAD PÚBLICA**

GOBIERNO DE COSTA RICA

and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted in New York on December 10, 1984; any other international legal obligations; and the constitution, laws, regulations, and immigration and visa policies of Costa Rica. Consistent with this intention, the Government of Costa Rica assures the Government of the United States of America that it intends that Mr. Abrego Garcia will not be subjected to either torture or persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

The Government of Costa Rica avails itself of this opportunity to renew to the Embassy of the United States of America in San José the assurances of its highest consideration.

Lic. D. Mario E. Zamora Cordero
Ministry of Governance, Police and Public Security

DESPACHO MINISTRO DE SEGURIDAD PÚBLICA
San José, Zapote, Barrio Córdoba, frente al Liceo Dr. José María Castro Madriz
Módulo A Daniel Oduber Quirós
despachoministro@msp.go.cr / www.seguridadpublica.go.cr
📞 2600-4204
@seguridadcrc
120

J



**DONATE NOW**

March 29, 2022 6:25PM EDT

Available In   English   Español

# El Salvador: Broad 'State of Emergency' Risks Abuse
**Basic Rights Suspended after Spike in Homicides**

 



Soldiers guard a checkpoint at the entrance of the Las Palmas Community, in San Salvador, El Salvador, March 27, 2022. © 2022 AP Photo/Salvador Melendez.

(Washington, DC) – A broad state of emergency adopted in El Salvador in the name of security suspends a range of basic rights, opening the door to abuse, Human Rights Watch said today.

121

On March 27, 2022, the Legislative Assembly passed a law declaring a "state of emergency" that suspends for 30 days the rights to freedom of association and assembly, and privacy in communications, as well as some due process protections. President Nayib Bukele requested the suspension to address a spike in alleged gang violence. The government followed the vote with a series of announcements that threaten multiple human rights, including to liberty, due process, and to be free from cruel, inhuman, and degrading treatment.

"The government of President Bukele should take serious and rights-respecting steps to address heinous gang violence in El Salvador," said Tamara Taraciuk Broner, acting Americas director at Human Rights Watch. "Instead of protecting Salvadorans, this broad state of emergency is a recipe for disaster that puts their rights at risk."

In recent months, the pro-Bukele majority in the Legislative Assembly has packed the Supreme Court, replaced the attorney general with a Bukele administration ally, and dismissed hundreds of low-level judges and prosecutors. El Salvador has virtually no independent institutions left as a check on executive power, Human Rights Watch said.

The emergency law is based on article 29 of the Salvadoran Constitution, which allows the Legislative Assembly to suspend certain constitutional rights in extreme circumstances, such as a foreign invasion or "serious disturbances of public order." The 30-day period can be extended once for the same period.

Sixty-two people were killed, seemingly by gangs, on March 26 in El Salvador, the highest daily homicide rate in several years, according to official records. That night and the next morning, Bukele responded by asking the Legislative Assembly to declare a state of emergency and by ordering a lockdown in prisons.

The assembly suspended the constitutional rights to freedom of association and assembly, privacy in communication, the right to be informed about the reason of arrest, to remain silent, and to legal representation, and the requirement to take anyone detained before a judge within 72 hours.

Salvadoran authorities have not detailed what measures they will take in connection with the "state of emergency." President Bukele tweeted that the measures "will be adopted by the relevant institutions" and "informed only when necessary." His government and allies in the Legislative Assembly have previously taken other measures to undermine access to official information.

Bukele later said that people could continue studying and attending religious and sport events, "unless you are a gang member or authorities consider you to be suspicious," without specifying what they would consider "suspicious" behavior or evidence of gang membership.

Bukele also announced "maximum emergency" measures in the country's prisons, ordering them to keep cells closed 24 hours a day. "Nobody is allowed out, not even to the patio," he tweeted, while also sending

122

"a message to the gangs" suggesting that the detainees were being punished for the conduct of gang members outside of prison.

On March 28, Bukele tweeted that "We have 16,000 'homeboys' in our power. Aside from the 1,000 arrested these days. We seized everything they had, even their mattresses, we've rationed their food, and now they won't see the sun. STOP KILLING NOW or they will pay too." He was referring to the 16,000 gang members allegedly in the country's prisons and more than 1,000 arrests since the recent killings."

Punishing detainees for the actions of people outside prison is a form of collective punishment that violates multiple human rights, and the harsh treatment of detainees described by Bukele may amount to cruel, inhuman or degrading treatment or punishment, Human Rights Watch said. Depriving detainees of adequate clothing, light, bedding, access to the outdoors, food, and water is also inconsistent with international standards on the treatment of detainees.

Attorney General Rodolfo Delgado has tweeted that his office is on a "hunt" and the police have reported arresting over 1,400 alleged gang members who they have said were responsible for recent homicides.

The police tweeted photos of dozens of detained people accusing them unequivocally of committing crimes, even before many of them have been taken before a court. The Legislative Assembly has said that the state of emergency allows the police to extend the time limit to take a detainee before a judge so that prosecutors can "collect evidence."

"'The Bukele strategy government seems to be 'first arrest, then tweet, and investigate later,'" Taraciuk said.

Bukele also tweeted that the police and military forces should "allow agents and soldiers to do their work and defend them from accusations by those who protect gang members." He also tweeted, "We will be monitoring the judges who favor criminals." Such messages send a dangerous signal to security forces that they will be shielded from accountability if they engage in abuses, and appear designed to intimidate independent judges, Human Rights Watch said.

The spike in gang violence comes after a substantial decrease in homicide rates during the Bukele government. El Faro, a media outlet, reported in September 2020 that the government had negotiated with gangs to grant members prison privileges in exchange for a commitment to lower the homicide rate and support the president's political party in the February 2021 legislative elections. In December 2021, the US government accused the Bukele government of carrying out "covert negotiations" with MS-13, the biggest gang in the country, and sanctioned two Salvadoran officials who it said had taken part in the talks.

123

Bukele denied the allegations and, shortly after the El Faro report, announced an investigation, which he did not support with evidence, against El Faro for alleged "money laundering." Attorney General Delgado, who took office in May 2021, dismantled a unit that was investigating the alleged negotiations and, months later, his office raided the offices of prosecutors who had conducted the investigations.

International law allows countries to temporarily derogate or suspend some of their human rights obligations in very limited circumstances, which do not appear to apply in this case, Human Rights Watch said.

Under article 4 of the International Covenant on Civil and Political Rights, which El Salvador has ratified, governments may derogate from some of their obligations under the covenant "in time of public emergency which threatens the life of the nation." Derogations should be only those "strictly required by the exigencies of the situation." The UN Human Rights Committee, which is charged with providing authoritative interpretations of the covenant, has made clear that states of emergency may not be used as a justification to violate peremptory norms of international law, for example through arbitrary deprivations of liberty or by deviating from fundamental fair trial principles.

Similarly, article 27 of the American Convention on Human Rights allows governments to derogate from some obligations in times of "war, public danger, or other emergency that threatens the independence or security," provided that such measures are strictly required by the emergency and consistent with other obligations under international law.

The United Nations Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules") provide basic standards for the treatment of prisoners, including minimum requirements with regard to access to the outdoors for exercise, and adequate clothing, food, and bedding. They note that prisoners' clothing shall not be degrading or humiliating. Several treaties, including the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, prohibit cruel, inhuman or degrading treatment or punishment.

Your tax deductible gift can help stop human rights violations and save lives around the world.





**HUMAN**

**RIGHTS**

**WATCH**

# DEPORTED TO DANGER

United States Deportation Policies Expose Salvadorans
to Death and Abuse

# Deported to Danger

United States Deportation Policies Expose Salvadorans
to Death and Abuse

Copyright © 2020 Human Rights Watch
All rights reserved.
Printed in the United States of America
ISBN: 978-1-6231-38004
Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 100 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website: http://www.hrw.org

# Deported to Danger

## United States Deportation Policies Expose Salvadorans to Death and Abuse

**Summary** ................................................................................................................ 1

**Glossary** ................................................................................................................ 7

**Methodology** ........................................................................................................ 12

**I. Background** ........................................................................................................ 19

    Human Rights Situation in El Salvador ................................................................ 19

        Gangs .......................................................................................................... 22

        Disappearances, Abductions, and Missing Persons .................................... 22

        Harassment and Violence Against Women and LGBT Individuals ................ 23

    US Laws Affecting Salvadoran Asylum Seekers, Refugees, and Other Migrants ......... 24

**II. Deportees Killed** ................................................................................................ 27

    Deported Former or Current Gang Members Killed by Gangs ............................ 28

    Deported Former or Current Gang Members Killed by State Actors .................. 29

    Deportees Killed Without Apparent Gang-Involvement ..................................... 31

    Deported Former Police Officers Killed by Gangs .............................................. 33

    Data on Deportees Killed ................................................................................... 35

    Killing of Deportees Likely Undercounted ......................................................... 38

**III. Other Harms Faced by Deportees** .................................................................... 42

    Disappearances ................................................................................................ 43

    Sexual Crimes .................................................................................................. 45

    Torture, Other Ill-Treatment, or Excessive Use of Force .................................. 47

    Armed Attacks, Beatings, Extortion, and Death Threats by Gangs .................. 48

    People Forced into Hiding ................................................................................. 50

**IV. Particularly Violent Neighborhoods** ................................................................ 57

    Specific Neighborhoods, High Levels of Violence .............................................. 57

    Society and Authorities Stigmatize Certain Neighborhoods .............................. 66

Nowhere Else to Go ................................................................................................ 68

## V. State Actors as Perpetrators of Harm ...............................................................**71**

Unable or Unwilling to Protect ................................................................................ 73

Police Killings and Abuse ......................................................................................... 75

Death Squads and Extermination Groups .............................................................. 79

## VI. Long-Term Residence in the US ......................................................................**86**

Former Long-Term US Residents Easy Targets of Abuse ........................................ 88

Extortion ................................................................................................................... 89

Tattoos ...................................................................................................................... 91

## VII. US and International Law ............................................................................. **97**

US Failure to Prevent Return to Persecution ........................................................... 97

The United States Eviscerates the Right to Seek Asylum ...................................... 102

US Law Fails to Adequately Value Long-Term Connections to US ........................ 107

US Law Should Protect People at Risk of Serious Harm Who Do Not Qualify for Asylum .......... 109

## Medium and Long-Term Recommendations ........................................................**112**

To the US Congress ................................................................................................ 112

To Congress and the Executive Branch ................................................................. 113

To the US Department of Justice ........................................................................... 114

To the Attorney General of the United States ........................................................ 114

To the Immigration and Customs Enforcement Agency ....................................... 115

To the Government of El Salvador .......................................................................... 115

## Acknowledgements ............................................................................................**117**

# Summary

The US government has deported people to face abuse and even death in El Salvador. The US is not solely responsible—Salvadoran gangs who prey on deportees and Salvadoran authorities who harm deportees or who do little or nothing to protect them bear direct responsibility—but in many cases the US is putting Salvadorans in harm's way in circumstances where it knows or should know that harm is likely.

Of the estimated 1.2 million Salvadorans living in the United States who are not US citizens, just under one-quarter are lawful permanent residents, with the remaining three-quarters lacking papers or holding a temporary or precarious legal status. While Salvadorans have asylum recognition rates as high as 75 percent in other Central American nations, and 36.5 percent in Mexico, the US recognized just 18.2 percent of Salvadorans as qualifying for asylum from 2014 to 2018. Between 2014-2018, the US and Mexico have deported about 213,000 Salvadorans (102,000 from Mexico and 111,000 from the United States).

No government, UN agency, or nongovernmental organization has systematically monitored what happens to deported persons once back in El Salvador. This report begins to fill that gap. It shows that, as asylum and immigration policies tighten in the United States and dire security problems continue in El Salvador, the US is repeatedly violating its obligations to protect Salvadorans from return to serious risk of harm.

Some deportees are killed following their return to El Salvador. In researching this report, we identified or investigated 138 cases of Salvadorans killed since 2013 after deportation from the US. We found these cases by combing through press accounts and court files, and by interviewing surviving family members, community members, and officials. There is no official tally, however, and our research suggests that the number of those killed is likely greater.

Though much harder to identify because they are almost never reported by the press or to authorities, we also identified or investigated over 70 instances in which deportees were subjected to sexual violence, torture, and other harm, usually at the hands of gangs, or who went missing following their return.

In many of these more than 200 cases, we found a clear link between the killing or harm to the deportee upon return and the reasons they had fled El Salvador in the first place. In other cases, we lacked sufficient evidence to establish such a link. Even the latter cases, however, show the risks to which Salvadorans can be exposed upon return and the importance of US authorities giving them a meaningful opportunity to explain why they need protection before they are deported.

The following three cases illustrate the range of harms:

- In 2010, when he was 17, Javier B. fled gang recruitment and his particularly violent neighborhood for the United States, where his mother, Jennifer B., had already fled. Javier was denied asylum and was deported in approximately March 2017, when he was 23 years old. Jennifer said Javier was killed four months later while living with his grandmother: "That's actually where they [the gang, MS-13 (or Mara Salvatrucha-13)] killed him.… It's terrible. They got him from the house at 11:00 a.m. They saw his tattoos. I knew they'd kill him for his tattoos. That is exactly what happened.… The problem was with [the gang] MS [-13], not with the police." (According to Human Rights Watch's research, having tattoos may be a source of concern, even if the tattoo is not gang-related).

- In 2013, cousins Walter T. and Gaspar T. also fled gang recruitment when they were 16 and 17 years old, respectively. They were denied asylum and deported by the United States to El Salvador in 2019. Gaspar explained that in April or May 2019 when he and Walter were sleeping at their respective homes in El Salvador, a police patrol arrived "and took me and Walter and three others from our homes, without a warrant and without a reason. They began beating us until we arrived at the police barracks. There, they held us for three days, claiming we'd be charged with illicit association (*agrupaciones ilícitas*). We were beaten [repeatedly] during those three days."

- In 2014, when she was 20, Angelina N. fled abuse at the hands of Jaime M., the father of her 4-year-old daughter, and of Mateo O., a male gang member who harassed her repeatedly. US authorities apprehended her at the border trying to enter the US and deported her that same year. Once back in El Salvador, she was at home in October 2014, when Mateo resumed pursuing and threatening her. Angelina recounted: "[He] came inside and forced me to have sex with him for the

first time. He took out his gun.… I was so scared that I obeyed … when he left, I started crying. I didn't say anything at the time or even file a complaint to the police. I thought it would be worse if I did because I thought someone from the police would likely tell [Mateo].… He told me he was going to kill my father and my daughter if I reported the [original and three subsequent] rapes, because I was 'his woman.' [He] hit me and told me that he wanted me all to himself."

As in these three cases, some people deported from the United States back to El Salvador face the same abusers, often in the same neighborhoods, they originally fled: gang members, police officers, state security forces, and perpetrators of domestic violence. Others worked in law enforcement in El Salvador and now fear persecution by gangs or corrupt officials.

Deportees also include former long-term US residents, who with their families are singled out as easy and lucrative targets for extortion or abuse. Former long-term residents of the US who are deported may also readily run afoul of the many unspoken rules Salvadorans must follow in their daily lives in order to avoid being harmed.

Nearly 900,000 Salvadorans living in the US without papers or only a temporary status together with the thousands leaving El Salvador each month to seek safety in the US are increasingly at risk of deportation. The threat of deportation is on the rise due to various Trump administration policy changes affecting US immigration enforcement inside its borders and beyond, changes that exacerbated the many hurdles that already existed for individuals seeking protection and relief from deportation.

Increasingly, the United States is pursuing policies that shift responsibility for immigration enforcement to countries like Mexico in an effort to avoid any obligation for the safety and well-being of migrants and protection of asylum-seekers. As ever-more restrictive asylum and immigration policies take hold in the US, this situation—for Salvadorans, and for others—will only worsen. Throughout, US authorities are turning a blind eye to the abuse Salvadorans face upon return.

Some people from El Salvador living in the United States have had a temporary legal status known as "Temporary Protected Status" or "TPS," which has allowed those present in the United States since February 2001 (around 195,000 people) to build their lives in the country with limited fear of deportation. Similarly, in 2012, the Obama administration provided some 26,000 Salvadorans with "Deferred Action for Childhood Arrivals" or "DACA" status, which afforded some who had arrived as children with a temporary legal

status. The Trump administration had decided to end TPS in January 2020, but to comply with a court order extended work authorization to January 2021. It remains committed to ending DACA.

While challenges to both policies wend their way through the courts, people live in a precarious situation in which deportation may occur as soon as those court cases are resolved (at the time of writing the DACA issue was before the US Supreme Court; and the TPS work authorization extension to January 2021 could collapse if a federal appellate court decides to reverse an injunction on the earlier attempt to terminate TPS).

Salvadoran asylum seekers are also increasingly at risk of deportation and return. The Trump administration has pursued a series of policy initiatives aimed at making it harder for people fleeing their countries to seek asylum in the United States by separating children from their parents, limiting the number of people processed daily at official border crossings, prolonging administrative detention, imposing fees on the right to seek asylum, extending from 180 days to one year the bar on work authorization after filing an asylum claim, barring asylum for those who transited another country before entering the United States, requiring asylum seekers to await their hearings in Mexico, where many face dangers, and attempting to narrow asylum.

These changes aggravated pre-existing flaws in US implementation of its protection responsibilities and came as significant numbers of people sought protection outside of El Salvador. In the decade from 2009 to 2019, according to government data, Mexican and United States officials made at least 732,000 migration-related apprehensions of Salvadoran migrants crossing their territory (175,000 were made by Mexican authorities and just over 557,000 by US authorities).

According to the United Nations' refugee agency, the number of Salvadorans expressing fear of being seriously harmed if returned to El Salvador has skyrocketed. Between 2012 and 2017, the number of Salvadoran annual asylum applicants in the US grew by nearly 1,000 percent, from about 5,600 to over 60,000. By 2018, Salvadorans had the largest number (101,000) of any nationality of pending asylum applications in the United States. At the same time, approximately 129,500 more Salvadorans had pending asylum applications in numerous other countries throughout the world. People are fleeing El Salvador in large numbers due to the violence and serious human rights abuses they face

at home, including one of the highest murder rates in the world and very high rates of sexual violence and disappearance.

Despite clear prohibitions in international law on returning people to risk of persecution or torture, Salvadorans often cannot avoid deportation from the US. Unauthorized immigrants, those with temporary status, and asylum seekers all face long odds. They are subjected to deportation in a system that is harsh and punitive—plagued with court backlogs, lack of access to effective legal advice and assistance, prolonged and inhumane detention, and increasingly restrictive legal definitions of who merits protection. The US has enlisted Mexico—which has a protection system that its own human rights commission has called "broken"—to stop asylum seekers before they reach the US and host thousands returned to wait for their US proceedings to unfold. The result is that people who need protection may be returned to El Salvador and harmed, even killed.

Instead of deterring and deporting people, the US should focus on receiving those who cross its border with dignity and providing them a fair chance to explain why they need protection. Before deporting Salvadorans living in the United States, either with TPS or in some other immigration status, US authorities should take into account the extraordinary risks former long-term residents of the US may face if sent back to the country of their birth. The US should address due process failures in asylum adjudications and adopt a new legal and policy framework for protection that embraces the current global realities prompting people to flee their homes by providing "complementary protection" to anyone who faces real risk of serious harm.

As immediate and first steps, the United States government should adopt the following six recommendations to begin to address the problems identified in this report. Additional medium- and long-term legal and policy recommendations appear in the final section of this report.

- **The Trump** administration should repeal the Migration Protection Protocols (MPP); the two Asylum Bans; and the Asylum Cooperation Agreements.
- The Attorney General of the United States should reverse his decisions that restrict gender-based, gang-related, and family-based grounds for asylum.

- Congress and the Executive Branch should ensure that US funding for Mexican migration enforcement activities does not erode the right to seek and receive asylum in Mexico.

- Congress should immediately exercise its appropriation power by: 1) Refraining from providing additional funding to the Department of Homeland Security (DHS) for Immigration and Customs Enforcement (ICE) and US Customs and Border Protection (CBP) unless and until abusive policies and practices that separate families, employ unnecessary detention, violate due process rights, and violate the right to seek asylum are stopped; 2) Prohibiting the use of funds to implement the Migrant Protection Protocols, the "Asylum Bans," or the Asylum Cooperation Agreements, or any subsequent revisions to those protocols and agreements that block access to the right to seek asylum in the United States.

- Congress should exercise its oversight authority by requiring the Government Accountability Office and the Office of Inspector General to produce reports on the United States' fulfilment of its asylum and protection responsibilities, including by collecting and releasing accurate data on the procedural experiences of asylum seekers (access to counsel, wait times, staff capacity to assess claims, humanitarian and protection resources available) and on harms experienced by people deported from the United States to their countries of origin.

- Congress should enact, and the President should sign, legislation that would broadly protect individuals with Temporary Protected Status (including Salvadorans) and DACA recipients, such as the Dream and Promise Act of 2019, but without the overly broad restrictions based on juvenile conduct or information from flawed gang databases.

# Glossary

### The National Civilian Police (Policía Nacional Civil, PNC)

The PNC is the only governmental agency with offices in all 262 municipalities of El Salvador.[1] It receives crime reports, but by law must refer them to the District Attorney's office (Fiscalía General de la República, FGR), which officially classifies crimes. The PNC is the first to arrive at homicide scenes.[2] At the center to which deportees arrive (the migrant return center), the PNC conducts one of two interviews deported adults must complete before being released.[3]

### The Salvadoran Attorney General's Office (Fiscalía General de la República, FGR)

The Salvadoran Attorney General's Office (FGR) has at least one District Attorney's Office per department.[4] This agency is responsible for bringing criminal charges and conducting criminal investigations.[5] At homicide scenes, the FGR often enters with the police and always directs the investigation. Given the high incidence of crime in El Salvador, prosecutors and investigators have very large caseloads.[6]

---

[1] Government of El Salvador, Ministry of Justice and Public Safety, National Civilian Police, http://www.pnc.gob.sv (accessed January 5, 2020).

[2] When reporters are present at crime scenes, they may arrive before the police, as may representatives from burial or funeral services. Once at the scene, authorities may end up interviewing people who have already talked with one or multiple reporters.

[3] A police agent explained their four objectives, as he understands them, to Human Rights Watch: "First, to understand why the person left; second, to check their personal details; third, to take photos of all their scars and tattoos; and fourth, to verify criminal records." Human Rights Watch interview with PNC agent, El Salvador's Central Region, November 28, 2018.

[4] Government of El Salvador, Office of the Attorney General, http://www.fiscalia.gob.sv (accessed January 5, 2020).

[5] Other crimes against all victims can be reported to local justices of the peace as well. Crimes against women can additionally be reported to municipal development offices for women (Instituto Salvadoreño para el Desarrollo de la Mujer, ISDEMU), and crimes against children can be reported to either child protection agency (Instituto Salvadoreño para el Desarrollo Integral de la Niñez y la Adolescencia, ISNA, or Consejo Nacional de la Niñez y de la Adolescencia, CONNA). In all such cases, those agencies—such as the police and forensic body—must refer the case to the District Attorney's office.

[6] Human Rights Watch interview with FGR prosecutor, El Salvador's Paracentral Region, November 5, 2018 (who described carrying between 300 and 400 cases at any point) and Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, November 6, 2018 (who described carrying between 150 and 180 cases at any point). Multiple others told Human Rights Watch they struggled to recall details of specific homicides, even those occurring within the year, because they dealt with so many.

**The Salvadoran Institute of Legal Medicine (Instituto de Medicina Legal, IML)**

The Salvadoran Institute of Legal Medicine (IML) is the national forensic body tasked with conducting anthropological, biological, chemical, forensic, and pathological exams and autopsies at crime scenes and for criminal investigations.[7] Every department has at least one IML office, and seven departments have a regional clinic, totaling 17 IML installations countrywide.[8] Of the three governmental agencies that attend homicide scenes and crime victims, IML has the smallest staff and budget, despite some of the highest levels of education and training.[9]

**Local Office for Attention to Victims (Oficina Local de Atención a Víctimas, OLAV)**

During the Sánchez Cerén administration, Plan El Salvador Seguro (adopted by the Salvadoran government to try to improve security conditions in the country)[10] created 20 Local Offices for Attention to Victims (OLAV) in 10 departments to provide legal, psychological, and social attention to victims of crime, including those displaced by violence.[11] One OLAV is located at the migrant return center. There, migration authorities are expected to screen returned migrants for protection needs in their intake interviews.[12] Any adult who presents a protection need should then be referred to the OLAV.

**Salvadoran Institute for the Holistic Development of Children and Adolescents (Instituto Salvadoreño para el Desarrollo Integral de la Niñez y la Adolescencia, ISNA)**

---

[7] By law, the District Attorney (FGR), a judge or the federal defender's office (Procuraduría General de la República, PGR) orders an IML exam. In practice, however, victims themselves or other agencies will go to the IML for the needed exam before going to the FGR, judge, or PGR and may elect not to go to one of those three at all. Hospitals will also call the IML without necessarily informing the FGR or police. For this reason, FGR and IML statistics on non-homicide crimes, like rape, are often widely discrepant.

[8] Although three offices in Cabañas department and Meanguera del Golfo have just one doctor, the other offices in Ahuachapán, Chalatenango, Cuscatlán, La Paz, La Unión, Morazán, Metapán of Santa Ana, typically have two doctors who take turns working 12- to 24-hour shifts. The seven regional clinics in La Libertad, San Miguel, San Salvador, San Vicente, Santa Ana, Sonsonate, and Usulután departments have substantially more staff and can receive bodies or victims on weekends, when smaller offices are closed.

[9] Human Rights Watch interview with IML leadership, El Salvador's Central Region, May 2, 2017.

[10] Government of El Salvador, Ministry of Security, "Plan El Salvador Seguro," http://www.seguridad.gob.sv/dia/monitoreo-y-evaluacion/plan-el-salvador-seguro-pess/ (accessed January 17, 2020).

[11] Chalatenango, La Libertad, La Unión, and Morazán departments did not have an OLAV when we conducted this research.

[12] Child protection officials, rather than migration officials, interview boys and girls aged 17 or younger and at the time of writing also have the duty to screen for protection needs.

ISNA is the Salvadoran governmental institution that develops and executes programming for children and adolescents.[13] Their programming includes childcare and foster care, physical and psychological health and wellbeing services, job and vocational training, and education.[14]

### The Center for Attention to Children, Adolescents and Family (Centro de Atención a la Niñez, Adolescencia y Familia, CANAF)

Created in response to increased attention to child migration in El Salvador, the Center for Attention to Children, Adolescents and Family (CANAF) is a program overseen by ISNA primarily providing health and social services to returned child and youth migrants and their families.[15] According to the Salvadoran newspaper *La Prensa Gráfica*, between January to July 2019, 4,150 children were returned to El Salvador from Guatemala, Mexico, and the United States, and CANAF had contact with at least 2,000 of these children through its staff at the migrant return center and four offices in San Vicente, Usulután, San Miguel and Santa Ana departments.[16] Staff at departmental offices reported caseloads no greater than 300 since opening their doors, in part because so many children migrated again.[17]

### El Salvador's General Directorate for Migration and Foreigners (Dirección General de Migración y Extranjería, DGME)

The General Directorate for Migration and Foreigners (DGME) is the Salvadoran government agency responsible for overseeing migration matters. This includes services ranging from

---

[13] Government of El Salvador, Institute for the Integral Development of Children and Adolescents, http://www.isna.gob.sv/ISNANEW/ (accessed January 17, 2020).

[14] Government of El Salvador, Institute for the Integral Development of Children and Adolescents, "Services" ("Servicios"), http://www.isna.gob.sv/ISNANEW/?cat=8 (accessed January 17, 2020).

[15] Mental Health Training and Research Association, "ISNA Opens Inaugural Site of CANAF in San Vincente" ("ISNA inaugura sede del CANAF en San Vicente"), October 7, 2018, https://www.acisam.info/novedades/2018/isna-inaugura-sede-del-canaf-en-san-vicente/ (accessed January 17, 2020) and Government of El Salvador, Center for Attention to Children, Adolescents and Family, February 19, 2016, http://www.isna.gob.sv/ISNANEW/?p=1519 (accessed January 17, 2020).

[16] Susana Peñate, "4,150 Children and Adolescents Returned in Seven Months to El Salvador" ("4,150 niños y adolescentes retornados en siete meses a El Salvador"), *La Prensa Gráfica*, August 16, 2019, https://www.laprensagrafica.com/elsalvador/4150-ninos-y-adolescentes-retornados-en-siete-meses-a-El-Salvador--20190815-0481.html (accessed January 17, 2020).

[17] Human Rights Watch interview with CANAF social worker, El Salvador's (region withheld for security), November 2018 (date withheld for security); Human Rights Watch group interview with entire CANAF team, El Salvador's (region withheld for security), November 2018 (date withheld for security); and Human Rights Watch interview with CANAF attorney, El Salvador's (region withheld for security), November 2018 (date withheld for security).

the issuance of passports and visas to immigration enforcement.[18]

### Directorate for Attention to the Migrant (Dirección de Atención al Migrante, DAMI)[19]

Also called the "Center for Holistic Attention to the Migrant (CAIM),"[20] "Migrant Return Center," and "Return Center," the Directorate for Attention to the Migrant (DAMI) is the DGME-run center in the Quiñonez neighborhood (also called "La Chacra") of San Salvador where people deported from US federal immigration detention are processed back into El Salvador.[21] As of 2018, up to three flights from the US arrive to El Salvador's International Airport each week, with as many as 135 people on each flight who are taken by bus to DAMI for two interviews. In the first interview, DGME officials ask deportees basic questions about their destination, family, and plans. At the second, PNC agents ask about where the person plans to live, run the deported person's name in the Salvadoran criminal database, and photograph tattoos and scars. Agents conduct additional questions based upon information received in advance about certain people marked as gang members by US law enforcement agencies or with criminal records in the US.[22] The responses are stored in Salvadoran police databases and shared the same day with local PNC's where deportees say they will reside.

### Yo Cambio ("I Change")

Officially, Yo Cambio is a government-sponsored program and prison management model administered by El Salvador's General Directorate of Prison Centers (Dirección General de Centros Penales) that works with former gang members and incarcerated persons on their rehabilitation and reintegration into society. According to El Salvador's government, Yo Cambio began in 2011 as a treatment project in a sector of the Apanteos Prison in Santa

---

[18] Government of El Salvador, General Directorate for Migration and Foreigners, http://www.migracion.gob.sv/# (accessed January 17, 2020).

[19] Unless otherwise referenced, information in this entry is based on Human Rights Watch interview with DAMI staff, El Salvador's Central Region, November 28, 2018.

[20] The Center for Holistic Attention to the Migrant (CAIM) is actually El Salvador's residential facility for non-Salvadoran migrants. It is housed in a separate building on the same property as DAMI, and returned Salvadorans can stay the night at CAIM, when needed.

[21] Salvadorans deported from Mexico are also processed at CAIM.

[22] See, for example, Shannon Dooling, "What's Waiting for Deported Salvadorans Inside 'La Chacra,'" *WBUR News Boston*, August 30, 2018, https://www.wbur.org/news/2018/08/30/deported-el-salvador-la-chacra (accessed January 17, 2020).

Ana Department.[23] In 2014, Yo Cambio was launched from a program to a prison management model used across El Salvador, but as of 2016, it had hardly any budget.[24] As of February 2018, Yo Cambio has been replicated in 14 prisons. Demand is high, but lack of budget continues to be an issue.[25] Two deportees interviewed for this report who had never been charged with a crime in El Salvador carried with them a Yo Cambio certificate to verify for police who harassed them that they had no criminal record.[26]

### Particularly / Chronically Violent Neighborhood

Human Rights Watch will call "particularly" or "chronically" violent those neighborhoods that are typically densely populated and low-resourced and which consistently (year-in and year-out) register higher numbers of homicide, sexual crime, and other crime than nearly all others in a municipality.[27] Gang presence is strong in these neighborhoods. As a result, authorities and society view them and their residents as particularly dangerous, creating stigma impossible to escape, even if a resident from one of these neighborhoods moves to a new neighborhood. State actors, so-called death squads or extermination groups and private actors have also committed abuses in these neighborhoods.

---

[23] Government of El Salvador, Ministry of Justice and Public Security, "Prison Management Model I Change" ("Modelo de Gestión Penitenciaria Yo Cambio"), https://www.transparencia.gob.sv/institutions/dgcp/documents/303032/download (accessed January 17, 2020).

[24] "I Change, The Promise Without a Budget" ("Yo cambio, la promesa sin presupuesto"), *La Prensa Gráfica*, October 30, 2016, https://www.laprensagrafica.com/revistas/Yo-Cambio-la-promesa-sin-presupuesto-20161030-0098.html (accessed November 23, 2019).

[25] Roberto Valencia, "'I Change' Makes its Way into Prisons for Gang Members" ("'Yo cambio' se abre paso en las cárceles de pandilleros"), *El Faro*, March 22, 2019, https://elfaro.net/es/201901/ef_foto/22907/'Yo-cambio'-se-abre-paso-en-las-cárceles-de-pandilleros.htm (accessed November 23, 2019).

[26] Human Rights Watch interview with Carlos P., El Salvador's Central Region, March 27, 2019 (pseudonym); Human Rights Watch interview with Santiago U., El Salvador's Eastern Region, January 28, 2019 (pseudonym).

[27] When Human Rights Watch controlled for their population, particularly violent neighborhood crime rates were consistently above national averages but were not always the highest and even sometimes fell below average in a given year.

# Methodology

This report is based on research conducted by Human Rights Watch in El Salvador, Mexico, and the United States between November 2018 and December 2019. Human Rights Watch conducted multiple-session interviews with more than 50 directly impacted individuals, including 11 female and 22 male deportees; the surviving relatives or friends of two women (one who was transgender) and 16 men killed after their deportations; and the surviving relatives of two women killed following their husbands' return to El Salvador after long-term residence in the US. In a few cases, our researchers had previously spoken with the same interviewees in 2014.

In El Salvador, we interviewed 41 officials in nine departments at local district attorney's offices (FGR), forensic units (IML), and police agencies (PNC) who work at homicide scenes and participate in both crime investigations and hearings, and 31 additional authorities at the migration agency (DGME), local child migrant protection offices (CANAF), the armed forces of El Salvador, criminal sentencing courts, and victim's assistance offices (OLAV) in all 14 departments, as well as researchers, journalists, and non-profit service providers. In the United States, we interviewed approximately 30 immigration attorneys, three defense attorneys, and several social workers, trauma-informed healthcare workers, and researchers in nine states and the District of Columbia. These interviewees identified deportees who suffered harm. They also discussed other cases known to them, professionally or personally, of individuals and families harmed following deportation.[28]

---

[28] We used a variety of methods and networks to locate people harmed after deportation to El Salvador. We used attorneys and social services agencies to reach interview subjects. We also reached out to researchers, Salvadorans met through previous research projects, reporters, hundreds of immigration attorneys, social service providers and organizers and asked them to further reach out to their colleagues and networks about persons who had either been recently deported or harmed after deportation. However, many Salvadorans who get deported did not have contact with attorneys or social services in El Salvador before or after they migrated or in the US while living there. Among those Salvadorans who did contact attorneys or social services in El Salvador or the US, most did not remain in contact with their client over time, either because their organization prohibited them from doing so, limited the time a client could receive services, or other barriers arose. For example, two Salvadoran governmental agencies working with deported children explained that they wished to remain in contact at least over the year following deportation their agencies permit, but doing so is difficult, because most children migrate again. Other Salvadoran agency workers face threats themselves and thus limit where they go and with whom they meet. US-based attorneys, volunteers, and researchers who attempted to remain in contact after deportation found at times that phone numbers provided changed or no longer worked and that Facebook accounts got deactivated. Salvadoran providers also encountered phone number and location changes among former clients. If service providers did remain in

In the United States, we went to the individuals and families those in El Salvador and the US referred to us, visiting the three most common counties of residence of Salvadorans in the US and others in nine states and the District of Columbia.[29] We also contacted reporters, immigration attorneys, social service providers, and organizers and asked them to further reach out to their colleagues and networks about persons who had either been recently deported or harmed after deportation.

Included in this report are cases of people who experienced post-deportation harm between 2013 and 2019.[30] In the majority of these cases, the harm occurred within a year of deportation, often in the same month of deportation. In order to assess harms that escalate over time or which for other reasons do not occur immediately (for instance, because a deportee successfully hides from potential abusers for a period), our analysis also includes cases in which the post-deportation harm started within five years of deportation.[31] For deportees killed, we have detailed the time elapsed between deportations and deaths in section II. Likewise, we focused this report on harms suffered after deportation from the US, as opposed to Mexico or other countries.[32]

---

contact over time, they did not always ask or care about migration status, and knew that some clients feared the stigma of disclosing migration status, so that social services providers may have had clients relevant to our investigation without knowing it. Among the small universe of known cases, social service providers in both countries must respect their clients' confidentiality, making sharing cases or contact information for deported persons complex and often impossible.

[29] The three most common counties of residence for Salvadorans in the US are: Los Angeles County, California; Prince George's County, Maryland; and Harris County, Texas. See Allison O'Connor, Jeanne Batalova, and Jessica Bolter, "Central American Immigrants in the United States," Migration Policy Institute, August 15, 2019, https://www.migrationpolicy.org/article/central-american-immigrants-united-states (accessed August 24, 2019). We conducted interviews in each of these places and others.

[30] We chose this time frame primarily because (1) we wanted this report to reflect current conditions in El Salvador; (2) fact-checking was more feasible, since we had access to databases back to 2013 but not earlier; (3) real time constraints on how many years' data we could analyze; and (4) this time frame includes two presidential administrations from different political parties in El Salvador and the US. However, choosing this time frame meant excluding several earlier cases, including most of the cases yielded from Salvadoran Criminal Sentencing Tribunal decisions, since investigations–when they occur–take such a long time to conclude.

[31] For the majority (81 of 106 or 76 percent) of deportees killed documented through press coverage, the harm occurred within 1 year of deportation. However, we spoke with multiple families targeted for harm in violent neighborhoods over longer periods than this. Likewise, we did uncover cases of persons killed between 2013 and 2019 more than five years after their deportation. The killing was preceded by lesser but nonetheless serious harms, including abuse by law enforcement or state officials, in some of their cases.

[32] When interviewees (officials and directly impacted individuals) described someone as deported from the US, we asked follow-up questions to try to eliminate the possibility that the individual had been deported from another country. Interviewees sometimes did not know all the details of the harmed individual's case in El Salvador or the US, particularly around the type of immigration relief sought. We did all we could to consult other available sources to fill in those details; however, sometimes, we could not find other sources.

We spoke with fewer women than men who had been deported, primarily because they constitute a smaller proportion of deportees. According to statistics obtained through a public information request with El Salvador's General Directorate for Migration and Foreigners (DGME), women constituted between 7.7 and 17.1 percent of all individuals deported from the United States annually from 2012 to 2017.[33] We chose to conduct our interviews with children with their parents present and therefore could have missed important components of their experiences related to their parents or household, such as domestic violence or neglect.

Human Rights Watch carried out interviews in Spanish or in English, without interpreters, depending on the preference of the interviewee(s). We conducted a handful of interviews in the US and two interviews in El Salvador by voice or video call. We conducted all other interviews in person. Human Rights Watch informed all interviewees of the purpose of the interview, its voluntary nature, and the ways in which the information would be collected and used. Interviewers assured participants that they could end the interview at any time or decline to answer any questions, without negative consequences. All interviewees provided verbal informed consent to participate. When appropriate, Human Rights Watch provided contact information for organizations offering counseling, health, legal, or other social services.

Initial interview sessions with deportees, their family, or friends lasted between one and four hours and were intentionally unstructured so that the interviewee could elect what they shared.[34] Subsequent sessions were shorter and more structured. In El Salvador and Mexico, sessions most often took place in a private part of the preferred restaurant closest to an interviewee's home, although a few sessions took place at the person's home, workplace, or by phone or social media (principally Facebook Messenger and WhatsApp). In the US, interviews most often took place in the person's home but also occurred in a detention center, at an office, and by phone.

---

[33] Data from 2012-2017 obtained by Human Rights Watch via public information request submitted to DGME and received on October 24, 2018 (on file with Human Rights Watch).

[34] The only mandatory information collected in these first interviews were basic biographical data and neighborhoods of residence.

Human Rights Watch did not provide interviewees with compensation for participating but did in some cases provide a meal and transportation costs. Interviews with other types of sources lasted between half-an-hour and two hours, with almost all occurring in work offices or over the phone, although a few with persons previously known to Human Rights Watch took place over a meal or while in transit together.

Human Rights Watch took extreme care to minimize the risk that recounting experiences could further traumatize those interviewed. Besides letting interviewees determine the first session's structure and building rapport over multiple sessions, we also fact-checked aspects of each individual's account before meeting with them again.

The names of all persons interviewed, including officials, have been replaced with pseudonyms to mitigate security concerns or retaliation. In particularly sensitive cases, like those involving state perpetrators of harm or interviewees in the process of fleeing or seeking asylum, we have also deliberately withheld details about the date or location of abuses and our interviews. Although we analyzed the neighborhoods in which particular deportees were harmed, deportees' pseudonyms are intentionally disassociated from them to further ensure anonymity.

In addition to interviews, we used four techniques to identify possible cases of harm experienced by deported people, to fact-check individual accounts obtained through interviews, and to deepen our contextual knowledge of the neighborhoods and circumstances surrounding deportees' daily lives in El Salvador:

- First, we compiled data from the three Salvadoran agencies that maintain registries on disappearances, sexual crimes and violent deaths.[35] Through public information requests to the Salvadoran Attorney General's Access to Public Information Office,[36] we acquired municipal-level data on adult and child

---

[35] El Salvador's national civilian police (PNC), medical legal [forensic] institute (IML), and attorney general's office (FGR) attend crime scenes and form a tripartite table that is supposed to meet monthly to consolidate any discrepancies between their homicide registries. Their homicide statistics are housed within FGR. For all crimes, the FGR classifies the crime according to the criminal code.

[36] Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador, data on homicides between 2013-2017 were received November 9, 2018 and

homicides[37] and sexual crimes[38] and arrests, hearings and convictions for these crimes. The supplied data was aggregated annually for the years 2013 to 2018. We also monitored the national Salvadoran attorney general's Twitter page and compiled a database of public reports of child disappearances.[39]

- Second, we systematically searched the Salvadoran printed press (in Spanish) for the neighborhood names (including various spelling variations, when necessary) where those interviewed lived or fled, yielding over 22,000 articles that formed the basis of analysis.[40] The relevant results were skimmed, and we then read and analyzed relevant articles describing violence or other aspects of neighborhood life relevant to deportees' (and other residents') experiences.[41]

data on sexual crimes between 2013-2017 were received November 1, 2018. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch). El Salvador's Access to Public Information Law [Ley de Acceso a la Información Publica] became effective in 2011 and subsequently resulted in the creation of Access to Public Information Offices in governmental and non-governmental offices.

[37] "Homicides" refer to the following classifications in El Salvador's Penal Code [Código Penal], approved in 1997 and last updated in 2008, and Special Holistic Law for a Life Free of Violence for Women [Ley Especial Integral para una Vida Libre de Violencia para Las Mujeres (LEIV)], approved in 2011: Homicidio simple (128 CP), Homicidio agravado (129 CP), Homicidio culposo (132 CP), Feminicidio (45 LEIVM), and Feminicidio agravado (46 LEIVM).

[38] "Sexual crimes" refer to the following classifications in El Salvador's Penal Code [Código Penal]: Violación (158 CP), Violación en Menor o incapaz (159 CP), Violación y agresión sexual agravada (162 CP), Estupro (163 CP), and Estupro por Prevalimiento (164 CP).

[39] The FGR has since August 2013 operated a child disappearance reporting mechanism on Twitter called Ángel Desaparecido. It shows 220 girls and 204 boys reported as disappeared nationwide through May 2019. Researchers and reporters indicated to Human Rights Watch that gangs have used the mechanism to track down those who have offended them, and thus, an unknown number of families choose not to use it. It is likely for this reason–alongside impunity, a history of State persecution, and organized crime's operation within the State–that in the departments of Morazán and Usulután, only one report was ever made to the site, despite at least some additional disappearances reported by the Salvadoran press. In San Vicente, only two reports were ever made, and in the departments of La Paz and La Unión, no reports were ever made. See "Disappeared Angel" ("Ángel Desaparecido") Twitter page, https://twitter.com/alertaangelsv?lang=en (accessed January 17, 2020).

[40] Human Rights Watch searched 24 neighborhood names and four less-populous municipalities' names, yielding 27,326 total results (each neighborhood yielded between 32 and 5,749 results, and each municipality yielded between 670 and 3,494 results). Because of time constraints, we reviewed just over 22,000 of them and note specific numbers for each neighborhood in text.

[41] The bulk of the 22,000 articles were summaries of the events ("sucesos") of the day, which included homicides and arrests. In-depth pieces were written for some neighborhoods and these took significant time to read and summarize. For some neighborhoods—like Chaguantique—almost every result was relevant and ended up analyzed. For other neighborhoods—like Platanar—most results were relevant, but since it is the name of at least two other neighborhoods in different municipalities, we had to carefully focus on the relevant neighborhood where deportees were likely to live. Then, other neighborhoods—like Apaneca, San Francisco, Buena Vista—returned many irrelevant results, because they are such common names. But the only way for us to know that was to read them.

These data have extreme limitations.[42] However, they did allow us to identify themes in neighborhood dynamics, including incidents of violence, stories evidencing economic hardship in these neighborhoods, crimes committed, victims, victimizers, and state actions. Having these additional data facilitated chronological questioning during subsequent interview sessions.

- Third, we searched the words "*deportada/o*" in digitized decisions of El Salvador's 24 criminal sentencing tribunals. Among the 260 resulting criminal sentencing tribunal decisions,[43] we found 18 decisions that documented harm to persons deported from the United States in eight Salvadoran departments, but only seven documented harm experienced in 2013 or more recently. We obtained one more 2018 decision by requesting it from the tribunal in person.

- Fourth, we searched the words "deportada/o" in 14 Salvadoran news outlets (all in Spanish). Among the 3,767 articles that returned,[44] we found 288 appearing in 13 Salvadoran outlets and five international or US outlets reporting on abuse of deportees. Among these, we identified 219 articles describing the killings of 106 persons deported from the United States. The deaths occurred between January 2013 and September 2019 in all 14 Salvadoran departments.[45]

---

[42] This methodology produced a data set of media-reported incidents, which is different from a complete accounting of incidents. Moreover, these neighborhoods are probably the least likely to have complete reporting, as authorities and journalists alike told us gang members had prohibited their entry to homicide scenes in them, and journalists told us of police cordoning four or five blocks (so the press could not enter) scenes where they suspected authority participation.

[43] Thirty-seven decisions returned for "deportada," most of them involving human trafficking but also other crimes like drug possession, extortion, fraud and homicide. For "deportado," 223 decisions returned, only 44 of which were for human trafficking. The other crimes included arms distribution or possession, bodily harm, bribery, drug distribution or possession, extortion, feminicide, fraud, homicide, illicit association, kidnapping, rape, robbery, threats and usurpation.

[44] 1,508 links returned for "deportada," and 2,259 links returned for "deportado." Around 25 percent of links for both terms could not be opened. Articles ranged in subject matter from programming available to persons deported from Mexico and the United States, persons deported from other countries, like Nicaragua, persons seeking asylum or other legal relief in Canada and the United States, persons suspected to have committed a crime following a previous deportation, and persons disappeared or killed after deportation. Among the latter, one article documented the killing of a man most recently deported from Nicaragua (who was earlier deported from the United States), and two articles documented the murders of two men deported from Mexico.

[45] Multiple outlets covered some incidents with consistent but more or fewer details. Because we only identified articles for three women—one transgender, one disappeared after her deportation, and one killed after her stepson was deported—we also searched monthly summaries of news reports on girls or women by the Salvadoran Women's Organization for Peace (Organización de Mujeres Salvadoreñas por la Paz, ORMUSA), but found no additional mention of harm suffered after deportation from the US. For cases involving state actors as persecutors, Human Rights Watch also reviewed accompanying public pronouncements made by US Immigration and Customs Enforcement (ICE), International Criminal Police Organization (INTERPOL), and FGR and PNC on seven women and 65 men at their websites, on social media, and in news reports.

When describing our findings from these various sources we used the term "identified" for cases found only through press searches; and the terms "investigated" or "documented" for cases we found through interviews with directly impacted individuals cross-checked with other sources such as criminal tribunal decisions, press accounts, or interviews with officials.

Finally, Human Rights Watch compiled data from El Salvador's General Directorate for Migration and Foreigners (DGME) on deportations. Through public information requests to DGME's Access to Public Information Office, we acquired data on deportations from 2012 to 2017 for all countries, and for only Mexico and the United States for 2018, according to municipality of birth and residence for children and adults.[46] However, these data contain no information about the experiences of deportees after their return to El Salvador. No governmental or nongovernmental organizations, domestic or international, monitor what happens to deported Salvadorans, including their criminal victimization or other alleged harm suffered. This makes it impossible to obtain a complete or representative sample of cases of deportees harmed after return to El Salvador.[47]

[46] Data from 2012-2017 obtained by Human Rights Watch via public information request submitted to DGME and received on October 24, 2018 (on file with Human Rights Watch); and 2018 data obtained by Human Rights Watch via public information request submitted to DGME and received on February 18, 2019 (on file with Human Rights Watch).

[47] Anecdotally, such follow-up would facilitate better sampling for the type of investigation we have completed in this report. For example, while children constituted less than 1 percent–between 0.05 and 0.8 percent–of all individuals deported annually from the United States from 2012 to 2017, because they are the only subset of deportees who now require Salvadoran government follow-up, we recruited the largest percentage of child deportees of any subset.

# I. Background

## Human Rights Situation in El Salvador

El Salvador, with just over six million citizens, has among the world's highest homicide rates,[48] alongside thousands of missing-persons cases and sexual crimes since 2013, according to data from the Salvadoran Attorney General's Access to Public Information Office.[49] State authorities have historically been largely ineffective in protecting the population from this violence, which is often perpetrated by gangs.

At the same time, Salvadoran security forces have themselves committed extrajudicial executions, sexual assaults, enforced disappearances, and torture. Impunity is widespread. For example, investigations reached hearings in only 14 of 48 cases involving 116 extrajudicial killings committed from 2014 to 2018 that the Salvadoran Ombudsperson for the Defense of Human Rights (PDDH) examined. Two resulted in convictions.[50] Successive Salvadoran governments have deployed military units alongside police in

---

[48] United Nations Office on Drugs and Crime, "Global Study on Homicide," July 2019, https://www.unodc.org/unodc/en/data-and-analysis/global-study-on-homicide.html (accessed October 23, 2019).

[49] Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador, data on homicides between 2013-2017 were received November 9, 2018 and data on sexual crimes between 2013-2017 were received November 1, 2018. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch).

[50] See Nelson Rauda Zablah and Gabriela Cáceres, "PDDH: Police Executed 116 People Between 2014 and 2018" ("PDDH: La Policía ejecutó a 116 personas entre 2014 y 2018"), *El Faro*, August 28, 2019, https://elfaro.net/es/201908/el_salvador/23592/PDDH-La-Polic%C3%ADa-ejecut%C3%B3-a-116-personas-entre-2014-y-2018.htm?fbclid=IwAR3MMMKRWyebfe1kq8_qR_23R-MKzynnJJmvtrb4jvpc4CqwUbn8MTtp4xl (accessed January 17, 2020)(linking to report of Salvadoran Ombudsperson for the Defense of Human Rights [Procuraduría para la Defensa de los Derechos Humanos], PDDH), "Special Report of the Ombudswoman for the Defense of Human Rights, Attorney Raquel Caballero de Guevara, about extralegal executions attributed to the National Civilian Police in El Salvador, period 2014-2018: Characterization of cases of violation of the right to life and patterns of extralegal action" ("Informe especial de la señora Procuradora para la Defensa de los Derechos Humanos, licenciada Raquel Caballero de Guevara, sobre las ejecuciones extralegales atribuidas a la Policía Nacional Civil, en El Salvador, periodo 2014-2018: Caracterización de casos de violación al derecho a la vida y patrones de actuación extralegal") (hereinafter "PDDH Report"), August 2019, https://www.pddh.gob.sv/portal/file/index.php?dwfile=MjAxOS8xMC9JbmZvcm1lLWVzcGVjaWFsLXNvYnJlLWVqZWN1Y2lvbmVzLWV4dHJhbGVnYWxlcyoxLTEucGRm (accessed November 11, 2018).

public security operations,[51] despite a 1992 peace accord stipulation against it.[52] Media outlets widely report that the current national police director is under investigation for threats and links to drug trafficking and extermination groups.[53]

In 2019 alone, the Central American University Human Rights Institute received seven reports of elite Salvadoran police units burning victims.[54] For example, in March 2019, Tactical Operation Section agents beat, strangled, blindfolded, and handcuffed a 20-year-old man in a sugarcane field in Apopa municipality whom they suspected of gang

[51] See Inter-American Commission on Human Rights, "IACHR Presents Preliminary Observations of its On-site Visit to El Salvador" ("CIDH presenta observaciones preliminares de su visita in loco a El Salvador"), December 27, 2019, http://oas.org/es/cidh/prensa/comunicados/2019/335.asp (accessed January 12, 2020) (stating that "several civil society organizations expressed concern about the continuity of a security policy by the current Government with repressive emphasis, through the intervention of police and military forces. . . . According to the information received, there appear to be almost 13,000 military members in public security tasks. This is despite the precedent of the Constitutional Chamber of the Supreme Court that established that military members should not participate in public security. In this regard, the IACHR was informed that the new Government has initiated a process of broad recruitment of the Armed Forces to carry out citizen security tasks."); and The National Civilian Police ("Policía Nacional Civil") "One Month After the Territorial Control Plan Was Implemented, the Police reported 2,031 arrests" ("A un mes de implementado el Plan Control Territorial, la Policía reporta 2,031 arrestos"), July 20, 2019, http://www.pnc.gob.sv/portal/page/portal/informativo/novedades/noticias/A%20un%20mes%20de%20implementado%20el%20Plan%20Control%20Territorial%20la%20Poli#.XhuFm8hKg2w (accessed January 12, 2020) (while discussing the operations of a unit called the "Fuerza Operativa Conjunta Antidelincuencial / Anticriminal" (FOCA) or the "joint anti-crime operational force" this press release states that in the initial phase of President Bukele's security plan, the "combined security force between the police and armed forces in 17 municipalities" has dismantled illegal businesses and criminal structures relied upon by gangs and has blocked telephone communications around prisons).

[52] See United Nations, "Chapultepec Agreement" ("Acuerdo de Chapultapec"), January 16, 1992, https://peacemaker.un.org/elsalvador-chapultepec92 (accessed December 8, 2019) (noting that "immediate reaction infantry battalions will not be necessary in the new peace reality"); nevertheless, the PDDH report lists such units implicated in extrajudicial killings. President Bukele and previous administrations in El Salvador have declared a "State of Emergency" in El Salvador, which they argue justifies the use of military units in law enforcement, despite the fact that this is contrary to the peace agreements.

[53] See, for example, Hector Silva, "The Infiltrators: Chronicle of the Corruption in the Police of El Salvador" ("Los infiltrados: Crónica de la corrupción en la policía de El Salvador"), *Insight Crime*, February 20, 2014, https://es.insightcrime.org/investigaciones/los-infiltrados-cronica-de-la-corrupcion-en-la-policia-de-el-salvador/ (accessed January 17, 2020); Walter Sibrián, "IDHUCA Disapproves Appointment of New PNC Director for Having Led Police Groups Involved in Extrajudicial Executions" ("IDHUCA desaprueba nombramiento de nuevo director de PNC por haber dirigido grupos policiales implicados en ejecuciones extrajudiciales"), *La Prensa Gráfica*, June 6, 2019, https://www.laprensagrafica.com/elsalvador/IDHUCA-desaprueba-nombramiento-de-nuevo-director-de-PNC-por-haber-dirigido-grupos-policiales-implicados-en-ejecuciones-extrajudiciales--20190606-0413.html (accessed January 17, 2020); Diana Escalante, "IDHUCA Criticizes Appointment of Arriaza Chicas as Police Director" ("IDHUCA critica nombramiento de Arriaza Chicas como director de la Policía"), *ElSalvador.com*, June 6, 2019, https://www.elsalvador.com/noticias/nacional/idhuca-critica-nombramiento-de-arriaza-chicas-como-director-de-la-policia/610338/2019/ (accessed January 17, 2020); Leonor Arteaga, "Bukele's Security Policy: the Regressive Side of the Millennial President?" ("La política de seguridad de Bukele: ¿el lado regresivo del presidente milenial?"), *El Faro*, July 4, 2019, https://elfaro.net/es/201907/columnas/23469/La-pol%C3%ADtica-de-seguridad-de-Bukele-¿el-lado-regresivo-del-presidente-milenial.htm (accessed January 17, 2020).

[54] Central American University Institute of Human Rights, "Press Releases," http://www.uca.edu.sv/idhuca/noticias/comunicados-de-prensa/#more-587 (accessed January 18, 2020).

membership or hiding weapons or drugs, and set fire to the field where they left him unconscious. He emerged from the fire with burns to his face and feet.[55] Victims or witnesses of eight arbitrary arrests in two incidents in 2019 and late 2018 told Human Rights Watch of beatings at police barracks.[56]

In August 2019, the Lethal Force Monitor reported that Salvadoran police and soldiers killed 1,626 people from 2011 through 2017, including 48 boys, four women, and 355 men in 2017.[57] Authorities recorded every year more than 92 percent of victims as gang members and nearly all incidents as "confrontations" or "shootouts." However, also in August 2019, the PDDH reported that it had examined killings of 28 boys, seven women, and 81 men and found few resulted from confrontations.[58]

As of October 2019, the country's jails, juvenile and youth facilities, and adult prisons held 45,439 people in custody, more than twice the official capacity, according to the online database World Prison Brief.[59] The IML registered 14 homicides in police barracks and prisons in 2018.[60] One official told Human Rights Watch that 10 other detainees had died from extreme heat. Two inmates said there was tuberculosis in Salvadoran prisons.[61] One

[55] See Inter-American Commission on Human Rights ("Comisión Interamericana de Derechos Humanos"), Resolution 28/2019 "'Key January' and Family in Respect of El Salvador" ("'Clave Enero' y familia respecto de El Salvador"), June 11, 2019, https://www.oas.org/es/cidh/decisiones/pdf/2019/28-19MC542-19-ES.pdf (accessed November 20, 2019).

[56] Human Rights Watch interview with Gaspar T., El Salvador's Central Region, March 28, 2019 (pseudonym); Human Rights Watch interview with Walter T., El Salvador's Central Region, March 28, 2019 (pseudonym); and Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security), November 26, 2018 (pseudonym).

[57] "Report on the Use and Abuse of Lethal Force in Latin America: A comparative study of Brazil, Colombia, El Salvador, Mexico and Venezuela," ("Monitor del uso de la fuerza letal en América Latina: Un estudio comparativo de Brasil, Colombia, El Salvador, México y Venezuela"), August 2019, http://monitorfuerzaletal.com (accessed November 26, 2019)( The Lethal Force Use Monitor brings together researchers from 5 countries: Brazil, Colombia, El Salvador, Mexico and Venezuela. The participants jointly developed indicators to establish a series of unified tools to measure, analyze and compare the use of lethal force by the State across the 5 countries.).

[58] Rauda Zablah and Cáceres, "PDDH: Police Executed 116 People Between 2014 and 2018" ("PDDH: La Policía ejecutó a 116 personas entre 2014 y 2018"), *El Faro*, August 28, 2019, https://elfaro.net/es/201908/el_salvador/23592/PDDH-La-Polic%C3%ADa-ejecut%C3%B3-a-116-personas-entre-2014-y-2018.htm (accessed January 21, 2020).

[59] Institute for Crime and Justice Policy Research, World Prison Brief, "El Salvador," https://www.prisonstudies.org/country/el-salvador (accessed November 26, 2019).

[60] IML, "Violent Homicide Deaths Occurring in El Salvador in 2018" ("Practicados A Personas Fallecidas en Henchos de Violencia (Homicidios), Ocurridos en El Salvador en el año 2018"), http://www.transparencia.oj.gob.sv, (accessed November 25, 2019) (2018 data on file with Human Rights Watch).

[61] Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, March 24, 2019; Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security) (pseudonym), November 26, 2018; and Human Rights Watch interview with Yavany B., El Salvador's Central Region, December 1, 2018 (pseudonym). See also, Sarah Esther Maslin,

of these same inmates along with another inmate told Human Rights Watch that officials provided them inadequate food, hygiene products, and medicine and, in what appeared to be instances of excessive use of force, beat them and used pepper spray during prison searches.[62]

## Gangs

Gangs in El Salvador effectively exercise territorial control over specific neighborhoods and extort residents throughout the country. They forcibly recruit children. They sexually assault people targeted on the basis of their gender and/or real or perceived sexual orientation or gender identity. Gangs kill, abduct, rape, or displace those who resist. Many of those who are abducted are later found dead or never heard from again. According to unverified estimates cited by the UN special rapporteur on extrajudicial, summary or arbitrary executions, approximately 60,000 gang members reportedly operate in some 247 out of 262 municipalities in the country.[63] Gangs enforce their territories' borders and extort and surveil residents and those transiting, particularly around public transport, schools, and markets. Allegations of security and elected officials collaborating with gangs in criminal operations have been reported by the press and all political parties have negotiated with gangs according to consistent allegations reported, but not substantiated by, the UN special rapporteur.[64]

## Disappearances, Abductions, and Missing Persons

The Inter-American Commission on Human Rights (IACHR) reported in December 2019 that the FGR registered 3,289 people who "disappeared" in 2018 and 3,030 in 2019.[65] According to the IACHR, victims said they are at times unable to file complaints regarding

"How an Innocent Man Wound Up Dead in El Salvador's Justice System," *Washington Post*, March 16, 2017, https://www.washingtonpost.com/world/the_americas/how-an-innocent-man-wound-up-dead-in-el-salvadors-justice-system/2017/03/16/7144e7fc-dd13-11e6-8902-610fe486791c_story.html?noredirect=on (accessed December 5, 2019).

[62] Human Rights Watch interview with Ransés I., Tijuana, Mexico, March 8, 2019 (pseudonym); Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security), November 26, 2018 (pseudonym).

[63] United Nations Office of the High Commission for Human Rights, El Salvador End of Mission Statement, Agnes Callamard, special rapporteur for extrajudicial, summary or arbitrary executions, February 5, 2018, https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=22634&LangID=E (accessed June 16, 2019).

[64] Ibid.

[65] Inter-American Commission on Human Rights, "IACHR Presents Preliminary Observations of its On-site Visit to El Salvador" ("CIDH presenta observaciones preliminares de su visita in loco a El Salvador"), December 27, 2019, http://oas.org/es/cidh/prensa/comunicados/2019/335.asp (accessed January 12, 2020).

family members who have gone missing, and that they usually face delays in the investigations, including failure to respond in the critical first hours after a disappearance.

Between 2010 and August 2019, the police have registered over 10,800 victims who have gone missing—more than the estimated 8,000 to 10,000 disappeared during the civil war (1979-1992), according to press accounts.[66] Because very few cases are investigated, knowledge of perpetrators is limited.[67] These figures likely include suspected abductions by criminal gangs or state authorities and other cases in which people have gone missing in unexplained circumstances.

### Harassment and Violence Against Women and LGBT Individuals

A 2017 national survey found that 67 percent of women in El Salvador faced violence at some point in their lives,[68] and the rates of "feminicide," including domestic violence killings are the highest in the region.[69] Despite some reform efforts, such as specialized women's courts and dedicated units in the Attorney General's Office, formidable obstacles remain for women seeking police protection, investigation, or justice through the courts.[70]

Lesbian, gay, bisexual, and transgender (LGBT) people who are deported from the United States to El Salvador are likely to face specific threats. Human Rights Watch research has

---

[66] "Salvadoran Commission Close to Resolving First Case of Disappearance in War" ("Comisión salvadoreña cerca de resolver primer caso de desaparición en guerra"), *La Prensa Gráfica*, August 31, 2019, https://www.laprensagrafica.com/elsalvador/Comision-salvadorena-cerca-de-resolver-primer-caso-de-desaparicion-en-guerra-20190831-0264.html (accessed November 26, 2019).

[67] Mary Beth Sheridan and Anna-Catherine Brigida, "Disappeared in El Salvador: the Return of a Cold War Nightmare,"*Washington Post*, October 19, 2019, https://www.washingtonpost.com/world/the_americas/disappeared-in-el-salvador-amid-a-cold-war-nightmares-return-a-tale-of-one-body-and-three-grieving-families/2019/10/19/d806d19a-e09d-11e9-be7f-4cc85017c36f_story.html (accessed January 18, 2020).

[68] Government of El Salvador, Ministry of the Economy, "National Survey of Violence Against Women" ("Encuesta Nacional de Violencia Contra las Mujeres"), May 2018, http://aplicaciones.digestyc.gob.sv/observatorio.genero/docs/ENVCM%2017.pdf (accessed January 4, 2020).

[69] Economic Commission for Latin America and the Caribbean, "At Least 2,795 Women Were Victims of Femicide in 23 Countries of Latin America and the Caribbean in 2017," November 15, 2018, https://www.cepal.org/en/pressreleases/eclac-least-2795-women-were-victims-femicide-23-countries-latin-america-and-caribbean (accessed January 4, 2017).

[70] Louise Donovan and Christina Asquith, "El Salvador Kills Women as the U.S. Shrugs," *Foreign Policy*, March 7, 2019, https://foreignpolicy.com/2019/03/07/el-salvador-kills-women-as-the-us-shrugs/ (accessed January 4, 2020); Observatory of Gender-based Violence Against Women ("Observatorio de violencia de género contra las mujeres, ORMUSA"), "Impunity is One of the Main Premises in the Fight Against Violence Against Women, Only 5% of Cases Ends in Sentencing–ORMUSA Violence Report 2017-2018" ("La impunidad es una de las principales premisas en la lucha contra la violencia contra las mujeres, solo 5% de casos termina en sentencia–Informe Violencia ORMUSA 2017-2018"), June 2018, http://observatoriodeviolencia.ormusa.org/boletinas/2018-0506_BOLETINA_VG.pdf (accessed January 4, 2020).

found that LGBT people in El Salvador are often rejected by their families, meaning that many would have no family support during the process of reintegration. Human Rights Watch repeatedly heard from LGBT Salvadorans, both in El Salvador and in the United States, that gangs had targeted them on the basis of their sexual orientation or gender identity, subjecting some LGBT people to sexual violence and extorting others due to their perceived vulnerability.[71] Several LGBT Salvadorans also reported being beaten or sexually assaulted by the police.[72] In January 2019, Camila Díaz Cordova, a transgender woman deported from the United States, was beaten to death. In July, the FGR charged three police officers with her kidnapping and aggravated homicide.[73] The case remained open at the time of writing. Within the span of one month in late 2019, three transgender women and one gay man were murdered in El Salvador in circumstances that led activists to suspect they were hate crimes.[74]

## US Laws Affecting Salvadoran Asylum Seekers, Refugees, and Other Migrants

Salvadoran nationals who are neither citizens of the United States nor undocumented hold one of several legal statuses, none of which protects them completely from deportation. These various statuses, and the degree to which the US laws affording them comport with international human rights and refugee law are discussed in greater detail in Section VI.

According to 2017 US Census data analyzed by the Migration Policy Institute,[75] about 1.2 million non-citizens whose country of birth was El Salvador live in the United States. They in turn fall in four main legal categories.

---

[71] Human Rights Watch group interviews with LGBT Salvadorans in El Salvador, May 2019 and July 2019; in Washington, DC, December 2019; and in Los Angeles, December 2019.

[72] Ibid.

[73] Paula Rosales and Nelson Rentería, "Camila's Last Night, Trans Chased by Gangs and Killed by the Police" ("La última noche de Camila, trans perseguida por pandillas y asesinada por la Policía"), *Presentes*, December 5, 2019, http://agenciapresentes.org/2019/12/05/la-ultima-noche-de-camila-trans-perseguida-por-pandillas-y-asesinada-por-la-policia/ (accessed January 7, 2020).

[74] Oscar Lopez, "Pressure Mounts for El Salvador to Investigate Wave of LGBT+ Killings," Reuters, November 21, 2019, https://www.reuters.com/article/us-el-salvador-lgbt-murder-trfn/pressure-mounts-for-el-salvador-to-investigate-wave-of-lgbt-killings-idUSKBN1XW01G (accessed January 18, 2020); Human Rights Watch telephone interview with a representative of COMCAVIS TRANS, December 2019.

[75] Allison O'Connor, Jeanne Batalova, and Jessica Bolter, "Central American Immigrants in the United States," Migration Policy Institute, August 15, 2019, https://www.migrationpolicy.org/article/central-american-immigrants-united-states (accessed August 24, 2019).

- First, about 665,000 Salvadorans are living in the United States in an **unauthorized** legal status, meaning at any moment they could be arrested and deported from the country. During their deportation proceedings, they technically would have the ability to raise their fears of persecution or torture as a defense against removal. In reality, this is extremely difficult to do successfully.

- Second, about 340,000 Salvadorans live in the United States as lawful permanent residents. These people have permission to work and build their lives in the United States, but if they are convicted of any of a long list of crimes (including non-violent drug or driving offenses generally considered as misdemeanors), they are subject to deportation under procedures that severely restrict the possibility of raising their fears of persecution upon return as a defense against removal. They might be able to raise fear of torture in El Salvador, but in reality, the torture standard is more difficult to meet than the "fear of persecution" standard.

- Third, another 195,000 Salvadorans have temporary protection against deportation as recipients of Temporary Protected Status (TPS), a program that the US Congress put in place for Salvadorans since two devastating earthquakes hit the country in 2001. The Trump administration decided to end TPS in September 2019,[76] but a court injunction has prevented termination from going into effect. Consequently, the Trump administration extended work authorization associated with TPS until January 2021, without extending TPS beyond January 2020.[77] If appellate courts lift the injunction, Salvadorans who have been protected by TPS will be subject to removal. Due to lack of resources, legal advice, fear, or other reasons, some Salvadorans have not re-registered their TPS status, which moves them into an unauthorized status. During their deportation proceedings, former TPS holders technically would

---

[76] United States Federal Register, "Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for Sudan, Nicaragua, Haiti, and El Salvador," October 31, 2018, https://www.federalregister.gov/documents/2018/10/31/2018-23892/continuation-of-documentation-for-beneficiaries-of-temporary-protected-status-designations-for-sudan?utm_campaign=subscription%20mailing%20olist&utm_source=federalregister.gov&utm_medium=email (accessed November 26, 2019).

[77] United States Federal Register, "Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan," November 4, 2019, https://www.federalregister.gov/documents/2019/11/04/2019-24047/continuation-of-documentation-for-beneficiaries-of-temporary-protected-status-designations-for-el (accessed November 26, 2019).

have the ability to raise their fears of persecution or other types of harm as a defense to removal; but in reality, this is very challenging to do successfully.

- Fourth, some 25,600 Salvadorans have been living in the US with temporary permission to remain in two-year increments under the **Deferred Action for Childhood Arrivals (DACA)** program, which began in 2012, but which the Trump administration decided to end in September 2017. DACA status has been maintained by temporary court rulings but the Trump administration's decision to end the program is being reviewed by the Supreme Court at this writing, making DACA recipients legitimately fearful of deportation. Due to lack of resources, legal advice, fear, or other reasons, some Salvadorans have not re-registered their DACA status, which moves them into an unauthorized status. During their deportation proceedings, former DACA holders technically would have the ability to raise their fears of persecution or other types of harm as a defense to removal; in reality, this is difficult to do successfully.

# II. Deportees Killed

In researching this report, Human Rights Watch identified or investigated 138 cases of people killed between 2013 and 2019 after being deported from the United States.[78] El Salvador's high homicide rates (alongside many other types of harm), and the fact that these cases have been reported publicly over time, has put the United States government and its immigration officials on notice. On a daily basis, US immigration officials and judges nevertheless turn a blind eye to the reality that people deported by the United States to El Salvador have lost their lives, often at the hands of their original persecutors or people they legitimately feared would harm them in the future. In several of the cases we investigated for this report, such targeting was evident.

In other cases, the US government is returning people to a country with such significant levels of violence that there is a real risk that deportees will face a serious threat to their lives or physical integrity. Because current US asylum law does not provide "complementary protection" that would protect people facing such serious threats of violence, Human Rights Watch calls on the US Congress to adopt such a standard (discussed further in Section VII below). Even without such a standard, Salvadorans subject to deportation should have a meaningful opportunity to describe the risks they would face upon return and have that information considered before they are returned to El Salvador.[79] The deaths described in this section, moreover, represent the tip of the iceberg—as detailed in subsequent sections, people deported to El Salvador encounter a wide range of human rights abuses that fall short of death.

---

[78] As discussed in the methodology section, the sources for this claim are: Human Rights Watch review of 3,840 links with mentions of the word "deportada/o" in 14 Salvadoran news outlets; Human Rights Watch interviews with directly impacted individuals; Human Rights Watch interviews with officials who go to crime scenes, officials who receive victims of crime and recently-returned migrants, and Salvadoran criminal sentencing Tribunal decisions. Using these sources, we had also identified cases of killings of deportees going back as far as 2003; but we have not included those in our count, using 2013 as the cut off for recency and related reasons.

[79] Even under existing US asylum law, Salvadorans and others face major barriers to receiving fair consideration of the risks they face if returned to their countries of origin.

## Deported Former or Current Gang Members Killed by Gangs

According to Salvadoran authorities, the deportees at the highest risk of harm are alleged former and current gang members and those with alleged links to gangs.[80] These alleged former and current gang members are sometimes killed by their own or rival gangs (they are also killed by state actors or death squads, as discussed below). An individual deportee's reported status as a gang member by the press, by the police, or by other observers, may or may not be true.

Accounts of killings of deportees by gangs in court filings and press accounts indicate that a deportee might be killed by his own gang for not "re-activating" with the gang once in El Salvador,[81] battling for power within the gang,[82] committing crimes like robbery,[83] or calling attention to the gang through flamboyant behavior.[84] Gangs reportedly kill members of rival gangs, or those assumed to be members, for living in or transiting their area,[85] including one who was evangelizing after leaving behind gang life[86] and one who was recently deported.[87]

---

[80] Interviews with 41 officials from the FGR, IML, PNC and OLAV in nine departments, El Salvador, November 2018 to December 2019.

[81] Criminal Sentencing Tribunal, Santa Tecla, March 13, 2014 (on file with Human Rights Watch).

[82] José Luis Sanz and Carlos Martínez, "The Letter 13" ("La letra 13"), *El Faro*, August 8, 2012, https://salanegra.elfaro.net/es/201208/cronicas/9302/II-La-letra-13.htm (accessed January 6, 2019); Óscar Martínez and Juan Martínez, "The Thorn in the Mara Salvatrucha" ("La espina de la Mara Salvatrucha"), *El Faro*, March 3, 2014, https://salanegra.elfaro.net/es/201403/cronicas/14879/La-espina-de-la-Mara-Salvatrucha.htm (accessed January 6, 2019); José Luis Sanz and Carlos Martínez, "The Revolution in Mariona" ("La Revolución en Mariona")," *El Faro*, October 25, 2011, http://www.elfaro.net/es/201110/cronicas/5917/ (accessed January 6, 2019); Roberto Valencia, "The Last Interview with El Directo" ("La ultima entrevista con El Directo"), *El Faro*, September 9, 2013, https://salanegra.elfaro.net/es/201309/entrevistas/13232/La-última-entrevista-con-El-Directo.htm (accessed January 6, 2019); and Efrén Lemus, "Purges in the MS-13 Leadership Over Money" ("Purgas en la cúpula de la MS-13 por dinero"), *El Faro*, August 9, 2016, https://elfaro.net/es/201608/salanegra/19066/Purgas-en-la-cúpula-de-la-MS-13-por-dinero.htm, (accessed January 6, 2019).

[83] Criminal Sentencing Tribunal, Santa Tecla, March 13, 2014 (on file with Human Rights Watch).

[84] Human Rights Watch interview with El Salvador-based researcher, El Salvador's Central Region, November 10, 2018.

[85] Criminal Sentencing Tribunal, Santa Tecla, April 18, 2017 (on file with Human Rights Watch); Criminal Sentencing Tribunal, Santa Tecla, March 25, 2015 (on file with Human Rights Watch); Criminal Sentencing Tribunal, Santa Tecla, November 13, 2008 (on file with Human Rights Watch); and Criminal Sentencing Tribunal, Chalatenango, August 31, 2006 (on file with Human Rights Watch).

[86] Criminal Sentencing Tribunal, Santa Tecla, July 11, 2016 (on file with Human Rights Watch).

[87] Criminal Sentencing Tribunal, San Miguel, January 24, 2007 (on file with Human Rights Watch).

## Deported Former or Current Gang Members Killed by State Actors

State actors, such as police or other law enforcement, reportedly have killed deportees alleged to be former or current gang members, according to relatives, journalists, and academics who spoke with Human Rights Watch.[88] Through interviews with directly affected persons and witnesses, we learned of several such cases. For example:

Enrico X. told Human Rights Watch in 2019 his cousin, Luis Y., a former member of a gang then called B-18, tried to leave the gang by fleeing to the United States, but after he was deported from the US in either 2016 or 2017, Enrico said that the police in El Salvador killed Luis. Enrico told us:

> After he was deported back to El Salvador, one day he [Luis] was eating breakfast and the police came to the house and shot him in the head and killed him. The police officer said: "I told you I was going to kill you eventually," and put a gun to his head and shot him right there on the spot in front of the neighbor woman who used to cook his meals for him. Some of the other neighbors also witnessed this shooting.[89]

Enrico told Human Rights Watch that police in 2018 shot another young deportee from the United States in front of his home. "He was known to be deported from the US."[90] An affidavit filed by Enrico in his asylum and withholding case gave further details:

> I don't know the young man's real name, but everyone in town called him 'Roberto M.'.… I heard a shot and a noise.… I ducked down low, and I saw two police officers run towards [him], who was down on the ground in front of my property in the street. Roberto had been going by on a bicycle when

---

[88] Human Rights Watch interview with Elías F., United States East Coast, winter 2019 (location and exact date withheld for security) (pseudonym); Human Rights Watch interviews with two Salvadoran journalists, El Salvador's Central Region, November 9, 2018; Human Rights Watch interviews with two expert academics on security, gangs, and migration, El Salvador's Central Region, November 10, 2018.

[89] Human Rights Watch interview with Enrico X., (location withheld for security), 2019 (date withheld for security) (pseudonym). US Department of Justice, Executive Office for Immigration Review, *In re* (name withheld for security), (location withheld for security) Immigration Court, (date withheld for security).

[90] Human Rights Watch interview with (name withheld for security), (location withheld for security), 2019 (date withheld for security).

he was shot. The two police officers picked him up and took him away with them. I saw them take [him] into a sugar cane field. A police motorcycle drove up around the same time this was all happening. I did not see where they took [him] after they went into the field. I was very scared and I quickly went in my house and closed the door. Not long after this, a police officer came and banged on my door, yelling at me to come outside. I went outside and he immediately put a gun to my head and said, 'I know you saw.' I recognized this officer by his face. I had seen him patrol my street many times in the past with other rural police officers.… The officer was very aggressive with me, asking me who else was home with me.… The officer told me that Roberto was a B-18 gang member and that if I said anything about what I saw, the same will happen to me or worse.… Every day after [that], the same rural police officers started to come to the house and bang on my door.… They would bang on my door and yell profanities at me, demanding I come out.[91]

Our research indicates that Salvadoran officials often assume that individuals deported from the US are both active gang members and were convicted of violent crimes while in the US.[92] They also may choose to target specific deportees based on information shared by the United States via INTERPOL. Three departmental police delegations told Human Rights Watch they receive lists of deportees alleged to be gang members and share those lists throughout the department, including with neighborhood-level posts where deportees indicate they will live.[93] One ranking police officer explained to Human Rights Watch: "ICE communicates with INTERPOL in advance of deportation flights, and lists of persons with a capture order [an INTERPOL Red Notice] or guilty of a crime are sent to us in the departmental offices, [even though] most on this list are captured in the airport."[94] The

---

[91] US Department of Justice, Executive Office for Immigration Review, *In re* (name withheld for security), (location withheld for security) Immigration Court, (date withheld for security).

[92] Human Rights Watch interview with PNC, El Salvador's Paracentral Region, November 5, 2018.

[93] The different delegations did not respond consistently to Human Rights Watch's question about whether they had access to lists of deportees confirming crimes committed in the United States. Some said they could, some said they could not, and some said only those police investigators cleared beyond a certain level could.

[94] Human Rights Watch interview with police commissioner, El Salvador's Paracentral Region, November 5, 2018.

police then visit the locations provided. This officer said, "We think that if a person wasn't wanted in the United States, it must be because the deported person is bad."[95]

Police scrutiny of such individuals may be a legitimate activity in furtherance of public safety. At the same time, even if an individual is an active gang member or has served a sentence for a violent crime in the US and is suspected of further criminal activity in El Salvador, unlawful use of force by law enforcement is never justified. Security officials involvement in extrajudicial executions and excessive use of force is often linked to government efforts to combat gangs, as reported by the UN special rapporteur on extrajudicial killings in her 2018 report on El Salvador, as well as the Legal Force Monitor and the Salvadoran Ombudsperson for the Defense of Human Rights in 2019.[96]

## Deportees Killed Without Apparent Gang-Involvement

In some cases, the deportee victims had no apparent involvement with gangs, but nevertheless were killed in circumstances suggesting the killers were gang members. For example, several of the below cases identified through press accounts reference failure to pay extortion demands and non-gang-related tattoos as possible motives for the killings.

- Carlos Alberto Garay, 43, was killed while driving his pick-up truck in Usulután. A press account reported that he was intercepted by two men, who shot him several times and then fled on foot, according to police sources. Garay's neighbors told reporters he had been deported several months earlier from the

---

[95] Ibid.

[96] United Nations Office of the High Commission for Human Rights, El Salvador End of Mission Statement, Agnes Callamard, special rapporteur for extrajudicial, summary or arbitrary executions, February 5, 2018, https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=22634&LangID=E (accessed June 16, 2019); "Report on the Use and Abuse of Lethal Force in Latin America: A comparative study of Brazil, Colombia, El Salvador, Mexico and Venezuela" ("Monitor del uso de la fuerza letal en América Latina: Un estudio comparativo de Brasil, Colombia, El Salvador, México y Venezuela"), August 2019, http://monitorfuerzaletal.com (accessed November 26, 2019), pp. 80-95; "Special Report of the Ombudswoman for the Defense of Human Rights, Attorney Raquel Caballero de Guevara, about extralegal executions attributed to the National Civilian Police in El Salvador, period 2014-2018: Characterization of cases of violation of the right to life and patterns of extralegal action" ("Informe especial de la señora Procuradora para la Defensa de los Derechos Humanos, licenciada Raquel Caballero de Guevara, sobre las ejecuciones extralegales atribuidas a la Policía Nacional Civil, en El Salvador, periodo 2014-2018: Caracterización de casos de violación al derecho a la vida y patrones de actuación extralegal"), August 2019, https://www.pddh.gob.sv/portal/file/index.php?dwfile=MjAxOS8xMC9JbmZvcm1lLWVzcGVjaWFsLXNvYnJlLWVzcZWN1Y2lvbmVzLWV4dHJhbGVnYWxlcyoxLTEucGRm (accessed November 11, 2019).

United States, and they knew he was being extorted by gangs and that his family had been threatened. The press account did not describe Garay as gang-involved.[97]

- Mario Enrique Sandoval Gómez, around 30 years old, was shot dead in his home on June 29, 2017 by two people who convinced him to open the door by pretending they were police officers. According to press accounts, Sandoval Gómez was not suspected of gang affiliation and the "tattoos on his body were not related to gangs."[98] Sandoval Gómez reportedly had been deported from the United States two years prior to the incident. His wife, who was at home on the night of the murder, had applied for him to return to the US, where the couple planned to join her parents already living there.[99]

- Tommy Eduardo Paiz, 41, who worked in a call center in El Salvador, had been deported from the United States about one year prior to his death. A relative interviewed by the press said of Paiz, "he came here and started working."[100] On August 4, 2018, he was on his way to visit his partner and 6-month-old son when his car broke down in the department of La Libertad. Paiz had called a family member that same day to ask that they "let her know that I'm going to get home to see my little one."[101] Paiz had several "artistic tattoos" on his body. Police reports indicated he was approached by attackers, hit with a blunt object on the head and shot several times in the head and abdomen.[102] When found, he was handcuffed. The press account did not describe Paiz as gang-involved.

==While press accounts did not speculate on whether the victims faced harm from their killers previously, some interviewees specified that the same gang members who targeted==

---

[97] "Two Soldiers Killed in Front of SITRAMSS Station" ("Matan a dos soldados frente a estación del SITRAMSS"), *La Prensa Gráfica*, June 22, 2015, https://www.laprensagrafica.com/elsalvador/Matan-a-dos-soldados-frente-a-estacion-del-SITRAMSS-20150622-0044.html (accessed November 12, 2019).

[98] "San Miguel Deportee was Killed While He Was Waiting for a US Migratory Pardon" ("Migueleño deportado fue asesinado mientras esperaba perdón migratorio de EUA"), *La Prensa Gráfica*, June 29, 2017, https://www.laprensagrafica.com/elsalvador/Migueleno-deportado-fue-asesinado-mientras-esperaba-perdon-migratorio-de-EUA-20170629-0048.html (accessed on June 22, 2019)

[99] Ibid.

[100] Gadiel Castillo, "Man Killed in Santa Elena Worked at a Call Center" ("Hombre asesinado en Santa Elena trabajaba en call center"), *El Diario de Hoy*, August 4, 2018, https://www.elsalvador.com/noticias/nacional/familia-identifica-a-hombre-asesinado-en-bulevar-de-antiguo-cuscatlan/506348/2018/ (accessed November 10, 2019).

[101] Ibid.

[102] Ibid.

individuals before they fled El Salvador were responsible for killing these individuals after deportation. For example, José Miguel C., told us about his nephew, Joaquín, who he did not believe to be gang-involved, and who had fled gang threats to the US, but was deported in 2017 and killed by alleged gang members that same year. He said: "[Joaquín] always said they [MS members] would try to kill him again. They did [kill him] on [Salvadoran] Father's Day…. The same members who killed him had threatened him beforehand."[103]

Similarly, a policeman told us about Nicolas P., 25, who was the victim of an attempted homicide by gang members in 2015. The same year, he migrated to the US, only to be deported in 2017. According to a police report, the policeman said, "on the day Nicolas returned to El Salvador, he arrived at his family home…. At 9:30 p.m., he was at home, the gang members arrived and shot him dead."[104]

## Deported Former Police Officers Killed by Gangs

Human Rights Watch interviewed two families who had multiple members working for the Salvadoran military or police who were threatened, then fled to the United States hoping to seek asylum but were subsequently deported and killed.

Adriana J. worked for the Salvadoran police. After being threatened by gangs, she fled El Salvador for the United States, but according to her cousin Irene J., Adriana was detained by US authorities and did not get to apply for asylum presumably because she was rejected after her credible fear interview in the expedited removal screening. Irene believes that Adriana was still in detention in the US in 2015 and deported that year or later to El Salvador. Her death certificate indicates she died in El Salvador from gunshot wounds to her abdomen and skull in 2017. Irene learned from her mother, who lived nearby, that when she went to the cordoned crime scene and spoke with police officers, the officers told her, "The gang members killed her. Three bullets."[105]

---

[103] Human Rights Watch interview with José Miguel C., El Salvador's Paracentral Region, March 29, 2019 (pseudonym).
[104] Human Rights Watch telephone interview with PNC Officer, El Salvador's Eastern Region, October 2, 2019.

[105] Human Rights Watch interview with Irene J., United States East Coast, March 1, 2019 (pseudonym). Human Rights Watch also interviewed Adriana's cousin Matías J., United States East Coast, March 1, 2019 (pseudonym).

According to press accounts, Mauricio de Jesús Amaya had been a municipal police officer in El Salvador for 14 years. In 2017, his sister, Gloria, was shot dead as they rode together on a motorcycle in the El Vado neighborhood of Nueva Concepción municipality of Chalatenango department. Mauricio believes he was the actual target. Twenty days later, he and his family, including his brother, Santos Amaya, who also worked with the municipal police, fled El Salvador and arrived in the US approximately 10 days later.[106] Santos, who had received death threats from gang members who had been deliberately targeting police in the municipality where the family lived, was deported from the US in April 2018, and was killed that same month.[107]

---

**Jacinto K.**

Human Rights Watch interviewed Jacinto K. and first interviewed his then 15-year-old son, Óscar K., in El Salvador in April 2014.

In December 2011, Jacinto and his wife had been ordered removed from the United States. In order to avoid permanent bars in US law on returning to the country, they chose to depart "voluntarily." Jacinto and his wife had to borrow money to pay for the family's plane tickets (they had three children, Óscar, age 15 in 2014, and a younger daughter and US citizen son). Jacinto told us that upon the family's return to El Salvador:

> "I thought starting a small business in [a rural area of El Salvador's Central Region] was our best bet for paying the loan back quickly. Unfortunately, MS began charging me *renta* shortly after I opened it. I haven't been able to pay down the loan, am barely supporting my family, and worry that I won't be able to keep paying *renta*."[108]

---

[106] Mirella Cáceres and David Marroquín, "Police and Family Seek Asylum in USA After Being Attacked by Gang Members in Chalatenango" ("Policía y familia piden asilo en EE.UU. luego de ser atacados por pandilleros en Chalatenango"), *El Diario de Hoy*, May 18, 2018, https://www.elsalvador.com/noticias/nacional/policia-y-familia-piden-asilo-en-ee-uu-luego-de-emboscada/482369/2018/ (accessed July 1, 2019).

[107] Ibid.

[108] Human Rights Watch interview with Jacinto K., El Salvador's Central Region, April 4, 2014 (pseudonym).

At the time of our interview Jacinto discounted the power of MS in the area, telling us he felt relatively safe. However, two weeks after our interview, Jacinto was shot dead in broad daylight in a public space of their town.

Prior to his dad's death, when a Human Rights Watch researcher sat down to interview Óscar K. he said, "We can speak in English. I've missed it."[109] He said he wanted to return to the Midwestern United States, where he lived from 2003 to 2011, to finish high school.

Óscar said he had just completed 9th grade in his Salvadoran neighborhood public school. Besides the classes not being challenging, he told us, "I do not feel safe. I only leave the house to go to and from school. Still, to get there, I have to walk past the neighborhood's Mara Salvatrucha gang. They shout insults at me and threaten to kill me if I do not join them."[110]

After his father was killed, Óscar separated from his mother and siblings, and they each went to a different part of the country in search of safety. According to our subsequent contacts with Óscar,[111] the gang has found them each in their new locations within the country, and at the time of writing Óscar and his mother and siblings had each moved at least one other time.

## Data on Deportees Killed

For this report, we identified or investigated 138 cases of people killed after their deportations from the United States between 2013 and 2019. Most of these people died between a few days and two years after their return to El Salvador. Of 106 cases reported in 219 articles by the Salvadoran press,[112] 81 deportees died after being in the country for one

---

[109] Human Rights Watch interview with Óscar K., El Salvador's Central Region, April 4, 2014 (pseudonym).

[110] Human Rights Watch interview with Óscar K., El Salvador's Central Region, April 4, 2014 (pseudonym).

[111] Human Rights Watch Facebook online messenger correspondence with Óscar K., El Salvador, March 22, 2019 (pseudonym); Human Rights Watch Facebook online messenger correspondence with Óscar K., El Salvador, June 10, 2019 (pseudonym); and Human Rights Watch interview with Óscar K., El Salvador's (region withheld for security), December 2019 (date withheld for security) (pseudonym).

[112] These 106 cases are documented in 219 articles reviewed by Human Rights Watch, most commonly appearing in the

year or less, with 15 additional deportees killed after 13 months to two years in the country. Fourteen deportees were killed less than a week after their return, with three dying in their first 24 hours in El Salvador.

We eliminated many cases of deportees reportedly killed between 2013 and 2019 from our final count because they died more than five years after their deportations or after an unknown period from their deportations.[113] For all deported people killed, we focused only on individuals deported from the United States.[114] In addition, of all 138 cases included, the earliest year of deportation was 2010 (this was the year of deportation for one person killed in 2013, for one killed in 2014, and for two people killed in 2015).

In addition to the cases identified through the press, we documented five cases of deportees killed between 2013 and 2019 by reviewing court documents for Salvadoran criminal sentencing tribunals. For 14 cases in the same time frame, we learned of the killing of deportees through interviews with the victim's family members.[115] We documented 23 cases in interviews with authorities. In all of these cases, we sought corroboration of the killing and circumstances of the individual deportee's case with other sources. The below graphic illustrates the corroboration we were able to obtain.

following Salvadoran print / online outlets: *La Prensa Gráfica*, *El Diario de Hoy*, *Diario1*, *La Página*, and *El Blog*. (All articles are on file with Human Rights Watch).

[113] We also cut cases from our final count when it appeared the person had decided to voluntarily return to El Salvador without having had any contact with US immigration authorities. In one case reported by the press, we included an individual who was shot in 2018 by police seven years after his deportation in 2010 because his first experience of police harassment occurred soon after his deportation to El Salvador. For fifteen cases reported by the press that we did not include in our final tally, the date of deportation was not reported.

[114] When interviewing officials or directly impacted persons, if our questions caused us to uncover a case in which a person had been deported from Mexico or another country, we eliminated that case from our total count. For the cases documented through press searches, six deportees had no information about the country from which they were deported, therefore we eliminated these from our total count. In one case we included in our final count, some accounts reported the individual was deported from the United States, and others indicated Mexico.

[115] These 27 cases could not be corroborated in print media accounts. Authorities and reporters alike told us the press could not attend all homicide scenes, especially those in particularly dangerous neighborhoods where gang members or authorities would not let them enter or isolated rural areas they could not quickly reach. This has become even more applicable in recent years, as Salvadoran outlets have seen their budgets and staff decrease. Among the 10 cases we documented from 2016 to 2018 in interviews with directly impacted individuals, two occurred in areas that gang members or authorities had not let press enter at times, one occurred in an isolated rural area, and two occurred in an isolated rural area where gang members or authorities had previously prevented press from entering. Among the six unreported cases we documented from 2012 to 2015 in interviews with directly impacted individuals, one occurred in an isolated rural area, and one occurred in a particularly dangerous neighborhood. All 11 unreported cases documented in criminal sentencing tribunals occurred in an isolated rural area or particularly dangerous neighborhood, as well as having a day or more lapse between the killing and body discovery in more than half of the cases.



**Cases of 138 Deportees to El Salvador Killed**
**January 2013-September 2019**
**Identified or Documented for This Report**

1 case overlaps, corroborating name, deportee status, and killing.

5 deportees killed, documented through Tribunal Cases

2 cases overlap, corroborating name, deportee status, and killing.

14 deportees killed, documented through interviews with directly affected persons

1 case possibly overlaps, corroborating deportee status and killing.

106 deportees killed, identified through press

23 deportees killed, documented through interviews with Salvadoran authorities

6 cases overlap, corroborating name, deportee status, and killing.

Among the 219 press reports on killings of 106 deportees, Human Rights Watch found cases of six deportees killed between 2013 to 2019 that named state authorities or indicated death squads as the alleged killers.[116] The Rural Police were the suspected killers in two cases in an isolated rural area where gang members or authorities had previously prevented press from entering (and where police had been documented to have committed

---

[116] "Deportee Dies in Shootout with El Salvador's Special Reaction Force" ("Deportado muere en tiroteo con FES"), *La Prensa Gráfica*, July 4, 2017, https://www.laprensagrafica.com/elsalvador/Deportado-muere-en-tiroteo-con-FES-20170704-0103.html (accessed June 23, 2019); David Marroquín and Insy Mendoza, "Two Children Attacked by Gang Members for Defending Their Mother from Rape" ("Dos niños agredidos por mareros al defender a su madre de violación"), *El Diario de Hoy*, February 27, 2013, https://www.elsalvador.com/noticias/nacional/dos-ninos-agredidos-por-mareros-al-defender-a-su-madre-de-violacion/102064/2013/ (accessed 23 June 2019); "Armed Group Kills MS13 Deportee and Exconvict in Sonsonate" ("Grupo armado asesina a deportado y exconvicto de la MS13 en Sonsonate"), *Diario1*, January 12, 2019, http://diario1.com/nacionales/2019/01/grupo-armado-asesina-a-deportado-y-exconvicto-de-la-ms13-en-sonsonate/ (accessed June 22, 2019); "San Miguel Deportee Was Killed While He Was Waiting for a US Migratory Pardon" ("Migueleño deportado fue asesinado mientras esperaba perdón migratorio de EUA"), *La Prensa Gráfica*, June 29, 2017, https://www.laprensagrafica.com/elsalvador/Migueleno-deportado-fue-asesinado-mientras-esperaba-perdon-migratorio-de-EUA-20170629-0048.html (accessed June 22, 2019); "Two Massacres Leave 10 Gang Members Dead in Usulután" ("Dos masacres dejan 10 pandilleros muertos en Usulután"), *La Prensa Gráfica*, May 10, 2015, https://www.laprensagrafica.com/elsalvador/Dos-masacres-dejan-10-pandilleros-muertos-en-Usulutan-20150510-0023.html (accessed June 23, 2019); and Claudia Huete and Liz Aguirre, "Habitants of Olocuilta Neighborhood Dismayed by Massacre" ("Habitantes de colonia en Olocuilta consternados por masacre"), *La Prensa Gráfica*, May 2, 2010, (on file with Human Rights Watch).

extrajudicial killings starting in 2013).[117] Private actors were the alleged perpetrators in the overwhelming majority of the killings.[118] Only three accounts identified through our press searches[119]–in which one to three others were killed at the same time–left open the possibility that the deported man was not the target of the lethal attack.

## Killing of Deportees Likely Undercounted

Homicide data are regularly reported by police authorities in El Salvador.[120] However, we believe our count of 138 persons killed after deportation from the US to El Salvador between 2013-2019 represents a significant undercount for two main reasons. First, the specific victimization of *deportees* often goes unrecorded in forensic, media, or

[117] See "Special Report of the Ombudswoman for the Defense of Human Rights, Attorney Raquel Caballero de Guevara, about extralegal executions attributed to the National Civilian Police in El Salvador, period 2014-2018: Characterization of cases of violation of the right to life and patterns of extralegal action" ("Informe especial de la señora Procuradora para la Defensa de los Derechos Humanos, licenciada Raquel Caballero de Guevara, sobre las ejecuciones extralegales atribuidas a la Policía Nacional Civil, en El Salvador, periodo 2014-2018: Caracterización de casos de violación al derecho a la vida y patrones de actuación extralegal"), August 2019,
https://www.pddh.gob.sv/portal/file/index.php?dwfile=MjAxOS8xMC9JbmZvcm1lLWVzcGVjaWFsLXNvYnJlLWVjWZWN1Y2Ivb mVzLWV4dHJhbGVnYWxlcyoxLTEucGRm (accessed November 11, 2018). Twelve of the 48 cases–in which 25 persons were killed–the PDDH reviewed for its report occurred in La Paz department, all of them in rural areas, including in the municipalities of: El Rosario, Paraíso de Osorio, San Luis Talpa, San Pedro Masahuat, San Pedro Nonualco, Santiago Nonualco, and Zacatecoluca.

[118] We did identify 20 cases in which press descriptions of the victims, killings, and their aftermath included details that could be consistent with the activities of death squads; such as: previously witnessed police commit a crime; alleged perpetrators wearing ski masks / dark clothing / large weapons / bullet-proof vests; police locate victim minutes after family reports disappearance; one of several killings of similar victims (young males) in same geographic area. Human Rights Watch review of 39 articles appearing in Salvadoran media outlets such as *La Prensa Gráfica*, *Diario1*, *El Blog*, *Solo Noticias*, *La Pagina*, *El Mundo*, and *Diario Libre SV*. (All articles on file with Human Rights Watch.)

[119] "Massacre in Armenia" ("Masacre en Armenia"), *ContraPunto*, September 23, 2013,
http://www.contrapunto.com.sv/archivo2016/ultimas-noticias/ultimas-noticias/blog/page-69 (accessed November 9, 2019); "Quadruple Homicide in Armenia Neighborhood" ("Cuádruple homicidio en cantón de Armenia"), *La Prensa Gráfica*, September 23, 2013, https://www.laprensagrafica.com/elsalvador/Cuadruple-homicidio-en-canton-de-Armenia-20130923-0091.html (accessed November 9, 2019); Jaime López, Miguel Villalta, and Iris Lima, "Triple Murder on Sonsonate Soccer Field" ("Triple asesinato en una cancha de Sonsonate"), *El Diario de Hoy*, September 22, 2013,
https://historico.elsalvador.com/historico/113652/triple-asesinato-en-una-cancha-de-sonsonate.html (accessed November 9, 2019); Diana Escalante, Lissette Monterrosa, and Miguel Villalta, "Gang Members Armed with M-16's Shoot Down Three Brothers in Jiquilisco" ("Pandilleros armados con fusiles M-16 acribillaron a tres hermanos en Jiquilisco"), *El Diario de Hoy*, September 26, 2015, https://historico.elsalvador.com/historico/160540/pandilleros-armados-con-fusiles-m-16-acribillaron-a-tres-hermanos-en-jiquilisco.html (accessed November 12, 2019); and "Armed Attack Leaves Two Dead and One Injured in San Bartolomé Perulapia" ("Ataque armado deja dos muertos y un herido en San Bartolomé Perulapia"), *Diario1*, September 5, 2017, http://diario1.com/nacionales/2017/09/ataque-armado-deja-dos-muertos-y-un-herido-en-san-bartolome-perulapia/ (accessed November 11, 2019).

[120] See tweet from PNC Chief Howard Augusto Cotto's Twitter page,
https://twitter.com/Cotto100/status/1046763344286416896 (accessed December 3, 2019).

governmental accounts. Among victims who do report, protocol does not require authorities to ask about migration status of victims.[121]

All homicide journalists interviewed for this report said they mostly rely on police sources to determine if a victim was deported from the United States. Police acknowledged to Human Rights Watch that they do not always consult the relevant database to get a victim's migration status. In fact, they told Human Rights Watch that they only do so when the victim had no documents or had tattoos.[122] Reports on the killings of 53 deported men included police telling the press the victim had no identity documents or was a gang member; was linked to gangs, a thief, a drug user, or some other type of criminal (including 13 of those with tattoos).[123]

There is no mandatory requirement that the Salvadoran prosecutor's office (FGR) collects migratory status in its investigations, including in its homicide investigations.[124] One prosecutor explained his office's reasoning to Human Rights Watch: "We see crimes and do not give importance to this [migratory status]. It is not relevant."[125] An investigator in a different department also said migratory status was irrelevant to their office, "unless the

[121] Human Rights Watch interviews with 41 officials in nine departments at local district attorney, forensic investigators, and police officers who work in homicide scenes and participate in both crime investigations and hearings.

[122] Human Rights Watch interview with PNC investigator, El Salvador's Eastern Region, January 24, 2019; Human Rights Watch telephone interview with PNC high ranking official, El Salvador's Eastern Region, September 26, 2019. Human Rights Watch established that local police get lists of deportees suspected to be gang members (and possibly others), so police may check such lists to see if the victim matches the description of one of the persons on their list.

[123] Fifty-three articles out of 220 reporting killings of deportees from the United States reviewed by Human Rights Watch, most commonly appearing in the following Salvadoran print / online outlets: *La Prensa Gráfica*, *El Diario de Hoy*, *Diario1*, *La Pagina*, and *El Blog*. (All articles are on file with Human Rights Watch).

[124] For non-homicide crimes, FGR officials believe they do a thorough enough interview that migration status would likely emerge, telling Human Rights Watch: "We almost always ask [domestic, sexual and intrafamilial violence victims] about their situation. We do sometimes learn their migration status." Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, November 26, 2018. However, they also believe the majority of such victims do not report these crimes to them, saying: "Because of fear, there's a good percentage who do not report. They are intimidated by [the abuser] being her own dad, uncle, etc. A large quantity does not [report]." Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, November 26, 2018. Two other FGR officials did note collecting migration status would be possible and easy, based upon other components now collected that were not in the past. One said they had not collected if a person was LGBT in the past but do now. Another said they did not previously collect a person's profession in extortion cases but do now, even going so far as to say: "For us, it is no more than putting a check. It would be easy and fast." Human Rights Watch interview with FGR prosecutor, El Salvador's Western Region, January 7, 2019.

[125] Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, November 6, 2018.

person requests it."[126] Salvadoran authorities told us that too much stigma exists around deportation for victims or their family members to acknowledge it on their own. For example, a police chief told Human Rights Watch: "The deportee is stigmatized."[127] Likewise, a forensic doctor told us that none of the persons harmed after their deportation, or their surviving loved ones in cases of disappearance or killings, initially wanted to mention the victim's status as a deportee because, "They do not always identify themselves…. Many times, I think it's because of stigma, that they would feel pain to say it."[128]

In addition, Human Rights Watch documented three cases from 2013 to 2018 that illustrate how a victim's identity as a deportee may go unreported unless they possess a stigmatized characteristic, such as having tattoos, being a gang member, or being a male between the ages of 15 and 39.[129] The press did not mention in any of these three cases that the victim had been deported from the United States. None of the three had tattoos, and two were middle-aged men, perhaps explaining why the police did not check on their status in relevant databases or through other means.

The second reason we believe the 138 cases of killings to be an undercount is that certain categories of homicide cases, regardless of whether the person is a deportee or not, are much more likely to be undercounted, including cases involving (1) female victims, (2) people with identity documents (because they are less likely to be identified as deportees), (3) people without tattoos, (4) people killed in areas where crimes are more likely to go unreported including particularly violent neighborhoods, isolated rural areas, and areas where gangs or authorities do not permit journalists to enter, (5) LGBT victims, and (6) people killed in the custody of Salvadoran authorities.[130]

---

[126] Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, January 22, 2019.

[127] Human Rights Watch interview with police commissioner, El Salvador's Paracentral Region, November 5, 2018.

[128] Human Rights Watch interview with IML doctor, El Salvador's Eastern Region, January 22, 2019.

[129] Human Rights Watch interview with José Miguel C., El Salvador's Paracentral Region, March 29, 2019 (pseudonym); Human Rights Watch interview with Óscar K., El Salvador's Central Region, April 4, 2014 (pseudonym); and Human Rights Watch interview with Estefanie H., El Salvador's Central Region, April 15, 2014 (pseudonym).

[130] See methodology section for a more detailed discussion of why each of these categories represents a possible undercount.

Police, other Salvadoran officials, and reporters have apparently also failed to determine the migration status of female homicide victims. We could not find a single press report on the killing of any cisgender (non-transgender) female deportees—even for a case of a former female police agent whom we documented through our interview with her surviving relatives, who was killed after her deportation from the United States.[131] Nevertheless, several directly impacted individuals and authorities told us about women killed after their deportations.[132] For example, one forensic official recalled multiple females killed after their deportations, just in the one department where he works:

> Yes, there are women among these [who were deported and killed] …. Always by the gang, for the same phenomenon they'd left fleeing. She became their subject and could not free herself. If she gets with another [man], even [one] in the [same] gang, she is killed. Even if he's in prison, both [she and he] could be killed.[133]

---

[131] Human Rights Watch interview with Irene J., United States East Coast, March 1, 2019 (pseudonym). Because articles only returned for two women—one disappeared after her deportation and one killed after her stepson was deported—we also searched monthly summaries of news reports on girls or women by ORMUSA. ORMUSA has monitored mentions of girls and women in the Salvadoran printed press since 2007 and publishes monthly summaries of the results at their website, http://observatoriodeviolencia.ormusa.org/monitoreos.php.

[132] Human Rights Watch interview with Irene J. and Matías J., United States East Coast, March 1, 2019 (pseudonyms); Human Rights Watch telephone interview with Ana P., United States Mountain West, March 5, 2019 (pseudonym); Human Rights Watch interview with high-ranking PNC officer, El Salvador's Eastern Region, November 26, 2018; Human Rights Watch interview with PNC investigator, El Salvador's Paracentral Region, March 25, 2019; and Human Rights Watch interview with IML investigator, El Salvador's Western Region, January 7, 2019.

[133] Human Rights Watch interview with IML investigator, El Salvador's Western Region, January 7, 2019.

# III. Other Harms Faced by Deportees

In our research for this report we heard many gut-wrenching accounts from people subjected to terrible abuse after their deportations from the United States. Often, these were the same abuses from the same abusers that deportees had tried to escape by fleeing to the United States–only to be returned directly back to the violence they originally feared. The cycle of abuse and flight is chronic, and for many deportees feels inescapable. Given the horrors they had endured, it was not surprising to us that these people often tried to flee again.

Even more so than the numbers of killings of deportees, instances in which deportees were attacked by gangs or others, disappeared, forced into hiding, sexually assaulted, and tortured certainly exceed what we have been able to document.[134] Many non-homicide crimes are unreported and thus undocumented in El Salvador.[135] For example, one survey suggests that less than five percent of sexual crimes were reported to Salvadoran authorities in 2018.[136] Crimes less serious than homicide go unreported to authorities, are

---

[134] Since each source type yielded cases that did not fully overlap with any other source type, we know that each of the four sources is incomplete. When we asked official sources (PNC, FGR, IML, etc.) about limitations on their information, each was able to describe limitations as to why their data on killings of US deportees is likely incomplete. For further discussion of this issue, see the methodology section of this report.

[135] The newspaper, *La Prensa Gráfica*, surveys a representative sample (approximately 1,200 households) of the country several times a year. During their February 2017 survey, they asked respondents if someone in their family was a victim of a crime in the last three months. Fourteen percent of respondents with a margin of error between 2.2 and 2.5 percent, with 95 percent confidence said someone had been, working out to an extrapolated 868,000 members of the general population every quarter; extrapolating this figure to the year at nearly 3.5 million would be incorrect, because some victims experience crime across quarters. Regardless, during 2016, the Salvadoran Attorney General's Office (FGR) initiated only 14,162 cases. The number of crimes being investigated by the Attorney General's office clearly make up a small fraction of even the most conservative estimate of the total offenses. See Edwin Segura, "The San Salvador Metropolitan Area Remains the Most Dangerous Region" ("El AMSS se mantiene como la región mas peligrosa"), *La Prensa Gráfica*, March 13, 2017, http://www.laprensagrafica.com/2017/03/13/el-amss-se-mantiene-como-la-region-mas-peligrosa. While not reported in this article, Human Rights Watch obtained the margin of error from the study's authors. Human Rights Watch telephone interview with *La Prensa Gráfica* staff, October 30, 2019.

[136] See University Institute of Public Opinion, ("Instituto Universitario de Opinión Pública, IUDOP"), "Press Bulletin" ("Boletin de prensa año XXXII, No. 4, 2018"), IUDOP included in its 2018 survey this question: "Have you been a direct victim of some type of incident like a robbery, extortion or renta, threats or other criminal act during the year?" ("¿Ha sido usted víctima directa de algun hecho como robo, extorsión o renta, amenazas o de otro acto delincuencial durante el año?") In response to this question, 1 percent of those who responded affirmatively specified they had been raped or sexually assaulted. Assuming a population of 6.5 million, 1 percent would extrapolate to roughly 65,000 rape or sexual assault victims. In 2018, the Salvadoran prosecutor's office, FGR, documented 3,149 reports of sexual crimes, which is 4.8 percent of 65,000.

infrequently investigated and prosecuted; and partly as a result of the lack of public accountability for these categories of crimes, they go unreported in the Salvadoran press. As discussed in the previous section, the victimization of *deportees* in particular goes almost completely undocumented in the country, due in part to the lack of any requirement that law enforcement authorities obtain the migration status of victims and also because victims and their family members often fail to report the victim's status as a deportee.

## Disappearances

Press reporting on individual cases of disappearances in El Salvador is rare.[137] If a victim is killed, their body may never be found, and if a victim is alive, their whereabouts may not be known. When a victim's body is found, often too much time has passed for the Salvadoran press to take interest. A common security practice among Salvadoran reporters is not reporting on their own neighborhoods. Not surprisingly then, two journalists each told us about a case of a disappeared deportee they had not reported in 2018, one because the incident happened in his neighborhood and one because he had other incidents to report on the same day that interested his editors more.[138]

Still, we were able to identify 18 separate incidents (between 2013 and 2019, for which the disappearance happened within five years or less of the deportation) involving disappearances of deportees from the United States: at least one woman and four men,[139]

---

[137] See Mary Beth Sheridan and Anna-Catherine Brigida, "Disappeared in El Salvador: the Return of a Cold War Nightmare," *Washington Post*, October 19, 2019, https://www.washingtonpost.com/world/the_americas/disappeared-in-el-salvador-amid-a-cold-war-nightmares-return-a-tale-of-one-body-and-three-grieving-families/2019/10/19/d806d19a-e09d-11e9-be7f-4cc85017c36f_story.html.

[138] Human Rights Watch interview with Salvadoran journalist, El Salvador's Central Region, November 9, 2018; Human Rights Watch interview with Salvadoran journalist, El Salvador's Central Region, November 8, 2018.

[139] "Young Dancer who Lived in Las Palmas Community Found Dead" ("Encuentran muerta a joven bailarina que vivía en Comunidad Las Palmas"), *El Diario de Hoy*, July 17, 2017, (article on file with Human Rights Watch); "25 People Have Disappeared This Year" ("25 privados de libertad van este año en Usulután"), *La Prensa Gráfica*, March 3, 2014, https://www.laprensagrafica.com/elsalvador/25-privados-de-libertad-van-este-ano-en-Usulutan-20140303-0116.html (accessed October 11, 2019); "'My Husband Went to Pay Installments to a Store and Did Not Return'" ("'Mi esposo fue a pagar a unas letras a un almacén y ya no regresó'"), *El Blog*, June 22, 2017, http://elblog.com/noticias/registro-43551.html (accessed October 11, 2019); Flor Lazo, "Relief Teams Search for Missing Man" ("Cuerpos de socorro buscan a hombre extraviado"), *La Prensa Gráfica*, September 17, 2017, https://www.laprensagrafica.com/elsalvador/Cuerpos-de-socorro-buscan-a-hombre-extraviado-20170917-0028.html (accessed October 11, 2019); Jaime López, "Youth Arrived to El Salvador from the United States and Disappeared in Sensuntepeque" ("Joven llegó a El Salvador de EE.UU. y desapareció en Sensuntepeque"), *ElSalvador.com*, September 23, 2018, https://www.elsalvador.com/noticias/nacional/joven-llego-a-el-salvador-de-ee-uu-y-desaparecio-en-sensuntepeque/521291/2018/ (accessed October 11, 2019).

alongside 13 men who disappeared or were kidnapped before being found killed.[140]

In a separate case, the Inter-American Commission on Human Rights (CIDH) issued precautionary measures (measures the commission adopts after reviewing evidence indicating imminent risk of irreparable harm to an individual) to an 18-year-old man deported from the US in September 2017 who was taken from his home in January 2018 by "some youth [muchachos]," and has not been seen since.[141]

[140] Israel Serrano, "Deliveryman of 'Nash' Died After Falling in a Ravine Road to La Libertad" ("Repartidor de 'Nash' murió al caer en barranco carretera a La Libertad"), *La Pagina*, January 1, 2013 (article on file with Human Rights Watch); David Ernesto Perez, "They Murdered an Opposing Gang Member and Now They Have to Face Jail" ("Asesinaron a un marero del bando contrario y ahora tendrán que enfrentar cárcel"), *La Pagina*, February 18, 2013 (article on file with Human Rights Watch); "Man is Killed with a Stone in the Canton of El Jute" ("Asesinan a hombre con una piedra en el cantón El Jute"), *La Prensa Gráfica*, January 12, 2013, https://www.laprensagrafica.com/elsalvador/Asesinan-a-hombre-con-una-piedra-en-el-canton-El-Jute-20130112-0080.html (accessed October 11, 2019); "Man Murdered on Boulevard Antiguo Cuscatlán Was Going to Visit His Son, but Car Was Left" ("Hombre asesinado en bulevar de Antiguo Cuscatlán iba a visitar a su hijo, pero se le quedó el carro") *El Blog*, August 4, 2018; "Propane Gas Deliveryman Murdered in Lourdes Colón" ("Asesinan a repartidor de gas propano en Lourdes Colón"), *Diario Libre*, June 29, 2017, https://diariolibresv.com/nacionales/2017/06/29/asesinan-repartidor-gas-propano-lourdes-colon/ (accessed October 11, 2019); Kevin Sieff, "When Death Awaits Deported Asylum Seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/?noredirect=on&utm_term=.da4d1269d863 (accessed October 11, 2019); Jaime García, "Saleswoman, Taxi Driver and Newborn, Among Those Killed Today" ("Vendedora, taxista y recién nacida, entre los asesinados hoy"), *ElSalvador.com*, September 9, 2015, https://historico.elsalvador.com/historico/162636/vendedora-taxista-y-recien-nacida-entre-los-asesinados-hoy.html (accessed October 11, 2019); "Body of Person Reported Missing Found in Santo Domingo de Guzmán" ("Encuentran cadáver de persona reportada como desaparecida en Santo Domingo de Guzmán"), *La Prensa Gráfica*, April 22, 2015, https://www.laprensagrafica.com/elsalvador/Encuentran-cadaver-de-persona-reportada-como-desaparecida-en-Santo-Domingo-de-Guzman-20150422-0034.html (accessed October 11, 2019); "Missing Person Found Dead" ("Encuentran muerto a desaparecido"), *La Prensa Gráfica*, April 23, 2015, https://www.laprensagrafica.com/elsalvador/Encuentran-muerto-a-desaparecido-20150423-0089.html (accessed October 11, 2019); Lilibeth Sánchez and Óscar Iraheta, "Route 42 Minibus Fare Collector Killed During Violent Day" ("Asesinan a un cobrador de microbuses de la Ruta 42 durante jornada violenta"), *El Diario Hoy*, April 16, 2013, https://historico.elsalvador.com/historico/104614/asesinan-a-un-cobrador-de-microbuses-de-la-ruta-42-durante-jornada-violenta.html (accessed October 11, 2019); Héctor Rivas, "Man and His Stepson Killed with AK-47" ("Matan a hombre y a su hijastro con fusil AK-47"), *La Prensa Gráfica*, January 28, 2018, https://www.laprensagrafica.com/elsalvador/Matan-a-hombre-y-a-su-hijastro-con-fusil-AK-47-20180127-0070.html (accessed October 11, 2019); Human Rights Watch interview with immigration attorney, United States East Coast, February 22, 2019; Human Rights Watch interview with Gaspar T. and Walter T., El Salvador's Central Region, March 28, 2019 (pseudonyms); Criminal Sentencing Tribunal Decision, La Unión, January 13, 2016 (on file with Human Rights Watch); Human Rights Watch interview with Yaneth D., United States South, March 13, 2019 (pseudonym). As noted, these 13 cases of disappearances also appear in our total count of killings of deportees, above.

[141] Inter-American Commission on Human Rights, "Óscar Álvarez Rubio Regarding El Salvador" ("Óscar Álvarez Rubio respecto de El Salvador"), May 3, 2018, https://www.oas.org/es/cidh/decisiones/pdf/2018/26-18MC170-18-ES.pdf (accessed January 18, 2020).

We also spoke with an IML investigator who said that he knew of "people deported who did disappear," and a second IML investigator who agreed with this statement during the same interview.[142]

## Sexual Crimes

The United States Department of State (USDOS) Human Rights Reports on El Salvador from 2013 to 2018 stated that "rape and other sexual crimes against women were widespread."[143] Even so, news reporting on sexual crimes in El Salvador is rare,[144] and as noted above, we believe widely under-reported by victims to authorities.

We documented four cases of sexual crimes and harassment against people deported from the United States (in three of these cases we know the victimization occurred between 2013 and 2019 and was within five years or less of the deportation. For one of the cases, our source was unwilling to provide any dates for security reasons). A male deportee died after castration, according to a criminal sentencing tribunal decision.[145] In addition, according to a local prosecutor we interviewed, a woman was subjected to sexual harassment after her deportation from the US.[146] Two additional cases include a woman deportee who told us that she was physically assaulted by a person linked to her former intimate partner, and after years of previous emotional, physical, and sexual abuse that prompted her original flight from the country;[147] and a female deportee who said that she was raped by a gang member after deportation from the US.[148]

---

[142] Human Rights Watch interview with IML investigators, El Salvador's Eastern Region, January 22, 2019.

[143] United States Department of State, "Country Reports on Human Rights Practices," http://www.state.gov/j/drl/rls/hrrpt/ (accessed January 18, 2020).

[144] For example, in searches we did of 24 neighborhoods and four less-populous municipalities that yielded roughly 22,000 articles, only 27 articles (0.1 percent) mentioned sexual crimes. Thirteen neighborhoods returned no results. Seven returned only one result. None returned more than six results.

[145] Criminal Sentencing Tribunal Decision, La Unión, January 13, 2016 (on file with Human Rights Watch) (this case is also counted in the total for deportees who were killed; as well as deportees who were disappeared before being killed). Among the 13 homicides documented in criminal sentencing tribunal decisions, one was killed by removing his testicles and penis.

[146] Human Rights Watch interview with FGR prosecutor, El Salvador's Central Region, March 26, 2019.

[147] Human Rights Watch interview with Inés Z., El Salvador's Eastern Region, March 24, 2019 (pseudonym).

[148] Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym).

### Angelina N.

In 2014, when she was 20 years old, Angelina N. fled abuse at the hands of Jaime M., the father of her 4-year-old daughter, who regularly beat her.[149] Jaime falsely accused her of having an affair with Mateo O., a gang member in their neighborhood who had been persistently making advances towards her. Angelina fled, alone, to the United States and was apprehended at the border and detained. After a rare phone call home brought news that her 4-year-old was hospitalized in El Salvador, she chose not to appeal the US government's decision to deport her in September 2014.

Once back in El Salvador, Mateo resumed pursuing and threatening her, having his fellow gang members do so as well. She repeatedly rejected Mateo's advances, but according to a statement of facts in an immigration court ruling, "he threatened to kill Angelina's father and daughter if she did not accept to be 'his woman.'"[150]

In October 2014, Angelina's father took her daughter to church.[151] She told a Human Rights Watch researcher what happened when she heard a knock at the door:

> I just opened the door, expecting it to be [my daughter returning home], but it was [Mateo]. He forced open the door because I started trying to close it on him. [Mateo] came inside and forced me to have sex with him for the first time. He took out his gun…. I was so scared that I obeyed…. When he left, I started crying. I didn't say anything at the time, or even file a complaint to the police. I thought it would be worse if I did because I thought someone from the police would likely tell [Mateo]…. I didn't want anyone to know what was happening…. He told me he was going to kill my father and my daughter if I reported the [original and three subsequent] rapes, because I was "his woman." [He] hit me and told me that he wanted me all to himself.[152]

One month later, Mateo returned to Angelina's home. This time her daughter was at home. Mateo told Angelina's daughter to stay in the living room "watching cartoons" and "not to go to the bedroom."[153] He then "dragged [Angelina] to the bedroom, took out a gun, and told [her] to be quiet or [she] would see [her] daughter die before [her]

eyes."[154] After he left, Angelina cried but did not tell anyone. She told an immigration court "sometimes it is worse to tell the police because they do not help."[155]

Angelina was raped twice more by Mateo before fleeing again—this time with her daughter—to the United States.[156] She was ultimately granted protection from deportation in the United States under a provision known as "withholding of removal," and her daughter was granted asylum.

## Torture, Other Ill-Treatment, or Excessive Use of Force

We investigated five separate cases of torture, other ill-treatment, or excessive use of force by police or soldiers against deportees that we know occurred between 2013 and 2019 and within five years of the person's deportation. In interviews with deportees and their relatives or friends, we collected accounts of three male deportees from the United States who said they were beaten by police or soldiers during arrest, followed by beatings during their time in custody, which lasted between three days to over a year.[157] One of these deportees, formerly a member of MS, told us that when police came to his home to arrest him he was unarmed and did not resist arrest. Police hit and kicked him before putting him in the patrol car, and then beat him repeatedly during his detention, which lasted for over a year. He told us that during his detention, police officers kicked him repeatedly in the

---

[149] US Department of Justice, Executive Office for Immigration Review, *In re Matter of* (name withheld for security), (date withheld for security), (ruling on file with Human Rights Watch). Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym).

[150] ibid.

[151] Ibid.

[152] Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym).

[153] US Department of Justice, Executive Office for Immigration Review, *In re Matter of* (name withheld for security), (date withheld for security), (ruling on file with Human Rights Watch) and Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym).

[154] Ibid.

[155] Ibid.

[156] Ibid.

[157] Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security), November 26, 2018 (pseudonym); Human Rights Watch telephone interview with Gaspar T., El Salvador's Eastern Region, May 21, 2019 (pseudonym).

testicles, threatened to kill him, and "asked me about other MS members and were saying that if I name someone from MS, that is, if I turned them in, they would leave me free."[158]

Salvadoran criminal sentencing tribunal decisions described police abuses of two additional deported men. In one case, a man deported four months earlier, who police accused of resisting arrest, was put in a patrol car and brought to a police station. Throughout, the police repeatedly hit and kicked him, including kicks with their boots to his neck and abdomen. The deported man sustained injuries requiring an operation for a ruptured pancreas and spleen, month-long hospitalization, and 60 days of post-release treatment.[159] In the second case, a deportee who police accused of extortion, evading arrest, and shooting at police; claimed he was face down on the ground but nevertheless shot at by police agents. Once the agents took him into custody, the deportee claimed he was insulted, kicked in the face, and shot at again repeatedly. The deportee was taken to a hospital for his injuries and was later acquitted of all criminal charges.[160]

## Armed Attacks, Beatings, Extortion, and Death Threats by Gangs

We documented the cases of 33 individuals who known or suspected gang members threatened with death after their deportations.[161] Presumed gang members subsequently

---

[158] Human Rights Watch written communication with Bartolo A., January 6, 2019 (pseudonym).

[159] Criminal Sentencing Tribunal decision, San Francisco Gotera, Department of Morazán, December 8, 2014 (on file with Human Rights Watch).

[160] Criminal Sentencing Tribunal decision, San Miguel, El Salvador, April 6, 2017 (on file with Human Rights Watch).

[161] Human Rights Watch interview with Bernardo A., El Salvador's Central Region, January 25, 2019 (pseudonym); Human Rights Watch interview with Nelson E., El Salvador's (region withheld for security), January 26, 2019 (pseudonym); Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security) (pseudonym), November 26, 2018; Human Rights Watch interview with José Miguel C., El Salvador's Paracentral Region, March 29, 2019 (pseudonym); Human Rights Watch interview with Gabriel G., El Salvador's (region withheld for security), March 23, 2019 (pseudonym); Human Rights Watch interview with Santiago U., El Salvador's Eastern Region, January 28, 2019 (pseudonym); Human Rights Watch WhatsApp text message correspondence with Yeshua O., El Salvador's Central Region, June 20, 2019 (pseudonym); Human Rights Watch interview with Walter T., El Salvador's Central Region, March 28, 2019 (pseudonym); Human Rights Watch interview with Gaspar T., El Salvador's Central Region, March 28, 2019 (pseudonym); Human Rights Watch interview with Paloma V., telephone communication, United States East Coast, June 17, 2019 (pseudonym); Human Rights Watch Facebook online messenger correspondence with Óscar K., El Salvador's Central Region, June 10, 2019 (pseudonym); and Human Rights Watch interview with Irene J., United States East Coast, March 1, 2019 (pseudonym).

beat three[162] and shot and injured three others.[163] Suspected gang members likewise extorted 13 deportees (including one beaten and one shot and injured).[164] Alleged gang members subsequently killed 14 deportees (including six of those extorted).[165] For these

[162] Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym); Human Rights Watch telephone interview with Inés Z., El Salvador's Eastern Region, April 7, 2019 (pseudonym); and Human Rights Watch interview with Irene J., United States East Coast, March 1, 2019 (pseudonym).

[163] Human Rights Watch telephone interview with Helio L., United States Mountain West, July 1, 2019 (pseudonym); David Marroquín, "Three Detained After Attack and Persecution" ("Tres detenidos tras ataque y persecución"), *El Diario de Hoy*, January 17, 2013, https://historico.elsalvador.com/historico/100235/tres-detenidos-tras-ataque-y-persecucion.html (accessed November 9, 2019); and "Presumed Gang Members Injure Man in Ciudad Delgado" ("Presuntos pandilleros lesionan a hombre en Ciudad Delgado"), *La Prensa Gráfica*, May 13, 2013, https://www.laprensagrafica.com/elsalvador/Presuntos-pandilleros-lesionan-a-hombre-en-Ciudad-Delgado-20130513-0041.html (accessed November 9, 2019).

[164] Human Rights Watch interview with Elías F., United States (region withheld for security), 2019 (exact date withheld for security) (pseudonym); Human Rights Watch interview with Jacinto K. and Óscar K., El Salvador's Central Region, April 4, 2014 (pseudonyms); Human Rights Watch telephone interview with Helio L., United States Mountain West, July 1, 2019 (pseudonym); Human Rights Watch interview with Carlos P., El Salvador's Central Region, March 27, 2019 (pseudonym); Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym); Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 5, 2018; Human Rights Watch interview with OLAV, El Salvador's Central Region, January 11, 2019; Human Rights Watch interview with PNC investigator, El Salvador's Western Region, January 24, 2019; "Four Gang Members Killed in Usulután and La Libertad" ("Matan a cuatro pandilleros en Usulután y La Libertad"), *La Pagina*, June 9, 2014 (on file with Human Rights Watch); Lilibeth Sánchez and Diana Escalante, "Police Register 32 Murders Between Friday and Sunday" ("Policía registro 32 asesinatos entre el viernes y el domingo*"), El Diario de Hoy*, June 9, 2014, https://historico.elsalvador.com/historico/129747/policia-registro-32-asesinatos-entre-el-viernes-y-el-domingo.html (accessed November 9, 2019); David Marroquín, "2,841 Murders Registered on the Year, with 297 in September" ("Registran 2,841 asesinatos en el año, septiembre con 297 homicidios"), *El Diario de Hoy*, September 29, 2014, https://www.elsalvador.com/noticias/nacional/registran-2841-asesinatos-en-el-ano-septiembre-con-297-homicidios/136337/2014/ (accessed 21 June 2019); "Two Soldiers Killed in Front of SITRAMSS Station" ("Matan a dos soldados frente a estación del SITRAMSS"), *La Prensa Gráfica*, June 22, 2015, https://www.laprensagrafica.com/elsalvador/Matan-a-dos-soldados-frente-a-estacion-del-SITRAMSS-20150622-0044.html (accessed November 12, 2019); and José Napoleón Morales, "Suspected Gang Members Kill a Man and Injure His Wife" ("Supuestos pandilleros asesinan a un hombre y hieren de bala a su esposa"), *La Pagina*, June 22, 2015 (on file with Human Rights Watch).

[165] Human Rights Watch interview with Karina I., United States West Coast, March 6, 2019 (pseudonym); Human Rights Watch interview with Jacinto K. and Óscar K., El Salvador's Central Region, April 4, 2014 (pseudonyms); Human Rights Watch interview with Yaneth D., United States South, March 13, 2019 (pseudonym); Human Rights Watch interview with Jennifer B., United States East Coast, March 6, 2019 (pseudonym); Human Rights Watch interview with PNC investigator, El Salvador's Western Region, January 24, 2019; Jenny Ventura, Jaime López and Diana Escalante, "Nine-year-old Girl Found Murdered" ("Encuentran asesinada a niña de 9 años"), *El Diario de Hoy*, January 4, 2015, https://historico.elsalvador.com/historico/143432/encuentran-asesinada-a-nina-de-9-anos.html (accessed November 12, 2019); Wilmer Lizama, "Double Homicide Registered in Moncagua, San Miguel" ("Registran doble homicidio en Moncagua, San Miguel"), *El Mundo*, June 16, 2017, https://elmundo.sv/registran-doble-homicidio-en-moncagua-san-miguel/ (accessed June 10, 2019); "Three Farmers Killed in Moncagua" ("Asesinan en Moncagua a tres agricultores"), *La Prensa Gráfica*, June 17, 2017, https://www.laprensagrafica.com/elsalvador/Asesinan-en-Moncagua-a-tres-agricultores-20170617-0090.html (accessed November 11, 2019); Jorge Beltrán, "Why is There So Much Violence in Just One Neighborhood Called 'El Platanar' in El Salvador?" ("¿Por que hay tanta violencia en un solo cantón llamado 'El Platanar' en El Salvador?"), *El Diario de Hoy*, July 15, 2018, https://www.elsalvador.com/noticias/nacional/un-infierno-llamado-el-platanar/500528/2018/ (accessed November 11, 2019); "Two Soldiers Killed in Front of SITRAMSS Station" ("Matan a dos soldados frente a estación del

cases, we know the victimization was within five years or less of the deportation between 2013 and 2019.

Among those killed, known or suspected gang members threatened with death surviving relatives of at least four of the deportees killed.[166] While gang members told three to leave their homes or they would be killed within as little as 24 hours, they told one to stay with her family and keep quiet. Jennifer B. explained to Human Rights Watch: "They [the gang members] threatened my sister [with whom Javier B. had wanted to live] that if she opened her mouth or left that place, they'd look for her everywhere and kill her. So, she remains there. … They've kept their mouths shut there."[167]

## People Forced into Hiding

Most Human Rights Watch interviewees attempted to go into hiding in their own or different neighborhoods because they were afraid of gang members, police, or former intimate partners from whom they feared harm that authorities would or could not stop. US and Salvadoran authorities often make unrealistic assumptions about a particular individual's ability to remain safe, thinking a person could easily relocate. For example, when Alexander N. told Salvadoran migration officials he was afraid to return to the home where his sister was taken and killed, they responded: "'Why not go elsewhere?'"[168]

SITRAMSS"), *La Prensa Gráfica*, June 22, 2015, https://www.laprensagrafica.com/elsalvador/Matan-a-dos-soldados-frente-a-estacion-del-SITRAMSS-20150622-0044.html (accessed November 12, 2019); and José Napoleón Morales, "Suspected Gang Members Kill a Man and Injure his Wife" ("Supuestos pandilleros asesinan a un hombre y hieren de bala a su esposa"), *La Pagina*, June 22, 2015 (on file with Human Rights Watch); David Marroquín, "2,841 Murders Registered on the Year, with 297 in September" ("Registran 2,841 asesinatos en el año, septiembre con 297 homicidios"), *El Diario de Hoy*, September 29, 2014, https://www.elsalvador.com/noticias/nacional/registran-2841-asesinatos-en-el-ano-septiembre-con-297-homicidios/136337/2014/ (accessed June 21, 2019); "Four Gang Members Killed in Usulután and La Libertad" ("Matan a cuatro pandilleros en Usulután y La Libertad") *La Pagina*, June 9, 2014 (on file with Human Rights Watch); Lilibeth Sánchez and Diana Escalante, "Police Register 32 Murders Between Friday and Sunday" ("Policía registro 32 asesinatos entre el viernes y el domingo"*), El Diario de Hoy*, June 9, 2014, https://historico.elsalvador.com/historico/129747/policia-registro-32-asesinatos-entre-el-viernes-y-el-domingo.html (accessed November 9, 2019); David Marroquín, "Three Detained After Attack and Persecution" ("Tres detenidos tras ataque y persecución"), *El Diario de Hoy*, January 17, 2013, https://historico.elsalvador.com/historico/100235/tres-detenidos-tras-ataque-y-persecucion.html (accessed November 9, 2019).

[166] Human Rights Watch interview with Karina I., United States West Coast, March 6, 2019 (pseudonym); Human Rights Watch Facebook online messenger correspondence with Óscar K., El Salvador's Central Region, June 10, 2019 (pseudonym); Human Rights Watch interview with Yaneth D., United States South, March 13, 2019 (pseudonym), and Human Rights Watch telephone interview with Jennifer B., United States East Coast, March 6, 2019 (pseudonym).

[167] Human Rights Watch telephone interview with Jennifer B., United States East Coast, March 6, 2019 (pseudonym).

[168] Human Rights Watch interview Alexander N., El Salvador's (region withheld for security), November 25, 2018 (pseudonym).

Safe relocation in El Salvador is incredibly difficult for anyone.[169] According to unverified estimates cited by the UN special rapporteur for extrajudicial, summary or arbitrary executions, approximately 60,000 gang members reportedly operate in 247 of the 262 municipalities in the country.[170] State authorities have been largely ineffective at protecting the population from gang or private violence, and Salvadoran security forces have themselves committed extrajudicial executions, sexual assaults, enforced disappearances, and torture throughout the country.

The few organizations now offering assistance to the internally displaced can together only provide services to several hundred people per year and even then, are typically delayed, and limited to helping a limited number of people and for a period of no more than three months.[171] This leaves most of the estimated 285,000 internally displaced persons in El Salvador to rely on familial networks, or more commonly, as one survey with a nationally representative sample found, flee abroad.[172]

---

[169] As many as 296,000 new displacements occur a year. See Vickie Knox, "An Atomised Crisis: Reframing Displacement Caused by Crime and Violence in El Salvador," Internal Displacement Monitoring Centre, September 2018, http://www.internal-displacement.org/sites/default/files/inline-files/201809-el-salvador-an-atomised-crisis-en.pdf (accessed 21 August 2019).

[170] United Nations Office of the High Commission for Human Rights, El Salvador End of Mission Statement, Agnes Callamard, special rapporteur for extrajudicial, summary or arbitrary executions, February 5, 2018, https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=22634&LangID=E (accessed June 16, 2019).

[171] Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 5, 2018; Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 6, 2019; Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 26, 2018; Human Rights Watch interview with social worker to internally displaced children and families for international non-profit, El Salvador's Central Region, November 29, 2018; Human Rights Watch interview with aid director for internally displaced persons for international non-profit, El Salvador's Central Region, December 4, 2018; Human Rights Watch interview with aid workers to internally displaced persons for national non-profit, El Salvador's Central Region, December 4, 2018; Human Rights Watch interview with OLAV, El Salvador's Eastern Region, January 23, 2019; and Human Rights Watch interview with aid director for persons deported from Mexico and the United States for international non-profit, El Salvador's Central Region, 28 March 2019. The profiles these organizations told us they could not attend are: persons who have participated in crimes against gang members, families who have a relative in a gang, and those who were deported three or more years earlier.

[172] Every two years, the Central American University (UCA) Institute of Public Opinion (IUDOP) surveys a representative sample of the Salvadoran population about a range of issues. In 2016, IUDOP asked respondents if someone had to change their residence in the past year (a separate portion of the question asked about migration outside of El Salvador). We multiplied the adult population of El Salvador in 2016 (5,800,000) by the 4.9 percent of respondents who answered affirmatively that they had to change their residence inside El Salvador during the past year. It is important to note that our estimate of 285,000 people displaced includes only adults. In addition, the margin of error for this question in the survey is 2.3, which means as few as 2.6 percent and as many as 7.2 percent may represent the true proportion. See IUDOP, "Evaluation Survey of 2016 and the Peace Accords" ("Encuesta de evaluación del año2016 y sobre los Acuerdos de Paz"), http://www.uca.edu.sv/iudop/wp-content/uploads/INFORME-141.pdf (accessed October 24, 2019).

For example, after learning gang members planned to kill him in his rural municipality, Gabriel G., a retired high-ranking officer with specialized training in the Salvadoran military in his forties, told Human Rights Watch he fled to the United States in 2018 after "the gang went to the police to tell them when, where, and how they'd kill me."[173] Gabriel's wife and children have received threats because of his military service as well, and two of his sons fled El Salvador multiple times between 2013 and 2018 related to these threats. However, Gabriel had previously been deported from the US in 2008, after he went to the US seeking refuge because former guerillas[174] were threatening him. Gabriel was detained in Texas and failed his reasonable fear interview. His prior deportation barred him from asylum under US law, so he had to meet the higher standards of withholding of removal, which means that it would be "more likely than not" that he would be persecuted, rather than the lower asylum standard of a well-founded fear of persecution. Alternatively, he had to show he merited protection under the Convention against Torture. Gabriel remembered US officials asked him if he had been tortured. He told Human Rights Watch, "I didn't want to lie, because [what I consider torture] had not happened to me, although threats had been made, and they remained active."[175] Since being deported in 2018, Gabriel remains fearful and stays in hiding when he is not at work as a security guard, leaving his home as little as possible and refusing even to inform his wife of his weekly work schedule for fear that she might inadvertently tell others and the gang would attack him while he travels to work.[176] He described to us how different gang members come to the gate outside his house to demand he turn over his work-issued firearm. He consistently refuses to hand over the weapon, and in response the gang members threaten to kill him.[177]

At least 17 deported individuals whose cases we identified or investigated for this report attempted to hide from the violence or extortion they feared in the same neighborhoods

[173] Human Rights Watch interview with Gabriel G. and his wife, El Salvador's (region withheld for security), March 23, 2019 (pseudonym).

[174] Individuals who fought against the military-led Salvadoran government forces during El Salvador's civil war.

[175] Human Rights Watch interview with Gabriel G. and his wife, El Salvador's (region withheld for security), March 23, 2019 (pseudonym).

[176] Human Rights Watch interview with Gabriel G., El Salvador's (region withheld for security), December 15, 2019 (pseudonym).

[177] Ibid.

they had originally fled. Two who were beaten and extorted,[178] and one who was beaten, extorted, and raped have since fled El Salvador again.[179] Seven are dead.[180] Discussed more fully in Section IV below, individuals also relocated from one particularly violent neighborhood to another.[181] In another case, a male deportee fled the particularly violent neighborhood where one gang killed his father, to a neighborhood where a different gang controlled the territory.[182] Three additional male deportees attempted to go into hiding in a new location before they were killed or disappeared, according to press accounts.[183]

---

[178] Human Rights Watch interview with Elías F., United States (region withheld for security), (exact date withheld for security) 2019 (pseudonym), and Human Rights Watch telephone interview with Helio L., United States Mountain West, July 1, 2019 (pseudonym).

[179] Human Rights Watch interview with Angelina N., United States East Coast, February 22, 2019 (pseudonym).

[180] Human Rights Watch telephone interview with Moises X., United States West Coast, January 3, 2019 (pseudonym); Human Rights Watch interview with Karina I., United States West Coast, March 6, 2019 (pseudonym); Human Rights Watch interview with Yaneth D., United States South, March 13, 2019 (pseudonym); Mauricio Bolaños, "La Paz: Murder of Man Reported in Santiago Nonualco" ("La Paz: reportan asesinato de hombre en Santiago Nonualco"), *La Prensa Gráfica*, April 28, 2013, https://www.laprensagrafica.com/elsalvador/La-Paz-reportan-asesinato-de-hombre-en-Santiago-Nonualco-20130428-0020.html (accessed October 28, 2019); "His Brother Sought Asylum in the USA, the Judge Denied Him and Later, He was Killed: This is the Story" ("Su hermano pidió asilo EUA, el juez se lo negó y luego fue asesinado: esta es la historia"), *La Prensa Gráfica*, March 15, 2017, https://www.laprensagrafica.com/departamento15/Su-hermano-pidio-asilo-EUA-el-juez-se-lo-nego-y-luego-fue-asesinado-esta-es-la-historia-20170315-0043.html (accessed November 4, 2019); Kevin Sieff, "When Death Awaits Deported Asylum Seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/?noredirect=on (accessed November 10, 2019); and Gadiel Castillo, "Man is Killed When He Was Going to Work" ("Hombre es asesinado cuando iba a su trabajo"), *El Diario de Hoy*, November 28, 2018, https://www.elsalvador.com/noticias/nacional/hombre-es-asesinado-cuando-iba-a-su-trabajo/543809/2018/ (accessed on June 22, 2019).

[181] Human Rights Watch interview with Gaspar T. and Walter T., El Salvador's Central Region, March 28, 2019 (pseudonyms); Human Rights Watch interview with Santiago U., El Salvador's Eastern Region, January 28, 2019 (pseudonym); Human Rights Watch interview with Irene J., United States East Coast, March 1, 2019 (pseudonym); Human Rights Watch interview with Alexander N., El Salvador's (region withheld for security), November 25, 2018 (pseudonym); Human Rights Watch telephone interview with Zaida L., United States West Coast, July 12, 2019 (pseudonym); Human Rights Watch interview with Ransés I., Tijuana, Mexico, March 8, 2019 (pseudonym); Human Rights Watch interview with Digna R., El Salvador's Eastern Region, November 30, 2019 (pseudonym); Human Rights Watch interview with Jairo Q., El Salvador's Central Region, January 26, 2019 (pseudonym); Human Rights Watch social media interview with Óscar K., El Salvador's (region withheld for security), June 10, 2019 (pseudonym); Human Rights Watch interview with Paloma V., United States East Coast, June 17, 2019 (pseudonym).

[182] Human Rights Watch interview with hospital-based OLAV official, El Salvador's Central Region, March 26, 2019.

[183] Francisco Narváez, "Youth Murdered Who Had Recently Been Deported" ("Asesinan a joven que había sido deportado recientemente"), *El Blog*, June 1, 2017, http://elblog.com/noticias/registro-42799.html (accessed October 10, 2019); Flor Lazo, "Relief Teams Search for Missing Man" ("Cuerpos de socorro buscan a hombre extraviado"), *La Prensa Gráfica*, September 17, 2017, https://www.laprensagrafica.com/elsalvador/Cuerpos-de-socorro-buscan-a-hombre-extraviado-20170917-0028.html, (accessed October 10, 2019); "Extortion and Murder Afflicts El Carmen" ("Extorsiones y asesinatos afligen a El Carmen"), *El Diario del Hoy*, February 23, 2013, https://historico.elsalvador.com/historico/101223/extorsiones-y-asesinatos-afligen-a-el-carmen.html (accessed October 10, 2019).

### Alexander N.

Several months before our November 2018 interview with 20-year-old Alexander N. and his parents, men dressed in black identifying themselves as police arrived in the night. The men wanted only to take Alicia N., Alexander's teenage sister. They tied up the rest of the family and posted two men outside to make sure they did not leave. The other men took 17-year-old Alicia with them. Not long after, the family heard a shot, seemingly a few blocks away. Once they broke free and felt sure the men outside were gone, they went toward it. They found Alicia dead with one bullet to her forehead. Alexander and his parents showed a Human Rights Watch researcher the photo of her body, splayed on the dirt, hands above her head and blood coming from the gunshot wound.[184]

After the killing, the press arrived. Nearly every Salvadoran media outlet covered the murder, some in more than one story.[185] Some for several months. None could say definitively if the men in black were gang members of the neighborhood's particularly strong gang clique, law enforcement, or so-called "extermination groups." Alexander and his family suspect police involvement. In recent years, the Attorney General's Office investigated a group, police chiefs and businessmen among them, for forming an extermination group who killed those they believed to be gang members in Alexander's neighborhood and in surrounding municipalities. Alicia's murder was at least the seventh in four months in their community; she was the second child to be killed, and the second female. More killings, including of two females, occurred in the same neighborhood before the year ended. Authorities found additional bodies in clandestine graves. A press report alleged a member of the gang had raped girls and young women in the neighborhood.

[184] Human Rights Watch interview Alexander N., El Salvador's (region withheld for security), November 25, 2018 (pseudonym); Human Rights Watch interview with Alexander N.'s mother and father, El Salvador's (region withheld for security), November 25, 2018 (pseudonym); and January 23, 2019. Human Rights Watch interview with Alexander N.'s neighbor, El Salvador's (region withheld for security), November 25, 2018 (pseudonym); Human Rights Watch telephone interview with journalist, El Salvador's (region withheld for security), November 25, 2018; Human Rights Watch telephone interview with journalist, El Salvador's (region withheld for security), May 23, 2019.
[185] All press articles described in this account are withheld for security but are on file with Human Rights Watch.

Within 48 hours of his sister's death, the killers called Alexander's home and told his mother that they would come back and kill her son, Alexander, for "giving the press information" on the way they had killed her daughter.[186] She and her husband could not bear the thought of losing their son too. She told us what little they had; they gave him to flee. Alexander's father broke down when he told us he had decided, "My only child who remains can at least go."[187]

Less than a month after his sister's murder, Alexander was at the border in Texas. He told Human Rights Watch that he had told US authorities what happened to his sister and that he was afraid to return. At the seventh US immigration detention center he was held in, he got lucky: a group of volunteers worked with him and five or six other asylum seekers on how to present himself in his credible fear interview (the first stage of the US asylum process). US authorities determined Alexander had demonstrated credible fear and he was transferred to another detention center to present his case before the Immigration Court nearest it. A fellow detainee from Mexico helped him translate the proof he carried: photos, a news report, death certificate, and letters of support from his Catholic church, work, school, and City Hall.

In our interview with him, Alexander appeared humble and shy. He had recently graduated high school. In his community, eye contact and talking could get you killed, he said. According to Alexander, after four hearings, at which he appeared without counsel, he was denied asylum. Alexander said, "There was no one to help me. I felt so bad. There *was* danger of return." About a month later, US officials cuffed him at the wrists and ankles to deport him to El Salvador.

Alexander and his family told us that the men in black have gone to other homes since then, and they see masked police and soldiers stroll their dirt roads. Alexander lives in constant fear, saying that he feels it "day and night." His strategy: "I don't go out. I hide." He is not studying, working, or spending time with friends, despite his dreams

---

186 Human Rights Watch interview with Alexander N.'s mother and father, El Salvador's (region withheld for security), November 25, 2018; and January 23, 2019.

187 Ibid.

to get a college degree and help his family. When asked how long this could last, Alexander's mom said she did not know. "Meanwhile," she said, "we fear."[188]

[188] Human Rights Watch interview with Alexander N.'s mother and father, El Salvador's (region withheld for security), November 25, 2018; and January 23, 2019.

# IV. Particularly Violent Neighborhoods

When people are deported to El Salvador, the original neighborhoods they lived in prior to their emigration may carry significant risks of disappearance, homicide, and sexual crime, such that living in safety at home is nearly impossible. These particularly violent neighborhoods (see Glossary for definition) tend to have not just a concentration of organized crime but also of abusive law enforcement actors, documented cases of domestic and sexual violence, and violence perpetrated by so-called "death squads" or "extermination groups" (as discussed in Section V).

## Specific Neighborhoods, High Levels of Violence

According to government data, from 2013 to 2018, all of El Salvador's 262 municipalities registered at least a homicide or sexual crime.[189] In most municipalities, however, crime tends to concentrate in a small percentage of specific neighborhoods.[190] Such

---

[189] In that period, only three rural municipalities with populations of less than 2,600–El Rosario of Morazán department and [San José] Las Flores and San Fernando of Chalatenango department–registered no murders, but even so these municipalities registered multiple sexual crimes. Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador, data on homicides between 2013-2017 were received November 9, 2018 and data on sexual crimes between 2013-2017 were received November 1, 2018. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch).

[190] Since the late-1980s, research in numerous Brazilian, Canadian and US cities with varying populations has shown that crimes, including homicide and rape, concentrate at very small units of geography. Across studies, researchers have tended to find that roughly 1.5 percent of street segments in cities see about 25 percent of crime incidents. L.W. Sherman, P.R. Gartin, and M.E. Buerger, *The Geography of Crime* (London: Routledge, 1989); P.L. Brantingham and P.J. Brantingham, "Hot Spots of Predatory Crime: Routine Activities and the Criminology of Place," *Criminology*, vol. 27, no. 1 (1999), pp. 27-56; P.L. Brantingham, "A Theoretical Model of Crime Hot Spot Generation," *Studies on Crime and Crime Prevention*, vol. 8, no. 1 (1999), pp. 7-26; D. Weisburd, S. Bushway, C. Lum, S.M. Yang, "Trajectories of Crime at Place: A Longitudinal Study of Street Segments in the City of Seattle," *Criminology*, vol. 42, no. 5 (2004), pp.283-322; Ilona Szabo de Carvalho, Juan Carlos Garzon, and Robert Muggah, "Citizen Security Rising: New Approaches to Addressing Drugs, Guns and Violence in Latin America," Norwegian Peacebuilding Resource Centre (NOREF), 2013; A.A. Braga, A.V. Papachristos, and D.M. Hureau, "The Effects of Hot Spots Policing on Crime: An Updated Systematic Review and Meta-analysis," *Justice Quarterly*, vol. 31, no.4, (2014), pp.633-63; A.S. Curmen, M.A. Andresen, and P.J. Brantingham,"Crime and Place: A Longitudinal Examination of Street Segment Patterns in Vancouver, BC," *Journal of Quantitative Criminology*, vol. 31, no.1 (2014), pp.127-47; and David Weisburd, "The 2014 Sutherland Address: The Law of Crime Concentration and the Criminology of Place," *Criminology*, vol. 53, no. 2, (2015), pp.133-57.

neighborhoods register multiple homicides and sexual crimes each year.[191] Many have also been the sites of clandestine graves containing victims who were kidnapped, disappeared, and often tortured before they were killed.[192] Multiple actors, including gangs, authorities, those who present themselves as authorities, and private individuals are alleged to have committed these crimes. Victims include girls, boys, men, and women and those known or believed to be informants or witnesses. Visitors to these neighborhoods are also victims, and residents of these neighborhoods are victimized elsewhere because they are imputed to be affiliated with the gang that controls the neighborhood from which they fled.

Given persistent violence in these neighborhoods, individuals growing up in them likely experience multiple traumatic events.[193] For example, an aid director for deported persons, in summarizing the case of a mother and her daughters who fled sexual harassment, extortion, and threats (but have since been deported from the US back to El Salvador), said of residents of such neighborhoods: "One [criminal] event does not tend to be it [for what drove them to flee]."[194] The majority of directly impacted individuals we interviewed who originated from a particularly violent neighborhood recounted they or their loved ones being victims of multiple crimes before and after deportation, including witnessing or having loved ones abused, disappeared, or killed. Four deportees we interviewed had to live in the same home in which a family member had been killed.[195] They—like other

---

[191] Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador, data on homicides between 2013-2017 were received November 9, 2018 and data on sexual crimes between 2013-2017 were received November 1, 2018. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch).

[192] As described in the methodology section, using an open source media monitoring methodology, Human Rights Watch systematically searched the Salvadoran press for the neighborhood names (including various spelling variations, when necessary) where those interviewed lived or fled, yielding over 22,000 total results that we reviewed, and when relevant, analyzed. The results were then filtered to produce a database of neighborhood-specific violent incidents. These data have extreme limitations. However, they did allow us to identify themes on neighborhood dynamics, including poverty level, crimes committed, victims, victimizers and state actions.

[193] See US Centers for Disease Control and Prevention, "Adverse Childhood Experiences," https://www.cdc.gov/violenceprevention/childabuseandneglect/acestudy/index.html (accessed October 7, 2019).

[194] Human Rights Watch interview with aid director for persons deported from Mexico and the United States for international non-profit, El Salvador's Central Region, March 28, 2019.

[195] Human Rights Watch interview with Alexander N., El Salvador's (region withheld for security), November 25, 2018 (pseudonym); Human Rights Watch interview with Yaneth D., United States South, March 13, 2019 (pseudonym); and Human Rights Watch interview with Vivian R. and Wendy R., El Salvador's Eastern Region, March 25, 2019 (pseudonyms).

residents—may show symptoms of trauma.[196] At time of writing, such particularly violent neighborhoods in El Salvador included but *were not limited to*:

- Lourdes neighborhood of Colón municipality in La Libertad department;[197]
- Altavista neighborhood at the border of Ilopango, San Martín, and Tonacatepeque municipalities of San Salvador department,[198] and surrounding areas like San José Flores neighborhood of Tonacatepeque municipality of San Salvador department;

---

[196] Mayo Clinic, "Post Traumatic Stress Disorder," https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms-causes/syc-20355967 (accessed December 3, 2019). A Salvadoran researcher told Human Rights Watch that "We don't have many holistic programs here [for deportees]. … The psychosocial and cultural pieces are not addressed." Human Rights Watch telephone interview with Salvadoran researcher, December 14, 2018.

[197] Human Rights Watch interview with LGBT service provider, El Salvador's Central Region, December 1, 2018 and Human Rights Watch interview with aid director for persons deported from Mexico and the United States for international non-profit, El Salvador's Central Region, March 28, 2019. Furthermore, since August 2013, the FGR has operated a Twitter page for disappeared children. Our search of this page revealed 13 of 17 children forcibly disappeared from Colón municipality through July 2014 disappeared from the Lourdes neighborhood. Finally, a 2014 study produced by a co-author of this report contains data that Human Rights Watch re-analyzed for this report, showing that Lourdes was among the three most common neighborhoods of origin for child migrants. The data further shows that these neighborhoods frequently registered higher-than-average numbers of disappearance, homicide and suspected death squad activity. Elizabeth G. Kennedy, "No Childhood Here: Why Central American Children are Fleeing Their Homes," American Immigration Council, July 1, 2014, https://www.americanimmigrationcouncil.org/research/no-childhood-here-why-central-american-children-are-fleeing-their-homes (accessed January 18, 2020).

[198] Human Rights Watch telephone interview with Yeshua O., El Salvador's Central Region, November 13, 2018 (pseudonym); Human Rights Watch interview with aid director for internally displaced persons for international non-profit, El Salvador's Central Region, December 4, 2018. 5,749 results appeared for "Altavista" and "Alta Vista," some of them duplicates, in 14 news sources in El Salvador between 2000 and September 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Human Rights Watch compiled all these results but completed analysis of only relevant articles from November 2009 to November 2016. Three relevant articles from the thousands are: Roberto Valencia, "Scan of a Neighborhood of Swallows Called Ciudad Futura" ("Radiografía de una colonia de golondrinas llamada Ciudad Futura"), *El Faro*, February 8, 2019, https://elfaro.net/es/201902/el_salvador/22992/Radiograf%C3%ADa-de-una-colonia-de-golondrinas-llamada-Ciudad-Futura.htm (accessed June 12, 2019); Ezequiel Barrera, "Attackers Used War Weapons to Kill Seven in Alta Vista" ("Atacantes usaron armas de guerra para matar a 7 en Alta Vista"), *La Prensa Gráfica*, July 16, 2016, https://www.laprensagrafica.com/elsalvador/Atacantes-usaron-armas-de-guerra-para-matar-a-7-en-Alta-Vista-20160716-0019.html (accessed October 9, 2019); "Police Capture 31 Gang Members in Altavsita Neighborhood" ("Policía captura a 31 pandilleros en residencial Altavista"), *El Diario de Hoy*, September 29, 2016, https://historico.eldiariodehoy.com/historico-edh/26014/policia-captura-a-31-pandilleros-en-residencial-altavista.html (accessed October 9, 2019). Furthermore, since August 2013, the FGR has operated a Twitter page for disappeared children. Our search of this page revealed six of 14 children forcibly disappeared from San Martín and Tonacatepeque municipalities through May 2018 disappeared from the Altavista neighborhood. Finally, a 2014 study produced by a co-author of this report contains data that Human Rights Watch re-analyzed for this report, showing that Altavista was among the three most common neighborhoods of origin for child migrants. The data further shows that these neighborhoods frequently registered higher-than-average numbers of disappearance, homicide and suspected death squad activity. Elizabeth G. Kennedy, "No Childhood Here: Why Central

- San Roque neighborhood and surrounding neighborhoods like Zacamil of Mejicanos municipality[199] in San Salvador department;
- Iberia[200] and San Jacinto[201] neighborhoods of San Salvador municipality in San Salvador department;
- La Campanera neighborhood[202] of Soyapango municipality in San Salvador department;

American Children are Fleeing Their Homes," American Immigration Council, July 1, 2014, https://www.americanimmigrationcouncil.org/research/no-childhood-here-why-central-american-children-are-fleeing-their-homes (accessed January 18, 2020).

[199] Human Rights Watch interview with LGBT service provider, El Salvador's Central Region, December 1, 2018; Human Rights Watch interview with Salvadoran researcher on migration, El Salvador's Central Region, November 29, 2018. 1,231 results appeared for San Roque in 14 news sources in El Salvador between 2000 and June 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Human Rights Watch compiled all these results but completed analysis of only relevant articles in six outlets from 2013 to June 2019. Three relevant articles from the 1,231 are: "Raul Mijango's Community" ("La comunidad de Raul Mijango"), *Diario1*, May 6, 2016, http://diario1.com/nacionales/2016/05/la-comunidad-de-raul-mijango/ (accessed October 16, 2019); Carmina Castro, "Woman Murdered and Her Two-month-old Son Injured in Mejicanos" ("Asesinan a mujer y hieren a su hijo de dos meses en Mejicanos"), *El Salvador Times*, April 5, 2019, https://www.elsalvadortimes.com/content/print/asesinan-mujer-hieren-hijo-meses-mejicanos/201904051918575704 (accessed October 16, 2019); Jorge Archila, "Unknown Youth Eliminated by Gang Members in San Roque, Mejicanos" ("Joven desconocido fue ultimado por mareros en la San Roque, Mejicanos"), *El Blog*, April 5, 2019, http://elblog.com/inicio/joven-desconocido-fue-ultimado-por-mareros-en-la-san-roque-mejicanos/ (accessed October 16, 2019). Furthermore, since August 2013, the FGR has operated a Twitter page for disappeared children. Our search of this page revealed five of 29 children forcibly disappeared in Mejicanos municipality through March 2019 disappeared from the San Roque or Zacamil neighborhood.

[200] Human Rights Watch interview with LGBT service provider, El Salvador's Central Region, December 1, 2018. Human Rights Watch review of 783 articles appearing in 13 news outlets in El Salvador between January 2002 and February 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three relevant articles from the 783 are: Evelyn Machuca, "Between the Murderer and the Murder, There's Something Called Life" ("Entre el asesino y el asesinato hay algo que se llama vida"), *La Prensa Gráfica*, November 8, 2018, https://www.laprensagrafica.com/elsalvador/Entre-el-asesino-y-el-asesinato-hay-algo-que-se-llama-vida-20181107-0122.html (accessed October 8, 2019); "San Salvador Divided by Gangs' Control" ("San Salvador dividido por el control de las pandillas"), *El Diario de Hoy,* December 19, 2015, https://www.elsalvador.com/fotogalerias/noticias-fotogalerias/san-salvador-dividido-por-el-control-de-las-pandillas/324851/2015/ (accessed October 16, 2019); David Martinez, "The Iberia, a Stigmatized Community That Looks to Develop its New Generations" ("La Iberia, una comunidad estigmatizada que busca desarrollar a sus nuevas generaciones"), *Diario Co-Latino*, April 30, 2015, https://www.diariocolatino.com/la-iberia-una-comunidad-estigmatizada-que-busca-desarrollar-a-sus-nuevas-generaciones/ (accessed October 16, 2019). Furthermore, since August 2013, the FGR has operated a Twitter page for disappeared children. Our search of this page revealed two of 49 children forcibly disappeared from San Salvador municipality through March 2019 disappeared from the Iberia neighborhood.

[201] Since August 2013, the FGR has operated a Twitter page for disappeared children. Our search of this page revealed 12 of 49 children forcibly disappeared from San Salvador municipality disappeared from the San Jacinto neighborhood.

[202] Human Rights Watch interview with aid workers to internally displaced persons for national non-profit, El Salvador's Central Region, December 4, 2018; Human Rights Watch interview with OLAV staff, El Salvador's Central Region, January 11, 2019; and Human Rights Watch interview with social worker to internally displaced persons for national non-profit, El Salvador's Central Region, January 23, 2019. See also, "The Crazy Life" ("La Vida Loca"), documentary, depicting the violence

189

- Amapalita neighborhood of La Unión municipality in La Unión department;[203]
- El Platanar neighborhood of Moncagua municipality in San Miguel department;[204]

plaguing Campanera; "'La Vida Loca' Captures Daily Reality of El Salvador's Gangs, or Maras," *Los Angeles Times*, April 10, 2019, https://latimesblogs.latimes.com/laplaza/2009/04/la-vida-loca-reflects-a-depressing-and-hopeless-reality-the-documentary-filmed-by-photojournalist-and-filmmaker-chris.html (accessed January 18, 2020). The filmmaker, Christian Poveda, was killed in September 2009. Rory Carroll, "Killers of Filmmaker Christian Poveda Jailed," *Guardian*, March 11, 2011, https://www.theguardian.com/world/2011/mar/11/christian-poveda-murders-jailed, (accessed January 18, 2020). The neighborhood also appeared in these three representative articles: Roberto Valencia, "Scan of a Neighborhood of Swallows Called Ciudad Futura" ("Radiografia de una colonia de golondrinas llamada Ciudad Futura"), *El Faro*, February 8, 2019, https://elfaro.net/es/201902/el_salvador/22992/Radiograf%C3%ADa-de-una-colonia-de-golondrinas-llamada-Ciudad-Futura.htm (accessed 12 June 2019); Enrique García, "Centers Overrun with Gangs to be Re-enforced" ("Reforzaran los centros asediados por las maras"), *El Mundo*, February 26, 2018, https://elmundo.sv/reforzaran-los-centros-asediados-por-las-maras/ (accessed October 16, 2019); and "Ten Places Where Taxi Drivers Do Not Want to Go" ("Diez lugares donde los taxistas no queren ir"), *El Diario de Hoy*, March 5, 2014, https://www.elsalvador.com/noticias/nacional/124039/diez-lugares-donde-los-taxistas-no-quieren-ir/ (accessed October 16, 2019).

[203] Human Rights Watch interview with IML doctor, El Salvador's Eastern Region, January 22, 2019; Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, January 22, 2019; and Human Rights Watch interview with Criminal Sentencing Tribunal judge, El Salvador's Eastern Region, January 23, 2019. 18th Street Surenos members killed the stepmother of a young deportee from the US, because they believed her to be an informant to police in this neighborhood. See also "Sentencing Document for 57 Alleged Gang Member Defendants," Specialized Sentencing Court for Organized Crime Cases in El Salvador's Eastern Region, San Miguel, August 3, 2018 (on file with Human Rights Watch). See Diana Escalante and Insy Mendoza, "Woman Killed Because of Disagreement Between Gang Members" ("Matan a una mujer por pleito entre pandilleros"), *El Diario de Hoy*, April 29, 2014, https://www.elsalvador.com/noticias/nacional/matan-a-una-mujer-por-pleito-entre-pandilleros/125579/2014/ (accessed 12 June 2019). Human Rights Watch review of 146 articles appearing in 11 news outlets in El Salvador between 2003 and April 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles from the 146 are: Insy Mendoza, "One Student Killed and Three Injured in La Unión" ("Asesinan a un estudiante y lesionan a tres en La Unión"), *El Diario de Hoy*, March 6, 2015, https://www.elsalvador.com/noticias/nacional/147746/asesinan-a-un-estudiante-y-lesionan-a-tres-en-la-union/ (accessed October 16, 2019); "A Woman is Killed Because of Gang Dispute" ("Matan a una mujer por pleito entre pandillas"), *El Diario de Hoy*, April 29, 2014, https://historico.elsalvador.com/historico/125579/matan-a-una-mujer-por-pleito-entre-pandilleros.html (accessed October 14, 2019); "Three Police Are Captured with Collaborating with Gang Members" ("Capturan a Tres Policías por Colaborar con Pandilleros"), *El Mundo*, May 16, 2017, https://elmundo.sv/capturan-a-tres-policias-por-colaborar-con-pandilleros/ (accessed October 16, 2019).

[204] Human Rights Watch interview with Salvadoran journalist, El Salvador's Eastern Region, November 6, 2018; Human Rights Watch interview with Salvadoran journalist, El Salvador's Central Region, November 9, 2018; and Human Rights Watch interview with PNC high-ranking officer, El Salvador's Eastern Region, November 26, 2018 Human Rights Watch review of 474 articles appearing in 10 news outlets in El Salvador between July 2001 and May 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles from the 474 are: "Extortion Obligates Tens of Businesses to Close in the East" ("Extorsiones obligan a cerrar decenas de negocios en Oriente"), *El Diario de Hoy*, June 2, 2015, https://www.elsalvador.com/noticias/nacional/extorsiones-obligan-a-cerrar-decenas-de-negocios-en-oriente/154450/2015/ (accessed October 16, 2019); "He Took Charge of Terrorizing Moncagua Girls and Obligating Them to Have Sex with Him" ("Se encargaba de aterrorizar a muchachas de Moncagua y las obligaba a que tuvieran sexo con el"), *La Prensa Gráfica*, August 3, 2017, https://www.laprensagrafica.com/elsalvador/Se-encargaba-de-aterrorizar-a-muchachas-de-Moncagua-y-las-obligaba-a-que-tuvieran-sexo-con-el-20170803-0022.html (accessed October 16, 2019); Jorge Beltrán, "Why is There So Much Violence in Just One Neighborhood Called 'El Platanar' in El Salvador?" ("¿Por qué hay tanta violencia en un solo cantón llamado 'El Platanar' en El Salvador?"), *El Diario de Hoy*, July 15, 2018, https://www.elsalvador.com/noticias/nacional/un-infierno-llamado-el-platanar/500528/2018/ (accessed November 11, 2019).

- Ciudad Pacífica,[205] Milagro de la Paz[206] and San Antonio Silva[207] neighborhoods of San Miguel municipality in San Miguel department;

[205] Human Rights Watch interview with PNC high-ranking officer, El Salvador's Eastern Region, November 26, 2018 and Human Rights Watch interview with CANAF staff, El Salvador's (region withheld for security), November 26, 2018. In Human Rights Watch's review of 528 articles appearing in 11 news outlets in El Salvador between April 2011 and January 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles from the 528 are: "These are the Places That Provoke Most Fear in Salvadorans" ("Estos son los lugares que más miedo provocan a los salvadoreños"), *La Prensa Gráfica*, March 16, 2017, https://www.laprensagrafica.com/lpgdatos/Estos-son-los-lugares-que-mas-miedo-provocan-a-los-salvadorenos-20170316-0002.html (accessed October 16, 2019);  Wilmer Lizama, "Police Deploy FIRT–Intervention and Recuperation of Territory Force–Group in San Miguel" ("PNC despliega grupo FIRT en San Miguel"), *El Mundo*, July 13, 2016, https://elmundo.sv/pnc-despliega-grupo-firt-en-san-miguel/ (accessed October 16, 2019); Lucinda Quintanilla, "Extortion Obligates Tens of Businesses to Close in the East" ("Extorsiones obligan a cerrar decenas de negocios en Oriente"), *El Diario de Hoy*, June 2, 2015, https://www.elsalvador.com/noticias/nacional/extorsiones-obligan-a-cerrar-decenas-de-negocios-en-oriente/154450/2015/ (accessed October 16, 2019). Finally, a 2014 study produced by a co-author of this report contains data that Human Rights Watch re-analyzed for this report, showing that Ciudad Pacífica was among the three most common neighborhoods of origin for child migrants. The data further shows that these neighborhoods frequently registered higher-than-average numbers of disappearance, homicide and suspected death squad activity. Elizabeth G. Kennedy, "No Childhood Here: Why Central American Children are Fleeing Their Homes," American Immigration Council, July 11, 2014, https://www.americanimmigrationcouncil.org/research/no-childhood-here-why-central-american-children-are-fleeing-their-homes (accessed January 18, 2020).

[206] Human Rights Watch interview with PNC high-ranking officer, El Salvador's Eastern Region, November 26, 2018 and Human Rights Watch interview with CANAF staff, El Salvador's (region withheld for security), November 26, 2018. In Human Rights Watch's review of 620 articles appearing in 11 news outlets in El Salvador between June 2000 and April 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles from the 620 are: Roberto Valencia, "Scan of a Neighborhood of Swallows Called Ciudad Futura" ("Radiografía de una colonia de golondrinas llamada Ciudad Futura"), *El Faro*, February 8, 2019, https://elfaro.net/es/201902/el_salvador/22992/Radiograf%C3%ADa-de-una-colonia-de-golondrinas-llamada-Ciudad-Futura.htm (accessed  June 12, 2019); Wilmer Lizama, "Police Deploy FIRT–Intervention and Recuperation of Territory Force–Group in San Miguel" ("PNC despliega grupo FIRT en San Miguel"), *El Mundo*, July 13, 2016, https://elmundo.sv/pnc-despliega-grupo-firt-en-san-miguel/ (accessed October 16, 2019); "The Neighborhoods Causing Fear in the East" ("Las colonias que dan miedo en el oriente"), *La Prensa Gráfica*, September 12, 2014, https://www.laprensagrafica.com/elsalvador/Las-colonias-que-dan-miedo-en-el-oriente-20140912-0097.html (accessed October 16, 2019).

[207] Human Rights Watch review of 1,377 articles appearing in 13 news outlets in El Salvador between 2000 and February 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details (San Antonio Silva had more-than-normal irrelevant results, because "San Antonio" is common neighborhood name in multiple municipalities, and Silva is a common last name, including of a journalist and politician). Of relevant articles three representative ones are: "More Than a Thousand Salvadorans Leave in a Caravan With Their Eyes Toward the United States" ("Más de mil salvadoreños salen en caravana con la mirada en EEUU"), El Mundo, October 31, 2018, https://elmundo.sv/parte-segunda-caravana-de-migrantes-salvadorenos-rumbo-a-estados-unidos/ (accessed October 16, 2019); "The Killing that Uncovered a Death Squad" ("El asesinato que delató al grupo de exterminio"), *El Diario de Hoy*, July 24, 2016, https://www.elsalvador.com/noticias/nacional/el-asesinato-que-delato-al-grupo-de-exterminio/193811/2016/ (accessed October 16, 2019); "Three Are Killed in San Salvador, San Vicente and San Miguel" ("Asesinan a tres en San Salvador, San Vicente y San Miguel"), *La Prensa Gráfica*, February 26, 2015, https://www.laprensagrafica.com/elsalvador/Asesinan-a-tres-en-San-Salvador-San-Vicente-y-San-Miguel-20150226-0088.html (accessed October 16, 2019).

- Tierra Blanca neighborhood of Jiquilisco municipality in Usulután department;[208]
- Chaguantique neighborhood and surrounding areas at the border of Jiquilisco and Puerto El Triunfo municipalities in Usulután department;[209]
- El Ojuste[210] and La Poza[211] neighborhoods of Usulután municipality in Usulután department;

---

[208] 507 results appeared for "Tierra Blanca" in 14 news sources in El Salvador between 2000 and October 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Human Rights Watch compiled all these results but completed analysis of only relevant articles for one sector of the neighborhood in five outlets from 2002 to June 2019. See, for example: "Information About Killings in Different Parts of the Country" ("Informan sobre asesinatos en distintos puntos del país"), *La Prensa Gráfica*, December 5, 2014, https://www.laprensagrafica.com/elsalvador/Informan-sobre-asesinatos-en-distintos-puntos-del-pais-20141205-0002.html (accessed October 16, 2019); "Man Killed in San Miguel" ("Matan a hombre en San Miguel"), *La Prensa Gráfica*, June 25, 2014, https://www.laprensagrafica.com/elsalvador/Matan-a-hombre-en-San-Miguel-20140625-0027.html (accessed October 16, 2019); and Rosa Fuentes, "Citizens Help Capture Rapists" ("Ciudadanos ayudan a capturar a violadores"), *El Diario de Hoy*, October 15, 2002, http://archivo.elsalvador.com/noticias/2002/10/15/elpais/elpais8.html (accessed October 16, 2019).

[209] Human Rights Watch review of 89 articles appearing in nine news outlets in El Salvador between July 2012 and February 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles are: "Residents of Jiquilisco at Risk Because of the Diversion of River Canal" ("Habitantes de Jiquilisco en riesgo por desvío de cauce de río"), *La Prensa Gráfica*, February 24, 2017, https://www.laprensagrafica.com/elsalvador/Habitantes-de-Jiquilisco-en-riesgo-por-desvio-de-cauce-de-rio-20170224-0069.html (accessed October 15, 2019); "Usulután, Under a Wave of Killings and a Siege from Gangs" ("Usulután, bajo ola de asesinatos y asedio de pandillas"), *El Diario de Hoy*, March 3, 2014, https://www.elsalvador.com/noticias/nacional/usulutan-bajo-ola-de-asesinatos-y-asedio-de-pandillas/124984/2014/ (accessed October 16, 2019); "Ex-policeman and Ex-soldier Captured" ("Capturan a expolicía y a exmilitar"), *La Prensa Gráfica*, August 8, 2017, https://www.laprensagrafica.com/elsalvador/Capturan-a-expolicia-y-a-exmilitar-20170808-0090.html (accessed October 16, 2019).

[210] Human Rights Watch review of 170 articles appearing in 12 news outlets in El Salvador between 2001 and February 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles are: Willian Martínez, "Young Woman Reported as Missing is Found Dead in Santa Elena, Usulután" ("Joven reportada como desaparecida es encontrada muerta en Santa Elena, Usulután"), *Cronio*, February 8, 2019, http://cronio.sv/nacionales/joven-reportada-como-desaparecida-es-encontrada-muerta-en-santa-elena-usulutan/ (accessed October 16, 2019); Iliana Avila, "A Fruit and Sweet Seller is Killed in Front of a School" ("Matan a vendedora de frutas y dulces frente a escuela"), *El Diario de Hoy*, August 16, 2018, https://www.elsalvador.com/noticias/nacional/509872/matan-a-vendedora-de-frutas-y-dulces-frente-a-escuela/ (accessed October 16, 2019); Jaime López, "Thugs Take a Man by Force and He is Found Dead in Usulután" ("Maleantes toman por la fuerza a un hombre anoche y ahora amaneció muerto en Usulután"), *El Diario de Hoy*, https://historico.eldiariodehoy.com/historico-edh/37704/maleantes-toman-por-la-fuerza-a-un-hombre-anoche-y-ahora-amanece-muerto-en-usulutan.html (accessed January 20, 2020).

[211] Human Rights Watch review of 170 articles appearing in 12 news outlets in El Salvador between 2001 and February 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles are: Héctor Rivas, "Deportee is Killed in La Poza" ("Deportado es asesinado en La Poza"), *La Prensa Gráfica*, June 1, 2018, https://www.laprensagrafica.com/elsalvador/Deportado-es-asesinado-en-La-Poza-I-20180531-0142.html (accessed October 7, 2019); Beatriz Calderon, Francisco Aleman, and Hector Rivas, "Two Injured After Attack on Route 152 Microbus in Front of Santa Tecla Police Station" ("Dos heridos tras ataque a microbus ruta 152 frente a la PNC en Santa Tecla"), *La Prensa Gráfica*, May 31, 2018, https://www.laprensagrafica.com/elsalvador/Dos-heridos-tras-ataque-a-microbus-ruta-152-frente-a-la-PNC-en-Santa-Tecla-20180531-0079.html (accessed 10 June 2019); and "11

- El Junquillo neighborhood of Ahuachapán municipality in Ahuachapán department;[212] and
- Apaneca and surrounding neighborhoods of Chalchuapa municipality of Santa Ana department.[213]

No publicly available dataset demonstrates what percentage of migrants leaving El Salvador come from hot spots of violence;[214] however, among the cases of people deported from the United States who were subsequently harmed in El Salvador

Homicides Committed in Last 24 Hours; Attorney General also Reports Finding Human Bones in Usulután" ("11 homicidios cometidos en las últimas 24 horas Fiscalía además informó del hallazgo de osamentas en Usulután"), *La Prensa Gráfica*, November 8, 2014, https://www.laprensagrafica.com/elsalvador/11-homicidios-cometidos-en-las-ultimas-24-horas-20141108-0050.html (accessed October 7, 2019).

[212] Human Rights Watch interview with Salvadoran journalist, El Salvador's Central Region, November 9, 2018; Human Rights Watch interview with PNC investigator, El Salvador's Western Region, January 24, 2019; and Human Rights Watch interview with IML doctor, El Salvador's Western Region, January 24, 2019. Human Rights Watch review of 342 articles appearing in 14 news outlets in El Salvador between 2000 and September 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details. Three representative articles of the 342 are: "Gang Member was Brought Down by Police During Confrontation in Ahuachapán" ("Pandillero fue abatido por la PNC durante enfrentamiento en Ahuachapán"), *Solo Noticias*, April 18, 2018, https://www.solonoticias.com/2018/04/18/pandillero-fue-abatido-por-la-pnc-durante-enfrentamiento-en-ahuachapan/ (accessed October 14, 2019); Iliana Rivas, "A Mother and Two Children Massacred in Ahuachapán" ("Masacran a una madre y a dos hijos en Ahuachapán"), *La Prensa Gráfica*, September 10, 2017, https://www.laprensagrafica.com/elsalvador/Masacran-a-una-madre-y-a-dos-hijos-en-Ahuachapan-20170911-0407.html (accessed October 14, 2019); "Inside a House That is Being Constructed a Man Was Killed at Noon" ("Dentro de una casa en construcción asesinaron a un hombre este mediodía"), *El Blog*, http://elblog.com/noticias/registro-46061.html (accessed October 14, 2019).

[213] Human Rights Watch review of 1,482 articles appearing in 14 news outlets in El Salvador between 2002 and March 2019 reporting on incidents of violent crime; multiple outlets covered some incidents but often had consistent but more or less details (Apaneca had more-than-normal irrelevant results, because Apaneca is also the name of a municipality in Sonsonate department and a common neighborhood name in other municipalities). Three representative articles of the 1482 are: "The Most Feared Neighborhoods in the West" ("Las colonias más temidas en occidente"), *La Prensa Gráfica*, September 13, 2014, https://www.laprensagrafica.com/elsalvador/Las-colonias-mas-temidas-en-occidente-20140913-0071.html (accessed October 14, 2019); "Authorities Report Triple Homicide in Chalchuapa" ("Autoridades reportan triple homicidio en Chalchuapa"), *El Mundo*, August 3, 3018, https://elmundo.sv/autoridades-reportan-triple-homicidio-en-chalchuapa/ (accessed October 14, 2019); "Confrontation Between the Police and Gang Members Leaves a Terrorist Dead in Chalchuapa" ("Enfrentamiento entre PNC y pandilleros deja un terrorista muerto en Chalchuapa"), *Solo Noticias*, November 25, 2017, https://www.solonoticias.com/2017/11/25/enfrentamiento-entre-pnc-y-pandilleros-deja-un-terrorista-muerto-en-chalchuapa/ (accessed October 14, 2019). Furthermore, since August 2013, the FGR has operated a Twitter page for disappeared children. Our search of this page revealed two of four children forcibly disappeared in the Chalchuapa municipality through October 2018 disappeared from the Apaneca neighborhood. In Chalchuapa municipality, neighborhoods are particularly small in size, sometimes containing only four blocks.

[214] The Salvadoran Migration Agency (DGME) collects neighborhood and municipality of origin information from those deported from both Mexico and the United States but did not agree to share this information with Human Rights Watch when we asked for it in 2018. Likewise, the United States Agency for International Development (USAID) selects "high risk" neighborhoods for its funding, which often aims to "reduce migration," but USAID does not make these neighborhoods public.

identified or investigated for this report, many had lived in the neighborhoods listed above. For example:

- From 2006 to 2019, four deportees were reported killed in **Lourdes neighborhood of Colón municipality,**[215] as was an uncle who reportedly died defending his deported nephew in a shootout in which the nephew and one other person with them were also injured.[216]
- In 2017 and 2018, a Salvadoran-born individual who moved between El Salvador and the United States, and two deportees—who residents told reporters were cousins—were killed in **El Platanar of Moncagua.**[217]
- In 2014, one deportee was reported killed in Tierra Blanca of **Jiquilisco.**[218]
- Two deportees were killed in the **La Poza neighborhood of Usulután municipality** in 2014 and 2018.[219]
- In September 2017, according to press sources, in **El Junquillo neighborhood of Ahuachapán municipality** a deportee's female partner, her mother, and her child were killed; one article reporting on this incident also reported that the

---

[215] See, for example, Anna-Catherine Brigida, "Kicked Out of the U.S., Salvadoran Deportees Are Struggling Simply to Stay Alive," *World Politics Review*, October 9, 2018, https://www.worldpoliticsreview.com/articles/26302/kicked-out-of-the-u-s-salvadoran-deportees-are-struggling-simply-to-stay-alive (accessed June 10, 2019). Two of these cases are also documented in Salvadoran Criminal Tribunal decisions on file with Human Rights Watch.

[216] See, for example, Enrique Ortiz, "Two Men's Lives Taken in La Libertad" ("Le quitan la vida a dos hombres en La Libertad"), *El Blog*, May 20, 2019, http://elblog.com/inicio/le-quitan-la-vida-a-dos-hombres-en-la-libertad/ (accessed June 10, 2019).

[217] Human Rights Watch interviews with Salvadoran reporters in 2018 and mid-2019. See also, Wilmer Lizama, "Double Homicide Registered in Moncagua, San Miguel" ("Registran doble homicidio en Moncagua, San Miguel"), *El Mundo*, June 16, 2017, https://elmundo.sv/registran-doble-homicidio-en-moncagua-san-miguel/ (accessed June 10, 2019); Beatriz Mendoza and Flor Lazo, "A Man Was Killed in San Miguel When He Returned from Running Errands" ("Un hombre fue asesinado en San Miguel cuando volvía de hacer diligencias"), *La Prensa Gráfica*, February 26, 2018, https://www.laprensagrafica.com/elsalvador/Un-hombre-fue-asesinado-en-San-Miguel-cuando-volvia-de-hacer-diligencias-20180226-0094.html (accessed June 10, 2019); and "Patrols Look for a Tailor Kidnapped by Gang Members in San Miguel" ("Patrullas buscan a un sastre privado de libertad por pandilleros en San Miguel"), *El Blog*, October 20, 2017, http://elblog.com/noticias/registro-47382.html (accessed June 10, 2019).

[218] "DJ in Usulután Shot Dead" ("Assesinan a balazos a DJ en Usulután"), *El Blog*, September 28, 2014, http://elblog.com/noticias/registro-16430.html (accessed June 10, 2019).

[219] Héctor Rivas, "Deportee is Killed in La Poza I" ("Deportado es asesinado en La Poza I"), *La Prensa Gráfica*, June 1, 2018, https://www.laprensagrafica.com/elsalvador/Deportado-es-asesinado-en-La-Poza-I-20180531-0142.html (accessed October 7, 2019); Beatriz Calderón, Francisco Alemán, and Héctor Rivas, "Two Injured After Attack on Route 152 Microbus in Front of Santa Tecla Police Station" ("Dos heridos tras ataque a microbús ruta 152 frente a la PNC en Santa Tecla"), *La Prensa Gráfica*, May 31, 2018, https://www.laprensagrafica.com/elsalvador/Dos-heridos-tras-ataque-a-microbus-ruta-152-frente-a-la-PNC-en-Santa-Tecla-20180531-0079.html (accessed June 10, 2019); and "11 Homicides Committed in Last 24 Hours" ("11 homicidios cometidos en las últimas 24 horas"), *La Prensa Gráfica*, November 8, 2014, https://www.laprensagrafica.com/elsalvador/11-homicidios-cometidos-en-las-ultimas-24-horas-20141108-0050.html (accessed October 7, 2019).

deportee himself had been killed the day prior.[220] An official in that region told Human Rights Watch two other deportees from the United States had also been killed in El Junquillo or adjacent Las Viñas in 2012 or 2013 and 2016.[221] A separate official in the same region told reporters they "go [there] frequently" to investigate homicides.[222]

- In 2014, two deportees were reported killed near **Cara Sucia neighborhood in San Francisco Menéndez municipality** (where one's brother was killed a month earlier).[223]

## Society and Authorities Stigmatize Certain Neighborhoods

According to a poll by the Salvadoran paper, *La Prensa Gráfica*, Salvadorans fear particular neighborhoods and try to avoid them. From 2008 to 2017, *La Prensa Gráfica* three times polled a representative sample of the population in El Salvador's most populous municipalities, asking: "From what you know and have heard said, what is the most dangerous place in the municipality?"[224] Residents' responses included Altavista (and San Jose de las Flores next to it), San Roque, Iberia, La Campanera, Ciudad Pacífica, Milagro de la Paz, and San Francisco adjacent to Apaneca of Chalchuapa. These neighborhoods are often notorious beyond just residents. For example, in 2019, the Salvadoran investigative

[220] Iliana Rivas, "A Mother and Two Children Massacred in Ahuachapán" ("Masacran a una madre y a dos hijos en Ahuachapán"), *La Prensa Gráfica*, September 10, 2017, https://www.laprensagrafica.com/elsalvador/Masacran-a-una-madre-y-a-dos-hijos-en-Ahuachapan-20170911-0407.html (accessed June 10, 2019).

[221] Human Rights Watch interview with official who attends crime scenes, El Salvador's Western Region, January 24, 2019.

[222] Human Rights Watch interview with separate official who attends crime scenes, El Salvador's Western Region, January 24, 2019.

[223] "Four Dead in Two Armed Attacks" ("Cuatro muertos en dos ataques armados"), *La Prensa Gráfica*, December 23, 2014, https://www.laprensagrafica.com/elsalvador/Cuatro-muertos-en-dos-ataques-armados-20141223-0082.html (accessed October 7, 2019) and "They Kill an Evangelical Pastor and His Friend in Ahuachapán" ("Matan a pastor evangélico y su acompañante en Ahuachapán"), December 22, 2014, *El Diario de Hoy*, https://historico.elsalvador.com/historico/142406/matan-a-pastor-evangelico-y-su-acompanante-en-ahuachapan.html (accessed October 7, 2019).

[224] "These Are the Places That Most Provoke Fear in Salvadorans" ("Estos son los lugares que más miedo provocan a los salvadoreños"), *La Prensa Gráfica*, March 16, 2017, https://www.laprensagrafica.com/lpgdatos/Estos-son-los-lugares-que-mas-miedo-provocan-a-los-salvadorenos-20170316-0002.html (accessed June 12, 2019) and "The Neighborhoods That Cause Fear in the East" ("Las colonias que dan miedo en el oriente"), *La Prensa Gráfica*, September 12, 2014, https://www.laprensagrafica.com/elsalvador/Las-colonias-que-dan-miedo-en-el-oriente-20140912-0097.html (accessed June 12, 2019).

press outlet, *El Faro*, noted that Altavista, La Campanera, and Milagro de la Paz are nationally stigmatized.[225]

For their security, multiple non-PNC governmental offices keep maps or appoint a long-serving staff member to inform others of neighborhoods where staff have been threatened or harmed in the past, and thus, they either cannot enter or only enter with a police presence.[226] One police officer expressed concerns to Human Rights Watch that naming such neighborhoods can negatively impact their residents and make them "even hotter."[227]

Police statements to the press in articles reporting on crime sometimes solidified stigmatization. Police would describe homicide victims in these neighborhoods as either gang members, collaborators of gang members, or those with personal relationships to gangs or gang members, even when relatives told the press their loved ones who were killed had no such links. For one youth from Iberia, this stigma from authorities especially stung. He broke down in tears recalling to a reporter what a policeman told him about his neighborhood: "All of them that live in that community, they are rats."[228]

The stigmatization of these neighborhoods' residents is partially due to perceived and real links between crime and poverty. The residents of these neighborhoods that Human Rights Watch interviewed reported monthly household incomes of less than US$500, and their homes were often composed of mud- or dirt-mixture for the walls, tin metal for the roof,

[225] Roberto Valencia, "Scan of a Neighborhood of Swallows Called Ciudad Futura" ("Radiografia de una colonia de golondrinas llamada Ciudad Futura"), *El Faro*, February 8, 2019, https://elfaro.net/es/201902/el_salvador/22992/Radiograf%C3%ADa-de-una-colonia-de-golondrinas-llamada-Ciudad-Futura.htm (accessed June 12. 2019).

[226] Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 6, 2019; Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 5, 2018; Human Rights Watch interview with CANAF, El Salvador's (region withheld for security), November 26, 2018; Human Rights Watch interview with IML, El Salvador's Eastern Region, January 22, 2019; and Human Rights Watch interview with FGR, El Salvador's Eastern Region, January 22, 2019.

[227] Human Rights Watch interview with Salvadoran PNC officer, El Salvador's Eastern Region, November 26, 2018.

[228] Evelyn Machuca, "'Between the Killer and the Killing, There is Something Called Life'" ("'Entre el asesino y el asesinato hay algo que se llama vida'"), *La Prensa Gráfica*, November 8, 2019, https://www.laprensagrafica.com/elsalvador/Entre-el-asesino-y-el-asesinato-hay-algo-que-se-llama-vida-20181107-0122.html (accessed January 18, 2020).

bars to cover windows, and dirt floors.[229] Similarly, two youth from one of the neighborhoods listed above, who fled in 2013 and were deported in 2018, made only $5 per day in the nearby fields; even in planting and harvesting season, they could not count on five days of work in a week.[230] Another family whose young daughter fled with her grandmother in 2017 and was deported in 2018 did not have a home, and they instead moved from place to place in the neighborhood, living with hosts who would let them stay for brief periods if they paid for their use of utilities only.[231]

One Salvadoran policeman said: "Evidently, there are places safer than others, and it is related to wealth levels. Poverty levels influence [crime]. We rarely go to residences where middle-class people live."[232] One criminal sentencing judge went further in his analysis of the links between poverty and crime to say that in these places, "We have to say it … the state has been absent."[233]

## Nowhere Else to Go

Deportees often have nowhere to go in El Salvador except to live with family already residing in a particularly violent neighborhood. For example, Nohemy P. fled El Salvador at the age of nine in 2000 because she feared gang kidnapping and rape.[234] She had lived two-thirds of her life in the US, had DACA status, and had three US-citizen children under the age of nine. However, US authorities near the Texas-Mexico border accused her of trafficking her own children across the border (she told us she had not crossed the border), told her "DACA was over," and detained and deported her in the fall 2018. Upon arriving back in El Salvador, Nohemy had no choice but to live with an aunt in a violent neighborhood "because she is the only family we have here [now]." Nohemy's mother,

---

[229] Human Rights Watch interview Alexander N., El Salvador's (region withheld for security), November 25, 2018 (pseudonym); Human Rights Watch interview with Vivian & Wendy R., El Salvador's Eastern Region, March 25, 2019 (pseudonyms); and Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security), November 26, 2018 (pseudonym).

[230] Human Rights Watch telephone interview with Gaspar T., May 21, 2019 (pseudonym).

[231] Human Rights Watch interviews with Teresa Q. and Teresa's mother Gloria Q., El Salvador's Eastern Region, January 28, 2019 and March 24, 2019 (pseudonyms).

[232] Human Rights Watch interview with Salvadoran PNC officer, El Salvador's Eastern Region, November 26, 2018.

[233] Human Rights Watch interview with Salvadoran criminal sentencing judge, El Salvador's Eastern Region, January 23, 2019.

[234] Human Rights Watch interview with Nohemy P., El Salvador's Eastern Region, February 8, 2019 (pseudonym).

Leticia P., told Human Rights Watch that Nohemy and her two deported male cousins "almost don't go out, because they're afraid to do so."[235]

Deportees are often unable to find another, safer neighborhood to live in. Press accounts we identified for this report describe three male deportees' attempts to hide in new neighborhoods before they were killed or disappeared.[236] An FGR prosecutor told Human Rights Watch that "depending on the deportee's [neighborhood], we do see changing addresses as a risk [for death]."[237]

Deportees often cannot afford to relocate long distances away nor can they afford exclusive, gated residences with private security. An FGR prosecutor told Human Rights Watch: "People with few resources [who are displaced] have nowhere to go. Someone should be investigating that. Sometimes, it hurts me to observe that there is nothing more we [the authorities] can do for these people."[238] The brother of a young man killed approximately two years after his September 2013 deportation explained why his brother did not try to live elsewhere: "We don't have resources to go moving around in El Salvador. Likewise, if he'd gone to a place without the gang [in our neighborhood], they [rival gang members] would have assumed [he was aligned with the gang in our neighborhood]. You are trapped in the same system."[239]

Individuals we interviewed for this report were repeatedly forced to move from one particularly violent neighborhood to another after being deported to El Salvador from the United States. For example, the neighborhood where Ransés I. grew up no longer existed when he was deported nearly 15 years later in 2015. Therefore, he went to an uncle's home in a chronically violent neighborhood. He said: "One day, I went to the store not far [from my home] with my nephew who'd lived his whole life

[235] Ibid.

[236] Francisco Narváez, "Youth Murdered Who Had Recently Been Deported" ("Asesinan a joven que había sido deportado recientemente"), *El Blog*, June 1, 2017, http://elblog.com/noticias/registro-42799.html (accessed October 10, 2019); Flor Lazo, "Relief Teams Search for Missing Man" ("Cuerpos de socorro buscan a hombre extraviado"), La Prensa Gráfica, September 17, 2017, https://www.laprensagrafica.com/elsalvador/Cuerpos-de-socorro-buscan-a-hombre-extraviado-20170917-0028.html, (accessed October 10, 2019); "Extortion and Murder Afflicts El Carmen" ("Extorsiones y asesinatos afligen a El Carmen"), *El Diario del Hoy*, February 23, 2013, https://historico.elsalvador.com/historico/101223/extorsiones-y-asesinatos-afligen-a-el-carmen.html (accessed October 10, 2019).

[237] Human Rights Watch interview with FGR prosecutor, El Salvador's Paracentral Region, November 5, 2018.

[238] Human Rights Watch interview with FGR prosecutor, El Salvador's Paracentral Region, March 29, 2019.

[239] Human Rights Watch telephone interview with Moises X., January 3, 2019 (pseudonym).

there.… Two [gang members] looked at me. Then, five more came and asked who I was, from where I was.… I told them I was deported.… I was there only a month [before I moved again].[240]

In nearly all particularly violent neighborhoods, gang members, authorities, and residents view new arrivals with suspicion. Nelson E., after his most recent deportation from the US in October 2014, tried living on his own in a new neighborhood but soon had to flee that neighborhood. He told Human Rights Watch,

> When I got back [in 2014], I didn't want to live with my mom.… I had work. But one time, people arrived to rob me. They wanted my DUI [government-issued, photo identification]. They told me I couldn't be there. They told me to remove myself from there. They said they would disappear me if I stayed … so I went back to my mom. This is the risk here. You cannot go where they do not know you.[241]

It is likely, and especially dangerous, that a person who attempts to relocate inside El Salvador will end up in a neighborhood controlled by a different gang.[242] A PNC officer told Human Rights Watch that among murdered deportees, including women, are those who "arrive to live in or visit a neighborhood different from the one they are from."[243] Irene J., said of her recently deported husband:

> It actually worries me more [that he's not in our old neighborhood]. Our neighborhood was MS-controlled, but where he is now is 18 [18 Revolucionarios or 18 Sureños]-controlled. If they realize that, they'll take him out and kill him just for that. He is afraid of it, too, so he's not going out at all. He can't stay in one place. He's having to move around.[244]

---

[240] Human Rights Watch interview with Ransés I., Northern State of Mexico, March 8, 2019 (pseudonym).

[241] Human Rights Watch interview with Nelson E., El Salvador's (region withheld for security), January 26, 2019 (pseudonym).

[242] Human Rights Watch telephone interview with Irene J. about husband, July 1, 2019 (pseudonym); Human Rights Watch telephone interview with Paloma V., June 17, 2019 (pseudonym); and Human Rights Watch interview with Walter T., El Salvador's Central Region, March 28, 2019 (pseudonym).

[243] Human Rights Watch interview with PNC officer, El Salvador's Eastern Region, November 26, 2018.

[244] Human Rights Watch interview with Irene J., United States East Coast, March 1, 2019 (pseudonym).

# V. State Actors as Perpetrators of Harm

Many authorities in El Salvador are dedicated to protecting Salvadoran citizens and ensuring justice in the country. However, authorities often face significant barriers to providing protection, especially—as discussed in the previous section—in particularly violent neighborhoods. These authorities and their families face serious threats themselves from gangs or from other authorities within their own government for the actions they may take to protect the public.

Data obtained by Human Rights Watch through a public information request submitted to El Salvador's Attorney General Office's (FGR) illustrate pervasive impunity.[245] Nationwide, in 2018, authorities made arrests in approximately 22 percent of registered homicide cases.[246] For homicides of boys, the 2018 clearance rate (meaning charges were filed) in El Salvador is 13.6 percent.[247] The clearance rate for homicides in the US (adults and children) was several times higher at 62 percent; in many European countries the rate is above 75 percent.[248] For sexual crimes, authorities in El Salvador made arrests in only 9.5

---

[245] Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador, data on homicides between 2013-2017 were received November 9, 2018, and data on sexual crimes between 2013-2017 were received November 1, 2018. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch).

[246] Registered cases mean those identified through a monthly coordination meeting between the FGR, IML and PNC to harmonize all reported cases of homicide. This is a crude clearance rate, following the US Federal Bureau of Investigation methodology. It is computed by dividing the number of annual arrests by the number of annual cases. An arrest in any given year may pertain to a murder from a previous year. There were 3,341 registered homicides in 2018 and 730 arrests. The arrest data is from a public information request to the Salvadoran Attorney General's Access to Public Information Office. Data on file with Human Rights Watch.

[247] 32 arrests for 235 registered homicides in 2018. The registered cases mean those identified through a monthly coordination meeting between the FGR, IML and PNC to harmonize all reported cases of homicide and the arrest data is from a public information request to the Salvadoran Attorney General's Access to Public Information Office. Data on file with Human Rights Watch.

[248] There may be slight differences in the definitions used between the two countries for definition of the crime and clearance. Still, this is the closest comparative measure possible. See United States Department of Justice, Federal Bureau of Investigation, "Crime in the United States, 2018, Table 25," September 2019. The US figure includes murder and nonnegligent manslaughter. Additional international examples include a clearance rate of 98 percent for homicides in Finland, 77 percent in the Netherlands, 83 percent in Sweden and 95 percent in Switzerland. See Marieke Liem, Karoliina Suonpää, Martti Lehti, Janne Kivivuori, Sven Granath, Simone Walser, and Martin Killias, "Homicide Clearance in Western Europe," *European Journal of Criminology,* Vol 16, Issue 1 (2019), doi: https://doi.org/10.1177/1477370818764840 (accessed January 18, 2020).

percent of registered[249] cases in 2018.[250] The comparable clearance rate for sexual crimes in the US was 33.4 percent in 2018.[251] For sexual crimes against girls in El Salvador, the 2018 clearance rate was 7.6 percent.[252] Low clearance rates can occur for a number of reasons, but in El Salvador, the state is frequently either unable, due to limited resources, or unwilling, because of corruption, infiltration and threats, to protect its citizens.

In this report, we documented cases in which government authorities were responsible for committing grave abuses against deportees in particularly violent neighborhoods. These abuses—alongside low arrest, hearing, and conviction rates—are especially concerning, because they contribute to residents' perception that authorities are persecutors, rather than protectors facing structural limits on their ability to successfully pursue their work.

Enrico X., a resident of a particularly violent neighborhood, told Human Rights Watch about his state of mind after police killed his cousin, a former gang member, at point blank range in public in 2016 or 2017 (after the cousin had been deported from the US in 2016 or 2017): "I became wary of the police even more after they killed my cousin in this manner…. I was afraid to report [other crimes] to them."[253]

El Salvador's crime and insecurity should be seen within the context of the power, control, and violence imposed by gangs, and the state's feeble struggles to protect public safety.

---

[249] Sexual crime cases are registered when a victim or witness or interested party reports an alleged sexual crime to the police, local justices of the peace, local municipal offices for women, child protection agencies (there are two in El Salvador), and/or mandatory reporters such as hospital and school staff, and the IML; in accordance with procedure, all of these cases should be reported to the FGR. Our calculation of these rates is based on the FGR's data for rape.

[250] Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch).

[251] The US definition of rape within the FBI's Uniform Crime Report is "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." There may be slight differences in the definitions used between the two countries for definition of the crime and clearance. Still, this is the closest comparative measure possible. United States Department of Justice, Federal Bureau of Investigation, "Crime in the United States, 2018, Table 25," September 2019.

[252] Data obtained via public information request to the Salvadoran Attorney General's Access to Public Information Office for crime incidence data throughout El Salvador. Homicide data for 2018 were received February 18, 2019, sexual crime data for 2018 were received February 25, 2019 (data on file with Human Rights Watch).

[253] Human Rights Watch interview with (name withheld for security), (location withheld for security), (date withheld for security) 2019. US Department of Justice, Executive Office for Immigration Review, *In re* (name withheld for security), (location withheld for security) Immigration Court, (date withheld for security).

Violence and killings occur against a backdrop of "armed confrontations," when authorities report being called to an area or on a routine patrol, are attacked with gunfire and respond with reportedly defensive fire. In 2016, the Central American Institute of Investigations for Development and Social Change (INCIDE) reported an increase of these incidents in El Salvador between state actors and gangs, with 142 incidents in 2013, 256 incidents in 2014 and 676 incidents that left 359 people dead in 2015.[254]

## Unable or Unwilling to Protect

There are many reasons why authorities are unable or unwilling to help protect Salvadoran citizens who are afraid for their safety, including the fact that they themselves are monitored and threatened, authorities' offices have also been infiltrated by gangs, they lack resources, and carry large caseloads.[255] Women victims of violence face particular obstacles in seeking protection or justice, due to the inadequacy of Salvadoran laws and deeply entrenched institutional resistance to gender equality, which has led to, among other problems, insufficient funding for investigation and law enforcement focused on violence against women, and virtual impunity for the failure of governmental officials to carry out their responsibilities.[256]

For this report, we interviewed several individuals who attempted to seek help from Salvadoran agencies or authorities but were unable to receive assistance. For example, Gaspar T., who fled threats from gangs in his particularly violent neighborhood and has,

---

[254] Alexander Segovia, Leslie Quiñonez, Diana Contreras, Laura Pacheco and Manuel Talavera, "El Salvador: New Pattern of Violence, Territorial Impact and Community Response" ("El Salvador: Nuevo patrón de violencia, afectación territorial y respuesta de las comunidades"), Central American Institute of Investigations for Development and Social Change ("Salvador Instituto Centroamericano de Investigaciones para el Desarrollo y el Cambio Social, INCIDE"), August 2016. In 2011, State security forces killed just 0.66 percent of homicide victims, but in 2015, 2016 and 2017, they killed 5.72, 11.69, and 10.27 percent of victims, respectively. "Report on the Use and Abuse of Lethal Force in Latin America: A comparative study of Brazil, Colombia, El Salvador, Mexico and Venezuela" ("Monitor del uso de la fuerza letal en América Latina: Un estudio comparativo de Brasil, Colombia, El Salvador, México y Venezuela"), August 2019, http://monitorfuerzaletal.com (accessed November 26, 2019), pp. 80-95. Across years, officials had marked in their databases that between 92 and 99 percent of the victims in these "confrontations" were gang members, even though some were as young as 13 years old. In one such case of a 13-year-old shot dead by authorities, the Salvadoran Human Rights Ombudsperson (PDDH) found he had been shot six times from behind while on his knees.

[255] In our interviews with 41 officials from the FGR, IML, PNC and OLAV in nine departments, El Salvador, November 2018 to December 2019, officials repeatedly named most of these reasons. For the other reasons, the US State Department has repeatedly named some of these reasons for the inability of state authorities to effectively protect public safety.

[256] See Karen Musalo, "El Salvador–A Peace Worse than War: Violence, Gender and a Failed Legal Response," *Yale Journal of Law and Feminism,* vol. 30, Issue 1 (2019), https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=1383&context=yjlf (accessed January 18, 2020).

since his February 2019 deportation, faced new threats by gangs and abuse by state authorities (discussed below):

> They [the Salvadoran DGME] asked me why I had left, and I told them I'd been threatened by gangs. They took my name and nothing else, and that was it, they didn't offer me protection or services ….[257]

Walter T., who had been threatened by gangs and witnessed a murder before fleeing to the US, was deported in 2019 to face new threats by gangs and abuse by state authorities (discussed below). He said: "I told them [the Salvadoran DGME] I'd left because of threats, and they offered me nothing."[258] Zaida L., who fled domestic violence and rape, was deported in July 2018 and then went into hiding from her abusers, said: "The police asked why I'd left, what my motives were, if I'd reported [the rape and domestic violence] beforehand and why I did not.… No, no one from the government followed up with me."[259]

### Walter T. and Gaspar T.

In 2013, cousins Walter T. and Gaspar T. when they were 16 and 17 years old, respectively, were desperate to escape constant harassment and gang recruitment in their violent Salvadoran neighborhood; between them, they know of six friends or relatives they said were disappeared or murdered between 2013 and the time of our interview with them, in 2019. They crossed into the US without documentation. Walter was able to finish 9th grade in Maryland before he left school to work construction in order to pay the coyote (smuggler) who brought him across the border. Gaspar made his way to New Jersey, where he lived with an older brother, and was excited to enroll in the local high school and resume his studies.

During his junior year of high school Gaspar said he was arrested by US Immigration and Customs Enforcement "off the street." He was put in removal proceedings for his unauthorized status and applied for asylum during those proceedings. He was denied asylum in December 2016, a decision he appealed and lost. He was deported back to

---

[257] Human Rights Watch interview with Gaspar T., El Salvador's Central Region, March 28, 2019 (pseudonym).

[258] Human Rights Watch interview with Walter T., El Salvador's Central Region, March 28, 2019 (pseudonym).

[259] Human Rights Watch telephone interview with Zaida L., United States West Coast, July 12, 2019 (pseudonym).

El Salvador in February 2019. His cousin, Walter, had already been deported slightly earlier. Gaspar said that in April/May 2019, when they were sleeping at their respective homes:

> A patrol arrived and took me and Walter and three others from our homes, without a warrant or a reason. They began beating us [in the vehicle and continued doing so] until we arrived at the police barracks. There, they held us for three days, claiming we'd be charged with illicit association [*agrupaciones ilicitas*]. We were beaten [repeatedly] during those three days.[260]

Walter and Gaspar were subsequently released from police custody and, through June 2019, were still living in a chronically violent neighborhood in El Salvador. They could no longer be reached in December 2019.

## Police Killings and Abuse

In several cases in which deportees were killed after return to El Salvador, police were responsible for the killings (see Section II, above). The United Nations special rapporteur on extrajudicial killings noted in her 2018 report on El Salvador that killings of alleged gang members by security forces increased from 103 in 2014 to 591 in 2016.[261] Some of these confrontations certainly involve shoot-outs between gangs and police, in which law enforcement is responding to threats with lawful force. In other cases, journalists and human rights investigators question the degree to which police are using force lawfully.[262]

In 2019, the governmental Ombudsperson for the Defense of Human Rights (PDDH) in El Salvador reported that it had examined killings of 28 boys, 7 women, and 81 men and

---

[260] Human Rights Watch telephone interview with Gaspar T., May 21, 2019 (pseudonym).

[261] United Nations Office of the High Commission for Human Rights, El Salvador End of Mission Statement, Agnes Callamard, Special Rapporteur for extrajudicial, summary or arbitrary executions, February 5, 2018, https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=22634&LangID=E (accessed June 16, 2019).

[262] Anna-Catherine Brigida, "El Salvador's Tough Policing Isn't What It Looks Like," *Foreign Policy*, July 6, 2019, https://foreignpolicy.com/2019/07/06/el-salvadors-tough-policing-isnt-what-it-looks-like/ (accessed July 13, 2019).

found few resulted from such armed confrontations.[263] In 70 percent, witnesses said victims were unarmed. In 37 percent, witnesses saw police move the body or place or hide evidence. In 30 percent, PDDH concluded that the body showed signs of torture, including sexual assault.[264] Data on police and military's use of lethal force from 2011 to 2017 include deportee victims, but we could not reliably analyze the data in order to include these cases in our overall counts.[265]

In our research, we also found cases in which authorities without justification stopped and then harassed, and in some cases beat, individuals recently deported from the United States.

Elías F., who migrated to the United States as a teenager in the early-2000s, was deported to El Salvador in early 2011. Upon his return, he learned the home his remittances built was at a dividing line between two gangs. Starting a few years after his return, the rural police began to also view it as a strategic location, which made Elías deeply concerned about the risk to his family. One time, when Elías returned from work, a policeman stopped him and asked him for information about the gangs. When Elías could not answer, the policeman assaulted him:

[263] "Special Report of the Ombudswoman for the Defense of Human Rights, Attorney Raquel Caballero de Guevara, about extralegal executions attributed to the National Civilian Police in El Salvador, period 2014-2018: Characterization of cases of violation of the right to life and patterns of extralegal action" ("Informe especial de la señora Procuradora para la Defensa de los Derechos Humanos, licenciada Raquel Caballero de Guevara, sobre las ejecuciones extralegales atribuidas a la Policía Nacional Civil, en El Salvador, periodo 2014-2018: Caracterización de casos de violación al derecho a la vida y patrones de actuación extralegal"), August 2019, https://www.pddh.gob.sv/portal/file/index.php?dwfile=MjAxOS8xMC9JbmZvcm1lLWVzcGVjaWFsLXNvYnJlLWVqZWN1Y2lvbmVzLWV4dHJhbGVnYWxlcyoxLTEucGRm (accessed November 11, 2018).

[264] Ibid.

[265] Limitations of the data prevent us from calculating true numbers for deportations from each country in each year. Primarily, the closed-response (Y/N) box about whether a homicide victim is a deportee is only one of tens to be completed and may be skipped for reasons other than not knowing. Also, if authorities later learn a victim was a deportee, the box is not updated to reflect that knowledge. See Access to Public Information Unit ("Unidad de Acceso a la Información Pública, UAIP"), "Modification of compliance to final resolution NUE 322-A-2017" ("Modificación de cumplimiento a resolución definitiva NUE 322-A-2017"), August 17, 2018. While it does not discuss deportees among victims, fuller analysis of "use of lethal force" in El Salvador using this data is can be found in: "Report on the Use and Abuse of Lethal Force in Latin America: A comparative study of Brazil, Colombia, El Salvador, Mexico and Venezuela" ("Monitor del uso de la fuerza letal en América Latina: Un estudio comparativo de Brasil, Colombia, El Salvador, México y Venezuela"), August 2019, http://monitorfuerzaletal.com (accessed November 26, 2019), pp. 80-95.

Some people were playing loud music at another house and drinking. The police saw me walking without a shirt on and stopped me, asking me who had just yelled at them. I didn't know who yelled. I had just heard music. I did not have the information that the officer wanted but I guess he thought I was lying to him or ignoring him.… The officer grabbed a broomstick and hit me very hard across the stomach.… I was very angry and also scared.… Some other police officers came by and the owner of the store told me to come inside for a while. The police officer told me that he would find me alone one day and get me.… The next day the officer saw me on the street. He told me that one day he will find me alone. He also said that if I try to report him to anyone, I know what will happen to me.[266]

Several people recently deported from the US told Human Rights Watch that law enforcement authorities had detained or stopped and questioned them.[267] They said they lived in fear of something worse. Santiago U., in his early twenties and gay, fled a series of violent neighborhoods in mid-2016 and was deported from the United States in late 2018. According to Santiago, who we interviewed in January 2019—about two months after his November or early December deportation from the United States—his brothers, with whom he had been living, were targeted by an extermination group which Santiago feared would also target him. His brothers and the rest of his family in El Salvador also did not accept his sexual orientation. For both reasons—fear of the gang that was targeting his brothers, and rejection by his own family—he decided to live with friends in a particularly violent neighborhood near the police barracks. In an interview with a Human Rights Watch researcher, Santiago explained that police were constantly stopping him:

The police ask me where I'm from, because they haven't seen me here.… I got the Yo Cambio document [confirming no criminal record] a week ago.[268]

---

[266] Human Rights Watch interview with Elías F., United States East Coast, winter 2019 (exact date withheld for security) (pseudonym).

[267] Human Rights Watch interview with Santiago U., El Salvador's Eastern Region, January 28, 2019 (pseudonym); Human Rights Watch interview with Carlos P., El Salvador's Central Region, March 27, 2019 (pseudonym); Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security), November 26, 2018 (pseudonym); Human Rights Watch interview with Walter T., written communication by text, April and May 2019 (pseudonym); and Human Rights Watch interview with Gaspar T., written communication by text, April and May 2019 (pseudonym).

[268] Human Rights Watch researcher reviewed Santiago's "Yo Cambio" form, which confirmed he did not have a criminal record in El Salvador (form on file with Human Rights Watch).

> I went [to Yo Cambio] then, because here, the police stopped me many
> times. There [at the barracks], many people are innocent. Only because
> they have US$80 in their backpack, they're accused of extortion. So, when
> friends send me money, I always have records of the remittance with me.[269]

In 2018, Alexander N. fled El Salvador after men who identified themselves as police
arrived at his home stating they were "doing a census," and took his sister from their
family home. She was later found dead. He and his family believe the killers were police.
When Alexander sought asylum in the US in June 2018, his application was denied, and he
was deported in the fall of 2018. A few months after his deportation, Alexander told us that
he and his family feared they would be killed when men who identified themselves as
police again arrived at his home claiming they intended to "do a census."[270]

---

[269] Human Rights Watch interview with Santiago U., El Salvador's Eastern Region, January 28, 2019 (pseudonym).

[270] Human Rights Watch telephone interview with Alexander N., March 20, 2019 (pseudonym).

## Death Squads and Extermination Groups

People deported to El Salvador also fear so-called "death squads" or "extermination groups"—not new phenomena in El Salvador. They existed before,[271] during,[272] and immediately after the country's civil war from 1980 to 1992.[273] Experts have shown that during and after the civil war, "death squads" or "extermination groups" were deeply rooted in the country's security forces[274] and in specific cases, targeted deportees.[275]

[271] See Margaret Popkin, *Peace without Justice: Obstacles to Building the Rule of Law in El Salvador* (University Park: The Pennsylvania State University Press, 2000); Michael McClintock, *The American Connection, vol.1: State Terror and Popular Resistance in El Salvador* (London: Zed, 1986).

[272] The United Nations Truth Commission found that paramilitary groups and death squads were responsible for 25 percent of 22,000 human rights violations from 1980 to 1991 included in their review. See Americas Watch, *El Salvador's Decade of Terror* (New Haven: Yale University Press, 1991); Americas Watch, *El Salvador–Accountability and Human Rights: The Report of the United Nations Commission on Truth for El Salvador*, News from Americas Watch, vol. V, no. 7, August 10, 1993, https://www.hrw.org/legacy/reports/pdfs/e/elsalvdr/elsalv938.pdf; Americas Watch, *El Salvador–The Jesuit Trial: An Observer's Report*, News from Americas Watch, vol. III, no. 13, December 13, 1991, https://www.hrw.org/legacy/reports/pdfs/e/elsalvdr/elsalv91d.pdf; and Americas Watch, "El Salvador: Impunity Prevails in Human Rights Cases," *News from Americas Watch*, September 1990, https://www.hrw.org/legacy/reports/pdfs/e/elsalvdr/elsalv909.pdf.

[273] Human Rights Watch/Americas, *El Salvador–Darkening Horizons: Human Rights on the Eve of the March 1994 Elections*, vol. VI, no. 4, March 1994, p. 1 ("[A]ssassinations, which became more frequent, brazen, and selective in the fall of 1993, have continued into the new year. They have raised fears that notorious death squads which sowed terror in the 1980s have been reactivated if, in fact, they were ever disbanded."), https://www.hrw.org/legacy/reports/pdfs/e/elsalvdr/elsalv943.pdf.

[274] Cynthia Arnson, "Window on the Past: A Declassified History of Death Squads in El Salvador," in Bruce Campbell and Arthur Brenner, *Death Squads in Global Perspective: Murder with Deniability* (New York: St. Martin's Press, 2000)(stating that "Death squads in El Salvador were deeply rooted in official security bodies, particularly the intelligence sections of the Treasury Police, National Police, and National Guard, but also the army and air force. Privately constituted groups, especially the one headed by Roberto D'Aubuisson, distinguished themselves less for their independence from than for their degree of contact, and at times, coordination with state security bodies.").

[275] Robert S. Kahn, *Other People's Blood: U.S. Immigration Prisons in the Reagan Decade* (Boulder: Westview Press, 1996)(stating that "On 20 June 1984, the American Civil Liberties Union (ACLU) Political Asylum Project gave the US House Subcommittee on Rules a list of 112 Salvadoran deportees believed to have suffered human rights abuses after they were deported. ...The State Department … wrote to two Salvadoran human rights organizations … they confirmed eight of the 26 cases and provided the U.S. Embassy with eyewitness testimonies to them, [including] … Four deportees were captured in daylight by heavily armed civilians while nearby security forces ignored the abductions.… Two were taken from their homes in the city at night—one by heavily armed civilians armed with G-3 rifles, standard government issue in El Salvador.").

UN agencies,[276] human rights observers,[277] the press,[278] and government[279] all acknowledge that death squads and extermination groups still operate in El Salvador

[276] United Nations High Commissioner for Refugees, "Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from El Salvador," https://www.refworld.org/docid/56e706e94.html, accessed December 13, 2019, (stating that "Moreover, since 2014, reports have begun to emerge of death squads and vigilante groups with possible connections to the security forces engaging in the extrajudicial killing of suspected gang members …"); United Nations Office of the High Commission for Human Rights, El Salvador End of Mission Statement, Agnes Callamard, Special Rapporteur for extrajudicial, summary or arbitrary executions, February 5, 2018, https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=22634&LangID=E (accessed June 16, 2019) (stating, "In addition, I received various allegations of the existence of "death squads" within the Police, some of which have been confirmed by officials and corroborated by investigations."); Cecilia Jimenez-Damary, "Report of the special rapporteur on the human rights of internally displaced persons on her visit to El Salvador," April 23, 2018, https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/116/64/PDF/G1811664.pdf?OpenElement (accessed December 13, 2019).

[277] Sarah Kinosian, "El Salvador's Security Policy is Increasing Extra Judicial Killings and Abuse," Latin American Working Group (LAWG), February 12, 2016, https://www.lawg.org/el-salvadors-security-policy-is-increasing-extrajudicial-killings-and-abuse/ (accessed December 4, 2019); International Crisis Group, "El Salvador's Politics of Perpetual Violence," December 19, 2017, https://www.crisisgroup.org/latin-america-caribbean/central-america/el-salvador/64-el-salvadors-politics-perpetual-violence (accessed January 22, 2019); US Department of State, "El Salvador 2018 Human Rights Report," https://www.state.gov/wp-content/uploads/2019/03/EL-SALVADOR-2018.pdf, p. 2 (accessed December 13, 2019) (stating that "an alleged extermination group operating in San Miguel. The group, composed of civilians, some of whom were alleged rival gang members, and retired and active members of the military and police, was purportedly responsible for murder-for-hire and targeted killings of alleged gang members in San Miguel. Funding for the extermination group reportedly came from Salvadoran citizens living abroad."); US Department of State, "El Salvador 2017 Human Rights Report," https://www.justice.gov/sites/default/files/pages/attachments/2018/04/24/dos-hrr_2017_el_salvador.pdf, p. 10 (stating that "559 members of the PNC had been arrested for crimes including membership in extermination groups.").

[278] Jorge Beltrán Luna, "Tension in El Tigre Neighborhood After the Killing of El Limonada" ("Tensión en caserío El Tigre tras el asesinato de El Limonada"), *El Diario de Hoy*, October 12, 2019, https://www.elsalvador.com/eldiariodehoy/tension-en-caserio-el-tigre-tras-el-asesinato-de-el-limonada/648744/2019/ (accessed December 4, 2019); "Supposed Extermination Group Advertises on Social Media That it Will 'Clean La Herradura' of Criminals" ("Supuesto grupo de exterminio advierte en redes sociales que va a 'limpiar La Herradura' de delincuentes"), *La Prensa Gráfica*, March 15, 2018, https://www.laprensagrafica.com/elsalvador/Supuesto-grupo-de-exterminio-advierte-en-redes-sociales-que-va-a-limpiar-La-Herradura-de-delincuentes-20180315-0096.html (accessed December 4, 2019); Ricardo Flores and Gabriel García, "Six Police Members of Extermination Group Sentenced" ("Condena a 6 policías miembros de grupo de exterminio"), *La Prensa Gráfica*, February 10, 2018, https://www.laprensagrafica.com/elsalvador/Condenan-a-seis-policias-miembros-de-grupo-de-exterminio-20180209-0135.html (accessed December 4, 2019).

[279] "Special Report of the Ombudswoman for the Defense of Human Rights, Attorney Raquel Caballero de Guevara, about extralegal executions attributed to the National Civilian Police in El Salvador, period 2014-2018: Characterization of cases of violation of the right to life and patterns of extralegal action" ("Informe especial de la señora Procuradora para la Defensa de los Derechos Humanos, licenciada Raquel Caballero de Guevara, sobre las ejecuciones extralegales atribuidas a la Policía Nacional Civil, en El Salvador, periodo 2014-2018: Caracterización de casos de violación al derecho a la vida y patrones de actuación extralegal"), August 2019, https://www.pddh.gob.sv/portal/file/index.php?dwfile=MjAxOS8xMC9JbmZvcm1lLWVzcGVjaWFsLXNvYnJlLWVqZWN1Y2lvbmVzLWV4dHJhbGVnYWxlcyoxLTEucGRm (accessed November 11, 2018) ("Paralelamente a la adopción de las medidas extraordinarias de seguridad, se advirtio un resurgimiento de estructuras de exterminio que han generado temor y zozobra en diferentes comunidades del interior del país, algunas de las cuales se integraron con miembros de la PNC, militares y civiles, tal y como ha quedado evidenciado en algunos casos que se juducializaron."). In addition, Salvadoran press have reported on the police and judicial proceedings in El Salvador arresting and bring to trial member of death squads and extermination groups. See, for example, Jorge Beltrán Luna, "Tension in El Tigre Neighborhood After the Killing of El Limonada" ("Tensión en caserío El Tigre tras el asesinato de El Limonada"), *El Diario de Hoy*, October 12, 2019, https://www.elsalvador.com/eldiariodehoy/tension-en-caserio-el-tigre-tras-el-asesinato-de-de-el-limonada/648744/2019/ (accessed December 4, 2019); Ricardo Flores and Gabriel García, "Six Police Members of Extermination Group Sentenced"

today. Three individuals interviewed for this report, all of whom were gang members but told us they left the gang prior to their deportations from the United States, expressed their fear of these groups to Human Rights Watch.[280] Often, when these cases are described by journalists in press accounts, the assailants are described as "men wearing black" or men "wearing military or police-style" uniforms; victims are sometimes described as blindfolded, with their hands and/or feet tied behind their backs.[281] For example, in four particularly violent neighborhoods:

- In San Antonio Silva, according to press accounts, such groups killed 11 of the 33 reported homicide victims in the neighborhood. A group of men dressed in

---

("Condenan a 6 policías miembros de grupo de exterminio"), *La Prensa Gráfica*, February 10, 2018, https://www.laprensagrafica.com/elsalvador/Condenan-a-seis-policias-miembros-de-grupo-de-exterminio-20180209-0135.html (accessed December 4, 2019); "'The Exterminators,' the Group that was Killing Gang members in San Miguel'" ("'Los exterminio', el grupo que mataba pandilleros en San Miguel"), *El Diario de Hoy*, July 25, 2016, https://www.elsalvador.com/noticias/nacional/los-exterminio-el-grupo-que-mataba-pandilleros-en-san-miguel/194433/2016/ (accessed December 4, 2019); "The Crime of a Gang Member that Uncovered an Extermination Group in San Miguel" ("El crimen del pandillero que dejó al descubierto al grupo de exterminio en San Miguel"), *El Diario de Hoy*, July 24, 2016, https://historico.elsalvador.com/historico/193808/el-crimen-del-pandillero-que-dejo-al-descubierto-al-grupo-de-exterminio-en-san-miguel.html (accessed December 4, 2019).

[280] Human Rights Watch interview with Yavany B., El Salvador's Central Region, December 1, 2018 (pseudonym); Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security) November 26, 2018 (pseudonym); Human Rights Watch interview with Ransés I., Tijuana, Mexico, March 8, 2019 (pseudonym).

[281] For example, police agents told the press that extermination groups could be involved in a February 2016 incident, in which a group of men in a double-cabin pickup got a 17-year-old from his home, took him away, and he was then found dead in sugar-cane fields with his eyes blindfolded, hands tied and a message on his back. "Body with Eyes Blindfolded Found in San Miguel with Message 'This is How Gang Members Will Die'" ("Encuentran en San Miguel un cadáver con los ojos vendados y con el mensaje 'Así morirán los pandilleros'"), *El Blog*, February 23, 2016, http://elblog.com/noticias/registro-27043.html (accessed July 2, 2019). Then, in March, four masked men kidnapped 19- and 25-year-old men from their homes, took them to a ravine and shot them in the head. See "Two Youth Killed in San Miguel Ravine" ("Matan a dos jóvenes en quebrada de S. Miguel"), *La Prensa Gráfica*, March 19, 2016, https://www.laprensagrafica.com/elsalvador/Matan-a-2-jovenes-en-quebrada-de-S.-Miguel-20160319-0019.html (accessed July 2, 2019). Three days after that double homicide, various men in dark clothing "acting as police" attacked a 17-year-old boy as he entered his home. "Three Gang Members Killed in San Miguel" ("Matan en San Miguel a tres pandilleros"), *La Prensa Gráfica*, March 22, 2016, https://www.laprensagrafica.com/elsalvador/Matan-en-San-Miguel--a-tres-pandilleros-20160322-0026.html (accessed July 2, 2019). The next day, the body of a 25-year-old man kidnapped earlier was found with his hands tied behind his back, his body showing signs of torture, with a written message left on his body. "Gang Member's Body Found with a Message: 'This Happens to Gang Members'" ("Localizan cadáver de pandillero con un mensaje: 'Por mareros así les toca'"), *El Blog*, March 23, 2016, http://elblog.com/noticias/registro-27926.html (accessed July 2, 2019). A little over a week later, men identifying themselves as police took by force a 35-year-old man, and he was found dead days later in a different municipality. Jaime López, "Five Half-buried Bodies Found in Santo Tomas" ("Hallan cinco cadáveres semienterrados en Santo Tomas"), *El Diario de Hoy*, April 2, 2016, https://www.elsalvador.com/noticias/nacional/hallan-cinco-cadaveres-semienterrados-en-santo-tomas/186510/2016/ (accessed 2 July 2019). Before April ended, a teenage male's body was found with his hands and feet tied and bullet wounds to the head and back. Diana Escalante and Insy Mendoza, "Businessman Killed in Ayutuxtepeque" ("Asesinan a un comerciante en Ayutuxtepeque"), *El Diario de Hoy*, April 19, 2016, https://www.elsalvador.com/noticias/nacional/asesinan-a-un-comerciante-en-ayutuxtepeque/184534/2016/ (accessed July 2, 2019).

military- or police-style uniforms arrived in at least five victims' homes, took them out, and then shot them dead, according to press reports.[282] Men dressed in dark clothing reportedly took at least six more victims from their homes before killing them.[283]

- In Chaguantique, of the 12 homicides the press reported, the killers of three in 2015 wore "clothing similar to what the police use."[284]

[282] Very early on New Year's Day 2016, a group of at least eight armed men, dressed in camouflage clothing similar to military uniforms arrived on foot to the community. When an 11-year-old boy came running, they shot him dead. They went to one home and asked for names on a list, taking the two brothers out, putting them to their knees, and shooting them. From there, they shot and possibly killed a woman. Then, they went to two other homes looking for a man, took him out, put him to his knees and shot him dead. They last went to the home of the man's mother, took her out, put her to her knees and shot her. See, for example, "First Day of the Year with a Massacre and a Confrontation" ("Primer día del año con una masacre y un enfrentamiento"), *La Prensa Gráfica*, January 2, 2016, https://www.laprensagrafica.com/elsalvador/Primer-dia-del-ano-con-una-masacre-y-un-enfrentamiento-20160102-0025.html (accessed July 2, 2019); Liseth Alas and Lucinda Quintanilla, "Five Gang Members Die When Confronting Police in the Beginning of 2016" ("Mueren 5 pandilleros tras enfrentarse a policías en el inicio de 2016"), *El Diario de Hoy*, January 1, 2016, https://www.elsalvador.com/noticias/nacional/mueren-5-pandilleros-tras-enfrentarse-a-policias-en-el-inicio-de-2016/176047/2016/ (accessed 2 July 2019); and "2016 Starts with Two Quintuple Homicides in San Miguel and La Paz" ("2016 inicia con dos quíntuples homicidios en San Miguel y La Paz"), *El Mundo*, January 1, 2016, https://elmundo.sv/2016-inicia-con-quintuple-homicidio-en-san-miguel/ (accessed July 2, 2019). Then, in February 2019, four men with their faces covered and dressed in uniforms similar to police who identified themselves as police took from their home a man in the community and then another man and woman from a neighboring community from their homes and shot them dead. See, for example, Beatriz Calderon, Flor Lazo, and Juan Carlos Díaz, "Four People Were Killed in San Miguel: One Victim had an Electronic Bracelet" ("4 personas fueron asesinadas en San Miguel: una víctima tenía brazalete electrónico"), *La Prensa Gráfica*, February 15, 2019, https://www.laprensagrafica.com/elsalvador/4-personas-fueron-asesinadas-en-San-Miguel-una-victima-tenia-brazalete-electronico-20190215-0183.html (accessed July 2, 2019).

[283] Then in March 2016, three youth, aged 18 to 24, and one 38-year-old man were taken from their homes to the community's stadium. There, they were killed. See, for example, Carlos Segovia, Jaime López, and Enrique Carranza, "Four Alleged Gang Members Are Killed in San Miguel" ("Asesinan a cuatro supuestos pandilleros en San Miguel"), *El Diario de Hoy*, March 25, 2016, https://www.elsalvador.com/noticias/nacional/asesinan-a-cuatro-supuestos-pandilleros-en-san-miguel/180334/2016/ (accessed July 2, 2019). Within a seven-week period of 2018, two or more men took two male youth, aged 18 and 21, from their homes in the La Piedad section of the neighborhood and then killed them. See, for example, "Two Young People Were Killed Last Night in the Municipality of San Miguel" ("Dos jóvenes fueron asesinados anoche en el municipio de San Miguel"), *Solo Noticias*, September 10, 2018, https://www.solonoticias.com/2018/09/10/dos-jovenes-fueron-asesinados-anoche-en-el-municipio-de-san-miguel/ (accessed July 2, 2019), and Beatriz Calderón, Franklin Zelaya, Francisco Hernández, Juan Carlos Díaz, Broman Mármol, Ángel Gómez, and José Cardona, "A Shooting in San Salvador Leaves Five Victims" ("Tiroteo en San Salvador deja cinco víctimas"), *La Prensa Gráfica*, October 27, 2018, https://www.laprensagrafica.com/elsalvador/Tiroteo-en-San-Salvador-deja-cinco-victimas-20181027-0017.html (accessed July 2, 2019). Men in dark clothing arrived to a man's home in January 2019, took him out and shot him in the face. See, for example, Flor Lazo, "Five Men Are Killed in Different Points of San Miguel" ("Asesinan a cinco hombres en distintos puntos de San Miguel") *La Prensa Gráfica*, January 6, 2019, https://www.laprensagrafica.com/elsalvador/Asesinan-a-cinco-hombres-en-distintos-puntos-de-San-Miguel-20190105-0272.html (accessed July 2, 2019).

[284] Jaime Anaya, "Three Men Are Killed in a Neighborhood in Puerto El Triunfo" ("Acribillan a tres hombres cantón de Puerto El Triunfo") *El Diario de Hoy*, September 20, 2015, https://www.elsalvador.com/noticias/nacional/acribillan-a-tres-hombres-canton-de-puerto-el-triunfo/161151/2015/ (accessed July 2, 2019).

- In Milagro de la Paz, of the 47 homicides reported by press in recent years, seven articles named as killers persons with extermination group profiles.[285]
- In 2017 in El Platanar, "men in black" reportedly took two women from their homes in the neighborhood and then killed them.[286] In 2018, residents and journalists alike reportedly suspected the "exterminators" in a separate double homicide.[287]

According to press accounts, people deported to El Salvador have been killed in circumstances consistent with the methods of operation that death squads and extermination groups have employed:

- In the El Zapote neighborhood of Jucuarán municipality in May 2015, 15 to 20 "men dressed in black and camouflage" entered a home "simulating a police operation," according to a press report. They killed a 32-year-old deportee in the home's hallway and took the other six to line them up in the street before shooting dead four face down and two face up.[288]
- In the El Jícaro neighborhood of Lolotique municipality in June 2017, subjects dressed in black simulating a police operation killed a man deported from the

---

[285] In 2001, criminal groups dressed in police uniforms assaulted persons, especially those arriving from the US. See, for example, Evelyn Granados, "Criminals Suffer Reverse" ("Criminales sufren revés"), *El Diario de Hoy* , May 3, 2001, http://archivo.elsalvador.com/noticias/2001/5/3/ELPAIS/elpais2.html (accessed July 2, 2019) and Rosa Fuentes, "'The Blues' Fall in Police Operation" ("Caen 'Los Azules' en operativo policial"), *El Diario de Hoy* , August 25, 2001, http://archivo.elsalvador.com/noticias/2001/8/25/ELPAIS/elpais1.html (accessed July 2, 2019).

[286] "A R133 Fare Collector and Two Women Are Today's Homicide Victims" ("Un cobrador de la R133 y dos mujeres son las víctimas de homicidio de hoy") *La Prensa Gráfica*, February 23, 2017, https://www.laprensagrafica.com/elsalvador/Un-cobrador-de-la-R-133-y-dos-mujeres-son-las-victimas-de-homicidio-de-hoy-20170223-0056.html (accessed July 2, 2019) and Beatriz Calderón, Juan Carlos Díaz and Fátima Membreño, "Killers Hit and Shoot a Bread Maker in La Unión" ("Homicidas atropellan y tirotean a panadero en La Unión") *La Prensa Gráfica*, October 2, 2017, https://www.laprensagrafica.com/elsalvador/Homicidas-atropellan-y-tirotean-a-panadero-en-La-Unin-20171002-0014.html (accessed July 2, 2019).

[287] Iliana Ávila, "In San Miguel, Brothers Linked to Gang killed" ("En San Miguel, matan a hermanos vinculados a pandilla") *El Diario de Hoy*, January 11, 2018, https://www.elsalvador.com/noticias/nacional/en-san-miguel-matan-a-hermanos-vinculados-a-pandilla/438000/2018/ (accessed July 2, 2019).

[288] Beatriz Calderon, Angela Alfaro, and Jessel Santos, "Two Massacres Leave 10 Gang Members Dead in Usulután" ("Dos masacres dejan 10 pandilleros muertos en Usulután") *La Prensa Gráfica*, https://www.laprensagrafica.com/elsalvador/Dos-masacres-dejan-10-pandilleros-muertos-en-Usulutan-20150510-0023.html (accessed June 23, 2019).

United States in 2015 who had non-gang-related tattoos, at his home.[289]

- In the Los Lagartos neighborhood of San Julián in January 2019, armed men arrived at the home of a man deported from the US two months prior, taking him and his teenage nephew, both alleged gang members, some 100 meters away to a coffee field where they were interrogated and killed.[290]

### Ransés I.

Ransés I., a 44-year-old-man deported from the US to El Salvador in 2018, spoke about the scrutiny he faced from Salvadoran authorities after he returned to his home country, much of it based on tattoos that he had painstakingly tried to remove or alter in order to distance himself from the gang to which he had once belonged. He told Human Rights Watch, "I'd gone [to a tattoo artist] since 2006, changing each of them. Correcting them…."[291]

However, upon arrival in El Salvador, his tattoos became the focus of police attention. Soon after he returned, Ransés got into a dispute with another man, who called the police. When they arrived at Ransés' home, they seemed to intentionally expose his tattoos, which he otherwise kept hidden wherever he went. He explained, "They called me outside. They took off my shirt in public. 'Don't worry about your tattoos,' they told me. 'Do you have documents?' I showed them my DUI [documento único de

---

[289] "San Miguel Deportee Was Killed While He Was Waiting for a US Migratory Pardon" ("Migueleño deportado fue asesinado mientras esperaba perdón migratorio de EUA") *La Prensa Gráfica*, May 10, 2015, https://www.laprensagrafica.com/elsalvador/Migueleno-deportado-fue-asesinado-mientras-esperaba-perdon-migratorio-de-EUA-20170629-0048.html (accessed on June 22, 2019).

[290] "Armed Group Kills Deportee and Exconvict From MS13 in Sonsonate" ("Grupo armado asesina a deportado y exconvicto de la MS13 en Sonsonate"), *Diario1,* January 12, 2019, http://diario1.com/nacionales/2019/01/grupo-armado-asesina-a-deportado-y-exconvicto-de-la-ms13-en-sonsonate/ (accessed June 22, 2019). In an earlier case, in the San Juan de Dios neighborhood of Olocuilta municipality in 2010, according to press accounts, five men dressed in black arrived at a neighborhood basketball court. The around 40 persons present remained, because they thought the men were police. The men called out the names of youth playing a quick soccer game, then asked them to remove their shirts and primarily shot those who had tattoos, including one deported from the United States years earlier. Claudia Huete and Liz Aguirre, "Inhabitants of Olocuilta Neighborhood Dismayed by Massacre" ("Habitantes de colonia en Olocuilta consternados por masacre"), *La Prensa Gráfica*, May 2, 2010, (on file with Human Rights Watch).

[291] Human Rights Watch interview with Ransés I., Northern State of Mexico, March 8, 2019 (pseudonym).

identidad][292] and passport … They took photos of everything … and told me it was evidence."[293]

When Ransés complained to the Human Rights Ombudsperson about police harassment and exposure of his tattoos in public, he said the Ombudsman staff, "told me to be careful, because extermination groups use those photos to exterminate."[294]

[292] El Salvador's government-issued photo identification.

[293] Human Rights Watch interview with Ransés I., Northern State of Mexico, March 8, 2019 (pseudonym).

[294] Ibid.

# VI. Long-Term Residence in the US

Salvadorans who have resided for an extended period in the United States face several unique risks as deported persons. They are often easily identified because of their style of clothing, way of speaking, and financial resources. At the same time, because they have been away for so long, they often do not understand the unspoken rules Salvadorans follow in order to protect themselves from gangs, extermination groups, or corrupt authorities. As a result, they can be particularly susceptible to harm in El Salvador after deportation.[295]

Several people harmed after being deported to El Salvador had arrived in the United States as children and adolescents.[296] Several described attending school in the US and nearly all

---

[295] Salvadoran news articles on persons disappeared or killed after their deportation also often indicate that that the victim had lived in the United States for years – even most of their life – beforehand. "In San Miguel, Life Taken of Man Who Returned Deported to the Country Yesterday" ("Le quitan la vida a un hombre que ayer regreso deportado al país en San Miguel"), *El Blog*, December 4, 2018, http://elblog.com/inicio/le-quitan-la-vida-a-un-hombre-que-ayer-regreso-deportado-al-pais-en-san-miguel/ (accessed June 21, 2019); Gadiel Castillo, "Man is Killed When He Was Going to Work" ("Hombre es asesinado cuando iba a su trabajo"), *El Diario de Hoy*, https://www.elsalvador.com/noticias/nacional/hombre-es-asesinado-cuando-iba-a-su-trabajo/543809/2018/ (accessed June 22, 2019); Anna-Catherine Brigida, "Kicked Out of the U.S., Salvadoran Deportees Are Struggling Simply to Stay Alive," *World Politics Review*, November 28, 2018, https://www.worldpoliticsreview.com/articles/26302/kicked-out-of-the-u-s-salvadoran-deportees-are-struggling-simply-to-stay-alive (accessed June 22, 2019); David Marroquín, "Violence Takes the Life of 64 People in the Last Four Days" ("Violencia acaba con la vida de 64 personas en los últimos cuatro días"), *El Diario de Hoy*, March 15, 2018, https://www.elsalvador.com/noticias/nacional/violencia-acaba-con-la-vida-de-64-personas-en-ultimos-cuatro-dias/460839/2018/ (accessed 21 June 2019); Jaime López, "Youth Arrived to El Salvador from the United States and Disappeared in Sensuntepeque" ("Joven llego a El Salvador de EE.UU. y desapareció en Sensuntepeque"), *El Diario de Hoy*, September 23, 2018, https://www.elsalvador.com/noticias/nacional/joven-llego-a-el-salvador-de-ee-uu-y-desaparecio-en-sensuntepeque/521291/2018/ (accessed June 21, 2019); Roberto Lovato, "Deported to Death: the Tragic Journey of a Salvadoran immigrant," *Al Jazeera*, July 11, 2015, http://america.aljazeera.com/articles/2015/7/11/deported-to-death-the-tragic-journey-of-an-el-salvadoran-immigrant.html (accessed  June 21, 2019); David Marroquín, "2,841 Murders Registered on the Year, with 297 in September" ("Registran 2,841 asesinatos en el año, septiembre con 297 homicidios"), *El Diario de Hoy*, September 29, 2014, https://www.elsalvador.com/noticias/nacional/registran-2841-asesinatos-en-el-ano-septiembre-con-297-homicidios/136337/2014/ (accessed June 21, 2019); Ricardo Flores, "Witness to Crime Killed in the Capital" ("Matan en la capital a testigo de crimen"), *La Prensa Gráfica*, (on file with Human Rights Watch); and Julia Preston, "Losing Asylum, Then His Life," *New York Times*, June 28, 2010, https://www.nytimes.com/2010/06/29/us/29asylum.html (accessed June 29, 2019).

[296] Human Rights Watch interview with Karina I., United States West Coast, March 6, 2019 (pseudonym); Human Rights Watch interview with Wendy R., El Salvador's Eastern Region, December 9, 2019 (pseudonym); Human Rights Watch telephone interview with Jennifer B., United States East Coast, March 6, 2019 (pseudonym); Human Rights Watch interview with Nohemy P., El Salvador's Eastern Region, March 24, 2019 (pseudonym); Human Rights Watch interview with Bernardo A., El Salvador's Central Region, January 25, 2019 (pseudonym); Human Rights Watch interview with Yavany B., El Salvador's Central Region, December 1, 2018 (pseudonym); Human Rights Watch interview with Óscar K., El Salvador's (region withheld

worked, but given their limited economic means and precarious legal status, many also found themselves living in US communities with higher levels of poverty.[297] In the areas where they resided in the US, poverty also coincided with higher levels of police abuse, gangs, and violence, placing them at higher risk of being victims of crime and of being accused of crimes themselves.[298]

for security), December 2019 (exact date withheld for security)(pseudonym); Human Rights Watch interview with Ruben M.'s immigration attorney, United States East Coast, February 22, 2019 (pseudonym); Human Rights Watch interview with Walter T. and Gaspar T., El Salvador's Central Region, March 28, 2019 (pseudonyms); and Human Rights Watch interview with Ransés I., Tijuana, Mexico, March 8, 2019 (pseudonym).

[297] Allison O'Connor, Jeanne Batalova, and Jessica Bolter, "Central American Immigrants in the United States," Migration Policy Institute, August 15, 2019, https://www.migrationpolicy.org/article/central-american-immigrants-united-states (accessed August 24, 2019).

[298] Since the late-1980s, research in numerous Brazilian, Canadian and US cities with varying populations has shown that crimes, including homicide and rape, concentrate at very small units of geography. Across studies, researchers have tended to find that roughly 1.5 percent of street segments in cities see about 25 percent of crime incidents. See W. Crow and J. Bull, *Robbery Deterrence: An Applied Behavioral Science Demonstration: Final Report*, (La Jolla: Western Behavioral Science Institute, 1975); M. Felson, "Routine Activities and Crime Prevention in the Developing Metropolis," *Criminology*, vol. 25, no. 4, 1987, pp. 911-32; G.L. Pierce, S. Spaar, and L.R. Briggs, *The Character of Police Work: Strategic and Tactical Implications*, (Boston, MA: Center for Applied Social Research, Northeastern University, 1988); D.J. Evans and D.T. Herbert, *The Geography of Crime*, (London: Routledge, 1989); L.W. Sherman, P.R. Gartin and M.E. Buerger, "Hot Spots of Predatory Crime: Routine Activities and the Criminology of Place," *Criminology*, vol. 27, no. 1, 1989, pp. 27-56; P.L. Brantingham and P.J. Brantingham, "Hot Spots of Predatory Crime: Routine Activities and the Criminology of Place," *Criminology*, vol. 27. no. 1 (1999), pp. 27-56; P.L. Brantingham, "A Theoretical Model of Crime Hot Spot Generation," *Studies on Crime and Crime Prevention*, vol. 8, no. 1 (1999), pp. 7-26; D. Weisburd, S. Bushway, C. Lum, and S.M. Yang, "Trajectories of Crime at Place: A Longitudinal Study of Street Segments in the City of Seattle," *Criminology*, vol. 42, no. 5 (2004), pp.283-322; Ilona Szabo de Carvalho, Juan Carlos Garzon, and Robert Muggah, "Citizen Security Rising: New Approaches to Addressing Drugs, Guns and Violence in Latin America," Norwegian Peacebuilding Resource Centre (NOREF), 2013; A.A. Braga, A.V. Papachristos, and D.M. Hureau, "The Effects of Hot Spots Policing on Crime: An Updated Systematic Review and Meta-analysis," *Justice Quarterly*, vol. 31, no.4, (2014), pp.633-63; A.S. Curmen, M.A. Andresen, and P.J. Brantingham, "Crime and Place: A Longitudinal Examination of Street Segment Patterns in Vancouver, BC," *Journal of Quantitative Criminology*, vol. 31, no.1 (2014), pp.127-47; and David Weisburd, "The 2014 Sutherland Address: The Law of Crime Concentration and the Criminology of Place," *Criminology*, vol. 53, no. 2, (2015), pp.133-57. As early as 1977, research in the US found that as unemployment increased in an area, so too did the area's homicide rate. See H. Brenner, "Health Costs and Benefits of Economic Policy," *International Journal of Health Services*, vol. 7 no. 4, 1977, pp. 581-623. This is inherently tied with poverty, as areas of high unemployment are stigmatized and often provide few educational or economic opportunities. Indeed, subsequent research showed that when socioeconomic status is controlled across place and race, homicide rate discrepancies disappear. See J. Jason, L.T. Strauss, C.W. Tyler, "A Comparison of Primary and Secondary Homicides in the United States," *American Journal of Epidemiology*, vol. 117, no. 3, 1983, pp. 309-319; B.S. Centerwall, "Race, Socioeconomic Status, and Domestic Homicide, Atlanta, 1971-1972," *American Journal of Public Health*, vol. 74, no. 8, 1984, pp. 813-5; R. Sampson and J. Laub, *Crime in the Making: Pathways and Turning Points through Life*, (Boston: Harvard University Press, 1993); and Steven Whitman, Nanette Benbow, and Glenn Good, "The Epidemiology of Homicide in Chicago," *Journal of the National Medical Association* vol. 88, no. 12, 1996, pp. 781-787. Such neighborhoods are likely marked by authorities who fail to make arrests as well. A *Washington Post* investigation found that all of the US's 50 most populous cities had neighborhoods they dubbed as "pockets of impunity" with homicide arrest rates less than 33 percent. See Wesley Lowery, Kimbriell Kelly, Ted Mellnik, and Steven Rich, "Where Killings Go Unsolved," *Washington Post*, June 6, 2018, https://www.washingtonpost.com/graphics/2018/investigations/where-murders-go-unsolved/ (accessed January 21, 2020).

## Former Long-Term US Residents Easy Targets of Abuse

Salvadorans who have lived for a long time in the United States are often easily identifiable. One director of an agency providing aid to deported persons told us: "At the beginning, there's no problem. But as they're noticed—their clothing, their accent, their money—the gang finds interest."[299]

Yeshua O., in his late-thirties, fled a particularly violent neighborhood in El Salvador for the United States as a teenager and remained there nearly two decades with TPS before his deportation in 2018 after serving a sentence for first degree assault in Maryland.[300] Within weeks of his arrival back to his particularly violent neighborhood in El Salvador, Yeshua told Human Rights Watch he had tried to keep track of rules over whether he should or shouldn't wear "certain shoes, certain colors and certain hair styles," because they could signal membership in a gang and put him in danger. He said, "It's confusing here. I'd always had a military style, but in [US immigration] detention, they [other detainees] told me to keep my hair longer.… I guess the military style is linked with one of the gangs."[301]

The sister of Baltazar G., a man who had been deported in January 2012 after 10 years in the US, told Human Rights Watch, his style of dress was dangerous: "After living so long there, he dressed differently. Loose. It attracted gang members' attention here. I told him to dress differently."[302]

Bernardo A., in his late forties, first fled to the United States as a teenage child trying to avoid forced conscription into the guerilla forces. He has lived most of his life since then in the United States but has been deported multiple times to El Salvador, the first of which

---

[299] Human Rights Watch interview with aid director for persons deported from Mexico and the United States for international non-profit, El Salvador's Central Region, March 28, 2019.

[300] Human Rights Watch interview with Yeshua's sister, United States East Coast, April 5, 2019 (pseudonym). The assault occurred when his sister attempted to take a hunting rifle away from Yeshua when he was drunk. According to our interview with Yeshua's sister, her arm was only slightly injured by scratches during the struggle. She said that while there was some blood, her injuries were so minor that "at the hospital they did nothing." Police were called when witnesses heard the rifle go off.

[301] Human Rights Watch telephone interview with Yeshua O., El Salvador's Central Region, November 13, 2018 (pseudonym).

[302] Human Rights Watch interview with Baltazar's sister and nephew, El Salvador's Central Region, December 1, 2018 (pseudonym).

occurred in 1990 as a young adult and the most recent of which occurred in December 2017. He remembers that after his first deportation: "I was at church, and people wanted to beat me. So, I left. I think they didn't like the way I talked. I didn't speak Spanish well anymore. I'd learned English … and no longer spoke Spanish well."[303]

People deported from the United States, through remittances sent to their families, often end up having noticeable assets compared to others. For example, Elías F., who fled to the United States as a teenager from a violent neighborhood in the early 2000s, had sent money to his family for seven years to buy a home in their neighborhood.[304] When he was deported in the early 2010s, he realized his home was better constructed and had better finishes than the others and marked him as a target.

In our research for this report, we also learned of two cases of wives[305] of former long-term US residents who were killed, and of the case of a US citizen[306] who was killed after traveling to El Salvador to marry his fiancée (who had been deported from the US and had an infant child). While we were unable to document the motivation for the killing of the US citizen; in the two cases of the wives, we know from our interviews with them that one victim had regularly received money from the US and the other had resisted gang extortion. In all three cases, their linkages to former long-term US resident deportees who were perceived to have greater wealth seemed to make them conspicuous targets.

## Extortion

Deportees who spent a long time in the US are often targeted for extortion because they are perceived as having greater financial resources. Several of the people Human Rights Watch interviewed for this report told us that their unwillingness to succumb to gang extortion or other demands (motivated, they believed, by their perceived wealth resulting from their long residence in the US) put them or their family members at risk, including risk

---

[303] Human Rights Watch interview with Bernardo A., El Salvador's Central Region, January 25, 2019 (pseudonym).

[304] Human Rights Watch interview with Elías F., United States East Coast, winter 2019 (exact date withheld for security) (pseudonym).

[305] Human Rights Watch interview with surviving family member Norman S., United States (region withheld for security), March 2019 (pseudonym); Human Rights Watch telephone interview with surviving family member Ana P., United States Mountain West, March 5, 2019 (pseudonym).

[306] Human Rights Watch telephone interview with IML investigator, El Salvador's Western Region, September 26, 2019.

of death.[307] Police officers interviewed for this report thought failure to pay extortion was the most common factor in the killings of deported former US long-term residents because some respond in ways—refusing to pay or reporting demands to authorities—that while typically non-life threatening in the United States, got them or their loved ones killed in El Salvador.[308]

A police investigator told Human Rights Watch that among his recent homicide cases were several involving deportees who had been extorted:

> I can think of three cases. One was in El Junquillo, I think in 2016.… He was deported and was killed. The investigation showed that the gang extorted him. The second was in [neighborhood name withheld], likewise because of extortion. He set up a business, a cereal products store, and they killed him. That was in 2018. The third was in [municipality name withheld], but I don't remember the neighborhood. It was the same: the person was deported with a little money, set up a business, and [the demand for] *la renta* came.[309]

Implicit in these cases is that the person either did not pay at all or stopped paying. In the case of a woman killed by a gang, family members told Human Rights Watch the family,

---

[307] Human Rights Watch interview with Norman S., El Salvador's (region withheld for security), first quarter of 2019 (exact date withheld for security) (pseudonym); Human Rights Watch interview with Matías J., United States East Coast, March 1, 2019 (pseudonym); Human Rights Watch telephone interview with Ana P., March 5, 2019 (pseudonym); Human Rights Watch interview with Elías F., United States (region withheld for security), first quarter of 2019 (exact date withheld for security) (pseudonym); and Human Rights Watch interview with PNC officer, El Salvador's Paracentral Region, March 25, 2019.

[308] Human Rights Watch interview with PNC Investigator, El Salvador's Western Region, January 24, 2019; Human Rights Watch interview with police person, El Salvador's Paracentral Region, March 25, 2019; Human Rights Watch interview with city hall based OLAV official, El Salvador's Central Region, January 11, 2019; Human Rights Watch interview with aid director for persons deported from Mexico and the United States for international non-profit, El Salvador's Central Region, March 28, 2019.

[309] Human Rights Watch interview with police officer, El Salvador's Western Region, January 24, 2019. Two other long-term residents from the United States were killed in 2014 and 2018 one in Ahuachapán and the other in La Libertad–worked for 10 or more years in the United States to save enough money to open businesses in El Salvador. David Marroquín, "Violence Takes the Life of 64 People in the Last Four Days" ("Violencia acaba con la vida de 64 personas en los últimos cuatro días"), *El Diario de Hoy*, March 15, 2018, https://www.elsalvador.com/noticias/nacional/violencia-acaba-con-la-vida-de-64-personas-en-ultimos-cuatro-dias/460839/2018/ (accessed 21 June 2019), and David Marroquín, "2,841 Murders Registered in the Year, with 297 in September" ("Registran 2,841 asesinatos en el año, septiembre con 297 homicidios"), *El Diario de Hoy*, September 29, 2014, https://www.elsalvador.com/noticias/nacional/registran-2841-asesinatos-en-el-ano-septiembre-con-297-homicidios/136337/2014/ (accessed June 21, 2019).

including the woman killed, had resisted extortion because after living for years in the United States, they felt they had worked too hard for their money to give it to "criminals."[310] Similarly, an official [office withheld for security] reported a concluded case in which a former legal resident of the United States had started a business in Los Blancos neighborhood of San Luis La Herradura. The official said, "She refused to pay extortion and told them [the gang members]: 'I didn't owe my money to bums [*a vagos, no debía mi dinero*].'"[311]

## Tattoos

Tattoos are common in the United States.[312] Some deportees who had been long-term US residents we interviewed for this report had gotten them for artistic and sentimental reasons. For example, we interviewed Paloma V., who entered the US at around age 20 and lived there for six years. She returned from the US voluntarily to El Salvador to visit her sick family and because she was worried her sons were being forcibly recruited by the gangs. Upon her return, Paloma remained in hiding most of her time in El Salvador to avoid gang extortion demands rising to US$50 per week and increased recruitment of her two boys. She explained the artistic tattoos on her neck, shoulder, and side were visual remembrances of her family, country, and God.[313] A few other former long-term US residents we interviewed acknowledged their tattoos were gang-related.[314]

Even gang-related tattoos are sometimes obtained in the United States as a survival mechanism rather than simply as a mark of gang affiliation. Bartolo A., who had lived in the US for 17 years before he was deported in 2017, got tattoos, according to his attorney,

---

[310] Human Rights Watch interview with police officer, El Salvador's Paracentral Region, March 25, 2019; Human Rights Watch interview with Norman S., El Salvador's (region withheld for security), first quarter of 2019 (exact date withheld for security) (pseudonym).

[311] Human Rights Watch interview with Salvadoran official (office withheld for security), Paracentral Region, March 25, 2019.

[312] *Newsweek* reported on a survey of respondents in 18 countries, finding that 46 percent of respondents in the United States had tattoos – the third highest of the 18 countries surveyed. James Tennet, "Which Country Has the Most People with Tattoos? It's not the US," *Newsweek*, May 24, 2018, https://www.newsweek.com/which-country-most-people-tattoos-943104 (accessed October 9, 2019).

[313] Human Rights Watch interview with Paloma V., United States East Coast, June 17, 2019 (pseudonym).

[314] Human Rights Watch interview with Yavany B., El Salvador's Central Region, December 1, 2018 (pseudonym); Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security) (pseudonym), November 26, 2018; Human Rights Watch interview with Ransés I., Tijuana, Mexico, March 8, 2019 (pseudonym).

after being beaten repeatedly in a US federal prison when he was young and vulnerable.[315] Bartolo A. agreed, stating: "Many times, one does it [gets tattoos while in prison] to obtain protection from the gangs. Yes, when one walks with gang tattoos, no one messes with him."[316] Bartolo maintains it saved his life: "The tattoos were my help and my survival in prison."[317]

In El Salvador, however, tattoos are deeply stigmatized, and can prove deadly. This has been true for many years.[318]

Today, gangs, authorities, and death squads link tattoos to gang membership in El Salvador. Officials[319] interviewed for this report thought tattoos were the most common factor among deportees who were killed:

- "Usually, the common factor is a tattoo, because people think that they are gang-related, but some are decorative." This official remembered his own voluntary return to El Salvador at the end of the civil war in the mid-1990s, saying: "My own mom inspected me for tattoos. Apparently, all the [news] stories at the time were about tattooed gang members coming from the United States. My friends deported [around then] had tattoos and faced discrimination."[320]
- "What I have noticed about those murdered after their deportation is nearly all have tattoos. Among them, they have artistic tattoos that do not allude to gangs. Yet, gangs will kill them, as will others. This happens primarily in rural

---

[315] Human Rights Watch interview with defense attorney, United States (region withheld for security), April 4, 2019.

[316] Human Rights Watch interview with Bartolo A., El Salvador's (region withheld for security), November 26, 2018 (pseudonym).

[317] Ibid. See also, "Why Prisoners Join Gangs," *Economist*, November 12, 2014.

[318] "No Place to Hide: Gang, State, and Clandestine Violence in El Salvador," The International Human Rights Clinic, Human Rights Program, Harvard Law School, February 2007, https://static1.squarespace.com/static/5b3538249d5abb21360e858f/t/5cabca6ce4966bf580ea3471/1554762350561/No+Place+to+Hide+Cavallaro+2007.pdf.

[319] Human Rights Watch interview with FGR prosecutor, El Salvador's Paracentral Region, March 29, 2019; Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, January 22, 2019; Human Rights Watch interview with IML examiners, El Salvador's Western Region, January 24, 2019; Human Rights Watch interview with IML investigators, El Salvador's Western Region, January 7, 2019; Human Rights Watch interview with IML examiner, El Salvador's Eastern Region, November 26, 2018.

[320] Human Rights Watch interview with FGR prosecutor, El Salvador's Eastern Region, January 22, 2019.

areas. The constant variables among murdered deportees and disappeared deportees is tattoos. Some are gang members."[321]

Deportees who were disappeared and/or killed often had tattoos. Out of 30 cases reported in the Salvadoran media of deportees with tattoos from the United States who were killed between 2010 and 2019, only seven had gang-related tattoos, the 23 others had artistic or non-gang-related tattoos, like a tribute to children,[322] an angel and Christ,[323] a shield,[324] stars on the elbows,[325] and allusions to the US city of Los Angeles.[326] In some of these 30 cases, the individuals had spent their childhoods, their adolescence and/or more than 10 years in the US.[327] Some were killed within days of their deportation,[328] but others were killed years later, despite trying to leave their homes as little as possible (for example, travelling only to and from work).[329] Other cases we documented through interviews for this report include:

- A man, Jaír F., whose cousin Ángel F. had arrived in the US during his adolescence, had tattoos that Jaír believed were not gang related. Jaír told a

---

[321] Human Rights Watch interview with IML doctor, El Salvador's Eastern Region, November 26, 2018.

[322] "My Husband Went to Pay Installments to a Store and Did Not Return" ("Mi esposo fue a pagar a unas letras a un almacen y ya no regreso"), *El Blog* http://elblog.com/noticias/registro-43551.html (accessed October 28, 2019).

[323] Lilibeth Sanchez and David Marroquín, "Deportee from United States Killed" ("Matan a deportado de Estados Unidos"), *El Diario de Hoy* (on file with Human Rights Watch).

[324] Mauricio Bolanos, "La Paz: Murder of Man Reported in Santiago Nonualco" ("La Paz: reportan asesinato de hombre en Santiago Nonualco"), *La Prensa Gráfica*, April 28, 2013, https://www.laprensagrafica.com/elsalvador/La-Paz-reportan-asesinato-de-hombre-en-Santiago-Nonualco-20130428-0020.html (accessed October 28, 2019).

[325] "25 Persons Kidnapped in Usulután This Year" ("25 privados de libertad van este año en Usulután") *La Prensa Gráfica*, April 28, 2013, https://www.laprensagrafica.com/elsalvador/25-privados-de-libertad-van-este-ano-en-Usulutan-20140303-0116.html (accessed October 28, 2019).

[326] Anna-Catherine Brigida, "Kicked Out of the U.S., Salvadoran Deportees Are Struggling Simply to Stay Alive," *World Politics Review*, October 9, 2018, https://www.worldpoliticsreview.com/articles/26302/kicked-out-of-the-u-s-salvadoran-deportees-are-struggling-simply-to-stay-alive (accessed October 28, 2019).

[327] Anna-Catherine Brigida, "Kicked Out of the U.S., Salvadoran Deportees Are Struggling Simply to Stay Alive," *World Politics Review*, October 9, 2018, https://www.worldpoliticsreview.com/articles/26302/kicked-out-of-the-u-s-salvadoran-deportees-are-struggling-simply-to-stay-alive (accessed October 28, 2019); Gadiel Castillo, "Man is Killed While Going to Work" ("Hombre es asesinado cuando iba a su trabajo"), *ElSalvador.com*, November 28, 2018 https://www.elsalvador.com/noticias/nacional/hombre-es-asesinado-cuando-iba-a-su-trabajo/543809/2018/ (accessed October 10, 2019); Criminal Sentencing Order, Tribunal de Sentencia de Santa Tecla, June 22, 2015 (sentencing document for the individual convicted in a deportee's killing)(on file with Human Rights Watch).

Human Rights Watch researcher that Ángel was killed in 2018 in their rural municipality after Ángel's deportation in 2018.[330]

- A Salvadoran journalist told us in 2018, "[D]ays ago, a youth arrived deported who had tattoos. He disappeared. Some cases like that are never reported."[331]

- Another Salvadoran journalist remembered, "In [the neighborhood] where I live, a deportee around 40 years old got back [returned to El Salvador]. He had tattoos that I thought were super cool and in no way associated with a gang. However, few in El Salvador understand this. Here, having tattoos is a problem. He disappeared about a month later. The case was not reported [in the press]. I didn't cover it, because of our [Salvadoran journalists'] rule: don't cover anything in your own neighborhood."[332]

Despite the grave risks associated with having tattoos, getting them removed is difficult in the United States, especially when a person is held in immigration detention.[333] In one case, after living in the US for 17 years, while his deportation proceedings were underway, Bartolo A.'s defense attorneys tried to arrange for the removal of his tattoos, but the immigration facility detaining him would not coordinate visits by tattoo-removal professionals or allow Bartolo to leave the facility to have them removed.[334]

According to Salvadoran officials, the government agency for the health and welfare of youth, the National Institute of Youth (Instituto Nacional de la Juventud, INJUVE) offers a tattoo removal program in El Salvador, so as one return center official put it to Human Rights Watch "you will not be confused with gang members."[335] However, the removal

---

[330] Human Rights Watch interview with Jaír F., United States East Coast, February 23, 2019 (pseudonym).

[331] Human Rights Watch interview with Salvadoran journalist, El Salvador's Central Region, November 9, 2018.

[332] Human Rights Watch interview with Salvadoran journalist, El Salvador's Central Region, November 8, 2018.

[333] Human Rights Watch's decades of research in US immigration detention centers has shown that detainees are rarely, if ever, allowed to leave immigration detention centers including to go to hospitals for serious medical conditions, or to attend important events such as funerals or children's graduations. It is also extremely difficult to enter immigration detention centers, unless as an attorney representing an immigrant client. Therefore, under current US policy, detainees would experience significant barriers to leaving detention to have tattoos removed and tattoo removal professionals would experience significant challenges in entering detention centers repeatedly to remove tattoos.

[334] Human Rights Watch interview with former public defender, United States (region withheld for security), April 4, 2019.

[335] Human Rights Watch interview with migrant reinsertion official, El Salvador's Central Region, November 28, 2018.

sessions are only offered in San Salvador, must be spaced weeks apart, and can take years to completely remove tattoos.[336]

### Javier B.

In 2010, Javier B., 17, fled his particularly violent home neighborhood in El Salvador, where the local gang had repeatedly attempted to recruit him. His mother, Jennifer B., said that the gang had killed a close family member and generally targeted the family.[337]

After crossing the border, Javier lived with his mother in an unauthorized immigration status in a city located on the East Coast of the United States, where she worked to send money home to El Salvador. Javier started high school, but soon dropped out and began living with a friend.[338] He also worked the limited odd jobs that were available, such as construction, two or three times per week.[339] In 2012, Javier's girlfriend became pregnant. Javier later testified before the immigration judge in his deportation proceedings that he "was excited" to become a father, but he was also worried that he could "not support a family."[340] Javier testified that he "gave in to the easy money" of participating in burglaries.[341]

In June 2013, Javier was convicted, at the state level, of two separate counts of attempted burglary and burglary in the second degree. After serving his sentence in an East Coast prison, he was put in removal proceedings in New York State.

In August 2016, when Javier was 23, the immigration court denied him asylum due to his criminal convictions. Although Javier raised fears that gangs in El Salvador would attack and even kill him, the court found that it was not "more likely than not" that Javier would be tortured (defined in part as any act to intentionally inflict severe pain or suffering on an individual) upon return to El Salvador, thereby

---

[336] Human Rights Watch interview with migrant reinsertion official, El Salvador's Central Region, November 28, 2018.

[337] US Department of Justice, Executive Office of Immigration Review, *In the Matter of* (name and date withheld for security) (ruling on file with Human Rights Watch).

[338] Ibid.

[339] Ibid.

[340] Ibid.

[341] Ibid.

denying him protection under the Convention against Torture and ordering him deported from the United States.[342] Javier was deported in approximately March 2017. He was killed by MS in June that same year, according to his mother, Jennifer. She told Human Rights Watch:

> Only four months passed. He was thinking of living with my mother in [the neighborhood he had fled], but he decided to live with [my] sister in [a different but also violent neighborhood]. That's actually where they [MS] killed him…. It's terrible. They got him from the house at 11:00 am. They saw his tattoos. I knew they'd kill him for his tattoos. That is exactly what happened…. The problem was with [the gang] MS [-13], not with the police [who had stopped him multiple times but not beaten him]. [343]

[342] US Department of Justice, Executive Office of Immigration Review, *In the Matter of* (name and date withheld for security). (ruling on file with Human Rights Watch).

[343] Human Rights Watch telephone interview with Jennifer B., United States East Coast, March 6, 2019 (pseudonym).

# VII. US and International Law

In several key respects, US immigration law and policy violate international human rights and refugee law, with direct effects upon people seeking asylum or facing deportation from the United States, like the Salvadorans featured in this report.

## US Failure to Prevent Return to Persecution

The United States is obligated to uphold the central provisions of the 1951 Refugee Convention by its accession to the Refugee Convention's 1967 Protocol.[344] The US government passed the Refugee Act of 1980 in order to bring the country's laws into conformity with the Refugee Convention and Protocol, by incorporating into US law the convention's definition of a "refugee" as a person with a well-founded fear of being persecuted on account of race, religion, nationality, membership of a particular social group, or political opinion, and by incorporating the principle of non-return (also called "nonrefoulement"), which prohibits the return of people whose lives or freedom would be threatened on account of their race, religion, nationality, membership of a particular social group, or political opinion.[345]

Despite the fact that the principle of nonrefoulement is codified in US law, the cases in this report illustrate that Salvadorans face very uncertain odds when trying to convince US courts and authorities that they should not be deported due to their fears of serious harm.

Anyone who is an unauthorized immigrant (Salvadorans among them) will find it difficult to obtain protection from deportation to harm, especially once such an immigrant has been apprehended by immigration enforcement and put in removal proceedings. One of the biggest obstacles for these people is the reality that they are very likely to be locked up in

---

- [344] Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, entered into force April 22, 1954, http://www.unhcr.org/3b66c2aa10.html; U.N. Protocol Relating to the Status of Refugees, 606 U.N.T.S. 268, entered into force October 4, 1967. The United States acceded to the 1967 Protocol in 1968.

[345] The US incorporated the provisions of the 1967 Protocol into domestic law through the Refugee Act of 1980, Pub. L. No. 96- 212, 94 Stat. 102 (1980). As the Supreme Court has confirmed, a primary purpose of Congress in passing the Refugee Act "was to bring United States refugee law into conformance with the 1967 United Nations Protocol." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 426 (1987); see also, *INS v. Stevic*, 467 U.S. 407, 416-24 (1984) (providing a history of the incorporation of the Refugee Convention standards into US law through the Refugee Protocol and the Refugee Act of 1980).

immigration detention, from where they are expected to claim asylum, usually without assistance from an attorney, since nearly all migrants and asylum seekers facing deportation in the United States have no right to a court-appointed lawyer.[346]

In a review of immigration court data from 2007 to 2012, the American Immigration Council determined that of all Salvadorans (detained and non-detained) in removal proceedings, only 40 percent were represented by counsel. In addition, 38 percent of Salvadorans in removal proceedings were detained.[347]

Under a July 2019 rule that is currently enjoined, all unauthorized immigrants living in the US will become  targets for arrests and deportation through expanded procedures that accelerate deportation known as "expedited removal."[348] Any unauthorized foreigner who cannot prove continuous presence in the US for at least two years could, if the rule goes into effect, be placed in a fast-track deportation process, without the opportunity to plead their case in front of an immigration judge or, in most cases, to get the help of an attorney. Expedited removal proceedings do allow individuals to seek referral to an immigration court proceeding to seek asylum, but make access to a court hearing contingent on a screening procedure, and Human Rights Watch and other groups have consistently criticized expedited removal for DHS officers' failure to identify legitimate asylum seekers during that screening process.[349]

---

[346] The only exception is individuals with mental health disabilities or cognitive impairments. See *Franco-Gonzalez v. Holder*, No. CV-10-02211 DMG (DTBx), Central District of California, (October 29, 2014).

[347] Ingrid Eagly and Steven Shafer, "Access to Counsel in Immigration Court," American Immigration Council, September 28, 2016, https://www.americanimmigrationcouncil.org/research/access-counsel-immigration-court (accessed January 5, 2020).

[348] See *Make the Road New York v. McAleenan*, No. 19-cv-2369, Order by the US District Court for the District of Columbia, September 27, 2019, https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/challenging_the_expansion_of_exp edited_order_granting_preliminary_injunction.pdf (accessed January 13, 2020).

[349] See, for example, Human Rights Watch, *You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm* (New York: Human Rights Watch, 2014), https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk.

Although deportations of individuals with TPS or DACA status are on hold as of the writing of this report,[350] those court-ordered injunctions could be lifted at any time. If this happens, these people are also likely to struggle to defend against deportation without assistance from a court-appointed attorney. Even with the aid of an attorney, every individual trying to prevent their deportation because they fear harm in El Salvador faces a battle to successfully make such a claim under current US law, discussed more below.

For individuals with criminal convictions, the odds against them being able to prevent deportation due to fear of harm in El Salvador are nearly insurmountable.[351] Article 33(2) of the Refugee Convention states that protection against refoulement may not be claimed by a refugee, "who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[352] The UN refugee agency (UNHCR) has defined such a crime as a "capital crime or a very grave punishable act."[353] UNHCR's Executive Committee has further explained that deporting a refugee under article 33(2) "may have very serious consequences for a refugee and his immediate family members …

---

[350] In September 2017, the Trump Administration announced that it would end the Deferred Action for Child Arrivals (DACA) program (1.8 percent of Salvadorans living in the US were DACA recipients), and although three lawsuits (*Regents of the University of California, et al. v. Dept. of Homeland Security (DHS)*, 908 F.3d 476 (9th Cir. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018); and *NAACP v. Trump*, 298 F. Supp. 3d 209 – (US Dist. Court, Dist. of Columbia 2018) have resulted in three nationwide injunctions, the government has appealed the injunctions to the US Supreme Court. Oral argument was held on November 12, 2019 and at the time of writing a decision was pending. At the same time, in May 2019, the Department of Homeland Security announced it would end Temporary Protected Status (TPS) for Salvadorans (13.9 percent of Salvadorans in the US were Temporary Protected Status (TPS) re-registrants). TPS status is also in a precarious state, because of legal challenges due to claims that the administration ended it for Salvadorans based on racial discrimination. In the case *Ramos et al v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), Judge Edward Chen in the Northern District of California issued a preliminary injunction preventing DHS from implementing TPS terminations for El Salvador, Haiti, Nicaragua, and Sudan while the case is resolved on its merits. DHS published steps it is taking to comply with the injunction in Federal Register Notices issued on October 31, 2018, March 1, 2019, and November 3, 2019. Currently, an automatic extension of TPS for Salvadorans, Haitians, Nicaraguans, and Sudanese is in place through January 4, 2021 unless the injunction is overturned. The government has appealed the injunction to the 9th Circuit Court of Appeals, oral argument was held August 14, 2019 and at the time of writing a decision was pending.

[351] For further discussion of the legal arguments presented here, see Human Rights Watch, *A Price Too High: US Families Torn Apart by Deportations for Drug Offenses* (New York: Human Rights Watch, 2015), https://www.hrw.org/report/2015/06/16/price-too-high/us-families-torn-apart-deportations-drug-offenses#bc77e3; Human Rights Watch, *Forced Apart: Families Separated and Immigrants Harmed by US Deportation Policy* (New York: Human Rights Watch, 2007), https://www.hrw.org/report/2007/07/16/forced-apart/families-separated-and-immigrants-harmed-united-states-deportation.

[352] Convention Relating to the Status of Refugees, art. 33(2).

[353] UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees, UNHCR, Geneva, January 1992), para. 155.

[and therefore should only happen] in exceptional cases and after due consideration of all the circumstances."[354]

Therefore, in accordance with international refugee law, procedures must be in place to ensure careful application of this narrow exception.[355] Even individuals convicted of "particularly serious" crimes are guaranteed the right of a hearing to establish whether or not they pose a current threat. Indeed, the "danger to the community" exception "hinges on an appreciation of a future threat from the person concerned rather than on the commission of some act in the past."[356] Accordingly, under international refugee law, past criminality is not per se evidence of future danger.

Unfortunately, United States law falls short of these standards, which helps to explain why some of the people featured in this report were deported to El Salvador after criminal convictions despite the clear harm they faced and the lack of danger they posed. People who have criminal convictions that are not "particularly serious" are usually barred from asylum in the US, but can seek protection from refoulement based on the much higher

---

[354] UN High Commissioner for Refugees (UNHCR) Executive Committee, Conclusion No. 7 (1977). The exceptions to non-refoulement in article 33(2) were intended to be used only as a "last resort" where "there is no alternative mechanism to protect the community in the country of asylum from an unacceptably high risk of harm." James C. Hathaway, *The Rights of Refugees under International Law* (Cambridge, UK: Cambridge University Press, 2005), p. 352.

[355] The Refugee Convention and Protocol require that a refugee should be "allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority." Ibid., art. 32(2). An individualized determination must occur before deportation, during which states must weigh two elements: 1) that a refugee has been convicted of a particularly serious crime and 2) that he or she constitutes a danger to the community. James C. Hathaway, *The Rights of Refugees under International Law*, pp. 344-351; Rene Bruin and Kees Wouters, "Terrorism and the Non-derogability of Non-refoulement," *International Journal of Refugee Law*, vol. 15, no. 1 (2003), p. 18. With regard to the first prong of the inquiry, the determination of a particularly serious crime cannot be merely rhetorical: It requires that the crime in question be distinguished from other crimes. The "particularly serious crime" exception in article 33(2) is presumed to require that the individual refugee be even more dangerous in order to fall under this exception. See Sir Elihu Lauterpacht & Daniel Bethlehem, UNHCR, "Opinion: The Scope and Content of the Principle of Non-Refoulement," June 20, 2001, paragraph 147 ("Article 33(2) indicates a higher threshold than article 1F . . .") With regard to the second prong, a government must separately assess the danger the individual poses to the community: "A judgment on the potential danger to the community necessarily requires an examination of the circumstances of the refugee as well as the particulars of the specific offence." UNHCR, "Nationality Immigration and Asylum Bill 2002: UNHCR comments relating to serious criminals and statutory review," 2002, paragraph 3; UNHCR, Handbook, p. 157 ("The fact that an applicant convicted of a serious non-political crime has already served his sentence or has been granted a pardon or has benefited from amnesty is also relevant.").

[356] UNHCR, "The Scope and Content of the Principle of Non-Refoulement," June 20, 2001, https://www.unhcr.org/en-us/protection/globalconsult/3b33574d1/scope-content-principle-non-refoulement-opinion.html (accessed October 18, 2019), paras. 147 and 164. ("While past conduct may be relevant to an assessment of whether there are reasonable grounds for regarding the refugee to be a danger to the country in the future, the material consideration is whether there is a prospective danger to the security of the country").

standard known as "withholding of removal."[357] But for people who have been convicted of what are regarded as "particularly serious crimes," withholding is also barred.[358]

In addition to all refugees convicted of aggravated felonies with five-year sentences, some US courts have found that the US attorney general has discretionary authority to send refugees or asylees back to persecution based on the attorney general's often-unreviewable determination of what constitutes a particularly serious crime.[359]

A final defense against removal for people convicted of particularly serious crimes derives not from the Refugee Convention and Protocol but rather from the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), which prevents the United States from returning anyone without exception to countries where they would more likely than not face torture.[360] The CAT defines torture as severe pain or suffering that is intentionally inflicted by or at the instigation of or with the consent or acquiescence of a public official, or other person acting in an official capacity. CAT withholding or deferral of removal therefore requires that an applicant prove that he or she will "more likely than not" face torture upon return, which must be shown to be severe pain or suffering inflicted by or with the acquiescence of a government official. Though it is an essential protection in international and US law, and people with criminal convictions are eligible to seek CAT relief, it is a very difficult standard to meet, especially without the assistance of an attorney.

---

[357] 8 USCS § 1231(b)(3) (2005) INA § 241(b)(3).

[358] 8 U.S.C. Section 1231 (b)(3)(B) (stating, "[A]n alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have been convicted of a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime."). US immigration law's definition of "aggravated felony" includes a broad range of crimes, including some that are actually not felonies at all. See Human Rights Watch, *Forced Apart;* Human Rights Watch, *Forced Apart (By the Numbers): Non-Citizens Deported Mostly for Nonviolent Offenses* (New York: Human Rights Watch, 2009), https://www.hrw.org/report/2009/04/15/forced-apart-numbers/non-citizens-deported-mostly-nonviolent-offenses; Human Rights Watch, *A Price Too High: Detention and Deportation of Immigrants in the US for Minor Drug Offenses* (New York: Human Rights Watch, 2015), https://www.hrw.org/report/2015/06/16/price-too-high/us-families-torn-apart-deportations-drug-offenses.

[359] See *In re Y-L-*, Immigration & Nationality Laws Administrative Decisions, vol. 23, decision 270, (B.I.A. 2002). The BIA and most courts have found that an offense that is not an "aggravated felony" may be deemed a "particularly serious crime". See for example, *Matter of N-A-M-*, 24 I&N Dec. 336 (BIA 2007), aff'd, *N-A-M- v. Holder*, 587 F.3d 1052 (10th Cir. 2009), holding that Congress did not intend to limit what offenses may be "particularly serious crimes" to those offenses classified as aggravated felonies.

[360] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1., Dec.10 1984, 1465 U.N.T.S. 85, art. 1., 8 C.F.R. § 208.18. See 8 CFR § 208.18.

Overly broad United States interpretation of crimes as "particularly serious" for purposes of barring individuals from asylum and withholding of removal, failure to assess whether the potential deportee poses a risk of dangerousness to the community of the US, and the failure to provide court-appointed legal representatives to people facing deportation on their rights and on the mechanics of due process, has resulted in the US failing to meet its obligations under international law not to return Salvadorans (and others) to countries where they would be under threat of persecution, torture, or other serious harms. In addition to policy changes within the authority of the Departments of Justice and Homeland Security, Congress should amend US law to ensure that criminal bars to asylum and withholding are consistent with international law, that there is greater judicial scrutiny of the application of these bars, and that people facing removal have the right to court-appointed attorneys.

## The United States Eviscerates the Right to Seek Asylum

There is no right to be granted asylum under international law, but there is a right to seek asylum.[361] On its face, US law generally recognizes this right. The law provides that any person "physically present in the United States or who arrives in the United States … irrespective of such alien's status, may apply for asylum…."[362]

However, since President Donald Trump's inauguration, the federal government has nearly eviscerated the right to seek asylum in a relentless series of policy and legal changes. This attack on asylum affects all nationalities, Salvadorans among them. Salvadorans whose claims to asylum have not yet been resolved, and those who may be attempting to travel to the United States to claim asylum from persecution in their home country, face enormous obstacles due to these changes to asylum law and policy.

One of the most sweeping US policies undermining the right to seek asylum in the United States is the Migrant Protection Protocols (MPP), also called the "Remain in Mexico" policy, which have been in place since January 2019. Under this policy, the implementation of which Human Rights Watch has investigated,[363] the US government returns to Mexico

---

[361] Universal Declaration of Human Rights, 1948, art. 14.1.

[362] 8 USC Sec. 1158.

[363] Human Rights Watch, *"We Can't Help You Here": US Returns of Asylum Seekers to Mexico* (New York: Human Rights Watch, 2019), https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico.

nearly all asylum seekers who have been put into removal proceedings. Since its inception, the program has been implemented at ports of entry and Border Patrol sectors across the southern border, placing asylum seekers at risk of violence, exploitation at the hands of cartels and corrupt officials, and death. Approximately one percent of people returned to Mexico under the program are able to find representation in their court cases,[364] vulnerable populations such as pregnant women, babies, and LGBT individuals have been regularly returned, and our own research shows the program regularly results in family separations.[365]

Although legal challenges continue, the United States Court of Appeals for the Ninth Circuit has allowed this sweeping policy to remain in place.[366] At time of writing, more than 59,000 asylum seekers had been returned to dangerous and unlivable conditions in Mexico, with significant barriers to obtaining legal representation and a fair asylum hearing.[367]

The MPP program is layered on top of a policy that dates back to 2016 (called "metering"), under which United States Customs and Border Protection (CBP) turns back asylum seekers at ports of entry where they are forced to wait in haphazardly operated queues in Mexico, which can cause weeks and months of delay. People affected by these policies often make desperate decisions to attempt to cross the border in dangerous locations. Among these were Óscar Alberto Martínez Ramírez and his daughter Valeria, both from the

---

[364] Syracuse University Transactional Records Access Clearinghouse, "Access to Attorneys Difficult for Those Required to Remain In Mexico," July 29, 2019, https://trac.syr.edu/whatsnew/email.190729.html (accessed November 25, 2019).

[365] "US: Family Separation Harming Children, Families," Human Rights Watch news release, July 11, 2019, https://www.hrw.org/news/2019/07/11/us-family-separation-harming-children-families.

[366] Immigrant advocacy groups challenged MPP in the US District Court for the Northern District of California in *Innovation Law Lab v. McAleenan*, No. 19-00807 (N.D. Ca. 2019). The court originally halted MPP and the government appealed to the U.S. Court of Appeals for the Ninth Circuit. The government also moved for a stay of the order during the pendency of the appeal which the Ninth Circuit granted. See *Innovation Law Lab v. McAleenan*, No. 19-15716, U.S. Court of Appeals for the Ninth Circuit, May 7, 2019,  http://cdn.ca9.uscourts.gov/datastore/general/2019/05/07/19-15716%20opinion.pdf. Thus, MPP remains in effect until the Ninth Circuit reviews the merits of the case.

[367] Michelle Hackman, "At Migrant Camp in Mexico, Crowds and Complaints Swell," *Wall Street Journal*, November 23, 2019, https://www.wsj.com/articles/at-migrant-camp-in-mexico-crowds-and-complaints-swell-11574510400 (accessed November 25, 2019); "US Move Puts More Asylum Seekers at Risk: Expanded 'Remain in Mexico' Program Undermines Due Process," Human Rights Watch news release, September 25, 2019, https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk#.

particularly violent Altavista neighborhood in El Salvador, who both died while trying to cross the Rio Grande in June 2019.[368]

In July 2019, in another change with devastating effect on all people trying to cross the United States-Mexico border to seek protection from persecution, the administration published an interim final rule banning all people, including children, who have traveled through another country first, and did not apply for and get asylum there, from applying for asylum in the United States.[369] This rule (sometimes referred to as "Asylum Ban 2.0") is a ban of nearly all non-Mexican asylum seekers attempting to enter the US through the southern border. On September 11th, the Supreme Court issued a decision allowing the ban to go into effect while litigation challenging it continues.[370]

In yet another effort to block people from even accessing the United States asylum system, in the summer and fall of 2019, the Trump administration reached agreements with Honduras, El Salvador, and Guatemala that will enable the administration to reject asylum claims from people who first pass through any of these countries.[371] The United States' Asylum Cooperative Agreement with Guatemala, in particular, raises alarm bells for Salvadorans, since nearly all Salvadoran asylum seekers transit through that country on their northward journey. Few details about these agreements had been released at time of writing; however, what is known about each country's refugee protection system raises

---

[368] Kirk Semple, "'I Didn't Want Them to Go: Salvadoran Family Grieves for Father and Daughter Who Drowned," *New York Times*, June 28, 2019, https://www.nytimes.com/2019/06/28/world/americas/rio-grande-drowning-father-daughter.html (accessed October 23, 2019); Sharyn Alfonsi, "You've Seen the Image. Now, Hear a Widow Recall How her Husband and Daughter Drowned in the Rio Grande," *CBS News 60 Minutes*, November 24, 2019, https://www.cbsnews.com/news/tania-avalos-mother-wife-drowned-migrants-salvador-60-minutes-2019-11-24/.

[369] See Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security, "governing asylum claims in the context of aliens who enter or attempt to enter the United States across the southern land border after failing to apply for protection from persecution or torture while in a third country through which they transited en route to the United States," US Federal Register, July 16, 2019, https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications.

[370] *Barr v. East Bay Sanctuary Covenant*, 140 S.Ct. 3 (2019),  September 11, 2019, https://www.supremecourt.gov/opinions/18pdf/19a230_k53l.pdf.

[371] Priscilla Alvarez and Geneva Sands, "US Signs Asylum Deal with Honduras, the Latest in a String of Agreements with Central America," *CNN*, September 25, 2019, https://www.cnn.com/2019/09/25/politics/united-states-honduras-asylum-agreement/index.html (accessed November 25, 2019); Priscilla Alvarez and Geneva Sands, "US Signs Asylum Agreement with Guatemala," *CNN*, July 26, 2019, https://www.cnn.com/2019/07/26/politics/guatemala-us-immigration/index.html (accessed November 25, 2019); Geneva Sands, "Deal Could Allow the US to Send Some Asylum Seekers Back to El Salvador," *CNN*, September 20, 2019, https://www.cnn.com/2019/09/20/politics/asylum-us-el-salvador/index.html (accessed November 25, 2019).

serious doubts about their ability to handle large numbers of asylum claims and offer effective protection.[372]

Each of these changes are layered upon other, earlier policy shifts engineered to create a harsh and punishing response to arriving asylum seekers. In 2017, then-Attorney General Jeff Sessions introduced a "zero-tolerance" policy, which required that all migrants arriving between ports of entry, including asylum seekers, be prosecuted for the federal crimes of illegal entry or reentry. What resulted was the mass, systemic separation of families, as parents were prosecuted and children were ripped away from them to be taken into separate custody, causing irreversible, life-long trauma to over 5,400 children,[373] including all but one of the Salvadoran children interviewed for this report. Subsequently revealed internal government memos show that this policy was explicitly intended to serve as a deterrence mechanism for asylum seekers.[374] Despite the official end to family separation in June 2018,[375] many separations are still happening,[376] and the "zero-tolerance" memo was still in place, at time of writing.

Other changes have attempted to narrow the definitions United States immigration judges use to determine who merits asylum. In 2019, US Attorney General William Barr reversed a case, *Matter of L-E-A*[377], limiting and in some cases eliminating the possibility of even presenting a claim for asylum for individuals who are fleeing harm on the basis of their

---

[372] See, for example, "Human Rights Watch Submits Comment in Opposition to the Asylum Eligibility and Procedural Modifications Interim Final Rule," Human Rights Watch news release, August 15, 2019, https://www.hrw.org/news/2019/08/15/human-rights-watch-submits-comment-opposition-asylum-eligibility-and-procedural (accessed January 13, 2020); Eleanor Acer, "Safe Third Country Agreement with Guatemala Would Endanger, not Protect Refugees," Human Rights First, June 14, 2019, https://www.humanrightsfirst.org/press-release/safe-third-country-agreement-guatemala-would-endanger-not-protect-refugees (accessed January 13, 2020).

[373] Chantal da Silva, "More Than 5,400 Children Were Separated from Their Parents by the Trump Administration, 'Shocking' New Tally Shows," *Newsweek*, October 25, 2019, https://www.newsweek.com/trump-administration-family-separation-policy-aclu-1467715 (accessed November 25, 2019).

[374] Cora Currier, "Prosecuting Parents–and Separating Families–Was Meant to Deter Migration, Signed Memo Confirms," *The Intercept*, September 25, 2018, https://theintercept.com/2018/09/25/family-separation-border-crossings-zero-tolerance/ (accessed January 13, 2020).

[375] Executive Order of the President of the United States, "Affording Congress the Opportunity to Address Family Separation," June 20, 2018, https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/ (accessed January 13, 2020).

[376] "US: Family Separation Harming Children, Families," Human Rights Watch news release, July 11, 2009, https://www.hrw.org/news/2019/07/11/us-family-separation-harming-children-families; Miriam Jordan, "No More Family Separations, Except These 900," *New York Times*, July 30, 2019, https://www.nytimes.com/2019/07/30/us/migrant-family-separations.html (accessed January 13, 2020).

[377] 27 I&N Dec. 40 (BIA 2017).

membership in a particular family. This decision holds dire consequences for many asylum seekers, including several of the Salvadoran individuals and their family members whose cases are documented in this report. Also, in 2018, then-Attorney General Sessions issued *Matter of A-B*[378], effectively limiting the availability of asylum to most individuals fleeing gender-based violence or violence at the hands of gangs—each of which is often central to the fears of harm that prompt people from El Salvador to flee to the United States.[379]

Former Attorney General Sessions took this decision despite caselaw in the United States clearly establishing, for decades, that gang violence and gender-based violence can constitute persecution under international refugee law.[380] This established legal understanding is shared by UNHCR, the United Nations refugee agency, which has concluded that people fleeing gang and gender-based violence, as well as forced recruitment by gangs, may have valid persecution claims under the Refugee Convention.[381] Beyond that, his decision failed to evidence awareness of the state's absence and inability or unwillingness to protect, as well as its role in active persecution, as root causes of gender-based and gang violence.

In February 2017, United States Citizenship and Immigration Services (USCIS) raised the threshold for demonstrating credible fear in the first stage of the asylum process. This new guideline ordered asylum officers to be stricter in assessing claims of fear made during

---

[378] 27 I&N Dec. 316 (A.G. 2018).

[379] See *In Matter of E-F-H-L-*, Sessions certified to himself and then overturned a third BIA decision, eviscerating the rights of asylum seekers to testify on their own behalf before they can be denied asylum and/or deported. 27 I&N Dec. 226 (A.G. 2018).

[380] See *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014)(establishing domestic violence survivors as a "particular social group" under US asylum law in certain cases); and USCIS, "Notification of *Ramos v. Holder*: Former Gang Membership as a Potential Particular Social Group in the Seventh Circuit," March 2, 2010, https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2010/Asylum-Ramos-Div-2-mar-2010.pdf (discussing Circuit Court precedent in which gang membership is considered to be a "particular social group" under US asylum law in certain cases).

[381] United Nations High Commissioner for Refugees, Brief of the United Nations High Commissioner for Refugees before the United States Court of Appeals for the First Circuit in the case *O.L.B.D., petitioner, v. William P. Barr, Attorney General, respondent*, March 11, 2019, https://www.refworld.org/docid/5c8924454.html (accessed October 23, 2019); United Nations High Commissioner for Refugees, Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from El Salvador, March 15, 2016, https://www.refworld.org/docid/56e706e94.html (accessed October 23, 2019).

"credible fear interviews," the threshold interview that is required before an affirmative asylum seeker is allowed to present their claim to an immigration judge.[382]

Each of these policy changes on its own represents a significant erosion of the right to seek asylum in the United States. Taken together, the US is violating the rights of hundreds of asylum seekers on a daily basis. One proposed bill before Congress, the Refugee Protection Act of 2019, would make important strides towards reversing these, and other, harmful policies.[383]

## US Law Fails to Adequately Value Long-Term Connections to US[384]

Salvadorans (and immigrants of other nationalities in similar situations) who have lived in the United States for many years in an unauthorized status, as legal permanent residents, or as TPS or DACA beneficiaries often have developed and/or deepened family and other ties to the United States. Under current US law these ties are often not weighed at all before deportation.[385] This is despite the fact that the UN Human Rights Committee (HRC), the expert body that interprets and monitors state party compliance with the International Covenant on Civil and Political Rights (ICCPR), has explicitly stated that the right to family unity entails limits on states' power to regulate immigration.[386] Though it has not always ruled in favor of migrants seeking to defend against their deportations, the HRC jurisprudence establishes that any interference with a person's family caused by deportation is "arbitrary" if the state fails to weigh that human rights impact in the balance against its own interests in deporting the person.[387] Moreover, the UN special rapporteur

---

[382] United States Citizenship and Immigration Services, "Credible Fear and Torture Determinations and Reasonable Fear and Torture Determinations," USCIS Memorandum, February 13, 2017, https://drive.google.com/file/d/0B_6gbFPjVD0xY0FCczROOFZ4SVk/edit (accessed January 13, 2019).

[383] See "Leahy & Lofgren Introduce Bicameral Refugee Protection Act of 2019," November 21, 2019, https://lofgren.house.gov/media/press-releases/leahy-lofgren-introduce-bicameral-refugee-protection-act-2019 (accessed November 26, 2019).

[384] For further discussion of the legal arguments presented in this section, see Human Rights Watch, *The Deported: Immigrants Uprooted from the Country They Call Home* (New York: Human Rights Watch, 2017), https://www.hrw.org/report/2017/12/05/deported/immigrants-uprooted-country-they-call-home#5de4cc; Human Rights Watch, *A Price Too High*; Human Rights Watch, *Forced Apart*; Human Rights Watch, *Forced Apart (By the Numbers)*.

[385] This is true except under highly limited circumstances where removal would result in "extremely unusual hardship" to the US citizen or lawful permanent resident child, spouse, or parent of the otherwise deportable person who has lived in the US for ten or more years and maintained good moral character. See Immigration and Nationality Act § 240A(b)(1).

[386] United Nations Human Rights Committee, General Comment No. 15, paras. 5 and 7.

[387] See, for example, *Madaferri v. Australia*, Communication No. 1011/2001, UN Doc CCPR/C/81/D/1011/2001 (2004). See also, *Husseini v. Denmark*, Communication No. 2243/2013, UN Doc CCPR/C/112/D/2243/2013 (2014); *MGC v. Australia*, Communication No. 1875/2009, UN Doc CCPR/C/113/D/1875/2009 (2015).

on the rights of non-citizens has stated, "[D]eportation is justified only if the interference with family life is not excessive compared to the public interest to be protected."[388] Even without strong family ties, an unauthorized immigrant develops stronger ties to the country of immigration over time. Children brought as unauthorized immigrants to the US at a very young age often have no ties at all to their country of origin, other than birth, yet are subject to deportation without consideration of their ties to the US.

There is no recognized human right to immigrate to another country and obtain legal status, and states enjoy considerable leeway to remove non-citizens from their territory—particularly those who are present unlawfully.[389] But this discretion is not unlimited, and the US should ensure its immigration policies meet its obligations under international human rights law. In particular, US law should take into account the often profound human rights impacts and other hardships of deportation, and weigh those in the balance against its interest in deporting a person.

Article 12(4) of the International Covenant on Civil and Political Rights (ICCPR) requires that "no one shall be arbitrarily deprived of the right to enter his own country," and the Human Rights Committee has found that the definition of "one's own country" is broader than the concept of a person's country of nationality.[390] In two cases involving people who were brought to Australia and Canada from other countries as young children, the Committee found a violation of article 12(4) where the state sought to deport those individuals later on in life.[391] These cases are closely analogous to the situation of DACA beneficiaries and, in some cases, TPS beneficiaries as well.

---

[388] United Nations Office of the High Commissioner for Human Rights (OHCHR), The Rights of Non-Citizens, 2006, HR/PUB/06/11, http://www.refworld.org/docid/46ceabb22.html (accessed December 3, 2017).

[389] Article 13 of the International Covenant on Civil and Political Rights (ICCPR) provides that non-citizens "lawfully present in the territory of a state party" may be only expelled pursuant to a decision made "in accordance with law," and that the person in question should have the opportunity to have their case reviewed before some "competent authority or a person or persons especially designated by the competent authority." Article 13 explicitly allows a limited exception to these obligations where "compelling reasons of national security otherwise require," and excludes from its scope all immigrants who articulate no claim that their presence on the state party's territory is "lawful." International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966). 999 U.N.T.S. 171, entered into force March 23, 1976. The United States ratified the ICCPR in 1992.

[390] UN Human Rights Committee, General Comment No. 27, Freedom of Movement (art. 12), U.N. Doc, CCPR/C/21/Rev.1/Add.9 (1999), Para. 20.

[391] UN Human Rights Committee, *Nystrom v. Australia*, Communication No. 1557/07, U.N. Doc CCPR/C/102/D/1557/2007; UN Human Rights Committee, *Warsame v. Canada*, Communication No. 1959/10, U.N. Doc CCPR/C/102/D/1959/2010 (2011).

Instead of requiring deportation of almost any immigrant without legal status, including those who have lived in the country for many years, US law should be changed to uphold these rights to family unity and to enter one's own country, among others. One way to recognize these rights is to weigh them before deporting someone from the United States. Another is to implement a fair and inclusive legalization program that provides legal status for certain qualifying unauthorized immigrants in the US—including those who previously qualified for and had a prolonged temporary legal status—who meet a clearly defined set of criteria, and that aims to integrate those with strong family and community ties to the US.

## US Law Should Protect People at Risk of Serious Harm Who Do Not Qualify for Asylum

In addition to all the limitations to the right to seek asylum and to be protected from return to persecution outlined above, Human Rights Watch notes two additional gaps in US law governing who should be protected from return to harm: first, US law fails to meet US treaty obligations not to return people to places where they would be at real risk of facing cruel, inhuman, or degrading treatment or punishment; second, US law fails to protect from deportation newly arriving asylum seekers who are fleeing situations of indiscriminate violence or other exceptional circumstances that would threaten their lives or personal security.

On the first gap, the United States has rejected any obligation to prevent people from being returned to face the risk of cruel, inhuman, or degrading treatment or punishment that does not rise to the level of torture, in contravention of the requirements of the Convention against Torture. In the case *In re J-E-* , the US Board of Immigration Appeals dismissed the appeal of a Haitian man who showed that he would most likely be subjected to inhuman and degrading treatment upon return, saying, "we find that the respondent has failed to establish that these severe instances of mistreatment are so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment."[392]

---

[392] 23 I&N Dec. 291 (BIA 2000).

This interpretation is inconsistent with the United States' obligation under the International Covenant on Civil and Political Rights (ICCPR).[393] The UN Human Rights Committee, the expert body that interprets and assesses state compliance with the ICCPR, has stated that, "States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."[394]

On the second gap in US law, countries around the world receiving migrants conduct a two-pronged assessment when considering a claim for protection against deportation.[395] First, they examine claims using the international refugee definition from the Refugee Convention: a well-founded fear of being persecuted on account of race, religion, nationality, membership of a particular social group, or political opinion. But they also assess in the same individualized interview whether an asylum seeker who does not meet this definition can also be recognized as qualifying for a complementary status as a protected person if they can establish that, if returned, they would face a real risk of serious harm for reasons other than a fear of being persecuted. This type of "complementary protection" provides a safety net for those people who still face extreme risks.

Human Rights Watch recommends that US law be amended to ensure protection from deportation for people who would face serious threats to life or physical integrity if returned to their countries because of a real risk of violence or in exceptional situations, such as natural or human-made disasters, including from the effects of climate change, for which there is no adequate domestic remedy. As this report has shown, this is important for those Salvadorans who might not meet the high persecution or torture standard but who nevertheless would be at real risk of death or serious bodily injury if returned. It is

---

[393] GA res. 2200A (XXI), 21 UN GAOR Supp. (No. 16) at 52, UN Doc. A/6316 (1966); 999 UNTS 171; 6 ILM 368 (1967).

[394] UN Human Rights Committee (HRC), CCPR General Comment No. 20: art. 7 (Prohibition of Torture, or Other Cruel, Inhuman or Degrading Treatment or Punishment), March 10, 1992, https://www.refworld.org/docid/453883fb0.html (accessed November 24, 2019).

[395] They include all European Union (EU) member states, Albania, Australia, Bosnia, Canada, Finland, Macedonia, Mexico, Montenegro, New Zealand, Norway, Serbia, South Africa, South Korea, Switzerland, Turkey, and Ukraine. Bill Frelick, "What's Wrong with Temporary Protected Status and How to Fix It: Exploring a Complementary Protection Regime," *Journal of Migration and Human Security* (forthcoming).

also important for individuals of any nationality who would face a real risk of serious harm after deportation from the United States.

# Medium and Long-Term Recommendations

## To the US Congress

- Enact legislation that codifies into domestic law the international legal obligations of the United States by passing the Refugee Protection Act of 2019 or similar legislation that:
    - Realigns the definition of terms in US law like "particular social group" to international standards;
    - Clarifies that transit through a third country shall not be grounds for discretionary denial of asylum;
    - Provides that asylum officers, with training in asylum law and non-adversarial interviewing techniques, have initial jurisdiction over all asylum claims;
    - Ends federal criminal prosecution, such as the "zero tolerance policy," for asylum seekers;
    - Ensures access to counsel for all persons in immigration detention and border facilities and provides counsel for certain particularly vulnerable populations;
    - Creates a presumption of release from detention for all asylum seekers.
- Enact legislation that enables access to fair asylum determination proceedings in the United States by: 1) Rescinding the Migrant Protection Protocols (MPP) with retroactive effect. For individuals already in the MPP program, ensure that each has access to full and fair asylum proceedings under US law by paroling them into the United States and enrolling them in community-supported release programs that will ensure their appearance for immigration proceedings and provide support for them while their claims are pending; 2) Providing a right to readjudication for those deported to El Salvador under the Trump administration; and 3) Ending metering of asylum claims.
- Also, in order to provide access to fair asylum determination proceedings in the United States, enact legislation to eliminate expedited removal from US law. Until such legislation is adopted, while expedited removal remains in place: 1) Provide sufficient resources to the United States Citizenship and Immigration Services (USCIS) for additional asylum officers; 2) Allow the USCIS to conduct

timely in-person "credible fear" and "reasonable fear" screening interviews and address backlogs, without creating delays for affirmative asylum interviews or for USCIS interviews in the overseas US refugee admissions program; 3) Ensure that USCIS has adequate training and supervision; 4) Expand the grounds of qualification for parole.

- Protect and safeguard the independence and impartiality of the immigration court system by adopting a law creating an independent immigration court system in the form of an Article I court, modeled after the US Bankruptcy Court.

- Enact the New Way Forward Act of 2019 or similar legislation that improves due process for all immigrants by:

  o Ending near-mandatory deportation for people with criminal convictions and ending expedited deportation proceedings;

  o Restoring discretion to immigration judges to grant relief to those otherwise barred by criminal records or certain conduct if it would serve humanitarian purposes, to assure family unity, or in the public interest;

  o Reducing unnecessary detention by adopting a presumption of liberty for immigrants during deportation proceedings;

  o Repealing laws making illegal entry and reentry federal criminal offenses, rather than simply civil offenses to be addressed in an administrative court.

- Enact legislation providing "complementary protection" from removal to people outside their country and subject to the jurisdiction of the United States who would face serious threats to life or physical integrity if returned to their countries because of a real risk of violence or exceptional situations, such as natural or human-made disasters, including from the effects of climate change, for which there is no adequate domestic remedy.

## To Congress and the Executive Branch

- The Attorney General should withdraw or Congress should rescind through legislation the Attorney General decisions that overruled Board of Immigration Appeals (BIA) decisions Matter of AB and Matter of L-E-A- narrowing gender, gang-related, and family-based grounds for asylum.

- Ensure that US funding for Mexican border and immigration enforcement capacity includes funding:

- o To improve and expand Mexico's capacity to register and process refugee and other protection claims;
- o To increase Mexico's capacity to provide social support for asylum seekers with pending claims and for other vulnerable migrants; and
- o To integrate recognized refugees and beneficiaries of complementary protection.
- Direct US foreign assistance to El Salvador and other countries in the region to initiatives designed to enhance due process, accountability, and equitable economic development, and support critical efforts to promote human rights, tackle corruption, strengthen the rule of law, reintegrate Salvadorans who repatriate, and provide trauma-informed care to Salvadorans.
- End political pressure and US funding to El Salvador and other countries in the region for border security or immigration enforcement that has the purpose or effect of infringing on the right to leave one's own country, the right to seek asylum from persecution in other countries, or in any other way violates fundamental human rights.

## To the US Department of Justice

- Reduce barriers to due process and backlog in the immigration court system, including by restoring the ability of immigration judges to close cases administratively and funding court-appointed counsel for removal proceedings.
- End reliance on gang databases as an indicator of gang membership for arrests and detention decisions without a criminal conviction evidencing gang membership and warranting detention for removal purposes.

## To the Attorney General of the United States

- Issue a new opinion reverting to the pre-2018 definition of a "particular social group" and recognizing that certain individuals (including those of Salvadoran nationality) may possess a well-founded fear of persecution and/or a need for complementary protection from removal due to factors that include long term residence in the United States, neighborhood of origin, tattoos, sexual violence, and all forms of intimate partner violence.

## To the Immigration and Customs Enforcement Agency

- Grant parole to people in expedited removal who have established a credible fear.
- End all unnecessary immigration detention. In instances in which detention is warranted based on flight risk or danger demonstrated by the government to an immigration judge and regularly reviewed, locate immigration detainees in areas more accessible to families, lawyers, and community support.
- Promulgate a new policy allowing individuals in immigration detention to access tattoo removal at their own (or at charitable organizations') expense, without extending the period of detention for such individuals.

## To the Government of El Salvador

- Conduct prompt, thorough, and impartial investigations into allegations of killings and other abuses committed by gang members, including into their possible links to authorities.
- Collect accurate data about victims and perpetrators of crime who are also returned migrants.
- Train police and law enforcement not to make assumptions that individuals have committed a crime or belong to a gang based on reasons such as being a deportee or having tattoos.
- Conduct prompt, thorough, and impartial investigations into allegations of abuses committed by authorities and security forces and remove them from their official duties that relate to contact with the public until their cases are resolved.
- Invest in the justice system, particularly around gender equity and inclusion, investigation capacity, and addressing state corruption and gender-based violence.
- Enhance the government's ability to provide trauma-informed care to victims of crime and human rights abuse.
- Enhance the government's reception and re-integration capacity for Salvadorans who repatriate.

- Ensure Consular staff in the United States are monitoring abuses experienced at the hands of immigration enforcement and border protection personnel and submit complaints with individuals' consent.

# Acknowledgments

Elizabeth G. Kennedy, former researcher on El Salvador for the United States Program of Human Rights Watch, researched this report. It was jointly authored by Kennedy and Alison Parker, managing director of the US Program. Clara Long, US Program senior researcher, edited and contributed writing to the report. Thomas J. Rachko, Jr., US Program acting advocacy officer, assisted with systematic searches of Salvadoran criminal sentencing tribunals and news, as did an assistant researcher who remains anonymous for her security. Jorge Beltrán Luna, Anna-Catherine Brigida, Virginia Salazar, and Israel Serrano identified some individuals to interview. Anna-Catherine Brigida additionally edited sections of this report for brevity and clarity. Jorge Beltrán Luna did additional reporting for one neighborhood.

Grace Meng, US Program senior researcher; Thomas J. Rachko, Jr., US Program acting advocacy officer; Dani Hass, senior editor; Joseph Saunders, deputy program director; Bill Frelick, refugee rights director; Neela Ghoshal, senior researcher in the LGBT Rights Program, Nisha Varia, advocacy director of the Women's Rights Division, Tamara Taraciuk Broner, acting deputy director of the Americas Division; Michael Bochenek, senior counsel in the Children's Rights Division and acting senior legal advisor edited the report. Colleagues from Alianza Americas also provided very helpful feedback. Remy Arthur, digital associate prepared the report for publication. Gabriela Haymes translated it into Spanish.

Most of all, Human Rights Watch thanks the persons deported and their surviving relatives who made this report possible by taking time, and risks, to share their experiences. We likewise appreciate the Salvadoran and US officials, lawyers, social service providers, researchers and others who spoke with us or identified cases during research for this report.



# DEPORTED TO DANGER

## United States Deportation Policies Expose Salvadorans to Death and Abuse

The US is deporting Salvadorans to death and abuse. *Deported to Danger* identifies 138 cases of Salvadorans who, since 2013, were killed after deportation from the United States and more than 70 others who were beaten, sexually assaulted, extorted, or tortured.

People deported to El Salvador are sometimes targeted by the same abusers they originally fled—such as gangs or former intimate partners—or are targeted for reasons, such as their status as a deportee, their neighborhood of origin, or perceived wealth, that US government officials should take into account when deciding their eligibility for asylum or other protection from deportation.

US authorities should strengthen, not further weaken, asylum protections, ensuring that all asylum-seekers receive dignified treatment via procedures that ensure full and fair consideration of their claims. Human Rights Watch also urges the United States to take a step further and offer "complementary protection" to anyone, including Salvadorans, facing a real risk of serious harm upon return. Instead of closing the door on Salvadorans and others fleeing their homelands, the US should ensure their protection.

*(above) People gather at the scene of a shooting in downtown San Salvador on September 29, 2018.*

*(front cover) A newly-arrived Salvadoran deportee from the United States waits for an interview with Salvadoran authorities at a reception center on September 28, 2018.*

*© 2018 Moises Saman/Magnum Photos*

## hrw.org

L

September 13, 2022 10:00AM EDT

**Available In**   English   Español

# Living Without Rights Feels Normal in El Salvador. It Shouldn't Be.

Published in: *el faro*

 **Tamara Taraciuk Broner**
Deputy Director, Americas Divison

🐦 **@TamaraTaraciuk**





People participate in a protest to demand the release of their relatives who were detained during the government's state of emergency, in San Salvador, El Salvador August 9, 2022. © 2022 REUTERS/Jose Cabezas

President Nayib Bukele took office promising to provide security, after decades of violence and criminality by gangs. In response to a spike in gang violence after he secretly negotiated with them, as El Faro reported, the government adopted a broad state of emergency in late March

which has been a disaster for human rights. Thanks to this measure, that remains very popular, Salvadorans continue to live in fear—not only of gangs, but also of the security forces.

Authorities have committed short-term enforced disappearances; arbitrary mass arrests of people with no ties to gangs; and mistreatment, inhumane conditions, and deaths in custody. The measure, meant to be temporary, has been extended five times.

It is easy to see why a majority of Salvadorans support the state of emergency. El Salvador's homicide rate, although decreasing since 2015, has been among the highest in the hemisphere for years. But tough-on-crime approaches have proven again and again to be ineffective and have at times led to more violence.

President Bukele is using his social media propaganda machine to peddle the tired old story of a "war" on gangs. When authorities use a war narrative for domestic operations, it's a red flag for excessive use of force, arbitrary prosecutions, and lawmaking that tramples basic rights.

President Bukele's youthful, personable brand, built on social media and a backward baseball cap, seems to mesmerize many Salvadorans, while he quietly removes critical safeguards.

President Bukele's crackdown on gangs, with raids in mostly low-income communities and mass incarceration of supposed members, is sadly similar to past security policies. More than 50,000 people have been detained since March—thousands without arrest warrants. To justify the raids, the authorities have described all those netted in mass roundups as gang members who deserve the abuse they receive.

"If you are law-abiding, no worries, you have nothing to fear," his powerful propaganda machine promises. Yet Human Rights Watch has documented many arrests apparently based solely or largely on people's age, their appearance, or their residence in a gang-dominated rural or urban neighborhood, factors that have nothing to do with whether they have committed a crime.

Most are languishing in prolonged pretrial detention, with many in overcrowded and unhealthy detention facilities. More than 70 have died in custody. Investigations into their deaths have lacked rigor. The effect on families is devastating. Relatives, mostly women, make the rounds of detention centers, courts and government offices, looking for their missing loved ones.

The families of victims have nowhere to turn, no local government agencies to process complaints and start the wheels turning toward releases—nor prospects of eventual justice and reparations.

Hundreds of people are suffering from abuse. But some groups face heightened risks to their life and health in detention. A particularly egregious example is the people with disabilities. In one case, four months ago, police officers detained a 23-year-old man with autism at his home in a rural community. Authorities accused the man of belonging to a gang and ordered him held in pretrial detention for six months. No one in the family has seen or talked to him since.

People with disabilities are entitled to due process safeguards and what are known as procedural accommodations—in this case to enable him to understand the reason for his detention and his rights—to ensure equality with other detainees. There is no way of knowing if the authorities have fulfilled these obligations in this case or others. Failing to do so puts people with disabilities at risk of abuse.

To seriously address gang violence, the government needs effective security strategies to dismantle criminal groups, as well as sustainable programs to address the structural causes of gang membership. That means creating both jobs for marginalized young people, a way for them to participate fully in society and, when needed, robust rehabilitation programs. The government should train police and prosecutors to enforce the law strictly while rooting out police corruption and ending excessive use of force, so that people come to trust the justice system instead of being afraid of it.

The country has a long history of security force misdeeds, and the rhetoric of "war" is giving security forces a green light to use excessive force and cover up their lawless tactics. The president is using this narrative to justify extending the state of emergency, which has suspended rights to free association and assembly, privacy in communications, and several due process guarantees. The legislature, where he holds a super-majority, has been a cheerleader and enabler of the "war"—and with it, the president's concentration of power.

Closing democratic spaces, packing the courts, and the increasing opacity of government all amount to a removal of checks on the president's power.

If it hasn't happened to anyone you know, it is easy to ignore the arbitrary detentions and associated rights violations of the state of emergency. But unless democracies set limits that reflect universally accepted values, anything goes. And if you have no government institutions to act as a check on executive power, anyone could wake up one day as the target of government repression and possible criminal prosecution. Normalizing living without rights is dangerous for everyone.



December 7, 2022

# "We Can Arrest Anyone We Want"

Widespread Human Rights Violations Under El Salvador's "State of Emergency"

**Available In**   English   Español

Bystanders wait as police inspect a bus during a patrol operation in search of gang members on June 30, 2022, in Santa Ana, El Salvador. © 2022 Camilo Freedman/NurPhoto via AP

▶ **Video**

## Summary

Between March 24 and 27, 2022, 92 people were killed in El Salvador, seemingly by gangs. The killings, which amounted to the deadliest peak in lethal violence in the country's recent history, were a bleak reminder of El Salvador's failure to take sustainable and rights-respecting measures to fulfill its duty to protect the population from chronic gang violence.

In response, and at the request of President Nayib Bukele, the Legislative Assembly promptly adopted a 30-day "state of emergency," suspending a range of constitutional rights, including the rights to freedom of association and assembly, to privacy in communications, and to be informed of the reason for arrest, as well as the requirement that anyone be taken before a judge within 72 hours. The Assembly, where President Bukele's New Ideas (Nuevas Ideas) party has a two-thirds majority, also expanded counterterrorism legislation in ways that violate basic rights, including by allowing judges and prosecutors to try to jail children ages 12 and above.

Between March and November, police officers and soldiers have conducted hundreds indiscriminate raids, particularly in low-income neighborhoods, arresting over 58,000 people, including more than 1,600 children. Officers have often targeted communities where people have, for years, suffered insecurity and lack of economic and educational opportunities.

This joint report by Human Rights Watch and Cristosal documents widespread human rights violations committed during the state of emergency, which the Assembly has extended eight times and remains in place at time of writing. These human rights violations include arbitrary arrests, enforced disappearances, torture and other ill-treatment of detainees, and significant due process violations. In addition, the circumstances of many deaths in custody during the state of emergency suggest state responsibility for those deaths.



Between March and November 2022, Human Rights Watch and Cristosal interviewed more than 1,100 people from all 14 states in El Salvador, including during a Human Rights Watch visit to San Salvador in October. Interviewees included victims of abuse, their relatives and lawyers, witnesses, prosecutors, judges, journalists, human rights defenders, and government officials. Whenever possible, researchers also reviewed relevant case files, medical records, and death certificates, and in some cases consulted international forensic experts.

We found that human rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country, throughout a period of several months, by both the military and the police.

Official policies and the rhetoric of high-level government authorities, including President Bukele, who commands the National Civil Police and the armed forces, have in some cases incentivized abuses.

Between March and late September, some police commanders appear to have established a policy of quotas, requiring officers to arrest a given number of people daily. Instead of taking measures to prevent abusive arrests, the president has publicly backed the security forces and

acted in intimidating ways toward the few remaining independent judges and prosecutors in the country who could investigate violations. He has also promoted dehumanizing rhetoric against detainees and their families, and stigmatized independent journalists and civil society groups that document abuses.

Despite this record, President Bukele remains very popular, largely because some indicators of violence appear to have improved in the short term. Homicides, which have been decreasing in El Salvador since 2015, have fallen further, although government restrictions on accessing homicide and other data and changes in the ways killings are counted make it harder to estimate the true extent of the reduction and the prevalence of other crimes.

The authorities' campaign of mass, indiscriminate arrests has led to the detention of hundreds of people with no apparent connections to gangs' abusive activity. In many cases, detentions appear to be based on the appearance and social background of the detainees, or on questionable evidence, such as anonymous calls and uncorroborated allegations on social media. In these cases, police and soldiers did not show people a search or arrest warrant, and rarely informed them or their families of the reasons for their arrest. A mother who witnessed the detention of her son said that police officers told her, "We can arrest anyone we want."

In some cases of people detained by security forces, officers refused to provide information about the detainees' whereabouts, in what amount to enforced disappearances under international law. Authorities left such victims defenseless and caused their family members inhumane and abusive uncertainty and suffering.

Lack of information about detainees' whereabouts and their conditions in detention drove hundreds of people, mostly women, to sleep outside detention facilities in the hope of receiving some information about their loved ones. In many cases, the seemingly arbitrary arrest of breadwinners severely curtailed the income of families already suffering from poverty and lack of economic opportunities.

As of November 2022, judges had charged over 51,000 people arrested during the state of emergency with gang membership and sent them to pretrial detention, often appearing to apply a recent and abusive amendment to the Criminal Code that expanded mandatory pretrial detention. Two thousand people, less than 4 percent of those detained during the state of emergency, had been released from prison, often on bail.

The prison population increased from 39,000 in March 2022 to an estimated 95,000 detainees as of November. The latest public figures, from December 2020, indicate that prisons in El Salvador have capacity for 27,000, less than one-third of the number actually detained at the end of 2022. Thousands were held incommunicado for weeks or months or were only allowed

to see their lawyer for a few minutes before their hearings. At time of writing, many continue in incommunicado detention.

This mass incarceration has aggravated historically poor conditions in detention, including extreme overcrowding, violence, and poor access to goods and services essential to rights, such as food, drinking water, and health care. Some of the few people who were released from detention reported inhumane conditions and, in some cases, torture and other forms of ill-treatment.

According to Salvadoran authorities, 90 people have died in custody during the state of emergency. Authorities have failed to meaningfully investigate these deaths. In some cases, detainees who died in prison did not receive access to the medication they needed, family members said.

Judges and prosecutors repeatedly and impermissibly infringed on due process protections under international law, violating detainees' human rights and making it difficult, if not impossible, for them to adequately defend themselves during criminal proceedings. Most detainees had public defenders who faced an immense workload and often failed to provide an adequate defense.

Hearings were conducted in groups that were at times massive, with up to 500 detainees participating, often virtually, in each. Such conditions make it difficult or nearly impossible for judges, prosecutors, and detainees' lawyers to fairly assess or present evidence and arguments related to each individual detainee.

These widespread human rights violations were enabled by President Bukele's swift dismantling of democratic institutions since taking office in 2019, which has left virtually no independent government bodies that can serve as a check on the executive branch or ensure redress for victims of abuse.

Since President Bukele's party obtained a two-thirds majority in the Legislative Assembly in May 2021, legislators from his party have severely undermined the separation of powers. They have summarily removed and replaced all five judges of the Constitutional Chamber of the Supreme Court, as well as the Attorney General, and have passed laws that allow the Supreme Court and the Attorney General to arbitrarily transfer or dismiss independent lower-level judges and prosecutors.

In September 2022, President Bukele announced he will seek re-election in 2024, relying on a 2021 ruling by the new Constitutional Chamber that departed from longstanding jurisprudence interpreting the Constitution as forbidding immediate re-election.

The Bukele administration has also undermined transparency and accountability, including by weakening the agency in charge of ensuring access to public information. It has created a hostile environment for journalists and civil society members, who have become targets of digital and physical harassment, surveillance, seemingly spurious criminal investigations, and other attacks in response to their work on corruption and human rights violations. President Bukele and other authorities have assaulted the credibility of independent media and civil society groups, accusing them, without any evidence, of being "gang supporters."

President Bukele has tried to justify human rights violations as supposedly acceptable "errors" committed during what the government calls a "war against gangs." He also said that the government will be "watching judges who favor criminals," in what appears to be an effort to intimidate judges and prosecutors from investigating human rights violations or releasing people who are arbitrarily detained.

There are serious reasons to question the long-term effectiveness of President's Bukele security measures. Iron-fist strategies attempted by prior governments have proven to be ineffective and have at times led to more violence. Gangs have in the past benefited from policies of mass incarceration by using prisons to recruit new members. Failure to invest meaningful resources in prevention and rehabilitation policies, as well as to address illegal economies and the lack of legitimate economic opportunities that allow gangs to thrive, have contributed to the spiraling of atrocious cycles of violence.

At the same time, the dismantling of judicial independence in El Salvador means that victims of gang violence or human rights violations by security forces will have little, if any, access to meaningful remedy.

The administration of President Bukele should ensure Salvadorans' safety by taking sustainable and rights-respecting steps to protect the population and dismantle gangs, which continue to be responsible for heinous abuses. This requires developing and implementing a new security policy that promotes strategic criminal prosecutions focused on prosecuting higher-level gang leaders and investigating violent crimes, as well as addressing the illegal economies that allow these groups to thrive, including extortion, money laundering, and contraband in weapons. To do so, having a truly independent judiciary is key.

Additionally, the government should bolster efforts to reduce gang membership by taking steps to address the structural causes that push people, particularly children and youth, into gangs. These include lack of economic opportunities, social marginalization, and abusive and ineffective security policies.

The government should also expand current programs, such as the "Urban Centers of Wellbeing and Opportunity" (Centros Urbanos de Bienestar y Oportunidades, CUBO), that seek

to prevent violence by increasing economic and educational opportunities for youth in vulnerable communities, and it should strengthen reintegration programs for former gang members.

International action is needed to protect the country's rapidly deteriorating rule of law and prevent further human rights violations. Despite his enormous popularity in El Salvador, President Bukele is not totally immune to international pressure.

The administration of United States President Joe Biden and the European Union should rally multilateral pressure, including from governments in Latin America, to focus attention on the situation in El Salvador, including at the United Nations Human Rights Council.

Foreign governments and international financial institutions, in particular the Central American Bank for Economic Integration (CABEI), should suspend any existing loans or donations to government entities directly involved in abuses, including the Justice and Public Safety Ministry, the National Civil Police, the Ministry of Defense, the prison system, and the Attorney General's Office, and condition any further cooperation with these institutions on significant human rights progress.

The US government has adopted positive steps by redirecting some funding away from Salvadoran institutions such as the National Civil Police and toward civil society groups. The European Union has redirected its funding of the National Civil Police toward the Ministry of Education.

Meanwhile, in recent years, the Central American Bank for Economic Integration approved significant funding to the National Civil Police, the Ministry of Defense, the prison system, and the Attorney General's Office. Several funds had not been disbursed at time of writing and the Bank's authorities said that some of the loans were being "reformulated" to replace the National Civil Police, Ministry of Defense, and the prison system as the entities charged with executing the funds. Its board of directors, composed of representatives from Central American governments, as well as Mexico, Taiwan, Argentina, Colombia, Spain, Dominican Republic, and the Republic of Korea, should condition programs on the Salvadoran government taking concrete steps to prevent and investigate torture, deaths in custody, enforced disappearances, and arbitrary detentions.

Foreign governments should also step up efforts to support independent journalists and civil society groups, which remain virtually the sole check on abuse of power and human rights violations in El Salvador.

The international community should redouble its efforts to support the rule of law in El Salvador and help ensure that Salvadorans are safe from heinous crimes by gangs, human rights

violations, and other abuse of power.

## Related Content



December 7, 2022  News Release

El Salvador: Widespread Abuses Under State of Emergency

Enforced Disappearances, Torture, Deaths in Custody, Hundreds of Arbitrary Arrests

# Recommendations

## To the Bukele administration

- Work with the Attorney General's Office and security forces to develop and implement a new, rights-respecting security policy to dismantle gangs and protect the population from their abuses, including by promoting strategic criminal prosecutions, focused on prosecuting higher-level gang leaders and investigating violent crimes, as well as curbing extortion, money laundering, and contraband weapons.

- Prioritize efforts to address the root causes of gang membership, such as lack of economic and educational opportunities, including by expanding violence-prevention strategies that increase opportunities for children and youth, such as the "Urban Centers of Wellbeing and Opportunity," as well as legal and safe paths for former gang members to reintegrate.

- End the state of emergency absent credible evidence that its restrictions on fundamental rights are proportionate and strictly necessary to respond to situations that genuinely threaten the life of the nation.

- Ensure that police officers' performance is not measured by the number of arrests or other criteria that could incentivize arbitrary arrests and other human rights violations.

- Take progressive steps to eliminate the role of the armed forces in public safety tasks.

- Refrain from posting on social media photos of detained people and prejudging them as criminals based on their clothing, where they live, their tattoos, or their family relationships before they have had a fair trial.

- Take immediate steps to reduce prison overcrowding, including by applying alternatives to imprisonment for people with disabilities or with underlying health conditions and for older people, and by using, when appropriate, reporting requirements and other less-restrictive measures.

- End incommunicado detention and ensure that detainees can communicate and receive visits from their families and lawyers.

- Take meaningful steps to comply with the United Nations Standard Minimum Rules for the Treatment of Prisoners, including by ensuring access to adequate and timely medical care, adequate food, water, and sanitation in prisons.

- Ensure that prison authorities comply with judicial decisions ordering the release of detainees.

- Allow international humanitarian organizations and the Human Rights Ombudsperson's Office to have unimpeded access to prisons, including by allowing them to conduct private and confidential meetings with detainees.

- Refrain from harassing and stigmatizing independent journalists and civil society members, including on social media.

- Ensure that any negotiation with gangs is conducted in a transparent and inclusive manner and prioritizes human rights, including the right of equal access to justice.

- Work with the Legislative Assembly to ratify the International Convention for the Protection of All Persons from Enforced Disappearance, the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women.

- Comply fully with the 2011 Law on Access to Public Information, including by publishing public interest information, such as homicide rates, information on the implementation of the Territorial Control Plan, and the prison population, as well as by responding in a timely and fair manner to public information requests.

- Increase funding to the Public Defender's Office to ensure it is able to provide adequate and timely defense.

# To the Legislative Assembly

- End the state of emergency.

- Increase the age of criminal responsibility to 14 or above, consistent with international human rights standards.

- Derogate the 2022 reforms to the Special Law Against Terrorist Acts, the Juvenile Criminal Law, and the Law Banning Gangs, Bands, Groups, Associations and Organizations, and bring these laws and the Criminal Code and the Code of Criminal Procedure in line with international standards, including by eliminating mandatory pretrial detention and narrowing the definitions of terrorism and "unlawful association."

- Repeal the 2021 reforms to the Judicial Career Law and the Organic Law of the Attorney General's Office.

- Reform the Penitentiary Law to ensure that it complies with international legal standards, including by ensuring that detainees have access to family visits and private meetings with their lawyers.

- Refrain from adopting the 'foreign agents' bill or any other law that could be used to restrict the work of civil society groups and independent media outlets.

- Increase the funding and staffing of the Public Defender's Office to ensure that it can provide adequate legal assistance to all detainees.

## To the Attorney General's Office

- Develop and implement a policy of strategic criminal prosecutions to address gang violence by improving prosecutors' technical capacity to gather credible evidence, prioritizing the prosecution of higher-level gang leaders, investigating violent crimes, as well as curbing extortion, money laundering, and contraband in weapons.

- Promptly initiate thorough, impartial investigations into unlawful connections between gangs, government officials, and security forces.

- Conduct prompt, thorough, and impartial investigations into allegations of human rights violations, including instances of arbitrary detention, enforced disappearances, and torture and other ill-treatment of detainees, as well as into circumstances such as suspicious deaths in custody.

- Conduct swift, impartial, and thorough investigations into the arrest quota in the police and whether it has incentivized arbitrary detention and other human rights abuses.

- Conduct prompt, thorough, and impartial investigations into government officials who may have failed to comply with court decisions ordering the release of detainees.

## To the Constitutional Chamber of the Supreme Court

- Reach and announce timely decisions on habeas corpus petitions from or on behalf of people detained in the context of the state of emergency.

## To the Public Defender's Office

- Increase staffing and ensure that the legal assistance provided to people guarantees due process rights.

## To the Human Rights Ombudsperson's Office

- Conduct swift investigations into allegations of human rights violations and report on the office's findings in a transparent and periodic manner.

- Investigate abuses by gangs in El Salvador and provide concrete recommendations to the government on how to protect the population from these groups in a sustainable and rights-respecting manner.

- Work with the National Penitentiary Office, the Attorney General's Office, and the Public Defender's Office to ensure respect for the rights of people who have been detained.

- Continue monitoring prison conditions, including by seeking private and confidential meetings with detainees, and releasing comprehensive reports of the visits, including on allegations of ill-treatment, overcrowding, lack of access to adequate or timely medical care, and poor sanitary conditions.

## To the Institute of Legal Medicine

- Conduct autopsies for everyone who dies in custody and ensure that family members have access to such documentation.

- Ensure that investigations into deaths in custody adhere to internationally accepted medical practices and international standards as outlined by the Minnesota Protocol on the Investigation of Potentially Unlawful Death.

# To the Central American Bank for Economic Integration and the members of its Board of Directors including Costa Rica, Panama, Honduras, Mexico, Taiwan, Argentina, Colombia, Spain, Dominican Republic and the Republic of Korea

- Suspend current loans benefiting El Salvador's National Civil Police, Ministry of Defense, prison system, and Attorney General's Office and develop specific and measurable human rights benchmarks to condition future financial support to these institutions, such as:
  - Concrete steps toward eliminating torture and other forms of ill-treatment in detention;

  - Reductions in reports of arbitrary detentions and due process violations reported by detainees;

  - Evidence of credible and timely criminal investigations of abuses committed by members of the armed forces and the National Civil Police;

  - Reforms of legal frameworks adopted in the context of the current state of emergency that severely undermine human rights;

  - Improvements in detention conditions, including reduction of overcrowding and increased access to medical care; and

  - Increased access of independent monitors to interview detainees in Salvadoran detention centers.

- Closely monitor the situation in El Salvador, including by conducting regular meetings with civil society groups, to verify human rights conditions and ensure that the bank's funding is not enabling further abuses.

# To Members of the United Nations Human Rights Council

- Bring attention to the situation in El Salvador and raise human rights concerns during Council meetings and debates, including during Interactive Dialogues with relevant Special Procedures mandate-holders or in their statements under item 4.

# To the UN High Commissioner for Human Rights

- Closely monitor the human rights situation in El Salvador and publicly condemn human rights violations in the country.

261

# To Relevant UN Special Procedures including the Working Group on Arbitrary Detention, the Working Group on Enforced or Involuntary Disappearances, the Special Rapporteur on extrajudicial, summary or arbitrary executions, the Special Rapporteur on torture and other cruel, inhumane or degrading treatment or punishment, the Special Rapporteur on the independence of judges and lawyers, and the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism:

- Conduct visits to El Salvador, as permitted under the country's 2010 standing invitation, to document human rights violations within their mandates, and report to the Human Rights Council on the situation in the country.

# To the governments of the United States, Canada, and Latin American countries, the European Union, and EU member states:

- Publicly and privately oppose human rights violations committed by Salvadoran security forces and press, in a multilateral manner, Salvadoran authorities to ensure respect for human rights and the rule of law.

- Refrain from providing loans or other economic support to El Salvador's police, army, prison system, and Attorney General's Office until there are meaningful human rights improvements, and condition any future aid or loans to these entities on human rights benchmarks.

- Increase support for independent media outlets and civil society groups in El Salvador, including through financial assistance.

- Press Salvadoran authorities to progressively restore judicial independence including by conducting, at the appropriate time, independent, fair, and transparent processes for the selection of Supreme Court justices and the attorney general, and abrogating laws that undermine judicial independence.

- Impose or maintain targeted sanctions, including travel bans and asset freezes, on senior government officials who bear responsibility for the human rights violations documented in this report, including:

262

- Gustavo Villatoro, the minister of justice and public safety, who oversees the National Civil Police and the prison system.

- Mauricio Arriaza Chicas, the director of the National Civil Police, which has been responsible for widespread human rights violations during the state of emergency.

- René Francis Merino Monroy, the minister of defense, who oversees the work of the army, which has been involved in multiple human rights violations in the context of the state of emergency.

- Osiris Luna Meza, head of the prison system and vice minister of justice and public safety. Luna Meza has adopted extraordinary measures in detention facilities that violate international standards and has openly supported and publicized ill-treatment of detainees and overcrowding.

## To the Inter-American Commission on Human Rights:

- Closely monitor the human rights situation in El Salvador and publicly condemn human rights violations in the country.

- Closely monitor the ongoing constitutional reform process to verify its consistency with international human rights standards, including on judicial independence, as well as with the Inter-American Court of Human Rights' Advisory Opinion 28/2021 regarding the incompatibility of indefinite presidential re-election with the American Convention on Human Rights.

---

## Methodology

This joint report by Human Rights Watch and Cristosal is based on both organizations' research between March and November 2022 on abuses committed during the state of emergency.

Over 2,900 people completed an online form created by Cristosal and advertised on their social media to report on cases of abuses. Out of these cases, as well as others referred to Cristosal by other non-governmental organizations and others, Cristosal selected a subset of cases on

263

the basis of the gravity of the allegations and their consistency with other reports. In total, Cristosal interviewed over 1,100 victims or their relatives.

Human Rights Watch interviewed over 140 people, including victims of abuse, their relatives and lawyers, witnesses, independent journalists, prosecutors, judges, and government officials. While most of the interviews were conducted by phone, some were carried out during a visit to San Salvador in October 2022.

Most of the interviewees feared for their security and only spoke to researchers on condition that we withhold their names and other identifying information. Details about their cases or the individuals involved, including the location of the interviews, have also been withheld when requested or when Human Rights Watch and Cristosal believed that publishing the information would put someone at risk. In footnotes, we may use the same language to refer to different interviewees to preserve their security.

Interviews with victims, their relatives, or witnesses were conducted in confidential settings or through secure means of communication. We informed all participants of the purpose of the interview, its voluntary nature, and how the information would be used. Each participant orally consented to be interviewed.

Human Rights Watch and Cristosal did not make any payments or offer other incentives to interviewees. Care was taken with victims of trauma to minimize the risk that recounting their experiences could further traumatize them. Where appropriate, the organizations provided contact information for organizations offering legal, social, or counseling services, or linked those organizations with survivors.

Whenever possible, Human Rights Watch and Cristosal also reviewed case files, medical records of victims and death certificates, and obtained expert opinion on some cases of abuse from the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), an international group of prominent forensic experts.

Human Rights Watch and Cristosal sent multiple information requests to government authorities for this report. These include:

- On April 29, July 27, September 26, and November 7, 2022, Cristosal or Human Rights Watch asked the National Civil Police for information regarding people detained under the state of emergency, their gender and age, and the crimes of which they were accused, as well as whether police officers were required to arrest a number of people per day. The National Civil Police replied on May 5, August 15, October 11, and November 25, indicating that all the information requested, with the exception of the total number of people detained, was "classified."

264

- On November 7, 2022, Human Rights Watch asked El Salvador's Armed Forces for information, including the number of people arrested and of confrontations between the soldiers and gangs. The Armed Forces had not responded at time of writing.

- On April 29, July 12 and July 27, 2022, Cristosal or Human Rights Watch asked the Attorney General's Office for information regarding people detained under the state of emergency, their gender and age, and the crimes of which they were accused, as well on whether prosecutors were investigating members of the security forces for human rights violations. Authorities replied on May 17, August 12, and September 9, indicating in all cases that the information requested was either "non-existent" or "classified."

- On April 29, July 12, July 27, and September 20, 2022, Cristosal or Human Rights Watch asked the Public Defender's Office for information on people detained under the state of emergency, their health conditions, age, and gender, the crimes of which they were accused, the status of the investigations against them, and the number of officials in the Public Defender's Office, and inquired about documentation requested of detainees' relatives. The Public Defender's Office replied on July 7, July 25, August 31, and October 19, providing large parts of the information requested and indicating that other information, such as on the status of investigations, was "classified."

- On April 29, 2022, Cristosal asked the Human Rights Ombudsperson's Office for information on people detained under the state of emergency, their age and gender, and the crimes of which they were accused. On May 25, the Human Rights Ombudsperson's Office replied by providing information on the number of complaints received by the agency.

- On July 27 and November 7, 2022, Cristosal or Human Rights Watch asked the General Directorate of Penal Centers for information on the number of detainees under the state of emergency, the total prison population, the number of people in pretrial detention, and the number of people convicted, among others. At time of writing, Cristosal and Human Rights Watch had not received a response.

- On September 26, 2022, Cristosal asked the Institute of Legal Medicine for information on the number of deaths in custody during 2022. The Legal Medicine Institute replied on October 6 that the institution "lacked the authority" to respond and that a request should be made to the Attorney General's Office and the National Civil Police.

# Background: Chronic Gang Violence in El Salvador

## Gang Violence

Widespread violence and soaring crime rates have affected Salvadorans for decades, ranking El Salvador as one of the most violent countries in the world.[1]

During the 1980s, thousands of Salvadorans fled to the United States, escaping the violence of a brutal 1980-1992 civil war between a civilian-military dictatorship and the leftist guerrilla group known as the Farabundo Martí National Liberation Front (Frente Farabundo Martí para la Liberación Nacional, FMLN).[2] The war led to more than 75,000 deaths.[3]

As they struggled to navigate US asylum and immigration laws and to build a new life in the US, some Salvadorans formed gangs that provided a sense of community, as well as protection from rival groups, and that engaged in a range of criminal acts from very minor to brutally violent.[4] Youth under 18 and adults were involved in these gangs.

US criminal and immigration laws became increasingly harsh in the 1990s and thereafter.[5] Authorities in many US states and localities established databases of alleged gang members, which were notoriously vague and thus ripe for arbitrary and discriminatory application.[6] In most cases, after a criminal conviction US laws mandated deportation once people completed their sentences, which often separated family members and further destabilized communities.[7] Some Salvadorans were deported after serving their sentences for criminal offenses involving extreme violence and others were deported for minor offenses linked to poverty and the circumstances of their lives in the US.[8] These laws were applied to all non-citizens in the US, including Salvadorans, and in many respects also violated international human rights law.[9]

El Salvador, struggling to recover from the war, was ill-prepared to deal with the arrival of large numbers of people deported from the US.[10] The country's socio-political instability, coupled with high levels of poverty, helped push many young people into the gangs that had formed in the US.[11] The circumstances surrounding young people's decisions to join gangs often prompted questions about the voluntariness of these decisions.[12] Gang membership spread throughout El Salvador.

Gangs, locally known as "maras," are generally viewed as one of the main sources of violence in El Salvador. The most notorious gangs—Mara Salvatrucha (MS-13) and the Eighteenth

Street Gang (Barrio 18), which has divided into the Eighteenth Street Gang "Southerners" (Sureños) and the Eighteenth Street Gang "Revolutionaries" (Revolucionarios)—effectively exercise territorial control over specific areas in rural and urban settings throughout the country, using brutal violence to extort and intimidate residents.[13]

These gangs obtain funding from a range of illegal activities, including most prominently extortion, and, to a lesser extent, drug trafficking.[14] They are also widely believed to participate in contraband of weapons.[15]

Gangs continue to participate in numerous and serious criminal activities that violate human rights, including recruitment of children, rape and other sexual assault, killings, abductions, and displacement of people from their homes.[16] Gang members sexually assault people on the basis of their gender and real or perceived sexual orientation or gender identity.[17] Many of those who are abducted are later found dead or are never heard from again.[18]

The International Crisis Group estimated in 2017 that the country had suffered "at least 93,000 murders since 1993, over half of which can be attributed to gangs."[19] El Salvador's per capita homicide rate fluctuated but was for years among the highest in Latin America.[20]

Disappearances—meaning, in El Salvador and elsewhere in the region, the taking of people against their will, their fate and whereabouts unknown, committed by any perpetrator—have also been a grave concern.[21] In addition to kidnappings to increase control in gang-dominated areas, gangs appear to use disappearances to continue killing while lowering official homicide counts including during negotiations with governments. Some studies indicate that during the 2012 truce between the government and gangs, disappearances rose by a number almost identical to the decline in homicides.[22]

There is no single registry of missing people nationwide. Figures vary by institution, for example, between the Attorney General's Office and the National Civil Police.[23] The Attorney General's Office registered more than 22,000 reports of missing people between 2014 and 2019.[24] According to the Foundation for the Study and Application of Law (Fundación de Estudios para la Aplicación del Derecho, FESPAD), a Salvadoran nongovernmental organization, the National Civil Police registered over 12,000 reports in the same period, [25] more than the estimated 8,000 to 10,000 disappeared during the 12-year civil war. [26] Between January and May 2022, FESPAD counted 500 cases of disappearances registered by the National Civil Police.[27]

Family members of victims face significant obstacles to filing complaints regarding their loved ones who have gone missing, the Inter-American Commission on Human Rights (IACHR) reported in 2021, and delays in investigations —including failure to respond in the critical first

Gang membership appears to have significantly increased in recent decades. According to unverified figures that Minister of Justice and Public Safety Gustavo Villatoro shared during an interview, there are 76,000 gang members in El Salvador.[30] In 2003, a Central American University (UCA) study estimated the figure to be 20,000.[31] Some studies suggest that, prior to the state of emergency, the gangs were present in 90 percent of the country's municipalities. [32] Root causes of gang membership, particularly among children and young people, include poverty, social marginalization, ineffective police and justice systems, and poor security policies.[33]

While gangs are responsible for egregious crimes and Salvadorans suffer violations of their human rights as a result, individuals who have been deported from the US are themselves targeted by gangs and by Salvadoran police and security forces for abuse and even killings, a problem that Human Rights Watch and other experts have investigated.[34]

## Salvadoran Security Forces

The National Civil Police, created in 1992 by the peace accords that ended the civil war, is responsible for El Salvador's public safety. It reports to the Ministry of Justice and Public Safety, and was created to be a civilian, apolitical, and professional force.[35]

The peace accords stipulate that the armed forces, under the authority of the Ministry of Defense,[36] are responsible for the country's "national defense" and can play a role in public safety "only under very exceptional circumstances."[37] But successive governments have repeatedly involved them in the maintenance of order and public safety.

No "proper legal framework that determines the specific role of the military units involved in public security tasks" has been invoked for such operations, according to a report by the United Nations Special Rapporteur on extrajudicial, summary, or arbitrary executions, who visited El Salvador in early 2018.[38] Increasingly, governments have deployed joint police-military forces in gang-affected communities and during confrontations.[39]

Security forces, including members of the police and the military, have long been responsible for rights violations, including arbitrary detentions, excessive use of force, extrajudicial killings, and the formation of so-called "death squads," which have committed abuses with either the participation or acquiescence of members of security forces.[40]

Widespread impunity exacerbates the problem. For example, between 2014 and 2018, police officers committed 116 extrajudicial killings, the Human Rights Ombudsperson's Office reported.[41] The Office found that only two had resulted in convictions as of late 2018.[42] The legal framework, including a 2013 reform to the Code of Criminal Procedure granting judges overbroad powers to dismiss charges against officers when they commit crimes "during the fulfillment of their duties," has contributed to impunity.[43]

Human rights monitors have also expressed concern that extrajudicial executions of alleged gang members are being portrayed as killings during clashes between security forces and gang members. The UN Special Rapporteur on extrajudicial, summary, or arbitrary executions noted, in her report on El Salvador, that during armed confrontations, "alleged gang members were reportedly killed execution-style and the crime scene tampered with by those responsible or others, including by placing weapons and drugs alongside the dead bodies."[44]

## Past Responses to Gang Violence

Authorities in El Salvador have historically been largely heavy handed and ineffective in protecting the population from gang violence.

Iron-fist public safety policies that rely on mass detention and incarceration of suspected gang members have been common. Politicians appear to have deployed such measures in part to gain popular support and enhance their party's appeal during electoral campaigns.[45]

The governments of Presidents Francisco Flores (1999-2004) and Antonio Saca (2004-2009) launched anti-gang plans in El Salvador. The "Iron Fist Plan" (Plan Mano Dura) of 2003 and the "Super Iron Fist Plan" (Plan Súper Mano Dura), in 2004, mostly deployed joint police and military anti-gang squads to patrol the streets.[46] Mass arrests of alleged gang members reportedly relied on insubstantial evidence, including tattoos and the overall appearance of detainees.[47]

In October 2003, authorities passed an anti-gang law (Ley Anti Maras) with a six-month sunset clause, criminalizing gang membership and lowering the age of legal responsibility to 12.[48] The Supreme Court declared it unconstitutional in early April 2004, before its intended expiration date.[49]

But in the meantime, more than 19,000 people were arrested between July 2003 and August 2004, FESPAD reported in 2005.[50] Around 84 percent of those detained were later acquitted by Salvadoran judges, in most cases, due to lack of evidence.[51] Other studies report similar rates.[52]

269

Punitive security policies encouraged police and military crackdowns that, in turn, contributed to mass imprisonment, aggravating overcrowding in the prison system. Gangs consolidated their power within several prisons across the country.[53] Enabled by prison policies that segregated detainees according to their membership, gangs were able to strengthen their structures from within the prisons.[54]

The administration of President Mauricio Funes (2009-2014), representing a party going by the same name as the former guerilla group —the FMLN— launched a process of negotiation, in 2012, with gang leaders from the MS-13 and both factions of the Eighteenth Street Gang to reduce killings in exchange for better conditions in prisons.[55] The process, commonly referred to as "the truce" (la tregua), reportedly included cash payments to gang leaders and several transfers of gang leaders from maximum security prisons to less restrictive detention facilities.[56]

Homicide rates declined significantly between 2011 and 2013: from 64 and 70 per 100,000 people in 2010 and 2011, respectively, to 41 and 40 per 100,000 in 2012 and 2013.[57] But disappearances surged and numerous studies showed that, throughout the process, gangs continued exerting control over local territory and were involved in other crimes, including extortion and threats.[58]

In May 2014, the truce broke down, generating a surge of gang violence.[59] By 2015, El Salvador had the highest homicide rate in the hemisphere, with 105 murders per 100,000 people.[60]

The truce also had the unintended consequence of increasing gangs' awareness of their political power.[61] Repeatedly, they have unleashed waves of violence, seemingly to push governments into making concessions.[62]

In 2014, Salvador Sánchez Cerén (2014-2019), also from the FMLN, won the presidency. In mid-2016, as the murder rate escalated, the Legislative Assembly adopted "urgent" and "provisional" measures for a maximum period of one year in seven detention centers to "ensure the effectiveness of the prison system" and "protect society from criminal actions" occurring in prisons.[63] The measures included 24-hour confinement of prisoners to their cells, suspension of all family visits, and denial of access by national and international organizations to certain prisons.[64]

The measures, reportedly adopted to regain control over prisons, exacerbated deplorable conditions.[65] Although adopted as temporary, they have been used repeatedly, subjecting thousands of people to prolonged detention in isolation, including prolonged solitary confinement and other inhumane conditions that violate the international prohibition on torture and other ill-treatment.[66]

270

Additionally, in 2018, the Legislative Assembly amended the Penitentiary Law to allow the director of detention facilities to impose extraordinary measures on a permanent basis as, according to lawmakers, they had become a critical tool used to control the penitentiary system.[67] Extraordinary measures included conducting online hearings for detainees at proceedings, granting discretionary powers to prison directors to restrict visits for up to 30 days, and transferring detainees from and to different prisons.[68]

As a part of their anti-gang strategy, authorities have also pursued criminal groups through repressive anti-gang legislation, criminalizing gang membership, and toughening penalties.

In 2006, legislators enacted the Special Law against Acts of Terrorism, defining "terrorist organizations" broadly. The law imposes harsh punishments for acts committed by organizations that "by their form of execution, or means and methods employed, evidence the intention to provoke a state of alarm, fear or terror in the population."[69] Among other concerns, that definition allows acts to be criminalized as terrorist for causing "fear," a relatively low threshold. Moreover, although the law requires intent to cause alarm, fear or terror within the public, it does not require intent to endanger lives, physical or mental integrity, or other harms, thereby allowing the authorities to prosecute as terrorism certain acts that intend to provoke fear but that otherwise may be unintentional or reckless.

In 2010, during the Funes administration, the Legislative Assembly passed a law banning gangs and criminal groups, associations, and organizations.[70] In 2015, the Supreme Court issued a ruling classifying MS-13, the Eighteenth Street Gang and other gangs as "terrorists" due to their attempts to "arrogate the exercise of legal authority" from the state.[71]

The enforcement of counterterrorism laws against alleged gang members has led to charges of terrorism against thousands of people, many of whom have been detained but never convicted. The IACHR reported that between 2016 and September 2019, over 18,000 persons were charged for their alleged "involvement in terrorist organizations," including more than 3,000 who were convicted and over 6,900 who were acquitted after spending "approximately two years in pretrial detention."[72] The UN Special Rapporteur on extrajudicial, summary, or arbitrary executions noted that the "disparity" between the number of people charged and those convicted "could indicate that the charges are used primarily for the purpose of (arbitrary) detention."[73]

In 2016, the Legislative Assembly further expanded the definition of "terrorist organization" to include not only those organizations that seek to "provoke a state of alarm, fear or terror in the population," but also those that have the intention of "assuming the exercise of powers that belong to the sovereignty of the states or systematically affecting the fundamental rights of the population or part of it."[74]

271

# Another Way Forward?

There is wide consensus among independent security experts that past iron fist strategies in El Salvador have proven counterproductive to addressing gang violence and have led to mass human rights violations.[75] In turn, truces between the government and gangs have often caused only a short-term reduction of killings, followed by long-term surges in gang violence.[76]

Historically, authorities have measured their success in lowering homicide rates as the main indicator of a reduction of gang violence.[77] Although lowering homicide rates is an extremely important part of improving security, a successful security plan should also include assessments of impact on gangs' territorial control and membership and data on other offenses, such as sexual violence, disappearances, and extortion.[78]

To dismantle gangs and prevent further cycles of violence, El Salvador's government should develop a comprehensive policy that tackles the root causes of gang violence, including in particular high levels of poverty and social exclusion and limited economic and educational prospects.[79] The government should also examine ways of more effectively addressing the illegal economies that allow gangs to thrive and entrench their control over territorial enclaves, most notably through extortion.[80] It should also prioritize strategic criminal investigations over mass arrests and prosecutions.

Security experts have found that a large part of people who join gangs in El Salvador do so at age 15 or younger, and come from underprivileged backgrounds, with little access to education and economic opportunities.[81]

Just over 30 percent of the population in El Salvador was living in poverty in 2020 and over 8 percent in extreme poverty.[82] According to UNICEF, multidimensional poverty in El Salvador is concentrated in families with children, where its "incidence is twice that of adult-only households."[83] UNICEF estimates that six out of ten schools in the country are ill-prepared to face environmental risks and disasters. According to UNICEF, El Salvador's out-of-school rate for lower secondary school in 2020 was 11.5 percent, compared to an average rate of 6.8 percent across Latin America.[84]

El Salvador's government should prioritize addressing the socioeconomic conditions that drive children and young people to join gangs in the first place, including low school attendance and early dropout, poverty, and lack of access to economic opportunities, as well as violence at home or at school.[85] Independent security experts across the globe have consistently found that programs designed to prevent the involvement of young people in crime have had a positive impact in curbing violence.[86]

272

Experts on crime and security have noted that criminal investigations are likely to be more effective in addressing organized crime when they strategically prioritize violent crimes by higher-level or chronic perpetrators, instead of heavily criminalizing broad types of behavior. [87] Such strategies can help ensure meaningful justice for victims, reduce prison overcrowding, and prevent a sense of widespread impunity that can foster additional violence in the longer-term. [88]

Conversely, policies that target low rank-and-file members have been found to be "the least efficacious strategy" as these "rarely alter[] the behavior of organized crime groups or incapacitate[] them." [89] Such overbroad criminalization strategies, on the contrary, undermine the legitimacy of authorities' efforts and lead to prison overcrowding, which creates conditions for gangs to strengthen their criminal capacity. [90]

This analysis suggests that rather than engaging in mass arrests and prosecutions, El Salvador should prioritize strategic criminal investigations—something it has not done.

Efforts to reduce corruption and links between the police and gangs, and to ensure accountability for police abuses, including excessive use of force and extrajudicial executions, are also critical to build trust between law enforcement and local communities, which is necessary for more effective policing. [91]

To implement any such policies, El Salvador needs to bolster the capacity of judicial officers to conduct serious criminal investigations, as well as to take serious steps to protect prosecutors and judges and ensure that they are free from undue interference with their independence. [92] Additionally, authorities would need to review the country's laws and policies and reform them to encourage a focus on criminal prosecutions of violent abuses, particularly those committed by senior or chronic perpetrators, as opposed to a broad focus on gang membership.

A large number of gang members in El Salvador are believed to be interested in leaving their gangs. [93] However, meaningful state action is needed to make such disengagement viable and safe, including by finding legal paths to actively reintegrate and protect people who want to leave organized crime and do not have pending charges for serious abuses. [94] This includes establishing programs to address social stigma, including through tattoo removal, access to work and educational opportunities, protection, and psychosocial assistance. [95]

# The Bukele Administration's Assault on the Rule of Law

In the run-up to the 2019 elections, President Bukele campaigned on an anti-establishment platform and won more than 53 percent of the vote.[96] Since his inauguration in June 2019, he has used his overwhelming popularity to undermine democratic checks and balances, limit transparency and accountability, and attack independent journalists and civil society groups.

## Dismantling Democratic Institutions

The Bukele administration has undermined the independence of virtually all government bodies that could serve as check to the executive branch.

Shortly after taking office, President Bukele aggressively confronted the legislature and the Supreme Court over funding for his security plan and his harsh enforcement of a Covid-19 quarantine. In particular:

- In February 2020, President Bukele entered the Legislative Assembly, where his party held a minority, with armed soldiers, in an apparent effort to intimidate legislators into approving a $109 million loan from the Central American Bank for Economic Integration (CABEI) for security forces.[97] After occupying the chair of the Assembly's president, he announced he would give it "a week to approve the loan." He threatened to remove lawmakers from the Assembly, if needed.

- The government repeatedly defied court rulings related to its response to the Covid-19 pandemic, including on its arbitrary detention of hundreds of people in containment centers where there was an increased risk of spreading Covid-19.[98] After the Constitutional Chamber of the Supreme Court issued rulings in March and April 2020 that limited the government's ability to detain people under the lockdown, President Bukele called on law enforcement personnel to ignore the rulings.[99] He used social media to lash out against judges and accused them of being "genocidal."[100]

- In the months prior to the February 2021 legislative elections, President Bukele intensified attacks against the Supreme Electoral Tribunal (Tribunal Supremo Electoral, TSE), the institution overseeing the elections. He repeatedly accused the TSE, without evidence, of planning "electoral fraud" to defeat his party.[101]

274

In the legislative elections of February 2021, President Bukele's party, New Ideas (Nuevas Ideas), and its allies won a supermajority of over two-thirds of the seats (56 out of 84).[102] In the year and a half since the new Legislative Assembly took office, lawmakers have taken drastic steps to undermine judicial independence and limit accountability. For example:

- On May 1, 2021, the same day that new legislators took office, they summarily removed and replaced all five judges of the Constitutional Chamber of the Supreme Court for supposedly inhibiting the government's pandemic response.[103] The same night, legislators dismissed the attorney general, who had been investigating corruption allegations against high-level government officials and reports of a pact between President Bukele's administration and gangs.[104] The removals violated international human rights standards that removals of judges (and by analogy, removals of prosecutors) should be determined in accordance with established standards of conduct, should be subject to independent review, and should take place "only for reasons of incapacity or behaviour that renders them unfit to discharge their duties."[105]

- On June 30, 2021, the Assembly appointed five new judges to the Supreme Court, in violation of the process established in the Constitution and the Assembly's own internal rules. Salvadoran law allows each newly constituted legislative body to appoint five Supreme Court judges, but the Assembly has appointed 10 of a total 15.[106]

- In September 2021, lawmakers passed laws allowing the Supreme Court and the attorney general to dismiss judges and prosecutors over 60 years of age and expanding their authority to transfer judges and prosecutors to new posts.[107] The laws run counter to international human rights standards on judicial independence[108] and have been used to dismiss and transfer independent judges or prosecutors.[109]

On September 3, 2021, the Constitutional Chamber of the Supreme Court, whose members have been named by the pro-Bukele legislature, ruled that the Constitution allows for immediate presidential re-election.[110] El Salvador's Constitution forbids "any individual who served for at least six months, consecutive or not, in the previous presidential term" from running for president.[111] The court had previously interpreted this provision to forbid immediate re-election.[112] President Bukele himself said during a TV interview in 2013 that there was "no re-election in El Salvador" and that the constitution "does not allow the same person to be president twice in a row."[113]

In one example of retaliation against a judge who ruled against government interests, on April 1, 2022, the Supreme Court transferred Judge Godofredo Salazar, only seven hours after President Bukele tweeted that he had asked the Attorney General's Office to "investigate [the judge's] possible links with organized crime."[114] Salazar had acquitted 42 alleged gang members who, he said, had been charged with insufficient evidence.[115]

In May 2021, after five Supreme Court judges and the attorney general were ousted, a pro-Bukele legislator threatened to oust then Human Rights Ombudsperson Apolonio Tobar, who had been a vocal critic of the government's human rights policies.[116] Tobar then changed his position toward the government and began using euphemistic language to avoid criticizing human rights violations committed during the state of emergency.[117] In August 2022, Tobar announced he was seeking re-election, but in October the pro-government legislators in the Legislative Assembly named Raquel Caballero de Guevara, who had been the ombudsperson between 2016 and 2019.[118]

In September 2021, Vice President Félix Ulloa made public a draft proposal to revise the Constitution, proposing more than 200 changes,[119] including to extend the presidential term from five to six years and to overhaul institutions such as the Supreme Court's Constitutional Chamber, the Supreme Electoral Tribunal, and the Court of Accounts (which audits public funds). Under Salvadoran law, the reform needs to be approved by the current Assembly and ratified by the next one, which will be elected in 2024. It has not been discussed at time of writing.

## Security Policies

President Bukele campaigned on the promise of reforming the country's security policies and ensuring safety for Salvadorans. He said that he would promote education and economic opportunities to "take away from the gangs the breeding ground that is Salvadoran youth" and criticized the country's prisons, which he described as "crime universities."[120]

Yet, since he took office, his policies have oscillated between closed-door negotiations with gangs and iron fist measures that took his predecessors' policies of mass incarceration to unprecedented levels.

The digital media outlet *El Faro* has published extensive evidence showing that, at the beginning of his term, the Bukele government negotiated a "truce" with gangs, offering privileges to imprisoned gang members and employment opportunities to those outside in exchange for the gangs' commitment to lower homicide rates and provide political support during 2021 legislative elections.[121] President Bukele has denied these allegations.[122]

In June 2019, President Bukele announced the Territorial Control Plan, a multi-step initiative to address gang violence and improve security in the country.[123]

The administration has described the plan as involving modernizing El Salvador's security forces; increasing their presence across the country, with a particular focus on gang strongholds; declaring a state of emergency in the penitentiary system; and certain initiatives to

support underprivileged communities.[124] Under the plan, the military has been deployed to support police in public safety operations.[125] However, details about the plan and its implementation have not been made public. In May 2021, the Minister of Justice and Public Safety broadly classified all information and documents related to the plan for seven years.[126]

The government has expanded the budget, recruitment, and tasks of the military. The Ministry of Defense has increased its budget from US$145 million in 2019 to over $284 million in 2022, and over 11,000 soldiers are estimated to be patrolling neighborhoods along with the police. [127] The army has also expanded its tasks beyond those of public safety, including by providing food during the pandemic and supporting the work of the Institute of Legal Medicine, the national forensic body tasked with conducting autopsies and analyzing crime scenes.[128]

After waves of gang violence in 2020, the government ordered a state of emergency at maximum security prisons. President Bukele said he had received reports that homicides outside had been orchestrated by gang members inside the prisons. During a subsequent lockdown that the president ordered, authorities held prisoners in inhumane conditions that may amount to torture or other cruel, inhuman, or degrading treatment or punishment under international law.

Measures included lockdowns of prisoners in cells for 24-hour periods; what President Bukele described as solitary confinement of alleged gang leaders for undefined periods; and placement of members of various gangs in shared cells, a practice that foreseeably increased the risk of violence in these cells.[129] Authorities also forbade visits to prisons, blocked networks in and around prisons, and transferred prisoners to more secure facilities.[130]

The IACHR noted in its 2021 report that "100 percent of the population deprived of liberty remains isolated from the outside world" and "procedures in maximum-security prisons are against what is suggested by international standards" for the treatment of detainees.[131]

Less prominently, the government has also taken some steps to prevent violence by improving opportunities for children and young adults. For example, President Bukele established "Urban Centers of Wellbeing and Opportunity" (Programa Centros Urbanos de Bienestar y Oportunidades, CUBO), a series of libraries and cultural centers in poor neighborhoods that seek to draw children away from gangs.[132] As of April 2022, the government had built eight such centers and was building six others.[133]

According to the government, homicides declined from about 36 per 100,000 people in 2019 to 17 per 100,000 in 2021.[134] There is no aggregated data on the number of homicides for 2022, and authorities have told journalists that such information is "classified."[135] Human Rights Watch and Cristosal obtained a National Civil Police document indicating that 463 people were killed between January and the end of October 2022—a reported 50 percent decrease

compared to the same months in 2021.[136] According to press reports, since July 2019, authorities have not included deaths resulting from encounters with security forces in the homicide data.[137] Authorities and some experts also report a decrease in extortion by gangs. [138]

The number of disappearances surged from 595 in 2020 to 832 in 2021, according to the Attorney General's Office.[139] The Attorney General's Office reported opening 212 investigations into disappearances between April and September 2022.[140]

# Attacks on Independent Media and Civil Society

Freedom of expression and of association have seriously deteriorated during the Bukele administration. Journalists and human rights defenders have been targets of digital and physical surveillance and harassment on social media, in response to coverage of corruption, concentration of power, and organized crime.[141]

President Bukele and his allies have assaulted the credibility of independent media, particularly digital outlets, including *El Faro*, *Revista Factum*, and *Gato Encerrado*, accusing them of spreading "fake news," and being "gang supporters."[142] Government-run media outlets have repeatedly published articles that appear designed to damage the reputation of independent outlets.

In July 2020, authorities launched a tax audit of *El Faro* that appears selective and abusive. [143] After *El Faro* reported on a truce between the government and gangs, President Bukele announced criminal investigations, accusing the outlet of "money laundering" and "tax evasion."[144]

Government officials have also tried to intimidate journalists with possible criminal charges. In October 2021, Vice President Félix Ulloa said, "some journalists should be prosecuted on slander and defamation charges" for criticizing the government.[145] In June 2021, Justice and Public Safety Minister Gustavo Villatoro accused several journalists of "advocating the commission of crimes," without providing any evidence for his claims.[146]

In January 2022, Citizen Lab and Access Now found that Pegasus spyware, which enables surveillance of mobile phone users and their contacts, had been used to hack the phones of at least 35 Salvadoran journalists and civil society members.[147]

In May 2021, legislators created a commission to investigate the allocation of public funds granted to nongovernmental organizations, in an apparent effort to intimidate civil society groups.[148] The commission, consisting of pro-government legislators and allies, has not

announced any results, but some of its members have accused nongovernmental organizations of being corrupt without presenting evidence for those claims.

In November 2021, prosecutors raided the offices of seven non-governmental organizations to probe alleged irregularities in the allocation and management of public funds.[150] Some of the organizations have members of the opposition among their founders or have been otherwise linked to the opposition.[151]

Pro-Bukele legislators in the Legislative Assembly have also introduced or passed legislation that severely restricts freedom of expression and association.

In November 2021, the government proposed a Foreign Agents Law, requiring individuals and organizations that "directly or indirectly" receive funding from abroad, as well as those who work under the "control" of people abroad or represent their "interests," to register as "foreign agents." Failure to comply would be punishable, under the law, by fines and cancellation of legal status.[152]

After several foreign governments criticized the bills and the German embassy said that it was considering ending its humanitarian programs in the country, the Bukele administration announced that it would delay voting on the law.[153] In August 2022, the speaker of the government's party, Christian Guevara, said authorities would use the law, once passed, to punish *El Faro*.[154]

In December 2021, the Legislative Assembly amended the Special Law Against Computer Crimes, defining new offenses in broad and vague terms. One amendment, for example, would criminalize the use of technology to obtain or distribute "confidential" information, a provision that could easily be misused against journalists, advocacy groups, and whistleblowers.[155]

In February 2022, the Assembly approved an amendment to the country's Criminal Procedure Code that could lead to infringements on privacy and chill free expression and association. Under the amendment, agents operating under police control could conduct "necessary undercover digital operations" to investigate crimes under El Salvador's Special Law Against Computer Crimes and other "special laws." The digital agents would operate with approval by the Attorney General's Office and without a court order, and the amendment is vague about the scope of the agents' operations, establishing no clear limits on the circumstances in which agents might be deployed.[156]

# Limiting Transparency and Accountability

The Bukele administration has dramatically undermined government transparency and accountability mechanisms, increasing the risk of corruption and abuse of power.

Soon after President Bukele took office, he disbanded the Agency for Transparency and Anti-Corruption (Secretaría de Transparencia y Anticorrupción), one of the main agencies charged with oversight of public spending.[157]

In March 2020, the Legislative Assembly established a committee of six government officials and five civil society representatives to monitor and account for the use of pandemic-related funds. All five civil society members of the committee resigned in May 2020, saying the executive branch had failed to provide the reports that they were charged with auditing.[158]

In June 2021, Rodolfo Delgado, the new pro-Bukele attorney general, ended a cooperation agreement with the International Commission Against Impunity in El Salvador (Comisión Internacional Contra la Corrupción en El Salvador, CICIES), a body backed by the Organization of American States to fight corruption in the country.[159] The commission had supported investigations into alleged corruption by high-level officials in the Bukele administration, including in connection with irregular purchases of equipment used to respond to the Covid-19 pandemic. Delgado also reportedly dismantled a prosecutors' unit that was investigating alleged negotiations between the administration and gangs.[160]

The government has not disclosed public spending during the Covid-19 health crisis. Between March and June 2020, following a state of emergency invoked in response to Covid-19, the Access to Public Information Agency in El Salvador (Instituto de Acceso a la Información Pública, IAIP) —which is charged with implementing the Access to Public Information Law— suspended all hearings and processes.[161] The suspension reduced citizen oversight of the pandemic response, including of emergency spending.[162]

President Bukele's administration has weakened the role of the IAIP, including by reforming regulations under the Access to Public Information Law in ways that undermine the agency's autonomy.[163] In August 2020, President Bukele issued an executive decree changing the IAIP's procedures.[164] The decree restricted oversight and transparency, for example, by removing powers from the IAIP's four commissioners and giving them to its president. Between August and September 2019, President Bukele appointed three new IAIP commissioners and dismissed a commissioner who had been widely perceived as independent from the government.[165]

The press has reported several allegations of government corruption during the pandemic. *El Faro* reported that, before Attorney General Melara was ousted in May 2021, prosecutors were investigating alleged irregular purchases by the Bukele administration.[166] In January 2022, Attorney General Delgado's office raided the offices of prosecutors who were investigating

allegations of corruption and officials' negotiations with gangs.[167] At least four prosecutors fled the country, fearing persecution.[168]

Case 8:25-cv-02780-BX    Document 28-1    Filed 09/22/25    Page 314 of 431

## State of Emergency

On March 27, 2022, the Legislative Assembly passed a law declaring a broad "state of emergency" that suspended for 30 days the constitutional rights to freedom of association and assembly; privacy in communication; the rights to be informed of the reason for arrest, to remain silent, and to legal representation; and the requirement to bring anyone detained before a judge within 72 hours.[169]

President Bukele requested the suspension of rights, portraying it as necessary to address a spike in gang violence. Ninety-two people were killed, seemingly by gangs, between March 24 and 27 in El Salvador, with March 26 having the highest daily homicide rate in several years, according to official records.[170] Nobody had been convicted of the killings as of July.[171]

President Bukele also announced "maximum emergency" measures in the country's prisons, ordering prison authorities to keep cells closed 24 hours a day. "Nobody is allowed out, not even to the patio," he tweeted, while also sending "a message to the gangs" suggesting that the detainees were being punished for the conduct of gang members outside of prison.[172]

According to *El Faro*, the wave of violence in March was the result of collapsed secret government negotiations with the MS-13 gang.[173]

The state of emergency is based on article 29 of the Salvadoran Constitution, which allows the Legislative Assembly to suspend certain constitutional rights in extreme circumstances, such as a foreign invasion or "serious disturbances of public order."[174] The 30-day state of emergency, which can be extended once for the same period under the Constitution, has been extended eight times.[175] But since August, the Assembly has narrowed the state of emergency, eliminating the suspensions of the rights to freedom of association and assembly.[176]

International law allows countries to temporarily derogate or suspend some of their human rights obligations only in very limited circumstances, which did not appear to apply to conditions in El Salvador in March 2022 or at the times of the subsequent extensions of the state of emergency.

Under article 4 of the International Covenant on Civil and Political Rights, which El Salvador has ratified, governments may derogate from some of their obligations under the covenant "in time of public emergency which threatens the life of the nation."[177] Derogations should be only those "strictly required by the exigencies of the situation."[178] The United Nations Human

Rights Committee, which is charged with providing authoritative interpretations of the covenant, has made clear that states of emergency may not be used as a justification to violate peremptory norms of international law, for example through arbitrary deprivations of liberty or by deviating from fundamental fair trial principles.[179]

Similarly, article 27 of the American Convention on Human Rights allows governments to derogate from some obligations in times of "war, public danger, or other emergency that threatens the independence or security" of the nation, provided that such measures are strictly required by the emergency and consistent with other obligations under international law.[180]

# Sweeping Criminal Amendments

On March 30 and April 5, 2022, the Legislative Assembly approved a series of gang-related criminal law amendments proposed by President Bukele that allow judges to imprison children as young as 12, restrict freedom of expression, and significantly expand the use of pretrial detention.[181]

A law passed on April 5 allows criminal charges against anyone who "participates in the creation, assists or creates" any type of publication, image, graffiti or other form of visual expression that "explicitly or implicitly" transmits "messages" about or that "allude to" the various types of gangs.[182] The penalty is up to 15 years in prison. The law similarly allows criminal charges against people who use media outlets to "reproduce or transmit messages or statements created or allegedly created" by gangs that "could generate a state of anxiety and panic in the population in general."[183]

These provisions could potentially be used to target critics and journalists. They are inconsistent with international human rights protections for freedom of expression, which may only be restricted when necessary and proportionate to achieve a legitimate goal, such as to protect national security or the rights of others.[184]

On March 30, the Legislative Assembly lowered from 16 years to 12 the age of criminal responsibility for children accused, amongst others, of the existing crimes of "terrorist organizations" and "unlawful association."[185] The amendments allow prison sentences of up to 10 years for children ages 12 to 16 and up to 20 years for children over 16. Salvadoran law establishes that children have a right not to be held in adult detention sites.[186]

The United Nations Convention on the Rights of the Child, to which El Salvador is a party, defines a child as anyone under age 18.[187] The UN Committee on the Rights of the Child, which interprets the convention, has called on countries not to set the age of criminal

responsibility below 14, and has encouraged countries to progressively increase the age of criminal responsibility.[188]

Other amendments dramatically increase sentences for alleged gang members in ways that could lead to disproportionate punishment.

El Salvador has broadly defined "terrorist organizations" to include those that use "violent or inhumane methods with the express purpose of instilling terror, insecurity, or alarm within the population," or to "assume the exercise of powers that belong to the sovereignty of the states or systematically affect the fundamental rights of the population or part of it."[189] The March 2022 amendments expanded the definition of "terrorist organizations" to explicitly include gangs, including Mara Salvatrucha (MS-13) and the Eighteenth Street Gang (Barrio 18), following the 2015 Supreme Court ruling mentioned above.[190]

Sentences for people convicted of leading a "terrorist" gang were increased from 10 to 15 years to between 30 and 40 years in prison.[191] The sentence for people who "take part" in these groups with the "intention of" carrying out "acts of terrorism" was increased to 15 to 20 years, up from 8 to 12.[192]

Under legislation in effect since 2016, gang members in El Salvador can also be prosecuted for membership in "unlawful association" (agrupaciones ilíctas), under provisions that target anyone who "takes part" in gangs, is the "creator, organizer, chief, leader [or] financer" of a gang, or "promotes, helps, facilitates or favors the creation or presence" of these groups or, knowing that these groups are unlawful, "receives direct or indirect benefit" by having relations "of any nature" with gangs "even without being a part of them."[193] Such a broad definition could be used to charge family members, lawyers, journalists, and civil society members.

The March amendments drastically increased the penalties for these crimes, regardless of whether an alleged member committed any other crime. Prison terms for "taking part" in gangs were increased to between 20 and 30 years, up from 3 to 5.[194] Terms for "supporting" gangs were also increased to between 20 and 30 years, up from 3 to 6.[195]

The legislative changes also allow criminal courts to conceal the names and identities of judges to protect their safety and to "use necessary measures to make impossible their visual identification."[196] While protecting a judge's life and physical integrity is fundamental to ensuring the proper administration of justice, the Inter-American Court of Human Rights has ruled that "faceless judges" make it impossible for defendants to assess whether judicial authorities have a conflict of interest and are independent and impartial, violating due process protections under the American Convention on Human Rights.[197]

283

The Legislative Assembly also expanded mandatory pretrial detention to apply to all crimes committed by members of gangs.[198] This provision is inconsistent with international human rights standards requiring an individualized determination that pretrial detention is reasonable and necessary for purposes such as preventing flight, interference with evidence, or the recurrence of crime.[199]

The legislature also modified El Salvador's Code of Criminal Procedure to allow for indefinite pretrial detention.[200] Previously, the Code said pretrial detention should never exceed 12 months for "less serious crimes" or 24 months for "serious crimes." For defendants accused of being part of "terrorist or unlawful association," the new Code of Criminal Procedure eliminates any time limits, violating the right to trial within a reasonable time or to release under the International Covenant on Civil and Political Rights.[201] In addition, as the UN Human Rights Committee has noted, "[e]xtremely prolonged pretrial detention may also jeopardize the presumption of innocence."[202]

Additionally, in September, the Legislative Assembly passed a law allowing prosecutors and judges to try people in absentia.[203] On its face, the International Covenant on Civil and Political Rights (ICCPR) does not appear to permit in absentia trials.[204] Even so, the UN Human Rights Committee, which provides authoritative interpretations of the ICCPR, has clarified that in absentia proceedings may be permissible in limited circumstances, such as where the accused has been informed of the charges, the date, and the place of the hearing reasonably in advance but has declined to be present.[205] The Human Rights Committee has called on courts to verify these circumstances before starting a trial in the absence of the accused.[206] The apparent absence of this safeguard in El Salvador's in absentia trials raises concerns about respect for due process rights, particularly in a context of widespread violations like El Salvador's.

# International Funding

The Central American Bank for Economic Integration (Banco Centroamericano de Integración Económica, CABEI) has provided significant funding to Salvadoran government institutions.

In total, the CABEI has 13 "active loans" to fund El Salvador's government, with funds aproved for a total of over US$1.5 billion.[207] For instance, in 2021, the CABEI Board of Directors – made up of the governments of Guatemala, El Salvador, Panama, Nicaragua, Costa Rica, Honduras, Mexico, Taiwan, Argentina, Colombia, Spain, Dominican Republic, and the Republic of Korea– approved loans to El Salvador for over $884 million, the largest to any country in Central America.[208]

Part of the Bank's loans have been directed to state agencies that, as shown in this report, are implicated in human rights violations committed during the state of emergency. Although the disbursement of most of these funds has been postponed,[209] El Salvador's budget for fiscal year 2022 (January-December) indicates that the government was expecting to receive part of these funds this year and the 2023 proposed budget also includes these funds.[210] For example:

· In 2019, the Bank approved loans to support the Territorial Control Plan with $200 million, including funds to the National Civil Police, the Ministry of Defense, and the Ministry of Public Works and Transportation.[211] In November 2022, officials from the Bank told Human Rights Watch that these funds had not been disbursed and that the loans were being "reformulated" to replace the National Civil Police and the Ministry of Defense as the entities charged with executing the funds.[212] However, El Salvador's proposed 2023 budget indicates that the Ministry of Justice and Public Safety is expected to receive $20 million from these loans to develop the police's infrastructure in 2023, roughly 67 percent of the funds allocated for this purpose in the budget.[213] Similarly, the Defense Ministry's proposed 2023 budget includes funds from one of these loans for $17 million, roughly 7 percent of the ministry's expected total budget.[214]

- In 2014 and 2019, the Bank approved loans to build and equip new headquarters for the Attorney General's Office, for a total of over $70 million, which have yet to be disbursed.[215] The Attorney General's Office budget indicates it expected to receive over $35 million from this loan in 2022, which represents more than 30 percent of the office's total funding for the year.[216] The 2023 proposed budget notes that the office is expected to receive almost $44 million from these loans in 2023, roughly 35 percent of the office's expected budget for the year.[217] In November 2022, an official from the Bank said that they expected to disburse funds from this loan in 2023.[218]

- In 2012, the Bank approved a $71 million loan to "strengthen the prison system" in El Salvador.[219] The Bank has already disbursed roughly $57 millon.[220] In September 2022, the bank's directory approved a resolution replacing the Ministry of Justice and Public Safety with the Ministry of Public Works and Transportation as the entity charged with executing the funds.[221] The change was requested by Salvadoran authorities as a result of the December 2021 decision by the US Department of Treasury to sanction Osiris Luna Meza, the head of the prison system and vice minister of justice and public safety, due to his alleged involvement in closed-door negotiations with gangs.[222]

In May 2021, the US Agency for International Development (USAID) announced it was redirecting its funding away from Salvadoran government institutions, the police, and the Access to Public Information Agency and toward civil society and human rights groups.[223] USAID said its decision was "in response" to the removal of the Attorney General and the

judges of the Supreme Court's Constitutional Chamber, as well as "larger concerns about transparency and accountability." USAID has not publicly announced how much funding was redirected.[224]

The US government has taken additional steps to support civil society groups in El Salvador. This includes the Voices Initiative, launched in June 2022 by USAID, which will put approximately $42 million toward activities that "protect, defend, and promote civic space in Central America."[225]

In 2022, the European Union redirected $8 million in support for El Salvador's National Civil Police toward the Ministry of Education.[226]

---

# Widespread Abuses During the State of Emergency

Cristosal and Human Rights Watch documented widespread human rights violations committed during the state of emergency in El Salvador.

The National Civil Police and the army conducted dozens of raids, particularly in low-income neighborhoods, arresting thousands of people across El Salvador's 14 states over the eight-month period covered by this report. Over 58,000 people have been detained in the context of the state of emergency, according to official figures, including over 1,600 children.[227] Additionally, the police and the army report killing at least 84 alleged gang members during "confrontations."[228]

Human rights violations documented by Human Rights Watch and Cristosal include arbitrary arrests, short-term enforced disappearances, torture and other ill-treatment in detention, and due process violations. Ninety people detained during the state of emergency have reportedly died in custody.[229] Authorities failed to meaningfully investigate these deaths and, in some cases, detainees who died in prison did not receive the medication they needed.

Many arbitrary arrests appear to have been driven by a policy of "quotas" imposed by commanders in the National Civil Police, according to police officers.[230] Police officers told Human Rights Watch and Cristosal that between March and September, emergency officers were pressed to arrest a specific number of people per day. Witnesses said that during raids in

low-income neighborhoods security forces arrested people indiscriminately with the apparent purpose of filling their quotas to their full capacity.

High-level authorities, including President Bukele and Vice President Ulloa, have consistently tried to justify human rights violations as supposedly acceptable "errors" committed during what they called a "war against gangs."[232] At the same time, President Bukele has signaled that security forces will be shielded from accountability if they engage in abuses and said that the government will be "watching judges who favor criminals,"[233] in what appears to be an effort to intimidate judges and prosecutors and keep them from investigating human rights violations or releasing people who they consider arbitrarily detained.

Such rhetoric, coupled with the government's control of courts and the Attorney General's Office, appears to have created a widespread sense that security officers can commit human rights violations with impunity. A mother who witnessed the detention of her son said that police officers told her, "We can arrest anyone we want."[234] Another relative of a victim said that officers told her that "under the state of emergency, we can go as far as we want."[235]

## Arbitrary Detention and Short-term Enforced Disappearances

Human Rights Watch and Cristosal gathered evidence of over 1,100 cases of arbitrary detention committed during the state of emergency and documented in detail 130 of them, including 12 that amount to short-term enforced disappearances.

In virtually all cases that Human Rights Watch and Cristosal documented, people were taken from their homes or work or picked up on the street without being shown a search or arrest warrant by security forces.

Salvadoran authorities argue that an arrest warrant is not required to arrest alleged gang members because, in their view, these people are in "permanent flagrancy" as gang membership is considered a "continuous offense."[236] Such a broad and vague standard makes it possible to arbitrarily detain anyone security forces claim belongs to a gang, bypassing the usual legal requirement to obtain an arrest warrant.

Many arrests appear to be based on the appearance or social background of the detainees, or on questionable evidence, such as anonymous calls and uncorroborated allegations on social media. "Being poor is now a crime in El Salvador," a relative of two people detained in a low-income neighborhood said.[237] Officers repeatedly searched for tattoos on people's bodies while conducting arrests, presumably for evidence of gang affiliation, according to relatives of detained people and victims.

287

On August 8, the digital media outlet *El Faro* revealed records by the Attorney General's Office suggesting that scores of arrests had been conducted based on questionable or no evidence. Out of 690 cases examined by *El Faro*, 160 detentions were purportedly based on detainees' "suspicious appearance," 73 others on "nervous appearance," and 34 on "anonymous reports."[238]

In the cases documented by Human Rights Watch and Cristosal, detainees were rarely informed of the reasons for their arrest. In some cases officers said they were "following the orders of their superiors" or "orders from the president." In some others, security forces portrayed the arrests as "informal questioning." However, many people taken for such "questioning" were later reported as being under arrest.

Witnesses said that in some cases police or soldiers hit people and family members during the arrest or threatened to arrest them as well. Cristosal reported 77 cases in which family members of those detained were beaten or threatened with being arrested.

On July 18, 2022, soldiers detained **Noemí Abrego** (pseudonym), 16, in the state of Sonsonate.[239] Abrego works with her mother selling food at a market and was waiting for the bus outside of her home when four soldiers stopped her. They did not show her a warrant or explain the reason for the arrest.

Abrego's sister, who witnessed the detention through a window, saw a soldier pushed Abrego to the ground and told her mother. Her mother went outside and told soldiers that Abrego was pregnant. One soldier replied that she should stop talking or he "was going to arrest her" as well.

Abrego was taken to a police station in Sonsonate. She was held there for five days and then transferred to a juvenile detention facility in the city of San Salvador.

Fifteen days after her arrest, Abrego was taken to a judge for the first time. She was accused of "unlawful association" and sent to pretrial detention, her mother, who attended the hearing, said.

On October 6, her mother went to the juvenile detention facility to leave her clothes and sanitary supplies. She was told by a prison guard that her daughter had had a miscarriage two months after her arrest. When the mother asked why she had not been informed, an officer said they "had forgotten to let her know."

Abrego remained in detention as of November.

On April 30, police officers kicked and beat **Lucas Sánchez, 18,** and **Ricardo Marín, 28** (pseudonyms) as they were arrested at their home in Chalatenango state, a relative said.[240] The police said they were arresting them because of the "state of emergency."

The relative, who was eight months pregnant at the time, tried to defend them, but a police officer pushed her against a police car, saying she could also be detained if she didn't stop asking questions. The relative said she bled for a week and a health care worker told her the pregnancy was at risk. Sánchez and Marín remain imprisoned at time of writing.

Human Rights Watch and Cristosal gathered information about 14 cases in which people with psychosocial disabilities or mental health conditions were detained and documented five such cases in detail. These arrests can lead to damaging long-term consequences for their physical and mental health.

People with disabilities are entitled to due process safeguards and what are known as procedural accommodations—in this case to enable them to understand the reason for their detention and their rights—to ensure equality with other detainees.[241] Human Rights Watch and Cristosal have not been able to determine whether authorities have fulfilled these obligations in these cases or others. Failing to do so puts people with disabilities at risk of abuse.

On May 1, 2022, police officers detained **Roberto Ramírez** (pseudonym), 25, in the state of Chalatenango. Ramírez, who sold fruits at the local market and has a mental health condition, was stopped by police when he took the family's dogs out.[242]

Officers asked him for an identification document and, when he showed it, they said he was being detained for "collaborating with gangs." They did not show an arrest warrant, a witness said. When the family told the officers that Ramírez had a mental health condition, one agent responded that "if [Ramírez] died, [the officer] would bring him to me dead," a relative recalled.

The officers also arrested Ramírez's brother, who arrived at the house later when they were taking Ramírez to celebrate a relative's birthday party.

The brothers were sent to a nearby police station and, two days later, to the Mariona prison. They have been held incommunicado since their arrest. On May 13, a judge charged them with "unlawful association" and ordered their detention pending trial.

Police and soldiers detained **Edubai Molina** (pseudonym), 23, at his home in Cuscatlán state on April 12.[243] A relative said that Molina has a condition that causes bone deformation.

Security forces did not tell him or a relative who was present why he was being detained; they only said it was "due to the state of emergency." He was taken to a police station in the municipality of Santa Cruz Michapa, Cuscatlán state, and, a few hours later, moved to a police station in the municipality of Coatepeque, Santa Ana state.

There, an officer told his family that he had to comply with an "arrest quota." The officer acknowledged that the detention was unjust, his relative said, but alleged he could not do anything about it.

Molina was transferred to the Mariona prison, but his family was not informed. Unaware of his whereabouts, his relatives looked for him for almost three months, until in July, a prison guard acknowledged that he was in Mariona.

A judicial document that Human Rights Watch reviewed indicates that on September 8 a judge ordered that Molina be released on bail.[244] But as of November 23, he remained in detention, in apparent violation of the judge's decision. His family is not aware of any judicial orders overturning the release order.

After conducting the arrests, security forces systematically posted photographs of the detainees on the police's and army's institutional accounts on social media platforms, accusing them of being gang members or "terrorists."[245] In some cases, the photos showed that the detainees had been injured, apparently during their arrest, and President Bukele minimized the incidents or made fun of them in an apparent attempt to justify possibly abusive behavior.[246]

Human Rights Watch and Cristosal received detailed reports of over 30 cases in which people were not informed of the whereabouts of their loved ones. Some have not been allowed to communicate with their relatives for days or weeks. In several cases, officers refused to provide information about the detainees' whereabouts, in what amounts to an enforced disappearance under international law.[247]

Lack of information about detainees' health conditions and, at times, about their whereabouts drove hundreds of family members, mostly women, to gather outside the Mariona prison for days or weeks between April and May.[248]

The police arrested **Tomás Rivera** (pseudonym), 21, a construction worker, on April 24, 2022, at his home in Chalatenango state.[249] When his family asked why he was being detained, an officer said it was because "[I] do not like you," a relative told Human Rights Watch. Rivera had an initial hearing on May 1, and he was charged with belonging to a "terrorist organization."

On April 30, the police detained Tomás' brother, **Martín Rivera** (pseudonym), a 28-year-old mechanic, and his brother-in-law, **Juan González** (pseudonym), an 18-year-old construction worker. Officers did not provide a reason for the detention. A relative said three officers kicked and beat the two men.

Authorities did not give the family any information about the detainees' whereabouts. A family member spent 24 days sleeping outside the Mariona prison awaiting news about the three. She was pregnant and waited with her 2-year-old son and, for some days, other family members, including children.    290

On the night of May 24, the police dispersed the crowds outside of the Mariona prison using what several witnesses believed to be tear gas and water cannons.[250] Officers stated that they would "beat the bugs," in an apparent threat of retaliation against their relatives in detention, the relative said.

On May 21, authorities established "information center[s]" outside prisons following what the government described as "challenges" in providing information to relatives about their loved ones.[251] The government described the purpose of these centers as providing information to relatives about detainees' "whereabouts, pavilion and cell."[252] Interviewees told Human Rights Watch and Cristosal that these centers did provide some information on detainees' whereabouts including their pavilion and cell. One interviewee said, however, that when she asked about her relative, a person working at the center in the Mariona prison told her that if "she asked again she would be detained."[253]

While establishing these centers is an important step toward fulfilling authorities' obligations to provide information on detainees' whereabouts, they do not address the fact that many victims have been held incommunicado. They also do not allow relatives to obtain other crucial information about their loved ones, including on their health. The centers were created two months into the state of emergency, when thousands had already been detained and hundreds of relatives were gathering outside of prisons to obtain information.

Police officers detained brothers **Eric** and **Ricardo Gallegos** (pseudonyms), ages 23 and 26, on April 5 and 6, respectively, in Santa Ana state.[254] Officers said the brothers were "gang members" and detained them without showing an arrest or search warrant, a relative said.

Officers arrested Eric in a food market and, a day later, took Ricardo from his home. Officers did not tell the family where they were taking Ricardo, so the family followed the police to a station in Santa Ana. On April 7, the family saw the brothers taken out of the station and placed on a bus, apparently to move them to another detention facility. When a relative asked where they were being taken, officers said they "could not provide information about their whereabouts."

Their family was not aware of their whereabouts for two months. In June, when the government announced that relatives would be allowed to leave clothes and medicine for detainees, family members decided to visit the Izalco prison to see if the brothers were held there. Guards said that they were detained there and received the package, but relatives have not been able to see them since their arrest.

On the morning of April 16, police officers detained **William Gavidia** (pseudonym), 24, when he was heading to a bus station in Monteliz, in the state of San Salvador,

according to his brother and a family friend.[255]

Officers asked for his phone and identification document, which he provided. They arrested him, saying he was in a different neighborhood than the one noted on his identification document, and accused him of being "a gang member hiding from justice."

Officers threatened his brother with arrest. "You can't do anything," one of them said, "and if you keep asking for his rights, I will detain you and take you to a police station."

They did not say where they were taking him. His relatives and a friend, who is a lawyer, toured detention centers to try to find him. In one of them, known as "El Penalito," they recalled seeing what they estimated to be more than one hundred women waiting outside to learn if their relatives were detained there.

After a six-hour search, officers told them that Gavidia was held in the San Marcos police station. A police officer told the lawyer that, "We did not find anything [to detain] him but we are not going to release him." "There is nothing you can do now. We are in a 'state of emergency,'" an officer told them, "We cannot release him, these are the orders from above."

Gavidia has not been able to talk with his family since. On April 25, a judge charged him with "unlawful association" and sent him to pretrial detention.

In some specific cases, officers have arrested or threatened to arrest people in apparent retaliation for previous incidents involving those detained or their families, including reporting police conduct to the Attorney General's Office or to the Human Rights Ombudsperson's Office. In some cases, police harassment and fear of being arbitrarily arrested has forced people to move or hide in different places. Cristosal has documented over 50 cases of people who have fled their homes during the state of emergency, fearing arbitrary arrests.

In April 2022, the police arrived at the home of **Elbin Hernández** (pseudonym), a 26-year-old student, in the state of San Salvador and threatened to detain and kill him, a relative told Cristosal. He fled his house.[256]

For over ten years, the relative said, police had repeatedly harassed Hernández, demanding that he provide information on gang members who operate in his community. The relative reported the officers to the Human Rights Ombudsperson's Office; one police officer was dismissed temporarily, and the harassment ended for some time.

But when Hernández turned 18, the same officer arrived at his home with an arrest order and accused him of murder. He was held in the Quezaltepeque prison for three years. He was acquitted and released in 2019. Soon after, officers arrested him again, this time accusing him of drug possession, but he was released on parole.

The relative said that during the state of emergency, police officers have repeatedly arrived at his home searching for him. Currently, Hernández is in hiding, fearing that

officers will arrest him again.

# Abusive Prison Conditions and Ill-Treatment in Custody

Prisons in El Salvador have for decades been overcrowded and marked by violence and poor access to basic services, such as food, drinking water, and health care.[257]

Overcrowding has been rooted in part in policies of mass incarceration implemented by previous governments in response to gang violence.[258] By 2020, the official capacity of the prison system was about 27,000 detainees, but it housed over 39,000, according to official statistics.[259]

The excessive use of pretrial detention is another factor driving high levels of prison overcrowding.[260] The Inter-American Commission on Human Rights has noted that authorities have routinely resorted to pretrial detention "based on the type of offense, with no sufficient and individualized consideration of each case to determine whether the necessary conditions for detention are met."[261]

However, overcrowding has seriously worsened during the state of emergency. Between late March and late November 2022, over 58,000 people have been detained, according to official figures, including over 51,000 who have been sent to pretrial detention.[262] Such mass imprisonment raised El Salvador's prison population to an estimated 95,000 detainees, 68,000 more than the country's prison capacity.[263]

According to the International Crisis Group, between March and October police detained over 7,500 women, over two times the number of women who were detained in El Salvador as of February 2021.[264]

On April 19, the Legislative Assembly passed a law authorizing the creation of new prisons.[265] Months later, President Bukele announced the construction of a sprawling new prison with capacity for 40,000 detainees, which he said would be ready "in 60 days."[266] The United Nations Standard Minimum Rules for the Treatment of Prisoners, also known as the "Mandela Rules," recommend that the "number of prisoners in closed prisons should not be so large that the individualization of treatment is hindered," noting that "in some countries it is considered that the population of such prisons should not exceed 500."[267] A prison complex designed to hold tens of thousands of people would be clearly inconsistent with this international standard.

Human Rights Watch and Cristosal interviewed eight people who have been released from prison. They reported poor conditions and degrading and inhumane treatment at police stations

and at Mariona, Izalco, Ilopango, Quezaltepeque, and Jucuapa prisons, as well as cases of torture in the Mariona and Izalco prisons, including beatings and waterboarding.

Currently, overcrowding is so extreme that detainees barely have space to move, they said.[268] One interviewee said that at the Jucuapa prison detainees had to "sleep standing" or "take shifts to sleep lying on the floor."[269]

Such prison conditions, coupled in some cases with limited access to health services in detention, can seriously aggravate the health conditions of detainees. Human Rights Watch and Cristosal gathered evidence of over 240 cases of people detained with underlying health conditions, including diabetes, recent history of stroke, and meningitis.

> The police detained **Esteban Guevara** (pseudonym), a 54-year-old Uber driver, on April 25, 2022, at his home in the state of San Salvador. According to a relative who spoke with Cristosal, officers said that they had received an "anonymous phone call" that accused him of "collaborating with gangs."[270]
>
> Guevara was taken to the Mariona prison, prison guards said to a relative. Two months after his detention, a person who did not identify himself arrived at Guevara's house and told relatives that Guevara had been hospitalized at the National Hospital since May 3. An official in the Human Rights Ombudsperson's Office told a relative that Guevara had injured his left foot when he was taken to the Mariona prison, but he did not say how.
>
> A relative who was able to visit Guevara briefly in the hospital learned that doctors amputated Guevara's right leg and a part of his left foot.
>
> Guevara is diabetic. His relatives took his medication to the Mariona prison before the amputation but do not know if prison authorities gave him access to it. On July 8, Guevara was taken to the Quezaltepeque prison, where he remained as of November 24.

On June 29 and July 12, 2022, then-Human Rights Ombudsperson Apolonio Tobar Serrano conducted hours-long visits to the Mariona and Izalco prisons, along with each prison director.[271] He did not conduct private interviews with detainees.[272] He found overcrowding in both prisons as a consequence of the "increase in the number of detainees." His finding of overcrowding is consistent with tweets and videos published by President Bukele and other authorities that show thousands of detainees stripped to their underwear and jammed together on the floors inside prisons.[273]

Although Tobar Serrano also said that detainees were receiving three meals a day and had access to daylight as well as adequate access to health care, President Bukele and other authorities have announced that detainees' food would be "rationed" and they would not have access to sunlight.[274] On April 3, President Bukele threatened to deny all prisoners food if the

spike in murders in the country continued,[275] an action that would amount to collective punishment prohibited under international human rights law.[276]

(As discussed earlier in this report, lawmakers repeatedly threatened to oust Tobar Serrano, a vocal critic of the government's human rights policies between 2019 and mid-2021.)

## Selected Cases of Abuses in Detention

### Lucrecia López (pseudonym), 48, Cuscatancingo

On March 30, police arrested **Lucrecia López**, a 48-year-old fruit seller, in Cuscatancingo, San Salvador state.[277] After raiding the house without showing a search warrant, officers told her they were detaining her because "[they] needed to make numbers," she said, in an apparent reference to the police's arrest quotas. Officers took López to a police station in Cuscatancingo where they told her she was detained for "unlawful association."

Later that day, she was transferred to a police station in Sacamil. López said she was held in a small room with 45 women; many had to sleep standing. There were no beds or mattresses in the cell, she said.

On April 2, she was moved to the women's prison in Ilopango. López said that she slept on the floor for several days until her family sent her a mattress and some blankets. She said there was no running water.

On April 17, she was charged with "unlawful association" and placed in pre-trial detention. Sixty-five other people were charged in that hearing; all of them participated virtually.

On May 11, López was transferred to the Jucuapa prison, where she said conditions were "worse." She had to sleep standing due to overcrowding. Some women died while she was detained, and others got sick, she said. López said she has a colon disease and that she did not receive medical treatment while in detention. She was released on bail on July 8.[278]

### Marcelo Gómez (pseudonym), 39, Cuscatancingo

Four police officers detained **Marcelo Gómez**, a-39-year-old taxi driver, outside his home in the municipality of Cuscatancingo, San Salvador state.[279] After reviewing his ID card and phone, officers told Gómez's partner that they were taking him to the police station as part of a "police routine" and that they would "release him soon."

He spent three days at the police station, without knowing why he had been detained. He "cried all day." The cell had capacity to house 20 people, but when he arrived, there were over 75 prisoners, he said. He slept on the floor next to "the bathroom," a hole in the ground that smelled "terrible."

He was sent to Izalco prison on the third day. During the transfer, officers tied his hands with plastic straps so tight that his fingers swelled: "I felt they were going to explode," he said.

When they arrived, the prison's guards ordered the group to take off their clothes. They were forced to kneel on the ground naked looking downwards for four hours in front of the prison's gate, Gómez said. They were then forced to squat several times.

Guards took the group to a room with five barrels full of water with ice, he said. Fifteen guards forced him and others to go into the barrels for around two hours in total, as they questioned them about their supposed links with gangs.

He was forced into a barrel "around 30 times," and was kept there for about a minute each time. Guards forced his head under water so he could not breathe. "I felt I was drowning," he said. Guards repeatedly insulted them, calling them "dogs" and "scum" and saying they would "pay for what [they] had done."

He was then taken to a cell along with 124 other people. Gómez said that the cell had capacity for 60 detainees. He had two meals per day, which normally "arrived dirty, and smelled bad." Gómez said he lost 60 pounds in one month.

Some people were forced to sleep on the floor. Gómez said he had fever and pain in his ear. After eight days in pain, a guard took him to the infirmary where a health professional gave him two pills for an "ear infection" and sent him back to his cell. He also said he suffered from continuous coughs that were severe enough that he could not speak.

Around two weeks later, he was taken before a judge with around 400 other detainees. All of them participated virtually. In the hearing, he learned about the charges against him for the first time; authorities said they were accusing him of "unlawful association." Gómez said he did not talk to his lawyer before or during the hearing. On June 2, he was released on bail.[280]

## Marvin Argueta (pseudonym), 45, Ilopango

On March 27, police officers detained **Marvin Argueta** a 45-year-old professor and taxi owner, at his taxi shop in the state of San Salvador. [281] He was detained with seven other taxi drivers who were also there.

296

Officers asked Argueta to provide documentation of the taxis, which he did. But the police officer detained him without showing an arrest warrant, according to Argueta. The officer said it was due to the "state of emergency."

He was taken to the Ilopango police station, where he was held for four days. It was the first time Argueta had been detained, he said. He received food once or twice a day. At the police station an officer told him he had been detained for "unlawful association."

On March 30, Argueta was transferred, handcuffed, to the Izalco prison. He was forced to keep his head down during the transfer, Argueta said, and police officers kicked and beat up those who disobeyed. Before entering the prison, officers forced him to kneel on the ground for about two hours, under the sun, and to squat 25 times naked, Argueta said. "Welcome to hell," prison guards said, according to Argueta.

As detainees walked to their cells, police officers stood on both sides and beat them, Argueta said. "We had to walk almost squatting, and without looking up," he said. Argueta fell and officers kicked him repeatedly.

He said he vomited when he arrived in his cell and had fever for four days. The cell had capacity for 30 people but actually held 125, according to Argueta. He slept on the floor due to the overcrowding. There was no water or toilet paper in the cell. Guards told detainees they could not talk or pray, and threw tear gas in the cell every time someone disobeyed, Argueta said.

Argueta suffers hypertension and diabetes, but he said he did not receive health care while he was detained.

On April 14, he was taken to a virtual hearing with over 50 other people. The prosecutor accused all of them of belonging to a "terrorist organization." Argueta told the judge that he was innocent. The judge charged him and sent him to pretrial detention.

On April 23, guards took him to the prison's infirmary where they treated him for a severe flu. The next day he was sent to a hospital, where he spent one night, before being transferred to the Quezaltepeque prison.

In Quezaltepeque, food was only "tortillas and beans." There were 90 people in the cell, which had capacity for 30, he said.

On September 8, he was taken to the Occidental Santa Ana prison, also known as "El Peñalón," where he said conditions were better. He was taken to a health examination and had a bed. He also was able to be outside his cell and had three meals each day.

On September 22, he was released on $3,000 bail.[282] He said he was held incommunicado during his entire time in detention.

## Luis Orozco (pseudonym), 47, Ahuachapán

On April 20, police officers detained Luiz Orozco, a 47-year-old tractor driver, after they pulled over the bus he was using to go to work.[283]

Officials said he was detained due to the "state of emergency." Orozco was taken to a police station in Ahuachapán, where he was held for a day, handcuffed and without food or water, he said.

He was then moved to a police station in the municipality of Atiquizaya. Orozco's wife said she went to the police station to leave food and clothes, but officials said he was not there.

Orozco was moved to the Mariona prison on April 22. When he arrived, he said, a prison guard told him and other detainees, "welcome to Mariona, a hell for gang members like you." Five prison guards beat him with batons on his leg and back for approximately 10 minutes while he was handcuffed, he said. The guards said he had to "acknowledge that he was a gang member."

He was taken to a cell with capacity for 80 people that held over 200, according to Orozco. Officers gave him one tortilla twice a day, and he had to share with another detainee. Sometimes he was also given water, he said.

There was one toilet inside the cell, but some days it did not have water. He spent one month and 10 days in that cell. Guards did not allow them to go outside, and the cell had no natural light. Orozco said he did not receive any health care and that he saw three people die in the cell.

On June 7, he was taken to what he described as a "punishment cell." He said officers moved him and others there to "make room for other detainees." The new cell was constantly dark, and detainees had to sleep standing due to overcrowding. There was no regular access to drinking water, and he could not shower.

On June 28, he was taken to participate virtually in a hearing, where he first learned he was being accused of "unlawful association." The prosecutor said he had been detained "at a market along with a gang member." Orozco denies this charge, but in the hearing, he was not allowed to intervene. He could only communicate with his lawyer through a screen that allowed him to respond "yes" or "no."

After the hearing he was returned to the "punishment cell" where he spent 25 more days. He was then transferred to another cell where the conditions were better, he said. He spent one month there, and was released on August 22 on a $3,000 bail.[284]

# Deaths in Custody

In November 2022, Salvadoran authorities confirmed that 90 people had died in custody since March.[285]

Deaths in prison in El Salvador are not new. In her last visit to El Salvador in 2018, the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions reported that "the number of deaths in detention is alarming," particularly in maximum-security prisons, in part due to outbreaks of tuberculosis.[286]

Cristosal has received reports of 86 deaths in custody since March. Human Rights Watch and Cristosal documented 11 cases in detail, based on interviews with victims' relatives, medical records, analysis by forensic experts, and other evidence.

In one case, a person who died in custody was buried in a mass grave, without the family's knowledge.[287] This practice could amount to an enforced disappearance if authorities intentionally concealed the fate or whereabouts of the detainee.

In at least two other cases, officials appear to have failed to provide detainees the daily medication they required to manage underlying health conditions such as diabetes.[288]

In at least four of the eleven cases documented in detail, photographs of the bodies show bruises. Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), who reviewed the photos and other evidence in two of the cases, told Human Rights Watch and Cristosal that the deaths were "suspicious" given that the bodies "present multiple lesions that show trauma that could have been caused by torture or ill-treatment that might have contributed to their deaths while in custody."[289]

Medical authorities reported some of these deaths as being the result of "pulmonary edema" and "cerebral edema." But the IFEG noted that the death certificates "fail to meet internationally accepted medical practice and legal standards that require recording of not only immediate causes of death, but also all underlying causes and other significant conditions contributing to death." In the experts' view, Salvadoran authorities "failed to adhere to internationally accepted medical practices and legal standards as outlined by the Minnesota Protocol on the Investigation of Potentially Unlawful Death in its investigation into the suspicious deaths."

In at least two cases, authorities did not conduct an autopsy, contrary to the international standards, in line with widely accepted medical practice, that autopsies should be carried out in almost all cases of potentially unlawful death.[290]

Investigations into deaths in custody also appear to be slow. Salvadoran authorities say they are investigating these deaths, but as of mid-November, all such investigations appeared to be at an "initial phase."[291] Human Rights Watch formally asked the Attorney General's Office for information regarding these investigations, but the office responded that information on complaints of alleged human rights violations by security forces had been "classified" for two years.[292]

**Saul Rivas** (pseudonym), a 46-year-old construction worker, was detained on April 21 in San Salvador.[293]

The police raided Rivas' home on April 21 without showing a search warrant. They told the family he was suspected of "unlawful association." A relative went to a police station where officials had taken Rivas and told the officer that Rivas had diabetes and required daily medication. "We are not giving any [medication] right now," the officer replied, saying that he should try again at the "El Penalito" police station, where they said Rivas would be transferred the next day.

On April 22, relatives went to "El Penalito," but officers said they were not "receiving medication" either. They asked a prison guard at the gatehouse if Rivas was there. The guard said he "was not authorized to provide information" but assured them that he would receive any medication he needed.

On May 7, employees from a mortuary arrived at Rivas' home, informing his family that he had died. According to the Institute of Legal Medicine, Rivas died from "pulmonary edema." Authorities conducted an autopsy but had not provided a copy of the report to relatives at time of writing.[294]

Police arrested **José Luis Moreno Terán**, 18, on April 2 in Atiquizaya, Ahuachapán.[295]

A relative told Human Rights Watch that the family learned about Terán's arrest after seeing a tweet by the police showing a picture of him.[296] The tweet indicated that Terán had been arrested in "flagrant" commission of a crime and would "face more than 30 years in prison for "unlawful association" and 'extortion.'"

Authorities held Terán for three days at a police station in Atiquizaya. He was then moved to the Izalco prison, where he was held incommunicado.

On June 3, workers from a mortuary went to Terán's house and informed his family that he had died. A report by the Institute of Legal Medicine says he died due to "pulmonary edema."[297] But photographs of his body show he had multiple bruises on his torso and arms.[298] The injuries are not visible in the photograph published by the police during

his arrest, which suggests they were caused during detention.[299] As mentioned above, forensic experts who received the photos concluded that his body "presented multiple lesions that evidence trauma that could have been caused by torture or ill-treatment that might have contributed to their deaths while in custody."[300]

Authorities conducted an autopsy but had not provided a copy of the report to relatives at time of writing.[301]

**Romeo Mauricio Posada**, a 57-year-old agricultural worker, was arrested on April 5 in Guatajiagua, Morazán state.[302] A family member who was present during the detention said police officers did not show an arrest warrant.

"We are following orders from the president," an officer responded when she asked in the police station why Posada had been detained. On April 8, he was transferred to Izalco prison, where he was held incommunicado.

On May 16, employees from a funeral home went to Posada's home and told a family member that he had died. According to the Institute of Legal Medicine, Posada died from "cerebral edema."[303] Authorities conducted an autopsy but had not provided a copy to the family at time of writing.

Police arrested **Rafael López Castellón**, a 53-year-old mill worker, on April 8 in Jucuapa, Usulután state.[304]

A relative who witnessed the arrest said that police did not show an arrest warrant or explain the reasons for his arrest. When a relative asked why he was being detained, an agent threatened to detain him as well.

After two days in a police station in Usulután, López Castellón was moved to the Mariona prison. On April 21, López Castellón was taken to a hearing where he was charged with belonging to a "terrorist organization." On May 31, a relative went to Mariona to leave medicine for López Castellón, who the relative says suffered from diabetes and a heart condition. Prison guards received it.

On August 8, the relative went to the Public Defender's Office to request López Castellón's criminal records. A staff member told him she could not provide the records because López Castellón was dead.

The following day, a family member went to the Institute of Legal Medicine where authorities showed him photographs of López Castellón's torso and head, so he could recognize him. They said López Castellón had died of a "cardiomyopathy," a heart disease.[305] The authorities did not conduct an autopsy, his relatives said, because they said he died from an underlying heart condition.

López Castellón had been transferred to the Zacamil hospital on May 27. Four days later, his relatives left him medicine in the Mariona prison, but prison authorities did not

inform the family about the transfer. The Institute of Legal Medicine told a relative he was buried in a mass grave without the family's knowledge or consent. In mid-September, his family was able to exhume his body and bury him in a cemetery in their municipality.

# Abusive Criminal Proceedings

Authorities repeatedly infringed due process guarantees established under international law, violating detainees' human rights, and making it difficult, if not impossible, for detainees to adequately defend themselves during criminal proceedings.

These violations have been taking place in a context in which there are few protections for judicial and prosecutorial independence from the executive branch.

Some due process protections established under the Salvadoran constitution have been suspended during the state of emergency, including the right to be informed about the reason of arrest, to remain silent, and to legal representation, and the requirement that all people who are detained be taken before a judge within 72 hours.[306]

As of mid-October, over 43,000 people have been arrested for "unlawful association" and over 7,000 for belonging to a "terrorist group."[307] Under Salvadoran law, including recent reforms passed in the early days of the state of emergency, these crimes carry a range of legal consequences that run counter to international human rights law.[308] For example:

- El Salvador's law establishes that hearings concerning crimes related to "unlawful association" or "terrorism" should, as a general rule, be conducted virtually.[309] Making virtual hearings the rule rather than the exception is inconsistent with the right to be present at one's trial, does not afford a full opportunity to challenge the validity of pretrial detention, and is not an adequate safeguard for the right to security of person and the prohibition of torture and other ill-treatment.[310] These concerns are heightened in mass hearings. In many cases documented by Human Rights Watch and Cristosal, detainees participated in the hearings virtually, although prosecutors, judges, and the defendants' lawyers were present physically in the court.

- Courts sent over 51,000 detainees to pretrial detention, seemingly applying a recent amendment to the criminal code that expanded mandatory pretrial detention to include all crimes committed by members of terrorist groups, gangs, and other criminal organizations.[311] As explained above, this provision is inconsistent with international human rights standards requiring an individualized determination establishing that pretrial

302

detention is necessary and proportionate for purposes such as preventing flight, interference with evidence, or the recurrence of crime.

Case 8:25-cv-02780-RX    Document 28-1    Filed 09/22/25    Page 336 of 431

At the same time, the mass arrests notably increased the workload of judges, prosecutors and lawyers, including from human rights groups who provided pro bono representation to victims. As a point of comparison, the number of cases handled by public defenders increased from 9,000 between early January and late-March to over 55,000 between late-March, when the state of emergency was passed, and July.[312]

Detainees' lawyers said that in many cases they were notified of the hearings the same day, or the day before they took place, which undermined their capacity to provide an adequate defense, including to obtain relevant documents such as medical records or work references. [313]

In the limited number of cases in which relatives had information about their family member's hearings, they say that detainees were normally taken to a judge within 15 days after their arrest, the maximum period allowed under the Salvadoran constitution when a state of emergency has been declared.[314]

Thousands were held incommunicado for weeks or months or were only allowed to see their lawyer for a few minutes before their hearings.[315] Authorities have in many cases prohibited prison visits, including of the defendant's lawyers, allegedly because "they were conducting raids in prisons" or due to "increased Covid-19 cases."[316] They also denied detainees the right to make phone calls.[317]

Most detainees had public defenders who faced an inmense workload and often failed to provide an adequate defense. The Public Defender's Office hired 40 additional lawyers after the beginning of the state of emergency, but as of October, there were 287 public defenders in El Salvador, who were representing an average of 194 cases each.[318]

Additionally, several relatives of detainees said that public defenders failed to provide them with sufficient information on their relative's case, or to inform them in a timely manner of the evidence required from them.[319]

Private attorneys also faced daunting challenges to provide an adequate defense. Some said that their access to criminal files had been restricted and that they were denied access to critically important information, such as the court file number of their case.[320]

Initial hearings—where, under El Salvador's law, judges review the lawfulness of the arrest, decide on charges and rule on whether the detainee is sent to pretrial detention— were conducted in groups and at times with up to 500 people in each, severely curtailing the opportunity to present a defense and raising other serious due process concerns.[321] Public

defenders said that, in some hearings, authorities gave public defenders "three or four minutes" to present their case for 400 or 500 detainees.[322]

As of October, none of the over 58,000 people detained during the state of emergency appeared to have been taken to trial.[323]

In over 17,000 cases, public defenders requested a "special review hearing" to consider alternative measures to imprisonment for detainees.[324] Human Rights Watch and Cristosal documented four cases in which courts granted the release on bail but the penitentiary authorities did not release the detainees.[325]

The Constitutional Chamber of the Supreme Court has addressed only a handful of the habeas corpus requests filed by lawyers representing detainees.[326] As of November 29, Socorro Jurídico Humanitario, a human rights organization, had filed 611 habeas corpus requests; the Constitutional Chamber of the Supreme Court had only ruled on five.[327]

## Lack of Accountability for Human Rights Violations

Human Rights Watch and Cristosal have not been able to identify any meaningful investigations into allegations of human rights violations committed during the state of emergency.[328]

On July 22, Human Rights Watch sent a letter to the Attorney General's Office requesting information on such investigations. But the Attorney General's Office responded that the information was "classified."[329]

On July 29, El Salvador's Permanent Mission to the United Nations in Geneva sent a communication to several UN Experts indicating that "the Human Rights Ombudsperson's Office has not learned about the existence or lack of existence of judicial or administrative investigations about arbitrary arrests, torture, or other cruel, inhumane or degrading treatment against people accused of crimes who remain under custody."[330]

On November 18, 2022, an official in the Attorney General's Office told the UN Committee Against Torture that the office had opened 90 investigations into deaths in custody. She said that there was "no evidence" that the deaths had been caused by a "disproportionate use of force by police, military or prison personnel."[331] She did not report any concrete progress in these 90 investigations, nor did she mention whether the office had opened investigations into other cases of possible human rights violations committed during the state of emergency.

The Attorney General's Office, which periodically tweets about arrests and other progress in criminal investigations, has not published any information on its social media accounts about investigations into police or army officers allegedly responsible for abuses committed during the state of emergency.

Salvadoran law requires the Human Rights Ombudsperson's Office to conduct non-judicial investigations into allegations of human rights violations to "promote" the end of violations and ensure victims' rights, as well as to provide recommendations to authorities on reforms to practices or laws that open the door to abuses.[332]

However, the Human Rights Ombudsperson's Office has so far failed to carry out serious investigations into abuses committed during the state of emergency. As of June, the Office had opened 24 files grouping over 700 allegations of abuses committed during the state of emergency.[333] Although Salvadoran law requires that investigations be concluded within eight days,[334] no investigation into alleged abuses committed during the state of emergency had been finished as of early June.[335]

---

# Acknowledgments

This report was researched by staff members of Cristosal and Human Rights Watch.

It was written by Juan Pappier, acting associate director of Human Rights Watch's Americas Division, and by a Human Rights Watch staff member whose name is withheld for security reasons.

The following Cristosal staff members reviewed the report: Noah Bullock, executive director; Abraham Abrego, director for strategic litigation; Rina Montti, director for human rights research; and Daniel Nieto, human rights researcher.

The report was also reviewed by the following Human Rights Watch staff members: Juanita Goebertus, Americas director; Tamara Taraciuk Broner, Americas deputy director; Kyle Knight, senior health and human rights researcher; Matt McConnell, economic justice and rights researcher; Margaret Wurth, senior children's rights researcher; Letta Tayler, associate director, Crisis and Conflict Division; Regina Tamés, deputy director, Women's Rights Division; Alison

Leal Parker, managing director, US Program; Claudio Francavilla, senior EU advocate; Carlos Ríos-Espinosa, senior researcher, Disability Rights Division; Kate Waine, Washington advocacy coordinator; Floriane Borel, senior United Nations advocacy coordinator. María McFarland Sánchez-Moreno and Michael Bochenek García provided Human Rights Watch's program and legal review, respectively.

Americas Division associates Camilo Moraga-Lewy, Delphine Starr, and Johan Romero contributed to the report production. The report was prepared for publication by Travis Carr, publications officer, Fitzroy Hepkins, administrative manager, and José Martínez, senior administration coordinator. It was translated into Spanish by Gabriela Haymes.

Human Rights Watch is deeply grateful to the victims who, despite often incredibly difficult circumstances, shared their testimonies with us.



# El Salvador 2023 Human Rights Report

## Executive Summary

Under the state of exception, reports of gang violence decreased significantly, allowing citizens to exercise their right to life, liberty, and security of person, and to engage in daily activities and commerce without the constant threat of violence and extortion.  Arbitrary arrests and mass pretrial hearings, however, undermined due process and exacerbated historically difficult conditions in overcrowded prisons.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may have committed human rights abuses.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse.  The human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario recorded the deaths of 79 detainees as of August 16 and determined that 33 of the deaths were violent.  The human rights organization Cristosal confirmed 71 deaths of detainees and determined that 13 of the deaths showed signs of violence, including beatings by a club or baton.  In March the newspaper *El Pais* interviewed several released detainees, one of whom stated prison guards beat his cellmate to death.  Socorro Jurídico Humanitario reported that 21 detainees died from a lack of medical attention.  Cristosal reported two of the detainees who died had anemia and 11 died of complications from illnesses such as diabetes to chronic kidney disease.

On June 13, the attorney general announced his office had investigated 143 deaths in prison during the state of exception and that his office, in conjunction with the Institute for Legal Medicine, had determined the 143 deaths resulted from pre-existing conditions or illness.

The government reported that widespread killings by criminal gangs decreased significantly in comparison with previous years. The Attorney General's Office reported intentional homicides of a criminal nature (excluding ones resulting from a family or social dispute) decreased from 366 during the first half of 2022 to 32 during the first half of 2023. The government and observers widely attributed the decrease to the government's policies under the state of exception, declared in March 2022 and extended monthly. As of December, it continued in effect. Despite the reduction, the Observatory for Human Rights at the University of Central America, a human rights think tank, argued the government homicide figures could have been undercounted, as they did not take into consideration the number of human remains located or disappearances reported.

## b. Disappearance

There were regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts. Socorro Jurídico Humanitario reported that as of August, it was tracking 1,376 cases in which the families of those detained under the state of exception did not receive confirmation that their relatives were in the prison system, information regarding their whereabouts, or confirmation that they were alive. Socorro Jurídico Humanitario also reported that in three cases, detainees' bodies were interred before their families were notified of their

deaths. The Human Rights Ombudsperson's Office (PDDH) received 17 complaints regarding the lack of information on detainees under the state of exception.

Media and human rights groups reported cases of disappearances and missing persons continued to occur, although it was often impossible to distinguish between a "disappearance" and a "missing person," due to limited law enforcement resources to investigate. In June the Foundation of Studies for the Application of Law calculated there were 2,397 unresolved cases of missing persons first reported between January 2019 and June 2022. The National Civil Police (PNC) reported that of the missing persons reported from January to August, 143 cases remained unsolved as of August 11.

On March 27, the minister of justice and public security announced that investigations into disappearances would remain suspended, as authorities continued to prioritize capturing gang members.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibited such practices, but there were credible reports that government officials employed them.

Human rights organizations and media outlets reported complaints of abuse

and mistreatment of detainees by prison guards.  On July 14, a coalition of human rights organizations at an Interamerican Human Rights Commission public audience stated they collectively interviewed more than 100 released detainees, many of whom reported systemic abuse in the prison system, including beatings by guards and the use of electric shocks.  The coalition alleged the treatment of prisoners constituted torture.

On March 25, the newspaper *El País* reported a man released from Izalco prison said guards beat one of his cellmates to death with batons and the butts of their rifles.  He also said guards activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell.

Cristosal spoke with the family of a prisoner who died of stomach cancer on February 10, after being released from Zacatecoluca prison on January 28. Cristosal reported his body showed signs of torture, including significant bruising on his back and stomach, as well as signs of malnutrition and gastrointestinal hemorrhaging.

There were sporadic complaints of mistreatment by police and members of the armed forces.  As of July 26, the PNC registered 48 complaints of threats committed by police officers.  As of July 31, 129 victims registered complaints with the PDDH regarding the violation of physical integrity, mistreatment, or physical abuse by the PNC, and seven registered complaints of the same abuses committed by members of the armed forces. Five victims registered complaints with the PDDH concerning torture or

cruel and inhuman punishment at the hands of PNC officers, and one victim registered a complaint of the same treatment committed by members of the armed forces.

The judiciary continued prosecuting several cases from the civil war against members of the armed forces. The judge in the 1981 El Mozote massacre case continued to hear witness testimony. The government, however, continued to deny expert witnesses access to military archives to determine criminal responsibility for the massacre, in defiance of a 2020 judicial order. On February 7, a judge opened trial proceedings against three former soldiers who allegedly belonged to a death squad that kidnapped, tortured, and killed civilians in San Miguel during the civil war. This was the first time a case involving death squad members had come to trial.

Impunity was a problem in the General Directorate of Penal Centers, particularly for prison guards. Human rights organizations noted the Attorney General's Office had not opened any complaints into the allegations of torture, abuse, or mistreatment by prison guards.

Some concerns remained regarding impunity in the PNC and armed forces. The state of exception empowered security forces to make arrests without meeting traditional evidentiary standards, and media and civil society reported some security officials might have used that authority to extract bribes, sexual favors, or other concessions from citizens. Some members of the security forces were convicted, however, and were facing criminal

proceedings for misconduct, such as sexual assault.

## Prison and Detention Center Conditions

Prison conditions before the state of exception were harsh and life threatening due to gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks. The addition of 72,000 detainees under the state of exception exacerbated the problem. Human rights organizations reported that as of August 22, more than 70 detainees died in prisons from violence, insufficient medical care, and chronic health conditions.

**Abusive Physical Conditions:** Prisons were severely overcrowded, as the number of detainees increased and only a limited number were released. As of July, the government reported that 71,776 persons were detained under the state of exception. In 2021, the prison system had a capacity of 30,000 and was already overcrowded. The government inaugurated a new prison with a reported capacity for 40,000 on January 31, but as of September, only 12,000 detainees had been moved into it. A prisoner released from the Izalco prison reported that 100 prisoners were held in a cell built for 50.

Detainees released from the Izalco and La Esperanza prisons reported a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day. They also reported limited water for

sanitation.  Human rights organizations noted released prisoners reported severe heat and lack of ventilation in the cells and prolonged confinement, without the opportunity for movement or the use of sanitary facilities.

Released prisoners and their families reported a lack of access to medical care or medicine in prison.  One released prisoner reported to *El País* that his diabetic cellmate received insulin only two or three times during his period of incarceration and died suddenly in his sleep.  Although families of prisoners were often instructed to bring medicine to the prison for the prisoner, the medicine often did not reach the prisoner.  Human rights organizations reported communicable diseases such as tuberculosis and scabies were widespread in the prisons.

Human rights groups and news outlets reported unsanitary conditions and limited food and medical care in women's prisons.  There were reports of life-threatening lack of medical care or sanitation for detained pregnant women and young children held with their mothers.  On July 24, the newspaper *El Faro* published an interview with a released prisoner who gave birth while in prison.  She reported being held in a unit with 150 other pregnant women in the Izalco prison farm, with two doctors assigned to them.  She reported receiving only sporadic prenatal care and extremely limited access to medicine.  Cristosal published a statement from a released prisoner who reported many pregnant women miscarried due to a lack of medical care.

Young babies often stayed with their mothers in prison and received limited medical care, despite widespread scabies and other communicable diseases. The newspaper *El Diario de Hoy* reported that on May 17, a girl, age one, died of pneumonia after being held in Apanteos prison with her mother for six months. Socorro Jurídico Humanitario reported a baby, age six months, born while his mother was held in Izalco, died of kidney failure, liver failure, and pneumonia on June 26, six days after he was transferred from the prison to the care of other members of his family.

**Administration:** The PDDH had the authority to investigate allegations of abusive conditions in prison; however, the human rights ombudsperson reported the PDDH did not receive access to visit prisons during the year. PDDH representatives conducted 32 visits to jails in the Ahuachapan Department, where they found the detainees' basic needs were provided for but detainees were transferred to prisons within five days of their arrest, without the ability to contact their families.

**Independent Monitoring:** The International Committee of the Red Cross had access to prison facilities.

## d. Arbitrary Arrest or Detention

The constitution prohibited arbitrary arrests, and the law provided for the right of any person to challenge the lawfulness of their arrest or detention in court. The state of exception, itself a legal mechanism, suspended the right

to legal defense, as well as the requirement that persons be informed of the reason of their arrest at the time of their detention, and increased the number of days an individual could be held in detention before being formally charged.  The government did not always observe the requirements of the law and constitution.

## Arrest Procedures and Treatment of Detainees

The constitution required a written warrant for arrest, except in cases where an individual was caught in the act of committing a crime.  The language of the state of exception decree did not detail changes to enforcement procedures.

Security forces arrested suspected gang members or collaborators "in the act" of being a gang member or collaborator without a warrant and entered homes without warrants, ostensibly with verbal permission of the residents. The state of exception decree suspended the right to legal counsel, and law enforcement agents did not wait for suspects to obtain counsel before questioning them.

A July 2022 change in the law provided that hearings for gang membership charges could proceed without the detainees' physical presence, although with defense counsel participating in person.  Many detainees' hearings were conducted virtually and en masse, often with one defense lawyer in the courtroom representing hundreds of persons appearing by video, unable

to consult with their defense lawyers in real time or hear the proceedings because of technical problems, complicated by the number of participants.

In July the Legislative Assembly approved legislation for the prosecution of detainees under the state of exception cases, eliminating the previous provision that a criminal process could not exceed 24 months. As of November, no case from the state of exception had gone to trial.

The court system was slow to respond to habeas corpus petitions filed by those challenging their detention under the state of exception. In July Socorro Jurídico Humanitario submitted 1,285 requests for habeas corpus and received 28 responses, of which 25 were declared inadmissible.

**Arbitrary Arrest:** As of July 31, the PDDH reported 738 complaints of arbitrary detention, compared with 283 from January to July 2022. Civil society entities also received complaints from the public regarding arbitrary arrests during the state of exception, although fewer than in 2022. Cristosal reported that as of August 9, it received 348 complaints of arbitrary arrest, compared with 3,110 such complaints in 2022. Several human rights organizations asserted that many detainees who remained in pretrial detention were arrested arbitrarily in 2022, without evidence of gang affiliation and only for having tattoos or living in a gang-controlled area. Leaked arrest files of 690 persons detained in March-April 2022 showed 50 were charged with being a gang member based on a suspicious or nervous appearance, and 50 for having a tattoo, with no indication if the tattoo was

gang-related.

The government established an anonymous tip line to provide information about gang members. Media reported cases in which detainees, or their families, believed they had been arrested on the basis of anonymous complaints. On March 30, in an interview with the BBC, the vice president declared police did not carry out arrests based on tattoos or being named in an anonymous call. He stated the government maintained a database of profiled gang members and carried out arrests based on that database. The vice president acknowledged it was possible persons with no gang ties were arrested but noted that courts released more than 3,000 detainees after determining they had no such ties. On August 22, the minister of justice and public security reported that of the more than 71,000 persons arrested under the state of exception, approximately 7,000 had been released.

On July 28, the PNC reported four police officers were arrested on charges of detaining civilians and extorting their relatives for money in exchange for their release.

**Pretrial Detention:** Lengthy pretrial detention was a significant problem. COVID-19 pandemic closures had already severely delayed trial and hearing dates, and the sharp increase in cases during the state of exception further exacerbated the situation. For example, in the majority of hearings, judges ordered defendants to remain in detention even when the Attorney General's Office failed to provide sufficient evidence demonstrating

defendants were affiliated with a gang.

In March the Foundation for the Study of the Application of Law noted prosecutors often requested extensions to the six-month evidence-gathering period due to their large caseload resulting from the state of exception.  This further prolonged pretrial detention.

## e. Denial of Fair Public Trial

The law provided for an independent judiciary.  The government held approximately 72,000 detainees to try under the state of exception but presented no plan to accomplish this.  The government indicated it likely would resort to mass trials, calling into question the availability of a fair public trial for these detainees.

### Trial Procedures

The law provided for the right to a fair and public trial, but the state of exception suspended the right to be informed promptly of charges and the right to defense.  Other rights were not always respected.  The law allowed for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person. On July 26, the Legislative Assembly approved amendments to the law that would allow collective trials with up to 900 defendants for those who were already detained under the state of exception and were charged as gang

members.  No case of persons detained under the state of exception had gone to trial as of November.

After implementation of the state of exception, the demand for public defenders exceeded the capacity of the Public Defender's Office.  One public defender noted in 2022 that his caseload had grown from 45-50 new cases a month to 95 new cases a day.  In March the Foundation for the Study of the Application of Law reported that defense lawyers continued to be overwhelmed by cases.

## Political Prisoners and Detainees

The government arrested or continued to detain sitting and former politicians from opposition parties and the governing party.  Media questioned the legitimacy of the detentions, but the government declared the charges against them were legitimate.  The detainees were generally subjected to the same harsh prison conditions as convicted prisoners.

As of August 24, Ernesto Muyshondt, former mayor of San Salvador and a prominent opposition politician, had been detained for more than two years and two months, even though the criminal code prior to the state of exception did not allow for defendants to be held for more than two years in pretrial detention without a sentence.  Arrested in 2021, he was acquitted of misappropriation of tax withholdings and breach of duty on August 9.  The remaining charges against him were for appropriation of five million dollars

in labor contributions and also electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections.

Muyshondt developed serious health problems during his detainment and in 2022 said that while detained he was beaten and tied up.  In January he was hospitalized after a four-week hunger strike.  Prison officials did not comply with seven subsequent orders issued by a judge for Muyshondt to be taken to a hospital.  During a preliminary hearing on April 23, Muyshondt said prison officials planned to kill him and that the Director of Penitentiaries, Osiris Luna, had denied him access to a hospital for 63 days.

Two former Farabundo Marti National Liberation Front (FMLN) party officials, charged in 2021 with money laundering and illicit enrichment, remained in detention.  Three other former FMLN officials also charged in the same case were under house arrest.  Defenders of the three claimed they were detained for political reasons, while the government asserted the charges against them were legitimate.  Investigations continued as of October.

On January 11, six former FMLN guerrillas were arrested in Santa Marta, Cabañas, for the 1989 kidnapping, torture, and killing of Maria Inés Alvarenga during the civil war.  Many in the Santa Marta community recalled the accused parading Alvarenga's body around town as a warning and few denied the allegations, but they said the government was pursuing the

charges for possibly political reasons. Five of those arrested were members of an FMLN-linked community organization that advocated against mining. Defenders of those arrested claimed authorities chose to prosecute the case to silence their environmental activism. The repeal of the civil war amnesty law in 2016 allowed for the prosecution of cases from the civil war. The government declared the charges against the former guerrillas were legitimate and based on testimony from multiple witnesses.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibited such actions. Reforms to the criminal code introduced in 2022 allowed the Attorney General's Office to carry out a wide range of undercover digital monitoring activities without a warrant, with no restrictions on scope or duration. There were allegations the government tracked journalists, members of NGOs, and political opponents and collected information from private messages on their cell phones. There were reports

security forces entered homes without warrants.

As of August, the Association of Journalists of El Salvador (APES) reported two cases of government officials monitoring of journalists, two cases of surveilling journalists, and one case of illegally accessing the telephone of a journalist.

The PNC reported that as of July 26, they received nine complaints that police officers entered homes without a warrant.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media, and the government generally respected this right.  Journalists, media and civil society organizations, and opposition figures criticized the government's online harassment of critics and rhetoric towards journalists.  There were sporadic reports of monitoring and threats against journalists.

**Freedom of Expression:**  In November the government repealed a 2022 amendment to the criminal code that prohibited creating, reproducing, or transmitting any visual content (texts, images, graffiti, or other forms of

visual expression) that related to gangs, and stipulated a penalty of 10 to 15 years in prison.  Media organizations and NGOs stated this had served as a threat to journalists and had created a chilling effect on the independent media for the duration of time it was active.  The government stated the legislation was designed to prevent persons from relaying gang messages to the public.  No one was arrested under this law while it was in effect.

**Violence and Harassment:**  As of August, the APES Center for Monitoring Attacks on Journalists reported 14 acts of intimidation against journalists committed by government officials, six cases in which government officials threatened journalists, and two instances in which government officials issued threats of legal action against journalists.

APES and other media outlets reported one journalist was detained arbitrarily.  The journalist, Victor Barahona, host of a local television show, was arrested in June 2022 on charges of gang associations and released on parole on May 19.  Barahona said his arrest was either because he interviewed a guest on his show who criticized local government leaders for corruption or because of his involvement in a community organization in a gang-controlled neighborhood.  In July he gave an interview regarding prison conditions to national media.  After the interview, he was summoned to a hearing to review his conditions of release, during which he was warned to keep the process confidential, according to his lawyer.

APES reported that from January to August, five journalists left the country.

Two left pre-emptively after publishing investigative pieces, and three cited threats as their reason for leaving.  One other journalist moved internally after publishing an investigative piece, and another moved internally after he reported he was followed to his residence by police and military officials.

APES raised concerns that in 10 separate instances, government officials arbitrarily stopped journalists and prevented them from carrying out their work, restricting their access into certain areas and demanding that they delete photographic or video footage.  In one such instance, on March 31, five soldiers prevented two journalists from *El Diario de Hoy* from entering a section of a neighborhood and said they needed a permit to enter.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  In April *El Faro*, an investigative online newspaper, moved its administrative headquarters and legal registration to Costa Rica, citing primarily the multiple audits it faced from the Ministry of Finance and fabricated criminal accusations, as well as surveillance, threats, harassment of advertisers, and defamation by public officials.  Its journalists remained in the country and continued to report.

There were reports that other news outlets also experienced harassment of advertisers and chose to self-censor or reduce operations.

**Nongovernmental Impact:**  Unlike in previous years, there were no reports that journalists who reported on gangs and narcotics trafficking were

subject to threats from criminal groups.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content.

There were reports that government-backed bots and troll accounts were used to manipulate social media discourse.  On July 14, the investigative digital magazine *Revista Factum* tracked the activity of a network of progovernment accounts they determined to be trolls.  The site's reporters determined the most prolific account tweeted up to 700 times per day and had 61,000 followers.  *Revista Factum* reported that in one case, the network generated more than 2,000 negative tweets against a target in 24 hours.

## b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the

## Country

The constitution provided for freedom of internal movement, foreign travel, emigration, and repatriation.  As part of Phase V of the administration's "territorial control plan," security forces occasionally restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

In contrast with previous years, gangs did not restrict movement between neighborhoods and areas.  In February *El Faro* visited 14 previously gang-controlled communities.  The residents interviewed reported gangs no longer restricted movement between communities or the circulation of outside service providers in their neighborhoods.  The residents reported having access for the first time to services such as ride-hailing apps and food delivery.  Communities were able to use communal spaces, including soccer fields and cemeteries, without restriction; previously only gang members were allowed access.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees or asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees, but the law had major regulatory and operational gaps.  The legal framework required persons with international protection needs to file their claim within five days of entering the country and asylum seekers to renew their status every 30 days.

## f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated there were 52,000 new IDPs due to violence in 2022 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs.  The center also reported an additional 4,600 IDPs in 2022, affected mostly by Tropical Storm Julia.

## Section 3. Freedom to Participate in the Political Process

The constitution provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

# Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** National elections were widely reported to be fair and free of abuses and irregularities.

**Political Parties and Political Participation:** On March 15, the Legislative Assembly repealed a section of the electoral code that prohibited changes to election laws within one year of elections. In June the Legislative Assembly approved laws to reduce the number of deputies in the assembly from 84 to 60 and the number of municipalities from 262 to 44. The law also changed the formula for calculating party seat distribution in the assembly. Some opposition politicians and political analysts argued these reductions were designed to consolidate the power of the president's party, Nuevas Ideas (New Ideas). The NGO Acción Ciudadana (Citizen Action) stated several small minority parties risked losing representation in the Legislative Assembly altogether under the new formula. President Nayib Bukele and Nuevas Ideas legislators asserted the change would return the number of deputies to the same number that existed in 1991 prior to the signing of the peace accords, which added deputies to increase FMLN representation, and that reducing the number of municipalities was necessary to streamline government administration and to save money. The reforms were passed quickly, but in line with democratic requirements per the constitution.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Some transgender persons reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials, and the government implemented the law, prosecuting officials from both the opposition and the governing party.

**Corruption:** President Bukele touted his government's enforcement actions against corrupt officials, declaring a "war on corruption" on June 1. The Attorney General's Office filed civil and criminal charges against, and courts convicted, high-ranking officials from past administrations. Charges were also filed against sitting officials in municipal governments as well as several lower-level sitting Nuevas Ideas officials and one Nuevas Ideas Legislative Assembly member. Courts convicted former high-ranking officials from several past administrations on charges of corruption. Allegations of corruption among sitting officials persisted, however. Opposition critics argued the government selectively prosecuted corruption charges to persecute political opponents.

As of July 26, the Attorney General's Office opened investigations into 285 cases involving corruption, including embezzlement, extortion, illicit

negotiations, illicit enrichment, and bribery.  As of August 10, the Government Ethics Tribunal reported it opened 178 administrative proceedings against 290 public officials.  The tribunal imposed sanctions in 25 cases and referred eight cases to the Attorney General's Office.

On May 29, a court sentenced former President Mauricio Funes to 14 years in prison for arranging a gang truce during his administration.  Funes, who resided in Nicaragua, called the trial unjust and politically motivated.  On August 10, court proceedings began against Funes' former wife and nine other former high-level members of his administration for money laundering, embezzlement, and tax evasion.

As part of President Bukele's "war on corruption," the Attorney General's Office seized the assets of former President Alfredo Cristiani on June 1, alleging he stole public funds while in office and used those funds to enrich himself and family members.  Cristiani did not reside in the country. Corruption-related charges were brought against a former Supreme Electoral Tribunal president and a former president of the Legislative Assembly.  A former minister of defense, a former minister of justice, a former Legislative Assembly deputy, a former state intelligence agency director, and a former vice minister of commerce and industry were convicted of corruption-related charges.

Municipal officials were also the subject of corruption charges and investigations.  On August 11, the mayors of two municipalities, Conchagua

and Tacuba, along with various other municipal officials and council members, were arrested on unrelated corruption charges. The mayor of Conchagua and two associates charged with him remained under arrest as of August 22, while the remaining officials were released pending their initial hearing.

Although most officials investigated for or charged with corruption were from the ARENA party, FMLN, or minor opposition parties, several sitting members of the Nuevas Ideas party also faced corruption investigations. On January 11, the Attorney General's Office charged the mayor of Soyapango, Nercy Patricia Montano De Martínez, and four other officials in the mayor's office with misappropriation and embezzlement of public funds. Montano, a member of the Nuevas Ideas party, had been the subject of municipal unrest and protests due to her mismanagement of funds. In February a waste disposal company filed a complaint with the Attorney General's Office against the Nuevas Ideas mayor of Mejicanos, Saúl Antonio Meléndez, accusing the mayor of embezzlement and breach of duty for nonpayment of services rendered totaling more than $896,000, plus interest. On August 9, the attorney general accused Nuevas Ideas deputy Erick Garcia of fraud relating to election campaign expenses and requested the Legislative Assembly strip Garcia of his immunity. The Legislative Assembly voted to do so on August 17, and Garcia was arrested the same day. Garcia's alternate deputy, Nidia Aracely Turcios Anaya, was also arrested.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings. Several domestic human rights groups, including Cristosal, accused the government of opening excessive audits into their operations as an intimidation tactic and using the revocation of tax-exempt status as a tool to punish organizations critical of the government.

Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes. *Gato Encerrado*, an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements.

**Government Human Rights Bodies:** The principal human rights

investigative and monitoring body was the autonomous PDDH, whose ombudsperson was chosen by the Legislative Assembly for a three-year term. The PDDH had a constitutional duty to investigate human rights abuses and defend human rights conventions in the country. Some NGOs believed the PDDH was not fully independent or effective.

On May 25, President Bukele created a Presidential Commission for Human Rights and Freedom of Speech and appointed Andrés Guzmán Caballero as the commissioner. The responsibilities and duties of the commission were unclear.

## Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape of women or men, domestic or intimate partner rape, and other forms of domestic and sexual violence, including so-called corrective rape of lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons. The law could apply to spousal rape, at the judge's discretion. The law required the Attorney General's Office to prosecute rape cases whether or not the survivor pressed charges and did not permit the survivor to withdraw the charge. The penalty for rape was generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

Violence against women, including domestic violence, remained a widespread and serious problem. The law prohibited domestic violence and generally provided for sentences ranging from one to three years in prison, although some forms of domestic violence carried higher penalties. The law also permitted restraining orders against offenders. The law against domestic violence was poorly enforced. The domestic NGO Feminist Network Against Violence Against Women analyzed cases of violence reported in the first half of 2021 and found the conviction rate was 6 percent. They attributed the low conviction rate to fear of aggressors, normalization of violence, a lack of understanding regarding survivors' rights, impunity, and an overall patriarchal system.

ORMUSA, a domestic women's rights organization, registered 26 femicides between January and May 31, 42 percent of which were committed by the partner of the victim and 54 percent of which were committed in the home of the victim. On February 21, the Legislative Assembly unanimously voted to remove the statute of limitations for prosecuting femicide.

**Other Forms of Gender-based Violence or Harassment:** The law prohibited sexual harassment and established sentences of five to eight years' imprisonment for the crime. Courts also could impose fines in cases in which the perpetrator held a position of trust or authority over the victim. By law, employers were required to create and implement programs to prevent sexual harassment. The government, however, did not consistently

enforce the law effectively.  The Union of Seamstresses and Tailors asserted the Ministry of Labor lacked the will to investigate one such sexual harassment case it filed during the year.

As of August 26, the PNC registered 21 complaints of sexual harassment committed by police officers.  On February 7, a police officer filed a complaint against the chief inspector of her division for sexual harassment.

**Discrimination:**  The constitution granted women and men the same legal status.  The law was generally respected, but with exceptions.  Women faced discrimination in employment and occupation.  Although the law provided for equal pay between men and women, women did not receive equal pay.  In 2021, the United Nations reported that women made 18 percent less than men in the same jobs.  The law established sentences of one to three years in prison for public officials who denied a person's civil rights based on gender, and six months to two years for employers convicted of discriminating against women in the workplace, but labor organizations noted that employees generally did not report such discrimination due to fear of employer reprisals.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law banned abortion under all circumstances.  Civil society advocates expressed concern the ban led to the wrongful incarceration of women who

suffered severe pregnancy complications, including miscarriages. As of July 26, the Attorney General's Office reported six women were under investigation for abortions and two for alleged feticide, which the legal system termed "homicide of a 'recently born' child," a charge often invoked for suspicions related to the cause of miscarriage. Charges were brought in one case of feticide.

Numerous factors served as barriers to access sexual and reproductive health services. In 2021, UN experts noted that there was "a systemic practice of discrimination against women who suffer obstetric emergencies or pregnancy losses." In 2022, the women's rights organization Las Dignas presented the results of a study on contraception access carried out in two rural districts. It found that 20 percent of the population studied had an active sex life but did not use contraceptives for reasons including dangerous or difficult conditions that prevented travel to health centers, not having required parental authorization for minors to obtain contraceptives, and a lack of availability of contraceptives in health centers.

The government provided access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were available as part of clinical management of rape.

## Systemic Racial or Ethnic Violence and Discrimination

There were several laws to protect members of racial or ethnic minorities or groups from violence and discrimination.  The government did not enforce the laws effectively, and the administration took no action to implement a 2018 policy designed to focus on the inclusion of ethnic groups in all social and economic aspects.  Some civil society organizations and individuals reported instances of racial discrimination against Afro-descendent persons and Indigenous groups.

## Indigenous Peoples

The constitution recognized Indigenous peoples and stated the government was required to adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of Indigenous peoples. The law provided for the preservation of Indigenous languages and archeological sites.  The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, had special laws to recognize Indigenous cultural heritage.

Although the law provided for Indigenous groups to participate in decision making on issues that affected their rights, it did not include the right to be consulted regarding development and other projects envisioned on Indigenous land, nor did it provide Indigenous groups the right to share in revenue from exploitation of natural resources on historically Indigenous

lands.  The government did not demarcate any lands as belonging to Indigenous communities.  Because few Indigenous persons possessed title to land, opportunities for bank loans and other forms of credit were limited.

As of October, there was no progress in the case against the Attorney General's Office brought by victims' family members for failing to investigate the death of three Indigenous persons during "The Massacre of 1932."

# Children

**Child Abuse:**  The law prohibited child abuse.  Penalties for child abuse included losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse.  The government enforced the law effectively.

**Child, Early, and Forced Marriage:**  The legal minimum age for marriage was 18.  The law banned child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise banned exceptions to child marriage in cases where the child was pregnant. The government enforced the law effectively.

**Sexual Exploitation of Children:**  The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking. The law stipulated imprisonment of 16 to 20 years.

The minimum age for consensual sex was 18.  The law classified statutory

rape as sexual relations with anyone younger than age 18 and included sentences of four to 13 years' imprisonment.

The law prohibited paying anyone younger than 18 for sexual services. The law prohibited participating in, facilitating, or purchasing materials containing child pornography and provided for prison sentences of up to 16 years. Despite these provisions, sexual exploitation of children remained a problem. The government did not enforce the law effectively.

## Antisemitism

The Jewish community totaled approximately 150 persons. There were no reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** The law did not criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behaviors.

**Violence and Harassment:**  COMCAVIS TRANS, a domestic NGO that promoted LGBTQI+ rights, found 43 percent of transgender women, 42 percent of cisgender men, and 14 percent of cisgender women had encountered problems with law enforcement officials.

Violence against LGBTQI+ persons was a problem.  The Attorney General's Office reported that as of July 26, 13 LGBTQI+ persons were victims of sexual assault or harassment, and one was the victim of bodily harm.

The law allowed for stricter sentences for crimes committed on the basis of sex, gender identity, and gender expression, among other categories.  The PDDH recorded and investigated complaints of violence and harassment against LGBTQI+ individuals.  As of July 31, the PDDH received 20 complaints, involving 23 victims, ranging from five victims of acts of cruel and degrading punishment to five victims of insults.

**Discrimination:**  The law prohibited discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics.  Discrimination against LGBTQI+ persons was widespread and hindered access to education and employment.  Surveys conducted in 2021 by COMCAVIS TRANS found that 39 percent of LGBTQI+ individuals surveyed were unemployed, compared with 5 percent of the general population.  Transgender persons regularly faced discrimination in health care, banking, and voting.

**Availability of Legal Gender Recognition:**  The Legislative Assembly did not take steps to create a procedure allowing transgender persons to change their identity documents to reflect their gender, despite a 2022 Supreme Court ruling to do so by February.

**Involuntary or Coercive Medical or Psychological Practices:**  There were no reports of the practice of so-called conversion therapy targeting LGBTQI+ individuals in an attempt to change their sexual orientation, gender identity, or expression.  There were no reports that medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:**  There were no restrictions on freedom of expression or association regarding LGBTQI+ matters.

## Persons with Disabilities

The law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce the law.  Persons with disabilities did not have access to education, health services, public buildings, or transportation on an equal basis with others.  Persons with disabilities faced discrimination in employment and occupation.  No formal system existed for filing a discrimination complaint based on disability.

The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, was the agency responsible for protecting the rights of persons with a disability, but it lacked enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings or information and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

Disability advocates said children with disabilities faced access problems in school, including a lack of ramps and other accommodations. The government provided little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

Persons with disabilities also faced discrimination in the public health-care system. Disabilities rights groups reported that women with disabilities were often instructed by their doctors to use birth control to avoid having children, believing the women would bear children with disabilities.

Persons with disabilities faced discrimination in employment and occupation. CONAIPD stated there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they were qualified. The

Network of Survivors and Persons with Disabilities Foundation noted the Special Law on Inclusion of Persons with Disabilities was never implemented or enforced.  The Association of Blind Women added that companies preferred to pay fines instead of employing workers with disabilities.

## Other Societal Violence or Discrimination

The law prohibited discrimination based on HIV or AIDS status.  As of August 11, the PDDH received three complaints of discrimination against persons with HIV or AIDS.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right of most workers to form and join independent unions, in certain workplaces to bargain collectively, and after a lengthy regulated process, the right to strike.  The government did not enforce these rights.  Unions experienced lengthy delays in processing their credentials with the Ministry of Labor, some waiting nine months or longer.  Without credentials, unions could not engage in collective bargaining or participate in tripartite entities that governed worker-related issues such as setting a minimum wage, health care, and housing.  According to media reports and union representatives, the minister of labor rewarded unions

loyal to him and his party with expedited credentials and punished unions critical of the government by delaying their certifications.

The law prohibited antiunion discrimination, and workers were protected from firing or demotion for union organizing activity. If fired during this time, they could bring cases to court for reinstatement. Members of the military, judges, and high-level public officers could not form or join unions. Workers in private security firms could not form or join unions. The labor code did not cover public-sector workers and municipal workers, whose wages and terms of employment were regulated by law. Only citizens could serve on unions' executive committees. The labor code also barred individuals from holding membership in more than one trade union. Unions had to meet certain requirements to register, including having a minimum of 35 members. If the Ministry of Labor denied registration, the law prohibited any attempt to organize for up to six months following the denial.

Collective bargaining was strictly regulated. Unions representing fewer than 51 percent of the workers in an enterprise did not have the right to bargain, even on behalf of their own members. Provisions of the law allowed either party to a collective bargaining agreement, under some conditions, to seek to change its provisions after one year in force. Employees of most public institutions did not have the right to bargain collectively.

The law contained cumbersome and complex procedures for conducting a legal strike. The law did not recognize the right to strike for public and

municipal employees or for workers in essential services.  The law did not specify which services met this definition, and courts therefore applied this provision on a case-by-case basis.  The law required that 30 percent of all workers in an enterprise support a strike for it to be legal and that 51 percent support the strike before all workers were bound by the decision to strike.  Unions could strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions were required to engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps.  Workers at times engaged in strikes that did not meet legal requirements.  The law provided no way for workers to appeal a government decision declaring a strike illegal.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were less than those for other laws involving denials of civil rights, such as discrimination.  Penalties were rarely applied against violators.  Judicial procedures were subject to lengthy delays and appeals.  According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions.

Unions reported that their members sometimes faced violence or threats of violence and that viable legal recourse against such violence was

unavailable. Public-sector union members reported public officials threatened to dismiss employees who made labor complaints.

On January 10, three members of the union of municipal workers in Soyapango were arrested on charges of public disorder and resisting arrest during a demonstration in which they demanded payment of salary owed. The charges against them were provisionally dismissed in June.

There were concerns the lowered standard of evidence required for an arrest under the state of exception allowed employers and municipal officials to retaliate against union members by alleging they were gang members. The human rights NGO Socorro Jurídico Humanitario reported 21 union members were arrested during the state of exception, 40 percent on charges of gang associations and 60 percent on charges of public disorder or resisting arrest. The NGO stated the individuals were arrested for their labor-related activities, but their cases were handled following the same procedures as other state-of-exception cases, as if the arrestees were members of illicit groups. The NGO further reported that as of August 16, 10 union members remained in pretrial detention.

Although many unions were aligned with political parties, they functioned independently from the government and political parties.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

# c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law provided for a minimum wage for all sectors, to be set by the government.  The minimum wage varied by sector; all were above poverty income levels.  The law set a maximum normal workweek of 44 hours – limited to no more than six days per week and to no more than eight hours per day – but allowed overtime, which was to be paid at double the usual hourly wage.  The law mandated that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek.  The law prohibited compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who were obligated to work on holidays if their employer made this request.  In such cases, they were entitled to double pay.

**Occupational Safety and Health:**  The Ministry of Labor set and enforced

occupational safety and health (OSH) standards, and the standards were appropriate for the main industries.  The law established a tripartite committee to review the standards.  The law required employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment.  The law promoted occupational safety awareness, training, and worker participation in OSH matters.

Workers could legally remove themselves from situations that endangered health or safety without jeopardy to their employment.

**Wage, Hour, and OSH Enforcement:**  The government did not adequately enforce wage, hour, or OSH laws.  Penalties were less than those for similar crimes, such as fraud, and were rarely applied against violators.  Some companies reportedly found it more cost-effective to pay fines than comply with the law.  The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws.

The government trained inspectors on legal standards.  The number of inspectors was insufficient to enforce compliance.  Inspectors did not have the authority to initiate unannounced inspections or sanctions.  Inspections were scheduled according to a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors notified companies prior to their arrival.  Allegations of corruption among labor inspectors continued.

The Ministry of Labor received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and the illegal withholding of benefits, including social security and pension funds.  Reports of overtime and wage violations occurred in several sectors.  According to the ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, and rest days.  Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions.  Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws.

The informal sector represented almost 75 percent of the economy.  The government did no enforce labor laws in this sector.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
350



The Washington Post

*Democracy Dies in Darkness*

AMERICAS

# Fans went to admire El Salvador's gang crackdown — and got arrested

By Samantha Schmidt and Diana Durán

May 15, 2023 at 5:00 a.m. EDT

BOGOTÁ, Colombia — From his small town in rural Colombia, José Antonio Potes watched the videos with interest. A foreign leader claimed he had defeated the violent gangs that had terrorized a country considered one of the world's most dangerous.

The 27-year-old welder saw photos of alleged gang members massed into crowded prisons. He heard the murder rate had dropped — cut by more than half, the government said. And he watched a smiling Nayib Bukele, the millennial president of El Salvador, announce in a video broadcast worldwide in January that his country would host next year's Miss Universe pageant.

"El Salvador is a country full of beauty," Bukele said, walking along a red carpet. "It has the best beaches in the world for surfing. Imposing volcanoes. Exquisite coffee.

"And now it has been converted into the safest country in Latin America."

Potes was convinced. Within days, he joined a friend in El Salvador, hoping to find work, earn in dollars and build a life in Bukele's crime-free paradise.

Then they got arrested. A day after his arrival, Potes and his friend, fellow Colombian Manuel Fernando Castrillon, were stepping out of a shopping mall when they were stopped by soldiers. They wanted to see their tattoos, the men recounted. The friends were accused of being members of a criminal gang and detained for months, they said, sudden victims of the iron fist they had so admired.

"We let ourselves fall for this propaganda," Potes told The Washington Post. "And the reality is totally different."

Bukele's crackdown — driven by an emergency decree last year that suspends key civil rights, has resulted in the arrests of tens of thousands of mostly young men — many of them, their defenders say, for simply violating new curfews or having tattoos.

The approach has drawn condemnation from international rights advocates. It's also made Bukele wildly popular in his country, even among some family members of people who have been detained, and one of the most admired leaders in Latin America.

The face of the 41-year-old president appears on magazine covers and in widely shared WhatsApp memes. His name has been invoked by political leaders from Guatemala to Colombia to Peru. Governments in Ecuador and Jamaica, watching his example, have declared states of emergency of their own.

In a country with just over 6 million people, human rights groups say, more than 66,000 have been stuffed into overcrowded prisons. El Salvador has become the country with the highest incarceration rate; to accommodate the surge, the government has opened a new mega-prison that could become the largest in the world.

The U.S. State Department has warned citizens to reconsider travel to El Salvador, due in part to the risk of arbitrary arrest.

The Bukele administration did not respond to requests for comment on Potes and Castrillon.

At a time when crime rates are surging throughout Latin America — including in ordinarily peaceful countries such as Costa Rica, Chile and Ecuador — Bukele is being heralded by the right as a sort of savior. Polls consistently show him the most popular leader in the region, by a wide margin.

He might also be benefiting from the wave of anti-establishment sentiment across the region that has seen a succession of incumbents voted out of office.

"There's this match made in heaven between the image and the brand Bukele has been cultivating for a decade now and this particular moment in Latin American politics," said Manuel Meléndez-Sánchez, a Salvadoran political scientist and PhD candidate at Harvard.

That image has been carefully crafted by Bukele's powerful public relations apparatus, an operation with wide reach on social media and growing control of state-owned news outlets.

In Colombia, it's resonating with critics of Gustavo Petro, the country's first leftist president, amid a lack of popular domestic leaders on the right. Petro and Bukele have fought publicly on Twitter. A candidate for mayor in Cali is running on promises to bring the Bukele model to Colombia's third-largest city.

Bukele's approach has also drawn admirers among U.S. Republicans. "For decades, the Central American nation was little more than a playground for ruthless gangs ... until President Nayib Bukele cracked down hard against the criminal element," Sen. Marco Rubio said last month. "In the words of local news media, the gangs now 'do not exist.'"

With rights so suspended, police say serious crimes in the small Central American country of El Salvador last year dropped to the lowest level since the country's civil war ended in 1992, Bukele's government says.

But human rights advocates report <u>widespread violations of due process, severe prison overcrowding and deaths in custody</u>.

"This is where his story of progress and security is threatened," said Juan Pappier, acting deputy director for the Americas at Human Rights Watch. "Any person, any working Salvadoran or foreigner can be arrested any day with little to no evidence."

At least 29 Colombians have been detained in El Salvador since the start of the government's emergency order, according to the Colombian Embassy in El Salvador. At least 19 of them have been accused of links with illegal groups.

It took Potes one day in El Salvador to experience it firsthand.

He arrived months after his friend. Castrillon was in Guatemala when he heard Bukele describe neighboring El Salvador as the best country in the world, "one free of robberies, of theft, of murders." With its dollarized economy, Castrillon saw an opportunity, and asked Potes to join him.

The pair were leaving a cosmetics store outside San Salvador, the capital, when the soldiers asked to see their documents — and any body art.

Potes showed them his chest, illustrated with a rosary, hands in prayer, and the name of his grandmother. The soldiers said the tattoo was similar to one associated with a local gang, according to Potes; they later told Potes and Castrillon to strip down to be searched and confiscated their phones, both men said.

The Colombians were in the country legally, they said, under the 180 days allowed for tourists. But they were detained in the Ilopango prison, their heads shaved and their communications with the outside world cut off.

The friends were held in a cell with more than 500 other people, they said, packed so densely they had to sleep on their sides on the floor. They were told they would be detained for at least six months while their case was investigated. They were not given a hearing, they said.

It wasn't until mid-February that Potes and Castrillon were able to speak with someone outside the prison. The call came from the Colombian embassy in San Salvador. The men shared contact information for relatives in Colombia and abroad and asked that they be told "that they are all right" and "that they love you a lot and God bless you," the embassy wrote in an email to at least one relative.

The men were accused of association with criminal groups under the state of exception, the embassy wrote.

After months of mass arrests and a forced Colombian immigrants' story quickly went viral in the friends' home country. And soon, the men said, a group of three Salvadoran officials, including at least one from the presidential press office, was escorting them around San Salvador, taking them to a medical clinic and a barber, treating them to meals and hotel rooms, and directing them to record videos telling the world it was all a big misunderstanding.

The three officials did not respond to a request for comment. Bukele this month retweeted a video of Potes and Castrillon dancing to Colombian music at a Salvadoran restaurant with their minders after their release.

Potes said he was asked to refute reports that he had been detained for alleged links to criminal gangs. He was not told how the video would be used, he said, but only that it would help let his family know he was okay.

In the video, Potes says his detention had been "misunderstood"; he had been held for immigration issues because he had been working in the country without a proper permit. (Back in Colombia, Potes told The Post his statement was untrue; he said he felt obligated to record it.)

Once they were given cellphones, Potes and Castrillon saw the video had been published in Semana, a right-leaning news outlet in Colombia, which used it to deny claims that Potes had been ensnared by Bukele's crackdown on gangs.

Potes and Castrillon grew suspicious of their hosts. They contacted the Colombian Embassy for help returning home.

They landed April 30, less enamored of Bukele's paradise.

"They told us a thousand times over that we should stay in El Salvador, that it's the safest country in the world ... that they have the support of 90 percent of people," Potes said. "But what if the people inside don't have any way to speak?"

P



Overseas Security Advisory Council
Bureau of Diplomatic Security
U.S. Department of State

9/30/2022 | 📄 Country Security Report

👁 1 all time - 0 last 7 days

# El Salvador Country Security Report

## Travel Advisory

The current U.S. Department of State Travel Advisory ↗ at the date of this report's publication assesses that travelers reconsider travel to El Salvador due to crime. Review OSAC's report, Understanding the Consular Travel Advisory System.

The Institute for Economics & Peace Global Peace Index 2021 ↗ ranks El Salvador 110 out of 163 worldwide, rating the country as being at a medium state of peace.

## Crime Environment

The U.S. Department of State has assessed San Salvador as being a **CRITICAL**-threat location for crime directed at or affecting official U.S. government interests.

The U.S. Department of State has included a Crime "C" Indicator on the Travel Advisory for El Salvador, indicating that there may be widespread violent crime and/or organized crime present in the country, and/or that local law enforcement may have limited ability to respond to serious crimes.

The crime emergency line in El Salvador is **911**. Review the State Department's Crime Victims Assistance brochure.

### Crime: General Threat

El Salvador is the smallest and most densely populated country in Central America, with more than six million people, high unemployment, generally low wages, and comparatively high housing costs. Some of these factors push families in lower economic status into marginal housing zones. These zones, located throughout urban areas, including in upscale neighborhoods, provide a point of origin and safe haven for criminals.

Crime can run the gamut from credit card skimming to homicide. It is characterized by violence directed against known targeted victims and targets of opportunity. No information suggests that criminals specifically target U.S. citizens. The threat of violent crime in El Salvador often leads to the curtailment of recreational opportunities. Crimes of every type occur routinely.

The Government of El Salvador tracks eleven specific categories of crime and logged **21,715** reports of crime in 2021 in the categories of theft, robbery, injuries, homicide, extortion, theft of vehicle, carjacking, rape, road deaths, truck jacking, and kidnapping. Non-categorized crime reports totaled 37,097 incidents.

Property crimes (e.g., robbery, burglary, theft, theft of vehicles) are the most common crimes committed in El Salvador, normally accounting for 40-50% of all reported crime. Of these, simple theft, including burglary, normally accounts for 10-15% of all reported property crimes. Armed robberies normally account for around 25% of all reported property crimes. Burglaries during daylight hours occur in residential neighborhoods throughout San Salvador. At times, individuals pose as delivery people or police officers to gain access to a home. Cameras, concertina wire, and grilles on all windows/doors appear to dissuade some would-be burglars; residences without these features are more frequently targets. The presence of armed security and the use of security features in homes have proven successful in combating home invasion. Review OSAC's report Hotels: The Inns and Outs and Considerations for Hotel Security.

Most theft cases reported to the Embassy involve the loss of a U.S. passport during a surreptitious theft of bags, backpacks, or purses. Review OSAC's report All That You Should Leave Behind. Crimes against the person (e.g., assault, homicide, rape, sexual assault) normally account for 30-40% of all categorized crime. Of these, physical assaults including domestic violence normally account for around 15%. Rapes typically account for 25% of all reported crimes against the person.

Although the homicide rate has consistently and notably declined since 2015's high of 104 per 100,000 inhabitants, El Salvador continues to have one of the highest homicide rates in the world. As late as 2018, El Salvador's homicide rate was the world's worst, but it has since fallen below that of more than 20 other countries. Since 2015, the per capita annual homicide rate has fallen from 81:100,000 in 2016, to 60 in 2017, 50 in 2018, 36 in 2019, 20 in 2020, and 17.6 in 2021; this new low rate, more than 80% below 2015 highs, is similar to that of Brazil or Guatemala within the region, or Augusta, Georgia, whose homicide rate ranks 32nd among U.S. cities.

Crime rates have fallen considerably under the current government due in part to a clandestine truce between the major gangs and the government. In March 2022, a spike in homicides that represented the highest toll against the populace in El Salvador's history raised serious concerns that the gangs could continue to use the threat of violence to gain concessions from the government. The government met the spike in homicides with a State of Emergency, implementing stricter conditions in prisons, limiting basic civil liberties and deploying heightened security across the country.

### Crime: Areas of Concern

Homicide rates are not uniform across the country. In 2021, San Salvador (29%), La Libertad (12%), Sonsonate (9%), Santa Ana (9%), Ahuachapan (6%) were the five municipalities registering the most homicides. However, the organized crime and gang situation in El Salvador makes it difficult to parse out specific areas of concern. While a gang presence is most visible in low-income areas, crime permeates the country, even affluent neighborhoods and districts. Estimates of gang control of Salvadoran territory run as high as 93% of the surface area of the country.

355

U.S. Embassy personnel may not travel to the following departments (El Salvador's version of states or provinces), except to directly travel on main roads during daylight hours to the locations listed as exceptions under each department name:

- **Santa Ana**, with the following exceptions: Lago De Coatepeque, Parque Nacional Monte Cristo, Parque Nacional Los Volcanes (Cerro Verde, Volcan De Izalco, Volcan De Santa Ana/Ilamatepec), Lago De Guija, Metapan, Apuzunga, Metapan, El Tazumal Ruins, Chalchuapa, Casa Blanca Ruins, Chalchuapa,Laguna Cuzcachapa, Chalchuapa, Balnearo El Trapiche, Chalchuapa Piscinas De Galiano, and Chalchuapa.

- **Cuscatlán**, with the following exceptions: Suchitoto Town, Lago Suchitlan (Puerto San Juan, Suchitoto/San Francisco Lempa, Chalatenango Vía Ferry Crossing), Cascada Los Tercios, Cerro Las Pavas, Sitio Arqueologico Ciudad Vieja, Casa De Alejandro Coto, Museo La Memoria Viva, Parque Ecologico Cinquera, Rio Lempa,and Grottoes.

- **San Vicente**, with the following exceptions: Laguna De Apastepeque, Amapulapa Water Park, Chinchontepec Volcano, and San Sebastian (Telares).

- **San Miguel**, with the following exceptions: Playa Las Flores, Playa El Cuco, Laguna De Olomega, Laguna El Ocotal, Turicentro Altos De La Cueva, and Ruinas De Quelepa.

- **La Unión**, with the following exceptions: Conchagua (The Town), Volcán De Conchagua, Golfo De Fonseca, La Union Port (Pier), Parque De La Familia, Guatajiagua (Black Clay Crafts).

- **La Union Beach Exceptions**: Las Tunas, Torola, Playas Negras, El Jagüey, Maculis, Playa La Flor, Playa Blanca, Las Mueludas, El Tamarindo, Estero El Encantado, Chiquirín, Playitas, Golfo De Fonseca, Isla Conchaguita, Isla Meanguera Del Golfo, Isla Zacatillo, Isla Martín Pérez, Isla Pirigallo, Playa Majahual, Playa Guerrero, Playa El Corozal, Rio Goascoran, Los Islotes Y Los Farallones (border between Honduras and Nicaragua).

Within departments where travel is permitted in general, U.S. Embassy personnel may not travel to the following:

- **San Salvador**: The area bordered by the municipalities of Ayutuxtepeque, Apopa, Distrito Italia, Tonacatepeque, San Martin, Ilopango, San Marcos, Soyapango, and Centro Urbano Amatepec 2a Etapa is off limits. So is Downtown San Salvador (except for professional guided tours) and Urbanización Las Lomitas. However, clubs on the shores of Lake Ilopango are permitted.

- **Sonsonate**: The tourist attraction at Chorros de la Calera, Juayúa.

- **La Libertad**: The municipalities of Colón and Lourdes, and the tourist attraction at Los Chorros, Santa Tecla.

The U.S. Embassy warns its personnel to be cautious and aware at all times, and advises personnel to visit only locations and routes frequented by the international community unless coordinated in advance with the Embassy and local authorities.

Review OSAC's reports, All That You Should Leave Behind, Hotels: The Inns and Outs, Considerations for Hotel Security, and Taking Credit.

### Kidnapping Threat

The U.S. Department of State has not included a Kidnapping "K" Indicator on the Travel Advisory for El Salvador. Review OSAC's reports, Kidnapping: The Basics and Active Shooter and Kidnapping Response Tips.

Kidnapping for ransom does occur in El Salvador, and the Embassy receives reports of attempts to kidnap private dual nationals due to their perceived wealth and access to U.S.-based funds. The Embassy has no recent reports of kidnapping attempts against the international community writ large, and organized crime generally seeks to avoid the response such a kidnapping would engender.

Additionally, the phenomenon of disappearances is on the rise while the murder rate declines; many experts estimate that many murder victims are first being abducted and their bodies disposed of discreetly. This is a direct contrast to the gangs' historical penchant for high profile violence, but tracks with their current preference for a lower operating profile.

### Drug Crime

El Salvador is not considered a major transit point for illegal narcotics, though maritime smuggling routes do exist in the eastern Pacific. El Salvador is party to the 1988 United Nations Drug Convention. The relatively small volume of drugs transiting the country in comparison with some regional neighbors, as well as active efforts by Salvadoran authorities to combat transit routes, has kept El Salvador from becoming a major transit location.

El Salvador's gangs are not major narcotics trafficking organizations. Rather, they are primarily involved in retail street-level drug sales. Penalties for possession, use, or trafficking illegal drugs are strict; convicted offenders can expect lengthy jail sentences and fines.

Consult with the CIA World Factbook's section on Illicit Drugs ⬈ for country-specific information.

## Terrorism Environment

The U.S. Department of State has assessed San Salvador as being a LOW-threat location for terrorism directed at or affecting official U.S. government interests. The U.S. Department of State has not included a Terrorism "T" Indicator on the Travel Advisory for El Salvador.

The Institute for Economics & Peace Global Terrorism Index 2022 ⬈ ranks El Salvador 83 out of 163 worldwide, rating the country as having no impact from terrorism.

### Terrorism: General Threat

Though the Government of El Salvador considers gangs and other organized crime to be domestic terrorists, there is no identified, significant transnational terrorist threat in the country.

## Political Violence and Civil Unrest Environment

The U.S. Department of State has assessed San Salvador as being a MEDIUM-threat location for political violence directed at or affecting official U.S. government interests.

Elections/Political Stability

Election seasons in El Salvador have been accompanied by heated political rhetoric and occasional violence between individuals or groups of opposing parties; in early 2021, the most significant such incident was a shooting that followed an altercation in traffic. However, political demonstrations are typically peaceful and controlled by authorities.

Legislative elections in 2021 were generally orderly, though some administrative delays caused agitation among crowds of waiting voters in certain locations. These elections resulted in the administration's political party, New Ideas, gaining a supermajority in the legislature. Combined with the removal of several Supreme Court judges, the political situation in El Salvador is now under one-part control. President Bukele has proclaimed on social media that he is "the world's coolest dictator."

### Protest & Demonstration Activity

Public protests and strikes against the government, generally by government employees, are common. Most demonstrations concentrate in/around city centers or public buildings and other public areas. Although usually non-violent, these public displays sometimes create security problems and impede traffic.

Review OSAC's report, Surviving a Protest.

## Law Enforcement Concerns: Security Agencies

There is only one national police service: The Policía Nacional Civil (PNC). Each major city, municipality, or town has a PNC delegation. The PNC also has several specialized units that investigate specific crimes and traffic enforcement, anti-gang, civil disturbance, VIP protection, and other special operations units.

### Police Response

While receiving significant support from U.S. and other partners, the police often suffer from inadequate funding and limited resources. Because of perceived and actual corruption, they do not enjoy the full confidence and cooperation of much of El Salvador's citizenry. The police's investigative units have shown great promise; however, routine street-level patrol techniques, anti-gang work, and crime suppression efforts remain a constant, difficult challenge. Equipment shortages (particularly radios and vehicles) limit their ability to deter or respond to crimes expeditiously. Other impediments to effective law enforcement are unsupportive laws, general distrust, and the occasional lack of cooperation between the police, prosecutors, and corrections.

Local law allows the police to detain individuals for up to 72 hours for administrative processing. This is a common practice for most automobile accidents resulting in personal injury, apprehensions for DUI, and for criminal acts, including accusations.

Police generally treat arrested or otherwise detained foreigners well. U.S. citizen residents/travelers should insist on speaking to U.S. Embassy representatives upon arrest or detention. Except in some very rural locations, police are generally aware of a U.S. citizen detainee's right to contact the Embassy. Embassy assistance is limited to ensuring U.S. citizens are not mistreated, contacting family/friends, protesting breaches of due process, and providing a list of local attorneys.

Judicial procedures are not always clear or easily understood. Significant delays during the investigation and legal process are common.

The government continues to extend its State of Emergency, originally enacted in early April 2022. The decree limits freedom of association, makes it easier for police to arrest and detain people (including allowing for detention for up to 15 days without access to an attorney or explanation of charges), and gives the police and attorney general the right to intercept communications without a warrant  In the first 30-days, police have arrested well over 20,000 suspected gang members. NGOs, and local press have reported numerous cases of people being rounded up who have no nexus to the gangs. A member of the Embassy police auxiliary force was rounded up as was a member of the contract Local Guard Force, but both were released subsequently and not subject to the 15-day detention imposed on the majority of other suspects.

### Law Enforcement Concerns: Emergency Contact/Information

For public safety emergencies, dial 911. Operators generally only speak Spanish. U.S. victims of crime should contact the police and the U.S. Embassy.

## Transportation Security

### Road Safety

A significant percentage of vehicles are in disrepair, underpowered, beyond their service life, or otherwise do not meet U.S. road safety standards. Passing on blind corners and over hills is common. Driving while intoxicated is common and is a major contributing factor to traffic accident fatalities. Due to lax enforcement of traffic laws, drivers must drive defensively.

Road conditions in urban areas are generally fair; rural area conditions are poor. Likewise, road lighting in urban areas is generally fair, but generally non-existent on roads and highways outside urbanized areas. In urban and rural areas alike, stray animals, unwary pedestrians and bicyclists, and numerous large potholes (or missing manhole covers) make driving particularly dangerous and hazardous at night.

Engage in travel outside of cities and to Guatemala or Honduras during daylight hours and, if possible, with multiple-vehicle convoys for safety. Refrain from driving outside the capital after dark, for personal security and traffic safety reasons. In 2021, there were 1,298 deaths due to traffic accidents.

Private tour companies frequently employ national police officers from the tourist police division to accompany their groups for personal security. For detailed, country-specific road and vehicle safety information, read the World Health Organization's Global Status Report on Road Safety ↗ .

Review OSAC's reports, Road Safety Abroad, Driving Overseas: Best Practices, and Evasive Driving Techniques; and read the State Department's webpage on driving and road safety abroad.

## Public Transportation Safety

Avoid public transportation, especially local buses. Public buses are often in poor mechanical condition, and passengers are often subject to extortion as buses pass through gang turf, with violent repercussions for failure to pay. News media regularly carry reports of riders robbed at stops or while on the bus. Regional "first class" or "executive" commercial bus travel is generally safe, although robberies have occurred in neighboring countries. Minibus, bus, and taxi drivers commonly disregard traffic rules.

Privately owned cabs are unregulated. Use only taxis you can call via telephone or that you find at major reputable hotels. Rideshares operate in San Salvador and have a generally good safety record, but the U.S. Embassy has unconfirmed reports of rideshare vehicles seized by criminals who victimize passengers. If you use a rideshare, ensure the driver of the vehicle is the individual registered in the application prior to embarking in the car.

## Aviation Concerns

The U.S. Federal Aviation Administration (FAA) has assessed the government's Civil Aviation Authority as compliant with International Civil Aviation Organization (ICAO) aviation safety standards for oversight of El Salvador's air carrier operations.

Review OSAC's Report, Security in Transit: Airplanes, Public Transport, and Overnights; and consider the European Union Air Safety List ↗ .

## Maritime Security

There are not significant maritime security issues facing El Salvador that impact the private sector. The relatively small amount of narco-trafficking affecting the country does have a maritime component, and Salvadoran security forces conduct counter-narcotics efforts offshore.

Consult with the Stable Seas Maritime Security Index ↗ for detailed information and ratings regarding rule of law, law enforcement, piracy, and other maritime security indicators.

## Personal Identity & Human Rights Concerns

Significant human rights issues include credible reports of unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; torture and cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest and detention; serious problems with the independence of the judiciary; serious restrictions on free expression and media, including violence or threats of violence against journalists and censorship; substantial interference with the freedom of peaceful assembly and freedom of association; serious acts of government corruption; lack of consistent investigation and accountability for gender-based violence; significant barriers to accessing reproductive health; and crimes involving violence by security forces against lesbian, gay, bisexual, transgender, queer, and intersex individuals.

## Safety Concerns for Women Travelers

Though El Salvador is generally conservative, women play prominent roles in society, politics, and business. Female travelers should follow safety precautions as they would elsewhere in the world. Domestic abuse and gender-based violence remain serious problems within society, and the government and NGOs have launched public campaigns to raise awareness and deter abusive behavior.

Consider composite scores given to El Salvador by the UN Development Program (UNDP) in its Gender Development Index ↗ measuring the difference between average achievement in three basic dimensions of human development, and Gender Inequality Index ↗ , measuring inequality in achievement in reproductive health, empowerment, and the labor market. For more information on gender statistics in El Salvador, see the World Bank's Gender Data Portal ↗ .

Review the State Department's webpage for female travelers.

## Safety Concerns for LGBTI+ Travelers

There is negative sentiment toward individuals who identify as LGBTI+. Members of the LGBTI+ community engaged in sex work or gang activity are at the highest risk of victimization. In 2018, the Government of El Salvador commissioned the National Division for the Protection of Women, Children, Adolescents, and Other Vulnerable Populations; this agency employs prosecutors specially trained to investigate crimes against the LGBTI+ community. The Office of the Human Rights Ombudsman has proactively condemned attacks against the LGBTI+ community.

The Equaldex Equality Index ↗ measures the status of LGBTI+ rights, laws, and freedoms, as well as public attitudes towards LGBTI+ people around the world. As of this report's publication date, El Salvador has a score of 57/100, ranking 112 out of 198 countries on the index.

Consider information from Destination Pride ↗ , a data-driven search platform associated with PFLAG Canada that visualize the world's LGBTQ+ laws, rights, and social sentiment; as well as from ILGA World, a worldwide federation that produces an annual map ↗ showing sexual orientation laws from around the world, available in multiple languages.

Review OSAC's report, Supporting LGBT+ Employee Security Abroad, and the State Department's webpage on security for LGBTI travelers.

## Safety Concerns for Travelers with Disabilities

Salvadoran law prohibits discrimination against persons with physical and mental disabilities in employment, education, access to health care, or the provision of other state services. The government, however, does not allocate sufficient resources to enforce these prohibitions effectively. There are few access ramps or provisions for the mobility of persons with sight and hearing disabilities. El Salvador's infrastructure for the physically disabled is not to U.S. standards. Travelers with disabilities should ensure their destinations are suitable prior to traveling.

Review the State Department's webpage on security for travelers with disabilities.

Safety Concerns for Travelers Based on Race, Religion, & Ethnicity

Indigenous communities report facing racial discrimination and economic disadvantage. According to community leaders, gangs pushed out of urban centers by police have mounted incursions into and appropriated indigenous land. Gang members threaten indigenous children for crossing gang territorial lines artificially drawn across ancestral indigenous land, forcing some children to drop out of school or leave home.

According to the 2007 census (the most recent), there were 60 indigenous groups, making up 0.4% of citizens, mainly from the Nahua-Pipl, Lencas, Cacaopera (Kakwira), and Maya Chorti groups. The constitution recognizes the rights of indigenous peoples to maintain their cultural and ethnic identity. The law, however, does not include the right to be consulted regarding development and other projects envisioned on indigenous land, nor does it provide indigenous peoples the right to share in revenue from exploitation of natural resources on historically indigenous lands. The government does not demarcate any lands as belonging to indigenous communities. Because few indigenous persons possess title to land, opportunities for bank loans and other forms of credit remain limited.

Review the latest U.S Department of State Report on International Religious Freedom for country-specific information.

Review OSAC's report, Freedom to Practice, and the State Department's webpage on security for faith-based travelers.

## Anti-U.S./Anti-Western Sentiment

In general, El Salvador's population holds pro-U.S. views.  However, political events have placed the U.S. in a critical posture against the Government of El Salvador, and the dominant political party has been vocally critical of the U.S. and the international community, especially over social media. The verbal and media sparring has not resulted in any additional security concerns for U.S. citizens or the international community.  Additionally, some opposition political parties rooted in Cold War-era left wing insurgents favor Russia and China as partners.

## Concerns involving the Rule of Law, Arbitrary Detention, Official Harassment, Corruption &/or Transparency

In 2021, controversy erupted when the Nuevas Ideas party of President Bukele won a supermajority in the legislature. The legislature promptly dismissed all five Constitutional Chamber Justices and the Attorney General, replacing them with party loyalists. The move's debatable constitutionality sparked an outcry among political opposition and the international community, who voiced concerns for the rule of law, democratic norms, transparency, and potential suppression of ongoing anti-corruption investigations. As of this report, the Embassy has no information on government harassment or arbitrary detention resulting from the situation.

The law provides criminal penalties for conviction of corruption by officials. Although the Supreme Court investigated corruption in the executive and judicial branches and referred some cases to the FGR for possible criminal indictment, corruption and impunity remained endemic in 2020. Courts issued inconsistent rulings and failed to address secret discretionary accounts within the government.

Corruption in the judicial system contributes to the high level of impunity, undermining the rule of law and public respect for the judiciary. The Supreme Court has received dozens of complaints against judges due to irregularities, but had punished only one judge. Accusations against judges include collusion with criminal elements and sexual harassment.

The Transparency International Corruption Perceptions Index ⬈ ranks El Salvador 104 out of 180 worldwide, where 1 means most transparent.

## Communication Issues

The constitution provides for freedom of expression, including for the press, although the government at times does not respect this right. The law permits the executive branch to use the emergency broadcasting service to take control of all broadcast and cable networks temporarily to televise political programming.

Journalists from several digital and print media outlets publicly accused President Bukele, his administration, and his supporters of a pattern of harassment designed to constrain media. In public statements and in testimony to the Legislative Assembly, journalists claimed President Bukele and his cabinet officials bullied them on Twitter, threatened them with physical harm, launched unwarranted financial investigations into their taxes and funding sources, denied them access to press conferences, and surveilled them. President Bukele strongly denied threatening journalists and dismissed accusations he was stifling freedom of the press.

The Salvadoran Journalist Association (APES) has registered dozens of violations of the exercise of journalism. Among these are restrictions to asking questions during press conferences related to the government handling of the pandemic, destruction of journalistic material, harassment against independent journalists and discrediting of media outlets by government officials. The PDDH has received at least 10 recent complaints of violence against journalists by government officials.

In November the president of the Association of Salvadoran Journalists (APES) stated at a journalism forum that journalists were seen by the government as enemies of the state. He also confirmed that an increasing number of journalists were under attack by the government.

Government advertising accounted for a significant portion of media income. According to media reports, the Bukele administration punitively cancelled all government advertising in the newspaper El Diario de Hoy after it reported on the banning of some journalists from the president's press conferences. According to APES, media practice self-censorship, especially in reporting on gangs and narcotics trafficking.

APES noted journalists who reported on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation. Observers reported that gangs also charged print media companies to distribute in their communities, costing media outlets as much as 20% of their revenues. The Legislative Assembly has passed legislation that appears to criminalize reporting on gang activities.  Any outlet that relays a message "originating or allegedly originating" from a gang could face up to 15 years in prison. Critics fear that this legislation could be used as a pretense to limit media reporting. The government does not restrict or disrupt access to the internet or censor online content, and there are no credible reports that the government monitors private online communications without appropriate legal authority.

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respects these rights, except with respect to labor unions.

The Reporters Without Borders World Press Freedom Index ⬈ ranks El Salvador 82 out of 180 worldwide, where 1 means most freedom. The Freedom House Freedom in the World report ⬈ rates El Salvador's freedom of speech as partly free.

Review OSAC's report, Lèse Majesté: Watching what you say (and type) abroad.

## Health Concerns

Emergency services are more readily available in San Salvador than in outlying areas, but city facilities would be overwhelmed quickly in the event of a mass-casualty incident. Public hospitals are very crowded. Their resources are typically very limited, and they do not see patients quickly that are not assessed to have an obvious life-threatening emergency. There are few private hospitals, and the standards of these hospitals are less than those of the United States.

Pharmacies are plentiful, but not all medicines found in the U.S. are available. Medicines often have a different brand name and are frequently more expensive than in the U.S. Recent regulatory changes that established price limits for pharmaceuticals may affect quality and availability of certain medicines.

There is only one private ambulance service with a fleet of vehicles in San Salvador that has trained personnel and medical equipment to manage emergencies. The response time is often delayed because of heavy traffic in San Salvador. It is often quicker for people to transport themselves by private vehicle.

Private hospitals and physicians expect up-front payment (by cash or, for hospitals, credit card) for all bills. No hospitals or medical offices will bill U.S. insurance companies. Check with insurance providers to ensure you have adequate medical insurance valid for El Salvador, including coverage for medical evacuation (medevac).

The U.S. Department of State has not included a Health "H" Indicator on the Travel Advisory for El Salvador. Review the U.S. Centers for Disease Control and Prevention's (CDC) country-specific Travel Health Notices  for current health issues that impact traveler health, like disease outbreaks, special events or gatherings, and natural disasters.

Find contact information for available medical services and available air ambulance services on the U.S. Embassy website. The U.S. Department of State strongly recommends purchasing international health insurance before traveling internationally. Review the State Department's webpage on health insurance overseas.

See OSAC's Guide to U.S. Government-Assisted Evacuations; review OSAC's reports, The Healthy Way, Shaken: The Don'ts of Alcohol Abroad, Health 101: How to Prepare for Travel, and Fire Safety Abroad; and visit the State Department's webpage on Your Health Abroad for more information.

## Vaccinations

Strongly consider COVID-19 vaccination prior to all travel. All routinely recommended immunizations for the U.S. should be up to date. Measles, mumps, rubella, tetanus, pertussis, and chickenpox are much more common than in the U.S., especially among children. Additionally, all travelers should have hepatitis A and typhoid immunizations. Those who may have sexual contact, receive tattoos, or require medical treatment in El Salvador should receive the hepatitis B vaccine.

Review the CDC Travelers' Health  site for country-specific vaccine recommendations.

## Issues Traveling with Medications

Carry an adequate supply of any required medication in its original, clearly labeled container. A copy of the prescription from the prescribing doctor will be helpful if immigration or customs authorities question you about your medications. Medications that are prescription-only in the U.S. are often available over the counter from numerous pharmacies in El Salvador.

Review OSAC's report, Traveling with Medication.

## Water Quality

Most Salvadorans and travelers use bottled water for drinking, while tap water may generally be used without issue for non-drinking purposes.

Review OSAC's report, I'm Drinking What in My Water?

## Environmental Hazards

El Salvador is prone to frequent earthquakes and volcanic activity, and experiences severe storms, hurricanes and related flooding. These natural disasters can present inconvenience or danger, including mud slides and rockslides which cause injury/death, destroy property, and cut off roads. Response capacity, including search and rescue, is rudimentary, especially in remote areas.

Review OSAC's report, Central Asia Earthquake Preparedness.

## Cybersecurity Concerns

The U.S. Embassy has no information on specific cybersecurity concerns endemic to El Salvador. General worldwide cybersecurity precautions continue to apply.

The government's decision to make Bitcoin legal tender in El Salvador makes the financial system more vulnerable to instances of cybercrime.

Review OSAC's reports, Cybersecurity Basics, Best Practices for Maximizing Security on Public Wi-Fi, Traveling Abroad with Mobile Devices, and Guide for Overseas Satellite Phone Usage.

## Counterintelligence Issues

The Embassy has no information on particular counterintelligence issues affecting the private community in El Salvador. Standard personal self-security awareness and privacy measures continue to apply worldwide.

## Other Security Concerns

### Landmines

Despite the civil wars of the past, landmines do not present a specific concern in El Salvador.

Import/Export Restrictions

There are no specific security concerns regarding imports or exports.

A country-specific listing of items/goods prohibited from being exported to the country or that are otherwise restricted is available from the U.S. International Trade Agency website⧉ .

## Photography

Refrain from photographing security personnel and sites or other sensitive locations, and exercise good judgement in photographing strangers without explicit permission.

Review OSAC's report, Picture This: Dos and Don'ts for Photography.

## ID Requirements

International visitors should carry their passport and/or copies of their passport and any relevant visas for identification, or an ID issued by the Government of El Salvador such as a diplomatic carnet.  ID is usually needed when making credit card purchases.

## Critical Infrastructure Concerns

El Salvador's infrastructure varies widely across the country.  However, even the best, most modern infrastructure can be negatively affected by its connection to wider, legacy networks and systems.  Utilities and communications can be sporadic and generator/battery backups for electrical and computer systems are advisable.  Physical infrastructure such as roads and bridges also varies widely, and even the latest additions are subject to closure due to natural disaster.

## OSAC Country Chapters

San Salvador's country chapter was reactivated in 2021, and will be establishing a regular meeting cadence.

Contact OSAC's Americas team ✉ with any questions.

## Embassy Contact Information

U.S. Embassy, Final Boulevard Santa Elena, La Libertad, San Salvador. Tel: **+503-2501-299**; Emergencies: **+503-2501-299**. Hours: Monday-Friday, 0800-1700.

## Trustworthy News Sources

· La Prensa Gráfica ⧉
· El Diario de Hoy ⧉
· El Mundo TV ⧉
· El Noticiero ⧉
· Telecorporación Salvadoreña (TCS) – Channels 2, 4, and 6 ⧉

## Other Helpful Info

· State Department Country Information
· OSAC Risk Matrix
· OSAC Travelers Toolkit
· State Department Travelers Checklist
· Smart Traveler Enrollment Program (STEP)
· How OSAC Analysts Can Benefit Your Global Security Operations

---

**Attachments**

📄 OSAC 2022 CSR El Salvador.pdf ⤓

---

**Related Content**

←

📄 Gang Homicide and Official Harassment: Increasing Risk in El Salvador

4/29/2022 | Report

→

---

361

*The contents of this (U) report in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The document was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Q

6/7/23, 4:37 PM    Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons | International | EL PAÍS En...

Case 8:25-cv-02780-PX    Document 28-1    Filed 09/22/25    Page 400 of 431

# Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons

Cristosal, the primary human rights organization in the Central American country, describes a regime of terror through interviews of hundreds of people who were mistakenly arrested or freed after being declared innocent



Transfer of gang members to the Terrorism Confinement Center (CECOT) in Tecoluca, El Salvador, on March 15, 2023.
**GOBIERNO DE EL SALVADOR (EFE)**

**BRYAN AVELAR**

Tapachula (Mexico) - MAY 29, 2023 - 14:32 EDT

Dozens of inmates died as a result of torture, beatings, mechanical suffocation via strangulation or wounds or were left to die because of lack of medical attention. That is the primary result of an exhaustive investigation by Cristosal, the primary civil society human rights organization in El Salvador, after a year of the state of exception implemented by the government of president Nayib Bukele in his so-called "war on gangs."

The report, published on Monday, is the clearest investigation to date. Its results are terrifying. To write it, the institution interviewed hundreds of people who were imprisoned for months during the state of exception and were freed after being declared innocent, as well as relatives of inmates who died in prison during the same period. Cristosal also contrasted the

363

6/7/23, 4:37 PM                Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons | International | EL PAÍS En…

Case 8:25-cv-02780-PX     Document 28-1     Filed 09/22/25     Page 401 of 431

testimonies with medical forensic documents, police documents and photographs. Authorities have withheld official information and have insisted that all deaths within prisons are from natural causes.

The document presents stories from survivors who recount the torture they experienced within the prison. For exmaple, they were forced to pick food off of the floor with their mouths, given electric shocks and exposed to untreated epidemics of skin fungus.

"The massive and systemic violations are now a state policy. The suspension of rights and militarization is not an exception anymore, but a norm that affects the lives of all Salvadorans," Noah Bullock, director of Cristosal, told EL PAÍS.

## Executions in prisons

Cristal has documented the death of 153 prisoners in state custody between March 27, 2022 and March 27, 2023, all detained in the same period. Of those, 29 died violent deaths and 46 "probable violent deaths" or under "suspicions of criminality." Since March 23, more cases of inmate deaths, which do not enter into the previous count, have been reported.

Among those 75 cases, the investigation points out as a "common pattern" the presence of lacerations, hematomas caused by beatings, wounds with sharp objects and signs of choking or strangling on the cadavers. According to the report, death by mechanical asphyxiation is one of the "most frequent" causes of death described in medical legal reports.

One of the clearest cases is that of a 30-year-old man whose dead body was given to his relatives with a protuberance on the neck. The medical documents reported that he died as a result of "mechanical asphyxiation by strangling." The autopsy of another man, an 42-year-old who died in a police cell, determined the cause of death "mechanical asphyxiation by choking."

Mechanical asphyxiation and immersion asphyxiation were used as methods of torture in El Salvador by security forces during the country's civil war between 1970 and 1992. Bulock told EL PAÍS: "It is very sad to see that the state has again recurred to arbitrary detentions and torture in the name of national security."

6/7/23, 4:37 PM                    Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons | International | EL PAÍS En…

Case 8:25-cv-02780-PX     Document 28-1     Filed 09/22/25     Page 402 of 431



Gang members wait to be transferred to their cells at the Terrorism Confinement Center in Tecoluca, El Salvador, on March 15, 2023.
**SECRETARÍA DE PRENSA DE LA PRESIDENCIA (REUTERS)**

Other cadavers presented other signs of torture. In the case of a 32-year-old man whose body was delivered to his family, the autopsy determined the cause of death was a "severe contusion-type closed thorax trauma." According to the report, the body had deep wounds on the elbow, blows on the forearm and a wound of approximately eight centimeters on the left side of the head.

In other cases, according to the investigation, people died due to unattended mortal illnesses or because of lack of access to medication. Such is the case of a 50-year-old woman who suffered from liver disease at the time of her detention. "Despite her family taking the medications to the prison where she was detained, they were not received, and when her family asked about her, they responded that if she needed medications, the doctor would let them know," the report says.

## Hidden numbers

The execution numbers that Cristosal reveals may be incomplete, according to the report. The investigation detected that in 39 of the 153 cases, the forensic experts did not clearly establish the cause of death. Such is the case of a 23-year-old man who died on April 18, 2022: "The cadaver presented signs of blows on various parts of the body, fracture on feet and hands, long burn-type wounds on the back, which demonstrate that hey may have been a victim of torture. The cadaver was given to the family in a closed coffin," says the report. The coroner's report stated that it was a "sudden death."

Case 8:25-cv-02780-PX    Document 28-1    Filed 09/22/25    Page 403 of 431

The report also reveals that, in some cases, the cause of death established by the forensic doctors does not coincide with the deceased's previous health conditions. For example, a 42-year-old woman died of "septic shock by immunosuppression caused by nasal carcinoma," suffocation as a result of a tumor, according to the autopsy, but her family never knew that she had cancer. A 44-year-old farmer was detained for four months and died in a hospital at the end of the period as a result of "pneumonia," according to the autopsy. He had wounds on his body, however, and he had lost so much weight that he was "unrecognizable" to his family.

Another fact that may increase the number of deaths is that some inmates are being buried in mass graves without their families being notified. Cristosal detected at least four cases: "The body of a 45-year-old man with an intellectual disability was moved to [the Institute of] Legal Medicine with different last names than those with which he was buried in a mass grave in La Bermeja Memorial Park. The medical legal obituary establishes that he died as result of a 'pulmonary edema'; however, the forensic photographs show that the cadaver presented edemas on the face. People interviewed informed that he was beaten within the prison where he was detained, he received kicks in the stomach that caused him to expel blood from his nose and mouth, which caused him to lose mobility and not be able to eat. He did not receive medical attention," the report says.

According to the document, one of the primary demands of inmates' relatives under the state of exception has to do with the lack of information about their inmates' whereabouts, effectively making them victims of disappearances that are not registered by the justice system.

Additionally, many inmates who are freed after being declared innocent leave prison in deplorable health conditions, which end up causing their deaths, as with a 24-year-old man detained in May 2022. After being detained in the prison known as Mariona for seven months, his family was notified that he was in critical condition in the hospital with stomach pains. His family found him gravely ill. Days after entering the hospital, the young man had a special trial. The judge told the family that she had two pieces of news: the good news was that the man was declared innocent. The bad news was that he now suffered from chronic renal insufficiency. Two days after being freed, the man died.

6/7/23, 4:37 PM                    Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons | International | EL PAÍS En…

Case 8:25-cv-02780-PX     Document 28-1     Filed 09/22/25     Page 404 of 431



Traces of torture on the back of a Salvadoran prisoner.
**CORTESÍA**

## Electroshocks, beatings and punishment cells

The report also includes horror stories of ex-inmates who remained in prison for months under the state of exception and were eventually declared innocent.

According to the testimonies in the document, overcrowding, beating and mistreatment are the daily bread of the prisons of El Salvador's state of exception.

A 20-year-old man detained in the Mariona prison recalls that a guard, known as Montaña, constantly threatened inmates with death. "You'll leave here alive only if you're lucky," he would say to the prisoners. "While [inmates] kneeled, [guards] gave them electric shocks, and they drew blood from one. When they entered the area where the guards stayed, they were beaten again," the report says.

Another type of torture within Bukele's prisons has to do with cleanliness and the inmates' living conditions. According to the report, "in some cases, during an entire day, they are only allowed to drink a cup of water."

A 20-year-old man who was detained in Mariona recalled the following: "One day a guard arrived with a bucket of food and said, 'Are you hungry?' When they responded that they were, the guard threw the food on the floor, which was covered with mud and filth, and told them, 'You're only going to pick it up with your mouth, and if you grab it with your hands, I'm going to take you out and beat you.' And he gave them five seconds to pick up the food with their mouths. We were hungry and he

Case 8:25-cv-02780-PX     Document 28-1     Filed 09/22/25     Page 405 of 431

said that we had to eat like that, only with our mouths. Then he walked away. When he came back, the guard said, 'The dogs were hungry.'"

That same week, foreign representatives of a human rights organization entered the prison, but a guard had warned them in advance not to complain: "Visitors are going to come tomorrow, and the first [one to speak out] about the treatment here will die from electric shocks."

Another type of torture that the report reveals, according to the survivors, is the isolation cells. These cells "are used for whoever complains or talks at night or does not follow the guards' instructions, sometimes without any reason," the document says. The cells are very small. They are usually dark, and light is not visible. They do not have cots and some do not have toilets. Inmates in the cells rarely receive drinking water and are not permitted to bathe. Numerous detainees affirm that "some who go to the cells return in a state of malnutrition, or do not come out alive," the report says.

One of the survivors recalls his experience in the cell: "They gave one meal, beans with a tortilla, first in the hand, then in a tupper. When he left there, he was taken to the Malnutrition area, where they treated them well so that they would recover and then take them to be beaten again. About 20 days after being there he had a stroke, when he woke up they took him to the hospital, his mouth was sideways, he felt trembling and tingling in his face," the report states.



Prison officers guard the gang members as they are processed upon arrival at the Anti-Terrorism Confinement Center.
**SECRETARÍA DE PRENSA DE LA PRESIDENCIA (VIA REUTERS)**

6/7/23, 4:37 PM    Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons | International | EL PAÍS En…

Case 8:25-cv-02780-PX    Document 28-1    Filed 09/22/25    Page 406 of 431

Bukele's government has maintained a state of exception since March 27, 2022, as a response to gang violence. The measure was adopted after MS-13 and Barrio 18, the two largest gangs in the country, organized a massacre that left 87 dead in the streets in just one weekend. According to journalists' investigations, the massacre was due to a rupture of the pact that Bukele had with the gangs since the beginning of his administration, which kept the violence low.

Since its beginning, the state of exception has been criticized by national and international human rights organizations, not only because of the arbitrariness of the measure being extended beyond what the law allows, but also because in practice, it permits the systemic violation of human rights.

Bukele has responded to critiques dismissing anyone who questions his measures, and has called human rights organizations "gang defenders." However, reality demonstrates that not all of the almost 67,000 detainees are really gang members. At least 5,000 of them have been freed, according to authorities.

For human rights defenders, the measure takes El Salvador back to the past. "In Salvadoran history, states of exception are not a novelty. They are the preferred instruments of social control and political repression of the military dictatorships of the past. [The situation today] is a concerning and painful familiar scenario from the darkest eras of Salvadoran history. Self-censorship is clear. People do not talk anymore. All Salvadorans know that any encounters with a police officer could end up in being captured and tortured to death," Bullock said.

*Sign up for our weekly newsletter to get more English-language news coverage from EL PAÍS USA Edition*

R

# Uganda 2024 Human Rights Report

## Executive Summary

There were negative developments in the human rights situation in Uganda during the year.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment; arbitrary arrest or detention; transnational repression against individuals in another country; unlawful recruitment or use of children in armed conflict by nonstate armed groups; serious restrictions on freedom of expression and media freedom, including violence or threats of violence against journalists, and censorship; and significant presence of any of the worst forms of child labor.

The government did not take credible steps or action to identify and punish officials who committed human rights abuses.

The rebel group Allied Democratic Forces continued to threaten attacks in urban areas while fighting government forces.  The government arrested and prosecuted multiple individuals accused of belonging to or supporting the group.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
370

# Section 1. Life

## a. Extrajudicial Killings

There were several reports the government or its agents committed arbitrary or unlawful killings during the year.

Opposition activists, local media, and human rights defenders reported security forces killed individuals identified as dissidents or opposition party members the government accused of criminal activity.

On February 2, former opposition leader Mathias Mpuuga accused police of killing a National Unity Platform (NUP) supporter in Kasese after witnesses observed his forced abduction into an unmarked white van prior to his transfer to Kasese Prison.  Three days later a police spokesperson claimed the victim slipped on a bathroom floor and died as a result of injuries sustained in the fall.  There were no reports of an investigation or punishment of the officials involved in the killing.

Human rights activists and journalists reported the indiscriminate use of force by government forces in so-called disarmament operations in the conflict-plagued northeastern Karamoja region

## b. Coercion in Population Control

There were no reports of coerced abortion or involuntary sterilization on the

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
371

part of government authorities.

## c. War Crimes, Crimes against Humanity, and Evidence of Acts that May Constitute Genocide, or Conflict-Related Abuses

On August 13, the International Crimes Division of the High Court convicted former Lord's Resistance Army commander Thomas Kwoyelo on 44 counts of crimes against humanity, war crimes, and other crimes, including murder, rape, enslavement, and torture committed during the Northern Uganda conflict.  Kwoyelo had been in detention since 2009.

# Section 2. Liberty

## a. Freedom of the Press

The constitution and law provided for freedom of expression, including for members of the press and other media, but the government often restricted this right.

The government restricted some citizens from criticizing its actions and officials or discussing some matters of public interest.  In February, police arrested Ibrahim Musana for defamation, promoting hate speech, and incitement to violence related to social media posts that allegedly insulted President Yoweri Museveni, the King of Buganda, Speaker of Parliament

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
372

Anita Among, and State Minister for Information Communication Technology Joyce Nabbosa Ssebugwawo.  Musana was released on bail in April.

An investigative civil society organization released reports via a social media campaign in February and March alleging members of parliament inappropriately used public funds to enrich themselves.  Following the publication of the reports, the organization received dozens of harassing calls from security service members and political supporters of the accused legislators.  A contributor to the reports went into hiding for two weeks due to credible information that security forces would arrest him.

## Physical Attacks, Imprisonment, and Pressure

Security forces subjected journalists and media houses to violence, harassment, and intimidation.  Local media and media freedom activists reported numerous incidents of security officials, local government officials, and private individuals with connections to government officials assaulting journalists in the course of their work.

On August 5, four journalists were attacked by police while filming a protest by a political opposition party.  Three of the journalists were injured during the attack, and one had his equipment destroyed by security officers.

An April report from the nongovernmental organization (NGO) Africa Centre for Media Excellence noted state actors tracked SIM cards in the cell phones

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
373

of journalists and human rights defenders, violating their anonymity, to inhibit the publishing of sensitive reporting.  The same report cited numerous reports from journalists whose ability to report anonymously or disguise their identity was compromised by those they were investigating and who threatened the journalists with arrest.  The report estimated 60 percent of journalists believed compulsory registration of SIM cards and national identification cards made their work less safe and had increased self-censorship.

## Censorship by Governments, Military, Intelligence, or Police Forces, Criminal Groups, or Armed Extremist or Rebel Groups

Journalists, opposition politicians, and human rights activists reported authorities wielded control over editorial decisions at public broadcasters and at some private media outlets as well.  The government penalized those who published items contrary to its guidelines and directly and indirectly censored media, including by controlling licensing and advertising and instructing editors to suspend critical journalists.  Press freedom activists reported the government used advertising to control editorial coverage of private media organizations.

Government officials and ruling party members owned many of the private rural radio stations and imposed reporting restrictions.  Media practitioners stated government and security agents occasionally called editors and

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
374

instructed them to refrain from publishing stories portraying the government negatively, hosting critical commentators on radio and television talk shows, and discussing some political matters. The police Media and Political Crimes Unit and communications regulator Uganda Communications Commission closely monitored all radio, television, and print media.

## b. Worker Rights

### Freedom of Association and Collective Bargaining

The law provided for workers, except members of the armed forces, to form and join independent unions, bargain collectively, and conduct legal strikes. Unions registered with the Ministry of Gender, Labour, and Social Development could engage in collective bargaining. The law required the completion of labor union registration within 90 days, and the registrar authority could suspend and interdict an elected union officer if the officer was convicted by a court of law or under investigation with potential prosecution. The law gave the registrar authority to cancel a union's registration if the union's principal objectives or constitution became unlawful. The law did not define what constituted unlawful objectives. The law precluded noncitizens from becoming members of the executive committee of a trade union. The law gave the registrar authority to inspect the trade union books of account and membership.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
375

The law allowed unions to conduct activities without interference, prohibited antiunion discrimination by employers, and provided for reinstatement of workers dismissed for union activity.  The law also empowered the labor minister and labor officers to refer disputes to the Industrial Court if initial mediation and arbitration attempts failed.  The law gave government labor officers power to declare industrial actions illegal if a labor officer took steps to resolve the labor dispute in question through conciliation.  The government failed to recruit an adequate number of judicial officers to the Industrial Court, which delayed resolution of cases.

The government did not effectively enforce the law.  Civil society organizations stated labor ministry officials failed to hire, train, and equip labor officers to enforce labor laws effectively.  Employers who violated a worker's right to form and join a trade union or bargain collectively faced penalties that were not commensurate with similar abuses, and penalties were rarely applied against violators.  Administrative and judicial procedures were subject to lengthy delays and appeals.  The NGO Platform for Labor Action (PLA) reported some companies refused to honor awards handed down by the Industrial Courts, and workers were forced to incur additional costs for the proceedings.

The government and employers generally did not respect the constitutionally protected rights to freedom of association and collective bargaining.  The law did not provide trade union federations with a right to

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
376

engage in collective bargaining and further imposed mandatory conciliation to resolve labor disputes before a strike action was recognized. The law gave the government the right to declare a strike illegal, and the labor minister had authority to refer a dispute to the Industrial Court. The PLA reported limited opportunities for workers in informal sectors such as domestic work, artisanal mining, and transportation to exercise their freedom of association and organize collective bargaining measures. The government restricted some union activity through issuance of threats and harassment of union leaders, especially of medical workers' unions. The law required trade unions to provide notice of a strike and adhere to the time limits set for public meetings.

Public servants and medical workers staged strikes during the year, largely regarding delayed salaries and undelivered promises of salary raises. On May 15, police fired tear gas and arrested nine medical interns protesting delayed hospital assignments and stoppage of allowance payments following unsuccessful negotiations between the Uganda Medical Association and the Office of the Prime Minister.

## Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
377

## Acceptable Work Conditions

### Wage and Hour Laws

The law technically provided for a national minimum wage that was much lower than the government's official poverty income level.  This minimum wage standard was never implemented, and the minimum wage remained unchanged at the 1984 level of 130,000 Ugandan shillings ($35.50) per month.

The maximum legal workweek was 48 hours, and the maximum workday was 10 hours.  The law provided the workweek could be extended to 56 hours, including overtime, with the employee's consent.  An employee could work more than 10 hours in a single day if the average number of hours over a period of three weeks did not exceed 10 hours per day or 56 hours per week.  For employees who worked beyond 48 hours in a single week, the law required employers to pay a minimum of 1.5 times the employee's normal hourly rate for the overtime hours, and twice the employee's normal hourly rate for work on public holidays.  According to labor rights organizations, violations of wage, hour, or overtime laws were common in the informal sector, particularly in domestic work, agriculture, manufacturing, and mining.  The PLA reported employers regularly abused overtime laws because of poor enforcement of labor standards, lack of social protections, and high unemployment.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
378

**Occupational Safety and Health**

The law established appropriate occupational safety and health (OSH) standards and regulations for all workers. These standards were appropriate for the main industries in the country. The law authorized labor inspectors in the Ministry of Labour's Department of Occupational Safety and Health to access and examine any workplace unannounced, issue fines, and mediate some labor disputes. While the law allowed workers to remove themselves from situations endangering their health or safety without jeopardizing their employment, legal protection for such workers was ineffective. According to the PLA, most workers were unaware of their employers' responsibility to ensure a safe working environment, and many did not challenge unsafe working conditions due to fear of losing their jobs.

**Wage, Hour, and OSH Enforcement**

The Ministry of Labour and local government labor offices were responsible for enforcement of wage and hour laws, but the government did not effectively enforce them. Inspection was insufficient to enforce compliance. In addition to inspectors, labor officers conducted inspections of worksites and examined standards of employment and workers' rights more broadly. Labor officers had the authority to make unannounced inspections, initiate sanctions, instigate prosecutions of repeat offenders through the Industrial Court, and close worksites. Labor officers often depended on complainants and local civil society organizations for travel to inspection sites. PLA

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
379

officials reported many labor officers served concurrently as social workers and did labor-related work only when a complainant reported an abuse. PLA officials also reported companies often did not respect recommendations made by labor officers during workplace inspections, including providing contracts or protective wear, or they bribed labor officers to prevent them from issuing penalties.

Authorities rarely enforced labor laws on wages and hours, and penalties were not commensurate with those for similar abuses. Penalties were rarely applied against violators. The legal minimum wage was never implemented, and civil society organizations reported most domestic employees worked all year without leave. Wage arrears were common in both the public and private sectors. Workers' claims for overtime wages were difficult to enforce as they lacked documentation of their accumulated hours. PLA officials reported abuses of standard wages and overtime pay were common in the manufacturing, education, private security, retail, agriculture, private health care, domestic work, and transport sectors.

The same inspectors conducted wage, hour, and OSH inspections. Authorities rarely enforced OSH laws, and penalties were not commensurate with those for similar abuses. Penalties were rarely enforced against violators. Workers in the mining, construction, and textile sectors faced hazardous and exploitive working conditions. The PLA reported abuses of safety and health standards were common in the

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
380

manufacturing, education, private security, and transport sectors.

According to 2021 government statistics, the most recent available, the informal sector, excluding agriculture, employed up to 88 percent of the labor force, primarily in the service industry, trade, domestic work, construction, and transport.  The government did not enforce labor laws in the informal economy.

# c. Disappearance and Abduction

## Disappearance

There were reports of enforced disappearances by or on behalf of government authorities.  Local media, opposition political parties, and human rights lawyers stated police, the Internal Security Organization, and military, including the Defense Intelligence and Security (DIS) and the Special Forces Command, abducted and held citizens at unidentified detention facilities without charge.  Members of the political opposition and environmental protesters were particularly targeted.

Following the attempted arrest of an environmental activist by the Special Forces Command at a June 1 protest in Hoima, his family reported him missing on June 4.  Local residents found the activist coughing up blood and unable to communicate on a roadside on June 10.

On January 8, the chair of the Uganda Human Rights Commission, an entity

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
381

mandated by the constitution, disputed the disappearance of 18 NUP party supporters, some missing since 2019, claiming the individuals "either don't exist or are very much alive living overseas." On January 19, the families of the 18 missing persons petitioned the High Court requesting the presentation of their family members before a judge. On April 8, the government announced security forces were unable to locate 11 of the 18 missing NUP supporters, claiming these individuals were never in police custody. The government did not produce the remaining seven individuals for the hearing, claiming they had already been released from detention.

## Prolonged Detention without Charges

The constitution and law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court. The government generally did not observe these requirements.

The law required judges or prosecutors to issue a warrant before authorities made an arrest unless the arrest occurred during commission of a crime or while in pursuit of a perpetrator, but authorities often arrested suspects without warrants. The law required authorities to arraign suspects within 48 hours of arrest, but they frequently held suspects longer without charge. Some detainees remained in detention for long periods without a court appearance. Authorities were required to try suspects arrested for capital offenses within 360 days (120 days if charged with an offense triable by

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
382

subordinate courts) or release them on bail.  If prosecutors presented the case to a court within this time, however, there was no limit on further pretrial detention.  While the law required authorities to inform detainees immediately of the reason for detention, at times they did not do so.

The law provided for bail at the judge's discretion, but many suspects were unaware of the law or lacked the financial means to pay bail fees.  Judges generally granted requests for bail.  Human rights organizations reported illiterate persons were disproportionately more likely to come into conflict with the law and be detained, which led to high rates of abuse of rights to bail and police bond due to a lack of awareness of the right and an inability to afford legal services.  The law provided detainees the right to legal representation and access to a lawyer, but authorities did not always respect this right.  The law required the government to provide an attorney for indigent defendants charged with capital offenses, and the government adhered to this requirement.  Political opposition and terrorism suspects were often held incommunicado for extensive periods.

Arbitrary arrests and unlawful detention, particularly of political opposition supporters, journalists, environmental activists, citizens in the Karamoja region, and protesters, were widespread.

Throughout the year, police and military officials arrested and harassed opposition supporters.  There were numerous abuses similar to the following example.  On August 5, police arrested 14 opposition Patriotic

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
383

Freedom Front officials as they marched in protest to the Kenyan embassy regarding the July detention of 36 youth activists who were arrested in Kenya and brought back to Uganda on terrorism-related charges.  Police charged the party officials with "participating in unlawful assembly activities" and "public nuisance."

In a 2023 annual report, the Ministry of Justice reported 48 percent of prisoners were in pretrial detention.  Factors contributing to prolonged pretrial detention included case backlogs due to an inefficient judiciary, inadequate police investigations, insufficient use of bail, and the absence of a time limit for the detention of detainees awaiting trial.  There was insufficient information available to determine whether the length of pretrial detention frequently equaled or exceeded the maximum sentence for an alleged crime.

## d. Violations in Religious Freedom

See the Department of State's annual *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## e. Trafficking in Persons

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
384

# Section 3. Security of the Person

## a. Torture and Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution and law prohibited such practices, but there were credible reports government agents tortured and physically abused detainees, according to media, opposition political parties, and human rights activists.

On September 3, police officers shot NUP presidential candidate Robert Kyangulanyi (also known as Bobi Wine) in the leg with a tear gas cannister after he left the home of an NUP lawyer.  Video of the incident showed officers discharging nonlethal weapons at NUP supporters from close range, including an officer who fired a cannister between Wine's legs; the cannister exploded and lodged two pieces of shrapnel in Wine's leg.  A police statement claimed Wine injured himself while getting into his vehicle.  Following the incident, Wine was hospitalized for lower-leg injuries, which limited his ability to walk.  On September 4, authorities announced an investigation into the matter, but no results were released as of year's end.

Government officials reportedly committed acts of sexual violence.  NGOs reported police medical staff subjected at least 15 persons to forced anal examinations following their arrests.  Opposition protesters stated security forces used or threatened to use forced anal examinations during

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
385

interrogations.

Allegations of abuse and torture were often associated with detainees held at the police Special Investigations Unit facility at Kireka and the nearby DIS headquarters in Mbuya.

Impunity was widespread within the police, prison, and executive branch security services, as well as the military.  Abuse victims identified DIS personnel in multiple cases of cruel, inhuman, and degrading treatment of detainees.  Security forces did not take adequate measures to investigate and punish officers implicated in human rights abuses.  There were no public reports of disciplinary actions against security personnel accused of torture or abuse during the year.

The law prohibited female genital mutilation/cutting (FGM/C) and established a maximum penalty of 10 years' imprisonment for perpetrators or life imprisonment if the victim died.  The government did not effectively enforce the law.

## b. Protection of Children

## Child Labor

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
386

## Child Soldiers

The terrorist group Allied Democratic Forces continued the recruitment of children for its armed rebellion in the Democratic Republic of the Congo (DRC).  On April 10, Muslim leaders in Busia warned followers against extremist recruitment after two local youths were arrested and accused of planning to join the group.  For a detailed accounting of conflict abuses, see the *Country Reports on Human Rights Practices* for the DRC.

In July, a UN Group of Experts on the DRC alleged the government provided active support to the March 23 Movement, a nonstate armed group that forcibly recruited and used child soldiers in the conflict in the eastern DRC.  The government denied the allegation.  On September 10, security forces arrested three DRC nationals for recruiting 32 DRC national refugees, including four girls, at the Kyangwali Refugee Settlement.  The government charged the recruiters with trafficking in persons.

## Child Marriage

The legal minimum age for marriage was 18, but authorities generally did not enforce this law.  Child marriages were prevalent.  Local media, human rights activists, political leaders, and police reported some communities forced girls into marriage, particularly along the eastern border of the country.  Activists noted police classified cases of child marriage as statutory rape, referred to locally as "defilement," indicating the potential for a higher

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
387

number of child marriages than captured in official reports. Officials stated some parents married off girls they could not financially support in return for payment. Children's rights activists reported some parents forced child survivors of statutory rape to marry their abusers if the child became pregnant. Officials from local government and police partnered with cultural institutions and civil society organizations to carry out community sensitization campaigns in rural areas to speak out against the practice.

Humanitarian workers reported some refugee girls were forced into early marriage, sent by their families into South Sudan to avoid prosecution or annulment, and then brought back to the country months later. The government, the Office of the UN High Commissioner for Refugees (UNHCR), and humanitarian NGOs took steps to prevent or dissolve early and child marriages, although they were not always successful. Additionally, media reported arrests and prosecutions of the parents of child brides.

## c. Protection to Refugees

The government cooperated with UNHCR and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.

### Provision of First Asylum

The law provided for the granting of asylum or refugee status, and the

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
388

government had a system for providing protection to refugees.  Individuals from Sudan, South Sudan, and the eastern DRC who entered the country through a designated border post had prima facie refugee status (status without requiring individual determination of refugee status).  The government Refugee Eligibility Committee determined refugee status.  The committee was functional, but administrative matters and the influx of asylum seekers caused backlogs despite efforts by UNHCR and the government to expedite the process.

# d. Acts of Antisemitism and Antisemitic Incitement

The Jewish population numbered between 2,000 and 3,000 members centered around the Mbale District.  There were no reports of antisemitic incidents.

# e. Instances of Transnational Repression

According to human rights groups, media, and opposition figures, the government engaged in actions of transnational repression.

## Threats, Harassment, Surveillance, or Coercion

Human rights activists, journalists, and opposition politicians located outside the country reported regular threats, harassment, surveillance, and coercion from security officials.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
389

On August 7, Ugandan Ambassador to Canada Joy Ruth Acheng reportedly confronted NUP supporters in Toronto, telling protesters to "stop abducting yourselves and killing yourselves, saying it is President Museveni" while also threatening to have them deported from Canada.

## Bilateral Pressure

On July 23, 36 activists from the opposition party Forum for Democratic Change attending a youth leadership event were arrested in Kisumu, Kenya by Kenyan security forces and transported to Uganda, where they were detained and charged with "terrorism-related offences."  One of the arrested youths was a registered political asylee who had lived in Kenya since 2012.  At year's end, none of the 36 activists were granted bail, and they remained in custody awaiting trial.

In November, security forces arrested opposition Patriotic Freedom Front party leader Keeza Besigye in Kisumu, Kenya, brought him back to Uganda, and charged him in a military court with illegal possession of arms and undermining national security.  At year's end, Besigye remained detained in a military barracks awaiting trial and was denied bail.

Country Reports on Human Rights Practices for 2024
United States Department of State • Bureau of Democracy, Human Rights, and Labor
390

**In the Matter of:**                                          **File No.:**
**ABREGO GARCIA, Kilmar Armando**                              **A# 201-577-119**

### CERTIFICATE OF SERVICE

On this 25th day of August, 2025, I, Benjamin Osorio, served a copy of the Emergency Motion for Stay of Removal and any attached pages, by electronically filing through the EOIR Courts and Appeals System (ECAS), which will automatically send service notification to both parties that a new document has been filed.


Benjamin Osorio, Esq.
*Counsel for Respondent*

# Payment Confirmation - BIA MOTION Kiosk Payment Form (MY AGENCY)

Before You
Begin

Complete
Agency Form

Enter
Payment Info

Review &
Submit

**Confirmation**

## Your payment is complete

You will not be able to access this receipt once you leave this page. A confirmation email has been sent to vilma@murrayosorio.com.

**Because you are not signed in:**

This payment will not show in your payment activity. You can sign in or create an account now and Pay.gov will have a record of your payment.

**To confirm your payment went through:**

Contact the federal government agency you paid. Pay.gov is unable to cancel this transaction.

**We value your feedback!**

Do you have any feedback regarding your Pay.gov experience?
Please share it here.

USCIS Refund Policy

By completing this transaction, you agree that you have paid for a government service and that the filing fee, biometric services fee and all related financial transactions are final and not refundable, regardless of any action USCIS takes on an application, petition, or request. You must submit all fees in the exact amounts.

Please refer to the form(s) you are filing for additional information, or you may call the USCIS Customer Contact number at 1-800-375-5283. For TTY (deaf or hard of hearing) call: 1-800-767-1833.

## Tracking Information

Pay.gov Tracking ID: 27QRD0JV

Agency Tracking ID: 77136981075

Form Name: BIA MOTION Kiosk Payment Form (MY AGENCY)

Application Name: EOIR MOTION Payment Form (Kiosk)

## Payment Information

Payment Type: Debit or credit card

Payment Amount: $1,045.00

Transaction Date: 08/25/2025 03:46:09 PM EDT

Payment Date: 08/25/2025

office Location: BAL

First Last Applicant: Kilmar Abrego Garcia

Applicant add 1, 2 City State Zip: 508 Waterworks Road, Farmville, VA, 23901

Applicant Phone:

Applicant Email:

Payor First/Last: Natalia Santos

Address 1, 2 City, State Zip: 5230 Herzell Woods Ct., Fairfax, VA, 22032

Payor Phone: 703-352-2399

Payor Email: vilma@murrayosorio.com

## Account Information

Cardholder Name: Natalia Santos

Card Type: American Express

Card Number: ************1267