# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Greenbelt Division

| | |
|---|---|
| Kilmar Armando Abrego Garcia, | |
| Petitioner, | |
| v. | Case No. 8:25-cv-02780 (PX) |
| Kristi Noem, *et al.*, | |
| Respondents. | |

## Petitioner's Supplemental Brief in Support of His Petition for Habeas Corpus

## Table of Contents

Page(s)

Introduction....................................................................................................................1

Background .....................................................................................................................2

Argument ........................................................................................................................7

I.    The Government's arbitrary and retaliatory treatment of Abrego Garcia violates
      due process......................................................................................................... 7

II.   Due process requires immigration judge review of the negative reasonable fear
      determination. ................................................................................................... 12

Conclusion ....................................................................................................................21

## Table of Authorities

**Page(s)**

### Cases

*Abrego Garcia v. Noem*,
2025 WL 1021113 (4th Cir. Apr. 7, 2025) ...........................................................2, 8

*Abrego Garcia v. Noem*,
2025 WL 1024654 (D. Md. Apr. 4, 2025) ............................................................2, 8

*Abrego Garcia v. Noem*,
2025 WL 1085601 (D. Md. Apr. 10, 2025) .............................................................3

*Abrego Garcia v. Noem*,
2025 WL 1135112 (4th Cir. Apr. 17, 2025) ............................................................3

*Abrego Garcia v. Noem*,
2025 WL 2062203 (D. Md. July 23, 2025)..........................................................4, 19

*Bordenkircher v. Hayes*,
434 U.S. 357 (1978).........................................................................................7

*Crespin-Valladares v. Holder*,
632 F.3d 117 (4th Cir. 2011) ........................................................................17, 18

*Cruz-Medina v. Noem*,
2025 WL 2841488 (D. Md. Oct. 7, 2025) ...................................14, 15, 16, 17, 21

*D.A. v. Noem*,
2025 WL 2646888 (D.D.C. Sept. 15, 2025) .........................................................19

*D.B. v. Cardall*,
826 F.3d 721 (4th Cir. 2016) ........................................................................13, 14

*D.V.D. v. DHS*,
778 F. Supp. 3d 355 (D. Mass. 2025) .................................................................19

*Guzman Chavez v. Hott*,
940 F.3d 867 (4th Cir. 2019) ...........................................................................14

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004)........................................................................................16

*Khouzam v. Att'y Gen. of U.S.*,
549 F.3d 235 (3d Cir. 2008)..............................................................................19

*Kirk v. Comm'r of Soc. Sec. Admin.*,
    987 F.3d 314 (4th Cir. 2021) ............................................................. 15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ................................................................. 13, 14

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ......................................................................... 13

*Nat'l Black Police Ass'n, Inc. v. Velde*,
    712 F.2d 569 (D.C. Cir. 1983) ......................................................... 18

*Nguyen v. Scott*,
    2025 WL 2419288 (W.D. Wash. Aug. 21, 2025) ............................. 19

*Noem v. Abrego Garcia*,
    145 S. Ct. 1017 (2025) ................................................................... 2, 8

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ......................................................................... 18

*Reno v. Flores*,
    507 U.S. 292 (1993) ......................................................................... 13

*Sagastizado Sanchez v. Noem*,
    2025 WL 2957002 (S.D. Tex. Oct. 2, 2025) .................... 14, 15, 18, 19, 20

*Sagastizado Sanchez v. Noem*,
    2025 WL 2957003 (S.D. Tex. Sept. 10, 2025) ................................. 14

*Tanha v. Warden, Baltimore Det. Facility*,
    2025 WL 2062181 (D. Md. July 22, 2025) ..................................... 19

*Tomas-Ramos v. Garland*,
    24 F.4th 973 (4th Cir. 2022) ........................................................... 17

*Trump v. J.G.G.*,
    604 U.S. 670 (2025) ................................................................. 13, 15

*U.S. Dep't of Homeland Sec. v. Thuraissigiam*,
    591 U.S. 103 (2020) ......................................................................... 15

*United States v. Abrego Garcia*,
    ---F. Supp. 3d. ---, 2025 WL 2814712 (M.D. Tenn. Oct. 3, 2025) ..................... 3, 8

*United States v. Goodwin*,
    457 U.S. 368 (1982) ......................................................................... 7

*United States v. R. Enters., Inc.*,
   498 U.S. 292 (1991) ........................................................................................7

*Wolff v. McDonnell*,
   418 U.S. 539 (1974) .............................................................................1, 7, 11

## Constitution

U.S. Const. amend V ........................................................................................13, 15

## Statutes

8 U.S.C. § 1182(d)(5) ...........................................................................................3

8 U.S.C. § 1229a ................................................................................................20

8 U.S.C. § 1231(b)(2) ....................................................................................10, 13

8 U.S.C. § 1231(b)(3) ....................................................................................15, 20

## Regulations

8 C.F.R. § 208.30(g) ...........................................................................................16

8 C.F.R. § 208.31 ...............................................................................................16

8 C.F.R. § 1003.42 ........................................................................................16, 21

8 C.F.R. § 1208.31(g) ...............................................................................16, 18, 21

## Other Authorities

Adekunle Owolabi, *Eswatini to repatriate US deportees to home countries,*
   Independent News Eswatini (July 17, 2025),
   https://independentnews.co.sz/18740/news/diplomacy/eswatini-to-repatriate-
   us-deportees-to-their-home-countries ...................................................................19

DECLARATION OF INDEPENDENCE para. 20 (U.S. 1776) ...............................................7

*Judge Philip P. Taylor FY 2019 - 2024, Atlanta Immigration Court*, TRAC
   Immigration,
   https://tracreports.org/immigration/reports/judgereports/00787ATL/index.html ..................10

Savior Kakama & Muza Fihlani, *Eswatini Accepts 10 US Deportees Despite
   Legal Challenge*, BBC (Oct. 6, 2025) ...................................................................19

Petitioner Kilmar Armando Abrego Garcia respectfully submits this Supplemental Brief in support of his Petition for Habeas Corpus, ECF No. 1 (the "Petition" or "Pet.").

## Introduction

As directed by this Court, this supplemental brief addresses the constitutionality of the Government's process for removing Abrego Garcia to a third country, and in particular the legality of the March 30 Memorandum governing third-country removals. *See* Transcript of Status Conf. at 17:15–18:5, *Abrego Garcia v. Noem*, Case No. 8:25-cv-02780-PX (D. Md. Oct. 27, 2025) ("Oct. 27 Tr."). The Government has violated due process in two main ways.

*First*, the Government has waged a campaign of retaliation against Abrego Garcia that began shortly after his unlawful removal to El Salvador and continues through its arbitrary and punitive use of civil immigration and criminal proceedings today. The record demonstrates overwhelming evidence of retaliatory intent. The Government has cycled through four purported third-country destinations—Uganda, Eswatini, Ghana, and now Liberia—without providing the notice, opportunity to be heard, and individualized assessment that due process requires. It has disregarded Abrego Garcia's statutory designation of Costa Rica, despite that nation's written assurances that it would accept him. Most strikingly, these actions appear to have been coordinated at the highest levels of government rather than through the ordinary administrative channels that the Government itself represented to this Court that it would follow. *See* Transcript of Evid. Hr'g at 32:1–33:8, *Abrego Garcia v. Noem*, Case No. 8:25-cv-00951-PX (D. Md. Jul. 10, 2025) ("Jul. 10 Tr.").

This pattern bears none of the hallmarks of lawful process. It reflects instead the arbitrary and retaliatory exercise of government power that violates the core component of the Due Process Clause: the "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

1

*Second*, due process forbids the Government from removing Abrego Garcia to a third country where he faces a substantial risk of persecution, torture, or re-deportation to El Salvador (*i.e.*, refoulement), without review by an immigration judge. The Government insists that the unreasoned determination of a single immigration officer—who concluded that Abrego Garcia failed to establish that it is "more likely than not" that he will be persecuted or tortured in Liberia— satisfies due process. It does not. Due process entitles Abrego Garcia both to review of that determination and to the application of the correct standard of review: whether there is a "reasonable possibility" of persecution or torture, evaluated in light of the risk of refoulement.

It is undisputed that individuals on far weaker footing than Abrego Garcia receive immigration-judge review of negative fear determinations—including those who unlawfully re-enter the United States and have prior removal orders reinstated, and those placed in expedited removal proceedings. Due process requires that Abrego Garcia—whose case presents at least as serious a deprivation of liberty—receive at least as much procedural protection.

## Background

In March 2025, the Government illegally removed Abrego Garcia to El Salvador in the middle of the night, in violation of a withholding order, and without even a modicum of process. Pet. ¶ 1. Although the Government later conceded the removal was erroneous, it nevertheless sought to keep Abrego Garcia confined in El Salvador. Pet. ¶ 2.

Within a single week, this Court, the Fourth Circuit, and the Supreme Court—with no dissents—each ordered the Government to "'facilitate' Abrego Garcia's release from custody in El Salvador and to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025); *accord Abrego Garcia v. Noem*, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) ("*Abrego Garcia II*"); *Abrego Garcia v. Noem*, 2025 WL 1024654, at *1 (D. Md. Apr. 4, 2025) ("*Abrego Garcia I*"). On the same day the Supreme

Court issued its order, this Court directed the Government to "take all available steps to facilitate the return of Abrego Garcia to the United States as soon as possible." *Abrego Garcia v. Noem*, 2025 WL 1085601, at *1 (D. Md. Apr. 10, 2025) ("*Abrego Garcia III*"). Yet the Government did not concede that obligation until April 17, after the Fourth Circuit issued the fifth unequivocal court order on the subject. *Abrego Garcia v. Noem*, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) ("*Abrego Garcia IV*"); *see also* Transcript of Hr'g at 91:8–24, *Abrego Garcia v. Noem*, Case No. 8:25-cv-00951-PX (D. Md. May 16, 2025) ("May 16 Tr.") (Government acknowledging it continued to contest the ruling until the second Fourth Circuit decision).

For months, the Government flouted this Court's orders while professing it was powerless to bring Abrego Garcia back. It delayed his return until June 6, 2025, which was timed to enable the Government to file criminal charges it investigated while he was incarcerated in El Salvador. Pet. ¶¶ 4, 34; ECF No. 1-2. Upon his return, the Government paroled Abrego Garcia into the United States under significant public benefit parole, 8 U.S.C. § 1182(d)(5), valid through June 4, 2026. Pet. ¶ 34.

Back in the United States, Abrego Garcia moved to dismiss the criminal charges for being an unconstitutional selective and vindictive prosecution. *United States v. Abrego Garcia*, ---F. Supp. 3d. ---, 2025 WL 2814712 (M.D. Tenn. Oct. 3, 2025). The Tennessee court determined that Abrego Garcia had established a prima facie showing of vindictiveness, and it ordered discovery and an evidentiary hearing. *Id.*

Meanwhile, the Government represented that if Abrego Garcia were released from criminal custody on pre-trial conditions, U.S. Immigration and Customs Enforcement ("ICE") would take him into custody and seek to remove him either to El Salvador or to a third country. Pet. ¶ 5. On July 10, 2025, this Court held an evidentiary hearing in the original *Abrego Garcia v. Noem* matter.

During that evidentiary hearing and the oral argument that followed the next day, the Government's witness (a corporate designee whose testimony binds the Government) and counsel made two consistent and important representations: (1) Abrego Garcia would be assigned a docket officer—a local ICE agent, like every other detainee—who would be in charge of making any third-country removal decision, Transcript of Evid. Hr'g at 52:1–54:23, *Abrego Garcia v. Noem*, Case No. 8:25-cv-00951-PX (D. Md. Jul. 11, 2025) ("Jul. 11 Tr."); and (2) the docket officer would not begin looking for a placement until Abrego Garcia entered ICE custody, Jul. 10 Tr. at 26:14–27:1, 31:14–21, 32:6–7, 33:4–7.

After that hearing, the Court ordered that if the Government sought to remove Abrego Garcia to a third country, it had to provide "written notice to Abrego Garcia and all counsel of record in this case of the intended third country at least seventy-two hours prior to commencing removal so that Abrego Garcia may assert claims of credible fear or seek any other relief available to him under the law and the Constitution." *Abrego Garcia v. Noem*, 2025 WL 2062203, at *9 (D. Md. July 23, 2025) ("*Abrego Garcia V*"); *see also* Pet. ¶ 5.

On August 21, 2025, the Government provided Abrego Garcia's counsel with a letter from the government of Costa Rica stating that Costa Rica would accept Abrego Garcia as a refugee. Pet. ¶ 5. The Government offered deportation to Costa Rica on the condition that Abrego Garcia plead guilty to the criminal charges and forgo the pretrial release that the Tennessee court had ordered—terms he declined. *United States v. Abrego Garcia*, Case No. 3:25-cr-00115 (M.D. Tenn.), ECF No. 113 at 2. He was then released from U.S. Marshals custody on August 22 pursuant to a court order. Pet. ¶ 37.

That same day—before Abrego Garcia entered ICE custody—the Principal Legal Advisor for Immigration and Customs Enforcement's Office of the Principal Legal Advisor, rather than a

local docket officer, informed Abrego Garcia's counsel (but not Abrego Garcia himself) that it intended to remove him to Uganda. Pet. ¶¶ 6, 39–40. Abrego Garcia immediately expressed fear of persecution and torture in Uganda and requested a fear interview. Pet. ¶ 41. He also designated Costa Rica as his preferred country of removal. Pet. ¶ 42.

On August 25, ICE took Abrego Garcia into custody, prompting him to file this habeas petition. ECF No. 1. At a status conference two days later, the Government represented that DHS could "commit to adjudicating" the fear "process for any particular country within two weeks." Transcript of Status Conf. at 8:21–9:7, *Abrego Garcia v. Noem*, Case No. 8:25-cv-02780-PX (D. Md. Aug. 27, 2025) ("Aug. 27 Tr."). Abrego Garcia never received a fear interview for Uganda.

Instead, on September 5, ICE's Principal Legal Advisor notified Abrego Garcia that he would be removed to Eswatini. ECF No. 57-1. Abrego Garcia promptly asserted fear of removal to Eswatini and requested a fear interview. *Id.* At a hearing on October 6, this Court observed that "nothing has been done" with respect to Eswatini, Transcript of Status Conf. at 19:2–4, *Abrego Garcia v. Noem*, Case No. 8:25-cv-02780-PX (D. Md. Oct. 6, 2025) ("Oct. 6 Tr."), and the Government admitted that it had not yet formalized a removal plan or even contacted Eswatini, *id.* at 12:22–23, 13:10–25.

On October 9—on the eve of the Court's evidentiary hearing concerning steps that had been taken to remove Abrego Garcia to Eswatini or any other third country—Abrego Garcia (but not his counsel) received written notice from the Government that it was now processing his removal to Ghana. Ex. E. When his counsel requested a copy of that notice, the Government responded that the notice was "premature." *Id.*

At the evidentiary hearing the following day, the Government conceded that it had not taken any steps to contact Eswatini until October 8, 2025. Transcript of Evid. Hr'g at 56:10–21,

*Abrego Garcia v. Noem*, Case No. 8:25-cv-02780-PX (D. Md. Oct. 10, 2025) ("Oct. 10 Tr."). The Government further stipulated that "Costa Rica is on the table if Eswatini falls through." *Id.* at 107:8–9. The Government also noted that it was in discussions with Ghana to accept Abrego Garcia. *Id.* at 32:11, 32:22–23. But while the hearing was in progress, Ghana publicly announced that it would not accept Abrego Garcia. ECF Nos. 49, 49-1.

On October 14, the Government conducted a fear interview for Eswatini. Although results are ordinarily issued within days, Abrego Garcia never received them, and the Government has produced no documentation concerning that interview.

Instead, on October 24, the Government notified Abrego Garcia's counsel that it was designating Liberia as the new country of removal and represented it could remove Abrego Garcia there as early as October 31—just days before the scheduled hearing on his motion to dismiss for vindictive prosecution in Tennessee. ECF No. 56. Abrego Garcia asserted fear of removal to Liberia that same day. ECF No. 57-1. The Government later produced to counsel purported "diplomatic assurances" from Liberia that it deemed credible. *See* Exs. A–D. Those assurances state that Liberia agreed to receive Abrego Garcia only on a temporary basis. Ex. D.

The Court held another status conference on October 27. Fewer than five minutes before that conference began, Abrego Garcia's counsel learned that the Government had scheduled Abrego Garcia's fear interview for that same moment. At the Court's urging, the Government postponed the interview to the following day. *See* Oct. 27 Tr. at 4:2–5:20.

Abrego Garcia's fear interview for Liberia took place on October 28. On November 4, his counsel requested disclosure of any determination the Government had already made. Only then did the Government reveal that an immigration officer had, on the day of the interview, concluded that Abrego Garcia did not establish that it is more likely than not that he will be persecuted or

tortured in Liberia. *See* Exs. F–H. The Government has offered no explanation for its week-long delay in notifying Abrego Garcia and his counsel of those results. Abrego Garcia has submitted a written request for review of the denial by an Immigration Judge, to which he has received no response. Ex. I.

To date, the Government has provided no evidence that it has made any further contact with Costa Rica or taken any steps to remove Abrego Garcia there.

**Argument**

## I.    The Government's arbitrary and retaliatory treatment of Abrego Garcia violates due process.

"The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Retaliation against an individual for exercising constitutional rights is the quintessential form of arbitrary government action. The Founders understood this danger well: the Declaration of Independence condemned the King for "transporting us beyond Seas to be tried for pretended offences." DECLARATION OF INDEPENDENCE para. 20 (U.S. 1776). The Government's treatment of Abrego Garcia since March 2025 exemplifies this constitutional wrong: a sustained pattern of arbitrary and retaliatory measures designed to punish him for invoking the protection of the courts after his unlawful removal to El Salvador.

The Supreme Court has long held that the Government may not "select targets out of malice or an intent to harass." *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991). Nor may it "punish a person because he has done what the law plainly allows him to do," for that constitutes "a due-process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Here, the Government's conduct—from its defiance of judicial orders to its manipulation of criminal and immigration proceedings—reveals precisely the kind of retaliation that due process forbids.

The opening chapter of this retaliatory campaign began with the Government's deliberate obstruction of court orders directing it to facilitate Abrego Garcia's return from El Salvador. Every level of the federal judiciary—including this Court, the Fourth Circuit, and the Supreme Court—ordered the Government to facilitate his return, yet the Government delayed for months. *See Noem v. Abrego Garcia*, 145 S. Ct. at 1018; *see also Abrego Garcia I*, 2025 WL 1024654, at *1; *Abrego Garcia II*, 2025 WL 1021113. It ultimately complied only after initiating criminal charges in Tennessee that it had investigated while Abrego Garcia was unlawfully detained in El Salvador—an unmistakable act of punishment for his success in obtaining judicial relief against the Government. *See* Transcript of Motions Hr'g at 11:2–12:8, *Abrego Garcia v. Noem*, Case No. 8:25-cv-00951-PX (D. Md. Jul. 7, 2025) ("Jul. 7 Tr."). The Middle District of Tennessee has already found a prima facie showing of prosecutorial vindictiveness and ordered discovery and an evidentiary hearing. *United States v. Abrego Garcia*, ---F. Supp. 3d. ---, 2025 WL 2814712. That finding betrays that what animates the Government's actions here is retaliation.

Having manipulated the criminal process, the Government turned next to the immigration process. On August 22, 2025—the day Abrego Garcia was released from criminal custody by order of the Middle District of Tennessee—ICE's Principal Legal Advisor notified Abrego Garcia's counsel that the Government intended to remove Abrego Garcia to Uganda. Pet. ¶¶ 6, 39–40 & ECF No. 1-5. That announcement contradicted the Government's sworn testimony that any third-country removal determination would occur only after Abrego Garcia entered ICE custody, *see* Jul. 10 Tr. at 75:16–17 ("[D]ecisions aren't going to be made until that individual arrives in ICE custody."); *see also id.* at 31:10–21, 32:6–7, 33:4–7, and that the decision would be made by a local docket officer in the jurisdiction in which he was detained, *see* Jul. 10 Tr. at 26:10–27:1 ("The responsibility will fall on the docket officer or case officer at the facility he or she is detained

at. . . . We don't work these cases that are in other jurisdictions."); *see also id.* at 22:4–13, 46:10–15; Jul. 11 Tr. 50:20–51:20 (representing Abrego Garcia would be treated like "the garden variety case . . . if he is actually released on Wednesday and if ICE takes him into custody."); *id.* at 52:1–54:2.

At the October 10 evidentiary hearing, the Government's designated witness—whose testimony binds the Government, *see* ECF No. 47 ¶ 3—admitted that directives concerning Abrego Garcia's removal were coming from the White House National Security Council. *See* Oct. 10 Tr. at 47:13–22. The Government's counsel confirmed the involvement of presidential advisors by invoking the presidential communications privilege and stipulating that all of the factors necessary to establish the privilege were satisfied. *See id.* at 119:24–123:6, 125:14–23. Departing from the ordinary administrative process and routing removal decisions through the White House evinces the arbitrary and retaliatory nature of the Government's actions.

The arbitrariness and retaliation continued with the Government's selection of purported third-country removal destinations—first Uganda, then Eswatini, then Ghana, and now Liberia—each lacking any connection to Abrego Garcia. The Government designated most of these countries as removal destinations before it had even asked whether they would accept Abrego Garcia. *See* Oct. 10 Tr. at 134:20 (Government witness testifying that "Uganda ultimately said no"); *id.* at 56:10–21 (Government did not ask Eswatini to accept Abrego Garcia before designating it); *id.* at 161:20–22 (referencing Ghana's public rejection); *see also* ECF No. 32 at 13; ECF Nos. 32-6, 49. Whenever one destination fell through, the Government selected another, seemingly without even considering whether removal there would be possible. All the while, Abrego Garcia has languished in ICE custody.

Perhaps the clearest evidence of retaliation lies in the Government's unprecedented refusal to honor Abrego Garcia's statutory designation of Costa Rica as his country of removal. Under 8 U.S.C. § 1231(b)(2), the Government must remove a noncitizen to the country he designates unless one of four narrow exceptions applies—none of which are present here. *See* ECF No. 32 at 14–17. Costa Rica has offered written assurances that it would accept Abrego Garcia as a refugee, grant him legal status, and prevent his refoulement to El Salvador. Pet. ¶ 36 & ECF No. 1-3. The Government's counsel represented that Costa Rica would be "on the table" if Eswatini fell through—which it did—yet, the Government has ignored that option and instead pursued removal to distant countries in Africa with which Abrego Garcia has no connection. The Government has not identified a single case in which it refused removal to a designated country that (1) offered written assurances of acceptance and non-refoulement, and (2) presented no statutory basis for rejection. The only plausible explanation is that the Government aims to punish Abrego Garcia.

The Government's procedural manipulations extend to the administrative immigration proceedings. After instructing Abrego Garcia that his sole recourse was to move to reopen in immigration court, Aug. 25 Tr. at 14:14–22, the Government reassigned his Baltimore-based case to an Atlanta-based immigration judge with a history of denying asylum claims. *See* Oct. 10 Tr. at 109:10–114:9; ECF No. 39.[1] That judge disclaimed jurisdiction, opining that "only the Department has jurisdiction to seek reopening." ECF No. 39 at 10. The Government then refused to act, foreclosing the very avenue for an opportunity to be heard that the Government had told Abrego Garcia to pursue. *See* Aug. 25 Tr. at 14:14–22.

---

[1] *Judge Philip P. Taylor FY 2019 - 2024, Atlanta Immigration Court*, TRAC Immigration, https://tracreports.org/immigration/reports/judgereports/00787ATL/index.html ("Compared to Judge Taylor's denial rate of 88.9 percent, Immigration Court judges across the country denied 57.7 percent of asylum claims during this same period.").

Further evidence appears in the Government's handling of Abrego Garcia's fear interviews. The Government apparently never conducted a fear interview for Uganda and Ghana, despite designating both as intended countries of removal. *See* Ex. E. It has never provided the results of the fear interview for Eswatini. As for Liberia, the Government initially attempted to schedule the fear interview just moments before this Court's October 27 status conference was set to begin. Oct. 27 Tr. at 4:2–7. It then withheld the negative determination for Liberia for a full week, producing it only after Abrego Garcia's counsel demanded disclosure. *See* Ex. I.

After months of inaction, the Government abruptly accelerated removal proceedings to Liberia, informing this Court that it wished to execute removal just days before the scheduled hearing on Abrego Garcia's motion to dismiss for vindictive prosecution in Tennessee. ECF No. 56; Oct. 27 Tr. at 14:20–15:7. This was a sharp departure from the Government's prior conduct. Despite holding Abrego Garcia in ICE detention since August, the evidence in the record demonstrates that the Government made no effort to contact any potential receiving country until October 8, two days before this Court's October 10 evidentiary hearing. Oct. 10 Tr. at 56:10–21. The timeline suggests a pattern: when the Government received orders it disliked in Abrego Garcia's civil case challenging his unlawful removal to El Salvador; it initiated a criminal prosecution in retaliation; and when it received orders it disliked in Abrego Garcia's criminal case, it initiated third-country removal efforts in retaliation.

Through these actions, the Government has violated Abrego Garcia's most basic due process rights. As the Supreme Court has made clear, the "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558. The record here shows precisely such arbitrary action: a sustained campaign of retaliation directed by the highest levels of government against an individual who sought judicial protection from his unlawful

removal to El Salvador. Abrego Garcia cannot receive due process so long as the Government continues to act with retaliatory purpose. This Court should intercede to ensure that Abrego Garcia receives the due process the Constitution demands—an immigration process untainted by political or punitive motive.

## II.    Due process requires immigration judge review of the negative reasonable fear determination.

The Government seeks to remove Abrego Garcia pursuant to a memorandum dated March 30, 2025, which was clarified on July 9, and which it argues governs third-country removals for individuals with final orders of removal (the "March 30 Memorandum"). *See* Exs. J–K. Under the March 30 Memorandum, DHS must first determine whether a third country "has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured." Ex. J at 1. "If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures." *Id.* at 1–2. Where the United States has not received diplomatic assurances or does not believe them to be credible, DHS will "inform the alien of removal to that country," but it "will not affirmatively ask whether the alien is afraid of being removed to that country." *Id.* at 2. If—unprompted—an "alien . . . affirmatively states a fear of removal," a U.S. Citizenship and Immigration Services ("USCIS") officer "will generally screen the alien within 24 hours of referral . . . [to] determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal." *Id.* at 2.

The March 30 Memorandum does not provide for any administrative or judicial review of an unfavorable fear determination. Ex. K ("If USCIS determines that the alien has not met this standard, the alien will be removed."). Nor does it provide for any consideration of the risk of refoulement. Instead, it asks only whether a noncitizen would be "persecuted . . . in the *country of*

*removal*." Ex. J at 2 (emphasis added). According to the Government, "[t]he Constitution requires nothing" more than provided for in the Memorandum's bare text. ECF No. 28 at 18.

Abrego Garcia asserted fear of removal to Liberia, and a single USCIS officer concluded that Abrego Garcia did not establish that it is "more likely than not" that he would be persecuted or tortured in Liberia.[2] *See* Exs. J, F. The Government insists that it can now remove Abrego Garcia to Liberia with no further process or review. But the Due Process Clause of the Fifth Amendment entitles Abrego Garcia to review of that negative fear determination by an immigration judge. And the Constitution requires that review be at the "reasonable possibility" standard that applies in the analogous reasonable fear context and that it take into consideration the risk of refoulement.

Third-country removal, while permitted under 8 U.S.C. § 1231(b)(2), must comply with procedural due process. "'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "The procedural component of due process 'imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause.'" *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). "And when the government deprives a person of a protected liberty or property interest, it is obliged to provide 'notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* at 741–42 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). "The mere availability and utilization of some procedures does not mean they [are] constitutionally sufficient." *Id.* at 743.

---

[2] Three of the four documents the Government produced regarding Liberia were designated as attorney's eyes only and unable to be shared with Abrego Garcia or the USCIS officer who conducted the interview. Yet Abrego Garcia was expected to prove that those documents provided insufficient guarantees of his safety.

Because "withholding of removal is country-specific . . . if a noncitizen who has been granted withholding as to one country faces removal to an alternative country, then she must be given notice and an opportunity to request withholding of removal to *that* particular country." *Cruz-Medina v. Noem*, 2025 WL 2841488, at *6 (D. Md. Oct. 7, 2025) (emphasis in original) (quoting *Guzman Chavez v. Hott*, 940 F.3d 867, 879 (4th Cir. 2019), *rev'd on other grounds*, 594 U.S. 523 (2021)). "In other words, '[n]oncitizens have a right to meaningful notice and opportunity to be heard before being deported to a third country.'" *Id.* (quoting *Sagastizado Sanchez v. Noem*, 2025 WL 2957003, at *2 (S.D. Tex. Sept. 10, 2025) ("*Sagastizado I*")).

"The question of what form of 'notice and opportunity for hearing' is 'appropriate' and thus constitutionally required in a given case requires considering" the three *Mathews v. Eldridge* factors: "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements." *Id.* at *5 (quoting *D.B.*, 826 F.3d at 742); *see also Mathews*, 424 U.S. at 340, 343, 347.

The Government's attempt to remove Abrego Garcia to Liberia after only a USCIS interview with no immigration judge review flunks the *Mathews* test. *See Cruz-Medina*, 2025 WL 2841488, at *9 ("Petitioner has shown a strong likelihood of success on the merits of his claim that until and unless an immigration judge concurs with the asylum officer's determination that Petitioner lacks a reasonable fear of persecution or torture in Mexico, due process precludes his removal to Mexico."); *Sagastizado Sanchez v. Noem*, 2025 WL 2957002, at *9 (S.D. Tex. Oct. 2, 2025) ("*Sagastizado II*") ("[Petitioner] has demonstrated a likelihood of success as to his claim that he cannot be removed to a third country without sufficient notice and a meaningful opportunity

to raise a claim, and that Respondents' failure to provide him with review of his negative RFI determination deprives him of his rights under the Due Process Clause of the Fifth Amendment.").

**Factor 1: Private Interest.** Abrego Garcia's private interest in "not being removed to a country where he alleges he would face persecution or torture" is "precisely the type of interest that courts consistently have held is significant enough to justify procedural protections to ensure that individuals who are actually entitled to withholding of removal under § 1231(b)(3) or the Convention Against Torture receive such protection." *Cruz-Medina*, 2025 WL 2841488, at *6 (citing *J.G.G.*, 604 U.S. at 673); *see also Sagastizado II*, 2025 WL 2957002, at *12.

This is especially so given Abrego Garcia's ties to the United States, where he has lived for more than a decade, and for more than five years he has worked pursuant to a work authorization and raised his U.S. citizen child. "[T]he Supreme Court [has recognized] that 'aliens who have established connections in this country' have greater due process rights than 'an alien at the threshold of initial entry.'" *Sagastizado II*, 2025 WL 2957002, at *11 (quoting *U.S. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020)). And at the threshold of initial entry, or at "felony illegal reentry," a noncitizen is entitled to immigration judge review of an immigration officer's initial fear determination. *Sagastizado II*, 2025 WL 2957002, at *11. Abrego Garcia cannot be afforded "lesser protections now than he would have been upon his initial entry or upon a future commission of felony illegal reentry into the United States." *See id.* (finding such argument "carries significant weight").

**Factor 2: Risk of Erroneous Deprivation.** "[T]he Supreme Court has indicated that the risk of an erroneous deprivation is too high where an individual is not provided 'notice of the factual basis' for a material government finding and 'a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker.'" *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d

314, 325 (4th Cir. 2021) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004)). That is exactly the case here. A single USCIS officer denied Abrego Garcia's assertion of reasonable fear through a check-the-box form that reveals only a rudimentary transcript of the interview and the results— with no explanation for why Abrego Garcia's claim was denied or mechanism for immigration judge review. But in the ordinary course, the screening officer creates a written record, and the immigration judge and noncitizen receive the written record of the asylum officer's determination, "including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture." 8 C.F.R. § 208.31(c); *see also* 8 C.F.R. § 208.31(g) (written record including "[t]he record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based").

"The Court need look no further than DHS regulations themselves to conclude that, where a person alleges that he would be persecuted or tortured if removed to a particular country, a single review by an asylum officer creates an unacceptably high risk of erroneous deprivation." *Cruz-Medina*, 2025 WL 2841488, at *7. "DHS regulations address various scenarios where individuals may seek protection from removal based on a fear of how they will be treated in another country, and in every scenario addressed by those regulations they entitle noncitizens to *de novo* review by an immigration judge of negative asylum officer determinations—from applicants for admission who are found inadmissible, to reinstated removal orders." *Id.* (citing 8 C.F.R. §§ 208.30(g), 1208.31(g)). Indeed, immigration judge review of a denied USCIS fear interview is available to noncitizens who have just been caught crossing the border illegally, 8 C.F.R. § 1003.42, or re-entering the United States illegally after a prior deportation, 8 C.F.R. § 1208.31(g). "Even in

the context of *expedited* removal, an applicant who indicates either an intention to apply for asylum or a fear of persecution may appeal to an immigration judge, who can take further evidence and shall make a de novo determination." *Cruz-Medina*, 2025 WL 2841488, at *7 (cleaned up) (emphasis in original).

"In short, there are no regulations that provide for circumstances under which USCIS is given the authority to conduct fear-screening interviews without providing for independent review of that screening by an IJ." *Id.* That may well be why the Government's witness during the October 10 evidentiary hearing assumed "that judicial review of a determination of noncredibility as to fear will occur," even though the March 30 Memorandum does not specify such review. Oct. 10 Tr. at 143:11–25, 174:6–15. The Government cannot offer any credible justification "for why there is any less[] risk of erroneous deprivation in this scenario than in scenarios where DHS regulations contemplated the potential risk of erroneous deprivation of a noncitizen's liberty interest and determined to mandate review by an immigration judge." *Cruz-Medina*, 2025 WL 2841488, at *7.

Moreover, in the ordinary course, a "reasonable fear" interview and the immigration judge's review is at the easier-to-satisfy "reasonable possibility" standard, not the "more likely than not" standard applied by the immigration officer here. *See* Exs. J, F; *Tomas-Ramos v. Garland*, 24 F.4th 973, 982 (4th Cir. 2022) (vacating IJ's negative fear determination and applying "reasonable possibility" standard to claim of "reasonable fear of persecution"). The difference is significant: as the Fourth Circuit has explained in the asylum context, "reasonable possibility" is "as low as a ten percent chance—of persecution." *Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011). "Such a showing does not require that an applicant prove it more likely than not that he will suffer persecution, because [o]ne can certainly have a well-founded fear of an event

happening when there is less than a 50% chance of the occurrence taking place." *Id.* (internal citation removed).

Applying the more lenient standard makes good sense. A fear interview is a preliminary screening to determine if an individual may have a valid basis for seeking protection. "The existing regulations provide that an [immigration judge] review should be conducted within ten days of denial of a [fear interview], and only if the noncitizen passes that review may he proceed to a full evidentiary hearing on his claim before an IJ." *Sagastizado II*, 2025 WL 2957002, at *12 (citing 8 C.F.R. § 1208.31(g)). Thus, both the initial interview with an immigration officer, and an immigration judge's initial review of that decision, are threshold screenings to identify individuals who may have viable protection claims deserving of full adjudication, at which point a higher evidentiary standard applies. Indeed, the March 30 Memorandum appears to recognize that the immigration officer's fear determination should be a threshold step—instructing that such interviews should take place "within 24 hours," Ex. J, hardly sufficient time to prepare evidence or witnesses for a full evidentiary hearing.

The immigration officer's determination, and the immigration judge's review of it, also must consider the risk of refoulement in assessing fear.[3] The boilerplate assurances from Liberia here do not offer sufficient protection, and Abrego Garcia has been given no opportunity to

---

[3] "Chain refoulement"—*i.e.*, when a country sends a refugee or asylum seeker to a third country that then turns around and returns the refugee to the unsafe country—is impermissible for the same reason direct refoulement is impermissible: the Government may not do indirectly, through an intermediary, what it is forbidden to do directly. *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("[I]t is also axiomatic that a State may not induce, encourage or promote [third parties] to accomplish what it is constitutionally forbidden to accomplish."); *Nat'l Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569, 580 (D.C. Cir. 1983) ("Activities that the federal government could not constitutionally participate in directly cannot be supported indirectly through the provision of support for other persons engaged in such activity. This prohibition encompasses various forms of support that are much less direct than the funding involved in this case.").

challenge them. *See Tanha v. Warden, Baltimore Det. Facility*, 2025 WL 2062181, at *3 (D. Md. July 22, 2025) ("[B]lanket assurances offer no protection against . . . chain refoulement, whereby the third country proceeds to return an individual to his country of origin")[4]; *Sagastizado II*, 2025 WL 2957002, at *15 (similar); *see also Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258 (3d Cir. 2008) (holding that the Government's acceptance of diplomatic assurances does not nullify noncitizen's due process right to an opportunity to test the reliability of the assurances); *Nguyen v. Scott*, 2025 WL 2419288, at *19 (W.D. Wash. Aug. 21, 2025) (similar). That is especially so given that Liberia has agreed to receive Abrego Garcia only on a "temporary basis," Ex. D, and the many public examples of third countries that have refouled deportees even when they promised they would not, *e.g.*, *D.A. v. Noem*, 2025 WL 2646888, at *5 (D.D.C. Sept. 15, 2025) ("Despite [its nonrefoulement] assurance, Ghana promptly returned one Plaintiff to his home country and has declared its intention to repatriate the remaining Plaintiffs as well."); *Abrego Garcia V*, 2025 WL 2062203, at *9 & n.15 (discussing case of O.C.G.).[5]

Where, as here, a noncitizen has already been granted withholding of removal as to his country of origin, due process requires that the burden rest with the Government to show that removal to a third country complies with its refoulement obligations. Once the United States has

---

[4] *Tanha*'s conclusion that the petitioner there was a member of the class certified in *D.V.D. v. DHS*, 778 F. Supp. 3d 355, 378 (D. Mass. 2025), carries no water here. There, the petitioner "agree[d] he is a member of the *D.V.D.* class." 2025 WL 2062181, at *5. Abrego Garcia, however, contends that he is *not* a member of that class for several reasons, including because his claims are not identical to those at issue in *D.V.D. See* ECF No. 32 at 2–5.

[5] Indeed, despite Eswatini's assurances against persecution and torture, Ex. L, it has confirmed its intent to "repatriate" third-country nationals accepted from the United States. Adekunle Owolabi. *Eswatini to repatriate US deportees to home countries*, Independent News Eswatini (July 17, 2025), https://independentnews.co.sz/18740/news/diplomacy/eswatini-to-repatriate-us-deportees-to-their-home-countries. Eswatini has already refouled at least one deportee from the United States. *See* Savior Kakama & Muza Fihlani, *Eswatini Accepts 10 US Deportees Despite Legal Challenge*, BBC (Oct. 6, 2025), https://www.bbc.com/news/articles/cn5qdx260lzo.

determined that return to an individual's country of origin would more likely than not result in persecution or torture, it necessarily follows that removal to a third country—absent reliable guarantees—risks the same prohibited result. The Government alone possesses the means to rebut that presumption because it can secure, through diplomatic channels, credible and verifiable assurances that the proposed country of removal will offer lawful, durable protection and will not, "in any manner whatsoever," return the individual to the territory of persecution. United Nations Refugee Convention, art. 33.1; *see also* 8 U.S.C. § 1231(b)(3). Thus, once the Government has recognized that a noncitizen is entitled to protection from refoulement, it bears a duty to show that any third-country removal will not result in the individual's return to a place where their life or freedom would be threatened.

In all, there can be no serious doubt that "the value of the additional procedural safeguard of IJ review" at the reasonable possibility standard that considers the risk of refoulement "is substantial." *See Sagastizado II*, 2025 WL 2957002, at *12.

**Factor 3: Governmental Burden.** The additional burden of immigration review as requested above is negligible compared to Abrego Garcia's interest in not being removed to a country where he risks being persecuted, tortured, or refouled. At minimum, requiring immigration judge review at the "reasonable possibility" standard adds no more burden than if the Government named Liberia as the country of removal during Abrego Garcia's initial removal proceedings. *See id.* at *11 ("Had Respondents designated Mexico as the country of removal during Petitioner's initial removal proceedings under 8 U.S.C. § 1229a, he would have been provided the opportunity to apply for withholding of removal from Mexico directly before an IJ rather than complete a threshold fear-based screening."). Indeed, the *Cruz-Medina* court has already concluded that "DHS's own regulations confirm that any applicable delay and burden" in requiring immigration

judge review "is not only justified, but minimal. Under the existing, analogous regulations, an immigration judge is required to conduct such mandatory review within 7 days or 10 days." *Cruz-Medina*, 2025 WL 2841488, at *8 (citing 8 C.F.R. § 1003.42(e); 8 C.F.R. § 1208.31(g)). Nor does requiring the immigration judge to consider the risk of refoulement add any significant burden, as the judge must already consider the noncitizen's stated fear and reasons for it. Regardless, "some delay and administrative burden is inherent in due process," and is not by itself a reason to deny it. *Id.*

Finally, it is irrelevant that Abrego Garcia has asserted fear to the other third countries the Government has designated for removal, or that the Government may be concerned "about an endless cycle in which noncitizens subject to third-country removal repeatedly express fear of persecution or torture for every proposed destination." *Id.* "[T]hat argument flips the due process analysis on its head." *Id.* "If an immigration judge determines that a person has shown a likelihood of persecution or torture in a particular country, the government would violate the withholding statutes, DHS regulations and international law by sending such person to such country." *Id.* Any concern about an endless cycle also "presumes that immigration judges will routinely reverse asylum officers' negative reasonable fear determinations," but if they do, that only "proves [the] point that there is a substantial risk of erroneous deprivation of protected liberty interests" if Abrego Garcia is denied immigration judge review. *See id.*

### Conclusion

For the aforementioned reasons, the Court should grant Abrego Garcia's Petition for Writ of Habeas Corpus and prohibit his removal to Liberia (or any other country to which he expresses a fear of removal) unless and until an immigration judge concurs in the USCIS officer's negative fear determination, in a manner that considers the risk of refoulement to El Salvador, at the reasonable possibility of persecution or torture standard.

Respectfully submitted,


Dated: November 7, 2025

/s/ Jonathan G. Cooper

**MURRAY OSORIO PLLC**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Simon Y. Sandoval-Moshenberg

Jonathan G. Cooper (D. Md. Bar No. 21345)

Rina Gandhi

Olivia Horton* (*pro hac vice*)

4103 Chain Bridge Road, Suite 300

Nithya Pathalam** (*pro hac vice*)

Fairfax, VA 22030

1300 I St. NW, Suite 900

(703) 352-2399

Washington, DC 20005

ssandoval@murrayosorio.com

(202) 538-8000

jonathancooper@quinnemanuel.com

oliviahorton@quinnemanuel.com

nithyapathalam@quinnemanuel.com

*admitted in Texas; not admitted in D.C. Supervised by attorney admitted in D.C.

**admitted in New York; not admitted in D.C. Supervised by attorney admitted in D.C.


Andrew J. Rossman (*pro hac vice*)

Sascha N. Rand (*pro hac vice*)

295 Fifth Avenue, 9th Floor

New York, NY 10016

(212) 849-7000

andrewrossman@quinnemanuel.com

saccharand@quinnemanuel.com


*Counsel for Petitioner*