# EXHIBIT M

No. 24A_____

# In the Supreme Court of the United States

————————

U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

D.V.D., ET AL.,

————————

**APPLICATION FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**TABLE OF CONTENTS**

Statement ................................................................................................ 9

    A.   Legal Background ................................................................ 9

    B.   Factual Background ............................................................ 14

Argument ............................................................................................... 17

    I.   The Government Is Likely To Succeed On the Merits ................................ 18

    A.   The district court lacked jurisdiction ..................................... 19

    B.   Respondents' due-process claims are meritless ....................... 28

    II.   The Other Factors Support Relief ................................................. 36

Conclusion ............................................................................................. 40

ii

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are the U.S. Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of Homeland Security; Pamela J. Bondi, in her official capacity as Attorney General of the United States; and Antone Moniz, in his official capacity as Superintendent of the Plymouth County Correctional Facility.

Respondents (plaintiffs-appellees below) are D.V.D.; M.M.; E.F.D.; and O.C.G.

## RELATED PROCEEDINGS

United States District Court (D. Mass.):

> *D.V.D.* v. *DHS*, No. 1:25-cv-10676 (Mar. 28, 2025) (order granting in part plaintiffs' motion for temporary restraining order)

> *D.V.D.* v. *DHS*, No. 1:25-cv-10676 (Mar. 29, 2025) (order denying defendants' motion to stay temporary restraining order)

> *D.V.D.* v. *DHS*, No. 1:25-cv-10676 (Apr. 18, 2025) (order granting plaintiffs' motion for class certification and granting in part plaintiffs' motion for preliminary injunction)

> *D.V.D.* v. *DHS*, No. 1:25-cv-10676 (Apr. 18, 2025) (order denying defendants' motion for stay of preliminary injunction pending appeal)

> *D.V.D.* v. *DHS*, No. 1:25-cv-10676 (May 21, 2025) (memorandum clarifying preliminary injunction)

> *D.V.D.* v. *DHS*, No. 1:25-cv-10676 (May 26, 2025) (order denying motion for reconsideration)

United States Court of Appeals (1st Cir.):

> *D.V.D.* v. *DHS*, No. 25-1311 (Apr. 7, 2025) (order denying defendants' motion for stay pending appeal)

> *D.V.D.* v. *DHS*, No. 25-1393 (May 16, 2025) (order denying defendants' motion for stay pending appeal)

# In the Supreme Court of the United States

————————

No. 24A———

U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

D.V.D., ET AL.,

————————

**APPLICATION FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of applicants United States Department of Homeland Security (DHS), et al.—respectfully files this application for a stay of the injunction issued by the United States District Court for the District of Massachusetts (App., *infra*, 6a-53a), pending the disposition of the government's appeal to the United States Court of Appeals for the First Circuit and, if the court of appeals affirms the injunction, pending the timely filing and disposition of a petition for a writ of certiorari in this Court. Given the urgency of the circumstances and the government's ongoing irreparable injury in the diplomatic, immigration, and foreign-policy spheres, the Solicitor General also respectfully requests an immediate administrative stay of the district court's injunction pending the resolution of this application.

This case addresses the government's ability to remove some of the worst of the worst illegal aliens. The United States is facing a crisis of illegal immigration, in no small part because many aliens most deserving of removal are often the hardest

to remove.  When illegal aliens commit crimes in this country, they are typically or-
dered removed.  But when those crimes are especially heinous, their countries of
origin are often unwilling to take them back.  As a result, criminal aliens are often
allowed to stay in the United States for years on end, victimizing law-abiding Amer-
icans in the meantime.

The Executive Branch has taken steps to resolve this problem by removing
aliens to third countries that have agreed to accept them.  Convincing third countries
to accept some of the most undesirable aliens requires sensitive diplomacy, which
involves negotiation and the balancing of other foreign-policy interests.  Until re-
cently, those efforts were working.  Just last week, the government was in the process
of removing a group of criminal aliens who had been in the country for years or dec-
ades after receiving final orders of removal, despite having committed horrific crimes.
These aliens include one who was convicted of sexually abusing a child victim for the
better part of a decade, beginning when the victim was seven years old.  Another was
convicted of sexually abusing a mentally handicapped woman with the mental capac-
ity of a three-year-old.  At least two others were convicted of murder.[1]

All these aliens have already received extensive legal process.  All were tried

---

[1] These aliens illustrate the government's urgent and compelling interest in
proceeding expeditiously with third-country removals: (1) an alien convicted of armed
robbery under a final order of removal for 26 years, who was convicted of additional
armed robbery and kidnapping after being ordered removed; (2) an alien subject to a
final order of removal for 13 years with convictions for arson, drug trafficking, and
other felonies, and who committed attempted first-degree murder by stabbing a vic-
tim with a knife after being ordered removed; (3) an alien subject to a final order of
removal convicted of the first-degree murder of a German tourist in 1994, and of
gravely injuring her husband; (4) an alien subject to a final order of removal for 20
years who was convicted of second-degree murder for stabbing the victim with a knife;
(5) an alien convicted of repeatedly sexually assaulting a minor from 2011 to 2017,
which began when the victim was approximately seven years old; (6) an alien con-
victed of the sexual assault of a mentally disabled victim with the mental capacity
equal to that of a three-year-old; and (7) an alien convicted of first-degree murder for
killing two innocent bystanders in a gang-related shooting. See App., *infra*, 74a-82a.

and convicted in a criminal court, with all the process and protections afforded to criminal defendants. All were adjudicated removable.

A single federal district court, however, has stalled these efforts nationwide. On behalf of a nationwide class of aliens with final orders of removal, the district court issued an extraordinary preliminary injunction that restrains DHS from exercising its undisputed statutory authority to remove an alien to a country not specifically identified in his removal order (*i.e.*, a "third country"), unless DHS first satisfies an onerous set of procedures invented by the district court to assess any potential claim under the Convention Against Torture (CAT), see 8 U.S.C. 1231 note, no matter how facially implausible.

Those judicially created procedures are currently wreaking havoc on the third-country removal process. In addition to usurping the Executive's authority over immigration policy, the injunction disrupts sensitive diplomatic, foreign-policy, and national-security efforts. Recent events vividly illustrate the injunction's pathologies. Last week, the district court required the government to halt the ongoing third-country removal of the aforementioned criminal aliens to South Sudan. The court did so by exploiting an open-ended term in its injunction, holding that the government did not give them a "meaningful opportunity" to raise a fear of torture in that country—notwithstanding that they were all notified they were going to be removed there, and that none expressed any fear at the time, or even that day. Having slammed on the brakes while these aliens were literally mid-flight—thus forcing the government to detain them at a military base in Djibouti not designed or equipped to hold such criminals—the court then retroactively "clarified" its injunction to impose an additional set of intrusive and onerous procedures on DHS. As a result, the United States has been put to the intolerable choice of holding these aliens for *additional* proceedings

at a military facility on foreign soil—where each day of their continued confinement risks grave harm to American foreign policy—or bringing these convicted criminals *back* to America. Most telling: The injunction creates such a diplomatic and logistical morass that the Secretaries of State and Defense both submitted declarations in the district court last Friday to stress the "significant and irreparable" harm that its orders impose. App., *infra*, 71a ¶ 3 (Rubio); D. Ct. Doc. 131 (May 23, 2025) (Hegseth).

In addition to being misguided, these court-ordered procedures are unlawful. To issue its injunction, the district court disregarded three separate sets of jurisdictional bars that Congress adopted to preserve the primacy of the Executive Branch in carrying out the core sovereign function of removing aliens from this country. Having done so, the court wielded its own subjective "sense" of "fairness," App., *infra*, 51a n.46, under the guise of constitutional due-process principles, to second-guess the Executive's judgments about how best to remove dangerous aliens while complying with this Nation's CAT obligations. These judicially invented policies, and the district court's aggressive enforcement of them, cause severe harm to the Executive Branch. Because the court of appeals declined to stay the injunction despite all of that, this Court's intervention is urgently needed.

The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, entrusts the Executive Branch with executing removal orders, and ensuring that aliens who have been ordered removed are in fact removed from the United States. The INA gives the Executive broad authority to remove aliens to various countries—including, where other options are unavailable, any country willing and able to accept them. See 8 U.S.C. 1231(b). Of course, under the statute and regulations implementing CAT, the Executive will not remove an alien to any country where he is likely to be tortured—*i.e.*, the extreme scenario where the alien is likely to face severe pain or suf-

fering intentionally inflicted by the hand or with the consent of a public official.

While the INA authorizes the Executive Branch to remove aliens to third countries after a final order of removal has been issued, it is silent as to the particular process that aliens must receive under CAT. Instead, Congress has delegated that decision entirely to the Executive Branch. See 8 U.S.C. 1231 note. In March 2025, DHS issued guidance detailing its policy in this context, App., *infra*, 54a, after President Trump issued an Executive Order directing DHS to take action against the many aliens who stay in this country for years on end despite being subject to final orders of removal, see *id*. at 56a § 1.

The DHS guidance establishes a two-track system to address such aliens, who have been ordered removed but for various reasons cannot be sent to a country specifically designated in their removal orders. Where the United States has received a sufficient assurance from a third country that no aliens will be tortured upon removal there, DHS policy provides that the Executive can remove an alien to that country without further process. App., *infra*, 54a-55a. But for countries where the United States has not received such an assurance, DHS policy provides that the alien is entitled to notice of the third country and an opportunity for a prompt screening of any asserted fear of being tortured there. *Id*. at 55a.

After certifying a class of aliens with final orders of removal, the district court held that those procedures violate due process. And it enjoined the government from "removing any alien to a third country" unless it follows a new set of procedures that the court devised from whole cloth, App., *infra*, 51a-53a—and then later "clarified" in a way that magnifies their onerous, intrusive nature, *id*. at 1a-2a.

That injunction runs afoul of multiple independent jurisdictional bars. First, 8 U.S.C. 1252(f)(1) prohibits lower federal courts from issuing classwide relief that

"enjoin[s] or restrain[s] the operation of [specified] provisions" in the INA. *Ibid.* Specifically, Section 1252(f)(1) prohibits classwide "injunctions that order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out" their statutory authority to conduct third-country removals. *Garland* v. *Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Contrary to the district court's holding (App., *infra*, 29a), it makes no difference that respondents' claim is "based on" CAT, which is not one of the statutory provisions specified in Section 1252(f)(1). It is irrelevant that the court relied on a provision not specified in Section 1252(f)(1) to *justify* its injunction, because what matters is that the injunction unquestionably *restrains the operation* of a provision that is specified in Section 1252(f)(1)—namely, DHS's implementation of Section 1231(b)'s authorization of third-country removals. See *Aleman Gonzalez*, 596 U.S. at 552-554 and n.4.

In addition, the immigration laws specifically strip district courts of jurisdiction to review claims challenging the government's implementation of CAT, and generally strip them of jurisdiction to adjudicate freestanding suits arising from actions taken to execute removals—requiring such claims to be brought, if at all, only in a petition for review of a final removal order filed in a court of appeals. See 8 U.S.C. 1252(a)(4) and (5), (b)(9), and (g); see also 8 U.S.C. 1231 note. Both sets of bars apply here in full: respondents are demanding greater process for their CAT claims, and they seek to prevent the execution of their removal orders until they get that process. The district court held itself above these limits, largely by ignoring the statutory text and emphasizing the importance of judicial review. That is no way to read any statute, but especially not these. The INA reflects a comprehensive effort by Congress to restrict judicial review to "protect[] the Executive's discretion from the courts." *Reno* v. *American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 486 (1999). The in-

7

junction below intrudes upon the core executive functions Congress sought to shield.

The district court's analysis of the merits is also fatally flawed. Without any mooring in law, the district court revised the government's policy to better comport with the court's "sense" of "fairness." App., *infra*, 51a n.46. It rejected the government's approach to utilizing country-wide assurances as to the treatment of removed aliens, instead insisting that "individualized assessment[s]" are required. *Id.* at 47a. But as this Court has made clear, the "Judiciary is not suited to second-guess such determinations," in either substance or scope, given their "foreign policy" ramifications. *Munaf* v. *Geren*, 553 U.S. 674, 702 (2008). The district court also crafted new timelines, ordering that aliens must be given at least 10 days to raise a CAT-based fear, and another 15 to contest any adverse finding as to that claim. App., *infra*, 51a-52a, 2a. But it typically takes "minutes," not weeks, for an alien to express a fear of being tortured in a country. *Id.* at 62a ¶11. These arbitrary deadlines are also out of step with analogous immigration law, which tolerates far more efficient proceedings.

All of this is particularly unjustifiable because many class members are aliens who have never been admitted into the United States. Thus, they do not have due-process rights to any additional removal procedures beyond the ones the political branches have provided. See *DHS* v. *Thuraissigiam*, 591 U.S. 103, 138-140 (2020).

The district court's injunction jeopardizes the public interest. The injunction prevents DHS from efficiently removing aliens, delaying third-country removal by at least 25 days for every alien who raises a CAT claim, no matter how frivolous. Given practical realities that the court neither appreciated nor acknowledged, the consequence of such delays is that ICE will often need to restart the "entire" removal process afresh, freezing things as the government attempts to rework arrangements with foreign countries. App., *infra*, 68a ¶ 29. Meanwhile, the very aliens whose removal

is most urgent will be allowed to remain—and often will be released, given resource limitations and legal requirements, to the peril of law-abiding Americans. *Id.* at 64a ¶ 20 (describing criminal alien who attempted murder after having been released).

The district court's injunction also causes severe, ongoing irreparable harm to the government. Finding third countries willing and able to accept aliens is a delicate diplomatic endeavor. By interjecting itself in that process, and disrupting those carefully negotiated arrangements, the court's actions have already caused major and irremediable "harm to U.S. foreign policy." App., *infra*, 71a ¶ 3 (Rubio). Moreover, the injunction's open-ended terms allow the court to continually move the goalposts as to what compliance entails, as illustrated by its recent "clarification" that its original command—to give aliens a "meaningful opportunity" to raise a CAT-based fear—in fact meant "a minimum of ten days." *Id.* at 2a. Together, these "onerous and duplicative" burdens "significantly impede" the government's ability to "effectively enforce immigration laws and remove dangerous criminals from the United States." *Id.* at 67a-68a ¶¶ 28-30 (Rubio); see D. Ct. Doc. 131 (May 23, 2025) (Hegseth).

By contrast, respondents cannot establish offsetting irreparable harm. All members of the class have already been ordered removed, and all have already had the opportunity to raise fears under CAT. The injunction adds new hurdles to the already additional process DHS has decided to offer, in circumstances where valid concerns about torture are notably unlikely to arise—*i.e.*, removals to third countries where the aliens lack prior ties. Moreover, DHS's policy is similar in timing to the expedited-removal process that this Court upheld against a due-process challenge in *Thuraissigiam*, and it amply guards against the removal of aliens to countries where they may face torture. The district court's invented process offers little but delay. While certain aliens may benefit from stalling their removal, the Nation does not.

**STATEMENT**

A.    **Legal Background**

1.    The INA authorizes the removal of classes of aliens from the United States.  8 U.S.C. 1182, 1227.  The removal process can include a hearing before an immigration judge, an appeal to the Board of Immigration Appeals, and review in a court of appeals.  8 U.S.C. 1229a, 1252.  Many aliens facing removal have an opportunity to apply for relief or protection from removal.  See, *e.g.*, 8 U.S.C. 1158 (asylum); 8 U.S.C. 1229b(a) (cancellation of removal); 8 U.S.C. 1229b(b) (adjustment of status).

Congress has established a streamlined process for removing aliens who, having previously been removed from the United States under a final order of removal, have reentered the country unlawfully.  If DHS "finds that an alien has reentered the United States illegally after having been removed  * * *  under an order of removal, the prior order of removal is reinstated from its original date."  8 U.S.C. 1231(a)(5); see *Nielsen* v. *Preap*, 586 U.S. 392, 397 n.2 (2019) (explaining Congress transferred enforcement of certain provisions from Attorney General to DHS Secretary).  DHS may "at any time" effectuate removal "under the prior order."  8 U.S.C. 1231(a)(5).  The reinstated order "is not subject to being reopened or reviewed," and the alien "is not eligible and may not apply for any relief" from that order.  *Ibid.*

Congress has further established a process for the expedited removal of certain aliens, regardless of whether they have received a prior final order of removal.  Expedited-removal procedures may be applied to defined categories of aliens who have not been admitted into the United States, including those who, lacking valid entry documents, are either arriving in the United States or unable to adequately show that they have been continuously present in the United States for the two years immediately prior.  See, *e.g.*, 8 U.S.C. 1225(b)(1)(A)(i) and (iii).  Under that expedited-

10

removal system, inadmissible aliens are entitled to speedy administrative review (typically within days) of any asserted fears of persecution in the country to which they will be removed; they are not entitled to judicial review of an adverse administrative determination. See *Thuraissigiam*, 591 U.S. at 109-113 (citing provisions).

2.    In the INA, Congress has enacted provisions governing the determination of the country to which an alien is to be removed. See 8 U.S.C. 1231(b)(1) and (2); *Jama* v. *ICE*, 543 U.S. 335, 338-341 (2005). For certain aliens arriving in the United States (Section 1231(b)(1)) and then all other aliens (Section 1231(b)(2)), the statute establishes sequences of countries where an alien shall be removed, subject to certain disqualifying conditions (*e.g.*, the receiving country does not consent). For instance, under Section 1231(b)(2), possible countries of removal can include a country designated by the alien, the alien's country of citizenship, the alien's previous country of residence, the alien's country of birth, and the country from which the alien departed for the United States. See 8 U.S.C. 1231(b)(2). Importantly, under both Section 1231(b)(1) and (b)(2), Congress provided a fail-safe option in the event that other options do not work: An alien may be removed to any country willing and able to accept him. See 8 U.S.C. 1231(b)(1)(C)(iv) and (2)(E)(vii).

3.    Congress has also provided means for an alien to challenge removal to a particular country where he may face persecution or torture. As relevant here, the alien may seek withholding or deferral of removal under regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), *adopted* Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85—a treaty that addresses the removal of aliens to countries where they would face torture. See Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, § 2242(b), 112 Stat. 2681-822;

8 C.F.R. 208.31, 241.8(e).  "Torture" is defined as an "extreme form of cruel and inhuman treatment," which intentionally inflicts "severe pain or suffering" on another for an improper purpose, and is performed "at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity."  8 C.F.R. 208.18(a)(1) and (a)(2); see, *e.g.*, *Del Carmen Amaya-De Sicaran* v. *Barr*, 979 F.3d 210, 218-219 (4th Cir. 2020) (torture is a "high bar").[2]

CAT protection does not alter *whether* an alien may be removed; it affects only *where* an alien may be removed.  That is, a grant of CAT protection "means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country."  *Nasrallah* v. *Barr*, 590 U.S. 573, 582 (2020).  The United States remains free to remove that alien "at any time to another country where he or she is not likely to be tortured."  *Ibid.* (citation omitted); see *INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987).

Ordinarily, an alien raises a CAT claim during removal proceedings under 8 U.S.C. 1229a, where the immigration court decides both the alien's removability and CAT claim together.  See, *e.g.*, 8 C.F.R. 1240.1(a)(1)(iii), 1240.12(c); *Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 433-434 (BIA 2008).  But sometimes, CAT claims arise outside of those removal proceedings.  For instance, aliens subject to a reinstated order of removal—where the prior order of removal is restored—may nonetheless seek CAT protection in "withholding-only" proceedings.  See *Johnson* v. *Guzman Chavez*, 594 U.S. 523, 530 (2021).  Likewise, aliens placed in expedited-removal proceedings are still able to raise CAT claims, and receive administrative procedures,

---

[2] An alien may also seek "withholding of removal" under 8 U.S.C. 1231(b)(3), which prohibits the removal of an alien to a country where he would face persecution because of a protected trait.  *Ibid.*  This form of protection is not at issue in this application, because the district court limited its injunction to the procedures for raising CAT claims.  See App., *infra*, 53a n.51.

the extent of which depends on the claim's credibility. See, *e.g.*, 8 C.F.R. 235.3(b)(4).

An alien may seek judicial review of his CAT claim only under defined circumstances. Specifically, Congress directed that the "sole and exclusive means for judicial review of any cause or claim under [CAT]" must be "a petition for review filed with an appropriate court of appeals in accordance with [Section 1252]." 8 U.S.C. 1252(a)(4); see FARRA § 2242(d), 112 Stat. 2681-822 (same for "any other determination made with respect to the application of [CAT]").

4.    On his first day in office, President Trump declared that the millions of aliens who have illegally crossed the border pose a serious threat to national security. App., *infra*, 56a § 1. To combat this, the President directed DHS to take "all appropriate actions" to detain and remove aliens who had been ordered removed, but whom had still been "released into the United States." *Id.* at 57a § 5.

Following this order, on February 18, DHS issued internal guidance that directed the Enforcement and Removal Operations directorate (ERO) of U.S. Immigration and Customs Enforcement (ICE) to review cases of aliens who had been ordered removed, but for whom CAT had impeded their actual removal. D. Ct. Doc. 1-4, at 2 (Mar. 23, 2025). DHS directed ERO to "determine the viability of removal to a third country" for such aliens, especially "in light of the Administration's significant gains with regard to previously recalcitrant countries." *Ibid.*

Third-country removals—again, removals to a country other than the ones designated on an alien's order of removal—are often the only viable option for removing certain aliens. At times, the country (or countries) specified in an immigration judge's removal order are no longer possible destinations by the time DHS is prepared to actually remove the alien. In other cases, an alien may obtain CAT protection from the only location listed on his removal order, either in his original proceedings or later

ones (as with reinstated orders).  Thus, to effectuate a removal, the government often needs to send an alien to a country other than the ones specifically designated on his removal order.  As a practical matter, that third country often falls within Section 1231(b)'s catch-all provisions for any country willing and able to accept the alien.

While the INA provides for third-country removals, it does not delineate a particular process for carrying out those removals.  See 8 U.S.C. 1231(b).  More specifically, Congress did not provide a particular process for ensuring that third-country removals remain consistent with the United States's obligations under CAT.  Instead, it delegated to the Executive Branch the responsibility for developing such procedures.  See 8 U.S.C. 1231 note (providing that the "heads of the appropriate agencies shall prescribe regulations to implement" the United States's CAT obligations).

On March 30, DHS issued guidance clarifying its "policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the [INA] to countries other than those designated for removal in those removal orders."  App., *infra*, 54a-55a (March Guidance).[3]  The Guidance distinguishes between removals to countries that have provided credible assurances that any aliens removed there will not be tortured, and removals to those countries that have not done so.

For countries that have provided such an assurance, "the alien may be removed without the need for further procedures."  App., *infra*, 54a-55a.  For countries that have not, DHS must first inform the alien of removal to the country, and give him an opportunity to "affirmatively express a fear of persecution or torture" there.  *Id.* at 55a.  If he does so, an immigration officer will conduct a prompt screening to deter-

---

[3]  Section 240 corresponds with 8 U.S.C. 1229a ("Removal proceedings"); Section 241(a)(5) corresponds with 8 U.S.C. 1231(a)(5) ("Reinstatement of removal orders against aliens illegally reentering"); and Section 238(b) corresponds with 8 U.S.C. 1228(b) ("Removal of aliens who are not permanent residents").

mine whether he "would more likely than not be" tortured in the country of removal. *Ibid.* If the alien fails to satisfy this standard, he "will be removed." *Ibid.* If he does satisfy it, he will be put into additional administrative procedures, consistent with how CAT claims are typically handled. See *ibid.* "Alternatively, ICE may choose to designate another country for removal," and start the process afresh. *Ibid.*

> **B.  Factual Background**

1.     Respondents are four illegal aliens subject to final orders of removal. See App., *infra*, 12a-14a (detailing respondents' allegations). They each allege that there are "valid reasons to fear removal to specific countries that were not included in their removal orders." *Id.* at 15a. Each respondent claims, among other things, that the government would violate due process if it does not provide sufficient "notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders." *Ibid.* Soon after filing their complaint, respondents filed motions for class certification and a preliminary injunction. D. Ct. Docs. 4, 6 (Mar. 23, 2025). The same day, respondents moved for a temporary restraining order, D. Ct. Doc. 6, which the district court granted, D. Ct. Doc. 34 (Mar. 28, 2025). The First Circuit declined to stay the TRO, citing concerns over its appellate jurisdiction. See *D.V.D.* v. *DHS*, No. 25-1311, 2025 WL 1029774 (April 7, 2025).[4]

2.     On April 18, the district court granted respondents' motion for class cer-tification, and granted in part their motion for a classwide preliminary injunction. The court first held that none of the INA's jurisdictional bars applied to this case, including the bar on classwide injunctive relief restraining the removal of aliens.

---

[4]  Three of the four named respondents remain in the United States. One was removed to Mexico in February 2025 (and has since gone to Guatemala). The circum-stances of his removal are subject to ongoing proceedings below. See, *e.g.*, D. Ct. Doc. 132, at 13 (May 23, 2025) (ordering that the government "facilitate" his return).

App., *infra*, 16a-32a.  Next, it certified a proposed class of aliens with final orders of removal.  *Id.* at 28a-41a.[5]  Last, it granted injunctive relief based on respondents' due-process challenge to the government's third-country removal policy.  *Id.* at 51a-53a.

In the injunction, the district court substantially revised the third-country removal policy that DHS had developed.  Namely, the court ordered that DHS must (i) provide written notice to aliens (and any counsel) of the third country to which they might be removed; (ii) provide aliens with a "meaningful opportunity" to raise a fear of removal; (iii) use a "reasonable fear" rather than a "more likely than not" standard to assess the credibility of those assertions; and (iv) provide aliens with at least 15 days to "move to reopen immigration proceedings" in the event an alien failed to make this showing.  App., *infra*, 51a-52a.

3.     On May 16, the First Circuit denied the government's request for an emergency stay in an unpublished order.  The court expressed "concerns" regarding the government's March Guidance, but also instructed the parties to brief on appeal a number of questions about the district court's jurisdiction.  App., *infra*, 4a-5a.

4.     During this time, the district court intervened in efforts by DHS to remove aliens to third countries—sometimes without the benefit of governmental briefing as to the particular circumstances of removal.  See, *e.g.*, D. Ct. Doc. 91 (May 7, 2025) (ordering DHS not to remove aliens to Libya or Saudi Arabia following only respondents' motion for a temporary restraining order).  Nevertheless, the govern-

---

[5]  The full class definition reads (App., *infra*, 28a):

All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

ment developed an interim procedure to comply with the district court's injunction, which would (among other things) provide aliens with "written notice of the country of removal in a language they understood," have an ICE ERO officer "explain[] [that] written notice to [the alien]," and then generally give the alien at least twenty-four hours to "raise a fear of torture." App., *infra*, 61a ¶¶ 7-8.

Following this procedure, on May 20, the government initiated the removal of a group of aliens on a military flight destined for South Sudan. All of these aliens were provided notice that they would be removed to South Sudan; none expressed a fear of being removed there. App., *infra*, 61a-62a ¶¶ 9-10; see *id.* at 62a ¶ 11 ("Based upon my nearly thirty years as an immigration officer at various levels, any alien who is being told that he or she is being removed to a third country would reasonably be expected to immediately notify ICE of any fear of removal to that third country and certainly within twenty-four hours.").[6]

All of these aliens had committed heinous crimes in the United States, including murder, arson, armed robbery, kidnapping, sexual assault of a mentally handicapped woman, child rape, and more. See generally App., *infra*, 74a-82a (detailing offenses). But for various reasons, including that foreign countries are often reluctant to accept such dangerous criminals, the United States had been unable to remove these criminal aliens for years. See, *e.g.*, *id.* at 65a ¶ 21. Moreover, because there are limitations on the ability of the United States to detain an alien pending removal, some of these aliens were previously forced to be released, notwithstanding their convictions and removal orders. *Id.* at 63a ¶ 18. Tragically but predictably, some aliens then committed further crimes in this country—such as one who was convicted of

---

[6] One of the aliens initially set to be removed to South Sudan was redesignated for removal to his native country of Burma. See D. Ct. Doc. 125 (May 22, 2025).

attempted murder after his release. *Id.* at 64a ¶ 20.

Respondents sought emergency relief to halt the removal of these class member aliens to South Sudan. Following an emergency hearing that same day, the district court granted this request. D. Ct. Doc. 116 (May 20, 2025). The next day, on May 21, the court held the removal process violated its injunction, because the aliens were supposedly not given enough time to raise any CAT-based fear. App., *infra*, 1a-2a. The court purported to "clarify" its injunction, declaring that a "meaningful opportunity" for an alien to express a fear of removal in fact meant "a minimum of ten days." *Id.* at 2a. As for the aliens in the process of being removed—who were (and are) being held at a military base in Djibouti—the court ordered the government must "maintain custody and control" over the aliens, D. Ct. Doc. 116, at 1, and ordered a series of remedial measures, D. Ct. Doc. 119 (May 21, 2025). Among them, the government must give each alien a reasonable fear interview "in private"; and ensure the alien has at least 72-hours' notice of that interview, as well as resources to prepare for that interview "commensurate" with what he would have received in the United States. D. Ct. Doc. 119, at 1-2.[7]

## ARGUMENT

To obtain a stay pending appellate proceedings, an applicant must show a likelihood of success on the merits, a reasonable probability of obtaining certiorari, and a likelihood of irreparable harm. See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam). In "close cases," "the Court will balance the equities and weigh the relative harms." *Ibid.* Those factors overwhelmingly support a stay of the injunction.

---

[7] The government moved for reconsideration of the district court's order finding that the government violated its injunction, as well as the court's later clarifications of that injunction's terms, but the district court denied the motion. See D. Ct. Doc. 130 (May 23, 2025); D. Ct. Doc. 135 (May 26, 2025).

## I.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

Through the federal immigration laws, Congress vested the Executive Branch with broad authority over the removal of aliens, and narrowly circumscribed the authority of the Judiciary to superintend those functions. The injunction below inverts that distribution of power. It sets aside the chosen policy of DHS to effectuate third-country removals, replaces that policy with one of the district court's own making, and invites continued judicial micromanagement of such removals going forward.

That injunction exceeds the district court's lawful authority in numerous respects. To start, the injunction violates the plain terms of multiple jurisdictional bars. The INA strips district courts of jurisdiction (i) to issue classwide injunctive relief restraining the operation of third-country removals, (ii) to review claims challenging the government's process for complying with CAT, and (iii) to adjudicate suits arising from actions taken to execute removals. The district court's injunction does all three of these prohibited things, and its contrary conclusions read these jurisdictional bars so narrowly as to effectively write them out of the INA.

The district court's merits analysis was just as flawed. The March Guidance provides more than ample process—including, where appropriate, notice and an opportunity to be heard—to a class of aliens who have already been ordered removed and who have already had the chance to raise claims under CAT. The district court's decision to augment those procedures was policymaking, not law. The Constitution assigns the political branches preeminent (and at times, conclusive) authority over designing this Nation's immigration laws and deciding what process is due to those who violate them. And the intrusion here is all the more intolerable because it disrupts sensitive diplomatic, foreign-policy, and national-security initiatives that implicate the balancing of interests far beyond the district court's ken.

19

A.    **The District Court Lacked Jurisdiction**

The district court issued a classwide injunction that prohibits DHS from re-moving aliens with final removal orders to third countries not previously identified, unless DHS complies with certain procedures adopted by the court. App., *infra*, 51a-52a. That injunction contravenes at least three separate sets of jurisdictional bars imposed by the INA and FARRA.

First, under 8 U.S.C. 1252(f)(1), lower federal courts lack jurisdiction to issue classwide injunctions that restrain the operation of third-country removals pursuant to 8 U.S.C. 1231(b). Second, under 8 U.S.C. 1252(a)(4) and Section 2242(d) of FARRA, district courts lack jurisdiction in particular to review claims challenging the govern-ment's process for complying with CAT. Third, under 8 U.S.C. 1252(a)(5), (b)(9), and (g), district courts lack jurisdiction in general to adjudicate suits arising from actions taken to execute removals. Individually, each of those bars justifies a stay, and col-lectively, they make clear that a stay is warranted.

1.    Section 242(f)(1) of the INA, codified at 8 U.S.C. 1252(f)(1), provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Illegal Immigration Reform and Immi-grant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

Pub. L. No. 104-208, Div. C, sec. 306(a)(2), § 242(f), 110 Stat. 3009-611 to 3009-612. By its terms, that provision bars the lower federal courts from issuing any "classwide injunctive relief" that "order[s] federal officials to take or to refrain from taking ac-tions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland* v. *Aleman Gonzalez*, 596 U.S. 543, 550-551 (2022) (citation omitted).

The district court's injunction clearly violates 8 U.S.C. 1252(f)(1). It runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-551, rather than an "individual alien," 8 U.S.C. 1252(f)(1). And it concerns one of the covered statutory provisions: Section 1231(b)—which authorizes the Executive to remove aliens to third countries, when appropriate—is within the "provisions" covered by Section 1252(f)(1). See *Aleman Gonzalez*, 596 U.S. at 551 (holding injunction restraining the operation of Section 1231(a) was covered by Section 1252(f)(1)). There is also no doubt that the injunction below "restrain[s] the operation" of Section 1231(b). 8 U.S.C. 1252(f)(1). That was the whole point. The district court enjoined DHS from "removing any alien to a third country" until the mandated procedures are followed. App., *infra*, 51a-52a. That is, the court ordered the government to "refrain" from "carry[ing] out" its third-country removal authority under Section 1231(b) unless certain conditions are satisfied. *Aleman Gonzalez*, 596 U.S. at 550.

That is exactly the type of injunction that *Aleman Gonzalez* held that Section 1252(f)(1) forbids. There, as here, the district court enjoined the government class-wide from taking action under a specified provision (detaining aliens under Section 1231(a)(6)) until it provided additional process to those aliens (a bond hearing). *Aleman Gonzalez*, 596 U.S. at 547. This Court held that such an injunction was "barred" by Section 1252(f)(1), because an injunction that stops the government from implementing a statutory provision until certain conditions are satisfied is one that "enjoin[s] or restrain[s]" the operation of that provision. *Id.* at 551. The same reasoning applies here: The injunction below "'enjoin[s] or restrain[s] the operation' of [Section 1231(b)] because [it] require[s] officials to take actions that (in the Government's view) are not required by [Section 1231(b)] and to refrain from actions that (again in the Government's view) are allowed by [Section 1231(b)]." *Ibid.* It is the precise type

of injunction that cannot run to an entire class of aliens under Section 1252(f)(1).

Notwithstanding this Court's holding in *Aleman Gonzalez*, the district court held that Section 1252(f)(1) "simply does not apply." App., *infra*, 29a. It observed that respondents' claim "concerning the availability of CAT protection" is "based on" FARRA, which is "a different statute" outside of the provisions covered by Section 1252(f)(1). *Id.* at 29a-30a. At most, the court reasoned, the injunction has a mere "collateral[]" effect on "covered parts of the INA." *Id.* at 30a.

The district court's rationale rests on a fundamental error. It conflates *why* a particular action is alleged to be unlawful with *whether* that is a category of action shielded from classwide relief under Section 1252(f)(1). For purposes of Section 1252(f)(1), all that matters is whether the action that the injunction restrains is taken to enforce or implement one of the covered statutory provisions (*i.e.*, those "governing the inspection, apprehension, examination, and removal of aliens"). *Aleman Gonzalez*, 596 U.S. at 549-550. It does not matter whether that action is in fact "what the statute allows or commands." *Id.* at 552. And it does not matter whether that action violates some external legal limit, be it "constitutional" or "statutory." *Id.* at 553-554 and n.4. So long as the governmental conduct at issue is taken pursuant to a covered provision, Section 1252(f)(1) bars classwide injunctive relief to stop it. *Id.* at 554-555. So here, classwide relief restraining DHS's operation of third-country removals pursuant to Section 1231(b) is barred, notwithstanding that respondents' claims are "based on a different statute" than Section 1231(b). App., *infra*, 24a.

Likewise, the injunction's "impact" on DHS's operations pursuant to Section 1231(b) is far more than "collateral[]." App., *infra*, 30a. This is nothing like cases where an injunction restrains the "operation of a provision *that is not specified in § 1252(f)(1)*," which then has a downstream "collateral effect on the operation of a

covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4. Rather, the injunction itself bears directly on Section 1231(b), and expressly restrains DHS's operation of third-country removals under that specified provision.

In short, by enjoining DHS from "removing any alien to a third country" under Section 1231(b) unless it follows certain procedures, App., *infra*, 51a-52a, the district court entered an order that, by design and intent, "interfere[s] with the Government's efforts to operate" Section 1231(b), *Aleman Gonzalez*, 596 U.S. at 551. And because that injunction awards relief on a classwide basis, it is barred by Section 1252(f)(1). That inescapable conclusion alone warrants a stay of the injunction here.

2.    In addition, the district court's injunction violates the CAT-specific bars in the INA and FARRA. The INA provides that "a petition for review filed with an appropriate court of appeals  * * *  shall be the sole and exclusive means for judicial review of any cause or claim under [CAT]." 8 U.S.C. 1252(a)(4). Likewise, FARRA confirms that "no court shall have jurisdiction to review  * * *  any  * * *  determination made with respect to the application of [CAT]  * * *  except as part of the review of a final order of removal." § 2242(d), 112 Stat. 2681-822; see 8 C.F.R. 208.18(e). FARRA also bars judicial review of the "regulations adopted to implement [CAT]," and assigns to the Executive alone the duty to design procedures to "implement the obligations of the United States" under that treaty. § 2242(d), 112 Stat. 2681-822.

The injunction runs afoul of these limits. Respondents' suit—which challenges DHS's existing procedures for certain CAT claims—both concerns the "application" of CAT, and is a "cause or claim under [CAT]." See App., *infra*, 29a (recognizing the "class-wide injunctive relief Plaintiffs seek" is "based on" FARRA). And there is no doubt that this action arises outside of a petition for review from a final order of re-

23

moval. Thus, the district court lacked jurisdiction: The sorts of claims raised here can only be reviewed, if at all, in an appellate court through a petition for review.

For its part, the district court largely ignored FARRA. See App., *infra*, 23a-24a. It never explained how it had authority to issue an injunction regarding the "application" of CAT here. § 2242(d), 112 Stat. 2681-822. Nor did it try to justify how it had "jurisdiction to review" the procedures that the Executive Branch has adopted to "implement" CAT. *Ibid.* By definition, in augmenting the procedures that the Executive Branch has crafted for CAT claims in this context, the district court "review[ed]"—and held inadequate—those that the Executive "implemented." *Ibid.*

As for Section 1252(a)(4), the district court held the provision applies only to matters that could have been raised in a petition for review of a final order of removal. App., *infra*, 23a. And because respondents' CAT objections arose *after* the final removal order was issued, the court reasoned they fell outside Section 1252(a)(4). *Ibid.*

That rationale is flawed at multiple levels. To start, the premise is wrong: CAT claims like those here *can* be raised in the administrative process. See p. 27, *infra*. But more fundamentally, the conclusion does not follow. Section 1252(a)(4) identifies a type of action—"any cause or claim under [CAT]"—and specifies the "sole and exclusive" way that such a claim can be reviewed in court: a petition for review filed in a court of appeals. To the extent an action does not fit within that means for review, the result is that judicial review is not available. That is the nature of exclusive review. See, *e.g.*, *United States* v. *Fausto*, 484 U.S. 439, 454-455 (1988) (holding that the comprehensive framework of the CSRA precluded review of certain claims). And that holds particular force in the context of CAT, which is a non-self-executing treaty that Congress implemented through FARRA, by giving the Executive broad discretion over setting its procedures. See § 2242(b) and (d), 112 Stat. 2681-822.

24

Concluding otherwise, the district court invoked this Court's decision in *Jennings* v. *Rodriguez* to argue that the INA's channeling provisions "cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings." App., *infra*, 24a, 17a-18a (citing 583 U.S. 281, 293 (2018)). But *Jennings* did not adopt such a categorical rule. Instead, the Court read a specific statutory term narrowly ("arising from") to limit the reach of a different jurisdiction-stripping provision. 583 U.S. at 293 (interpreting 8 U.S.C. 1252(b)(9)). There is a world of difference between adopting the narrower reading of an open-ended phrase, and ignoring the plain text of a limitation entirely. The latter is what the district court did here. When Congress specifies the "sole and exclusive" means for judicial review over a claim, there is only one way for the federal courts to review that claim. Anything more involves amending the statute, not interpreting it.

3.    On top of those jurisdictional bars, the injunction also violates the INA's provisions that prohibit district courts from exercising jurisdiction over suits challenging actions taken to execute removal orders. Congress has stripped district courts of jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action  * * *  to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. 1252(g). Instead, such claims—along with any other "questions of law and fact  * * *  arising from any action taken or proceeding brought to remove an alien"—must be brought as part of a petition for review of a "final order" of removal. 8 U.S.C. 1252(b)(9). And that petition, again, is the "sole and exclusive means for judicial review" of such claims. 8 U.S.C. 1252(a)(5).

Together, these provisions strictly limit judicial review over certain "stages in the deportation process." *Reno* v. *American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-484 (1999). One such stage is the *execution* of a removal order.

*Ibid.* If an alien wishes to challenge that discrete act in court, his sole and exclusive means of doing so is a petition for review; if that means is unavailable, then nothing in the INA "provides for jurisdiction" for the federal courts to intervene.  *Id.* at 487.

Once more, that principle precludes the injunction below.  Respondents' claims arise *entirely* from actions taken to "execute removal orders," 8 U.S.C. 1252(g)—namely, to remove respondents to third countries without the additional process demanded by the district court—and thus those claims "fall[] squarely within" the INA's jurisdictional bar, *AADC*, 525 U.S. at 487.  The district court lacked the authority to enjoin the government from removing respondents to third countries without additional process—*i.e.*, from executing those aliens' removal orders in a particular way.

Once more, the district court's attempts to avoid these jurisdictional bars fail.  As for Section 1252(g), the court read that bar to cover "only discretionary decisions." App., *infra*, 26a-28a.  And it held the actions here were thus not covered, because the government lacks discretion to remove an alien contrary to law.  *Ibid.*

That misreads Section 1252(g).  Nothing in that provision's text is limited to acts of "discretion"—which Congress knows how to do.  See, *e.g.*, 8 U.S.C. 1226(e) ("The [DHS Secretary's] discretionary judgment regarding the application of this section shall not be subject to review.").  Rather, the text reaches "*any* cause or claim * * * arising from the decision *or* action by the [DHS Secretary] to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. 1252(g) (emphases added).  To be sure, those actions often involve "discretion" on the part of the Executive Branch, and Congress sought to protect that discretion from judicial review. *AADC*, 525 U.S. at 486.  But nothing in Section 1252(g) limits protection to *only* the discretionary aspects of the specified actions; rather, its text reaches "any" "action" taken to "execute removal orders."  See, *e.g.*, *E.F.L.* v. *Prim*, 986 F.3d 959, 965 (7th

Cir. 2021) (rejecting view that Section 1252(g) is limited to "discretionary decisions").

Moreover, Congress had good reason to sweep more broadly. A jurisdictional bar that turns on the merits of the underlying action is no bar at all. See *Aleman Gonzalez*, 596 U.S. at 554. Nor would it do much for Section 1252(g)'s goal of curbing the "prolongation of removal proceedings." *AADC*, 525 U.S. at 487. Instead, the straightforward reading of Section 1252(g) is the more sensible one: If a claim challenges the execution of a removal order, it must be brought via a petition for review.

Compounding the error, the district court dismissed Sections 1252(a)(5) and (b)(9) on the ground that they only cover actions that "could have been raised in [an alien's] removal proceedings." App., *infra*, 18a. And because respondents' objections to third-country removal arose after their final removal orders were entered, the court reasoned that they were not barred.

That reasoning, however, fares no better than it did under the CAT-specific bars. Again, when a statutory scheme creates an exclusive mechanism for reviewing a type of grievance, the fact that a subset of those claims cannot satisfy that mechanism is not a license for a federal court to create another one. Here too, the district court relied heavily on its misunderstanding of *Jennings*. But again, there, this Court declined to interpret Section 1252(b)(9) so broadly as to cover *categories* of claims that either had nothing to do with removal (*e.g.*, assault) or could never be "effectively" reviewable in any form (*e.g.*, prolonged detention). 583 U.S. at 293. None of that bears on the allegations here, which inescapably—indeed, exclusively—target an "action taken * * * to remove an alien from the United States." 8 U.S.C. 1252(b)(9).

Tellingly, the district court never attempted to square its ruling with the actual text of the INA. Nowhere did it say how a suit seeking to impose conditions on third-country removals does not challenge an "action" to "execute removal." 8 U.S.C.

1252(g).  Nor did it explain how a case objecting to the process for third-country re-
movals was not one "arising from" "action[s] taken" to "remove an alien."  8 U.S.C.
1252(b)(9).  Its sole response was to insist that these sorts of claims *must* be review-
able at some point, by some court—and working from that premise, the district court
held that those jurisdictional bars did not control, because they could not apply.

That is no way to read a statute.  Indeed, that logic undermines the whole point
of jurisdictional bars, which is, after all, to create at least some situations where ju-
dicial review is actually barred.  And it is especially misguided here, because many
aliens *can* raise CAT objections to third-country removals in the administrative pro-
cess—and, in turn, before a court of appeals.  On the front end, aliens can raise in
their initial removal proceedings the list of countries where they fear removal.  See
U.S. Citizenship & Immigration Servs., DHS, *Form I-589: Application for Asylum
and for Withholding of Removal* 6 (Jan. 20, 2025) (asking alien to list and explain
"any" country "to which [he] may be returned" where he fears "torture"); see also
8 C.F.R 1240.10(f), 1240.11(c).  And on the back end, aliens can move to reopen pro-
ceedings to assert new fear claims regarding removal to a third country.  See, *e.g.*,
8 U.S.C. 1229a(c)(7) (allowing a motion to reopen within 90 days after removal order
becomes administratively final); 8 C.F.R. 1003.2(c), 1003.23(b) (allowing a motion to
reopen after 90 days under immigration court or BIA's *sua sponte* authority).

The district court found those options inadequate.  App., *infra*, 19a-23a.  It
maintained, for instance, that forcing an alien to affirmatively list where he might
"have a reasonable fear" would be "impractical."  *Id.* at 45a.  But that, at bottom, is a
policy objection to the scheme Congress designed.  And it is a weak one at that.  There
is little to recommend a system where the government is forced to go country-by-
country until the alien acquiesces to removal without further, lengthy process.  See

*id.* at 65a ¶¶ 22-23 (detailing "time consuming" and "operationally burdensome" process of finding viable third countries for removal).  Nor is it unreasonable to place the burden on the alien to proactively identify where he fears he may be "tortured," as defined under CAT.  CAT protection is an extraordinary remedy reserved for the "extreme" scenario when an alien faces a specific threat of severe pain or suffering intentionally inflicted by the hand or with the concurrence of a *government official* in the receiving country.  See p. 11, *supra.*  It does not, as the district court seemed to suggest, extend to whenever an alien is removed to a country with a high crime rate, civil unrest, or other risk of private violence.  See App., *infra*, 1a.  Given that demanding standard, it is far from unreasonable to expect that an alien with a bona fide CAT claim will be able to say the countries where he faces a genuine threat of torture—especially aliens like the class members, who have already "gone through a removal process" and would have been "advised" as to the scope of CAT.  *Id.* at 62a ¶ 12.

## B.    Respondents' Due-Process Claims Are Meritless

Even setting aside the injunction's many jurisdictional defects, it also fails on the merits.  The government's procedures for implementing CAT in this context are fully consistent with due process, and the district court had no legal basis to order that those procedures be supplemented with ones it preferred.

Notably, all class members here have final orders of removal.  All have had the opportunity to raise CAT claims in prior proceedings, voice fears as to any potential countries of removal, and move to reopen past proceedings as new fears have arisen.

The March Guidance explains that the government provides these aliens with additional process, before any one of them is removed to a third country.  That process, as detailed below, ensures that an alien will either be sent to a country where the United States has received adequate assurance the alien will not be tortured, or

that the alien will be given notice and an opportunity to be heard regarding any fear as to his country of removal.  The district court erred in second-guessing the details of these procedures under the guise of constitutional due-process analysis.

1.    As noted, the March Guidance provides that an alien may be removed to a "country [that] has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured."  App., *infra*, 54a.  If the State Department finds that country's assurances credible, "the alien may be removed without the need for further procedures."  *Id.* at 54a-55a.

The Constitution requires nothing further.  Indeed, this Court has already held that when the Executive determines a country will not torture a person on his removal, that is conclusive.  *Munaf* v. *Geren*, 553 U.S. 674, 702-703 (2008); see *Kiyemba* v. *Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009) (federal courts "may not question the Government's determination that a potential recipient country is not likely to torture a detainee"), cert. denied, 559 U.S. 1005 (2010).  The "*Munaf* decision applies here a fortiori: That case involved transfer of *American citizens*, whereas this case involves transfer of alien detainees with no constitutional or statutory right to enter the United States."  *Kiyemba*, 561 F.3d at 517-518 (Kavanaugh, J., concurring).  When the Executive decides an alien will not be tortured abroad, courts may not "second-guess [that] assessment," at least unless Congress has specifically authorized judicial review of that decision.  *Id.* at 517 (citation omitted); see *Munaf*, 553 U.S. at 703 n.6.

The district court disagreed, but gave no sound reason for doing so.  It mainly insisted that the Executive Branch must make an "individualized assessment" to satisfy due process.  App., *infra*, 47a.  But courts may not "second-guess" the *scope* of the Executive's conclusion any more than its substance.  See *Kiyemba*, 561 F.3d at 517-518 (Kavanaugh, J., concurring).  The decision that a foreign government's categorial

assurance against torture is sufficient to be accepted for all aliens is itself a "foreign policy" judgment the Judiciary "is not suited" to question. *Munaf*, 553 U.S. at 702.[8]

Relatedly, the district court's objection does not sound in *procedural* due process at all. It is a *substantive* objection that an assurance alone provides insufficient basis for the government to find that an alien is not likely to be tortured. This Court has rejected attempts to "recast in 'procedural due process' terms" what is really a challenge to the "'substantive'" criteria that the government has adopted. *Reno* v. *Flores*, 507 U.S. 292, 308 (1993) (rejecting similar argument for "individual[ized]" procedure). For good reason: It makes no sense to require the government to provide additional process with respect to potential evidence that is *immaterial* under the substantive standard the government has adopted. When the government is satisfied based on foreign assurances that *no* alien will be tortured in the receiving country, a further "individualized" assessment serves no rational purpose.

The district court also held that the March Guidance was insufficient because it did not provide for judicial review before removal. App., *infra*, 48a. But that too is irreconcilable with *Munaf*'s recognition that certain determinations by the political branches are conclusive in this context. Moreover, the district court never explained why judicial review would be required here, but not for the many other provisions in the INA that make the Executive's decisions conclusive and unreviewable. See, *e.g.*, *AADC*, 525 U.S. at 486-487 (collecting examples); cf. 8 C.F.R. 1208.30(g)(2)(iv)(A)

---

[8] The district court also stated that an individualized determination was required under CAT regulations. App., *infra*, 47a-48a. Of course, that has no bearing on what the *Constitution* might require. Anyway, the court was wrong. While the regulations say that an assurance must be limited to a "specific country," nothing requires an alien-by-alien determination as to what will likely happen in that country. 8 C.F.R. 1208.18(c)(1). The Secretary is free to conclude that "an alien" would not be tortured upon removal, on the ground that *no alien* would be treated that way in light of the strength and reliability of the assurance provided by that country. *Ibid.*

(barring judicial review over adverse fear determination in expedited-removal proceedings). The court just cited *Marbury* for the notion that every right must have a remedy. But it never provided a coherent legal rationale why a *judicial* remedy is necessary in these circumstances, yet not elsewhere across the INA where an *administrative* remedy is sufficient. See *Haaland* v. *Brackeen*, 599 U.S. 255, 279 (2023).

2.    For aliens being removed to a third country not covered by an adequate assurance, the March Guidance states that DHS will first inform the alien of removal to that country, and then give him an opportunity to affirmatively state that he fears removal there. App., *infra*, 55a. If the alien does so, immigration officials will generally screen the alien within 24 hours to determine whether he "would more likely than not" be tortured if sent to that country. *Ibid.* If not, the alien will be removed; if so, the alien will be placed in further administrative proceedings—or if appropriate, the government "may choose to designate another country for removal." *Ibid.*

The district court deemed those procedures unconstitutional too. According to the court, the Constitution requires (i) not just that an alien be given a "meaningful opportunity" to simply express a fear of return, but that he be given a "minimum of ten days" to do so; (ii) the government must use a "reasonable fear" standard, rather than a "more likely than not" standard, in evaluating that asserted fear; and (iii) an alien must have "a minimum of 15 days" to "move to reopen" immigration proceedings if he fails to establish a reasonable fear. App., *infra*, 51a-52a, 1a-2a.

The district court offered no basis in law for those supposed constitutional dictates. To the contrary, they are inconsistent with established immigration law. Most analogous, in expedited-removal proceedings, aliens are expected to raise fears of removal "almost immediately," and are often processed in a matter of hours. App., *infra*, 62a ¶¶ 11, 13; see, *e.g.*, 8 U.S.C. 1225(b)(1)(B)(i). If the asylum officer decides the

32

alien does not have a credible fear, any review by an immigration judge must be completed within seven days after that finding was made. 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 C.F.R. 1003.42(e). The expedited-removal statute does not limit the countries to which an alien can be removed pursuant to Section 1231(b), see 8 U.S.C. 1225(b), so its expedited procedures for raising and assessing fear claims apply even when an alien is removed somewhere other than his home country, see, *e.g.*, 8 U.S.C. 1231(b)(1)(A)-(C) (listing alien's country of birth or citizenry as alternatives only where removal to the country from which the alien arrived is unavailable).

The district court did not explain why those sorts of procedures are adequate for expedited removal, but not here—where, again, the entire class comprises aliens who already have valid removal orders, and who already have had a prior opportunity to raise claims under CAT. The court underscored that the additional measures it imposed tracked its "sense of what fairness requires," App., *infra*, 51a n.46; but that is an improper basis to displace DHS's judgment about the best way to carry out the core executive power of removing aliens consistent with our treaty obligations.

Nor does the district court's preferred policy even make sense on its own terms. The injunction requires that *all* class members receive at least 15 days to move to reopen proceedings after an adverse "reasonable fear" finding. App., *infra*, 52a. But when the government makes a decision to accept an *individualized* assurance from a foreign nation that an alien would not be tortured upon removal—as even the district court acknowledged was permissible, see *id.* at 47a-48a—that determination is conclusive for the Executive Branch. See 8 C.F.R. 208.18(c). Yet if the government opts to take that course as to a particular alien, the court's injunction *still* requires two-plus weeks for that alien to file a futile motion to reopen. While aliens in that position may welcome the manufactured delay, such judicial policymaking only further bur-

dens an immigration system already plagued by protraction.[9]

3.    The district court's creation of novel due-process requirements is particularly misguided here because, for many aliens included in the class, the Due Process Clause requires no more process than what the political branches provide.  This Court has long held that "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever the procedure[s] authorized by Congress."  *Thuraissigiam*, 591 U.S. at 139 (citation omitted).  For aliens who have never been admitted—a group which undoubtedly includes many class members here—"the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law."  *Nishimura Ekiu* v. *United States*, 142 U.S. 651, 660 (1892) (emphasis added); accord *Thuraissigiam*, 591 U.S. at 138-140.

To this end, this Court has also long applied the so-called "entry fiction" that all "aliens who arrive at ports of entry  * * *  are treated for due process purposes as if stopped at the border."  *Thuraissigiam*, 591 U.S. at 139 (citation omitted).  Indeed, that is so "even [for] those paroled elsewhere in the country for years pending removal."  *Ibid.*  This Court has applied the entry fiction to aliens with highly sympathetic claims to having "entered" and developed significant ties to this country.  See, *e.g.*, *Kaplan* v. *Tod*, 267 U.S. 228, 230 (1925) (holding that a mentally disabled girl paroled into the care of relatives for nine years must be "regarded as stopped at the boundary line" and "had gained no foothold in the United States"); *Shaughnessy* v. *United States ex rel. Mezei*, 345 U.S. 206, 214-215 (1953) (holding that an alien with 25 years' of lawful presence who sought to reenter enjoyed "no additional rights" be-

---

[9]  In its analysis, the district court emphasized a stray comment from oral argument, taken out of context, where an attorney indicated the government would send an alien to any country it did not know "there's someone standing there waiting to shoot him."  App., *infra*, 49a.  As detailed here, that is not DHS's policy in any way.

yond those granted by "legislative grace"). Compared to these cases, it follows *a fortiori* that an unlawful entrant who violates our laws and evades detection must, once found, be "treated as if stopped at the border." *Mezei*, 345 U.S. at 215.

Accordingly, this Court's precedents indicate that illegal aliens who evade detection in crossing the border should be treated the same as those who are stopped at the border in the first place. See *Thuraissigiam*, 591 U.S. at 138-140. While aliens who have been *admitted* may claim due-process protections beyond what Congress has provided, even when their legal status changes (*e.g.*, an alien who overstays a visa, or is later determined to have been admitted in error), see *Wong Yang Sung* v. *McGrath*, 339 U.S. 33, 49-50 (1950), this Court has never held that aliens who have "entered the country clandestinely" are entitled to such additional rights, *The Japanese Immigrant Case*, 189 U.S. 86, 100 (1903). Put differently, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence"—a status that, by definition, unlawful entrants are legally barred from obtaining—"his constitutional status changes accordingly." *Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982). But before then, an alien who clandestinely enters "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law." *United States ex rel. Turner* v. *Williams*, 194 U.S. 279, 292 (1904); accord *Wong Yang Sung*, 339 U.S. at 49-50.

Congress has codified that distinction by treating all aliens who have not been admitted—including unlawful entrants who evade detection for years—as "applicants for admission." 8 U.S.C. 1225(a)(1) ("An alien present in the United States who has not been admitted  * * *  shall be deemed for purposes of [the INA] an applicant for admission."). That rule comports with the Constitution. The Due Process Clause does not offer a windfall for those who successfully circumvent our laws and evade

detection.  For constitutional purposes, it should not matter whether an alien was apprehended "25 yards into U.S. territory" or 25 miles; nor should it matter whether he was here unlawfully and evades detection for 25 minutes or 25 years.  See *Thuraissigiam*, 591 U.S. at 139.  When an illegal alien has never been admitted to this country by immigration officers, his constitutional status for due-process objections to removal is no different from an alien stopped at the border.[10]

That principle is fatal to the classwide relief granted below.  The class covers "[a]ll individuals who have a final order of removal issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA."  App., *infra*, 28a.  That includes aliens who were apprehended at the border reentering after having been removed.  It includes aliens deemed inadmissible at the border but then released into the country for removal proceedings.  And it includes aliens who were able to clandestinely enter the country illegally, only to be apprehended later.

The Due Process Clause does not give such aliens a constitutional entitlement

---

[10]  This conclusion is consistent with this Court's recent rulings that aliens detained and subject to removal under the Alien Enemies Act (AEA), 50 U.S.C. 21 *et seq.*, are entitled to judicial review, including notice and opportunity to be heard regarding their AEA status.  *Trump* v. *J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam); *A.A.R.P.* v. *Trump*, No. 24A1007, 2025 WL 1417281, at *2 (May 16, 2025) (per curiam).  As noted in the government's application in *J.G.G.*, Gov't Br. at 18-20, *Trump* v. *J.G.G.*, 145 S. Ct. 1003 (2025) (No. 24A931), this Court in *Ludecke* v. *Watkins*, 335 U.S. 160 (1948), interpreted the AEA and the habeas corpus statute to provide for limited but significant judicial review of the Executive's AEA determinations, including review of "questions of interpretation and constitutionality," *id.* at 163, and "[t]he additional question as to whether the person restrained is in fact an alien enemy," *id.* at 171 n.17.  In those cases, therefore, Congress has *provided* procedures by statute that comport with due process, and they apply regardless of whether the AEA-designated alien is an applicant for admission who lacks due-process removal rights beyond what Congress provides.  Here, by contrast, the district court created an entirely new process without any statutory basis, based on its subjective "sense of what fairness requires"; superimposed that process upon the more limited (but still constitutionally adequate) procedures adopted by the political branches; and then applied that judge-manufactured process to many aliens who lack due-process removal rights beyond what Congress provides.  See App., *infra*, 51a-52a and n.46.

to any extra removal procedures beyond what the political branches have provided. See *Thuraissigiam*, 591 U.S. at 138-140. But that is precisely what the district court's injunction does. Again, the INA is silent as to any specific process that aliens must be afforded under CAT before they are removed to a third country, and FARRA delegates that decision to the Executive Branch. See 8 U.S.C. 1231 note. The March Guidance thus constitutes the political branches' reasoned judgment as to what that process should be in these circumstances, for aliens who have a final order of removal. For aliens who were never admitted to the United States, the Executive's policies and decisions made under FARRA "*are* due process of law." *Nishimura Ekiu*, 142 U.S. at 660 (emphasis added). And as detailed, far from some exercise of "arbitrary power," *Japanese Immigrant*, 189 U.S. at 101, that Guidance is exceedingly reasonable, and provides aliens with more than ample process to effectuate their responsible removal. The Constitution requires nothing further.

## II.    THE OTHER FACTORS SUPPORT RELIEF

Besides the merits, in deciding whether to grant emergency relief, this Court also considers whether the underlying issues warrant review; whether the applicants likely face irreparable harm; and in close cases, the balance of equities. See *Hollingsworth*, 558 U.S. at 190. Those factors all overwhelmingly support relief here.

1.    The issues raised by this case warrant this Court's review. The district court's injunction interferes with the implementation of an important Executive Order, in an area that Congress and the Constitution have entrusted to the Executive Branch. This Court has recently and repeatedly intervened in similar cases. See, *e.g.*, *Trump* v. *Wilcox*, No. 24A966, 2025 WL 1464804 (May 22, 2025); *Noem* v. *National TPS Alliance*, No. 24A1059, 2025 WL 1427560 (May 19, 2025); *Trump* v. *Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of district court order enjoining the Depart-

ment of Defense from undertaking border-wall construction using certain funds); *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (granting stay of district court order that required INS to engage in certain immigration procedures, as "an improper intrusion" upon a "coordinate branch").

The same course is merited here. President Trump has determined that the millions of illegal aliens who have been released back into the United States, notwithstanding a valid order of removal, present an immediate threat to the nation. App., *infra*, 57a § 5. To combat this, the Administration has engaged in an "unprecedented" effort to work with foreign countries to facilitate the removal of illegal aliens. D. Ct. Doc. 1-4, at 2. And in turn, DHS has developed a policy for such third-country removals, which was designed to strike a balance for the government between providing adequate process while ensuring long overdue expedition in removals. The district court's order blocking that critical policy warrants this Court's attention.

2.     All the more so because the government will suffer severe irreparable harm absent prompt action by this Court. Of course, whenever a government's policy is blocked by court order, it suffers an irreparable sovereign harm. *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And that harm is even more acute in the immigration context, where the Constitution assigns preeminent power to the political branches. See *Galvan* v. *Press*, 347 U.S. 522, 531 (1954).

Those harms are particularly pronounced in this case. While the Constitution envisions that "the Government's political departments [will be] largely immune from judicial control" in the immigration sphere, *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977) (citation omitted), the district court's injunction portends the opposite, with that court generally superintending third-country removals so long as its injunction is in effect. As the episode with South Sudan confirms, the injunction's open-ended terms allow

the district court to continually revise its invented removal policy.  See App., *infra*, 2a (purporting to "clarify" that "meaningful opportunity" means at least "ten days").  And indeed, the court has indicated that further revisions are to come—with those details fleshed out over the course of "experience," which in practice could only mean seriatim contempt hearings.  *Id.* at 1a-2a.  That is unworkable.  It was problematic enough for the court to write its own procedures, but it is simply untenable for that project to be a work-in-progress in which the goalposts continuously move.

The practical consequences of the district court's injunction only underscore why the Constitution assigns immigration policy to the political branches.  As noted, the court's policy allows for at least 25-days' worth of delay for every alien being removed to a third country who decides to voice a fear under CAT—regardless of how frivolous his claim.  Because ICE "often has only a short window to remove an alien"—including because travel documents are not "valid indefinitely"—this unfounded delay can scuttle an alien's "entire" removal process, forcing ICE to start anew.  App., *infra*, 68a ¶ 29.  And because ICE has both limited legal authority and practical ability to detain aliens, the result may be that ICE must "release these dangerous criminals once again" while it restarts removal.  *Ibid.*  Those operational burdens from the injunction will weigh heavily on an already strained immigration system.

Worse, the injunction has harmed—and will harm—American foreign policy and national security, as Secretaries Rubio and Hegseth explained below.  Arranging removal to a third country is a delicate diplomatic endeavor, which is the product of a carefully negotiated process.  See App., *infra*, 71a ¶ 4 (Rubio) (describing diplomatic consequences of disrupting possible removals to Libya).  When a court upends those efforts, it visits "significant and irreparable harm to U.S. foreign policy."  *Id.* at 71a ¶ 3.  And that is exactly what happened here.  By interrupting the transfer of

39

aliens to South Sudan, the district court's injunction "derail[ed]" our efforts to "quietly rebuild a productive working relationship" with that country, and to gain South Sudan's "cooperation" in broader regional priorities. *Id.* at 72a ¶ 5. Of a piece, in causing the United States to keep criminal aliens at its military base in Djibouti, the district court forced the United States to "re-engage the Djiboutians to explain that the mission they had approved had subsequently changed" in important respects. *Id.* at 72a ¶ 7. Such actions have serious repercussions for American foreign policy, given Djibouti's "strategic[] locat[ion] in the Horn of Africa." *Id.* at 72a ¶ 6. So too national security, because the sudden need for the government to detain criminal aliens in Djibouti has forced the United States to divert critical resources from elsewhere, and has more broadly undermined the Department of Defense's relationship with that host nation. See generally D. Ct. Doc. 131 (Hegseth).

Nor are these severe costs in service of any public benefit. As noted, the United States relies on third countries to facilitate the removal of criminal aliens who are difficult to otherwise remove. Absent an effective third-country removal policy, the United States is forced to retain (and often, release) vicious criminals who have already harmed our communities. The aliens sent to South Sudan—a group of convicted sex offenders and murderers, among others—are illustrative of a broader problem. The March Guidance marks a long overdue solution, and the public is not served by an order that hollows its efficacy. See *Nken* v. *Holder*, 556 U.S. 418, 436 (2009) (recognizing the "public interest in prompt execution of removal orders").

On the other side of the ledger, respondents have not established irreparable harm that warrants extraordinary relief. The Secretary of State already has the authority to obtain "assurances" from a foreign country that an alien will not be tortured if removed there, and those assurances are already dispositive with regard to CAT

protection. 8 C.F.R. 208.18(c). Neither the district court nor respondents have identified any sort of imminent or irreparable harm from the government's ability to obtain these assurances categorically versus one-by-one. Nor could they: Because either decision would rest on the same basis (*i.e.*, that *no* alien will be tortured), any requirement for an "individualized" determination would amount to a paperwork demand. Likewise, as for aliens set to be removed to other countries, the March Guidance already provides them notice and an eminently reasonable opportunity to raise a fear of removal. See App., *infra*, 61a-62a ¶¶ 7-8, 11-13. And respondents have never justified why the district court's added measures—which, as noted, go well beyond the typical timeframe in expedited removal—are necessary to forestall irreparable harm here. That is especially so given the lack of any realistic risk that they will be tortured with the concurrence of foreign governments in third countries where they have little or no preexisting connection, particularly given that the Executive Branch has determined those countries are acceptable places of removal.

## CONCLUSION

This Court should stay the district court's injunction. The Court should also enter an immediate administrative stay of the district court's injunction pending its consideration of this application.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

MAY 2025

# APPENDIX

District court clarification opinion (D. Mass. May 21, 2025) ..................................... 1a

Court of appeals order denying stay pending appeal (1st Cir. May 16, 2025) .......... 4a

District court order granting preliminary injunction
    (D. Mass. Apr. 18, 2025) ............................................................................... 6a

DHS guidance regarding third country removals (Mar. 30, 2025) ......................... 54a

"Securing Our Borders" executive order (Jan. 20, 2025) ........................................ 56a

Declaration of Acting Deputy Executive Associate Director Garrett J. Ripa
    (May 23, 2025) ............................................................................................. 59a

Declaration of Secretary of State Marco Rubio (May 23, 2025) ............................. 70a

Declaration of Acting Assistant Director Marcos D. Charles (May 23, 2025) ......... 74a

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. |
| v. ) | 25-10676-BEM |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM ON PRELIMINARY INJUNCTION

**MURPHY, J.**

At today's hearing, the Court found that Defendants violated the Preliminary Injunction entered in this case by failing to provide six non-citizen class members a "meaningful opportunity" to assert claims for protection under the Convention Against Torture before initiating removal to a third country. *See* Dkt. 64 at 46–47.

Defendants maintain that ambiguity in the phrase "meaningful opportunity" precipitated this controversy. Indeed, when the Court issued the Preliminary Injunction, it declined to elaborate on what constitutes a "meaningful opportunity," preferring instead to let experience show through hard cases the finer points of what is required under the Due Process Clause.

To be clear, this is not one of those hard cases. Giving every credit to Defendants' account, the non-citizens at issue had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane and sent to a country as to which the U.S. Department of State issues the following warning: "Do not travel to South Sudan due to **crime**, **kidnapping**, and **armed conflict**." *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphasis in original). As detailed on the record during today's

hearing, further facts regarding the unavailability of information, the hurried and confused notice that the individuals received, language barriers, and attorney access compound and confirm this Court's finding that no reasonable interpretation of the Court's Preliminary Injunction could endorse yesterday's events.

Nevertheless, given Defendants' position that further detail would help Defendants comply, the Court offers the following summary and clarification of its Preliminary Injunction:

All removals to third countries, *i.e.*, removal to a country other than the country or countries designated during immigration proceedings as the country of removal on the non-citizen's order of removal, *see* 8 U.S.C. § 1231(b)(1)(C), must be preceded by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Dkt. 64 at 46–47. Following notice, the individual must be given a meaningful opportunity, **and a minimum of ten days**, to raise a fear-based claim for CAT protection prior to removal. *See id.* If the non-citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. *Id.* If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings. *Id.*

This Preliminary Injunction applies to the Defendants, including the Department of Homeland Security, as well as their officers, agents, servants, employees, attorneys, any person acting in concert, and any person with notice of the Preliminary Injunction. Fed. R. Civ. P. 65(d)(2); *see also* Dkts. 86, 91. Accordingly, no Defendant may avoid their duty to follow the Preliminary Injunction by involving or ceding responsibility to any other person. *See* Dkt. 86.

**So Ordered.**

/s/ Brian E. Murphy

Brian E. Murphy

Dated:  May 21, 2025                    Judge, United States District Court

# United States Court of Appeals
## For the First Circuit

———————————

No. 25-1393

D.V.D.; M.M.; E.F.D.; O.C.G.,

Plaintiffs - Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of Department of Homeland Security (DHS); PAMELA BONDI, United States Attorney General; ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility,

Defendants - Appellants.

———————————

Before

Montecalvo, Howard, and Aframe,
Circuit Judges.

———————————

**ORDER OF COURT**

Entered: May 16, 2025

The emergency motion for a stay of the April 18 preliminary injunction pending appeal and for an immediate administrative stay is denied, the government not having met the standard for the relief sought. See Nken v. Holder, 556 U.S. 418 (2009). To justify a stay, the movant must "(1) make a 'strong showing that [it] is likely to succeed on the merits' in its appeal; (2) show that it 'will be irreparably injured absent a stay'; (3) show that 'issuance of the stay will [not] substantially injure the other parties interested in the proceeding'; and (4) show that the stay would be in 'the public interest.'" New Jersey v. Trump, 131 F.4th 27, 34–35 (1st Cir. 2025) (quoting Nken, 556 U.S. at 434).

In particular, we have concerns regarding the continuing application of the Department of Homeland Security's March 30 Guidance Regarding Third Country Removals; the defendants' filing of a "provisional" stay motion three days before the injunction was entered; the irreparable harm that will result from wrongful removals in this context; the equities of stay relief; and certain merits-related issues that the parties are instructed to address in their briefs.

First, does the class-based injunction "enjoin or restrain the operation of" covered INA provisions insofar as it requires compliance with the terms of such provisions or the terms of removal orders previously generated pursuant to those provisions? Second, does 8 U.S.C. § 1252(f)(1) presume the availability of individualized judicial review to individuals subject to third-country removals and therefore does not bar class-wide injunctive relief where such relief is necessary to make such individualized review available? Third, do the APA/due process claims stated in Counts I to III of the complaint have a sufficiently attenuated connection to the statutory removal provisions covered by § 1252(f)(1) that they do not fall within its sweep? Cf. Garland v. Aleman Gonzalez, 596 U.S. 543, 553 n.4 (2022) (leaving open the possibility of class-based injunctive relief with respect to at least some statutory claims that are not themselves covered by § 1252(f)(1) but have a collateral effect on the operation of a covered provision).

The assented-to motions to file an oversized stay motion and opposition are allowed. The Clerk shall set a briefing schedule.

By the Court:

Anastasia Dubrovsky, Clerk

cc:
Donald Campbell Lockhart
Abraham R. George
Elianis N. Perez
Matthew Patrick Seamon
Mary Larakers
Mark Sauter
Trina A. Realmuto
Mary A. Kenney
Kristin Macleod-Ball
Tomas Arango
Aaron Korthuis
Glenda M. Aldana Madrid
Leila Kang
Matthew H. Adams

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| D.V.D., *et al.*,<br>individually and on behalf of all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br>Defendants. | Civil Action No.<br>25-10676-BEM |

## MEMORANDUM AND ORDER ON PLAINTIFFS'
## MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION

**MURPHY, J.**

This case presents a simple question: before the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there? Defendants argue that the United States may send a deportable alien to a country not of their origin, not where an immigration judge has ordered, where they may be immediately tortured and killed, without providing that person any opportunity to tell the deporting authorities that they face grave danger or death because of such a deportation. All nine sitting justices of the Supreme Court of the United

States,[1] the Assistant Solicitor General of the United States,[2] Congress,[3] common sense,[4] basic

decency, and this Court all disagree.  Plaintiffs are seeking a limited and measured remedy—one

Defendants have conceded in other proceedings is the minimum that comports with due process.[5]

Plaintiffs are simply asking to be told they are going to be deported to a new country before they

are taken to such a country, and be given an opportunity to explain why such a deportation will

likely result in their persecution, torture, and/or death.  This small modicum of process is mandated

by the Constitution of the United States, and for this reason, the motion for class certification is

GRANTED, and the motion for preliminary injunction is GRANTED in part.

---

[1] *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [deportable aliens] to actually seek . . . relief in the proper venue before such removal occurs."); *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available.").

[2] Transcript of Oral Argument at 32–33, *Bondi v. Riley*, No. 23-1270 (S. Ct. Mar. 24, 2025) ("JUSTICE KAGAN: . . . [W]hen you have the order of removal but the [Convention Against Torture] proceedings have not yet been concluded, what does the government feel itself free to do with the alien? . . . [ASSISTANT TO THE SOLICITOR GENERAL]: We do think we have the legal authority to [send the non-citizen to some other country, assuming no pending claim under the Convention Against Torture as to that other country], with the following caveat: We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ("JUSTICE KAGAN: So that's what it would depend on, right?  That -- that you would have to provide [an individual being removed] notice [of what country he is being sent to], and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?  ASSISTANT TO THE SOLICITOR GENERAL: Yes, that's right.").

[3] *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231) (codifying protections under the Convention Against Torture and prohibiting the removal of an alien to any country where they would likely be tortured); 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 238.1, 241.8, 1208.16–18, 1240.11; 28 C.F.R. § 200.1 ("A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.").

[4] "[C]ommon sense often makes good law."  *Peak v. United States*, 353 U.S. 43, 46 (1957).

[5] *Supra* note 2.

# I.    Background

## A.    Legal Background

### 1.    Removal Proceedings

When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ").  8 U.S.C. § 1229a.  Removal proceedings determine not only *whether* an individual may be removed from the United States but also to *where* he may be removed.  In the first instance, the alien is entitled to select a country of removal.  *Id.*; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f).  If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries.  8 C.F.R. § 1240.10(f).

Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections.  8 C.F.R. § 1240.11(c)(1).[6]  Some of these protections are discretionary.[7]  Others are mandatory, meaning that protection must be given if the conditions are met.  Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted.  *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections].").  CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured.  *See* Foreign Affairs Reform and

---

[6] Technically, CAT protections can be a form of withholding.  *See Guzman Chavez*, 594 U.S. at 530.  The Court uses the phrase "withholding of removal" to refer to what has been called "statutory withholding."  *Id.*

[7] For example, asylum, which protects against deportation generally to any country, is discretionary absent certain exceptions.  *See generally* 8 U.S.C. § 1158; 8 C.F.R § 208.2.

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.

### 2.  Reinstatement or Withholding-Only Proceedings

Alternatively, the U.S. Department of Homeland Security ("DHS") may reinstate a prior order of removal for an alien it finds "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5).  When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed."  *Id.*  DHS may also issue administrative removal orders to individuals whom DHS determines are not lawful permanent residents and who have an aggravated felony conviction.  *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1.

While in both processes aliens are barred from pursuing nearly all avenues of relief from removal, aliens may still seek protection through withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT.  8 C.F.R. §§ 238.1(f)(3), 241.8(e).  If the alien demonstrates a reasonable fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ where they can only seek withholding of removal and/or CAT protection.  8 C.F.R. §§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the Immigration and Nationality Act ("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal."[8]).

---

[8] Deferral of removal provides CAT protections to aliens who are mandatorily ineligible for withholding of removal.  *See* 8 C.F.R. § 208.17(a).

Withholding of removal and CAT protection only affect to *where* the alien may be removed, rather than *whether* the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").

### 3.  Third-Country Removals

Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.

In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals."  As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:

> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A).  Similarly, under FARRA,[9] which codified CAT protections, an alien may not be removed to any country where they would be tortured.  *See* 28 C.F.R. § 200.1; 8 C.F.R.

---

[9] *See supra* note 3.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 6 of 48
Case 8:25-cv-02780-PX    Document 71-11    Filed 11/07/25    Page 56 of 127
11a

§§ 208.16–18, 1208.16–18.   In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

### B.    Factual Background

#### 1.    The February 18, 2025 Directive and March 30, 2025 Guidance

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, entitled "Securing our Borders."  90 Fed. Reg. 8467.  As relevant here, on or about February 18, 2025, DHS issued a directive to the Enforcement and Removal Operations ("ERO") division of Immigration and Customs Enforcement ("ICE").  Dkt. 1-4 (the "February Directive").  The February Directive instructs ERO officers to review the cases of aliens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained" and, in case of persons who previously could not be removed because the designated countries were unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals."  *Id.* at 2.

On March 23, 2025, Plaintiffs filed this lawsuit challenging, in part, the February Directive.  Dkt. 1 ("Compl.").  Plaintiffs seek an order guaranteeing them the opportunity to show—before being removed to countries not included on their removal orders—that they will suffer persecution, torture, and/or death in those countries.  They are challenging Defendants' policy or practice of designating aliens for removal to any country other than the country or alternative country of removal designated and identified in writing in their prior immigration proceedings without first providing notice and an opportunity to apply for protection from removal to that "third" country.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 7 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 57 of 127
12a11

On March 28, 2025, the Court entered a temporary restraining order after hearing oral arguments from both parties.[10]  Dkt. 34.

On March 30, 2025, DHS issued an updated guidance (the "March Guidance") on removals to third countries.  Dkt. 43-1.  This guidance dictates that aliens may be removed to a third country without notice if the United States has received assurances from that country that aliens removed from the United States will not be persecuted or tortured.  *Id.* at 2–3.  Importantly, these assurances are not individualized, and the March Guidance provides for no review, meaning that deportations to a third country can occur without any consideration of the individual risks facing a particular alien.  *Id.*  According to the March Guidance, DHS will provide the alien with notice of the third country (and an opportunity to affirmatively assert a fear of return to that third country) only if the United States has not received assurances, or if the Department of State does not believe those assurances to be credible.  *Id.* at 3.

### 2.    **Plaintiffs' Cases**

Plaintiffs are individuals subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders.  Compl. ¶ 1.[11]

Plaintiff D.V.D.[12] is a citizen of Cuba who entered the United States from Mexico.  *Id.* ¶¶ 10, 62.  In February 2017, in removal proceedings, he was ordered removed.  *Id.* ¶ 62.  His removal order specified only Cuba as the country of removal.  *Id.*  He was released from detention on an Order of Supervision in May of 2017.  *Id.*  Plaintiffs allege that on March 10, 2025, ICE instructed D.V.D.'s attorney that D.V.D. needed to report for an in-person check-in on March 28,

---

[10] The Court extended the temporary restraining order after hearing further oral arguments from both parties on April 10, 2025.  Dkt. 62.

[11] Except where indicated, the relevant facts are largely undisputed.

[12] The Court has allowed Plaintiffs to proceed under pseudonyms.  Dkt. 13.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 8 of 48
Case 8:25-cv-02780-PX    Document 78-11    Filed 11/07/25    Page 58 of 127
18a

2025, and that the ICE officer later explained that ICE was requiring all people to report in person and more frequently on a case-by-case basis. *Id.* ¶¶ 64–66. If deported to a third country, D.V.D. alleges that he is at risk of persecution due to his mental health conditions or possible imprisonment in certain countries. *Id.* ¶ 67. At oral argument on March 28, 2025, counsel indicated that D.V.D. had not been detained at that day's check-in and had been given another check-in date in September 2025. Dkt. 44 ("March 28, 2025 Tr.") at 4:24–25.

Plaintiff M.M. is a citizen of Honduras who fled due to severe domestic violence. Compl. ¶¶ 11, 68. In 2014, because she had previously been ordered removed from the United States, DHS issued a reinstatement order. *Id.* ¶ 69. In withholding-only proceedings before an IJ in 2021, she was granted withholding of removal to Honduras. *Id.* ¶¶ 69–70. M.M. is not in ICE custody, but she alleges that on March 7, 2025, an ICE officer informed her that she was on a list of people who would be deported imminently. *Id.* ¶ 71. If deported to a third country, M.M. alleges that she is at risk of being sent back to Honduras or another country where she would again face severe domestic violence. *Id.* ¶ 73. At oral argument on April 10, 2025, counsel indicated that M.M.'s check-in had been cancelled by ICE after the initiation of this suit. April 10, 2025 Rough Tr. at 1:19–21.

Plaintiff E.F.D. is a citizen of Ecuador. Compl. ¶¶ 12, 74. In October 2015, he was placed in removal proceedings after entering the United States and raising a credible fear of return. *Id.* In 2018, in removal proceedings, an IJ granted E.F.D.'s application for CAT protection. *Id.* ¶ 75. On March 18, 2025, ICE re-detained him. *Id.* ¶¶ 12, 76. He has not yet been told when his removal might happen or to where. *Id.* ¶¶ 76–77. E.F.D. alleges that he will be deported to a third country without the opportunity to apply for protection, which could include countries that will deport him

back to Ecuador, from which he was awarded CAT protection, or to countries where he has had prior dangerous experiences. *Id.* ¶ 77.

Plaintiff O.C.G. is a native of Guatemala who was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala in March 2024, without a credible fear interview. *Id.* ¶¶ 13, 78. In May of 2024, he reentered the United States, through Mexico, after experiencing violence in Mexico. *Id.* ¶¶ 79–80. His removal order was reinstated by DHS, but he was referred to an asylum officer based on his expressed fear of returning to Guatemala. *Id.* ¶ 80. He was then placed in withholding-only proceedings before an IJ and was granted withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3). *Id.* ¶¶ 80–82. Plaintiffs allege that the IJ did not designate Mexico as a country of removal and that, when DHS tried to add Mexico during the withholding-only proceedings, the IJ told DHS that it was "too late" to do so. *Id.* ¶¶ 81–83. DHS waived appeal. *Id.* ¶ 84. Despite this success, O.C.G. remained in detention and was quickly deported to Mexico. *Id.* ¶¶ 85–86. The parties dispute whether he was provided an opportunity to express fear prior to being deported to Mexico. *Compare id.* ¶¶ 85–86 (complaint alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of ICE's ERO Phoenix Field Office, asserting that notice was provided on the day of his removal, and fear of removal to Mexico was expressly denied). Plaintiffs allege that O.C.G. was taken to Mexico by bus and that, once he was placed in detention in Mexico, he was informed by Mexican authorities that he could apply for asylum in Mexico—and remain incarcerated for an unknown period of time while that application was pending—or be returned to Guatemala. Compl. ¶¶ 87–88. Plaintiffs allege that, on February 25, 2025, O.C.G. returned to Guatemala, where he remains in hiding today. *Id.* ¶ 89.

Each Plaintiff alleges that he or she has valid reasons to fear removal to specific countries that were not included in their removal orders. *Id.* ¶¶ 67, 73, 77, 88. Plaintiffs challenge Defendants' policy or practice of failing to provide notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders, which Plaintiffs allege violates the INA, FARRA, regulations implementing the two statutes, and the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 99–138.

### 3.  Current Motions

Before the Court now are Plaintiffs' Motion for Class Certification, Dkt. 4, and Motion for a Preliminary Injunction, Dkt. 6,[13] through which Plaintiffs seek: (1) to prevent Defendants from removing certain of the named Plaintiffs to a "third" country without notice and an opportunity to assert fear of persecution or torture; (2) to prevent Defendants from removing any class member to a "third" country without notice and an opportunity to assert fear of torture; and (3) an order directing Defendants to facilitate the immediate return of O.C.G. to the United States. For the reasons set forth below, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for a preliminary injunction is GRANTED in part.

---

[13] The Court has already ruled on the motion to the extent it sought a temporary restraining order, and as stated on the record in the March 28, 2025 hearing, the Court denies the motion to the extent it seeks an administrative stay of the February Guidance.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 11 of 48
Case 8:25-cv-02780-PX    Document 76-11    Filed 11/07/25    Page 61 of 127
16a

## II.    **Jurisdiction**

Several subsections of 8 U.S.C. § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal.    Defendants argue that sections 1252(a), (b), and (g) strip this Court of jurisdiction.[14]

### A.    **Sections 1252(a) and (b)**

In the REAL ID Act of 2005, Congress amended the INA to limit the ways by which an individual might challenge his order of removal.  *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007) (citing 8 U.S.C. § 1252(a)(5)).[15]  In turn, section 1252(b)(9) limits the forum for those challenges to courts of appeals.  *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).[16]

Accordingly, actions that do not challenge final orders of removal are not subject to this channeling scheme.  *J.E.F.M.*, 837 F.3d at 1032.  "[A] suit brought against immigration authorities

---

[14] Defendants also argue that section 1252(f)(1) limits this Court's jurisdiction with respect to class-wide relief.    However, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court explicitly confirmed that section 1252(f)(1) concerns the availability of relief, not subject matter jurisdiction.  *Id.* at 800–01.  As the Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims."  *Id.* at 801.  While the provision may "withdraw[ ] a district court's 'jurisdiction or authority' to grant a particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA."  *Id.* at 798; *see also Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief").  As discussed below, the Court has jurisdiction to grant both the class-wide declaratory and injunctive relief sought in this case.  *See infra* at 23–27.

[15] In pertinent part, section 1252(a)(5) states:

[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

[16] Section 1252(b)(9) states:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

is not *per se* a challenge to a removal order." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011).

The Supreme Court has expressly affirmed this proposition, explaining that the phrase "arising from" in section 1252(b)(9) does not encompass all claims that merely result from the fact of or potential for removal, which reading the Court said would have "staggering results." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). Because the respondents in *Jennings* were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in section 1252(b)(9) did not apply. *Id.* Notably, under *Jennings*, an individual is not required to "cram[]" claims into the judicial review of a removal order where doing so would be unnatural.[17] *Id.*

The First Circuit has had further opportunity to clarify that the scope of section 1252(b)(9) is limited to claims that specifically arise out of what happens in the removal proceeding:

> [R]emoval proceedings are confined to determining whether a particular alien should be deported. *See* [8 U.S.C.] § 1229a(c)(1)(A). While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA. *See, e.g., McNary* [*v. Haitian Refugee Ctr., Inc.*], 498 U.S. [479,] 496, 111 S.Ct. 888 [(1991)]; *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005). Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review. Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of

---

[17] Even if an individual raised claims related to the risk of torture in a third country, the IJ would not normally consider or address such claims unless that country had already been designated as a country of removal. *See infra* at 16–17 & note 24; *see also, e.g.*, Compl. ¶¶ 81–83 (alleging that, when DHS sought to add Mexico during O.C.G.'s withholding-only proceedings, the IJ told DHS that it was "too late" to do so); Dkt. 8-4 ¶¶ 5–7 (declaration of O.C.G. that the IJ did not designate Mexico as a country of removal and that the IJ informed DHS that Mexico was not a country for removal during the withholding-only proceedings); Dkt. 8-11 at 5–6 (motion to reopen denied despite third country identified for removal); Dkt. 59-12 at 4 (motion to reopen denied where removal to third country was speculative, and indicating that even if third country were identified for removal, relief would need to be sought in federal court rather than in immigration proceedings); Dkt. 59-13 at 4 (motion to reopen denied as premature where "Respondent was not seeking protection from removal to any particular country").

18a

section 1252(b)(9), reading "arising from" as used in that statute to encompass
those claims would be perverse.

*Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007).  As such, "claims which
cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition
for review are 'independent of, or wholly collateral to, the removal process,' not 'arising from' it."
*Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting *Aguilar*, 510 F.3d at 11).[18]

In examining Plaintiffs' requested relief, the issues in this case extend beyond those that
could have been raised in their removal proceedings.  This largely follows from the simple fact
that Plaintiffs are no longer in removal proceedings and complain only of actions that post-date
their removal proceedings.  Plaintiffs neither challenge the IJs' determinations that they are
removable nor claim any deficiency in the removal orders themselves.  *Cf. Delgado*, 643 F.3d at
55 (challenging adjustment of status, which would necessarily render removal order "invalid");
*Aguilar*, 510 F.3d at 13–14 (challenging right to counsel in removal proceedings).  Rather,
Plaintiffs' claims do quite the opposite of challenge their orders of removal—they seek to hold
Defendants to the terms of those orders and to receive notice and an opportunity to be heard before
Defendants explicitly exceed those orders.  *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D.
Wash. 2019) (finding claims that "challenge[d] DHS's attempts, *outside* of removal proceedings,
to designate [a third country] without reopening his proceedings so that an IJ could make the
designation in the first instance and/or determine whether petitioner's life or freedom would be

---

[18] In reaching its decision in *Aguilar*, the First Circuit cited and relied upon decades of Supreme Court
precedent that is "hostil[e] toward requiring exhaustion when adequate relief could not feasibly be obtained through
the prescribed administrative proceedings." *Aguilar*, 510 F.3d at 12 (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958),
*Matthews v. Eldridge*, 424 U.S. 319, 330–31 (1976), *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986), and
*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 14 of 48
Case 8:25-cv-02780-PX   Document 73-11   Filed 11/07/25   Page 64 of 127
19a11

threatened in that country" independent of removal order and thus not barred by section 1252(a)(5)).[19]

Defendants propose that Plaintiffs can "cram," *Jennings*, 583 U.S. at 294, their fear-based claims into the removal proceedings (thereby placing those claims into section 1252's jurisdictional funneling scheme) by filing motions to reopen their immigration proceedings. Dkt. 51 ("PI Opp.") at 8–9. But this Court finds that remedy to be both legally insufficient and logistically impossible, effectively "foreclos[ing] all meaningful judicial review." *See Aguilar*, 510 F.3d at 12 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).[20]

For most aliens, directly moving to reopen is simply not an option. "With a few narrow exceptions, the Immigration and Nationality Act limits petitioners to a single motion to reopen

---

[19] Although this case involves sensitive subject matter and complex statutory schemes, its underlying principles are surprisingly familiar. Courts routinely consider whether jurisdiction is barred based on a prior court's order. *See, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022), *aff'd*, 2022 WL 19795808 (1st Cir. Nov. 14, 2022). Under sections 1252(a)(5) and (b)(9), district courts are precluded from revisiting orders made by immigration judges. It would not make sense, however, to offer that same protection for acts that go beyond those orders' preclusive scope.

[20] Defendants claim that an alien can raise fear-based concerns through reopening IJ proceedings or petitioning the court of appeals for review. *E.g.*, April 10, 2025 Rough Tr. at 9:24–10:5 ("MR. ENSIGN: Your Honor, they would have needed to raise it earlier or -- and if we were in the second part of the [March] guidance, they also could manifest fear at that point and then it would go to screening. So there's that potentially available as well. But, you know, to the extent they have awareness of that now, they should go back before the IJ and BIA."); *id.* at 10:19–22 ("MR. ENSIGN: Your Honor, they would have needed to go to the BIA before [they are notified of third-country removal plans]. There's nothing under the [March] guidance that would require additional notice or an opportunity to challenge it at that moment."); *id.* at 27:10–13 ("[MR. ENSIGN:] There is -- the typical way it . . . would be raised is a motion to reopen if you haven't raised it already, and then you can raise it to the Court of Appeals."); *id.* at 44:2–11 ("THE COURT: So it happens Saturday morning, the person raises a fear that department disagrees -- they make it through the first screening, the department disagrees. That person is then going to be deported on Sunday morning. As a practical matter, there's no judicial review of that decision, right? MR. ENSIGN: There would be administrative review potentially in the IJ. THE COURT: How would they do that? It's Saturday. MR. ENSIGN: Your Honor, I don't know the specifics of the IJ proceedings."). This claim is either an effort to prevaricate or is deeply disingenuous. The suggestion that an alien must—or even can—reopen an immigration proceeding at 6:00 a.m. on a Saturday prior to being removed that same weekend is preposterous on its face. *See, e.g.*, Exec. Office for Immigr. Rev., *Boston Immigration Court*, U.S. Dep't of Just., https://www.justice.gov/eoir/boston-immigration-court (last updated Apr. 9, 2025) ("The immigration court is open Monday to Friday except for federal holidays."). Further, Defendants have provided no evidence or authority—only their own argument—that there is a way for Plaintiffs to *successfully* reopen their immigration proceedings as of right and do not address Plaintiffs' well-supported contention that motions to reopen to assert fear of removal to a country not designated in their removal order are routinely denied as speculative. *See* PI Opp. at 8–9 (discussing only sua sponte motions to reopen process). Defendants' contention is belied by both the evidence in the record and clear case law on the limits of sua sponte motions to reopen. *See infra* at 14–18.

filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024)

(citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)).  In the absence of any

right to reopen the underlying immigration case, the petitioner can only ask the immigration court

to reopen "sua sponte."  *Id.*  Immigration courts have nearly unfettered "discretion to decide

whether to grant or deny sua sponte reopening."  *Id.*; *see also Phimmady v. Bondi*, 128 F.4th 18,

23 (1st Cir. 2025) (holding that judicial review of immigration court's decision not to reopen sua

sponte is limited and that there is no legal error in declining to reopen where plaintiff could not

establish settled practice of reopening cases sua sponte in similar circumstances).  Consistent with

this, Plaintiffs have provided sworn declarations indicating that their various attempts at reopening

proceedings to seek CAT protections have been denied by IJs.  *See* Dkt. 8-8 ¶ 9 (explaining that

an IJ denied motion to reopen); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (IJ order denying motion

to reopen and noting that neither "Immigration Judges nor the Board of Immigration Appeals ha[s]

jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15 regarding

the country of removal.  Nothing in this order forbids DHS from acting on its own authority to

designate a country, or forbids the parties from litigating that issue in any forum outside of the

Executive Office of Immigration Review" (citations omitted)); Dkt. 59-12 ¶¶ 12–18 ("If the United

States government were to remove Respondent to El Salvador under a separate authority, that is

outside the jurisdiction of this Court to adjudicate and/or analyze.  Respondent's relief would be

sought in Federal court, not Immigration Court.");[21] Dkt. 59-13 at 4 (IJ order denying motion to reopen as premature where "Respondent was not seeking protection from removal to any particular country").[22]  *But see* Dkt. 8-14 ¶ 7 (noting that an IJ granted a motion to reopen proceedings for an alien currently in detention).[23]

Even where an alien may move as of right, or in the unlikely event that the immigration court reopens the case sua sponte, there is no reason to believe that the court will entertain such preemptive CAT and withholding claims.  "[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in Dai v. Sessions*, 884 F.3d

---

[21] The full reasoning for the IJ's denial states:

First, country conditions in El Salvador are not relevant to Respondent's case.  Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best.  Respondent has been ordered removed to Venezuela by this Court, not El Salvador.  If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze.  Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Dkt. 59-12 at 4.

[22] There are further substantive and logistical barriers to filing motions to reopen, especially for pro se and detained aliens and those with limited English proficiency, and particularly where removals are executed unexpectedly and with great haste.  *See* Dkt. 59-9 (describing procedural, evidentiary, and substantive barriers to filing motions to reopen, especially for pro se and detained noncitizens given limitations on communication and mail access in immigration detention, as well as the impossibility of seeking reopening without knowledge of the country to which someone will be deported); Dkt. 59-10 (same, and highlighting that pro se individuals are unlikely to be aware of the availability of motions to reopen as a procedural mechanism); Dkt. 59-11 (same, and highlighting difficulties for detained individuals with limited English proficiency and the likelihood of deportation while a motion to reopen is pending).

[23] Moreover, as a practical matter, even if Plaintiffs could viably seek to reopen their immigration proceedings without knowing where the Government intends to send them, Plaintiffs would then need to make separate cases for each and every potential country for which they might have a fear-based claim to avoid removal.  It is hard to imagine that this solution, which would dramatically clog the immigration courts—and would seem to pose an even greater hindrance to Defendants' removal efforts than providing the sought-after notice in the first place—is what Congress intended.

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 17 of 48
Case 8:25-cv-02780-PX   Document 22-11   Filed 11/07/25   Page 67 of 127
22a

858, 867 n.8 (9th Cir. 2018)) (explaining that "should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide [plaintiff] with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan"). Until an individual receives notice of the country to which he is being deported, he has no basis for reopening his immigration case and no merits basis to seek withholding from a hypothetical third country.[24]

The inability to effectively raise preemptive CAT and/or withholdings claims before an IJ precludes meaningful review in courts of appeals. That is so because courts of appeals are limited to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and are thus, at most, able to review the IJ's discretionary decision not to reopen the case or adjudicate hypothetical claims, which—when the motion or request concerns "a country that nobody is trying to send them to," *Sadychov*, 565 F. App'x at 651—is not wrongly decided. *See id.* But even that may overstate the review available to petitioners. Multiple circuits have held that courts of appeals lack *any* jurisdiction to review discretionary decisions to reopen. *See, e.g.*, *Manyary v. Bondi*, 129 F.4th 473, 479 (8th Cir. 2025) (calling due-process argument raised through request to reopen sua sponte "'an abuse of discretion argument in constitutional garb'" (quoting *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008))); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009); *see also Tamenut*, 521 F.3d at

---

[24] For this reason, the Court has declined to distinguish between those whose removal or withholding-only proceedings conclude before versus after entrance of this Court's Order. *See* April 10, 2025 Rough Tr. at 16:5–23 (considering the idea). Whichever countries or fear-based claims an alien may attempt to raise during proceedings, IJs are under no obligation to make findings about countries not previously identified as "proposed countr[ies] of removal." *See* 8 C.F.R. § 1208.16(b) (defining eligibility with respect to that limited subset); *id.* § 1240.11(c)(1) (instructing IJs to advise aliens that they may apply to that subset (citing 8 C.F.R. § 1240.10)). Imposing a before-and-after distinction would require crafting a new, burdensome system for how immigration courts identify countries of removal and adjudicate related claims.

1004 (citing cases from ten circuits).[25]  Indeed, just over two months ago, the First Circuit openly

doubted (and declined to resolve) whether it had jurisdiction to review the denial of a request to

reopen involving consideration of factual circumstances.  *Phimmady*, 128 F.4th at 22 & n.2

(highlighting that the "Supreme Court has 'express[ed] no opinion on whether federal courts may

review [a] decision not to reopen removal proceedings.'" (quoting *Kucana v. Holder*, 558 U.S.

233, 251 n.18 (2010)) (first alteration in *Phimmady*)).[26]  Accordingly, such preemptive CAT and/or

withholding claims, including the due-process issues raised in this case, are precisely the type of

"claims which cannot be raised in removal proceedings and eventually brought to the court of

appeals on a petition for review" that the First Circuit has held are "'independent of, or wholly

collateral to, the removal process,' not 'arising from' it."  *See Gicharu*, 983 F.3d at 16 (quoting

*Aguilar*, 510 F.3d at 11).

Finally, Defendants argue that "Congress, in its discretion, implemented [CAT] by

directing the issuance of regulations, expressly depriving courts of jurisdiction to review those

regulations, and channeling all review of individual CAT claims into review of final orders of

---

[25] Several of these cases appear to have since been superseded, *see, e.g.*, *Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020), or qualified in later decisions, *see, e.g.*, *Arzu-Robledo v. Garland*, 2023 WL 6532649, at *2 (5th Cir. Oct. 6, 2023).

[26] Even assuming jurisdiction, *Phimmady* gives a strong sense of just how unreviewable, on the merits, these motions to reopen really are.  In *Phimmady*, an alien sought to reopen his immigration case after the conviction that had rendered him removable was overturned.  128 F.4th at 20.  The Board of Immigration Appeals ("BIA") denied the motion to reopen, and the First Circuit affirmed.  *Id.* at 25.  Although prior BIA decisions had established that reopening was "'an extraordinary remedy reserved for truly exceptional situations,'" *id.* at 22 (quoting *In re G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999)), nothing required reopening, "[e]ven in truly exceptional situations," *id.* (citing *Charles*, 113 F.4th at 23).  As such, the First Circuit held that there is no legal error in the denial of a sua sponte motion to reopen unless a plaintiff shows that the BIA violated an established practice of granting similar sua sponte motions.  *Id.* at 23.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 19 of 48
Case 8:25-cv-02780-PX    Document 22-11    Filed 11/07/25    Page 69 of 127
24a

removal."[27]  PI Opp. at 10 (citing FARRA § 2242(d); 8 U.S.C. § 1252(a)(4)).  But this argument

runs squarely up against the overall problem with Defendants' reading of the statute—there can

be no meaningful "review" of an issue that was not *and could not* have been raised in the first

place.  As the Supreme Court held in *Jennings* and the First Circuit confirmed in *Aguilar*,

section 1252(a)(4) cannot be read to strip jurisdiction over claims that could not have been raised

in the removal proceedings.  *See also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d

177, 188–90 (3d Cir. 2020) (holding that section 1252(a)(4) does not bar review "[w]hen a

detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for

review of a final order of removal").  As Defendants initiated the third-country-removal process

at issue *after* the conclusion of removal proceedings—and because Plaintiffs have no opportunity

to raise these issues before an IJ without some type of advance notice—there can be no judicial

review as contemplated in the channeling provisions of section 1252(a)(4).  *See also Compere v.

Nielsen*, 358 F. Supp. 3d 170, 177 n.8 (D.N.H. 2019) (finding section 1252(a)(4) "plainly

inapplicable" where the petitioner was not seeking review of CAT claim's denial).  As such,

neither section 1252(a) nor section 1252(b) bars this Court's jurisdiction.

---

[27] Defendants also highlight that CAT "is not self-executing."  PI Opp. at 10.  But CAT "has been implemented in the United States through FARRA and the subsequent regulations."  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005); *see also Nasrallah v. Barr*, 590 U.S. 573, 580 (2020).  As courts do, this Court uses "CAT" to refer to the processes and protections as embodied in the law.  *See, e.g., Guzman Chavez*, 594 U.S. at 530–31.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 20 of 48
Case 8:25-cv-02780-PX    Document 75-11    Filed 11/07/25    Page 70 of 127
25a

B.  <u>Section 1252(g)</u>

The Supreme Court has explained that 8 U.S.C. § 1252(g)[28] is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) [hereinafter *AADC*] ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").  In *AADC*, the Supreme Court emphasized that the provision does not encompass the universe of all possible acts and events arising from removal proceedings, but rather instructs courts to read it as a narrow provision that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Id.* at 482 (emphases in original) (quoting section 1252(g) and declining to read it so expansively as to say, "no judicial review in deportation cases unless this section provides judicial review").  Accordingly, section 1252(g) does not refer to "all claims arising from deportation proceedings." *Id.*

Following *AADC*, the First Circuit has held that section 1252(g) does not bar review of the "lawfulness" of a removal-related action because such claims are "collateral" to the discretionary decisions immunized by section 1252(g).  *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023); *accord United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (*en banc*) ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary

---

[28] 8 U.S.C. § 1252(g) states, in pertinent part:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 21 of 48
Case 8:25-cv-02780-PX    Document 26-11    Filed 11/07/25    Page 71 of 127
26a

authority."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While this provision bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions."); *Bowrin v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999) (holding that section 1252 "does not apply" to Government's interpretations of law); *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("The [Supreme] Court [in *AADC*] emphasized that § 1252(g) is not 'a general jurisdictional limitation,' but rather 'applies only to three discrete actions.'" (quoting *AADC*, 525 U.S. at 482)), *affirmed by an equally divided court sub nom. United States v. Texas*, 579 U.S. 547 (2016); *cf. Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1271, 1272–73 & n.2 (11th Cir. 2021) (confirming its narrow reading of section 1252(g) in *Madu*, based on *AADC*, but finding that section 1252(g) barred review of decision to remove pending *discretionary* waiver process).

Hewing close to the Supreme Court's guidance in *AADC* and the First Circuit's holding in *Kong*, this Court will not construe section 1252(g) to immunize an unlawful practice from judicial review. *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986) ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."). Here, Plaintiffs' claims do not arise from Defendants' discretionary decisions to execute their removal orders. Nor do Plaintiffs challenge their removability. What Plaintiffs challenge is Defendants' authority to effectively depart from the removal orders by designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent Plaintiffs' due-process rights and the carefully crafted

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 22 of 48
Case 8:25-cv-02780-PX   Document 27-11   Filed 11/07/25   Page 72 of 127
27a

scheme that Congress has set forth.[29]  *See Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 298 (3d Cir.

2020) ("[W]hen the Act deprives the Attorney General of the discretion to act, a challenge to that

lack of statutory authority is not barred as a challenge to the exercise of discretion.").  These

assertions are collateral to Defendants' decision to execute Plaintiffs' removal, and thus not subject

to section 1252(g)'s jurisdictional bar.  *See Kong*, 62 F.4th at 617.

This Court's decision is in accord with numerous sister courts around the country that have

recognized that section 1252(g) shields only discretionary decisions concerning the three stages of

the deportation process.  *See, e.g.*, *Abrego Garcia v. Noem*, — F. Supp. 3d —, 2025 WL 1014261,

at *7–8 (D. Md. Apr. 6, 2025), *aff'd*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025)

[hereinafter *Abrego Garcia II*], *aff'd in relevant part sub nom. Noem v. Abrego Garcia*, 604 U.S.

—, 2025 WL 1077101 (Apr. 10, 2025) (*per curiam*) [hereinafter *Abrego Garcia III*]; *Gondal v.

U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018); *Coyotl v. Kelly*, 261 F.

Supp. 3d 1328, 1339–41 (N.D. Ga. 2017); *Hovsepian*, 359 F.3d at 1155; *Bowrin*, 194 F.3d at 488.

*But see Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (openly disagreeing with the

Supreme Court's reading of the statute, as articulated in *AADC*).  This Court may review the purely

---

[29] During the March 28, 2025 oral argument, Defendants agreed that, in designating additional countries of removal, the Government drew its authority from statute.  March 28, 2025 Tr. at 6:12–7:4.  That implies something beyond mere "execut[ion]" of an order.  *Cf.* 8 U.S.C. 1252(g).  This plain reading of the statute is supported by the relevant regulations, which state that "the order of the immigration judge *does not limit* the authority of the Department of Homeland Security to remove [an] alien to any other country as permitted by section 241(b) of the Act."  8 C.F.R. § 1240.12(d) (emphasis added).  That such authority is not "limit[ed]" by an order does not suggest that the authority is still *pursuant to* that order.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 23 of 48
Case 8:25-cv-02780-PX    Document 28-11    Filed 11/07/25    Page 73 of 127
28a

legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country.[30]

There is no question that, if eligibility is demonstrated, withholding of removal and CAT protections are mandatory and removal to that country cannot occur. *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT). The only question is what right individuals have, under the Constitution and relevant statutes, to make that showing. This Court has jurisdiction to hear that question.

## III. Motion for Class Certification

Plaintiffs seek to certify a class, which they define as:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Dkt. 4 at 1.

As a threshold matter, limitations on certain class-wide injunctive relief under 8 U.S.C. § 1252(f)(1) do not preclude class certification or otherwise limit the Court's ability to grant Plaintiffs' requested class-wide relief. *See* Dkt. 52 ("Class Cert. Opp.") at 7–10.

---

[30] Defendants' out-of-circuit citations stand, at most, for the proposition that courts cannot indefinitely guarantee the pre-removal completion of certain review processes. *See Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) (finding no jurisdiction to halt removal pending appeal of motion to reopen removal proceedings); *Camarena*, 988 F.3d at 1273 (finding no jurisdiction to halt removal pending adjudication of discretionary applications for provisional unlawful presence waivers); *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021) (finding no jurisdiction to halt removal pending adjudication of a petition under the Violence Against Women Act, for which there was no mandate, statutory or otherwise, that adjudication occur prior to removal). Defendants also cite *Foster v. Townsley*, in which the Fifth Circuit held that that section 1252(g) extends to non-discretionary decisions. PI Opp. at 6 (citing *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)). But as Plaintiffs correctly note, the Fifth Circuit subsequently decided *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held that section 1252(g) does not preclude jurisdiction over a challenge to the constitutionality of the statutory scheme, as opposed to a discretionary determination. Insofar as *Tsering v. U.S. Immigr. & Customs Enf't*, 403 F. App'x. 339, 342–43 (10th Cir. 2010), an unpublished decision, relies on *Foster* and its interpretation of *AADC*, this Court views it as an outlier among the circuit courts and will not follow its reasoning.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 24 of 48
Case 8:25-cv-02780-PX    Document 28-11    Filed 11/07/25    Page 74 of 127
29a

Plaintiffs seek, among other relief, declaratory judgment.   Compl. ¶¶ 118–22. "[S]ection 1252(f)(1) does not strip the lower courts of the power to grant declaratory relief." *Brito v. Garland*, 22 F.4th 240, 250 n.7 (1st Cir. 2021) (citing *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief")); *accord Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 (9th Cir. 2024); *Make The Road New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Alli v. Decker*, 650 F.3d 1007, 1010–13 (3d Cir. 2011); *Gonzalez v. Sessions*, 325 F.R.D. 616, 626 (N.D. Cal. 2018); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993, at *1 (1st Cir. May 11, 2018) (citing *Jennings*, 583 U.S. 281). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (treating the issue as unsettled but suggesting that declaratory relief might be unavailable).   Accordingly, certification is proper at least toward that relief.

As to the requested injunctive relief, section 1252(f)(1) simply does not apply. Section 1252(f)(1) generally prohibits lower courts from ordering federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out "the specified statutory provisions," other than on a case-by-case basis.  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022).  But the class-wide injunctive relief Plaintiffs seek—concerning the availability of CAT protection, *see* Dkt. 6-1—is based on a different statute, the Foreign Affairs Reform and Restructuring Act ("FARRA").  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003)

(explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[31]

Defendants would have the Court go beyond the plain meaning of the statute to imply a bar to actions that collaterally impact covered parts of the INA.  PI Opp. at 5–6.  However, section 1252(f)(1) cannot be read so broadly.  Starting from first principles, "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)).  Here, the title of the section is "Judicial Review of Orders of Removal." 110 Stat. 3009–607 (codified in 8 U.S.C. § 1252).  Thus, the text of the statute itself implies that the limitation applies only to cases arising out of such review.  *Texas v. United States*, 524 F. Supp. 3d 598, 640–41, 667–68 (S.D. Tex. 2021) ("Section 1252 concerns '[j]udicial review of orders of removal.'" (quoting the title of 8 U.S.C. § 1252)) (reading section 1252 as a whole as "deal[ing] with . . . judicial review of orders of removal" and rejecting the argument that the INA's various limiting provisions collectively "establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement") (enjoining pause of removals).  Other subsections of 1252 concerning review of removal orders are interpreted narrowly to exclude collateral claims.  *See Jennings*, 583 U.S. at 294; *Aguilar*, 510 F.3d at 11.  The Court sees no basis to graft on Defendants' proposed, additional meaning.

---

[31] It is admittedly confusing that FARRA's provisions are intermingled with the INA's in the U.S. Code.  *See generally* 8 U.S.C. § 1231.  However, the Ninth Circuit has helpfully clarified that section 1252(f)(1), in its authoritative Statutes at Large version, refers only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.  *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022).  Further, because CAT protections were codified in FARRA in 1998, CAT protections are not covered by section 1252(f)(1)'s bar related only to INA provisions as amended in 1996.  *See* FARRA, § 2242(a); *Galvez*, 52 F.4th at 830.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 26 of 48
Case 8:25-cv-02780-PX    Document 32-11    Filed 11/07/25    Page 76 of 127
31a

Defendants cite *Aleman Gonzalez* for the proposition that section 1252(f)(1) applies not just to the explicitly covered parts of the statute but to "*the way that [those parts] [are] being carried out.*"  PI Opp. at 5 (quoting *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added)) (brackets added).  But this puts words into the Supreme Court's mouth—that part of the *Aleman Gonzalez* opinion dealt with an entirely different issue.[32]  Indeed, the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," *Aleman Gonzalez*, 596 U.S. at 552,[33] but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision."  *Id.* at 553 n.4 (emphasis removed) (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)).

The Fifth Circuit put it well and plainly in *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024):

> Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1).  It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3).  Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred.  Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226).  *Aleman Gonzalez*, 596 U.S. at 553 n.4, 142 S.Ct. 2057.  That is especially the case here, where the district court found Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.

> Defendants respond that, in essence, they are the ultimate judges of whether § 1252(f)(1)'s bar applies.  They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1).  That is badly mistaken.  Congress legislated which sections are covered by § 1252(f)(1).  The Executive Branch does not get to

---

[32] *See Aleman Gonzalez*, 596 U.S. 543, 551–52 (2022) (considering whether section 1252(f)(1) applies only to "the covered immigration provisions . . . 'as properly interpreted'" or as "operat[ed]" in practice by the Government).

[33] *See also id.* at 551 ("The respondents in both cases were detained pursuant to § 1231(a)(6), and no one disputes that § 1231(a)(6) is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1).").

32a

propose additions.  *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

*See also Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1357(d) is not located in Part IV [of the INA], and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that section 1252(f)(1) does not bar an injunction based on 8 U.S.C. § 1158(b)(1) since it is not a covered provision); *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1044–45 (S.D. Cal. 2020) (finding that section 1252(f)(1) did not bar class-wide injunctive relief with regards to access to counsel during non-refoulement interviews because the relief was not governed by sections 1221–32); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 585768, at *13 (D. Md. Feb. 24, 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 'simply because of collateral effects on a covered provision.'" (quoting *Al Otro Lado*, 120 F.4th at 627)).  Thus, the requested class-wide relief, limited only to otherwise removable aliens with potential CAT protection claims, falls outside of section 1252(f)(1)'s bar.

## A.    __Legal Standard__

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotations omitted).  A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ. P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in the relevant subsection of Fed. R. Civ. P. 23(b) ("Rule 23(b)").  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  "Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 28 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 78 of 127
38a

representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)).  Plaintiffs seek certification under Rule 23(b)(2), Dkt. 4, which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed R. Civ. P. 23(b)(2).  For both Rule 23(a) and 23(b), Plaintiffs must establish each of the elements; failure to establish any element will defeat class certification.  *See Smilow*, 323 F.3d at 38.

### B.  Discussion

#### 1.  23(a)(1) Numerosity

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable."  Fed. R. Civ. P. 23(a)(1).   The requirement presents a "low hurdle," *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007), but "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005).  "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citation omitted); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011).  The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, particularly where, as here, Plaintiffs seek only injunctive or declaratory relief, *Reid*, 297 F.R.D. at 189 ("[T]he threshold may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder." (citation omitted)); *see also Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 99 (D.N.H. 2021) (certifying a class where "the number of current *and future members* of the putative class exceeds 40 persons" (emphasis added)).

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 29 of 48
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 79 of 127
34a

Defendants do not dispute that Plaintiffs have met the numerosity requirement, *see generally* Class. Cert. Opp., and the Court finds this requirement met by Plaintiffs' identification of hundreds of potential class members, Dkts. 8-4, 8-8–23 (identifying individuals with final removal orders who were removed under the challenged policies and practices or are similarly at risk of unnoticed removal).

## 2.    23(a)(2) Commonality

Satisfying the commonality requirement in the instant case is simple and straightforward: Plaintiffs seek a single, common order that Defendants comply with the strictures of due process before deporting them to a county not covered by their final orders of removal.  Defendants' arguments to the contrary are uncompelling.

The commonality requirement is met when "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019).  The commonality requirement is a "low bar."  *In Re New Motor Vehicles*, 522 F.3d at 19.  Courts have found that "a single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."  *Gomes*, 561 F. Supp. 3d at 99; *see also Reid*, 297 F.R.D. at 189.

Defendants argue that the proposed class is overly broad, includes "clear dissimilarities between the proposed class and its proposed representatives," and includes aliens with "different processes and pathways for relief."  Class. Cert. Opp. at 11–14.  As such, Defendants argue class certification is not appropriate.  *Id.*

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 30 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 80 of 127
35a

The commonality requirement is met, notwithstanding purported or actual dissimilarities among named and potential class members, based on the common due-process issue. Due process adheres regardless of the removal context. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, . . . entered the country undetected, . . . or became a legal resident but then committed an enumerated crime." (citations omitted)). That specific circumstances may differ among the various putative class members does not undermine that they all seek notice and an opportunity to be heard, and the opportunity to challenge a policy or practice which allegedly denies it. *See, e.g.*, *Gomes*, 561 F. Supp. 3d at 101 ("[T]he existence of individual differences among putative class members does not foreclose a finding of commonality so long as least one common issue is raised.").

Likewise, that some members may present additional, individualized issues, *e.g.*, return to the United States if unlawfully removed,[34] does not affect commonality. *See Tassinari v. Salvation Army*, — F.R.D. —, 2025 WL 972724, at *7 n.12 (D. Mass. Mar. 26, 2025) ("Defendant's

---

[34] Defendants acknowledge that there are procedures to compel the return of illegally removal individuals. *See* March 28, 2025 Tr. at 17:12–13 ("Yes, Your Honor. There are procedures for that."); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72 (describing process for facilitating return of certain lawfully removed aliens whose petitions for review are granted after their removal). Courts regularly order the return of wrongfully removed individuals. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing how removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia III*, 2025 WL 1077101, at *1 (denying application to stay requirement that the Government "facilitate" plaintiff's return after wrongful removal); *Abrego Garcia II*, 2025 WL 1021113, at *2–3 (Thacker, J., concurring) (holding that the court retained jurisdiction because the decision to remove plaintiff to a country for which he had withholding of removal "was not one that was within [the Attorney General's] lawful discretion" and "was not the enforcement of a valid order of removal"); *id.* at *6 ("Nor can the Government be permitted to disclaim any ability to return those it has wrongly removed by citing their physical presence in a foreign jurisdiction."); *Ramirez v. Sessions*, 887 F.3d 693, 707 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador); *Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 287 (4th Cir. 2020) (directing the Government "to return [plaintiff] to the United States"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (similar). Here, the putative class members *already* have been awarded withholding of removal, and as discussed below, *infra* Section IV(B)(1), Plaintiffs are likely to succeed on the merits that they are and were entitled to due process in order to assert their statutory rights to seek CAT protections prior to removal, making such removals without due process wrongful.

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 31 of 48
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 81 of 127

36a

identified individualized issues really boil down to one common question."). "Ultimately, the gravamen of Defendant[s'] challenges on commonality really goes not to whether common issues exist but rather to whether common issues predominate over individual ones; this is not a concern for a 23(b)(2) class [seeking injunctive or declaratory relief], as predominance is a requirement for certifying a class only under 23(b)(3)." *Id.* at *7 (citing *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 11 (D. Mass. 2010) (reviewing First Circuit case law)).

"Plaintiffs in this case have identified a single alleged practice"—Defendants' system-wide policy or practice of designating aliens for removal to a third country without first providing those aliens notice and an opportunity to apply for protection from removal to that country—"that provides the basis for every class member's injury." *Ramirez v. ICE*, 338 F. Supp. 3d 1, 42–50 (D.D.C. 2018) (certifying class of immigrant teens challenging transfers to ICE custody). Regardless of differences in the removal procedures applicable to each class member, they all seek to establish their right to due process.[35] *See Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) (determining "that the admittedly significant variation among the Detainees does not defeat commonality"); *Quadrelli v. Moniz*, 2020 WL 3051778, at *5 (D. Mass. June 8, 2020) (following courts that have certified classes of individuals "who have alleged a general risk of harm due to a

---

[35] The Court rejects Defendants' implicit argument that allegations of due-process violations cannot ever sustain a class action. Class. Cert. Opp. at 14. While "due process is flexible" and can vary depending on the situation, *Matthews*, 424 U.S. at 321, the basics are clear: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 333; *see also id.* at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). As such, courts have certified classes asserting due-process claims under Rule 23(b), without raising commonality concerns. *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1776.1 (3d ed.) (collecting cases); *Garcia-Rubiera*, 570 F.3d at 456–58, 461 (remanding with instructions to certify, under Rule 23(b)(2), a class challenging, among other things, a lack of notice under the Due Process Clause).

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 32 of 48
Case 8:25-cv-02780-PX   Document 37-11   Filed 11/07/25   Page 82 of 127
37a

policy or practice, even if there might additionally be a unique or distinct impact as to an individual

putative class member").

Since Plaintiffs have identified a single, common question at the heart of the claims,

commonality has been satisfied. *See Gomes*, 561 F. Supp. 3d at 99 ("[A] single common question

is sufficient to satisfy the requirements of Rule 23(a)(2)."). Answering the common legal question

of whether Defendants must afford aliens with due process (and of what that due process consists)

prior to removal to a third country will "drive the resolution of the litigation." *Ramirez*, 338 F.

Supp. 3d at 45 (cleaned up).

Thus, the Court finds that Plaintiffs have satisfied the commonality requirement

under Rule 23(a)(2).

### 3.     **23(a)(3) Typicality**

The typicality requirement mandates that the "claims or defenses of the representative

parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does

not require that all putative class members share identical claims or defenses. *In re Credit

Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260); *see

also DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 405 (D. Mass. 2017) ("Even

relatively pronounced factual differences will generally not preclude a finding of typicality where

there is a strong similarity of legal theories or where the claim arises from the same practice or

course of conduct." (quotation omitted)). Instead, typicality is established if the claims of the class

representative "arise[] from the same event or practice or course of conduct that gives rise to the

claims of other class members, and . . . are based on the same legal theory." *Garcia-Rubiera*, 570

F.3d at 460 (citation omitted).

Defendants argue that "[t]he proposed class lacks typicality for the same reasons it lacks

commonality" and that "the class representatives are *not* part of the proposed class and do *not*

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 33 of 48
Case 8:25-cv-02780-PX    Document 38-11    Filed 11/07/25    Page 83 of 127
38a

possess the same interest or suffer the same injury as the proposed class members because they cannot demonstrate they will be removed absent any notice or opportunity to assert a fear-based claim." Class Cert. Opp. at 15–16 (emphases in original).[36]

Typicality is satisfied here for largely the same reasons that commonality is satisfied. The named Plaintiffs and putative class members all share an identical interest in an injunction mandating due-process protections prior to their removal to a third country. Defendants have taken the position that there is *no* due process entitled to any alien, under any method of removal, prior to removal to a third country regardless of any potentiality that such an alien will be tortured or murdered upon arrival. *See* March 28, 2025 Tr. at 10:17–11:1 ("THE COURT: In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation? MS. LARAKERS: DHS's position is no. THE COURT: They don't have to be told anything and given no opportunity to be heard? MS. LARAKERS: DHS's position is no."). Between Defendants' representations to the Court and the Court's ultimate finding that the procedures outlined in the March Guidance do not provide adequate due process, *see infra* at 42–43, the Court finds that the named and unnamed Plaintiffs alike share an identical interest in challenging Defendants' alleged practice of removing individuals to third countries without notice and an opportunity to be heard, and, as such, satisfy the typicality requirement under Rule 23(a)(2).

---

[36] Defendants also argue that "Plaintiffs[] attempt to meet typicality by expanding the description of their class" to apply the class to "to any alien with a final order of removal under the three named removal statutes regardless of what procedures DHS applied to their removal to a third country." Class. Cert. Opp. at 15. However, Plaintiffs have asserted a consistent class definition throughout this case, and by its plain language, the class definition applies only to those aliens who have been or will be attempted removed to a third country *without meaningful notice and opportunity to contest the removal*. Thus, whether an alien is a part of the class inherently depends on whether the alien received said notice and opportunity to be heard, *i.e.*, on the Government's own inaction and inaction.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 34 of 48
Case 8:25-cv-02780-PX    Document 73-11    Filed 11/07/25    Page 84 of 127
39a

### 4.     23(a)(4) Adequacy of Representation

The adequacy requirement is met when the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy is satisfied if (1) there is no conflict between the interest of the named Plaintiffs and the class members and (2) counsel chosen by the named Plaintiffs are qualified and able to litigate the claims vigorously.[37] *S. States Police*, 241 F.R.D. at 88 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Merely lacking identical interest, however, is not enough for a representative party to be found inadequate. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)).

Defendants argue that "Plaintiffs fail to meet the adequacy requirement for the same reasons Plaintiffs fail to meet the commonality and typicality requirements." Class Cert. Opp. at 16. But the adequacy requirement looks to whether the named Plaintiffs will fairly and adequately protect the interests of the proposed class. *See S. States Police*, 241 F.R.D. at 88. There is nothing in the record to suggest that the named Plaintiffs seek any unique or additional benefit from this litigation that may make their interests different from or adverse to those of absent class members. *Cf. Amchem*, 521 U.S. at 626–27 (holding that adequacy requirement was not met where named plaintiffs stood to benefit disproportionately and at the expense of other potential class members). Thus, the Court finds that Plaintiffs have satisfied the adequacy requirement under Rule 23(a)(2).

---

[37] Defendants do not contest the adequacy of Plaintiffs' counsel. *See* Class Cert. Opp. at 16.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 35 of 48
Case 8:25-cv-02780-PX    Document 78-11    Filed 11/07/25    Page 85 of 127
46a

###### 5.    23(b)(2) Injunctive or Declaratory Class

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).  "[C]ivil rights actions . . . where a party charges that another has engaged in unlawful behavior towards a defined group, are prime examples of Rule 23(b)(2) classes."  *Reid*, 297 F.R.D. at 193 (quotation omitted).

Defendants' first set of arguments goes mainly to whether the named Plaintiffs have valid claims.  *See* Class Cert. Opp. at 17 (arguing that O.C.G. received notice of his removal and had an opportunity to assert fear-based claims); *id.* (arguing that E.F.D. and M.M. have an adequate remedy in a motion to reopen); *id.* at 17–18 (arguing that the claims of D.V.D. and M.M. are speculative and unripe).  But these arguments, which go to the merits of the individual claims, are inappropriate to consider on a motion for class certification.  "Although . . . a court's class-certification analysis . . . may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 351).  To the extent Defendants' implied argument is that these individual infirmities bespeak some sort of "fatal similarity" common to the whole

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 36 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 86 of 127
11a

proposed class, "[s]uch a contention is properly addressed at trial or in a ruling on a summary-judgment motion." *Id.* at 470.[38]

More broadly, Defendants argue that, "[t]o the extent Plaintiffs are entitled to some additional procedures under the Due Process Clause, those procedures would be different for each alien depending on the underlying facts and circumstances of their case." Class Cert. Opp. at 18. But Defendants have not provided the Court with a single example of how an "underlying fact" and/or "circumstance" might lead to different procedural minima for one individual versus another. *Cf. Reid v. Donelan*, 17 F.4th 1, 9 (1st Cir. 2021) (finding certification improper where district court recognized that "relief must be adjudicated on an individual basis"). Defendants' own contention that—if due process applies to third-country removals—the March Guidance is sufficient, PI Opp. at 8, recognizes that it is possible to establish a baseline for all putative class members. The Court does not find that the claims here "hinge on the individual circumstances of each class member." *Reid*, 17 F.4th at 11. Rather, Defendants have taken a broad position, subject to class-wide challenge.

In sum, Plaintiffs challenge a policy or practice that impacts all putative class members: failing to provide meaningful notice and opportunity to present a fear-based claim before executing removal to a third country. In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2).

---

[38] The Court instead addresses these arguments in its analysis of Plaintiffs' motion for a preliminary injunction. *See infra* Section IV(B)(1).

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 37 of 48
Case 8:25-cv-02780-PX   Document 12-11   Filed 11/07/25   Page 87 of 127
72a

## IV.    Preliminary Injunction

### A.    Legal Standard

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'"  *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Of the four factors, likelihood of success "weighs most heavily" in the analysis.  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

In deciding a motion for preliminary injunction, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'"  *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction."  *Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### B.    Discussion

#### 1.    Likelihood of Success

Plaintiffs have established that they are likely to succeed in showing that Defendants have a policy or practice of executing third-country removals without providing notice and a meaningful

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 38 of 48
Case 8:25-cv-02780-PX    Document 78-11    Filed 11/07/25    Page 88 of 127
48a

opportunity to present fear-based claims, and that such policy or practice constitutes a deprivation of procedural due process.

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Congress clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment").

More generally speaking, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) [hereinafter *J.G.G. III*] (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). As all nine Supreme Court justices agreed less than two weeks ago, this means that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 39 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 89 of 127
44a

is available."); *id.* at *6 (Sotomayor, J., dissenting) ("That means, of course, that the Government cannot usher any detainees . . . onto planes in a shroud of secrecy.").

Likewise, there can be no disagreement that the same constitutional guarantees apply to withholding-only relief. *Guzman Chavez*, 594 U.S. at 557 (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . . withholding-only relief." (citing *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 n. 4 (2006))); *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (explaining that the Government has an "obligation to provide [the plaintiff who was subject to an order of removal] . . . notice and an opportunity to be heard"  and ensure compliance with its "obligations under [CAT]" prior to removal); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999)  (finding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence"); *Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) (due-process violation to order deportation to Russia after a claim of asylum as to Latvia where uncounseled noncitizen was provided insufficient notice of Russia possibility).

The Court rejects Defendants' argument that aliens have already received, during their initial removal proceedings, all the process to which they are entitled, so as to justify providing no additional process prior to third-country removal.  *See* April 10, 2025 Rough Tr. at 11:1–4 ("MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, the Due Process Clause does not require an additional procedural opportunity to raise [it] in . . . that context.").  Defendants argue that aliens could have brought up, during their initial removal proceedings, all the countries where they have concerns that they will be tortured.  *See, e.g.,*

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 40 of 48
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 90 of 127
15a

April 10, 2025 Rough Tr. at 4:13–16 ("[MR. ENSIGN:] They also previously would have had an opportunity to raise it during their initial removal proceedings and they would be asked on their [I-589] form if they have fear of returning anywhere.").  This is both impossible as a practical matter, since the immigration court does not normally consider claims about countries not proposed as a country of removal,[39] and fails to consider that conditions change in countries change over time.[40]  Listing all the countries in the world as to which an individual might have a reasonable fear is also impractical: doing so would potentially require, for example, a person with a same-sex sexual orientation to list, at least, all 64 countries where such an orientation is illegal such that the individual fears torture.  *See Homosexuality: The countries where it is illegal to be gay*, BBC (Mar. 31, 2023), https://perma.cc/32KN-RH6Q.  Indeed, the Assistant to the Solicitor General, arguing before the Supreme Court on the topic of third-country removals less than a month ago, affirmatively stated that "[w]e would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country," even where that individual was already subject to an order of removal.[41]

Even without that statement, the claims at issue concern removal to countries that were *not ruled upon* in the initial proceedings and are therefore not covered by the removal order.  As discussed above, the Court disagrees with Defendants' assertion that the theoretical option of a motion to reopen provides a sufficient remedy.  *See supra* at 14–18; *see also Sadychov*, 565 F.

---

[39] *See supra* at 16–17 & notes 17, 24 (discussing the non-viability of preemptive claims).

[40] An alien can remain in the United States on an Order of Supervision for decades after being granted withholding.  *See* April 10, 2025 Rough Tr. at 15:24–16:1 ("THE COURT: But some people have been granted withholding for 20 years, right?  MS. REALMUTO: Exactly."); *see also* Compl. ¶¶ 75–76 (alleging that E.F.D. was granted CAT protection in 2018 and had been released from immigration custody until he was re-detained in March 2025).  Country conditions can change dramatically, especially over decades.  *See, e.g.*, Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30976 (May 20, 2022) (providing Temporary Protected Status designation to Afghanistan in May 2022, after Taliban returned to power in August 2021).

[41] *Supra* note 2.

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 41 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 91 of 127
46a

App'x at 651 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" (quoting *She*, 629 F.3d at 962)); Dkt. 59-12 at 4–5 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court.").[42]

The Court finds it likely that Defendants have applied and will continue to apply the alleged policy of removing aliens to third countries without notice and an opportunity to be heard on fear-based claims—in other words, without due process. Defendants have repeatedly argued that they have no obligation to provide any process whatsoever when newly designating a third country for removal. *See, e.g.*, March 28, 2025 Tr. at 10:17–11:1; April 10, 2025 Rough Tr. at 9:5–8, 10:19–11:4. Defendants' own avowed position and the numerous declarations Plaintiffs have

---

[42] *See also* Dkt. 8-8 ¶ 9 (motion to reopen denied); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (same); Dkt. 59-12 ¶¶ 12–18 (same); Dkt. 59-13 at 4 (same).

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 42 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 92 of 127
17a

provided[43] substantiate both the prior and future use of Defendants' policy of providing no notice

prior to third-country removal.[44]

Nor do the procedures outlined in DHS's March Guidance satisfy due process. The March

Guidance provides no process whatsoever to individuals whom DHS plans to remove to a country

from which the United States has received blanket diplomatic assurances. Dkt. 43-1 at 1–2.

Defendants are, of course, correct that the Court may not question the substance of diplomatic

assurances endorsed by the Executive. *See* PI Opp. at 11. However, the Court may inquire into

the overall process and whether such assurances, on their own terms, satisfy the Constitution. *See*

*Khouzam*, 549 F.3d at 259 (finding that lack of individualized determination violated due process,

notwithstanding diplomatic assurance).

Blanket diplomatic assurances do not address DHS's obligation to undertake an

individualized assessment as to the sufficiency of the assurances, as required under the statutory

---

[43] Notably, the parties contest whether O.C.G. received any substantial notice or a meaningful opportunity to present a fear-based claim prior to his removal to Mexico. *Compare* Compl. ¶¶ 85–86 (alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of the ICE ERO Phoenix Field Office, asserting based on hearsay that notice was provided on February 21, 2025, by "ERO" and that O.C.G. denied fear of removal). Given O.C.G.'s sworn declaration—rebutted only by a hearsay declaration—the Court finds it likely that O.C.G. was not provided sufficient process prior to removal.

[44] Defendants argue that the claims of D.V.D. and M.M. are speculative and unripe because D.V.D. and M.M. have not yet been detained or notified of any impending third-country removal. Class. Cert. Opp. at 17–18. *But see* Compl. ¶ 71 (alleging that M.M. was informed by an ICE official that she would be deported in the immediate future). There, so to speak, lies the rub—according to Defendants, an individual must await notice of removal before his claim is ripe, even where the claim is that there is no notice. But once an individual is removed, Defendants argue, there is no jurisdiction. *See* Class Cert. Opp. at 11–12.

Having granted class certification, the individual cases of D.V.D. and M.M. are less dispositive as to the issue of likelihood of success. Nevertheless, insofar as they may represent some portion of the class, the Court notes that it does not find such cases unripe. Ripeness concerns both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300–01 (1998)). Here, both tests indicate justiciability. As Plaintiffs challenge Defendants' policy and practices, rather than the putative class members' individual removability, no further facts are necessary for judicial review. *See Pustell v. Lynn Pub. Scs.*, 18 F.3d 50, 52 (1st Cir. 1994) (finding claim ripe where "[n]o further factual development is necessary for us to resolve the question at issue, namely, whether the policy . . . is constitutional"). Likewise, Plaintiffs "suffer the harm of substantial uncertainty if we put off resolving their constitutional claims." *Id.*

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 43 of 48
Case 8:25-cv-02780-PX    Document 78-11    Filed 11/07/25    Page 93 of 127
48a

and regulatory framework.  *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that *an* alien would not be tortured there if *the* alien were removed to that country." (emphases added));[45] *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").

Moreover, blanket assurances offer no protection against either torture by non-state actors or chain refoulement, whereby the third country proceeds to return an individual to his country of origin.  *See, e.g.*, Compl. ¶¶ 68–69 (detailing domestic violence concerns that led to withholding of removal designation); Dkt. 8-2 ¶¶ 3–4, 7–8, 13 (same).  Yet these circumstances can trigger protections under CAT no less than threats coming from state actors.  8 C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

Even if such blanket assurances might, in some individual cases, satisfy due process, the March Guidance precludes any further review prior to removal.  Dkt. 43-1 at 1–2 (providing noncitizens "will be removed without the need for further procedures").  There can be no right without a remedy.  *Marbury v. Madison*, 5 U.S. 137, 163 (1803).  Without meaningful review, the rights Congress has provided are little more than dead letter.

---

[45] The Department of Justice has previously recognized its obligation to provide a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations.  *See Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) ("LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, 'Well, we won't torture this person you're sending back' – do you really think those assurances are credible?  GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis. . . .  Well, again, Senator, we take this obligation very, very seriously.  And we know what our legal obligations are.  We know what the directive of the president is.  And each case is very fact-specific.").

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 44 of 48
Case 8:25-cv-02780-PX   Document 78-11   Filed 11/07/25   Page 94 of 127
43a

It simply cannot be, as Defendants contend, that the Government can "decide right now that someone who is in [] custody is getting deported to a third country, give them no notice and no opportunity to say, 'I will be killed the moment I arrive there,' and, as long as the [Government] doesn't already know that there's someone standing there waiting to shoot him, that's [] fine." *See* March 28, 2025 Tr. at 29:12–18 ("In short, yes."). Defendants' obligations under CAT and the Due Process Clause require more. Plaintiffs have demonstrated a likelihood of success on the merits.

### 2.   Irreparable Harm

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

The irreparable harm factor likewise weighs in Plaintiffs' favor. Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.

Defendants' argument that this Court has no jurisdiction over already-removed aliens only bolsters Plaintiffs' argument toward finding irreparable harm. *See* Class Cert. Opp. at 11–12. Defendants contend that they may remove aliens to third countries with no possibility for review. *Id.* It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 45 of 48
Case 8:25-cv-02780-PX    Document 78-11    Filed 11/07/25    Page 95 of 127
36a

before an unprecedented and potentially irreversible removal occurs." *J.G.G. II*, 2025 WL 914682, at *30 (Millett, J., concurring).

Thus, Plaintiffs have demonstrated a likelihood of irreparable harm.

### 3.    Balance of Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest. "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In cases implicating removal, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. However, there is also "a public interest in prompt execution of removal orders." *Id.*

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022). The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 120–21 (2022) (staying an illegal vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming district court's preliminary injunction of an illegal executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

Here, the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face. The Court finds that these circumstances countervail the public's normal

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 46 of 48
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 96 of 127
31a

and meaningful "interest in prompt execution."  *See Nken*, 556 U.S. at 436.  Thus, the final two

factors support issuance of relief.

### 4.    Limitations of Relief

"[An] injunction should issue only where [it is] essential in order effectually to protect . . .

rights against injuries otherwise irremediable."  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305,

312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).  Here, the "irremediable"

injury would be deportation without meaningful opportunity to present a claim based on fear of

persecution, torture, or death.

Accordingly, the Court circumscribes its remedy and declines, at this time, to require the

full extent of process Plaintiffs propose.  Instead, the Court orders that, prior to removing any alien

to a third country, *i.e.*, any country not explicitly provided for on the alien's order of removal,

Defendants must: (1) provide written notice[46] to the alien—and the alien's immigration counsel,

if any[47]—of the third country to which the alien may be removed, in a language the alien can

understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility

---

[46] Written notice comports with the traditional standards of due process.  *See Matthews*, 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane*, 339 U.S. at 313, 315 ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. . . . [W]hen notice is a person's due, process which is a mere gesture is not due process.  The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.").  The Court's sense of what fairness requires is further supported by the Government's own internal documents.  *See* Dkts. 1-2 (2001 draft Form 1-913 that would provide written notice prior to third-country removal and require motion to reopen to be filed within fifteen days of being served with notice), 1-3 (2020 draft model notice that would provide written notice prior to removal to country other than designated country of removal and that provided that "DHS w[ould] not oppose [the alien's] filing of a motion to reopen with the Immigration Court" within fifteen days of being served with such notice).

[47] *See* 8 C.F.R. § 292.5 ("Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or requested of the attorney or representative of record, or the person himself if unrepresented.").

Case 1:25-cv-10676-BEM   Document 64   Filed 04/18/25   Page 47 of 48
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 97 of 127
32a

for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear";[48] and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days,[49] for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

With respect to the return of O.C.G.,[50] the Court recognizes that whether he received notice at all, let alone meaningful notice, is hotly contested. Until the factual dispute of whether he received notice is resolved, the Court will not order the return of O.C.G. A mandatory injunction, as would be required, "alters rather than preserves the status quo," and is thus subject to an even more heightened level of legal and factual scrutiny. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (citing *Massachusetts Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). Instead, Plaintiffs may renew their motion with regards to the return of O.C.G.

---

[48] "Reasonable fear" is the most stringent standard for screenings applied in the initial removal context, meaning the alien must show the highest and most credible level of fear required at the screening stage to garner relief. *Compare* 8 CFR § 208.31 (using "reasonable fear" as the screening standard for aliens removeable under certain INA provisions), *with* 8 CFR § 208.16 (using "credible fear" as the screening standard for aliens removeable under other INA provisions); *see also Reasonable Fear Screenings*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/reasonable-fear-screenings (last updated Jan. 24, 2025) ("Those who are found to have a reasonable fear of persecution or torture are then given an opportunity to seek withholding of removal or deferral of removal before an Immigration Judge."). While Defendants propose applying the "more likely than not" standard, *see* April 10, 2025 Rough Tr. at 33:2–4, that would require an alien to demonstrate full entitlement to CAT protections at merely the screening stage. *See* 8 C.F.R. § 208.17(a).

[49] The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable. *See* April 10, 2025 Rough Tr. at 48:10–13 ("THE COURT: What's an appropriate number of days? MR. ENSIGN: Your Honor, our -- we think it should be shorter than [21 days]. I'm not prepared to say exactly what that period is."). To tailor its preliminary injunction as narrowly as possible, the Court has chosen to use the timeframe that Defendants proposed when developing their own forms for this scenario. *Supra* note 46. Though these forms may never have been formally adopted, they would appear to, at a minimum, reflect the agencies' determination—on two separate occasions spanning a period of nearly 20 years—of an appropriate period of time during which an alien should be permitted to object to an adverse determination.

[50] It is clear that courts can still "grant relief once a deportee crosses the border." *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (citing *Rumsfeld v. Padilla*, 542 U. S. 426, 447, n. 16 (2004); *Boumediene v. Bush*, 553 U. S. 723, 732 (2008)).

Case 1:25-cv-10676-BEM    Document 64    Filed 04/18/25    Page 48 of 48
Case 8:25-cv-02780-PX    Document 78-11    Filed 11/07/25    Page 98 of 127
58a

after discovery.  The Court orders the parties to conduct expedited discovery on this issue and file a status update addressing a proposed discovery plan by April 25, 2025.[51]

###### C.    **Bond**

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"); *see also da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal rights at issue); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that district court did not abuse its discretion when it did not require low-wage laborers to post a bond).

## V.    **Conclusion**

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. 4) is GRANTED and motion for a preliminary injunction (Dkt. 6) is GRANTED in part.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  April 18, 2025                     Judge, United States District Court

---

[51] The Court notes that Plaintiffs have not requested injunctive relief based on the right to make claims under 8 U.S.C. § 1231(b)(3)(A) beyond the named Plaintiffs.  This is consistent with the limitation on certain relief under 8 U.S.C. § 1252(f)(1).  *See Galvez*, 52 F.4th at 829–30.  The Court thus limits its Order as to statutory claims to apply only to the named Plaintiffs while ensuring CAT protection to all similarly situated individuals.

Case 1:25-cv-10676-BEM    Document 43-1    Filed 03/30/25    Page 2 of 3
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 99 of 127
54a

MEMORANDUM FOR:    Kika Scott
                               Senior Official Performing the Duties of the Director
                               U.S. Citizenship and Immigration Services

                               Pete R. Flores
                               Senior Official Performing the Duties of the Commissioner
                               U.S. Customs and Border Protection

                               Todd Lyons
                               Acting Director
                               U.S. Immigration and Customs Enforcement

FROM:                Kristi Noem
                               Secretary of Homeland Security

SUBJECT:          **Guidance Regarding Third Country Removals**

## Purpose

This memorandum clarifies DHS policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (INA) to countries other than those designated for removal in those removal orders (third country removals).[1] DHS has used similar processes before, including with respect to Title 42 expulsions and the Migrant Protection Protocols.

## Process Regarding Third Country Removals[2]

*Written Notice to the Alien & Fear Screening*

Prior to the alien's removal to a country that had not previously been designated as the country of removal, DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured. If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien

---

[1] This memorandum does not address expedited removals pursuant to INA § 235(b)(1).
[2] These procedures only apply to aliens who have no ongoing proceeding in which to raise a claim under INA § 241(b)(3) or the Convention Against Torture. For aliens who have such proceedings, DHS will follow existing procedures.

Case 1:25-cv-10676-BEM   Document 43-1   Filed 03/30/25   Page 3 of 3
Case 8:25-cv-02780-PX   Document 22-11   Filed 11/07/25   Page 100 of 127
55a

may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. DHS is taking this approach in line with its determination in mid-2024 that such questioning may be suggestive and that asking them leads to false claims rendering the immigration system as a whole less efficient. *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (noting that aliens are "more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum" when asked affirmative fear questions); *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024). The allegation that a foreign country's government will torture an alien or allow an alien to be persecuted, particularly a government with which the United States has a diplomatic relationship, is a serious one. It is not unreasonable for an alien in that circumstance to be expected to affirmatively express a fear of persecution or torture.

Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.

> *Where the Alien Affirmatively States a Fear*

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the Immigration Court, USCIS will refer the matter to the Immigration Court in the first instance. In cases where the alien was previously in proceedings before the Immigration Court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform U.S. Immigration and Customs Enforcement (ICE). ICE OPLA may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under INA § 241(b)(3) and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.


# Presidential Documents

Executive Order 14165 of January 20, 2025

## Securing Our Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1.** *Purpose.* Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

**Sec. 2.** *Policy.* It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:

(a) Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

(b) Deterring and preventing the entry of illegal aliens into the United States;

(c) Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

(d) Removing promptly all aliens who enter or remain in violation of Federal law;

(e) Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

(f) Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

(g) Obtaining complete operational control of the borders of the United States.

**Sec. 3**. *Physical Barriers.* The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

**Sec. 4**. *Deployment of Personnel.* (a) The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and

(b) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)–(6) of the INA (8 U.S.C. 1103(a)(2) and (4)–(6)).

**Sec. 5**. *Detention.* The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

**Sec. 6**. *Resumption of Migrant Protection Protocols.* As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

**Sec. 7**. *Adjusting Parole Policies.* The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

(a) Cease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

(b) Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."

(c) Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

**Sec. 8**. *Additional International Cooperation.* The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

**Sec. 9**. *DNA and Identification Requirements.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109–162, for all aliens detained under the authority of the United States; and

(b) The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

**Sec. 10**. *Prosecution of Offenses.* The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the

**Federal Register**/Vol. 90, No. 19/Thursday, January 30, 2025/Presidential Documents    **8469**

prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

**Sec. 11.** *Additional Measures.* Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

**Sec. 12.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02015
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

D.V.D., *et al.*,
Individually and on behalf of all others
similarly situated,

    *Plaintiffs*,

v.

U.S. Department of Homeland Security,
*et al.*,

    *Defendants*.

Civil Action No. 1:25-cv-10676-BEM

---

## DECLARATION OF ACTING DEPUTY EXECUTIVE ASSOCIATE DIRECTOR GARRETT J. RIPA

Pursuant to 28 U.S.C. § 1746, I, Garrett J. Ripa, declare as follows:

1. I am the Acting Deputy Executive Associate Director ("D-EAD") for Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2. As the D-EAD, I lead ERO in its mission to protect the homeland through the arrest and removal of aliens who undermine the safety of our communities and the integrity of our immigration laws. I am responsible for a budget of approximately $4.7 billion and lead more than 8,600 employees assigned to 25 ERO field offices and

Case 1:25-cv-10676-BEM   Document 130-2   Filed 05/23/25   Page 2 of 11
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 105 of 127
60a

headquarters, in more than 200 domestic locations and 30 overseas locations. I

oversee the eight Assistant Directors that lead ERO's headquarters divisions,

including: Enforcement, Removal, Non-Detained Management, Custody

Management, Field Operations, ICE Health Service Corps, Law Enforcement

Systems and Analysis, and Operations Support.

3.  I began my career with the United States Government in 1996 as a Detention

Enforcement Officer in Miami, Florida, with legacy U.S. Immigration and

Naturalization Service. Over time, I have also held the positions of Deportation

Officer, Supervisory Detention and Deportation Officer, Assistant Field Office

Director, and Field Office Director of the Miami ERO Field Office at DHS ICE.

4.  I am aware of the orders issued in the above-captioned matter.

5.  I provide this declaration based on my personal knowledge, reasonable inquiry, and

information obtained from various records, systems, databases, other DHS

employees, and information portals maintained and relied upon by DHS in the regular

course of business.

6.  On April 18, 2025, this Court issued a Preliminary Injunction requiring that, prior to

removing any class member to a country not explicitly listed on the alien's order of

removal: (1) DHS must provide written notice to the alien—and the alien's

immigration counsel, if any—of the third country to which the alien may be removed,

in a language the alien can understand; (2) DHS must provide meaningful opportunity

for the alien to raise a fear of return for eligibility for Convention Against Torture

("CAT") protections; (3) DHS must move to reopen the proceedings if the alien

demonstrates "reasonable fear"; and (4) if the alien is not found to have demonstrated

"reasonable fear," DHS must provide a meaningful opportunity, and a minimum of fifteen days, for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

7. To implement the requirement that it provide a class member a "meaningful opportunity . . . to raise a fear of return for eligibility for CAT protections," ICE generally provides an alien twenty-four hours, depending on exigency, following service of the Notice of Removal for the alien to raise a fear of torture if they are removed to the third country or express an intent to file a CAT claim. A class member's fear claim need not be adjudicated within the twenty-four hours; that timeframe is simply the time given for aliens to express a fear of torture, which is then referred to U.S. Citizenship and Immigration Services for adjudication.

8. For the aliens on the flight at issue, ICE ERO provided them with written notice of the country of removal in a language they understood; ICE ERO explained the written notice to them; ICE ERO confirmed that they understood the notice; and none raised a fear of removal to South Sudan.

9. At approximately 10:45 a.m. on May 19, 2025, ██████████████, ██████████ ███████████, ████████████, █████████████████, ███████████, ██████, █████, and ████████████ were housed in the same holding cell at the Port Isabel Service Processing Center in Los Fresnos, Texas. Available records and recent interactions with the aliens reflect that each understood the English language.

10. Between 5:46 and 5:48 p.m. on May 19, 2025, each alien was informed that he would be removed to South Sudan via service of a "Notice of Removal" in the English

Case 1:25-cv-10676-BEM    Document 130-2    Filed 05/23/25    Page 4 of 11
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 107 of 127
62a

language listing South Sudan as the county of removal. The form was explained to each alien in English. Each alien individually affirmatively indicated they understood the contents of the form and refused to sign. ERO also emailed the "Notice of Removal" to the attorney for ███ At no time did any of the above-referenced aliens express a fear of being removed to South Sudan.

11. Based upon my nearly thirty years as an immigration officer at various levels, any alien who is being told that he or she is being removed to a third country would reasonably be expected to immediately notify ICE of any fear of removal to that third country and certainly within twenty-four hours. It usually takes minutes rather than hours for an alien to express fear.

12. Aliens in this situation would have gone through a removal process where they would have been advised of asylum, withholding of removal, and CAT protections. Some would have already sought these protections in the past.

13. In the expedited removal process, including under the Biden Administration's *Securing the Border* regulation, DHS is not limited in how quickly it can execute a removal. Although expedited removals may take more than 24 hours, many are executed in even shorter periods. There, fear claims are and were raised almost immediately.

14. Outside the context of expedited removal, the removal process, beginning with encounter and ending with removal, can take months to several years.

15. Much of this timeline is tied to the immigration court process and its constant delays and backlogs. Once in immigration proceedings, an alien has the opportunity to

challenge their removability from the United States. If removability is established, the alien then has a right to seek relief or protection from removal.

16. An alien ordered removed by an immigration judge may appeal to the Board of Immigration Appeals and, if the immigration judge's order is not overturned, may file a Petition for Review (PFR) with the relevant U.S. Court of Appeals. In multiple jurisdictions, the filing of a PFR automatically triggers a stay of removal for the duration of the process, which could take years and continuously taxes ICE resources.

17. Once an alien is the subject of an executable final removal order, ICE can move forward with the removal process. This process can be arduous, particularly with regard to the many countries that are recalcitrant in accepting the return of their nationals. It can be even more difficult when dealing with dangerous criminals, whose countries—and other countries—are hesitant to accept their nationals where those individuals are convicted rapists and murderers, like those who were on the flight at issue.

18. If removal cannot be timely effectuated, DHS may be forced, in compliance with *Zadvydas v. Davis*, 533 U.S. 678 (2001), to release the alien into the community while continuing to pursue removal options. This is true even for convicted rapists and murderers like those on the flight at issue in this case. In fact, multiple aliens on the flight at issue were forced to be released into the community and continued to terrorize American citizens despite their prior heinous crimes due to an inability to remove them.

19. For example, ███████████, a twice convicted violent criminal, was released from ICE custody in May of 2021 because ICE was unable to secure his removal to

Case 1:25-cv-10676-BEM   Document 130-2   Filed 05/23/25   Page 6 of 11
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 109 of 127
64a

Cuba due to that country's recalcitrance in accepting the return of its nationals. In 1999, ███████ held a .38 caliber gun to a victim's head and pulled the trigger twice. Fortunately, the gun misfired, causing ███████ to pistol whip the victim instead. Despite having an administratively final order of removal, ███████ was released into the community, allowing him to reoffend despite his attempt at murdering an innocent person. In 2007, ███████ was convicted of strongarm robbery and kidnapping, resulting in a sentence of over 15 years. Despite his violent nature, ███████ was released from ICE custody in 2021 because there was no likelihood of removal in the reasonably foreseeable future given the Cuban government's recalcitrance at accepting their citizens. It was not until four years later, in May of 2025, that ███████ was brought back into ICE custody, such that he was in the community for four years despite having convictions for attempted murder, robbery with a deadly weapon, and kidnapping.

20. On October 10, 2008, ███████ was convicted of arson and was sentenced to fifteen years of probation. A short time later, on November 8, 2010, ███████ was convicted of trafficking cocaine and sentenced to three years in prison. He was released on December 15, 2015, because there was no significant likelihood of removal in the reasonably foreseeable future given that Cuba refused to accept the return of its citizens from the United States. After his release, ███████ went on to commit a string of dangerous crimes to include possession of a firearm by a convicted felon resulting in additional jail time. In 2022, ███████ was convicted of attempted murder and sentenced to four years in prison.

Case 1:25-cv-10676-BEM    Document 130-2    Filed 05/23/25    Page 7 of 11
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 110 of 127
65a

21. In 1995, ███████████ was convicted of first-degree murder, attempted murder, and second-degree robbery against a sixty-four-year-old German tourist and her husband after robbing them in the mountains near Idyllwild, California. He shot and killed the wife and shot the husband in the face, who managed to survive. Nonetheless, on February 11, 2023, ICE was forced to release him into the community because he could not be removed, as the government of Laos refused to issue a travel document. ICE was only able to take him back into custody on March 31, 2025.

22. Where ICE cannot remove an alien to the country designated by the IJ, it will focus resources in appropriate cases on removal to a third country. This process is time consuming, operationally burdensome, and requires delicate engagement with foreign officials, often necessitating direct engagement by the U.S. Department of State to convince a foreign government to accept for removal a dangerous criminal alien with no or limited ties to that country.

23. If ICE, or another arm of the U.S. Government, is able to obtain an agreement by a third country to accept an alien, it then often must rearrest the alien in the community, which may require Special Response Teams (SRTs), which are specially trained to engage with violent criminals and conduct other high-risk operations. Deployment of such teams diverts significant additional resources. However, such precautions are necessary when seeking to re-arrest dangerous criminals at large in our communities.

24. Once ICE takes these aliens into custody, ERO must build a manifest for the flight. Aliens scheduled for removal are located throughout the country, requiring the coordination of officers in multiple Areas of Responsibility. On any given flight,

Case 1:25-cv-10676-BEM    Document 130-2    Filed 05/23/25    Page 8 of 11
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 111 of 127
66a

there may be aliens being removed to numerous foreign nations. This requires ICE to coordinate multi-leg flights through up to four countries. Given the complicated nature of these operations, charter flights can take 30 days or more to coordinate. In order to remove aliens on one charter ICE must contact and receive permission from each country for each landing. ICE must secure country clearance for all flights and visas for all ERO officers on the flight. In addition, all stakeholders in country must be notified, for example, U.S. Department of State, in-country ICE Homeland Security Investigations and ERO attachés. When flights are contracted, ICE must contract with additional pilots and crews in order to complete multi-leg flights. ICE also must coordinate with local foreign law enforcement when releasing an alien into their home country. Not all countries will allow ICE to land a plane with third-country nationals onboard, which adds significant logistical difficulties and a significant cost to the American people.

25. The dangerous aliens that were included on the flight at issue in this case needed appropriate levels of security staffing. This additional staffing included ICE SRT officers, who have the expertise, training, and equipment to respond to emergency situations and act to adequately protect the flight crew and ICE personnel. SRT members may be required to address a detainee acting in a violent manner who needs to be subdued for the safety of other detainees and the flights officers on board.

26. Given the planning and resource requirements for special removal charter flights, costs may be exorbitant for removal of even just a few dangerous aliens. For example, the average cost for a special charter to the African continent using the smallest available charter plane is over $1.3 Million. This figure is an approximation that only

Case 1:25-cv-10676-BEM    Document 130-2    Filed 05/23/25    Page 9 of 11
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 112 of 127
67a

accounts for total flight hours of between 30-40 and associated costs under the

contract with the charter company and also includes the cost of requiring multiple

SRT officers onboard.

27. Arrangements for a country to accept an alien, particularly a third country national, as

well as country clearances, related operational requirements, and charter flight

schedules are often time limited. For that reason, scheduling delays can result in the

need to revisit any or all parts of the process.  In addition to operational implications,

additional costs associated with delays, or layovers due to unforeseen circumstances

would substantially increase the total financial burden of such flights on the

government.

28. With the requirements imposed by the court in its April 18, 2025 order, ECF No. 64;

April 30, 2025 order, ECF No. 86; May 7, 2025 order, ECF No. 91; and now its May

21, 2025 order, ECF No. 119, the already extraordinary process is unreasonably

delayed and will in many cases need to be restarted. With the new requirement that an

alien be given a "minimum of ten days, to raise a fear-based claim for CAT protection

prior to removal[,]" ICE will be forced to dedicate sparce detention beds to criminal

aliens when it is already prepared to execute their lawful removal orders at both a

significant expense to the United States and the preclusion of using those detention

beds to detain other dangerous aliens and aliens posing a flight risk who are not yet

subject to a final order of removal. The process imposed by the court creates a vicious

cycle that would require ICE to relitigate enforceable removal orders when

attempting to remove aliens who have no right to remain in the United States, but hail

from countries who refuse to cooperate with the acceptance of their criminal citizens,

and has the potential to result in ICE being forced to release them back into the communities under *Zadvydas*.

29. With this process, assuming the alien does raise a fear claim in this time (which more will when they learn it will delay their removal and potentially derail them operationally) we are left with two options, neither good. Either aliens are found to have a reasonable fear and DHS is required to seek to reopen their often long-completed proceedings, or they are found not to have a fear and DHS must give them *yet another* fifteen days to seek to reopen their own proceedings. In short, even a frivolous fear claim could delay removal for twenty-five days, if not indefinitely, depending on the circumstances. Travel documents are not valid indefinitely, and ICE often has only a short window to remove an alien. This means that any delay could lead to ICE having to engage in the entire process again, wasting valuable government resources, straining detention capacity, and/or release these dangerous criminals once again.

30. Ultimately, this court-created process, overlaid atop the framework that Congress established and ICE developed to meet operational realities, adds an onerous and duplicative procedure for removal of aliens who have already received the benefit of comprehensive removal proceedings in the United States, who have been found to be removable from the United States, and who have been found to have no valid claim of protection in that process, and who have had access to recourse of Article III courts. Such a burden will significantly impede DHS's ability to effectively enforce immigration laws and remove dangerous criminals from the United States.

Case 1:25-cv-10676-BEM    Document 130-2    Filed 05/23/25    Page 11 of 11
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 114 of 127
69a

I declare under penalty of perjury that the foregoing is true and correct.


Signed on the 23rd day of May 2025


GARRETT J
RIPA

Digitally signed by GARRETT J RIPA
DN: cn=GARRETT J RIPA, o=U.S.
Government, ou=People,
email=Garrett.J.Ripa@ice.dhs.gov,
c=US
Date: 2025-05-23T17:47:52-0400

Garrett Ripa
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Case 1:25-cv-10676-BEM    Document 130-1    Filed 05/23/25    Page 1 of 4
Case 8:25-cv-02780-PX    Document 70-11    Filed 11/07/25    Page 115 of 127
70a

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|                                              |                             |
|----------------------------------------------|-----------------------------|
| D.V.D., et al.,                              |                             |
|                                              |                             |
| Plaintiffs,                                  | Civil Action No. 25-10676-BEM |
| v.                                           |                             |
| U.S. Department of Homeland Security, et al., |                             |
|                                              |                             |
| Defendants.                                  |                             |

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.    The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and

1

relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.      The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that the Orders by this Court, including on April 30 and May 20, 2025, cause significant and irreparable harm to U.S. foreign policy. The May 20 Order requires Defendants "to maintain custody and control of class members currently being removed to South Sudan or to any other third country, to ensure the practical feasibility of return if the Court finds that such removals were unlawful." This requirement has already had, and will continue to have, negative consequences to important U.S. strategic interests, including in Libya, South Sudan, and Djibouti.

4.      In Libya, the Court's Orders have interfered with quiet diplomatic efforts and exacerbated internal political and security divisions in Libya. As factions opposed to Prime Minister Dabaiba sought to capitalize on public reports of potential migration removals to Libya for political gain, Libya's Government of National Unity (GNU) publicly rejected the use of Libyan territory for accepting deportees; rival authorities based in Benghazi also denied any agreement with the United States to accept deportees. In the context of this political unrest, GNU-aligned forces took action against the two largest armed groups in the Libyan capital on May 12-13, sparking the most serious street fighting in Tripoli since 2022. As of May 21, the situation in Tripoli remains unsettled, as GNU-aligned forces and their opponents seek to consolidate political and military support. On May 19, a senior Libyan official informed the Department that the unrest in Tripoli had forced a postponement in the announcement of a significant commercial deal to expand activities of a U.S. energy company in Libya.

Case 1:25-cv-10676-BEM    Document 130-1    Filed 05/23/25    Page 3 of 4
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 117 of 127
72a1

5.      In South Sudan, the Orders threaten to derail significant efforts to quietly rebuild a

productive working relationship with the government in Juba. Before the Court's intervention, the

government in South Sudan, which previously refused to accept the return of one of its own

nationals, had taken steps to work more cooperatively with the U.S. government. Cooperation

between the U.S. and South Sudan is critical, both in terms of removals but also to advance the

U.S. government's humanitarian efforts in the country. Without South Sudan's cooperation,

moving humanitarian relief – food, medicine, etc. – into the region becomes more difficult. It is

almost certain the Court's interjection will result in delayed or significantly reduced humanitarian

efforts.

6.      The May 20 Order also causes harm in Djibouti. Djibouti is strategically located

in the Horn of Africa. The country sits astride the world's busiest shipping lanes and is adjacent

to at least seven regional conflicts and the presence of multiple terrorist organizations, including

ISIS, al-Shabaab, and the Houthis. For this reason, the U.S. military's Combined Joint Task Force

– Horn of Africa (CJTF-HOA) is based in Djibouti and represents the only U.S. military base on

the African continent. Ongoing security actions in the Red Sea and across the Horn of Africa are

complex and reflect deep ongoing diplomatic negotiations with our Djiboutian hosts.

7.      United States government aircraft use the CJTF-HOA facilities for a range of tasks,

all negotiated with the Djiboutians. A flight bringing 8 individual removals from the United States

for resettlement in South Sudan used the CJTF-HOA logistical facilities, for which we had

consulted and gained approval from the Djiboutians. The Order interrupted the transit process and

required that the aircraft and the 8 individuals removed, including convicted felons, temporarily

remain in Djibouti. That action required our government to re-engage the Djiboutians to explain

that the mission they had approved had subsequently changed.

3

Case 1:25-cv-10676-BEM    Document 130-1    Filed 05/23/25    Page 4 of 4
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 118 of 127
73a

8.    This situation both diverted attention from and further complicated ongoing security cooperation, including counter-terrorism operations and both United States and multinational military movements.

9.    Disruptions at CJTF-HOA as a result of the May 20 Order would have broader, negative implications.  For example, such disruptions could interfere with humanitarian assistance across the region in a time of severe humanitarian crisis.  Some parts of the region are suffering from famine.  It is therefore critical for the United States to maintain effective foreign policy engagements in the region without judicial interference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of May 2025.

_____
Marco Rubio
Secretary of State

4

74a

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| D.V.D., *et al.*,<br>Individually and on behalf of all others<br>similarly situated,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br>       *Defendants*. | Civil Action No. 1:25-cv-10676-BEM |

## DECLARATION OF ACTING ASSISTANT DIRECTOR
## MARCOS D. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Marcos D. Charles, declare as follows:

1. I am an Acting Assistant Director for Field Operations at Enforcement and Removal

   Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the

   U.S. Department of Homeland Security ("DHS"). As the Acting Assistant Director, I am

   responsible for oversight of the twenty-five ERO Field Offices, ensuring all field

   operations are working to efficiently execute the agency mission.

2. I began my career with the U.S. Government as a Border Patrol Agent for the former

   Immigration and Naturalization Service in Hebbronville, TX. Over time I was promoted

   to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations

Case 1:25-cv-10676-BEM    Document 129-1    Filed 05/23/25    Page 2 of 9
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 120 of 127
75a

Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I was

promoted to Supervisory Detention and Deportation Officer, Assistant Field Office

Director, Chief of Staff, Deputy Field Office Director, and Field Office Director before

becoming the Acting Assistant Director.

3.  I provide this declaration based on my personal knowledge, reasonable inquiry, and

information obtained from various records, systems, databases, other DHS employees,

and information portals maintained and relied upon by DHS in the regular course of

business.

4.  Pursuant to the Court's inquiries about the individuals on the plane during the May 21,

2025 hearing, I submit this declaration to inform the Court of the identities and serious

criminal histories of the seven aliens at issue in the litigation on the plane. (ECF No.

104).

████████████████████ (E.A.H.)

5.  I have personally reviewed the case of E.A.H.

6.  E.A.H. is a native and citizen of Cuba.

7.  On May 11, 1999, E.A.H. was convicted in the Eleventh Circuit Court of Florida, County

of Dade, for Robbery, in violation of Florida Statutes § 812.13(2)(c); Robbery Using

Deadly Weapon or Firearm, in violation of Florida Statutes §§ 812.13(2)(a) and 777.011;

Attempted Arm Robbery, in violation of Florida Statutes §§ 812.13(2)(a)(b), 777.04, and

777.0111; Attempted Second Degree Murder, in violation of Florida Statutes §§

782.04(2), 777.04, and 775.087; Unlawful Possession of a Firearm or Weapon by a

Convicted Felon, in violation of Florida Statutes §§ 790.23(1); and Robbery Using a

Deadly Weapon or Firearm, in violation of Florida Statutes §§ 812.13(2)(A) and 777.011.

Case 1:25-cv-10676-BEM     Document 129-1     Filed 05/23/25     Page 3 of 9
Case 8:25-cv-02780-PX     Document 72-11     Filed 11/07/25     Page 121 of 127
76a

8.  Specifically, on September 19, 1997, E.A.H. pushed the victim from behind as she was entering her car and stole her purse. Subsequently, on October 20, 1997, E.A.H. waited by the elevator of an apartment building with two other co-defendants. When the victim entered the building, E.A.H. pulled out a .38 caliber gun and held it to the victim's head while demanding his wallet. He then pulled the trigger twice while holding the gun to the victim's head, but the gun misfired both times, so he pistol whipped the victim.

9.  As a result of these criminal convictions, E.A.H. was sentenced to four years in prison to be followed by two years of probation.

10. On September 13, 1999, E.A.H. was ordered removed to Cuba by an immigration judge. E.A.H. did not file an appeal, and his removal order became administratively final on that date.

11. On February 6, 2007, E.A.H. was convicted in the Eleventh Judicial Circuit of Florida, Miami-Dade County, of Robbery/Strongarm, in violation of Florida Statute 812.13 2(c); Falsely Impersonating an Officer, in violation of Florida Statute § 843.08; and Kidnapping, in violation of Florida Statute 787.01.2, and was sentenced to fifteen years in prison to be followed by five years of probation.

12. Specifically, on March 17, 2006, E.A.H. approached the victim in a restaurant parking lot and falsely identified himself as a police officer. E.A.H. searched the victim and ordered him to get inside his vehicle, wherein he stole the victim's phone and wallet, and drove the victim away from the restaurant. The following day, E.A.H. called the victim and demanded a cash payment or he would otherwise place the victim under arrest. During the meet-up with the victim, E.A.H. was arrested by local law enforcement.

Case 1:25-cv-10676-BEM   Document 129-1   Filed 05/23/25   Page 4 of 9
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 122 of 127
77a

██████████████████████ **(J.M.R.)**

13. I have personally reviewed the case of J.M.R.

14. J.M.R. is a native and citizen of Cuba.

15. On October 10, 2008, J.M.R. was convicted in the Eighteenth Judicial Circuit of Florida, Brevard County, of Arson in the Second Degree, in violation of Florida Statutes § 806.01(2), and was sentenced to fifteen years of probation.

16. Specifically, on March 18, 2008, J.M.R. towed his vehicle to a remote location and then set fire to it by igniting combustible material in the passenger compartment in an attempt to receive the insurance proceeds.

17. On November 8, 2010, J.M.R. was convicted in the Eleventh Judicial Circuit of Florida, Miami-Dade County, of Cocaine/Trafficking, in violation of Florida Statutes §§ 893.135(1), (B)(1), and 777.011, and was sentenced to three years in prison.

18. Specifically, on August 12, 2008, J.M.R. attempted to sell approximately one kilogram of cocaine worth $22,000 to undercover police officers.

19. On October 24, 2012, J.M.R. was issued a Final Administrative Removal Order pursuant to section 238(b) of the Immigration and Nationality Act following his aggravated felony conviction described above.

20. On October 21, 2020, J.M.R. was convicted in the Seventh Judicial Circuit of Florida, Volusia County, of (1) Possession of a Firearm by a Convicted Felon, in violation of Florida Statute § 790.22(1), and was sentenced to four years in prison, and (2) Possession of Paraphernalia, in violation of Florida Statutes § 893.147(1), and was sentenced to 364 days in prison.

Case 1:25-cv-10676-BEM   Document 129-1   Filed 05/23/25   Page 5 of 9
Case 8:25-cv-02780-PX   Document 72-11   Filed 11/07/25   Page 123 of 127
76a

21. Specifically, on April 17, 2019, local law enforcement executed a search warrant at the residence of J.M.R. During the execution of the search, detectives found a .22 caliber rifle hidden behind J.M.R.'s bed. In addition, law enforcement seized the following items: one plastic box containing .22 cartridges, one cannabis oil cartridge, two magazines with .380 cartridges, fifty-two one-gram cannabis cartridges, approximately 8.9 grams of cannabis, miscellaneous drug paraphernalia, $3,240 dollars, two round blue tablets with no markings, approximately one gram of off-white power substance, miscellaneous chicken fighting paraphernalia, and multiple chickens used for cock fighting.

22. On January 12, 2022, J.M.R. was convicted in the Ninth Judicial Circuit of Florida, Orange County, of Attempted First Degree Murder with a Weapon, in violation of Florida Statute § 782.04(1)(A)(1), and was sentenced to four years in prison.

23. Specifically, on April 3, 2019, local law enforcement in Orange County, Florida, responded to multiple 911 calls. Officers arrived on scene to find a victim severely bleeding from his head and neck. The victim was given aid and rushed for emergency surgery. Upon investigation, it was discovered that J.M.R. and the victim were together at dinner, and when J.M.R. drove the victim to his car, he pulled over and attacked the victim with a knife.

█████████████ (T.N.)

24. I have personally reviewed the case of T.N.

25. T.N. is a citizen of the Lao People's Democratic Republic (Laos).

26. On November 13, 1995, T.N. was convicted in the Superior Court of California, County of Riverside, for First Degree Murder, in violation of California Penal Code § 187;

Case 1:25-cv-10676-BEM    Document 129-1    Filed 05/23/25    Page 6 of 9
Case 8:25-cv-02780-PX    Document 72-11    Filed 11/07/25    Page 124 of 127
73a

Attempted Murder, in violation of the California Penal Code §§ 664 and 187; and

Second-Degree Robbery, in violation the California Penal Code § 211, and was sentenced

to life in prison without parole.

27. Conviction records and media reporting on his convictions show that on May 16, 1994,

T.N. robbed and murdered a sixty-four-year-old German tourist and seriously injured her

husband near a scenic outlook in Idyllwild, California.[1]

28. On March 2, 2018, T.N. was resentenced by the same court to life with the possibility of

parole following a change in California law regarding minor offenders.

29. On July 12, 2023, T.N. was ordered removed to Laos by an immigration judge and

waived appeal.

████████████████ **(J.M.G.)**

30. I have personally reviewed the case of J.M.G.

31. J.M.G. is a native and citizen of Mexico.

32. On January 11, 2005, J.M.G. was convicted in the Thirteenth Circuit Court of Florida,

County of Hillsborough, for Murder in the Second Degree, in violation of Florida

Statutes § 782.04(2), and sentenced to twenty-five years in prison.

33. Specifically, on February 21, 2004, while hosting a gathering at his residence, J.M.G.

began fighting with his roommate in their driveway. After multiple attempts to separate

the men, J.M.G. went inside his residence and returned to the driveway with a large knife.

He then stabbed the victim in the chest and fled on foot.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

34. On June 16, 2005, J.M.G. was ordered removed to Mexico by an immigration judge and waived appeal.

35. Recently, J.M.G. was identified as and admitted to being a member of a criminal organization. While incarcerated, ████████ ██ ████ incurred multiple disciplinary violations; some of these violations were related to gang activity.

████████ (K.M.)

36. I have personally reviewed the case of K.M.

37. K.M. is a native and citizen of Burma.

38. On September 3, 2019, K.M. was convicted in the Iowa District Court, County of Marshall, of Lascivious Acts with a Child, in violation of Iowa Code § 709.8(1)(a), and was sentenced to no more than ten years of incarceration.

39. Specifically, K.M. was convicted of repeatedly sexually assaulting a minor from 2011 to 2017, which began when the victim was approximately seven years old.

40. Law enforcement found out that K.M. had been sexually assaulting the victim after the victim's mother opened a bedroom door to find K.M. on top of the victim, who was approximately seven years old at the time. Upon being discovered, K.M. separated himself from the victim, put his pants on, and walked away.

41. The last time K.M. raped the victim, he offered her fifty to one-hundred dollars and food in exchange for sex. When the victim rejected the offer, K.M. forced himself on her. At the time, the victim was twelve years old.

42. On September 23, 2021, K.M. was ordered removed by an immigration judge. On March 17, 2023, the Board of Immigration Appeals dismissed his appeal.

████████ (N.M.)

Case 1:25-cv-10676-BEM   Document 129-1   Filed 05/23/25   Page 8 of 9
Case 8:25-cv-02780-PX   Document 82-11   Filed 11/07/25   Page 126 of 127
61a

43. I have personally reviewed the case of N.M.

44. N.M. is a native and citizen of Burma.

45. On September 22, 2020, N.M. was convicted in the District Court of Nebraska, County of Lancaster, of Attempted Sexual Assault in the First Degree, in violation of Nebraska Revised Statutes §§ 28-201(4)(B) and 28-319(1)(A), and was sentenced from twelve to fourteen years in prison.

46. Specifically, in a March 2017 interview with law enforcement, N.M. admitted to having sex with a twenty-six-year-old woman described by her sister as having the mental capacity equal to that of a three-year-old. In the same interview, N.M., who was forty-four years old at the time, admitted that he had known the victim since she was twelve, knew she had attended a school for children with mental disabilities, and believed her to have the mental capacity of an eleven-year-old. Local law enforcement had been alerted to the situation after the victim was found to be pregnant.

47. On August 17, 2023, N.M. was ordered removed by an immigration judge and waived appeal.

███████████████ (T.T.P.)

48. I have personally reviewed the case of T.T.P.

49. T.T.P. is a native and citizen of Vietnam.

50. On January 12, 2001, T.T.P. was convicted in the Superior Court of Washington, County of Pierce County, of Murder in the First Degree, in violation of Washington Revised Code § 9A.32.030(1)(b), and sentenced to 264 months of imprisonment.

Case 1:25-cv-10676-BEM    Document 129-1    Filed 05/23/25    Page 9 of 9
82a
Case 8:25-cv-02780-PX    Document 62-11    Filed 11/07/25    Page 127 of 127

51. On January 12, 2001, T.T.P. was convicted in the Superior Court of Washington, County
of Pierce, of Assault in the Second Degree, in violation Washington Revised Code §
9A.36.021(1)(a), and sentenced to fifty months of imprisonment.

52. According to contemporaneous media reports, on June 4, 2000, T.T.P. "randomly"
discharged a firearm into a crowd following a gang dispute, where he struck two
teenagers (one of whom was a minor) who were unrelated to the gang conflict.[2]

53. On June 17, 2009, T.T.P. was ordered removed to Vietnam by an immigration judge and
waived appeal.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 23rd day of May 2025

MARCOS D
CHARLES

Digitally signed by
MARCOS D CHARLES
Date: 2025.05.23
19:12:12 -04'00'

Marcos D. Charles
Acting Assistant Director
Field Operations
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security