# EXHIBIT N

# In the
# Supreme Court of the United States

———————

U.S. DEPARTMENT OF HOMELAND SECURITY ET AL.,

*Applicants*,

v.

D.V.D. ET AL.,

*Respondents*.

———————

ON APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY

## OPPOSITION TO APPLICATION TO STAY

Matt Adams
Leila Kang
Aaron Korthuis
Glenda M. Aldana Madrid
NORTHWEST IMMIGRANT
  RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104

Anwen Hughes
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018

Trina Realmuto
  *Counsel of Record*
Kristin Macleod-Ball
Mary Kenney
NATIONAL IMMIGRATION
  LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4447
trina@immigrationlitigation.org

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

STATEMENT............................................................................................................. 4

I. Legal Background ................................................................................................. 4

    A.   Statutory Prohibition on Removal to Countries Where Noncitizens Face Persecution or Torture.................................................................................................................. 4

    B.   Statutory Scheme for Designating Countries of Removal and Notice ............................. 5

    C.   Defendants Repeatedly Have Told This Court That Notice and Opportunity to Apply for Protection Are Required Prior to Removal to a Third Country ......................................... 8

II. Factual and Procedural Background...................................................................... 9

    A.   Plaintiffs .................................................................................................................. 9

    B.   Issuance of Temporary Restraining Order and Preliminary Injunction .......................... 11

    C.   Defendants' Post-Injunction Actions and the Court's Responses ................................... 13

STANDARD OF REVIEW ....................................................................................... 16

ARGUMENT ............................................................................................................ 16

I. The District Court Had Jurisdiction to Issue the Injunction ................................... 16

    A.   8 U.S.C. § 1252(f)(1) Does Not Bar the Injunction........................................................ 16

    B.   8 U.S.C. § 1252(a)(5) and (b)(9) Are Inapplicable ......................................................... 20

    C.   8 U.S.C. § 1252(a)(4) and FARRA Also Do Not Bar Jurisdiction ................................... 22

    D.   8 U.S.C. § 1252(g) Does Not Apply ............................................................................. 24

II. Plaintiffs Are Likely to Prevail on the Merits of their Claims ................................ 25

    A.   The Law Requires Individualized Notice and a Meaningful Opportunity to Apply for Protection Prior to Any Third-Country Removal. .......................................................... 25

    B.   DHS's New Memo Does Not Comport with the Law ...................................................... 27

    C.   Defendants' Due Process Argument Is Erroneous ......................................................... 333

III. Defendants Do Not Demonstrate Irreparable Harm ........................................... 36

    A.   Complying with the Law Is Not a Cognizable Injury...................................................... 36

    B.   Defendants' Alleged Foreign Policy and National Security Injuries Are Self-Inflicted and Stem from Their Violations of the Injunction ................................................................ 38

CONCLUSION......................................................................................................... 40

**INTRODUCTION**

The preliminary injunction in this case provides a basic measure of fairness to comply with nondiscretionary statutory protections: meaningful notice and an opportunity to be heard. It requires the Department of Homeland Security (DHS) to notify class members if the agency intends to deport them to an entirely new country (a third country, i.e., a country other than the primary or alternate country designated on their removal order) and employs existing mechanisms for presenting their statutory claims for protection from torture. These measures are not "devised from whole cloth" by the district court, Stay Application (Appl.) 5; instead, they are mandated by the Foreign Affairs Reform Restructuring Act of 1998 (FARRA), implementing regulations, U.S. treaty obligations, and the Constitution. Indeed, the Solicitor General's Office *twice* has represented to this Court, including as recently as March 24, 2025, that the government *must* provide notice and an opportunity to present a fear-based claim before carrying out a third-country removal. Applicant-Defendants' (Defendants') position—that they do not owe these protections when DHS selects the third country *after* removal proceedings have concluded—is plainly unlawful. The district court had abundant authority to ensure compliance with the law and did so in a measured way.

The district court went to great lengths to avoid micro-managing Defendants' compliance with the law, repeatedly inviting them to suggest remedies and offering operational flexibility. Defendants not only rejected the court's invitations to accommodate them but repeatedly forced the court to address their continued defiance of the court's orders. They first did so on March 31 and April 13 by outsourcing removals to the Department of Defense (DoD) and removing class members to El Salvador via Guantanamo Bay, alleging that DoD carried out the removals without direction from DHS. Then, on May 7, Defendants attempted to remove thirteen class

members to Libya with insufficient notice and no opportunity to present their statutory claims for protection from torture. Most recently, on May 20, they placed at least six class members on a plane destined for South Sudan, only notifying them the night before and then removing them the next morning. Each of these last two flights included a citizen of Mexico whose government historically has accepted repatriation of all its citizens, suggesting that Defendants' third country removal policy is intentionally punitive.

Defendants attempt to paint the injunction as hindering their ability to remove "the worst of the worst," Appl. 1, focusing on a small number of individuals with serious criminal convictions that they hand-picked for the Libya and South Sudan flights *after* the district court issued the preliminary injunction and then holding a press conference an hour before the latest court hearing. But the statutory protections against torture under U.S. law rightly protect *everyone* from such basic human rights violations. More importantly, the injunction does not stop Defendants from executing removal orders to third countries. Instead, it simply requires Defendants to comply with the law when carrying them out. Defendants blatantly ignore the fact that many, if not the majority, of the class members in this case, including two of the named Plaintiffs, have no criminal convictions whatsoever. Many also entered legally on family-based, employment, or student visas, or as refugees.

Defendants' own *choices*—to violate the district court's orders and to opt to implement the court's remedy for those violations overseas—are causing the operational and diplomatic difficulties about which they complain. But Defendants exaggerate the scope of their harm and the extent to which the injunction limits their pursuit of lawful solutions. Defendants' real grievance is with being ordered to comply with the law prohibiting third-country deportations to countries where noncitizens would face persecution or torture. That is not a cognizable injury, let

alone irreparable harm, nor does it justify the emergency stay Defendants seek.

On the merits, Defendants are unlikely to prevail because the law prohibiting removal to countries where noncitizens face torture is clear. The injunction provides the individualized notice and opportunity to meaningfully examine and explain why deportation to a new country will result in torture or death. Defendants' March 30, 2025 policy memorandum (memo), issued immediately following the district court's initial temporary restraining order, is deeply flawed, as the district court concluded. It provides no process at all where the United States receives blanket diplomatic assurances. Blanket assurances violate the statutory and regulatory requirements that such assurances must be individualized. They also do not protect against torture by non-state actors, like gangs or armed militarized groups which, in countries like Libya and South Sudan, control much of the territory. And they do not protect against chain *refoulement*, i.e., removal by the third country back to the noncitizen's country of origin. Defendants' selection of war-torn, countries—countries to which the State Department advises *against* travel—as places to which it plans to remove class members raises grave concerns absent the district court's intervention.

For removals to countries that have not provided diplomatic assurances, the memo instructs DHS officers only to "inform" of removal to a third country, without requiring advance written notice to the individual and their counsel, as this Court has repeatedly emphasized is necessary. In addition, the memo proposes a woefully inadequate screening procedure that fails to inform class members of their rights or require officers to ask about fear, applies an impermissible, heightened fear standard, and curtails administrative and judicial review.

Finally, Defendants' actions over the past weeks underscore the need to keep the injunction in place: they have repeatedly sought to remove people as a punitive measure, to some of the most dangerous places on the planet, and with only hours' notice. A stay is an

extraordinary remedy that sounds in equity. Beyond Defendants' unlawful policy memo and overstated complaints about the alleged harm that they both created and can remedy, Defendants' actions in thwarting the district court's orders would render a stay particularly unjust. Absent the injunction, class members face a substantial risk of deportation to third countries where they could face torture or death without a meaningful ability to contest that fate. Defendants face no such comparable injuries; indeed, all the injunction requires is that they comply with the law when carrying out third-country deportations. The Court should deny the application for a stay.

## STATEMENT

### I. Legal Background

#### A. Statutory Prohibition on Removal to Countries Where Noncitizens Face Persecution or Torture

U.S. immigration law affords noncitizens in the United States three forms of protection from persecution and/or torture: asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Asylum typically provides full protection against deportation to any country. *See* 8 U.S.C. § 1158(c)(2). Individuals who are not eligible for asylum, *e.g.*, because they did not apply within one year of entering the country, s*ee id.* § 1158(a)(2), may qualify for withholding of removal. *Id*. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16, 1208.16. Withholding of removal is a "mandatory" protection that prohibits removal to a designated country where a noncitizen establishes that they are more likely than not to face persecution. *INS. v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999). Withholding of removal also contains exceptions for, inter alia, individuals who have committed certain serious crimes. *See* 8 U.S.C. § 1231(b)(3)(B).

Any noncitizen may also apply for mandatory protection under CAT in the form of withholding or deferral of removal. CAT prohibits removal to any country where there is a

substantial risk of torture. It is not codified in the Immigration and Nationality Act (INA).

Instead, pursuant to FARRA, Congress instructed that the U.S. government may not "expel,

extradite, or otherwise effect the involuntary return of *any person* to a country in which there are

substantial grounds for believing the person would be in danger of being subjected to torture."

Pub. L. 105-277 Div. G § 2242(a), 112 Stat. 2681, 2681-822 (1998) (emphasis added) (codified

as statutory note to 8 U.S.C. § 1231). To implement CAT, Congress instructed that the

government "shall prescribe regulations to implement the obligations of the United States under

Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman

or Degrading Treatment or Punishment," *id.* § 2242(b), 112 Stat. at 2681-822, which the

government has done, *see, e.g.*, 28 C.F.R. § 200.1 ("A removal order under Title V of the Act

shall not be executed in circumstances that would violate Article 3 of the United Nations

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment."). Individuals are eligible for CAT protection no matter the basis of their removal

order. *See* 8 C.F.R. §§ 208.16–208.18, 208.31, 241.8(e), 1208.16–1208.18.

Individuals can appeal the denial of an application for withholding of removal or CAT

protection to the Board of Immigration Appeals (BIA) and later to the courts of appeals. *See* 8

U.S.C. § 1252(a); 8 C.F.R. §§ 208.31(e), 1003.6(a), 1208.31(e), (g)(2)(ii), 1240.15; *Nasrallah v.

Barr*, 590 U.S. 573, 575 (2020).

### B. Statutory Scheme for Designating Countries of Removal and Notice

Paragraphs (b)(1) and (b)(2) of 8 U.S.C. § 1231 govern the countries to which DHS is

authorized to remove noncitizens with final removal orders.[1] This framework governs

---

[1]     References to the Attorney General in § 1231(b) refer to the Secretary of the Department
of Homeland Security for functions related to carrying out a removal order and to the Attorney

individuals with final removal orders, including those who have been granted withholding or CAT protection and those who may not be repatriated to their country of origin. The statutory scheme consists of "four consecutive removal commands." *Jama v. ICE*, 543 U.S. 335, 341 (2005). First, DHS must attempt to remove the individual to the country designated on the order of removal or their country of origin. *See* 8 U.S.C. § 1231(b)(2)(A)–(D).

DHS may *only* disregard the designation and seek to deport a noncitizen to a country to which they have no connection—i.e., a third country—if it is "impracticable, inadvisable, or impossible to remove" them to "each country described in a previous clause of this subparagraph." *Id*. § 1231(b)(2)(E)(vii). For individuals placed in removal proceedings upon "arriv[ing] in the United States," the country designated for removal is the one from which the individual departed or, alternatively, countries to which they have a connection. *Id*. § 1231(b)(1)(A)–(C). For these individuals too, removal to a third country where the noncitizen has no connections only is permitted if "removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible." *See id*. § 1231(b)(1)(C)(iv).

For example, this Court has recognized that, in some instances, removal to the designated or alternative country is not possible because DHS is unable to "bring about [a noncitizen's] removal from the United States." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). In that limited situation, DHS may seek removal to a country where the noncitizen has "lesser connection[s]," *Jama*, 543 U.S. at 341, such as the place the noncitizen was born or previously resided, *see* 8 U.S.C. § 1231(b)(1)(C), (b)(2)(E). Again, however, removal must be "impracticable, inadvisable, or impossible . . . to each country [previously] described" before DHS can pursue removal to a

General (as delegated to the immigration courts and BIA) for functions related to selection of designations and decisions about fear-based claims. *See* 6 U.S.C. § 557.

country where the noncitizen has no connection. *See id.* § 1231(b)(1)(C)(iv), (b)(2)(E)(vii).

Paragraphs (b)(1) and (b)(2) of 8 U.S.C. § 1231 make *any* designation of the country of removal, whether by DHS or an immigration judge (IJ), "[s]ubject to paragraph (3)." *Id.* Paragraph (3), entitled "Restriction on removal to a country where [noncitizen's] life or freedom would be threatened," reads:

> Notwithstanding paragraphs (1) and (2), the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion.

*Id.* § 1231(b)(3)(A); *see also Jama*, 543 U.S. at 348. Likewise, where DHS seeks to remove a noncitizen to a country where the noncitizen has a lesser connection (or no connection), FARRA and the regulations implementing CAT prohibit deportation to a country where the noncitizen will face torture. *See* FARRA § 2242(b); 8 C.F.R. §§ 208.16(c)–208.18, 1208.16(c)–1208.18.

The statute and regulations implement Congress' designation scheme in a way that ensures that noncitizens receive meaningful notice and an opportunity to present a fear-based claim. In removal proceeding under 8 U.S.C. § 1229a (commonly referred to as "Section 240" proceedings), individuals receive notice of all countries to which they may be deported. The regulations mandate that the immigration judge (IJ) "shall notify" the individual of the designated country of removal and "shall identify for the record" all alternative countries to which the person may be removed. 8 C.F.R. § 1240.10(f). Those who have been deported and subsequently return to the United States without inspection can have their removal orders reinstated by DHS officers. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8. The reinstatement regulations contemplate notice of a designated country. *See* 8 C.F.R. § 241.8(e) (referring to "the country designated in [the reinstatement] order"). Likewise, DHS officers can issue an administrative removal order to nonpermanent residents with an aggravated felony conviction.

*See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1. In this process, the noncitizen may designate "*the*

country to which he or she chooses to be deported" and the "deciding [DHS] officer shall

designate *the* country of removal." 8 C.F.R. § 238.1(b)(2)(ii), (f)(2) (emphasis added).[2]

Consistent with the United States' commitment to *non-refoulement*, DHS must provide

individuals who express a fear of return to the designated country with an opportunity to

demonstrate a reasonable fear of persecution or torture in interviews before asylum officers, and

those who do so, are eligible to apply for withholding of removal under 8 U.S.C. § 1231(b)(3)

and/or CAT protection in what are known as withholding-only proceedings. *See* 8 C.F.R.

§§ 241.8(e), 238.1(f)(3); *see also* 8 C.F.R. §§ 208.31, 1208.31.

### C. Defendants Repeatedly Have Told This Court That Notice and Opportunity to Apply for Protection Are Required Prior to Removal to a Third Country

The injunction applies to noncitizens with final orders of removal from Section 240

proceedings (8 U.S.C. § 1229a), reinstatement proceedings (8 U.S.C. § 1231(a)(5)), or

administrative removal proceedings (8 U.S.C. § 1228(b)), whom DHS seeks to remove to an

alternative, undesignated third country. It affords them and their counsel written notice of the

new country of removal and allows up to ten days for the noncitizen to contact counsel or family,

inform themselves of the conditions in the newly designated country and articulate a fear, if any.

If DHS determines the fear is reasonable, it must reopen removal proceedings to allow an IJ to

adjudicate the claim. If not, the noncitizen has up to 15 days to move to reopen proceedings

themselves. These protections—notice and the opportunity to contest removal based on a fear—

flow directly from FARRA § 2242(a)–(b), 8 C.F.R. §§ 208.16(c)–208.18, 28 C.F.R. § 200.1, the

---

[2]     In reinstatement proceedings, the country of removal is the country designated in the
original removal proceedings. In proceedings under § 1228(b), DHS typically designates the
person's country of citizenship or nationality. *See* 8 C.F.R. § 238.1(f)(2).

Constitution, this Court's precedent, and Defendants' own representations to this Court, including this term. Defendants twice affirmed to this Court that the agency must provide noncitizens with adequate notice and a meaningful opportunity to present a fear-based claim prior to removal to a third country. Most recently, just this March, Defendants stated the following:

> MR. McDOWELL: Under Title 8 we—we do not [send people to a third country while withholding-only and CAT proceedings are pending] as a matter of practice. We do think we have the legal authority to do that, with the following caveat: *We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country*. If they raise that reasonable fear, the withholding-only proceedings would simply continue. They would just focus on the new country, rather than the original one.
>
> JUSTICE KAGAN: But you don't have the legal power to remove the person to the country for which there is a pending CAT claim?
>
> MR. McDOWELL: That's exactly right. The regulate—the regulations prohibit that.

Transcript of Oral Argument at 33, *Riley v. Bondi*, No. 23-1270 (S. Ct. Mar. 24, 2025) (emphasis added). In 2021, Defendants similarly affirmed to this Court that if there was a "third country that . . . was willing to accept [a noncitizen]," then "[DHS] would have to provide [the noncitizen] notice, and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country." Transcript of Oral Argument at 20, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) (No. 19-897).

## II.    Factual and Procedural Background

### A.    Plaintiffs

Plaintiffs are four noncitizens who fear potential removal to a third country. They filed the instant class action on March 23, 2025, challenging DHS' failure to provide meaningful notice and an opportunity to present any relevant fear-based claims prior to removal to a third

country. Plaintiff D.V.D., a citizen of Cuba, has a history of severe mental illnesses which currently are controlled by psychiatric treatment. In 2017, he was ordered removed to Cuba and has been regularly reporting to ICE since his release. He especially fears removal to countries where he will be deprived of access to psychiatric treatment or where he will be imprisoned upon arrival. *See* D. Ct. Doc. 1 ¶¶ 62–67; D. Ct. Doc. 8-1 ¶¶ 4–13.

Plaintiff M.M., a citizen of Honduras, fled that country after her husband and father of her three eldest children severely beat her and the children after his release from prison. She has no criminal history. In 2021, an IJ granted M.M.'s withholding of removal application to Honduras and she has since been regularly reporting to DHS. M.M. is afraid that her husband would find her in a third country, as he previously did in Mexico, where he threw her out of a second-floor window. *See* D. Ct. Doc. 1 ¶¶ 68–73; Dt. Ct. Doc. 8-2 ¶¶ 3–13.

Plaintiff E.F.D., a citizen of Ecuador, fled the country in 2015 after the Ecuadorian police threatened, robbed, and beat him for refusing to transport drugs for them. During his journey to the United States, E.F.D. was kidnapped and robbed in Guatemala and Mexico. In 2018, an IJ granted him CAT protection, preventing his removal to Ecuador. He fears removal to (1) countries engaged in chain refoulement, (2) to El Salvador, Colombia, or Peru, where he fears drug traders will target him, and (3) to Mexico and Guatemala, based on his past experiences of being robbed and kidnapped. *See* D. Ct. Doc. 1 ¶¶ 74–77; D. Ct. Doc. 8-3 ¶¶ 3–16.

Plaintiff O.C.G. is a gay man from Guatemala who has faced multiple death threats on account of his sexuality. He has no criminal history. In March 2024, DHS refused to give him a fear interview and deported him. He again fled Guatemala and entered Mexico in April 2024, where he was kidnapped and raped. He then fled to the United States. On February 19, 2025, an IJ granted O.C.G.'s application for withholding of removal, preventing his removal to

Guatemala. During the proceedings, O.C.G. expressly articulated his fear of removal to Mexico, and the IJ told him he could not be removed there. A day and half later, DHS deported O.C.G. to Mexico, only informing him of his removal to that country while the removal was underway. After arrival, Mexican authorities removed him to Guatemala, where he remains in hiding. *See* D. Ct. Doc. 1 ¶¶ 78–89; D. Ct. Doc. 8-4 ¶¶ 2–10; Supp. App. 18a–31a.[3]

**B.      Issuance of Temporary Restraining Order and Preliminary Injunction**

Along with their complaint, Plaintiffs moved for a temporary restraining order (TRO), preliminary injunction (PI), and class certification. At a March 28, 2025, hearing, Defendants stated that Plaintiffs and similarly situated individuals were not entitled to *any* notice or opportunity to make a fear-based claim before a third-country removal:

> THE COURT: I don't want to mischaracterize your position; so that's why I'm saying it back to you, to make sure. Is your position that the Government can decide right now that someone who is in their custody is getting deported to a third country, give them no notice and no opportunity to say, I will be killed the moment I arrive there, and, as long as the Department doesn't already know that there's someone standing there waiting to shoot him, that that's fine?
>
> MS. LARAKERS: In short, yes.

Supp. App. 104a; *id*. 51a. Defendants declined the court's invitation to outline what they believe constitutes a meaningful opportunity to seek fear-based protection. *Id*. 105a–106a. The court issued a TRO requiring Defendants, prior to any third-country removal, to provide written notice and a meaningful opportunity to submit an application for CAT protection and have the agency adjudicate it. *Id*. 56a–57a. Defendants moved for a stay of the TRO, which the court denied, *id*.

---

[3]      In a sworn statement, a DHS officer falsely attested that O.C.G. had been provided notice of the third-country removal and had informed a DHS agent that he did not fear removal to Mexico. *See* D. Ct. Doc. 31-1 ¶ 13. After the court ordered discovery, App. 52a–53a, Defendants informed the court they could not identify any such agent. Supp. App. 22a; D. Ct. Doc. 103. The court subsequently ordered Defendants to facilitate O.C.G.'s return. Supp. App. 30a.

46a, 48a–55a, and also moved for an emergency stay from the First Circuit. C.A. Doc. 00118265973 (No. 25-1311).

On March 30, Defendants issued the memo entitled "Guidance Regarding Third Country Removals," App. 54a–55a, and moved the district court for an indicative ruling, D. Ct. Doc. 43. On April 7, the First Circuit denied Defendants' motion to stay the TRO, noting that the memo and motion "made a moving target of their removal policy (and potentially the underlying order) just days before the district court hearing on the [PI] motion." Supp. App. 44a–45a.

At the hearing on the PI motion, the district court again confirmed Defendants' position "that there is no constitutional or statutory infirmity to send [class members] to a country where they have an individualized uncontroverted fear of death." *Id*. 88a; *see also id.* 87a. Acknowledging Defendants' position that *no* process was due, the court nonetheless invited Defendants' position on the scope of any protections it might order; other than following the memo, Defendants declined to respond to the court's inquiry. *See id.* 89a–98a. Following the hearing, and before any ruling on the PI motion, Defendants filed a "provisional" stay motion, preemptively challenging any order granting a PI. D. Ct. Doc. 63.

On April 18, the district court certified the following nationwide class:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

*See* App. 28a, 53a. The court also issued a PI, ordering that, prior to any third-country removal, noncitizens and their counsel, if any, must receive written notice of the country of removal in a language the noncitizen understands and a meaningful opportunity to assert a claim for CAT protection related to that third country. *Id*. 51a–52a. Specifically, the court ordered that if a

noncitizen demonstrates a reasonable fear of removal to the third country, DHS must move to reopen proceedings to allow an IJ to adjudicate the CAT claim; but if the DHS finds that the noncitizen does not demonstrate reasonable fear, they have 15 days to move to reopen proceedings. *Id*. 52a. The PI ruling mooted Defendants' indicative ruling motion. D. Ct. Doc. 66.

Defendants appealed and again moved to stay the PI pending appeal. C.A. Doc. 00118275679 (No. 25-1393). The First Circuit denied the motion, expressing, inter alia, "concerns regarding the continuing application of the [memo]; the defendants' filing of a 'provisional' stay motion three days before the injunction was entered; [and] the irreparable harm that will result from wrongful removals in this context." App. 4a–5a.

### C.  Defendants' Post-Injunction Actions and the Court's Responses

On March 31, three days after the TRO issued, at least four alleged class members were deported from the continental United States to El Salvador, via the Naval Station Guantánamo Bay, without receiving the TRO's procedural protections. *See* D. Ct. Docs. 62, 72, 72-1. A second flight with class members, also from Naval Station Guantánamo Bay to El Salvador, departed on April 13, 2025. *See* D. Ct. Doc. 81; Supp. App. 84a. Defendants claim that "DHS did not violate" the TRO in conducting these removals, simply because the deportations were carried out by the DoD. Supp. App. 40a–42a. On April 30, the district court clarified the PI, ordering that Defendants cannot cede custody or control to another agency "in any matter that prevents [a noncitizen] from receiving" the protections of the PI. Supp. App. 38a–39a.

On May 7, reports surfaced that DHS was seeking to remove class members to Libya and Saudi Arabia. That day, DHS transported thirteen class members to an air force base, where a military airplane was waiting to deport them to Libya. *Id.* 66a–67a; D. Ct. Doc. 89 at 1-5. They were not provided the PI's protections. Supp. App. 59a ¶¶ 6–7; *id.* 66a ¶¶ 5–6. After Plaintiffs

filed an emergency TRO motion, the court again clarified its order, stating that the "[then-] allegedly imminent removals . . . would clearly violate" the PI. *Id.* 37a. After several hours, DHS returned the class members to detention. *See id.* 61a–63a ¶¶ 17–37; *id.* 66a–67a ¶¶ 8–12.

On May 20, Plaintiffs filed yet another emergency TRO, this time based on reports that DHS was removing class members to South Sudan without the PI's protections. D. Ct. Doc. 111. After convening an emergency hearing, the court ordered Defendants to "maintain custody and control" of the individuals "to ensure the practical feasibility of return if the Court finds that such removals were unlawful." Supp. App. 34a. The men received "fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane and sent to a country" that is the subject of a "Do not travel" warning from the U.S. Department of State. App. 1a; *see also* Supp. App. 11a n.15 (individuals received "at most, sixteen" hours' notice). The notice was provided only in English. *See, e.g.*, D. Ct. Doc. 130-2 ¶ 10. All the men refused to sign the notice, but DHS did not treat the refusal as an expression of fear. *Id.* The men were denied access to counsel or an opportunity to present a claim under CAT against removal to South Sudan. Supp. App. 12a–13a.[4]

The next day, immediately prior to the continued emergency hearing, DHS hosted a press conference, publicizing the names, photographs, and criminal histories of the men on the plane and attacking the judge. *Id.* 5a; *Immigration and Customs Enforcement Officials Hold News Conference*, at 5:07, CSPAN (May 21, 2025), https://tinyurl.com/mtcvptf3. At the hearing, in which DHS provided testimony, the court found that Defendants' actions violated the PI. Supp. App. 73a. The court invited Defendants to provide guidance as to what amount of time, beyond twenty-four hours, was sufficient to raise a CAT claim to a country an individual is unfamiliar with, but Defendants declined to do so. *Id.* 74a–77a; *see also id.* 11a.

---

[4]     Some of the individuals were lawfully admitted as refugees and/or on an immigrant visa.

The court then memorialized the violation in a written order, providing a "summary and clarification" of the PI. App. 2a. In response to the prior violations the court further explained that a "meaningful opportunity" to seek CAT protection requires a minimum of 10 days between notice and removal. *Id*. Notably, the court did not order Defendants to return the class members to the United States; instead, it allowed them to choose where to provide the PI's protections— either in the United States or abroad, provided that the class members receive the same access to counsel, interpretation, and telephone as they would have had but for the violation. Supp. App. 32a–33a; *see also id.* 1a–3a, 15a. The court found Plaintiffs' TRO motion with regard to South Sudan moot. D. Ct. Doc. 133.

Defendants sought reconsideration of the orders, criticizing them while simultaneously disavowing any responsibility for violating the PI. D. Ct. Doc. 130. As here, Defendants ignored the viability of returning the class members to a detention facility inside the United States. Instead, they submitted declarations from the Secretaries of State and Defense decrying the predicament they created by violating the injunction. *See* Appl. 4, 8, 38 (citing App. 70a–73a and D. Ct. Doc. 131-1). In denying reconsideration, the district court expounded in great detail its numerous solicitations of Defendants' input, reminded them "micromanag[ing]" DHS "as it fulfills its required obligations . . . is not the role of the courts," and strongly criticized their conduct and arguments. Supp. App. 1a–3a, 10a–11a. The court further noted that "[s]tays are tools of equity" and that "the unclean hands doctrine bars equitable relief." *Id*. 16a n.23.

Rather than exercise the option to provide the PI protections in the United States, Defendants elected to do so on a military base in Djibouti. Appl. 3, 17. On June 2, Defendants reported that all the men from the flight remain in DHS custody, DHS has set up a private interview room, and the men will be permitted to speak to counsel. D. Ct. Doc. 150. To date,

counsel have not heard from them.

## STANDARD OF REVIEW

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted). Applicants carry "an especially heavy burden" when they seek emergency relief after the appellate court below already "denied a motion for a stay." *Edwards v. Hope Med. Grp. for Women*, 512 U.S. 1301, 1302 (1994) (Scalia, J., in chambers) (citation omitted). An applicant seeking a stay must show (1) a likelihood of success on the merits, (2) "a reasonable probability" of obtaining certiorari, and (3) a likelihood of irreparable harm. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam). Defendants fail to carry this burden. Defendants similarly flounder when requesting an administrative stay. The "point" of such a stay is "to minimize harm while an appellate court deliberates." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring). As irreparable injury is the touchstone, Defendants fail because it is class members who face serious, life-threatening irreparable harm.

## ARGUMENT

### I.    The District Court Had Jurisdiction to Issue the Injunction

### A.    8 U.S.C. § 1252(f)(1) Does Not Bar the Injunction

The PI safeguards presentation of a claim under CAT, as FARRA requires. Defendants contend that it is preventing DHS from removing noncitizens to third countries. Appl. 19–22. Not so. The PI simply requires adequate notice and an opportunity, where relevant, to present a claim for CAT protection *before* DHS may execute the third-country removal order. Defendants assert § 1252(f)(1) bars jurisdiction but rightly acknowledge that "respondents' claim is 'based

on' CAT, which is not one of the statutory provisions specified in Section 1252(f)(1*)." Id.* 6.

First, as Defendants concede, *see id.*, the express terms of § 1252(f)(1) limit injunctive relief only with respect to "the relevant sections of the statute," *Biden v. Texas*, 597 U.S. 785, 798 (2022). As such, § 1252(f)(1) "[p]lainly[] does not encompass an injunction against statutes it does not cross-reference." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209 (5th Cir. 2024). Here, FARRA—and more specifically, its provisions regarding CAT—are not included in "chapter 4 of title II [of the INA], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA]," and they therefore are not part of the cross-referenced statutes for which classwide injunctions are barred. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, § 306, 1101 Stat. 3009, 3009-611–3009-12 (1996) (codified at § 1252(f)(1)).

IIRIRA's text did not include FARRA. Instead, FARRA was enacted in October 1998— two years after IIRIRA. *See generally* 112 Stat. at 2681-762–2681-854. Even then, FARRA did not directly amend any provisions of the INA, as the statute's CAT provisions were codified only as a statutory note to 8 U.S.C. § 1231. *Id.* § 2242, 112 Stat. at 2697-822. Section 1252(f)(1)'s reference to IIRIRA and FARRA's later enactment are critical because, where Congress specifically references a statute by name, a statute applies only with respect to "the referenced statute as it existed when the referring statute was enacted, *without any subsequent amendments*." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209–10 (2019) (emphasis added). This is true whenever a statute "refers to another statute by specific title," as is the case with § 1252(f)(1). *Id.* at 209; *see also id.* at 210 (explaining that the "reference canon" is one that "[f]ederal courts have often relied on"). Adding CAT to § 1252(f)(1)—which is what Defendants effectively request the Court now do—would thus impermissibly "add [a] new statute[] to the list

in § 1252(f)(1)." *Texas*, 123 F.4th at 210; *see also Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022) (holding that injunction was not barred by § 1252(f)(1) because "§ 235(d)(2) of the [Trafficking Victims Protection Reauthorization Act] is certainly not a provision of the INA *'as amended by* the [IIRIRA] of 1996'" (citation omitted)).

Second, any collateral effect the PI has on 8 U.S.C. § 1231(b)(1)–(3) does not bar the injunction. In *Garland v. Aleman Gonzalez*, this Court did not disagree with the principle that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." 596 U.S. 543, 553 n.4 (2022) (emphasis omitted). That is precisely what the injunction does here, as it merely enforces "a provision . . . not specified in § 1252(f)(1)." *Id.* (emphasis omitted); *see also, e.g.*, *Texas*, 123 F.4th at 209–10 (relying on *Aleman*'s footnote 4 to uphold injunction enjoining DHS from removing wire placed by the State of Texas along the border); *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, —, F.4th —, Nos. 22-55988, 22-56036, 2024 WL 5692756, at *16 (9th Cir. May 14, 2025) (relying on this "collateral-effect rule" to affirm injunction that enforced 8 U.S.C. § 1158—which is not covered by § 1252(f)(1)—and that enjoined an asylum-related regulation).

Defendants' only argument is that, in their view, the PI restrains DHS from conducting third-country removals under 8 U.S.C. § 1231(b). Appl. 20–22. Ignoring footnote 4 from *Aleman Gonzalez*, they assert that "all that matters is whether the action that the injunction restrains is taken to enforce or implement one of the covered statutory provisions." Appl. 21. But despite Defendants' protestations, Plaintiffs do not challenge DHS' authority to conduct third-country removals, and the PI *does not actually prevent them from conducting third-country removals* under 8 U.S.C. § 1231(b). The PI only requires that "prior to" any such removal, class members receive the protections that FARRA and its implementing regulations entitle them to receive

under CAT, and that procedural due process requires. App. 51a–52a. The PI thus assumes that Defendants will continue to carry out removals to third countries and simply ensures class members receive notice of and an opportunity to invoke a statutory right not covered by § 1252(f)(1). While the PI may, in limited cases, briefly delay Defendants' third-country removal plans, any such delay is the "collateral" consequence of Congress's explicit instruction to Defendants to implement CAT. *Aleman Gonzalez*, 596 U.S. at 553 n.4; *see also* 8 U.S.C. § 1231 (note).[5] Indeed, even when Defendants plainly violated the PI, *see* App. 1a, the district court proceeded cautiously in an effort *not* to interfere with removal operations by providing Defendants with discretion as to where to screen certain class members' CAT claims. *See supra* Statement, II.C; Supp. App. 32a–33a; *id*.14a–17a.

Such an injunction is necessary, as Defendants have attempted to undertake removals to some of the most dangerous parts of the planet with only hours' notice. App. 1a–3a; Supp. App. 36a–37a, 58a–68a; *see generally* Supp. App. 1a–17a. In related settings, Defendants have attempted to sidestep this Court's orders requiring due process by providing notice immediately before removal, emphasizing the need for the injunction here. *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1368 (2025) (per curiam) ("[N]otice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not [satisfy procedural due process requirements.]"). Indeed, even after *A.A.R.P.*, Defendants attempted to remove class members to South Sudan with only hours' notice. *See* App. 1a–2a.[6]

---

[5]     The PI only affords protection for CAT claims under FARRA and its implementing regulations. It does not afford any relief regarding withholding of removal under § 1231(b)(3), which protects against persecution, because such relief *is* covered by § 1252(f)(1).

[6]     Even with respect to referenced provisions of IIRIRA, § 1252(f)(1) "explicitly preserv[es] this Court's power to enter injunctive relief." *Texas*, 597 U.S. at 799. Thus, even if this Court finds that the CAT protections are encompassed by § 1252(f)(1), it should enjoin

## B.     8 U.S.C. § 1252(a)(5) and (b)(9) Are Inapplicable

Defendants mischaracterize Plaintiffs' claims and the statutory text in contending that 8 U.S.C. § 1252(a)(5) and (b)(9) bar jurisdiction. Appl. 23–24, 26. As a threshold matter, Plaintiffs do not seek "judicial review of an order of removal entered or issued," 8 U.S.C. § 1252(a)(5), because they challenge DHS' actions designating and removing individuals to a third country *after* the conclusion of removal proceedings. Because the challenged practice arises entirely after the conclusion of removal proceedings, it does not comprise part of an "order of removal" that can be reviewed through "a petition for review filed with an appropriate court of appeals." *Id.*; *see also id.* § 1252(b)(4)(A) (providing that "the court of appeals shall decide the petition only on the administrative record on which the order of removal is based").

Defendants also attempt to shoehorn Plaintiffs' claims into the scope of § 1252(b)(9) by arguing they arise from "action[s] taken . . . to remove [a noncitizen]." Appl. 24. But this reading ignores the paragraph's "context" and "place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 245 (2010) (instructing that "a particular clause" must be "consider[ed] in connection with . . . the whole statute" (citation omitted)). The title of § 1252 as well as that of subsection (b) make clear that (b)(9) specifically channels review of "orders of removal," rather than *any* "action" in the abstract. *Cf. Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275–76 (2023) (considering statutory text "alongside its neighboring [statutory] provisions" to conclude that its meaning "becomes overwhelmingly evident" in that light).

This Court has also rejected an "expansive interpretation of § 1252(b)(9)," explaining

---

Defendants from conducting removals that do not provide adequate notice or an opportunity to present a CAT claim by adopting the carefully crafted remedies the district court employed.

that it would be "absurd" to construe the provision to bar any claim that might tangentially relate to a removal proceeding. *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018); *see also, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 19 (2020) (rejecting the government's contention that § 1252(b)(9) barred review of a challenge to the termination of the Deferred Action for Childhood Arrivals (DACA) program because "the parties are not challenging any removal proceedings"). Here, all class members are defined to "have a final removal order," App. 28a, and are thus removable; but they do not challenge "an order of removal," "the decision . . . to seek removal," or "any part of the process by which their removability will be determined," *Jennings*, 583 U.S. at 294. Accordingly, "§ 1252(b)(9) does not present a jurisdictional bar." *Id.* at 295.

Furthermore, Defendants' assertion that noncitizens "can raise CAT objections to third-country removals in the administrative process—and, in turn, before a court of appeals," Appl. 27 (emphasis omitted), is unfounded as a matter of law and practice. As the district court correctly concluded, it is generally not possible for noncitizens to identify "during their initial removal proceedings[] all the countries where they have concerns that they will be tortured," App. 44a. This is true both because the immigration court generally considers claims regarding only those countries proposed as a country of removal,[7] and because it is not possible for noncitizens to address conditions in every country in the world that may be designated at some point in the future, let alone know how conditions in each country may change at a future time. *See* App. 45a; Supp. App. 79a–80a (addressing U.S. Citizenship & Immigr. Servs., Form I-589:

---

[7]     Plaintiff O.C.G. claimed a fear of removal to Guatemala, his birth country, and Mexico, where he had suffered past torture. The IJ did not designate Mexico for removal and declined to adjudicate a CAT claim with respect to Mexico. *See* App. 17a n.17; *see also* Supp. App. 21a–22a.

Application for Asylum and for Withholding of Removal).[8] Defendants' reliance on motions to

reopen is equally flawed: as Defendants themselves recognize, such motions are generally

subject to time and numerical limits, *see* Appl. 27; *see also, e.g.*, *Kucana*, 558 U.S. at 243–44

(recognizing agency discretion in granting or denying motions to reopen). Moreover, even if

there were no legal barriers, Defendants ignore that detained individuals have no practical ability

to file the motions when they are not provided meaningful advanced notice. *See* App. 19a–21a &

n. 20; *see also* Supp. App. 58a–68a; D. Ct. Doc. 59-12 at 4; D. Ct. Doc. 59-13 at 4. Ultimately,

Defendants cannot point to a single provision in "the scheme Congress designed," Appl. 27,

requiring an individual to affirmatively identify all the countries in which they might fear torture

as a part of their administrative proceedings.

### C.     8 U.S.C. § 1252(a)(4) and FARRA Also Do Not Bar Jurisdiction

Defendants' reliance on 8 U.S.C. § 1252(a)(4) and FARRA § 2242(d) is misplaced.

Plaintiffs' claims arise *after* removal proceedings conclude and concern removal to countries that

are not identified in any order of removal. Their claims could not have been raised earlier and

thus are not "reviewable '*as part of* the review of a final order of removal' under 8 U.S.C. §

1252." *Nasrallah*, 590 U.S. at 582 (emphasis added) (quoting FARRA § 2242(d)). Relatedly,

Plaintiffs do not challenge the outcome of a CAT claim; rather, they challenge Defendants' denial

of any opportunity to even assert such claim. Because Defendants do not provide adequate

procedures to present CAT claims with respect to third countries, there is no "cause or claim

under [CAT]," 8 U.S.C. § 1252(a)(4), or "any other determination made with respect to the

application of [CAT]," FARRA § 2242(d), and no means to seek judicial review thereof.

---

[8]     For example, one of the men DHS sought to remove to South Sudan was ordered
removed in July 2011, just ten days after South Sudan became a state. *See* App. 82a ¶ 53.

FARRA § 2242(d), which bars review of "regulations adopted to implement [CAT]," is also inapposite. Plaintiffs do not challenge the validity of any regulation promulgated to implement CAT. To the contrary, the injunction requires Defendants to comply with FARRA and the CAT regulations in executing third-country removals, consistent with the representations they twice have made to this Court. *See supra* p. 9. Defendants read the word "regulations" out of § 2242(d) and provide no authority for the contention that Plaintiffs are barred from challenging *any* "procedure[] that the Executive Branch has crafted." Appl. 23.

Defendants' additional argument that judicial review for any other type of claim is simply barred, *see* Appl. 23, is legally and logically unsound. This Court has consistently rejected efforts to shield procedural and constitutional claims from review under similar statutes. In *McNary v. Haitian Refugee Center*, the Court held that a bar on "judicial review of a determination respecting an application" for an immigration benefit did not preclude jurisdiction over "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." 498 U.S. 479, 491–93 (1991). Critically, the Court reasoned that where "the only judicial review permitted" by the statute "is in the context of a deportation proceeding," such a scheme "describ[es] the process of direct review of individual denials." *Id.* at 492. This Court reaffirmed that principle in *Reno v. Catholic Social Services, Inc.*, explaining that the plaintiffs could challenge policies notwithstanding a judicial review provision for individual denials. 509 U.S. 43, 63–64 (1993).

Here, as in *McNary* and *Reno*, Plaintiffs do not seek review of any individual CAT determination; they seek notice and an opportunity to present their CAT claims. Unlike in *United States v. Fausto*, neither § 1254(a)(4) nor FARRA § 2242(d) reflect a "congressional intent to preclude review." 484 U.S. 439, 452 (1988). The Court's decision in *Axon Enterprise, Inc. v.*

*FTC* further underscores the need for review of structural or constitutional claims where the statutory scheme providing for judicial review of an agency decision by a court of appeals does not afford meaningful review. 598 U.S. 175, 191 (2023) ("The claim, again, is about subjection to an illegitimate proceeding . . . . And as to that grievance, the court of appeals can do nothing . . . ."). Defendants cannot evade challenges of systemic violations by ignoring the distinction between an individual adjudication and access to obtain such an adjudication.

### D.    8 U.S.C. § 1252(g) Does Not Apply

Defendants also err in asserting that 8 U.S.C. § 1252(g) bars the PI. Appl. 24–27. Subsection 1252(g) governs jurisdiction over actions "arising from" three discrete and discretionary actions: decisions or actions "to commence proceedings, adjudicate cases, or execute removal orders." It does not apply here because Plaintiffs do not challenge, nor does the PI infringe upon, DHS' discretionary decisions to execute their removal orders or even the decision to remove them to a third country. Rather, Plaintiffs challenge DHS' failure to provide meaningful notice and an opportunity to apply for protection with respect to any newly designated country of removal. These mandatory protections are not imposed on DHS "by the district court," Appl. 25; they are imposed by FARRA, its regulations, and the Constitution.

More than 25 years ago, this Court held that § 1252(g) does not bar challenges to such mandatory, nondiscretionary decisions or actions. *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 482–87 (1999). Despite § 1252(g)'s seemingly broad language, its reach is "much narrower" when considered against the statutory and historical context. 525 U.S. at 482. In reconciling the various interacting provisions at issue, the Court found that what Congress sought to channel and otherwise insulate from litigation was the immigration authorities' "exercise of [their] *discretion*" with respect to the three specified actions. 525 U.S. at

24

483–84 (emphasis added). "Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations," the Court held. 525 U.S. at 485. Throughout its decision, this Court repeatedly emphasized that § 1252(g)'s focus was on shielding discretionary executive actions with respect to the three specified acts.

Defendants do not acknowledge that *AADC* limited § 1252(g)'s application to discretionary decisions, claiming that "misreads" the subsection. Appl. 25. Nor do they acknowledge that notice and the opportunity to be heard are nondiscretionary protections that they themselves have told this Court are obligatory. Instead, Defendants claim that "nothing in Section 1252(g) limits protection to *only* the discretionary aspects of the specified actions," Appl. 25, but this position is irreconcilable with *AADC*, *see, e.g.*, 525 U.S. at 487 (referring to § 1252(g) as a "discretion-protecting provision"); *id.* at 485 n.9 ("Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.").

Subsequent cases have affirmed § 1252(g)'s narrow scope and focus on discretionary decisions. *See INS v. St. Cyr*, 533 U.S. 289, 311 n.34 (2001) (describing § 1252(g) as "appl[ying] only to three types of discretionary decisions by the Attorney General—specifically, to commence proceedings, to adjudicate cases, or to execute removal orders"); *Regents of the Univ. of California*, 591 U.S. at 19 (noting § 1252(g) is "narrow"); *cf. Jennings*, 583 U.S. at 294 ("We did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General."). Compliance with FARRA, its regulations, and the Constitution is not discretionary or optional. Thus, § 1252(g) does not bar Plaintiffs' claims.

## II.    Plaintiffs Are Likely to Prevail on the Merits of their Claims

### A.    The Law Requires Individualized Notice and a Meaningful Opportunity to Apply for Protection Prior to Any Third-Country Removal

Contrary to Defendants' suggestion, Appl. 28–30, Plaintiffs' claims that they are entitled

to individualized notice and a meaningful opportunity to apply for protection from persecution,[9] torture, or death, are not solely based in the Due Process Clause, but, as the district court recognized, are "established in common moral sense, in statute and in treaty, and in the government's own assurances to our Supreme Court." Supp. App. 52a; *see also* App. 6a–7a & n. 2. FARRA and its implementing regulations prohibit removal to countries where a noncitizen would likely be tortured or killed. *See* 8 U.S.C. § 1231 (note); 28 C.F.R. § 200.1; 8 C.F.R. §§ 1208.16(c), 1208.17; 1208.18; *see also Nasrallah*, 590 U.S. at 580 (identifying sources of that obligation). The regulations implementing FARRA make clear that *individualized* CAT protections are mandatory prior to execution of a removal order. *See, e.g.*, 8 C.F.R. § 1208.16(c) (discussing IJs' individualized assessment of applicants' CAT claims); *id.* § 1208.17 (same, as well as individualized notice to individuals with CAT protection); *see also* 8 U.S.C. § 1231(b)(1)–(b)(2) (permitting removal "[s]ubject to" the protections provided in § 1231(b)(3)); *Jama*, 543 U.S. at 348 (noncitizens who "face persecution or other mistreatment in the country designated under § 1231(b)(2), . . . have a number of available remedies: asylum; withholding of removal; relief under an international agreement prohibiting torture" (internal citations omitted)).

These statutory, regulatory, and constitutional rights are eradicated unless the individuals who hold them receive adequate advanced notice and an opportunity to assert a claim for protection. As this Court has twice affirmed in recent weeks, this means that a person "must receive notice" that "they are subject to removal" (here, to a third country), and such notice must be provided "within a reasonable time and in such a manner as will allow the[] [noncitizen] to actually seek . . . relief." *A.A.R.P.*, 145 S. Ct. at 1368 (quoting *Trump v. J.G.G.*, 145 S. Ct. 1003,

---

[9]    Plaintiffs seek protection from persecution but have not moved for injunctive relief on this aspect of their claim. *See supra* n.5.

1006 (2025)). Such requirements of notice and an opportunity to be heard are the cornerstones of due process. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (holding that due process requires "at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case"); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (stating that "[t]he fundamental requisite of due process of law is the opportunity to be heard," which includes "timely and adequate notice" (internal quotation marks omitted)). This Court has "long held" these rights apply in this context. *A.A.R.P.*, 145 S. Ct. at 1367. The district court's order protects the statutory and regulatory rights codifying CAT by securing these long-recognized rights of notice and opportunity to be heard.

**B.      DHS's New Memo Does Not Comport with the Law**

Defendants' memo does not provide the basic protections required by the law. Neither the memo's provision of blanket diplomatic assurances nor its purported screening process provide the meaningful notice or an opportunity to present a fear-based claim that the law demands.

1. Defendants do not claim to have obtained diplomatic assurances under the memo with respect to the third-country removals they emphasize in their briefing. But even if they had, to the extent that Defendants obtain blanket "diplomatic assurances" that a country will not persecute or torture noncitizens, such assurances provide no process whatsoever, as individuals need not receive *any* notice or opportunity to apply for protection before they are deported to a country to which they have no connection. App. 54a–55a; *see also id.* 47a (finding that the memo "provides no process whatsoever to individuals who DHS plans to remove to a country from which the United States has received blanket diplomatic assurances"). The memo does not even require DHS to provide notice of which countries have provided such blanket diplomatic

assurances. Instead, for this group, the memo "precludes any further review prior to removal." App. 48a (citing App. 54a–55a).

Such blanket diplomatic assurances do not satisfy Defendants' legal obligations because they do not provide the "individualized assessment" necessary "under the statutory and regulatory framework." App. 47a–48a; *see also* D. Ct. Doc. 49 at 7–8. The regulations implementing CAT—consistent with the statute itself—require individual CAT inquires. *See, e.g.*, 8 C.F.R. §§ 208.16(c)–208.17, 208.31; 1208.16(c)–1208.17, 1208.31. Even the regulation regarding diplomatic assurances requires that assurances be "obtained from the government of a specific country" guaranteeing "that *an alien* would not be tortured there if the alien were removed to that country." 8 C.F.R. § 1208.18(c)(1). Defendants dispute that the regulations require individual assurances, Appl. 30 n.8, but the plain text does so, *id.* § 1208.18(c)(1)–(3) (discussing assurances in reference to a singular individual); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 160–61 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").[10] Nor does the memo safeguard against torture by non-state actors in particular, *see* 8 C.F.R. § 1208.18(a)(7), or against chain *refoulement* (such as in Plaintiff O.C.G.'s case). Indeed, by definition, *blanket* diplomatic assurances violate the governing regulation and merely restate a country's general obligations under international human rights law.[11]

---

[10]     This individualized requirement is consistent with 8 C.F.R. § 1208.16(c), requiring IJs to similarly make individualized CAT determinations. It is also consistent with testimony regarding assurances by former State Department Legal Advisor John Bellinger. *See* D. Ct. Doc. 50-9.
[11]     Moreover, any such assurances would be undermined by the State Department's reports documenting torture by state and non-state actors (including non-state forces acting with the consent or acquiescence of state officials) in the countries to which Defendants seek to deport individuals. *See, e.g.*, D. Ct. Docs. 50-4 (El Salvador), 50-7 (Libya), 112-2 (South Sudan).

The authorities Defendants cite for the proposition that blanket diplomatic assurances can supplant individual assessments of CAT protection are inapposite. Appl. 29–30. First, Defendants rely on *Munaf v. Geren,* 553 U.S. 674 (2008), and *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), to assert that courts cannot question diplomatic assurances. Appl. 29. That argument misses the mark. The Executive has not "determine[d]" that any country will not torture any *particular* person and so it is not before the Court whether such a determination would be "conclusive." App. 54a–55a. Moreover, unlike in those cases, the district court did not "question the substance of [any] diplomatic assurances," but was "inquir[ing] into the overall process and whether such [blanket] assurances, on their own terms, satisfy the Constitution," App. 47a. Courts may properly do so. *Id.* (citing *Khouzam v. Att'y Gen.*, 549 F.3d 235, 259 (3d Cir. 2008)).

Additionally, the cases are factually distinguishable. *Munaf* held that individuals in Iraq could be transferred to Iraqi custody for prosecution, reasoning that "[t]hose who commit crimes within a sovereign's territory may be transferred to that sovereign's government for prosecution." 553 U.S. at 700. But *Munaf* expressly declined to consider the petitioners' claims under FARRA because the issue had not been fully presented. 553 U.S. at 700, 703 & n.6. *Kiyemba* concerned *individualized* diplomatic assurances, including record evidence that the defendants there assessed "whether a particular country is likely to torture a particular detainee," 561 F.3d at 514; *see also id.* at 519 (Kavanaugh, J., concurring) (noting that "fundamentally, this is a case involving transfer of wartime [noncitizen] detainees").[12]

The preamble to the FARRA regulations repeatedly refers to the removal of "an alien" and articulates that such assurances will "be rare," underscoring their individualized nature.

---

[12] Even individualized assurances may be insufficient. *See* D. Ct. Doc. 49 at 13–14. In *Khouzam*, an individualized diplomatic assurance violated due process because DHS failed to provide advanced notice or any opportunity to review or challenge it. 549 F.3d at 256–59.

Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8484 (Feb. 19, 1999). Utilizing blanket diplomatic assurances to eliminate the ability of an entire category of noncitizens to seek CAT protection from a nation would not constitute a "rare" case and defies the regulations' requirements of individualized assessments.

Moreover, though the regulation indicates that compliance with paragraphs (c)(1) and (c)(2) precludes further consideration of a CAT claim by an IJ, the BIA, or an asylum officer, *see* 8 C.F.R. § 1208.18(c)(3), it does not limit judicial review. Indeed, a path to judicial review must be provided. *See* App. 48a (declaring lack of review problematic because "there can be no right without a remedy"); *see also* 8 U.S.C. § 1252(a)(4); *Nasrallah*, 590 U.S. at 585 ("[Section] 1252(a)(4) now provides for direct review of CAT orders in the courts of appeals."). In contrast, the memo forecloses access to administrative *and* judicial review. App. 54a–55a. Defendants suggest that permitting judicial review is "irreconcilable" with *Munaf*, Appl. 30, but, as discussed *supra*, that case addresses distinct facts and did not meaningfully address FARRA or the regulations implementing CAT protections.

Finally, the memo violates paragraph (c)(2) by delegating all responsibility regarding CAT claims[13] to the Department of State (DOS). The memo provides no further review following the issuance of a diplomatic assurance the DOS "believes . . . to be credible." App. 54a–55a. But the regulation requires the *Attorney General* to determine "in consultation with the Secretary of State, where the assurances are sufficiently reliable." 8 C.F.R. § 1208.18(c)(2). It further specifies that this responsibility may only be delegated to the Deputy Attorney General or the

---

[13]    The memo also purports to rely on diplomatic assurances for determinations regarding withholding of removal, App. 54a–55a & n.2, but unlike protection under CAT, there is no regulatory authority permitting the agency to rely on diplomatic assurances in the withholding context, *see* 8 C.F.R. § 1208.18(c) (addressing only claims under CAT, not claims for withholding of removal under 8 U.S.C. § 1231(b)(3)).

Commissioner for the now defunct Immigration and Naturalization Service. *Id.* It does not permit the Secretary of State to unilaterally determine the reliability of any diplomatic assurances with respect to a claim under CAT.

2. The memo also violates due process by failing to provide meaningful notice or opportunity to be heard where no diplomatic assurance is obtained. The memo provides no guidelines as to when notice must occur, and, as this case demonstrates, Defendants believe notice given only hours before removal or while removal is underway is sufficient. Even then, the memo requires noncitizens to immediately and spontaneously raise fear claims regarding countries they may have never heard of, imposes the burden for obtaining full CAT protection in an expedited screening interview, and limits the availability of review.

Each of these issues makes the policy insufficient. First, the memo contains no requirement that individuals receive notice in writing, in a language they understand, or in a time or manner sufficient to assert a fear-based claim. It also does not require notice to counsel, which DHS is *required* to provide "[w]henever a person is required" by the immigration regulations to receive notice. 8 C.F.R. §§ 292.5(a), 1292.5(a); *see also* App. 51a nn.46 & 47. As this Court recently stated, notice requires "sufficient time and information to reasonably be able to contact counsel . . . and pursue appropriate relief," *A.A.R.P.*, 145 S. Ct. at 1368. Furthermore, requiring individuals to "affirmatively state[] a fear of removal," App. 55a, absent any indication that they have the right to seek protection from fear, let alone when or how to do so, *see* App. 54a–55a, functionally ensures that people will not receive required protections against persecution and torture. *See A.A.R.P.*, 145 S. Ct. at 1368 (notice requires sufficient information to raise a claim); *see also* D. Ct. Doc. 49 at 14–18 (addressing U.S. obligation to employ procedures that make individuals aware of their right to seek mandatory protection); *Las Americas Immigrant Advoc.*

*Ctr. v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 1403811, at *16–17 (D.D.C. May 9, 2025) (invalidating rule requiring noncitizens to affirmatively manifest fear).

In addition, requiring individuals to meet a "more likely than not" standard as to the likelihood of torture—i.e., requiring them to "demonstrate full entitlement to CAT protections at merely the screening stage"—is similarly contrary to law. App. 52a n.48. This standard is even more unworkable because, under the memo, screening generally will be conducted within 24 hours of referral, App. 55a, rendering it all but impossible to gather and present sufficient evidence. This is particularly true where, as here, claims relate to a country with which the individual has no connection or familiarity with its human rights record, including whether it engages in chain *refoulement. Cf.* Supp. App. 72a. Such information is not readily accessible to detained individuals facing rushed screenings. The memo also does not create a path to judicial review, App. 55a, which is essential where the stakes are life and death, *cf. Nasrallah*, 590 U.S. at 585–86 ("Because the factual components of CAT orders will not previously have been litigated in court and because those factual issues may be critical to determining whether the noncitizen is likely to be tortured if returned, it makes some sense that Congress would provide an opportunity for judicial review . . . .").

Notably, Defendants suggest that the memo creates an adequate process because, they allege, similar procedures are used in expedited removal pursuant to 8 U.S.C. § 1225(b), which they describe as "analogous." Appl. 31–32. Whether the memo's procedures are lawful as applied to expedited removal is outside the scope of this case: individuals with expedited removal orders are not class members, App. 28a, and are expressly excluded from the memo itself, *see* App. 54a n.1; *cf.* Supp. App. 13a. Moreover, it defies logic to suggest that individuals would be able to discover, articulate, and prove any possible fear of removal to a country which

they may have never heard of on the same timeline as they would be able to explain their fear of their own country of origin.

## C.  Defendants' Due Process Argument Is Erroneous

Defendants also err in invoking Supreme Court precedent addressing entry to assert that class members are not entitled to any "more process than what the political branches provide." Appl. 33 (citing *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020) and *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892)).

First, Defendants ignore that all the injunction does *is* ensure an individual receives what Congress has provided: the opportunity to apply for CAT protections. Thus, even if the only process Plaintiffs were entitled to was "the procedure authorized by Congress," *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950), the injunction does not exceed what the Fifth Amendment requires. Defendants erroneously claim that class members "have already had the opportunity to raise fears under CAT." Appl. 8. That is incorrect and disproven by the district court's findings. Indeed, Defendants believe they have no obligation to give class members any notice or meaningful opportunity to apply for protection with respect to a newly designated third country after the underlying proceedings have already concluded:

> THE COURT: In this posture, where it is the discretionary decision of the department that's changing the [country] designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation?
>
> MS. LARAKERS: DHS's position is no.
>
> THE COURT: They don't have to be told anything and given no opportunity to be heard?
>
> MS. LARAKERS: DHS's position is no.

Supp. App. 102a–103a; *see also* App. 38a. DHS has applied this stated position to Plaintiffs and class members. *See, e.g.*, Supp. App. 27a.

33

Defendants claim that class members can apply for protection in their underlying removal proceedings. Appl. 28. They cannot. Plaintiffs' claims are predicated on the fact that in the underlying proceedings, the third country to which DHS now seeks to remove the noncitizen was *not* designated for removal, and the noncitizen has never known about or had the chance to apply for relief from such removal. "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). Only weeks ago, this Court explained due process requires that "notice must be afforded within a reasonable time and in such a manner as will allow the[] [noncitizen] to actually seek . . . relief in the proper venue before such removal occurs." *J.G.G.*, 145 S. Ct. at 1006. For statutory protections to be meaningful, there must be a means of *accessing* those protections. *See Yamataya v. Fisher*, 189 U.S. 86, 98–100 (1903) (holding that, even though what Congress provided as to exclusion was "due process of law," the statute must be interpreted to provide "notice and . . . an opportunity to be heard" that the person was not subject to deportation). The PI uses existing mechanisms—a reasonable fear interview and motion to reopen—to guarantee an opportunity to raise a CAT claim. *See* App. 2a. Given those existing processes, as well as Defendants' concessions, actions, and refusal to implement CAT, the PI simply provides "the procedure authorized by Congress." *Knauff*, 338 U.S. at 544.[14]

Second, Defendants' entry and admission arguments are misguided. Appl. 33–35. The cases Defendants cite invoke principles specifically applicable to admissions procedures for

---

[14]    It is nonsensical for Defendants to claim that "[t]he injunction adds new hurdles . . . in circumstances where valid concerns about torture are notably unlikely to arise—i.e., removals to third countries where the [noncitizens] lack prior ties." Appl. 8. Given the State Department's assessments of conditions in those countries, *any* person facing removal to Libya, South Sudan, or a prison in El Salvador would have "valid concerns about torture." *Id.*; *see also* D. Ct. Docs. 50-4, 50-7 & 112-2.

those seeking entry into the United States and, thus, their holdings are limited to Congress's power concerning admission and entry. "The distinction between [a noncitizen] who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693. After a person effects an entry, "the Due Process Clause applies . . . whether their presence here is lawful, unlawful, temporary, or permanent," *id.*, as this Court has long recognized*, see, e.g.*, *Plyler v. Doe,* 457 U.S. 202, 210 (1982); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).[15]

This precedent directly contradicts Defendants' arguments seeking to dramatically expand the holding in *Thuraissigiam* to *any* person who has never been lawfully admitted. *See* App. 34–35. To the contrary, *Thuraissigiam*'s due process analysis simply found that a person apprehended within 25 yards of the border is, for all intents and purposes, in the same position as someone apprehended at the border itself. 591 U.S. at 140 ("[A] [noncitizen] who is detained shortly after unlawful entry cannot be said to have 'effected an entry[.]'" (quoting *Zadvydas*, 533 U.S. at 693)). The Court's citation to *Zadvydas* elucidates the contrast between the petitioner in *Thuraissigiam* and noncitizens who are deemed to "effected an entry." *Zadvydas*, 533 U.S. at 693. Indeed, *Zadvydas* reaffirmed that the Due Process Clause protects those "subject to a final deportation order." *Id*. at 694. Here, class members have final removal orders and are subject to 8 U.S.C. § 1231(a), just like the petitioners in *Zadvydas*. Thus, Defendants' arguments related to *Thuraissigiam* and the expedited removal statute are a "red herring." Supp. App. 13a.

Finally, Defendants cannot meaningfully distinguish the central due process holdings of

---

[15]     In *Mezei*, the Court's decision not to review an exclusion order issued to a man apprehended at the point of entry relied heavily on its conclusion that he was a national security threat. *See* 345 U.S. at 214. The Court explained that admission of someone "barred from entry on security grounds nullifies the very purpose" of the exclusion order. *Id.* at 216. Unlike there, class members not seeking entry or admission; they are seeking protection against torture.

*J.G.G.* and *A.A.R.P.* from this one. Defendants claim that the cases are different because the Alien Enemies Act "provide[s] procedures by statute," and in Defendants' view, many [class members] "lack[] due-process removal rights beyond what Congress provides." Appl. 35 n.10. But Defendants miss that FARRA itself requires Defendants not to remove people to face torture and to provide a process to raise such a claim. *Supra* p. 26. The PI employs existing statutory and regulatory procedures to provide "sufficient time and information [for a noncitizen] to reasonably be able to contact counsel . . . and pursue appropriate relief." *A.A.R.P.*, 145 S. Ct. at 1368. This process is what Congress requires, and due process demands.

## III. Defendants Do Not Demonstrate Irreparable Harm

### A. Complying with the Law Is Not a Cognizable Injury

Here, a stay would place thousands at substantial risk of deportation to third countries where they could face torture or death without the meaningful ability to contest that fate. Defendants face no such comparable injuries; indeed, all the PI requires is compliance with the law when carrying out third country deportations. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992) (discussing "the public interest in Government observance of the Constitution and laws").

Defendants exaggerate the scope of the harm they claim and the extent to which the injunction limits their pursuit of lawful solutions. Their claim that "millions of illegal aliens who have been released back into the United States, notwithstanding a valid order of removal, present an immediate threat to the nation," Appl. 37, is unsupported even by the source Defendants cite, namely Executive Order 14165 (Jan. 20, 2025), which claims, without evidence or specifics, that noncitizens are "routinely released." App. 57a § 5. Moreover, this provision of the Executive Order does not pertain only to those with final removal orders, but also includes those who were not previously detained because there was no reason to detain them and others who are outside

the scope of the PI: people who are not removable to any country (e.g., because they have Temporary Protected Status or a U visa) and people whose removal to a designated country is feasible but has been stayed by DHS because of countervailing equities (e.g. because the noncitizen is the sole caregiver for a disabled U.S. citizen child or parent).

The PI simply requires Defendants to do what the Solicitor General's Office previously has assured this Court was already Defendants' policy. The ten-day notice period Defendants complain of was one the district court ordered only after Defendants rejected the court's invitation to define what *they* would consider meaningful notice, Supp. App. 11a, 74a–75a, and after Defendants, by their own admission, put class members with no connection to South Sudan on a flight to South Sudan on less than 24 hours' notice, *id.* 71a. Defendants' alleged harms stem in large part from their choice to tell noncitizens of their planned removal to a third country at the last minute, as happened in the case of both the Libya and South Sudan flights.

Defendants acknowledge that all the men refused to sign the English-language "Notice of Removal." App. 61a–62a ¶ 10. Given that a noncitizen's signature on this form is an acknowledgment of service, *not* an agreement to be removed, the obvious conclusion was that these men feared being removed to South Sudan and had no understanding of what if anything they could do to stop this. The ten-day notice window the district court imposed is calculated to give noncitizens faced with DHS's increasingly improbable and dangerous choices of third-country destinations a chance to contact counsel or sources of information about the country in question and to present any applicable claim for protection under CAT. Whether removal is delayed beyond that short period turns on whether the noncitizen seeks a reasonable fear interview, and if found not to have a reasonable fear, subsequently files a motion to reopen removal proceedings.

There is a troubling lack of clarity as to whether Defendants even attempted to remove class members to their designated countries of removal, as illustrated by the planned flights to Libya and South Sudan. For example, Mexico is not, and has never been, recalcitrant to accepting the return of its nationals from the United States, yet Mexican nationals were on both the Libya and South Sudan flights. Supp. App. 40a ¶ 1, 41a ¶ 2, 62a ¶¶ 21–22. Defendants shifted their plans for a Burmese class member on the South Sudan flight, informing the court that they were now removing him to Burma less than 24 hours after notifying his counsel of his removal to South Sudan. *Id*. 78a ("The Court: And what we were told is that the position of the Department changed only because he had a lawyer, and then, instead of deporting him to South Sudan, the Department elected to send him to—back to his home country."); *see also* D. Ct. Doc. 125 ¶ 7. Planning to remove these three men to their designated countries of removal at the outset would have been lawful and spared Defendants the need to comply with the injunction.

Defendants acknowledge their CAT obligations in passing, *see* App. 4, but resist giving any meaningful substantive content to those obligations, even as they seek removal of third-country nationals to countries that are the subjects of "Do Not Travel" advisories from the U.S. Department of State. U.S. Dep't of State, South Sudan Travel Advisory (Mar. 8, 2025), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/south-sudan-travel-advisory.html; U.S. Dep't of State, Libya Travel Advisory (Aug. 1, 2024), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/libya-travel-advisory.html. Their quarrel is not with the injunction but with the law itself and, thus, is not something this Court should remedy by means of an emergency stay.

### B.    Defendants' Alleged Foreign Policy and National Security Injuries Are Self-Inflicted and Stem from Their Violations of the Injunction

Defendants seek emergency relief from the consequences of their own actions, actions

which began with violations of the PI. Defendants ask this Court to stay the injunction to address alleged diplomatic and security fall-out from their aborted attempts to deport two groups of class members to Libya and South Sudan, respectively. App. 38–39. Remarkably, Defendants, through a declaration from the Secretary of State, blame the district court for an episode of political unrest in Libya, an unstable country with two warring governments and where, according to the State Department travel advisory issued well before the events at issue in this case, "[o]utbreaks of violence between competing armed groups can occur with little warning." Libya Travel Advisory, *supra* p. 38. Moreover, Secretary Rubio's declaration itself makes clear that it was not the PI that triggered the political conflict he described, but rather the fact of potential third-country removals from the United States becoming publicly known in Libya. App. 71a ¶ 4.

Libya is a country where governmental and non-state actors are notoriously hostile and violent towards migrants. *See* D. Ct. Docs. 89, 90-1. It is hardly surprising that the notion that one of Libya's governments was willing to accept class members with no connection to the region would provoke political and public reactions. In an interconnected world, it was inevitable that this extraordinary scheme would become publicly known, and, in this case, it became publicly known because of Defendants' violation of the PI, not their compliance with it. As for South Sudan, Secretary Rubio's declaration provides no rationale for why Defendants' inability thus far to send non-South Sudanese class members to South Sudan would affect that country's willingness to accept the return of its own nationals, much less its cooperation in any U.S. humanitarian efforts in that country. *See* App. 72a ¶ 5.

It is disingenuous for Defendants to assert that the district court compelled them to keep the class members at a U.S. military base in Djibouti, or "forced the United States to 're-engage the Djiboutians to explain that the mission they had approved had subsequently changed.'" App.

39 (quoting App. 72a ¶ 7). The district court did not force Defendants to keep anyone at a military base in Djibouti. Quite the opposite: it stated only that Defendants are only required to "maintain custody and control" over the class members, Supp. App. 34a, until they afford them the due protections of the PI. Where the class members were held was a matter the district court left to Defendants, who had the option of avoiding diplomatic complications by returning them to detention in the United States or moving them to any other overseas location where they had the logistical and diplomatic capacity to hold them. They reached the decision to keep the group in Djibouti after being given several hours to confer and stated on the record that the present situation was feasible and preferable from their standpoint. Supp. App. 81a ("[ICE Assistant Director]: I know it's possible and the Department can work it out. We've been working on it for the last couple of hours to make sure that we can do it, and it is possible to do it.").

If the alleged harms to the United States' interests from class members' continuing presence in Djibouti are as significant as Defendants claim, they retain the authority to return the individuals to the United States. Accordingly, any harm Defendants are suffering is not irreparable and is capable of reparation by unilateral action on their part. Class members, by contrast, are stranded incommunicado in Djibouti, a country of which they have no knowledge, and en route to another country, South Sudan, where none have ever set foot and which remains engulfed in ongoing and intensifying armed conflict. There is every reason for concern, as the district court found, that if they were left there and somehow survived, it may be impossible for Defendants to get them back. App. 49a–59a; Supp. App. 16a.

## CONCLUSION

The Court should deny Defendants' application.

Respectfully submitted,

Matt Adams
Leila Kang
Aaron Korthuis
Glenda M. Aldana Madrid
NORTHWEST IMMIGRANT
  RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104

Anwen Hughes
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018

Dated: June 4, 2025

Trina Realmuto
  *Counsel of Record*
Kristin Macleod-Ball
Mary Kenney
NATIONAL IMMIGRATION
  LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4447
trina@immigrationlitigation.org