```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                       GREENBELT DIVISION
   _____
3                                        )
   KILMAR ARMANDO ABREGO GARCIA,         )
4                                        )
        Petitioner,                      )
5                                        )Civil Case Number
                vs.                      )8:25-cv-02780-PX
6                                        )
   KRISTI NOEM, et al.,                  )
7                                        )
        Respondents.                     )
8  _____)

9              TRANSCRIPT OF EVIDENTIARY HEARING
                BEFORE THE HONORABLE PAULA XINIS
10            UNITED STATES DISTRICT COURT JUDGE
           THURSDAY, NOVEMBER 20, 2025, AT 11:45 A.M.
11
   APPEARANCES:
12 On Behalf of the Petitioner:

13      BY:  ANDREW ROSSMAN, ESQUIRE
             SASCHA RAND, ESQUIRE
14           MORGAN ANASTASIO, ESQUIRE
             COURTNEY DAUKAS, ESQUIRE
15      QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
        295 5th Avenue
16      New York, NY  10016
        (212)849-7000
17
        BY:  JONATHAN COOPER, ESQUIRE
18           OLIVIA HORTON, ESQUIRE
             NITHYA PATHALAM, ESQUIRE
19      QUINN, EMANUEL, URQUHART & SULLIVAN, LLC
        1300 I Street NW
20      Suite 900
        Washington, DC  20005
21      (617)712-7165

22      BY:  SIMON SANDOVAL-MOSHENBERG, ESQUIRE
        MURRAY OSORIO
23      4103 Chain Bridge Road, Suite 300
        Fairfax, VA  22030
24      (434)218-9376

25      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
1   APPEARANCES CONTINUED:

2   On Behalf of the Respondents:

3       BY:  JONATHAN GUYNN, ESQUIRE
             DREW ENSIGN, ESQUIRE
4       DEPUTY ASSISTANT ATTORNEY GENERAL
        CIVIL DIVISION, DEPARTMENT OF JUSTICE
5       950 Pennsylvania Avenue NW
        Washington, DC  20530
6       (202)353-0261

7       BY:  ERNESTO H. MOLINA, JR., ESQUIRE
        OFFICE OF IMMIGRATION LITIGATION
8       P.O. Box 878
        Ben Franklin Station
9       Washington, DC  20044
        (202)616-9344
10
        BY:  SHANE A. YOUNG, ESQUIRE
11      CIVIL DIVISION, DISTRICT COURT SECTION
        DEPARTMENT OF JUSTICE
12      P.O. Box 868
        Ben Franklin Station
13      Washington, DC  20044
        (503)891-8344
14

15      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    RESPONDENT WITNESSES:                          PAGE

3    TESTIMONY OF JOHNATHAN CANTÚ

4         Direct by Mr. Guynn                        15
          Cross by Mr. Rand                          30
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2        (Court called to order.)

 3             DEPUTY CLERK:  All rise.  The United States District

 4   Court for the District of Maryland is now in session.  The

 5   Honorable Paula Xinis presiding.

 6             THE COURT:  Good morning, everyone.  You all can have

 7   a seat.

 8        Mr. Ulander?

 9             DEPUTY CLERK:  Yes, Your Honor.  The matter now

10   pending before the Court is Civil Action Number PX25-2780,

11   Kilmar Armando Abrego Garcia v. Secretary Kristi Noem, et al.

12   The matter comes before this Court for a motions hearing.

13        Counsel, please identify yourselves for the record.

14             MR. ROSSMAN:  Good morning, Your Honor.  Andrew

15   Rossman for petitioner Kilmar Abrego Garcia.

16             MR. SANDOVAL-MOSHENBERG:  Good morning, Your Honor.

17   Simon Sandoval-Moshenberg for petitioner.

18             MR. COOPER:  Good morning, Your Honor.  Jonathan

19   Cooper for petitioner.

20             MR. ROSSMAN:  Good morning, Your Honor.  Sascha Rand

21   for petitioner.

22             MS. HORTON:  Good morning.  Olivia Horton for

23   petitioner.

24             MS. DAUKAS:  Good morning, Your Honor.  Courtney

25   Daukas for petitioner.
```

1          **MS. ANASTASIO:**  Good morning.  Morgan Anastasio, also

2     for petitioner.

3          **MS. PATHALAM:**  And good morning, Your Honor.  Nithya

4     Pathalam, also for petitioner.

5          **THE COURT:**  Okay.  Good morning.

6          **MR. GUYNN:**  Good morning, Your Honor.  Jonathan Guynn

7     on behalf of the respondents.

8          **MR. ENSIGN:**  Good morning, Your Honor.  Drew Ensign

9     on behalf of the United States.

10          **MR. MOLINA:**  Good morning, Your Honor.  Ernesto

11     Molina on behalf of the respondents.

12          **MR. YOUNG:**  Good morning, Your Honor.  Shane Young on

13     behalf of the respondents.

14          **THE COURT:**  And who else is with us at counsel table?

15          **MR. GUYNN:**  This is -- this is Mr. Jonathan --

16          **MR. CANTÚ:**  Good morning, Your Honor.  Jonathan

17     Cantú, ERO.

18          **THE COURT:**  Hi, Mr. Cantú.  Good to see you.  And

19     thank you for being here today.

20          Okay.  Counsel, what I'd like to do -- first, I want to

21     welcome everyone here again.  I expect that this is probably

22     going to be the last hearing, barring unforeseen circumstances,

23     on the petition for habeas corpus and the motion to dissolve.

24     We have a lot to do today.

25          The order of operations is going to be the following:

 1      There's a number of outstanding motions to seal that I

 2 think we can actually take care of pretty quickly, and that

 3 will guide the rest of today in terms of how we break it up.

 4      So I'd like to do that first as much we can in open court.

 5 And to the extent we can't, you can approach the bench, and

 6 we'll deal with any remaining argument.

 7      Then we'll have Mr. Cantú's testimony, and we'll break it

 8 up as we have in the past, the open-record testimony as well as

 9 the -- followed by any under-seal testimony, if necessary.

10      And then there will be argument.  We'll start argument

11 with regard to the petition first and all counts of the

12 petition.  And then I'll turn to the motion to dissolve.

13      Any question about that?

14           **MR. ROSSMAN:**  No, Your Honor.

15           **THE COURT:**  All right.  So the motions to seal that I

16 think are most relevant to today's conversation is ECF 74, 76,

17 and 83.

18      I resolved 86 yesterday, which is I'm going to, at least

19 for now, remain -- have Exhibits T and U of ECF 85 remain under

20 seal.

21      ECF 85 has now been refiled unredacted at ECF 98.  And I

22 find those redactions to be appropriate.  They're very, very

23 minor, and they're really consistent with some other, I think,

24 heated issues on what is to remain sealed or unsealed.  So I

25 find that appropriate.

1    I don't think there's anything more for me to do at this

2    juncture on ECF 86.

3    ECF 74, I suppose I'd turn to -- well, you're sort of both

4    using these documents, if I'm getting it right.  And in taking

5    a look at them, I see no -- well, it seems like sealing is

6    warranted for those documents, but -- so I wanted to ask if

7    there's any objection or any concern about having the exhibits

8    that are referenced in ECF 74 remain sealed.

9    And I can give you what -- maybe I have the -- whose

10   motion it is messed up.  But, in any event, I can give you the

11   short titles of each and then ask if there's any objection to

12   have them remain sealed.

13   And they are the -- DHS's determination concerning the

14   Republic of Liberia's diplomatic assurances, Secretary

15   Rubio's -- and that's ECF -- Exhibit A to ECF 74.  Secretary of

16   State Rubio's letter at Exhibit B.  The diplomatic notes at

17   Exhibit C.  A press -- I don't see why a press release from the

18   Republic of Liberia would be sealed.  That's Exhibit D; so

19   perhaps that's unsealed.

20        **MR. MOLINA:**  Your Honor, just for clarification, the

21   government submitted that not under seal.

22        **THE COURT:**  D?

23        **MR. MOLINA:**  D.  So that one was submitted not under

24   seal; so that should be --

25        **THE COURT:**  Very good.  Then I can cross that out.

1          F is the third-country screening notice.

2          G is the government's worksheet with regard to

3     third-country screening.

4          And H are interview notes for the same screening.

5          And I assume that those three, in part, were sealed

6     because of sensitive personal information.  So maybe they're

7     oversealed.  Maybe some of it can be redacted.

8          But does anyone right now object to those documents

9     remaining sealed?

10          **MR. ROSSMAN:**  Just as a practical matter, we're not

11     going to fight the sealing, Your Honor.  I just want Your Honor

12     to understand we filed a motion -- sorry -- I'm leaning over.

13          But we filed a motion as a protective matter because we

14     understood the government was asserting some rights there.  We

15     don't think any of it needs to be sealed.  But for purposes of

16     today, we're not going to make a fuss about that.

17          So we're content to have it stay under seal, although I'm

18     not sure that any of it actually meets the standards.

19          **THE COURT:**  So this is where I am with much of what

20     happens in these sealing situations is that they're oversealed.

21     They're often oversealed.

22          And I would say that, certainly with regard to the

23     third-country worksheets and the screening sheets, I think

24     there's a way to have those meet the public eye and redact any

25     sensitive personal information that really meets the sealing

1  requirements.

2       I would likewise say the same, I think, with regard to

3  some of the assurance exhibits.  But I -- I note that -- also

4  that it's sensitive, that when you have diplomatic notes or the

5  Secretary of State offering a letter with respect to diplomatic

6  assurances, it's not something that I'm going to get out there

7  and do willy-nilly.

8       But I did want to raise it because I'm sure the fact or

9  the existence, perhaps the timing, will come up today.  And

10  without -- you know, I would assume we speak freely in open

11  court about the existence -- the fact of -- the fact that there

12  are these documents without there being great heartburn about

13  doing so.

14       Government?

15           MR. ENSIGN:  That's acceptable from the government.

16  Essentially, the bottom-line conclusion of the documents, I

17  think we can refer to in open court.  To the extent it would go

18  into the details or the contents of them, that would be a

19  different matter.

20           THE COURT:  Okay.  So let's do this:  At least for

21  purposes of today, we'll call -- ECF 74, I'm going to take it

22  sort of more particularly under advisement; but I'm ultimately

23  going to grant it in part and deny it in part.

24       And I'm going to ask you all at some point to go back to

25  the drawing board and figure out whether there is, in your

```
 1  view, an unredacted version that can be put on the public

 2  document to -- to just reduce the level of dispute that has to

 3  occur and the level of work that has to be done by the Court

 4  because there does seem to be sufficient public information

 5  that can be shared with the public that doesn't impinge on --

 6  on privileges that the government has raised in the past.

 7        MR. GUYNN:  Your Honor, that's -- those points are

 8  very well taken.  I'll just say that, in addition to what

 9  Mr. Rossman said, I think you're correct to point out some of

10  the information is petitioner's personal identifying

11  information about his background.

12        THE COURT:  Right, right.

13        MR. GUYNN:  That's information we think that they

14  would have an interest in at least having it sealed or being

15  part of that conversation.  So we can meet and confer with the

16  petitioner, Your Honor.

17        THE COURT:  That would be -- at least as to the

18  screening notices, there is -- I think there's personal

19  information in there.

20        MR. ROSSMAN:  Yeah, I think there's a very modest

21  amount of information that could be easily redacted.  And we're

22  happy to work with the government on that, Your Honor.

23        THE COURT:  Okay.  That's great.  So that's 74.

24     76, I think, is perhaps more -- well, one, it's -- it's

25  duplicative, right?  76 has a number of the same documents
```

1   as --

2               MR. MOLINA:  Yes, Your Honor.

3               THE COURT:  -- 74?

4               MR. MOLINA:  Yes.

5               THE COURT:  I think the one document that is not in

6   74 is Mr. Cantú's declaration.

7               MR. MOLINA:  That is correct, Your Honor.

8               THE COURT:  Okay.  I'll tell you my -- my provisional

9   thought on that is I'm going to unseal it because I don't see

10  any of the information that Mr. Cantú shared as privileged in

11  and of itself.

12      It may reference the existence of privileged information

13  that may affect the questions that may be put to Mr. Cantú in

14  open court, but the affidavit or the declaration itself doesn't

15  appear to include any privileged information.

16      So I'm sensitive to the -- because I did grant the

17  petitioner the evidentiary hearing that petitioner requested,

18  that there's likely to be public information today that

19  Mr. Cantú can offer, and then under-seal information.

20      But as to the declaration itself, respondents, do you

21  persist in the sealing?  And --

22              MR. MOLINA:  I'm sorry.  I think -- we've conferred,

23  and I think that we're okay with the unsealing of the document.

24              THE COURT:  Okay.  So then I'm going to -- let me

25  make sure.  I'm taking 76 under advisement with regard to --

1   for the same reasons we've discussed.  But I am denying the

2   motion as to ECF 75-6, which is Exhibit S.  And that document

3   shall be unsealed on the public record.

4      Likewise, as to 83, which is the interim motion to seal

5   the letter motion to strike, I'm going to deny that as moot.

6   The unredacted version can be filed because the only part that

7   was redacted was Mr. Cantú's -- the quote from his declaration.

8      So that takes care of 83 in total, and most importantly, I

9   think it frees us up a bit to proceed with Mr. Cantú's

10   testimony in a way where there will be a public --

11      I'm sorry.  Yeah.

12      **MR. RAND:**  I'm sorry, Your Honor, to interrupt.  One

13   note of clarification.  If the declaration is coming unsealed,

14   on the top of respondent's -- the government's opposition

15   motion on page 7 -- it's Docket 85 -- there's one line of

16   redaction that should come out, we believe.

17      **THE COURT:**  Okay.  And that is because it's a direct

18   quote from the declaration that I've now unsealed?

19      **MR. RAND:**  I don't want to characterize what I think

20   it is, but it relates to the declaration.  It makes an

21   assertion.  It should be unsealed.  There's nothing --

22      **MR. MOLINA:**  Your Honor, I think I know the line.

23   And that was sealed just as a precaution.  I think, with the

24   unsealing of the -- of Exhibit S, that line that I'm thinking

25   of can come undone.  I believe it's -- we can do --

1          **THE COURT:**  So perhaps --

2          **MR. MOLINA:**  We can check that just real quickly,

3    Your Honor.

4          **THE COURT:**  Sure.  And maybe what you can do is check

5    it.  And then, during one of the breaks, meet and confer.  If

6    you agree with petitioner on that, Mr. Ulander, is it possible

7    just to get the unredacted swapped out -- the unredacted page?

8    So, in other words -- because we have the unredacted

9    memorandum.

10          **DEPUTY CLERK:**  We would be able to attach it to the

11    same ECF entry as a dash 1, and we would be able to lock the

12    initial document so it wouldn't be viewed.  But they would both

13    be on the docket; one would just not be accessible.

14          **THE COURT:**  So then I guess it's up to -- it may make

15    more sense to -- I hate to have another ECF entry now -- 99, I

16    suppose it's going to be -- of the same memorandum.

17          But it may be easier to figure out what, if anything,

18    in -- in the responsive memorandum now needs to remain sealed.

19    And if nothing, then -- or what you've just filed, file a new

20    version.  Does that make sense?

21          **MR. MOLINA:**  Yes, Your Honor, that makes sense.  And

22    that's a minimal inconvenience.

23          **THE COURT:**  Okay.  That's great.  I appreciate that.

24    Okay.

25          Anything else before Mr. Cantú is sworn in for the

1  parties?

2        **MR. ROSSMAN:**  No, Your Honor.

3        **THE COURT:**  Okay.  I have one quick question for you

4  all.

5        Are respondents going to examine Mr. Cantú, or is

6  Mr. Cantú being made available for the petitioner's

7  examination?

8        **MR. GUYNN:**  Your Honor, we're planning to do a very

9  quick direct.  And I think it will be especially quick now that

10  the declaration has been unsealed.  And that will help us move

11  things along very, very quickly.

12        **THE COURT:**  Okay.  Great.

13        Mr. Cantú, if you would approach Mr. Ulander, I'd

14  appreciate it.

15        **THE WITNESS:**  Absolutely.

16                        **JOHN EDWARD CANTÚ**

17  having been first duly sworn, was examined and testified as

18  follows:

19        **THE WITNESS:**  I do.

20        **DEPUTY CLERK:**  Thank you.  You may be seated.

21        Please speak loudly, closely, and clearly into the

22  microphone.  State your full name for the record, and spell

23  both your first and last name.

24        **THE WITNESS:**  Good afternoon.  John Edward Cantú,

25  J-O-H-N -- middle or last name?

*DIRECT OF JOHN EDWARD CANTÚ BY MR. GUYNN*

1    **DEPUTY CLERK:**  Just first and last.

2    **THE WITNESS:**  C-A-N-T-Ú.

3    **DEPUTY CLERK:**  Thank you.

4                    **DIRECT EXAMINATION**

5    **BY MR. GUYNN:**

6    **Q.**   Good morning, Mr. Cantú.

7    **A.**   Good morning.

8    **Q.**   Where are you currently employed?

9    **A.**   U.S. Immigration -- U.S. Immigration and Customs

10   Enforcement, Enforcement and Removal Operations.

11   **Q.**   What position do you currently hold with -- with

12   Enforcement Removal Operations?

13   **A.**   I'm currently the acting assistant director for the

14   removal division.

15   **Q.**   Okay.  In your work, Mr. Cantú, to what does the acronym

16   I-C-E or ICE refer?

17   **A.**   It stands for Immigration and Customs Enforcement.

18   **Q.**   So if, during your testimony, I refer to ICE, will you

19   understand that I'm referring to Immigration and Customs

20   Enforcement?

21   **A.**   Yes, sir.

22   **Q.**   To what does the acronym ERO refer?

23   **A.**   Enforcement and Removal Operations.

24   **Q.**   So if, during your testimony, I refer to ERO, will you

25   understand that I'm referring to Enforcement and Removal

*DIRECT OF JOHN EDWARD CANTÚ BY MR. GUYNN*

1   Operations?

2   **A.**   Yes, sir.

3   **Q.**   How long have you been serving as an acting assistant

4   director for ERO?

5   **A.**   Roughly three and a half weeks.

6   **Q.**   And what are your responsibilities in that role?

7   **A.**   I serve in support of the removal operations that ERO does

8   throughout the country.  I coordinate with our 25 field offices

9   to make sure that we are conducting our removals as quickly and

10  as efficiently as possible once the case has arrived to final

11  order status.

12  **Q.**   How long have you worked for the federal government?

13  **A.**   Since 1997.

14  **Q.**   When you joined in 1997, were you working for the agency's

15  predecessor entity, Immigration and Naturalization Services?

16  **A.**   Yes, sir, I was.

17  **Q.**   Can you just give us a sketch of the roles and, like, the

18  rough timelines that you -- in your federal service from when

19  you joined in 1997 until the present day?

20  **A.**   Sure.  August 1997, law enforcement communications

21  assistant, U.S. Border Patrol, McAllen sector.

22      Roughly 2000, United States Customs Service customs

23  inspector, Hidalgo, Texas.

24      Subsequently, 2002 detention enforcement officer,

25  Immigration and Naturalization Service, Tucson sector, U.S.

 1  Border Patrol.

 2      May 2010, deportation officer, Eloy Detention Center.

 3      I believe it was December 2013, assistant field office

 4  director, Eloy Detention Center.

 5      And then October 2017, officer in charge, Florence

 6  Detention Center.

 7      I also had a tour at headquarters in 2019 as the acting

 8  special -- I'm sorry -- deputy assistant director over the

 9  special operations division.

10      And then in January 2021, I was the acting field office

11  director for the field office of Los Angeles ERO.

12      And then in May of 2021, I assumed the role as field

13  office director for Phoenix ERO.

14  **Q.**  Okay.  Mr. Cantú, in the context of your employment with

15  ERO, under what conditions are aliens sometimes removed to a

16  third country rather than their country of origin?

17  **A.**  We seek third-country removals when an immigration judge

18  has determined after proceedings that the subject of the case

19  is not able to return to his or her country.

20      There's also cases where the receiving or the home

21  countries will not accept their citizenship -- or their

22  citizens, I should say.

23  **Q.**  So in one of those situations, Mr. Cantú, how does ERO

24  identify a third country when it's attempting to remove an

25  alien to a third country?

*DIRECT OF JOHN EDWARD CANTÚ BY MR. GUYNN*

1  **A.**   We work with the Department of State to identify those

2  countries.

3  **Q.**   And which federal agency actually identifies the third

4  country for removal?

5  **A.**   The Department of State.

6  **Q.**   Which federal agency handles discussions with foreign

7  nations to negotiate third-country removal agreements?

8  **A.**   That would be the Department of State.

9  **Q.**   Do you work for the Department of State?

10 **A.**   No, sir, I don't.

11 **Q.**   Mr. Cantú, what is Mr. Abrego Garcia's immigration status?

12 **A.**   Presently, he has a final order of removal, with

13 withholding of removal, to El Salvador.

14 **Q.**   Okay.

15        **MR. GUYNN:**  Your Honor, I'm going to mark a document

16 as Government Exhibit 1.

17     May I approach?

18        **THE COURT:**  Have you shown Mr. Rand the document?

19        **MR. GUYNN:**  Yes.

20        **THE COURT:**  Let's make sure there's no objection.

21        **MR. GUYNN:**  This is the declaration.

22        **THE COURT:**  What's that?

23        **MR. GUYNN:**  It's his declaration.

24        **THE COURT:**  Great.  Okay.  Yeah, I'm assuming there's

25 no objection.  It's in.

1          **THE WITNESS:**  Thank you.

2          **THE COURT:**  Thank you.

3   **BY MR. GUYNN:**

4   **Q.**   Mr. Cantú, do you recognize this document?

5   **A.**   Yes, sir.

6   **Q.**   What is it?

7   **A.**   This is the declaration that I submitted to the Court.

8   **Q.**   Did you prepare this declaration in consultation with DHS

9   and ICE lawyers?

10  **A.**   Yes, sir, I did.

11  **Q.**   Did you sign this declaration?

12  **A.**   Yes, sir, I did.

13  **Q.**   Is it your declaration?

14  **A.**   Yes, sir, it is.

15  **Q.**   What country has ERO identified as Mr. Abrego Garcia's

16  country of removal?

17  **A.**   That would be Liberia.

18  **Q.**   How did ERO identify Liberia as Mr. Abrego Garcia's

19  country of removal?

20          **MR. RAND:**  Objection.  Foundation.

21          **THE COURT:**  Can you lay the foundation?

22  **BY MR. GUYNN:**

23  **Q.**   Do you know how ERO identified Liberia as Mr. Abrego

24  Garcia's country of removal?

25  **A.**   I was told by the Department of State that Liberia was the

1    country for removal.

2    **Q.**    To the extent you know, has the Department of State shared

3    any documents with ERO regarding the viability of removing

4    Mr. Abrego Garcia to Liberia?

5    **A.**    Yes.

6    **Q.**    What documents are those?

7    **A.**    I received an e-mail from a state department attorney

8    outlining the basis for those assurances that Liberia would be

9    the country of removal.

10    **Q.**    And have you reviewed documents that contained those

11    assurances?

12    **A.**    Yes, sir.

13    **Q.**    Okay.  What is your understanding of assurances, if any,

14    that Liberia has provided to the United States regarding how

15    third-country nationals will be treated if they're removed from

16    the United States to Liberia?

17    **A.**    They have provided the Department of State assurances that

18    they will not torture, prosecute, and that they will abide by

19    all of the international laws and conventions that they are

20    sworn to.

21    **Q.**    I think I heard you say "prosecute."  Is that your

22    understanding of what their assurance is?

23    **A.**    Yes, sir.

24    **Q.**    Not persecute?

25    **A.**    I'm sorry.  You're correct.  It's persecute.

*DIRECT OF JOHN EDWARD CANTÚ BY MR. GUYNN*

1           It's persecute, torture, and they will abide by the

2   laws -- the international laws and the conventions that they

3   have signed on to.

4   **Q.**   What, if any, is your understanding of whether the

5   Department of State has assessed those assurances from Liberia?

6   **A.**   It's my understanding that they have assessed those to be

7   credible.

8   **Q.**   What is your understanding of assurances, if any, that

9   Liberia has provided to the United States specifically with

10  regards to Mr. Abrego Garcia and how he will be treated if he's

11  removed from the United States to Liberia?

12              **MR. RAND:**  Objection.  Foundation.

13              **MR. GUYNN:**  He said that he's reviewed the documents.

14              **THE COURT:**  Do you know?  Do you know?  Do you know

15  what assurances, if any, have been provided regarding

16  Mr. Abrego Garcia by the Department of State?

17              **THE WITNESS:**  Yes, ma'am.

18              **THE COURT:**  How do you know that?

19              **THE WITNESS:**  I saw it -- I saw it in a diplomatic

20  note.

21              **THE COURT:**  Okay.  All right.

22              **THE WITNESS:**  Sorry.

23              **THE COURT:**  No, that's okay.  The existence, I think,

24  is not a problem; it's the --

25

1    **BY MR. GUYNN:**

2    **Q.**    At a high level, what, if any, is your understanding of

3    those assurances that were provided?

4    **A.**    So my understanding are that they have assured the State

5    Department of the United States that they will not persecute,

6    they will not torture, nor will they refoule Mr. Abrego Garcia

7    to El Salvador.

8    **Q.**    If the Court and --

9          **MR. GUYNN:**    Your Honor, can I approach before I ask

10    my next question?

11          **THE COURT:**    Sure.  Yep.  Let's go under seal.

12        (A bench conference was held on the record as detailed

13    below:)

14    **The following proceedings are SEALED by order of the Court****

15

16

17

18

19

20

21

22

23

24

25

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12      (The bench conference concluded and proceedings resumed as

13  follows:)

14      ***THIS ENDS THE SEALED PORTION OF THE TRANSCRIPT***

15  BY MR. GUYNN:

16  **Q.**   Mr. Cantú, if ERO had a green light to remove Mr. Abrego

17  Garcia from the United States, what is its plan for removing

18  him from the United States?

19  **A.**   We would -- we would schedule a commercial airline flight

20  to Liberia or -- and/or a charter via ICE Air.

21  **Q.**   And I'm sorry if I missed it, but to where would those

22  flights be chartered -- would they be headed?

23  **A.**   To Liberia.

24  **Q.**   All right.  Mr. Cantú, would you please refer to the

25  document that's in front of you as Government Exhibit 1.

*DIRECT OF JOHN EDWARD CANTÚ BY MR. GUYNN*

 1    Would you please turn to the second page that says

 2  paragraph 4.  I'm just going to read that to you.

 3    "As part of this process, I have been in communication

 4  with U.S. Department of State personnel regarding petitioner's

 5  removal from the United States.  During" --

 6         **DEPUTY CLERK:**  Mr. Guynn, could you read a little

 7  slower?

 8         **MR. GUYNN:**  Sure.

 9  **BY MR. GUYNN:**

10  **Q.**  "During these communications, I have learned that, on

11  August 21st, 2025, following sensitive discussions at senior

12  levels between the government of Costa Rica and the Department

13  of State, the government of Costa Rica provided written

14  assurances as to its willingness to receive the transfer of

15  Mr. Abrego Garcia from the United States to Costa Rica.

16    "I was advised that those assurances were nonbinding and

17  were extended based on certain understandings and contingencies

18  not reflected in the assurances themselves."

19    Did I read that correctly?

20  **A.**  Yes, sir.

21  **Q.**  So regarding paragraph 4 and regarding the substance of

22  your declaration, with which Department of State personnel did

23  you communicate regarding the substance of your declaration?

24  **A.**  That would be a Department of State attorney.

25  **Q.**  Who else, if anyone, did you communicate with at the

1   Department of State regarding your declaration?

2   **A.**   No one else.

3   **Q.**   What's your understanding, if any, of the ultimate source

4   of the information that you received from the Department of

5   State attorney?

6           **MR. RAND:**  Objection.  Foundation.

7           **THE COURT:**  Do you know the original source of the

8   information of paragraph 4?

9       Do you understand my question?

10          **THE WITNESS:**  I do not, Your Honor.  I'm sorry.

11          **MR. GUYNN:**  I can try to ask it differently.

12          **THE COURT:**  Thank you.

13  **BY MR. GUYNN:**

14  **Q.**   Do you know -- do you know where the Department of State

15  lawyer got the information that he conveyed to you that's now

16  contained in paragraph 4?

17          **THE WITNESS:**  Oh, yes, Your Honor, I do know that.

18          **THE COURT:**  Okay.  Go ahead.

19          **THE WITNESS:**  Department -- I'm sorry -- the Deputy

20  Secretary of State, U.S. Department of State.

21          **THE COURT:**  And how do you know that?

22          **THE WITNESS:**  I believe the attorney told me that in

23  a verbal conversation, if I recall.

24          **THE COURT:**  Thank you.

25

1   **BY MR. GUYNN:**

2   **Q.**   Did you participate in discussions with Costa Rica

3   alongside the Department of State representatives?

4   **A.**   No, sir.

5   **Q.**   So if you look at paragraph 4, if you look at the final

6   sentence, do you see where it says the words "certain

7   understandings"?

8       So paragraph 4, final sentence, do you see where it says

9   the word -- the words "certain understandings"?

10  **A.**   I found it.

11      Yes, I do.  I see it.

12  **Q.**   What are the certain understandings referenced in the last

13  sentence?

14  **A.**   I don't know.

15  **Q.**   Later in that sentence, you see where it uses the word

16  "contingencies"?

17  **A.**   Yes, sir, I do.

18  **Q.**   What are the contingencies referenced in the last

19  sentence?

20  **A.**   I do not know.

21  **Q.**   All right.  Take a look at paragraph 5.  I'm going to read

22  that as well, and I'll read it slowly.

23      "Several months have passed since those assurances were

24  provided.  And due to interim developments, the Department of

25  State assesses that the government of Costa Rica would not

*DIRECT OF JOHN EDWARD CANTÚ BY MR. GUYNN*

1   accept the transfer of Mr. Abrego Garcia to Costa Rica at this

2   time without further negotiations and likely additional

3   commitments by the United States."

4        Did I read that correctly?

5   **A.**   Yes, sir.

6   **Q.**   So if you take a look in that sentence going from the

7   first line to the second, do you see where it uses the words

8   "interim developments"?

9   **A.**   Yes, sir.

10  **Q.**   What are the interim developments referenced in

11  paragraph 5?

12  **A.**   I don't know.

13  **Q.**   Why does the Department of State believe that Costa Rica

14  would not --

15            **THE COURT:**   Can I ask a question first?

16        Did you write this, Mr. Cantú?  Did you write this

17  declaration?

18            **THE WITNESS:**   I did write it, yes, with the help of

19  counsel.

20            **THE COURT:**   With the help of counsel.  I mean, these

21  words that were selected, were they your words or were they

22  somebody else's words?

23            **THE WITNESS:**   They were in a document that I was

24  given by this attorney from U.S. Department of State.

25            **THE COURT:**   That e-mail that you referenced?

 1            THE WITNESS:  (Nods head.)

 2            THE COURT:  Yes?

 3            THE WITNESS:  Yes, ma'am.

 4            THE COURT:  You have to say yes or no for the court

 5    reporter's sake.

 6            THE WITNESS:  Yes.  Sorry.

 7            THE COURT:  So today when you're saying you don't

 8    know what the words mean, is it because it was taken from this

 9    e-mail and put in this declaration without any further work?

10            THE WITNESS:  There was no further discussion; it was

11    just relayed to me and --

12            THE COURT:  Okay.

13            THE WITNESS:  -- meeting over.

14            THE COURT:  All right.

15       Go ahead, Mr. Guynn.

16    BY MR. GUYNN:

17    Q.   Why does the Department of State believe that Costa Rica

18    would not accept Mr. Abrego Garcia without further negotiations

19    and commitments by the United States?

20            MR. RAND:  Objection, Your Honor.  No foundation.

21    Double hearsay.  I could go on.

22            THE COURT:  Right.  Sustained.  I'm not sure --

23    BY MR. GUYNN:

24    Q.   Mr. Cantú, you said "I don't know" in response to a few of

25    my questions.  Who knows these details about the U.S.'s

1  negotiations with Costa Rica?

2  **A.**    The Department of State.

3          **THE COURT:**  Do you know any particular person who may

4  know, or is your contact that attorney that you referenced?

5          **THE WITNESS:**  It would be the attorney, Your Honor.

6          **THE COURT:**  Do you have the name of that person?

7          **THE WITNESS:**  If my recollection is correct, it's

8  Carl Anderson.

9          **THE COURT:**  Okay.  Thank you.

10          **THE WITNESS:**  Yes, ma'am.

11  **BY MR. GUYNN:**

12  **Q.**    All right.  So looking at paragraph 6, "Department of

13  State personnel have advised that the Republic of Liberia is at

14  present the only state willing to accept Mr. Abrego Garcia

15  without further negotiations and additional commitments from

16  the United States."

17      Did I read that correctly?

18  **A.**    Yes, sir.

19  **Q.**    Is that what the Department of State told you that it

20  believed?

21  **A.**    That is what they said.

22  **Q.**    If ERO got the green light to remove Mr. Abrego Garcia

23  from the United States, what has the Department of State told

24  you about the viability of removing Mr. Abrego Garcia from the

25  United States to Costa Rica?

1   **A.**   That it's not an option at the -- at the moment.

2            **MR. GUYNN:**  No further questions.

3            **THE COURT:**  Okay.

4        Mr. Rand?

5            **MR. RAND:**  Your Honor, with the Court's permission?

6            **THE COURT:**  Sure.

7            **MR. RAND:**  Thank you.

8                         **CROSS-EXAMINATION**

9   BY MR. RAND:

10  **Q.**   Good afternoon, Mr. Cantú.  How are you?

11  **A.**   Good.  Good afternoon.

12  **Q.**   A couple of preliminary questions for you.

13       On direct you testified about a final order of removal.

14       Do you recall that?

15  **A.**   Yes, sir.

16  **Q.**   Based upon your many years of experience you described to

17  us, you know what a final order of removal looks like, right,

18  sir?

19  **A.**   I do.

20  **Q.**   And have you seen a final order of removal in regard to

21  Mr. Abrego Garcia?

22  **A.**   I have not.

23  **Q.**   Okay.  How do you know a final order of removal exists,

24  then?

25  **A.**   Because that was what was discussed in our prep.  And I

 1  believe -- I believe there was a mention of that in Secretary

 2  Noem's memo.

 3  **Q.**    Okay.  So your belief that there's a final order of

 4  removal is based upon representations made to you by counsel

 5  and a line in Secretary Noem's memorandum?

 6              **MR. GUYNN:**  Objection, Your Honor.

 7              **THE COURT:**  Well, that --

 8              **MR. GUYNN:**  I would move to -- I would move to strike

 9  his reference to attorney-client information.  And then Mr. --

10  and then I would object to Mr. Rand's attempt to repeat and

11  reinforce it.

12              **THE COURT:**  No, I think he's trying to clarify it.

13  Maybe I can do it really simply.

14      Mr. Cantú, when you say that there is a final order of

15  removal, are you basing that, one, on the conversation you

16  had -- or the exchange you had with the attorney for the

17  Department of State?  Is that where you're saying it comes

18  from?

19              **THE WITNESS:**  No, not the Department of State.

20              **THE COURT:**  I'm sorry.  Where does it come from?

21              **THE WITNESS:**  Counsel.

22              **THE COURT:**  Oh, counsel sitting at counsel table.

23              **THE WITNESS:**  Yes, ma'am.

24              **THE COURT:**  Counsel told you.

25              **THE WITNESS:**  Yes, ma'am.

1          THE COURT:  Okay.  That's one place.  And then the

2  other is the letter authored by Secretary Noem?

3          THE WITNESS:  If my memory serves me correct, I

4  thought I read a line in there stating that.

5          THE COURT:  Understood.  Anywhere else?

6          THE WITNESS:  No, ma'am.

7          THE COURT:  Okay.  Very good.  Thanks.

8  BY MR. RAND:

9  Q.   Now, Mr. Anderson was the Department of State attorney

10  that you spoke to?

11  A.   Yes, sir.

12  Q.   And you spoke to Mr. Anderson on or around November 6th,

13  you figure?

14       The declaration, I'll remind you, was signed by you

15  electronically on November 7th.

16  A.   I think the meeting actually occurred on the 7th.  Would

17  that --

18  Q.   I'm sorry.  Please.

19  A.   Was that a Friday?

20  Q.   Yes, it is, sir.

21  A.   I believe the meeting occurred on a Friday, which would

22  have been the 7th.

23  Q.   So you were in person with Mr. Anderson?

24  A.   No, sir, it was a Teams.

25  Q.   It was a Teams meeting Mr. Anderson was on with you,

1  correct?

2  **A.**    Yes, sir.  Correct.

3  **Q.**    How long did this Teams meeting last?

4  **A.**    I would say it was no more than five minutes.

5  **Q.**    Did you ask any questions during this Teams meeting?

6  **A.**    No, sir.

7  **Q.**    So Mr. Anderson just told you some things during these

8  five minutes -- this five-minute Teams meeting, correct?

9  **A.**    Correct.

10 **Q.**    Then Mr. Anderson sent you an e-mail that attached a draft

11 declaration for you to consider and sign, fair?

12 **A.**    I'm sorry.  Who sent me the e-mail?

13 **Q.**    Mr. Anderson.  Did he send you an e-mail with a draft

14 declaration?

15 **A.**    No, sir, he did not.

16 **Q.**    Where did you -- you referred in your direct to an e-mail

17 you received from somebody at the Department of State.  Who was

18 that?

19 **A.**    Mr. Anderson sent me -- what he told me on the meeting via

20 Teams, he sent me an e-mail with that verbiage.  So there was

21 no declaration; it was just a message.

22 **Q.**    And the message was shared with you during the Teams?

23 **A.**    I believe it was at the same time.

24 **Q.**    Was it by e-mail, or was it in the Teams chat?

25 **A.**    I believe it was e-mail, sir.

1  **Q.**   So you received an e-mail during the Teams five-minute

2  meeting from Mr. Anderson including the verbiage of what he

3  wanted you to put into a declaration, fair?

4  **A.**   Well, he gave me the verbiage that came from the Deputy

5  Secretary, which then is part of my declaration that I wrote.

6  **Q.**   Okay.  And the language that he provided to you, is that

7  the language that is set forth in paragraphs 3, 4, and 5, and 6

8  of the declaration you have in front of you that is Government

9  Exhibit 1?

10        **MR. GUYNN:**  Objection, Your Honor.  Attorney-client

11  and attorney work product.  We -- we have the declaration.

12  They have that.  But to the extent there's additional

13  language --

14        **THE COURT:**  Wait, wait, wait.  Hold on.

15      The attorney from the Department of State attorney-client

16  work product and privilege?  You made much at the last hearing

17  that they're not a party.

18        **MR. GUYNN:**  They're not a party.

19        **THE COURT:**  So overruled.

20        **MR. GUYNN:**  But we are a unitary executive.

21        **THE COURT:**  Well, which one is it?  Are they at the

22  table or aren't they?

23      Do you wish to approach?

24        **MR. GUYNN:**  I can -- I can -- okay.

25      No, Your Honor.  Never mind.

1          **THE COURT:**  Okay.

2          **MR. GUYNN:**  I'll withdraw the objection.

3          **THE COURT:**  Reask the question, Mr. Rand.

4     Overruled.

5          **MR. RAND:**  Very good.

6  **BY MR. RAND:**

7  **Q.**  Let me ask the question again, if I could, Mr. Cantú.

8     The verbiage that you received from Mr. Anderson in an

9  e-mail on November 7th, is that the verbiage that appears in

10 paragraphs 4, 5, and 6 of the declaration you have in front of

11 you as Government Exhibit 1?

12 **A.**  Yes, sir, it is.

13 **Q.**  And verbatim it's the verbiage, correct, sir?  You did not

14 change a comma in that verbiage that's set forth in 4, 5, and

15 6?

16          **MR. GUYNN:**  Objection.  Asked and answered.

17 Argumentative.

18          **THE COURT:**  No, it isn't.

19     Overruled.

20     Did you change any of the language, sir?

21          **THE WITNESS:**  Well, I -- I wrote 3, 4, and 5, I think

22 is what your reference was?

23 **BY MR. RAND:**

24 **Q.**  My reference was to 4, 5, and 6.

25 **A.**  4, 5, and 6.  Yes, I did write that.  But it's not

1   verbatim, meaning the entire paragraph is not what the attorney

2   sent me.

3           **THE COURT:**  Okay.  So --

4           **THE WITNESS:**  But --

5           **THE COURT:**  Yeah.

6           **THE WITNESS:**  Or however, the other verbiage, right,

7   so the -- like, the first part of paragraph 4 --

8           **THE COURT:**  Okay.

9           **THE WITNESS:**  -- "during the communications," right?

10          **THE COURT:**  Yeah.

11          **THE WITNESS:**  "Sensitive senior levels."  All of

12  that, that's not verbatim -- it is verbatim what he said there;

13  I just -- I just put some other stuff in there.

14      And then the assurances, the nonbinding, understandings,

15  and the contingencies also not reflected in the assurances

16  thereof, that was in there as well.

17          **THE COURT:**  When you say, "that was in there," do you

18  mean that was in the content of --

19          **THE WITNESS:**  That was in the content that was

20  provided to me.

21          **THE COURT:**  Okay.

22          **THE WITNESS:**  I believe that the entire fifth

23  paragraph was also in that --

24          **THE COURT:**  Communication.

25          **THE WITNESS:**  -- communication that was provided to

 1  me.

 2      And I believe that Number 6, that paragraph was also in

 3  the communication that was provided to me.

 4          **THE COURT:**  Okay.  All right.  Thank you.

 5          **THE WITNESS:**  Does that make sense?

 6          **THE COURT:**  Yes, it does.  Thanks.

 7  **BY MR. RAND:**

 8  **Q.**   And when you received this -- when you received this

 9  e-mail from Mr. Anderson, did the cover of the e-mail include

10  any other information other than the language you've described

11  to us that made its way into your declaration?

12  **A.**   No.  I don't believe there was anything else.

13  **Q.**   Was there anything, when you looked at this language, that

14  you thought you wanted to clarify or understand better once you

15  received this e-mail from Mr. Anderson?

16  **A.**   No, I did not.

17  **Q.**   Did it cross your mind that maybe you wanted to ask the

18  questions of Mr. Anderson, what sensitive discussions? for

19  instance, in paragraph 4?

20          **MR. GUYNN:**  Objection, Your Honor.  That's

21  argumentative.

22          **THE COURT:**  Well, he --

23          **MR. GUYNN:**  Saying he should have thought to ask

24  that.

25          **THE COURT:**  Sustained.  Sustained.

 1          Rephrase.  Rephrase.

 2               **MR. RAND:**  I'll ask another question.  Fair enough.

 3    **BY MR. RAND:**

 4    **Q.**   Did -- I believe we've established you asked no questions

 5    of Mr. Anderson whatsoever.

 6    **A.**   No, I did not.

 7    **Q.**   Did you understand in your mind that you were allowed to

 8    ask Mr. Anderson questions about the substance of what he had

 9    communicated to you in the e-mail?

10    **A.**   Yes, sir, I did.

11    **Q.**   And no questions came to mind at all as to what you might

12    want to ask him, fair?

13    **A.**   No, no questions.

14    **Q.**   And am I correct that if I spent 20 minutes walking

15    through each of the words in paragraphs 4, 5, and 6 of your

16    declaration, Government Exhibit 1, and asked you, for instance,

17    what sensitive discussions are being referred to or who had

18    those discussions or what the contingencies or certain

19    understandings were, you would have nothing to offer by way of

20    understanding, fair?

21    **A.**   Can you repeat that question.

22    **Q.**   Yeah.  I'm asking you the question -- well, let's do it

23    this way.  That was very compound.

24          On paragraph 4 -- are you with me, sir? -- on Government's

25    Exhibit 1, your declaration.

1          You with me, sir?

2   **A.**    Paragraph 4.

3   **Q.**    You say it's part of this process.  You see that?

4   **A.**    (Nods head.)

5   **Q.**    All right.  And this process you're referring to is the

6   five-minute call with Mr. Anderson and looking at his e-mail

7   and incorporating it in the declaration that sits before you

8   right now, right, sir?

9   **A.**    I would say so.

10  **Q.**    All right.  You've had no involvement whatsoever with

11  Mr. Abrego Garcia's case prior to having this call with

12  Mr. Anderson on November 7th, correct, sir?

13  **A.**    That is correct.

14  **Q.**    All right.  You hadn't even been in your acting role until

15  the very end of October in ERO, correct?

16  **A.**    That's not correct.

17  **Q.**    All right.  When did you assume the acting directorship

18  position you've described to us?

19  **A.**    I believe it was November 3rd.

20  **Q.**    Okay.

21  **A.**    Yeah, 3rd.

22  **Q.**    So -- again, my question, right.  Before November 3rd, you

23  weren't even in this acting directorship role at ERO, fair?

24  **A.**    That is correct, sir.

25  **Q.**    And then four days later, that Friday of that week, your

1  only involvement with the Garcia matter was this five-minute

2  Teams call with Mr. Anderson, fair?

3  **A.**    Correct.

4  **Q.**    All right.  So let's go back to paragraph 4 of

5  Government's Exhibit 1.

6      You say, "I've been in communications" -- excuse me --

7  "communication with U.S. Department of State personnel."

8      You see that?

9  **A.**    Yes, sir.

10  **Q.**    There's only one person, Mr. Anderson, right?

11  **A.**    Correct, sir.

12  **Q.**    There was only one call, right?  It was the five-minute

13  call you've described to us?

14  **A.**    Correct, sir.

15  **Q.**    Since November 7th and this moment that you are speaking

16  to me, you've spoken to nobody else at the Department of State

17  about Mr. Abrego Garcia, correct?

18  **A.**    That is correct.

19  **Q.**    All right.  Was -- were you provided with a copy of Her

20  Honor's order in regard to your testimony here today about what

21  kind of preparation was expected of you by the counsel sitting

22  to my left?

23  **A.**    Can you repeat that question.

24  **Q.**    Were you provided with an order that Her Honor issued

25  about how you were to be prepared to speak today on behalf of

1  DHS?

2  **A.**   No, I was not.

3  **Q.**   Did you -- did you make any inquiry of anybody outside of

4  the attorneys sitting to my left from November 7th to today

5  about Abrego Garcia in any shape or form?

6  **A.**   No, sir.

7  **Q.**   Were you asked to do so?

8  **A.**   No, sir.

9  **Q.**   Did you ask to do so?

10  **A.**   No, sir.

11  **Q.**   Do you know whether you -- whether you're here as a

12  designee on behalf of DHS in regard to DHS's knowledge about

13  the current situation with Costa Rica and Mr. Abrego Garcia's

14  removal?

15      Do you understand my question?

16  **A.**   I'm sorry.  I do not.

17  **Q.**   Do you understand that you're here today to bind and speak

18  on behalf of the Department of Homeland Security and ICE on the

19  questions about Mr. Abrego Garcia and his potential removal to

20  Costa Rica?

21      Do you understand that?

22  **A.**   Yes, sir.

23          **MR. GUYNN:**   I --

24  **BY MR. RAND:**

25  **Q.**   Yes?  Correct, sir?  You do understand that?

1  **A.**    Can you repeat the question one more time.  I'm sorry.

2  **Q.**    Do you understand that you're here today to speak on

3  behalf of the Department of Homeland Security and ICE and bind

4  that agency in regard to Mr. Abrego Garcia's situation

5  vis-a-vis Costa Rica and potential removal there?

6      Do you understand that?

7      Or did no one explain that to you?

8          **MR. GUYNN:**  Objection.  Argumentative, Your Honor.

9          **THE COURT:**  Do you understand that you're here to

10  bind DHS?

11      And if you have any -- any question about that, just tell

12  me.

13          **THE WITNESS:**  I'm here representing ERO; so I -- I'm

14  not sure if that means the department.  I guess it does.  I

15  don't know.

16          **THE COURT:**  Okay.  All right.  Did you have any

17  conversation with anyone -- not the substance of it -- but that

18  there was an order I filed which says the witness will bind

19  the -- the department --

20          **THE WITNESS:**  No, Your Honor.

21          **THE COURT:**  -- or the defendants?

22      No?

23          **THE WITNESS:**  No, Your Honor.

24          **THE COURT:**  Okay.  All right.

25

1    **BY MR. RAND:**

2    **Q.**    Let's go back to paragraph 4 of Government Exhibit 1, your

3    sworn declaration.

4          Oh, by the way, you signed your declaration electronically

5    on November 7th.  Were you in the office or at home --

6              **MR. GUYNN:**  Objection.

7    **BY MR. RAND:**

8    **Q.**    -- on November 7th?

9              **MR. GUYNN:**  Objection.  Relevance.

10             **THE COURT:**  Well, I'll overrule.

11   **BY MR. RAND:**

12   **Q.**    Were you at home or in the office?

13   **A.**    I was not at home; I was at a hotel.

14   **Q.**    You were at a hotel.  Okay.  And that's the reason you

15   signed it electronically?

16   **A.**    Yes, sir.

17   **Q.**    What did Mr. Anderson tell you during that five-minute

18   phone call about Mr. Landau, the Deputy Secretary of State, and

19   his conversations with Costa Rica, if any?

20   **A.**    All he told me was that he had information that he had to

21   pass to me.  And then he read it to me.  He sent it to me in an

22   e-mail.  And that was it.

23   **Q.**    And the information he had passed to you was verbatim

24   what's set forth in your declaration, what was set forth in his

25   e-mail to you, correct, sir?

*CROSS OF JOHN EDWARD CANTÚ BY MR. RAND*

1  **A.**    Well, I don't think it's verbatim because I didn't -- I

2  didn't put everything in there.  But --

3  **Q.**    Let me ask it differently.

4       This Teams meeting that you had with Mr. Anderson.

5       Please, and I don't mean to be weird, sir, but keep your

6  eyes on me if you could.  It's distracting.  Please, I'm

7  examining you right now.  Stay with me.  Okay?

8       This Teams meeting you had with Mr. Anderson, is all it

9  encompassed was him reading something to you, saying "I got

10 this from the Deputy Secretary of State," and then forwarding

11 it to you by e-mail?  Was that the sum and substance of what

12 happened?

13 **A.**    Yes, sir.

14 **Q.**    And there was no other conversation whatsoever, fair?

15 **A.**    No, sir, there wasn't.

16 **Q.**    And you -- sitting here today, you can't tell me whether,

17 in fact, what Mr. Anderson read to you has any basis in

18 conversations that actually occurred with anybody from Costa

19 Rica, right, sir?

20      In other words, you sitting here have no idea where this

21 information might have come from other than what Mr. Anderson

22 read to you, fair?

23 **A.**    Correct.

24 **Q.**    You -- I used Mr. Landau's name.  Did you know that that's

25 the Deputy Secretary of State?

1  **A.**    I'm not aware of that.

2  **Q.**    Mr. Landau wasn't even mentioned to you by name on this

3  five-minute call, correct?

4  **A.**    No.  I'm pretty sure he just said "the Deputy Secretary."

5  **Q.**    And, again, you made no inquiry as to who that might be?

6  **A.**    No, sir.

7  **Q.**    Sitting here today, you can't tell me whether anyone from

8  the U.S. government -- secretary -- excuse me -- the Department

9  of State or otherwise, has contacted Costa Rica since August 21

10 of 2025, right, sir?

11        **MR. GUYNN:**  Objection.  Asked and answered.

12        **THE COURT:**  Well, do you have any independent

13 knowledge of that, sir?

14        **THE WITNESS:**  I'm sorry, Your Honor?

15        **THE COURT:**  Do you have any independent knowledge of

16 whether anyone from the Department of State has been in touch

17 with Costa Rica?

18        **THE WITNESS:**  No, Your Honor, I don't.

19 **BY MR. RAND:**

20 **Q.**    Let me go back to paragraph 4 of your declaration, sir.

21        I'm in the second sentence, "During these communications."

22        Do you see that, sir?

23 **A.**    Yes.

24 **Q.**    Well, there were only two communications, right?  There

25 was an e-mail and the Teams.  Those are the two?

1    **A.**    Correct.

2    **Q.**    Right?

3        "I've learned that on August 21st, following sensitive

4    discussions at senior levels," you see that language, sir?

5    **A.**    Yes, sir.

6    **Q.**    If I were to spend some time asking you questions -- what

7    were the nature of the discussions and who were the people

8    involved? -- you would have no information to offer me, fair?

9    **A.**    That's correct.

10   **Q.**    All right.  And that was my -- my convoluted question

11   before.

12       If I were to walk through paragraphs 4, 5, and 6 and pick

13   out various words that describe things that happened and ask

14   you what is your understanding as to what that means, there's

15   nothing you could offer me, right, sir?

16   **A.**    That's correct.

17           **MR. GUYNN:**  Objection.  Calls for speculation.

18           **THE COURT:**  Overruled.

19           **MR. RAND:**  Fair enough.  We'll walk through some more

20   of it.

21           **THE COURT:**  You don't need to.  I think the point has

22   been made.

23           **MR. RAND:**  All right.  Fair, fair, fair.

24           **THE COURT:**  This witness has zero information about

25   the content of the declaration.

1              **MR. RAND:**  Fair enough.

2              **THE COURT:**  No shade on you, Mr. Cantú.  You have

3    been very candid with the Court, and the Court appreciates

4    that.

5         But the point has been made.  There hasn't been any -- any

6    offering from the witness of -- that he would know personally

7    or otherwise any more detail.

8    **BY MR. RAND:**

9    **Q.**   Do you have any idea, Mr. Cantú -- I know you've only been

10   in your position as acting -- what's today? -- for 17 days.

11        Do you have any idea, sitting here today, as to who the

12   right person might be at the Department of Homeland Security

13   who would know more information in regard to the sum and

14   substance of your declaration?

15        Is there somebody who comes to mind and strikes you, based

16   on your experience of the last two weeks, of being

17   knowledgeable about the things that are set forth in your

18   declaration that we can go talk to?

19   **A.**   No, sir, because, as far as I know, I was the -- I'm the

20   only one that he talked to.

21   **Q.**   Okay.  Now, you were the head of the Phoenix field office

22   for ERO until late October, correct?

23   **A.**   Correct.

24   **Q.**   When were you removed from that position?

25              **MR. GUYNN:**  Objection.  Misstates testimony.

1          MR. RAND:  I'm asking -- I'll ask --

2          THE COURT:  Well, I think the removed part is the

3    part that you -- can you rephrase.

4          MR. RAND:  Fair enough.

5    BY MR. RAND:

6    Q.   Were you removed in your role as the field officer in

7    Phoenix for ERO at the end of October as a part of a

8    reorganization that involved four other field offices, sir?

9    A.   I was already programmed to come up on a TDY and

10   subsequently was instructed that the assignment was going to be

11   permanent.

12   Q.   And what is a TDY, please?

13   A.   Temporary duty assignment.

14   Q.   And when did you receive that TDY, if you recall

15   generally?

16   A.   I believe it was the first week of October.

17   Q.   And when did you find out that you would be moved into

18   specifically the role of the acting assistant director for

19   removal?

20          MR. GUYNN:  Objection, Your Honor.  Relevance.

21          THE COURT:  It's his background.  Overruled.

22      Put him on.  Go ahead.

23   BY MR. RAND:

24   Q.   Best of your recollection, sir.

25   A.   I think it would have been the week of October 24th.

1   **Q.**   And then you spent approximately a week or so not having a

2   post?

3   **A.**   No.  I did the job in Phoenix, sir.

4   **Q.**   You did the job in Phoenix until November 2nd?

5   **A.**   Correct.

6   **Q.**   At the time that you left the job in Phoenix, are you

7   aware of whether four field officers -- four directors of field

8   offices were also moved to other positions --

9           **MR. GUYNN:**  Objection.  Relevance.

10  **BY MR. RAND:**

11  **Q.**   -- in DHS?

12          **THE COURT:**  Can you all approach.  Real briefly.

13      (A bench conference was held on the record as detailed

14  below:)

15          **THE COURT:**  Mr. Rand, can you put a proffer as to

16  what the relevance is of this?

17          **MR. RAND:**  Yeah, this witness literally, frankly, was

18  terminated from his role as part of a purge, brought into this

19  acting role on November 3rd, and then put into this situation

20  of this declaration.  I don't know what his current status is.

21  But, frankly, it goes to --

22          **THE COURT:**  Bias?

23          **MR. RAND:**  It goes to the good faith of the

24  government in terms of proffering this witness -- or this

25  declaration based upon his recent past in terms of how he came

 1  into this acting role.

 2          **THE COURT:**  What's your response to that?

 3          **MR. GUYNN:**  I don't know.  This is the first I'm

 4  hearing of this purge and this potential source of bias.  I

 5  think it's absurd.  I'm embarrassed for Mr. Rand --

 6          **THE COURT:**  Really?  Because the -- the declaration

 7  is absurd.  If there is a sham declaration so far, it's this

 8  one.  It -- sir, you going to let me finish.

 9          **MR. GUYNN:**  Okay.

10          **THE COURT:**  Okay?

11          **MR. GUYNN:**  Yes.

12          **THE COURT:**  This is the quintessential triple

13  hearsay.  Doesn't say a thing, was sealed until 15 minutes ago

14  for reasons beyond my ken.  And now this witness is basically,

15  "I was given the words by a guy, and I don't know if that guy

16  is the guy who knows it or not.  He got it from another guy.  I

17  don't know that guy's name.  I just know they call him the

18  Deputy Secretary of State.  And I know nothing about anything."

19      It doesn't get more empty than that.  Now, I don't know

20  why you're doing it, and I don't know why you did it under

21  seal.  But it's going to come out in oral argument that there's

22  a representation by the Department of State that Costa Rica

23  will no longer take Mr. Abrego Garcia, and we'll take it from

24  there as to whether that's even trustworthy because this

25  witness has zero information for me.

1        And I hear you, from your -- from your proffer at the last

2    call, that the Department of State is not a party.  But if

3    you're asking me to accept the reliability of what's in here,

4    then you have to show its bona fides and you haven't yet.

5        To say it's absurd to then allow --

6        **MR. GUYNN:**  Well, the purge.  This purge.

7        **THE COURT:**  I don't know.  We'll have to see what the

8    witness says.  Maybe he denies it.  Maybe he says, "There's no

9    purge.  I'll explain to you what happened to me.  It's totally

10   aboveboard."

11       And I'll certainly -- I won't -- Mr. Rand, you can't --

12   you know, you can't characterize before you get the evidence.

13       If you don't get the evidence --

14       **MR. RAND:**  Fair enough.

15       **THE COURT:**  -- then you can't call it a termination

16   because that really is slanderous to him.

17       **MR. RAND:**  Fair enough.

18       **THE COURT:**  So how are you going to do it in a way

19   that gets the underlying information?

20       **MR. RAND:**  I'm going to ask it in the way of a

21   question.

22       **THE COURT:**  Okay.  That's fair.  And open-ended.

23       **MR. RAND:**  And I will represent to the Court and

24   counsel that there were numerous newspaper articles discussing

25   that -- that --

 1              **THE COURT:**  So you've got a good-faith basis for

 2    asking questions, for sure.

 3              **MR. RAND:**  I would never do something like that with

 4    a witness without --

 5              **THE COURT:**  Understood.

 6              **MR. RAND:**  Especially this witness, frankly.

 7              **THE COURT:**  Right.  Because he has no dog in this

 8    game.

 9              **MR. RAND:**  I agree.  I agree.  And I didn't mean in

10    any way to snap at the witness.

11              **THE COURT:**  Okay.  And that's probably a harsh word

12    from my perspective.

13              **MR. RAND:**  It's a fair consideration.  And given the

14    stakes in this case, I probably -- I will restrain myself.

15              **THE COURT:**  Okay.  So if you ask open-ended

16    questions, we'll see where it goes.  It's not going to go too

17    far.  But the point is that if he had some recent adverse

18    employment action, and now your theory would be there's an

19    opportunity to get in the good graces of those higher-ups,

20    it's -- it's proper for my consideration.

21         So I'll allow you a little bit of leeway.  And be general.

22              **MR. RAND:**  I will be.  Thank you.

23              **THE COURT:**  All right.

24              **MR. GUYNN:**  So I would just -- so two points, Your

25    Honor.

1        One, I hear your -- your views and your interpretation of

2   what the content and the significance of the declaration is.

3   As you know, respectfully, Your Honor, we disagree.

4        **THE COURT:**  Sure.

5        **MR. GUYNN:**  Our theory of the case and how these

6   removals do and how the division of labor between the

7   departments is, you know all of that.

8        I'll just say I told you this was exactly what was going

9   to happen.  He's not a department --

10       **THE COURT:**  See, you put this affidavit in play

11  because you want to make this legal argument that the

12  Department of State's assurances as to third-country removal

13  for the petitioner's choice is under the same rubric that your

14  clients have made up under the March 30th memorandum -- and

15  elsewhere that you haven't made up, right?

16       **MR. GUYNN:**  And the Supreme Court confirms.

17       **THE COURT:**  Well, no, they haven't.  They have stayed

18  an order in an emergency situation.  You -- you ascribe too

19  much to it.  But that -- I'm not going to chase that ball of

20  yarn.  Okay?

21       **MR. GUYNN:**  Sure.

22       **THE COURT:**  But the point being that, one, I don't

23  necessarily know if you're right on the law.

24       But, two, if you want that fact in evidence, you got to

25  prove it.  Okay?  And an affidavit that says nothing about

1  nothing of a guy who knows nothing because he learned it from a

2  guy who learned it from a guy -- and I don't even know if these

3  people are men -- I know Mr. Landau is.

4      It's -- it's -- that is not a reliable declaration.  I

5  mean, it's exactly what the petitioner said and what they

6  wanted -- why they wanted this evidentiary hearing.  They

7  suspected, as other witnesses have been, to be a conduit for

8  multiple levels of hearsay.

9          **MR. GUYNN:**  I think, Your Honor, that it is reliable

10 of --

11         **THE COURT:**  Do you want to show me the documents?

12         **MR. GUYNN:**  -- what the Department of State

13 believes --

14         **THE COURT:**  You want to show me the documents on

15 Costa Rica and when they were obtained and what the

16 negotiations were?

17     I don't know.  You have diplomatic notes from four African

18 countries.  You have zero in front of me from Costa Rica.

19 You've given me no indicia of reliability that what's in this

20 affidavit, which is triple hearsay, is accurate.

21     So I -- you know, up to you.

22         **MR. GUYNN:**  Sure.  I would actually refute the

23 hearsay --

24         **THE COURT:**  How?

25         **MR. GUYNN:**  -- characterization.  I mean, this is --

*CROSS OF JOHN EDWARD CANTÚ BY MR. RAND*

 1  this is the Department of State's state of mind.  This is what

 2  they believe the state of play is with respect to whether --

 3          **THE COURT:**  Who is the "they"?  It's this monolith --

 4          **MR. GUYNN:**  The Department of State.

 5          **THE COURT:**  No.  It's some lawyer who's sitting at a

 6  desk saying, "I've been given directive to" --

 7          **MR. GUYNN:**  It's a Department of State lawyer.

 8          **THE COURT:**  -- "give you this information --

 9      So?  It's a lawyer.  And I don't know the identity of the

10  individuals or the information behind it.  Certainly, this

11  witness doesn't, and he hasn't helped me at all.  And I have to

12  be able to weigh the reliability of the information.

13      So I'm just pointing -- I'm not telling you how to do it

14  if you want to do it.  But when you have a dip note and you

15  want me to look at it, you've brought it, we've put it under

16  seal, and I've considered it.  I don't have anything like that

17  for Costa Rica apart from what the petitioner attached to the

18  petition, which is the assurance from Costa Rica.

19      You're asking me to consider this declaration as somehow

20  counterevidence.  That's a hard one.  But given that that's

21  the -- you know, the -- the -- your position on it, I'm going

22  to allow this limited cross with open-ended questions as to

23  bias.  And we'll see where we go.

24          **MR. GUYNN:**  Fair enough, Your Honor.  And that was

25  going to be my second point is he's here for the narrow purpose

1    of talking about Costa Rica --

2          **THE COURT:**  No, the narrow purpose of doing what you

3    want this declaration to do.

4          **MR. GUYNN:**  Fair enough.

5          **THE COURT:**  I have asked -- I have ordered that

6    petitioner has an opportunity to cross.  This is one engine of

7    cross is bias.

8          **MR. GUYNN:**  Sure.

9          **THE COURT:**  So I'm going to allow.  Okay?  So it's

10   overruled.

11         **MR. GUYNN:**  Well --

12         **THE COURT:**  So why don't we step back, get it done.

13   If you have another objection, you can --

14         **MR. GUYNN:**  We're in agreement, actually, that the

15   Overton window with respect to his cross is the declaration.

16         **THE COURT:**  No, it's the substance of the declaration

17   as well and whether it's reliable, whether there's any "there"

18   there, like meat in the hot dog.  I mean, he's allowed to mine

19   that.

20         **MR. GUYNN:**  I don't disagree.

21         **THE COURT:**  Okay.  Very good.  So that's -- that's

22   the limited purpose of this inquiry.

23         **MR. RAND:**  I'll just make one observation, which I'm

24   sure Your Honor is cognizant of, which is that you issued an

25   order --

 1              **THE COURT:**  Oh, yeah.  We've blown by that order a

 2   long time ago.

 3              **MR. RAND:**  It's astounding.

 4              **THE COURT:**  Yeah, that's his case.  We'll talk about

 5   it more at the oral argument.  But yeah, I get it.

 6              **MR. RAND:**  All right.  Thank you, Your Honor.

 7      (The bench conference concluded and proceedings resumed as

 8   follows:)

 9              **MR. RAND:**  With the Court's permission.

10              **THE COURT:**  Yes.

11              **MR. RAND:**  Thank you, Your Honor.

12   **BY MR. RAND:**

13   **Q.**   Mr. Cantú, do you have an understanding of why you were

14   asked to no longer be the head of the Phoenix field office?

15   **A.**   One more time.

16   **Q.**   Do you understand why you no longer -- why today you're

17   not in Phoenix as the head of the field office?  Do you have an

18   understanding in your own mind?

19   **A.**   I was asked to come on a TDY to assist; so I came on the

20   TDY to assist.  And then I was notified that the position was

21   going to become a permanent position.  So I don't know why.

22   **Q.**   Are you aware of four other head -- are you aware if four

23   other heads of field offices, ERO field offices heads, changed

24   their positions in late October along with you?

25   **A.**   I am.

1    **Q.**    Do you know why that happened?

2    **A.**    I don't.

3    **Q.**    Do you have any information you can provide the Court as

4    to why you along with these other four heads of field offices

5    changed roles at the end of October?

6    **A.**    I cannot.

7    **Q.**    When were you advised that you would be the acting

8    assistant director for removal division at ERO, specifically

9    that position?

10   **A.**    In the permanent position?

11   **Q.**    Well, let me ask it -- I appreciate the clarification

12   you're seeking.

13        The acting moniker, are you -- is this a permanent

14   position now, or are you acting temporarily?

15   **A.**    I'm acting temporarily.

16   **Q.**    And how long do you understand that you'll be acting

17   temporarily?

18   **A.**    For 120 days.

19   **Q.**    And that clock started on November 3rd?

20   **A.**    Correct, sir.

21   **Q.**    And then where are you going to go, to your understanding,

22   sir?

23   **A.**    The position will become permanent.

24   **Q.**    This specific position you're in now will become

25   permanent?

1   **A.**    Yes, sir.

2   **Q.**    And I mean nothing negative by the word, but this is kind

3   of a probationary period for 120 days?  Is that the concept?

4   **A.**    No, sir, it's a temporary detail assignment.

5   **Q.**    All right.  And then it becomes permanent in 120 days?

6   **A.**    Correct.  That is my understanding.

7   **Q.**    When was the idea of this declaration that's sitting in

8   front of you as Government Exhibit 1 first raised with you?

9          Do you understand my question?

10  **A.**    I do not.  I'm sorry.

11  **Q.**    That's okay.

12         When did you first -- withdrawn.

13         When were you asked to do the declaration that is sitting

14  in front of you as Government Exhibit 1?

15  **A.**    After the meeting with the State Department attorney.

16  **Q.**    With Mr. Anderson?

17  **A.**    With Mr. Anderson.

18  **Q.**    Were you -- was the first time you heard about this

19  declaration the morning of November 7th?

20  **A.**    No.  It was in the -- it was in the afternoon.

21  **Q.**    In the afternoon of November 7th?

22  **A.**    (Nods head.)

23  **Q.**    How much time passed between when you were advised --

24  withdrawn.

25         Who told you about this meeting with Mr. Anderson?

1    **A.**    I believe it was our Office of Principal Legal Advisor.

2    **Q.**    And who is that?  Who is the person who contacted you?

3    **A.**    It would have been Jorge Montesino.

4    **Q.**    And who is Mr. Montesino?

5    **A.**    I don't know his exact title, but he is -- I think he's a

6    chief over one of the divisions within OPLA.

7    **Q.**    How did he contact you?

8    **A.**    I believe he called me via Teams.

9    **Q.**    In the afternoon of November 7th?

10   **A.**    Yes, sir.

11   **Q.**    What did he say?

12               **MR. GUYNN:**    Objection.  Attorney-client privilege.

13               **THE COURT:**    Sustained.

14   **BY MR. RAND:**

15   **Q.**    I want you to --

16               **THE COURT:**    Sustained.

17               **MR. RAND:**    Fair enough.  Let me ask a different

18   question.

19   **BY MR. RAND:**

20   **Q.**    How long did the conversation -- I just want to know the

21   amount of time.  How long was the conversation with him?  Just

22   the amount of time you spent talking to him over Teams.

23   **A.**    To who again?

24   **Q.**    Mr. -- I don't want to butcher the name.  His last name,

25   sir, was Mr. Montesino?

1   **A.**    Montesino.

2   **Q.**    Montesino.  Thank you.

3   **A.**    That would have been about, I guess, two- to three-minute

4   call.

5   **Q.**    And was Mr. Montesino providing you with what you

6   understood to be legal advice in those two to three minutes?

7           **MR. GUYNN:**  Objection.  Calls for a legal conclusion.

8           **THE COURT:**  Well, it's the foundation to your

9   attorney-client objection.

10      So overruled.

11  **BY MR. RAND:**

12  **Q.**    Was he -- do you understand Mr. Montesino -- in your mind,

13  do you understand Mr. Montesino to be providing you with legal

14  advice in those two to three minutes?

15  **A.**    I'm not sure.

16  **Q.**    Was there anything involving law that he was discussing

17  with you?

18  **A.**    No.

19  **Q.**    He was discussing with you whether you'd do this

20  declaration, right?

21  **A.**    No.  He was discussing with me that there was going to be

22  a meeting with the State Department official.

23  **Q.**    So he's directing you to be on this call with

24  Mr. Anderson?

25  **A.**    He's asking me if I'm available for a call that's coming.

1  **Q.**   How long after was the call with Mr. Anderson after the

2  call with Mr. Montesino?

3  **A.**   It my memory serves, it was about an hour and a half

4  later-ish.

5  **Q.**   Were there any other communications with Mr. Montesino

6  between the two- to three-minute Teams with him and the

7  approximately five-minute Teams with Mr. Anderson?

8  **A.**   No, sir.

9  **Q.**   Who else was on the call with -- the Teams call with

10 Mr. Anderson, if anybody?

11 **A.**   I think it was him and -- I can't remember if there was

12 another attorney from OPLA or not.

13 **Q.**   When you say OPLA, what is --

14 **A.**   I'm sorry.  Office of Principal Legal Advisor.

15 **Q.**   And that's within DHS?

16 **A.**   Correct.

17 **Q.**   So it was you and Mr. Anderson and possibly somebody from

18 DHS you understood to be an attorney?

19 **A.**   I'm sorry.  Not DHS; Enforcement and Removal Operations.

20 **Q.**   Let me ask the question again.

21     That call was just you, Mr. Anderson, and possibly another

22 lawyer from ERO?

23 **A.**   Me, Mr. Anderson, Jorge, and another lawyer from ERO/OPLA.

24 **Q.**   Did anyone other than Mr. Anderson say anything on this

25 call, this five-minute Teams call?

1    **A.**    Other than hello, how are you, no.

2    **Q.**    So it was a one-way conversation.  Mr. Anderson just

3    talking, reading?

4    **A.**    Correct.

5    **Q.**    Are you -- you would -- on direct you had indicated that

6    you had looked at some diplomatic materials from Liberia,

7    correct?

8    **A.**    Yes, sir.

9    **Q.**    You looked at those materials in connection with your

10   testimony here today?

11   **A.**    Yes, sir.

12   **Q.**    All right.  Have you looked at the August 21st assurances

13   from Costa Rica?

14   **A.**    I recall seeing Costa Rica.

15   **Q.**    You do recall seeing the Costa Rica assurance letter?

16   **A.**    I think -- yeah, I'm pretty sure I did.

17   **Q.**    Do you -- do you recall the Costa Rica assurance letter as

18   indicating that Costa Rica was prepared to give Mr. Abrego

19   Garcia refugee status or residency?

20        I can put it in front of you, if you need it.

21   **A.**    I can't recall off the top of my head, sir.  I'm sorry.

22   **Q.**    All right.

23        **MR. RAND:**  Let me mark as Petitioner's Exhibit 1 --

24   may I approach, Your Honor?

25        **THE COURT:**  You may.

1          **MR. RAND:**  Let me have the record reflect I'm placing

2    what is Petitioner's 1 in front of the witness.  I have copies.

3    **BY MR. RAND:**

4    **Q.**   Have you seen this document, what's been placed in front

5    of you --

6    **A.**   Yes, sir.

7    **Q.**   -- as Petitioner's Exhibit 1 before, sir?

8    **A.**   Yes, sir.

9    **Q.**   All right.  Let's go down to the second paragraph.

10         "The government of Costa Rica intends to provide refugee

11   status or residency to Mr. Abrego Garcia upon his transfer to

12   Costa Rica."

13         Do you see that, sir?

14   **A.**   I do, sir.

15   **Q.**   All right.  That -- sitting here today, do you recall

16   whether that language about providing refugee status or

17   residency exists in any of the communiques with Liberia -- to

18   or from Liberia?

19   **A.**   I would have to review those documents again, but I don't,

20   off the top of my head, recall that.

21   **Q.**   I'm trying to short-circuit this.

22          **MR. RAND:**  It's going into seal, Your Honor.

23          **THE COURT:**  Okay.

24          **MR. RAND:**  It may be necessary; but let me continue,

25   and we'll figure that out.

1  **BY MR. RAND:**

2  **Q.**   Sitting here today, you have no recollection one way or

3  the other?  I don't want you to guess.

4  **A.**   I don't.  I'm sorry.

5          **MR. RAND:**  One moment, Your Honor.

6  **BY MR. RAND:**

7  **Q.**   Sir, in connection with your role as the -- the head of

8  the field office in Phoenix, have you dealt with immigrant

9  folks who were aliens who were from Latin America?

10 **A.**   One more time.

11 **Q.**   Have you dealt with individuals who are aliens under the

12 regulatory statutes of the United States who were from Latin

13 America originally?

14         **MR. GUYNN:**  Objection.

15         **THE WITNESS:**  Yes, sir.

16         **MR. GUYNN:**  Relevance.

17         **THE COURT:**  Yeah, I --

18         **MR. RAND:**  I'm just going to ask one more question,

19 your Honor, and I think it will make it real clear.

20         **THE COURT:**  Real quick.  Okay.

21 **BY MR. RAND:**

22 **Q.**   You've had experience with folks from Latin America,

23 correct, and removing them to other parts of the world?

24 **A.**   Yes, sir.

25 **Q.**   Are you aware of removing anyone who was from Latin

1    America to African countries in your experience?

2    **A.**    We've done that before.

3    **Q.**    When, sir?

4    **A.**    I couldn't give you a -- I couldn't give you an exact

5    date, but I know we've done it maybe in the past six or seven

6    months.

7    **Q.**    Prior to the past six or seven months, has that ever

8    happened, in your experience, in all of your decades of

9    experience you described to us on direct?

10   **A.**    I cannot recall one.

11   **Q.**    Okay.

12            **MR. RAND:**  I pass the witness, Your Honor.

13            **THE COURT:**  Okay.  All right.  Any redirect?

14            **MR. GUYNN:**  No further -- we have no redirect, Your

15   Honor.

16            **THE COURT:**  Okay.  And no need to go under seal,

17   right?

18            **MR. GUYNN:**  No.

19            **MR. RAND:**  No.  Thank you.

20            **THE COURT:**  All right.  Mr. Cantú, this concludes

21   your testimony.  Thank you so much.  You are free to step down

22   and either resume your seat or leave and enjoy your day, either

23   one.  And not that they are mutually exclusive, but I think --

24            **THE WITNESS:**  Thank you, Your Honor.  Appreciate it.

25        (Witness exited the stand.)

1          **THE COURT:**  Okay.  Counsel, it's 1:00.  I'm happy to

2    proceed with oral argument on the petition, but does anybody

3    need a short break?

4        Okay.  The most important person in the room, Ms. Leeper,

5    our court reporter, does.  So let's take 15.

6          **DEPUTY CLERK:**  All rise.  This Honorable Court now

7    stands in recess.

8        (Recess taken from 12:59 p.m. to 1:19 p.m.)

9          **DEPUTY CLERK:**  All rise.  This Honorable Court now

10   resumes in session.

11         **THE COURT:**  All right, everyone.  You can have a

12   seat.

13       I'm going to start with the petitioner's petition.

14       I'll hear from you first, Mr. Rossman.

15         **MR. ROSSMAN:**  Good afternoon, Your Honor.  Andrew

16   Rossman for petitioner Kilmar Armando Abrego Garcia.

17       Your Honor, it's been quite a journey.  And I'm going to

18   try to make this a very short argument today, but bear with me,

19   if you would, because it's quite an important one.

20       March 12th of this year, when Mr. Abrego Garcia was pulled

21   off the streets of Maryland and separated from his young son

22   and taken into custody by ICE, as Your Honor well knows, he was

23   promptly removed to a country, El Salvador, where he was

24   protected by a court order from being removed to.

25       He was imprisoned in a terrorist prison.  He was beaten.

1   He was subject to awful conditions.  And it took five orders of

2   federal courts and three months to get him returned to this

3   country, including two orders from Your Honor and a 9-0 order

4   from the United States Supreme Court.

5         And what the government came in and offered to Your Honor

6   was that they were powerless to bring him back, powerless to

7   correct the mistake that they had made.

8         And since that time -- since that time that first came

9   into this court and asserted Mr. Abrego Garcia's rights, there

10  has been an unrelenting campaign on the part of the government

11  to deprive him of due process, an unrelenting campaign to

12  retaliate against him for asserting his constitutional rights

13  and to make him a poster child for the broader political agenda

14  that this administration has with respect to immigration

15  policy.

16        And, Your Honor, we submit that the history of this

17  case -- and I'm going to talk for a few minutes not just about

18  the treatment of Mr. Abrego Garcia, but I'm also going to talk

19  about the treatment of this Court by both the Department of

20  Justice and the Department of Homeland Security in this case.

21        The history shows that there was bad faith.  The history

22  shows that there was malice on the part of the government's

23  part.

24        **THE COURT:**  I'm going to tell you, for purposes of

25  this petition, I'm not even -- I mean, you have a pending

1  motion in what I call Abrego 1.  I think this course of conduct

2  will be relevant to that pending motion.

3       But in terms of the sufficiency of the five counts, in

4  terms of what I would really like you to focus on is which of

5  those counts are your principal counts and why and whether this

6  Court has jurisdiction to decide the relief that -- to decide

7  the question.  And then I think a companion of that is the

8  relief you're requesting.

9            MR. ROSSMAN:  Of course, Your Honor.  And that's

10  where I'm going.

11            THE COURT:  Okay.

12            MR. ROSSMAN:  So -- and I want to -- I think of the

13  due process arguments that underlie the habeas petition that

14  Your Honor has before you as having three components.

15       And the first one, which is the government's

16  retaliation -- retaliatory treatment, violates fundamental due

17  process.  And, you know, that is our first argument.

18       Our second argument, seeing how as Your Honor has them all

19  on the table, is that even in the government's formulation of

20  what the minimal due process is that's required, they've got to

21  comply with their own immigration statute.  Their failure to do

22  that, their violation of 1231, is a second violation of due

23  process.

24       The third is procedural due process and Mr. Abrego

25  Garcia's right to review by an immigration judge, an exhaustion

1  of appeals of his reasonable fear interview.

2      Those are the three substantive grounds that we offer as a

3  basis for --

4          **THE COURT:**  Which count?

5          **MR. SANDOVAL-MOSHENBERG:**  The due process claims.

6          **THE COURT:**  The due process claims.  Okay.

7          **MR. ROSSMAN:**  And Your Honor has briefed and has --

8  and I won't touch on it today -- has fully briefed and

9  submitted the *Zadvydas* claim.

10         **THE COURT:**  Although I think that the reason why I

11  sort of raised this is because I think the *Zadvydas* claim

12  really speaks to the relief for which I clearly have

13  jurisdiction.

14         **MR. ROSSMAN:**  Yes.

15         **THE COURT:**  And the thing that I'm really -- I'll

16  just be straight with you.

17         **MR. ROSSMAN:**  Please.

18         **THE COURT:**  The thing that I'm really focused on -- I

19  was very focused on in the first hearing of Abrego 1.  I have

20  been -- because it was such an emergency situation and we were

21  focused on the validity of the withholding order, I was less

22  focused on the argument that there is an absence of an order of

23  removal.

24      And you have been -- you've steadfastly made that record

25  that there is an absence of the order of removal.  There is no

1    order of removal in the docket -- in the record.

2              **MR. ROSSMAN:**  We've not seen one, Your Honor.  We've

3    seen an order of withholding.  That, we've seen.

4              **THE COURT:**  Correct.

5              **MR. ROSSMAN:**  And we're all familiar with the 2019

6    order.  And the 2019 order proceeds as if there had been an

7    order of removal in some respects.

8              **THE COURT:**  And respondents now say that is the order

9    of removal.

10             **MR. RAND:**  But --

11             **THE COURT:**  I know.  I know.  We're going to talk

12   about it.  But my point is that argument fundamentally

13   guides -- in my view, guides this case.  It guides the

14   jurisdictional questions.  It guides the power and the -- sort

15   of the legality of what the government did do or is asking to

16   do now.

17        In other words, you know, how do I say that third-country

18   removal is reasonably imminent or reasonably foreseeable if

19   there's an absence of a removal order because third-country

20   removal -- I know they're separate things, but you only get to

21   third-country removal if there's a removal order that says

22   shall not remove to this country and shall remove to other

23   countries.

24        I mean, that's what the order is supposed to say.

25             **MR. ROSSMAN:**  That's right, Your Honor.  And it's

1  critically important because the due process rights that are

2  accorded to all persons who are in this country, of which

3  Mr. Abrego Garcia is certainly one.  Okay?

4      It includes the right to be heard with respect to removal

5  to a third country.  That's plainly the law, as *JGG* provides

6  and lots of other cases we cite to Your Honor.  And what that

7  requires is the identification of the specific country to which

8  you intend to remove that person.

9      So, you know, returning our attention to 2019, in 2019,

10  there was only one country that the government sought to remove

11  Mr. Abrego Garcia to, which was El Salvador.  And the

12  withholding blocked that path.  And since then, as we well

13  know, the government made no effort to try to identify and

14  remove him to a third country.

15      So he had no opportunity to raise his hand and say that is

16  not an appropriate third country.  He had no opportunity back

17  in 2019 to designate a different country, for example.  He has,

18  as Your Honor well knows, designated Costa Rica recently in

19  response to the government's efforts to try to concoct a new

20  third country to remove him to.

21      But that is his right to be heard on the question of

22  specifically where to be removed.  And, foundationally, it's

23  got to start with an order of -- a final order of removal.

24      So I don't think that it is improper or overly fastidious

25  of us, Your Honor, to insist on the evidential basis of the

1    removal, to insist on seeing --

2         **THE COURT:**  Well, the government has -- sort of

3    quietly, but they have said it's the withholding of removal

4    order.  Every time they've said -- if they cite anything, when

5    they say there's a final order of removal, they cite that

6    opinion.  And it's at 1-1 in the petition, I believe.

7         **MR. ROSSMAN:**  Yes.

8         **THE COURT:**  And 28 in the respondent's response.

9    That's the only citation I've ever been given.  And in your

10   most recent papers, I think you screen capture the order which

11   says nothing about an order of removal to El Salvador --

12        **MR. ROSSMAN:**  Exactly.

13        **THE COURT:**  -- and it makes oblique reference in the

14   text to an order -- to removal to Guatemala, I think.  I mean,

15   the text gets it wrong, actually.  The opinion gets it wrong.

16        **MR. ROSSMAN:**  Yes.  There's obviously a glitch in the

17   opinion.  But the point is that it's about withholding.  It

18   does not establish the actual removal order itself.

19        **THE COURT:**  And what do you say in response to what I

20   think has been said from day one, which is, well, you can't --

21   and I had -- see some sort of intellectual appeal to this.  You

22   can't have a withholding order unless you have an order of

23   removal.  Like, one goes with the other.

24        **MR. ROSSMAN:**  I think that assumes too much, Your

25   Honor.  And the -- the name of the case escapes me -- so I may

1  turn to phone a friend.  But with respect to the Convention

2  Against Torture case that we cite, Your Honor, it wasn't

3  sufficient to --

4          **THE COURT:**  Is it the *Bracic* case, the Eighth

5  Circuit --

6          **MR. ROSSMAN:**  It is the *Riley* case.  Thank you.

7      In the *Riley* case, it was sufficient, to reference the

8  Convention Against Torture, you actually had to reference the

9  final order of removal.

10         **THE COURT:**  There has to be one, right?

11         **MR. ROSSMAN:**  I'm sorry?

12         **THE COURT:**  There has to be one.

13         **MR. ROSSMAN:**  Correct.  Correct.

14         **THE COURT:**  So this is my struggle for both sides:  I

15  think that it is clear in the Fourth Circuit and in the Supreme

16  Court that one cannot substitute the other.

17         **MR. ROSSMAN:**  Yes.

18         **THE COURT:**  That there's two separate orders.  And

19  the petitioners have often tried to use it to their advantage

20  to say, well, a separate order of withholding is the order of

21  removal when it comes to timeliness and other sort of

22  challenges, and the Supreme Court shot that down.

23      But in those cases, I think what the government is going

24  to get up and say is, well, Judge, you can't make that call

25  because you don't have jurisdiction.

1       Those -- the jurisdictional -- the statutes that -- that

2  deprive you of jurisdiction to review final orders of removal

3  preclude you from making that call here.

4       What's your response to that?

5            **MR. ROSSMAN:**  So I have a first level of response,

6  and then Your Honor -- so that you know how we sort of divide

7  our labors here.  Mr. Cooper is available to Your Honor to

8  answer particular questions about the jurisdiction stripping

9  statute and *D.V.D.* and the --

10           **THE COURT:**  Okay.  That would be great because I

11 think this matters for that.

12           **MR. ROSSMAN:**  I agree.

13      But, Your Honor, I think fundamentally you can't -- Your

14 Honor certainly has jurisdiction over the habeas petition to

15 the extent it asserts a due process violation.  And it would be

16 an obvious due process violation to remove someone without a

17 final order of removal.  That's in the statutes.  So I think

18 that's a starting point for that.

19      Your Honor, if you want to pivot immediately to the

20 jurisdiction questions, Mr. Cooper can address them.  If you

21 want to have me lay out the rest of the points on the petition,

22 we can do that.  However Your Honor wants to proceed.

23           **THE COURT:**  Well, I think so much of it does flow

24 from this question of is there an order of removal?  So

25 because -- or at least it changes -- it changes the complexion.

1        It certainly is relevant to Count 5 of your petition

2   because that's where you say we don't have an order of -- there

3   is no order of removal --

4        **MR. ROSSMAN:**  Correct.

5        **THE COURT:**  -- and there is a parole which may or may

6   not have changed.  So that's relevant to that count.  It's

7   certainly relevant to *Zadvydas*.

8        **MR. ROSSMAN:**  Yes.

9        **THE COURT:**  And I -- I think it's most fundamentally,

10  though, a question of the difference between looking at a

11  record to decide if something exists to determine whether I

12  have jurisdiction in the first instance versus passing on the

13  validity of the order.

14       But I think I've got to answer that first because if I

15  find that I've got jurisdiction to say I take judicial notice

16  of the record and the record does not include an order of

17  removal, then, at a minimum, there's -- Mr. Abrego is entitled

18  to certain immediate relief.

19       **MR. ROSSMAN:**  That's right, Your Honor.

20       **THE COURT:**  And I'm not passing on the substance; I'm

21  just passing on the sort of *Zadvydas* and other relief you've

22  asked for.

23       **MR. ROSSMAN:**  Right.  So I think, Your Honor, the

24  entire structure the government had crumbles if there is no

25  final order of removal demonstrated in this case.  Most of the

1    energy that's spent in our pages, that's spent in our briefing

2    and argument, it is even if they have one --

3            **THE COURT:** Right.

4            **MR. ROSSMAN:** Even if they have one, we've got, you

5    know, legions of reasons why it's been a violation of due

6    process, it continues to be a violation of due process, and the

7    habeas petition should be granted.

8        I'll take guidance from Your Honor as to whether you want

9    me to unpack that or you want to focus on jurisdiction first.

10           **THE COURT:** Well, let's unpack the rest of it because

11   my next question -- and then we'll turn to the jurisdictional

12   question.

13           **MR. ROSSMAN:** Right. So I don't bury the lede, Your

14   Honor, in terms of you asked about relief and I want to be

15   clear about where we're headed and then why I think we're

16   entitled to get there.

17       We think that the relief should be granted in the

18   petition. We think that Mr. Abrego Garcia should be released,

19   at a minimum -- at a minimum, we think Your Honor should grant

20   conditional release, giving the government a very short period

21   of time -- 24 hours, 72 hours -- you know, Your Honor can

22   decide what's an appropriate period of time -- to show that

23   they have a constitutionally valid basis to remove Mr. Abrego

24   Garcia.

25       And what we've said to the Court all along remains true.

1   If they want to remove him to Costa Rica, you will hear no

2   objection from us on that.  They can put him on the next plane

3   to Costa Rica.  We think the record on that is clear.  It's

4   ECF 1, Exhibit 3, is the document, you know, showing assurances

5   from the government in Costa Rica.  We think it's an utter

6   failure of proof on the government's part today --

7           **THE COURT:**  Well, to be clear, the government is now

8   saying Costa Rica is saying no.

9           **MR. ROSSMAN:**  Right.

10          **THE COURT:**  That's where the -- we don't think that

11  there's reasonable assurance that Costa Rica would take Abrego

12  Garcia today.  And I see that, in my very, like, tell it to me

13  like I'm a fifth grader, to quote Denzel Washington, means that

14  Costa Rica says no.  I don't have any evidence of that,

15  frankly.

16          **MR. ROSSMAN:**  Right.  That's the problem, Your Honor.

17  So the way I think of it in terms of the context of the habeas

18  petition is if the government fails to prove that Costa Rica is

19  off the table -- and if you'll remember, that's the phrase the

20  government used in one of the last hearings -- you asked

21  specifically if Costa Rica is still on the table, and they said

22  yes, if whatever --

23          **THE COURT:**  Eswatini.

24          **MR. ROSSMAN:**  -- at that point fell away.  I think it

25  was Eswatini pivoting into Ghana, now Liberia.  If that falls

 1  away, Costa Rica, at least at that point in time, the

 2  government was saying, was still on the table.

 3      And our perspective on this is you got a triple hearsay

 4  affidavit that has zero evidentiary value that should be

 5  disregarded.

 6      Despite the government -- despite Your Honor giving the

 7  government an order to produce a knowledgeable witness, they

 8  produced a nice witness -- I don't want to fault Mr. Cantú --

 9  but he was not someone who had the right knowledge to prove the

10  government's point -- which they had the burden of proving --

11  that Costa Rica is no longer -- after having given diplomatic

12  assurances, is no longer willing to take Mr. Abrego Garcia.

13      So the point --

14          **THE COURT:**  The point on that, though, is I don't

15  quite understand -- I mean, maybe the government is doing it in

16  the alternative because I thought their first-level point was

17  your time, Mr. Abrego, to have chosen Costa Rica was six years

18  ago.  And since you didn't do it under the INA, you're

19  time-barred.

20          **MR. ROSSMAN:**  Right.

21          **THE COURT:**  And so the judge -- Judge, you're getting

22  into discretionary land when you find otherwise -- or let's say

23  this -- there is not a fact that he asserted this selection

24  timely.  And even if he did, the attorney general can disregard

25  it for reasons that they are now trying to put in the record.

 1          **MR. ROSSMAN:**  So what that would have to imagine,

 2    Your Honor, is that it's consistent with due process to require

 3    a client who have -- who have received an order of withholding

 4    of removal to the one and only country the government sought to

 5    remove that person to, in a context where you heard from the

 6    witness today, prior this year, he had never -- he's not

 7    familiar with a case where they were removing Latin American

 8    nationals to Africa.  Okay?

 9          You would have to imagine that Mr. Abrego Garcia would

10    have a crystal ball and could predict that he would be asked

11    one day to go to Eswatini or Liberia or who knows where and, to

12    anticipate that, select some other country besides El Salvador

13    where he would go.

14          **THE COURT:**  But part --

15          **MR. ROSSMAN:**  The burden is extraordinary.

16          **THE COURT:**  It is extraordinary.  And this is part of

17    why I'm really pressing on this idea.  If there is no order of

18    removal, that's the genesis of a lot of these problems.

19    Because there's regulations and there's a statute, and we can

20    go back and forth.  This isn't immigration court, but we can

21    talk about what they say.

22          I mean, part of what a petitioner in the first instance

23    of -- a noncitizen is entitled to is to know the country to

24    which they are being removed.  And in the event that that's not

25    feasible, alternate countries that the IJ chooses, right?  And

1  hears from the noncitizen about alternative countries, and then

2  DHS can choose alternative countries.

3        **MR. ROSSMAN:**  Yes.

4        **THE COURT:**  If you don't have that conversation in

5  the first instance because there is no order of removal that

6  reflects it --

7        **MR. ROSSMAN:**  Right.

8        **THE COURT:**  -- then how can we, now what you're

9  saying as a matter of due process, hold Mr. Abrego responsible

10  for that?

11        **MR. RAND:**  I wholeheartedly agree.

12        **THE COURT:**  Is that it?

13        **MR. RAND:**  I wholeheartedly agree, Your Honor.  And I

14  would layer on top of that that, without -- not just a final

15  order of removal that we can all look at and read.  Okay?

16  Without that piece of paper and without the conversation that

17  you are anticipating where, you know, the government asks the

18  alien, you know, whether they would have a reasonable fear of

19  being exported to X, Y, or Z, okay, you don't have the

20  effective functioning of the statute.

21      So Mr. Abrego Garcia is deprived of what even the

22  government, you know, basically concedes would be his minimal

23  due process right, which is the protections that Congress

24  afforded him in 1231(b)(2).  And that would be to make a

25  designation.  A country is named, Costa Rica.  He made that

1  designation.

2      And the only override -- and the language is "shall."  The

3  language is mandatory.  It's not "may."

4      And the only overrides that are available to the

5  government is if, A, that country is unwilling to accept that

6  person.  That is a failure of evidence in this record.  They

7  have not established that in any evidence that Your Honor can

8  take as competent proof.

9      And/or, B, that there is prejudice to the United States

10  from sending that person to that country.  And if you remember

11  back to Mr. Swartz's [sic] testimony on that subject, he said

12  there was no evidence of any prejudice to the government of

13  sending Mr. Abrego Garcia to Costa Rica.  That would be strange

14  given that the government went to Costa Rica and got those

15  assurances, albeit in the context of, you know, they were

16  trying to get him to plead to a crime, as Your Honor knows.

17      So all of that, to us, suggests, you know, foundational

18  deprivation of due process not just based on the absence of the

19  final order of removal but the deprivation of his right to the

20  statutory protections in 1231(b)(2).

21      And, Your Honor, as well, you know, the position that the

22  government -- just to complete the menu, the position that the

23  government has taken that -- pursuant to their March 30 memo,

24  that they need only conclude by a USCIS, you know, officer

25  interview that there's no reasonable fear exhibited, that

1    that's sufficient to, you know, send my client away to Liberia,

2    I think plainly violates their own regulations.

3         We cite, you know, a series of recent cases on that for

4    Your Honor.

5         The -- you know, to us, the minimal procedural due process

6    that my client is due is the opportunity to have that -- that

7    issue heard before a neutral judge.  The opportunity to hear

8    and to review the reasonable fear interview before an

9    immigration judge, exhaust appeals, that is the bare minimum on

10   a procedural level that my client is due.

11        So those are the prongs of the petition in terms of the

12   relief.  Just to -- so Your Honor has all that we're seeking

13   here, our primary request is to release Mr. Abrego Garcia.  We

14   think Your Honor could, if Your Honor thought it was

15   appropriate, condition it on the government providing a

16   constitutionally valid, statutorily valid, basis for removal.

17   That could be Costa Rica today.

18        **THE COURT:**  You mean release him conditional -- I

19   don't understand that.

20        **MR. ROSSMAN:**  The order -- so this is something we've

21   seen in a couple of recent cases.  The order would basically

22   say if the government does not do X within -- sake of argument,

23   three days.  Okay?

24        If the government does not provide a constitutionally

25   statutorily valid path for removal, then Mr. Abrego Garcia will

1  be released on the third day.  That's the conditional order of

2  release.  And we've seen it in a couple of recent New Jersey

3  cases, like *Maldonado* is one, your Honor, and *Azzouka* is the

4  other.

5      The point is the government can have one last clear chance

6  to do it the right way.  And if there's some other country that

7  we're not thinking of, right, that they have, you know --

8          **THE COURT:**  Well, if I find that there's no order of

9  removal in the docket --

10         **MR. ROSSMAN:**  Then he should be released, period.

11         **THE COURT:**  Then there's -- so your position is it

12  should be released three days, period, or conditional release

13  upon -- give three days to either produce the order or obtain

14  an order?  Is that your position?

15         **MR. ROSSMAN:**  Well, the latter is a new wrinkle that

16  I've got to think about for a minute, Your Honor, obtain an

17  order.

18         **THE COURT:**  Right.  And that's the part -- that's the

19  part of all these Supreme Court cases that say substantive

20  rights flow from the existence of an order.  And you can't fake

21  it till you make it.  You got to have it.  And it's often gone

22  against the petitioner.  But, you know, it goes both ways.

23      That's the part -- the part that I'm struggling with is

24  you have to have the order, whether it's -- it's got to be an

25  order memorialized somewhere.  And I don't have it.  And I

1    recall, you know, Mr. Reuveni telling me on the first day it's

2    not in the file.

3        You look to withholding, but it's not in the file.  It's

4    not in the record.  We don't have it.  I don't have it.  You're

5    not going to like it, Judge, but I don't have a document to

6    show you called an order of removal.

7            **MR. ROSSMAN:**  Yes.

8            **THE COURT:**  And that hasn't changed since April.

9            **MR. ROSSMAN:**  It hasn't changed.  We've not seen an

10   order.  We've not seen a 2019 order.  We've not seen any order

11   since then.

12           **THE COURT:**  And your position is if -- if I believe I

13   have jurisdiction to find -- I have jurisdiction -- whether I

14   do have jurisdiction or not -- and there is no order of

15   removal, I should release immediately, full stop?

16           **MR. ROSSMAN:**  That is our first position, Your Honor.

17       Our second position, if that's too dramatic a request,

18   the -- the more protective way, perhaps, to put it, is to give

19   the government one last chance to effectuate removal in a

20   permissible way.  And that's why I would put it on a short

21   leash like three days.

22       In all events, relief that we would seek -- well, I should

23   say -- let me frame this properly.

24       The alternative minimum relief that we would seek is an

25   order requiring effectively an injunction prohibiting him from

1    being removed unless and until they give him the opportunity

2    for an immigration judge review and exhaustion of appeals.

3        So that would be comporting with their regulations and the

4    statute.

5            THE COURT:  So you're saying even if I go -- if I

6    make this finding, I have jurisdiction.  There is no order of

7    removal.  Under *Zadvydas*, it's not reasonably foreseeable or

8    imminent release is warranted, I should go on to address in the

9    alternative?

10            MR. ROSSMAN:  No.  I think that -- I don't think you

11    need to, Your Honor.  If -- and I'll want to take a moment and

12    confer with my cocounsel on this.  But the way I'm thinking of

13    it, Your Honor, is that you don't need to reach the alternative

14    minimum grounds if he's released because he will be released.

15        But just -- if you would indulge me, Your Honor, on that

16    for one second.

17            THE COURT:  Sure.  And while you're at it, to -- the

18    other question I'm going to have is your position, then, on the

19    motion to dissolve.  Because, frankly, I'm not sure, once I

20    grant the relief, that I have further power to say the

21    government -- that preliminary injunction, right, is done

22    because the case is done.  I've granted final relief, and

23    there's really no basis to enjoin any further.

24        And to the extent -- you know, the government will either

25    take my decision up on appeal and seek to stay my order or

1   they'll act consistently with it and there will be some new

2   case at some point, is the way I'm thinking about it, either in

3   immigration court or -- anyway, I just don't see the ongoing

4   vitality to the injunction if I accord the kind of relief

5   you're talking about once that's done.

6          **MR. ROSSMAN:**  I'm not sure that last part is right,

7   Your Honor.  In the *Maldonado* case, for example, which is a

8   couple of weeks ago in the district of New Jersey, a different

9   issue -- and to be very plain with Your Honor, it was about

10  whether someone could be detained under 1225(b)(2).

11         **THE COURT:**  Okay.

12         **MR. ROSSMAN:**  But the question there, putting aside,

13  you know, a different issue, what the Court did was granted the

14  writ, released the petitioner from detention, and then still

15  enjoined the government from rearresting the person and

16  detaining them under -- under that -- under that portion of the

17  statute.

18     They basically were trying to treat the person as if they

19  had just arrived in the country as opposed to someone who had

20  been in the country for some period of time.

21     So, I mean, that was permanent ongoing injunctive relief.

22  And if you give me a moment, I want to make sure that we're on

23  the same page as Mr. Sandoval-Moshenberg on the scope.

24         **THE COURT:**  Sure.

25         **MR. ROSSMAN:**  Why don't I have

1  Mr. Sandoval-Moshenberg address the Court directly, if that's

2  permissible, Your Honor.

3            **THE COURT:**  Sure.  That's fine.  And I just wanted to

4  ask you, is *Maldonado* in cases that you've cited, or do you

5  need to give me the citation?

6            **MR. ROSSMAN:**  I will give you the citation.  It's

7  2025 Westlaw 2968042.  There are others.  And

8  Mr. Sandoval-Moshenberg knows the cases intimately.

9            **MR. SANDOVAL-MOSHENBERG:**  Your Honor, I just think

10  it's relatively common for a court hearing a *Zadvydas* petition

11  and determining that the -- that there's no significant

12  likelihood of removal in the reasonably foreseeable future to

13  order release and then no redetention unless blank, right?

14      And I think what we need to discuss is what fills in the

15  blank in this case.  But I think that it's -- it's a relatively

16  common way for a court to structure its order granting a habeas

17  corpus under *Zadvydas*.

18            **THE COURT:**  Okay.  Well, I know that others have done

19  it, but the thing that I'm stuck on right now is I just don't

20  have such a fundamental absence in the record that -- I mean,

21  it's just a different -- it's different to say, as I think

22  Judge Abelson just did, give the petitioner his negative fear

23  review before an IJ or release him.  And you have until Monday

24  to do it.  And I'm intensely curious as to what happened.

25      But it's a different -- it's a different posture to be in

 1  than there is no order of removal.

 2          **MR. SANDOVAL-MOSHENBERG:**  Yes.

 3          **THE COURT:**  So until the government fixes that, do

 4  I -- do I continue to enjoin them?  I mean, what if they come

 5  up with an order of removal?

 6          **MR. SANDOVAL-MOSHENBERG:**  Well, Your Honor, if you're

 7  referring to the *Cruz-Medina* case, the government chose to

 8  release Mr. Cruz-Medina rather than scheduling the IJ review.

 9          **THE COURT:**  They did.

10          **MR. SANDOVAL-MOSHENBERG:**  If Your Honor finds that

11  there's no removal order, then there's no present basis for

12  immigration detention whatsoever.  And the writ of habeas

13  corpus should immediately issue and he should be immediately

14  ordered released.

15     I don't know that there's any need for them to go back to

16  the well after seven months of litigating this case to have yet

17  one more chance to produce the order of removal.  That

18  certainly isn't what we're requesting here.

19     They could, the following morning, issue him a notice to

20  appear, right?  Place him back into removal proceedings.  You

21  know, as I mentioned before, he's got a valid grant of parole.

22  It hasn't been revoked yet.  But those are probably issues for

23  the immigration judge on the new notice to appear.

24          **THE COURT:**  And where would that live?

25          **MR. SANDOVAL-MOSHENBERG:**  I don't understand.

1      **THE COURT:**  So what I mean by that -- and this is

2  going to be a question for the government as well -- is in

3  Abrego 1, my order was to restore Abrego to the status quo

4  ante.  And that was not only physically returning him to

5  Maryland, but so his case -- his immigration case continues in

6  Maryland and thereafter.  And it -- then you move to reopen

7  that case and it gets transferred to another judge outside of

8  this jurisdiction.

9      And so I guess my -- the tricky question is going to be,

10  after immediately release, if I do nothing else and now a

11  notice to appear issues, where is that notice going to be?

12      If I release Abrego, it's going to be under the current --

13  you know, he's going to have to report under the stringent

14  conditions set by the Tennessee court.

15      **MR. SANDOVAL-MOSHENBERG:**  Yes, Your Honor.

16      **THE COURT:**  So he'll be in Maryland.  And I just

17  wanted to know if you have any insight as to whether that

18  notice to appear on some new removal proceeding would be here

19  or elsewhere?

20      **MR. SANDOVAL-MOSHENBERG:**  Yeah.  Your Honor, I think

21  that as this Court -- as you've mentioned, essentially all of

22  the jurisdictional bars that the government has thrown up --

23  1252(g), 1252(b)(9) -- all assume the existence of an order of

24  removal.  And so this Court can certainly enter a finding as to

25  the existence or nonexistence of an order of removal.

1          **THE COURT:**  I'm not opining on the validity of it --

2          **MR. SANDOVAL-MOSHENBERG:**  Exactly.

3          **THE COURT:**  -- I'm just saying I don't know where it

4    lives.  I just don't see it.

5          **MR. SANDOVAL-MOSHENBERG:**  Right.  The existence or

6    nonexistence would certainly be a finding that this Court would

7    have the jurisdiction to make.  And then that would -- you

8    know, of course they can appeal it, but that would become the

9    law of the case, as it were.

10      And then, if, ultimately, that's the ruling of this Court,

11   then there's no removal order, and, you know, when his valid

12   parole expires or if they choose to revoke it before its

13   expiration date, they can issue him a new notice to appear.

14         **THE COURT:**  And in immigration law, does that

15   parole -- that parole is not jurisdictionally based.  It's not

16   issued from the District of Maryland, if you will; it's an --

17   it's an executive decision, right, and it doesn't -- that's

18   what I mean by live.  Does it live in any particular district?

19         **MR. SANDOVAL-MOSHENBERG:**  I understand Your Honor's

20   questions.  I mean, Your Honor ordered them to bring him back

21   to the United States.  The mechanism by which they chose to do

22   that, which Your Honor didn't really specify --

23         **THE COURT:**  Right.

24         **MR. SANDOVAL-MOSHENBERG:**  -- certainly didn't tell

25   them to parole him under Section 212(d)(5) of the INA.  They

1  chose to use that particular mechanism to bring him back to the

2  country.  And they chose to issue him a parole document that's

3  valid for 12 months.

4       The other option that the government would have, if they

5  are willing to sort of concede error in the underlying 2019

6  removal proceedings, is they can file a motion to reopen those

7  proceedings, right?

8           **THE COURT:**  Sure.

9           **MR. SANDOVAL-MOSHENBERG:**  If they are willing to

10  concede that the immigration judge really messed up by not

11  entering a removal order before determining and entering a

12  withholding order, the government, actually -- if I remember

13  correctly, the time bars to a motion to reopen don't apply when

14  the government is filing a motion to reopen.

15       So they could choose to file a motion to reopen in front

16  of the immigration judge to say to the immigration judge, hey,

17  you messed up; you didn't enter a removal order.

18       But then he would be back in active removal proceedings in

19  front of an immigration judge, and he would do all the things

20  we're saying that they should have given him the opportunity to

21  do in 2019.

22           **THE COURT:**  So along those lines, just for my

23  education more than anything else, what's going on with the

24  immigration case that was the -- you know, the decision that

25  was issued?

1          **MR. SANDOVAL-MOSHENBERG:**  Yes, Your Honor.  The

2   motion to reopen that we filed, you know, seeking asylum since

3   he's now returned to the United States less than one year ago,

4   that was -- as Your Honor knows, was denied by the judge.  We

5   did file an appeal to the Board of Immigration Appeals.  And

6   the Board of Immigration Appeals has not yet issued a briefing

7   order on that.

8          **THE COURT:**  And is that the only issue that was

9   appealed is the denial of asylum?  If you don't know, that's

10  fine.

11         **MR. SANDOVAL-MOSHENBERG:**  I don't want to

12  misrepresent.

13         **THE COURT:**  You made other arguments for adjustment

14  of status.

15         **MR. SANDOVAL-MOSHENBERG:**  I don't want to

16  misrepresent to the Court what -- the issues we raised on the

17  notice of appeal.

18         **THE COURT:**  Okay.

19         **MR. SANDOVAL-MOSHENBERG:**  Thank you, Your Honor.

20         **THE COURT:**  All right.  Thank you.

21         **MR. ROSSMAN:**  So, Your Honor, mindful of your time, I

22  would just say our primary -- putting aside the discussion --

23  the long discussion we had around the absence of the final

24  order of removal, our primary point on this is, you know, we

25  think we've won overwhelmingly on the 1231(b)(2) claim, which

94

1  is our first claim in the petition.  And we think that alone

2  merits a grant of the petition.

3      And I -- we would not have any qualms with, you know,

4  giving the government three days to remove him to Costa Rica,

5  which would be consistent with the statute, if that's what the

6  government wished to do.

7          **THE COURT:**  I suppose you'll have until my decision,

8  right?

9          **MR. SANDOVAL-MOSHENBERG:**  Correct.

10         **THE COURT:**  If I'm thinking -- the way I'm thinking,

11 it's not going to be a quick decision.  These are very hard

12 issues.  And if the government wants to moot it, it sounds like

13 Mr. Abrego is still open to going to Costa Rica.

14     Am I hearing that right?

15         **MR. ROSSMAN:**  Correct, Your Honor.

16         **THE COURT:**  Okay.

17         **MR. ROSSMAN:**  With that, I would pass the lectern to

18 Mr. Cooper to answer Your Honor's -- any remaining questions on

19 jurisdiction.

20         **THE COURT:**  On jurisdiction?

21         **MR. ROSSMAN:**  Yeah.

22         **THE COURT:**  Mr. Cooper, are you also going to address

23 the *D.V.D.* arguments?

24         **MR. COOPER:**  I'd be happy to, Your Honor.  Thank you.

25     Your Honor, the government asks the Court to read 8 U.S.C.

1252 as creating a jurisdictional black hole in which the

executive may devise haphazard procedures for removing

individuals to third countries without any judicial review to

ensure basic statutory and constitutional due process

commitments are honored.

     That's not what 8 U.S.C. 1252 says.  It's not what habeas

permits.  And so the Court should reject the government's

jurisdictional arguments.

     I think two bedrock principles should guide this Court's

analysis on the jurisdictional issues.

     Number one is the strong presumption in favor of judicial

review of agency action and also the equally strong presumption

against eliminating habeas review absent a crystal-clear

statement from Congress.  Neither supports the jurisdictional

void the government envisions here.

     Now, the government's theory turned 1252(g), 1252(b)(9),

and the other provisions the government invokes into

essentially a free-floating bar on district court review of any

claim that touches on immigration.  And that's precisely what

the Supreme Court rejected time and again in cases like *Reno*

v --

          THE COURT:  The government, though, is making, I

think, a slightly different argument, a more specific and

nuanced argument, which is a lot of what you seem to be asking

for is substantive review of a particular country or a

1  particular -- whether they -- whether the government has met

2  its particular burdens.  And that is really not in this court.

3       And so the whole idea was to eliminate, if I get it right,

4  since *St. Cyr*, eliminate habeas litigation, and have a lot of

5  those questions reside with the court of appeals.

6            **MR. COOPER:**  Understood, Your Honor, but in his

7  petition, Mr. Abrego Garcia is not asking this court to

8  second-guess any discretionary immigration judgments here, nor

9  is he asking for a review of the final order of removal.

10  Indeed, as I think we'll need to discuss, there is absolutely

11  no evidence of a final order of removal in this record.

12       His claims instead are collateral and procedural, right?

13  He challenges his detention, and he challenges the process that

14  the government seeks to use to effectuate a removal to a third

15  country.

16       And he challenges them because they violate due process.

17  And Congress has never withdrawn habeas review for those kinds

18  of claims.

19       And the 1252 narrow jurisdictional restrictions don't

20  foreclose them either.  And I think that is what the Supreme

21  Court has said in *Reno v. AADC*, in *Jennings v. Rodriguez*, in

22  *Department of Homeland Security v. Regents of the University of*

23  *California*.

24       And it's what decisions in this court, just in the past

25  month, have explicitly held in nearly identical circumstances

1  in terms of the types of claims at issue.  And that's in the

2  *Santamaria Orellana* case and the *Cruz-Medina* case.

3       So I'd like to walk through those.  But let me start maybe

4  with *D.V.D.*  And one thing that I think Your Honor asked

5  earlier to Mr. Rossman was, well, you know, is there

6  jurisdiction for you even to consider whether there is an order

7  of removal in the record?

8       And I think the *D.V.D.* argument -- which the government,

9  of course, is the one advancing -- puts that squarely at issue.

10 Because, of course, one of the fundamental components of being

11 a member of the *D.V.D.* class is is there, quote, a final order

12 of removal?  That is an element of being part of the *D.V.D.*

13 class.

14      And so the government has put that squarely at issue.  Is

15 he a member of the *D.V.D.* class, which requires them to have

16 proven that there's a final order of removal?  And they have

17 not done that, Your Honor.

18           **THE COURT:**  Are they going to say to me, though, that

19 the decision -- the memorandum, decision, and order withholding

20 assumes and subsumes, if you will -- subsumes within it there's

21 got to be an order of removal in there, and that's enough, at

22 least for purposes of -- for my purposes?

23           **MR. COOPER:**  Right.  I'm sure they'll argue that.

24 And I think it is telling, Your Honor, that now, seven months

25 after Mr. Reuveni told you there is no order of removal in the

1    record, they have not ever put one in the record.  And the best

2    they can do in their most recent submission is the point Your

3    Honor made, they cite to the order granting withholding of

4    removal.

5        Notably, they don't cite to any aspect of the actual order

6    itself; they cite to the procedural history section of the

7    accompanying memorandum, which also doesn't say there's any

8    order.  All it says in there is that there was a concession of

9    removability, and the Court --

10            **THE COURT:**  Counsel.

11        **MR. COOPER:**  -- and so the immigration judge found

12    that Mr. Abrego Garcia was removable.  That is not, though, an

13    order.

14        And, you know, we cite in our papers, as an example, to

15    the *Bracic* -- I'm maybe mispronouncing this -- *Bracic v. Holder*

16    case, where -- it's an Eighth Circuit case where it noted -- in

17    that case, the immigrant in that case conceded removability,

18    and the immigration judge denied in that case any relief from

19    removal.

20        And it went up to the Board of Immigration Appeals.  And

21    said, hey, you forgot to actually create any order of removal;

22    so we're remanding to the IJ because you need an actual order

23    of removal.  A simple statement of finding of removability,

24    even a concession of removability, is not enough.  You need to

25    have that actual order.

1      And that gets back to the discussion I believe you were

2   having with Mr. Rossman and Mr. Sandoval-Moshenberg about the

3   recent Supreme Court cases that have drawn a very bright-line

4   distinction between an order of removal and an order granting

5   withholding of removal.

6      And Your Honor noted, often that has been used one way by

7   the government or by the petitioners.  And in this instance,

8   the government has failed to obtain, it appears, any order of

9   removal.  And that goes against them in this case.

10      With respect to *D.V.D.*, I'm happy to address that pretty

11   briefly.  It -- we submit that it does not foreclose Mr. Abrego

12   Garcia's claims here for at least four reasons.

13      One, there isn't the final order of removal in the record.

14      Number two, his claims that are being challenged in this

15   petition are very different than the ones at issue in *D.V.D.*

16   In particular, he raises challenges to his detention, which the

17   *Tanha* case in this court -- I'm happy to provide citations if

18   you need them to any of these.  They're in our papers.

19          **THE COURT:**  No, we've looked at them.

20          **MR. COOPER:**  -- doesn't -- it explicitly says

21   challenges to detention not covered by *D.V.D.*

22      And then, in addition, he raises procedural challenges, as

23   I mentioned, to the government's third-country removal process

24   for him, including unique challenges such as the failure by the

25   government to comply with 1231(b)(2)(A) and his designation of

1    Costa Rica.

2        And the courts in *Santamaria Orellana* and in

3    *Cruz-Medina* -- excuse me -- not *Cruz-Medina*; I misspoke

4    there -- in the *Nguyen* case from the Western District of

5    Washington -- in both of those cases -- *Santamaria Orellana* and

6    *Nguyen* -- say that when you have unique procedural challenges

7    to third-country removal processes, that's not covered by

8    *D.V.D.*  So the exact same thing would apply here.

9        And then even if you were to find him a member of the

10   *D.V.D.* class, even if his claims were identical, neither of

11   which is the case, the Fourth Circuit has expressly held that

12   class actions are an exception to the claim-splitting rule.

13       So there's no reason to find that he's improperly

14   splitting claims.  As part of the mandatory class in *D.V.D.*,

15   class actions are an exception.  That's what the Fourth Circuit

16   held in the *Gunnells* case that we cite.

17       And then last -- I'll just note it briefly -- even if,

18   after all that, they still thought *D.V.D.* might apply, we would

19   submit that Mr. Abrego Garcia would have the fundamental due

20   process right to opt out of a mandatory class.  The Supreme

21   Court has never said that it comports with due process to have

22   mandatory classes when you have an individual in unique

23   circumstances who is otherwise going to be foreclosed from

24   raising claims to protect his -- himself from deprivations of

25   life and --

1          **THE COURT:**  Just so I get it right, in a situation

2    where, here, the government is saying deprive Abrego Garcia of

3    any of his claims because he's part of the *D.V.D.* class, but

4    before the high court on the *D.V.D.* class, they're arguing it

5    shouldn't be a class and --

6          **MR. COOPER:**  Correct.  Before the First Circuit, I

7    believe.

8          **THE COURT:**  Sorry.  The First Circuit.

9          **MR. COOPER:**  Indicated in the First Circuit.  And I

10   believe in the district court, they are going to move to

11   dismiss that whole case, that it's an improper class.  It's

12   basically the government saying nowhere should you get your

13   claims heard, Mr. Abrego Garcia.  And then obviously --

14         **THE COURT:**  It can't be.

15         **MR. COOPER:**  -- can argue it would violate his due

16   process rights.  And we cite to the *Phillips Petroleum* case,

17   where the Supreme Court held explicitly that members of a class

18   involving monetary claims have a due process right to opt out.

19      And we would submit that if monetary claims give you a due

20   process right to opt out, then claims where you're going to be

21   deprived of life and liberty potentially should do so as well.

22      Moving to the jurisdiction-stripping provisions the

23   government has invoked, I believe it begins with 1252(g), with

24   which Your Honor is obviously quite familiar.  The government

25   has been incessantly invoking it since at least March of this

1  year.

2      Time and again, this Court has held that it does not bar

3  jurisdiction over the various claims Mr. Abrego Garcia has

4  brought.  We submit the same should apply here.  To begin, the

5  Supreme Court in the *Department of Homeland Security v. Regents*

6  *of the University of California* held that 1252(g) is narrow.

7  And that also followed from the *Reno v. AADC* case.

8      And as this Court held in its April 6th decision, 1252(g)

9  applies only to discretionary decisions by the government, by

10  the attorney general, in three limited categories; namely, one,

11  commencing proceedings; two, adjudicating cases; or, three,

12  executing removal orders.  None of which are at issue here.

13      And there's, I don't believe, any argument.  None of our

14  claims go to commencing proceedings or adjudicating cases.  As

15  we already noted, there isn't any evidence of a final order of

16  removal.  So that would take that off the table as well.

17      But even if, assuming for the purposes of this argument,

18  there is a removal order, Mr. Abrego Garcia's claims are not

19  challenging any purported removal order.  Rather, as we said,

20  they're challenging detention.  They're challenging the

21  processes for third-country removal.

22      And many cases in recent months have held none of those

23  claims are foreclosed by 1252(g).  I'll point you to the

24  *Ibarra-Perez* case from the Ninth Circuit from just a few months

25  ago that explicitly held that.  And of course this court in

1    both the *Santamaria Orellana* and the *Cruz-Medina* case held

2    1252(g) does not bar procedural challenges to third-country

3    removal processes.

4        And then many other courts have also held that 1252(g)

5    does not bar detention challenges.  The Supreme Court held that

6    in *Zadvydas*.  The Second Circuit held it in *Öztürk* and the

7    *Mahdawi* case.  Petitioner maintains that 1252(g) is

8    inapplicable in this habeas petition.

9        The government next goes to 1252(a)(5) and (b)(9), both

10   which say -- and I'm summarizing -- paraphrasing here -- but

11   basically say you need to funnel review of challenges to final

12   orders of removal to courts of appeals.

13       But, again, Supreme Court has said this -- this provision

14   is narrow.  So the Supreme Court said that.  And, again, in the

15   *Department of Homeland Security v. Regents of the University of*

16   *California* case.

17       And here, Mr. Abrego Garcia is not challenging any final

18   purported order of removal.  That's not what his petition is

19   about.  Again, it's about detention.  It's about processes for

20   third-country removals.  And the cases I just cited all held

21   the exact same thing as with 1252(g).

22       They also hold 1252(a)(5) and (b)(9) don't bar those kinds

23   of claims.  Again, the *Ibarra-Perez* case.  That's the

24   *Cruz-Medina* case.  That's the *Santamaria Orellana* case.  All of

25   them say if you're challenging detention or if you're

104

challenging third-party removal processes, these provisions

don't apply because you're not challenging the underlying

purported removal order.

And I should also mention the Second Circuit *Öztürk* and

*Mahdawi* cases also say that for detention.

Next, the government talks about 1252(a)(4) and also the

FARRA statute, Section 2242(d).  Those provisions are quite

similar.  The 8 U.S.C. 1252 provision was designed to codify

what was passed in the FARRA Act.  All of those talk about

challenges to an immigration judge's resolution of a Convention

Against Torture, or CAT, claim.  Mr. Abrego Garcia, again, is

not challenging CAT -- a CAT adjudication in his petition.

**THE COURT:**  He's -- he's challenging the lack of

process.

**MR. COOPER:**  He's challenging the lack of process,

and he's challenging his detention, neither of which is a

challenge to a CAT determination.

**THE COURT:**  Even to the extent there is subject

matter touching on CAT relief, it's because Mr. Abrego Garcia

says he's not getting enough process to even tee that question

up.

**MR. COOPER:**  Exactly.  And, again, Your Honor, the

*Santamaria* case and the *Cruz-Medina* case both explicitly

address these alleged jurisdictional bars.  They say these are

not bars when you're challenging the process for third-country

1  removal.  Both of those decisions came out last month in this

2  court.  And we recommend Your Honor to follow those there as

3  well.

4      The last jurisdictional bar I believe the government cites

5  is 1252(a)(2)(B), which is about denials of discretionary

6  relief.  And nothing that Mr. Abrego Garcia is seeking here is

7  discretionary.

8      He is, as we said, talking about his improper detention.

9  That's a mandatory claim under *Zadvydas*.  He's talking about

10  the lack of process and due process.  None of those are

11  discretionary.  The government obviously is required to apply

12  due process under the Constitution and under the governing

13  statutes, including 1231(b)(2)(A).

14      So for all those reasons, Your Honor, we would submit that

15  none of the jurisdictional bars apply here.  I'm happy to

16  answer any other questions Your Honor might have on any of the

17  jurisdictional fronts.

18          **THE COURT:**  I don't think so yet; but since it's your

19  petition, I'll give you the last word after hearing from the

20  government.

21          **MR. COOPER:**  Thank you very much, Your Honor.

22          **THE COURT:**  Okay.  Thank you.

23      Okay.  Who's up?  Mr. Ensign?

24          **MR. ENSIGN:**  Yes, Your Honor.

25          **THE COURT:**  Okay.

1          **MR. ENSIGN:**  May it please the Court.  I'd like to

2   talk about a couple of different issues.  I think we've covered

3   a lot of ground --

4          **THE COURT:**  Sure.

5          **MR. ENSIGN:**  -- and so maybe I'll start with the

6   final order of removal issue since that was kind of a

7   centerpiece of the prior discussion.

8      So we do believe there is a final order of removal.

9   Actually, let me -- and it is what Your Honor cited at

10  Docket 28-1, I believe at page 35 of the PDF.

11         **THE COURT:**  Okay.  I have it up as 1-1.  That's the

12  hard copy that I have.  And so I would invite you to point

13  me -- the last page says "Order."  And there's three aspects of

14  that order.  And you would agree with me that no -- none of

15  those, does the order say order removed to a particular -- any

16  country.  It just doesn't say order removed, right?

17         **MR. ENSIGN:**  Not in so many words, Your Honor, but --

18         **THE COURT:**  Not at all.  Like, tell me where -- it's

19  one, two, three.  Tell me right where it says "ordered removed

20  to" any country.

21         **MR. ENSIGN:**  Not to any country specifically, Your

22  Honor, but as to, for example, Roman I, it says, "Respondent's

23  application for asylum pursuant to INA Section 2808 is denied."

24  The prior part of the order explains that Mr. Abrego Garcia

25  conceded removability and --

1          **THE COURT:**  That doesn't have to do with asylum, does

2   it?  I thought that it was denied in this case because he

3   hadn't brought it in sufficient time after entering the

4   country.  Am I right?

5          **MR. ENSIGN:**  Your Honor, it's been denied two times.

6   So this would be referring to the 2019 denial.

7          **THE COURT:**  Right, but the ground for the denial --

8   listen, I want us to be clear.

9          **MR. ENSIGN:**  Yes.

10         **THE COURT:**  I am just interested in finding the order

11  of removal.  I'm not here to fight about whether the IJ was

12  right or -- but if I'm looking to this document, and you say I

13  should read it as an order of removal, I want to be clear as to

14  what this document says.

15     The first thing it said is denying the asylum ground

16  because of the time that it took Mr. Abrego to bring it from

17  the date of entry into the country.  Isn't that right?

18         **MR. ENSIGN:**  That's correct, Your Honor.  And so --

19         **THE COURT:**  Okay.

20         **MR. ENSIGN:**  But I think the context of the order is

21  very important.  Mr. Abrego Garcia conceded removability.  And

22  his only defense to having a final order of removal being

23  entered against him was his assertion of an asylum claim.

24     So by rejecting that asylum claim, it was necessarily

25  deciding that -- you know, that a final order of removal should

1    issue and that he was removable.

2            **THE COURT:**  But that's not the judge -- listen, first

3    of all, point me to the language that you say is the order of

4    removal.  One, two, and three is not the order of removal.  The

5    Supreme Court has made that clear.  You don't collapse, when

6    the petitioner tries to collapse the relief, the withholding,

7    the CAT relief.  You don't do it.  That's what the Supreme

8    Court has said most recently in *Bondi*, right?

9            **MR. ENSIGN:**  As to a different issue, Your Honor --

10            **THE COURT:**  Sure.

11            **MR. GUYNN:**  -- not to this issue.  As to the

12    timeliness of the petition for review, it had a separate

13    analysis of that.

14            **THE COURT:**  Do you think the Supreme Court is going

15    to have a different view here that somehow the withholding

16    order is now the order of removal as well?  Do you think

17    they're going to shift course from the last three cases they've

18    decided in this regard?

19            **MR. ENSIGN:**  Not in that manner, Your Honor, but --

20            **THE COURT:**  Okay.

21            **MR. ENSIGN:**  -- the withholding order of removal, I

22    believe as Your Honor identified our argument earlier, is that

23    it necessarily would only exist because he had resolved the

24    final order of removability question.  You would never reach

25    the withholding question unless you had already determined that

1  he was removable, that all of his defenses failed.

2       And his defense was asylum.  I recognize it was denied on

3  procedural grounds.  But that -- a final order of removal would

4  have issued and did, in fact, issue by operation of law, by

5  rejecting his one and only defense, which was the asylum point.

6            THE COURT:  But there is no authority in the INS, in

7  the INA, in the statute or the regulations, for the proposition

8  you're giving me.  And there's ample law to say that you can't

9  just consider a withholding by operation of law to be an order

10 of removal.

11      I mean, I think Judge Wilkinson said it really well.  And

12 since we keep -- we keep going back to his wise words, let's --

13 let's talk about it because I want to hear your response to his

14 view on this.

15      Now, admittedly -- and that's why I thought we were going

16 to be talking about jurisdiction -- it comes up in a different

17 context.  But he -- in opining on the -- on the importance of

18 this question, in -- and I'll give you the case, *Kouambo v.*

19 *Barr*, 943 F.3d 205.

20      It's a 2019 case.  So it predates a number of the Supreme

21 Court cases on this.  But he says, "Importantly, when an IJ

22 grants withholding of removal, quote, an explicit order of

23 removal must be included in the decision."  And he cites an

24 immigration court decision that the Supreme Court uses

25 subsequently.

1      "This is so for two reasons.  First is a -- as a -- as a

2  matter of simple logic, in order to withhold removal, there

3  must first be an order of removal that can be withheld."

4      That's your point.

5      "Second, because an alien protected by an order of

6  withholding may still be removed to a willing third country,

7  the IJ must issue a final order of removal to authorize DHS to

8  effect such a removal if a third country is identified."

9      And then he goes on to say and the problem here was that

10  flowing from an order of removal and then withholding his

11  rigorous background checks, and the person wasn't subjected to

12  it, and the real question was so when the BIA remanded for

13  those background checks, does it confer jurisdiction on the

14  Fourth Circuit?

15      And the Fourth Circuit, Judge Wilkinson, said no because

16  that jurisdiction starts with the order.

17      So in that situation, right, where it's adverse to the

18  petitioner, it -- we were all very careful to make sure we knew

19  what the order of removal was and what the withholding was or

20  what the relief from the order was.

21      Why should I do it differently here?

22         MR. ENSIGN:  Well, Your Honor, I think that that is

23  presenting a different posture.  You know, notably, we'll get

24  to the jurisdictional bars, and there's a reason the Fourth

25  Circuit is reviewing that.  It's because it would have come up

1    on a petition for review.  And, therefore, through the proper

2    channeling processes under (a)(5) and (b)(9).

3                THE COURT:  Right.

4         MR. ENSIGN:  But assuming this was before you, I

5    think this represents necessarily the final order of removal.

6    This is what the IJ did.  He was adjudicating whether or not he

7    was removable.  He adjudicated Mr. Abrego Garcia's one and only

8    defense that would prevent the issuance of a final order of

9    removal, and then proceeded to reach an issue that he would

10   only reach if the final order of removal had issued.

11               THE COURT:  But he made a mistake.  And there is no

12   order of removal.  Why isn't that the correct status in the

13   record?

14        MR. ENSIGN:  Because, Your Honor, I think that is

15   requiring more formality than the law requires.  He has

16   adjudicated all issues.  And by operation of law, by rejecting

17   Mr. Abrego's one and only defense that would keep him from

18   having a final order of removal, that this is, in fact -- by

19   resolving all such issues, this is, by operation of law, a

20   final order of removal.

21               THE COURT:  So your argument is not that anywhere in

22   this document it says "order of removal" or "I order that

23   Mr. Abrego Garcia be removed to a designated country."  It

24   doesn't say that.  You're simply saying, by operation of law, I

25   am to construe the withholding as an order of removal?

1      **MR. ENSIGN:**  Not just the withholding, but, yes, Your

2  Honor.  By deciding the withholding issue, by deciding the

3  asylum issue, by providing his appeal rights that's further

4  down the page, these appeal rights would only run from the

5  entry of a final order of removal.  So by starting the clock

6  for a final order of removal, the IJ was further acknowledging

7  that this was, in fact, the final order of removal.  You

8  wouldn't provide for those appeal rights if the final order

9  of -- if this weren't the final order of removal.

10      **THE COURT:**  So you're saying at the point at which --

11  just to sort of humor me so I understand it.

12      At the point at which -- say, in a case in which an order

13  of removal was separate, there was a prior order of removal,

14  right?  And then there was a determination of denial of asylum,

15  denial -- a granting of withholding, denial of CAT, wouldn't

16  the judge give an advisement of appeal rights in that situation

17  on the second set of orders?

18      **MR. ENSIGN:**  Your Honor, I'm not sure that I follow

19  your hypothetical exactly because it sounds like you're

20  describing this situation.

21      **THE COURT:**  No, I'm actually saying --

22      **MR. ENSIGN:**  Okay.

23      **THE COURT:**  There's order on day one of removal.  And

24  then on day ten, there's the relief that is accorded Mr. Abrego

25  Garcia or the denial of it in -- in this decision.  Right?

1    If this decision is construed only as granting
2 withholding, denying CAT, denying asylum, wouldn't the decision
3 give Mr. Abrego notice of his right to appeal?
4         **MR. ENSIGN:**  It would, Your Honor, but that's -- this
5 order is different.  There are often withholding-only
6 proceedings.  This was not one of them because Mr. Abrego
7 Garcia chose to raise asylum; that if his asylum claim had been
8 meritorious, that would have kept a final order of removal from
9 being entered.  I don't think that's disputed in any way.  That
10 was his one and only defense to a final order of removal
11 issuing.  And by rejecting it, the IJ clearly meant for this to
12 be the final order of removal.
13         **THE COURT:**  Okay.  They may have meant it, but let's
14 talk about what orders of removal usually look like according
15 to the regs, right, according to the INA, and according to the
16 implementing regulations.
17    This doesn't look anything like -- I mean, it's not even
18 close -- an order of removal, right?  I mean it doesn't
19 designate the country.  Does it?  Does it designate the country
20 as El Salvador?
21         **MR. ENSIGN:**  It does not, Your Honor.  And
22 necessarily, by granting withholding of removal from
23 El Salvador, it could not be.
24         **THE COURT:**  Except they granted withholding of
25 removal to Guatemala.

1          **MR. ENSIGN:** Understood, Your Honor.

2          **THE COURT:** No, no, no. Let's not gloss over that.

3     That's important. Okay? Because that's why the order itself

4     is so important, so that there is no mistake. People make

5     mistakes. We're human. And -- and I'm not faulting this judge

6     because he's -- I'm sure he was very, very busy, right?

7          And he wrote a very recent decision. But, notably, in the

8     conclusion, said that DHS hasn't shown there are changed

9     circumstances in Guatemala, right, that would result in the

10    respondent's life not being threatened.

11         And the point of that is that was an important fact for

12    him in denying, if I'm getting it right, the Convention Against

13    Torture claim.

14         **MR. ENSIGN:** I believe so, Your Honor.

15         **THE COURT:** Okay. But he got the country wrong. So

16    how am I even to infer what country this is an order of removal

17    to?

18         **MR. ENSIGN:** Your Honor, the rest of the record

19    reflects -- strongly indicates that that is a typo. But you're

20    right. People -- people, including immigration judges, make

21    errors all the time.

22         **THE COURT:** Yeah.

23         **MR. ENSIGN:** And Congress created a process for that

24    to be reviewed. If you don't think that the IJ's order is

25    sufficient, then you can take it to the BIA. And, notably,

1   Mr. Abrego Garcia recently filed a motion to reopen before the

2   IJ.  And it seems like if they thought that this was a good

3   immigration argument, that would have been a fantastic thing to

4   raise to an immigration judge, to say you have not, in fact,

5   had an order of removal; therefore, you need to fix this

6   because the prior IJ did not follow the requirements.  But they

7   did not do so.

8        **THE COURT:**  Well, maybe; maybe not.  I don't know.

9   You know, I did note that, at almost every box that needed to

10  be checked where Mr. Abrego is asked if there was a final order

11  of removal, the answer was no.

12      So the petitioner was careful in that regard.  There was

13  no concession of a final order of removal.  And I'm not here to

14  figure out why things are going on in immigration one way or

15  another.

16      I'm just here to determine, first, whether I have

17  jurisdiction.  And I have jurisdiction to determine whether I

18  have jurisdiction.  And it's a fundamental question whether I

19  have jurisdiction.  You've raised all of these provisions that

20  say I don't.  They all depend on the existence of a removal

21  order.  I can't opine on a -- on the validity of an order if it

22  doesn't exist.

23      **MR. ENSIGN:**  Your Honor, actually, I don't think that

24  premise is correct for all of the jurisdictional bars.  So it

25  may be helpful to pivot to those and say which ones would.

1           THE COURT:  Sure.  Okay.

2           MR. ENSIGN:  I think if there weren't a final order

3     of removal, I don't think that 1252(g), that one would not

4     apply because that presupposes -- or execution of an order of

5     removal.  And so the 1252(g) would not.

6        However, (a)(5) and (b)(9) are zipper clauses that funnel

7     everything that is in a IJ's decision through a court of

8     appeals to the extent that your objection is that there is

9     legal error or insufficient reasoning in an immigration judge's

10    decision.  There's a process.

11          THE COURT:  But doesn't it say that those bar me from

12    reviewing the validity of a final order, all facts and law

13    related to a final order?  So, again, it presupposes -- because

14    in so many of these cases, everyone agrees there's a final

15    order.  It's not in dispute.

16          MR. ENSIGN:  Your Honor --

17          THE COURT:  And also that's why I -- I'm pushing back

18    a little bit because I think I have to decide is there a final

19    order to decide if I'm -- have jurisdiction or not.

20          MR. ENSIGN:  Your Honor, I don't believe so.  And I

21    think in two different ways.  So (b)(9) does refer to final

22    orders of removal; however, (a)(5) does not.  (a)(5) just

23    refers to an order of removal.  So it's not the term of art

24    within immigration law.  It's anything that looks like an order

25    of removal would fall within its bar.

1          **THE COURT:**  Wait, wait, wait.  Anything that looks

2     like it?  I mean, that vests all of the jurisdictional question

3     in the United States.  Because, frankly, like, just to push

4     this to its, like, absurd -- to a point of absurdity to make my

5     point.

6          You could say in the record that there is -- you know, you

7     could say anything in the record is an order.  And once you say

8     it, now I'm barred from reviewing it?

9          **MR. ENSIGN:**  No, Your Honor.  I think the case law

10    does recognize that the antecedent thing would have to be there

11    are IJ proceedings.  And you are -- you are taking some

12    objection to those IJ proceedings.  And if so, then the course

13    of appeal you recognize that the (a)(5) and (b)(9) zipper

14    clauses funnel everything, even if there is not yet a final

15    order of removal.

16         To the extent that you have injury that you're alleging

17    from a grievance that you have with an order issued by an IJ,

18    Congress added the (a)(5) and (b)(9) zipper clauses funnel

19    everything, including, because that could -- you know, that

20    will eventually lead to a final order of removal.  You can't

21    bring premature questions to the court of appeals under (b)(5)

22    and (a)(9).

23         And, again, all of those are being funneled to courts of

24    appeals.  There are explicit prohibitions on jurisdiction in

25    the district Courts, including the habeas statute is mentioned

1   by specific citation in either (a)(5) or (b)(9) or possibly

2   both.

3        So, you know, certainly that satisfies any clarity

4   requirement that will come up.

5            THE COURT:  But again, I think those go to -- I'm not

6   opining on the validity of an order, the sufficiency of an

7   order, the -- the legal import of it.  I'm saying, like -- like

8   courts often do, I've got a -- I've got a record.  I've got the

9   court file, if you will.  I take judicial notice of the court

10  file.  And this thing is missing.  There is no order of removal

11  that is -- that satisfies the INA or the implementing

12  regulations.

13       If I -- if I find that.  If I find that.  And then I say,

14  okay, if there is no order, on what authority can Mr. Abrego be

15  released -- or be detained for -- for imminent and reasonable

16  removal?  Not much because the removal to a third country is

17  predicated on an order of removal.

18       So under *Zadvydas*, which I do have the authority to review

19  the constitutionality of prolonged detention, since it's not

20  reasonably foreseeable, I'm going to give him the relief of

21  release.  Why don't I have jurisdiction to do that under these

22  other clauses that you mentioned?

23           MR. ENSIGN:  Your Honor, as to prolonged -- prolonged

24  detention, we agree that (a)(5) and (b)(9) do not -- are not a

25  bar to bringing a prolonged detention claim.  It is a bar to

1    challenging removal.  But as to prolonged detention, the -- the

2    (a)(5) and (b)(9) bars do not apply.

3        We think there's a different thing -- a different rule

4    that attaches, not presented here, when someone is arrested at

5    the same time that removal proceedings are initiated.  We think

6    it is then part and parcel of the same decision, but it falls

7    within the (g) clause.  That's not presented here.

8            **THE COURT:**  Right.

9            **MR. ENSIGN:**  *Zadvydas*, as Your Honor recognized,

10    those claims are reviewable.  As to prolonged detention, we

11    think that fails on the merits, but we're not saying that

12    (a)(5) and (b)(9) or 1252(g) prohibit Your Honor from reaching

13    the merits of that claim.

14            **THE COURT:**  Yeah, because I'm really trying,

15    Mr. Ensign, to wrestle with this and be careful.  I'm not

16    interested in going where district courts are not to go.

17        But it seems to me like there is a very strong argument

18    from Mr. Abrego that third-country removal is derivative of a

19    valid removal order.  And from the beginning, your former

20    colleague agreed that there is no order of removal in the

21    record.

22        He pushed back on whether I could make that finding

23    because there was this withholding of removal.  But that

24    concession was made in April that there is no order of

25    removal -- order of removal.

1    Okay.  So now, many months later, Mr. Abrego is still

2  detained.  And so tell me under *Zadvydas* why it's not relevant

3  in that regard.  Like, it doesn't seem to be imminent or

4  reasonably foreseeable, not only because of these third-country

5  problems; but in the first instance because there's no valid

6  order of removal.

7         **MR. ENSIGN:**  Well, Your Honor, in that circumstance,

8  it actually gets a little weird.  So the issues that would be

9  presented are actually quite different.

10    If there is no final order of removal, then Mr. Abrego

11  Garcia's detention is not governed by Section 1231 and *Zadvydas*

12  doesn't apply at all.

13         **THE COURT:**  Well, I don't know if it doesn't apply.

14  It's just applied in that case because it was 1231.  But the

15  fundamental principle remains, which is that if a person --

16  see, we've got this weird situation where if it's not 1231,

17  then it's nothing right now.  Okay?

18    So at some point, the government may elect that it's going

19  to proceed -- if you think that this argument is valid, you may

20  proceed with a new removal order with a new plan in mind.  And

21  we'll see.

22    But as of today, I don't read *Zadvydas* to only apply to

23  third-country removals because it gets to that fundamental

24  principle.  If you're being held by the government for -- for

25  removal purposes and removal is not reasonably foreseeable,

1    then you're entitled to release.

2         **MR. ENSIGN:**  Your Honor, I don't believe that's the

3    state of the law.  As *Zadvydas* resolves, the -- those claims as

4    to detention under Section 1231, which is post final order

5    removal.

6         **THE COURT:**  Okay.  Yeah.

7         **MR. ENSIGN:**  As to pre final order of removal

8    detention, that is governed by Sections 1225 and 1226.  The

9    Supreme Court in *Jennings* case refused to extend the *Zadvydas*

10   principle.

11        **THE COURT:**  To people who clearly were in 1225 and

12   1226.  I mean, here's the point:  The only basis that you have

13   given me to hold Abrego is 1231.  And without a valid order of

14   removal, the sanctity of that basis is really undercut.  And

15   that's the only basis you give me.

16        So if I'm just looking at is the basis you're giving me

17   enough to hold him beyond today or whenever I decide, why --

18   why is that not squarely *Zadvydas*?

19        **MR. ENSIGN:**  I guess several reactions, Your Honor.

20        The first is, again, 1231 and *Zadvydas* only applies to

21   1231, which is post final order of removal.  So in that

22   scenario, it wouldn't apply; different statutory authorities

23   would apply.

24        The second is that, as they've recognized, we could simply

25   issue a new NTA, which would then allow detention under 1225

1  and 1226.  And, candidly, I don't know the status of if there

2  is no final order of removal, I think the government could

3  potentially detain him under the original NTA, like that would

4  go back into effect as a matter of law.

5          THE COURT:  You may be right, in which case a lot of

6  the questions that we're wrestling with are mooted out because

7  it goes back into that original status.  And then, I mean, you

8  know, both sides proceed at their -- on their own merits with

9  whether Mr. Abrego is removable and, if so, whether he can

10  elect a third country or is subject to withholding of removal.

11       I mean, all those questions, I guess, I don't know if

12  they're back on the table.  My point is we're not there.  Where

13  we are right now is the only basis for holding him is 1231.

14  And in *Zadvydas*, the challenge was the government persists in

15  holding the individual because they looked for a third country

16  and they can't find one.

17       Here, the thing that I'm wrestling with, because the

18  petitioners never let this argument go, is the government

19  persists in holding him without any authority under the INA.

20  That's the upshot of the lack of the removal order.

21          MR. ENSIGN:  Your Honor, in that scenario, I do think

22  that that would mean that there's different detention

23  authorities that would take us outside of *Zadvydas*.  I'd --

24  just as a more global observation, I'll note that he has

25  conceded that he would go to Costa Rica tomorrow if we agreed

1  to do so.  That is an odd thing to agree to if you didn't think

2  that you had a final order of removal.

3        **THE COURT:**  No, not necessarily.  It's a concession

4  because he's been to CECOT and back and that he has negotiated

5  an arrangement where Costa Rica will not put him in a detention

6  center where he could be harmed.  It will not be thousands of

7  miles away, steps away from the ocean, in a country where he

8  doesn't know his language -- the language, he has no cultural

9  ties, no ties whatsoever.  He will be completely removed from

10  everything and everyone he knows, and no ability that I can

11  foresee in a normal human to get back to that.

12     So -- so you make -- you make decisions.  You are dealt a

13  hand, and you play it the best you can.

14     He has a country -- maybe he'll turn to that at some

15  point -- who said we will take him and we will give him

16  protected status.  That's why he offers it today.  That's what

17  I'm hearing from the petitioner.  And the government still

18  doesn't have any appetite for that.  Am I right?

19        **MR. ENSIGN:**  Appetite?  Your Honor, I believe the

20  testimony today was that that is not an open door.

21        **THE COURT:**  Well, I don't have any factual basis for

22  that because the government elected not to give me any.

23        **MR. ENSIGN:**  Your Honor --

24        **THE COURT:**  Let's stop for a second because I want to

25  be fair to you, Mr. Ensign, and understand why I'm saying that.

1    We've had four African countries that have been open for

2    discussion.  And every time, the government -- not for

3    everybody's eyes, but for mine -- has given me the factual

4    predicate of what's going on.  And I appreciate it because then

5    I can review it and I can make determinations.

6    For Costa Rica, you haven't done that.  And it's a real

7    curiosity.  It was filed under seal.  You fought keeping it

8    under seal.  This affidavit that says nothing.  This witness

9    said nothing today.  And I just want the underlying

10   information.

11   So you're saying now the government's position is Costa

12   Rica is no longer on the table.  Has Costa Rica conveyed that

13   to the United States?

14          **MR. ENSIGN:**  Your Honor, I don't know the specifics

15   of the discussions.  I know what has been conveyed to the Court

16   through the declaration, that it would require additional

17   negotiations that could not -- and, you know, it is not

18   something that can simply be done.  And it's not something that

19   is clear that could be, you know, achievable.

20          **THE COURT:**  So that means that the letter from August

21   authored by the government of Costa Rica saying we will take

22   Abrego, we will give him protected status, you're saying Costa

23   Rica now has rescinded that?  Because they made the offer.

24   It's in -- it's in the record.  It wasn't conditional.  That's

25   what I don't understand.

1      And if you are saying that, I would love to see the

2  evidence so that I can -- I'm rest assured that this is not

3  just an empty word salad of an affidavit.

4          MR. ENSIGN:  Your Honor, my understanding is that --

5  and I believe that it was conveyed in the declaration -- is

6  that even when made, it still had a degree of conditionality to

7  it.  That was not simply an absolute.  I guess I can say

8  something that bears more directly on this too.

9      To the extent that Costa Rica would like to take

10  Mr. Abrego Garcia, there's nothing that would stop Mr. Abrego

11  Garcia from, once being removed to Liberia, to apply to Costa

12  Rica to take him.

13          THE COURT:  Why do that, though?  Why?  He's paroled

14  in this country.  Costa Rica says we'll give you the papers.

15  Why is the government standing in the way of that?  And now

16  taking the position he should go to Africa first?  I mean, why

17  are you doing it other than what the petitioner is saying?

18          MR. ENSIGN:  Your Honor, I think it's exactly what

19  the statutory language says --

20          THE COURT:  Which is?

21          MR. ENSIGN:  -- that the secretary of Homeland

22  Security, it's the romanette iv within 1231(b), that the

23  secretary has determined that it would be prejudicial to the

24  interests of the United States to do so.  And that is not a

25  reviewable determination under 125 --

1          **THE COURT:**  I agree with you.  And when you have

2     given me reasonable assurances from the State Department, you

3     have shown me the work.  You have not shown me the work here.

4     Okay?

5          The affidavit of Mr. -- poor Mr. Cantú knew nothing about

6     anything.  He just took the word of a lawyer who was told by

7     someone -- we believe it's the Deputy Secretary of State -- I

8     don't see any underlying information in that regard -- that

9     these assurances are no longer on the table and they were

10    conditional in any event.

11         Can you just show me, just me, the underlying work on

12    that?

13         **MR. ENSIGN:**  Your Honor, I would have to talk to the

14    clients about that.  I don't -- I don't know the answer to

15    that.

16         **THE COURT:**  It's so odd to me.  It's so odd.  And

17    that's really being polite.  You know what today is.  And you

18    want me to make a finding that Costa Rica is no longer on the

19    table, but yet, despite your ability to get it done at every

20    other hearing to show me the work between this country and

21    third countries, not for public consumption, you do not want to

22    do it here and you're going to go back and ask again.

23         Now, the record is going to be closed as of today.

24         But, you know, in terms of any future proceedings where I

25    issue an order, say this is what I -- this is what the witness

1    most opine on; it's not followed.  I issue another one; not

2    followed.  This time, I even said, attorneys, make a good-faith

3    effort to make sure this witness is prepared, right?  And --

4    and he was the worst of all, the worst -- you've had three

5    witnesses do this.  They are supposed to bind DHS.  This

6    witness knew nothing.  He didn't know the meaning of the words

7    in his own affidavit.

8        That's extremely troubling.

9        Now, is it -- I don't even know if it matters here,

10    frankly, because if I make a finding that a -- a final order

11    doesn't exist, it might be we're done.  But it may matter for

12    proceedings in Abrego 1.  I don't know.

13        But I still don't understand why I can't -- if there

14    was -- let me put it this way:  If there was such evidence, you

15    all are reasonably competent and well-trained lawyers, I would

16    have gotten it.  That's how I'm looking at it.  There is no

17    evidence that Costa Rica is somehow conditional or withholding

18    their prior request.  That's how I'm seeing it.

19        **MR. ENSIGN:**  Your Honor, I guess some reactions.  I

20    agree first that, if you think there's no final order of

21    removal, that that issue is presented and you wouldn't need to

22    raise it.

23        **THE COURT:**  Right.

24        **MR. ENSIGN:**  Second, as to why there's not a record,

25    part of it is the defendants believe that this is not

1    reviewable, that the 1231 allows the Secretary of Homeland

2    Security to, in her discretion, you know, disregard a

3    designation either as untimely or as prejudicial to the

4    interests of the United States.  That's an explicitly

5    discretionary decision.  And, therefore, under

6    Section 1252(a)(2)(B)(ii), then that -- that is explicitly,

7    there is no judicial review.  And, you know, in particular, the

8    State Department feels strongly that that is not subject to

9    judicial probing.

10            **THE COURT:**  Okay.  All right.  Well, when it's the

11   petitioner's turn to respond, I will be interested in learning

12   whether, you know, you've had any direct -- if there's any

13   additional evidence as to whether Costa Rica is still on the

14   table.  But I hear you, Mr. Ensign.

15       Okay.  So that's -- we pivoted to that.  I think I got us

16   off the jurisdictional track.  So I'm happy to hear from you to

17   pick back up wherever.

18            **MR. ENSIGN:**  Certainly, Your Honor.

19       So as we're talking -- maybe let's turn back to 1252(g)

20   for a moment.

21            **THE COURT:**  Okay.

22            **MR. ENSIGN:**  So I agree that if there isn't a final

23   order of removal, that that would not apply because, by its

24   terms, it refers to that.

25       However, assuming that there is one, which we believe

1  there is, this is squarely within its core.  The Supreme Court

2  has described 1252(g) as narrow.  And that's correct because it

3  is three categories.  But this is one.  Execution of removal

4  orders is squarely within 1252(g).  An argument that you cannot

5  execute my -- my removal order until you do X, Y, Z is a

6  literal challenge to an execution order and it falls squarely

7  within a 1252(g) bar.

8      **THE COURT:**  Although *Zadvydas* -- if this were just a

9  garden-variety -- like, yes, there is a final order of removal,

10  but the petitioners are going back to their *Zadvydas* claim that

11  we talked about a couple of weeks ago, 1252(g) doesn't bar

12  that.

13      **MR. ENSIGN:**  That's correct, Your Honor.  And I

14  apologize.  I had suggested otherwise.  I am referring solely

15  to the challenges to removal.  The challenges to detention

16  would not be barred under 1252(g) in any context.  And we have

17  not made that argument.

18      **THE COURT:**  And your argument that the challenges to

19  removal also include the procedural infirmities.  So what

20  *Cruz-Medina* and a number of the other district judges have

21  done, you're saying is barred by 1252(g)?

22      **MR. ENSIGN:**  That's correct, Your Honor.  But I also

23  think that those cases would be distinguishable even if you

24  thought that their legal reasoning was correct.

25      So as an initial matter, 1252(g) bars those challenges in

1    execution of removal.  To the extent that your argument is you
2    can't execute my removal order until you do certain procedures,
3    that is squarely within the bar.

4        I think they have also suggested that it doesn't apply
5    because it's discretionary.  That's something that's been
6    squarely rejected by multiple courts of appeals.  For example,
7    in the Fifth Circuit, in the *Townsley* case, they say that
8    although the Supreme Court and the AADC emphasized the
9    importance of preserving the attorney general's discretionary
10   functions, in the three enumerated categories, it did not
11   explicitly state that the provision applies only to review of
12   discretionary decisions, end quote.  That's 243 F.3d at 214.

13       And it went on to reject an argument just like this.  So
14   we don't think the discretionary one applies.  But if you
15   thought this was the sort of -- the relief ordered in -- by one
16   of your colleagues on this court, for example, was --
17   additional review before an IJ.

18       But here, that wouldn't -- like, that would be an empty
19   formality that due process should not require.  He would be
20   raising a challenge that -- either that Liberia itself would
21   torture or persecute him or that it would send him to
22   El Salvador where he would be tortured or persecuted.

23       Those are the only fears that he has raised in his briefs.
24   In fact, I don't think he's ever raised any fear that Liberia
25   itself would torture or persecute him.  It relates solely to

1   him being sent to El Salvador.

2        The United States has received both general and specific

3   assurances that Mr. Abrego Garcia would not be tortured,

4   persecuted, or sent to El Salvador.

5            **THE COURT:**  Does it turn, though -- I guess the

6   procedural right does not turn on the success of the outcome,

7   does it?  I mean, I don't know if -- you may be right.  This

8   may be -- if a neutral IJ were to look at this, just as it --

9   the INA and the regulations require in other situations, like,

10  you know, reinstated orders of removal, if a IJ were to look at

11  this, the IJ might agree with the asylum officer.

12       That doesn't mean Mr. Abrego doesn't get the process,

13  though, does it?

14           **MR. ENSIGN:**  I think it would in this circumstance

15  for multiple reasons.  I think due process is flexible and

16  applies to different circumstances, where a circumstance is

17  that the order -- the process being sought is as a foregone

18  conclusion and, as a matter of law, can have no other

19  conclusion.

20           **THE COURT:**  Before I forget, speaking of foregone

21  conclusions -- I don't know why, when you say that, it made me

22  think of this question that I really need to understand.

23       How is it, after Abrego 1, when I ordered Mr. Abrego be

24  returned and restored to the status quo ante, which is he

25  should be placed back in the position that he should have been

1    had he not been wrongfully removed.  I think that's the way the

2    Supreme Court said.

3        How is it, when he is restored and he is detained in

4    Baltimore and then the petitioners move to reopen, the case

5    gets reassigned to another IJ or assigned to another IJ that

6    has no -- no ties to this jurisdiction?  Can you explain to me

7    how that happened and why?

8        **MR. ENSIGN:**  I don't specifically know, Your Honor.

9    I know -- I believe the original IJ --

10       **THE COURT:**  You don't know?  You don't know why an IJ

11   from Atlanta got it?

12       **MR. ENSIGN:**  I don't, Your Honor.  I can ask and

13   report back.

14       **THE COURT:**  Maybe Mr. Molina might know because he's

15   our subject matter expert on immigration.  But, I mean, the

16   petitioner raises at least, you know, a very concerning

17   statistic that it happened to go to an IJ that had a very high

18   denial rate of all kinds of relief, including asylum.

19       So it just seems to me like why Atlanta?  Why this judge?

20   How did this happen?  Especially when my order was to restore

21   him to the status quo ante, which -- you know, again, not

22   opining on the substance, but you would think that would mean

23   his case would stay in Baltimore where it started.  So I just

24   want to understand it.

25       **MR. ENSIGN:**  Your Honor, I don't specifically know.

1    I know that the -- I believe that the original IJ was not

2    available, and so it had to be reassigned.  The processes that

3    EOIR uses to assign those, I don't know why it ended up there.

4    That's a question we're happy to pose to them if you would

5    like, and happy to report.

6         **THE COURT:**  That would be great.

7         **MR. ENSIGN:**  I don't specifically know the answer to

8    that question.

9         **THE COURT:**  So what would happen, if you decide to

10   issue a new order of removal, you'd start this process over

11   again?  Where would it start?

12        **MR. ENSIGN:**  Your Honor, I don't know the answer to

13   that question.  And I think that there are -- some of that

14   depends on what -- how DHS would like to approach that.

15       And in many ways, I'm not aware of a parallel case that

16   raises a similar issue where, you know, something that was

17   previously understood to be a final order of removal is held

18   not to be and what that would trigger or what that would look

19   like.

20        **THE COURT:**  Well, it looks like in the immigration

21   context, when it happens, it just gets remanded to the original

22   judge.  And the original judge has to deal with it, all

23   depending on the scope of the remand.

24       That's not me.  But that's why I'm just curious because my

25   order was restore him to the status quo ante.  And then the

1   status quo ante, at least in my very basic understanding, would

2   be it starts in Baltimore, stays in Baltimore. And how is it

3   that -- you're saying that IJ wasn't -- is that IJ still on the

4   bench?

5           **MR. ENSIGN:** I don't believe so, Your Honor. I'm not

6   a hundred percent sure on that. I believe -- I'm pretty sure

7   that's correct. And then I think when the original IJ is not

8   available, there are different procedures that --

9           **THE COURT:** And there's no Baltimore IJ available; so

10  it has to go to Atlanta?

11          **MR. ENSIGN:** I don't know specifically how that was

12  assigned. I know there certainly are procedures that provide

13  for what happens when the original judge is not available.

14  And, you know, I think part of it depends on where the workload

15  is and where, you know, people have capacity.

16      I know there certainly is management of, like, you know,

17  docket -- like how crowded dockets are vis-a-vis each other.

18  But I don't know specifically that assignment. We can pose

19  that and get an answer, Your Honor.

20          **THE COURT:** Let's find out if Mr. Molina knows. He

21  may or may not.

22          **MR. MOLINA:** In this particular circumstance, Your

23  Honor, I do not know why EOIR does it. EOIR does, on occasion,

24  use remotely located immigration judges to help cover certain

25  dockets. I don't know whether Baltimore was low on immigration

1    judges so they needed to just outsource it for a little while,

2    et cetera.  But it is a question that we can look into.

3              THE COURT:  Well, I think because, on the one hand,

4    if it was done -- if it was done outside of the normal

5    procedure, that's a real problem because my order was restore

6    him to the status quo ante --

7              MR. MOLINA:  Yes, Your Honor.

8              THE COURT:  -- and according to the Supreme Court

9    where he would have been had he not been wrongfully removed.

10   And the next thing you know, he's got an IJ that's not familiar

11   with the original case who's deciding the motion to reopen.

12   That seems odd to me.

13             MR. MOLINA:  Certainly, Your Honor.  But I think you

14   can find some comfort in the fact that the new immigration

15   judge's decision actually does use the Baltimore immigration

16   court's heading.  So that gives the feel that it's a judge

17   standing in remotely to participate in that court.

18             THE COURT:  Got it.  So that's the next question.

19   Rather than a feel is, does it work like when a judge is

20   appointed by designation so, when it goes through the appellate

21   process, it's still going to be a Fourth Circuit case?

22             MR. MOLINA:  That is correct, Your Honor.  That

23   remote judge would still -- working for that particular court,

24   would still get processed to the board, at least.  You know,

25   there is some ongoing questions about the venue provision

 1  located in 1252 at Subsection (b)(2), I think it is --

 2          THE COURT:  Okay.

 3          MR. MOLINA:  -- which says it's supposed to be where

 4  the immigration judge's concluded proceedings.  But the

 5  government's perspective is -- and to the federal courts has

 6  always been -- when the court is -- when a case is assigned to

 7  a court like Baltimore, that's the location of the hearing even

 8  if the immigration judge is located in Hawaii.

 9          THE COURT:  Fair enough.  That's very helpful.

10          MR. MOLINA:  So that's the perspective that the

11  government has put forward constantly.

12          THE COURT:  And that's the government's

13  representation with regard to Mr. Abrego; so I need not worry

14  about this case suddenly ending up not in the status quo ante.

15          MR. MOLINA:  That is correct.  That I could detect,

16  there was no venue change in this court.  So presumptively by

17  all the clues, it appears this is still a Baltimore immigration

18  court case.

19          THE COURT:  Great.  Thank you for that.

20      Okay.  Thanks, Mr. Ensign, for letting me clarify that

21  with Mr. Molina.

22          MR. ENSIGN:  Well, and thank you, Mr. Molina, for

23  knowing that.

24      So perhaps I should circle back.

25          THE COURT:  Yes.

1          **MR. ENSIGN:**  So we're talking about the due process.

2     And so why -- so why I think -- so, first of all, I don't think

3     there would be any injury where the proceeding can have only

4     one outcome under the substantive law.  Then you're neither

5     injured by the lack of it nor would the due process clause

6     require additional proceedings to determine something that is

7     already as a matter of law 100 percent certain.  And that is

8     how the Supreme Court's decision in *Munaf v. Geren* makes this

9     context.

10          **THE COURT:**  Except it's such a different case, right?

11     Those are the folks who were in Iraq having committed an Iraqi

12     crime?  Is that *Munaf*?

13          **MR. ENSIGN:**  Certainly the context is different, but

14     the rule of law is controlling.  It's quite simply that federal

15     courts may not second-guess the executive's determination that

16     diplomatic assurances are credible and sufficient.  And so --

17          **THE COURT:**  But that -- that principle would swallow

18     up all IJ review.  Like, any time that the government says the

19     assurances are credible, now a person is deprived of

20     individualized review because the government said it and there

21     is no need for review.

22          In other words, all Mr. Abrego is asking for apart from

23     release is that a IJ review what the asylum officer came to.

24     When he's about to be removed to a country thousands of miles

25     away of which he has no connection and can't even speak the

1    language because he does not speak English, how is it not --

2    how is it a foregone conclusion?  Maybe an IJ would see it

3    differently.

4            MR. ENSIGN:  Your Honor, because the *Munaf v.* -- I

5    guess a couple things.  One is that *Munaf*, as a matter of law,

6    precludes courts from second-guessing the executive's

7    determination, the diplomatic assurances regarding torture or

8    related matters are -- are credible.

9        And so, you know, as the DC circuit said in the *Kiyemba*

10   case, the Supreme Court's ruling in *Munaf* precludes the

11   district court from barring the transfer, dot dot dot, on the

12   ground that he is likely to be tortured or subject to further

13   prosecution or detention in the recipient country.

14       The government has declared its policy not to transfer a

15   detainee to a country that is likely to torture him, and the

16   district court may not second-guess the government's assessment

17   of that likelihood.

18           THE COURT:  Okay.  I'm not proposing that according

19   Mr. Abrego Garcia this relief would second-guess the

20   government's assurances.  But what I am proposing is there's

21   some daylight between what you just said and Mr. Abrego's

22   relief being, as you put it, a foregone conclusion.

23       And what am I -- what do I mean by that?  Well, one of

24   the -- you know, again, not getting into the merits of it,

25   who's going to win, but petitioners have raised over and over

1   again Liberia hasn't given -- as to him, they have said certain

2   things.  But they haven't -- they haven't shown it.

3       And what I mean by that is they've said this is only going

4   to be temporary.  I don't know what that means.  Temporary,

5   what does -- what does that mean?  I mean, does it mean

6   temporary they're going to kick him out at some point?  They're

7   going to say he's not welcome anymore?  He's not legal?

8   They're going to send him not to El Salvador but to some other

9   country?  At whose direction?  That's one.

10      And, two, unlike Costa Rica, which said very specifically

11  we'll give him a status that protects him, there hasn't been

12  any assurances in that regard, has there?  Like, you haven't

13  gotten travel papers which say -- or papers which say Abrego

14  will be a legal resident of Liberia or have the equivalent of

15  refugee status, have you?

16          **MR. ENSIGN:**  Not specifically, Your Honor, but --

17          **THE COURT:**  Let's just stop for a second.

18          **MR. ENSIGN:**  Okay.

19          **THE COURT:**  So there you go.  There's the argument

20  for why Mr. Abrego needs process.  Because a reasonable

21  person -- I'm not opining on what the standard would be --

22  might say, okay, you have a fear -- you have a fear of

23  persecution or refoulement if you don't have any protection in

24  a country where you have no connection.

25      So, in other words, I don't think it's -- the passing on

1  the State Department's assurance, maybe you're right.  But I

2  don't think that's the whole story.  I guess that's my concern.

3           MR. ENSIGN:  And I think we'd just disagree with that

4  premise, that -- you know, specifically, the only -- the only

5  objections that he could conceivably raise as a matter of

6  immigration law are withholding of removal, which is a fear of

7  persecution or torture under CAT.  And we view those assurances

8  and the State Department's assessment that those assurances are

9  sufficient as being on all fours with *Munaf* and *Kiyemba* and the

10 other cases.

11          THE COURT:  And you're saying, like, refoulement, as

12 a matter of law, is not a cognizable reason?  It doesn't fit

13 into any of the persecutions or torture category?

14          MR. ENSIGN:  Yes, Your Honor, that's correct.  But in

15 addition to that, Liberia has specifically committed not to

16 send Mr. Abrego Garcia to El Salvador.  So that even if that

17 could be a cognizable claim, it is one that fails on the merits

18 here because we have a specific assurance that, you know, no

19 such refoulement would occur.

20          THE COURT:  What's the temporary piece?  How does

21 that fit into it?

22          MR. ENSIGN:  Your Honor, I think that's often common

23 in third-country removals.  Often third-country removals are

24 the original country of nationality won't take them.  And so

25 for third-country removals, it is often that they are taken,

1   but certainly if the original country of nationality changes

2   its mind and will accept them, it's often temporary that way.

3        It's also entirely possible that Mr. Abrego Garcia might

4   want to try to seek status in Costa Rica himself, for example.

5   And if he were to do so, then his stay in Liberia would

6   obviously be temporary.

7        **THE COURT:**  They say they'll accept him on a

8   temporary basis, not that he can -- and they say he's free to

9   leave.  And the free to leave part, I understand, in terms of

10  his going elsewhere.  But it's the country's commitment that

11  they say is temporary.

12       And, you know, it doesn't turn on El Salvador in Mr. -- in

13  Mr. Abrego's case, going back to whether IJ review makes sense,

14  it doesn't turn on whether El Salvador will accept him; it

15  turns on Mr. Abrego rightfully not wanting to return there.

16       So I'm still having a hard time understanding what was

17  meant here by temporary because it's not really dealt with in

18  your papers.

19       **MR. ENSIGN:**  It's not specifically dealt with.  But

20  temporary is often because these third-country removals are, in

21  fact, temporary.  That's something that's common in them

22  because, ultimately, people are able to find other countries,

23  including their -- sometimes the original country of origin,

24  sometimes other countries.

25       But whatever temporary means, we know what it doesn't

1   mean.  What it doesn't mean is that he would be sent to

2   El Salvador because they made a specific commitment to the

3   United States that they would not do so.  And all of this CAT

4   and the statutory withholding claims are fears of El Salvador.

5        So whatever temporary means, the fact that Liberia has

6   expressly committed not to sending him to El Salvador is

7   dispositive of both his CAT and statutory withholding claims.

8            THE COURT:  Okay.  I hear you.

9        Anything else on that?

10           MR. ENSIGN:  Not specifically on that one.  I think

11  we've covered most of the jurisdictional bars.  I think it's

12  useful to focus on *D.V.D.* for just a moment because I do think

13  that is instructive.

14       Certainly, to the extent that you -- the suggestion is

15  that he needs IJ review of that USCIS's officer's fear

16  assessment.  And let me just pause there for a second,

17  actually.

18       I don't think that's the only thing they're asking for.  I

19  believe at the podium today they also suggested that they would

20  get BIA review of that IJ's determination and that the BIA's

21  determination could be reviewed to the court of appeals.

22       So you have -- basically, you are stacking an entire

23  second removal process that takes many, many years on top of

24  the first one.  That is incredibly burdensome to the

25  government.  And I think that is directly relevant to the

1  *Mathews v. Eldridge* analysis to the extent that it applies,

2  which we don't think it is.

3      Under *Thuraissigiam*, the fact that he is an unadmitted

4  alien means that he only has those due process rights that are

5  provided by statute.  And you cannot rely on the due process

6  clause to create additional requirements that are not found in

7  the statute.

8      And that's specifically what he would be doing here.

9  There is a no statute that provides for IJ review of USCIS

10  negative fear determinations for third-country removals.

11  That's something they're trying to create whole cloth under the

12  due process clause.

13      And under *Thuraissigiam* and a long line of cases going all

14  the way back to a 19th century one called *Nishimura*, that is

15  precluded by any Supreme Court authority.  And it has real

16  teeth too.

17      I believe various courts have suggested that Mr. Abrego

18  Garcia's connections to this country give him more due process

19  rights.  That's -- that's not correct.  The Supreme Court --

20      **THE COURT:**  Well, I think -- I think the distinction

21  was there's a difference between the rights that are triggered

22  when your review begins at the border before you have had any

23  interaction with the country and rights that are triggered once

24  you have been here, you have been adjudicated, and that

25  adjudication now has downstream consequences.

1       I mean, I think they were just making a very -- to me, it

2    was just a very fundamental point that, like, rights at the

3    border are different than rights once you're in the system, if

4    you will.

5              MR. ENSIGN:  And, Your Honor, we disagree with that

6    because that's not where the Supreme Court has drawn the line.

7       Where the Supreme Court has drawn the line is lawful

8    admission to the country.  And that's when status changes to

9    where the due process clause can be invoked to potentially

10   create additional procedural rights.

11             THE COURT:  So, like, an employment authorization is

12   not an action by the government that created rights for

13   Mr. Abrego?

14             MR. ENSIGN:  It is not, Your Honor, just as -- and

15   let me give you an even more concrete example that shows very

16   starkly how this works.

17             THE COURT:  Okay.

18             MR. ENSIGN:  The Supreme Court's decision in *Kaplan*,

19   and that -- let me give you the citation.  It's 267 US 228.

20   That involved an alien who had been lawfully paroled but not

21   admitted into the country.  She had been living in the country

22   for more than five years in the interior of the country.  She

23   was living with her father, who was a naturalized U.S. citizen.

24       So by the standard that the petitioners are proposing, you

25   would say that clearly creates new -- it could create new due

1  process rights.  And the Supreme Court said no, that is not how

2  it works.

3      It said despite her more than five years in the country,

4  quote, she was still, in theory of law, at the boundary line

5  and had gained no foothold in the United States, end quote, and

6  thus had no ability to invoke the due process clause to create

7  additional procedures beyond those that are provided by

8  statute.

9          **THE COURT:**  And just so I understand, she was here

10 pending what sort of next step in immigration court?  Was she

11 pending an asylum review?  Was she -- what was she --

12         **MR. ENSIGN:**  She was paroled into the country and

13 remained as long as that parole wasn't revoked.

14         **THE COURT:**  But she was paroled for a purpose.  What

15 was the purpose?

16         **MR. ENSIGN:**  Back then, I don't think there was a

17 specific purpose.  I think she was just paroled.  And that

18 parole potentially could have been perpetual.

19         **THE COURT:**  Okay.  Well, I'll take a look at that.

20         **MR. ENSIGN:**  And that notably is cited by the Supreme

21 Court in its decision in *Thuraissigiam*, which is a very strong

22 indication, along with the other cases they cite, that that is

23 not limited to just the border.

24     The line the Supreme Court has drawn as to where due

25 process can create additional rights is unlawful admission.

1    The *Landon* case is really instructive on this as well.

2        What it says is "This country" -- sorry -- "This court has

3    long held that an alien seeking initial admission to the United

4    States requests a privilege and no constitutional rights

5    regarding its application," dot dot.  "Once an alien gains

6    admission to our country and begins to develop ties that go

7    with permanent residence, his constitutional status changes

8    accordingly."

9        **THE COURT:**  And this all goes to the point that

10   Mr. Abrego is not due, according to the government, any more

11   due process than what he's already been given?

12       **MR. ENSIGN:**  That's correct, Your Honor.  Because he

13   was never been lawfully admitted into the country, his status

14   has not changed.  And as a matter of due process rights, he is

15   only entitled to what procedures are provided by statute and

16   not those -- he cannot rely on the due process clause to create

17   additional procedural rights.

18       **THE COURT:**  Okay.  Understood.

19       **MR. ENSIGN:**  Your Honor, I think there was a

20   reference more generally to this being a judicial black hole at

21   some point.  But I think that's an unfairly sinister

22   characterization of what Congress has done in Section 1252.  In

23   particular, (a)(5) and (b)(9) are channeling provisions.

24       **THE COURT:**  I think Mr. Cooper's point only is what

25   the Supreme Court and other circuits have said, which is I got

1  to construe it narrowly.  You know, if you don't, you run the

2  risk that the jurisdictional bar just swallows up any potential

3  conceivable challenge ever.

4      I think that was it.  I think that was the point that you

5  were saying, Judge, read it very broadly.  And the petitioner

6  is, you know, understandably saying no, read it narrowly.

7          MR. ENSIGN:  I think there's actually two different

8  ones.  And there's an important distinction here.

9      1252(g) is an outright bar of review.  And for that

10  reason, it is somewhat narrower.  (a)(5) and (b)(9) under no

11  universe can be described as, like, narrow.  It's one of the

12  broadest zipper clauses that exists anywhere.  Congress has

13  specifically channeled these claims.  But that's not a judicial

14  black hole; that's channeling them to the courts of appeal.

15          THE COURT:  Let me make sure I understand what you're

16  saying.  It hasn't -- the court has said a *Zadvydas* claim, I do

17  have jurisdiction.

18          MR. ENSIGN:  Your Honor, you're absolutely correct.

19  And I -- and I should be throwing out that caveat.  We're not

20  raising bars -- the jurisdictional bars as to prolonged

21  detention, only as to challenges to removal.

22      As to detention, the 1252 bars do not -- do not bar that

23  claim.

24          THE COURT:  And you're saying that the zipper clause

25  covers their process claims as well.

1          **MR. ENSIGN:**  Exactly, Your Honor.

2          **THE COURT:**  That's what you're saying.

3          **MR. ENSIGN:**  And, notably, they've already filed a

4   motion to reopen before the IJ after -- you know, in this very

5   context, to raising these arguments.  They have an appeal

6   before the BIA.  They absolutely could seek a stay of removal

7   before the BIA, which would very much seek the same relief

8   they're seeking before Your Honor at least as to challenge to

9   removal.

10     But they refuse to do so.

11          **THE COURT:**  What do you mean they refuse to do so?

12   Seek a stay of the removal?

13          **MR. ENSIGN:**  Yes.

14          **THE COURT:**  Okay.  Well, I don't -- I don't know.

15   Maybe they have.  Maybe we can ask them about that, but --

16          **MR. ENSIGN:**  I -- I asked this morning, and the

17   latest information we have is that, although they appealed to

18   the BIA, they have not sought a stay of removal.

19          **THE COURT:**  Okay.

20          **MR. ENSIGN:**  But that's the procedure that Congress

21   provided.  And we also think that their availability to do that

22   order -- that motion to reopen, you know, satisfies any due

23   process concerns.

24          **THE COURT:**  But they don't have that -- they don't

25   have that ability, right, because the IJ said, nope, only the

1   government can do it.  So for you to argue here that they have

2   the ability when they clearly don't according to the IJ, what

3   am I supposed to do with that?

4        **MR. ENSIGN:**  If they think that's wrong as a matter

5   of immigration law, then they can raise that to the BIA and

6   seek a stay of removal in the interim because they think that

7   that wrongfully states immigration law.  And we disagree with

8   that.  But that's certainly the provision that Congress has

9   created.  If you think that what the IJ did was wrong as a

10  matter of law, you cannot --

11       **THE COURT:**  Right.  I understand that part.  But what

12  I don't accept is that you then say they have a right that the

13  IJ said they don't, or they have an avenue of relief that they

14  don't.  It seems to be in your papers and here you're

15  suggesting, well, you know, Mr. Abrego has that right.  He can

16  go back and move to reopen.  But the IJ plainly said no, you

17  can't; only the government can do it.

18       **MR. ENSIGN:**  Your Honor, they rejected it on

19  timeliness grounds but also rejected it on substantive grounds

20  as well.

21       **THE COURT:**  In any event, it doesn't sound like you

22  could say he's got a right when the IJ says he doesn't.  That's

23  my only point.  Like, you know, the argument just is a

24  nonstarter.  If the IJ says no, he cannot, he cannot pursue

25  that relief.  So why are you saying he can?

1          **MR. ENSIGN:** Your Honor, I think I would draw a

2    distinction between procedure and substance.  He certainly has

3    the procedural right to file something before the IJ.  And to

4    the extent that they think it's wrong as a matter of

5    immigration law that the immigration judge won't consider that

6    argument, that can be raised to the IJ.

7          And to the extent that they think that that's correct as a

8    matter of immigration law but wrong as a matter of

9    constitutional law because due process should give me that

10   additional right, then you have to raise that argument up the

11   chain to the BIA and then to a court of appeals.

12         You cannot go to the federal district court when Congress

13   has specifically channeled those to the courts of appeals

14   through the BIA and IJ; so --

15         **THE COURT:** They are making different arguments in

16   different places.  I mean, we've heard Mr. Rossman say a number

17   of times today we're only asking for two discrete -- important

18   but discrete aspects of relief:  release and additional

19   process.  And you heard the additional process all the way up

20   through the Fourth Circuit.

21         Maybe that's where the intersection is that you're talking

22   about.  Because I thought that they were saying follow

23   *Cruz-Medina* and others, which is, at a minimum, IJ review like

24   other noncitizens are afforded in similar context; so --

25         **MR. ENSIGN:** Your Honor, certainly to the extent that

1    they're arguing for anything that would permit an IJ to review

2    it, that would be -- that could be reviewed in the courts of

3    appeals.  And that necessarily would be something that Congress

4    has intended to channel to the courts of appeals and not the

5    federal district courts.

6            **THE COURT:**  Got it.

7            **MR. ENSIGN:**  So to the extent they're arguing for

8    anything in an Article III court, that court has to be a court

9    of appeals and not a federal district court.

10           **THE COURT:**  Okay.  I understand the argument.

11           **MR. ENSIGN:**  And then, finally, Your Honor, we read

12   *D.V.D.* more broadly than they do.  Certainly to the extent that

13   they're trying to say that *D.V.D.* is just a 1252(f)(1), that

14   that's implicitly what was accepted, I don't think that matches

15   what the Supreme Court did.

16           **THE COURT:**  The Supreme Court, on an emergency shadow

17   docket, stayed the injunction, right?  That's what they did?

18           **MR. ENSIGN:**  Stayed it in its entirety.  And I think

19   that's important.

20           **THE COURT:**  How?  Because, frankly, you know, we

21   can -- we can have a long debate that would bore everybody else

22   but I think would be very interesting about the infirmities of

23   the -- of the -- of perhaps how the class was defined.  And the

24   class is very broad.

25       Why isn't -- why isn't it not equally plausible that the

 1  court stayed the injunction based on the overbreadth of the

 2  class definition and nothing more, nothing more substantive?

 3  You can't read any more into it than that, can you?  You just

 4  don't know.

 5          MR. ENSIGN:  I believe you can, Your Honor.  And let

 6  me walk through why.

 7      So I don't think class definition was raised in the stay

 8  application.  What was raised is a very similar concept, which

 9  is that the relief was overbroad because it violated

10  Section 1252(f)(1), which bars class-based relief of covered

11  provisions of which 1231 is one.

12      But if the Supreme Court only thought that the government

13  was likely to prevail on 1252(f)(1), then it would have entered

14  a more limited stay.  It would have stayed only the class

15  aspect, but that would not have in any way invalidated the

16  relief that was given as to the named plaintiffs, which was

17  very much a live issue.

18      By giving the stay in its entirety and not merely as to

19  the class aspects, we think the Supreme Court necessarily

20  recognized that the government was likely to prevail on its

21  other arguments and not merely 1252(f)(1).  Because if they

22  thought it was just 1252(f)(1), than only a more narrow stay

23  could have been justified.  It --

24          THE COURT:  Except the more narrow, the more -- I

25  thought that the individual plaintiffs are just on a different

 1    footing certainly than Abrego.  They were -- they were -- they

 2    were removed for different reasons under different statutes.

 3    Am I right about that?  You had individuals with prior records

 4    that were very serious, right?

 5            MR. ENSIGN:  Some of them.  There's a gamut of

 6    different factual contexts.  But I think --

 7            THE COURT:  When did the court announce what you're

 8    saying as the principle, I guess?

 9            MR. ENSIGN:  There's not a specific announcement.

10    There are two things that I think are governing.

11        One is that, by giving a complete stay and not staying

12    merely as to class members, that is necessarily recognizing a

13    likelihood of success on something beyond 1252(f)(1).

14        And, second, the Supreme Court in *Boyle* has made clear

15    that its stay decisions must control in like cases.

16            THE COURT:  Sure, in the case itself.  But I don't

17    know if it necessarily means that no petitioner ever can raise

18    now a habeas that gets anywhere near challenging -- I mean,

19    *Zadvydas*?

20            MR. ENSIGN:  Not detention.  We agree --

21            THE COURT:  Okay.  So you're saying gets anywhere

22    near challenging the individual lack of process in the

23    government persisting and sending folks like Abrego to Africa,

24    it's just off the table?

25            MR. ENSIGN:  Not off the table entirely.  The

1    July 4th decision of D.D.C., I think, is pretty instructive in

2    this.  I can't recall the name of the case, unfortunately.

3    It's cited in our papers.

4         Specifically, class members who are nonnamed plaintiffs in

5    *D.V.D.*, but class members, brought a challenge raising a

6    constitutional challenge to their third-country removal.  And

7    what DEC said is that that was impermissible claim-splitting,

8    but not that you couldn't raise the claim, but rather that that

9    claim had to be raised before the District of Massachusetts.

10        And so it didn't dismiss the case; it transferred it to

11   the District of Massachusetts where then Judge Murphy denied

12   relief later on July 4th, presumably on the merits.  But he

13   didn't reject -- the District of Massachusetts didn't reject it

14   for impermissible claim-splitting.  And notably, named

15   plaintiffs are still able to seek relief in the *D.V.D.* case.

16        But the class does bar people from going to different

17   ports as impermissible claim-splitting to bring those claims.

18             **THE COURT:**  Okay.  And I understand the argument, and

19   it's been well briefed.  So is there anything else on that?

20             **MR. ENSIGN:**  No, Your Honor, unless you have further

21   questions.

22             **THE COURT:**  Not from -- not from the government.  I

23   want to turn to petitioner and make sure that they get the last

24   word.  And then it's -- your motion is up next, but we'll take

25   a brief break in between.

1          **MR. ENSIGN:**  Certainly, Your Honor, although, unless

2   Your Honor has many questions about the motion to dissolve, at

3   least from the government's perspective, the two are pretty

4   much coterminous.

5          **THE COURT:**  That's basically what I'm struggling

6   with.  Say I were to grant -- so maybe you want to just address

7   it now and then we can conclude after the petitioner has

8   another round at this, is I do see it as there's a lot of

9   overlap.

10      One of the things I'm struggling with is if I grant relief

11  on the *Zadvydas* claim and I -- I adjudicate the petition, it's

12  done.  What assurance does the government give that they're not

13  going to summarily remove him to a third country despite --

14  because all I'm doing is releasing him.

15      So until there's a presentment, I suppose, of a valid --

16  whether it be order of removal or a valid third country,

17  however this shakes out, does -- does it not seem relevant to

18  the case to keep the injunction in place?

19      Or is it, no, Judge, once you litigate the merits, once

20  the merits are concluded, unless it's an aspect of the final

21  relief, the PI goes away.  And you have to dissolve it.  Is

22  that where you -- which side -- can you -- explain where you

23  are.

24          **MR. ENSIGN:**  My answer might be a little frustrating.

25  It's just that I think there's unfortunately too many

1   permutations to answer that question definitively.  It would

2   really depend on what ground Your Honor decided and granted

3   relief.

4        So, for example, an order saying there was no final order

5   of removal, I think that would itself probably not require

6   any -- additional injunctive relief because that's -- you know,

7   that's a binding order that there is no final order of removal.

8   My understanding is that that would preclude removal.  So I

9   don't think anything else would potentially be needed or wanted

10  or even appropriate there.

11       As to just granting it on prolonged detention, then -- I

12  mean, that doesn't get to the validity of removal at all; so I

13  think you would still have to reach those claims.

14       **THE COURT:**  What if it's both?  What if it's

15  prolonged detention because there is no final order of removal?

16       Like, in other words, detention -- you can't hold him

17  anymore because it's going to be a very, very, very steep climb

18  to an imminent or reasonably foreseeable removal because there

19  is no final order of removal?  What if it's that?

20       **MR. ENSIGN:**  Your Honor, in that scenario, I would

21  have to confirm, but I very strongly suspect the answer would

22  be if a federal district court holds that there is no final

23  order of removal, then the government would take the position

24  it could not remove him.  And, therefore, additional injunctive

25  relief would not be needed -- you know, that would be an

1    adjudication by an Article III court.

2        We would disagree with the jurisdiction -- you know, that

3    jurisdiction exists for that.  But, of course, appellate courts

4    exist to resolve such questions.

5        So if that were the decision, I suspect that no additional

6    injunctive relief would be needed because essentially the

7    Court, by resolving the issue, defeats -- it's almost like

8    self-executing, I guess.

9            **THE COURT:**  Well, then maybe what we do is I

10   decide -- I decide first things first.  And let me figure out

11   what I'm doing with the petition.  And understanding your

12   position, which is it will depend, I might -- I might table the

13   motion to dissolve, not long, but get you all on the line once

14   I issue my first order.

15       Let me say this:  If I deny habeas, I'm going to dissolve

16   the petition.  If I grant habeas, all depending on how I grant

17   it, I may turn to you all as to, okay, what next?  Because you

18   have at times said, well, we're not going to remove the

19   petitioner until this is sorted out, whatever the "this" may

20   be.

21       So maybe I -- maybe I'm going to just table -- do it -- do

22   it -- eat the elephant one bite at a time, as they say.  Do the

23   petition, figure out where I am with that, and then we'll turn

24   to the motion to dissolve.

25           **MR. ENSIGN:**  Your Honor, I think that certainly makes

1  sense procedurally.  If you're inclined to decide the habeas

2  petition itself and then have the parties meet and confer, see

3  if they can agree and see if there's remaining disputes as to

4  what's left to be decided, you know, there's at least a fair

5  prospect that we can narrow or eliminate that.  And so that

6  approach seems procedurally sound to us.

7          **THE COURT:**  Okay.  Great.  Thank you, Mr. Ensign.  I

8  appreciate that.

9          **MR. ENSIGN:**  Thank you, Your Honor.

10          **THE COURT:**  Thank you.

11      **MR. ROSSMAN:**  Your Honor, I'll start with where we

12  agree.  We agree with that proposal.

13          **THE COURT:**  So you agree --

14      **MR. ROSSMAN:**  You should table the injunction

15  question until after you resolve it.

16          **THE COURT:**  And then it will be a quick status with

17  you all after I decide -- if I deny the petition, obviously

18  I'll dissolve it.  We won't need to talk again.

19      If I grant the petition, all depending on how I grant the

20  petition, I'll get you all on the line really quickly to talk

21  about the motion to dissolve.  Does that make sense?

22          **MR. ROSSMAN:**  The latter makes sense.  I'll

23  contemplate the former, Your Honor.

24          **THE COURT:**  You're an optimist.

25          **MR. ROSSMAN:**  I'm a relentless optimist, Your Honor.

1          **THE COURT:**  And you're all very good lawyers.

2          **MR. ROSSMAN:**  So a few things, and then I want to

3    make sure I answer all of Your Honor's questions so we're clear

4    on where to go from here.

5          First -- and not necessarily in -- maybe this is recency

6    bias that I have.  I'll respond to what I just heard recently.

7          So the defense had cited the Clark -- I'm sorry -- he

8    cited the *Kaplan* case.

9          **THE COURT:**  Yeah.

10          **MR. ROSSMAN:**  So I looked it up.  It's not in their

11    papers.  It's a 1925 case.  The opinion is from Oliver Wendell

12    Holmes.  So vintage.

13          In that case, apparently the detainee had been stopped at

14    Ellis Island; so stopped before crossing the border.  The

15    detainee was a minor.  They looked at sending the minor back

16    to -- I think the country was Russia.  It was in the middle of

17    the war.  And didn't send the minor back to Russia during

18    wartime and held that minor in the constructive custody of a

19    home, essentially, like, an Ellis orphanage, I guess, under the

20    rubric of that person not being admitted into the country yet.

21          So the person had never crossed the threshold for

22    immigration purposes into the United States.  Totally different

23    than this case.

24          Fast-forward 76 years to *Zadvydas*, and there, the court

25    said, well, once an alien enters the country, the legal

1    circumstances change for the due process clause applies to all

2    quote, persons -- according to the Constitution -- within the

3    United States, including aliens, whether their presence here is

4    lawful, unlawful, temporary, or permanent.

5        That same decision, three years later, in *Clark v.*

6    *Martinez*, in a 7-2 decision by the Supreme Court written by

7    Justice Scalia was affirmed.  And, you know, the court held

8    specifically that *Zadvydas* applies to inadmissible immigrants.

9        So once someone is here, there is no question -- no

10   question at all that they have the entitlement to the full

11   measure of due process under the Constitution.

12       So what the government is trying to do is transport us

13   back a century to a time period that people are treated as --

14   as they had just presented themselves at a port of entry.

15       And those who have lived in the United States -- we have

16   an individual here who's worked, had a family, reported to the

17   immigration authorities on an annual basis with a work permit,

18   you know the history, Your Honor.  There's no question that

19   that person is here for purposes of constitutional protection.

20       So I think we can dismiss that claim pretty quickly.

21       Your Honor, the -- on the issue -- and I'm glad Your Honor

22   raised it.  On the issue of the status that my client would

23   have in Liberia, it's of critical importance that Liberia has

24   only said it would be temporary and have not agreed to give him

25   travel documents, any kind of status as a refugee or otherwise

1    that would allow him to stay permanently.

2        The assurance that we hear from the government is that he

3    will not -- Liberia would not send Mr. Abrego Garcia directly

4    to El Salvador.

5        What is the unanswered and distressing question is what

6    happens at the end of temporary?  Will they send him without

7    travel documents, without refugee status, any other country

8    that you send him to --

9            **THE COURT:**  He wouldn't have authority.

10           **MR. ROSSMAN:**  He wouldn't have status, and he would

11   be sent to -- naturally, he would be sent to his country of

12   origin.

13           **THE COURT:**  What do you make of this argument now of,

14   well, he can always go from Liberia to Costa Rica?  Any insight

15   on that?

16           **MR. ROSSMAN:**  I wrote it down because it was

17   astonishing when you asked the question, Your Honor, why would

18   you do that?  Why would you send him to Liberia and then have

19   him try under his own auspices to get to Costa Rica when you

20   could send him directly to Costa Rica?  The government doesn't

21   have an answer to that.

22       I don't have the foggiest notion how Mr. Abrego Garcia

23   would, left to his own devices in a country in which he has no

24   understanding and no connections, be able to engineer an exit

25   from that country to Costa Rica or anywhere else.  I think he

1    would be, you know, very much at their mercy.

2         And, you know, the government's brief on this was, I

3    thought, pretty telling in terms of, you know, the -- how do I

4    put it? -- the callousness of their position.  On page 19 of

5    their supplemental brief, "Petitioner's interest under the

6    statute is limited to the question of whether, while in

7    Liberia, he will experience persecution, not whether he might

8    eventually experience harm in El Salvador."

9         So the government's view is what happens to him beyond our

10   borders, not our problem, not our care, not our worry.

11             **THE COURT:**  Well, it's a little more nuanced than

12   that because now they're saying, well, the reason why Abrego's

13   issue is off the table is because Liberia said we won't send

14   him back to El Salvador.

15             **MR. ROSSMAN:**  Right, which only begs the question of

16   what happens at the end of temporary?  Is temporary a month? a

17   year?  We don't know.  And then where does he go?  Does Liberia

18   continue to house him forever?  Does Liberia say we're going to

19   send him on to some other yet-unnamed country?  And what will

20   that country do with someone who doesn't have papers, doesn't

21   have a right to stay in that country?

22        There's a reason why an extraordinarily small fraction,

23   you know, .001 percent fraction kind of cases, where people are

24   ever removed to third countries after withholding of removal

25   and why there was no effort taken with respect to Mr. Abrego

1  Garcia before this year.

2      And the reason is because of that natural concern, that

3  wherever you send someone, unless they have status there, they

4  are necessarily at risk, either directly or indirectly, of

5  refoulement.

6      So that's our concern with Liberia.  I think it is well

7  founded.  And I think if, you know, Mr. Abrego Garcia is given

8  the opportunity to have that issue heard before an immigration

9  judge -- and to be clear about the process beyond, you know,

10  the first level of review by an immigration judge, I'm just not

11  prejudging what the appellate rights would be from there.

12      All I'm saying is that what I believe Mr. Abrego Garcia is

13  entitled to at a minimum under the statute, under the regs, is

14  review by an immigration judge to a final conclusion.  I mean,

15  whatever is the path for appellate review, whether it's there,

16  direct to the circuit, whether it's there, BIA approval --

17          **THE COURT:**  Well, I think Mr. --

18          **MR. ROSSMAN:**  -- it has its final order.

19          **THE COURT:**  I think Mr. Ensign's point is if you're

20  asking for something more than the IJ review that has been

21  accorded in *Cruz-Medina* and other cases like it, now the

22  *Mathews v. Eldridge* test gets more complicated because the

23  burden is heavier.

24          **MR. ROSSMAN:**  Well, let's talk about that.  So it's

25  an astonishing proposition for the government that it is

1  somehow too burdensome for someone to have their constitutional

2  rights examined on appeal.  Like, that's essentially what

3  they're saying.  And that's not the structure of the INA and

4  the immigration regulations as I understand them, which --

5          **THE COURT:**  But there are regulations which apply in

6  situations like expedited removal.  These were the ones that

7  came up in *Cruz-Medina*.

8          **MR. ROSSMAN:**  Correct.

9          **THE COURT:**  Expedited removal and, I think,

10  individuals with prior criminal convictions, they do get

11  review, but it stops at the IJ.  And there are regs that say

12  that.  And it is odd to me.  It seems irrational that

13  Mr. Abrego would not get at least the same review, but -- but

14  why is it unconstitutional to say if he doesn't get more given

15  that regulatory scheme?

16          **MR. ROSSMAN:**  So I obviously agree with Your Honor on

17  the first part.  I think it would be irrational for him not to

18  at least get IJ-level review.

19      The -- what you got in weighing the three *Mathews* factors,

20  right, you've got to consider the only interest tipping in the

21  government's favor is the burden of having to provide the

22  procedure, right?

23          **THE COURT:**  Right.

24          **MR. ROSSMAN:**  Right?  So when weighed against the

25  fundamental liberty interests of Mr. Abrego Garcia not having

1  that review, it seems quite modest to think about giving the

2  person, you know, two briefs and an argument before a court of

3  appeals.

4      And I don't think that's going to halt the machinery of

5  government if we allow, you know, for someone who is not

6  stopped at the border, not someone who's been convicted of a

7  crime, not someone who -- you know, I think, to my

8  understanding, fits into any of the exigent categories, you

9  know, for immediate treatment -- so it's not like someone

10  who -- who hops the fence at the border, is immediately turned

11  back, right?  It's not that circumstance.

12      Someone who has lived here and developed the full measure

13  of the process entitlements that the Supreme Court recognizes

14  for someone who is here.  I don't see that the *Mathews* factors

15  remotely weigh in favor of -- I'm just looking at a note that

16  Mr. Sandoval-Moshenberg passed me.

17      I don't see how they remotely tip in favor of the

18  government here, given the weight of the interests and the

19  relatively light burden.

20          **THE COURT:**  Yep.

21          **MR. ROSSMAN:**  Okay.  Let me put that to the side.

22  Anything else on that subject, Your Honor?

23          **THE COURT:**  I don't think so.

24          **MR. ROSSMAN:**  Okay.  I think, you know, the only

25  other substantive point that I wanted to make before giving you

1    an opportunity to ask any questions on the

2    jurisdiction-stripping provisions, if you have them, of

3    Mr. Cooper, is on Costa Rica itself.

4        So we have now -- so Your Honor knows, you'll recall we've

5    had three hearings in this courtroom.  Okay?  Before we got to

6    this courtroom, we took three depositions.  They were supposed

7    to provide us witnesses with knowledge.  You will recall what

8    those transcripts looked like.

9        We went through, you know, quite a painful exercise of I

10   don't knows.  That resulted in a hearing.  They brought first

11   Mr. Giles, then they brought Mr. Swartz [sic], and now they

12   brought Mr. Cantú.  We're 0 for 6 in terms of witnesses who are

13   able to speak substantively about any of these subjects.

14       There's no evidence at all of any -- how do I put it?

15   There's no evidence at all that Costa Rica is unwilling to take

16   my client.  The only evidence we have is the ones attached to

17   the habeas petition at Exhibit 3 that they are willing and have

18   given assurances.  That's where we stand.

19       And it wasn't for lack of opportunity for the government

20   to make its case.  If someone wants to learn what due process

21   looks like, they ought to come to Greenbelt, Maryland.  And you

22   have given the government every chance -- every chance to fix

23   their homework.  And they haven't done it.

24           **THE COURT:**  But it's interesting, because on that

25   question -- you know, again, I'm trying to be extremely

1  careful.  And if I do find that there is no order of removal,

2  I'm likely not to reach any of these downstream issues,

3  including the government's issue on timeliness.

4       Because if there's no order of removal, the government is

5  going to have a choice.  And if -- you know, if -- if the

6  nonexistence of the order is affirmed, or they have a choice,

7  which is to issue a new order of removal.  And that will allow

8  you to timely designate Costa Rica as your third country.  So

9  I'm likely not to reach -- and I'm not disagreeing with you.

10  There's -- today was a -- a zero, in my view.

11       But I don't know if I have to reach the import of it.

12            **MR. ROSSMAN:**  So optimist that I am, Your Honor, even

13  though that I'm hopeful that Your Honor concludes that there's

14  no final order of removal, I also have to make the other

15  arguments.

16            **THE COURT:**  In the alternative.  Okay.

17            **MR. ROSSMAN:**  So the point -- or, you know, in

18  addition.  So, you know, in addition to the absence of that

19  final order, they have no showing that Costa Rica won't take my

20  client.  And there's no showing of any prejudice to the

21  government.

22       We have -- the only testimony we have on that issue -- so

23  the argument has been made from -- from Mr. Ensign that the

24  Secretary of Homeland Security has -- has the right, right --

25  may -- choose a different third-country designation.

1    We don't think that's right because we think, you know,

2  the conditions have to be met.  We think it is a "shall" when

3  it comes to my client's designation of Costa Rica.

4    But the only circumstances -- the statute uses the word

5  "if"; so it's a condition precedent.  The only circumstances

6  where that could be overridden by the secretary is if the third

7  country won't take them.  We've covered that already.  We have

8  no evidence of that.  Or if there's a determination by the

9  secretary that there's prejudice to the United States.

10    Zero evidence in this courtroom at all that any such

11  determination has been made.  There's no substantive argument

12  for how it would prejudice the United States.  And the

13  testimony that we have on the record from Mr. Swartz [sic] is

14  an admission that there is no -- that there is no prejudice.

15    So we think on both of those showings --

16        **THE COURT:**  You mean Mr. Schultz.  You mean the

17  second witness, Mr. Schultz.

18        **MR. ROSSMAN:**  Schultz.  Schultz.  I apologize to

19  Mr. Schultz and to the Court.

20        **THE COURT:**  That's okay.

21        **MR. ROSSMAN:**  Yeah, I mean, it's been a parade of

22  less-than-memorable witnesses, Your Honor.

23    So, you know, the point of all that is, you know, they

24  fail both proof requirements.

25    And so we're left with, you know, a plain winner on the

1  statute from my client's perspective.  And their violation of

2  the statute is, by definition, a violation of due process.

3  That's the first claim in the habeas petition.

4      So with that, Your Honor, unless you have more questions

5  for me on the substance, I offer you the opportunity if you

6  want to ask questions on the jurisdictional issues.

7          **THE COURT:**  And if Mr. Cooper has any response to

8  Mr. Ensign's points.  Thank you.

9          **MR. ROSSMAN:**  Thank you, Your Honor.

10          **MR. COOPER:**  Thank you, Your Honor.  I'll try to keep

11  it pretty brief.

12      The, really, only one point I wanted to make in response

13  to Mr. Ensign's presentations on jurisdiction, and that's to

14  address, I believe he suggested at one point that this court

15  lacks jurisdiction to even decide whether there's a final order

16  of removal.  And to that, I've got three cases we've pulled up.

17  These aren't in the briefs.  So I'll give you the citations.

18          **THE COURT:**  Okay.

19          **MR. COOPER:**  But first there's an Eleventh Circuit,

20  *Madu v. U.S. Attorney General.*  That's at 470 F.3d 1362, and

21  the pincite is 1366.

22      And there the court holds expressly that a challenge to

23  the sheer existence of an order of removal is not barred by

24  1252(a)(5), 1252(b)(9), or 1252(g).

25      And it draws on a Third Circuit case called *Kumarasamy v.*

*U.S. Attorney General*, 453 F.3d 16.  And I'll also point --
Your Honor, there's a Ninth Circuit case, *Nadarajah v.*
*Gonzales*.  That's 443 F.3d 1069 and at pages 1075 to 76.
That's a Ninth Circuit case from 2006.

It holds that federal courts have habeas jurisdiction when
there is no final order of removal.  In that case -- none of
them are factually on all fours -- I don't know of any case
that's factually on all fours to this case.

In that instance, the individual there had obtained
asylum, and so there was never a final order of removal
entered.  He was nonetheless held in detention.  The Ninth
Circuit said in this context there is federal habeas
jurisdiction.  None of the jurisdiction-stripping provisions
apply.  We're entitled to look at whether there is actually an
order of removal or not.

**THE COURT:**  And it was the nonexistence of the final
order of removal that really put to bed all the jurisdictional
questions?

**MR. COOPER:**  In that particular case, yes, Your
Honor.  In the other cases, sometimes it was a petitioner
saying there wasn't an order when maybe there was.  They said,
well, in that instance, we can still decide the jurisdictional
factual question of is there an order of removal.  And we don't
have to close our eyes to whether or not it exists because of
the jurisdiction-stripping provisions.

1          **THE COURT:**  I appreciate that.

2          **MR. COOPER:**  So that was the main point I wanted to

3   get across, Your Honor.  I think that was one you may have had

4   as well.  If you have any other questions, I'm happy to address

5   them.  Otherwise, we stand on our arguments and our papers that

6   we don't believe any jurisdiction-stripping provisions bar this

7   Court's review.

8          **THE COURT:**  Okay.  Well, thank you.  I don't have any

9   other questions.  I appreciate your careful attention on both

10  sides to these issues.  I consider this -- the record and the

11  argument to be closed.  And so I'll reach the merits of the

12  petition as quickly as we can.  We're not going to -- we'll do

13  our best.  These are weighty issues.

14      And I will likely not raise -- not reach the -- in the

15  event I grant the petition, I'm not going to reach the motion

16  to dissolve.

17      Any questions or concerns from either side before we break

18  for the day?

19          **MR. ROSSMAN:**  No.  Just in the event this is the last

20  time we're here on this petition, I just want to thank Your

21  Honor and the court staff for all the attention and time you've

22  given us.

23          **THE COURT:**  Thank you.  I appreciate that.

24      All right.  Thank you all.  And thank you for those of you

25  in the community who have been stalwarts.  I recognize some

1    faces now.  You have been a wonderful -- wonderful members of

2    our community.  I thank you.  Because sometimes people come and

3    they -- they are loud and they're boisterous and they are

4    expressing their First Amendment opinion in the courtroom,

5    which can really get in the way of the orderly administration

6    of justice.

7         You all haven't done that.  You've been really wonderful

8    guests, and I appreciate it.  All right.  Thank you all.

9              **DEPUTY CLERK:**  All rise.  This Honorable Court now

10   stands adjourned.

11        (Proceedings were concluded at 3:42 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Paula J. Leeper, Federal Official Court Reporter, in

5   and for the United States District Court for the District of

6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7   the foregoing is a true and correct transcript of the

8   stenographically-reported proceedings held in the

9   above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                            Dated this 21st day of November 2025.

13

14

15                        /S/ Paula J. Leeper
                          _____
16
                          Paula J. Leeper, RPR, CRR
17                        Federal Official Reporter

18

19

20

21

22

23

24

25

BY MR. GUYNN: **[10]**   19/3 19/12 21/23
25/13 25/25 26/4 26/8 27/7 37/7 38/3
BY MR. RAND: **[23]**   30/9 32/8 33/6 37/20
41/24 42/25 43/7 43/11 45/19 47/8 48/5 48/23 49/10
57/12 60/14 60/19 61/11 64/3 65/1 65/6 65/21
DEPUTY CLERK: **[10]**   4/3 4/9 13/10 14/20 15/1 15/3
24/6 67/6 67/9 172/9
MR. CANTÚ: **[1]**   5/16
MR. COOPER: **[16]**   4/18 94/24 96/6 97/23 98/11 99/20
101/6 101/9 101/15 104/15 104/22 105/21 169/10
169/19 170/19 171/2
MR. ENSIGN: **[103]**   5/8 9/15 105/24 106/1 106/5
106/17 106/21 107/5 107/9 107/18 107/20 108/9
108/19 108/21 110/22 111/4 111/14 112/1 112/18
112/22 113/4 113/21 114/1 114/14 114/18 114/23
115/23 116/2 116/16 116/20 117/9 118/23 119/9
120/7 121/2 121/7 121/19 122/21 123/19 123/23
124/14 125/4 125/18 125/21 126/13 127/19 127/24
128/18 128/22 129/13 129/22 131/14 132/8 132/12
132/25 133/7 133/12 134/5 134/11 136/22 137/1
137/13 138/4 139/16 139/18 140/3 140/14 140/22
141/19 142/10 144/5 144/14 144/18 145/12 145/16
145/20 146/12 146/19 147/7 147/18 148/1 148/3
148/13 148/16 148/20 149/4 149/18 150/1 150/25
151/7 151/11 151/18 152/5 153/5 153/9 153/20
153/25 154/20 155/1 155/24 156/20 157/25 158/9
MR. GUYNN: **[65]**   5/6 5/15 10/7 10/13 14/8 18/15
18/19 18/21 18/23 21/13 22/9 22/15 22/17 22/25
23/6 23/10 24/8 25/11 30/2 31/6 31/8 34/10 34/18
34/20 34/24 35/2 35/16 37/20 37/23 41/23 42/8 43/6
43/9 45/11 46/17 47/25 48/20 49/9 49/16 50/11
51/6 52/24 53/5 53/16 53/21 54/9 54/12 54/22 54/25
55/4 55/7 55/24 56/8 56/11 56/14 56/20 60/12
61/7 65/14 65/16 66/14 66/18 108/11
MR. MOLINA: **[17]**   5/10 7/20 7/23 11/2 11/4 11/7
11/22 12/22 13/2 13/21 134/22 135/7 135/13 135/22
136/3 136/10 136/15
MR. RAND: **[43]**   12/12 12/19 19/20 21/12 25/6 28/20
30/5 30/7 35/5 38/2 46/19 46/23 47/1 48/1 48/4
49/17 49/23 51/14 51/17 51/20 51/23 52/3 52/6 52/9
52/13 52/22 56/23 57/3 57/6 57/9 57/11 60/17 63/23
64/1 64/22 64/24 65/5 65/18 66/12 66/19 71/10
81/11 81/13
MR. ROSSMAN: **[76]**   4/14 4/20 6/14 8/10 10/20 14/2
67/5 69/9 69/12 70/7 70/14 74/1 74/13 74/15 74/25
73/7 73/12 73/16 73/24 74/6 74/11 74/13 74/17 75/5
75/12 76/4 76/8 76/19 76/23 77/4 77/13 78/9 78/16
78/24 79/20 80/1 80/15 81/3 81/7 83/20 84/10 84/15
85/7 85/9 85/16 86/10 87/6 87/12 87/23 88/6 93/21
94/15 94/17 94/21 158/11 158/14 158/22 158/25
159/2 159/10 161/10 161/16 162/15 163/18 163/24
164/8 164/16 164/24 165/21 165/24 167/12 167/17
168/18 168/21 169/9 171/19
MR. SANDOVAL-MOSHENBERG: **[19]**   4/16 70/5 88/9 89/2
89/6 89/10 89/25 90/15 90/20 91/2 91/5 91/19 91/24
92/9 93/1 93/11 93/15 93/19 94/9
MR. YOUNG: **[1]**   5/12
MS. ANASTASIO: **[1]**   5/1
MS. DAUKAS: **[1]**   4/24
MS. HORTOM: **[1]**   4/22
MS. PATHALAM: **[1]**   5/3
THE COURT: **[357]**
THE WITNESS: **[44]**   14/15 14/19 14/24 15/2 19/1
21/17 21/19 21/22 25/10 25/17 25/19 25/22 27/18
27/23 28/1 28/3 28/6 28/10 28/13 29/5 29/7 29/10
31/19 31/21 31/23 31/25 32/3 32/6 35/21 36/4 36/6
36/9 36/11 36/19 36/22 36/25 37/5 42/13 42/20
42/23 45/14 45/18 65/15 66/24

-

-- **74 [1]**   11/3
-- and **[4]**   73/13 76/5 106/5 135/8
-- as **[1]**   64/7
-- certainly **[1]**   91/24
-- characterization **[1]**   54/25
-- I'm **[1]**   91/3
-- not **[1]**   108/11
-- or **[1]**   42/21
-- that **[1]**   125/21
-- then **[2]**   51/15 81/8
-- which **[1]**   136/3

.

.001 **[1]**   162/23

/

/S **[1]**   173/15

0

0261 **[1]**   2/6

1

1-1 **[2]**   73/6 106/11
100 percent **[1]**   137/7
10016 **[1]**   1/16
1069 **[1]**   170/3
1075 **[1]**   170/3
11:45 **[1]**   1/10
12 **[1]**   92/3
120 **[3]**   58/18 59/3 59/5
1225 **[4]**   87/10 121/8 121/11 121/25
1226 **[3]**   121/8 121/12 122/1
1231 **[17]**   69/22 81/24 82/20 93/25 99/25 105/13
120/11 120/14 120/16 120/21 121/4 121/13 121/20 121/21
122/13 125/22 128/1 152/11
125 **[1]**   125/25
1252 **[45]**   90/23 90/23 95/1 95/6 95/16 95/16 96/19
101/23 102/6 102/8 102/23 103/2 103/4 103/7 103/9
103/21 103/22 104/16 104/8 105/5 116/3 116/5 119/12
128/6 128/19 129/2 129/4 129/7 129/11 129/16

129/21 129/25 136/1 146/22 147/9 147/22 151/13
152/10 152/13 152/21 152/23 153/13 169/24 169/24
12th **[1]**   67/20
1200 **[1]**   1/19
1362 **[1]**   169/20
1366 **[1]**   169/21
15 **[3]**   3/4 50/13 67/5
16 **[1]**   170/1
17 **[1]**   47/10
18 **[1]**   162/4
1925 **[1]**   159/11
1997 **[4]**   16/13 16/14 16/19 16/20
19th **[1]**   143/14
1:00 **[1]**   67/1
1:19 **[1]**   67/8

2

20 **[2]**   1/10 38/14
2000 **[1]**   16/22
20005 **[1]**   1/20
2002 **[1]**   16/24
20044 **[2]**   2/9 2/13
2006 **[1]**   170/4
2010 **[1]**   17/2
2013 **[1]**   17/3
2017 **[1]**   17/5
2019 **[11]**   17/7 71/5 71/6 72/9 72/17 85/10
92/5 92/21 107/6 107/10 109/20
202 **[2]**   2/6 2/9
2021 **[2]**   17/10 17/12
2025 **[5]**   1/10 24/11 45/10 88/7 173/12
205 **[1]**   109/19
20530 **[1]**   2/5
21 **[1]**   45/9
212 **[2]**   1/16 91/25
214 **[1]**   130/12
218-9376 **[1]**   1/24
21st **[4]**   24/11 46/3 63/12 173/12
22030 **[1]**   1/23
2242 **[1]**   104/7
228 **[1]**   144/19
24 **[1]**   77/21
243 **[1]**   130/12
24th **[1]**   48/25
25 **[1]**   16/8
267 **[1]**   144/19
2780 **[1]**   4/10
28 **[2]**   73/8 173/6
2808 **[1]**   106/23
295 **[1]**   1/15
2968042 **[1]**   88/7
2nd **[1]**   49/4

3

30 **[2]**   3/4 82/23
300 **[1]**   1/23
30th **[1]**   53/14
35 **[1]**   106/10
353-0261 **[1]**   2/6
3:42 **[1]**   172/11
3rd **[5]**   39/19 39/21 39/22 49/19 58/19

4

4103 **[1]**   1/23
434 **[1]**   1/24
443 **[1]**   170/3
453 **[1]**   170/1
470 **[1]**   169/20
4th **[2]**   154/1 154/12

5

503 **[1]**   2/13
5th **[1]**   1/15

6

616-9344 **[1]**   2/9
617 **[1]**   1/21
6th **[2]**   32/12 102/8

7

7-2 **[1]**   160/6
7000 **[1]**   1/16
712-7165 **[1]**   1/21
7165 **[1]**   1/21
72 **[1]**   77/21
74 **[8]**   6/16 7/3 7/8 7/15 9/21 10/23 11/3 11/6
75-6 **[1]**   12/2
753 **[1]**   173/6
76 **[6]**   6/16 10/24 10/25 11/25 159/24 170/3
7th **[12]**   32/15 32/16 32/22 35/9 39/12 40/15 41/4
43/5 43/8 59/19 59/21 60/9

8

83 **[3]**   6/17 12/4 12/8
8344 **[1]**   2/13
849-7000 **[1]**   1/16
85 **[3]**   6/19 6/21 12/15
86 **[2]**   6/18 7/2
868 **[1]**   2/12
878 **[1]**   2/8
891-8344 **[1]**   2/13
8:25-cv-02780-PX **[1]**   1/5

9

9-0 **[1]**   68/3
900 **[1]**   1/20
9344 **[1]**   2/9
9376 **[1]**   1/24

943 **[1]**   109/19
950 **[1]**   2/5
98 **[1]**   28/22
99 **[1]**   28/22

A

A.M **[1]**   1/10
AADC **[3]**   96/21 102/7 130/8
Abelson **[1]**   88/22
abide **[2]**   20/18 21/1
ability **[5]**   123/10 126/19 145/6 148/25 149/2
able **[8]**   13/10 13/11 17/19 55/12 141/22 154/15
above **[1]**   173/9
above-entitled **[1]**   173/9
aboveboard **[1]**   51/10
ABREGO **[110]**   1/3 4/11 4/15 18/11 19/15 19/18 19/23
20/4 21/10 21/16 22/6 23/16 24/15 27/1 28/18 29/14
29/22 29/24 30/21 39/11 40/17 41/5 41/13 41/19
42/4 50/23 63/18 64/11 67/16 67/20 68/9 68/18 69/1
69/24 70/19 72/3 72/11 76/17 77/18 77/23 78/11
79/12 79/17 80/9 81/9 81/21 82/13 83/13 83/25 90/3
90/3 90/12 94/13 96/7 98/12 99/11 100/19 101/2
101/13 102/3 102/18 103/17 104/11 104/19 105/6
106/24 107/16 107/21 111/7 111/23 112/24 113/3
113/6 115/1 115/10 118/14 119/18 120/1 120/10
123/12 129/7 124/22 125/10 125/18 127/12 131/3
131/12 131/23 131/3 136/13 137/22 138/19 139/13
139/20 140/16 141/3 141/15 143/17 144/13 146/10
149/15 153/1 153/23 161/3 161/22 162/25 163/7
163/12 164/13 164/25
Abrego **[3]**   90/3 127/12 131/23
Abrego's **[4]**   111/17 138/21 141/13 162/12
absence **[7]**   70/22 70/25 71/19 82/18 88/20 93/23
167/18
absent **[1]**   95/13
absolute **[1]**   125/7
absolutely **[4]**   14/15 96/10 147/18 148/6
absurd **[4]**   50/5 50/7 51/5 117/4
absurdity **[1]**   117/4
accept **[10]**   17/21 27/1 28/18 29/14 51/3 82/5 141/2
141/7 141/14 149/12
acceptable **[1]**   9/15
accepted **[1]**   151/14
accessible **[1]**   13/13
accompanying **[1]**   98/7
accord **[1]**   87/4
accorded **[3]**   72/2 112/24 163/21
according **[8]**   113/14 113/15 113/15 135/8 138/18
146/10 149/2 160/2
accordingly **[1]**   146/8
accurate **[1]**   54/20
achievable **[1]**   124/19
acknowledging **[1]**   112/6
acronym **[2]**   15/15 15/22
across **[1]**   171/3
act **[2]**   87/1 104/9
acting **[16]**   15/13 16/3 17/7 17/10 39/14 39/17
39/23 47/10 48/18 49/19 50/1 58/7 58/13 58/14
58/15 58/16 58/16
action **[4]**   4/10 52/18 95/12 144/12
actions **[2]**   100/12 100/15
active **[1]**   92/18
actual **[4]**   73/18 98/5 98/22 98/25
actually **[20]**   6/2 8/18 18/3 32/16 44/18 54/22
56/14 73/15 74/8 92/12 98/21 106/9 112/21 115/23
120/8 120/9 135/15 142/17 147/7 170/14
added **[1]**   117/18
addition **[5]**   10/8 99/22 140/15 167/18 167/18
additional **[18]**   27/2 29/15 34/12 124/16 128/13
130/17 137/6 143/6 144/25 145/25 146/17
150/10 150/18 150/19 156/9 156/24 157/5
address **[9]**   75/20 86/8 88/1 94/22 99/10 104/24
155/6 169/14 171/4
adjourned **[1]**   172/10
adjudicate **[1]**   155/11
adjudicated **[3]**   111/7 111/16 143/24
adjudicating **[3]**   102/11 102/14 111/6
adjudication **[3]**   104/12 143/25 157/1
adjustment **[1]**   93/13
administration **[2]**   68/14 172/5
admission **[5]**   144/8 145/25 146/3 146/6 168/14
admitted **[3]**   144/21 146/13 159/20
admittedly **[1]**   109/15
advancing **[1]**   97/9
advantage **[1]**   74/19
adverse **[2]**   52/17 110/17
advice **[2]**   61/6 61/14
advised **[4]**   24/16 29/13 58/7 59/23
advisement **[3]**   9/22 11/25 112/16
Advisor **[2]**   60/1 62/14
affect **[1]**   11/13
affidavit **[9]**   11/14 53/10 53/25 54/20 79/4 124/8
125/3 126/5 127/7
affirmed **[2]**   160/7 167/6
Africa **[3]**   80/8 125/16 153/23
African **[3]**   54/17 66/1 124/1
after **[17]**   17/18 59/15 62/1 62/1 72/9 79/11 86/10 90/10
97/25 100/18 105/19 107/3 131/23 148/4 155/7
158/15 158/17 162/24
afternoon **[7]**   14/24 30/10 30/11 59/20 59/21 60/9
67/15
again **[26]**   5/21 35/7 39/22 45/5 60/23 62/20 64/19
95/20 102/2 103/13 103/14 103/19 103/23 104/11
104/22 116/13 117/23 118/5 121/20 126/22 132/21
133/11 138/24 139/1 158/18 166/25
against **[10]**   68/12 74/2 74/8 84/22 95/13 99/9
104/11 107/23 114/12 164/24
agency **[4]**   18/3 18/6 42/4 95/12
agency's **[1]**   16/14
agenda **[1]**   68/13
ago **[7]**   50/13 57/2 79/18 87/8 93/3 102/25 129/11

**A**

agree [19]   13/6 52/9 52/9 55/12 81/13 96/16 106/17
118/24 123/1 128/17 128/18 134/12 143/4 160/14
158/3 158/12 158/12 158/13 164/16
agreed [3]   119/20 122/25 160/24
agreement [2]   56/14
agreements [1]   18/7
agrees [1]   116/14
ahead [3]   25/18 28/15 48/22
AIDED [2]   1/25 2/15
Air [1]   23/20
airline [1]   23/19
al [2]   1/6 4/11
albeit [1]   82/15
alien [8]   17/25 81/18 110/5 143/4 144/20 146/3
146/5 159/25
aliens [4]   17/15 65/9 65/11 160/3
all [118]   4/3 4/6 6/11 6/15 9/24 14/4 20/19 21/21
23/24 26/21 28/14 29/12 36/11 37/4 38/11 39/5
39/10 39/14 39/17 40/4 40/19 42/16 42/24 43/20
44/8 46/10 46/23 49/12 52/23 53/7 55/11 57/6 59/5
63/12 63/22 64/9 64/15 66/8 66/13 66/20 67/6 67/9
67/11 69/18 71/5 72/2 77/25 81/15 82/17 83/12
84/19 85/22 90/21 90/23 92/19 93/20 98/8 100/18
103/20 103/24 104/9 105/14 106/18 108/3 109/1
110/18 111/16 111/19 114/21 115/19 115/20 115/24
116/12 117/2 117/23 120/12 122/11 127/4 127/15
128/10 132/18 133/22 136/17 137/2 137/18 137/22
140/9 142/3 143/13 146/19 150/19 155/14 156/12
157/13 157/16 157/17 158/17 158/19 158/20 159/1
159/3 160/1 160/10 163/12 166/14 166/15 168/10
168/23 170/7 170/8 170/17 171/21 171/24 171/24
172/7 172/8 172/8 172/9
alleged [1]   104/24
alleging [1]   117/16
allow [8]   51/5 52/21 55/22 56/9 121/25 161/1 165/5
167/7
allowed [2]   38/7 56/18
allows [1]   128/1
almost [2]   115/9 157/7
alone [1]   94/1
along [6]   14/11 57/24 58/4 77/25 92/22 145/22
alongside [1]   26/3
already [7]   48/9 102/15 108/25 137/7 146/11 148/3
168/7
also [29]   5/1 5/4 9/3 17/7 17/20 36/15 36/23 37/2
49/8 68/18 94/22 95/12 98/7 102/7 103/4 103/22
104/4 104/5 104/6 116/17 129/19 129/22 130/4 141/3
142/19 148/21 149/19 167/14 170/1
alternate [1]   80/25
alternative [7]   79/16 81/1 81/2 85/24 86/9 86/13
167/16
although [6]   8/17 70/10 129/8 130/8 148/17 155/1
always [2]   136/6 161/14
am [17]   8/19 12/1 38/14 57/25 94/14 107/4 107/10
111/25 114/16 123/18 129/14 138/20 138/23 149/3
153/3 157/23 167/12
Amendment [1]   172/4
America [4]   65/9 65/13 65/22 66/1
American [1]   80/7
amount [3]   101/2 60/21 60/22
ample [1]   109/8
analysis [3]   95/10 108/13 143/1
ANASTASIO [2]   1/14 5/1
Anderson [37]   32/9 32/9 32/12 32/23 32/25 33/7
33/10 33/13 33/19 34/2 35/8 37/9 37/15 37/18 38/5
38/8 39/6 39/12 40/2 40/10 43/17 44/4 44/8 44/17
44/21 59/16 59/17 59/25 61/24 62/1 62/7 62/10
62/17 62/21 62/23 62/24 63/2
ANDREW [3]   1/13 4/14 67/15
Angeles [1]   17/11
announce [1]   153/7
announcement [1]   153/9
annual [1]   160/17
another [13]   13/15 38/2 50/16 56/13 62/12 62/21
62/23 90/7 115/15 127/1 132/5 132/5 155/8
answer [14]   75/8 76/14 94/18 105/16 115/11 126/14
133/7 133/12 134/19 155/24 156/1 156/21 159/3
161/22
answered [2]   35/16 45/11
ante [7]   90/4 131/24 132/21 133/25 134/1 135/6
136/14
antecedent [1]   117/10
anticipate [1]   80/12
anticipating [1]   81/17
anybody [4]   41/3 44/18 62/10 67/2
anymore [2]   139/7 156/17
anyone [7]   8/8 24/25 42/17 45/7 45/16 62/24 65/25
anything [22]   7/1 13/17 13/25 37/12 37/13 50/18
55/16 61/16 62/24 73/4 92/23 113/17 116/24 117/1
117/7 126/6 142/9 151/1 151/8 154/19 156/9 165/22
anyway [1]   87/3
anywhere [6]   38/25 11/21 147/12 153/18 153/21
161/25
apart [2]   55/17 137/22
apologize [2]   129/14 168/18
apparently [1]   159/13
appeal [14]   73/21 86/25 91/8 93/5 93/17 112/3
112/4 112/8 112/16 113/3 117/13 147/14 148/5 164/2
appealed [2]   93/9 148/17
appeals [19]   70/1 83/9 86/2 93/5 93/6 96/5 98/20
103/12 116/8 117/21 117/24 130/6 142/21 150/11
150/13 151/3 151/4 151/9 165/3
appear [6]   11/15 89/20 89/23 90/11 90/18 91/13
APPEARANCES [2]   1/11 2/1
appears [3]   35/9 99/8 136/17
appellate [4]   135/20 157/3 163/11 163/15
appetite [2]   123/18 123/19
application [3]   106/23 146/5 152/8
applied [1]   120/14
applies [8]   102/9 121/20 130/11 130/14 131/16
143/1 160/1 160/8
apply [19]   92/13 100/8 100/18 102/4 104/2 105/11

**B**

back [39]   9/24 40/4 43/2 45/20 56/12 68/6 72/16
80/20 82/11 89/15 89/20 91/20 92/1 92/18 99/1
105/15 116/4 119/2 120/12 120/13 120/22 121/22
121/23 125/11 128/23 130/4 164/5 170/14
appoint [1]   128/17
appointed [1]   128/17 128/18 128/22 172/8
appreciates [1]   47/3
approach [9]   6/14 14/13 18/17 22/9 34/23 49/12
63/14 133/14 158/6
appropriate [6]   6/22 6/25 72/16 77/22 83/15 156/10
approval [1]   163/16
approximately [2]   49/1 62/7
April [3]   85/8 102/8 119/24
April 6th [1]   102/8
aren't [2]   34/22 169/17
argue [3]   97/23 101/15 149/9
arguing [3]   101/4 151/1 151/7
argument [41]   6/6 6/10 6/10 50/21 53/11 55/5 67/2
67/18 69/17 69/18 70/22 71/12 77/2 83/22 95/23
95/24 97/8 102/13 102/17 108/22 111/21 115/3
119/17 120/19 122/18 129/14 129/17 129/18 130/1
130/13 139/19 149/23 150/6 150/10 151/10 154/18
161/13 161/15 161/19 168/11 169/16
argumentative [1]   35/17 37/21 42/8
arguments [9]   69/13 93/13 94/23 95/8 148/5 150/15
152/21 167/15 171/5
ARMANDO [1]   1/3 4/11 67/16
around [2]   32/12 93/23
arrangement [1]   123/5
arrested [1]   119/4
arrived [2]   16/10 87/19
art [1]   116/24
Article [2]   151/8 157/1
articles [1]   51/24
ascribe [1]   53/18
aside [2]   87/12 93/22
ask [29]   7/6 7/11 9/24 22/9 25/11 27/15 33/5 35/7
37/17 37/23 38/2 38/9 38/12 41/9 44/3 46/13 48/1
51/20 52/15 58/11 60/17 62/20 65/18 88/4 126/22
132/12 148/15 166/1 169/6
asked [17]   35/16 38/4 38/16 41/7 45/11 56/5 57/14
57/19 57/23 76/22 77/14 78/20 80/10 97/4 115/10
148/16 161/17
asking [15]   38/22 46/6 48/1 51/3 52/2 55/19 61/25
71/15 95/24 96/7 96/9 137/22 142/18 150/17 163/20
asks [2]   81/17 94/25
aspect [3]   98/5 152/15 155/20
aspects [3]   106/13 150/18 152/19
asserted [2]   68/9 79/23
asserting [2]   8/14 68/12
assertion [2]   12/21 107/23
asserts [1]   75/15
assessed [2]   21/5 21/6
assesses [1]   26/25
assessment [3]   138/16 140/8 142/16
assign [1]   133/3
assigned [3]   132/5 134/12 136/6
assignment [4]   48/10 48/13 59/4 134/18
assist [2]   57/19 57/20
assistant [8]   2/4 15/13 16/3 16/21 17/3 17/8 48/18
58/8
assume [4]   8/5 9/10 39/17 90/23
assumed [1]   17/12
assumes [2]   73/24 97/20
assuming [4]   18/24 102/17 111/4 128/25
assurance [3]   9/3 20/22 55/18 63/15 63/17 78/11
140/1 140/18 155/12 161/2
assurances [32]   7/14 9/6 20/8 20/11 20/13 20/17
21/5 21/8 21/15 22/3 24/14 24/16 24/18 26/23 36/14
36/15 53/12 63/12 78/4 79/12 82/15 126/2 126/9
131/3 137/16 137/19 138/7 138/20 139/12 140/7
140/8 166/18
assured [2]   22/4 125/2
astonishing [2]   161/17 163/25
astounding [1]   57/3
asylum [19]   93/2 93/9 106/23 107/1 107/15 107/23
107/24 109/2 109/5 112/3 112/14 113/2 113/7 113/7
113/12 113/18 137/23 145/11 170/10
Atlanta [3]   132/13 132/19 134/10
attach [1]   13/10
attached [3]   33/10 55/17 166/16
attaches [1]   119/4
attempt [1]   31/10
attempting [1]   17/24
attention [3]   72/9 171/9 171/21
attorney [24]   20/7 24/24 25/5 25/22 27/24 29/4
29/5 31/9 31/16 32/9 34/10 34/11 34/15 36/1
59/15 60/12 61/9 62/12 62/18 79/24 102/10 130/9
attorney-client [5]   31/9 34/10 34/15 60/12 61/9
attorneys [2]   41/4 127/2
August [6]   16/20 24/11 45/9 46/3 63/12 124/20
August 1997 [1]   16/20
August 21 [1]   45/9
August 21st [3]   24/11 46/3 63/12
auspices [1]   161/19
authored [2]   32/2 124/21
authorities [3]   121/22 122/23 160/17
authority [6]   109/6 118/14 118/18 122/19 143/15
161/9
authorization [1]   144/11
authorize [1]   110/7
availability [1]   148/21
available [8]   14/6 61/25 75/7 82/4 133/2 134/8
134/9 134/13
avenue [3]   12/5 12/5 149/13
aware [6]   45/1 49/7 57/22 57/22 65/25 133/15
awry [7]   78/24 79/1 83/1 123/7 123/7 137/25 155/23
awful [1]   83/1
Azzouka [1]   84/3

**C**

109/12 116/17 119/22 122/4 122/7 122/12 123/4
123/11 126/22 128/17 128/19 129/10 131/25 132/23
136/11 137/5 138/21 139/11 145/16 146/16 159/15 159/17
160/5 165/25 169/1
background [4]   10/11 48/21 110/11 110/13
bad [1]   68/21
ball [2]   53/19 80/10
Baltimore [9]   132/4 132/23 134/2 134/2 134/9
134/25 135/15 136/7 136/17
bar [18]   95/18 102/2 103/2 103/5 103/22 105/4
116/11 116/25 118/25 125/8 129/7 129/11 130/3
147/2 147/9 147/22 154/16 171/6
bare [1]   83/9
Barr [1]   109/19
barred [5]   79/19 117/8 129/16 129/21 169/23
barring [2]   5/22 138/11
bars [14]   90/22 92/13 104/24 104/25 105/15 110/24
115/24 119/2 129/25 142/11 147/20 147/20 147/22
152/10
based [9]   24/17 30/16 31/4 47/15 49/25 82/18 91/15
152/1 152/10
basic [2]   95/4 134/1
basically [8]   50/14 81/22 83/21 87/18 101/12
103/11 142/22 155/5
basing [1]   31/15
basis [17]   20/8 44/17 52/1 70/3 72/25 77/23 83/16
86/23 89/11 121/12 121/14 121/15 121/16 122/13
123/21 141/8 160/7
bear [1]   67/18
bears [1]   125/8
beaten [1]   67/25
because [119]   8/6 8/13 9/8 10/4 11/9 11/16 12/6
12/17 13/8 28/8 30/25 44/1 47/9 51/9 54/16 52/16
52/7 53/11 54/1 67/19 70/10 70/20 71/19 72/1 74/25
75/10 75/25 76/2 76/14 77/10 79/16 80/19 81/5
86/14 86/19 86/22 96/16 97/10 98/22 101/3 104/2
104/19 107/2 107/16 108/23 109/13 110/5 110/15
110/25 111/14 112/19 113/6 114/3 114/6 115/6 116/4
116/13 116/18 117/3 117/19 118/16 119/14 119/23
120/4 120/5 120/14 120/23 122/6 122/15 122/17
123/4 123/22 123/24 124/2 126/23 127/10 128/23
129/2 130/5 132/19 132/25 133/7 135/5 137/23 138/1
138/4 139/20 140/18 141/17 141/20 141/22 142/2
142/12 144/6 146/12 148/25 149/6 150/9 150/22
151/20 152/9 152/21 155/16 156/15 156/16 156/17
156/18 157/6 157/17 161/16 162/12 162/13 163/2
163/22 166/24 167/4 168/1 170/24 172/2
become [4]   57/21 58/23 58/24 91/8
becomes [1]   59/5
bed [1]   170/17
bedrock [1]   95/9
before [30]   1/9 4/10 4/12 13/25 22/9 39/7 39/22
46/11 51/12 64/7 66/2 69/14 83/7 83/8 88/23 89/21
91/12 92/11 101/4 101/6 111/4 115/1 130/17 131/20
131/23 148/4 148/6 148/7 148/8 150/3 154/9 159/14
163/1 163/8 165/2 165/25 166/5 171/17
begin [1]   102/4
beginning [1]   119/19
begins [3]   101/23 143/22 146/6
begs [1]   162/15
behalf [6]   1/12 2/2 5/7 5/9 5/11 5/13 40/25 41/12
41/18 42/3
behind [1]   55/10
being [27]   5/19 9/12 10/14 14/6 38/17 47/16 53/22
67/24 80/24 81/19 86/1 97/10 97/12 99/14 107/22
113/9 114/10 117/23 120/24 125/11 126/17 131/11
131/17 138/22 140/9 146/20 159/20
belief [1]   31/3
believe [49]   12/16 12/25 17/3 25/22 27/13 28/17
31/13 32/21 33/23 33/25 36/22 37/2 37/12 38/4
39/19 48/16 55/2 60/1 60/8 73/6 85/12 99/1 101/7
101/10 101/23 102/15 103/5 106/8 106/10 108/22
114/14 116/20 121/2 123/19 125/5 126/7 127/25
128/25 132/9 133/1 134/5 134/6 142/19 143/17 152/5
163/12 169/14 171/6
believed [1]   29/20
believes [1]   54/13
below [2]   12/23 49/14
Ben [2]   2/8 2/12
bench [6]   6/5 22/12 23/12 49/13 57/7 134/4
besides [1]   80/12
best [4]   48/24 98/1 123/13 171/13
better [1]   37/14
between [11]   24/12 53/6 59/23 62/6 76/10 99/4
126/20 138/21 143/21 150/2 154/25
beyond [6]   50/14 121/17 145/7 153/13 162/9 163/9
BIA [10]   110/12 114/25 142/20 148/6 148/7 148/18
149/5 150/11 150/14 163/16
BIA's [1]   142/20
bias [5]   49/22 50/4 55/23 56/7 159/6
bind [5]   41/17 42/3 42/10 42/18 127/5
binding [1]   156/7
bit [3]   12/9 52/21 116/18
bite [1]   157/2
black [3]   95/1 146/20 147/14
blank [2]   88/13 88/15
blocked [1]   72/12
blown [1]   54/24
blue [5]   9/25 93/5 93/6 98/20 135/24
boisterous [1]   172/3
bona [1]   51/4
Bondi [1]   108/8
border [8]   16/21 17/1 143/22 144/3 145/23 159/14
165/6 165/10
borders [1]   162/10
bore [1]   151/21
both [19]   7/3 13/12 14/23 68/19 74/14 84/22 100/5
103/1 103/9 104/23 105/1 118/2 122/8 131/2 142/7
156/14 168/15 168/24 171/9
bottom [1]   9/16
bottom-line [1]   9/16
boundary [1]   145/4
box [3]   2/8 2/12 115/9

**B**

Boyle [1] 153/14
Bracic [3] 74/22 154/17 154/17
break [5] 6/3 6/7 6/3 154/25 171/17
breaks [1] 13/5
Bridge [1] 1/23
brief [4] 154/25 162/2 162/5 169/11
briefed [3] 70/7 70/8 154/19
briefing [2] 77/1 93/6
briefly [3] 49/12 99/11 100/17
briefs [3] 130/23 165/2 169/17
bright [1] 99/3
bright-line [1] 99/3
bring [6] 68/6 91/20 92/1 107/16 117/21 154/17
bringing [1] 118/25
broad [1] 151/24
broader [1] 68/13
broadest [1] 147/12
broadly [2] 147/5 151/12
brought [8] 49/18 55/15 102/4 107/3 154/5 166/10 166/11 166/12
burden [5] 79/10 80/15 163/23 164/21 165/19
burdens [1] 96/2
burdensome [2] 142/24 164/1
bury [1] 77/3
busy [1] 114/6
butcher [1] 60/24

**C**

C-A-N-T-Ú [1] 15/2
California [3] 96/23 102/6 103/16
call [24] 9/21 39/6 39/11 40/2 40/12 40/13 43/18 45/3 50/17 51/2 51/15 61/4 61/23 61/25 62/1 62/2 62/9 62/9 62/21 62/25 62/25 69/1 74/24 75/3
called [5] 4/2 60/8 85/6 143/14 169/25
callousness [1] 162/4
Calls [2] 46/17 61/7
came [9] 34/4 38/11 49/25 57/19 68/5 68/8 105/1 137/23 164/7
campaign [2] 68/10 68/11
can't [25] 6/5 44/16 45/7 51/11 51/12 51/15 62/11 63/21 73/20 73/22 74/24 75/13 84/20 105/19 108/9 115/21 117/20 122/16 127/13 130/2 137/25 149/17 152/3 154/2 156/16
candid [1] 47/3
candidly [1] 122/1
cannot [10] 58/6 66/10 74/16 129/4 143/5 146/16 149/10 149/24 149/24 150/12
CANTÚ [32] 3/3 5/17 5/18 11/10 11/13 11/19 13/25 14/5 14/6 14/13 14/16 14/24 15/6 15/15 17/14 17/23 18/11 19/4 23/16 23/24 27/16 28/24 30/10 31/14 35/7 47/2 47/9 57/13 66/20 79/8 126/5 166/12
Cantú's [4] 6/7 11/6 12/7 12/9
capacity [1] 134/15
capture [1] 73/10
care [3] 6/2 12/8 162/10
careful [5] 110/18 115/12 119/15 167/1 171/9
Carl [1] 29/8
case [90] 1/15 16/10 17/18 39/11 52/14 53/5 57/4 68/17 68/20 71/13 73/25 74/2 74/4 74/6 74/7 76/25 80/7 86/22 87/2 87/7 88/15 89/7 89/16 90/5 90/5 90/7 91/9 92/24 97/2 97/2 98/16 98/17 98/17 98/18 99/9 99/17 100/4 100/16 101/11 101/16 102/7 102/24 103/1 103/7 103/16 103/23 103/24 103/24 104/23 104/23 107/2 109/18 109/20 112/12 117/9 120/14 121/9 122/5 130/7 132/4 132/23 133/15 135/11 135/21 136/6 136/14 136/18 137/10 138/10 141/13 146/1 153/16 154/2 154/10 154/15 155/18 159/8 159/11 159/13 159/23 166/20 169/25 170/2 170/4 170/6 170/7 170/8 170/19
cases [29] 17/20 72/6 74/23 83/3 83/21 84/3 84/19 88/4 88/9 95/20 99/3 100/5 102/11 102/14 102/22 103/20 104/5 108/17 109/21 116/14 129/23 140/10 143/13 145/22 153/15 162/23 163/21 169/16 170/20
CAT [11] 104/11 104/12 104/12 104/17 104/19 108/7 112/15 113/2 142/3 142/7
categories [4] 102/10 129/3 130/10 165/8
category [1] 140/13
caveat [1] 147/19
CECOT [1] 123/4
center [4] 17/2 17/4 17/6 123/6
centerpiece [1] 106/7
century [2] 143/14 160/13
certain [10] 24/17 26/6 26/9 26/12 38/18 76/18 130/2 134/24 137/7 139/1
certainly [26] 8/22 51/11 55/10 72/3 75/14 76/1 76/7 89/18 90/24 91/6 91/24 118/3 128/18 134/12 134/16 135/13 137/13 141/1 142/14 149/8 150/2 150/25 151/12 153/1 155/1 157/25
CERTIFICATE [1] 172/12
certify [1] 173/6
cetera [1] 135/2
chain [2] 1/23 150/11
challenge [9] 104/17 122/14 129/6 130/20 147/3 148/8 154/5 154/6 169/22
challenged [1] 99/14
challenges [18] 74/22 96/13 96/13 96/16 99/16 99/21 99/22 99/24 100/6 103/2 103/5 103/11 104/10 129/15 129/15 129/18 129/25 147/21
challenging [5] 102/19 102/20 102/20 103/17 103/25 104/1 104/2 104/12 104/13 104/16 104/25 119/1 153/18 153/22
chance [5] 84/5 85/19 89/17 166/22 166/22
change [4] 35/14 35/20 136/14 160/1
changed [7] 57/23 58/5 76/6 85/8 85/9 114/8 146/14
changes [5] 75/25 75/25 141/1 144/8 146/7
channel [1] 151/4
channeled [2] 147/13 150/13
channeling [3] 111/2 146/23 147/14
characterization [2] 54/25 146/22
characterize [2] 12/19 51/12
charge [1] 17/5

---

charter [1] 23/20
chartered [1] 23/22
chattel [1]
chattel [1] 54/1
check [2] 13/2 13/4
checked [1] 115/10
checks [2] 110/11 110/13
chief [1] 60/6
child [1] 68/13
choice [3] 53/13 167/5 167/6
choose [4] 81/2 91/12 92/15 167/25
chooses [1] 80/25
chose [5] 89/7 91/21 92/1 92/2 113/7
chosen [1] 79/17
circle [1] 136/24
circuit [25] 64/21 74/5 74/15 98/16 100/11 100/15 101/6 101/8 101/9 102/24 103/6 104/4 110/14 110/15 110/25 130/7 135/21 138/9 150/20 163/16 169/19 170/12 170/24 170/12
circuits [1] 146/25
circumstance [5] 120/7 131/14 131/16 134/22 165/11
circumstances [8] 5/22 96/25 100/23 129/4 131/16 160/1 168/14 168/5
citation [5] 73/9 88/5 88/6 118/1 144/19
citations [2] 99/17 116/17
cite [12] 72/6 73/4 73/5 74/2 83/3 98/3 98/5 98/6 98/14 100/16 101/16 145/22
cited [7] 88/4 103/20 106/9 145/20 154/3 159/7 159/8
cites [2] 105/4 109/23
citizen [1] 144/23
citizens [1] 17/22
citizenship [1] 17/21
Civil [4] 1/5 2/4 2/11 4/10
claim [26] 70/9 70/11 93/25 94/1 95/19 100/12 104/11 105/9 107/23 107/24 113/7 114/13 118/25 119/13 129/10 140/17 147/16 147/23 154/7 154/8 154/9 154/14 154/17 155/11 160/20 169/3
claim-splitting [4] 100/12 154/7 154/14 154/17
claims [28] 70/5 70/6 96/12 96/18 97/1 99/12 99/14 100/10 100/14 100/24 101/3 101/13 101/16 101/19 101/20 102/3 102/14 102/18 102/23 103/23 119/10 121/3 142/4 142/7 147/13 147/25 154/17 156/13
clarification [3] 7/20 12/13 58/11
clarify [3] 31/12 37/14 136/20
clarity [1] 118/3
Clark [2] 159/7 160/5
class [24] 97/11 97/13 97/15 100/10 100/12 100/14 100/15 100/22 100/23 101/4 101/5 101/11 101/17 151/23 151/24 152/2 152/7 152/10 152/14 152/19 153/12 154/4 154/5 154/16
class-based [1] 152/10
classes [1] 100/22
clause [9] 119/7 137/5 143/6 143/12 144/9 145/6 146/16 147/24 160/11
clauses [5] 116/6 117/14 117/18 118/22 147/12
clear [14] 65/19 74/15 77/15 78/3 78/7 84/5 95/13 107/8 107/13 108/5 124/19 153/14 159/3 163/9
clearly [6] 14/21 70/12 113/1 121/11 144/25 149/2
client [12] 31/9 34/10 34/15 60/12 61/9 80/3 83/1 83/6 83/10 160/22 166/16 167/20
client's [2] 168/3 169/1
clients [2] 53/14 126/14
climb [1] 156/17
clock [2] 58/19 112/5
close [2] 113/18 170/24
closed [2] 126/23 171/11
closely [1] 14/21
cloth [1] 143/11
clues [1] 136/17
cocounsel [1] 86/12
codify [1] 104/8
cognizable [2] 140/12 140/17
cognizant [1] 54/24
collapse [2] 108/5 108/6
collateral [1] 96/12
colleague [1] 119/20
colleagues [1] 130/16
come [13] 9/9 12/16 12/25 31/20 44/21 48/9 50/21 57/19 89/4 110/25 118/4 166/21 172/2
comes [6] 4/12 31/17 47/15 74/21 109/16 168/3
comfort [1] 135/14
coming [2] 12/13 61/25
comma [1] 35/14
commencing [2] 102/11 102/14
commercial [1] 23/19
commitment [2] 141/10 142/2
commitments [4] 27/3 28/19 29/15 95/5
committed [3] 137/11 140/15 142/6
common [4] 88/10 88/16 140/22 141/21
communicate [2] 24/23 24/25
communicated [1] 38/9
communication [5] 24/3 36/24 36/25 37/3 40/7
communications [7] 16/20 24/10 36/9 40/6 45/21 45/24 62/1
communiques [1] 64/17
community [2] 171/25 172/2
companion [1] 69/7
competent [2] 82/8 127/15
complete [2] 82/22 153/11
completely [1] 123/9
complexion [1] 75/25
complicated [1] 163/22
comply [2] 69/21 99/25
components [2] 69/14 97/10
comporting [1] 86/3
comports [1] 100/21
compound [1] 38/23
COMPUTER [2] 1/25 2/15
COMPUTER-AIDED [2] 1/25 2/15
concede [2] 92/5 92/10
conceded [4] 98/17 106/25 107/21 122/25
concedes [1] 81/22

---

conceivable [1] 147/3
conceivably [1] 140/5
concern [3]
concern [3] 149/23 63/6
concerned [2] 7/13 132/16
concerns [2] 148/23 171/17
concession [5] 98/8 98/24 115/13 119/24 123/3
conclude [2] 82/24 155/7
concluded [3] 57/17 136/4 155/20 172/11
concludes [2] 66/20 167/13
conclusion [8] 9/16 61/7 114/8 131/18 131/19 138/2 138/22 163/14
conclusions [1] 131/21
concoct [1] 72/19
concrete [1] 144/15
condition [2] 83/15 168/5
conditional [7] 77/20 83/18 84/1 84/12 124/24 126/10 127/17
conditionality [1] 125/6
conditions [4] 17/15 68/1 90/14 168/2
conduct [1] 69/1
conducting [1] 16/9
confer [5] 10/15 13/5 86/12 110/13 158/2
conference [5] 22/12 23/12 49/13 57/7 173/10
conferred [1] 11/22
confirm [1] 156/21
confirms [1] 53/16
conformance [1] 173/10
Congress [11] 81/23 95/14 96/17 114/23 117/18 146/22 147/12 148/20 149/8 150/12 151/3
connection [4] 63/9 65/7 137/25 139/24
connections [2] 143/18 161/24
consequences [1] 143/25
consider [7] 33/11 55/19 97/6 109/9 150/5 164/20 171/10
consideration [2] 52/13 52/20
considered [1] 55/16
consistent [3] 6/23 80/2 94/5
consistently [1] 87/1
constantly [1] 136/11
Constitution [3] 105/12 160/2 160/11
constitutional [8] 68/12 95/14 146/4 146/7 150/9 154/6 160/19 164/1
constitutionality [1] 118/19
constitutionally [3] 77/23 83/16 83/24
constructive [1] 159/8
construe [2] 111/25 147/1
construed [1] 113/1
consultation [1] 19/8
consumption [1] 126/21
contact [2] 29/4 60/7
contacted [2] 45/9 60/2
contained [2] 20/10 25/16
contemplate [1] 158/23
content [5] 8/17 36/18 36/19 46/25 53/2
contents [1] 9/18
context [13] 17/8 74/17 80/5 82/15 107/20 109/17 129/16 133/21 137/9 137/13 148/5 150/24 170/12
contexts [1] 153/6
contingencies [5] 24/17 26/16 26/18 36/15 38/18
continue [3] 64/24 89/4 162/18
CONTINUED [1] 2/1
continues [2] 71/6 90/6
control [1] 153/15
controlling [1] 137/14
Convention [4] 74/1 74/8 104/10 114/12
conventions [2] 20/19 21/2
conversation [11] 6/16 10/15 25/23 31/15 42/17 44/14 62/20 62/21 63/2 81/4 81/16
conversations [2] 43/19 44/18
conveyed [4] 25/15 124/12 124/15 125/5
convicted [1] 165/6
convictions [1] 164/10
convoluted [1] 46/10
COOPER [8] 1/17 4/19 75/7 75/20 94/18 94/22 166/3 167/5
Cooper's [1] 146/24
coordinate [1] 16/8
copies [1] 64/2
copy [2] 40/9 106/12
core [1] 129/1
corpus [3] 5/23 88/17 89/13
correct [62] 10/9 11/7 20/25 29/7 32/3 33/1 33/2 33/8 33/9 33/13 38/14 39/9 39/12 39/15 39/16 39/24 40/3 40/11 40/14 40/17 40/18 41/25 43/25 44/23 45/3 46/1 46/9 46/16 47/22 47/23 49/5 58/20 59/6 62/16 63/4 63/7 65/23 68/7 71/3 74/13 74/13 76/4 94/9 94/15 101/6 107/18 111/12 115/24 129/22 129/13 129/22 129/24 134/7 135/22 136/15 140/14 143/19 146/12 147/18 150/7 164/8 166/15 167/8 167/9 168/3
correctly [4] 24/19 27/4 29/17 92/13
Costa [73] 24/12 24/13 24/15 26/2 26/25 27/1 27/13 28/17 29/1 29/25 41/13 41/20 42/5 43/19 44/18 45/9 45/17 50/22 54/15 54/18 55/17 55/18 56/1 63/11 63/13 63/14 63/15 63/18 64/10 64/12 72/18 78/1 78/3 78/5 78/9 78/11 78/14 78/18 78/21 79/1 79/11 79/17 81/25 82/13 82/14 83/17 94/4 94/13 100/1 122/25 123/5 124/6 124/11 124/12 124/22 126/2 125/9 125/11 125/16 128/17 128/13 139/10 141/4 141/14 161/14 161/19 161/20 161/25 163/6 166/15 166/3 166/15
couldn't [3] 66/4 66/4 154/8
counsel [14] 4/13 5/14 5/20 27/19 27/20 31/4 31/21 31/22 31/22 31/24 40/21 51/24 67/1 98/10
count [3] 70/4 76/1 76/6
counterevidence [1] 55/20
countries [14] 17/21 18/12 54/18 66/1 71/23 80/25 81/1 81/2 95/3 124/6 141/22 141/24 142/24 162/24
country [11A] 8/1 8/3 8/23 16/8 17/16 17/16 17/17 17/19 17/24 17/25 18/4 18/7 19/15 19/16 19/19 19/24 20/1 20/9 20/15 53/12 67/23 68/3 71/17 71/19

## C

**country... [90]** 71/21 21/22 72/3 72/9
72/14 72/16 76/1 80/19 81/1 81/15 81/18
82/5 82/10 84/6 87/19 87/20 92/2 95/25
100/7 102/21 103/2 103/20 104/25 106/16 106/20
106/21 107/4 107/17 110/6 110/8 111/23 113/19
113/19 114/15 114/16 118/16 119/24 120/4 120/23
122/10 122/15 123/7 123/14 125/14 126/20 137/24
138/13 138/15 139/9 139/24 140/23 140/23 140/24
140/25 141/1 141/20 141/23 143/10 143/18 143/23
144/8 144/21 144/21 144/22 145/3 145/12 146/2
146/6 146/13 154/6 155/13 155/16 159/16 159/20
159/25 161/7 161/11 161/23 161/25 162/19 162/20
162/21 167/8 167/25 168/7
**country's [1]** 141/10
**counts [6]** 6/11 69/3 69/5 69/5
**couple [9]** 30/12 83/21 84/2 87/8 106/2 129/11
138/5
**course [9]** 69/1 69/9 91/8 97/9 97/10 102/25 108/17
117/12 157/3
**court [135]** 1/1 1/10 2/11 4/2 4/4 4/10 4/12 6/4
9/11 9/17 10/3 11/14 19/7 22/8 22/14 28/4 47/3
47/3 51/23 53/16 58/3 67/5 67/6 67/9 67/24 68/4
68/9 68/19 69/6 74/16 74/22 77/25 80/20 84/19 87/3
87/13 88/1 88/10 88/16 90/14 90/21 90/24 91/6
91/10 93/16 94/25 95/7 95/18 95/20 96/2 96/5 96/7
96/21 96/24 98/9 99/3 99/17 100/21 101/4 101/10
101/17 102/2 102/5 102/8 102/25 103/5 103/13
103/14 105/2 106/1 108/5 108/8 108/14 109/21
109/24 109/24 116/7 117/21 118/9 118/9 121/9
124/15 129/1 130/8 130/16 132/2 135/8 135/17
135/23 136/6 136/7 136/16 136/18 138/11 138/16
142/21 143/15 143/19 144/6 144/7 145/5 145/10
145/21 145/24 146/2 146/25 147/16 150/11 150/12
151/8 151/8 151/8 151/9 151/15 151/16 152/1 152/12
152/19 153/7 153/14 156/22 157/1 157/7 159/24
160/6 160/7 165/2 165/13 168/19 169/14 169/22
171/21 172/9 173/4 173/5
**court's [8]** 30/5 57/9 59/9 135/16 137/8 138/10
144/18 171/7
**COURTNEY [1]** 1/14 4/24
**courtroom [4]** 166/5 166/6 168/10 172/4
**courts [20]** 68/2 100/2 103/4 103/12 117/23 117/25
118/8 119/16 130/6 136/5 137/15 138/6 143/17
147/14 150/13 151/2 151/4 151/5 157/3 170/5
**cover [2]** 37/9 134/24
**covered [6]** 99/21 100/7 106/2 142/11 152/10 168/7
**covers [1]** 147/25
**create [8]** 98/21 143/6 143/11 144/10 144/25 145/6
145/25 146/16
**created [3]** 114/23 144/12 149/9
**creates [1]** 144/25
**creating [1]** 95/1
**credible [4]** 21/7 137/16 137/19 138/8
**crime [3]** 82/16 137/12 165/7
**criminal [1]** 164/10
**critical [1]** 160/23
**critically [1]** 72/1
**cross [8]** 3/4 7/25 30/8 37/17 55/22 56/6 56/7
56/15
**CROSS-EXAMINATION [1]** 30/8
**crossed [1]** 159/21
**crossing [1]** 159/14
**crowded [1]** 134/17
**CRR [1]** 173/16
**crumbles [1]** 76/24
**Cruz [12]** 89/7 89/8 97/2 100/3 100/3 103/1 103/24
104/23 129/20 150/23 163/21 164/7
**Cruz-Medina [11]** 89/7 97/2 100/3 100/3 103/1
103/24 104/23 129/20 150/23 163/21 164/7
**crystal [2]** 80/10 95/13
**crystal-clear [1]** 95/13
**cultural [1]** 123/8
**curiosity [1]** 124/7
**curious [2]** 88/24 133/24
**current [3]** 41/13 49/20 90/12
**currently [3]** 15/8 15/11 15/13
**custody [2]** 67/22 159/18
**customs [5]** 15/9 15/17 15/19 16/22 16/22
**cv [1]** 1/5
**Cyr [1]** 96/4

## D

**D.D.C [1]** 154/1
**D.V.D [21]** 75/9 94/23 97/4 97/8 97/11 97/12 97/15
97/10 99/15 99/21 100/8 100/10 100/14 100/18 101/3
101/4 142/12 151/12 151/13 154/5 154/15
**dash [1]** 13/11
**date [3]** 66/5 91/13 107/17
**Dated [1]** 173/12
**DAUKAS [2]** 1/14 4/25
**day [10]** 16/19 66/22 73/20 80/11 84/1 85/1 112/23
112/24 171/18 173/12
**daylight [1]** 138/21
**days [10]** 39/25 47/10 58/18 59/3 59/5 83/23 84/12
154/16 159/22 167/15
**DC [5]** 1/20 2/5 2/9 2/13 138/9
**deal [2]** 6/16 123/22
**dealt [5]** 65/8 65/11 123/12 141/17 141/19
**debate [1]** 151/21
**DEC [1]** 154/7
**decades [1]** 6/6
**December [1]** 17/3
**December 2013 [1]** 17/3
**decide [14]** 69/6 69/6 76/11 77/22 116/18 116/19
121/17 133/9 157/10 157/10 158/1 158/7 169/15
170/22
**decided [3]** 108/18 156/2 158/4
**deciding [4]** 107/25 112/2 112/2 135/11
**decision [26]** 86/25 91/17 92/24 94/7 94/11 97/19
97/19 102/8 109/23 109/24 112/25 113/1 113/2 114/7
116/7 116/10 119/6 128/5 135/15 137/8 144/18
**decisions [6]** 96/24 102/9 105/1 123/12 130/12
130/14 160/6
**declared [1]** 138/14
**defeats [1]** 157/7
**defendants [2]** 42/21 127/25
**defense [7]** 107/22 109/2 109/5 111/8 111/17 113/10
159/7
**defenses [1]** 109/1
**defined [1]** 151/23
**definition [3]** 152/2 152/7 169/2
**definitively [1]** 156/1
**degree [1]** 125/6
**demonstrated [1]** 76/25
**denial [8]** 93/9 107/6 107/7 112/15 112/15 112/15
112/25 132/18
**denials [1]** 105/5
**denied [7]** 93/4 98/18 106/23 107/2 107/5 109/2
154/11
**denies [1]** 51/8
**deny [4]** 9/23 12/5 157/15 158/17
**denying [5]** 12/1 107/15 113/2 113/2 114/12
**Densei [1]** 78/13
**department [62]** 2/4 2/11 18/1 18/5 18/8 18/9 19/25
20/2 20/7 20/17 21/5 21/16 22/5 24/4 24/12 24/22
24/24 25/1 25/4 25/16 25/20 26/3 26/24 27/13
27/24 28/17 29/2 29/12 29/19 29/23 31/17 31/19
32/9 33/17 34/15 40/7 40/16 41/18 42/1 42/14 42/19
43/15 46/16 47/12 50/22 51/2 53/9 53/12 54/12 55/1
55/4 55/7 59/15 61/22 68/19 68/20 96/22 102/5
103/15 126/22 128/8
**Department's [2]** 140/1 140/8
**departments [1]** 53/7
**depend [3]** 115/20 156/2 157/12
**depending [3]** 133/23 157/16 158/19
**depends [2]** 133/14 134/14
**deportation [1]** 17/2
**depositions [1]** 16/6
**deprivation [2]** 82/18 82/19
**deprivations [1]** 100/24
**deprive [3]** 68/11 75/2 101/2
**deprived [3]** 81/21 101/21 157/19
**deputy [10]** 2/4 17/8 25/19 34/4 43/18 44/10 44/25
45/4 50/18 126/7
**derivative [1]** 119/18
**describe [1]** 46/13
**described [7]** 30/16 37/10 39/18 40/13 66/9 129/2
147/11
**describing [1]** 112/20
**designate [2]** 72/17 113/19 113/19 167/8
**designated [2]** 72/18 111/23
**designation [7]** 81/25 82/1 99/25 128/3 135/20
167/25 168/3
**designed [1]** 104/8
**designee [1]** 41/12
**desk [1]** 155/6
**despite [5]** 79/6 79/6 126/19 145/3 155/13
**detail [2]** 47/7 59/4
**detailed [2]** 122/12 49/13
**details [2]** 9/18 28/25
**detain [1]** 122/3
**detained [4]** 87/10 118/15 120/2 132/3
**detainee [3]** 138/15 159/13 159/15
**detaining [1]** 87/16
**detect [1]** 136/15
**detention [36]** 16/24 17/2 17/4 17/6 87/14 89/12
96/13 99/14 99/22 102/20 103/5 103/19 103/25 104/5
104/16 105/8 118/19 118/24 118/25 119/1 119/10
120/11 121/4 121/8 121/25 122/22 123/5 129/15
138/12 145/6 145/14 147/22 153/20 156/11 156/15 156/16
170/11
**determination [10]** 7/13 104/17 112/14 125/25
137/15 138/7 142/20 142/21 168/8 168/11
**determinations [2]** 124/5 143/10
**determine [4]** 76/11 115/16 115/17 137/6
**determined [3]** 17/18 108/25 125/23
**determining [2]** 88/11 92/11
**develop [1]** 146/6
**developed [1]** 165/12
**developments [3]** 26/24 27/8 27/10
**devices [1]** 161/23
**devise [1]** 95/2
**DHS [13]** 19/8 41/1 41/12 42/10 49/11 62/15 62/18
62/19 82/12 110/7 114/8 127/5 133/14
**DHS's [2]** 7/13 41/12
**difference [2]** 76/10 143/21
**different [38]** 9/19 60/17 72/17 87/8 87/13 88/21
88/21 88/25 88/25 95/23 99/15 106/2 108/9 108/15
109/16 110/23 113/5 116/21 119/13 119/23 119/3 120/9
121/22 122/22 131/16 134/9 137/10 137/13 144/7
147/7 150/15 150/16 152/25 153/2 153/2 153/6
154/16 159/22 167/25
**differently [4]** 25/11 44/3 110/21 138/3
**dip [1]** 55/14
**diplomatic [10]** 7/14 7/16 9/4 9/5 21/19 54/17 63/5
79/11 137/16 138/7
**direct [10]** 3/4 12/17 14/9 75/4 30/13 33/16 63/5
66/9 128/12 163/16
**directing [1]** 61/23
**direction [1]** 139/9
**directive [1]** 55/6
**directly [6]** 88/1 125/8 142/25 161/3 161/20 163/4
**director [8]** 15/13 16/4 17/4 17/8 17/11 17/13
48/18 58/8
**directors [1]** 49/7
**directorship [2]** 39/17 39/23

**disagree [6]** 53/3 56/20 140/3 144/5 149/7 157/2
**disagreeing [1]** 167/9
**disagrees [1]** 84/11
**disastrous [1]** 157/9
**discretionary [11]** 79/22 96/8 102/9 105/5 105/7
105/11 128/5 130/5 130/9 130/12 130/14
**discuss [2]** 88/14 96/10
**discussed [2]** 12/1 30/25
**discussing [4]** 51/24 61/16 61/19 61/21
**discussion [6]** 28/10 93/22 93/23 99/1 106/7 124/2
**discussions [9]** 18/6 24/11 26/2 37/18 38/17 38/18
46/4 46/7 124/15
**dismiss [3]** 101/11 154/10 160/20
**dispositive [1]** 142/7
**dispute [2]** 10/2 116/15
**disputed [1]** 113/9
**disputes [1]** 158/3
**disregard [2]** 79/24 128/2
**disregarded [1]** 79/5
**dissolve [11]** 5/23 6/12 86/19 155/2 155/21 157/13
157/15 157/24 158/18 158/21 171/16
**distinction [4]** 99/4 143/20 147/8 150/2
**distinguishable [1]** 129/23
**distracting [1]** 44/6
**distressing [1]** 161/5
**district [26]** 1/1 1/1 1/10 2/11 4/3 4/4 47/8 91/16
91/18 95/18 100/4 101/10 117/25 119/16 129/20
138/11 138/16 150/12 151/5 151/9 154/9 154/11
154/13 156/22 173/5 173/5
**divide [1]** 75/6
**division [7]** 1/2 2/4 2/11 15/14 17/9 53/6 58/8
**divisions [1]** 60/6
**do [155]** 5/20 5/24 6/4 7/1 9/7 9/20 11/20 12/25
13/4 14/8 14/19 15/1 18/9 19/4 19/23 21/14 21/14
21/16 21/18 25/7 25/9 25/10 25/14 25/14 25/17
25/21 26/6 26/8 26/11 26/17 26/20 27/7 29/16 29/6
30/14 30/19 30/23 31/13 34/23 36/17 38/22 41/7
41/9 41/11 41/15 41/16 41/17 41/21 41/25 42/2 42/6
42/9 45/12 45/15 45/22 47/9 47/11 51/18 52/3 53/6
54/11 55/13 55/14 56/3 57/13 57/16 57/17 58/1 58/3
58/16 59/9 59/10 59/13 61/12 61/13 61/19 63/15
63/17 63/17 64/13 64/14 64/15 69/21 71/15 71/16
71/17 73/19 75/22 79/18 83/22 84/6 85/14 88/4
88/24 89/3 89/4 90/10 91/21 91/23 92/11 94/6 98/2
101/21 106/8 107/1 108/7 108/14 108/16 110/21
115/7 118/8 118/18 118/21 118/24 119/2 122/21
123/1 125/13 125/24 126/21 126/21 129/1 129/5
130/2 134/23 138/23 141/5 142/3 142/12 147/16
147/22 147/22 148/10 148/11 148/21 149/1 149/6
149/9 149/17 151/12 155/8 157/9 157/21 157/21
157/22 160/12 161/13 161/18 162/3 162/20 164/10
166/14 167/1 171/12 173/6
**docket [7]** 12/15 13/13 71/1 84/9 106/10 134/17
151/17
**Docket 28-1 [1]** 106/10
**dockets [2]** 134/17 134/25
**document [17]** 10/2 11/5 11/23 12/2 13/12 18/15
18/18 19/4 23/25 27/23 64/4 78/4 85/5 92/2 107/12
107/14 111/22
**documents [15]** 7/4 7/6 8/9 9/12 9/16 10/25 20/3
20/6 20/10 21/13 54/11 54/14 64/19 160/25 161/7
**dog [2]** 52/7 56/18
**doing [8]** 9/13 50/20 56/2 79/15 127/17 143/8
155/14 157/11
**door [1]** 123/20
**dot [5]** 138/11 138/11 146/5 146/5
**Double [1]** 28/21
**down [5]** 64/9 66/21 74/22 112/4 161/16
**downstream [2]** 143/25 167/2
**draft [2]** 33/10 33/13
**dramatic [1]** 85/17
**draw [1]** 150/1
**drawing [1]** 150/5
**drawn [4]** 99/3 144/6 144/7 145/24
**draws [1]** 160/25
**DREW [2]** 2/3 5/8
**due [52]** 26/24 68/11 69/13 69/16 69/20 69/22 69/24
70/5 70/6 72/1 75/15 75/16 77/5 77/6 80/2 81/9
81/23 82/18 83/5 83/6 83/10 95/4 96/16 100/19
100/21 101/15 101/18 101/19 105/10 105/12 130/19
131/15 137/1 137/3 143/4 143/5 143/12 143/18 144/9
144/25 145/6 145/24 146/10 146/11 146/14 146/16
148/22 150/9 160/1 160/11 166/20 169/2
**duly [1]** 14/17
**duplicative [1]** 10/25
**during [13]** 13/5 15/18 15/24 24/5 24/10 33/5 33/7
33/22 34/1 36/9 43/17 45/21 159/17
**duty [1]** 48/13

## E

**e-mail [20]** 20/7 27/25 28/9 33/10 33/12 33/13
33/16 33/20 33/24 33/25 34/1 35/9 37/9 37/9 37/15
38/9 39/6 43/22 43/25 44/11 45/25
**each [3]** 7/11 38/15 134/17
**earlier [2]** 97/5 108/22
**easier [1]** 13/17
**easily [1]** 10/21
**eat [1]** 157/22
**ECF [14]** 6/16 6/19 6/21 6/21 7/3 7/8 7/15 7/15
9/21 12/2 13/1 13/15 78/4
**ECF 1 [1]** 78/4
**ECF 74 [3]** 7/8 7/15 9/21
**education [1]** 92/23
**EDWARD [2]** 14/16 14/24
**effect [2]** 110/8 122/4
**effective [1]** 81/20
**effectively [1]** 85/25
**effectuate [2]** 85/19 96/14
**efficiently [1]** 16/10
**effort [3]** 72/13 127/3 162/25
**efforts [1]** 72/19
**Eighth [2]** 74/4 98/16
**either [11]** 66/22 66/22 84/13 86/24 87/2 96/20

**E**

either... [5] 118/1 128/3 130/20 162/14 170/11
El [21] 18/12 19/6 112/2 112/4 112/25 113/23 130/22 131/4 131/4 139/8 140/16 141/12 141/14 142/2 142/4 142/6 161/4 162/8 162/14
El Salvador [18] 18/13 22/7 67/23 72/11 73/11 80/12 113/23 130/22 131/1 131/4 140/16 141/12 141/14 142/2 142/4 142/6 161/4 162/14
Eldridge [2] 143/1 163/22
elect [2] 120/18 122/10
elected [1] 123/22
electronically [3] 32/15 43/4 43/15
element [1] 97/12
elephant [1] 157/22
Eleventh [1] 169/19
eliminate [3] 96/3 96/4 158/5
eliminating [1] 95/13
Eliis [2] 159/14 159/19
Eloy [2] 17/2 17/4
else [16] 5/14 13/25 24/25 25/2 32/5 37/12 40/16 62/9 90/10 92/23 142/9 151/21 154/19 156/9 161/25 165/22
else's [1] 27/22
elsewhere [3] 53/15 90/19 141/10
EMANUEL [2] 1/15 1/19
embarrassed [1] 50/5
emergency [3] 53/18 70/20 151/16
emphasized [1] 130/8
employed [1] 15/8
employment [3] 17/14 52/18 144/11
empty [3] 50/19 125/3 130/18
encompassed [1] 44/9
end [7] 39/15 48/7 58/5 130/12 145/5 161/6 162/16
ended [4] 51/22 52/15 55/22 133/3
ending [1] 136/14
ENDS [1] 23/14
energy [1] 77/1
enforcement [10] 15/10 15/10 15/12 15/17 15/20 15/23 15/25 16/20 16/24 62/19
engine [1] 56/6
engineer [1] 161/24
English [1] 138/1
enjoin [2] 86/23 89/4
enjoined [1] 87/15
enjoy [1] 66/22
enough [14] 38/2 46/19 47/1 48/4 51/14 51/17 55/24 56/4 60/17 97/21 98/24 104/20 121/17 136/9
ENSIGN [9] 2/3 5/8 105/23 119/15 123/25 128/14 136/20 158/7 167/23
Ensign's [3] 163/19 169/8 169/13
ensure [1] 95/4
enter [2] 90/24 92/17
entered [4] 107/23 113/9 152/13 170/11
entering [3] 92/11 92/11 107/3
enters [1] 159/25
entire [4] 36/1 36/22 76/24 142/22
entirely [2] 141/3 153/25
entirety [2] 151/18 152/18
entitled [8] 76/17 77/16 80/23 121/1 146/15 163/13 170/14 173/9
entitlement [1] 160/10
entitlements [1] 165/13
entity [1] 16/15
entry [5] 13/11 13/15 107/17 112/5 160/14
enumerated [1] 130/10
envisions [1] 95/15
EOIR [3] 133/3 134/23 134/23
equally [2] 95/12 151/25
equivalent [1] 139/14
ERNESTO [2] 2/7 5/10
ERO [24] 5/17 15/22 15/24 16/4 16/7 17/11 17/13 17/15 17/23 19/15 19/18 19/23 20/3 23/16 29/22 39/15 39/23 42/13 47/22 48/7 57/23 58/8 62/22 62/23
ERO/OPLA [1] 62/23
error [2] 92/5 116/9
errors [1] 114/21
escapes [1] 73/25
especially [3] 14/9 52/6 132/20
ESQUIRE [12] 1/13 1/13 1/14 1/14 1/17 1/18 1/18 1/22 2/3 2/3 2/7 2/10
essentially [6] 9/16 90/21 95/18 157/6 159/19 164/2
establish [1] 73/18
established [2] 38/4 82/7
Eswatini [3] 78/23 78/25 80/11
et [3] 1/6 4/11 135/2
even [34] 39/14 39/23 45/2 50/24 54/2 68/25 69/19 77/2 77/4 79/24 81/21 86/5 97/6 98/24 100/9 100/10 100/17 102/17 104/18 104/20 113/17 114/14 125/6 127/2 127/9 129/23 136/7 137/25 140/16 144/15 156/10 167/12 169/15
event [6] 7/10 80/24 126/10 149/21 171/15 171/19
events [1] 85/22
eventually [2] 117/20 162/8
ever [7] 66/7 73/9 98/1 130/24 147/3 153/17 162/24
every [6] 73/4 115/9 124/2 126/19 166/22 166/22
everybody [1] 151/21
everybody's [1] 124/3
everyone [5] 4/6 5/21 67/11 116/14 123/10
everything [5] 44/2 116/7 117/14 117/19 123/10
evidence [18] 51/12 51/13 53/24 78/14 82/6 82/7 82/12 96/11 102/15 125/2 127/14 127/17 128/11 166/14 166/15 166/16 168/8 168/10
evidential [1] 72/25
evidentiary [4] 1/9 11/17 54/6 79/4
exact [4] 60/5 66/4 100/8 103/21
exactly [8] 53/8 54/5 73/12 91/2 104/22 112/19 125/18 148/1
examination [3] 14/7 15/4 30/8
examine [1] 14/5
examined [2] 14/7 164/2
examining [1] 44/7

**example [9]** 72/17 87/7 98/14 106/22 130/6 130/16 141/4 144/15 156/4
exception [1] 152/17
exchange [1] 31/16
exclusive [1] 66/23
excuse [3] 40/6 45/8 100/3
execute [2] 129/5 130/2
executing [2] 102/12 157/8
execution [4] 116/4 129/3 129/6 130/1
executive [3] 34/20 91/17 95/2
executive's [2] 137/15 138/6
exercise [1] 166/9
exhaust [1] 83/9
exhumation [2] 69/25 86/2
Exhibit [20] 7/15 7/16 7/17 7/18 12/2 12/24 18/16 23/25 34/9 35/11 38/16 38/25 40/5 43/2 59/9 58/14 63/23 64/7 78/4 166/17
exhibited [1] 82/25
exhibits [3] 6/19 7/7 9/3
exigent [1] 165/8
exist [4] 108/23 115/22 127/11 157/4
existence [10] 9/9 9/11 11/12 21/23 84/20 90/23 90/25 91/5 115/20 169/23
exists [6] 30/23 64/17 76/11 147/12 157/3 170/24
exit [1] 161/24
exited [1] 66/25
expect [1] 5/21
expected [1] 40/21
expedited [2] 146/9 164/9
experience [9] 30/16 47/16 65/22 66/1 66/8 66/9 162/7 162/8
expert [1] 132/15
expiration [1] 91/13
expires [1] 91/12
explain [4] 42/7 51/9 132/6 155/22
explains [1] 106/24
explicit [2] 109/22 117/24
explicitly [8] 96/25 99/20 101/17 102/25 104/23 128/4 128/6 130/11
exported [1] 81/19
expressing [1] 172/4
expressly [3] 100/11 142/6 169/22
extend [1] 121/9
extended [1] 24/17
extent [18] 6/5 9/17 20/2 34/12 75/15 86/24 104/18 116/8 117/16 125/9 130/1 142/14 143/1 150/4 150/7 150/25 151/7 151/12
extraordinarily [1] 162/22
extraordinary [2] 80/15 80/16
extremely [2] 127/8 166/25
eye [1] 8/24
eyes [3] 44/6 124/3 170/24

**F**

F.3d [9] 129/19 130/12 169/20 170/1 170/3
faces [1] 172/1
fact [16] 9/8 9/11 9/11 44/17 53/24 79/23 109/4 111/18 112/7 114/11 115/4 130/24 135/14 141/21 142/5 143/3
factors [2] 164/19 165/14
facts [1] 116/12
factual [4] 123/21 124/3 153/6 170/23
factually [2] 170/7 170/8
fail [1] 168/24
failed [2] 99/8 109/1
fails [3] 78/18 119/11 140/17
failure [4] 69/21 78/6 82/6 99/24
fair [26] 33/11 34/3 38/2 38/12 38/20 39/23 40/2 44/14 44/22 46/8 46/19 46/23 46/23 46/23 47/1 48/4 51/17 51/22 52/13 55/24 56/4 60/17 123/25 136/9 158/4
Fairfax [1] 1/23
faith [4] 49/23 52/1 68/21 127/2
fake [1] 84/20
fall [1] 116/25
falls [3] 78/25 119/6 129/6
familiar [4] 71/5 80/7 101/24 135/10
family [1] 160/16
fantastic [1] 115/3
far [3] 47/19 50/7 52/17
FARRA [2] 104/7 104/9
Fast [1] 159/24
Fast-forward [1] 159/24
fastidious [1] 72/24
father [1] 144/23
fault [1] 79/8
faulting [1] 114/5
favor [4] 95/11 164/21 165/15 165/17
fear [11] 70/1 81/18 82/25 83/8 88/22 130/24 139/22 139/22 140/6 142/15 143/10
fears [2] 130/23 142/4
feasible [1] 80/25
federal [15] 16/12 16/18 18/3 18/6 68/2 136/5 137/14 150/12 151/5 151/9 156/22 170/5 170/12 173/4 173/17
feel [2] 135/16 135/19
feels [2] 128/8
fell [1] 78/24
fence [1] 165/10
few [4] 28/24 68/17 102/24 159/2
fides [1] 51/4
field [16] 16/8 17/3 17/10 17/11 17/12 47/21 48/6 48/8 49/7 49/7 57/14 57/17 57/23 57/23 54/4 65/8
fifth [3] 36/22 78/13 130/7
fight [2] 8/11 107/11
figure [7] 17/11 32/17 32/13 64/25 115/14 157/10 157/23
file [9] 13/19 85/2 85/3 92/6 92/15 93/5 118/9 118/25 167/10
filed [9] 8/12 8/13 12/6 13/19 42/18 93/2 115/1 124/7 148/3
filing [1] 92/14

**fills [1]** 88/14
final [83] 16/10 18/12 26/5 26/8 30/13 30/17 30/20 30/24 31/10 31/13 31/25 32/4 44/9 75/2 75/17 76/25 89/19 90/24 90/25 91/1 96/11 97/11 97/16 99/13 102/15 103/11 103/17 106/6 106/8 107/22 107/25 108/24 109/3 110/7 111/5 111/8 111/10 111/18 111/20 112/5 112/6 112/7 112/8 112/9 113/8 113/10 113/12 115/10 115/3 116/2 116/5 116/11 116/14 116/14 116/18 116/21 117/14 117/20 120/10 121/4 121/7 121/21 122/2 123/2 127/10 127/20 128/22 129/9 133/17 135/20 156/4 156/7 156/15 156/19 156/22 163/14 163/18 167/14 167/19 169/15 170/6 170/10 170/16
finally [1] 151/11
find [16] 6/22 6/25 48/17 76/15 79/22 84/8 85/13 100/9 100/13 118/13 118/13 128/12 130/24 135/14 141/22 167/1
finding [8] 86/6 90/24 91/6 98/23 107/10 119/22 126/18 127/10
finds [1] 93/10
fine [2] 88/3 93/10
finish [1] 50/8
first [53] 5/20 6/4 6/11 14/17 14/23 15/1 27/7 27/15 36/7 48/16 50/3 59/8 59/12 59/18 67/14 68/8 69/15 69/17 70/19 75/5 76/12 76/14 77/9 79/16 80/22 81/5 85/1 85/16 91/4 94/1 101/6 101/8 101/10 107/15 108/2 110/1 110/3 115/16 120/5 121/20 125/16 127/20 137/2 142/24 157/10 157/10 157/14 159/5 163/10 164/17 166/10 169/3 169/19 172/4
first-level [1] 79/16
fit [2] 140/12 140/21
fits [1] 165/8
five [15] 33/4 33/8 33/8 34/1 39/6 40/1 40/12 43/17 45/7 62/7 62/25 68/1 69/3 144/22 145/3
five-minute [9] 33/8 34/1 39/6 40/1 40/12 43/17 45/3 62/7 62/25
fix [2] 115/5 166/22
fixes [1] 89/3
flexible [1] 131/15
flight [1] 23/19
flights [1] 23/22
floating [1] 95/18
Florence [1] 17/5
flow [2] 75/23 84/22
flowing [1] 110/10
focus [3] 69/4 77/9 142/12
focused [4] 70/18 70/19 70/21 70/22
foggiest [1] 161/22
folks [4] 65/9 65/22 137/11 153/23
follow [4] 105/2 112/18 115/6 150/22
followed [6] 6/9 102/7 127/1 127/2
following [5] 5/25 22/14 24/11 46/3 89/19
follows [3] 14/18 23/13 57/8
foothold [1] 145/5
footing [1] 153/1
foreclose [2] 96/20 99/11
foreclosed [2] 100/23 102/23
foregoing [1] 173/7
foregone [4] 131/17 131/20 138/2 138/22
foreign [1] 18/6
foresee [1] 131/3
foreseeable [7] 71/18 86/7 88/12 118/20 120/4 120/25 156/18
forever [1] 162/18
forget [1] 131/20
forgot [1] 98/21
form [1] 41/5
formality [2] 111/15 130/19
format [1] 173/9
former [2] 113/19 158/23
formulation [1] 69/19
forth [6] 34/7 35/14 43/24 43/24 47/17 80/20
forward [2] 136/11 159/24
forwarding [1] 44/10
fought [1] 124/7
found [3] 26/10 98/11 143/6
foundation [6] 19/20 19/21 21/12 25/6 28/20 61/8
foundational [1] 82/17
foundationally [1] 72/22
founded [1] 163/7
four [16] 39/25 48/8 49/7 49/7 54/17 57/22 57/22 58/4 99/12 124/1
fours [3] 140/9 170/7 170/8
Fourth [8] 74/15 100/11 100/15 110/14 110/15 110/24 135/21 150/20
fraction [2] 162/22 162/23
frame [1] 85/23
Franklin [2] 8/8 2/12
frankly [8] 49/17 49/21 52/6 78/15 86/19 117/3 127/10 151/20
free [4] 66/21 95/18 141/8 141/9
free-floating [1] 95/18
freely [1] 9/10
frees [1] 12/9
Friday [3] 32/19 32/21 39/25
friend [1] 74/1
front [11] 32/25 34/8 35/10 54/18 59/8 59/14 63/20 64/2 64/4 92/15 92/19
fronts [1] 105/17
frustrating [1] 155/24
full [4] 14/22 85/15 160/10 165/12
fully [1] 70/8
functioning [1] 81/20
functions [1] 130/10
fundamental [9] 69/16 88/20 97/10 100/19 115/18 120/15 120/23 154/2 160/25
fundamentally [3] 71/12 75/13 76/9
funnel [4] 103/11 116/6 117/14 117/18
funneled [1] 117/23
further [13] 27/2 28/9 28/10 28/18 29/15 30/2 66/14 86/20 86/23 112/3 112/6 138/12 154/20
fuss [1] 8/16
future [2] 88/12 126/24

**G**

gained [1] 143/5
gains [1] 52/8
game [1] 52/8
gamut [1] 153/5
GARCIA [64] 1/3 4/11 4/15 20/4 21/10 21/16 22/6
23/17 24/15 27/1 28/18 29/14 29/22 29/24 30/21
40/1 40/17 41/5 41/19 50/23 63/19 64/11 67/16
67/20 68/18 72/3 72/11 77/18 77/24 78/12 79/12
80/9 81/21 82/13 83/13 83/25 96/7 98/12 100/19
101/2 101/13 102/3 103/17 104/11 104/19 105/6
106/24 107/21 111/23 112/25 113/7 115/1 125/10
125/11 131/3 138/19 140/16 143/1 156/23 162/2
163/1 163/17 163/12 164/25
Garcia's [14] 18/11 19/15 19/18 19/24 39/11 41/13
42/4 48/9 69/25 99/12 102/18 111/7 120/11 143/18
garden [1] 129/9
garden-variety [1] 129/9
gave [1] 34/4
general [1] 2/4 52/21 79/24 102/10 131/2 169/20
170/1
general's [1] 130/9
generally [2] 48/15 146/20
genesis [1] 80/18
Geren [1] 137/8
getting [5] 7/4 79/21 104/20 114/12 138/24
Ghana [1] 70/3
Giles [1] 166/11
give [33] 7/9 7/10 16/17 55/8 63/18 66/4 66/4
84/13 85/18 86/1 87/22 88/5 88/22 101/19
105/19 109/18 112/16 113/3 118/20 121/15 123/15
123/22 124/22 125/14 139/11 143/18 144/15 144/19
150/9 155/12 160/24 169/17
given [22] 27/24 50/15 52/13 54/19 55/6 55/20 73/9
79/11 82/14 92/20 121/13 124/3 126/2 139/1 146/11
152/16 163/7 164/14 165/18 166/18 166/22 171/22
gives [1] 135/16
giving [9] 77/20 79/6 94/4 109/8 121/16 152/18
153/11 165/1 165/25
glad [1] 160/21
glitch [1] 73/16
global [1] 122/24
gloss [1] 114/2
go [39] 9/17 9/24 22/11 25/18 28/18 28/21 40/4
43/2 45/20 47/18 48/22 52/16 55/23 58/21 64/9
66/16 80/11 80/13 80/22 86/5 86/8 89/15 102/14
118/5 119/16 122/4 122/18 122/25 125/16 126/22
132/17 134/10 139/19 146/6 149/16 150/12 159/4
161/14 162/17
goes [12] 49/21 49/23 52/16 73/23 84/22 99/9 103/9
110/9 122/7 135/20 146/9 155/21
going [89] 5/22 5/25 6/18 8/11 8/16 9/6 9/21 9/23
9/24 11/9 11/24 12/5 13/16 14/5 18/15 24/2 26/21
27/6 48/10 50/8 50/21 51/18 51/20 52/16 53/8 53/19
55/21 55/25 56/9 57/21 58/21 61/1 64/22 65/18
67/13 67/17 68/17 68/18 68/24 69/10 71/11 74/23
85/5 86/18 90/2 90/9 90/11 90/12 90/13 92/23 94/11
94/13 94/22 97/18 100/23 101/10 101/20 108/14
108/17 109/12 109/15 115/14 118/20 119/16 120/18
124/4 126/22 126/23 129/10 135/21 138/25 139/3
139/6 139/7 139/8 141/10 141/13 143/13 154/16
155/13 156/17 157/15 157/18 157/21 162/18 165/4
167/5 171/12 171/15
gone [1] 84/21
Gonzales [1] 170/3
good [33] 4/6 4/14 4/16 4/18 4/20 4/22 4/24 5/1
5/3 5/5 5/6 5/8 5/10 5/12 5/16 5/18 7/25 14/24
15/6 15/7 30/10 30/11 30/11 32/7 35/5 49/23 52/1
52/19 56/21 67/15 115/2 127/2 159/1
good-faith [2] 52/1 127/2
got [34] 25/15 29/22 44/9 50/16 52/1 53/24 69/20
72/23 76/14 76/15 77/4 79/3 82/14 84/16 84/21
84/24 89/21 97/21 114/15 118/8 118/8 118/8 120/16
128/15 132/11 135/10 135/18 146/25 149/22 151/6
164/19 164/20 166/5 169/16
gotten [2] 127/16 139/13
governed [2] 120/11 121/8
governing [2] 105/12 153/10
government [120] 7/21 8/14 9/14 9/15 10/6 10/22
16/12 18/16 23/25 24/12 24/13 26/25 34/8 35/11
38/16 43/2 45/9 58/9 59/14 64/10 68/5 68/10
71/15 72/10 72/13 73/12 74/23 76/24 77/20 78/5 78/7
78/18 78/20 79/2 79/6 79/7 79/14 80/4 81/7 81/22
82/5 82/12 82/14 82/22 82/23 83/15 83/22 83/24
84/5 85/19 86/21 86/24 87/15 89/3 89/7 90/2 90/22
92/4 92/12 92/14 94/4 94/6 94/12 94/23 95/16 95/17
95/22 96/1 96/14 97/8 97/14 99/7 99/8 99/25 101/2
101/12 101/23 101/24 102/9 103/9 104/6 105/4
105/11 105/20 120/18 120/24 122/2 122/14 122/18
123/17 123/22 124/2 124/21 125/15 136/11 137/18
137/20 138/14 142/25 144/12 146/10 149/1 149/17
152/12 152/20 153/23 154/22 155/12 156/23 160/12
161/2 161/20 163/25 165/5 165/18 166/19 166/22
167/4 167/21
government's [23] 8/2 12/14 38/24 40/5 68/22 69/15
69/19 72/19 78/6 79/10 95/7 95/16 96/23 124/11
136/5 136/12 138/16 138/20 155/3 162/2 162/9
164/21 167/3
graces [1] 52/19
grader [1] 78/13
grant [13] 9/23 11/16 77/19 86/20 89/21 94/2 155/6
155/10 157/16 157/16 158/19 158/19 171/15
granted [6] 77/7 77/17 86/22 87/13 113/24 156/2
granting [7] 88/16 98/3 99/4 112/15 113/1 113/22
156/11
grants [1] 109/22
great [9] 9/24 13/22 13/23 14/12 18/24 75/10 133/6
132/19 158/7
green [2] 23/16 29/22
GREENBELT [2] 1/2 166/21
grievance [1] 117/17
ground [5] 106/3 107/7 107/15 138/12 156/2
grounds [5] 70/2 86/14 109/3 149/19 149/19

**Guatemala** [3] 73/14 113/25 114/9
guess [19] 13/14 42/14 61/3 65/3 90/9 96/9 121/19
123/7 124/15 128/15 133/9 137/4 137/23 143/2 149/5
150/1 159/1 159/15 159/19
guessing [1] 130/6
guests [1] 172/8
guidance [1] 77/8
guide [2] 6/3 95/9
guides [4] 71/13 71/13 71/13 71/14
Gunnella [1] 100/16
guy [7] 50/15 50/15 50/16 50/16 54/1 54/2 54/2
guy's [1] 50/17
GUYNN [6] 2/3 3/4 5/6 15/5 24/6 28/15

**H**

H are [1] 8/4
habeas [21] 5/23 69/13 75/14 77/7 78/17 88/16
89/12 95/6 95/13 96/4 96/17 103/8 117/25 153/18
157/15 157/16 158/1 166/17 169/3 170/5 170/12
hadn't [2] 39/14 107/3
half [2] 16/5 62/3
halt [1] 165/4
hand [3] 72/15 123/13 135/3
handles [1] 18/6
haphazard [1] 95/2
happen [3] 53/9 132/3 159/9
happened [8] 44/12 46/13 51/9 58/1 66/8 88/24
132/7 132/17
happens [6] 8/20 133/21 134/13 161/6 162/9 162/16
happy [10] 10/22 67/1 94/24 99/10 99/17 105/15
128/16 133/4 133/5 171/4
hard [4] 55/20 94/11 106/12 141/16
harm [1] 162/8
harmed [1] 123/6
harsh [1] 52/1
hasn't [9] 47/5 55/11 85/8 85/9 89/22 114/8 139/1
139/11 147/16
hate [1] 13/15
having [14] 7/7 10/14 14/17 39/11 49/1 69/14 79/11
99/2 107/22 111/18 137/11 141/16 164/21 164/25
Hawaii [1] 136/8
he'll [2] 90/16 123/14
head [10] 28/1 39/4 47/21 57/14 57/17 57/22 59/2
63/21 64/20 65/7
headed [2] 23/22 77/15
heading [1] 135/16
headquarters [1] 17/7
heads [3] 57/23 57/23 58/4
hear [10] 51/1 53/1 67/14 78/1 83/7 109/13 128/14
128/16 142/8 161/2
heard [11] 20/21 59/18 72/4 72/21 80/5 83/7 101/13
150/16 150/19 159/6 163/8
hearing [15] 1/9 4/12 12/2 11/17 34/16 50/4 54/6
70/19 88/10 94/14 105/19 123/17 126/20 136/7
166/10
hearings [2] 78/20 166/5
hears [1] 81/1
hearsay [6] 28/21 50/13 54/8 54/20 54/23 79/3
heartburn [1] 9/12
heated [1] 6/24
heavier [1] 163/23
held [23] 22/12 49/13 96/25 100/11 100/16 101/7
102/2 102/6 102/8 102/22 102/25 103/1 103/4 103/5
103/6 103/20 120/4 133/17 146/3 159/18 159/7
170/11 173/8
hello [1] 63/1
help [4] 14/10 27/18 27/20 134/24
helped [1] 55/11
helpful [2] 115/25 136/9
hereby [1] 173/6
hey [2] 92/16 98/21
Hi [1] 5/18
Hidalgo [1] 16/23
high [3] 22/2 101/4 132/17
higher [1] 52/19
higher-ups [1] 52/19
him [83] 23/18 38/12 44/9 48/22 50/17 51/16 60/21
60/22 62/6 62/11 68/2 68/6 68/11 68/12 68/13 72/14
72/20 78/1 78/2 81/24 82/16 83/18 85/25 86/1 88/23
89/19 89/20 90/4 91/13 91/20 91/25 92/1 92/2 92/20
94/4 99/24 100/9 100/23 111/7 114/12 118/20
121/17 122/3 122/13 130/21 130/25 131/1 132/21
133/25 135/6 138/15 139/1 139/6 139/8 139/11
139/11 141/7 141/14 142/6 143/18 150/5 154/11
156/16 156/24 160/24 161/1 161/6 161/8 161/12
161/19 161/20 162/9 162/14 162/18 162/19 164/17
himself [2] 100/24 141/4
his [67] 10/11 12/7 17/19 18/23 21/9 39/6 41/19
43/19 43/24 48/21 49/14 49/20 49/25 56/15 57/4
60/5 60/24 64/11 67/21 68/12 70/1 72/15 72/21
81/22 82/19 88/22 90/5 90/5 91/11 96/6 96/12 96/13
99/14 99/16 99/25 100/10 100/24 101/3 101/3 101/9
109/2 109/5 109/12 109/13 110/2 113/3 113/3 113/7
139/1 141/7 141/14 142/6 143/10 145/5 141/10
145/7 146/7 146/13 161/11 161/19 161/22 161/23
161/19 161/20 162/9 162/14 162/19 164/17
history [5] 68/16 68/21 68/21 98/6 160/18
hold [7] 15/11 34/14 81/9 103/22 121/13 121/17
156/16
Holder [1] 98/15
holding [3] 122/13 122/15 122/18
holds [3] 156/22 169/22 170/5
hole [3] 95/1 146/20 147/14
Holmes [1] 172/8
home [5] 17/20 43/5 43/12 43/13 159/19
Homeland [10] 45/1 42/3 47/12 68/20 96/22 102/5
103/15 125/21 128/1 167/24
homework [1] 166/23
Honor [226]
Honor's [4] 40/20 91/19 94/18 159/3
HONORABLE [5] 1/9 4/5 67/6 67/9 172/9
honored [1] 95/5

**hopeful** [1] 167/13
hops [1] 165/10
HORTON [1] 2/2
hot [1] 88/7
hotel [2] 43/13 43/14
hour [1] 62/3
hours [2] 77/21 77/21
house [1] 162/18
however [6] 36/6 75/22 116/6 116/22 128/25 155/17
human [2] 114/5 123/11
humor [1] 112/11
hundred [1] 134/6
hypothetical [1] 112/19

**I**

I'd [8] 5/20 6/4 7/3 14/13 94/24 97/3 106/1 122/23
I'll [34] 6/12 10/8 11/8 26/22 32/14 35/2 38/2
43/10 48/1 51/9 51/11 52/21 53/8 56/23 67/14 70/15
77/8 86/11 100/17 122/23 148/19 158/5 160/6 109/18
122/24 143/19 158/11 158/18 158/20 158/22 159/6
169/10 169/17 170/1 171/11
I'm [151] 6/18 7/4 8/12 8/17 9/6 9/8 9/21 9/22
9/24 11/9 11/16 11/22 11/24 11/25 12/5 12/11 12/12
12/24 15/13 15/19 15/23 17/8 18/15 18/24 20/25
23/21 24/9 25/10 25/19 28/21 29/1 31/20 32/18
33/12 38/22 41/16 42/1 42/13 42/13 44/6 45/1 45/4
45/14 45/21 47/19 48/1 50/3 50/5 50/23 50/24 53/13
55/13 55/21 56/8 56/15 62/1 62/14 62/19 63/21
62/14 62/19 63/16 63/21 64/1 64/21 65/4 65/18 67/1
67/13 67/17 68/7 68/18 68/24 69/10 70/18 74/1 74/8
76/18 76/20 76/20 78/13 80/17 84/23 86/12
94/10 97/23 98/15 99/10 99/17 103/10 105/15 107/11
107/12 112/18 112/21 114/5 114/6 114/12 115/13
115/16 116/17 116/19 117/6 117/18 117/21 118/18
119/14 119/15 121/16 122/17 123/25 125/2 125/22
127/16 127/18 128/16 133/6 133/10 134/5 134/19
138/18 139/21 141/16 155/15 155/10 155/14 155/18
163/5 164/13 165/3 166/22 167/9 167/10 167/13 171/4
171/15
I've [14] 12/18 40/6 46/3 55/6 55/16 73/9 76/14
76/15 84/16 86/22 118/8 118/8 118/8 169/16
I-C-E [1] 15/16
Ibarra [2] 102/24 103/23
Ibarra-Perez [2] 102/24 103/23
ICE [7] 15/16 15/18 19/9 23/20 41/18 42/3 67/22
idea [6] 44/20 47/9 47/11 59/7 80/17 96/3
identical [2] 96/25 100/10
identification [1] 72/7
identified [4] 19/15 19/23 108/22 110/8
identifies [1] 18/3
identify [5] 4/13 17/24 18/1 19/18 72/13
identifying [1] 10/10
identity [1] 15/9
ii [1] 128/6
III [2] 151/8 157/1
IJ [52] 80/25 88/23 89/8 98/22 107/11 109/21 110/7
111/6 112/6 113/11 115/2 115/6 117/11 117/12
117/17 130/17 131/8 131/21 132/3 133/8 132/5 132/5
132/9 132/10 132/17 133/1 134/3 134/3 134/7 134/9
135/10 137/18 137/23 138/2 141/13 142/15 143/9
148/4 148/25 149/2 149/9 149/13 149/16 149/22
149/24 150/3 150/6 150/14 150/23 151/1 163/20
164/11 164/18
IJ's [3] 114/24 116/7 142/20
IJ-level [1] 164/18
imagine [2] 80/1 80/9
immediate [2] 76/18 165/9
immediately [6] 75/19 85/15 89/13 89/13 90/10
165/10
immigrant [2] 65/8 98/17
immigrants [1] 160/8
immigration [62] 2/7 15/9 15/19 15/17 15/19 16/15
16/25 17/17 18/11 68/14 69/21 69/25 80/20 83/9
86/2 87/3 89/12 89/23 90/5 91/14 92/10 92/16 92/16
92/19 92/24 93/5 93/6 95/19 96/8 98/11 98/18 98/20
104/10 109/24 114/20 115/3 115/4 115/14 115/5
116/24 132/11 133/20 134/24 134/25 135/14 135/15
136/4 136/8 136/17 140/6 145/10 149/5 149/7 150/5
150/5 150/8 159/22 160/17 163/8 163/10 163/14
imminent [5] 71/18 86/18 118/15 120/3 156/18
impermissible [3] 154/7 154/14 154/17
impinge [1] 10/5
implementing [2] 113/16 118/11
implicitly [1] 151/14
import [2] 118/7 167/11
importance [3] 109/17 130/9 160/23
important [10] 67/4 67/19 72/1 107/21 114/3 114/4
114/11 147/8 150/17 151/13
importantly [2] 12/8 109/21
imprisoned [1] 67/25
improper [3] 72/24 101/11 105/8
improperly [1] 100/13
INA [19] 79/18 91/25 106/23 109/7 113/15 118/11
122/19 131/9 164/3
inadmissible [1] 160/8
inapplicable [1] 103/8
incessancy [1] 101/25
inclined [1] 158/1
include [4] 11/15 37/9 76/16 129/19
included [1] 109/23
includes [1] 72/4
including [10] 34/2 68/3 99/24 105/13 114/20
117/19 117/25 132/18 141/23 160/3 167/3
inconvenience [1] 12/12
incorporating [1] 39/7
incredibly [1] 142/24
Indeed [1] 96/10
independent [2] 45/12 45/15
indicated [2] 63/5 101/9
indicates [1] 114/19

**I**

indicating [1] 63/18
indication [1] 62/12
indicia [1] 54/19
indirectly [1] 163/4
individual [6] 100/22 122/15 152/25 153/22 160/16 170/9
individualized [1] 137/20
individuals [5] 55/10 65/11 95/3 153/3 164/10
indulge [1] 86/15
infer [1] 114/16
infirmities [2] 129/19 151/22
information [33] 8/6 8/25 10/4 10/10 10/11 10/13 10/19 10/21 11/10 11/12 11/15 11/18 11/19 25/4 25/8 25/15 31/9 37/10 43/20 43/23 44/21 46/8 46/24 47/13 50/25 51/9 55/10 55/12 58/3 124/10 126/8 148/17
initial [3] 13/12 129/25 146/3
initiated [1] 119/5
injunction [7] 85/25 86/21 87/4 151/17 152/1 155/18 158/14
injunctive [4] 87/21 156/6 156/24 157/6
injured [1] 137/5
injury [2] 117/16 137/3
inquiry [3] 41/3 45/5 56/22
INS [1] 109/6
insight [2] 90/17 161/14
insist [2] 72/25 73/1
inspector [1] 16/23
instance [9] 37/19 38/16 76/12 80/22 81/5 99/7 120/5 170/9 170/22
instead [1] 96/12
instructed [1] 48/10
instructive [3] 142/13 146/1 154/1
insufficient [1] 116/9
intellectual [1] 73/21
intend [1] 72/8
intended [1] 151/4
intends [1] 64/10
intensely [1] 88/24
interaction [1] 143/23
interest [3] 10/14 162/5 164/20
interested [3] 107/10 119/16 128/11
interesting [2] 151/22 166/24
interests [4] 125/24 128/4 164/25 165/18
interim [5] 12/4 26/24 27/8 27/10 149/6
interior [1] 144/22
international [2] 20/19 21/2
interpretation [1] 53/11
interrupt [1] 12/12
intersection [1] 150/21
interview [6] 8/4 70/1 82/25 83/8
intimately [1] 88/8
invalidated [1] 152/15
invite [1] 106/12
invoke [1] 145/6
invoked [2] 101/23 144/9
invokes [1] 95/17
invoking [1] 101/25
involved [3] 46/8 48/8 144/20
involvement [2] 39/10 40/1
involving [2] 61/16 101/18
Iraq [1] 137/11
Iraqi [1] 137/11
irrational [2] 164/12 164/17
is [550]
ish [1] 62/4
Island [1] 159/14
isn't [10] 35/18 80/20 89/18 99/13 102/15 107/17 111/12 128/22 151/25 151/25
issuance [1] 111/8
issue [38] 83/7 87/9 87/13 89/13 89/19 91/13 92/2 93/8 97/1 97/9 97/14 99/15 102/12 106/6 108/1 108/9 108/11 109/4 110/7 111/9 112/2 112/3 121/25 126/25 127/1 127/21 133/10 133/16 152/17 157/7 157/14 160/21 160/22 162/13 163/8 167/3 167/7 167/22
issued [8] 40/24 56/24 91/16 92/25 93/6 109/4 111/10 117/17
issues [14] 6/24 89/22 90/11 93/16 94/12 95/10 106/2 111/16 111/19 120/8 167/2 169/6 171/10 171/13
issuing [1] 113/11
itself [12] 11/11 11/14 11/20 73/18 98/6 114/3 130/20 125 153/16 156/5 158/2 166/3
iv [1] 125/22

**J**

J-O-H-N [1] 14/25
January [1] 17/10
January 2021 [1] 17/10
Jennings [2] 96/21 121/9
Jersey [2] 84/2 87/8
JGG [1] 72/5
job [3] 49/3 49/4 49/6
JOHN [2] 14/16 14/24
JOHNATHAN [1] 3/3
joined [2] 16/14 16/19
JONATHAN [6] 1/17 2/3 4/18 5/6 5/15 5/16
Jorge [1] 62/3 62/23
journey [1] 67/17
JR [1] 2/7
judge [4] 1/10 17/17 69/25 74/24 79/21 79/21 83/7 83/9 85/5 86/2 88/22 89/23 90/7 92/10 92/16 92/16 92/19 93/4 98/11 98/18 108/2 109/11 110/15 112/16 114/5 115/4 132/19 133/22 133/22 134/13 135/16 135/19 135/23 136/8 148/15 152/14 155/19 163/9 163/10 163/14
judge's [4] 104/10 116/9 135/15 136/4
judges [4] 114/20 129/20 134/24 135/1
judgments [1] 96/8
judicial [9] 76/15 95/3 95/11 118/9 128/7 128/9

**L**

labor [1] 53/6
labors [1] 75/7
lack [7] 104/13 104/15 105/10 122/20 137/5 153/22 166/19
lacks [1] 169/15
land [1] 79/22
Landau [3] 43/18 45/2 54/3
Landau's [1] 44/24
London [1] 146/1
language [15] 34/6 34/7 34/13 35/20 37/10 37/13 46/4 64/16 82/2 82/3 108/3 123/8 123/8 125/19 138/21
last [23] 5/22 14/23 14/25 15/1 26/12 26/18 33/3 34/16 47/16 51/1 60/24 78/20 84/5 85/19 87/6 101/23 105/14 105/19 106/13 108/17 154/23 171/19
late [2] 47/22 57/24
later [6] 26/15 39/25 62/4 120/1 154/12 160/5
later-ish [1] 62/4
latest [1] 148/17
Latin [5] 65/9 65/12 65/22 65/25 80/7
latter [2] 84/15 158/22
law [32] 16/20 53/23 61/16 72/5 91/9 91/14 109/4 109/8 109/9 111/15 111/16 111/24 116/12 116/24 117/9 121/3 122/4 131/18 137/4 137/7 137/14 138/5 140/6 140/12 145/4 149/5 149/7 149/10 150/5 150/8 150/9
lawful [2] 144/7 160/4
lawfully [2] 144/20 146/13
laws [3] 20/19 21/2 21/2
lawyer [7] 25/15 55/5 55/7 55/9 62/22 62/23 126/6
lawyers [3] 19/9 127/15 159/1
lay [2] 19/21 75/21
layer [1] 81/14
lead [1] 117/20
leaning [1] 8/12
learn [1] 166/20
learned [4] 24/10 46/3 54/1 54/2
learning [1] 128/11
leash [1] 85/21
least [17] 6/18 9/20 10/14 10/17 75/25 79/1 97/22 99/12 101/25 132/16 134/1 135/24 148/8 155/3 158/4 164/13 164/18
leave [3] 66/22 141/9 141/9
lectern [1] 94/17
lede [1] 77/13
Leeper [4] 67/4 173/4 173/15 173/16
leeway [1] 52/21
left [6] 40/22 41/4 49/6 158/4 161/23 168/25
legal [23] 53/11 60/1 61/6 61/7 61/13 66/25 118/7 129/24 139/7 139/14 139/25
legality [1] 71/15
legions [1] 77/5
less [3] 70/21 93/3 168/22
less-than-memorable [1] 168/22
letter [7] 7/16 9/5 12/5 32/2 63/15 63/17 124/20
letting [1] 136/20
level [8] 10/2 10/3 22/2 75/5 79/16 83/10 163/10 164/18
levels [4] 24/12 36/11 46/4 54/8
Liberia [39] 7/18 19/17 19/18 19/23 19/25 20/4 20/8 20/14 20/16 21/5 21/9 21/23 22/23 29/13 63/6 64/17 64/18 78/25 80/11 83/1 125/11 130/20 130/24 139/1 139/14 140/15 141/5 142/5 160/23 160/23 161/3 161/14 161/18 162/7 162/12 162/16 162/18 163/6
Liberia's [1] 7/14
liberty [2] 121/1 164/25
life [3] 100/25 101/21 114/10
light [3] 23/16 29/22 165/19
likelihood [3] 88/12 138/17 153/13

**K**

Kaplan [2] 144/18 159/8
keep [6] 44/5 109/12 109/22 111/17 155/18 169/10
keeping [1] 124/7
ken [1] 50/14
kept [1] 113/8
kick [1] 139/5
KITAMAR [4] 1/3 4/11 4/15 67/16
kind [6] 40/21 59/2 87/4 106/6 160/25 162/23
kinds [3] 96/17 103/22 132/18
Kiyemba [2] 139/9 140/9
knew [3] 110/18 126/5 127/6
knowing [1] 136/23
knowledge [5] 41/12 45/13 45/15 79/9 166/7
knowledgeable [2] 47/17 79/7
knows [13] 28/25 50/16 54/1 67/22 72/18 80/11 82/16 88/8 93/4 123/10 134/20 166/4 166/10
Kouambo [1] 109/18
KRISTI [2] 1/6 4/11
Kumarasamy [1] 169/25

**likely** [9] 11/18 27/2 138/12 138/15 152/13 152/20 167/2 167/9 171/14
likelyhood [1] 88/12
limited [6] 31/8 100/21 100/23 145/23 152/14 162/6
line [15] 9/16 12/15 12/22 12/24 27/7 31/5 32/4 99/3 143/13 143/14 144/7 145/4 145/24 157/13 158/20
lines [1] 92/22
listen [2] 107/8 108/2
literal [1] 129/6
literally [1] 49/17
litigate [1] 155/19
litigating [1] 89/16
litigation [2] 2/7 96/4
little [7] 24/6 52/21 116/18 120/8 135/1 155/24 162/11
live [4] 89/24 91/18 91/18 152/17
lived [2] 160/15 165/12
lives [1] 91/4
living [2] 141/21 144/23
LLC [1] 1/15
LLP [1] 1/15
located [3] 134/24 136/1 136/8
location [1] 136/7
lock [1] 33/11
logic [1] 110/2
long [14] 16/3 16/12 33/3 57/2 58/16 60/20 60/21 62/1 93/23 143/13 145/13 146/3 151/21 157/13
longer [8] 50/23 57/14 57/16 79/11 79/12 124/12 126/9 126/18
look [16] 7/5 26/5 26/5 26/21 27/6 55/15 81/15 85/3 113/14 113/17 131/8 131/10 133/18 135/2 145/19 170/14
looked [9] 37/13 63/6 63/9 63/12 99/19 122/15 159/10 159/15 166/8
looking [9] 29/12 39/6 76/10 107/12 121/16 127/16 165/15
looks [5] 30/17 116/24 117/1 133/20 166/21
Los [1] 17/11
lot [7] 5/24 80/18 95/24 96/4 106/3 122/5 155/8
lots [1] 72/6
loud [1] 172/3
loudly [1] 14/21
love [1] 125/1
low [1] 134/25

**M**

machinery [1] 165/4
made [26] 14/6 31/4 34/16 37/11 45/5 46/22 47/5 53/14 53/15 68/7 70/24 72/13 81/25 93/13 98/3 108/5 111/11 119/24 124/23 125/6 129/17 131/21 142/2 153/14 167/23 168/11
Madu [1] 169/20
Mahdawi [2] 103/7 104/5
mail [21] 20/7 27/25 28/9 33/10 33/12 33/13 33/16 33/20 33/24 33/25 34/1 35/9 37/9 37/9 37/15 38/9 39/6 42/22 43/25 44/11 45/25
main [1] 171/2
maintains [1] 103/7
make [40] 8/16 11/25 13/14 13/20 16/9 18/20 37/5 41/3 53/11 56/23 65/19 67/18 68/13 74/24 81/24 84/21 86/6 87/22 91/7 110/18 114/4 114/20 117/4 119/22 123/12 123/12 124/5 126/18 127/2 127/3 127/10 147/15 154/23 158/21 159/3 161/13 165/25 166/20 167/14 169/12
makes [7] 12/20 13/21 73/13 137/8 141/13 157/25 158/22
making [4] 75/3 95/22 144/1 150/15
Maldonado [3] 84/3 87/7 88/4
malice [1] 68/22
management [1] 134/16
mandatory [5] 82/3 100/14 100/20 100/22 105/9
manner [1] 108/19
many [11] 30/16 102/22 103/4 106/17 116/14 120/1 133/15 142/23 142/23 155/2 155/25
March [4] 53/14 67/20 82/23 101/25
March 12th [1] 67/20
March 30 [1] 82/23
March 30th [1] 53/14
mark [2] 18/15 63/23
Martinez [1] 160/6
MARYLAND [9] 1/1 4/4 67/21 90/5 90/6 90/16 91/16
Massachusetts [3] 154/9 154/11 154/13
matches [1] 151/14
materials [2] 63/6 63/9
Mathews [4] 143/1 163/22 164/19 165/14
matter [25] 4/9 4/12 8/10 8/13 9/19 40/1 81/9 104/19 110/2 122/4 127/11 129/25 131/18 132/15 137/7 138/5 140/5 140/12 146/14 149/4 149/10 150/4 150/8 150/8 150/19
matters [3] 75/11 127/9 138/8
may [36] 11/12 11/13 11/13 13/14 13/17 14/20 17/2 17/12 18/17 29/3 63/24 63/25 64/24 73/25 76/5 76/5 82/3 95/2 106/1 110/6 113/13 115/25 120/18 120/19 122/5 127/11 131/7 131/8 134/21 134/21 137/15 137/17 137/15 137/19 167/25 171/3
May 2010 [1] 17/2
maybe [29] 7/9 8/6 8/7 13/4 31/13 37/17 51/8 51/8 66/5 79/15 97/3 98/15 106/5 115/8 115/18 123/14 128/19 132/14 138/2 140/1 148/15 148/8 155/20 155/6 157/9 157/21 159/21 157/21 159/5 170/21
McAllen [1] 16/21
mean [50] 27/20 28/8 36/18 44/5 52/9 54/5 54/25 56/18 59/22 68/25 71/24 73/14 79/15 80/22 83/18 87/21 88/20 89/4 90/1 91/10 92/20 109/11 113/17 113/18 117/2 121/12 122/7 122/11 122/22 125/16 131/7 131/12 132/13 138/2 138/2 138/23 139/3 139/5 139/15 140/1 142/1 142/2 142/1 144/11 148/11 150/16 153/18 156/12 163/14 168/16 168/16 168/21
meaning [2] 36/1 127/6
means [9] 42/14 46/14 78/13 124/20 139/4 141/25 142/5 143/4 153/17
meant [3] 113/11 113/13 141/17

# M

**measure [2]** 160/11 165/12
**meat [1]** 56/14
**mechanism [2]** 91/21 92/1
**Medina [12]** 89/7 89/8 97/2 100/3 100/3 103/1 103/24 103/23 129/20 150/23 163/21 164/7
**meet [4]** 8/24 10/15 13/5 158/2
**meeting [14]** 28/13 32/16 32/21 32/25 33/3 33/5 33/8 33/19 34/2 44/4 44/8 59/15 59/25 61/22
**meets [2]** 8/18 8/25
**member [3]** 97/11 97/15 100/9
**members [5]** 101/17 153/12 154/4 154/5 172/1
**memo [2]** 31/2 82/23
**memorable [1]** 168/22
**memorandum [7]** 13/9 13/16 13/18 31/5 53/14 97/19 98/7
**memorialized [1]** 84/25
**memory [2]** 32/3 62/3
**men [1]** 54/3
**mention [2]** 31/1 104/4
**mentioned [6]** 45/2 89/21 90/21 99/23 117/25 118/22
**menu [1]** 82/22
**mercy [1]** 162/1
**merely [3]** 152/18 152/21 153/12
**meritorious [1]** 113/8
**merits [10]** 94/2 119/11 119/13 122/8 138/24 140/17 154/12 155/19 155/20 171/11
**message [2]** 33/21 33/22
**messed [3]** 7/10 92/10 92/17
**met [2]** 96/1 168/2
**microphone [1]** 14/22
**middle [2]** 14/25 159/16
**might [15]** 38/11 44/21 45/5 47/12 100/18 105/16 127/11 131/11 132/14 139/22 141/3 155/24 157/12 157/12 162/7
**miles [1]** 123/7 137/24
**mind [10]** 34/25 37/17 38/7 38/11 47/15 55/1 57/18 61/12 120/20 141/2
**mindful [1]** 93/21
**mine [2]** 56/18 124/3
**minimal [2]** 122/22 69/20 81/22 83/5
**minimum [8]** 76/17 77/19 77/19 83/9 85/24 86/14 150/23 163/13
**minor [5]** 6/23 159/15 159/15 159/17 159/18
**minute [7]** 33/8 34/1 39/6 40/1 40/12 43/17 45/3 61/3 62/6 62/7 82/25 84/16
**minutes [7]** 33/4 33/8 38/14 50/13 61/6 61/14 68/17
**mispronouncing [1]** 98/15
**misrepresent [2]** 93/12 93/16
**missed [1]** 23/21
**missing [1]** 118/10
**misspoke [1]** 100/3
**Misstates [1]** 47/25
**mistake [3]** 68/7 111/11 114/4
**mistakes [1]** 114/5
**modest [2]** 10/20 165/1
**MOLINA [6]** 2/7 5/11 132/14 134/20 136/21 136/22
**moment [7]** 30/1 40/15 65/5 86/11 87/22 128/20 142/12
**Monday [1]** 88/23
**monetary [2]** 101/18 101/19
**moniker [1]** 58/13
**monolith [1]** 55/3
**Montesino [10]** 60/3 60/4 60/25 61/1 61/2 61/5 61/12 61/13 62/2 62/5
**month [3]** 96/25 105/1 162/16
**months [10]** 26/23 66/6 66/7 68/2 89/16 92/3 97/24 102/22 102/24 120/1
**moot [2]** 12/5 94/12
**mooted [1]** 122/6
**more [40]** 7/1 9/22 10/24 13/15 33/4 42/1 46/19 47/7 47/13 50/19 57/5 57/15 65/10 65/18 85/18 89/17 92/23 95/23 111/15 122/24 125/8 143/18 144/15 144/22 145/3 146/10 146/20 151/12 152/2 152/2 152/3 152/14 152/22 152/24 152/24 162/11 163/20 163/22 164/14 169/4
**MORGAN [2]** 1/14 5/1
**morning [20]** 4/6 4/14 4/16 4/18 4/20 4/22 4/24 5/1 5/3 5/5 5/6 5/8 5/10 15/6 15/6 15/7 59/19 59/19 160/16
**MOSHENBERG [7]** 1/22 4/17 87/23 88/1 88/8 99/2 165/16
**most [10]** 6/16 12/8 67/4 73/10 76/9 76/25 98/2 108/8 127/1 142/11
**motion [27]** 5/23 6/12 7/10 8/12 12/12 12/4 12/5 12/15 69/1 69/2 86/19 92/6 92/13 92/14 92/15 93/2 115/1 115/11 148/4 148/22 154/24 155/2 157/13 157/24 158/21 171/15
**motions [3]** 4/12 6/1 6/15
**move [7]** 14/10 31/8 31/9 90/16 101/10 132/4 149/16
**moved [2]** 48/17 49/8
**Moving [1]** 101/22
**Mr. [225]**
**Mr. Abrego [90]** 18/11 19/15 19/18 19/23 20/4 21/10 21/16 22/6 23/16 24/15 27/1 28/18 29/14 29/22 29/24 30/21 39/11 40/17 41/13 41/19 42/4 50/23 63/18 64/11 67/20 68/9 68/18 69/24 72/3 72/11 76/17 77/18 77/23 79/12 79/17 80/9 81/9 81/21 82/13 83/13 83/25 94/13 96/7 98/12 99/11 101/13 102/3 102/18 103/17 104/11 104/19 105/6 106/24 107/16 107/21 111/7 111/23 112/24 113/3 113/6 115/1 115/10 118/14 119/18 120/1 129/16 136/13 137/22 139/18 139/20 140/16 141/3 141/15 143/17 144/13 144/23 144/25

**Mr. Abrego's [3]** 111/17 138/21 141/13
**Mr. Anderson [36]** 32/9 32/12 32/23 32/25 33/7 33/10 33/13 33/19 34/2 35/8 37/9 37/15 37/18 38/5 38/9 39/6 39/12 40/2 40/10 43/17 44/4 48/8 44/17 44/21 59/16 59/17 59/25 61/24 62/1 62/7 62/10

**Mr. Canto [28]** 5/18 11/10 11/13 11/19 13/25 14/5 26/2 29/19 38/12 38/14 66/20 78/11 140/25 141/12 141/14 141/17 141/21 141/24 141/24 141/24 66/20 79/8 126/5 166/12
**Mr. Canto's [4]** 6/17 11/16 12/7 12/9
**Mr. Cooper [6]** 75/7 75/20 94/18 94/22 166/3 169/7
**Mr. Cooper's [1]** 146/24
**Mr. Cruz-Medina [1]** 89/8
**Mr. Ensign [7]** 105/23 119/15 123/25 128/14 136/20 136/22
**Mr. Ensign's [3]** 163/19 169/8 169/13
**Mr. Giles [1]** 166/11
**Mr. Guynn [2]** 24/6 28/15
**Mr. Jonathan [1]** 5/15
**Mr. Landau [3]** 43/18 45/2 54/3
**Mr. Landau's [1]** 44/24
**Mr. Molina [4]** 132/14 134/20 136/21 136/22
**Mr. Montesino [7]** 60/4 60/25 61/5 61/12 61/13 62/2 62/5
**Mr. Rand [6]** 18/18 30/4 35/3 49/15 50/5 51/11
**Mr. Rand's [1]** 31/10
**Mr. Reuveni [2]** 85/1 97/25
**Mr. Rossman [5]** 10/9 67/14 97/5 99/2 150/16
**Mr. Sandoval-Moshenberg [4]** 88/1 88/8 99/2 165/16
**Mr. Schultz [3]** 168/16 168/17 168/19
**Mr. Swartz [2]** 166/11 168/13
**Mr. Swartz's [1]** 82/11
**Mr. Ulander [3]** 4/8 13/6 14/13
**Ms. [1]** 67/4
**Ms. Leeper [1]** 67/4
**much [14]** 6/4 8/19 34/16 53/19 59/23 66/21 73/24 75/23 105/21 118/16 148/7 152/17 155/4 162/1
**multiple [3]** 54/8 130/6 131/15
**Munaf [6]** 137/8 137/12 138/4 138/5 138/10 140/9
**Murphy [1]** 130/1
**MURRAY [1]** 1/22
**must [4]** 109/23 110/3 110/7 153/15
**mutually [1]** 66/23
**myself [1]** 52/14

# N

**Nadarajah [1]** 170/2
**name [11]** 14/22 14/23 14/25 29/6 44/24 45/2 50/17 60/24 60/24 73/25 154/2
**named [3]** 81/23 112/16 154/14
**namely [1]** 102/10
**narrow [10]** 55/25 56/2 96/19 102/6 103/14 129/2 147/11 152/22 152/24 158/5
**narrower [1]** 147/10
**narrowly [2]** 147/1 147/6
**nationality [2]** 140/24 141/1
**nationals [2]** 20/15 80/8
**nations [1]** 18/7
**natural [1]** 163/2
**Naturalization [2]** 16/15 16/25
**naturalized [1]** 144/23
**naturally [1]** 161/11
**nature [1]** 46/7
**near [2]** 153/18 153/22
**nearly [1]** 96/25
**necessarily [2]** 53/23 107/24 108/23 111/5 113/22 123/3 151/3 152/19 153/12 153/17 159/5 163/4
**necessary [2]** 6/9 64/24
**need [21]** 46/21 63/20 66/16 67/3 82/24 86/11 86/13 88/5 88/14 89/15 96/10 98/22 98/24 99/18 103/11 115/5 127/21 131/22 136/13 137/21 158/18
**needed [5]** 115/9 135/1 156/9 156/25 157/6
**needs [4]** 8/15 13/18 139/20 142/15
**negative [3]** 59/2 88/22 143/10
**negotiate [1]** 18/7
**negotiated [1]** 123/4
**negotiations [6]** 27/2 28/18 29/1 29/15 54/16 124/17
**neither [4]** 95/14 100/10 104/16 137/4
**neutral [2]** 83/7 131/8
**never [10]** 34/25 52/3 80/6 96/17 100/21 108/24 122/18 146/13 159/21 170/10
**new [18]** 1/16 13/19 72/19 84/2 84/15 87/1 87/8 89/23 90/18 91/13 120/20 121/25 133/10 135/14 144/25 144/25 144/24 145/22 145/22 167/7
**newspaper [1]** 51/24
**next [10]** 22/10 77/11 78/2 103/9 104/6 135/10 135/18 145/10 154/24 157/17
**Nguyen [2]** 100/4 100/6
**nice [1]** 79/8
**nilly [1]** 9/7
**Ninth [4]** 102/24 170/2 170/4 170/11
**Nishimura [1]** 143/14
**NITHYA [2]** 1/18 5/1
**no [177]**
**nobody [1]** 40/16
**Noda [3]** 28/1 39/4 59/22
**NORM [3]** 1/6 4/11 32/2
**Noem's [2]** 31/2 31/5
**nonbinding [2]** 24/16 36/14
**noncitizen [2]** 80/23 81/1
**noncitizens [1]** 150/24
**none [8]** 102/12 102/13 102/22 105/10 105/15 106/14 170/6 170/13
**nonetheless [1]** 170/11
**nonexistence [4]** 90/25 91/6 167/6 170/16
**nonnamed [1]** 154/4
**nonstarter [1]** 149/24
**nope [1]** 148/25
**normal [2]** 123/11 135/4
**not [295]**
**notably [7]** 98/5 110/23 114/7 114/25 145/20 148/3 154/14
**note [18]** 9/13 13/21 20/25 54/14 100/17 115/9 122/24 165/15
**noted [3]** 98/16 99/6 102/15
**notes [6]** 1/25 2/15 7/16 8/4 9/4 54/17

**nothing [20]** 12/21 13/19 38/19 46/15 50/18 53/25 54/1 54/1 59/2 73/24 95/18 105/6 120/17 124/8 124/10 139/23 90/11 90/11 90/18 91/13 97/17 113/3 118/9
**notice [6]** 14/22 20/9 24/13 83/24 91/6 152/2
**notices [1]** 10/18
**notified [1]** 57/20
**notion [1]** 161/22
**NOVEMBER [18]** 1/10 32/12 32/15 35/9 39/12 39/19 39/22 40/15 41/4 42/5 43/8 49/19 58/19 59/19 59/21 60/9 173/12
**November 2nd [1]** 49/4
**November 3rd [4]** 39/19 39/22 49/19 58/19
**November 5th [1]** 32/12
**November 7th [7]** 32/15 35/9 39/12 40/15 41/4 43/5 43/8
**nowhere [1]** 170/4
**NTA [2]** 121/25 122/3
**national [2]** 95/24 162/11
**number [10]** 1/19 6/1 6/1 10/25 37/2 95/11 99/14 109/20 129/20 150/16
**numerous [1]** 51/24
**NW [2]** 1/19 2/5
**NY [1]** 1/16

# O

**object [2]** 8/8 31/10
**objection [29]** 7/7 7/11 18/20 18/25 19/20 21/12 25/6 28/20 31/16 34/20 34/21 35/2 35/16 37/20 42/8 43/6 43/9 45/11 46/17 47/3 48/2 48/20 49/9 56/13 60/12 61/7 61/9 65/14 78/22 116/8 117/12
**objections [1]** 140/5
**oblique [1]** 73/13
**observation [2]** 56/23 122/24
**obtain [3]** 84/13 84/16 89/8
**obtained [2]** 54/15 170/9
**obvious [1]** 75/16
**obviously [7]** 73/16 101/13 101/24 105/11 141/6 158/17 164/16
**occasion [1]** 134/23
**occur [2]** 10/3 140/19
**occurred [3]** 32/16 32/21 44/18
**ocean [1]** 123/7
**October [8]** 17/5 39/15 47/22 48/7 48/16 48/25 57/24 58/5
**October 2017 [1]** 17/5
**October 24th [1]** 48/25
**odd [5]** 123/1 126/16 126/16 135/12 164/12
**off [19]** 63/21 64/20 67/21 78/19 102/16 128/16 153/24 153/25 162/13
**offer [7]** 11/19 38/19 46/8 46/15 70/2 124/23 169/5
**offered [1]** 68/5
**offering [2]** 9/5 47/6
**offers [1]** 123/16
**office [13]** 2/7 17/3 17/10 17/11 17/13 43/5 43/12 47/21 57/14 57/17 60/1 62/14 65/8
**officer [7]** 11/24 17/7 17/5 48/6 82/24 131/11 137/23
**officer's [1]** 142/15
**officers [1]** 49/7
**offices [6]** 16/8 48/8 49/8 57/23 57/23 58/4
**official [4]** 61/22 173/1 173/4 173/17
**often [11]** 82/21 74/19 84/21 99/6 113/5 118/10 140/22 140/23 140/25 141/2 141/20
**Oh [4]** 25/17 31/22 43/4 57/1
**okay [131]** 5/5 5/20 9/20 10/23 1/18 11/23 11/24 12/17 13/23 13/24 14/3 14/12 15/15 17/14 18/14 18/24 20/13 21/21 21/23 26/18 28/12 29/9 30/3 30/23 31/1 32/1 32/7 34/6 34/24 35/1 36/3 36/8 36/21 37/4 39/20 42/16 42/24 43/4 44/7 47/21 50/9 50/10 51/22 52/11 52/15 53/20 53/23 66/1 67/4 69/11 70/6 72/3 75/10 80/8 81/15 81/19 83/23 87/11 88/18 93/18 94/16 105/22 108/22 109/19 110/7 111/7 111/17 112/23 113/6 113/10 115/14 116/7 114/5 116/1 118/14 120/17 121/6 124/6 128/10 128/25 128/21 136/2 136/4 138/18 139/22 142/8 144/17 145/19 146/18 148/14 148/19 151/10 153/21 154/4 154/18 157/18 157/18 158/7 165/24 166/5 167/16 168/20 169/18 171/5
**Oliver [1]** 159/11
**OLIVIA [1]** 1/18 4/22
**once [14]** 16/10 37/14 86/19 87/5 117/7 125/11 143/23 144/3 146/5 155/19 155/19 157/13 159/25 160/9
**one [95]** 7/23 10/24 11/5 12/12 12/15 13/5 13/13 14/3 17/23 25/2 31/15 32/1 34/21 40/10 40/12 42/1 42/7 47/20 50/8 53/1 53/22 55/20 56/6 56/23 57/15 60/6 63/2 65/2 65/5 65/10 65/18 67/18 69/15 71/22 72/3 73/20 73/22 74/9 74/10 74/16 77/2 77/4 78/20 80/4 80/11 84/3 84/5 85/19 86/16 89/17 93/3 95/11 97/4 97/9 97/10 98/1 99/6 99/13 102/10 106/19 108/4 109/5 111/7 111/17 112/23 113/6 113/10 115/14 116/7 122/16 127/1 128/25 129/13 130/14 130/15 135/4 138/3 138/19 140/17 142/10 142/24 143/14 146/15 146/24 147/21 148/25 149/17 149/23 150/17 152/12 152/14 160/24 162/15 165/24 166/16 167/22 168/4 168/5 169/12
**one-way [1]** 63/2
**ones [5]** 99/15 115/25 147/8 164/6 166/16
**ongoing [3]** 87/3 87/21 135/25
**only [61]** 12/6 29/14 40/1 40/10 40/12 45/24 47/9 47/20 71/20 72/10 73/9 80/4 82/22 94/5 92/4 93/8 102/9 107/22 108/23 115/7 111/10 111/17 111/17 112/4 113/11 113/19 113/10 120/4 120/22 121/12 121/15 121/20 128/19 130/13 130/23 137/3 139/3 140/4 140/4 142/18 143/4 146/15 146/24 147/21 148/25 149/17 149/23 150/17 152/12 152/14 160/24 162/15 165/24 166/16 167/22 168/4 168/5 169/12
**open [11]** 6/4 6/8 9/10 9/17 11/14 51/22 52/15 55/22 94/13 123/20 124/1
**open-ended [3]** 51/22 52/15 55/22
**open-record [1]** 6/8

## O

**operation [5]** 109/4 108/9 111/16 112/23 117/9
**operations [9]** 62/11 105/9 109/22 130/23 130/23 108/9 117/9 62/19

**opine [2]** 115/21 127/1
**opining [5]** 91/1 109/17 118/6 132/22 139/21
**opinion [5]** 73/6 73/15 73/17 159/11 172/4
**OPLA [4]** 60/6 62/12 62/13 62/23
**opportunity [12]** 52/19 56/6 72/15 72/16 83/6 83/7 86/1 92/20 163/8 166/1 166/19 169/5
**opposed [1]** 87/19
**opposition [1]** 12/14
**opt [3]** 100/20 101/18 101/20
**optimist [3]** 158/24 158/25 167/12
**option [2]** 30/1 92/4
**oral [3]** 50/21 57/5 67/2
**order [244]**
**ordered [6]** 56/5 89/14 91/20 106/19 130/15 131/23
**orderly [1]** 172/5
**orders [11]** 68/1 68/3 74/18 75/2 102/12 103/12 112/17 113/14 116/22 129/4 131/10
**Orellana [5]** 97/2 100/2 100/5 103/1 103/24
**origin [3]** 17/16 141/23 161/12
**original [13]** 25/7 122/3 122/7 132/9 133/1 133/21 133/22 134/7 134/13 135/11 140/24 141/1 141/23
**originally [1]** 65/13
**orphanage [1]** 159/19
**OSORIO [1]** 1/22
**other [63]** 6/23 13/8 32/2 36/6 36/13 37/10 37/10 44/14 44/20 44/21 48/8 49/8 54/7 57/22 57/23 58/4 62/5 62/24 63/1 65/3 65/23 71/17 71/22 72/6 73/23 74/16 74/21 76/21 80/12 84/4 84/6 86/18 92/4 93/13 95/17 103/4 105/16 118/22 125/17 126/20 129/20 131/9 131/18 134/17 137/22 139/8 139/25 140/10 141/22 141/24 145/22 146/25 150/24 152/21 156/16 161/7 162/19 163/21 165/25 167/14 170/20 171/4 171/9
**others [3]** 88/7 88/18 150/23
**otherwise [7]** 45/9 47/7 79/22 100/23 129/14 160/25 171/5
**ought [1]** 166/21
**out [25]** 7/25 9/6 9/25 10/19 12/16 13/7 13/17 46/13 48/17 50/21 64/25 75/21 100/20 101/18 101/20 105/1 115/14 122/6 134/20 139/6 147/19 155/17 157/10 157/19 157/23
**outcome [2]** 131/6 137/4
**outlining [1]** 20/8
**outright [1]** 147/9
**outside [4]** 41/3 90/7 122/23 135/4
**outsource [1]** 135/1
**outstanding [1]** 6/1
**over [11]** 8/12 17/8 28/13 60/6 60/22 75/14 102/3 114/2 133/10 138/25 138/25
**overbreadth [1]** 152/1
**overbroad [2]** 152/9
**overlap [1]** 155/9
**overly [1]** 72/24
**overridden [1]** 168/6
**override [1]** 82/2
**overrides [1]** 82/4
**overrule [1]** 43/10
**overruled [7]** 34/19 35/4 35/19 46/18 48/21 56/10 61/10
**oversealed [3]** 8/7 8/20 8/21
**Overton [1]** 56/15
**overwhelmingly [1]** 93/25
**own [7]** 57/18 69/21 83/2 122/8 127/7 161/19 161/23

## P

**p.m [3]** 67/8 67/8 172/11
**P.O [2]** 2/8 2/12
**page [10]** 3/2 12/15 13/7 24/1 87/23 106/10 106/13 112/4 162/4 173/9
**pages [2]** 77/1 170/3
**painful [1]** 166/9
**paper [1]** 81/16
**papers [12]** 73/10 98/14 99/18 125/14 139/13 139/13 141/18 149/14 154/3 159/11 162/20 171/5
**parade [1]** 168/21
**paragraph [20]** 24/2 24/21 25/8 25/16 26/5 26/8 26/21 27/11 29/12 36/1 36/7 36/23 37/2 37/19 38/24 39/2 40/4 43/2 45/20 64/9
**paragraph 4 [5]** 38/24 39/2 40/4 43/2 45/20
**paragraph 5 [1]** 27/11
**paragraphs [4]** 34/7 35/10 38/15 46/12
**parallel [1]** 133/15
**paraphrasing [1]** 103/10
**parcel [1]** 119/6
**parole [9]** 76/5 89/21 91/12 91/15 91/15 92/25 92/2 145/13 145/18
**paroled [5]** 125/13 144/20 145/12 145/14 145/17
**part [35]** 8/5 9/23 9/23 10/15 12/6 24/3 34/5 36/7 39/3 48/2 48/3 48/7 49/8 58/10 68/22 68/23 78/6 80/14 80/16 80/22 84/18 84/19 84/23 84/23 87/6 97/12 100/14 103/3 106/24 119/6 127/25 134/14 141/9 149/11 164/17
**participate [2]** 26/2 135/17
**particular [14]** 29/3 75/8 91/18 92/1 95/25 96/1 96/2 99/16 106/15 128/7 134/22 135/23 146/23 170/19
**particularly [1]** 9/22
**parties [2]** 14/1 158/2
**parts [1]** 65/23
**party [4]** 34/17 34/18 51/2 104/1
**pass [3]** 43/21 66/12 94/17
**passed [5]** 26/23 43/23 59/23 104/9 165/16
**passing [4]** 76/12 76/20 76/21 139/25
**past [6]** 6/8 10/6 49/25 66/5 66/7 96/24
**path [2]** 72/12 83/25 163/15
**PATHALAM [2]** 1/18 5/4
**Patrol [2]** 16/21 17/1
**PAULA [5]** 1/9 4/5 173/4 173/15 173/16

---

**pause [1]** 142/16
**PDF [1]** 106/10
**Pennsylvania [1]** 2/9/2 1/24/7 1
**Pennsylvania [1]** 2/9
**people [21]** 46/7 54/3 114/4 114/20 121/11 134/15 141/22 156/14 160/13 162/23 172/2
**percent [3]** 134/6 137/7 162/23
**Perez [2]** 102/24 103/23
**perhaps [5]** 7/19 9/9 10/24 13/1 85/18 136/24 151/23
**period [7]** 59/3 77/20 77/22 84/10 84/12 87/20 160/13
**permanent [10]** 48/11 57/21 58/10 58/13 58/23 58/25 59/5 87/21 146/7 160/4
**permanently [1]** 161/1
**permissible [2]** 85/20 88/2
**permission [2]** 30/5 57/9
**permit [2]** 151/1 160/17
**permits [1]** 95/7
**permutations [1]** 156/1
**perpetual [1]** 145/18
**persecute [6]** 20/24 20/25 21/1 22/5 130/21 130/25
**persecuted [2]** 130/22 131/4
**persecution [3]** 139/23 140/7 162/7
**persecutions [1]** 140/13
**persist [1]** 11/21
**persisting [1]** 153/23
**persists [2]** 122/14 122/19
**person [21]** 29/3 29/6 32/23 40/10 47/12 60/2 67/4 72/8 80/5 82/6 82/10 87/15 87/18 110/11 120/15 137/19 139/21 159/20 159/21 160/19 165/2
**personal [4]** 8/6 8/25 10/10 10/18
**personally [1]** 47/6
**personnel [4]** 24/4 24/22 29/13 40/7
**persons [2]** 72/2 160/2
**perspective [6]** 52/12 79/3 136/5 136/10 155/3 169/2
**petition [40]** 5/23 6/11 6/12 55/18 67/2 67/13 68/25 69/13 73/6 75/14 75/21 76/1 77/7 77/18 78/18 83/11 88/10 94/1 94/2 96/7 99/15 103/8 103/18 104/12 105/19 108/12 111/1 155/11 157/11 157/16 157/23 158/2 158/17 158/19 158/20 166/17 169/3 171/12 171/15 171/20
**petitioner [35]** 1/4 1/12 4/15 4/17 4/19 4/21 4/23 4/25 5/2 5/4 10/16 11/17 11/17 13/6 54/5 55/17 56/6 67/16 80/22 84/22 87/14 88/22 103/7 108/6 110/18 115/12 123/17 125/17 132/16 147/5 153/17 154/23 155/7 157/19 170/20
**petitioner's [10]** 10/10 14/6 24/4 53/13 63/23 64/2 64/7 67/13 128/11 162/5
**petitioners [7]** 74/19 99/7 122/18 129/10 132/4 138/25 144/24
**Petroleum [1]** 101/16
**Phillips [1]** 101/16
**Phoenix [9]** 17/13 47/21 48/7 49/3 49/4 49/6 57/14 57/17 65/8
**phone [2]** 43/18 74/1
**phrase [1]** 78/19
**physically [1]** 90/4
**PI [1]** 155/21
**pick [2]** 46/12 128/17
**piece [2]** 81/16 140/20
**pinicte [1]** 169/21
**pivot [2]** 75/19 115/25
**pivoted [1]** 128/15
**pivoting [1]** 78/25
**place [3]** 32/1 89/20 155/18
**placed [2]** 64/4 131/25
**places [1]** 150/16
**placing [1]** 64/1
**plain [2]** 87/9 168/25
**plainly [3]** 72/5 83/2 149/16
**plaintiffs [4]** 152/16 152/25 154/4 154/15
**plan [2]** 23/17 120/20
**plane [1]** 78/2
**planning [1]** 14/8
**plausible [1]** 151/25
**play [3]** 53/10 55/2 123/13
**plead [2]** 82/16
**please [10]** 4/13 14/21 23/24 24/1 32/18 44/5 44/6 48/12 70/17 106/1
**podium [1]** 142/19
**point [49]** 9/24 10/9 46/21 47/5 52/17 53/22 55/25 71/12 73/17 75/18 78/24 79/1 79/10 79/13 79/14 79/16 84/5 87/2 93/24 98/2 102/23 106/12 108/3 109/5 110/4 112/10 112/12 114/11 117/4 117/5 120/18 121/12 122/12 123/15 139/6 144/2 146/9 146/21 146/24 147/4 149/23 163/19 165/25 167/17 168/23 169/12 169/14 170/1 171/2
**pointing [1]** 55/13
**points [4]** 10/7 52/24 75/21 169/8
**policy [2]** 68/15 138/14
**polite [1]** 126/17
**political [1]** 68/13
**poor [1]** 126/5
**port [1]** 160/14
**portion [2]** 23/7 87/16
**ports [1]** 154/17
**pose [2]** 13/4 134/18
**position [26]** 15/11 39/18 47/10 47/24 55/21 57/20 57/21 58/9 58/10 58/14 58/23 58/24 82/21 82/22 84/11 84/14 85/12 85/16 85/17 86/18 124/11 125/16 131/25 156/23 157/12 162/4
**positions [2]** 49/8 57/24
**possible [3]** 13/6 16/10 161/3
**possibly [3]** 62/17 62/21 118/1
**post [3]** 49/2 121/4 121/21
**poster [1]** 68/13
**posture [1]** 88/25 110/23
**potential [4]** 41/19 42/5 50/4 147/2
**potentially [5]** 101/21 122/3 144/9 145/18 156/9
**power [2]** 71/14 86/20
**powerless [1]** 68/6 68/6

---

**practical [1]** 8/10
**pre [1]** 121/7
**precede [2]** 7/25 8/10
**preceding [1]** 108/16
**precisely [1]** 95/19
**preclude [2]** 75/3 156/8
**precluded [1]** 143/15
**precludes [2]** 138/6 138/10
**predates [1]** 109/20
**predecessor [1]** 16/15
**predicate [1]** 124/4
**predicated [1]** 118/17
**predict [1]** 80/10
**prejudging [1]** 163/11
**prejudice [6]** 82/9 82/12 167/20 168/9 168/12 168/14
**prejudicial [2]** 125/23 128/3
**preliminary [2]** 30/12 86/21
**premature [1]** 117/21
**premise [2]** 115/24 140/4
**prep [1]** 30/25
**preparation [1]** 40/21
**prepare [1]** 19/8
**prepared [3]** 40/25 63/18 127/3
**presence [1]** 160/3
**present [3]** 16/19 29/14 89/11
**presentations [1]** 169/13
**presented [5]** 119/4 119/7 120/9 127/21 160/14
**presenting [1]** 110/23
**Presently [1]** 18/12
**presentment [1]** 155/15
**preserving [1]** 130/9
**presiding [1]** 4/5
**press [2]** 7/17 7/17
**pressing [1]** 80/17
**presumably [1]** 154/12
**presumption [2]** 95/11 95/12
**presumptively [1]** 136/16
**presupposes [2]** 116/4 116/13
**pretty [6]** 6/2 45/4 63/16 99/10 134/6 154/1 155/3 160/20 162/3 169/11
**prevail [2]** 152/13 152/20
**prevent [1]** 111/8
**previously [1]** 133/17
**primary [3]** 83/13 93/22 93/24
**principal [3]** 60/1 62/14 69/5
**principle [5]** 120/15 120/24 121/10 137/17 153/8
**principles [1]** 95/9
**prior [10]** 39/11 66/7 80/6 106/7 106/24 112/13 115/6 127/18 153/8 161/22
**prison [1]** 67/25
**privilege [3]** 34/16 60/12 146/4
**privileged [3]** 11/10 11/12 11/15
**privileges [1]** 10/6
**probably [5]** 5/21 52/11 52/14 89/22 156/5
**probationary [1]** 59/3
**probing [1]** 128/9
**problem [5]** 21/24 78/16 110/9 135/5 162/10
**problems [2]** 80/18 120/5
**procedural [14]** 69/24 83/5 83/10 96/12 98/6 99/22 100/6 103/2 109/3 129/19 131/6 144/10 146/17 150/3
**procedurally [2]** 158/1 158/6
**procedure [4]** 135/5 148/20 150/2 164/22
**procedures [6]** 95/2 130/2 134/9 134/12 145/7 146/15
**proceed [6]** 12/9 67/2 75/22 120/19 120/20 122/8
**proceeded [1]** 111/9
**proceeding [2]** 90/18 137/3
**proceedings [20]** 17/18 22/14 23/12 57/7 89/20 92/6 92/7 92/18 102/1 102/14 113/6 117/11 117/12 119/5 124/24 127/12 136/4 137/6 172/11 173/8
**proceeds [1]** 71/6
**process [72]** 24/3 39/3 39/5 68/11 69/13 69/17 69/20 69/23 69/24 70/5 70/6 72/1 75/15 75/16 77/6 77/6 80/2 81/9 81/23 82/8 83/5 95/4 96/13 96/16 99/23 100/20 100/21 101/16 101/18 101/20 104/14 104/15 104/20 104/25 105/10 115/10 119/2 124/23 116/10 130/19 131/12 131/15 131/17 133/10 135/21 137/1 137/5 139/20 142/23 143/4 143/5 143/22 143/18 144/9 145/1 145/6 145/25 146/14 146/17 146/24 146/25 148/23 150/9 150/19 153/22 160/1 160/11 163/9 165/3 166/20 169/2

**processed [1]** 135/24
**processes [7]** 100/7 102/21 103/3 103/19 104/1 111/2 133/2
**produce [3]** 79/7 84/13 89/17
**produced [1]** 79/8
**product [2]** 34/11 34/16
**proffer [2]** 49/15 51/1
**proffering [1]** 49/24
**programmed [1]** 48/9
**prohibit [1]** 119/12
**prohibiting [1]** 85/25
**prohibitions [1]** 117/24
**prolonged [9]** 118/13 118/23 118/23 118/25 119/1 119/10 147/20 156/11 156/15
**promptly [1]** 6/17
**prongs [1]** 83/11
**proper [3]** 78/6 82/8 168/24
**proper [2]** 52/20 111/1
**properly [1]** 85/23
**proposal [1]** 158/12
**proposing [3]** 138/18 138/20 144/24
**proposition [2]** 109/7 163/25
**prosecute [2]** 20/18 20/21
**prosecution [2]** 138/13
**prospect [1]** 158/5
**protect [1]** 100/24
**protected [4]** 67/24 110/5 123/16 124/22
**protection [2]** 139/23 160/19
**protections [2]** 81/23 82/20
**protective [2]** 81/3 85/18
**protects [1]** 139/11

## P

**prove [3]** 53/24 78/18 79/9
**proven [1]** 99/6
**provide [8]** 58/3 64/10 82/24 99/17 112/8 134/12 164/21 166/7
**provided [17]** 22/14 20/17 21/9 21/15 22/3 24/13 26/24 34/6 36/20 36/25 37/3 40/19 40/24 143/5 145/7 146/15 148/21
**provides [2]** 72/5 143/9
**providing [5]** 61/5 61/13 64/16 83/15 112/3
**proving [1]** 79/10
**provision [5]** 103/13 104/8 130/11 135/25 149/8
**provisional [1]** 11/8
**provisions [11]** 95/17 101/22 104/1 104/7 115/19 146/23 152/11 166/2 170/13 170/25 171/6
**public [8]** 8/21 10/4 10/5 11/18 12/3 12/10 126/21
**pulled [2]** 67/20 169/16
**purge [5]** 49/18 50/4 51/6 51/6 51/9
**purported [2]** 102/19 103/18 104/3
**purpose [6]** 55/25 56/2 56/22 145/14 145/15 145/17
**purposes [9]** 8/15 9/21 68/24 97/22 97/22 102/17 120/25 159/22 160/19
**pursuant [3]** 82/23 106/23 173/6
**pursue [1]** 149/24
**push [1]** 117/3
**pushed [1]** 119/22
**pushing [1]** 116/17
**put [26]** 10/1 11/13 28/9 34/3 36/13 44/2 48/22 49/15 49/19 53/10 55/15 63/20 78/2 79/25 85/18 85/20 97/14 98/1 123/5 127/14 136/11 138/22 162/4 165/21 166/14 170/17
**puts [1]** 97/9
**putting [2]** 87/12 93/22
**PX [1]** 1/5
**PX25 [1]** 4/10
**PX25-2780 [1]** 4/10

## Q

**qualms [1]** 94/3
**question [55]** 11/3 14/3 22/10 25/9 27/15 35/3 35/7 38/2 38/21 38/22 39/22 40/23 41/15 42/1 42/11 46/10 51/21 59/9 60/18 62/20 65/18 69/7 72/21 75/24 76/10 77/11 77/12 86/18 87/12 90/2 90/9 104/20 108/24 108/25 109/18 110/12 115/18 117/2 131/22 133/4 133/8 133/13 135/2 135/18 156/1 158/15 160/9 160/10 160/18 161/5 161/17 162/6 162/15 166/25 170/23
**questions [37]** 11/13 28/25 30/2 30/12 33/5 37/18 38/4 38/8 38/11 38/13 41/19 46/6 52/2 52/16 55/22 71/14 75/8 75/20 91/20 94/18 96/5 105/16 117/21 122/6 122/11 135/25 154/21 155/2 157/4 159/3 166/1 169/4 169/6 170/18 171/4 171/9 171/17
**quick [6]** 14/3 14/9 14/9 65/20 94/11 158/16
**quickly [7]** 6/2 13/2 14/11 16/9 59/20 160/20 171/12
**quietly [1]** 73/3
**QUINN [2]** 1/15 1/19
**quintessential [1]** 50/12
**quite [9]** 67/17 67/19 79/15 101/24 104/7 120/9 137/14 165/1 166/9
**quo [7]** 90/3 131/24 132/21 133/25 134/1 135/6 136/14
**quote [9]** 12/7 12/18 78/13 97/11 109/22 130/12 145/4 145/5 160/2

## R

**raise [9]** 9/8 72/15 113/7 115/4 127/22 140/5 149/5 150/10 153/17 154/8 171/14
**raised [13]** 10/6 59/8 70/11 93/16 115/19 130/23 130/24 138/25 150/6 152/7 152/8 154/9 160/22
**raises [4]** 99/16 99/22 132/16 133/16
**raising [5]** 100/24 130/20 147/20 148/5 154/5
**RAND [9]** 1/13 3/4 4/20 18/18 30/4 35/3 49/5 50/5 51/11
**Rand's [1]** 31/10
**rate [1]** 132/18
**rather [5]** 17/16 89/8 102/19 135/19 154/8
**reach [6]** 86/13 108/24 111/9 111/10 156/13 167/2 167/9 167/11 171/11 171/14 171/15
**reaching [1]** 119/12
**reactions [2]** 121/19 127/19
**read [19]** 24/2 24/6 24/19 26/21 26/22 27/4 29/17 37/11 41/3 44/17 44/22 81/15 94/25 107/13 120/22 147/5 147/6 151/11 152/3
**reading [2]** 44/9 63/3
**real [8]** 13/2 49/12 65/19 65/20 110/12 124/6 135/5 143/15
**really [27]** 6/23 8/25 31/13 50/6 51/16 69/4 70/12 70/15 70/18 80/17 86/23 91/22 92/10 96/2 109/11 119/14 121/14 126/11 131/22 141/17 146/1 156/2 158/20 169/12 170/17 172/5 172/7
**rearresting [1]** 87/15
**Reask [1]** 35/3
**reason [9]** 43/14 70/10 100/13 110/24 140/12 147/10 162/12 162/22 163/2
**reasonable [8]** 70/1 78/11 81/18 82/25 83/8 118/15 126/2 139/20
**reasonably [9]** 71/18 71/18 86/7 88/12 118/20 120/4 120/25 127/15 156/18
**reasoning [2]** 116/9 129/24
**reasons [9]** 12/1 50/14 77/5 79/25 99/12 105/14 110/1 131/15 153/2
**reassigned [2]** 132/5 133/2
**recall [14]** 25/23 30/14 48/14 63/14 63/15 63/17 63/17 64/15 64/20 66/10 85/1 154/2 166/4 166/7
**receive [2]** 24/14 48/14
**received [10]** 20/7 25/4 33/17 34/1 35/8 37/8 37/8 37/15 80/3 131/22
**receiving [1]** 17/20
**recency [1]** 159/5
**recent [10]** 49/25 52/17 73/10 83/3 83/21 84/2 98/2

**99/3 102/22 114/7**
**recently [4]** 72/18 108/8 115/1 159/6
**recognize [5]** 19/4 109/2 117/10 117/13 171/25
**recognized [1]** 119/9 121/24 152/24
**recognizes [1]** 165/13
**recognizing [1]** 153/12
**recollection [3]** 29/7 48/24 65/2
**recommend [1]** 105/2
**record [33]** 4/13 6/8 12/3 14/22 22/12 49/13 64/1 70/24 71/1 76/11 76/16 76/16 78/3 79/25 82/6 85/4 88/20 96/11 97/7 98/1 98/1 99/13 111/13 114/18 117/6 117/7 118/8 119/21 124/24 126/23 127/24 168/13 171/10
**records [1]** 153/3
**redact [1]** 8/24
**redacted [3]** 8/7 10/21 12/7
**redaction [1]** 12/14
**redactions [1]** 6/22
**redetention [1]** 88/13
**redirect [2]** 66/13 66/14
**reduce [1]** 10/2
**refer [7]** 9/17 15/16 15/18 15/22 15/24 23/24 116/21
**reference [8]** 11/12 31/9 35/22 35/24 73/13 74/7 74/8 146/20
**referenced [6]** 7/8 26/12 26/18 27/10 27/25 29/4
**referred [2]** 33/16 38/17
**referring [6]** 15/19 15/25 39/5 89/7 107/6 129/14
**refers [2]** 116/23 128/24
**refiled [1]** 6/1
**reflect [1]** 64/1
**reflected [2]** 24/18 36/15
**reflects [2]** 81/6 114/19
**refoule [1]** 22/6
**refoulement [4]** 139/23 140/11 140/19 163/5
**refugee [6]** 63/19 64/10 64/16 139/15 160/25 161/7
**refuse [2]** 148/10 148/11
**refused [1]** 121/9
**refute [1]** 54/22
**regard [16]** 6/11 8/2 8/22 9/2 11/25 30/20 40/20 41/12 42/4 47/13 108/18 115/12 120/3 126/8 136/13 139/12
**regarding [10]** 20/3 20/14 21/15 24/4 24/21 24/21 24/23 25/1 138/7 146/5
**regards [1]** 21/10
**Regents [3]** 96/22 102/5 103/15
**regs [3]** 113/15 163/13 164/11
**regulations [10]** 80/19 83/2 86/3 109/7 113/16 118/12 131/9 164/4 164/5 173/10
**regulatory [2]** 61/22 164/15
**reinforce [1]** 31/11
**reinstated [1]** 131/10
**reject [4]** 95/7 130/13 154/13 154/13
**rejected [4]** 95/20 130/6 149/18 149/19
**rejecting [4]** 107/24 109/5 111/16 113/11
**related [2]** 116/13 138/8
**relates [2]** 122/10 130/25
**relatively [3]** 88/10 88/15 165/19
**relayed [1]** 28/11
**release [17]** 7/17 77/20 83/13 83/18 84/2 84/12 85/15 86/8 88/13 88/23 89/8 90/10 90/12 118/21 121/1 137/23 150/18
**released [9]** 77/18 84/1 84/10 84/12 86/14 86/14 87/5 90/9 150/19
**releasing [1]** 155/14
**relentless [1]** 158/25
**relevance [5]** 43/9 48/20 49/9 49/16 65/16
**relevant [8]** 6/16 69/2 76/1 76/6 76/7 120/2 142/25 155/17
**reliability [1]** 51/3 54/19 55/12
**reliable [3]** 54/4 54/9 56/17
**relief [41]** 69/6 69/8 70/12 76/18 76/21 77/14 77/17 83/12 85/22 85/24 86/20 86/22 87/4 87/21 98/18 104/19 105/6 108/6 108/7 110/20 112/24 118/20 130/15 132/18 138/19 138/22 148/7 149/13 149/25 150/18 152/9 152/10 152/14 154/15 155/10 155/21 156/3 156/6 156/25 157/6
**rely [2]** 143/5 146/16
**remain [6]** 6/19 6/19 6/24 7/8 7/12 13/18
**remained [1]** 145/13
**remaining [4]** 6/6 8/9 94/18 158/3
**remains [2]** 77/25 120/15
**remand [1]** 133/23
**remanded [2]** 110/12 133/21
**remanding [1]** 98/22
**remember [4]** 62/11 78/19 82/10 92/12
**remind [1]** 32/14
**remote [1]** 135/23
**remotely [4]** 134/24 135/17 165/15 165/17
**removability [7]** 98/9 98/17 98/23 98/24 106/25 107/21 108/24
**removable [5]** 98/12 108/1 109/1 111/7 122/9
**removal [235]**
**removals [10]** 16/9 17/17 53/6 103/20 120/23 140/23 140/23 140/25 141/20 143/10
**remove [17]** 17/24 23/16 29/22 71/22 71/22 72/8 72/10 72/14 72/20 72/25 73/11 74/7 80/5 94/4 135/13 156/24 157/18
**removed [23]** 17/15 20/15 21/11 47/24 48/2 48/6 67/23 67/24 72/22 80/24 86/1 106/15 106/16 109/6 110/6 111/23 123/9 125/11 132/1 135/9 137/24 153/2 162/24
**removing [7]** 20/3 21/17 29/24 65/23 65/25 80/7 95/2
**Reno [3]** 95/20 96/21 102/7
**reopen [12]** 90/6 92/6 92/13 92/14 92/15 93/2 115/1 132/4 135/11 148/4 148/22 149/16
**reorganization [1]** 48/8
**repeat [4]** 31/10 38/21 40/23 42/1
**rephrase [3]** 38/1 38/1 48/3
**report [3]** 90/13 132/13 133/5

**reported [2]** 160/16 173/8
**reporter [4]** 67/5 173/1 173/4 173/17
**reporters... [illegible] 3/22**
**representation [2]** 52/22 136/13
**representations [1]** 31/4
**representatives [2]** 26/3
**representing [1]** 42/13
**represents [1]** 11/15
**Republic [3]** 7/14 7/18 29/13
**request [3]** 83/13 85/17 127/18
**requested [1]** 11/17
**requesting [2]** 69/8 89/18
**requests [1]** 146/4
**require [6]** 80/2 124/16 130/19 131/9 137/6 156/5
**required [2]** 69/20 105/11
**requirement [1]** 118/14
**requirements [4]** 9/1 115/6 143/6 168/24
**requires [3]** 72/7 97/15 111/15
**requiring [2]** 85/25 111/15
**rescinded [1]** 124/23
**reside [1]** 96/5
**residence [1]** 146/7
**residency [3]** 63/19 64/11 64/17
**resident [1]** 139/14
**resolution [1]** 104/10
**resolve [2]** 157/4 158/15
**resolved [2]** 6/18 108/23
**resolves [1]** 121/3
**resolving [2]** 111/19 157/7
**respect [8]** 9/5 55/2 56/15 68/14 72/4 74/1 99/10 162/25
**respectfully [1]** 53/3
**respects [1]** 71/7
**respond [2]** 128/11 159/6
**RESPONDENT [2]** 3/2
**respondent's [2]** 12/14 73/8 106/22 114/10
**respondents [8]** 1/7 2/2 5/7 5/11 5/13 12/10 14/5 71/8
**response [8]** 28/24 50/2 72/19 73/8 73/19 75/4 75/5 109/13 169/7 169/12
**responsibilities [1]** 16/6
**responsible [1]** 81/9
**responsive [1]** 13/18
**rest [5]** 6/3 75/21 77/10 114/18 125/2
**restore [4]** 90/3 132/20 133/25 135/5
**restored [2]** 131/24 132/3
**restrain [1]** 52/14
**restrictions [1]** 96/19
**result [1]** 114/9
**resulted [1]** 166/10
**resume [1]** 66/22
**resumed [2]** 23/12 57/7
**resumes [1]** 67/10
**retaliate [1]** 68/12
**retaliation [1]** 69/16
**retaliatory [1]** 69/16
**return [2]** 17/19 141/15
**returned [3]** 68/2 93/3 131/24
**returning [2]** 72/9 90/4
**Reuveni [2]** 85/1 97/25
**review [44]** 64/19 69/25 75/2 83/8 86/2 88/23 89/8 95/3 95/12 95/13 95/25 96/9 96/17 103/11 108/12 111/1 118/8 127/8 128/7 130/11 130/17 137/18 137/20 137/21 137/23 141/13 142/15 142/20 143/9 143/22 145/11 147/9 150/23 151/1 163/10 163/14 163/15 163/20 164/11 164/13 164/18 165/1 171/7
**reviewable [3]** 11/10 125/25 128/1
**reviewed [5]** 20/10 21/13 114/24 142/21 151/2
**reviewing [3]** 110/25 116/12 117/8
**revoke [1]** 91/12
**revoked [2]** 89/22 145/13
**Rica [73]** 24/12 24/13 24/15 26/2 26/25 27/1 27/13 28/17 29/1 29/25 41/13 41/20 42/5 43/19 44/19 45/9 45/17 50/22 54/15 54/18 55/17 55/18 56/1 63/13 63/14 63/15 63/17 63/18 64/10 64/12 72/18 78/1 78/3 78/5 78/8 78/11 78/14 78/18 78/21 79/1 79/11 79/17 81/25 82/13 82/14 83/17 94/4 94/13 100/1 122/25 123/5 124/6 124/12 124/18 124/19 124/22 125/9 125/12 126/14 126/18 127/17 128/13 139/10 141/4 161/15 161/19 162/20 163/18 163/19 164/16 165/14 167/7 167/8 167/18 168/3
**right [144]** 6/15 7/4 8/8 10/12 10/12 10/25 21/21 23/24 26/21 28/14 28/22 28/22 30/17 36/6 36/9 37/4 39/5 39/8 39/8 39/10 39/14 39/17 39/22 40/4 40/10 40/12 40/19 42/16 42/24 44/7 44/19 45/10 45/24 46/2 46/10 46/15 46/23 47/12 52/7 52/23 53/15 53/23 57/6 59/5 61/20 63/12 63/22 64/9 64/15 66/13 66/17 66/20 67/11 69/25 71/25 72/4 72/21 74/10 76/19 76/23 77/3 77/13 78/9 78/16 79/9 79/20 80/25 81/7 81/23 82/19 84/6 84/7 84/18 88/24 89/3 89/7 89/10 91/17 91/19 91/23 92/7 93/20 94/8 94/14 96/3 96/12 97/20 100/20 107/3 107/12 108/7 108/8 108/20 108/25 108/25 109/12 109/12 110/13 111/12 112/14 112/21 113/13 113/18 113/18 114/9 114/12 114/22 118/9 120/17 122/13 123/18 123/23 127/23 128/10 131/6 131/7 137/10 140/1 148/25 149/1 149/12 149/19 150/1 150/7 150/10 151/17 153/3 153/4 159/1 159/14 162/18 162/21 164/20 164/24 165/23 167/20 167/24 168/1 170/6 170/24 171/24 172/8
**rightfully [1]** 143/7
**rightly [1]** 110/1
**rights [25]** 8/14 68/9 68/12 72/1 84/20 101/16 112/3 112/4 112/8 112/16 143/4 143/19 143/21 143/23 144/2 144/3 144/10 144/12 145/1 145/25 146/1 146/10 146/14 146/17 163/11 164/2
**rigorous [1]** 110/11
**Riley [2]** 74/6 74/7
**rise [4]** 4/3 67/6 67/9 172/9
**risk [2]** 147/2 163/4
**Road [1]** 1/23
**Rodriguez [1]** 96/21

**R**

role [10] 16/2 17/12 33/14 39/23 45/23 47/14 49/10 49/9 50/1 68/5
roles [2] 16/17 58/5
Roman [1] 106/22
romanette [1] 125/22
room [1] 67/4
ROSSMAN [8] 1/13 4/15 10/9 67/14 67/16 97/5 99/2 150/16
rough [1] 16/18
Roughly [2] 16/5 16/22
round [1] 155/8
RPR [1] 173/16
Rubio's [2] 7/15 7/16
rubric [2] 53/13 159/20
rule [3] 100/12 119/3 137/14
ruling [2] 91/10 138/10
run [2] 112/4 147/1
Russia [2] 159/16 159/17

**S**

sake [2] 28/5 83/22
salad [1] 125/3
Salvador [21] 18/13 22/7 67/23 72/11 73/11 80/12 113/20 113/23 130/22 131/1 131/4 139/8 140/16 141/12 141/14 142/2 142/4 142/6 161/4 162/8 162/14
same [17] 8/4 9/2 10/25 12/1 13/11 13/16 33/23 53/13 87/23 100/8 102/4 103/21 119/5 119/6 148/7 160/5 164/13
sanctity [1] 121/14
SANDOVAL [7] 1/22 4/17 87/23 88/1 88/8 99/2 165/16
SANDOVAL-MOSHENBERG [3] 1/22 4/17 87/23
Santamaria [6] 97/2 100/2 100/5 103/1 103/24 104/23
SASCHA [2] 1/13 4/20
satisfies [3] 118/3 118/11 148/22
saw [2] 21/19 21/19
saying [42] 28/7 31/17 37/23 44/9 55/6 78/8 78/8 79/2 81/9 86/5 91/3 92/20 101/2 101/12 111/24 112/10 112/21 118/7 119/11 123/25 124/11 124/22 124/22 125/1 125/17 129/21 134/3 140/11 147/15 147/6 147/16 147/24 148/2 149/25 150/22 153/8 153/21 156/4 162/12 163/12 164/3 170/21
Scalia [1] 160/7
scenario [3] 121/22 122/21 156/20
schedule [1] 23/19
scheduling [1] 89/8
scheme [1] 164/15
Schultz [5] 168/16 168/17 168/18 168/18 168/19
scope [2] 87/23 133/23
screen [1] 73/10
screening [5] 8/1 8/3 8/4 8/23 160/18
seal [16] 6/1 6/9 6/15 6/20 7/21 7/24 8/17 11/19 12/4 22/11 50/21 55/16 64/22 66/16 124/7 124/8
sealed [13] 6/24 7/8 7/12 7/18 8/5 8/9 8/15 10/14 12/23 13/18 22/14 23/14 50/13
sealing [5] 7/5 8/11 8/20 8/25 11/21
seat [3] 4/7 66/22 67/12
seated [1] 14/20
second [26] 24/1 27/7 45/21 55/25 64/9 69/18 69/22 85/17 86/16 96/8 103/6 104/4 110/5 112/17 121/24 123/24 127/24 137/15 138/6 138/16 138/19 139/17 142/16 142/23 153/14 168/17
second-guess [4] 96/8 137/15 138/16 138/19
second-guessing [1] 138/6
secretary [22] 4/11 7/14 7/15 9/5 25/20 31/1 31/5 32/2 34/5 43/18 44/10 44/25 45/4 45/8 50/18 125/21 125/23 126/7 128/1 167/24 168/6 168/9
section [20] 2/11 91/25 98/6 104/7 106/23 120/11 121/4 128/6 146/22 152/10
Section 1252 [2] 128/6 152/10
Sections [1] 121/8
sector [2] 16/21 16/25
Security [10] 41/18 42/3 47/14 68/22 96/22 102/5 103/15 125/22 128/2 167/24
see [32] 5/18 7/5 7/17 11/9 26/6 26/8 26/11 26/15 27/7 39/3 40/8 45/22 46/4 51/7 52/16 53/10 55/23 64/13 73/21 78/12 87/3 91/4 120/16 120/21 125/1 126/8 138/2 155/9 158/2 163/14 165/14 165/17
seeing [5] 63/14 63/15 69/18 73/1 127/18
seek [10] 17/17 85/22 85/24 86/25 141/4 148/6 148/7 148/12 149/6 154/15
seeking [6] 58/12 83/12 93/2 105/6 146/3 148/8
seeks [1] 96/14
seem [4] 10/4 95/24 120/3 155/17
seems [9] 7/5 115/2 119/17 132/19 135/12 149/14 158/6 164/12 165/1
seen [10] 30/20 64/4 71/2 71/3 71/3 83/21 84/2 85/9 85/10 85/10
select [1] 80/12
selected [1] 27/21
selection [1] 79/23
self [1] 157/8
self-executing [1] 157/8
send [14] 33/13 83/1 130/21 139/8 140/16 159/17 161/3 161/6 161/8 161/18 161/20 162/13 162/19 163/3
sending [5] 82/10 82/13 142/6 153/23 159/15
senior [3] 31/14 36/11 46/4
sense [8] 13/15 13/20 13/21 37/5 141/13 158/1 158/12 158/22
sensitive [9] 8/6 8/25 9/4 11/16 24/11 36/11 37/18 38/17 46/3
sent [11] 33/10 33/12 33/19 33/20 36/2 43/21 131/1 131/4 142/1 161/11 161/11
sentence [7] 26/6 26/8 26/13 26/15 26/19 27/6 45/21
separate [5] 71/20 74/18 74/20 108/12 112/13
separated [1] 67/21
series [1] 83/3
serious [1] 153/4
serve [1] 16/7

serves [2] 32/3 62/3
service [3] 16/18 16/22 16/25
Service-Related [1] 16/20
session [2] 4/4 67/10
set [7] 34/7 35/14 43/24 43/24 47/17 90/14 112/17
seven [4] 66/5 66/7 89/16 97/24
several [2] 26/23 121/19
shade [1] 47/2
shadow [1] 151/16
shakes [1] 155/17
shall [5] 12/3 71/22 71/22 82/2 168/2
sham [1] 50/7
SHANE [2] 2/10 5/12
shape [1] 41/5
shared [4] 10/5 11/10 20/2 33/22
sheer [1] 169/23
sheets [1] 8/23
shift [1] 108/17
short [6] 7/11 64/21 67/3 67/18 77/20 85/20
short-circuit [1] 64/21
shot [1] 74/22
shouldn't [1] 101/5
show [7] 51/4 54/11 54/14 77/22 85/6 126/11 126/22
showing [3] 78/4 167/19 167/20
showings [1] 168/15
shown [5] 18/18 114/8 126/3 126/3 139/2
shows [3] 68/21 68/22 144/15
sic [3] 82/11 166/11 168/13
side [3] 155/22 165/21 171/17
sides [3] 74/14 122/8 171/10
sign [2] 19/11 33/11
signed [2] 21/3 32/14 43/4 43/15
significance [1] 53/2
significant [1] 88/11
similar [4] 104/8 133/16 150/24 152/8
SIMON [2] 1/22 4/17
simple [2] 98/23 110/2
simply [6] 31/13 111/24 121/24 128/14 125/7 137/14
since [17] 16/13 26/23 40/15 45/9 68/8 68/8 72/12 79/18 85/8 85/11 93/2 96/4 101/25 105/18 106/6 109/12 118/19
sinister [1] 146/21
sits [1] 39/7
sitting [12] 31/22 40/21 41/4 44/16 44/20 45/7 47/11 55/5 59/7 59/13 64/15 65/2
situation [10] 41/13 42/4 49/19 53/18 70/20 101/1 110/17 112/16 112/20 120/16
situations [4] 8/20 17/23 131/9 164/6
six [3] 66/5 66/7 79/17
sketch [1] 16/17
slanderous [1] 51/16
slightly [1] 95/23
slower [1] 24/7
slowly [1] 26/22
small [1] 162/22
snap [1] 52/10
so [257]
solely [2] 129/14 130/25
somebody [4] 27/22 33/17 47/15 62/17
somehow [4] 55/19 108/15 127/17 164/1
someone [17] 75/16 79/9 87/10 87/19 119/4 126/7 160/9 162/20 163/4 164/1 165/5 165/6 165/7 165/9 165/12 165/14 166/20
something [17] 9/6 44/9 52/3 76/11 83/20 124/18 124/18 125/8 130/5 133/16 137/6 141/21 143/11 150/3 151/3 153/13 163/20
sometimes [5] 17/15 141/23 141/24 170/20 172/2
somewhat [1] 147/10
somewhere [1] 84/25
son [1] 67/21
sorry [26] 8/12 11/22 12/11 12/12 17/8 20/25 21/22 23/21 25/10 25/19 28/6 31/20 32/18 33/12 41/16 42/1 45/14 59/10 62/14 62/19 63/21 65/4 74/11 101/8 146/2 159/7
sort [13] 7/3 9/22 70/11 71/14 73/2 73/21 74/21 75/6 76/21 92/5 112/11 130/15 145/10
sorted [1] 157/13
sought [2] 72/10 80/4 131/17 148/18
sound [2] 149/21 158/6
sounds [2] 94/12 112/19
source [3] 25/3 25/7 50/4
speak [8] 9/10 14/21 40/25 41/17 42/2 137/25 138/1 166/13
speaking [2] 40/15 131/20
speaks [1] 70/12
special [2] 17/8 17/9
specific [9] 58/24 72/7 95/23 118/1 131/2 140/18 142/2 145/17 153/9
specifically [22] 21/9 48/18 58/8 72/22 78/21 123/18 132/25 133/7 134/11 134/18 139/10 139/16 140/14 140/15 141/19 142/10 143/8 147/13 150/13 154/4 160/8
specifics [1] 124/14
specify [1] 91/22
speculation [1] 44/6
spell [1] 14/22
spend [1] 46/6
spent [5] 38/14 49/1 60/22 77/1 77/1
splitting [5] 100/12 100/14 154/7 154/14 154/17
spoke [2] 32/10 32/12
spoken [1] 40/16
squarely [8] 97/9 97/14 121/18 129/1 129/4 129/6 130/3 130/6
St [1] 96/4
stacking [1] 142/22
staff [1] 171/21
stakes [1] 52/14
stalwarts [1] 171/25
stand [3] 66/25 166/18 171/5
standard [2] 139/21 144/24
standards [1] 8/18
standing [1] 125/15 135/17

stands [3] 15/17 67/7 172/10
starkly [1] 144/16
start [9] 20/18 67/23 92/3 93/13 106/5 133/10 133/11 134/6 148/6
started [2] 58/19 132/23
starting [2] 75/18 112/5
starts [2] 110/16 134/2
state [62] 7/16 9/5 14/22 18/1 18/5 18/8 18/9 19/25 20/2 20/7 20/17 21/5 21/16 22/4 24/4 24/13 24/22 24/24 25/1 25/5 25/14 25/20 25/20 26/3 26/25 27/13 27/24 28/17 29/2 29/13 29/14 29/19 29/23 31/17 31/19 32/9 33/17 34/15 40/7 40/16 43/18 44/10 44/25 45/9 45/16 50/18 50/22 51/2 54/12 55/1 55/2 55/4 55/7 59/15 61/22 121/3 126/2 126/7 128/8 130/11 140/1 140/8
State's [2] 53/12 55/1
statement [2] 95/14 98/23
states [40] 1/1 1/10 4/3 5/9 16/22 20/14 20/16 21/9 21/11 22/25 23/17 23/18 24/5 24/15 27/3 28/19 29/16 29/23 29/25 65/12 68/4 82/9 91/21 93/3 117/3 124/13 125/24 128/4 131/2 142/3 145/5 146/4 149/7 159/22 160/3 165/15 168/9 168/12 173/5 173/11
stating [1] 32/4
Station [2] 2/8 2/12
statistic [1] 132/17
status [31] 16/11 18/11 49/20 63/19 64/11 64/16 90/3 93/14 111/12 122/1 122/7 123/16 124/22 131/24 132/21 133/25 134/1 135/6 136/14 139/11 139/15 141/4 144/8 146/7 146/13 158/16 160/22 160/25 160/7 162/3 162/10 163/3
statute [20] 69/21 75/9 80/19 81/20 86/4 87/17 94/5 104/7 109/7 117/25 143/5 143/7 143/9 145/8 146/15 162/6 163/13 168/4 169/1 169/2
statutes [5] 65/12 75/1 75/17 105/13 153/2
statutorily [2] 83/16 83/25
statutory [6] 82/20 95/4 121/22 125/19 142/4 142/7
stay [17] 8/17 44/7 86/25 132/23 141/5 148/6 148/12 148/18 149/6 152/7 152/14 152/18 152/22 153/11 153/15 161/1 162/21
stayed [5] 53/17 151/17 151/18 152/1 152/14
staying [1] 153/11
stays [1] 134/2
steadfastly [1] 70/24
steep [1] 156/17
stenographically [1] 173/8
stenographically-reported [1] 173/8
STENOTYPED [2] 1/25 2/15
step [3] 56/12 66/21 145/10
steps [1] 123/7
still [21] 78/21 79/2 87/14 94/13 100/18 110/6 120/1 123/17 125/6 127/13 128/13 134/3 135/21 135/23 135/24 136/17 141/16 145/4 154/15 156/13 170/22
stop [4] 85/15 123/24 125/10 139/17
stopped [2] 159/13 159/14 165/6
stops [1] 164/11
story [1] 140/2
straight [2] 70/16
strange [1] 82/13
Street [1] 1/19
streets [1] 67/21
strike [2] 12/5 31/8
strikes [1] 47/15
stringent [1] 90/13
stripping [6] 75/8 101/22 166/2 170/13 170/25 171/6
strong [4] 95/11 95/12 119/17 145/21
strongly [3] 114/19 128/8 156/21
structure [3] 76/24 88/16 164/3
struggle [1] 74/14
struggling [3] 84/23 155/5 155/10
stuck [1] 88/19
stuff [1] 36/13
subject [9] 17/18 68/1 82/11 104/18 122/10 128/8 132/15 138/12 165/22
subjected [1] 110/11
subjects [1] 166/13
submission [1] 98/2
submit [6] 68/16 99/11 100/19 101/19 102/4 105/14
submitted [4] 7/21 7/23 19/7 70/9
Subsection [1] 136/1
subsequently [3] 16/24 48/10 109/25
substance [11] 24/21 24/23 38/8 42/17 44/11 47/14 56/16 76/20 132/22 150/2 169/5
substantive [8] 70/2 84/19 95/25 137/4 149/19 152/2 165/25 168/11
substantive [1] 74/16
substitute [1] 74/16
subsumes [2] 97/20 97/20
success [2] 131/6 153/13
such [10] 70/20 88/20 99/24 110/8 111/19 127/14 137/10 140/19 157/4 168/10
suddenly [1] 136/14
sufficiency [2] 69/3 118/6
sufficient [8] 10/4 74/3 74/7 83/1 107/3 114/25 137/16 140/9
suggested [5] 129/14 130/4 142/19 143/17 169/14
suggesting [1] 149/15
suggestion [1] 142/14
suggests [1] 82/17
Suite [2] 1/20 1/23
SULLIVAN [2] 1/15 1/19
sum [2] 44/11 47/13
summarily [1] 155/13
summarizing [1] 103/10
supplemental [1] 162/5
support [1] 16/7
supports [1] 95/14
suppose [4] 7/3 13/16 94/7 155/15
supposed [5] 71/24 127/5 136/3 149/3 166/6
Supreme [42] 53/16 68/4 74/15 74/22 84/19 95/20 96/20 99/3 100/20 101/17 102/5 103/13 103/14 108/5 108/7 108/14 109/20 109/24 121/9 121/9 121/9 130/8

**S**
Supreme... [20] 132/2 135/8 137/8 139/12 143/3
143/19 144/6 146/4 148/25 149/3 151/16 152/7
146/25 151/15 151/16 152/12 152/19 153/14 160/6
165/13
suspect [2] 156/21 157/5
suspected [1] 54/7
Sustained [5] 28/22 37/25 37/25 60/13 60/16
swallow [1] 137/17
swallows [1] 147/2
swapped [1] 13/7
Swartz [2] 166/11 168/13
Swartz's [1] 82/11
sworn [4] 13/25 14/17 20/20 43/3
system [1] 144/3

**T**
table [19] 5/14 31/22 34/22 69/19 78/19 78/21 79/2
102/16 122/12 124/12 126/9 126/19 128/14 153/24
153/25 157/12 157/21 158/14 162/13
taken [7] 10/8 28/8 67/8 67/22 82/23 140/25 162/25
takes [2] 12/8 142/23
taking [4] 7/4 11/25 117/11 125/16
talk [14] 47/18 57/14 68/17 68/18 71/11 80/21 104/9
106/2 109/13 113/14 126/13 158/18 158/20 163/24
talked [2] 47/20 129/11
talking [10] 56/1 60/22 63/3 87/5 105/8 105/9
109/16 128/19 137/1 150/21
talks [1] 104/6
Tanha [1] 99/17
TDY [5] 48/9 48/12 48/14 57/19 57/20
Teams [19] 32/24 32/25 33/3 33/5 33/8 33/20 33/22
33/24 34/1 40/2 44/4 44/8 45/25 60/8 60/22 62/6
62/7 62/9 62/25
tee [1] 104/20
teeth [1] 143/16
tell [11] 11/8 42/11 43/17 44/16 45/7 68/24 78/12
91/24 106/18 106/19 120/2
telling [4] 55/13 85/1 97/24 162/3
temporarily [3] 58/14 58/15 58/17
temporary [20] 48/13 59/4 139/4 139/4 139/6 140/20
141/2 141/6 141/8 141/11 141/17 141/20 141/21
141/25 142/5 160/4 160/24 161/6 162/16 162/16
ten [1] 112/24
Tennessee [1] 90/14
term [1] 116/23
terminated [1] 49/18
termination [1] 51/15
terms [14] 6/3 49/24 49/25 69/3 74/14 77/14 78/17
83/11 97/1 126/24 128/24 141/9 162/3 166/12
terrorist [1] 67/25
test [1] 163/22
testified [2] 14/17 30/13
testimony [15] 3/3 6/7 6/8 6/9 12/10 15/18 15/24
40/20 47/25 63/10 66/21 82/11 123/20 167/22 168/13
Texas [1] 16/23
text [2] 73/14 73/15
Thanks [3] 32/7 37/6 136/20
themselves [2] 24/18 160/14
theory [4] 52/18 53/5 95/16 145/4
thereafter [1] 90/6
therefore [4] 111/1 115/5 128/5 156/24
thereof [1] 36/16
they'll [3] 87/1 97/23 141/7
they're [28] 6/22 6/23 8/6 8/20 8/21 20/15 34/17
34/18 71/20 99/18 101/4 102/20 102/20 108/17
122/12 139/6 139/6 139/8 142/18 143/11 148/8 151/1
151/7 151/13 155/12 162/12 164/3 172/3
they've [6] 69/20 73/4 108/17 121/24 139/3 148/3
thing [16] 50/13 70/15 70/18 88/19 97/4 100/8
103/21 107/15 115/3 117/10 118/10 119/3 122/17
123/1 135/10 142/18
things [13] 14/11 33/7 46/13 47/17 71/20 92/19
115/14 138/5 139/2 153/10 155/10 157/10 159/2
think [189]
thinking [6] 12/24 84/7 86/12 87/2 94/10 94/10
third [51] 8/1 8/3 8/23 17/16 17/17 17/24 17/25
18/3 18/7 20/15 53/12 69/24 71/17 71/19 71/21 72/5
72/14 72/16 72/20 84/1 95/3 96/14 99/23 100/7
102/21 103/2 103/20 104/1 104/25 110/6 110/8
118/16 119/18 120/4 120/23 120/24 122/15 126/21
140/23 140/23 140/25 141/20 143/10 150/4 155/3
155/16 162/24 167/8 167/25 168/6 169/25
third-country [26] 8/1 8/3 8/23 17/17 18/7 20/15
53/12 71/17 71/19 71/21 99/23 100/7 102/21 103/2
103/20 104/25 119/18 120/4 120/23 140/23 140/23
140/25 141/20 143/10 155/16 167/25
third-party [1] 104/1
though [9] 76/10 79/14 95/22 97/18 98/12 125/13
131/5 131/13 167/13
thought [17] 11/9 32/4 37/14 37/23 79/16 83/14
100/18 107/2 109/15 115/2 129/24 130/15 150/22
152/12 152/22 152/25 162/3
thousands [2] 123/6 137/24
threatened [1] 114/10
three [28] 8/5 16/5 61/3 61/6 61/14 62/6 68/2
69/14 70/2 83/23 84/12 84/13 85/21 94/4 102/10
102/11 106/13 106/19 108/4 108/17 127/4 129/3
130/10 160/5 164/19 166/5 166/6 169/16
three-minute [2] 61/3 62/6
threshold [1] 139/21
through [12] 38/15 46/12 46/19 97/3 111/1 116/7
124/16 135/20 150/14 150/20 152/6 166/9
throughout [1] 16/8
throwing [1] 147/19
thrown [1] 90/22
Thuraisaigiam [3] 143/3 143/13 145/21
THURSDAY [1] 1/10
thus [1] 145/6
ties [4] 123/9 123/9 132/6 146/6
till [1] 84/21
time [37] 27/2 33/23 42/1 46/6 49/6 57/7 57/15

59/18 59/23 60/21 60/22 65/10 68/8 68/8 73/4 77/21
77/22 79/1 79/17 79/19 87/20 92/13 93/21 95/20
time-barred [1] 79/19
timelines [1] 16/18
timeliness [4] 74/21 108/12 149/19 167/3
timely [2] 79/24 167/8
times [3] 107/5 150/17 157/18
timing [1] 9/9
tip [1] 165/17
tipping [1] 164/20
title [1] 60/5
titles [1] 7/11
today [37] 5/19 5/24 6/3 8/16 9/9 9/21 11/18 28/7
40/20 40/25 41/4 41/17 42/2 44/16 45/7 47/10 47/11
57/16 63/10 64/15 65/2 67/18 70/8 78/6 78/12 80/6
83/17 120/22 121/17 123/16 123/20 124/9 126/17
126/23 142/19 150/17 167/10
today's [1] 6/16
told [1] 19/25 25/22 29/19 29/23 31/24 33/7 33/19
43/20 53/8 59/25 97/25 126/6
tomorrow [1] 122/25
took [4] 69/1 107/16 126/6 166/6
top [5] 12/14 63/21 64/20 81/14 142/23
torture [13] 20/18 21/1 22/6 74/2 74/8 104/11
114/13 130/21 130/25 138/7 138/15 140/7 140/13
tortured [3] 130/22 131/3 138/12
total [1] 12/8
totally [2] 51/9 159/22
touch [2] 45/16 70/8
touches [1] 95/19
touching [1] 104/19
tour [1] 17/7
Townsley [1] 130/7
track [1] 128/16
trained [1] 127/15
transcript [4] 1/9 23/14 173/7 173/9
TRANSCRIPTION [2] 1/25 2/15
transcripts [1] 166/8
transfer [5] 2/4 24/21 64/11 138/11 138/14
transferred [2] 90/7 154/10
transport [1] 160/12
travel [3] 139/13 160/25 161/7
treat [1] 87/18
treated [3] 20/15 21/10 160/13
treatment [4] 68/18 68/19 69/16 165/9
tricky [1] 90/9
tried [1] 74/19
tries [1] 108/8
trigger [1] 133/18
triggered [2] 143/21 143/23
triple [3] 50/12 54/20 79/3
troubling [1] 127/8
true [2] 77/25 173/7
trustworthy [1] 50/24
try [7] 25/11 67/18 72/13 72/19 141/4 161/19
169/10
trying [10] 31/12 64/21 79/25 82/16 87/18 119/14
143/11 151/13 160/12 166/25
Tucson [1] 16/25
turn [15] 6/12 7/3 24/1 74/1 77/11 123/14 128/11
128/19 131/5 131/6 141/14 154/23 157/17 157/23
turned [2] 95/16 165/10
turns [1] 141/15
two [25] 45/24 45/25 47/16 52/24 53/24 61/3 61/6
61/14 62/6 68/3 74/18 95/9 99/14 102/11 106/19
107/5 108/4 110/1 116/21 139/10 147/7 150/17
153/10 155/3 165/2
types [1] 97/1
typo [1] 114/19

**U**
U.S [12] 15/9 15/9 16/21 16/25 24/4 25/20 27/24
40/7 45/8 144/23 169/20 170/1
U.S.'s [1] 28/25
U.S.C [4] 94/25 95/6 104/8 173/6
Ulander [3] 4/8 13/6 14/13
ultimate [1] 25/3
ultimately [1] 9/22 91/10 141/22
unadmitted [1] 143/3
unanswered [1] 161/5
unconstitutional [1] 164/14
under [56] 6/9 6/19 7/21 7/23 8/17 9/22 11/19
11/25 17/15 22/11 50/20 53/13 53/14 55/15 65/11
66/16 79/18 86/7 87/10 87/16 87/16 87/16 88/17
90/12 90/13 91/25 105/9 105/12 105/12 117/2 117/21
118/18 118/21 120/2 121/4 121/25 122/3 122/19
124/7 124/8 125/25 128/5 129/16 137/4 140/7 143/3
143/13 143/18 143/19 151/12 159/19 160/11 161/19
162/5 163/13 163/13
under-seal [2] 6/9 11/19
undercut [1] 121/14
underlie [1] 69/13
underlying [6] 51/19 92/5 104/2 124/9 126/8 126/11
understand [35] 8/12 15/19 15/25 25/9 37/14 38/7
41/15 41/17 41/21 41/25 42/2 42/6 47/9 57/16 58/16
59/9 61/12 61/13 79/18 89/25 91/19 112/11 123/25
124/25 127/13 131/22 132/24 141/9 145/9 147/15
149/11 151/10 154/18 164/4
understandably [1] 147/6
understanding [21] 20/13 20/22 21/4 21/6 21/8 21/22
22/2 22/4 25/3 38/20 46/14 57/13 57/18 58/21 59/6
134/1 141/16 156/8 157/11 161/24 165/8
understandings [6] 24/17 26/7 26/9 26/12 36/14
38/19
understood [9] 8/14 32/5 52/5 61/6 62/18 96/6
114/1 133/17 146/18
undone [1] 122/25
unfairly [1] 146/21
unforeseen [1] 5/22
unfortunately [2] 154/2 155/25

unique [3] 99/24 100/6 100/22
unitary [1] 34/20
UNITE... [38] 16/22 20/14 20/16
21/7 24/5 24/15 27/3 28/19
29/16 29/23 29/25 65/12 68/4 82/9 91/21 93/3 117/3
124/13 125/24 128/4 131/2 142/3 145/5 146/3 159/22
160/3 160/15 168/9 168/12 173/3 173/11
universe [1] 147/11
University [3] 96/22 102/6 103/15
unlawful [2] 145/25 160/4
unless [9] 73/22 86/1 88/13 108/25 154/20 155/1
155/20 163/3 169/4
unlike [1] 139/10
unnamed [1] 162/19
unpack [2] 77/9 77/10
unredacted [6] 6/21 10/1 12/6 13/7 13/7 13/8
unrelenting [2] 68/10 68/11
unseal [1] 11/9
unsealed [7] 6/24 7/19 12/3 12/13 12/18 12/21
14/10
unsealing [2] 11/23 12/24
until [14] 16/19 39/14 47/22 49/4 50/13 86/1 88/23
89/3 94/7 129/5 130/2 155/15 157/19 158/15
untimely [1] 128/3
unwilling [2] 82/5 166/15
up [34] 6/3 6/8 7/10 9/9 12/9 13/14 48/9 53/14
53/15 54/21 74/24 86/25 89/5 90/22 92/10 92/17
98/20 104/21 105/23 106/11 109/16 110/25 118/4
128/17 133/3 136/14 137/18 147/2 150/10 150/19
154/24 159/10 164/7 169/16
upon [5] 30/16 31/4 49/25 64/11 84/13
ups [1] 52/19
upshot [1] 122/20
URQUHART [2] 1/15 1/19
USCIS [2] 82/24 143/9
USCIS's [1] 142/15
use [5] 74/19 92/1 96/14 134/24 135/15
used [3] 44/24 78/20 99/6
useful [1] 142/12
uses [5] 26/15 27/7 109/24 133/3 168/4
using [1] 7/4
usually [1] 113/14
utter [1] 78/5

**V**
VA [1] 1/23
valid [13] 77/23 83/16 83/16 83/25 89/21 91/11
92/3 119/19 120/5 120/19 121/13 155/15 155/16
validity [7] 70/21 76/13 91/1 115/21 116/12 118/6
156/12
value [1] 79/4
variety [1] 129/9
various [3] 46/13 102/3 143/17
venue [2] 135/25 136/16
verbal [1] 25/23
verbatim [6] 35/13 36/1 36/12 36/12 42/23 44/1
verbiage [8] 33/20 34/2 34/8 35/9 35/9 35/13 35/14
36/6
version [3] 10/1 12/6 13/20
versus [1] 76/12
very [52] 6/22 6/22 7/25 10/8 10/20 14/8 14/11
14/11 32/7 35/5 38/23 39/15 47/3 56/21 67/18 70/19
77/20 78/12 87/9 94/11 99/3 99/15 105/16 107/20
110/8 114/6 114/6 114/7 119/7 132/16 132/17
134/1 136/9 139/10 141/1 144/2 145/15 147/5
148/4 148/7 151/22 151/24 152/8 152/17 153/4
156/17 156/17 156/17 156/21 159/1 162/1
vests [1] 117/2
via [3] 23/20 33/19 60/8
viability [2] 20/3 29/24
vier [7] 10/1 71/13 108/15 109/14 140/7 162/9
167/10
viewed [1] 13/12
views [1] 53/1
vintage [1] 159/12
violate [2] 96/16 101/15
violated [1] 152/9
violates [2] 69/16 83/2
violation [8] 69/22 69/22 75/15 75/16 77/5 77/6
169/1 169/2
vis [4] 42/5 42/5 134/17 134/17
vitality [1] 87/4
void [1] 95/15
vs [1] 1/5

**W**
wait [6] 34/14 34/14 34/14 117/1 117/1 117/1
walk [4] 46/12 46/19 97/3 152/6
walking [1] 38/14
want [42] 5/22 8/11 9/8 12/19 38/12 53/11 53/24
54/11 54/14 55/14 55/15 56/3 60/15 60/20 60/24
65/3 69/12 75/19 75/21 77/8 77/9 77/14 78/1 79/8
86/11 87/22 93/11 93/15 107/8 107/13 109/13 123/24
124/9 126/18 126/21 132/24 141/4 154/23 155/6
159/2 169/6 171/20
wanted [12] 7/6 34/3 37/14 37/17 54/6 54/6 88/3
90/7 156/3 156/25 169/12 171/2
wanting [1] 141/15
wants [3] 75/22 94/12 166/20
war [1] 159/17
warranted [2] 7/6 86/8
wartime [1] 159/18
was [250]
Washington [6] 1/20 2/5 2/9 2/13 78/13 100/5
wasn't [9] 44/15 45/2 74/2 110/11 124/24 134/3
145/13 166/19 170/21
way [30] 8/24 12/10 37/11 38/19 38/23 43/4 51/18
51/20 52/10 63/2 65/2 78/17 84/6 85/18 85/20
87/2 88/16 94/4 99/6 113/2 115/14 125/15 127/14
132/1 141/2 143/14 150/19 152/15 172/5
ways [3] 84/22 116/21 133/15
we'd [1] 140/3
we'll [21] 6/6 6/7 6/7 6/10 9/21 46/19 50/23 51/7

## W

**we'll...** [13]   55/16 55/23 57/4 64/25 77/13 96/10
110/23 127/20 136/24 137/2 138/15 152/7 167/17
**week** [4]   39/25 48/16 48/25 49/1
**weeks** [4]   16/5 47/16 87/8 129/11
**weigh** [2]   55/12 165/15
**weighed** [1]   164/24
**weighing** [1]   164/19
**weight** [1]   165/18
**weighty** [1]   171/13
**weird** [3]   44/5 120/8 120/16
**welcome** [2]   5/21 139/7
**well** [79]   6/8 7/3 7/5 10/8 10/24 26/22 31/7 34/4
34/21 35/21 36/16 37/22 38/22 43/10 44/1 45/12
45/24 48/2 51/6 53/17 56/11 56/17 58/11 61/8 67/22
72/12 72/18 73/2 73/20 74/20 74/24 75/23 77/10
78/7 82/21 84/8 84/15 85/22 88/18 89/6 89/16 90/2
97/5 101/21 102/16 105/3 108/16 109/11 110/22
115/8 120/7 120/13 123/21 127/15 128/10 133/20
135/3 136/22 138/23 143/20 145/19 146/1 147/25
148/14 149/15 149/20 154/19 157/9 157/18 159/25
161/14 162/11 162/12 163/6 163/17 163/24 170/22
171/4 171/8
**well-trained** [1]   127/15
**Wendell** [1]   159/11
**went** [4]   82/14 98/20 130/13 166/9
**Western** [1]   100/4
**Westlaw** [1]   88/7
**whatever** [5]   78/22 141/25 142/5 157/19 163/15
**whatsoever** [5]   38/5 39/10 44/14 89/12 123/9
**whenever** [1]   121/17
**wherever** [2]   128/17 163/3
**whether** [47]   9/25 21/4 41/11 41/11 44/16 45/7
45/16 49/7 50/24 55/2 56/17 56/17 61/19 64/16 69/5
76/11 77/8 81/18 84/24 85/13 87/10 90/17 96/1 96/1
97/6 107/11 111/6 115/16 115/17 115/18 119/22
122/9 122/9 128/12 128/13 134/25 141/13 141/14
155/16 160/3 162/6 162/7 163/15 163/16 169/15
170/14 170/24
**while** [3]   86/17 135/1 162/6
**who's** [6]   55/5 105/23 135/11 138/25 160/16 165/6
**whole** [4]   96/3 101/11 140/2 143/11
**wholeheartedly** [2]   81/11 81/13
**whose** [2]   7/9 139/9
**Wilkinson** [2]   109/11 110/15
**willing** [6]   29/14 79/12 92/5 92/9 110/6 166/17
**willingness** [1]   24/14
**willy** [1]   9/7
**willy-nilly** [1]   9/7
**win** [1]   138/25
**window** [1]   56/15
**winner** [1]   168/25
**wise** [1]   109/12
**wish** [1]   34/23
**wished** [1]   94/6
**withdraw** [1]   35/2
**withdrawn** [3]   59/12 59/24 96/17
**withheld** [1]   110/3
**withhold** [1]   110/2
**withholding** [38]   18/13 70/21 71/3 72/12 73/3 73/17
73/22 74/20 80/3 85/3 92/12 97/19 98/3 99/5 108/6
108/15 108/21 108/25 109/9 109/22 110/6 110/10
110/19 111/25 112/1 112/2 112/15 113/2 113/5
113/22 113/24 119/23 122/10 127/17 140/6 142/4
142/7 162/24
**withholding-only** [1]   113/5
**within** [13]   60/6 62/15 83/22 97/20 116/24 116/25
119/7 125/22 129/1 129/4 129/7 130/3 160/2
**without** [16]   9/10 9/12 27/2 28/9 28/18 29/15 52/4
75/16 81/14 81/16 81/16 95/3 121/13 122/19 161/6
161/7
**witness** [23]   42/18 46/24 47/6 49/17 49/24 50/14
50/25 51/8 52/4 52/6 52/10 55/11 64/2 66/12 66/25
79/7 79/8 80/6 124/8 126/25 127/3 127/6 168/17
**witnesses** [6]   3/2 54/7 127/5 166/7 166/12 168/22
**won** [1]   93/25
**won't** [8]   51/11 70/8 140/24 150/5 158/18 162/13
167/19 168/7
**wonderful** [3]   172/1 172/1 172/7
**word** [9]   26/9 26/15 52/11 59/2 105/19 125/3 126/6
154/24 168/4
**words** [19]   13/8 26/6 26/9 27/7 27/21 27/21 27/22
28/8 38/15 44/20 46/13 50/15 71/17 106/17 109/12
127/6 137/22 139/25 156/16
**work** [14]   10/3 10/22 15/15 18/1 18/9 28/9 34/11
34/16 126/3 126/3 126/11 126/20 135/19 160/17
**worked** [2]   16/12 160/16
**working** [2]   16/14 135/23
**workload** [1]   134/14
**works** [2]   144/16 145/2
**worksheet** [1]   8/2
**worksheets** [1]   8/23
**world** [1]   65/23
**worry** [2]   136/13 162/10
**worst** [2]   127/4 127/4
**wouldn't** [9]   13/12 112/8 112/15 113/2 121/22
127/21 130/18 161/9 161/10
**wrestle** [1]   119/15
**wrestling** [2]   122/6 122/17
**wrinkle** [1]   84/15
**writ** [2]   87/14 89/12
**write** [4]   27/16 27/16 27/18 35/25
**written** [2]   24/13 160/6
**wrong** [7]   73/15 73/15 114/15 149/4 149/9 150/4
150/8
**wrongfully** [3]   132/1 135/9 149/7
**wrote** [4]   34/5 35/21 114/7 161/16

## X

**XINIS** [2]   1/9 4/5

## Y

**yarn** [1]   53/20

**yeah** [20]   10/20 12/11 18/24 36/5 36/10 38/22 39/21
49/17 57/1 57/4 57/5 63/16 65/17 90/20 94/21
119/17 120/13 120/18 168/14 169/23
**year** [3]   15/7 37/21 168/13
**years** [7]   30/16 79/17 142/23 144/22 145/3 159/24
160/5
**Yep** [2]   22/11 165/20
**yes** [76]   4/9 11/2 11/4 13/21 15/21 16/2 16/16
18/19 19/5 19/10 19/12 19/14 20/5 20/12 20/23
21/17 24/20 25/17 26/11 26/17 27/5 27/9 27/18 28/2
28/3 28/4 28/6 29/10 29/18 30/15 31/23 31/25 32/11
43/16 44/13 45/23 46/5 50/11 57/10 59/1 60/10 63/8
63/11 64/6 64/8 65/15 65/24 70/14 73/7 73/16 74/17
76/8 78/22 81/3 85/7 89/2 90/15 93/1 105/24 107/9
112/1 129/9 135/7 136/25 140/14 148/13 170/19
**yesterday** [1]   6/18
**yet** [9]   51/4 89/16 89/22 93/6 105/18 117/14 126/19
159/20 162/19
**yet-unnamed** [1]   162/19
**York** [1]   1/16
**you'd** [2]   61/19 133/10
**you'll** [4]   58/16 78/19 94/7 166/4
**young** [3]   2/10 5/12 67/21
**yourselves** [1]   4/13

## Z

**Zadvydas** [27]   70/9 70/11 76/7 76/21 86/7 88/10
88/17 103/6 105/9 118/18 119/9 120/2 120/11 120/22
121/3 121/9 121/18 121/20 122/14 124/8 129/8
129/10 147/16 153/19 155/11 159/24 160/8
**zero** [6]   46/24 50/25 54/18 79/4 167/10 168/10
**zipper** [5]   116/6 117/13 117/18 147/12 147/24

## Ö

**Öztürk** [2]   103/6 104/4