**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>KILMAR ARMANDO<br>ABREGO GARCIA,</td><td>*</td><td></td></tr>
<tr><td><em>Petitioner,</em></td><td>*</td><td></td></tr>
<tr><td></td><td></td><td>Civil Action No. 8:25-cv-02780-PX</td></tr>
<tr><td>v.</td><td>*</td><td></td></tr>
<tr><td>KRISTI NOEM, <em>et al.</em>,<br><em>Respondents.</em></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td></td><td>***</td><td></td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Kilmar Armando Abrego Garcia ("Abrego Garcia") petitions this Court for a writ of habeas corpus to release him from the custody of Respondents, Secretary of the Department of Homeland Security ("DHS") Kristi Noem, United States Immigration and Customs Enforcement ("ICE") Director Todd Lyons, ICE Baltimore Field Office Director Nikita Baker, and Attorney General Pamela Bondi. ECF No. 1. Since Abrego Garcia's return from wrongful detention in El Salvador, he has been re-detained, again without lawful authority. *Id.* For this reason, the Court will GRANT Abrego Garcia's Petition for immediate release from ICE custody.

### I.    Background

The history of Abrego Garcia's case is as well known as it is extraordinary. The Court will not recite all of it here, but only those events necessary to explain why Abrego Garcia is entitled to immediate release.

1

Abrego Garcia is a national of El Salvador.  At sixteen years old, in 2012, he came to the United States as a noncitizen[1] to avoid persecution by the notorious gang, Barrio 18.  ECF No. 1-1 at 4; *Abrego Garcia v. Noem,* 8:25-cv-00951-PX ("*Abrego I*"), ECF No. 31 at 2–3 (D. Md. 2025).  For many years thereafter, he lived and worked in Maryland.  *Abrego I*, ECF No. 31 at 3.  But in 2019, after a brief encounter with Prince George's County police, ICE took custody of Abrego Garcia and commenced removal proceedings to El Salvador.[2]  *Id*. at 3–4.

Abrego Garcia, in turn, asked an Immigration Judge ("IJ") for three kinds of relief from removal: (1) withholding of removal under the Convention Against Torture ("CAT") 8 C.F.R. § 1208.16, (2) statutory withholding of removal provided in 8 U.S.C. § 1231(b)(3), and (3) asylum.  ECF No. 1-1.  Statutory withholding of removal shields a noncitizen from removal to a particular country if he demonstrates that more likely than not, his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  Like statutory withholding, CAT withholding shields a noncitizen from being removed to a country if the noncitizen demonstrates that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).  Asylum is a legal protection granted to a noncitizen "who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group."  8. U.S.C. § 1101(a)(42).  *See also* 8 U.S.C. § 1158(b)(1)(A).

---

[1] This opinion uses the term "noncitizen" as equivalent to the statutory term "alien," in keeping with recent preferred nomenclature.  *Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023) (collecting cases).  *See Barton v. Barr*, 590 U.S. 222, 254 n.2 (2020) (Kavanaugh, J., concurring) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3)).  *See, e.g., United States v. Palomar-Santiago*, 593 U.S. 321 (2021); *Patel v. Garland*, 596 U.S. 328 (2022).

[2] Abrego Garcia's arrest did not result in criminal charges.  *Abrego I*, ECF No. 31 at 4.

After an evidentiary hearing at which Abrego Garcia testified and was found credible, the IJ granted him statutory withholding of removal and denied the remaining requests.  ECF No. 1-1 at 15.  The IJ memorialized this determination in a written "memorandum of decision and order" dated October 10, 2019 (the "October 10 withholding decision" or "withholding decision").  *Id.*

The October 10 withholding decision referenced as "procedural history" Abrego Garcia's concession at a prior hearing that he was an El Salvadoran national who entered the United States without lawful permission, and that an IJ "found his removability to be established by clear and convincing evidence."  ECF No. 1-1 at 3.  But nothing suggests the IJ ordered Abrego Garcia removed to El Salvador.  In fact, the withholding decision twice erroneously suggested that the stated country of removal from which Abrego Garcia sought relief was Guatemala.  *Id.* at 9 ("DHS has failed to carry their burden to show that there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened . . . ."); *id.* at 14 ("DHS has not shown there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable under the circumstances.").

The withholding decision also included a separate "order" that did not command Abrego Garcia's removal to El Salvador or anywhere else.  *Id.*  The order reads in its entirety:

**ORDER**

It is hereby ordered that:

I.     the Respondent's application for asylum pursuant to INA[3] § 208 is **DENIED**;

II.    the Respondent's application for withholding of removal pursuant to INA § 241(b)(3) is **GRANTED**; and

---

[3] The Immigration and Nationality Act, § 101 *et seq.*, 8 U.S.C. § 1101 *et seq.*

III.   the Respondent's application for withholding of removal under the Convention Against Torture is **DENIED**.

ECF No. 1-1 at 15 (dated and signed by IJ).

For the next six years, Abrego Garcia lived and worked in Maryland subject to an ICE order of supervision.  *Abrego Garcia I*, ECF No. 1-3.  *See also* ECF No. 32-10 (employment authorization identification card); ECF No. 33 (order of supervision).  But on March 12, 2025, while driving with his son in the car, ICE agents pulled over Abrego Garcia and arrested him.  *Abrego I*, ECF No. 31 at 4.  Three days later, Respondents forcibly expelled him, along with 252 Venezuelan and Salvadoran nationals, to El Salvador where they were detained in the Terrorism Confinement Center ("CECOT").  *See* Nicholas Riccardi and Regina Garcia Cano, *Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped*, AP NEWS (Mar. 17, 2025), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.  While at CECOT, the men, including Abrego Garcia, were systematically beaten and tortured.  *See "You Have Arrived in Hell," Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison,* HUMAN RIGHTS WATCH (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el.  *See also Abrego I*, ECF No. 211-3 ¶ 116.

In response, on March 24, 2025, Abrego Garcia filed suit in this Court and separately moved for an injunction directing Respondents to secure his immediate release from CECOT and his return to the United States.  *Abrego I*, ECF Nos. 1 & 2.  On April 4, 2025, the Court granted such relief, ordering Respondents[4] to "facilitate and effectuate" his return to the United States.  *Abrego I*, ECF No. 21 at 2.  Respondents appealed, and within days, the United States Court of

---

[4] Respondents were also Defendants in *Abrego I*, along with the Department of State and Secretary Marco Rubio.  *Abrego I*, ECF No. 31.  The same legal team represents Respondents and Defendants in both actions.

Appeals for the Fourth Circuit and the Supreme Court affirmed the order as modified to command facilitation of Abrego Garcia's return "to ensure that his case is handled as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025); *see also Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025).

In the ensuing weeks, Respondents refused to facilitate Abrego Garcia's release or his return.[5]  However on June 6, 2025, Respondents paroled[6] Abrego Garcia to the United States after securing a federal indictment in the Middle District of Tennessee, a matter that is itself under scrutiny for vindictive and selective prosecution.  *See United States v. Abrego Garcia,* 3:25-cr-00115-1 (M.D. Tenn.) ("*Tennessee Criminal Matter*"), ECF Nos. 3 & 104.

Once in criminal custody, and after several hearings, Abrego Garcia was released on stringent conditions of supervision.  *See Tennessee Criminal Matter*, ECF Nos. 43, 44, 55, 95 & 96.  But Respondents found this result intolerable and complained bitterly.[7]  Respondents also

---

[5] *See Abrego I*, ECF No. 211-16 (April 18, 2025, White House post announcing Abrego Garcia "is NOT coming back," and "is never coming back" from El Salvador) (emphasis in original); *Abrego I*, ECF No. 211-17 at 13 (April 25, 2025, Time Magazine interview with President Trump wherein he confirmed he has not asked the President of El Salvador to release and return Abrego Garcia); *Abrego I*, ECF No. 211-19 at 2 (May 2, 2025, DHS post confirming Abrego Garcia "will never be allowed to return to the United States").  *See also* Karina Tsui, *Trump says he 'could' bring Abrego Garcia back from El Salvador, but won't*, CNN (May 1, 2025), https://www.cnn.com/2025/04/30/us/trump-could-bring-abrego-garcia-back-us-hnk.

[6] When Respondents returned Abrego Garcia, they granted him significant public benefit parole pursuant to 8 C.F.R. § 212.5, which remains valid through June 4, 2026.  ECF No. 1 ¶ 34; ECF No. 6 at 2.  Notably, such parole is conferred "for urgent humanitarian reasons or significant public benefit" to a noncitizen "applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).  *See also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018); USCIS website defining "Humanitarian or Significant Public Benefit Parole", as permission for "an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be paroled into the United States for a temporary period." *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States*, U.S. CITIZENSHIP AND IMMIGR. SERV., https://www.uscis.gov/humanitarian/humanitarian_parole (last visited Dec. 10, 2025).  Less clear is how it could ever apply to a noncitizen with a final order of removal.  *See* discussion *infra* Sections IV. A–B.

[7] *See, e.g., Tennessee Criminal Matter*, ECF No. 98 at 2 (quoting DHS on X); DHS (@DHSgov), X, *This is a LAWLESS judge.  This MS-13 gang member, human trafficker and illegal alien will never walk America's streets again.* (July 23, 2025, at 4:32 ET), https://x.com/DHSgov/status/1948119106785362028; Gary Grumbach & Matt Lavietes, *Judge pauses Kilmar Abrego Garcia's release from federal custody,* NBC (July 23, 2025), https://www.nbcnews.com/news/us-news/judge-orders-kilmar-abrego-garcia-released-federalcustody-rcna217953 (DHS spokesperson, Tricia McLaughlin, stating "It will be a cold day in hell before this criminal illegal alien is back

warned Abrego Garcia that upon his release, ICE would take him into its custody to effectuate his removal to a country other than El Salvador.  *See Abrego I*, ECF No. 203 at 1; ECF No. 210 at 10.

Abrego Garcia, in response, urged the Court to order his return to Maryland under the ICE supervision terms that were in effect prior to his wrongful removal.  *Abrego I*, ECF No. 210 at 10. The Court agreed and ordered Abrego Garcia's release and return to ICE supervision out of the Baltimore Field Office.  *Abrego I*, ECF No. 239.  The Court also ordered that in the event Respondents initiated third-country removal proceedings, they give Abrego Garcia 72 hours' notice of the intended third country.  *Id*.

Meanwhile, during plea negotiations in the criminal case, Costa Rica offered to grant Abrego Garcia residency as a refugee.  ECF No. 1-3; ECF No. 1-7; *Tennessee Criminal Matter*, ECF No. 114-1.  Official correspondence dated August 21, 2025, from Costa Rica's Minister of Public Security Mario E. Zamora Cordero ("Zamora Cordero"), confirmed:

> The Government of Costa Rica intends to provide refugee status or residency to Mr. Abrego Garcia upon his transfer to Costa Rica. The Government of Costa Rica assures the Government of the United States of America that, consistent with that lawful immigration status and Costa Rican law, it does not intend to detain Mr. Abrego Garcia upon his arrival in Costa Rica.
>
> The Government of Costa Rica further assures the Government of the United States of America that it will not remove Mr. Abrego Garcia to any third country, including Mr. Abrego Garcia's home country, without Mr. Abrego Garcia's consent.

ECF No. 1-3.

---

on American streets."); U.S. DEP'T OF HOMELAND SEC., *Secretary Noem to Host Press Conference Exposing "Worst of the Worst" Criminal Illegal Aliens in TN*, at 14:26–14:50 (YouTube, July 18, 2025), https://www.youtube.com/watch?v=6J0-YouvMGo.  *See also* Tricia McLaughlin (@TriciaOhio), X, *Kilmar Abrego Garcia is a dangerous criminal illegal alien. We have said it for months and it remains true to this day: he will never go free on American soil*.  (June 22, 2025, 7:31 ET),  https://x.com/TriciaOhio/status/1936929967423754665; NEWSMAX, *Abrego Garcia Won't Be on U.S. Soil Much Longer: Tricia McLaughlin,* at 4:10–5:00 (YouTube, June 27, 2025), https://www.youtube.com/watch?v=tqOiNZ8jD58 ("[T]his is a man who should not be on U.S. soil for long and won't be.").

The next day, on August 22, 2025, as Abrego Garcia left the detention center in Tennessee, Respondents served him with a Notice to Appear to the Baltimore ICE Field Office the following Monday.  ECF No. 1-4.  Respondents separately notified his counsel that they intended to remove Abrego Garcia to Uganda.  ECF No. 1-5.  Abrego Garcia immediately responded with written notice to Respondents of his fear that if sent to Uganda, he would face persecution, torture and ultimate refoulment to El Salvador.  ECF No. 1 ¶ 41; ECF No. 1-6.  He also separately notified Respondents in writing that Costa Rica was "the country to which I want to be removed."  ECF No. 1-7.

Abrego Garcia next appeared at the Baltimore ICE Field Office as directed on August 25, 2025.  ECF No. 6 at 2.  He was immediately taken into ICE custody, and according to DHS Secretary Noem, he was "being processed for removal to Uganda" instead of Costa Rica.  ECF No. 32-14 at 2.

Abrego Garcia, in turn, filed the Petition pursuant to 28 U.S.C. § 2241, contending that his removal to Uganda violates 8 U.S.C. § 1231(b)(2) and (b)(3) of the INA; that Respondents' third-country removal policy deprives him of procedural and substantive due process; and that his detention is without lawful authority in the absence of a valid removal order.  ECF No. 1.  The Petition also challenged the constitutionality of Abrego Garica's continued detention pursuant to 8 U.S.C. § 1231(a)(6) under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because "[n]o significant likelihood of removal in the reasonably foreseeable future exists," thereby undercutting any claim that he was being detained for the purpose of third-country removal.  ECF No. 1 ¶¶ 51–57 ("the *Zadvydas* claim").  The Court set a briefing schedule on the Petition and an evidentiary hearing for October 6, 2025.  ECF No. 20.

In the days that followed, Respondents took no steps to "process" Abrego Garcia for removal to Uganda, ostensibly because of his claimed fear of persecution and torture in that country.  ECF No. 24 at 19–20; ECF No. 28 at 17; ECF No. 52 at 219:11–15.  Instead, on September 5, 2025, Respondents notified Abrego Garcia's counsel that they now would remove him to the South African country of Eswatini.  ECF No. 27-3.  Abrego Garcia immediately asserted fear of removal to Eswatini on similar grounds.  ECF No. 57-1 at 3.

Within days, Eswatini learned of Respondents' notice to Abrego Garcia and it bit back.  On September 11, 2025, Eswatini's spokesperson, Thabile Mdluli, announced that "the Government of Eswatini ha[d] not received any communication regarding this person," and did not have any agreement with the United States to receive Abrego Garcia.  ECF No. 32-6 at 2.  Respondents also had not done anything with Abrego Garcia's credible fear assertions, or communicated whether he would receive similar refugee or other status in Eswatini or be protected from persecution or torture.  ECF No. 27 at 4–5.

Having heard nothing, and with the October 6 hearing approaching, Abrego Garcia asked the Court to order targeted discovery on the Respondents' plans to remove him to either Uganda or Eswatini in lieu of Costa Rica.  ECF No. 27 at 6.  Respondents, for their part, asked to continue the evidentiary hearing.  ECF No. 30 at 3.  So, the Court converted the evidentiary hearing to an in-person status conference.  ECF No. 31.

At the conference, the Court tried to assess whether Respondents had made any real effort toward removing Abrego Garcia in conformity with *Zadvydas*.  ECF No. 44.  It quickly became clear they had not.  Respondents, through counsel, could say no more than "Eswatini" has been "selected" for Abrego Garcia's removal.  ECF No. 48 at 17:12–14.  But they had no information about whether Respondents had even asked Eswatini about the same.  Nor did Respondents have

any further details about whether any efforts had been made to secure removal to Costa Rica.  *Id.* at 29:25–30:4.  This was so even though Abrego Garcia reaffirmed that he would depart "this afternoon" for Costa Rica, thus obviating the need for any further hearings or adjudication of this Petition.  *Id.* at 30:3–7, 29:11–12 (Simon Sandoval-Moshenberg, counsel for Abrego Garcia, stating, "If the government's goal is to effectuate the removal, he would be in Costa Rica right now as we speak.").[8]

Because Respondents had done nothing—other than send emails to Abrego Garcia's lawyers about removal to Uganda and Eswatini—Abrego Garcia asked that the Court rule expeditiously on the *Zadvydas* claim.  ECF No. 48 at 26:9–13.  Respondents, in turn, asked for an evidentiary hearing to demonstrate the sincerity of their third-country removal efforts.  ECF No. 48 at 30:14–19.  The Court granted their request and specifically ordered Respondents to produce a witness or witnesses to testify about "what steps, if any, Respondents have taken to remove Petitioner to Eswatini or any other country, including but not limited to, Costa Rica," and "what additional steps, if any, Respondents will take in the reasonably foreseeable future to remove Petitioner to Eswatini or any other country, including but not limited to, Costa Rica."  ECF No. 47 at 1–2.

The Court held an evidentiary hearing four days later, on October 10, 2025.  ECF No. 50.  Respondents produced one witness, Deputy Assistant Director of ICE Enforcement and Removal Operations, John Schultz ("Schultz").  ECF No. 52 at 13:3–9.  Contrary to the Court's order, Schultz was not prepared *at all* to discuss Costa Rica's offer to accept Abrego Garcia as a refugee.  Schultz candidly admitted he had not even seen Costa Rica's August 21, 2025, correspondence,

---

[8] Despite the intense global attention paid to this case and the purpose of the status hearing, counsel for Respondents came to this hearing supposedly unaware of any removal efforts pertaining to Abrego Garcia.  Even with a recess, counsel still could not "reach anyone that could provide an answer."  ECF No. 48 at 30:14–33:4.

and he had "no knowledge" about whether the Respondents had done anything to commence removal proceedings to Costa Rica. *See id.* at 84:24–85:1, 101:8–14 & 106:19–24.

Next as to Uganda, Schultz testified that Respondents had asked Uganda to take Abrego Garcia, but it "ultimately said no." ECF No. 52 at 134:16–22. As to Eswatini, Schultz testified that Respondents had not formally asked Eswatini to accept Abrego Garcia until the Wednesday night *before* the Friday evidentiary hearing. ECF No. 52 at 56:13–21 ("Q: So the United States had not asked Eswatini to accept Mr. Abrego until this past Wednesday? Schultz: Your Honor, I don't know what occurred in, say, September. That was before the notification that Eswatini was the country. I just know that a request was made Wednesday evening to Eswatini. Q: But you have no other information of prior requests? Schultz: No, Your Honor."). Schultz also reported that even though Eswatini "said no," "the conversations weren't over." *See id.* at 29:6–11, 54:23–25 & 56:5–7.

Schultz further confirmed that the night before the hearing, Respondents notified Abrego Garcia's counsel that he would now be removed to yet a third African country, Ghana. ECF No. 52 at 32:11–19, 156:3–25. But once this purported designation to Ghana became public, Ghanian Foreign Minister, Sam Okudzeto Ablakwa, immediately announced that "Ghana [was] not accepting Abrego Garcia. He cannot be deported to Ghana," and that this position "has been directly and unambiguously conveyed to U.S. authorities." ECF No. 49-1. *See also* Maxwell Nyagamago, *'Ghana is not accepting Abrego Garcia,' – Ablakwa denies reports*," PULSE (Oct. 10, 2025), https://www.pulse.com.gh/story/ghana-is-not-accepting-abrego-garcia-ablakwa-denies-reports-2025101014063418514.

Schultz ultimately confirmed that he knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from Respondents that effectuating such removal would run

contrary to "U.S. interests." ECF No. 52 at 105:12–15. Schultz further attested that he had been told nothing about why Respondents had not yet processed Abrego Garcia's removal to Costa Rica. *Id.* at 105:16–22, 106:11–24. Counsel for Abrego Garcia, in turn, emphasized that his client's continued detention must be for purposes other than facilitating removal because if Respondents "want to remove him to Costa Rica, you will hear no objection from us . . . . They can put him on the next plane to Costa Rica." ECF No. 107 at 78:1–5. *See also* ECF No. 52 at 184:5–12.

Indeed, in oral argument, Respondents' counsel acknowledged that the only legitimate ground to hold Abrego Garcia was to effectuate removal. ECF No. 52 at 213:15–18 ("[I]t's clear that it's detention for a removal."). And yet, they had no answers as to why the "policymaker[s]" eschewed Costa Rica. *Id.* at 206:16–18. The best they could do was "stipulate" that "Costa Rica is on the table if Eswatini falls through." *Id.* at 107:8–10.[9]

The Court concluded the hearing by announcing it would reach the *Zadvydas* claim expeditiously. But before the Court could formally rule, Respondents notified Abrego Garcia and the Court on October 24, 2025, that now they intended to remove him to yet a fourth African country, Liberia. ECF No. 56. Liberia evidently agreed to accept Abrego Garcia on a "strictly humanitarian" and "temporary" basis, with promises to not to persecute, torture or refoul him. *Id.*; ECF No. 72-6 at 3.

The Court convened a status conference after the Liberia notice, during which Abrego Garcia requested one final hearing to address the remaining counts of his Petition. ECF No. 64. at 9:3–15. Respondents posed no objection and indicated they would separately move for this Court

---

[9] The Court does not credit Respondents' contention that Abrego Garcia had claimed fear of removal to Costa Rica. ECF No. 52 at 206:16–24. Abrego Garcia's counsel admitted he had mistakenly included Costa Rica on a blanket fear assertion that named several other countries. ECF No. 52 at 188:14–189:2. Abrego Garcia also has confirmed in writing, and repeatedly through counsel, his consent to be removed to Costa Rica without delay. The Court credits this evidence.

to dissolve its temporary prohibition on removing Abrego Garcia from the continental United States.[10]  *Id.* at 13:10–15.  The Court allowed supplemental briefing and set a hearing for the following month.  *Id.* at 18:12–24.

In their subsequent filings, Respondents justified removing Abrego Garcia to Liberia because it was "the only state" willing to accept him.  ECF No. 75-6 ¶ 6.  They told the Court that Costa Rica "does not wish to receive" Abrego Garcia any longer, and that Costa Rica "would not simply accept" Abrego Garcia.  ECF No. 85 at 9 & 14.  Thus, said Respondents, "they can hardly be at fault for not removing Petitioner to *a country that refuses to accept him*."  *Id.* at 14 (emphasis added).  Respondents also attached the sworn Declaration of ICE Acting Assistant Director for the Removal Division, Johnathan Cantú ("Cantú"), as purported evidence of Costa Rica's change of heart (the "Cantú Declaration").  ECF No. 75-6.

Oddly, however, Respondents submitted their memoranda and the Cantú Declaration under seal[11] and moved to seal the evidentiary hearing entirely.  ECF No. 91.  This represented a sharp departure from their prior practice to seal only that which is necessary to protect diplomatic communications as typically memorialized in a diplomatic note or memorandum of understanding.  *See, e.g.*, ECF Nos. 73-7 & 75-3; *Abrego I*, ECF No. 141.  Respondents also did not attach any communication from Costa Rica reflecting any recission or modification of its prior offer to receive Abrego Garcia as a refugee.

---

[10] Given that Respondents had once illegally removed Abrego Garcia, the Court had ordered Respondents not to remove Abrego Garcia from the United States absent further order of the Court.  ECF Nos. 13 & 20.  The Court also made plain that at any time, Respondents could move for dissolution of the injunction if it presented an impediment to expeditious removal.  *See, e.g.*, ECF No. 24 at 15:7–9; *id*. at 21:4–11.  Nonetheless, at points, counsel for Respondents tried to blame the injunction as imposing some chimeric obstacle to their removal efforts.  This misdirection failed, as the Court was always clear that once actual removal was underway, if taken consistently with the INA and due process, the Court would dissolve the injunction upon Respondents' motion.  *See, e.g.*, ECF No. 52 at 34:3–37:12.

[11] Filings that are accompanied by a motion to seal are provisionally sealed pending resolution of the sealing motion.  *See* D. Md. Loc. R. 105.11.

Abrego Garcia quickly asked the Court to make Cantú available for testimony. ECF Nos. 81 & 82. The Court granted that motion over the Respondents' vigorous objection. ECF No. 92 at 12:18–13:20. The Court also unsealed the relevant filings and ordered the Respondents and their lawyers to prepare the witness in good faith to answer questions about Costa Rica's willingness to accept Abrego Garcia. ECF Nos. 90, 94 & 95.

At the hearing on November 20, it became evident that once again, Respondents defied this Court's orders.[12] They simply refused to prepare and produce a witness with knowledge to testify in any meaningful way. Cantú candidly admitted, for example, that he had no prior involvement in Abrego Garcia's case and spent approximately five minutes preparing to testify. *See* ECF No. 107 at 33:3–4, 39:5–9. Cantú also shared that none of Respondents' attorneys had discussed this Court's order with him or showed him its contents. *See id.* at 42:1–24. Nor did Cantú understand the purpose of his testimony. *Id.*

Then at the hearing, Respondents showcased Cantú's ignorance about the content of his Declaration pertaining to Costa Rica. As the pointed questions of Respondents' counsel made clear, Cantú's lack of knowledge was planned and purposeful.

| | |
|---|---|
| Counsel: | So paragraph 4, final sentence [of the Cantú Declaration], do you see where it says the word—the words "certain understandings"? |
| Cantú: | I found it. Yes, I do. I see it. |
| Counsel: | What are the certain understandings referenced in the last sentence? |
| Cantú: | I don't know . . . |

---

[12] Cantú is *the sixth witness* whom the Court directed Respondents to prepare for either deposition or in-court testimony concerning this case. *See, e.g., Abrego I*, ECF Nos. 117 & 146 (collecting testimony of three deponents); ECF No. 234 at 36:23–39:9 (Giles testimony); *see also* ECF No. 52 at 108:3–17 (Schultz testimony); ECF No. 107 at 42:2–25 (Cantú testimony). Each witness was either unprepared or defiant in their refusal to answer questions. The Court will consider the entire course of conduct when it reaches the motions pending in *Abrego I*.

| | |
|---|---|
| Counsel: | What are the "contingencies" referenced in the last sentence? |
| Cantú: | I do not know . . . |
| Counsel: | What are the "interim developments" referenced in paragraph 5? |
| Cantú: | I don't know. |

ECF No. 107 at 26:8–27:12 (counsel for Respondents, Jonathan Guynn ("Guynn"), questioning Cantú). *See also id.* at 53:8–9 (Guynn, at sidebar with Court, stating "I'll just say I told you this was exactly what was going to happen," regarding the witness' ignorance on Costa Rica as a viable country of removal).

Ultimately, Respondents' calculated effort to take Costa Rica "off the table" backfired. Within 24 hours, Costa Rica, through Minister Zamora Cordero, communicated to multiple news sources that its offer to grant Abrego Garcia residence and refugee status is, and always has been, firm, unwavering, and unconditional. *See* ECF No. 108 at 1. *See also* Maria Sacchetti, *Costa Rica says it would accept Kilmar Abrego García, contradicting U.S.*, WASH. POST (Nov. 21, 2025), https://www.washingtonpost.com/immigration/2025/11/21/kilmar-trump-deport-costarica/ (Zamora Cordero stating that Costa Rica would receive Abrego Garcia "under humanitarian conditions that guarantee the full respect for his rights and liberties . . . . That position that we have expressed in the past remains valid and unchanged to this day."); Laura Romero, *Costa Rican official says country willing to accept Abrego Garcia, contradicting Trump administration officials*, ABC NEWS (Nov. 21, 2025), https://abcnews.go.com/International/costa-rican-official-country-accept-abrego-garcia-contradicting/story?id=127775855, (Zamora Cordero confirming that "Costa Rica's offer to receive Mr. Abrego Garcia for humanitarian reasons remains in place . . . . My letter dated August 25, 2025 [sic], is the official position of the government."). Respondents have sat mum since.

## II.     Abrego Garcia's Requested Relief

Despite this tortured history, Abrego Garcia's arguments in favor of release are quite simple.  He contends that his detention is without lawful authority because Respondents have no final order of removal authorizing as much under the third-country removal statute, 8 U.S.C. § 1231.  Thus, says Abrego Garcia, his release is compelled.  ECF No. 1 ¶¶ 51–57, 68–69. Alternatively, Abrego Garcia maintains that Respondents' steadfast refusal to remove him to Costa Rica amidst constant threats of removal to a series of African countries that expressed no or limited desire to take him can only be construed as punitive and contrary to the purposes of ICE detention. ECF No. 71 at 6 & 17.

Respondents' central retort is that this Court lacks jurisdiction to reach the Petition at all. Accordingly, the Court first addresses whether it retains jurisdiction to reach the claims.

## III.     Jurisdiction

Respondents contend the Court lacks subject matter jurisdiction pursuant to three provisions of the INA, 8 U.S.C. §§ 1252(g), (a)(5) and (b)(9).  *See* ECF Nos. 28 & 72.   Each is easily disposed.

First, as to 8 U.S.C. § 1252(g), this provision bars this Court from hearing three discrete kinds of claims "arising from" an action of the Attorney General "to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter."  *See Reno v. American Arab Anti–Discrimination Comm.,* 525 U.S. 471, 485 n.9 (1999).  Abrego Garcia's Petition does not challenge the commencement of proceedings or adjudication of any case. Accordingly, the only conceivable argument for which § 1252(g) strips the Court of jurisdiction is that the Petition challenges the "execution of a removal order."

But Abrego Garcia does not challenge the *execution* of a removal order. Instead, he contends that his detention is unlawful and not reasonably foreseeable because he is held in the *absence* of such a removal order. Thus, Abrego Garcia's request for immediate release cannot touch upon the execution of a removal order if no such order exists. *See, e.g.*, *Madu v. U.S. Att'y. Gen.*, 470 F.3d 1362, 1367–68 (11th Cir. 2006) (holding a district court retains jurisdiction over a § 2241 habeas petition challenging detention based on the lack of a removal order and finding that challenge distinct from the challenge to the "execution" of a removal order as barred under § 1252(g)); *cf. Kumarasamy v. Att'y Gen. of U.S.*, 453 F.3d 169, 172 (3d Cir. 2006), *as amended* (2006) (holding district court retains jurisdiction to reach § 2241 petition because petitioner's challenge to detention absent an order of removal did not deprive court of jurisdiction under 8 U.S.C. § 1252(a)(5)); *Rivas-Melendrez v. Napolitano*, 689 F.3d 732, 737 (7th Cir. 2012) (recognizing jurisdictional distinction between "a challenge to a removal order and an argument that no order of removal even existed to be executed.").[13]

Second, and for similar reasons, neither 8 U.S.C. §§ 1252(a)(5) nor (b)(9) bar this Court's power to adjudicate the Petition. Sections 1252(a)(5) and (b)(9) were enacted to "eliminate[] habeas review over all final orders of removal," *A. Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007), by channeling such challenges directly to the "appropriate court of appeals . . . [as] the sole and exclusive means for judicial review of an order of removal . . . ." *Id*. (quoting 8 U.S.C. § 1252(a)(5)). *See also* § 1252(b)(9) (channeling "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove a [noncitizen] from the United States under this subchapter" as "available only in judicial review of a final order under this section"). But again,

---

[13] The Court similarly retains jurisdiction over Petitioner's *Zadvydas* claim. *See Zadvydas*, 533 U.S. at 688–89.

Abrego Garcia is not challenging a final order of removal. He argues instead that his detention lacks lawful authority because there is no such order. *See A. Singh*, 499 F.3d at 978 ("By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal."). In this important respect, "the question presented by [the habeas petition] is whether there is a removal order at all," which is different than "whether an extant removal order is lawful." *Madu*, 470 F.3d at 1367 (citing *Kumarasamy,* 453 F.3d at 172*)*. Because the Petition, at bottom, turns on the *absence* of a removal order, the channeling provisions simply "do[] not apply." *Madu*, 470 F.3d at 1368. *See also Kumarasamy*, 453 F.3d at 172; *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075–76 (9th Cir. 2006) ("By its terms, the jurisdiction-stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal. Here, as we have noted, there is no final order of removal . . . . Therefore, in cases that do not involve a final order of removal, federal habeas corpus jurisdiction remains in the district court, and on appeal to this Court, pursuant to 28 U.S.C. § 2241."). *Cf. Zadvydas*, 533 U.S. at 688 ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."); *Jennings v. Rodriguez,* 583 U.S. 281, 293 (2018) (rejecting expansive interpretation of § 1252(b)(9) as applied to claims of "prolonged detention").

For these reasons, the Court retains jurisdiction to reach Abrego Garcia's arguments because none concern the review of a removal order.[14] The Court next turns to the merits of Abrego Garcia's grounds for relief.

---

[14] Respondents' two remaining jurisdictional arguments focus on Abrego Garcia's subsidiary due process challenge to Respondents' policy concerning third-country removal procedures, *citing* 8 U.S.C. § 1252(a)(4), the Foreign Affairs Reform and Restructuring Act of 1998 § 2242(d) (codified as Note to 8 U.S.C. § 1231) and 8 U.S.C. § 1252(a)(2)(B)(ii). ECF No. 72 at 27–28. *See also* ECF No. 28 at 12 n.2. The Court need not reach these jurisdictional questions because it grants the petition on other grounds.

## IV.    Merits of the Petition

Throughout, Abrego Garcia has maintained that no order of removal exists for him.  ECF No. 1 ¶¶ 54, 68–69; ECF No. 32 at 10 & 32; ECF No. 87 at 11.  Although the proceedings until now have not squarely depended on adjudicating this most basic fact, the time has come.  To understand why, the Court first explains what a removal order is, and is not, as a matter of law; and next, why the Court finds no such order exists for Abrego Garcia.  Last, the Court discusses why the absence of such order compels his release.

### A.  What is a Removal Order Under the INA

An order of removal is the vehicle by which the Executive branch retains the power conferred by Congress under the INA to remove a noncitizen from the United States against his will.  *See* 8 U.S.C. § 1231(a)(1)(A).  Such power is tantamount to an order of deportation, defined as "an *order* 'concluding that the [noncitizen] is deportable or ordering deportation.'"  *Riley v. Bondi*, 606 U.S. 259, 267 (2025) (quoting 8 U.S.C. § 1101(a)(47)(A)) (emphasis added).  *See also Nasrallah v. Barr*, 590 U.S. 573, 584 (2020) (citing 8 U.S.C. § 1101(a)(47)(A)) (holding that under the INA, in the deportation context, a "final order of deportation is now defined as a final order 'concluding that the [noncitizen] is deportable or ordering deportation.'").

An order of removal must be "explicit" in its directive that a noncitizen is to be removed to an identified country or countries.  *Kouambo v. Barr*, 943 F.3d 205, 210 (4th Cir. 2019) (quoting *Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 434 (BIA 2008)).  Further, where, as here, "an Immigration Judge issues a decision granting a [noncitizen's] application for withholding of removal . . . the decision must include an explicit order of removal."  *Matter of I-S- & C-S-*, 24 I. & N. Dec. at 432.  This is so because when a noncitizen receives protection from removal to an identified country, the predicate removal order takes on special importance.

As Judge Wilkinson ably explained in *Kouambo v. Barr*, the existence of a removal order is fundamental to determining whether, and to where, a noncitizen may be removed:

> First, as a matter of simple logic, 'in order to withhold removal, there must first be an order of removal that can be withheld' . . . . Second, because a [noncitizen] protected by an order of withholding may still be removed to a willing third country, the IJ must issue a final order of removal to authorize DHS to effect such a removal if a third country is identified.

943 F.3d at 210 (quoting *Matter of I-S- & C*-S-, 24 I. & N. Dec. at 433).  Thus, an order of removal *must* "identify a country, or countries in the alternative to which the [noncitizen's] removal may in the first instance be made, pursuant to the provisions of section 241(b) of the Act."  8 C.F.R. § 1240.12(d).

### B.  No Order of Removal Exists for Abrego Garcia

No such order of removal exists for Abrego Garcia.  When Abrego Garcia was first wrongly expelled to El Salvador, the Court struggled to understand the legal authority for even seizing him in the first place.   At the first hearing in *Abrego I*, the Court inquired of Respondents' counsel:

| | |
|---|---|
| The Court: | I want to ask, though, the very specific question, if there is a final order of removal, what . . . document got this process started? There is no warrant for his arrest by an order of removal. There is no statement of probable cause. There's no charge. There's no report that says that anyone saw Mr. Abrego Garcia doing anything illegal or criminal. So what is the actual document that gave these officers the authority to start this process? |
| Counsel: | That is not in the record, and the government has not put that into the record. And that's the best I can do. |

*Abrego I*, ECF No. 33 at 21:11–22.

The Court continued to press counsel about the existence of a removal order and was told plainly that none can be found:

| | |
|---|---|
| The Court: | Okay. So if there's a Title 8 removal order, there would be an order of removal that's being executed, and we don't have one for Mr. Abrego Garcia, right? . . . Do you have that order? . . . Is it in the record? |
| Counsel: | I do not have that order. It is not in the record. |

*Id.* at 23:7–24:4.

Since that time, Respondents have never produced an order of removal despite Abrego Garcia hinging much of his jurisdictional and legal arguments on its non-existence. ECF No. 1 ¶¶ 68–69; ECF No. 32 at 10, 15–17, 27; ECF No. 87 at 11–12. Indeed, Respondents twice sponsored the testimony of ICE officials whose job it is to effectuate removal orders, and who candidly admitted to having never seen one for Abrego Garcia. *See* ECF No. 107 at 30:16–22 (testimony of Cantú) ("Q: Based upon your many years of experience you described to us, you know what a final order of removal looks like, right, sir? Cantú: I do. Q: And have you seen a final order of removal in regard to Mr. Abrego Garcia? Cantú: I have not."). *See also Abrego I*, ECF No. 234 at 46:6–12 (testimony of interim Assistant Director for ICE Removal Operations, Thomas Giles ("Giles")) ("Q: You have not seen the final order of removal, have you, sir? Giles: What do you mean by that? Q: I mean, you have not seen a piece of paper that represents the final order of removal vis-a-vis Mr. Abrego Garcia, correct? Giles: No, I have not.").[15] Based on this, the Court concludes that no order of removal exists.

Respondents do not contend otherwise. Instead, they urge the Court to construe the October 10 withholding decision as an *implied* order of removal, or one that exists "by operation

---

[15] Additionally, the ICE Immigration detainer for Abrego Garcia dated June 6, 2025, and first made part of the record in *Abrego I*, corroborates that no final order of removal exists. ECF No. 32-1. The detainer includes a preprinted section articulating the "probable cause" for believing the "subject is a removable individual" because of *either* the existence of a "final order of removal against the individual" *or* "[t]he pendency of ongoing removal proceedings against the individual." ECF No. 32-1 at 2. The ICE officer checked the box for "pendency" of proceedings even though nothing was "pending" at the time. *Id.* More to the point, the ICE officer did not check that detention was based on the existence of a final order of removal. *Id.*

of law." ECF No. 107 at 111:11–20. They essentially argue that because an IJ would not grant withholding of removal absent a valid order of removal, then the Court can read into the withholding decision the existence of a removal order. *Id.* While this argument may have some intuitive appeal, it belies both the facts of this case and the long-established precedent which commands against collapsing two legally distinct orders—removal and withholding of removal—into one.

The October 10 withholding decision is unambiguously *not* an order of removal. It does not "order" Abrego Garcia removed to any country or designate removal to alternative countries, as required under the INA. *See Nasrallah*, 590 U.S. at 579 (an order of removal is "an order 'concluding that the [noncitizen] is deportable or ordering deportation.'") (citing 8 U.S.C. § 1101(a)(47)(A). *See also* 8 C.F.R. § 1240.12(d). Nowhere in the October 10 withholding decision does the IJ order Abrego Garcia removed to El Salvador or anywhere else.

Nor can the Court conclude legally that a removal order is "implicit" in the October 10 withholding decision, as Respondents urge. The Fourth Circuit has made clear, "when an IJ grants withholding of removal, an *explicit* order of removal must be included in the decision," that identifies the country to which the noncitizen may be removed and alternative countries. *Kouambo*, 943 F.3d at 210 (internal quotation marks and citation omitted). It is this explicit designation that "authorizes DHS to effectuate such a removal if a third country is identified." *Id. See also Matter of I-S- & C-S-*, 24 I. & N. Dec. at 434 ("We find that the proceedings in this case are unresolved and incomplete because the Immigration Judge found the respondents removable and granted their application for withholding of removal but failed to order them removed."); *cf. Bracic v. Holder*, 603 F.3d 1027, 1032–33 (8th Cir. 2010). Because the October 10 withholding

decision does not order Abrego Garcia removed to any country, it is simply *not* an order of removal.

Moreover, to conclude as the Respondents suggest—that the withholding order is also the order of removal—would contravene well established Supreme Court precedent directing otherwise.  Consider first *Nasrallah v. Barr*, 590 U.S. 573 (2020).  There, the Court held that for jurisdictional purposes under the INA, a final order of removal cannot "merge" with a withholding order.  *Nasrallah*, 590 U.S. at 583.  The *Nasrallah* Court reasoned that withholding relief under CAT cannot be construed as a final order of removal because the withholding order itself does not conclude "the [noncitizen] is deportable or ordering deportation."  *Id.* at 579.  Rather, a withholding order "means only that, notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country."  *Id.* at 582.  For this reason, the *Nasrallah* Court concluded:

> A CAT order may be reviewed together with the final order of removal.
> But a CAT order is distinct from a final order of removal and does not
> affect the validity of the final order of removal.  The CAT order therefore
> does not merge into the final order of removal for purposes of [the Court's
> jurisdictional limitation on the scope of judicial review].

*Id.* at 583.

The following year, the Court in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) was called to answer, among other questions, whether an order of removal becomes final at the point the removal order issues, or later, when the noncitizen's withholding-only proceedings conclude.  The Court held the former, because:

> [R]emoval orders and withholding-only proceedings address two distinct
> questions.  As a result, they end in two separate orders, and the finality of
> the order of removal does not depend in any way on the outcome of the
> withholding-only proceedings.

*Id.* at 539.

Last, just a few months ago, the Court in *Riley v. Bondi,* 606 U.S. 259 (2025) reaffirmed that "the lessons taught by *Nasrallah* and *Guzman Chavez* are clear."  606 U.S. at 269.  In concluding that an order from Board of Immigration Appeals ("BIA") that vacated the grant of CAT relief was not a final order of removal, the *Riley* Court emphasized that the BIA order simply did not "affect the validity of a previously issued order of removal or render that order non-final." *Id*.  Because removal orders remain legally distinct from subsequent denials of relief, the final removal order "does not depend" on the outcome of the withholding proceedings.  *Id.* (quoting *Guzman Chavez*, 594 U.S. at 539).  This is so even though this construction invites procedural difficulties in streamlined appellate review of both the removal order and the withholding decision. *Id.* at 271–72.

Read together, *Nasrallah, Guzman Chavez,* and *Riley* foreclose the Respondents' "implicit" removal-order theory.  Each confirms that an order of removal retains separate legal vitality.  It must be an *order* "concluding that the [noncitizen] is deportable or ordering deportation."  *Nasrallah*, 590 U.S. at 579 (quoting 8 U.S.C. § 1101(a)(47)(A)).  *See also Riley*, 606 U.S. at 278.  It must also identify the country or countries to which the noncitizen is ordered removed.  8 C.F.R. § 1240.12(d).  Absent an order to this effect, the Court cannot simply infer that the withholding decision does the trick, as "removability and withholding relief are distinct." *Guzman Chavez*, 594 U.S. at 537.

For the same reasons, the Court also rejects Respondents' entreaties to construe the "procedural history" section of the October 10 withholding decision as an order of removal.  ECF No. 72 at 17.  True, the procedural history section reflects that at some point earlier, Abrego Garcia "through counsel . . . conceded removability as charged," and that "[b]ased on the Respondent's admissions and concessions, the Court found his removability to be established by clear and

convincing evidence as required by INA 240(c)(3)." ECF No. 1-1 at 2. But nowhere does the IJ *order* Abrego Garcia removed to any country at all. *See* 8 C.F.R. § 1240.12(d) (a removal order must "identify a country, or countries in the alternative, to which the [noncitizen's] removal may in the first instance be made, pursuant to the provisions of section 241(b) of the Act."). *See also Guzman Chavez*, 594 U.S. at 536. Thus, to credit this argument, the Court would have to collapse two legally distinct orders into one. This the Court cannot do. *Id.* at 537.

Because no order of removal exists, the Court turns next to why detention in the absence of such an order cannot continue.[16]

### C.  Continued Detention Without a Removal Order Violates the INA and Due Process

The absence of a removal order raises an intractable problem for Respondents. They took Abrego Garcia into ICE custody with the singular purpose of removing him to a third country pursuant to 8 U.S.C. § 1231. *See* ECF No. 1-5 (notice of removal to Uganda); ECF No. 27-3 (notice of removal to Eswatini); ECF No. 52 at 32:18–19 (confirming notice of removal to Ghana sent "prematurely" to Abrego Garcia's counsel); ECF No. 56 (notice of removal to Liberia). *See also* ECF No. 28 at 18 (Respondents arguing their third-country removal procedures are consistent with due process); ECF No. 72 at 25 (Respondents arguing Abrego Garcia "is subject to detention under 8 U.S.C. § 1231 *as a result of his final order of removal*") (emphasis added).

---

[16] Given the absence of a removal order, the Court easily rejects Respondents' argument that the Petition must be dismissed because Abrego Garcia is a member of the putative class in *D.V.D. v. DHS*, 778 F. Supp. 3d 355 (D. Mass. 2025). ECF No. 72 at 15. The *D.V.D.* class is defined as noncitizens "subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders." *D.V.D. v. DHS*, 778 F. Supp. 3d 355, 368 (D. Mass.), *opinion clarified*, No. CV 25-10676-BEM, 2025 WL 1323697 (D. Mass. May 7, 2025), *and opinion clarified*, No. CV 25-10676-BEM, 2025 WL 1453640 (D. Mass. May 21, 2025), *reconsideration denied sub nom. D.V.D v. DHS*, 786 F. Supp. 3d 223 (D. Mass. 2025). Abrego Garcia, however, does not have a final order of removal and thus, falls outside the class. Moreover, even if Abrego Garcia could be considered part of the class, the Court disagrees this Petition must be dismissed as impermissible claim splitting because membership in an opt-out class remains a recognized exception to the claim-splitting rule. *See Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 432 (4th Cir. 2003) (quoting 18 MOORE'S FEDERAL PRACTICE § 131.40[3][e][iii] (2002)) (citing Restatement (Second) of Judgments § 26(1)(c) (1982)).

Section 1231, however, only permits such third-country removal proceedings upon the issuance of a final order of removal. Entitled "Detention and removal of [noncitizens] ordered removed," 8 U.S.C. § 1231 authorizes detention after the noncitizen "is ordered removed" and enters the "removal period." § 1231(a)(1)(A). Section 1231(a)(2)(A) further articulates the terms of release or detention during the removal period, and § 1231(b)(1)–(2) discusses the selection of alternate countries in the event the noncitizen is granted relief from removal, or where the designated country of removal is unwilling to accept him. *See also Guzman Chavez*, 594 U.S. at 542–43. Thus, without a final order of removal, § 1231 provides no lawful basis to detain and remove the noncitizen.

Respondents do not disagree. *Abrego I*, ECF No. 217 at 63:11–16 (Ernesto Molina, counsel for Respondents, explaining that ICE has statutory authority under 8 U.S.C. § 1231 to take into custody noncitizens subject to a final order of removal); *Abrego I*, ECF No. 235 at 86:6–17 (Sarmad Khojasteh, counsel for Respondents in *Abrego I*, explaining that the authority to remove Abrego Garcia flows from the final order of removal). Nor have they articulated any other basis to hold Abrego Garcia apart from § 1231. Accordingly, because Respondents continue to detain Abrego Garcia solely for the purpose of effectuating third-country removal under § 1231 but lack any authority to effectuate such removal absent a removal order, his continued detention must end.

### D. Release is Further Compelled Under *Zadvydas v. Davis*

Alternatively, continued detention appears constitutionally infirm under *Zadvydas v. Davis*, 533 U.S. 678 (2001). Although *Zadvydas* is an imperfect fit precisely because Respondents have no lawful authority to hold Abrego Garcia under 8 U.S.C. § 1231, its teachings are nonetheless instructive. There, the Supreme Court was called upon to set the due process limits of prolonged detention under § 1231. Or more particularly, "whether this post-removal-period

statute authorizes the Attorney General to detain a removable [noncitizen] *indefinitely* beyond the removal period or only for a period reasonably necessary to secure the [noncitizen's] removal" to a third country.  *Zadvydas*, 533 U.S. at 682 (emphasis in original).

The *Zadvydas* Court concluded that to read § 1231 as permitting "indefinite detention" would "raise serious constitutional concern," that must be avoided by also reading an implicit reasonable time limitation on such detention.  533 U.S. at 682.  Thus, the *Zadvydas* Court announced a presumptive six-month period of post-removal detention as sufficient to accord Respondents time to secure a suitable third country without running afoul of the noncitizen's Fifth Amendment due process rights.  *Id.* at 701.

In so holding, the *Zadvydas* Court grounded its decision in three fundamental principles of special relevance to Abrego Garcia.  First, as the Court explained, Respondents can only detain a noncitizen pursuant to the statutory authority of the INA, and with a purpose to effectuate lawful removal.  *Zadvydas*, 533 U.S. at 683, 688–89.  Although this principle may seem self-evident, it bears emphasizing for Abrego Garcia, as he has been held without a removal order, and thus without lawful authority.

Second, detention to effectuate third-country removal can only be for the period "reasonably necessary" to secure such removal.  *Zadvydas*, 533 U.S. at 689.  The presumptive six-month period announced in *Zadvydas* provides an important limitation on § 1231 to avoid indefinite detention.  But it is a presumption which can be rebutted where the petitioner demonstrates that removal is not reasonably foreseeable.  *See, e.g.*, *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 379 (D. Md. 2025).  As *Zadvydas* emphasized, a noncitizen may be held only until "it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."  533 U.S. at 701.  *See Jennings*, 583 U.S. at 299 ("[I]f the [noncitizen]

'provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future,' the Government must either rebut that showing or release the [noncitizen].") (quoting *Zadvydas*, 533 U.S. at 701).

Third, the *Zadvydas* Court reaffirmed that ICE detention exists for the "basic purpose" of securing third-country removal. *Zadvydas*, 533 U.S. at 699. *See also id.* at 697 (§ 1231 has "as its basic purpose effectuating [a noncitizen's] removal."); *cf. Demore v. Kim*, 538 U.S. 510, 527 (2003) (where removal was "no longer practically attainable," "detention there did not serve its purported immigration purpose") (quoting *Zadvydas*, 533 U.S. at 690); *Clark v Martinez*, 543 U.S. 371, 384 (2005) (§ 1231 "should be read . . . to authorize detention only for a period consistent with the purpose of effectuating removal."). Respondents are not to hold the noncitizen based on whim, caprice, or like motive. *Zadvydas*, 533 U.S. at 718 ("As persons within our jurisdiction, [noncitizens] are entitled to the protection of the Due Process Clause" which "includes protection against unlawful or arbitrary personal restraint or detention.") and at 721 ("[B]oth removable and inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious.") (Kennedy, J., dissenting). Nor can detention be used as punishment. "The proceedings at issue here are civil, not criminal," and so must be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690.

With these principles of *Zadvydas* as guidance, the Court turns to Abrego Garcia's continued detention. First, because Respondents have no statutory authority to remove Abrego Garcia to a third country absent a removal order, his removal cannot be considered reasonably foreseeable, imminent, or consistent with due process. Although Respondents may eventually get it right, they have not as of today. Thus, Abrego Garcia's detention for the stated purpose of third-country removal cannot continue.

Second, and equally troubling, the circumstances of Abrego Garcia's detention since he was released from criminal custody cannot be squared with the "basic purpose" of holding him to effectuate removal. *Zadvydas*, 533 U.S. at 697. That is, even if Abrego Garcia could have been lawfully removed to a third country, Respondents do not appear to have held him to fulfill that purpose. For if they had wished to remove him, they certainly could have as early as August 21, 2025, to Costa Rica. And even if the Court accords Respondents a measure of deference in exercising their discretion to favor another country, "discretion" cannot explain what happened next. *Cf. Zadvydas*, 533 U.S. at 696 (recognizing propriety of "habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity . . . .").

Respondents serially "notified" Abrego Garcia—while he sat in ICE custody—of his expulsion to Uganda, then Eswatini, then Ghana; but *none* of these countries were ever viable options, and at least two had not even been *asked* to take Abrego Garcia before Respondents claimed supposed removal to each. *See* ECF No. 52 at 28:10–13 (Schultz confirming the "United States has not had a discussion with Eswatini regarding Abrego Garcia"). *See also* ECF No. 52 at 32:18–19 (Schultz stating the notice of removal identifying Ghana was "prematurely sent" to Abrego Garcia).

At the same time, Respondents did not take any steps to remove Abrego Garcia to the country which *had* offered to take him, Costa Rica. This inexplicable reluctance seemed at odds with continued detention for purposes of third-country removal. So the Court asked repeatedly during oral arguments to address the disconnect. ECF No. 48 at 37:24–38:17; ECF No. 52 at 205:11–207:13; ECF No. 107 at 124:1–125:12; and twice compelled testimony to that effect, ECF Nos. 47 & 90. These orders were ignored without justification.

Respondents instead found a fourth African country, Liberia.  This time, when the Court sought information about Liberia and Costa Rica so to fairly assess the validity of Abrego Garcia's claims, Respondents did not just stonewall.  They affirmatively misled the tribunal.  They announced that Liberia is the only viable removal option because Costa Rica "does not wish to receive him," ECF No. 85 at 9, and that Costa Rica will no longer "accept the transfer" of him, ECF No. 75-6 ¶ 5; ECF No. 85 at 14.

But Costa Rica had *never* wavered in its commitment to receive Abrego Garcia, just as Abrego Garcia never wavered in his commitment to resettle there.  *See* ECF No. 108 at 1; Maria Sacchetti, *Costa Rica says it would accept Kilmar Abrego García, contradicting U.S.*, WASH. POST (Nov. 21, 2025), https://www.washingtonpost.com/immigration/2025/11/21/kilmar-trumpdeport-costarica/.  *See also* Laura Romero, *Costa Rican official says country willing to accept Abrego Garcia, contradicting Trump administration officials*, ABC NEWS (Nov. 21, 2025), https://abcnews.go.com/International/costa-rican-official-country-accept-abrego-garcia-contradicting/story?id=127775855.  This evidently remained an inconvenient truth for Respondents.  But more to the point, Respondents' persistent refusal to acknowledge Costa Rica as a viable removal option, their threats to send Abrego Garcia to African countries that never agreed to take him, and their misrepresentation to the Court that Liberia is now the only country available to Abrego Garcia, all reflect that whatever purpose was behind his detention, it was not for the "basic purpose" of timely third-country removal.  *Zadvydas*, 533 U.S. at 697.

### E.  Abrego Garcia's Due Process Challenge to Removal Procedures

Abrego Garcia separately challenges the lack of due process associated with Respondents' efforts to remove him to Liberia.  ECF No. 71.  He particularly presses that the Respondents' summary third-country removal policy articulated in the DHS Memorandum dated March 30,

2025, does not provide meaningful review of his fear-based claims of persecution, torture or refoulment. *Id.* at 18 (citing *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025)) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings.") (internal quotation marks omitted). Given Liberia's nebulous offer of "temporary" status, and Respondents' history of erroneous removal to El Salvador, this challenge may very well have merit. *See Cruz Medina*, No. ABA-25-CV-1768, 2025 WL 2841488, at *10 (D. Md. Oct. 7, 2025) (granting injunctive relief directing respondents to accord petitioner meaningful judicial review of fear based claims concerning intended third-country removal); *Sagastizado v. Noem*, No. 5:25-CV-00104, 2025 WL 2957002, at *16 (S.D. Tex. Oct. 2, 2025) (same); *Nguyen*, 2025 WL 2419288, at *28–29 (granting immediate release and enjoining removal absent meaningful opportunity to be heard in reopened removal proceedings). The Court, however, need not reach the claim because the absence of a removal order precludes Respondents from removing Abrego Garcia at this juncture.

## V.    Conclusion

As before, Abrego Garcia's case demands judicial intervention to ensure that Respondents choose constitutionally permissible means of implementing the INA. *Zadvydas*, 533 U.S. at 695. Because Abrego Garcia has been held in ICE detention to effectuate third-country removal absent a lawful removal order, his requested relief is proper. Separately, Respondents' conduct over the past months belie that his detention has been for the basic purpose of effectuating removal, lending further support that Abrego Garcia should be held no longer.

The Court orders Respondents to release Abrego Garcia from ICE custody immediately. Thereafter, he will receive instruction from the United States Pretrial Services Office as to installation on the release conditions previously imposed in his criminal case.[17]

A separate order follows.

<table>
<tr><td>_____December 11, 2025_____</td><td>_____/s/_____</td></tr>
<tr><td>Date</td><td>PAULA XINIS<br>United States District Judge</td></tr>
</table>

---

[17] Pursuant to the Bail Reform Act, 18 U.S.C. § 3142(c)(1)(B), the criminal court has imposed on Abrego Garcia the restrictive conditions of home detention with electronic monitoring, third-party custodianship, a residence requirement, and other programming to reasonably assure Abrego Garcia's appearance in court and the safety of the community. *See Tennessee Criminal Matter*, ECF No. 112.