**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Greenbelt Division**

Kilmar Armando Abrego Garcia,

                Petitioner,

v.

Kristi Noem, *et al.*,

                Respondents.

Case No. 8:25-cv-02780 (PX)

**Petitioner's Response in Opposition to
Government's Motion to Dissolve**

**Table of Contents**

**Page**

Introduction.................................................................................................................... 1

Background ..................................................................................................................... 2

Legal Standard ............................................................................................................... 6

Argument ....................................................................................................................... 6

I.    This Court Has Jurisdiction To Maintain The Injunction. ................................... 6

II.   The Government Has Not Carried Its Burden To Dissolve The Injunction Against Abrego Garcia's Removal....................................................................................................... 7

        A.    Removal To Liberia Would Violate 8 U.S.C. § 1231(b)(2). ................................. 8

            1.    Abrego Garcia's Designation of Costa Rica Is Valid. ............................... 8

            2.    The Lyons Memorandum Is Not Authoritative. ........................................ 9

            3.    The Lyons Memorandum Does Not Lawfully Override That Designation. ............................................................................................. 12

                a.    Applicable Standard Of Review. ................................................. 13

                b.    The Lyons Memorandum Lacks A Facially Legitimate And Bona Fide Reason As To Why Removal To Costa Rica Would Be Prejudicial To The United States. ................................................. 14

        B.    Removal To Liberia Would Violate Abrego Garcia's Due Process Rights.......... 18

            1.    Removal To Liberia Would Violate Abrego Garcia's Procedural Due Process Rights. ..................................................................................... 18

            2.    Removal To Liberia Would Violate Abrego Garcia's Fundamental Due Process Rights As Applied In This Case. ................................................. 21

III.  The Government Has Not Carried Its Burden To Dissolve The Injunction Against Abrego Garcia's Detention. ................................................................................................. 23

        A.    Detention To Remove To Liberia Presents The Same Question The Court Has Already Resolved............................................................................................. 23

        B.    There Is No Basis For Detention In Aid Of Removal To Any Other Country..... 26

IV.   All Preliminary Injunction Factors Favor Maintaining Both Injunctions......................... 26

V.    The Government's Request For A Ruling By April 17 Should Be Rejected. ................... 27

Conclusion .................................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*3Nod Digital (Hong Kong) Ltd. v. U.S. Dep't of State*,
2026 WL 759439 (D.D.C. Mar. 18, 2026)............................................................................9, 12

*Abrego Garcia v. Noem*,
2025 WL 1021113 (4th Cir. Apr. 7, 2025) ...............................................................................7

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025) .......................................................................14, 15, 18

*Am. Coll. of Obstetricians & Gynecologists v. FDA*,
506 F. Supp. 3d 328 (D. Md. 2020)..............................................................................6, 7, 23, 25

*Asylum Seeker Advoc. Project v. U.S. CIS*,
2025 WL 3029552 (D. Md. Oct. 30, 2025) .............................................................................27

*Banoub v. Crawford*,
2025 WL 3723458 (E.D. Va. Dec. 23, 2025) ........................................................................25

*CASA, Inc. v. Noem*,
2025 WL 3514378 (D. Md. Dec. 8, 2025)...............................................................................14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)...............................................................................................................15

*Cruz Medina v. Noem*,
806 F. Supp. 536 (D. Md. 2025).......................................................................................18, 20

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....................................................................................................14, 15, 17

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020)...............................................................................................................13

*Doherty v. Meese*,
808 F.2d 938 (2d Cir. 1986)...................................................................................................17

*Elrod v. Burns*,
427 U.S. 347 (1976)...............................................................................................................27

*Gooch v. Life Invs. Ins. Co. of Am.*,
672 F.3d 402 (6th Cir. 2012) ...................................................................................................6

*Guzman Chavez v. Hott*,
   940 F.3d 867 (4th Cir. 2019) ........................................................................................18

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997) .......................................................................................9

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)......................................................................................................19

*Jama v. ICE*,
   543 U.S. 335 (2005)................................................................................................12, 16

*Jama v. INS*,
   329 F.3d 630 (8th Cir. 2003) ...................................................................................12, 14

*Juarez Villatro v. Noem*,
   No. 1:25-cv-2359, ECF No. 18 (E.D. Va. Jan. 6, 2026)...............................................20

*Kerry v. Din*,
   576 U.S. 86 (2015)........................................................................................................14

*Kirk v. Comm'r of Soc. Sec. Admin.*,
   987 F.3d 314 (4th Cir. 2021) ........................................................................................19

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972)................................................................................................13, 14

*L.J. v. Wilbon*,
   633 F.3d 297 (4th Cir. 2011) ....................................................................................6, 26

*Lee v. Crawford*,
   2026 WL 745263 (E.D. Va. Feb. 27, 2026)................................................................25

*Miot v. Trump*,
   --- F. Supp. 3d ---, 2026 WL 266413 (D.D.C. Feb. 2, 2026)......................................13

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022) ........................................................................................27

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
   60 F.3d 823, 1995 WL 406612 (4th Cir. 1995) (unpublished) .....................................6

*NLRB v. SW General, Inc.*,
   580 U.S. 288 (2017)......................................................................................................11

*Piao v. Lyons*,
   2025 WL 3046783 (E.D. Va. Oct. 31, 2025)..............................................................25

*Portela-Hernandez v. Trump*,
  2026 WL 74042 (D. Md. Jan. 9, 2026) ................................................................................21

*President & Fellows of Harv. Coll. v. DHS*,
  788 F. Supp. 3d 182 (D. Mass. 2025) ............................................................................15, 18

*Rivas Rojas v. Noem*,
  No. 1:25-cv-1624, ECF No. 18 (E.D. Va. Nov. 17, 2025) ....................................................20

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
  525 U.S. 471 (1999) ..............................................................................................................13

*Reno v. Flores*,
  507 U.S. 292 (1993) ..............................................................................................................18

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) ................................................................................................................6

*Sagastizado Sanchez v. Noem*,
  2025 WL 2957003 (S.D. Tex. Sept. 10, 2025) .....................................................................18

*Service v. Dulles*,
  354 U.S. 363 (1957) ................................................................................................................9

*Sesay v. United States*,
  984 F.3d 312 (4th Cir. 2021) ................................................................................................14

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953) ..............................................................................................................17

*Six v. Generations Fed. Credit Union*,
  891 F.3d 508 (4th Cir. 2018) ................................................................................................17

*Solis Nolasco v. Noem*,
  2026 WL 25002 (D. Md. Jan. 5, 2026) .................................................................................25

*Stone v. Trump*,
  400 F. Supp. 3d 317 (D. Md. 2019) ........................................................................................6

*Tomas-Ramos v. Garland*,
  24 F.4th 973 (4th Cir. 2022) ............................................................................................13, 14

*Trump v. J.G.G.*,
  604 U.S. 670 (2025) ..............................................................................................................18

*United States ex rel. Scala Di Felice v. Shaughnessy*,
  114 F. Supp. 791 (S.D.N.Y. 1953) ........................................................................................12

*United States v. Abrego*,
 802 F. Supp. 3d 1055 (M.D. Tenn. 2025)........................................................................2, 13, 18

*United States v. Giordano*,
 416 U.S. 505 (1974)................................................................................................................9

*Zadvydas v. Davis*,
 533 U.S. 678 (2001)....................................................................................................1, 13, 21

## Constitution

U.S. Const. amend I ....................................................................................................................15, 18

U.S. Const. amend IV ......................................................................................................................18

U.S. Const. art. II, § 2, cl. 2 ...........................................................................................................10

## Statutes

5 U.S.C. § 3345(a) ..........................................................................................................................11

5 U.S.C. § 3346(a) ..........................................................................................................................11

5 U.S.C. § 3348(d)(1) ................................................................................................................11, 12

6 U.S.C. § 113(a)(1)(G) ..................................................................................................................10

8 U.S.C. § 1231...............................................................................................................................10

8 U.S.C. § 1231(b)(2) .......................................................................................................8, 12, 13, 16

8 U.S.C. § 1231(b)(2)(A)..........................................................................................1, 2, 7, 8, 12

8 U.S.C. § 1231(b)(2)(A)(i) .............................................................................................................8

8 U.S.C. § 1231(b)(2)(C) ...............................................................................................12, 13, 14, 16

8 U.S.C. § 1231(b)(2)(C)(iv) ....................................................................................................9, 10, 12

8 U.S.C. § 1252(a)(5).......................................................................................................................6

8 U.S.C. § 1252(b)(9) ......................................................................................................................6

28 U.S.C. § 1292(a)(1)....................................................................................................................27

## **Regulations**

8 C.F.R. § 1208.30(g) ..................................................................................................20

8 C.F.R. § 1208.31(g) ..................................................................................................20

## **Rules**

Fed. R. App. P. 4(a)(1)(B) .....................................................................28Fed. R. Civ. P.
    60(b)(5) ...............................................................................................................6

## **Other Authorities**

Department of Homeland Security Delegation 7030.2,
    Delegation of Authority to the Assistant Secretary
    for U.S. Immigration and Customs Enforcement (Nov. 13, 2004) ......................9, 10

**Introduction**

The Government moves to dissolve two injunctions: the August 27, 2025 order barring the removal of Kilmar Armando Abrego Garcia (ECF No. 13), and the February 17, 2026 order barring his re-detention (ECF No. 141). Nothing has changed to warrant disturbing either one.

The Government insists that circumstances are different now because it has submitted (1) a memorandum from Todd Lyons purporting to disregard Abrego Garcia's designation of Costa Rica as his country of removal and (2) a declaration from John Schultz attaching a mock flight itinerary to Liberia. But neither the Lyons Memorandum nor the Schultz Declaration establishes the kind of significant change in fact, law, or circumstance that would justify dissolution.

Removal to Liberia remains unlawful for at least three independent reasons. First, it would violate the INA. Abrego Garcia designated Costa Rica as his country of removal under 8 U.S.C. § 1231(b)(2)(A), and the Government has not lawfully invoked any statutory basis for overriding that designation. Second, removal to Liberia would deny due process. The Government's fear screening was conducted by a single officer under the wrong standard, without the pertinent documents, and without authority to consider chain refoulement. Plus, Abrego Garcia still has not received review by an immigration judge. Third, removal to Liberia would be unconstitutionally vindictive and retaliatory. The Government threatens to exile Abrego Garcia to a distant African country with which he has no connection, even though Costa Rica remains available, as punishment for Abrego Garcia having the temerity to oppose the Government's unlawful conduct and vindicate his rights in this Court, the Fourth Circuit, and the Supreme Court. The Lyons Memorandum and Schultz Declaration cure none of those defects.

Because lawful removal remains not reasonably foreseeable, Abrego Garcia's re-detention remains unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001). The Court should deny the motion and leave both injunctions in place.

1

**Background**

"The history of Abrego Garcia's case is as well known as it is extraordinary." ECF No. 110 at 1. On March 12, 2025, the Government unlawfully arrested Abrego Garcia, removing him three days later to El Salvador's notorious CECOT prison despite a withholding of removal order. *Id.* at 4. Twelve days later, Abrego Garcia filed suit in this Court challenging his unlawful removal. *Id.* The Government "disingenuously slow footed his return" despite orders from this Court, the Fourth Circuit, and the Supreme Court. ECF No. 141 at 8; ECF No. 110 at 5. The Government finally returned Abrego Garcia to United States soil on June 6, but only after securing an indictment in the Middle District of Tennessee on May 21. ECF No. 110 at 5; *United States v. Abrego*, 802 F. Supp. 3d 1055, 1060 (M.D. Tenn. 2025). There, Abrego Garcia established a *prima facie* case that the criminal prosecution is unconstitutionally vindictive and retaliatory. *Abrego*, 802 F. Supp. 3d at 1061–62. In that preliminary ruling, the Middle District of Tennessee found sufficient evidence to support a presumption of vindictiveness, even as proceedings remain ongoing to determine whether the actual vindictiveness standard is satisfied. *Id.* at 1060–61 (citation omitted).

When Abrego Garcia was released from criminal detention on August 22, 2025, the Government "found this result intolerable and complained bitterly." ECF No. 110 at 5. That same day, the Government designated Uganda as Abrego Garcia's country of removal and instructed Abrego Garcia to report to an ICE facility in Baltimore on August 25. ECF No. 1-5; ECF No. 1-4. On or before August 21, however, the government of Costa Rica offered to grant Abrego Garcia residency as a refugee. ECF No. 110 at 6; ECF No. 1-3. On August 23, Abrego Garcia designated Costa Rica as his preferred country of removal under 8 U.S.C. § 1231(b)(2)(A) and asserted a fear of persecution or torture in Uganda. ECF No. 1-7; ECF No. 1-6. Since then, Abrego Garcia has implored the Government to remove him to Costa Rica, and the Government has refused without

2

explanation for seven months. ECF No. 110 at 8–9; ECF No. 141 at 8 n.4 (describing these facts as "extraordinary").

Instead of explaining its refusal to remove Abrego Garcia to Costa Rica, the Government "made one empty threat after another to remove him to countries in Africa with no real chance of success." ECF No. 141 at 8. On August 22, the Government designated Uganda even though that government "ultimately said no." ECF No. 110 at 10 (quoting ECF No. 52 at 134:16–22). Fourteen days later, on September 5, the Government designated Eswatini. ECF No. 27-3. As revealed at the October 10 hearing, the Government had designated Eswatini 33 days before it even asked that government if it would accept Abrego Garcia, which it ultimately declined to do. ECF No. 52 at 56:13–21 (Government's witness testifying he had no knowledge of the Government requesting that Eswatini accept Abrego Garcia until two days before the October 10 hearing); ECF No. 110 at 10 (citing ECF No. 52 at 29:6–11, 54:23–25, & 56:5–7); *see also* ECF No. 32-6. Then, on October 9—one day before the Court's hearing on removal to Eswatini and 34 days after designating that country—the Government designated Ghana. ECF No. 110 at 10 (citing ECF No. 52 at 32:11–19, 156:3–25). Once that designation became public the next day, however, Ghana's government "immediately announced" it was not accepting Abrego Garcia. *Id.* (citing ECF No. 49-1). The Government ultimately conceded that the Ghana designation was "prematurely sent." *Id.* at 28 (quoting ECF No. 52 at 32:18–19).

Once Ghana was rebuffed, the Government represented to the Court that it would "stipulate" that "Costa Rica is on the table if Eswatini falls through." *Id.* at 11 (quoting ECF No. 52 at 107:8–10). Its sole witness at an evidentiary hearing on the issue, Deputy Assistant Director of ICE Enforcement and Removal Operations, John Schultz, testified that he "knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from [the

Government] that effectuating such removal would run contrary to 'U.S. interests,'" and that "he had been told nothing about why [the Government] had not yet processed Abrego Garcia's removal to Costa Rica." *Id.* at 10–11 (citing ECF No. 52 at 105:12–15, 105:16–22, 106:11–24).

Nevertheless, on October 24, the Government designated Liberia, which agreed to accept Abrego Garcia only on a "temporary" basis—still without explanation for bypassing Costa Rica. ECF No. 110 at 11 (quoting ECF No. 72-6 at 3); *see also* ECF No. 56; ECF No. 57-1 at 2. Then, on November 7, under the cover of sealed briefing, the Government went further: it claimed Liberia was "the only state" willing to accept Abrego Garcia because Costa Rica "does not wish to receive" and "would not simply accept" him. ECF No. 110 at 12 (quoting ECF No. 85 at 9 & 14; ECF No. 75-6); *see also* ECF No. 85 at 7 (claiming the Government "can hardly be at fault for not removing [Abrego Garcia] to *a country that refuses to accept him*" (emphasis added)). That effort "backfired": as soon as the Government's claims of Costa Rica's changed position became public, Costa Rica confirmed its continued, unwavering, and unconditional commitment to accepting Abrego Garcia. ECF No. 110 at 14. At a November 20 hearing, the Government produced the declarant who had signed the submission claiming Costa Rica would not accept Abrego Garcia. He testified that he had no knowledge of Costa Rica's position and could not explain the contents of his own declaration—ignorance the Court described as "planned and purposeful." *Id.* at 13–14 (quoting ECF No. 107 at 26:8–27:12).

Sixty-four days passed between Costa Rica's offer to accept Abrego Garcia and the Government's designation of Liberia. Throughout, the Court's orders to the Government to produce witnesses that could explain the Government's "inexplicable reluctance" to remove Abrego Garcia to Costa Rica "were ignored without justification," and the Government "affirmatively misled the [Court]" about Costa Rica's willingness to accept him. *Id.* at 28–29.

On December 11, this Court granted Abrego Garcia's habeas petition and ordered his immediate release, finding that there was no evidence of a final order of removal and thus no significant likelihood of lawful removal in the reasonably foreseeable future. ECF No. 110. Less than twelve hours later, the Government obtained an order from an immigration judge purporting to add an order of removal to the October 2019 withholding decision *nunc pro tunc*. ECF No. 112-2. The Court granted Abrego Garcia's December 12 emergency motion for a temporary restraining order (**TRO**) barring his re-detention on the basis of the purported *nunc pro tunc* order. ECF No. 114. After a hearing on December 22, an additional status conference on January 14, 2026, and additional briefing, ECF Nos. 125, 137, 138, 139, the Court ruled on February 17 that the *nunc pro tunc* order could not reset the *Zadvydas* clock, reaffirmed that no significant likelihood of lawful removal existed, and converted the TRO into a preliminary injunction barring Abrego Garcia's re-detention. ECF No. 141.

On March 2, 2026, "Senior Official Performing the Duties of the Director" Todd Lyons issued a memorandum (**Lyons Memorandum**) purporting to disregard Abrego Garcia's designation of Costa Rica as his country of removal, asserting that (1) Abrego Garcia's only opportunity to designate a country for removal was during his May 2019 initial removal proceeding, and (2) removal to Costa Rica would be "prejudicial to the United States" because of political capital invested in negotiating with Liberia. ECF No. 143-1. On March 20, the Government filed the instant motion. ECF No. 142 (**Mot.**). On March 23—three weeks after the Lyons Memorandum and while this motion was pending—the United States signed a removal cooperation agreement with Costa Rica, under which Costa Rica agreed to serve as a removal destination for migrants deported by the United States from third countries, accepting up to 25 people per week. *See Costa Rica plans To Accept U.S.-Sent Migrants From Other Countries*,

Reuters (Mar. 23, 2026), https://www.reuters.com/world/americas/costa-rica-plans-accept-us-sent-migrants-other-countries-2026-03-24 ("Ex. A").

## Legal Standard

Courts in this district have looked to Federal Rule of Civil Procedure 60(b)(5) to determine whether to dissolve an injunction. *See, e.g.*, *Stone v. Trump*, 400 F. Supp. 3d 317, 332 (D. Md. 2019). Under that standard, the party seeking to dissolve the injunction "as 'no longer equitable' has the 'burden of establishing that a significant change in circumstances warrants'" dissolution. *L.J. v. Wilbon*, 633 F.3d 297, 304–05 (4th Cir. 2011) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992)). To meet this burden, the movant "must demonstrate 'significant changes in fact, law, or circumstances since the [Court's] previous ruling.'" *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 506 F. Supp. 3d 328, 338 (D. Md. 2020) (quoting *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012)); *L.J.*, 633 F.3d at 305 ("A party 'may meet its initial burden by showing either a significant change either in factual conditions or in law' that makes 'enforcement of the decree ... detrimental to the public interest.'" (quoting *Rufo*, 502 U.S. at 384)). "[M]inor changes in the facts or law usually are insufficient." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 60 F.3d 823, 1995 WL 406612, at *3 (4th Cir. 1995) (unpublished). Here, the Government fails to meet its burden.

## Argument

**I.    This Court Has Jurisdiction To Maintain The Injunction.**

The Government faults the Court for failing to reconsider its jurisdiction in light of the existence of a final removal order (Mot. 9), despite the Government's failure to argue such reconsideration was warranted in its prior briefing. *See generally* ECF No. 137. In any event, this Court and others have repeatedly explained why neither 8 U.S.C. § 1252(a)(5), (b)(9), nor (g) deprives it of jurisdiction. *See Abrego Garcia v. Noem*, No. 25-cv-00951 ("*Abrego Garcia I*"), ECF

No. 31 at 7–16; *Abrego Garcia v. Noem*, 2025 WL 1021113, at \*2–3 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring); *Abrego Garcia I*, ECF No. 238 at 12–14. Nor does the existence of a final removal order change the Court's jurisdiction over Abrego Garcia's *Zadvydas* claim, as the Court recognized in its December 11 order. *See* ECF No. 110 at 16 n.13. The Government fails to acknowledge this separate basis for jurisdiction. Mot. 9.

Accordingly, and for the reasons Abrego Garcia previously explained, *see* ECF No. 32 at 8–10; ECF No. 87 at 7–16; ECF No. 118 at 8–10, the Court retains jurisdiction.

## II.    The Government Has Not Carried Its Burden To Dissolve The Injunction Against Abrego Garcia's Removal.

The Government essentially concedes that there has been no "significant changes in fact, law, or circumstances" warranting dissolution, *Am. Coll. of Obstetricians & Gynecologists*, 506 F. Supp. 3d at 338 (citation omitted), arguing that the "removal agreement [with Liberia] has not changed since October 2025," and the Government "has, for months and continuing to the present day, been ready, willing, and able to promptly remove" Abrego Garcia to Liberia. Mot. 7. The Court already rejected these contentions in its rulings in December 2025 and February 2026. ECF No. 110 at 28–29; ECF No. 141 at 8–9. The motion should be denied on this basis alone.

The only nominally "new" evidence the Government introduces is the Lyons Memorandum and the Schultz Declaration. *See* ECF Nos. 142-1; 143-1. The Lyons Memorandum purports to conclude that: (1) the *only* time Abrego Garcia could designate a third country for removal under 8 U.S.C. § 1231(b)(2)(A) was in his May 2019 initial immigration hearing; (2) removal to Costa Rica would be "prejudicial to the United States" because of the "resources and political capital" expended on negotiations with Liberia; and (3) the United States will remove Abrego Garcia to Liberia "absent any legal impediments." ECF No. 143-1. The Schultz Declaration, for its part, attaches a mock flight itinerary and asserts that removal to Liberia could be accomplished within

7

days. ECF No. 142-1 ¶¶ 18–19. These legal assertions are incorrect, and the factual assertions are not credible. In any event, as detailed below, removal to Liberia remains unlawful.

### A.     Removal To Liberia Would Violate 8 U.S.C. § 1231(b)(2).

Abrego Garcia has validly designated Costa Rica as his country of removal under § 1231(b)(2), and the Government has not lawfully invoked any statutory basis to override that designation. Accordingly, the Government cannot lawfully remove Abrego Garcia to Liberia.

### 1.     Abrego Garcia's Designation of Costa Rica Is Valid.

The Lyons Memorandum asserts that Abrego Garcia's designation of Costa Rica was untimely because he had already designated El Salvador during a hearing on May 29, 2019. ECF No. 143-1 at 2. That argument fails on its face. By the plain terms of the statute, a noncitizen can designate "one country to which [he] wants to be removed" only if he "*has been ordered removed*." 8 U.S.C. § 1231(b)(2)(A)(i) (emphasis added). As of May 29, 2019, Abrego Garcia had not been ordered removed. ECF No. 110 at 24 (holding that no order of removal existed as of that date). Even treating the *nunc pro tunc* removal order as dating to October 2019, that postdates the May 2019 hearing by several months. The May 2019 statement was therefore legally incapable of constituting a designation under § 1231(b)(2)(A). Thus, the Lyons Memorandum's assertion that Abrego Garcia designated a country of removal in May 2019 is simply wrong.

Were that not enough, the transcript of the May 2019 hearing shows that immediately after purporting to designate El Salvador, Abrego Garcia expressed fear of removal there. ECF No. 137-1 at 6. It is therefore clear from the transcript that, even if he lawfully could have done so at the time (he could not), he was not intending to designate El Salvador as the "one country to which [he] *wants to be removed*." 8 U.S.C. § 1231(b)(2)(A)(i) (emphasis added).

The only country Abrego Garcia has designated under § 1231(b)(2)(A) is Costa Rica. He made that designation on August 23, 2025, within 48 hours of receiving assurances from Costa

Rica that it would grant him legal status and not return him to El Salvador, and within 24 hours of the Government's first notice that it intended to remove him to a third country (Uganda). ECF No. 1-7; ECF No. 1-3; ECF No. 1-5. There was no meaningful earlier opportunity to exercise that right.

### 2. The Lyons Memorandum Is Not Authoritative.

The Government argues that even if Abrego Garcia's designation of Costa Rica is valid, the Lyons Memorandum overrides that designation. As the next section explains, that is wrong on the merits. But it is also wrong for the threshold reason that the Government has not shown that Lyons has any authority to attempt to override Abrego Garcia's designation.

The authority to disregard a noncitizen's country designation as "prejudicial to the United States" under § 1231(b)(2)(C)(iv) is vested by statute in the "Attorney General," and has since been transferred by the Homeland Security Act of 2002 to the "Secretary of Homeland Security." *See Jama*, 543 U.S. at 338 n.1. It is unlawful for a person to carry out authority statutorily entrusted to a specific official unless that official lawfully delegated the authority to that person. *See United States v. Giordano*, 416 U.S. 505 (1974); *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997); *see also Service v. Dulles*, 354 U.S. 363, 387 n.40 (1957) ("No doubt the Secretary could delegate that duty. But nothing of the kind appears to have been done here."). While government officials typically have broad discretion to subdelegate authority, "a delegation must actually have been made." *3Nod Digital (Hong Kong) Ltd. v. U.S. Dep't of State*, 2026 WL 759439, at *5 (D.D.C. Mar. 18, 2026) (setting aside action by an Office of the State Department due to lack of record evidence of delegation from the Secretary of State).

In 2004, the Secretary of Homeland Security delegated to the Director of ICE (also called the Assistant Secretary of ICE) the authority to implement certain immigration laws. *See* Department of Homeland Security Delegation 7030.2, Delegation of Authority to the Assistant

9

Secretary for U.S. Immigration and Customs Enforcement (Nov. 13, 2004).[1] That delegation is extremely precise about which authorities under which statutes are encompassed by the delegation. Among other things, it grants the Director of ICE authority to carry out certain provisions of § 1231, including to "issue and execute detainers and warrants of arrest or removal, detain aliens, release aliens on bond and other appropriate conditions as provided by law, and remove aliens from the United States," *id.* § 2(T), and to "reinstate exclusion, deportation, and removal orders," *id.* § 2(Y). But nothing in that delegation—or in any other delegation that Petitioner has located— authorizes the Director of ICE to exercise the authority of the Secretary of Homeland Security to disregard a noncitizen's designation of a country of removal under § 1231(b)(2)(C)(iv).

Moreover, even if the *Director of ICE* had such authority, there is no evidence that *Lyons* lawfully exercised such authority. The Director of ICE is an officer of the United States who is required by the Constitution and by statute to be appointed by the President and confirmed by the Senate. U.S. Const. art. II, § 2, cl. 2; 6 U.S.C. § 113(a)(1)(G). Lyons has never been appointed Director of ICE by the President and confirmed by the Senate. Instead, the office of Director of ICE is currently vacant. Indeed, when Lyons signed the Memorandum on March 2, 2026, he expressly signed it not as the Director of ICE but instead as the "Senior Official Performing the Duties of the Director." ECF No. 143-1 at 1.

The Federal Vacancies Reform Act (**FVRA**) provides that when the office of the Director of ICE is vacant, only "the first assistant to the office" or a person directed by "the President (and

---

[1] *Available at* https://www.ice.gov/doclib/foia/policy/7030.2_DelegationAuthority_03.01.2003.pdf. Todd Lyons has relied on that delegation recently in other contexts. *See, e.g.*, ICE Delegation Order (April 16, 2025), *available at* https://www.ice.gov/doclib/foia/policy/005-2025_DelegationLimitedCustomsOfficerEnfAuthorityToERO.pdf.

only the President)" may perform the office's functions and duties, *see* 5 U.S.C. § 3345(a), and they may do so for no more than 210 days, *see* 5 U.S.C. § 3346(a).

Lyons does not satisfy the FVRA's requirements. He was not (and is not) the "first assistant" to the Director of ICE; rather, the first assistant is the Deputy Director of ICE, a role currently held by Charles Wall, but never held by Lyons. *See* Press Release, Dep't of Homeland Sec., *Secretary Noem Announces New Deputy Director of ICE* (Jan. 15, 2026)[2]; *ICE Leadership*, U.S. Immigration & Customs Enforcement (Feb. 3, 2026)[3] (Leadership Biography for Todd M. Lyons: "Prior to this appointment Mr. Lyons served as the Executive Associate Director of ICE's Enforcement and Removal Operations directorate."). Nor was Lyons directed by the President to perform the functions and duties of the Director of ICE. Instead, he was named the "Acting ICE Director" by then-Secretary of Homeland Security Noem. Press Release, U.S. Dep't of Homeland Sec., *Secretary Kristi Noem Announces Expanded Leadership to Revamp ICE* (Mar. 9, 2025).[4] And Lyons was named Acting ICE Director on March 9, 2025, which was 358 days before he signed the Lyons Memorandum—well in excess of the 210-day limit set by the FVRA.

Actions taken by a person improperly serving as an acting officer are void under the FVRA. 5 U.S.C. § 3348(d)(1). That Lyons signed the Memorandum as "Senior Official Performing the Duties of the Director" rather than as "Acting ICE Director" makes no difference; the Supreme Court has held that titular distinctions of the kind the Government employs here do not place an acting official outside the FVRA's reach. *See NLRB v. SW General, Inc.*, 580 U.S. 288 (2017).

---

[2]   *Available at* https://www.dhs.gov/news/2026/01/15/secretary-noem-announces-new-deputy-director-ice.

[3]   *Available at* https://www.ice.gov/leadership.

[4]   *Available at* https://www.dhs.gov/news/2025/03/09/secretary-kristi-noem-announces-expanded-leadership-revamp-ice.

11

And even setting aside the FVRA violation, nothing in the record shows that the Secretary of Homeland Security ever delegated to the "Senior Official Performing the Duties of the Director" the authority to disregard a designated country of removal under § 1231(b)(2)(C)(iv). The Court should, accordingly, set aside the Lyons Memorandum as having no legal force or effect. *See* 5 U.S.C. § 3348(d)(1); *3Nod Digital*, 2026 WL 759439, at *5–6.

### 3. The Lyons Memorandum Does Not Lawfully Override That Designation.

Even setting aside the authority question, the Memorandum fails on its own terms. Because third-country removals are rare and virtually unheard of until 15 months ago, ECF No. 88 at 23 n.4, and because ignoring a noncitizen's designation under § 1231(b)(2)(A) is rarer still, *see, e.g.*, ECF No. 141 at 8 n.4, there is little law on the scope of the Government's authority under that section. Nevertheless, it has long been held that under § 1231(b)(2)(C)(iv), the Government "may not completely ignore a properly made choice merely as a matter of whim or caprice." *United States ex rel. Scala Di Felice v. Shaughnessy*, 114 F. Supp. 791, 794 (S.D.N.Y. 1953). Further, the Supreme Court has held that § 1231(b)(2) "provides four consecutive removal commands," which as relevant here, dictate that the noncitizen "*shall* be removed to the country of his choice (subparagraphs (A) to (C)), *unless* one of the conditions eliminating that command is satisfied." *Jama v. ICE*, 543 U.S. 335, 341 (2005) (emphasis added), *aff'ing sub nom.*, *Jama v. INS*, 329 F.3d 630, 633 (8th Cir. 2003) (holding the Government may not disregard the noncitizen's designation under § 1231(b)(2)(A) unless it can demonstrate that at least one of the "four specified circumstances" in § 1231(b)(2)(C) applies).

At various times in this case, the Government has argued that decisions under § 1231(b)(2) are discretionary and therefore courts are barred from reviewing them. *See* ECF No. 72 at 20–22; ECF No. 107 at 127:24–128:9. As Abrego Garcia has explained, that is incorrect—where

§ 1231(b)(2)(C)'s exceptions are not met, there is no discretionary decision to make or discretionary action to take. ECF No. 88 at 13–16. The Court should be especially hesitant to accept the Government's claim of immunity from judicial review in this case because the last time the Government sought to evade review on § 1231(b)(2), the Government "affirmatively misled the [Court]." ECF No. 110 at 29 (citing ECF No. 85 at 9, 14; ECF No. 75-6 ¶ 5). If there were ever "a rare case in which the alleged basis of discrimination is so outrageous" as to warrant additional judicial scrutiny, this would be the case. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 491 (1999); *see generally Abrego*, 802 F. Supp. 3d 1055.

As explained further below, the Government's reasoning in the Lyons Memorandum does not withstand even the most deferential level of scrutiny.

### a.     Applicable Standard Of Review.

"The Supreme Court has not announced a categorical rule for the standard of review in immigration cases." *Miot v. Trump*, --- F. Supp. 3d ---, 2026 WL 266413, at *30 (D.D.C. Feb. 2, 2026). The Supreme Court has explained, however, that even when the Government's discretion is at its apex—such as in the context of visa denials—the Government still may not act without "a facially legitimate and bona fide reason." *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972); *Tomas-Ramos v. Garland*, 24 F.4th 973, 980–82 (4th Cir. 2022) (observing that in the "limited and distinctive setting" of visa denials, the Government exercises "'plenary power' and virtually unlimited discretion"). Given the level of discretion, the Fourth Circuit has rejected the Government's invitation to apply it where Congress has imposed express limits on the Government's removal authority. *Tomas-Ramos*, 24 F.4th at 980–82. Moreover, "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas*, 533 U.S. at 693; *DHS v. Thuraissigiam*, 591 U.S. 103, 107 (2020). Thus, while *Mandel*'s standard of review may be

13

sufficient for noncitizens prior to entry, a more searching standard is required for those already present in the United States. *See, e.g.*, *CASA, Inc. v. Noem*, 2025 WL 3514378, at *3–4 (D. Md. Dec. 8, 2025) (refusing to apply *Mandel* to review the cancellation of temporary protected status on this basis); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 183 (D. Mass. 2025) (recognizing this distinction).

Abrego Garcia is not a visa applicant who has yet to enter the United States; until March 2025, he was living and working in Maryland for over a decade. ECF No. 110 at 2–4. The Government's authority in removing Abrego Garcia to a country other than the one he designates is not unlimited; it is circumscribed by the "four specified circumstances" in § 1231(b)(2)(C). *Jama*, 329 F.3d at 633. Circuit precedent therefore indicates the Court must apply the substantial evidence standard to its review of the Lyons Memorandum, not *Mandel*'s highly deferential standard. *Tomas-Ramos*, 24 F.4th at 980–82; *see also* ECF No. 88 at 22–23. Nevertheless, the Court need not decide this issue because the Lyons Memorandum does not withstand even the most deferential standard of review.

> **b.** **The Lyons Memorandum Lacks A Facially Legitimate And Bona Fide Reason As To Why Removal To Costa Rica Would Be Prejudicial To The United States.**

Under *Mandel*, courts may not "'look behind' [the Government's] explanation" or "second guess" the Government's reasoning so long as it provides a "facially legitimate and bona fide reason" for its action. *Tomas-Ramos*, 24 F.4th at 981–82 (quoting *Mandel*, 408 U.S. at 770). That said, courts may "look behind" the Government's asserted reasoning based on an "affirmative[] show[ing] [of] bad faith." *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021) (citing *Kerry v. Din*, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring in the judgment)). This is consistent with other Supreme Court precedents that permit further judicial inquiry into "'the mental processes of administrative decisionmakers' upon a 'strong showing of bad faith or improper behavior.'" *Dep't*

14

*of Com. v. New York*, 588 U.S. 752, 755 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Although the Court's review is deferential, it is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* at 785 (citation omitted). Applying this standard, multiple courts recently held that suppression of, or retaliation for, the exercise of First Amendment rights is not a "facially legitimate and bona fide" reason under *Mandel*. *See Am. Ass'n of Univ. Professors*, 802 F. Supp. 3d at 183; *President & Fellows of Harv. Coll. v. DHS*, 788 F. Supp. 3d 182, 201 & n.9 (D. Mass. 2025).

Two undisputed facts foreclose the Government from arguing at this point that removing Abrego Garcia to Costa Rica would be prejudicial to the United States. First, the Government's own designated witness, Schultz, testified under oath that he "knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from [the Government] that effectuating such removal would run contrary to 'U.S. interests.'" ECF No. 110 at 10–11 (citing ECF No. 52 at 105:12–15). That sworn concession binds the Government here. Second, on March 23, 2026, the United States signed a broad removal cooperation agreement with Costa Rica, under which Costa Rica agreed to accept migrants deported by the United States from third countries. *See* Ex. A. By executing a deportation deal with Costa Rica, the Government cannot now credibly maintain that sending Abrego Garcia to Costa Rica would be diplomatically prejudicial.

Faced with that reality, the Government's offered justification for disregarding Abrego Garcia's designation of Costa Rica is illegitimate on its face. The Lyons Memorandum asserts that such removal would "cast doubt on the diplomatic reliability of the United States" because the Government expended "resources and political capital" to negotiate Liberia's acceptance of Abrego Garcia, among others. ECF No. 143-1 at 3. Yet Costa Rica agreed to accept Abrego Garcia, and Abrego Garcia designated Costa Rica as his country of removal in August 2025—at least 50

days *before* the Government expended any resources in negotiating with Liberia. *See supra* pp .2–4. Section 1231(b)(2) "provides four consecutive removal commands" that the Government must follow in order. *Jama*, 543 U.S. at 341. The Government must remove Abrego Garcia to the country of his choice "unless," at that time, "one of the conditions [in § 1231(b)(2)(C)] eliminating that command is satisfied." *Id.* At the time Abrego Garcia designated Costa Rica, its stated reason for prejudice to the United States did not exist; the Government had not even approached Liberia regarding Abrego Garcia. In fact, the Government did not even affirmatively assert that sending Abrego Garcia to Costa Rica would be prejudicial until 193 days *after* Abrego Garcia's designation. *See* ECF No. 1-7; ECF No. 143-1. The Government cannot ignore Abrego Garcia's designation for six months to fabricate a post-hoc reason to disregard it.

Furthermore, the Lyons Memorandum's contention that "abandoning" its agreement with Liberia would "cast doubt on the diplomatic reliability of the United States," ECF No. 143-1 at 3, is irreconcilable with the fact that the United States previously reached agreement with Costa Rica to send Abrego Garcia there—which is what led to Costa Rica's letter stating that it would accept Abrego Garcia. ECF No. 110 at 6; ECF No. 1-3. The Lyons Memorandum also does not acknowledge that the Government repeatedly designated removal countries for Abrego Garcia *before* even asking those countries if they would accept him. ECF No. 110 at 28–29. And the Lyons Memorandum does not acknowledge that the Government "affirmatively misled the [Court]" by misstating Costa Rica's position, attempting to conceal this fact through sealing, and requiring the government of Costa Rica to correct the record through the media. ECF No. 110 at 12, 29.

Tellingly, the Government in its Motion has not pointed to any comparable cases in which the United States has validly claimed prejudice from removing a noncitizen to a designated country. And the scant cases that address the subject show that the Government's assertions here

16

fall far short of showing true prejudice to the United States. For example, the Government asserted it would be prejudicial to admit a noncitizen from Communist Hungary in the midst of the Cold War who was a "danger to the national security." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 216 (1953); *see also id.* at 223 (Jackson, J., dissenting). The Government has also asserted it would be prejudicial to deport to Ireland an accused terrorist who was convicted of murdering a British Army Captain as a member of the Provisional Irish Republican Army. *Doherty v. Meese*, 808 F.2d 938 (2d Cir. 1986). This case is nothing like those and the asserted prejudice here is nothing like the asserted prejudice in those cases.

On this record, the Government's reasoning in the Lyons Memorandum is not a "facially legitimate and bona fide reason" for refusing to remove Abrego Garcia to Costa Rica. In *Abrego Garcia I*, the Court already found the Government was acting in bad faith. *Abrego Garcia I*, ECF No. 100 at 2; *see also Abrego Garcia I*, ECF No. 235 at 11:7–10 (stating to the Government "you have taken the presumption of regularity and you've destroyed it in my view, because I can't presume anything to be regular in this highly irregular case"). The Government's refusal to follow the Court's orders regarding witnesses here, its affirmative misleading the Court, and then unsuccessful attempt to cover it up is only further proof that the Government's bad faith continues. *See Six v. Generations Fed. Credit Union*, 891 F.3d 508, 519–20 (4th Cir. 2018) (upholding sanctions for bad faith conduct upon the finding that the litigants "deliberately misled the Court"). If concealing the true motivation behind a policy change is sufficient to constitute a "strong showing of bad faith or improper behavior," *Dep't of Com.*, 588 U.S. at 785, "affirmatively misle[ading] the [Court]" surely is, ECF No. 110 at 29.

Moreover, absent a plausible explanation for the Government's refusal to remove Abrego Garcia to Costa Rica—which the Government presumably would have done had Abrego Garcia

17

pleaded guilty in the Middle District of Tennessee—its continued refusal to do so can only be seen as an extension of the vindictive prosecution and retaliation for Abrego Garcia's exercise of his rights—including his First Amendment right to petition the courts for redress of his grievances— to challenge his initial unlawful removal. *See generally Abrego*, 802 F. Supp. 3d 1055. Retaliation for the exercise of First Amendment rights cannot be a "facially legitimate and bona fide" reason under *Mandel*. *See Am. Ass'n of Univ. Professors*, 802 F. Supp. 3d at 183; *President & Fellows of Harv. Coll.*, 788 F. Supp. 3d at 201 & n.9.

**B.**     **Removal To Liberia Would Violate Abrego Garcia's Due Process Rights.**

Removal to Liberia also violates Abrego Garcia's right to due process under the Fifth Amendment for two independent reasons: it was not preceded by constitutionally adequate process, and it is retaliatory punishment rather than a legitimate exercise of removal authority.

**1.**     **Removal To Liberia Would Violate Abrego Garcia's Procedural Due Process Rights.**

It is well established that the Fifth Amendment entitles noncitizens to due process in the context of removal proceedings, including removal to third countries. *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Because withholding of removal is country-specific, noncitizens are entitled to "notice and an opportunity to request withholding of removal to *that* particular country." *Cruz Medina v. Noem*, 806 F. Supp. 536, 548 (D. Md. 2025) (quoting *Guzman Chavez v. Hott*, 940 F.3d 867, 879 (4th Cir. 2019)). That means "[n]oncitizens have a right to meaningful notice and opportunity to be heard before being deported to a third country." *Id.* (quoting *Sagastizado Sanchez v. Noem*, 2025 WL 2957003, at *2 (S.D. Tex. Sept. 10, 2025)). Due process further requires meaningful review of any negative fear determination, not merely a single, unreviewed USCIS officer determination at the more demanding "more likely than not" standard. *Id.* at 542; ECF No. 88 at 18–20.

18

The fear determination Abrego Garcia received falls short on every requirement. On October 28, 2025, a single USCIS asylum officer conducted a screening interview to assess whether Abrego Garcia would more likely than not be persecuted or tortured in Liberia. That officer did not have the benefit of three of the four relevant documents in the Government's possession regarding Liberia's assurances of Abrego Garcia's safety. ECF No. 71 at 13 n.2. The officer also was not permitted to consider the risk of chain refoulement, despite that risk being a central concern given that Liberia agreed to accept Abrego Garcia only on a "temporary" basis, and that once that arrangement expires, he will have nowhere to go but El Salvador. ECF No. 72-6. A fear determination that ignores that fact is constitutionally inadequate regardless of who conducts it. Any review that asks only whether Abrego Garcia faces a risk of harm in Liberia, without accounting for the well-accounted for prospect that Liberia will ultimately return him to El Salvador, is not meaningful review. *See also* ECF No. 88 at 26 (arguing the same). When the interview concluded, Abrego Garcia was not given any explanation for why his claim was denied; he received only a check-the-box form stating the conclusion. ECF No. 88 at 18–19. Where "an individual is not provided 'notice of the factual basis' for a material government finding and 'a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker,'" "the risk of an erroneous deprivation is too high." *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 325 (4th Cir. 2021) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004)).

The legal standard applied at that interview compounds the problem. In the ordinary course, a screening interview of this kind is conducted under the more lenient "reasonable possibility" standard precisely because it is a preliminary screening, not a final adjudication. ECF No. 71 at 17–18. The Government instead applied the more demanding "more likely than not" standard—a threshold ordinarily reserved for final determinations. There can be no serious dispute that an

unreviewed determination conducted at a higher-than-required standard creates an elevated risk of erroneous deportation. ECF No. 88 at 19.

The Government's own conduct confirms that a single USCIS determination is not enough. DHS regulations in analogous circumstances reflect that the Government itself does not consider such a determination to be sufficiently protective. 8 C.F.R. §§ 1208.30(g), .31(g). "[T]he Court need look no further than DHS regulations themselves to conclude that, where a person alleges that he would be persecuted or tortured if removed to a particular country, a single review by an asylum officer creates an unacceptably high risk of erroneous deprivation." *Cruz Medina*, 806 F. Supp. 3d at 549. Indeed, Schultz, the Government's own designated witness, testified at the October 10 hearing that it was his understanding that ordinary course immigration judge review of a negative fear determination "will occur." ECF No. 52 at 143:11–25. That testimony binds the Government here. No immigration judge review has been provided. No court in the Fourth Circuit has found the Government's March 30 Memorandum procedures constitutionally sufficient. *See Juarez Villatro v. Noem*, No. 1:25-cv-2359, ECF No. 18 (E.D. Va. Jan. 6, 2026); *Rivas Rojas v. Noem*, No. 1:25-cv-1624, ECF No. 18 (E.D. Va. Nov. 17, 2025). This Court has already reached the same conclusion in the related civil matter, finding that adherence to the March 30 Memorandum "raised a substantial risk that Abrego Garcia could once again be removed without due process and in a manner that would evade this Court's jurisdiction." *Abrego Garcia I*, ECF No. 238 at 8. Nothing has changed to warrant a different conclusion now.

The Government has argued that this Court's injunction is what has prevented it from completing the removal process. That argument has it backwards. It is the Government's refusal to provide the constitutionally required process, not this Court's injunction, that has stalled lawful removal. As a court in this district recently explained on similar facts, "immigration judge review

20

is necessary to meet the minimum requirements of constitutional due process before [the noncitizen] can be removed"; the Government's failure to provide that review means "removal cannot be reasonably foreseeable ... because [the noncitizen] will not receive the process he is due." *Portela-Hernandez v. Trump*, 2026 WL 74042, at *14 (D. Md. Jan. 9, 2026). The Government "cannot overcome *Zadvydas*'s due process requirements by skipping other procedures that are constitutionally due." *Id.* The record confirms this: the Government continued designating third countries and conducting a USCIS screening for Liberia while the injunction was in place, demonstrating that the injunction "has not affected the Government's ability to take steps toward effectuation of removal." *Id.* at *7 n.9. The Government, however, has taken no additional, constitutionally-required steps to effectuate Abrego Garcia's removal. And it cannot remove Abrego Garcia before providing the process the Constitution requires. *Id.* at *14.

### 2. Removal To Liberia Would Violate Abrego Garcia's Fundamental Due Process Rights As Applied In This Case.

Civil immigration proceedings must be directed at the "basic purpose" of effectuating lawful removal and must be "nonpunitive in purpose and effect." *See Zadvydas*, 533 U.S. at 697. As set out in the background above, the record demonstrates that the Government's insistence on Liberia is not a legitimate exercise of that authority. It is the latest chapter in a sustained campaign of retaliation against Abrego Garcia for vindicating his legal rights.

The pattern is plain. The Government unlawfully removed Abrego Garcia to CECOT, defied orders from this Court, the Fourth Circuit, and the Supreme Court to return him to the United States, and then secured a pretextual criminal indictment to punish him for vindicating his legal rights. *See supra* p. 2. When that prosecution failed to keep him detained in criminal custody, the Government immediately re-detained him in immigration custody and made "one empty threat after another to remove him to countries in Africa with no real chance of success." ECF No. 141

21

at 8. Throughout, Costa Rica—which had agreed to accept Abrego Garcia *sixty-four days before* the Government first identified Liberia as a third-country removal destination—was ignored without explanation. Worse, when pressed, the Government went further: it falsely indicated *under seal* that Costa Rica's offer to accept Abrego Garcia no longer stood. *See supra* pp.4, 16. After Abrego Garcia successfully moved for this information to be filed publicly, Costa Rica's government corrected the record within twenty-four hours, reaffirming its offer as unwavering and unconditional. ECF No. 110 at 14.

As this Court has already found, the Government's "inexplicable reluctance seemed at odds with continued detention for purposes of third-country removal." ECF No. 110 at 28. The Government's own counsel could offer no explanation, stipulating only that "Costa Rica is on the table if Eswatini falls through." ECF No. 52 at 107:8–10. That too proved false. When Eswatini fell through, the Government did not turn to Costa Rica. It turned to Ghana and then to Liberia— not because Liberia was necessary, but because the Government is determined to send Abrego Garcia to any country except for one that he will go to willingly.

The Lyons Memorandum does not cure this; rather, in advancing a facially illegitimate justification for disregarding Abrego Garcia's designation of Costa Rica as his country of removal, the Lyons Memorandum is additional evidence of the Government's retaliatory and vindictive approach to Abrego Garcia that is already established by the broader record. Moreover, the Government's actions since submitting the Lyons Memorandum have only added to the evidence of retaliatory intent. On March 23, 2026, the United States signed a removal cooperation agreement with Costa Rica under which that country agreed to accept migrants deported by the United States from other countries. *See* Ex. A; Emiliano Rodriguez Mega, *Costa Rica Agrees to Take Migrants Deported by the Trump Administration*, N.Y. Times (Mar. 24, 2026),

https://www.nytimes.com/2026/03/24/world/americas/costa-rica-us-deportation-deal.html ("Ex. B"). That the Government negotiated a broad deportation cooperation agreement with Costa Rica demonstrates that it has no genuine concern about sending migrants there; and there is no evidence that any such concern has ever existed. In the absence of a legitimate justification, the Government's insistence on removing Abrego Garcia to Liberia rather than Costa Rica is retaliatory and barred by due process.

### III. The Government Has Not Carried Its Burden To Dissolve The Injunction Against Abrego Garcia's Detention.

The Government's contention that Abrego Garcia has only been detained for "6 days," Mot. 8, does not present any "significant changes in fact, law, or circumstances since the [Court's] previous ruling" that would warrant dissolving the injunction, *Am. Coll. of Obstetricians & Gynecologists*, 506 F. Supp. 3d at 338 (citation omitted). It also completely ignores the *nunc pro tunc* nature of the removal order despite the Court's detailed explanation of the *nunc pro tunc* order's significance. ECF No. 141 at 3–6. Rather, the Government once again attempts to "conveniently erase this last year of Abrego Garcia's detention and count none of it as relevant to the *Zadvydas* analysis." ECF No. 141 at 6. Just as a *nunc pro tunc* order cannot "rewrite the history of this case," *id.*, the Government cannot do the same through its motion to dissolve.

#### A. Detention To Remove To Liberia Presents The Same Question The Court Has Already Resolved.

This Court has repeatedly explained why Abrego Garcia's continued detention is unlawful under *Zadvydas*. *See* ECF No. 110 at 25–29; ECF No. 141 at 8–9. The Government's motion makes no attempt to grapple with the Court's prior orders and instead attempts to rewrite history by arguing Abrego Garcia has "manufacture[d] a legal obstacle to his removal and … detention." Mot. at 9. The Government provides no basis to dissolve the injunction.

23

As the Court previously explained, between late 2019 and August 2025, the Government made no attempt to remove Abrego Garcia to a third country, which "cuts decidedly against any requested finding that Abrego Garcia's removal is reasonably foreseeable." ECF No. 141 at 7. The Government's motion does not contest this finding. In March 2025, the Government unlawfully "purchased Abrego Garcia's detention in El Salvador and [was] disingenuously slow footed in his return." ECF 141 at 8. The Government's motion ignores this as well. Since August 2025 and through today, the Government "purposely—and for no reason—ignored the one country that has consistently offered to accept Abrego Garcia as a refugee [(Costa Rica)], and to which he agrees to go." ECF 141 at 8.; ECF No. 110 at 28 ("[The Government] did not take any steps to remove Abrego Garcia to the country which *had* offered to take him, Costa Rica. This inexplicable reluctance seemed at odds with continued detention for purposes of third-country removal." (emphasis in original)). Again, the Government's motion fails to acknowledge this reality.

Instead of taking steps to effectuate Abrego Garcia's removal to a viable third country, the Government "made one empty threat after another to remove him to countries in Africa with no real chance of success." ECF No. 141 at 8. While Abrego Garcia was in custody, the Government "notified" Abrego Garcia "of his expulsion to Uganda, then Eswatini, then Ghana; but *none* of these countries were ever viable options, and at least two had not even been asked to take Abrego Garcia before Respondents claimed supposed removal to each." ECF No. 110 at 28. The Government repeatedly "ignored without justification" the Court's orders to explain itself. ECF 110 at 28. When the Government raised the prospect of removal to Liberia, the Government "did not just stonewall," it "affirmatively misle[d] the [Court]" by insisting Costa Rica "will no longer 'accept the transfer' of" Abrego Garcia despite the fact that "Costa Rica had *never* wavered in its commitment to receive Abrego Garcia, just as Abrego Garcia never wavered in his commitment to

resettle there." ECF 110 at 29. Again, the Government's motion fails to acknowledge any of these findings.

The Government's motion does not pretend to offer anything new that would call into doubt the Court's "eas[y] conclu[sion] that there is no 'good reason to believe' removal is likely in the reasonably foreseeable future." ECF No. 141 at 9. Instead, it supplies a memorandum purporting to explain why removal to Costa Rica would be "prejudicial" to the interests of the United States. ECF No. 143-1. As explained above, that memorandum provides no lawful basis to refuse removal to Costa Rica. *Supra* pp. 8–18. The Government also submits an affidavit by John A. Schultz, which states the Government would remove Abrego Garcia to Liberia "without a travel document or completion of any other procedure" and provides a mock itinerary for flights to Liberia dated February 22, 2026 from an unnamed contractor. ECF No. 142-1 ¶¶ 18–19. Yet removal is ordinarily not reasonably foreseeable when the Government has not secured travel documents. *See Lee v. Crawford*, 2026 WL 745263, at *5 (E.D. Va. Feb. 27, 2026); *Banoub v. Crawford*, 2025 WL 3723458, at *11 (E.D. Va. Dec. 23, 2025); *see also Solis Nolasco v. Noem*, 2026 WL 25002, at *5 (D. Md. Jan. 5, 2026); *cf. Piao v. Lyons*, 2025 WL 3046783, at *3 (E.D. Va. Oct. 31, 2025) (removal reasonably foreseeable where petitioner's travel documents to China "were approved").

To the extent this Court considered the absence of logistical steps in finding that removal was not reasonably foreseeable, the point was that the Government had failed to take the steps necessary to effectuate lawful removal—securing travel documents, obtaining written confirmation of acceptance, providing only constitutionally adequate process—not that no charter flight could be arranged. A mock itinerary does not cure any of the deficiencies.

In any event, the Government presents no "significant changes in fact, law, or circumstances since the [Court's] previous ruling," *Am. Coll. of Obstetricians & Gynecologists*,

506 F. Supp. 3d at 338 (citation omitted), that Abrego Garcia's removal is likely in the reasonably foreseeable future, ECF No. 141 at 8–9. As then, the Government has "not yet secured any travel documents necessary to effectuate Abrego Garcia's third-country removal," ECF 141 at 8, and in fact, the Schultz affidavit confirms it has no plans of doing so, ECF No. 142-1 ¶ 18. Accordingly, the Court should deny the motion to dissolve the injunction against detention under *Zadvydas*.

**B.      There Is No Basis For Detention In Aid Of Removal To Any Other Country.**

The Government's motion to dissolve the detention injunction rests entirely on the premise that removal to Liberia is imminent and lawful. For the reasons set out in Section II, it is neither. There is accordingly no basis to dissolve the injunction to permit re-detention in aid of Liberia removal. Nor is there any other removal destination on the table. This Court has already held that the absence of a viable, lawful removal destination is precisely the circumstance that *Zadvydas* is designed to address, and has already applied that analysis to this case. *See* ECF No. 141 at 8–9; ECF No. 110 at 25–29. Nothing in the Government's current submission changes the factual predicates of those holdings. Because the Government has identified no removal destination other than Liberia, and because removal to Liberia is not viable for the reasons stated in Section II, the detention injunction should remain in force regardless of whether the Court frames its analysis around Liberia specifically or the absence of any lawful removal prospect more generally.

**IV.     All Preliminary Injunction Factors Favor Maintaining Both Injunctions.**

The Government argues that the removal injunction should be dissolved in part because this Court failed to conduct a proper preliminary injunction analysis when it entered the August 27, 2025 letter order. Mot. at 10. As an initial matter, the Government has the wrong legal standard. It is seeking dissolution, not opposing entry of a new injunction, and the question is therefore whether it has demonstrated a significant change in circumstances warranting dissolution—a burden it has not come close to meeting, as explained above. *See L.J.*, 633 F.3d at 304–05. If the

Government truly believed that the Court applied the wrong standard when issuing the August 2025 injunction, then it would have moved for reconsideration in this Court or appealed to the Fourth Circuit under 28 U.S.C. § 1292(a)(1). It did neither. Instead, it now seeks dissolution, and the preliminary injunction factors are not the operative framework for a dissolution motion.

In any event, even if the Court were to assess the injunction factors afresh, every one of them favors Petitioner. First, Abrego Garcia has demonstrated a strong likelihood of success for the reasons set out above in Sections II and III. Second, Abrego Garcia would be subjected to irreparable harm if the Court's injunctions are dissolved. Unlawful detention is irreparable injury as a matter of law, "for even minimal periods of time." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This Court already found this factor "easily met." ECF No. 114 at 3. Removal to Liberia on a temporary basis and at risk of chain refoulement to El Salvador would compound that harm in ways that cannot be undone. Third, the balance of the equities and public interest favor Abrego Garcia. Abrego Garcia's interest in avoiding unconstitutional detention and punitive removal is substantial, and any interest the Government has is fully preserved through existing supervision conditions it originally proposed and that the Middle District of Tennessee found adequate to protect the community. ECF No. 114 at 3–4. The Government identifies no reason those conditions are now insufficient. And there is no public interest in permitting an agency to proceed with unlawful action. *Asylum Seeker Advoc. Project v. U.S. CIS*, 2025 WL 3029552, at *9 (D. Md. Oct. 30, 2025).

**V.      The Government's Request For A Ruling By April 17 Should Be Rejected.**

The Government has requested that this Court rule on its motion by April 17, 2026, stating that it will consider the motion denied after that date. Petitioner objects. Mot. at 11.

The only basis for this arbitrary deadline is the Government's separate deadline to appeal the Court's order enjoining Abrego Garcia's re-detention. The Court entered that order on

27

February 17, 2026, *see* ECF No. 141 at 10, so under Federal Rule of Appellate Procedure 4(a)(1)(B), the Government has until April 20, 2026 (the first business day that is 60 days later) to appeal it. The motion does not identify any real-world urgency—no imminent removal window, no expiring diplomatic arrangement, no logistical constraint that would be lost if the Court takes the time this motion warrants. That is not urgency; it is a litigation tactic.[5]

The Government is also the author of the alleged time pressure it now invokes. The Schultz Declaration reveals that ICE obtained the mock flight itinerary on February 17, 2026—the very same day the detention injunction issued. ECF No. 142-1 ¶ 19. The Lyons Memorandum is dated March 2, 2026. *See* ECF 143-1. But the Government did not file the pending motion until March 20, 2026. *See* ECF 142. Moreover, the Government has asserted since October 2025 that Liberia had agreed to accept Petitioner. It could have issued the Lyons Memorandum and obtained a flight itinerary at any point in the interim. Instead, it waited until the eve of an appeal deadline to assemble these submissions and demand a ruling within four weeks. The Court should not reward that choice by compressing the process due to Petitioner.

Such compression would be particularly unjust here because this motion cannot be resolved on the existing record. Indeed, the motion does not present a pure question of law. It rests on new factual submissions—the Schultz Declaration and the Lyons Memorandum—that, however weak, need to be tested before being accepted. This is particularly true given that the Schultz Declaration comes from a declarant whose prior testimony this Court has already found wanting, *see* ECF No. 110 at 13 n.12, and the Lyons Memorandum is contradicted by the Government's own subsequent

---

[5] Abrego Garcia also notes that his counsel offered to join a motion to seek an extension of the Government's deadline to appeal the existing injunctions in the name of judicial efficiency, as the Government's appeal deadline is the only basis for seeking a ruling by April 17. *See* Ex. C (email from S. Young to S. Sandoval-Moshenberg concerning appeal deadline). The Government declined.

conduct and prior representations. *See supra* pp. 8, 15–18. If the Government wishes to place these submissions before this Court as part of the record on the motion to dissolve or any record going forward, it must allow that record to be properly developed. Accordingly, Abrego Garcia has filed a contemporaneous motion for discovery setting forth the specific materials needed to properly respond to the Government's new factual claims and requests a hearing on this Motion before the Court rules.

## Conclusion

The Court should maintain its current injunctions and deny the Government's Motion to Dissolve.

Respectfully submitted,


Dated: April 3, 2026

| | |
|---|---|
| **MURRAY OSORIO PLLC** | /s/ Jonathan G. Cooper |
| Simon Y. Sandoval-Moshenberg | **QUINN EMANUEL URQUHART &** |
| Rina Gandhi |   **SULLIVAN, LLP** |
| 4103 Chain Bridge Road, Suite 300 | Jonathan G. Cooper (D. Md. Bar No. 21345) |
| Fairfax, VA 22030 | Olivia Horton* (*pro hac vice*) |
| (703) 352-2399 | Nithya Pathalam (*pro hac vice*) |
| ssandoval@murrayosorio.com | 555 13th Street NW, Suite 600 |

Washington, DC 20004
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
nithyapathalam@quinnemanuel.com
*admitted in Texas; not admitted in D.C. Supervised by attorney admitted in D.C.*

Andrew J. Rossman (*pro hac vice*)
Sascha N. Rand (*pro hac vice*)
Courtney Daukas (*pro hac vice*)
Morgan L. Anastasio (*pro hac vice*)
Roey Goldstein (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
courtneydaukas@quinnemanuel.com
morgananastasio@quinnemanuel.com
roeygoldstein@quinnemanuel.com

*Counsel for Petitioner*