# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### GREENBELT DIVISION

|  |  |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, <br><br> *Petitioner*, <br><br> v. <br><br> KRISTI NOEM, *et al.*, <br><br> *Respondents*. | Civ. No. 8:25-2780-PX |

## BRIEF OF IMMIGRATION AND CONSTITUTIONAL LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER AND IN OPPOSITION TO RESPONDENTS' MOTION TO DISSOLVE INJUNCTIONS

Charlotte S. Butash (N.Y. Bar No. 5907860)[*]
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
(212) 841-1000
cbutash@cov.com

Suzan F. Charlton (D. Md. Bar No. 09555)
David M. Zionts (D.C. Bar No. 995170)[*]
Hassan Ahmad (D.C. Bar No. 1030682)[*]
Nicolas Peña Brown (D.C. Bar No. 90040775)[*]
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
scharlton@cov.com
dzionts@cov.com
hahmad@cov.com
npenabrown@cov.com

*Counsel for* Amici Curiae
*Immigration and Constitutional Law Professors*

April 10, 2026

[*]*Motion for Admission* pro hac vice *forthcoming.*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................................ii

INTEREST OF *AMICI CURIAE* ........................................................................................ 1

INTRODUCTION ................................................................................................................. 1

ARGUMENT........................................................................................................................ 3

I.    Third-Country Removals Are Punishment. ....................................................... 3

    A.    The Text of the Immigration and Nationality Act Does Not Resolve Whether Congress Intended Third-Country Removals to Operate as Punishment.................................................................................................... 5

    B.    In Practice and In Effect, Third-Country Removals Are Punishment. ................... 7

        1.    The Executive Branch's Third-Country Removals Intend To Punish. ................................................................................................................. 7

        2.    Third-Country Removals Are Punitive In Effect......................................... 9

II.    As Punishment, Third-Country Removals Are Subject to Constitutional Limits............. 12

CONCLUSION.................................................................................................................... 15

Pedro Gerson, Cori Alonso-Yoder, Matthew Boaz, Danielle C. Jefferis, and Tania N. Valdez (collectively, "Immigration and Constitutional Law Professors") respectfully submit this brief as *amici curiae* in opposition to the Government's motion to dissolve injunctions, ECF 142.

## INTEREST OF *AMICI CURIAE*

*Amici* are law professors whose research, writing, and teaching focus on immigration and constitutional law.  They have no personal stake in the outcome of this case.  Their sole interest is in assisting the Court in understanding constitutional principles of immigration and criminal law relevant to the resolution of this case.  Joining in this brief as *amici* are the following professors: Pedro Gerson, Assistant Professor of Law at the Chicago-Kent College of Law; Cori Alonso-Yoder, Assistant Professor of Law and Director of the Immigration Clinic at the University of Maryland Carey School of Law; Matthew Boaz, Assistant Professor of Law at the University of Kentucky Rosenberg College of Law; Danielle C. Jefferis, Schmid Professor for Excellence in Research and Associate Professor of Law at the University of Nebraska College of Law; and Tania N. Valdez, Associate Professor of Law at the George Washington University Law School.[1]

## INTRODUCTION

Deportation—though itself a severe measure—has traditionally been treated as a civil, not penal, sanction.  But that distinction has limits.  The Supreme Court has long held that, when government action is intended to punish, or functions as punishment in substance, the Constitution requires courts to treat it as such, regardless of label.

Removal of a person not to a country of which they are a national, but to a third country

---

[1] The views of *amici* expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.  Pursuant to Local Rule 105.12(b)(4)–(5), *amici* affirm that no counsel for a party authored this brief in whole or in part, and that no person other than *amici* or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

with which they may have no ties at all, crosses that line. Although Congress articulated no clear purpose for third-country removal under the Immigration and Nationality Act ("INA"), its punitive nature is revealed by both Executive intent and the procedure's practical effect. Congress's delegation of expansive immigration authority to the Executive Branch compels courts to examine how that power is used. Here, the Executive has framed third-country removal in explicitly punitive terms and implemented it in ways disproportionate to, and thus inexplicable by, any legitimate regulatory aim. That alone suffices to recognize third-country removal as punishment.

Separate and independent from the Executive Branch's intent, the substance of third-country removal demonstrates its penal nature. Unlike ordinary deportation, it does not return individuals to countries where they hold citizenship or legal rights. Instead, it forcibly transfers them to countries with which they have no real connection, often without lawful status or protection from onward removal. Some of these countries forcibly transfer people directly to prisons. *See e.g.*, Marcos Aleman & Regina Garcia Cano, *What to Know About El Salvador's Mega-Prison After Trump Sent Hundreds of Immigrants There*, Associated Press (Mar. 16, 2025), https://perma.cc/8C23-YSDB. And although the U.S. government must guarantee that individuals will not be sent to any country where they face the prospect of persecution, *see* 8 U.S.C. § 1231(b)(3)(A), third-country removals in practice violate that refoulement assurance. As a result, third-country removal functions as a form of punitive exile, imposing hardship far beyond routine administration of immigration laws.

Recognizing removal to third countries as punishment does not collapse the civil-criminal distinction set out above. To the contrary, it preserves it by delineating a constitutional boundary. Once that line is crossed, the constitutional limits attendant to punishment apply. The Constitution's Due Process Clause and the Eighth Amendment do not permit such penal exile

2

without meaningful safeguards, and the mere fact that this punishment is effectuated through the vehicle of immigration law does not untether it from normal constitutional rules.

In sum, third-country removals constitute punishment and therefore trigger constitutional protections.  Procedural safeguards—notice, an opportunity to be heard, and judicial review—are necessary but not always sufficient.  Even when those requirements are met, a removal may still violate the Due Process Clause or the Eighth Amendment if it exposes the individual to severe harm.  Courts must therefore evaluate the individualized facts of each case and determine whether removal to the Government's selected country violates the procedural or substantive protections of the Constitution.

**ARGUMENT**

## I.    Third-Country Removals Are Punishment.

The Supreme Court has long distinguished between government sanctions that are civil in nature and those that are penal.  That distinction does not simply reflect the line between proceedings that happen to be labeled civil or criminal.  Sanctions are properly understood as punishment—even if imposed in civil proceedings—when Congress "plainly employed the sanction . . . as a punishment" or, if intent is unclear, when the sanction's design and operation reveal a punitive purpose or effect.  *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165–66 (1963); *see also Ellingburg v. United States*, 607 U.S. __, 146 S. Ct. 564, 567 & n.1 (2026) ("Assessing whether a statutory scheme is civil or criminal is first of all a question of statutory construction" and, secondarily, a question of whether "the statutory scheme is so punitive either in purpose or effect as to negate the Government's intention to deem it civil." (cleaned up)).

That inquiry is especially important in the immigration context, where courts have often fielded questions regarding when the government crosses over from civil immigration enforcement to criminal punishment.  As the immigration system has become increasingly criminal in nature,

3

the traditional civil-criminal boundary has blurred and, in some cases, has imposed consequences as severe as criminal penalties without affording the constitutional protections that would accompany formal criminal sanctions.  In *Padilla v. Kentucky*, the Court recognized an obligation for defense counsel to advise criminal defendants of the potential deportation consequences of criminal convictions.  559 U.S. 356, 367 (2010).  Yet at the same time, the Supreme Court explained that "we have long recognized that deportation is a particularly severe 'penalty,' . . . but it is not, in a strict sense, a criminal sanction." *Id.* at 365 (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)).

Although the Supreme Court has not treated deportation—standing alone—as punishment, it has recognized that sanctions resembling banishment or denationalization cross the constitutional line into punishment.  *See Trop v. Dulles*, 356 U.S. 86, 100-02 (1958) (plurality opinion) (concluding "that use of denationalization as a punishment is barred by the Eighth Amendment"); *cf. Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (concluding that a person could not be subjected to "infamous punishment at hard labor" without constitutional protections).  Deportation to a *third country* does exactly that.  Unlike ordinary removals, it sends an individual to a country with which they have no connection—a country not designated for removal by either an immigration judge or by the Department of Homeland Security in the underlying removal proceedings.  These individuals often lack lawful status, durable ties, or the protection of the law in the third country.  In this way, the government has created a system of international exile that puts people at risk of statelessness, which subjects individuals to a condition where they may be "subject to termination at any time" of even the limited rights they may possess.  *Trop*, 356 U.S. at 101–02.  That bears little resemblance to the administrative immigration process courts have long deemed "purely civil." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

4

The traditional *Mendoza-Martinez* framework shows that third-country removals cross the constitutional threshold into punishment.  Under the first prong of the test, congressional intent is ambiguous: the text and legislative history of the INA treat third-country removal as a residual mechanism and say little about its purpose or limits.  In that vacuum, the manner in which the Executive Branch carries out third-country removals matters.  Since early 2025, the Executive Branch has repeatedly framed third-country removal as imposing consequences, deterrence, and incapacitation—core aims of punishment.  Independently, under the second *Mendoza-Martinez* prong, the multi-factor test confirms the same conclusion.  Third-country removal imposes severe disabilities, mirrors historical exile, advances retribution and deterrence, and is excessive relative to any plausible regulatory purpose.  Properly applied, those factors show that third-country removals differ not merely in degree but in kind from traditional immigration enforcement and so constitute punishment.

A.    **The Text of the Immigration and Nationality Act Does Not Resolve Whether Congress Intended Third-Country Removals to Operate as Punishment.**

When Congress enacted a statutory scheme governing the detention and removal of noncitizens, it did not make clear whether it intended third-country removals to be punitive.  The statutory framework governing removals to countries other than those designated by the individual is set forth in 8 U.S.C. § 1231(b)(2)(E).  Subsections (i) through (vi) establish a hierarchy of alternative removal destinations—each with some nexus between the individual and the potential removal destination, whether based on prior admission, recent travel, residence, or birth.  *Id*. § 1231(b)(2)(E)(i)–(vi).

Subsection (vii) establishes statutory authority for third-country removal.  It states: "*If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph,*" the government shall remove the alien to "another country

5

whose government will accept the alien into that country." *Id.* § 1231(b)(2)(E)(vii) (emphasis added). In other words, Congress provided third-country removal as a residual mechanism offering it as a last resort to effectuate removal, if removal to countries with which the individual has any connection is unavailable. But the text provides no further clues, and the legislative materials surrounding the 1952 enactment reflect little substantive deliberation about why relocation to an unconnected state is appropriate as a matter of policy. *See* Immigration & Nationality Act, Pub. L. No. 82-414, § 243, 66 Stat. 163, 212 (1952), codified as amended at 8 U.S.C. § 1231(b)(2); S. Rep. No. 82-1137, at 31–32 (1952).

To the extent congressional attention was drawn to the distinctive harms of third-country removal, the record reflects that such concerns were minimized as unlikely and "remote," with Congress effectively assuming the authority would be "far down the list" and exercised sparingly. Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearings Before the Subcomms. of the Comms. on the Judiciary, 82d Cong. 540 (1951). Congress did not respond by adding substantive standards, defining "last resort," or creating procedures tailored to the banishment-like risks witnesses described (*e.g.*, loss of ties, isolation, exposure to persecution short of "physical persecution"). *Id.* at 540, 628, 681; *see also* S. Rep. No. 82-1137, at 32 (1952) (relying chiefly on a limited "physical persecution" protection administered through Attorney General discretion). Nor did the 1996 restructuring supply a clearer statement of purpose; the third-country authorization persisted without meaningful debate regarding its scope or intended use. *See* Illegal Immigration Reform & Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 305, 110 Stat. 3009-546, 3009-602; *see also* K. Larry Storrs, Cong. Rsch. Serv., RL32735, Mexico-United States Dialogue on Migration and Border Issues, 2001–2005, at 2 (2005), https://perma.cc/ZR7N-TPLC.

**B.    In Practice and In Effect, Third-Country Removals Are Punishment.**

Because the statutory text does not resolve whether Congress intended third-country removals to serve as punishment, courts must look elsewhere to understand the nature of such removals. *See Ellingburg*, 146 S. Ct. at 567 n.1 ("If the text and structure of a statute do not demonstrate that Congress intended criminal punishment, the statute may still be deemed criminal or penal if the party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate the Government's intention to deem it civil." (cleaned up)). First, in light of the deference historically accorded to the Executive Branch in immigration enforcement, courts should look to the Executive's intent in analyzing whether third-country removals constitute punishment in practice. Second, and independently, the *Mendoza-Martinez* factors make clear that third-country removals are plainly punitive in effect. In sum, whether a court looks to the Executive's intent in practice or the nature of the sanction in effect, both paths compel the same conclusion: third-country removals are punishment.

**1.    The Executive Branch's Third-Country Removals Intend To Punish.**

Congress delegated immigration enforcement to the Executive Branch, which exerts extraordinary practical control over how the statutory tools operate. *See Mendoza-Martinez*, 372 U.S. at 168–69; *see also* Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 YALE L.J. 458, 460–65 (2009). When the legislature provides a broad residual mechanism yet supplies no meaningful account of its intended purpose or limits—and then relies on executive discretion as the principal safeguard—courts should look to executive intent to resolve the punishment inquiry. *See* S. Rep. No. 82-1137, *supra*, at 31–32 (1952); Joint Hearings, *supra*, at 540, 715. In that posture, the operative question becomes how the branch wielding the power is using it: whether the Executive is employing third-country removal as a narrow administrative action or as a sanction designed to impose hardship and condemnation. *Cf. Dep't*

7

*of Com. v. New York*, 588 U.S. 752, 785 (2019) (holding that courts need not accept implausible administrative justifications where the record shows otherwise).

As of late, the intent has not been ambiguous: third-country removals have been publicly framed and operationalized in terms that track the traditional aims of punishment—retribution and deterrence—and implemented in ways that maximize incapacitation and condemnation. *See Mendoza-Martinez*, 372 U.S. at 168–69 (recognizing that traditional aims include "retribution and deterrence"); *see also Trop*, 356 U.S. at 96 (concluding that penal purpose can be shown by intent "to reprimand the wrongdoer, to deter others, etc."). Senior administration officials have used explicitly punitive vocabulary, describing third-country removal as a set of "consequences," *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 518 (D. Md. 2025) (quoting ECF No. 10-5 at 4), promising to "punish criminals," *see* Dep't of Homeland Sec., *ICYMI—Deputy Secretary Edgar: "An Illegal Immigrant Killed Two Teenagers in My Community. Under the Trump Administration, He Will Face Justice,"* May 13, 2025, https://perma.cc/3JAU-ZWWJ. At the same time, officials have warned that targets could end up in notorious foreign detention settings—while the program has included removals to prisons, war-torn states, and destinations where refoulement risks are acute, *see, e.g., Mercado v. Noem*, 800 F. Supp. 3d 526, 575–76 (S.D.N.Y. 2025); *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (Mem.) (2025) (Sotomayor, J., dissenting) (compressed notice; inability to assess risks); Memorandum from Todd M. Lyons, Acting Dir., U.S. Immigr. & Customs Enf't, Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.*, No. 24A1153, at 1 (July 9, 2025), https://perma.cc/3BEG-DRTJ. The executive's own posture—treating third-country removal as a highly publicized enforcement effort aimed at consequences, deterrence, and incapacitation—supplies precisely the kind of punitive intent evidence that is often missing in civil-sanction cases. *See Mendoza-Martinez*, 372

8

U.S. at 168–69; *see also Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979) (recognizing that due process turns on whether a restriction is imposed "for the purpose of punishment" or is "excessive" relative to a legitimate nonpunitive purpose).  In short, where Congress left its intent largely unstated and entrusted implementation to executive discretion, the Executive Branch's practices— targeting, moral condemnation, deterrence, and retributive "consequences"—are probative indicators of whether third-country removal is intended as punishment in fact.

### 2.    Third-Country Removals Are Punitive In Effect.

When congressional intent is unclear, courts assess the nature of the government sanction to determine whether the sanction is, in effect, punitive.  *See Mendoza-Martinez*, 372 U.S. at 165– 66.  In *Mendoza-Martinez*, the Court identified several factors relevant to this analysis: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only upon a finding of scienter; (4) whether its operation promotes the traditional aims of punishment (retribution and deterrence); (5) whether the behavior to which it applies is already a crime; (6) whether an alternative regulatory purpose can be assigned to it; and (7) whether it appears excessive in relation to any such alternative purpose.  *See id.* at 168–69.  These factors demonstrate that third-country removals function as punishment rather than neutral administration of the immigration system.

*Affirmative Disability.*  Third-country removal imposes a severe and affirmative restraint. Unlike ordinary removal to a country of nationality, third-country removal often strips individuals of any realistic access to legal status, social membership, or governmental protection.  Individuals are frequently deposited in countries where they lack citizenship, lawful residence, linguistic competence, family ties, or political rights—often with no lawful means of remaining or relocating.  The result is not mere geographic relocation but enforced legal and social dislocation tantamount to exile and denationalization, which the Supreme Court has recognized as among the

9

most severe forms of punishment. *See Trop*, 356 U.S. at 101–02 (recognizing that denationalization "is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development"). Third-country removal replicates those effects in practice, even if not in name.

*Historical Recognition as Punishment.* Historically, banishment and exile have been paradigmatic punishments. The Supreme Court has sometimes distinguished deportation from banishment. *Compare Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893) ("The order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment."), *with Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) ("Deportation can be the equivalent of banishment or exile."). This distinction rests on the premise that deportation returns individuals to their own countries, where they can mitigate the effects of removal. Not so for third-country removal. Removal to a country with which the individual has no connection or opportunity to obtain durable lawful status is tantamount to banishment; it renders the individual effectively stateless and produces the same condition the Court condemned as cruel and unusual punishment in *Trop*: loss of the "right to have rights." 356 U.S. at 102.

*Traditional Aims of Punishment: Retribution and Deterrence.* Third-country removals as of late unmistakably advance retribution and deterrence, the "traditional aims of punishment" the Supreme Court identified in *Mendoza-Martinez*. *See* 372 U.S. at 168. Executive officials have publicly described third-country removal as a set of "consequences," framed it as a tool to hold accountable and incapacitate disfavored individuals, and emphasized its deterrent effect on others. *See, e.g.*, Video by Kristi Noem (@EnvoyNoem), X (Mar. 27, 2025, 19:08 ET), https://perma.cc/8NNW-7MQE (former DHS Secretary Noem explaining, "If you come to our

10

country illegally, [third-country removal] is one of the consequences you could face"). The government has also highlighted the harshness of receiving conditions and the suffering imposed as a feature, not a flaw, of the policy—serving to deter others. *See Mercado*, 800 F. Supp. 3d at 575 ("Statements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration."). Where a sanction is designed and publicized to condemn conduct and deter others, it operates as punishment regardless of its civil label.

*Scienter and Connection to Criminal Conduct.* Although not formally limited to individuals with criminal convictions, the administration has suggested third-country removal has been implemented primarily against those with criminal histories. *See* Dep't of Homeland Sec., *DHS Releases Statement on Major Victory for Trump Administration and the American People on Deporting Criminal Illegal Aliens to Third Countries* (June 23, 2025), https://perma.cc/8PDX-9KMS ("DHS can finally exercise its undisputed authority to deport criminal illegal aliens–who are not wanted in their home country–to third countries that have agreed to accept them."). In practice, third-country removal operates as an additional sanction layered on top of completed criminal punishment and is imposed after conviction, incarceration, and completion of a sentence. That close linkage to criminal conduct further supports its punitive character.

*Absence of Legitimate Purpose and Excessiveness.* Even assuming third-country removal serves the regulatory purpose of facilitating removal where countries of origin refuse repatriation, the government's implementation of the sanction is excessive relative to that goal. The government has removed hundreds of individuals to third countries, reflecting a systematic program rather than the exceptional use of a last-resort measure. It has negotiated agreements with numerous countries, underscoring that third-country removal has become a standard enforcement

11

tool rather than a contingent response to repatriation barriers. *See* Ariel G. Ruiz Soto, *U.S. Third-Country Deportation Agreements Are More About Fear than Numbers*, Migration Pol'y Inst. (Mar. 31, 2026), https://perma.cc/C8U4-2RUT. This scale and institutionalization render the sanction grossly disproportionate to any asserted nonpunitive purpose. Under *Mendoza-Martinez*, such excessiveness strongly indicates that the regime functions as punishment: it shows not reluctant immigration regulation but an embraced enforcement mechanism designed to maximize hardship—hallmarks of penalization.

*      *      *

No single *Mendoza-Martinez* factor is dispositive. But here, all factors point in the same direction. Third-country removal imposes severe disabilities, mirrors historically punitive sanctions, advances retribution and deterrence, targets individuals based on criminalized conduct, and does so in a manner excessive to any legitimate regulatory aim. So, under controlling Supreme Court precedent, it constitutes punishment. That conclusion does not require reclassifying all deportation as punishment. It applies narrowly to third-country removals, which differ not merely in degree but in kind from traditional immigration enforcement. Nor does that conclusion necessarily lead to a prohibition on all third-country removals; it merely requires that the government abide by the Constitution's limits on punishment.

## II.    As Punishment, Third-Country Removals Are Subject to Constitutional Limits.

Because third-country removals constitute punishment under Supreme Court precedent, they trigger heightened constitutional protections similar to those that attach to criminal sanctions. As a procedural matter, for example, third-country removal requires notice, an opportunity to be heard, and judicial review. But even when procedurally proper, a removal could impose such significant harm as to violate the Due Process Clause or the Eighth Amendment's prohibition on cruel and unusual punishment. These substantive constitutional limitations are inherently case

12

specific. Removal to a stable democracy with robust refugee protections differs from removal to a warzone; removal to an unknown country differs from removal to a country that offers familial or social connection. A court thus need not conclude that all third-country removals are unconstitutional; it need only evaluate whether *this* removal, to *this* destination, of *this* individual, violates the Constitution. Here, that means this Court should consider whether Mr. Abrego Garcia's removal to Liberia—rather than, for example, Costa Rica, which has offered to accept him—runs afoul of his constitutional rights.

The Eighth Amendment and Due Process inquiries enable courts to engage in this case-specific inquiry, drawing lines at the most egregious cases while leaving open questions about removals that present closer calls until such cases are actually presented. To evaluate the constitutionality of third-country removals, courts can draw on frameworks developed in the incarceration context. Under the Eighth Amendment, post-conviction prisoners challenging conditions of confinement generally must demonstrate that officials acted with "deliberate indifference" to a substantial risk of serious harm under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (establishing "deliberate indifference" to serious medical needs constitutes cruel and unusual punishment). Pretrial detainees—whose conditions are governed by the Due Process Clause—must establish that there was "an expressed intent to punish on the part of detention facility officials" or the restriction was "excessive in relation to" any legitimate regulatory purpose. *Wolfish*, 441 U.S. at 538. As a result, the constitutional analyses under the Eighth Amendment and Due Process Clause will involve similar questions of punitive intent and deliberate indifference that drive the *Mendoza-Martinez* analysis, *supra* Part I.B.2.

Constitutional challenges to third-country removal are strongest when individuals would

be removed into violent circumstances, or where the individuals have been granted asylum or similar protections in the United States. Removals to active war zones, for example, can expose individuals to conditions of violence and danger that constitute a "deliberate indifference" to a substantial risk of serious harm, *Farmer*, 511 U.S. at 828, or that are "excessive in relation to" any legitimate regulatory purpose, *Wolfish*, 441 U.S. at 538. Likewise, removals to foreign prisons place individuals in indefinite incarceration in facilities notorious for harsh conditions. And for individuals who have already been granted protections—like asylum, withholding of removal, or protection under the Convention Against Torture—removal to a third country renders them functionally stateless—unable to return to their countries of origin. Removal under those circumstances also raises the risk that the receiving country could effectuate the return itself, sending those individuals back to their home countries where they could face death or torture. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, § 2242(a), 112 Stat. 2681-761, 2681-822, codified as 8 U.S.C. § 1231 (stating that it shall be U.S. policy "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."); *see also* 28 C.F.R. § 200.1 (providing that "[a] removal order . . . shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," which prohibits refoulement).

The question in this case is thus whether the Constitution permits Mr. Abrego Garcia's removal to Liberia. Less restrictive alternatives are readily available, including removal to a country where Mr. Abrego Garcia would have connections and legal rights. Indeed, Costa Rica— a Spanish-speaking country—has stated that it is willing to accept Mr. Abrego Garcia and offer him refugee status and permanent residency. *See* Laura Romero, *Costa Rican Official Says*

14

*Country Willing to Accept Abrego Garcia, Contradicting Trump Administration Officials*, ABC News (Nov. 21, 2025), https://perma.cc/E4M7-3VR8.  This Court should determine whether the Government's choice instead to reject Costa Rica's offer and Mr. Abrego Garcia's acceptance runs afoul of the constitutional protections that attach to this proceeding, including whether removal to Liberia would subject him to cruel and unusual punishment under the Eighth Amendment or violate the Due Process Clause.

## CONCLUSION

Applying the Supreme Court's established doctrine, third-country removals constitute punishment—not mere civil enforcement—and thus trigger Constitutional protections by which the government must abide.

April 10, 2026

Respectfully submitted,

*/s/Suzan F. Charlton*

Charlotte S. Butash (N.Y. Bar No. 5907860)[*]
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
(212) 841-1000
cbutash@cov.com

Suzan F. Charlton (D. Md. Bar No. 09555)
David M. Zionts (D.C. Bar No. 995170)[*]
Hassan Ahmad (D.C. Bar No. 1030682)[*]
Nicolas Peña Brown (D.C. Bar No. 90040775)[*]
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
scharlton@cov.com
dzionts@cov.com
hahmad@cov.com
npenabrown@cov.com

*Counsel for* Amici Curiae
*Immigration and Constitutional Law Professors*

[*]*Motion for Admission* pro hac vice *forthcoming.*

15