**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Greenbelt Division**

Kilmar Armando Abrego Garcia,

               Petitioner,

v.

Markwayne Mullin, *et al.*,

               Respondents.

Case No. 8:25-cv-02780 (PX)

**Petitioner's Memorandum in Support of**
**Petitioner's Motion to Resolve Outstanding Habeas Claims**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................2

ARGUMENT....................................................................................................................8

    I.      The Government's attempt to disregard Abrego Garcia's designation of Costa Rica violates 8 U.S.C. § 1231(b)(2)..................................................8

        A.      Abrego Garcia timely and validly designated Costa Rica. ..........................9

        B.      The Government has no lawful basis to disregard the designation. ..........11

              1.      The Lyons Memorandum is untimely...........................................12

              2.      The Lyons Memorandum is not authoritative...............................12

              3.      The Lyons Memorandum flunks even deferential review. ............15

    II.     The Government's attempt to remove Abrego Garcia to third countries is punitive and violates the Due Process Clause........................................................21

    III.    Removal to Liberia is independently unlawful under 8 U.S.C. § 1231(b)(3), 8 C.F.R. § 1208.16, and procedural due process. ...........................24

CONCLUSION................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3Nod Digital (Hong Kong) Ltd. v. U.S. Dep't of State*,
2026 WL 759439 (D.D.C. Mar. 18, 2026)...............................................................................13

*Abrego Garcia v. Noem*,
2025 WL 1021113 (4th Cir. Apr. 7, 2025) ................................................................................3

*Abrego Garcia v. Noem*,
2025 WL 1113440 (D. Md. Apr. 15, 2025) ...............................................................................3

*Abrego Garcia v. Noem*,
2025 WL 1135112 (4th Cir. Apr. 17, 2025) ..............................................................................3

*Abrego Garcia v. Noem*,
777 F. Supp. 3d 501 (D. Md. 2025) ......................................................................................2, 3

*Am. Acad. of Religion v. Napolitano*,
573 F.3d 115 (2d Cir. 2009)...................................................................................................17

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025) .........................................................................16, 17, 20

*Blackledge v. Perry*,
417 U.S. 21 (1974).............................................................................................................21, 24

*Bordenkircher v. Hayes*,
434 U.S. 357 (1978).................................................................................................................21

*Bridges v. Wixon*,
326 U.S. 135 (1945).............................................................................................................21, 22

*Casa de Md., Inc. v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020) .......................................................................................15

*CASA, Inc. v. Noem*,
2025 WL 3514378 (D. Md. Dec. 8, 2025)..............................................................................16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).................................................................................................................17

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998).................................................................................................................24

*Cruz Medina v. Noem*,
  2025 WL 3157608 (D. Md. Nov. 12, 2025) ...........................................................................27

*Cruz Medina v. Noem*,
  806 F. Supp. 3d 536 (D. Md. 2025) ...............................................................................25, 26

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ......................................................................................................17, 20

*DHS v. Thuraissigiam*,
  591 U.S. 103 (2020) ...............................................................................................................16

*Doherty v. Meese*,
  808 F. 2d 938 (2d Cir. 1986) .........................................................................................13, 19

*Edmonson v. Eagle Nat'l Bank*,
  922 F.3d 535 (4th Cir. 2019) .................................................................................................10

*Elgendy v. Bondi*,
  2026 WL 1014146 (E.D. Va. Mar. 9, 2026) .........................................................................25

*Gomez v. Mattos*,
  817 F. Supp. 3d 1002 (D. Nev. 2025) ...................................................................................27

*Guzman Chavez v. Hott*,
  940 F.3d 867 (4th Cir. 2019) .................................................................................................25

*Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997) ...............................................................................................12

*Harris v. Hutchinson*,
  209 F.3d 325 (4th Cir. 2000) .................................................................................................10

*Jama v. ICE*,
  543 U.S. 335 (2005) ..............................................................................................11, 12, 18

*Kennedy v. Mendoza-Martinez*,
  372 U.S. 144 (1963) ...............................................................................................................22

*Kerry v. Din*,
  576 U.S. 86 (2015) .................................................................................................................17

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) .........................................................................................................16, 17

*Kuusk v. Holder*,
  732 F.3d 302 (4th Cir. 2013) .................................................................................................10

*Mathews v. Eldridge*,
 424 U.S. 319 (1976) ............................................................................................26

*Mendoza Palacios v. Mullin*,
 2026 WL 933319 (D. Md. Apr. 7, 2026)..............................................................26

*Miot v. Trump*,
 --- F. Supp. 3d ---, 2026 WL 266413 (D.D.C. Feb. 2, 2026).................................15

*Nadari v. Bondi*,
 2025 WL 2934514 (C.D. Cal. Sept. 3, 2025) ........................................................25

*Nguyen v. Scott*,
 796 F. Supp. 3d 703 (W.D. Wash. 2025)................................................................27

*Noem v. Abrego Garcia*,
 145 S. Ct. 1017 (2025)..............................................................................................3

*North Carolina v. Pearce*,
 395 U.S. 711 (1969)..........................................................................................21, 24

*Portela-Hernandez v. Trump*,
 2026 WL 74042 (D. Md. Jan. 9, 2026)...................................................................24

*President & Fellows of Harv. Coll. v. DHS*,
 788 F. Supp. 3d 182 (D. Mass. 2025) ..............................................................17, 21

*Reno v. Flores*,
 507 U.S. 292 (1993)..........................................................................................22, 25

*Reyes-Caona v. N.C. Growers Ass'n*,
 250 F.3d 861 (4th Cir. 2001) .................................................................................13

*Sagastizado Sanchez v. Noem*,
 2025 WL 2957003 (S.D. Tex. Sept. 10, 2025) ......................................................25

*Sagastizado v. Noem*,
 2025 WL 3760317 (S.D. Tex. Nov. 14, 2025) .......................................................27

*Sagastizado v. Noem*,
 802 F. Supp. 3d 992 (S.D. Tex. 2025) ...................................................................26

*United States ex rel. Scala Di Felice v. Shaughnessy*,
 114 F. Supp. 791 (S.D.N.Y. 1953)........................................................................16

*Service v. Dulles*,
 354 U.S. 363 (1957)...............................................................................................12

*Sesay v. United States*,
    984 F.3d 312 (4th Cir. 2021) ...................................................................................17

*Six v. Generations Fed. Credit Union*,
    891 F.3d 508 (4th Cir. 2018) ..................................................................................20

*Tomas-Ramos v. Garland*,
    24 F.4th 973 (4th Cir. 2022).............................................................................16, 17

*Trump v. J.G.G.*,
    604 U.S. 670 (2025)...............................................................................................22, 25

*United States v. Abrego Garcia*,
    ---F. Supp. 3d---, 2026 WL 1454303 (M.D. Tenn. May 22, 2026) ..............................4, 20, 22

*United States v. Giordano*,
    416 U.S. 505 (1974)..................................................................................................12

*United States v. Giraud*,
    160 F.4th 390 (3d Cir. 2025) ....................................................................................15

*United States v. Goodwin*,
    457 U.S. 368 (1982)..................................................................................................21

*United States v. Jackson*,
    390 U.S. 570 (1968)..................................................................................................21

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991)..................................................................................................21

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)..............................................................................16, 21, 23, 24

## Constitution

U.S. Const. art. II, § 2, cl. 2 ........................................................................................14

## Statutes

5 U.S.C. § 3345..............................................................................................................15

5 U.S.C. § 3345(a) ........................................................................................................14

5 U.S.C. § 3346..............................................................................................................15

5 U.S.C. § 3346(a) ........................................................................................................14

5 U.S.C. § 3347(a) ..................................................................................................................15

5 U.S.C. § 3348(d)(1) .............................................................................................................15

6 U.S.C. § 113(a)(1)(G) ..........................................................................................................14

8 U.S.C. § 1231 ......................................................................................................................13

8 U.S.C. § 1231(b)(2) ...........................................................................................................8, 27

8 U.S.C. § 1231(b)(2)(A) ...........................................................................1, 2, 4, 8, 9, 10, 11

8 U.S.C. § 1231(b)(2)(A)(i) ..................................................................................................9, 10

8 U.S.C. § 1231(b)(2)(A)(ii) ...................................................................................................11

8 U.S.C. § 1231(b)(2)(C) ..............................................................................................11, 16, 18

8 U.S.C. § 1231(b)(2)(C)(i) .....................................................................................................11

8 U.S.C. § 1231(b)(2)(C)(ii) ....................................................................................................11

8 U.S.C. § 1231(b)(2)(C)(iii) ...................................................................................................11

8 U.S.C. § 1231(b)(2)(C)(iv) .....................................................................................11, 12, 13, 15

8 U.S.C. § 1231(b)(3) ...........................................................................................................24, 27

## Regulations

8 C.F.R. § 1208.16 ................................................................................................................24, 27

## Other Authorities

*Bona Fide*, Black's Law Dictionary (12th ed. 2024) .....................................................................17

Delegation 7030.2 Delegation of Authority to the Assistant Secretary for U.S.
    Immigration and Customs Enforcement (Nov. 13, 2004) ...........................................................13

## INTRODUCTION

Immigration detention and removal are not meant to be tools of reprisal. Yet the record in this case shows that the Government is trying to abuse its immigration powers to punish Petitioner Kilmar Armando Abrego Garcia. It seeks to do so because he had the audacity to challenge the Government in court last year when it unlawfully removed him to El Salvador. After this Court, the Fourth Circuit, and the Supreme Court ordered the Government to facilitate Abrego Garcia's return, the Government brought him back begrudgingly, only after it had vindictively filed criminal charges against him in Tennessee. Earlier this month, the district court in that case dismissed the criminal charges, holding that they violated Abrego Garcia's due process rights. Just as the Government unlawfully wielded its criminal powers against Abrego Garcia, so it seeks to unlawfully exploit its immigration powers against him.

Abrego Garcia designated Costa Rica as his country of removal under 8 U.S.C. § 1231(b)(2)(A). The Immigration and Nationality Act (**INA**) mandates that the Government "shall" honor that designation, absent a lawful basis to disregard it. Rather than faithfully execute that statutory command, the Government aims to punish Abrego Garcia by detaining and removing him to a third country with which he has no connection.

The record leaves no mystery about what is going on. If the Government truly wanted to remove Abrego Garcia from the United States, it would have sent him to Costa Rica in August 2025 when he designated it. Costa Rica has agreed to accept Abrego Garcia and has offered him refugee status and legal residency. Yet for months the Government has ignored that lawful option, instead proposing a series of removal destinations in Africa—first Uganda, then Eswatini, then Ghana, and now Liberia—all places with which Abrego Garcia has no meaningful tie. Along the way, the Government misrepresented Costa Rica's position to this Court, shifted justifications for its approach to removal as earlier ones collapsed, and, most recently, submitted an unauthorized

and facially implausible memorandum asserting that it has now become prejudicial to send Abrego Garcia to Costa Rica because doing so would squander the effort the Government has spent trying to evade its statutory obligation to use Costa Rica as his removal destination.

The remaining habeas claims in this case present three straightforward questions for this Court. First, whether the Government may disregard Abrego Garcia's designation of Costa Rica under § 1231(b)(2)(A) based on a memorandum issued by an official who lacked authority and whose rationale flunks even deferential review. Second, whether the Government's insistence on removing Abrego Garcia to Liberia (or some other third country) instead of Costa Rica is lawful rather than punitive and retaliatory in violation of due process. Third, whether the Government may remove Abrego Garcia to Liberia without first providing the process required by the INA and the Fifth Amendment. On this record, the answer to each question is a resounding "no." The INA does not permit the Government to ignore a valid country designation because it now prefers a harsher destination. The Constitution does not permit the Government to use its immigration powers to punish a litigant for prevailing in court. And neither the INA nor due process permit removal to a third country on the basis of truncated procedures that deny meaningful notice, meaningful review, and meaningful protection against persecution, torture, and refoulement.

For these reasons, the Court should enter a final order that grants the remaining claims of Abrego Garcia's habeas petition (the first, third, and fourth claims), declares the Government's conduct unlawful, and enjoins the Government from removing Abrego Garcia—and from detaining him for the purpose of removal—to any country other than Costa Rica.

## BACKGROUND

The Government's insistence on removing Abrego Garcia to Liberia did not arise in a vacuum. On March 12, 2025, "while driving home from work with his young son in the car, Abrego Garcia was stopped by ICE agents." *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 508 (D. Md.

2025) (***Abrego Garcia I***). He was arrested on the spot and removed three days later to El Salvador, in violation of an October 2019 withholding of removal order. *Id.* at 509. Abrego Garcia filed suit, and this Court ordered the Government to "facilitate and effectuate" his return. *Abrego Garcia I*, ECF No. 21 at 2. The Fourth Circuit affirmed. *Abrego Garcia v. Noem*, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025). And the Supreme Court, without any dissent, ordered the Government to "facilitate" Abrego Garcia's return and to handle his case "as it would have been had he not been improperly sent to El Salvador." *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

On remand, this Court implemented the Supreme Court's instructions, *Abrego Garcia v. Noem*, 2025 WL 1113440 (D. Md. Apr. 15, 2025), and the Fourth Circuit again affirmed, *Abrego Garcia v. Noem*, 2025 WL 1135112 (4th Cir. Apr. 17, 2025). In sum, three courts issued five orders to the same effect, all directing the Government to facilitate Abrego Garcia's return. Yet the Government's response was to publicly announce that Abrego Garcia "is NOT coming back," "is never coming back," and "will never be allowed to return to the United States." ECF No. 110 at 5 n.5 (quoting *Abrego Garcia I*, ECF No. 211-16 and *Abrego Garcia I*, ECF No. 211-19 at 2). At the same time, the Acting General Counsel of the U.S. Department of Homeland Security (**DHS**) testified in a deposition in this case that DHS had taken no steps to parole Abrego Garcia back into the United States because, in his words: "That would be insane. That would be a dereliction of duty . . . my wife would see that as a violation of my oath to this country and the Constitution . . . ." *Abrego Garcia I,* ECF 129-9 at 114:10–116:10 (Ex. A).

The Government eventually did return Abrego Garcia to the United States, not to comply with any court order, but to face a federal criminal indictment in the Middle District of Tennessee. Last week, the criminal court dismissed that indictment in its entirety for violating Abrego Garcia's due process rights under the Fifth Amendment because the prosecution bore a "vindictive taint"

that the Government failed to rebut. *United States v. Abrego Garcia*, ---F. Supp. 3d---, 2026 WL 1454303, at *3 (M.D. Tenn. May 22, 2026) (**Tennessee Criminal Matter**). The official whose conduct the court found initiated that "taint" was Todd Blanche—then Deputy Attorney General, now Acting Attorney General, and a named defendant here. Blanche declared that the Government began investigating Abrego Garcia only after "a judge in Maryland 'questioned'" the decision to remove him to El Salvador. *Id.* at *5. As the Tennessee court found, and the Government has failed to rebut, those statements "directly establish that the motivations for Abrego's criminal charges stem from his exercise of his constitutional and statutory rights." *Id.* The court concluded: "Blanche's words directly confirm that the Executive Branch reopened the criminal investigation because the Judicial Branch required the Executive Branch to facilitate Abrego's return from El Salvador." *Id.*

The Government exhibited the same vindictive and retaliatory impulse in its immigration proceedings against Abrego Garcia, especially in its ongoing refusal to remove Abrego Garcia to Costa Rica. On August 21, 2025, Costa Rica offered Abrego Garcia refugee status and legal residency, with written assurances it would not detain him upon arrival or refoul him to El Salvador. ECF No. 1-3; ECF No. 110 at 6. When Abrego Garcia was released from criminal pre-trial detention the next day, the Government "found this result intolerable and complained bitterly." ECF No. 110 at 5. It swiftly pivoted to seeking immigration detention, notifying Abrego Garcia that he would be removed to Uganda and instructing him to report to a U.S. Immigration and Customs Enforcement (**ICE**) facility in Baltimore on August 25. ECF No. 1-5; ECF No. 1-4.

On August 23, 2025, Abrego Garcia designated Costa Rica under 8 U.S.C. § 1231(b)(2)(A) as his country of removal and asserted a fear of persecution and refoulement from Uganda. ECF No. 1-7; ECF No. 1-6. Since then, Abrego Garcia has repeatedly urged the Government to remove

4

him to Costa Rica, but the Government has refused without explanation. During an evidentiary hearing on the issue last year, Deputy Assistant Director of ICE Enforcement and Removal Operations, John Schultz, testified that he "knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from [the Government] that effectuating such removal would run contrary to 'U.S. interests,'" and that "he had been told nothing about why [the Government] had not yet processed Abrego Garcia's removal to Costa Rica." ECF No. 110 at 10–11 (citing ECF No. 52 at 105:12–15, 105:16–22, 106:11–24).

Rather than remove Abrego Garcia to Costa Rica, the Government "made one empty threat after another to remove him to countries in Africa with no real chance of success." ECF No. 141 at 8. As a Government witness confirmed, removing a person from Latin America to an African country was without precedent in his decades of experience. ECF No. 107 at 66:7–10.

***Uganda.*** The Government designated Uganda the day of Abrego Garcia's release from criminal custody—and one day after Costa Rica's formal offer—before it knew whether Uganda would accept Abrego Garcia. Uganda ultimately "said no." ECF No. 52 at 134:16–22.

***Eswatini.*** On September 5, fifteen days after Costa Rica's offer, the Government switched to Eswatini as its planned removal country. ECF No. 27-3; ECF No. 110 at 8. On September 11, Eswatini's spokesperson publicly announced that "the Government of Eswatini ha[d] not received any communication regarding this person." ECF No. 32-6 at 2. Thirty-three days elapsed before the Government made its first diplomatic inquiry. ECF No. 52 at 56:13–21; ECF No. 32-6 at 2. Throughout, the Government stipulated on the record that "Costa Rica is on the table if Eswatini falls through." ECF No. 52 at 107:8–10. When Eswatini fell through, however, the Government did not turn to Costa Rica. When this Court asked Government counsel at a conference on October

what efforts had been made to effectuate removal to Costa Rica, counsel answered: "We have not been informed of any effort on that regard, Your Honor." ECF No. 48 at 38:16–17.

*Ghana.* On October 9, one day before a scheduled evidentiary hearing on removal to Eswatini and forty-nine days after Costa Rica's offer, the Government changed to Ghana as its planned destination. ECF No. 110 at 10. Nothing in the record indicates that the Government asked Ghana about Abrego Garcia before making that designation either. When the Government's designation became public through this case, Ghana's Foreign Minister immediately announced that while his country had agreed to accept "a limited number of non-criminal West Africans," it would not accept Abrego Garcia, and this position "has been directly and unambiguously conveyed to U.S. authorities." ECF No. 49-1.

*Liberia.* On October 24, sixty-four days after Costa Rica's offer, the Government designated Liberia. ECF No. 56. Liberia agreed to accept Abrego Garcia only on a "temporary" basis, with none of the same protections Costa Rica has offered. ECF No. 72-6 at 3.

In November 2025, under cover of sealed briefing, the Government claimed that Liberia was "the only state" willing to accept Abrego Garcia because Costa Rica "does not wish to receive" and "would not simply accept" him. ECF No. 110 at 12 (quoting ECF No. 85 at 2, 7; ECF No. 75-6); *see also* ECF No. 85 at 7 (claiming that the Government "can hardly be at fault for not removing [Abrego Garcia] to a *country that refuses to accept him*") (emphasis added). After the Court unsealed these papers and the Government's assertions became public, Costa Rica confirmed its continued, unwavering, and unconditional commitment to accepting Abrego Garcia. ECF No. 110 at 14; ECF No. 108 at 1. That was the third foreign state to undermine the Government's representations to this Court. ECF No. 110 at 14. At a November 20 hearing, the Government produced the declarant who had signed the submission claiming Costa Rica would not accept

6

Abrego Garcia. He testified that he had no knowledge of Costa Rica's position and could not explain the contents of his own declaration—ignorance the Court described as "planned and purposeful." *Id.* at 13–14 (quoting ECF No. 107 at 26:8–27:12). Ultimately, the Court concluded that the Government had "affirmatively misled" the Court about Costa Rica's willingness to accept Abrego Garcia. *Id.* at 28–29.

The Government has acted vindictively toward Abrego Garcia in other ways too. When Abrego Garcia sought to reopen his administrative immigration proceedings last year, the Department of Justice reassigned the matter from the Baltimore-based judge who had granted his withholding of removal in 2019 to an out-of-state judge with a history of denying asylum claims. *See* ECF No. 52 at 109:10–114:9; ECF No. 39.1. That judge promptly denied Abrego Garcia's motion to reopen the proceedings in October 2025. ECF No. 39. Then, within hours of this Court granting Abrego Garcia's habeas petition in December 2025 because no final order of removal existed, that same immigration judge *sua sponte* issued a *nunc pro tunc* removal order effective October 2019. ECF No. 112-2. The Government sought to re-detain Abrego Garcia, and this Court observed the sequence was "déjà vu all over again." ECF 125 at 5:6–13. The Court also noted that the supervision order issued to Abrego Garcia upon his habeas release contradicted this Court's opinion—an officer had been instructed to "ignore the District Judge's order." *Id.* at 33:18; *see* ECF No. 112-1. This Court blocked the re-detention first through a TRO in December 2025, ECF No. 114, and then through an injunction entered in February 2026, ECF No. 141. The Court also stated that the evidentiary record was closed. *See* ECF No. 107 at 126:23 ("Now, the record is going to be closed as of today [November 21, 2025]."); ECF No. 128 at 11:3–17 (confirming with both sides in January 2026 that "the factual record is what it is at this point").

7

The Government was undeterred. On March 2, 2026, 193 days after Costa Rica's offer, Todd Lyons, bearing the title "Senior Official Performing the Duties of the [ICE] Director," issued a memorandum purporting to disregard Abrego Garcia's designation of Costa Rica as his country of removal. ECF No. 143-1 (**Lyons Memorandum**). The Lyons Memorandum asserts that Abrego Garcia's only opportunity to designate a country of removal was during an immigration proceeding in May 2019. It also asserts, for the first time, that removing Abrego Garcia to Costa Rica would prejudice the United States because it would waste the work the Government had supposedly invested in negotiating with Liberia. *Id.* at 3. Yet on March 23—21 days after the Lyons Memorandum issued—the Government announced a deportation cooperation agreement with Costa Rica, which would accept up to twenty-five deportees per week from the United States. ECF No. 144-2. Asked at a conference on April 7 whether that agreement changed the Government's position on Costa Rica for Abrego Garcia, the Government's counsel answered: "I have not heard that it's changed the government's perspective." ECF No. 158 at 4:18–5:8. This Court was direct: "So this is [chi]merical." *Id.* 7:25. The Government has never explained how removal of Abrego Garcia to Costa Rica can be prejudicial and a diplomatic liability, while removal of anyone else to Costa Rica is part of a cooperative partnership with the United States.

## ARGUMENT

**I.      The Government's attempt to disregard Abrego Garcia's designation of Costa Rica violates 8 U.S.C. § 1231(b)(2).**

Abrego Garcia has validly designated Costa Rica as his country of removal under 8 U.S.C. § 1231(b)(2)(A), and the Government has not lawfully invoked any statutory basis to override Abrego Garcia's designation. Accordingly, the Government cannot lawfully remove Abrego Garcia to Liberia or any country other than Costa Rica.

A.    **Abrego Garcia timely and validly designated Costa Rica.**

Abrego Garcia properly designated Costa Rica as his preferred country of removal under § 1231(b)(2)(A) on August 23, 2025. ECF No. 1-7.

The Government has asserted, in prior briefing and in the Lyons Memorandum, that Abrego Garcia's designation of Costa Rica is unavailing and untimely because he had already designated El Salvador as his country of removal during an immigration proceeding on May 29, 2019. *See* ECF No. 137 at 7–8; ECF No. 143-1 at 2. That assertion ignores the plain language of the INA, which provides that a noncitizen can designate "one country to which [he] wants to be removed" only if he "*has been ordered removed.*" 8 U.S.C. § 1231(b)(2)(A)(i) (emphasis added). As of May 29, 2019, Abrego Garcia had not been ordered removed. ECF No. 110 at 24 (holding that no order of removal existed as of December 2025). Even treating the *nunc pro tunc* removal order as dating to October 2019, that postdates the May 2019 hearing by several months. The May 2019 statement was therefore legally incapable of constituting a designation under § 1231(b)(2)(A). The assertion that Abrego Garcia could and did designate a country of removal in May 2019 is simply wrong.

Were that not enough, the transcript of the May 2019 hearing shows that immediately after purporting to designate El Salvador, Abrego Garcia expressed fear of removal there. ECF No. 137-1 at 6. It is therefore clear from the transcript that even if he lawfully could have designated El Salvador at that time (which he could not), he did not intend to designate El Salvador as the "one country to which [he] *wants to be removed.*" 8 U.S.C. § 1231(b)(2)(A)(i) (emphasis added).

The only country Abrego Garcia has designated under § 1231(b)(2)(A) is Costa Rica. ECF No. 1-7. Abrego Garcia made this designation within 48 hours of receiving assurances from Costa Rica that it would accept him, grant him legal status, and not return him to El Salvador, and within 24 hours of the Government's notice that it intended to remove him to a third country. ECF No. 1-3; ECF No. 1-5. He had no meaningful opportunity to designate a country earlier than that, and he

9

has repeatedly reaffirmed since then—including after the *nunc pro tunc* removal order issued in December 2025, which was the first time Abrego Garcia had "*been ordered removed*," § 1231(b)(2)(A)(i)—that Costa Rica is his one and only designated country of removal. *See* ECF No. 110 at 11; ECF No. 118 at 3, 10 n.3.

Further, even if the Government's untimeliness assertion were sound (and it is not), any deadline to designate a country of removal under § 1231(b)(2)(A) is not jurisdictional and should be equitably tolled. *See, e.g.*, *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 546 (4th Cir. 2019). In habeas and immigration cases, the Fourth Circuit applies equitable tolling if "(1) 'the plaintiffs were prevented from asserting their claims by some kind of wrongful conduct on the part of the defendant'; or (2) 'extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time.'" *Kuusk v. Holder*, 732 F.3d 302, 305 (4th Cir. 2013) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)). "[T]his rigorous standard was necessary to ensure that 'any resort to equity . . . be reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Id.*

This exceptional case meets that rigorous standard. Abrego Garcia was not informed of the Government's intent to remove him to a third country until years after his initial immigration proceeding concluded. *See* ECF No. 110 at 2–4. The Government did not even issue an order of removal until December 2025, when it issued the *nunc pro tunc* order. *See* ECF No. 112-2. After Abrego Garcia was informed of the Government's intention, he immediately designated Costa Rica as his country of removal. ECF No. 1-7. These are "extraordinary circumstances" that are "beyond [his] control." *Kuusk*, 732 F.3d at 305. Thus, even if the Government were correct that

10

Abrego Garcia had a deadline to designate a country of removal under § 1231(b)(2)(A) that had expired, any such deadline should be equitably tolled.

### B.    The Government has no lawful basis to disregard the designation.

The INA provides that the Government "shall remove" a noncitizen "to the country" he "designates," 8 U.S.C. § 1231(b)(2)(A)(ii), unless one of four narrow exceptions applies, 8 U.S.C. § 1231(b)(2)(C). As the Supreme Court has explained, this is a statutory "command" mandating that the noncitizen "shall be removed to the country of his choice . . . , unless one of the conditions eliminating that command is satisfied." *Jama v. ICE*, 543 U.S. 335, 341 (2005).

The Government has not lawfully invoked any of the statutory bases for disregarding Abrego Garcia's designation. The first statutory exception concerns the timeliness of the designation. 8 U.S.C. § 1231(b)(2)(C)(i). As explained above, Abrego Garcia timely designated his country of removal, so this exception is inapplicable. The second and third exceptions concern whether the designated country is unwilling, or has not communicated its willingness, to accept the noncitizen. *Id.* § 1231(b)(2)(C)(ii), (iii). They, too, are inapplicable here because Costa Rica has publicly confirmed that "its offer to grant Abrego Garcia residence and refugee status is, and always has been, firm, unwavering, and unconditional." ECF No. 110 at 14 (citing ECF No. 108 at 1); *see also* ECF No. 1-3.

The final statutory exception is when "the Attorney General decides that removing the alien to the country is prejudicial to the United States." 8 U.S.C. § 1231(b)(2)(C)(iv). During an evidentiary hearing in October 2025, Deputy Assistant Director of ICE Enforcement and Removal Operations, John Schultz, testified that he "knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from [the Government] that effectuating such removal would run contrary to 'U.S. interests.'" ECF No. 110 at 10–11 (citing ECF No. 52 at 105:12–15). In other words, the record shows that this "prejudice" exception is also inapplicable here.

11

The first and only time the Government sought to invoke the "prejudice" exception was months later, in the Lyons Memorandum from March 2026. But the Lyons Memorandum fails to outweigh Schultz's testimony and lawfully invoke the "prejudice" exception for three reasons: (1) the record was already closed; (2) Lyons lacked authority to issue his Memorandum; and (3) the Lyons Memorandum's rationale fails to pass muster even under deferential review.

### 1. The Lyons Memorandum is untimely.

The Lyons Memorandum was executed on March 2, 2026, and submitted to this Court on March 20, 2026. *See* ECF No. 143-1. That is months after this Court closed the factual record for this case. On November 21, 2025, the Court stated conclusively: "the record is going to be closed as of today." ECF No. 107 at 126:23. Lest there be any doubt, at a hearing on January 14, 2026, the Court confirmed with both sides "that the factual record is what it is at this point and there is nothing else that you wish to bring to my attention in terms of changed facts or circumstances." ECF No. 128 at 11:3–7. Both sides so confirmed, with the Government adding that the caveat that it was "working to get travel documents," but otherwise the Court was correct that there would be no new facts. *Id.* at 11:9–17. Because the Lyons Memorandum did not come until months later in March 2026 after the factual record was closed, this Court should disregard the Lyons Memorandum as outside the closed record.

### 2. The Lyons Memorandum is not authoritative.

The authority to invoke the "prejudice" exception is vested by statute in the "Attorney General," § 1231(b)(2)(C)(iv), and has since been transferred by the Homeland Security Act of 2002 to the "Secretary of Homeland Security," *Jama*, 543 U.S. at 338 n.1. Absent a lawful delegation from that official, any purported invocation of this authority is a legal nullity. *See United States v. Giordano*, 416 U.S. 505 (1974); *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997); *see also Service v. Dulles*, 354 U.S. 363, 387 n.40 (1957). If there is no evidence that a delegation of

authority from a statutorily entrusted official has actually been made, the purported action is a legal nullity and may be set aside. *See 3Nod Digital (Hong Kong) Ltd. v. U.S. Dep't of State*, 2026 WL 759439, at *5 (D.D.C. Mar. 18, 2026); ECF No. 176 at 12:15–20.

In 2004, the Secretary of Homeland Security delegated to the Director of ICE (also called the Assistant Secretary of ICE) the authority to implement certain immigration laws. *See* Delegation 7030.2 Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement (Nov. 13, 2004).[1] That delegation is extremely precise about which authorities under which statutes are encompassed by the delegation. Among other things, it grants the Director of ICE authority to carry out certain provisions of § 1231, including to "issue and execute detainers and warrants of arrest or removal, detain aliens, release aliens on bond and other appropriate conditions as provided by law, and remove aliens from the United States," *id.* § 2(T), and to "reinstate exclusion, deportation, and removal orders," *id.* § 2(Y). But nothing in that delegation—or in any other delegation that Petitioner has located—authorizes the Director of ICE to exercise the authority of the Secretary of Homeland Security to disregard a noncitizen's designation of a country of removal under § 1231(b)(2)(C)(iv). That omission is significant. *Cf. Reyes-Caona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) ("[W]here a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded."). The omission is compounded by the fact that § 1231(b)(2)(C)(iv) authority has rarely been invoked, has no accompanying regulation, and when invoked has, to the best of Petitioner's knowledge, been exercised only by the Attorney General. *E.g.*, *Doherty v. Meese*, 808 F. 2d 938 (2d Cir. 1986). The authority should not be assumed delegated sub silentio.

---

[1] Available at
https://www.ice.gov/doclib/foia/policy/7030.2_DelegationAuthority_03.01.2003.pdf.

Regardless, even if the *Director of ICE* has such authority, there is no evidence that *Lyons* lawfully exercised it. ECF No. 144 at 10–12. The Director of ICE is an officer of the United States who is required by the Constitution and by statute to be appointed by the President and confirmed by the Senate. U.S. Const. art. II, § 2, cl. 2; 6 U.S.C. § 113(a)(1)(G). Lyons has never been appointed the Director of ICE by the President and confirmed by the Senate. Instead, the office of Director of ICE is currently vacant. Indeed, when Lyons signed the Memorandum on March 2, 2026, he expressly signed it not as the Director of ICE but instead as the "Senior Official Performing the Duties of the Director." ECF No. 143-1 at 1.

The Federal Vacancies Reform Act (**FVRA**) provides that when the office of the Director of ICE is vacant, only "the first assistant to the office" or a person directed by "the President (and only the President)" may perform the office's functions and duties, *see* 5 U.S.C. § 3345(a), and they may do so for no more than 210 days, *see* 5 U.S.C. § 3346(a).

Lyons does not satisfy the FVRA's requirements. He was not (and is not) the "first assistant" to the Director of ICE; rather, the first assistant is the Deputy Director of ICE, a role currently held by Charles Wall, but never held by Lyons. *See* Press Release, Dep't of Homeland Sec., Secretary Noem Announces New Deputy Director of ICE (Jan. 15, 2026);[2] *ICE Leadership*, U.S. Immigration & Customs Enforcement (Feb. 3, 2026);[3] Todd M. Lyons Biography[4] ("Prior to this appointment Mr. Lyons, served as the acting Executive Associate Director of ICE Enforcement and Removal Operations."). Nor was Lyons directed by the President to perform the functions and

---

[2] Available at https://www.dhs.gov/news/2026/01/15/secretary-noem-announces-new-deputy-director-ice.

[3] Available at https://www.ice.gov/leadership.

[4] Available at https://docs.house.gov/meetings/AP/AP15/20250514/118240/HHRG-119-AP15-Bio-LyonsT-20250514.pdf.

14

duties of the Director of ICE. Instead, he was named the "Acting ICE Director" by then-Secretary of Homeland Security Noem. Press Release, U.S. Dep't of Homeland Sec., *Secretary Kristi Noem Announces Expanded Leadership to Revamp ICE* (Mar. 9, 2025).[5] And Lyons was named Acting ICE Director on March 9, 2025, which was 358 days before he signed the Lyons Memorandum—well in excess of the 210-day limit set by the FVRA.

Actions taken by a person improperly serving as an acting officer are void under the FVRA. 5 U.S.C. § 3348(d)(1). That Lyons signed the Memorandum as "Senior Official Performing the Duties of the Director" rather than as "Acting ICE Director" makes no difference. The FVRA's exclusivity provision makes §§ 3345 and 3346 "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office," 5 U.S.C. § 3347(a), and applies to any person "perform[ing] the functions and duties of the office temporarily in an acting capacity" regardless of title. *See United States v. Giraud*, 160 F.4th 390, 403–04 (3d Cir. 2025). Accepting the Government's position would allow the Executive to evade Senate confirmation requirements through meaningless title changes—precisely the gamesmanship the FVRA was designed to prevent. *See Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950–51 (D. Md. 2020) (Xinis, J.). The Lyons Memorandum is therefore ultra vires and without legal effect. 5 U.S.C. § 3348(d)(1); ECF No. 176 at 12:15–20.

### 3.     The Lyons Memorandum flunks even deferential review.

Even setting aside the authority question, the Memorandum fails on its own terms. The Government's stated justification for overriding Abrego Garcia's designation does not survive even the most deferential standard of review.

---

[5] Available at https://www.globalsecurity.org/security/library/news/2025/03/sec-250309-dhs01.htm.

"The Supreme Court has not announced a categorical rule for the standard of review in immigration cases." *Miot v. Trump*, --- F. Supp. 3d ---, 2026 WL 266413, at *30 (D.D.C. Feb. 2, 2026). However, it has long been held that, under the authority conveyed by § 1231(b)(2)(C)(iv), the Government "may not completely ignore a properly made choice merely as a matter of whim or caprice." *United States ex rel. Scala Di Felice v. Shaughnessy*, 114 F. Supp. 791, 794 (S.D.N.Y. 1953). And the Supreme Court has explained that, even when the Government's discretion is at its apex—such as in the context of visa denials—the Government may not act without "a facially legitimate and bona fide reason." *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972).

The Fourth Circuit has rejected the *Mandel* standard where Congress has imposed express limits on the Government's removal authority. *Tomas-Ramos v. Garland*, 24 F.4th 973, 980–82 (4th Cir. 2022). Moreover, "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *DHS v. Thuraissigiam*, 591 U.S. 103, 107 (2020). Thus, while *Mandel*'s standard of review may be sufficient for noncitizens prior to entry, a more searching standard is required for those already present in the United States. *See, e.g.*, *CASA, Inc. v. Noem*, 2025 WL 3514378, at *3–4 (D. Md. Dec. 8, 2025) (refusing to apply *Mandel* to review the cancellation of temporary protected status on this basis); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 183 (D. Mass. 2025) (recognizing this distinction).

Abrego Garcia is not a visa applicant who has yet to enter the United States; until March 2025, he was living and working in Maryland for over a decade. ECF No. 110 at 2–4. The Government's authority in removing Abrego Garcia to a country other than the one he designates is not unlimited; it is circumscribed by the four specified circumstances in § 1231(b)(2)(C). Circuit precedent therefore indicates the Court must apply the substantial evidence standard to its review

16

of the Lyons Memorandum, not *Mandel*'s highly deferential standard. *Tomas-Ramos*, 24 F.4th at 980–82; *see also* ECF No. 88 at 22–23. Nevertheless, the Court need not decide this issue because the Lyons Memorandum does not withstand even the deferential *Mandel* standard of review.

Under *Mandel*, courts may not "'look behind' [the Government's] explanation" or "second guess" the Government's reasoning so long as it provides a "facially legitimate and bona fide reason" for its action. *Tomas-Ramos*, 24 F.4th at 981–82 (quoting *Mandel*, 408 U.S. at 770). That said, Justice Kennedy's controlling concurrence in *Kerry v. Din* makes clear that the *Mandel* standard yields to "*an affirmative showing of bad faith* on the part of the [Government] … *plausibly alleged with sufficient particularity*." 576 U.S. 86, 105 (2015) (Kennedy, J., concurring in the judgment) (emphasis added) (quoting *Mandel*, 408 U.S. at 770); *Sesay v. United States*, 984 F.3d 312, 314–16 (4th Cir. 2021); *see also Sesay*, 984 F.3d at 315 n.2 (recognizing Justice Kennedy's concurrence is controlling). A reason given in bad faith cannot, by definition, be "bona fide." *Bona Fide*, Black's Law Dictionary (12th ed. 2024); *see, e.g.*, *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 126 (2d Cir. 2009) (pre-*Din* case requiring an allegation of bad faith to rebut a bona fide reason). This is consistent with other Supreme Court precedents that permit judicial inquiry into "'the mental processes of administrative decisionmakers' upon a 'strong showing of bad faith or improper behavior.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 755 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Although the Court's review is deferential, it is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* at 785 (citation omitted). Applying this standard, multiple courts have recently held that suppression of, or retaliation for, the exercise of First Amendment rights is not a "facially legitimate and bona fide" reason under *Mandel*. *See Am. Ass'n of Univ. Professors*, 802 F. Supp. 3d at 183; *President & Fellows of Harv. Coll. v. DHS*, 788 F. Supp. 3d 182, 201 & n.9 (D. Mass. 2025).

17

Two undisputed facts confirm that removing Abrego Garcia to Costa Rica would not be prejudicial to the United States. First, the Government's own designated witness, Schultz, testified under oath that he "knew of no impediment to remove Abrego Garcia to Costa Rica, including no statement from [the Government] that effectuating such removal would run contrary to 'U.S. interests.'" ECF No. 110 at 10–11 (citing ECF No. 52 at 105:12–15). That sworn concession binds the Government here. Second, on March 23, 2026, the United States signed a broad removal cooperation agreement with Costa Rica, under which Costa Rica agreed to accept migrants deported by the United States from third countries. *See* ECF No. 144-2. By executing a deportation deal with Costa Rica, the Government cannot now credibly maintain that sending Abrego Garcia to Costa Rica would be diplomatically prejudicial.

Faced with that reality, the Government's offered justification for disregarding Abrego Garcia's designation of Costa Rica is illegitimate on its face. The Lyons Memorandum asserts that such removal would "cast doubt on the diplomatic reliability of the United States" because the Government expended "resources and political capital" to negotiate Liberia's acceptance of Abrego Garcia, among others. ECF No. 143-1 at 3. Yet Costa Rica agreed to accept Abrego Garcia, and Abrego Garcia designated Costa Rica as his country of removal in August 2025—at least 50 days before the Government expended any resources in negotiating with Liberia. The Government must remove Abrego Garcia to the country of his choice "unless," at that time, "one of the conditions [in § 1231(b)(2)(C)] eliminating that command is satisfied." *Jama*, 543 U.S. at 341. At the time Abrego Garcia designated Costa Rica, its stated reason for prejudice to the United States did not exist; the Government had not even approached Liberia regarding Abrego Garcia. The Government had a statutory obligation to honor Abrego Garcia's designation of Costa Rica as soon as it occurred. The Government cannot, months later, attempt to negotiate a different removal

18

destination with Liberia—in violation of the statutory command to remove to Costa Rica—and then claim prejudice because removal to Costa Rica would squander the resources it spent on Liberia in pursuit of its unlawful goal. Indeed, the Government did not even affirmatively assert that sending Abrego Garcia to Costa Rica would be prejudicial until 193 days after Abrego Garcia's designation. See ECF No. 1-7; ECF No. 143-1. The Government cannot ignore Abrego Garcia's designation for six months and then fabricate a post-hoc reason to disregard it.

Furthermore, the Lyons Memorandum's contention that "abandoning" its agreement with Liberia would "cast doubt on the diplomatic reliability of the United States," ECF No. 143-1 at 3, is irreconcilable with the fact that the United States previously reached agreement with Costa Rica to send Abrego Garcia there—which is what led to Costa Rica's letter stating that it would accept Abrego Garcia. ECF No. 110 at 6; ECF No. 1-3. And it is irreconcilable with the later agreement the United States reached with Costa Rica to send third-country deportees there. ECF No. 144-2.

The scant caselaw addressing this subject shows that the Government's prejudice assertions fall far short of true prejudice to the United States. For example, the Government has asserted it would be prejudicial to deport to Ireland an accused terrorist who was convicted of murdering a British Army Captain as a member of the Provisional Irish Republican Army. *Doherty*, 808 F.2d 938. The asserted prejudice here is nothing like that.

Instead of a bona fide showing of prejudice, what is here is abundant evidence of the Government's bad faith. The Court already found the Government was acting in bad faith with respect to Abrego Garcia in his prior lawsuit challenging his unlawful removal to El Salvador. *See Abrego Garcia I*, ECF No. 100 at 2; *see also Abrego Garcia I*, ECF No. 235 at 11:7–10 (stating to the Government "you have taken the presumption of regularity and you've destroyed it in my view, because I can't presume anything to be regular in this highly irregular case"). After the Judicial

19

Branch uniformly ordered the Government to facilitate Abrego Garcia's return, the Government repeatedly declared that Abrego Garcia "is NOT coming back." ECF No. 110 at 5 n.5. It begrudgingly brought him back only after filing unconstitutionally vindictive criminal charges. *See Abrego Garcia*, ---F. Supp. 3d---, 2026 WL 1454303.

That bad-faith and retaliatory conduct has continued in this habeas case. The Government found Abrego Garcia's release from criminal custody in August 2025 to be "intolerable," ECF No. 110 at 5, so to punish him, it immediately took him into immigration detention; rather than remove him to Costa Rica, his designated country of removal, the Government "made one empty threat after another to remove him to countries in Africa with no real chance of success." ECF No. 141. The Government stipulated that "Costa Rica is on the table if Eswatini falls through," ECF No. 52 at 107:8–10, and its own witness testified that he "knew of no impediment to remove Abrego Garcia to Costa Rica," ECF No. 110 at 10–11. Yet when Eswatini fell through, the Government turned to Ghana. When Ghana fell through, it turned to Liberia. It never turned to Costa Rica. Instead, the Government "affirmatively misled" this Court by claiming Costa Rica would no longer accept Abrego Garcia, attempted to conceal that misrepresentation under seal, and required Costa Rica to correct the record publicly. ECF No. 110 at 14, 29. *See also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 519–20 (4th Cir. 2018) (upholding sanctions for bad-faith conduct when litigants "deliberately misled the Court"). The Supreme Court has found that concealing the true motivation behind a policy change is sufficient to constitute a "strong showing of bad faith or improper behavior." *Dep't of Commerce*, 588 U.S. at 785. "[A]ffirmatively misle[ading] the [Court]," as the Government did here about Costa Rica, is much worse. ECF No. 110 at 29. Such bad-faith retaliation is not a "facially legitimate and bona fide" reason under *Mandel*. *See Am.*

20

*Ass'n of Univ. Professors*, 802 F. Supp. 3d at 183; *President & Fellows of Harv. Coll.*, 788 F. Supp. 3d at 201 & n.9.

On this record, the Government's reasoning in the Lyons Memorandum about alleged prejudice from removing Abrego Garcia to Costa Rica is not a "facially legitimate and bona fide reason" for disregarding Abrego Garcia's designation of Costa Rica as his country of removal.

## II.      The Government's attempt to remove Abrego Garcia to third countries is punitive and violates the Due Process Clause.

The Constitution does not permit the Government to transform the immigration system into an instrument of retaliation or vindictiveness. Yet "[s]eldom if ever in the history of this nation has there been such a concentrated and relentless crusade to deport an individual because he dared to exercise the freedom … that is guaranteed to him by the Constitution." *Bridges v. Wixon*, 326 U.S. 135, 159 (1945) (Murphy, J., concurring). The Fifth Amendment forbids the Government from so wielding its power to "select targets out of malice or an intent to harass," *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991), or "punish[ing] a person because he has done what the law plainly allows him to do," *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)); *see also Blackledge v. Perry*, 417 U.S. 21, 27 (1974) (due process forbids state action creating a "realistic likelihood of 'vindictiveness'" in response to the exercise of legal rights); *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969) ("Due process of law … requires that vindictiveness … must play no part" in governmental decision making); *United States v. Jackson*, 390 U.S. 570, 581 (1968) (government action that "chill[s] the assertion of constitutional rights by penalizing those who choose to exercise them" is "patently unconstitutional"). Those principles carry special force in removal proceedings, which demand "meticulous care" to ensure that executive action complies with "essential standards of fairness." *Bridges*, 326 U.S. at 154. Civil immigration proceedings must be directed at the "basic purpose"

21

of effectuating lawful removal and must be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690, 697.

It follows that the Due Process Clause forbids the Executive from retaliating against a noncitizen for exercising his First Amendment right to challenge unlawful government action and petition the courts for relief. *Reno v. Flores*, 507 U.S. 292, 306 (1993) (noncitizens present in the United States entitled to protections of Due Process Clause); *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (same); *Bridges*, 326 U.S. at 148 ("Freedom of speech and of press is accorded aliens residing in this country."). Yet in retaliation for Abrego Garcia having successfully challenged his unlawful removal, the Government has refused to remove him to Costa Rica—the country he lawfully designated and that has agreed to accept him—and instead repeatedly sought to send him to remote third countries with which he has no connection, where he does not speak the language, and where he faces refoulement to El Salvador. The Government's shifting rationales, repeated misrepresentations, disregard of Abrego Garcia's lawful designation, and insistence on pursuing removal to remote African countries reflect not a neutral administration of the immigration laws, but an arbitrary, retaliatory, and punitive exercise of executive power.[6]

The history of this case lays bare a campaign of retaliatory conduct by the Government. The Government unlawfully removed Abrego Garcia to CECOT, defied orders from three courts to facilitate his return, and, as the Middle District of Tennessee just found, opened a criminal investigation against him because "a judge in Maryland 'questioned'" the decision to deport him. *Abrego Garcia*, ---F. Supp. 3d---, 2026 WL 1454303, at *5. The Tennessee court found that

---

[6] Amici immigration and constitutional law professors have argued persuasively that all third-country removals are punitive and therefore subject to heightened constitutional scrutiny. *See* ECF No. 149-1 at 2–3 (arguing that third-country removal "constitutes punishment" under *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), because it "imposes hardship far beyond routine administration of immigration laws").

Blanche's statements "directly establish that the motivations for Abrego's criminal charges stem from his exercise of his constitutional and statutory rights." *Id.*

When that prosecution failed to keep Abrego Garcia detained, the Government did not release him. Within days, it re-detained him in immigration custody and cycled through a series of African countries—designating Uganda, Eswatini, and Ghana before even asking whether those governments would accept him, and ultimately settling on Liberia—while repeatedly refusing Costa Rica's "firm, unwavering, and unconditional" offer to accept him. ECF No. 108 at 1; ECF No. 110 at 28-29. As this Court has already found, the Government's "inexplicable reluctance" to remove Abrego Garcia to Costa Rica "seemed at odds with continued detention for purposes of third-country removal," ECF No. 110 at 28, and whatever purpose was behind his detention, "it was not for the 'basic purpose' of timely third-country removal," *id.* at 29 (quoting *Zadvydas*, 533 U.S. at 697). Since then, the Government's insistence on pursuing removal to Liberia instead of Costa Rica has become only more puzzling. On March 23, 2026, the Government announced a cooperation agreement under which it is now removing up to twenty-five third-country nationals to Costa Rica every week. ECF No. 144-2. At a hearing on May 12, this Court was even more direct: "everything from the criminal indictment, to the four African countries that have been named, to the ignorance of Costa Rica is all punitive and vindictive." ECF No. 176 at 8:18-22. Considered cumulatively, the Government's message is clear: because Abrego Garcia successfully challenged his unlawful removal to CECOT, declined the Government's plea offer, and has continued to prevail in courts, the Government would rather seek to unlawfully remove him to a distant third country than lawfully remove him to the country he has designated. That is not a removal policy. It is punishment.

It is also unconstitutional. Due process forbids vindictiveness against a person for successfully vindicating his rights. *See Pearce*, 395 U.S. at 725; *Blackledge*, 417 U.S. at 27 ("A person convicted of an offense is entitled to pursue his statutory right … without apprehension that the State will retaliate."). The constitutional bar on using government power "as an instrument of oppression," *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998), applies here. The Government's insistence on detaining Abrego Garcia for removal to Liberia is not a legitimate exercise of its authority, it is the continuation of a retaliatory campaign that the Tennessee court has already found "directly" stems from Abrego Garcia's exercise of his legal rights. Because civil immigration detention must be "nonpunitive in purpose and effect," *Zadvydas*, 533 U.S. at 690, and the record establishes the opposite, Abrego Garcia is entitled to judgment in his favor on Count Three.

**III.  Removal to Liberia is independently unlawful under 8 U.S.C. § 1231(b)(3), 8 C.F.R. § 1208.16, and procedural due process.**

The immigration laws prohibit the Government from removing someone to a third country where he would be persecuted or tortured, 8 U.S.C. § 1231(b)(3), 8 C.F.R. § 1208.16, and the Fifth Amendment requires meaningful notice and an opportunity to be heard before any such removal occurs. Abrego Garcia has received neither. Because removal to Liberia cannot lawfully proceed without the process the statute and Constitution require, it is not "reasonably foreseeable," and detention premised on that removal cannot continue. *See Portela-Hernandez v. Trump*, 2026 WL 74042, at *14 (D. Md. Jan. 9, 2026) ("[T]he Government cannot overcome *Zadvydas*'s due process requirements by skipping other procedures that are constitutionally due.").

24

The Government has claimed that its March 30 Memorandum authorizes removal to Liberia based on diplomatic assurances alone, with no additional process.[7] That position cannot be squared with the Constitution. "It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings," including removal to third countries. *J.G.G.*, 604 U.S. at 673 (quoting *Reno*, 507 U.S. at 306). And because withholding of removal is country-specific, that right encompasses "meaningful notice and opportunity to be heard before being deported to a [*particular*] third country." *Cruz Medina v. Noem*, 806 F. Supp. 3d 536, 549 (D. Md. 2025) (quoting *Sagastizado Sanchez v. Noem*, 2025 WL 2957003, at *2 (S.D. Tex. Sept. 10, 2025)); *see also Guzman Chavez*, 940 F.3d at 879 (noncitizen facing removal to alternative country "must be given notice and an opportunity to request withholding of removal to that particular country").

The Government, therefore, cannot remove someone to a third country based only on purported assurances, without providing any opportunity to assert fear and without any administrative or judicial oversight. *Nadari v. Bondi*, 2025 WL 2934514, at *3 & n.2 (C.D. Cal. Sept. 3, 2025) ("[E]ven in the presence of diplomatic assurances, such a removal may still result in an 'erroneous deprivation,' especially because threats of harm or persecution to a noncitizen in a third country may be outside that country's government's control"). The March 30 Memorandum

---

[7] Under the March 30 Memorandum, DHS must first determine whether a third country "has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured." ECF No. 71-10 at 1. "If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed *without the need for further procedures*." *Id.* at 1–2 (emphasis added). The March 30 Memorandum does not provide for any administrative or judicial review of an unfavorable fear determination. ECF No. 71-11 ("If USCIS determines that the alien has not met this standard, the alien will be removed."). Nor does it provide for any consideration of the risk of refoulement. Instead, it asks only whether a noncitizen would be "persecuted . . . in the *country of removal."* ECF No. 71-10 at 2 (emphasis added).

is unconstitutional on its face, and it cannot be used to justify Abrego Garcia's removal. *Abrego Garcia I*, ECF No. 238 at 8 ("Adherence to the Memorandum … raised a substantial risk that Abrego Garcia could once again be removed without due process and in a manner that would evade this Court's jurisdiction and the attendant protection against further constitutional violation"); *see also* ECF No. 88 at 6–7, 17–18 (collecting cases holding the March 30 Memorandum violates due process); *Elgendy v. Bondi*, 2026 WL 1014146, at *3 (E.D. Va. Mar. 9, 2026) (similar).

The Government alternatively argues that the single USCIS officer interview conducted in October 2025, applying the heightened "more likely than not" standard, supplied sufficient process, and that a motion to reopen was available. Neither argument survives scrutiny. The constitutional adequacy of process is assessed under the *Mathews v. Eldridge*, 424 U.S. 319 (1976) framework, as Abrego Garcia has previously briefed in detail. ECF No. 71 at 14–20; *Cruz Medina*, 806 F. Supp. 3d at 547. All three factors favor Abrego Garcia.

The private interest is substantial. Avoiding removal to a country where Abrego Garcia faces persecution or torture is among the weightiest interests justifying procedural protection. *Cruz Medina*, 806 F. Supp. 3d at 549; *Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1011 (S.D. Tex. 2025). The risk of erroneous deprivation is severe. The interviewing officer lacked access to three of the four documents in the Government's possession regarding Liberia's assurances, could not consider the risk of refoulement despite Liberia agreeing to accept Abrego Garcia only temporarily, applied the wrong legal standard, provided no reasoned explanation—only a check-the-box form—and no immigration judge reviewed the determination. ECF No. 71 at 11, 13 n.2, 15–18; *see Mendoza Palacios v. Mullin*, 2026 WL 933319, at *5 (D. Md. Apr. 7, 2026). Finally, a court in this district has already held that DHS's own regulations confirm the delay and burden of immigration judge review "is not only justified, but minimal." *Cruz Medina*, 806 F. Supp. 3d at 551.

26

Further, the Government's suggestion that a motion to reopen supplies any additional process is illusory. After the Government advised that Abrego Garcia's sole recourse was to move to reopen in immigration court, ECF No. 14 at 14:14–22, he did so. But the immigration judge denied that motion for lack of jurisdiction, because "only the [Government] has jurisdiction to seek reopening." ECF No. 39 at 10. The Government refused to seek reopening. ECF No. 71 at 10. Due process is not satisfied "by simply allowing the noncitizen to file a motion to reopen their removal proceedings; rather, the removal proceedings must be reopened so that a hearing can be held." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 727 (W.D. Wash. 2025).

The Government's attempts to remove Abrego Garcia to Liberia without immigration judge review of the negative fear determination, without consideration of the risk of refoulement to El Salvador, and under the wrong legal standard violate 8 U.S.C. § 1231(b)(3), 8 C.F.R. § 1208.16, and the Due Process Clause. *See, e.g.*, *Cruz Medina v. Noem*, 2025 WL 3157608, at *3 (D. Md. Nov. 12, 2025) (ordering the Government to "REFER the negative fear determination to an immigration judge for *de novo* review or [] RELEASE Petitioner from ICE custody"); *Lisbeth Lopez De Barahona v. Noem*, 1:26-cv-00561-DLB, ECF No. 24 at 14:10–18 (D. Md. Apr. 16, 2026) (Ex. B); *Gomez v. Mattos*, 817 F. Supp. 3d 1002, 1013 (D. Nev. 2025) ("the Court holds that Petitioner has a due process right to receive meaningful notice and opportunity to present a fear-based claim to an IJ before DHS deports him to a third country"); *Sagastizado v. Noem*, 2025 WL 3760317, at *10 (S.D. Tex. Nov. 14, 2025) (granting habeas petition because the Government failed "to demonstrate their intent to provide" immigration judge review of a fear determination and "have not presented any evidence of their intent to remove [petitioner] to other third countries").

27

**CONCLUSION**

The Government has unlawfully and vindictively detained and sought to remove Abrego Garcia to Liberia and other countries that are not his designated country of removal under § 1231(b)(2): Costa Rica**.** The Court should enter a final order that grants the first, third, and fourth claims of Abrego Garcia's habeas petition, declares the Government's conduct unlawful, and enjoins the Government from removing Abrego Garcia—and from detaining him for the purpose of removal—to any country other than Costa Rica, as set out in the accompanying proposed order.

Respectfully submitted,


Dated: May 27, 2026

|  |  |
|---|---|
| **MURRAY OSORIO PLLC** | /s/ Jonathan G. Cooper |
| Simon Y. Sandoval-Moshenberg | **QUINN EMANUEL URQUHART &** |

**MURRAY OSORIO PLLC**
Simon Y. Sandoval-Moshenberg
Rina Gandhi
4103 Chain Bridge Road, Suite 300
Fairfax, VA 22030
(703) 352-2399
ssandoval@murrayosorio.com

*/s/ Jonathan G. Cooper*
**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
Jonathan G. Cooper (D. Md. Bar No. 21345)
Olivia Horton* (*pro hac vice*)
Nithya Pathalam (*pro hac vice*)
555 13th Street NW, Suite 600
Washington, DC 20004
(202) 538-8000
jonathancooper@quinnemanuel.com
oliviahorton@quinnemanuel.com
nithyapathalam@quinnemanuel.com
*admitted in Texas; not admitted in D.C.
Supervised by attorney admitted in D.C.*

Andrew J. Rossman (*pro hac vice*)
Sascha N. Rand (*pro hac vice*)
Courtney Daukas (*pro hac vice*)
Morgan L. Anastasio (*pro hac vice*)
Roey Goldstein (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
andrewrossman@quinnemanuel.com
sascharand@quinnemanuel.com
courtneydaukas@quinnemanuel.com
morgananastasio@quinnemanuel.com
roeygoldstein@quinnemanuel.com

29